# EXHIBIT A

## (PART 1)

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

NEW YORK
COUNTY CLERK'S OFFICE

AUG 27 2007

NOT COMPARED
WITH COPY FILE

| | |
|---|---|
| MARC S. KIRSCHNER, as Trustee of the Refco Private Actions Trust, <br><br> Plaintiff, <br><br> -vs- <br><br> PHILLIP R. BENNETT, SANTO C. MAGGIO, ROBERT C. TROSTEN, MAYER, BROWN, ROWE & MAW, LLP, GRANT THORNTON LLP, and ERNST & YOUNG U.S. LLP, <br><br> Defendants. | Index No. 07-602896 <br><br> Jury Trial Demanded |

## COMPLAINT

Plaintiff Marc S. Kirschner (the "Trustee"), as court-approved Trustee for the Refco Private

Actions Trust (the "Trust") and assignee of all claims related to Refco Inc. (collectively, with its

direct and indirect subsidiaries, "Refco," and with respect to those Refco entities that commenced

Chapter 11 bankruptcy cases, the "Debtors") belonging to, among others, the 75 former Refco

customers listed on Exhibit A (the "FX Customers") who maintained accounts at, and entrusted

funds to, Refco Capital Markets, Ltd. ("RCM"), as and for his Complaint against Phillip R. Bennett

("Bennett"), Santo C. Maggio ("Maggio"), and Robert C. Trosten ("Trosten") (collectively, the

"Refco Insiders"); and Mayer, Brown, Rowe & Maw LLP ("MB"), Grant Thornton LLP ("GT"),

and Ernst & Young U.S. LLP ("E&Y") (collectively, the "Professional Defendants"), states as

follows, based on information and belief, such information and belief based on the investigation of

the Trustee and his counsel and a review of, among other things:

1

a)      filings of Refco, Inc. with the U.S. Securities and Exchange Commission ("SEC");

b)      a review of the filings, documents, and testimony produced pursuant to Refco's re-organization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Proceedings") (assigned to the Honorable Judge Robert Drain and jointly administered under the caption "*In re Refco Inc., et al.*, Case No. 05-60006 (RDD)");

c)      the Final Report of the Court-appointed Independent Examiner (the "Examiner") in the Bankruptcy Proceedings;

d)      the Third Superseding Indictment in *U.S. v. Phillip R. Bennett, et al.*, S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007); and

e)      other relevant public documents.

## Nature of the Case

1.      This is an action based on fraud, breach of fiduciary duty, conversion, and aiding and abetting fraud, breach of fiduciary duty, and conversion. The Trustee seeks to recover over half a billion dollars that the FX Customers were fraudulently induced to entrust to RCM and was later siphoned from the FX Customers' accounts by and at the direction of the Refco Insiders and persons or entities acting in active concert or participation with them, with the knowledge, active participation, and substantial assistance of the Professional Defendants.

2.      The ultimate goal of the activities alleged herein was simple: to allow the Refco Insiders and others to monetize and cash out their interests in Refco for more than those interests were worth through one or more liquidity transactions. To accomplish this objective, it was necessary, among other things, to present Refco as having various desirable characteristics, including without limitation: being financially strong and healthy; highly profitable; growing quickly; not

having suffered or being exposed to significant trading losses; having a low-risk business model; not having a balance sheet comprised of enormous amounts of uncollectible and related-party receivables; capable of exercising excellent expense control; able to satisfy its substantial working capital needs and meet growth objectives with its legitimate cash flow and available funds; and having excellent liquidity and strong credit ratings. Refco was able falsely to present itself as having these desirable characteristics because of the activities alleged herein, all of which ultimately related to, and were undertaken because of, a desire to "dress up" Refco for one or more lucrative and personally enriching liquidity events.

3.      As a result of the fraudulent scheme and other activities alleged herein, the Refco Insiders were able to carry out a leveraged buyout ("LBO") in 2004 in which hundreds of millions of dollars were transferred to Bennett and entities he controlled and to persons or entities acting in active concert or participation with him, as well as an initial public offering ("IPO") in 2005 in which Bennett and entities he controlled received transfers of more than $145 million and persons or entities acting in active concert or participation with him received transfers of approximately $226 million. The Professional Defendants not only played substantial roles in the fraudulent scheme, but were aware at all relevant times of the Refco Insiders' desire to consummate one or more liquidity events, and GT and MB played substantial roles in the LBO and the IPO as well.

4.      Before its collapse in October 2005, Refco presented itself to the public as one of the nation's leading independent providers of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange ("FX") markets. In fact, as was first publicly disclosed in October 2005, Refco's business was a house of cards. As would soon be discovered, Refco was being financed, in substantial part, by massive, ongoing, and secretive siphoning of funds entrusted to RCM for specific, limited

purposes by its customers including the FX Customers. Refco would never have been able to undertake the lucrative LBO or IPO had it not been for the massive fraud alleged herein.

5.    When the truth concerning Refco's finances, and the misconduct of the Refco Insiders emerged in October 2005, the house of cards collapsed and bankruptcy filings ensued within days. It was then discovered that over $2 billion of entrusted customer assets had been wrongfully siphoned from the accounts of RCM customers to fund other Refco businesses, to "dress up" Refco for one or more liquidity events, and to line the pockets of the Refco Insiders. The FX Customers instructed RCM to return their property -- as RCM was duty-bound to do -- but discovered, to their shock and dismay, that enormous amounts of property entrusted to RCM for specific, limited purposes -- and supposedly maintained in their accounts at RCM -- had been wrongfully removed from RCM; provided in undocumented, uncollateralized, unsecured, transactions to other Refco entities that lacked the intent and/or the financial wherewithal to repay the wronged RCM customers; and squandered or looted by the Refco Insiders and others. The FX Customers' entrusted property was thus unavailable for return to them pursuant to their instructions.

6.    The FX Customers whose claims have been assigned to the Trust, and whose claims the Trustee asserts in this action, collectively suffered losses totaling over half a billion dollars from the fraudulent inducement to entrust their funds to RCM and the improper siphoning of funds that they had entrusted to RCM and maintained in accounts with RCM for use solely in connection with FX transactions to be conducted pursuant to their instructions. By this action, the Trustee seeks to recover those funds from the Refco Insiders and monetary damages from the Professional Defendants that substantially assisted the Refco Insiders in:

a)    creating and maintaining the inducement and opportunity for the FX Customers to place and/or maintain funds in accounts with RCM by permitting RCM to remain in business and to serve as a magnet for such funds despite the undisclosed activities described herein;

b)    allowing, inducing, and causing the FX Customers to entrust their funds to RCM by placing and/or maintaining funds in accounts with RCM;

c)    siphoning, and hiding the siphoning of, the FX Customers' funds from their accounts at RCM, and then from RCM to other Refco entities that had provided no assurances of their ability, intent, or obligation to repay those funds on demand or otherwise, that had provided no security for the siphoned funds, and that, in fact, lacked the intent and/or financial wherewithal to repay the siphoned funds on demand or otherwise; and

d)    diverting the FX Customers' funds, directly or indirectly, from other Refco entities to the Refco Insiders and persons or entities in active concert or participation with them.

## Jurisdiction and Venue

7.    This Court has jurisdiction over defendants pursuant to New York's general jurisdiction statute (CPLR § 301) and long-arm statute (CPLR § 302).

8.    Venue is proper under CPLR § 503 because, among other things, the appointment of the Trustee was approved by the U.S. Bankruptcy Court in New York County and RCM maintained its principal place of business and conducted its business with the FX Customers from Refco's global headquarters in New York County at all relevant times.

## Parties

### The Plaintiff

9.    Plaintiff Marc S. Kirschner is the Court-approved Trustee of the Refco Private Actions Trust, which was established in connection with the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries confirmed on December 15, 2006 by

5

the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the Chapter 11 cases and proceedings of Refco on December 15, 2006. The Trustee is the assignee of all Refco-related claims belonging to a number of persons and entities, including the 75 FX Customers of RCM listed on Exhibit A, all of whom maintained accounts at Refco's subsidiary RCM principally for the purpose of engaging in FX trading and who entrusted funds to RCM for the specific, limited purpose of effectuating FX transactions pursuant to their instructions.

