# EXHIBIT A

## (PART 2)

unwound a few days into the new Refco fiscal year, with the RCM note returned to CIM Ventures and stamped by MB as "paid in full."

106.    In early 2002, Ingram Micro was prepared to go forward with yet another RTL, going so far as to send a mark-up of the 2001 loan documents to Collins. However, Ingram Micro developed second thoughts about engaging in the RTLs due to recent news about the Enron scandal. On January 30, 2002, Ingram Micro sent Refco an email backing out of the proposed RTL, referencing the Enron debacle and the amount of heightened scrutiny from the SEC.

107.    While fear of the Enron scandal was enough to give Ingram Micro second thoughts about engaging in these kinds of sham transactions, MB remained unconcerned. Over the next four years, MB handled RTLs an additional 14 times. Each time, MB drafted (and sometimes negotiated) the deal documents. Each time, Bennett signed the loan documents on behalf of RGHI and signed the guarantees and indemnities on behalf of RGL, except when another Refco insider signed them. The RTL Participants changed over time, with some participants backing out, necessitating redrafts and renegotiations. Significantly, the dollar values of the RTLs increased over time, soaring to as much as $720 million for one RTL in February/March 2004 -- repeatedly occurring in amounts that dwarfed Refco's total capital.

108.    Even more importantly, the frequency of the RTLs increased over time. The RTLs took place every February/March through 2004, and then increased to every fiscal quarter-end beginning May/June 2004 when Refco began having to report its financial statements on a quarterly basis due to the closing of the 2004 LBO. And as Refco's main counsel, MB knew full well that the RTLs were occurring only when Refco had to meet a financial reporting deadline.

109.    On their face, the RTLs had no legitimate business purpose. They were uncollateralized, short-term, back-to-back loans involving the lending of hundreds of millions of

dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL participants. The transactions clearly lacked any economic substance and were inherently suspicious.

110.    The RTLs were even more suspicious because, as MB was aware, Refco's bank financings contained covenants prohibiting Refco from incurring additional indebtedness, such as guaranteeing a third party's debts, beyond certain limits. MB knew these covenants existed because *MB had participated in the negotiation and drafting of the LBO financing documents.* Thus, by preparing the RTL documents, MB assisted in transactions that it knew violated loan covenants in financing documents that MB had previously negotiated and drafted.

111.    MB was also fully aware that the Refco Insiders had incentives to manipulate Refco's financial statements. For example, beginning in September 2003, MB began to provide legal services to Refco in connection with what would ultimately become the LBO. Having drafted Refco's executive compensation plan, MB was aware that Refco executives stood to profit directly and considerably by the sale of the company, such as through an LBO. The plan that MB drafted (the "Profit Sharing Agreement" or "PSA") provided certain Refco executives, including the Refco Insiders, with equity-like interests in RGL.

**Maintaining the Fraudulent Business Model**

112.    Refco facilitated its fraudulent scheme to attract and siphon RCM customer funds by purporting to maintain RCM as an unregulated offshore broker-dealer despite the fact that after closing its Bermuda operations in late 2001, RCM conducted all of its activities in the U.S. MB advised Refco and RCM on these efforts beginning no later than October 1996 and continuing through October 2005.

113.    In furtherance of the fraudulent scheme described herein, Refco desired to close down RCM's Bermuda operations and to "repatriate" RCM to the U.S. This was actually accomplished in

2002. In so doing, Refco enlisted the assistance of MB, which advised RCM on the implications of repatriating to the U.S. In the course of so doing and as reflected in, among other things, a June 24, 2002, MB memorandum, MB became intimately familiar with the business and operations of RCM through discussions with Maggio and others. As reflected in an August 3, 1998, MB memorandum, MB was aware when it did this work that RCM was engaging in repurchase agreements ("repos")[1] and buying and selling customer securities "for its own account." In connection with the repatriation of RCM's Bermuda operations to the U.S., MB advised RCM on, among other things, ways to structure its business so as to attempt to avoid being treated as a regulated broker-dealer subject to, *inter alia*, segregation requirements imposed by U.S. law.

114.    According to a January 31, 1999, memorandum from Refco to MB, MB was also involved in and familiar with various other "projects underway with respect to Refco's FX business," which -- along with other aspects of MB's engagements for Refco and RCM -- caused MB to be aware of the siphoning of RCM customer funds to other Refco entities as alleged herein.

115.    In June 2004, in connection with a discussion of financial covenants for a Credit Agreement with Refco Finance Holdings LLC as Borrower, questions were raised concerning Refco's "average cash on hand." One phrase used in connection with this discussion was "house cash," which MB characterized as "a difficult concept." In response to a question regarding whether it would be feasible to have GT provide a better explanation in future quarterly filings of the composition of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," MB notes state emphatically, "No!! Impossible to breakout. Too restrictive operationally i.e. funding." This reaction shows that MB was fully aware of the

---

[1]    In addition to FX transactions, RCM profited from fixed income transactions, where customers engaged predominantly in repos. A repo is a loan to a customer wherein the customer uses its securities as collateral.

manner in which Refco was siphoning RCM customer funds to finance its overall business operations.

116.    MB's knowledge of and participation in the overall scheme is clearly shown through emails from Thomas Yorke to Joseph Collins in January 2005. In those emails, Yorke sought advice from MB on impending regulatory changes that "could mean an extremely large asset transfer away from RCM" and on how to avoid the potential impact of those changes and how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. As MB was aware, the reason that Yorke wanted to minimize any transfer of cash from RCM customer accounts to customer accounts at other Refco entities was that Refco treated the cash in customer accounts at RCM as available to fund Refco's operations and would not be able to treat cash in customer accounts held at other Refco entities as available for this purpose. MB's proposed solutions included "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

117.    As indicated in a MB memorandum draft dated October 11, 2005, just as the massive fraud at Refco was unraveling, MB was fully aware that as a result of the repatriation of RCM's operations from Bermuda on which it had previously advised RCM:

a)    RCM's activities were conducted by RSL and not by RCM, and RCM had no personnel available to look out for the legitimate interests of RCM's customers;

b)    "RCM no longer maintains any personnel or operations in Bermuda and . . . all of its functions and operations are performed by RSL personnel that are located in the United States;"

c)    while assets in RCM customer accounts were "carried on the books of RCM," those assets were in fact not held by RCM;

d)    RCM was engaging in "significant" conduct in the U.S. and, with MB's knowledge and advice, had structured its activities with an intent to "avoid U.S. regulatory requirements" and could not properly claim to be exempt from the regulatory requirements of U.S. law; and

e)    RCM was not in fact a "foreign broker-dealer."

118.    The fact that MB was preparing such a memorandum in October 2005, at precisely the same time as the public disclosure of the massive fraud at Refco, is inherently suspicious. By preparing to advise RCM that it should consider changing the way it conducted its business after the fraud had already been disclosed and RCM had been effectively shut down, MB was simply trying to paper the file, cover its tracks, and create the appearance after the fact that it had rendered appropriate, objective advice to RCM when in fact MB had been intimately involved in advising RCM on RCM's earlier repatriation from Bermuda to the U.S. at a time when the law was no different than it was in October 2005.    Indeed, all of the authorities cited in that draft MB memorandum pre-dated the advice rendered by MB in 2001 and 2002 with respect to RCM's repatriation.

### MB's Conduct Prior to the LBO

119.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from MB's conduct prior to the LBO. MB was closely involved in the LBO process. The Equity Purchase and Merger Agreement ("Merger Agreement"), the document underlying the transaction, was negotiated and reviewed by MB.    The Merger Agreement represented that there were no undisclosed related-party loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million.    This representation was false and MB knew that the guarantee requirement would immediately be breached. There were, in fact, massive related-party loans between Refco and RGHI

that had not been disclosed, but rather had been temporarily hidden by the RTL scheme that MB had been effectuating. Moreover, at the very same time MB was reviewing these provisions in the Merger Agreement, MB was also preparing documents for a $720 million RTL in which a Refco entity -- RGL -- was guaranteeing the debt.