**The Refco Insiders**

10.     Defendant Phillip R. Bennett was the highest ranking corporate officer and Chairman of various Refco entities until he was forced to resign following the disclosure of the massive fraud he, Maggio, and Trosten perpetrated at Refco with the assistance of the Professional Defendants. Among his other positions within Refco, he served as a director and officer of RCM at all relevant times and therefore owed fiduciary duties both to RCM and to the FX Customers themselves and, independently, was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties to the FX Customers. Bennett is currently under indictment in the U.S. District Court for the Southern District of New York, and stands charged with conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud, and money laundering, as a result, in part, of acts alleged herein. *See* Third Superseding Indictment ("Indict.") in *U.S. v. Phillip Bennett, et al.*, S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007).

11.     Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985, and held executive positions with various Refco entities until he was forced to resign following the disclosure of the massive fraud he, Bennett, and Trosten perpetrated on Refco with the assistance of the Professional Defendants. Among his other positions within Refco, he served as President and a director of RCM at all relevant times and therefore owed fiduciary duties both to RCM and to the FX

6

Customers themselves and, independently, was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties to the FX Customers. Maggio ran the brokerage operations of Refco Securities, LLC ("RSL") and RCM and directly participated in, and orchestrated and supervised, the theft of RCM customer assets alleged herein. According to press reports, Maggio is cooperating with the U.S. Justice Department and the SEC in relation, *inter alia*, to his role in various frauds perpetrated during his tenure at Refco.

12.     Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001, and the Chief Financial Officer of Refco Group Ltd., LLC ("RGL") from 2001 to October 2004. Trosten was intimately familiar with all details of the fraud he, Bennett, and Maggio perpetrated on Refco with the assistance of the Professional Defendants. Trosten has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

**The Professional Defendants**

13.     Defendant Mayer, Brown, Rowe & Maw LLP is among the largest law practices in the world, with more than 1,500 lawyers operating in 14 major cities. MB is a combination of two limited liability partnerships, each named Mayer, Brown, Rowe & Maw LLP, one established in Illinois, USA, and one organized in England. MB served as Refco's principal outside counsel from 1994 until October 2005. As set forth below in more detail, MB was intimately involved in numerous aspects of the Refco Insiders' fraudulent scheme, including preparing the loan documents through which Refco concealed its trading losses and operational expenses, advising the Refco Insiders as to how to continue diverting RCM's assets to fund Refco's businesses, and playing an active role in the LBO and IPO which it knew was premised on a fictitious picture of Refco's financial condition. Indeed, the Court-appointed Examiner in the Bankruptcy Proceedings, after exhaustive review of MB's documents and interviews of the responsible MB attorneys, issued a

report concluding, among other things, that MB understood that fraudulent loans it structured for Refco were designed to assist the fraud: "there is significant evidence that Mayer Brown . . . assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements" and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

14.    Defendant Grant Thornton LLP is the Chicago-based U.S. member firm of Grant Thornton International, one of six global accounting, tax, and business advisory organizations with member firms in 11 countries and offices in New York.   GT served as Refco's purportedly independent auditor at all relevant times after 2002, when it replaced Arthur Andersen LLP ("AA") in that role.   GT issued clean and unqualified audit opinions on Refco's financial statements for fiscal years 2003, 2004, and 2005.   GT also served as the auditor for RCM and, with GT's authorization, financial statements of RCM audited by GT were periodically delivered to RCM customers, including the FX Customers, as an integral part of the fraud and other actionable conduct alleged herein.  According to the Examiner, whose investigation was limited by an inability to speak to any GT employees or Refco employees who dealt with the lead GT partner on the engagement, GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud" and "circumstantial evidence suggests that [GT] may have had actual knowledge of the fraud."

15.    Defendant Ernst & Young U.S. LLP is the New York-based U.S. member firm of Ernst & Young Global Limited.  E&Y is a public accounting firm that provides a range of business

and professional advisory services to companies worldwide, including assisting firms with complex tax issues. E&Y is a Delaware limited liability partnership with 83 offices and over 26,000 employees across the United States. E&Y and its affiliates prepared tax returns for Refco and Refco Group Holdings Inc. ("RGHI") from approximately 1991 through the 2002 tax year and continued to provide tax advice and assistance thereafter until 2005. E&Y also provided Refco with tax advice during that time. As explained in more detail below, during the course of its engagement with Refco and RGHI, E&Y became aware of the fraud alleged herein and actively aided and abetted it. According to the Examiner, "there is sufficient evidence to permit Refco's estate to allege that E&Y had actual knowledge of a fraud and breach of fiduciary duty," and "there is sufficient evidence to state a claim upon which relief may be granted [against E&Y] for aiding and abetting a fraud and/or breach of fiduciary duty."

## **Factual Background**

### **RCM's Position in Refco's Overall Operations**

16.     Before its collapse in 2005, Refco had three major operating subsidiaries:

a)     RSL, a Delaware limited liability company and registered broker-dealer which at all relevant times had its principal place of business in New York, New York;

b)     Refco, LLC ("Refco LLC"), a Delaware limited liability company and regulated futures commission merchant which at all relevant times had its principal place of business in New York, New York; and

c)     RCM, a company which at all relevant times had its principal place of business in New York, New York, held itself out to the public and to customers as a securities and foreign exchange broker, and acted as the clearing house for all FX business conducted by Refco.

17.     Refco offered prime brokerage services, such as securities financing, securities lending, and trade processing through RSL, a registered broker-dealer that was regulated by the SEC

and the National Association of Securities Dealers ("NASD"), and was subject to the net capital and other regulatory requirements of those entities. Refco executed and cleared customers' orders for exchange-traded derivatives primarily through Refco LLC, which was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to various net capital and other regulatory requirements of those entities. Refco engaged in various brokerage activities, including clearing FX trades, through RCM.

18.     In December 2001, in furtherance of the fraudulent scheme alleged herein, Refco shut down RCM's Bermuda operations and "repatriated" RCM to the U.S. This repatriation was conducted with the advice and assistance of MB, which as a result of this and other work performed for RCM and Refco was intimately familiar with RCM's business and operations and the activities alleged herein.

19.     In addition to its major operating subsidiaries, Refco also maintained other subsidiaries, including Refco Capital LLC ("RCC"), a Delaware limited liability company which at all relevant times had its principal place of business in New York, New York, and which functioned as the "bank," "treasury," or "disbursing agent" for Refco. At all relevant times, a substantial portion of the funds disbursed by RCC to or on behalf of various Refco entities in performing this "bank," "treasury," or "disbursing agent" function for Refco were derived from the improper diversion and conversion of entrusted funds and securities from the accounts of RCM customers, including the accounts of the FX Customers. Without conversion of the customer property improperly siphoned from RCM customer accounts, RCC could not have performed its "bank," "treasury," or "disbursing agent" function, and Refco's house of cards would have collapsed for lack

of liquidity, as in fact occurred immediately after the fraud alleged herein was first publicly disclosed in October 2005.

## RCM's FX Business Model

20.    As a result of RCM's implementation of its FX business model and the fraud alleged herein, RCM's FX customers, including the FX Customers whose claims the Trustee asserts in this action, were able and allowed to place and maintain, fraudulently induced to place and maintain, and did in fact place and maintain, a substantial amount of their property in accounts at RCM at all relevant times and entrusted substantial sums of cash to RCM for use for specific, limited purposes in connection with FX transactions at the time of Refco's collapse in October 2005.

21.    A typical FX trade involves the exchange of one currency for another -- *e.g.*, the purchase of Yen with Dollars.  When an FX customer engages in an FX trade, the broker simultaneously enters into an offsetting transaction with a market maker and earns either a transaction fee or profit on the spread between the price it charged to the customer and the price it paid to the market maker.  FX trades do not constitute trades of "securities" as that term is defined by U.S. federal securities laws.