120.    In addition, as the Examiner found, MB "appears to have failed to disclose key information to THL" during the LBO diligence process. When asked by THL's counsel, MB boldly represented, despite having prepared and overseen the execution of dozens of RTLs, that there were no transactions or deals between Refco and RGHI. In fact, at the same time MB was making these representations, MB was preparing documents for the $720 million RTL involving both Refco and RGHI.

121.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from its failure to disclose the existence of the RGHI Receivable despite its review of the LBO Offering Circular and its issuance of a legal opinion making representations in connection with the LBO. Furthermore, the Offering Circular: (a) did not mention the existence of RTLs; (b) stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004; (c) did not disclose the guaranty -- that MB itself had prepared -- to a RTL participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) as discussed above, falsely stated that the LBO bond debt was effectively junior to the payables owed to RCM.

## MB's Conduct Before and After the IPO

122.    After the LBO closed, Refco began the process of registering the Senior Subordinated Notes so that they could become publicly traded, and also began preparing a prospectus that would lead to an IPO. MB was involved with both processes.

123.    During this time, MB continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, $550 million in December 2004, $345 million in February 2005 and $450 million in May 2005). In addition, MB continued to receive and respond to periodic requests for audit response letters -- keyed to Refco's fiscal quarters that ended in the same months as the RTLs.

124.    In late August 2005, after the IPO was completed, MB assisted Refco in engaging in yet another $420 million RTL designed to cover the existence of the RGHI Receivable.

\*          \*          \*

125.    Given MB's awareness (a) of the massive RGHI Receivable; (b) that the RTLs were merely sham transactions designed to allow RGHI to temporarily pay down the RGHI Receivable at the end of every relevant financial and audit reporting period; (c) of Bennett's dual roles in the RTLs; (d) that the RTLs violated Refco's financing covenants; and (e) that Refco executives had an incentive to maximize Refco's annual profits and ultimate sale price, MB clearly understood that the purpose of the RTLs was to hide the RGHI Receivable from Refco's books in order to create a false impression of financial health and strength and that Refco and RCM were safe repositories for customer cash and securities.

126.    MB also understood that Refco's continued operation and growth objectives required a continuous infusion of cash. MB knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and purportedly had no segregation or net capital requirements. MB thus understood that Refco was consuming RCM customer funds, including the property belonging to the FX Customers.

127.    MB further understood that the goal of both the RTLs and the theft of RCM customer funds was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with

a low-risk, high profit business model. MB understood that the ultimate purpose of this deception was to allow the Refco Insiders and others to cash out their interests in Refco. By its actions, MB not only violated applicable ethical and disciplinary rules, it substantially assisted and participated in a scheme that ultimately cost the FX Customers hundreds of millions of dollars in losses. MB is liable for the damages that were incurred as a result of its malfeasance.

### GT's Role in the Fraudulent Scheme

128.    GT was aware of the activities alleged herein, or, in the alternative, consciously avoided knowledge of them. By its actions, as alleged herein, GT actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and conversion alleged herein.

129.    After it took over the Refco engagement from AA in 2002, GT provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005. GT served as the purportedly independent auditor of RGL and its affiliates, not just on a consolidated basis, but also audited Refco subsidiaries, such as RCM, on a stand-alone basis. Refco's financial statements were audited by GT on a consolidated basis under RGL's name. The financial information of RGHI -- RGL's parent company "shell" -- was not consolidated with Refco. As a result, as GT knew, the ballooning RGHI Receivable was hidden from the public to preserve Refco's reputation in the marketplace and to conceal the hundreds of millions of dollars of losses that Refco had transferred to a related-party entity owned by Bennett and Grant.

130.    Accordingly, GT was on both sides of the fence, giving it a complete picture of the finances, operations, and business of both RCM and the rest of Refco. Given its multiple roles, GT had access to all material information concerning the improper transfers of FX Customer assets alleged herein and the uncollectible debts owed to RCM by other Refco entities. As Refco's auditor,

GT also had a complete picture of Refco's third-party transactions, including its related-party transactions with RGHI. GT thus had access to all material information regarding the RTLs and the fraudulent scheme to hide the RGHI Receivable from Refco's books. Given its intimate familiarity with Refco's finances, GT thus knew and/or consciously avoided the details of the fraud described herein and substantially assisted the Refco Insiders in perpetrating a fraud on RCM's customers, including the FX Customers whose claims the Trustee asserts in this action.

131.   As GT knew, clean audit opinions were essential to Refco's continued functioning. Had GT ever failed to issue a clean audit opinion for Refco in general or for RCM in particular, the entire fraudulent scheme would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005 notwithstanding GT's efforts to assist the Refco Insiders to hide the true facts.

132.   In each of its audits for Refco and affiliated entities, GT failed to satisfy the minimum acceptable standards of professional conduct, including but not limited to Generally Accepted Auditing Standards ("GAAS"), and failed to ensure that Refco's financials were consistent with Generally Accepted Accounting Principles ("GAAP"). Audits performed with the appropriate degree of diligence and professional skepticism would have uncovered the fraudulent scheme alleged herein, and would have prevented the theft of FX Customer assets.

133.   Auditors are not permitted to accept corporate assurances at face value; if directors and corporate records were to be blindly accepted, there would be little or no point in performing an audit. For that reason auditors must conduct themselves at all times with a high degree of professional skepticism and with an independence in mental attitude. The lead partner on the engagement, Mark Ramler, throughout his tenure both at AA and at GT, consistently failed to act with the requisite degree of professional skepticism. Ramler not only took Bennett and other Refco

employees at their word -- he personally vouched for their trustworthiness and veracity. Ramler's motivation for doing so was obvious; Refco was an extremely valuable account, and keeping the account through a successful IPO would constitute a coup both for GT and for Ramler. In a conscious attempt to maintain the illusion that Refco was financially solid so as to allow the Refco Insiders and others to cash-out, GT regularly issued unqualified audit opinions following a procedure that amounted to no audit at all.

134.    GT also failed to perform sufficient fieldwork and neglected to obtain competent evidence to afford a reasonable basis for forming an opinion regarding Refco's financial statements. For example, GT failed to analyze RCM account statements for "customers" who were Refco entities, related parties or RTL Participants, despite their availability to GT. Similarly, contrary to the requirements of GAAS, GT failed to satisfy itself that Refco had implemented adequate safeguards, procedures and controls. GAAS specifically identifies a number of "red flags" for auditors to consider that GT knew and/or consciously avoided knowing were present in this case, including without limitation (a) significant related-party transactions totaling hundreds of millions of dollars annually; (b) strong pressures to perpetrate fraud, since the Refco Insiders had confessed a desire to maintain Refco's value for a personally enriching sale of the company in the near future; (c) weaknesses in internal control; (d) numerous undocumented intercompany transfers; and (e) unusual or unexpected analytical relationships evidenced by asymmetrical balance sheets that did not accurately reflect intercompany transactions, including significant funds diverted from RCM without any loan documentation.

135.    This is not a case of an auditor overlooking a few details. GT completely abandoned its obligations of independence, learned first-hand of the fraud, and then aided and abetted that fraud by, among other things, continuing to provide clean audit opinions in the face of grotesque

52

accounting manipulations.  GT was aware of all aspects of the Refco Insiders' scheme to prop up Refco long enough to cash out their interests, from the fraudulent RTLs designed to hide Refco's losses to the theft of RCM customer money, including FX Customer money.

## GT's Knowledge of Refco's Balance Sheet Problems

136.  Each year, GT issued, among other things, unqualified audit opinions that the financial statements of RGL fairly presented RGL's financial condition in accordance with GAAP and that its audits had been conducted in accordance with GAAS.  In addition, GT consented to the incorporation of its audit opinion in RCM's stand alone financial statements.