22.    In order to conduct FX transactions with RCM, the FX Customers were required to deposit with RCM an amount of money which, in the specific context of FX trading, was referred to as "margin."  The FX Customers entrusted these funds to RCM for the specific, limited purpose of allowing the customers to engage in specific FX transactions pursuant to the FX Customers' instructions and, as found by U.S. Bankruptcy Judge Robert D. Drain in a closely related context in the Bankruptcy Proceedings, entrusted these funds to RCM with the reasonable expectation that they would be returned to the FX Customers on their instruction.

23.    In this context, the term "margin" has a different meaning than in the securities context.  Whereas in the securities context, "margin" typically refers to putting up cash and

borrowing against securities to increase buying power, in the context of FX trades, the margin ("FX Margin") is a good-faith or "earnest money" deposit. The FX Margin serves as security for the broker against swings in the value of currencies.

24.     FX trades are typically liquidated before closing, so that the customer will either have his original FX Margin plus a profit (if the currency appreciated in value during the open trade period), or his original FX Margin minus a loss (if the currency decreased in value during the open trade period). Unless and until a new trade is initiated by the customer, this money is not FX Margin, but simply property belonging entirely to the customer and remaining in the customer's account for use in additional FX transactions pursuant to the customer's instructions and, as found by Judge Drain in a closely related context, for return to the customer on the customer's instructions.

25.     At the time of the Refco bankruptcy, according to the rosy picture painted by their periodic account statements, the FX Customers had over half a billion dollars in their accounts at RCM.

26.     The fraud alleged herein enabled the Refco Insiders to cause RCM to continue to implement this FX business model and to continue to obtain improper access to funds maintained in customer accounts by the FX Customers whose claims the Trustee asserts in this action. This was done, in whole or in part, in pursuit of the ultimate goal of the fraud alleged herein: to allow the Refco Insiders to monetize and cash out of their interests in Refco through one or more liquidity transactions for more than those interests were worth. If the fraud alleged herein had not occurred or if the true facts been publicly disclosed at an earlier time, RCM would have been unable to continue to implement its FX business model, and the FX Customers would not have placed and maintained their property in accounts at RCM, where it was wrongfully siphoned by the Refco Insiders.

27.    As a result of the fraud alleged herein, and unbeknownst to the FX Customers, RCM was insolvent or in the zone of insolvency at all relevant times.

28.    As a result of the totality of the facts and circumstances surrounding the creation and maintenance of the relationship between the FX Customers and RCM, RCM and its directors and officers, including Bennett and Maggio, had a fiduciary duty to the FX Customers with respect to the protection and use of funds in the FX Customers' accounts, which the FX Customers had entrusted to RCM for the specific, limited purpose of conducting FX transactions pursuant to the customers' instructions.  These facts and circumstances included, among others and without limitation:

a)    RCM's role as a broker-dealer for the FX Customers and its acceptance of responsibility to act at all times on the FX Customers' behalf and in their best interest;

b)    the custodial and entrustment nature of the relationship between RCM and the FX Customers with respect to the FX Customers' funds;

c)    the fact that the FX Customers entrusted their funds to RCM for the specific, limited purpose of conducting FX transactions pursuant to their instructions and, as found by Judge Drain in a closely related context in the Bankruptcy Proceedings, did so with the reasonable expectation that the funds would be returned to the FX Customers on their instruction;

d)    Refco's efforts to position RCM with its customers such that, while purporting to be an off-shore unregulated entity, it was a financially healthy company and its customers' assets were safe and secure;

e)    RCM's decision, at the direction of the Refco Insiders to make use of FX Customer funds for purposes unrelated to RCM or to RCM's ability to service its FX Customers, and without any benefit to RCM or the FX Customers;

f)      the undisclosed facts and risks to which the FX Customers were exposed by virtue of the undisclosed, unsecured, uncollateralized transactions alleged herein;

g)      the fact that RCM was insolvent or in the zone of insolvency at all relevant times;

h)      the lack of deposit or similar insurance protecting funds in FX Customer accounts with RCM;

i)      Refco's public statements, designed to foster greater trust and confidence with RCM's customers, concerning, among other things, its "focus on acting as an agent," its "customer-oriented philosophy," its appeal to "customers concerned about . . . potential conflicts of interest," and its efforts to "avoid potential conflicts with [its] customers";

j)      Refco's public statements, designed to foster greater trust and confidence with RCM's customers, that the business of Refco and RCM did not involve proprietary trading for RCM's account but rather involved acting as an agent and executing customer instructions;

k)      Refco's statements to the effect that the relationships between RCM and other Refco entities were structured in such a way as to ensure that RCM would be able to satisfy its obligations to its customers before funds from RCM could be made available to other Refco entities for other corporate purposes, such as discharging obligations under notes issued by other Refco entities on which RCM was not obligated and which RCM did not guarantee;

l)      the terms and conditions of the agreements entered into between RCM and its FX Customers at the time an FX account was opened;

m)      the periodic account statements that RCM provided to its FX Customers which showed, among other things, customer orders being fulfilled and showed them being fulfilled in a way that reflected customer ownership;

n)    the lack of indicia that the relationship between RCM and the FX Customers was a debtor/creditor relationship, in which the customers were lenders or investors in RCM or any other Refco entity;

o)    RCM's failure to disclose to its FX Customers the existence, nature, and extent of the massive intercompany transfers alleged herein;

p)    the structure of the relationship whereby an RCM customer was assigned a dedicated salesperson who was responsible for the customer's account and FX transactions, thereby engendering greater trust and confidence by the FX Customers in RCM;

q)    the lack of any communications from RCM to the FX Customers that would have suggested to the FX Customers that their orders would not be executed or that RCM could not be relied upon to return their funds when instructed to do so; and

r)    RCM's superior knowledge of all of the underlying facts and the fraud alleged herein.

29.    The nature of the relationship between RCM and its customers was considered by Judge Drain in the Bankruptcy Proceedings. RCM asserted that the relationship between it and its customers was not a fiduciary relationship and that its customers did not entrust property with it. Judge Drain rejected this assertion. Judge Drain concluded that the relationship was fiduciary in nature in that RCM's customers entrusted securities and cash to RCM in order to effectuate transactions on the customers' instructions, and his decision stands for the proposition that RCM's customers had every reason to expect that securities and cash in their accounts would be returned to them on their instructions. Although Judge Drain reached this conclusion in connection with RCM's securities customers, it is fully applicable to the FX Customers as well because of the substantial similarities between RCM's relationship with its securities customers and its relationship with its FX

15

Customers.  Indeed, Judge Drain noted that it was unfair and inequitable (not withstanding the applicable priority provisions in the Bankruptcy Code) to distinguish cash entrusted to RCM by FX Customers from cash and securities entrusted to RCM by securities customers.

### Refco's Improper Diversion and Conversion of FX Customers' Funds

30.    In order to keep Refco appearing to be a fast-growing group of companies and simultaneously to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available funds" instead of frequently accessing the capital markets to borrow money, Bennett, and other entities controlled by Bennett, had substantial needs for cash. As Refco itself stated, "[r]eady access to cash is essential to our business."

31.    As a result of the Bankruptcy Proceedings, the Trustee has learned that those cash needs were satisfied largely by a scheme to fraudulently induce RCM's customers to entrust their assets with RCM, followed by the diversion and conversion of RCM customer funds and securities and by siphoning those entrusted funds from RCM to other Refco entities that had provided no assurances of their ability, intent, or obligation to repay those assets on demand or otherwise, that had provided no security for the siphoned assets, and that, in fact, lacked the intent and/or financial wherewithal to repay the siphoned assets on demand or otherwise.