137.  The RCM financial statements for each of years 2003, 2004, and 2005 were false and misleading and failed to state material facts necessary to make the statements contained therein not misleading.  In particular, the RCM financial statements were false because they failed to disclose that the "loans" that RCM had made to other Refco affiliates were uncollectible and should have been written off -- a fact which would have shown that RCM's net income, net assets, and stockholders equity were negative.

138.  For example, RCM's 2003 financial statements failed to recognize losses with respect to approximately $275 million in uncollectible obligations which the financial statements falsely characterized as "receivable from customers."  In fact, as GT was aware, these were simply RCM customer assets, including FX Customer assets, that had been improperly directed and converted, removed from RCM and siphoned to other uncreditworthy Refco entities, had been improperly characterized as "receivable from customers" and should instead have been written off.  Moreover, had GT properly audited the 2003 financial statements, it would have recognized the need to write off an additional approximately $650 million in uncollectible receivables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2003 fiscal reporting period.

139.    The 2004 RCM financial statements similarly failed to recognize losses with respect to approximately $1.1 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." Again, as GT was aware, these were simply RCM customer assets, including FX Customer assets, that had been improperly siphoned, removed from RCM and siphoned to other uncreditworthy Refco entities, had been improperly characterized as "receivable from customers" and should instead have been written off. Moreover, had GT properly audited the 2004 financial statements, it would have recognized the need to write off an additional approximately $720 million in uncollectible receivables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2004 fiscal reporting period.

140.    The 2005 RCM financial statements failed to recognize losses with respect to approximately $2.1 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." As GT was aware, these were simply RCM customer assets, including FX Customer assets, that had been improperly siphoned, removed from RCM and siphoned to other uncreditworthy Refco entities, had been improperly characterized as "receivable from customers" and should instead have been written off. Moreover, had GT properly audited the 2005 financial statements, it would have recognized the need to write off an additional approximately $345 million in uncollectible receivables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2005 fiscal reporting period.

141.    Although in each case, the RCM financial statements that GT audited stated that a portion of these "receivable[s] from customers" were attributable to "related-party transactions," the financial statements falsely mischaracterized these transactions as having consisted of "securities and other financial instrument transactions" that RCM had transacted with related parties "in the normal course of business." In fact, as GT was aware, a significant portion of these transactions were

54

simply extractions of money, with no collateral, and were certainly not in the normal course of business, as the affiliated companies that received RCM customer assets lacked the intent and/or the financial wherewithal to repay the stolen assets.

142.    GT knew and/or consciously avoided knowing that these assertions in the RCM financial statements were false because it not only had access to, but actually reviewed material information concerning RCM and the intercompany transfers of RCM customer assets.    GT knowingly or recklessly failed to take the required audit steps or disregarded the resulting audit evidence.    For almost all of the transactions, the affiliated companies lacked the intent and/or financial wherewithal to repay RCM, the loans had no legitimate business purpose for RCM but benefited only the affiliates, the loans were falsely documented as "customer" receivables, RCM's board of directors never approved the transactions, and no collateral or security existed of any value. These facts constituted huge "red flags" which were known and/or consciously avoided by GT.    Any proper audit examination would have revealed these facts and uncovered the fraud alleged herein.

143.    GT also ignored numerous other instances in which the Refco Insiders fraudulently manipulated Refco's financial results through transactions with RGHI.    As discussed above, the Refco Insiders hid tens of millions of dollars of Refco expenses -- computer expenses, payroll and outside professional fees -- by allocating them to RGHI.    GT knew and/or consciously avoided knowing about these transactions, which resulted in a massive overstatement of Refco's operating results.    GT also permitted Refco Insiders to fraudulently book approximately $250 million in fraudulent interest on the RGHI receivable and ignored the fictitious trades in U.S. Treasury Notes in RGHI's account at RCM which created phantom "losses" at RGHI and corresponding phantom "income" for RCM's parent company.

**GT's Knowledge of The RTL Transactions**

144.    In addition to its knowledge of the looting of FX Customer funds and the fraudulent manipulation of Refco's operating results through the use of the RGHI Receivable, GT was well aware of the RTL scheme that was used to hide the RGHI Receivable.

145.    Before 2002, AA served as Refco's supposedly independent and objective auditor. However, in reality, AA's Ramler had abandoned any pretense of independence or objectivity. While at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his thoughts and advice. Ramler also bragged that Bennett and other senior Refco management called him on an almost daily basis to discuss transactions and business issues.

146.    After AA collapsed under the weight of the Enron debacle, Ramler moved to GT, taking the Refco engagement with him. Refco was a marquee customer for GT, was Ramler's ticket to partnership at GT, and stood to be an even better client for GT if, as GT anticipated, Refco went public. During the course of the Refco engagement, GT earned close to $10 million in fees. With Ramler heading the engagement, GT continued AA's practice of turning a blind eye to billions of dollars of questionable accounting transactions in Refco's consolidated financial statements.

147.    Based on his long experience with Refco, when Ramler joined GT, he brought with him knowledge of the following facts:

- As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next 3 to 10 years.

- Refco's internal accounting controls were deficient and readily capable of being overridden by Refco's management.

- As of February 28, 2002, RGHI was a shell entity with no operations that owed RGL approximately $170 million, and whose financial results were not included in RGL's consolidated financial statements.

- Refco was engaging in substantial and complex related-party transactions with RGHI and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

- Bennett had promised AA that the RGHI Receivable would no longer increase, would be paid down, and that $35 million of the RGHI Receivable would be paid off in fiscal year 2003.

148.    GT was thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable was a viable tool for accomplishing such manipulation. GT was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards of the need to apply far more scrutiny to related-party transactions than to ordinary arm's length transactions, when conducting an audit. Accordingly, GT internally categorized Refco as a "high risk" client in part because it engaged in significant and complex related-party transactions, lacked an internal audit function, and was dominated by a limited number of senior executives and managers who had an interest in maximizing the apparent financial condition and operating results of the company in order to cash out their stake in the company.

149.    Nevertheless, GT utterly failed to properly audit Refco's related-party transactions. As a result, even though GT knew and/or consciously avoided knowledge that the RGHI Receivable was used to fraudulently inflate Refco's operating results and learned of the RTLs which served to hide the RGHI Receivable, it continued to issue clean audit opinions for Refco as a whole and separate clean audit opinions for the stand alone audits of various Refco subsidiaries, including RCM.

150.    For example, in connection with the 2003 audit, on April 28, 2003, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down the receivable owed by RGHI. In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of the receivable, then purportedly totaling $105 million, by at least $35 million per year, resulting in full payment by

February 28, 2006. GT made no effort to determine whether those payments actually were made —
and indeed, they were not. Nor did GT make any attempt to verify the $105 million figure, which
was false, or seek any assurance that RGHI and/or its shareholders had the financial wherewithal to
repay the amount. During its 2004 and 2005 audits, GT likewise failed to obtain sufficient evidence
to provide any reasonable assurance that related-party transactions were properly reflected in the
financial statements. And GT repeatedly ignored the fact that, contrary to Bennett's assurances, the
RGHI receivable was not paid, and in fact increased.

151.    GT's work papers from the 2003 audit show that GT contemplated steps to scrutinize
related-party transactions, but simply chose not to implement any of them. For example, in
conducting its audit of RCC in 2003, GT told Refco that it needed to see certain loan receivables
owed to RCC on the books of the affiliate owing the money. When making this inquiry, GT
specifically requested the information about a loan from RCC to RGHI purporting to have a balance
of approximately $71 million, including documents to verify the existence and terms of the loan and
ensure that RGHI was actually making payments that were received by RCC and reflected on its
bank statements. In violation of GT's own practices, as well as GAAS, GT never carried out any of
these procedures. Had GT done so, GT would have quickly exposed the fraud.

152.    Furthermore, despite the high degree of risk GT knew was connected with
related-party transactions at Refco, GT deliberately chose not to take the simple and obvious step of
examining the customer statement for the RGHI account at RCC for the months of February and
March 2003. Had GT done so, it would have seen the following:

• Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI
owed Refco over $600 million.