32.    RCC collected assets improperly siphoned from RCM customer accounts and distributed those proceeds to Refco affiliates and other entities as directed by the Refco Insiders. Using assets improperly siphoned from RCM customer accounts, including from the FX Customers' accounts, RCC served as the bank for the entire Refco organization and assisted Refco in creating and maintaining a false and misleading appearance of financial health and strength for Refco in the eyes of the public while at the same time allowing RCM customer funds to be used as a personal piggy bank that was looted by the Refco Insiders. By these actions, the Refco Insiders sought to,

16

and did, "dress up" Refco for one or more lucrative and personally enriching liquidity events, including the LBO and the IPO, which were conducted with the substantial assistance of MB and GT.

33.    The siphoning occurred with respect to all of RCM's customers. With respect to RCM's FX business specifically, on a daily basis, assets in the accounts of FX Customers were improperly siphoned from those accounts, transferred out of RCM, and then converted for use by other Refco entities. The Refco Insiders caused RCM to keep as little cash as possible in FX Customer accounts. As reflected in the account statements sent to the FX Customers, RCM purported to hold hundreds of millions of dollars of FX Customer cash at all relevant times. In reality, RCM maintained only a minimal amount of cash on hand to prevent routine customer withdrawals from jeopardizing the scheme. The remainder of the entrusted FX Customer cash was secretly deployed to fund other Refco businesses and to keep the Refco house of cards from collapsing, for the purpose of perpetuating the fraudulent scheme and enriching the Refco Insiders by enabling them to sell some or all of their interests in Refco for more than those interests were worth.

34.    Rather than putting RCM customer assets to their intended uses in connection with transactions conducted pursuant to customer instructions, with appropriate regard for the legitimate and reasonable interests and expectations of RCM's customers, the Refco Insiders, who had clear conflicts of interest and divided loyalties, caused the funds to be "upstreamed," "side-streamed," and "down-streamed" to other Refco entities. These transfers, which purportedly took the form of "loans" from RCM to other Refco entities, often occurred without any "loan" documentation between RCM and the Refco entities that received assets that had been wrongfully "siphoned" from the accounts of RCM customers. The purported "loans" of RCM customer funds to other Refco

entities for purposes unrelated to the business of RCM and without benefit to RCM were related-party transactions, reflecting blatant and undisclosed conflicts of interest by the Refco Insiders, and were made:

     a)     without compensation, security or collateral;

     b)     without assurances that the funds would or could be repaid on demand or at all by the Refco entities that received them;

     c)     without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM or RCM's customers of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

     d)     to other Refco entities that in fact lacked the intent and/or the financial wherewithal to repay the siphoned funds;

     e)     for the purpose of perpetuating Refco's shell game and enriching the Refco Insiders and others;

     f)     in transactions that provided no benefits to the affected RCM customers and in which the legitimate and reasonable interests and expectations of the RCM customers were entirely ignored; and

     g)     without appropriate disclosure to, or consent by, the affected RCM customers, including the FX Customers.

35.     As of October 2005, RCM had more than $2 billion of undisclosed and uncollectible related-party receivables outstanding as a result of these transactions by which entrusted funds were siphoned from customer accounts and distributed to other Refco entities without the intent and/or the financial wherewithal to repay RCM these funds. Ultimately, RCM's customers were left with losses of more than $2 billion as a result of these siphoning transactions, including over half a billion

dollars in losses (not including pre-judgment interest) incurred by the FX Customers whose claims the Trustee asserts in this action.

### Refco's Siphoning of RCM Customers' Funds Was Facilitated and Hidden by Fraud

36. The Refco Insiders' ultimate goal of cashing out of Refco, in whole or in part, through one or more liquidity events depended on continued improper siphoning from RCM customer accounts, including the FX Customers' accounts, to fund Refco's business and for other purposes.

37. The Refco Insiders recognized that Refco's business faced inherent "reputational" risks and that customers would not do business with RCM, and place or leave cash and securities in their accounts with RCM, and thereby entrust their funds to RCM, if they did not believe that RCM was financially healthy and strong and was a safe entity to which customers could entrust their cash and securities for specific, limited purposes – a fact that was indisputably confirmed by the "run" on RCM precipitated by the belated public disclosure of the fraud at Refco in October 2005. Accordingly, the Refco Insiders needed to, and did, commit fraud in order to keep RCM's customers in the dark and RCM's doors open long enough so that they could continue to siphon RCM customer funds until they could find a way to successfully sell some or all of their interests in Refco.

38. By allowing and causing RCM to continue to implement its FX business model, and by falsely presenting RCM to the public as financially healthy and strong and as a safe entity to which customers could entrust their cash and securities for specific, limited purposes, the Refco Insiders enabled RCM to attract a substantial volume of business from the FX Customers whose assigned claims the Trustee is pursuing in this action, and made huge quantities of cash entrusted to RCM by its customers available to the Refco organization for improper diversion, conversion, and siphoning. The false picture of financial health and strength to which these activities contributed was then used as a basis for the desired liquidity transactions.

19

39.    As a result of the fraud alleged herein, the quantity of entrusted FX customer funds available for diversion and conversion by the Refco Insiders increased dramatically. For example, for the fiscal year ended February 28, 2001, RCM's FX customers had entrusted approximately $115 million to RCM. Over the years this figure grew by hundreds of millions of dollars and ultimately ballooned to approximately $811 million on October 17, 2005 – the day Refco filed for bankruptcy. A very substantial percentage of these totals reflect funds entrusted to RCM by the FX Customers whose claims the Trustee asserts in this action. This could not and would not have happened in the absence of the fraud alleged herein.

### a.    Hiding Undisclosed Losses

40.    To enable Refco to present itself and RCM to the public as financially healthy and strong and as a safe entity to which customers could entrust their cash and securities for the specific, limited purpose of conducting securities, FX, and other transactions pursuant to their instructions, and to ensure that RCM customers would continue to place and maintain cash and securities in their accounts at RCM where they could be improperly siphoned to fund Refco's business, and to portray Refco as having a low-risk business model, not subject to the risk of substantial customer losses impacting Refco, nor the risk of enormous amounts of uncollectible receivables, the Refco Insiders hid significant losses throughout the relevant period.

41.    As discussed in more detail below, Refco had massive undisclosed losses caused by uncollectible customer receivables. These losses were hidden by transferring them to RGHI, (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Tone Grant ("Grant"), Refco's former CEO), increasing a related-party receivable owed by RGHI to Refco (the "RGHI Receivable"), and then concealing the amount due from RGHI through a series of undisclosed sham "loans" timed to occur at the end of Refco's financial reporting periods. This scheme was designed to (and did) enable Refco to temporarily transfer massive amounts of

uncollectible customer receivables off of its books by shifting it between wholly-owned Refco subsidiaries, related-party companies owned and controlled by the Refco Insiders, and several third-party customers of Refco. The goal of this scheme was to disguise hundreds of millions of dollars of uncollectible receivables due to Refco so that Refco could fraudulently avoid recording hundreds of millions of dollars in write-offs and fraudulently continue to project to the public a false impression of financial health and strength and a false sense that RCM was a safe entity to which customers could entrust the customer cash and securities that Refco needed to perpetuate its shell game.

42.     A significant portion of the uncollectible customer receivables originated in trading losses incurred by Refco's customers in the late 1990s. Refco regularly extended credit to customers who engaged in securities, commodities and futures trades. As a result, when markets fluctuated drastically, as they did, for example, during the Asian market collapse in 1997, several Refco customers (other than the FX Customers), having made large speculative trading bets on securities tied to Asian currencies, lost huge sums of money (the "Asian Losses") and were unable to repay over a hundred million dollars worth of loans that Refco had made to them. Refco was forced to assume those losses.

43.     Also in 1997, certain Refco customers in the United States to whom Refco had extended credit – entities associated with Victor Niederhoffer – lost more than $90 million in trades (the "Niederhoffer Losses"). When the customer could not meet its margin requirements, the Refco Insiders caused Refco to take out an intra-day loan from a financial institution to meet its margin call and then used funds taken from customers of other Refco entities to repay the loan. Ultimately, the Refco Insiders caused Refco to enter into settlement agreements with the Niederhoffer entities, pursuant to which the Niederhoffer entities agreed to liquidate the positions in their accounts for the benefit of Refco. Like the Asian Losses, the Niederhoffer Losses were uncollectible -- in fact, the

21

settlement agreements released the Niederhoffer entities from liability -- and should have been written off in Refco's books as a bad debt expense. Instead, most or all of these losses were transformed from bad debts to apparent assets by "selling" or transferring them to RGHI so that they could become part of the RGHI Receivable.