• On February 21, 2003, RGHI's account at RCC received "transfer funds" for $308.5
million, reducing the amount that RGHI owed RCC.

- On February 25, 2003, RGHI received two credits for an aggregate of $250 million from a wire transfer from a bank in New York.

- By March 4, 2003, (*i.e.*, just 4 days after Refco's fiscal year-end), the above entries were reversed, and the amount RGHI owed to RCC ballooned from $71.8 million on February 28, 2003 back up to over $600 million.

153.    Moreover, the disclosed portion of the February 28, 2003 receivable balance from RGHI's account of over $70 million represented an approximately $30 million increase over the prior year. Although GT inquired as to the reason for the increase, it took at face value the explanation from a Refco insider that the $30 million represented "additional loans" and never questioned why, during a time when Bennett had promised that RGHI would pay down the RGHI Receivable, RCC was extending RGHI additional credit.

154.    GT's audit plan for 2003 also called for GT to review loan documents concerning the RGHI Receivable at RCC and to perform an assessment of the interest income represented by Refco to have accrued on the RGHI Receivable. GT failed to perform either procedure.

155.    In fact, after the 2003 audit, GT failed to perform any procedures whatsoever to test the RGHI Receivable at RCC. One glaring omission in GT's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates." This document, which Refco's auditors had obtained and reviewed as part of every Refco audit from 1996 to 2003, detailed Refco's related-party receivables. Refco failed to provide this document to GT for the 2004 and 2005 audits. GT did nothing to investigate this change in documentation, even though the statement for RGHI's account at RCC made clear that RGHI still had a massive debit balance in favor of RCC. GT intentionally turned a blind eye to this issue.

156.    Similarly, GT failed to properly examine the RGHI balances at RCM. Though Ramler knew that in the past, RGHI owed substantial sums of money to Refco through an account at RCM, GT failed to perform even the simplest procedure to ensure that this

related-party account was being properly recorded in Refco's books. Had GT looked at the RGHI

customer statement at RCM for February 2003 (Refco's fiscal year end), GT would have seen the

following:

- The debit balance in the account as of February 1, 2003 was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003 of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar

manipulations of RGHI's account at RCM.

157.    GT's failure to examine the customer account statements of the related-party RGHI

was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it can only

be evidence of a willful blindness -- an intentional effort to avoid exposing evidence of the

accounting fraud at Refco.

158.    During its audits of Refco, GT not only knew of, and failed to properly audit, the

RGHI Receivable, but it also came face-to-face with the RTLs themselves. Again, GT deliberately

ignored numerous red flags indicating that these RTLs were part and parcel of the accounting fraud

being perpetuated by the Refco Insiders.

159.    The RTLs that occurred during the periods audited by GT were accomplished by

RCM falsely recording the cash loan as a "reverse repo" or "time deposit" in the RTL Participant's

customer account. A "reverse repo" is a securities sale and repurchase agreement executed between

two parties, and a "time deposit" is a loan extended to a customer for purposes of trading. Both

"reverse repos" and "time deposits" require the use of collateral, and because both involve

agreements with third parties who may fail to perform, both kinds of transactions raise serious

financial statement risks and warrant heightened scrutiny by auditors. Professional audit standards

advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, and not merely their amount.

160.    GT ignored these standards, deliberately failed to inquire into the obviously suspicious circumstances of these transactions, and subjected them to little or no scrutiny at all. As noted, the RTLs were not actually "reverse repos" or "time deposits." The RTLs lacked the hallmark of both transactions -- collateral. Nor did the RTL Participants' total capital provide Refco with adequate security for these substantial advances. Nevertheless, GT accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

161.    For example, during its audit of RCM for 2003, GT noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two of the RTL Participants totaling $650 million. The transactions were timed precisely to span Refco's fiscal year-end. On April 16, 2003, GT sent simple confirmation requests to these RTL Participants, which were signed and returned to GT. Although GT performed additional credit risk testing on other RCM customer accounts for 2003, GT did not conduct additional testing on these RTL Participant accounts and GT did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Participants' total capital.

162.    In the 2004 audit, GT noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner. As in 2003, GT sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did. This year, however, GT took the additional step of reviewing the potential credit risk from the transaction. GT noted that the entire amount of Liberty Corner's debit balance -- $720 million -- was at risk, meaning that no collateral secured it. However,

GT did not identify the account as a credit risk and ignored the fact that a real "reverse repo" transaction should be secured by collateral.

163.     As these examples illustrate, in every audit and review that it conducted of Refco, GT received information that RCM was engaging in large period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Participants. In each case, GT understood that the transactions were in fact unsecured loans of hundreds of millions of dollars made to entities without the intent and/or financial wherewithal to repay the loans rather than collateralized "reverse repo" transactions.   Yet in each case, GT declined to investigate further based on information -- often merely a representation from management -- that the unsecured balance had been repaid.  Moreover, despite being engaged for years as Refco's auditor, GT never alerted anyone to the pattern and never questioned why Refco entered into these uncollateralized transactions at the end of each and every relevant financial and audit reporting period.  Nor did GT ever question why Refco was characterizing these transactions as "reverse repos" or "time deposits" when they were not collateralized.

164.     Further evidence that GT understood that the RTLs were being used to hide the RGHI Receivable comes from Ramler's own handwritten notes.  In these notes, Ramler wrote the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL participants).  Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts."  During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts.  This is a connection Ramler would not have made unless he, and thus GT, had actual knowledge of the fraud.

165.   Records of internal communications within GT's management show that GT understood it was subject to liability for its conduct with respect to Refco. In late December 2004, Ramler had a conversation with a member of GT's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO. The note states, in part: "Atty called -- also this AM -- Refco makes Firm uncomfortable . . . issue is sig. def. . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to demonstrate GT's concerns about Refco and the upcoming IPO: "They are moving very fast -- too fast for comfort . . . what to do -- we would be sued." (emphasis in original).

166.   Unlike the FX Customers, GT knew that Refco was misappropriating RCM customer assets, including the deposits of the FX Customers, and using it for other Refco purposes. GT also knew and/or consciously avoided knowing that Refco was engaging in the RTL scheme in order to hide the fact that Refco was suffering massive losses due to uncollectible receivables, and that RGL was being saddled with guarantees for the RTLs. In sum, GT knew and/or consciously avoided knowing that Bennett and his cronies were fraudulently "dressing up" Refco using these schemes in order to cash out their own Refco interests. GT was a sophisticated audit and accounting firm that, when faced with knowledge of this fraudulent scheme, chose to look the other way -- apparently to keep a marquee customer happy. GT not only violated the governing standards of GAAS, it substantially assisted and participated in a scheme that ultimately cost the FX Customers over half a billion dollars in losses. GT is liable for the damages that were incurred as a result of its malfeasance.

## GT's Substantial Assistance in Maintaining the Fraudulent Business Model

167.   GT substantially assisted the fraud, allowing the fraud to continue and advancing the objectives of the fraud, by, among other things: ignoring red flags that alerted GT to the existence of accounting fraud; knowingly issuing unqualified opinions on Refco's consolidated financial

statements for each of fiscal years 2003, 2004, and 2005 that materially misrepresented Refco's financial condition; opining separately on the financial statements of RCM and authorizing the delivery of its clean audit opinions on RCM's fraudulent financial statements to RCM's customers, including the FX Customers; and continuing to act as Refco's auditor despite its knowledge of the fraud.

168.    GT also substantially assisted the Refco Insiders by issuing an unqualified audit opinion in connection with its re-audit of Refco's 2002 financial statements in the Fall of 2004 in connection with the LBO. As GT knew, it was a closing condition to the LBO that Refco's financial statements be SEC Regulation S-X compliant for fiscal years 2002 through 2004. Nonetheless, in re-auditing Refco's 2002 financial statements, which had not been Regulation S-X compliant, GT again chose to consciously avoid the numerous signs of the Refco Insiders' fraud.