44.    Refco also suffered substantial losses from its own proprietary trading, *i.e.*, trades carried out on its own behalf, which should have been written off, but instead were "sold" or transferred to RGHI, becoming part of the RGHI Receivable.

45.    Collectively, customer and proprietary trading losses sustained by Refco amounted to hundreds of millions of dollars. If disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management, and severely damaged Refco's business. Out of concern over the effect disclosure of the losses and uncollectible customer debts would have on Refco's business model and financial condition (and the value of their interest on any sale of Refco), the Refco Insiders transferred massive amounts of proprietary trading losses and uncollectible customer debt off Refco's books by shifting it into the RGHI Receivable.

46.    RGHI did not, however, have the ability to pay off the RGHI Receivable. RGHI's primary asset was its stock ownership of Refco, the inflated value of which hinged on the Refco Insiders' ability to conceal the very losses they were shifting off of Refco's books and onto RGHI.

**b.    Concealing Refco Operating Expenses**

47.    In addition to hiding proprietary and customer losses, in order to foster the illusion that Refco was in healthy financial condition and a good prospect for a lucrative buy-out or sale, the Refco Insiders also hid over a hundred million dollars of Refco expenses and other transactions by transferring them to RGHI, thereby fraudulently increasing Refco's apparent profits. Although the expenses were incurred by numerous Refco entities and paid by Refco, they were transferred to the

RGHI Receivable.  For example, in or around February 2000, $6.5 million was paid by a Refco entity relating to the settlement of a lawsuit against Refco.  The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco.  On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

48.    Through this scheme, millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses, and millions more in payroll and outside professional expenses, were concealed.

c.    **Hiding the RGHI Receivable**

49.    The multi-hundred million dollar RGHI Receivable was a related-party obligation that was required to be disclosed in Refco's financial statements.  To conceal the magnitude and related-party nature of the RGHI Receivable on these financial statements, the Refco Insiders came up with a remarkably simple scheme that should have been (and was) obvious to GT, MB, and E&Y. The scheme involved implementing a series of Round Trip Loan transactions ("RTLs") at the end of each fiscal year (and also, starting just before the LBO, at the end of several fiscal quarters) to temporarily pay down the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco.

50.    Hiding the related-party debt in this manner allowed Refco to avoid disclosing its massive trading losses and/or writing off the hundreds of millions of dollars in losses, thereby concealing Refco's true financial condition.  This, in turn, allowed the Refco Insiders to overstate Refco's financial condition and related operating results, understate its operating expenses, and fraudulently continue to project to the public a false impression of financial health and strength -- falsely securing customer confidence and ensuring continued deposits of cash and securities from customers.

51.    While some of the trading losses were permanently parked at RGHI, others were held at Refco and only moved off Refco's books and transferred into the RGHI Receivable just prior to reporting and auditing periods.  Aside from the irregularity of transferring losses off of Refco's books merely days before a reporting period, large intercompany receivables owed to Refco by a related-party (RGHI) would have to be disclosed on Refco's financial statements and would have invited scrutiny and skepticism.  The Refco Insiders, with the active assistance of the Professional Defendants, devised the RTLs to conceal the massive related-party receivable.

52.    Thus, at the end of every relevant reporting period, a Refco entity would extend a "loan" for an amount up to $720 million to a third-party with no apparent relation to Bennett or RGHI, and without sufficient collateral to support the loan.  That third party ("the RTL Participant") would then "loan" the same amount to RGHI.  The RTL was completed when RGHI used the "loan" from the RTL Participant to pay down the debt it owed to Refco.  Thus, on Refco's financial statements, the RGHI Receivable was transformed into a loan owed to Refco from an unrelated third-party.

53.    Right after the start of each new reporting period, the RTL was "unwound" by reversing the entire process.  RGHI would record a new "loan" from Refco, thereby restoring the RGHI Receivable.  Those funds were then transferred to the RTL Participant as repayment for its earlier "loan" to RGHI, and the RTL Participant in turn transferred those funds to Refco in satisfaction of its own "loan" from Refco.  This "unwinding" process, like the initial execution of each RTL, often occurred only on paper; no actual transfers occurred other than the payment of fees to third-party RTL Participants.  For agreeing to participate in the RTLs, the RTL Participants received payment of the "spread" between the interest rates of the two "loans."  The Refco Insiders

24

generally caused RCM to make these payments, even though RCM obtained no benefit from the RTLs.

54.     In addition, from 2000 through 2005, Refco engaged in approximately 12 wire transfer RTLs with, among others, longtime Refco customer Bank für Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG").   Like the other RTLs, the wire transfer RTLs involved transfers in late February, with those transactions being subsequently reversed in early March.  Altogether, these fraudulent RTLs occurred at least 30 times from 2000 through 2005, always at the end of a financial reporting period, never at any other time (with one exception), and were always unwound a few days into the new reporting period.

55.     The RGHI Receivable and the RTLs enabled Refco to hide its true financial picture from the public and to continue to present itself and RCM as financially healthy and strong, as having a low-risk business model, and as a entity to which customers could entrust their cash and securities for the specific, limited purpose of conducting securities, FX, and other transactions pursuant to their instructions.  The truth -- undisclosed to and unknown by RCM's customers, including the FX Customers -- was that Refco and RCM were a house of cards, highly susceptible to a liquidity crisis upon any disclosure of the fraud and the existence of the RTLs.

56.     Such a liquidity crisis materialized in October 2005, when the RGHI Receivable and the RTLs were publicly disclosed for the first time, leading to an immediate "run" on RCM which RCM was unable to satisfy because the customer cash and securities entrusted to it for specific, limited purposes had been wrongfully siphoned to Refco entities that were unable to repay the victimized RCM customers, including the FX Customers.

**d.     Inflating RGL's Revenues with Phantom Income and Commissions**

57.     The Refco Insiders also fraudulently inflated RGL's revenues by recording interest income associated with the fraudulent RGHI Receivable, charging as much as 35% at times.  For

example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal." The $62.75 million of illusory interest was recorded as income by Refco. But no interest payments were ever made, and because the RGHI Receivable was falsely created, held by a related-party and not subject to any form of repayment obligation, the interest income was entirely fictional and should never have been recorded. Between 2001 and 2005, the fictional interest on the RGHI Receivable amounted to approximately $250 million.

58.    The Refco Insiders also caused Refco to inflate its income as a result of "transactions" with RGHI. This practice served as a significant source of RGL's income. On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Refco Insiders of income at RGL. The description of the transaction on the account statement said only "Transfer" for each item.

59.    In addition, the Refco Insiders caused fictitious trades in RGHI's account at RCM for the purpose of creating phantom "losses" at RGHI and corresponding phantom "income" for RCM. For example, through 2004 and 2005, RGHI conducted fictitious trades in U.S. Treasury Bonds, buying bonds and selling them at a loss the same day. In this manner, the Refco Insiders manufactured millions of dollars of fake "income" for RCM's parent corporation.

**e.    Hidden Misuse of RCM Customer Assets**

60.    Having successfully hidden the uncollectible receivables, thereby allowing the Refco Insiders and others to continue to implement the RCM FX business model, and having fostered a public perception that Refco and RCM were financially healthy, strong and safe entities to which customers could entrust their cash and securities, the Refco Insiders devised an equally simple method of operating Refco's day-to-day business, engaging in costly transactions that they wished to

consummate but for which they lacked the financial wherewithal, and "dressing up" Refco for one or more lucrative and personally enriching liquidity events -- they simply stole operating funds from RCM's customers, including the FX Customers, and replaced the customer assets committed to RCM's safekeeping with, if anything, worthless IOUs from affiliated Refco entities.