169.    Further evidence of GT's knowledge of fraud, and GT's active assistance in covering up the fraud, comes from a Management Deficiency Letter ("Management Letter") prepared by GT following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco. As set forth in this letter, among the accounting irregularities and deficiencies known by GT to have existed well before the LBO were: "Consolidation Process," "Formalized Reporting and Closing Process," "Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," "RCM Custody Reconciliations," "Audit Coordination, " and "IT Environment Deficiencies."

170.    As the Management Letter revealed, GT was fully aware that Refco's internal accounting and auditing functions were in a shambles, that there was no internal audit function, there was insufficient audit coordination and that there were deficiencies in accounting procedures and functions and in the consolidation processes. Despite these numerous longstanding deficiencies, the

correction of which would have made the various accounting improprieties and frauds conducted by the Refco Insiders harder to conceal, GT provided Refco with a clean audit opinion prior to and in connection with the LBO.

171.    Despite being aware of these deficiencies prior to the LBO and having "previously discussed" these longstanding deficiencies with Trosten and other Refco Insiders, it was only after the LBO that, to cover its inaction and failure to properly audit Refco, GT "papered" the deficiencies in a letter to Bennett dated October 15, 2004. As GT alludes to in its Deficiency Letter, Refco's "accounting function d[id] not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer." As GT recognized, Refco's deficient accounting practices, and the fraud they helped conceal, could not withstand the increased scrutiny that Refco would be receiving from regulators and investors given the impending IPO. Nonetheless, in its cover letter to Bennett, GT minimizes the significance of these deficiencies by referring to them as merely "matters that are opportunities for strengthening internal control and operating efficiency." As set forth below, however, as GT admitted a few months later (after the February 28, 2005 audit and just before the IPO), Refco had "significant" accounting and control deficiencies.

172.    Even after belatedly presenting the Management Letter to Bennett in October 2004, GT failed to follow-up with Bennett or anyone else at Refco regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed. Even then, GT modified its findings at the instructions of Refco management and then affirmatively lied about the letter's existence when GT was asked by THL whether any such management letter existed during the LBO due diligence process.

173.    In late March 2005, long after the conclusion of the LBO, THL learned of the existence of the Management Letter. In an April 1, 2005, internal email, a THL executive expressed

his anger that neither Refco nor GT had provided the Management Letter to THL during the due diligence leading up to the LBO. As THL stated internally, "when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both[.]"

174. The same day, in another internal email, another THL executive explained his discovery that at or about the time that GT provided the Management Letter to the company, Refco management had pressured GT to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by GT:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

175. A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and GT if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

176. In sum, GT not only knew and/or consciously avoided knowledge of numerous accounting and controls deficiencies at Refco before, during and after the LBO, but GT also eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter. These facts demonstrate both GT's knowledge of and substantial assistance in the Refco Insiders' fraud.

## E&Y's Role in the Fraudulent Scheme

177.    E&Y was aware of the activities alleged herein, or, in the alternative, consciously avoided knowledge of them. By its actions, as alleged herein, E&Y actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and conversion alleged herein.

178.    E&Y began working for Refco around 1991, with the understanding that its client was RGHI and all of the subsidiaries below it, including RGL and Refco, Inc (which entity later became Refco LLC). Initially, E&Y was retained to review tax returns and answer tax questions. In 1993 or 1994, E&Y began preparing tax returns and later helped with IRS audits as well as state and municipal tax audits. In 2001 - 2002, E&Y provided Bennett with tax advice and proposed structures through which a partial sale of Refco could be effectuated with favorable tax treatment. During this time period, E&Y also prepared tax returns for RGL and its subsidiaries and affiliates, including RGHI, through the tax year 2002. E&Y and its affiliates continued to provide tax advice and tax services to Refco through as late as 2005, including the preparation of RGL's New York City tax returns.

179.    E&Y understood that the tax returns it was preparing for Refco were not only submitted to the IRS, but would also be reviewed by Refco's innocent directors, officers and agents and would be presented by Refco to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to get financing for Refco and, ultimately, to sell their interests in Refco.

180.    But E&Y was not simply a tax preparer for Refco. E&Y also repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and potential third-party investments involving Refco. E&Y thus assisted virtually every step of the plan

to enable the Refco Insiders and others to monetize and cash out their interests in Refco for more than those interests were worth through one or more liquidity transactions. Among the most significant transactions and issues on which E&Y assisted Refco were:

- RGHI's 1997 conversion to an S corporation and the efforts to avoid "busting" the S election or triggering a "Built-in-Gain" tax;

- Planning beginning in 1997 to take advantage of the Niederhoffer Loss;

- BAWAG's 1999 acquisition of a 10% interest in RGL;

- The 2000 Minglewood transaction designed to avoid the need to write off a $6.3 million "bad debt";

- The 2001 conversion of RGL subsidiary Refco, Inc. from a C corporation to an LLC (Refco, LLC);

- Structuring and analyzing the tax consequences of plans for profits-only interests in RGL for certain Refco executives;

- A 2001/2002 proposed acquisition by BAWAG of a controlling interest in RGL while minimizing or avoiding tax consequences to RGHI; and

- A 2002 proposed BAWAG investment of hundreds of millions of dollars in RGL in three installments in exchange for BAWAG's right to "participate" in the proceeds of a sale of Refco.

181.    E&Y's assistance in facilitating the Refco Insiders' fraudulent scheme was a two-way street. In 2000 and 2001, E&Y used Refco as a vehicle for a series of improper and fraudulent tax shelter transactions termed "Contingent Deferred Swaps" ("CDS"). These transactions were designed to create the illusion that the E&Y clients participating in the tax shelter scheme were losing money in trading activities (*i.e.* suffering business expenses) that could then be charged against these customers' sizable taxable incomes. The success of these tax shelters depended on E&Y fooling the IRS into believing that E&Y's clients were actually engaging in legitimate currency trading. Refco provided E&Y with the vehicle through which it could create that illusion.

182.    E&Y placed its clients' funds in Refco trading accounts and engaged in a high volume of short-term trades designed to create the appearance that the money was being traded and

was subject to trading risk. In reality, the trades were merely designed to preserve the clients' capital so it could be returned to the client once the tax benefit -- i.e., the fraudulent write-offs -- had been obtained.

183.    On May 22, 2007, four E&Y partners were indicted in connection with these CDS tax shelters. As the U.S. Senate's Permanent Subcommittee on Investigations noted in its reports on the Role of Professional Firms in the U.S. Tax Shelter Industry, E&Y enlisted a number of professional firms to help carry out CDS transactions" "including investment firms, law firms, and . . . Refco Bank, who participated as the counter-parties for swaps . . . from 2000-2001."

184.    As a result of E&Y's tax consulting and advice to Refco and involvement with Refco in connection with its CDS tax shelters and otherwise, E&Y understood as early as 1997 that Bennett wanted to sell the company.

185.    In mid-2001 through mid-2002, E&Y performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party. During the course of this work, Trosten asked E&Y to assume the existence of a receivable owed by RGHI to RGL in the amount of $720 million to $1 billion. E&Y's advice on this issue ultimately led Refco to structure its July 2002 transaction with BAWAG as a Proceeds Participation Agreement in which a BAWAG affiliate made payments to Refco in exchange for the right to participate in the proceeds of a future sale of RGL. E&Y understood that certain senior Refco executives stood to profit directly and considerably by a sale of the company and had a corresponding incentive to manipulate Refco's financial statements and related disclosures in addition to its tax returns.

186.    Through rendering tax advice to Refco, E&Y also learned that Refco, aided by GT and MB, was falsifying its financial statements. In 1999, E&Y provided tax advice in connection with the structuring of BAWAG's purchase of a 10% interest in RGL. In connection with this

process, E&Y reviewed and commented on the deal documents that MB drafted. An E&Y internal memorandum shows that E&Y disagreed with representations contained in these draft documents to the effect that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been paid.