61.    At all relevant times, the Refco Insiders engaged in a scheme pursuant to which RCM customer assets, including the assets of the FX Customers whose claims the Trustee asserts in this action, were secretly siphoned from their accounts at RCM and used to prop up Refco and to project a false appearance of financial health and strength on the part of Refco. The theft was accomplished through a series of intercompany transactions fraudulently mischaracterized as "loans" purportedly made from RCM to certain "customers" who were simply other Refco affiliates. By the time Refco filed for bankruptcy on October 17, 2005, over $2 billion in RCM customer assets were missing, and in their place were uncollectible intercompany receivables owed to RCM by Refco affiliates.

62.    As a result of the fraud alleged herein, the quantity of entrusted RCM customer funds siphoned to Refco entities at the direction of the Refco Insiders increased dramatically. By the end of fiscal year 2004, over a billion dollars of funds entrusted to RCM had been siphoned to other Refco entities; by the end of the fiscal year 2005, the amount of customer funds entrusted to RCM siphoned from their accounts at RCM and distributed to other Refco entities had grown to $2 billion and it continued to grow thereafter, so that it totaled over $2 billion on October 17, 2005 – the day Refco filed for bankruptcy. A very substantial percentage of these totals reflect funds entrusted to RCM by the FX Customers whose claims the Trustee asserts in this action. This could not and would not have happened in the absence of the fraud alleged herein.

63.    Thomas Yorke, the Refco executive primarily responsible for the execution of the hidden siphoning scheme, testified at the Bankruptcy Conversion Motion Hearing on March 3, 2006,

that RCM's customers were not told that entrusted property was swept from their accounts at RCM to other Refco entities. Given the opportunity to testify that RCM's customers were told that this might happen, he could identify no such communications to customers. He further testified that he would not expect RCM's customers to have known "about the inner workings, relative to what the upstream bank was doing, no." Yorke's reference to the "bank" was a reference to RCC.

64.    The scope of the scheme was enormous. Indeed, the scheme was so fundamental to the operation and financing of Refco that it had to have been apparent to each of the Professional Defendants. The volume and size of the transfers involved, on many occasions, hundreds of millions of dollars each, resulting in stolen amounts that dwarfed Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

65.    Without continued, fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue functioning, and would have collapsed long before it did. Indeed, as described above, when disclosures in October 2005 of the previously undisclosed related-party receivable prompted RCM customers to lose confidence in Refco and RCM and to begin to withdraw their securities and funds from RCM, the immediate response by Refco was to impose a moratorium on all activities of RCM, including withdrawals from customer accounts. Without the continued availability of RCM customer assets, Refco collapsed, filing for bankruptcy just days later.

66.    As part of the scheme, on a daily basis, acting on instructions from the Refco Insiders, the Refco executives responsible for maximizing the siphoning of funds entrusted to RCM from FX Customer accounts and for distributing those funds to other Refco entities would transfer all but a *de*

*minimis* amount of FX Customer assets to RCM's securities division. Without the knowledge, authorization, or consent of the FX Customers, that money (in addition to assets stolen from RCM's securities customers) would then generally be transferred by RCM to RCC, in a series of undocumented intercompany "loans." RCC functioned as a "disbursing" agent, distributing the looted property wherever it was needed in the Refco organization.

67.    The stolen FX Customer assets were used for a wide variety of general and specific funding purposes by various Refco affiliates, all of which were completely unrelated to RCM, and did not benefit RCM or the FX Customers in any way. Because of the importance of the RCM customer assets to the overall Refco shell game, the Refco Insiders also kept careful track of the intercompany transactions and of the customer funds that were available for diversion and conversion at RCM at any given time. Refco's treasury operations at all relevant times were managed by the treasury department of another Refco entity. This department generated regular reports for management concerning the amount of customer assets available at RCM. The reports were circulated to the Refco Insiders and were available to the Professional Defendants at all relevant times.

68.    The transfers that accomplished the theft of RCM customer assets, including the FX Customer assets, were fraudulently accounted for as "loans" purportedly made by RCM to "customers." In order to support this fiction, RCM issued fraudulent "customer account statements" to RCC, RSL, and other Refco affiliates to which it transferred RCM customer funds. The account statements showed the substantial amounts of indebtedness and interest that the entities owed to RCM. RCM then fraudulently mischaracterized these affiliate "loans" on its books as "customer receivables."

69.    However, these Refco affiliates were not RCM "customers" in any legitimate sense. None was evaluated for creditworthiness or risk, as was required of RCM customers in the normal course. Nor did the debts arise from securities or foreign exchange transactions, which were the ostensible businesses in which RCM was engaged. The debts in question arose from improper, undisclosed, unsecured, and uncollateralized transfers made by RCM to related parties, at the direction of the Refco Insiders, without consideration, without any analysis of the creditworthiness of the supposed "borrowers" or of the risks of the transactions, without proper documentation and corporate formalities, and without disclosure to RCM's customers, including the FX Customers. The recipient Refco affiliates were not required to post collateral or margin. The loans were not collateralized with marketable securities, as were the loans that RCM made to customers in the normal course. Moreover, these purported "loans" were uncollectible because the Refco affiliates to which the "loans" were made lacked the intent and/or the financial wherewithal to repay them.

70.    These transfers served no legitimate business purpose for RCM or the FX Customers. As noted, RCM received no margin, collateral, or security, and the loans were improperly and fraudulently documented. RCM did not even receive security interests in any of the assets purchased with the transferred funds. The monies were simply transferred and dissipated. When Refco filed for bankruptcy, RCM was left with more than $2 billion in receivables from the other Refco affiliates which were uncollectible and which RCM was therefore unable to return to its customers, including the FX Customers.

**f.    The LBO's Destruction of RCM's Asset Value**

71.    By the time the Refco Insiders arrived at their big liquidity event -- an LBO carried out in conjunction with Thomas H. Lee Partners ("THL") -- the unauthorized "loans" by RCM of customer property had grown to approximately $2 billion and were continuing to increase as more and more funds were siphoned from RCM's customers in exchange for undocumented,

uncollateralized IOUs from affiliates. Meanwhile, the Refco Insiders, with the active assistance of highly sophisticated legal and financial advisors and auditors, caused RGL (together with all of its domestic subsidiaries, including RCC) to borrow $1.4 billion of bank and bond debt primarily to fund the buyout of RGHI's control of Refco. The LBO proceeds were not used to honor any obligations to RCM in any way, and the advisors and auditors (including, among others, MB and GT) played key parts in masking how RCM's customers were severely damaged by the LBO debt.

72.    Immediately before the LBO, the biggest creditor of RGL and its affiliates was none other than RCM. Even though this was well known to Refco Insiders, and the sophisticated legal and financial advisors and auditors involved in the LBO, the Refco Insiders caused RGL to distribute the proceeds of the LBO debt to themselves, leaving RGL and its affiliates saddled with over $1 billion of new debt, from which RCM received no pay-down.

73.    To foster the illusion that RCM was financially healthy and strong, and was a safe entity to which customers could entrust their cash and securities for specific, limited purposes, RCM was specifically excluded as a guarantor of the debt issued in connection with the LBO, and reference to RCM was glaringly absent in the Offering Circular for the LBO bonds. Nowhere did the Offering Circular explain: (i) that the RCM assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard to RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; and (iii) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard to the interests of RCM.

74.    Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not

guaranteed the notes." This was a pretense designed to lull any of RCM's customers who received it into a state of comfort about the financial health of RCM and the impact of the LBO, because maintaining the perception that RCM's customer assets were safe and secure was key to continuing the siphoning scheme. More of the same type of false comfort was provided elsewhere in the Offering Circular: "The effect of this subordination is that, in the event of a bankruptcy . . . , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid." These and similar statements recognize the way the LBO should have been structured -- consistent with the duties of RCM's directors to RCM and its customers -- i.e., ensuring that all of RCM's obligations to its customers were satisfied before siphoning away RCM's funds in exchange for worthless IOUs.