187.    Moreover, as a result of its work for Refco, E&Y was aware that the RGHI Receivable was not a bona fide debt, but was a sham, based on, among other things, the following:

- E&Y knew that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value, and that RGHI lacked the ability to pay off the RGHI receivable;

- E&Y knew that Refco's officers were using the RGHI Receivable to intentionally manipulate Refco's financial statements for the purpose of bolstering the financial appearance of the company;

- By as early as September 2001, E&Y understood the RGHI Receivable stood at approximately $720 million to $900 million, even though E&Y knew that Refco's February 28, 2001 audited financial statements disclosed a related-party receivable balance of only approximately $219 million;

- As early as February 2002, E&Y knew about the RTL transactions whereby RCM loaned funds to a third party, who in turn loaned the funds to RGHI to pay down the RGHI Receivable. E&Y also knew these transactions occurred in late February and would be reversed in early March, straddling the end of Refco's financial year;

- By September 2002, E&Y knew that the Niederhoffer Loss, which made up part of the RGHI Receivable, was entirely uncollectible because the debt had been settled and released in 1997;

- E&Y knew that at least one purpose of the RTLs was to improve Refco's balance sheet on its financial statements by concealing the fact that the RGHI Receivable was composed of trading losses and operating expenses that were inappropriately moved to RGHI for the sole purpose of overstating Refco's financial position and operating results; and

- E&Y knew that Refco's income for tax reporting purposes was inaccurate and that correspondingly the income or loss of RGHI for tax reporting purposes was also inaccurate.

188.    Based on E&Y's knowledge of the Refco fraud, the senior E&Y advisor on the Refco engagement decided in late 2003 that E&Y should resign from its engagement with Refco. Nevertheless, E&Y continued to work for Refco on at least tax audits through as late as 2005, several months after the LBO, and carried out its withdrawal from Refco assignments in such a way as to allow the fraudulent scheme to continue.

**E&Y's Knowledge of Refco's Balance Sheet Problems**

189.    As early as 1998, E&Y was aware of a related-party receivable owed by RGHI to Refco that was created when RGHI purchased "bad debt receivables" for full face value from Refco. E&Y was also aware that this receivable had been sitting on RGL's books accruing interest "for years" while a corresponding payable grew on RGHI's books.

190.    In particular, E&Y was aware that one component of the RGHI Receivable was the so-called "Niederhoffer Loss," involving a "bad debt" purchased by an RGHI subsidiary, Wells, Ltd., at face value -- a price that vastly exceeded fair market value. By at least September 2002, and likely much earlier, E&Y knew that the Niederhoffer Loss was completely uncollectible from Niederhoffer because there had been a settlement and release in 1997 between Niederhoffer and Refco, Inc. pertaining to the losses. In addition, numerous E&Y documents discuss the "Wells losses," which pertain to losses of approximately $50 million on Russian Securities involving the same wholly owned subsidiary of RGHI (Wells, Ltd.) which purchased the Niederhoffer Loss. E&Y documents show that E&Y understood these losses also formed part of the RGHI Receivable.

191.    E&Y also knew that Refco had a practice of allocating vaguely described expenses -- often listed as IT and computer expenses -- to RGHI, but having RGL actually pay the expense and then adding those expenses to the RGHI Receivable.

192.    E&Y clearly understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL. In an email dated August 8, 2001, an E&Y partner observed that a

write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were "protected and buffered" by RGHI. This email demonstrates that E&Y knew that the RGHI Receivable was being maintained, not because it was legitimate debt, but because elimination of the receivable would destroy RGL's appearance of profitability.

193.  In addition, E&Y was fully aware that the RGHI Receivable was a sham based on the following evidence:

- E&Y never saw a written agreement evidencing the RGHI debt, never knew the terms and conditions of the debt or its repayment schedule, and never knew of any valuable consideration for the debt;

- E&Y never received a requested confirmation directly from Refco's counsel that the debt was valid;

- Other than the sham RTLs, RGHI never made a payment to service or pay down its debt during E&Y's engagement;

- RGHI never made interest payments on its debt and instead simply added accrued interest to the outstanding receivable balance; and

- RGHI never expressed an intention to repay the debt and, never could repay the debt, because, as E&Y knew, RGHI was "basically insolvent."

**E&Y's Knowledge of the RTL Transactions**

194.  In approximately September 2001, E&Y discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements. While the financial statements reported inter-company receivables of approximately $219 million, the RGHI Receivable was in the range of at least $700 to $900 million. When E&Y asked a Refco officer about the discrepancy, E&Y was told directly that Refco utilized the RTLs at fiscal year end in order to "clean up" the balance sheet and, for that reason, the related-party receivable balances did not appear on RGL's financial statements.

195.    E&Y has admitted to the Examiner that by no later than February 28, 2002, it knew that at the end of every Refco's fiscal year, RGHI would borrow funds from a third party to pay down the RGHI Receivable and the transaction would be reversed a few days later.

196.    E&Y was also aware and/or consciously avoided knowing, that the source of the third party funds in these annual fraudulent transactions was actually RCM. Several E&Y documents refer to "circular flows of cash" in the context of discussions of pay down of the RGHI Receivable at fiscal year end. For example, a November 6, 1997, E&Y handwritten memo regarding the Niederhoffer Loss (which E&Y knew to be part of the RGHI Receivable) states, in part, "Did RCM advance funds. Circular flow of cash." The handwritten notes of an E&Y partner dated March 4, 2002, contains the phrases "borrowed cash from RGL," "third party customer," and "Niederhoffer." In other words, the third-party customer had actually borrowed funds from RGL (via its subsidiary, RCM) to in turn loan to RGHI to hide the RGHI Receivable, which was partly composed of the Niederhoffer Loss. These notes demonstrate that E&Y understood that a Refco entity was likely the vehicle which RGHI was using to temporarily pay down its receivable.

### E&Y's Substantial Assistance in Maintaining the Fraudulent Business Model

197.    E&Y's own documents demonstrate that as early as 1997, E&Y had significant concerns about potential fraud at Refco and E&Y's own potential liability arising out of its involvement with Refco. Yet E&Y did nothing to address these concerns, and instead chose to assist Refco in perpetuating the fraud.

198.    For example, in November 1997, Kurt Neidhardt, the E&Y partner handling the Refco engagement, was concerned about how Refco had treated the Niederhoffer Loss. Concerned that E&Y could be viewed as "being an accessory to some type of fraud," Neidhardt met with the head of E&Y's Financial Services Department, Jerry Goldman. Incredibly, instead of advising Neidhardt to alert someone to this obvious accounting fraud and instead of demanding that E&Y

withdraw from representing Refco, Goldman informed Neidhardt that so long as E&Y prepared Refco's tax returns correctly and never gave Refco any accounting advice, E&Y should not be concerned. This cavalier attitude towards Refco's fraud would be shocking enough from one of the world's largest accounting firms. But even more egregious was the fact that E&Y **was not** preparing Refco's tax returns correctly. As discussed below, the RGL tax returns E&Y prepared were inaccurately reporting interest income from the RGHI Receivable that was not being paid and that RGHI did not have the wherewithal to pay. Accordingly, the tax returns were showing erroneous and inflated income on RGL's tax reporting documents.

199.    E&Y continued to have concerns about Refco, specifically about Refco's use of the sham RGHI Receivable to hide losses and other expenses. In the years 2001 through 2003, E&Y sent Refco a letter asking Refco to provide, *inter alia*: (a) a representation from Refco's legal counsel that the related-party receivable from RGHI to RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI"; and (c) an analysis of related-party accounts. Despite these requests, E&Y *never* received a written or verbal representation directly from Refco's legal counsel that the related-party payable was a legally enforceable obligation. Instead, E&Y accepted a representation from a Refco officer to that effect without demanding anything further. In addition, E&Y *never* received the requested schedule of expenses or analysis of related-party accounts. Despite Refco management having ignored E&Y's request, E&Y took no action and continued to prepare false and misleading tax returns and supporting tax documents that E&Y knew included a huge uncollectible related-party receivable.