75.    The Professional Defendants working on the LBO each knew and/or consciously avoided knowledge of the magnitude and significance of the Refco entities' obligations to RCM. Each of these defendants reviewed, helped prepare or were aware of the following information set forth in the "payable to customers" line of the condensed consolidating balance sheet to Note O of the financial statements attached to the LBO Offering Circular, which is labeled Condensed Consolidating Financial Information:

**Condensed consolidating balance sheet**

### February 29, 2004

| | Parent [RGL] | Guarantor Subsidiaries [Includes RCC] | Non-Guarantor Subsidiaries [Includes RCM and RGF] | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| Liabilities Payable to customers | $465,681 | $1,556,529 | $6,647,453 | ($3,573,946) | $5,095,717 |

76.    By performing professional services for Refco, each of the Professional Defendants were deeply familiar with Refco's corporate structure and its operations.  While an outsider would have been unable to discern from the condensed consolidating information the full extent to which RCM funds had been siphoned off to RGL and its other affiliates, these Professional Defendants understood, at least, the following:

(a)    that in order to obfuscate Refco's financial statements and conceal their fraudulent scheme, the Refco Insiders misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";

(b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," these Professional Defendants knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a parent holding company with no trading operations and no "customers";

(c)    RCC, the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did not have

33

any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and

(d)     that only RCM had the volume of unsegregated customer assets necessary to fund billions of dollars in intercompany loans.

77.     Furthermore, as these Professional Defendants knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion through a non-Guarantor Subsidiary, Refco Global Finance, Ltd. ("RGF"). Thus, these Professional Defendants knew and/or consciously avoided knowing that the $3.573 billion in consolidation adjustments were the result of eliminating the approximately $465,681,000 of RGL's intercompany debt owed to RCM, the approximately $1.556 billion of RGF's intercompany debt owed to RCM, and the approximately $1.556 billion of RCC's intercompany debt owed to RGF, and that RCM was thus owed $2 billion -- $465 million owed from RGL plus $1.556 billion owed from RCC (which when booked in a back-to-back fashion through RGF, added another $1.556 billion to the consolidation adjustment).

78.     Given their due diligence, detailed in-depth understanding of Refco's financial structure and operations, and access to and preparation of the type of condensed consolidating financial information set forth in Note O, each of the Professional Defendants who assisted and advised Refco in connection with the LBO were fully aware of the massive $2 billion payable owed by RGL and its affiliates to RCM. These legal and financial advisors further understood that none of this debt would be repaid as a result of the LBO, which took $1.4 billion in loan proceeds and used them instead to cash-out the Refco Insiders' and others' interests in Refco.

79.     The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, so as to put cash in the pockets of the Refco Insiders and others, leaving the Refco entities without any assets to satisfy their obligations to creditors such as the FX

Customers. Furthermore, as the Professional Defendants were aware, unlike the typical LBO participant, RGL went into the LBO with hundreds of millions of dollars of concealed trading losses, misallocated operating expenses, phantom revenues, and unpaid billions owing to RCM, whose assets had been used to fund Refco's entire operations.

80.     Given Refco's true financial condition -- and the devastating impact the concealed trading losses and hidden operational expenses would ultimately have on its business if properly recorded and disclosed in its financial statements -- the LBO irreparably undermined Refco's already precarious condition. By saddling RGL with $1.4 billion in secured and senior debt which Refco's operations could not service, and by continuing their plan and siphoning out all of RGL's assets, the Refco Insiders sealed Refco's fate and undermined RCM's ability to collect on its approximately $2 billion of IOUs from its Refco affiliates.

81.     The theft of RCM customer assets continued unabated after the LBO, and in fact increased until Refco's bankruptcy filing.

g.     **The IPO Further Damages Refco and RCM**

82.     RCM's ability to collect on its IOUs was further undermined when, just one year after the LBO, the Refco Insiders, with the active participation and assistance of GT and MB, led Refco though an initial public offering of its stock. In the IPO, Bennett sold approximately 7 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $146 million.

83.     The IPO was structured with the principal goal of allowing the Refco Insiders and others to cash out, as opposed to raising funds for Refco to reduce the enormous debt Refco had been saddled with in the LBO. Furthermore, because the LBO had put RGL's insolvency beyond question, approximately $231 million in proceeds from the IPO that Refco Inc. used to retire part of

RGL's LBO debt was entirely wasted; Refco was induced to spend over $200 million on an insolvent subsidiary that was going to file for bankruptcy merely weeks later.

84.     When the fraud was disclosed and Refco filed for bankruptcy only two months after the IPO, Refco was saddled with hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus.  Through the IPO, Refco was again saddled with liabilities it could not satisfy -- this time the liability to pay back investors who had purchased Refco stock.

85.     At the time of the IPO, GT and MB were all aware that Refco was concealing its true financial condition and was in no condition to undertake an IPO.  Indeed, the most blatant indication that GT and MB understood that there were hundreds of millions in undisclosed related-party receivables was the conscious editing of SEC documents to conceal the RGHI Receivable.

86.     Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO.  In early drafts of the S-4 registration statement, which were reviewed and commented on by GT and MB and subsequently submitted to the SEC for comment, the S-4 disclosed only a small portion of the RGHI Receivable, and falsely characterized an amount of $105 million due to Refco from RGHI as a "customer" receivable.  As this was a related-party receivable owed to Refco from RGHI, the SEC questioned the decision to characterize "amounts due from equity members (RGHI) as receivable from customers." GT and MB thereafter learned that Refco amended the S-4 registration statement to state that the receivable was due from "equity members."  MB and GT thus knew not only that Refco had initially tried to deceive the SEC and the investing public about the RGHI Receivable, but they also knew that the actual amount due from "equity members" was well above the $105 million and that the S-4 was still materially false.

87.    In hopes of concealing the fraud and maintaining the illusion of Refco's financial health for as long as possible, after the IPO was completed in late August 2005, Bennett, with the active participation and assistance of MB, caused Refco to carry out yet another $420 million RTL with an RTL Participant named Liberty Corner Capital Strategies, LLC to once again cover up the existence of the RGHI Receivable.

88.    Approximately two months after consummation of the IPO, on October 10, 2005, the entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI. Refco demanded repayment of the debt by Bennett, who instantly repaid the loan using an emergency loan from BAWAG.

89.    In a press release issued that same day, Refco announced that it had discovered a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction. As a result, Refco announced that "its financial statements, as of, for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005 and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

90.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization. Refco's stock was delisted by the New York Stock Exchange, and the company was forced into bankruptcy.

## MB's Role in the Fraudulent Scheme

91.    MB was aware of the activities alleged herein, or, in the alternative, consciously avoided knowledge of them. By its actions, MB actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and conversion alleged herein.

92.    MB's relationship with Refco dates back to 1994, when MB partner Joseph P. Collins ("Collins") brought the Refco account to MB from his previous law firm. Until October 2005, MB was Refco's primary law firm, and Collins was Refco's primary outside legal counsel. With bills, on average, of over $4 million a year, Refco was an extremely lucrative client for MB, and as Collins' largest client, accounted for half of the billings for which Collins was responsible. Between 1994 and October 2005, MB provided a broad range of legal services to Refco -- from representing Refco in SEC investigations, to drafting profit sharing plans for key executives, to advising Refco on corporate governance issues and U.S. and foreign regulations regarding its operations and activities, to drafting customer agreements, to providing Refco with tax advice, to leading financings for senior note and loan agreements, to negotiating the terms of and drafting the documents for the RTLs at issue in this case. As a result of the varied engagements MB undertook on behalf of Refco, the firm became thoroughly familiar with the inner machinations of the company. The vast majority of important transactions and deals at Refco were cleared through Collins or the attorneys working under his direct supervision, and Collins was aware of the work that everyone was doing on Refco matters by virtue of his review of the bills before they were submitted to Refco.