200.    On July 8, 2002, Neidhardt met with the number two partner in E&Y's tax department, Mike Kelley, to discuss E&Y's knowledge that RGHI (which E&Y knew was

unaudited) owed RGL approximately $750 million, that RGL's audited financial statements reflected a related-party receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable just before fiscal year end and reinstate it just afterwards so that only a receivable balance of $225 million would be reflected on RGL's audited financial statements. Echoing Goldman's earlier outrageous (and erroneous) reaction, Kelley concluded that this was not a tax return issue, despite the obvious manipulation of the audited financial statements. E&Y did not, however, request further information from Refco or its auditors. E&Y simply continued to prepare false tax returns for Refco based on inflated operating results and continued to provide the Refco Insiders with tax advice regarding their exit strategies.

201.    On January 16, 2003, Neidhardt met again with Kelley to discuss concerns over Refco. This time, Neidhardt described another RGHI transaction in which a third party would allow RGHI to pay down the RGHI Receivable at fiscal year end in a manner that would hide the related-party nature of the receivable and improve the balance sheet without disclosing why the balance sheet improved. Once again, the number two partner in E&Y's tax department chose to ignore this obviously fraudulent manipulation of Refco's balance sheet because he believed that as long as E&Y got Refco's tax returns correct (which it didn't), the fraud was not E&Y's concern.

202.    In or about November 2003, E&Y purported to resign from the Refco engagement, based in large part over its concerns over potential liability for aiding and abetting the Refco fraud as a result of its knowledge of the massive RGHI Receivable and the fiscal year-end pay down and reinstatement of the RGHI Receivable.

203.    But E&Y did not really resign. Though E&Y did not prepare Refco's 2003 tax returns, E&Y continued to perform tax services for Refco through at least 2005. Moreover, despite

its concerns, E&Y did not tell Refco's subsequent tax accountants (or anyone else) the true reasons for its decision to resign or the concerns it had about Refco.

204.    E&Y continued to be nervous about its relationship with Refco, even after December 2004. In October 2005, Rory Alex, an E&Y accountant who did not work on the prior Refco engagement, sent Neidhardt an email asking about the possibility of doing work for RGL. The next day, Neidhardt sent an email to another E&Y tax partner who had worked on the Refco account previously, saying "we need to be very careful here. I left [Rory Alex] a message too . . . [anything] we tell him must be strictly confidential. I may have Nancy Altobello [an E&Y employee] shut him down."

205.    E&Y clearly knew that the RGHI Receivable was a sham transaction and that it was not a bona fide debt on which interest income could properly accrue for tax purposes. Accordingly, the RGL tax returns reflected interest income associated with the RGHI Receivable that E&Y knew was partially or entirely inaccurate. (E&Y also knew and/or consciously avoided knowing that RGHI was falsely underreporting its own income by taking false deductions for this interest.) E&Y also knew that the RGL tax return balance sheets (Schedule L) included as assets the RGHI Receivable. Thus, the Schedules showed an erroneous and inflated income for tax reporting purposes by RGL. These falsehoods substantially assisted the Refco Insiders' efforts to create the illusion that Refco was profitable and financially healthy.

206.    E&Y substantially assisted the fraud by preparing and filing tax returns that E&Y knew were inaccurate or false, but that E&Y knew would be reviewed by Refco's innocent directors, officers and agents, and would be presented to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to get financing for Refco and, ultimately, to facilitate a lucrative cashing out of their interests in Refco.

207.    E&Y also actively assisted the Refco Insiders in hiding Refco's uncollectible customer debts. As discussed above, in late 1999 and early 2000, Refco entered into the Minglewood transaction in order to avoid having to write off the Deere Park Debit Balance. E&Y substantially assisted the Refco Insiders with this goal by devising the structure of the Minglewood transaction, a structure that allowed Refco to keep the Deere Park Debit Balance off its financial statements.

208.    E&Y understood that Refco's continued operation and growth objectives required a continuous infusion of cash. E&Y knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no net capital requirements. E&Y thus understood that Refco was consuming RCM customer funds, including the property belonging to the FX Customers.

209.    E&Y further understood that the goal of both the RTLs and the theft of RCM customer funds was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model. E&Y understood that the ultimate purpose of this deception was to allow the Refco Insiders, and other Refco insiders to cash out their interests in Refco at an inflated value. By its actions, E&Y substantially assisted and participated in a scheme that ultimately cost the FX Customers hundreds of millions of dollars in losses. E&Y is liable for the damages that were incurred as a result of its malfeasance.

### FIRST CLAIM FOR RELIEF
### (Fraud Against Refco Insiders)

210.    Paragraphs 1 to 209 are incorporated as if fully set forth herein.

211.    Bennett, Maggio, and Trosten were the masterminds behind the fraudulent scheme alleged herein, controlling and directing every aspect of the fraud.

212.    Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them made, directed, or are otherwise responsible for all of the fraudulent statements and omissions of Refco and RCM alleged herein.

213.    As a result of the fraud alleged herein, RCM was permitted to continue to implement its FX business model and to remain available to receive and maintain customer cash and securities, including property provided by the FX Customers.  Absent the fraud, RCM would not have been able to attract, receive, and retain cash and securities from its customers, and the FX Customers would not have placed and held their property in accounts at RCM, where it was available to be improperly siphoned by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, as alleged herein.

214.    Bennett, Maggio, and Trosten and persons or entities acting in active concert or participation with them were in a position of unique and superior knowledge regarding the true facts concerning the siphoning of RCM customers' cash and securities, the manner in which that siphoning was concealed, and the fact that the appearance of Refco's financial health and strength was manufactured.

215.    As expected and anticipated by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, RCM customers, including the FX Customers, placed and maintained cash and securities into accounts at RCM in ignorance of the fraud alleged herein.  Had the true facts been fully disclosed, RCM's customers, including the FX Customers, would not have done business with RCM, and their cash and securities would not have been available to be improperly siphoned by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, as alleged herein.

216.    In placing and maintaining funds in accounts at RCM, the FX Customers relied to their detriment on the appearance of financial health and strength fraudulently created by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, and on their ignorance of the true facts with respect to the improper diversion and conversion of funds from their accounts at RCM.

217.    Under the facts and circumstances alleged herein, reliance on the fraud by the FX Customers may be presumed.

218.    As a result of the fraud alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Bennett and Maggio)

219.    Paragraphs 1 to 218 are incorporated as if fully set forth herein.

220.    At all relevant times, RCM was insolvent or operating in the zone of insolvency. Accordingly, all relevant times, Bennett and Maggio, as directors of RCM, owed fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM and the FX Customers, who were creditors of RCM.

221.    At all relevant times, RCM owed fiduciary duties of care and loyalty to the FX Customers, the discharge of which was under the direction and control of Bennett, Maggio, and persons or entities acting in active concert or participation with them.

222.    RCM, Bennett, and Maggio breached their fiduciary duties of care and loyalty to the FX Customers.

223.    In the alternative, Bennett and Maggio are liable for aiding and abetting RCM's breach of its fiduciary duties to the FX Customers because, among other things, they were aware of

the existence of those duties and actively participated in and substantially assisted the breach of those duties, as alleged herein.

224.    As a result of the breach of fiduciary duties alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

### THIRD CLAIM FOR RELIEF
### (Conversion Against the Refco Insiders)

225.    Paragraphs 1 to 224 are incorporated as if fully set forth herein.

226.    At all relevant times, the FX Customers entrusted funds to RCM for specific, limited purposes and the amounts entrusted to RCM were reflected on periodic account statements that the FX Customers received from RCM.

227.    By the actions alleged herein, the Refco Insiders, and persons or entities acting in active concert or participation with them wrongfully converted funds that had been entrusted to RCM for specific, limited purposes by the FX Customers.

228.    In the alternative, the Refco Insiders are liable for aiding and abetting RCM's and/or Refco's conversion of funds that had been entrusted to RCM for specific, limited purposes by the FX Customers because, among other things, they were aware of the conversion and actively participated in and substantially assisted the conversion.