93.    As the Examiner found, MB was aware of Refco's fraud and aided and abetted it. As discussed in more detail below:

- MB was aware of Refco customer losses during the late 1990s through, among other things, its legal work helping Refco hide these losses by transferring them to RGHI. MB thus knew and/or consciously avoided knowledge of the existence of the RGHI Receivable as early as 1999, and by no later than June 2002, MB knew that RGHI owed an intercompany debt to RGL of at least $350 million.

- MB drafted virtually all of the RTL documents with respect to 18 separate transactions, negotiated the terms of the RTLs with the third-party RTL participants ("RTL Participants"), and fully understood the nature of the RTLs.

- MB understood that the RTLs ultimately involved lending hundreds of millions of dollars by Refco, for a period of only a few days, to RGHI, an entity that was

controlled by Bennett. MB knew that these massive loans were risk-free to the RTL Participants and that they served no legitimate business purpose.

- MB knew that the RTLs were engaged in at the expense of RCM and its customers, including the FX Customers. MB knew and/or consciously avoided knowledge that even though RGHI was the beneficiary of the RTLs, RCM advanced the funds or credits for the RTLs to the RTL Participants, and also paid the interest to the RTL Participants.

- MB knew the RTLs were tied to Refco's financial reporting periods. For example, MB knew and/or consciously avoided knowledge that prior to the LBO in 2004, Refco was required to submit audited financial statements on an annual basis and, after the LBO, was subject to external reporting requirements on a quarterly basis. MB knew that the RTLs straddled Refco's financial reporting periods and audit periods and occurred only at those times (with one exception).

- MB drafted guarantees and indemnities on behalf of RGL in favor of the RTL Participants to guarantee RGHI's repayment obligation, and MB knew that Bennett himself signed virtually all of the guarantees and indemnities on behalf of RGL and the loan documents on behalf of RGHI. MB knew and/or consciously avoided knowledge that the guarantees and indemnities Refco was signing in connection with the RTLs violated the terms of other loan agreements that MB had prepared for Refco.

**Knowledge of Refco's Balance Sheet Problems**

94.    Starting in 1997, MB provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco customers. In those cases, the "bad debts" were assigned to RGHI or related entities. For example, in 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian currency crisis. By 1998, these losses amounted to over a hundred million dollars. MB attorneys were involved in the resolution of Refco's claims against these customers, which debts later became part of the RGHI Receivable.

95.    In October 1997, a Refco customer named Victor Niederhoffer and several funds he controlled lost more than $90 million (the "Niederhoffer Loss"). Instead of disclosing the losses -- which the Niederhoffer funds could not cover -- Refco, with MB's assistance, sold these accounts receivable to an RGHI subsidiary (Wells Ltd.). These losses were subsequently added to the RGHI

Receivable. Because MB was advising both Refco and RGHI during the relevant period, MB was thus aware that Refco could and did use RGHI as a repository for bad debts incurred by Refco related to its customers.

96.     MB continued to be aware of the RGHI Receivable. In a letter dated October 15, 1999, Bennett wrote to Collins to provide arguments to be used to support the apparent net worth of RGHI. Bennett stated that RGHI's value was the value of its investment in RGL. Collins, aware of the RGHI Receivable, jotted in his handwritten notes: "Minus loans to RGH[I]." These handwritten notes show that Collins knew RGHI owed money to RGL.

97.     By June 2002, MB was clearly aware that the RGHI Receivable existed and totaled at least $350 million. On June 11, 2002, in connection with legal work for Refco, MB revised legal documents that included a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of intercompany debt of [RGHI]."

98.     The RGHI Receivable was not the only method by which MB actively participated in an effort to hide bad debts. For example, in late 1999 and early 2000, MB was instrumental in hiding what Maggio perceived to be a $6.3 million "bad debt" (the "Deere Park Debit Balance") owed to Refco by a customer called Deere Park Capital ("Deere Park"). Maggio asked his advisors MB and E&Y to assist with the development of a transaction -- the Minglewood scheme -- that would conceal the Deere Park Debit Balance. Based on tax advice from E&Y and legal advice from MB, the parties created a joint venture called Minglewood Investments LLC to which Deere Park contributed certain worthless or highly speculative securities and $2 million in cash, while Refco contributed the Deere Park Debit Balance. As Maggio admitted to one of Deere Park's principals, the Refco Insiders had Refco enter into this joint venture to avoid having to write off the Deere Park

Debit Balance. Under the terms of the agreement drafted by MB, the $6.3 million debit balance was converted into a note that would only be payable from profits Minglewood Investments LLC earned on its securities, and would convert to a zero balance -- in other words, disappear -- after a set time period. As MB understood, the entire purpose and effect of the Minglewood transaction was to hide the $6.3 million debt from Refco's financial statements. A Deere Park principal has testified under oath to having had conversations with an MB attorney regarding the fact that Refco was entering into the Minglewood transaction so that it would not have to write off a receivable.

**The RTL Transactions**

99.    MB was not only aware of the huge RGHI Receivable, but MB drafted and negotiated the fraudulent RTLs whose sole purpose was to hide its existence. Indeed, *over the course of five years, MB drafted virtually all of the documents for RTLs totaling billions of dollars.*

100.    The first RTLs that MB worked on occurred in February/March 2000. Collins and a colleague negotiated the terms of, and drafted the documents for, three RTLs involving a total of $310 million. On or about February 1, 2000, MB was approached by a Refco employee about the possibility of doing "back-to-back loans" -- the first one a loan from RCM to CIM Ventures, a subsidiary of Ingram Micro, Inc., and the second one a loan from CIM Ventures to RGHI. The loans were to take place just before the end of Refco's 2000 fiscal year, and be unwound just after the beginning of the next fiscal year.

101.    Although this loan structure -- a structure whereby a loan was made at the close of a financial reporting period only to be unwound shortly after Refco's financial reporting and audit periods-- was obviously illegitimate, MB proceeded to prepare, edit, and review documents for the CIM Ventures transaction, including loan documents, a guarantee by RGL of RGHI's repayment obligation, and an indemnification agreement by RGL in favor of CIM Ventures. At the end of the

process, MB was in possession of RCM loan documents, RGHI loan documents, and an RGL

guarantee of RGHI's obligation and an indemnity in favor of CIM Ventures -- all signed by Bennett.

102.    MB's understanding of the substance of the RTLs is confirmed by a letter that CIM

Ventures sent to MB along with execution copies of the RTL documents.    This email, dated

February 22, 2000, states, in pertinent part:

> It is planned that RCM will deposit the loan proceeds in CIM's account . . . at RCM
> on February 25, 2000.  CIM will then fax a letter to RCM instructing them to move
> the funds to RGHI with a 15 basis point uplift in the interest rate.  RCM then will
> withdraw the funds from CIM's account and deposit them in RGHI's account,
> thereby completing the back-to-back loan transaction.  The steps will be reversed on
> March 9, 2000.  RCM will then transfer the CIM spread on the transaction to its
> Royal Bank of Canada account in the Cayman Islands.

103.    MB drafted similar documentation for RTLs with two other RTL Participants in

February 2000.

104.    After the February/March 2000 RTLs matured, MB wrote to each of the RTL

participants, transmitting to them the original promissory notes which they had signed in connection

with their loans from RCM.  An MB associate also played an active role in the transactions when he

endorsed the notes as "paid in full" as the authorized agent of RCM.

105.    The following year, CIM Ventures agreed to participate in another RTL with RCM

and RGHI (with RGL acting as guarantor), this time for $250 million.  Once again, MB prepared all

of the necessary deal documents, including loan agreements, guarantees, and indemnifications.

Once again, Bennett signed the loan documents on behalf of RGHI and also signed the guarantees

and indemnities on behalf of RGL.  Once again, MB was told precisely how the RTL transaction

would work -- on February 19, 2001, CIM Ventures sent MB a letter almost identical to the one it

sent the previous year, again explaining precisely how the RTLs would work, including the fact that

RCM would pay the interest spread directly to CIM Ventures.  And once again, the transaction was

42