229.    As a result of the conversion alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

### FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Against the Professional Defendants)

230.    Paragraphs 1 to 229 are incorporated as if fully set forth herein.

231.    MB, GT and E&Y had actual knowledge of the fraud alleged herein. Alternatively, MB, GT and E&Y consciously avoided the truth.

232.    Notwithstanding this knowledge, MB, GT and E&Y substantially assisted in the fraud.

### FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Against the Professional Defendants)

233.    Paragraphs 1 to 232 are incorporated as if fully set forth herein.

234.    MB, GT and E&Y had actual knowledge of the breaches of fiduciary duties alleged herein.  Alternatively, MB, GT and E&Y consciously avoided the truth.

235.    Notwithstanding this knowledge, MB, GT and E&Y substantially assisted in the breaches of fiduciary duty.

### SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Conversion Against the Professional Defendants)

236.    Paragraphs 1 to 235 are incorporated as if fully set forth herein.

237.    MB, GT and E&Y had actual knowledge of the conversion alleged herein. Alternatively, MB, GT and E&Y consciously avoided the truth.

238.    Notwithstanding this knowledge, MB, GT and E&Y substantially assisted in the conversion.

### PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment and grant the following relief:

(a)    An award of an amount to be proven at trial in compensatory damages for the losses that the FX Customers have incurred as a result of the acts and omissions of the defendants set forth in this Complaint;

(b)    An award of punitive damages;

(c)    An award of all costs incurred in connection with the prosecution of this action;

(d)    An award of attorneys' fees incurred in the prosecution of this action; and

(e)    Prejudgment and post-judgment interest as allowed by law.

DATED:    New York, New York
          August 27, 2007

                                    QUINN EMANUEL URQUHART OLIVER &
                                    HEDGES, LLP


                                    By: _____
                                        Richard I. Werder, Jr.
                                        Michael B. Carlinsky
                                        Susheel Kirpalani
                                        Sascha N. Rand
                                        Robert C. Juman

                                    51 Madison Avenue, 22nd Floor
                                    New York, New York  10010-1601
                                    (212) 849-7000

                                    *Attorneys for Plaintiff*
                                    *Marc S. Kirschner, as Trustee for the*
                                    *Refco Private Actions Trust*


### JURY DEMAND

Plaintiff demands a jury trial on all matters so triable.


82

# EXHIBIT A

| | |
|---|---|
| ABADI & CO SECURITIES | $83,654.80 |
| ABU DHABI INVESTMENT AUTHORITY | $29,918,680.50 |
| ADVANCE CURRENCY MARKETS SA | $495,750.01 |
| ALARON TRADING CORPORATION | $378,282.41 |
| ALDARRA FUND SPC CLASS A EURO | $399,713.47 |
| ALPEN AGENCY LIMITED | $1,280,832.51 |
| ALPEN FUND LTD. | $5,026,911.19 |
| ALPHIX CO LTD | $760,556.51 |
| AQR ABSOLUTE RETURN MASTER ACCOUNT | $19,383,500.00 |
| AQR GLOBAL ASSET ALLOCATION MASTER ACCOUNT LP | $8,828,886.64 |
| AMERICAN PEGASUS PERPETUAL INCOME NTD PLUS | $148,677.52 |
| ANSELAN S A | $172,920.00 |
| CARGILL FINANCIAL SERVICES CORPORATION | $23,358,164.23 |
| CARGILL GLOBAL FUNDING PLC | $5,825,291.75 |
| CARGILL INCORPORATED | $21,377,793.66 |
| CENTRAL COOPERATIVE BANK PLC | $10,000.00 |
| COSMOREX LTD | $105,850,964.00 |
| CREATIVE FINANCE LIMITED | $4,235,972.00 |
| CREATIVE FINANCE LIMITED | $65,445,343.00 |
| DE SHAW LAMINAR PORTFOLIOS LLC | $3,949,848.10 |
| DENALI ASSET MANAGEMENT LLP | $7,968,275.23 |
| DENIZBANK A S | $332,743.00 |
| DFD DIVERSIFIED TRUST | $1,040,818.55 |
| DK ACQUISITION PARTNERS LP | $1,374,811.78 |
| DOMINIQUE MOTTAS | $296,772.55 |
| EDUARD SARKISYAN | $205,445.74 |
| ESPIRITO SANTO FUNDOS DE PENSOES, S A (ESAF) | $1,447,915.76 |
| EUROPEAN SICAV ALLIANCE ODIN | $33,677.21 |
| EUROPEAN SICAV ALLIANCE-INSULATE | $12,996,905.79 |
| FELBURY FINANCE LIMITED | $262,233.00 |
| FINNAVAL MARITIME LIMITED | $4,224,254.14 |
| GARY STECKEL | $17,331.46 |
| GRAND TRADING LIMITED | $3,543,331.87 |
| GUIDO RASO | $329,640.57 |
| HAIN CAPITAL/MBT TECHNOLOGIES | $852,559.00 |
| IDS MANAGED FUND LLC | $3,267,928.79 |
| IDS MANAGED FUTURES LP | $8,326,047.12 |
| IDS MANAGED FUTURES II LP | $1,550,582.38 |
| JWH GLOBAL TRUST | $56,544,205.40 |
| KPC CORPORATION | $7,842,900.65 |
| LE ROSE INCORPORATED | $80,190.83 |
| LEUTHOLD FUNDS INC | $67,855,495.84 |

| | |
|---|---|
| LYXOR ESTLANDER & RONNLUND LTD | $5,029,268.72 |
| LYXOR/BEACH DISCRETIONARY FUND LTD | $7,696,965.14 |
| MULTI MANAGER FUTURES LIMITED | $1,082,602.10 |
| MYRTLE ASSET LIMITED | $199,474.65 |
| NAMOS CAPITAL INTERNATIONAL LIMITED | $1,126,578.00 |
| NIKKO FUTURES FUND | $1,355,107.69 |
| OLEG ILCHENKO | $19,350.96 |
| REFCO ADVANTAGE MULTI-MANAGER FUND | $41,678,077.43 |
| REFCO DIVERSIFIED FUTURES | $27,222,787.85 |
| SAGE FUND LP | $1,184,068.04 |
| SAPPHIRE SPECIAL OPPORTUNITIES FUND | $1,718,014.68 |
| STILTON INTERNATIONAL HOLDINGS LIMITED | $54,000,000.00 |
| STRATFORD TRADING LLC | $1,158,727.80 |
| TAGOL SA | $477,862.98 |
| TAU 28 FUND LTD | $4,238,735.00 |
| TE GRINHAM PORTFOLIO, LTD. | $24,584,718.28 |
| TE JENKINS PORTFOLIO, LTD. | $124,052.52 |
| THE EVEREST FUND | $5,546,244.71 |
| THE EVEREST FUND | $1,936,086.95 |
| TOKYO FOREX FINANCIAL CO LTD | $11,514,726.54 |
| UNION HOLDING COMPANY INC | $251,592.96 |
| WAYLAND DISTRESSED OPPORTUNITIES FUND I-B LLC | $129,682.56 |
| WAYLAND DISTRESSED OPPORTUNITIES FUND I-C LLC | $191,208.10 |
| WAYLAND DISTRESSED OPPORTUNITIES I-A LLC | $134,113.89 |
| WAYLAND INVESTMENT FUND | $4,568,101.19 |
| WAYLAND INVESTMENT FUND LLC | $1,600,034.91 |
| WAYLAND INVESTMENT FUND LLC | $234,151.00 |
| WAYLAND INVESTMENT FUND LLC | $858,553.00 |
| WAYLAND INVESTMENT FUND LLC | $1,209,780.00 |
| WAYZATA RECOVERY FUND LLC | $652,990.76 |
| WAYZATA RECOVERY FUND LLC | $335,861.10 |
| WINTERBOTHAM TRUST CO LTD | $550,735.00 |
| YAMAZEN SHOJI CO LTD | $788,987.14 |

**TOTAL CLAIMS**        $680,725,050.61