```
 1                      UNITED STATES BANKRUPTCY COURT
                         SOUTHERN DISTRICT OF NEW YORK
 2

 3      --------------------------------X
                                        : Case No. 05-60006
 4      In re:                          :
                                        : One Bowling Green
 5         REFCO, INC., et al,          : New York, New York
                                        :
 6                          Debtors.    : December 15, 2006
                                        :
 7      --------------------------------X

 8
                         TRANSCRIPT OF HEARING ON MOTIONS
 9                BEFORE THE HONORABLE ROBERT D. DRAIN
                      UNITED STATES BANKRUPTCY JUDGE
10

11
        APPEARANCES:
12

13      For the Debtors:        J. GREGORY ST. CLAIR, ESQ.
                                Skadden, Arps, Slate, Meagher &
14                                Flom, LLP
                                Four Times Square
15                              New York, New York  10036

16                              SALLY MCDONALD HENRY, ESQ.
                                Skadden, Arps, Slate, Meagher &
17                                Flom, LLP
                                Four Times Square
18                              New York, New York  10036

19
                                J. GREGORY MILMOE, ESQ.
20                              Skadden, Arps, Slate, Meagher &
                                  Flom, LLP
21                              Four Times Square
                                New York, New York  10036
22

23

24

25

                                (Appearances continued on next page.)
```

```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    APPEARANCES CONTINUED:

4    For the RCM Chapter 11          TIMOTHY DESIENO, ESQ.
       Trustee:                      Bingham McCutchen LLP
5                                    399 Park Avenue
                                     New York, New York  10022-4689
6
                                     JARED CLARK, ESQ.
7                                    Bingham McCutchen LLP
                                     399 Park Avenue
8                                    New York, New York  10022

9    For the Official Committee      SHUSHEEL KIRPALANI, ESQ.
       of Unsecured Creditors:       Milbank, Tweed, Hadley &
10                                     McCloy, LLP
                                     1 Chase Manhattan Plaza
11                                   New York, New York  10005

12   For Refco LLC Chapter 7         VINCENT E. LAZAR, ESQ.
       Trustee:                      Jenner & Block
13                                   One IBM Plaza
                                     Chicago, Illinois  60611-7603
14
     For West Loop Associates:       SIDNEY P. LEVINSON, ESQ.
15                                   Hennigan Bennett & Dorman
                                     865 South Figueroa Street
16                                   Suite 2900
                                     Los Angeles, California  90017
17
     For Interactive Data           PETER D. BILOWZ, ESQ.
18     Corporation:                  Goulston & Storrs, PC
                                     400 Atlantic Avenue
19                                   Boston, Massachusetts  02110-3333

20   For Ad Hoc Noteholders          GERALD BENDER, ESQ.
       Committee:                    Stroock, Stroock & Lavan
21                                   180 Maiden Lane
                                     New York, New York  10038
22
     For THLE Equity                 JOSEPH GLYNN, ESQ.
23     Advisors 5 LLC:               Weil, Gotshal & Manges
                                     767 Fifth Avenue
24                                   New York, New York  10153

25
                            (Appearances continue on next page.)
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3     APPEARANCES CONTINUED:

 4     For Forex Capital         DOUGLAS L. FURTH, ESQ.
         Markets, LLC:           Golenbock, Eiseman, Assor, Bell &
 5                                   Peskoe, LLP
                                  437 Madison Avenue
 6                                New York, New York  10022

 7     For Mr. Grady and         LAWRENCE J. KOTLER, ESQ.
         Mr. Sherer:             Duane, Morris & Hechscher, LLP
 8                                4200 One Liberty Place
                                  Philadelphia, Pennsylvania  19103
 9

10     For Dennis Klejna:        MATTHEW R. GOLDMAN, ESQ.
                                  Baker & Hostetler LLP
11                                3200 National City Center
                                  1900 East Ninth Street
12                                Cleveland, Ohio  44114-3485

13     For Lead Plaintiff and    MICHAEL S. ETKIN, ESQ.
         Prospective Class:      Lowenstein Sandler, PC
14                                65 Livingston Avenue
                                  Roseland, New Jersey  07068
15

16

17

18

19

20
       Court Transcriber:        RUTH ANN HAGER
21                                TypeWrite Word Processing Service
                                  356 Eltingville Boulevard
22                                Staten Island, New York 10312

23

24

25

       Proceedings recorded by electronic sound recording,
       transcript produced by transcription service
```

1                        UNITED STATES BANKRUPTCY COURT
                         SOUTHERN DISTRICT OF NEW YORK
2

3                               I N D E X

4
                                                        Further
5    Witness              Direct    Cross    Redirect   Recross   Redirect

6    DEBTOR:

7    David Pauker          41

8
                              E X H I B I T S
9
                              Description              ID      EV
10   DEBTOR:

11   A        Terms of Plan of Disribution            46      47

12   B        Summary of Creditor Dispute             50      51
13

14

15

16

17

18

19

20

21

22

23

24

25

5

1   (Proceedings began at 10:10 a.m.)

2               THE COURT:  Okay.  Please be seated.  All right.

3   Refco, Inc.

4               MR. ST. CLAIR:  Good morning, Your Honor.

5               THE COURT:  Good morning.

6               MR. ST. CLAIR:  Greg St. Clair, Skadden, Arps,

7   Meagher & Flom on behalf of the Refco debtors.

8               Also in the courtroom with me this morning, Your

9   Honor, is Mr. J. Gregory Milmoe and Sally Henry, my partners at

10  Skadden.  As well, we have Jay Golden and David Hocker, which I

11  believe are both familiar to the Court.

12              Your Honor, before we get to confirmation, there

13  are a couple of other things on the docket that we probably

14  ought to go through.  The first matter, Your Honor, was the

15  Debtor's application for an order to employ Sonnenschein as

16  special counsel to represent the debtors in connection with

17  [inaudible] litigation.  Sonnenschein is representing nondebtor

18  affiliates in connection with some -- an arbitration in

19  Illinois with Cantor Associates.  We're going to bring them in

20  to also represent the debtors in connection with claims

21  litigation with Cantor.  There haven't been any objections to

22  the application and we'd ask that the Court enter the order.

23              THE COURT:  I will approve that application.

24              MR. ST. CLAIR:  Thank you.

25              Second on the doctor, Your Honor, was the

6

1   Debtor's fifth omnibus motion for an order seeking to reduce

2   disputed litigation claims.  This was for purposes of voting in

3   connection with the plan.  There were no objections to the

4   motion, and so we would ask that the Court grant that order as

5   well.

6           THE COURT:  All right.  And so it allowed them as

7   a claim for voting purposes without the dollar amount?

8           MR. ST. CLAIR:  That's correct, Your Honor.

9           THE COURT:  All right.  I will grant that motion.

10           MR. ST. CLAIR:  Thank you.

11           MR. DESIENO:  Good morning, Your Honor.

12           THE COURT:  Good morning.

13           MR. DESIENO:  Tim DeSieno from Bingham,

14   McCutchen, the RCM Chapter 11 Trustee.

15           This next motion is effectively the same --

16   excuse me, effectively the same as Mr. St. Clair has

17   characterized their voting motion.  This is our motion to seek

18   to have the claims allowed -- [mike squeals] excuse me.  I'm

19   unsure if I'm dancing wrong -- claims allowed at zero for

20   voting purposes as well.  And we understand that these claims

21   were actually counted.  A number of them were counted because

22   3018 motions were filed and that there is no voting

23   consequence.  Nevertheless, we would ask that the Court enter

24   this order on the same basis.

25           THE COURT:  Well, except insofar as there's an

7

1   unopposed 3018 motion?

2                MR. DESIENO:  Exactly.  We did not oppose the

3   3018 motion.

4                THE COURT:  Okay.  So to the extent that no one

5   opposed this motion either directly or by filing a Rule 3018

6   motion, I'll grant this motion.

7                MR. DESIENO:  Very well.

8                MR. ST. CLAIR:  The next matters on the docket,

9   Your Honor, are the 3018 motions that were filed in connection

10  with plan confirmation.  We did not oppose any of the 3018

11  motions that were filed, and included those ballots.  They were

12  not material and did not affect the voting, so we have no

13  reason to oppose those.

14               THE COURT:  All right.  In light of that, I'll

15  grant each of those motions.

16               MR. ST. CLAIR:  Thank you, Your Honor.

17               Now, we would turn to confirmation of the

18  modified plan reorganization.  Before we go into the

19  evidentiary portion, Your Honor, I thought it might be helpful

20  to the Court to be able to walk through the status of the

21  various objections that have been filed and the resolutions

22  that we have to those objections so we can focus on what's live

23  when we go to the testimony, if that's all right with the

24  Court.

25               THE COURT:  Okay.

8

1          MR. ST. CLAIR:  Your Honor, the first settlement

2    that we would like to make the Court aware of is not on the

3    objection chart that we filed, and that's because this

4    settlement occurred on the eve of the date that the objections

5    were due to be filed.  This, Your Honor, is the settlement with

6    the Ad Hoc Equity Committee in the Refco, Inc. case.

7          As the Court's aware, this committee has been

8    extremely active in its cases and have been tireless advocates

9    for the proposition that there's value for shareholders at the

10   Inc. level.  The debate has centered at various times in the

11   cases on the value of the causes of action that Inc. may or may

12   not have which are being attributed to the trust versus the

13   value of the other debtors' causes of action.

14          Your Honor, one of the considerations in settling

15   this from the plan proponent's perspective was the potential

16   enormous cost to litigate these issues, the delay to any chance

17   to confirm plans in these cases, and most importantly the

18   potential to really damage to the extent there are value of

19   causes of action there to damage the value of those causes of

20   action, which would be detrimental to all the creditors in

21   these estates.

22          So ultimately we in the Ad Hoc Committee agreed

23   that although precise estimation of these potential recoveries

24   was impossible and unnecessary, to minimize the cost and

25   maximize the value to all the creditors of this estates we

9

1    agreed to a settlement.

2             Your Honor, the settlement which is as follows,

3    the holders of old equity in this class, which are the

4    shareholders in the 510(b) subordinated debt are allowed to

5    participate --

6             THE COURT:  Well, is it the 510(b) subordinated

7    debt or subordinated equity, right?

8             MR. ST. CLAIR:  I'm sorry, Your Honor.  That's

9    right.  It's subordinated equity.

10            THE COURT:  Okay.

11            MR. ST. CLAIR:  Are able to participate in the

12   litigation trust by agreeing not to compete with the litigation

13   trust with respect to nonestate litigation.  And they effect

14   that by transferring any private actions they have to the

15   private action trust.  We think this enhances the value of both

16   trusts for the benefit of all the beneficiaries.

17            In return, they're allowed a claim on behalf of

18   old equity in the amount of 3 percent of the first 500 million

19   dollars of any recoveries from the trust jointly, 7-1/2 percent

20   of the amount of any recoveries from 500 million to a billion

21   dollars of recovery, and 15 percent of any recoveries in excess

22   of a billion dollars.

23            The election by anyone in the old equity class to

24   participate is voluntary.  If they elect in, they get to share

25   in that traunch.  If they don't, they get no distributions from

10

1    the estate.

2             And finally, Your Honor, the Ad Hoc Equity

3    Committee's fees and expenses during the case up to a cap of

4    1.5 million will be paid by the estate as an administrative

5    expense.

6             We've incorporated the terms of the settlement in

7    the modified plan that we filed with the Court, I believe it

8    was December 4th, to the various provisions and we put

9    provisions of the confirmation order to affect it as well.

10            THE COURT:  Is the payment subject to an

11   application being made and the ability of the debtor to object

12   as set forth in the plan?

13            MR. ST. CLAIR:  That's correct, Your Honor.

14            THE COURT:  Okay.

15            MR. ST. CLAIR:  That's correct.

16            THE COURT:  And that would resolve the Ad Hoc

17   Committee's plan objection?

18            MR. ST. CLAIR:  They never filed the objection,

19   but it certainly resolved the objections they've been stating

20   all along.

21            THE COURT:  Okay.

22            MR. ST. CLAIR:  Okay.  All right.  Your Honor, on

23   to the objection chart.  First objection is the objection filed

24   by West Loop Associates.  Your Honor, we have resolved that

25   objection as of early this morning and the resolution generally

11

1    is -- well, specifically is that West Loop will be allowed a

2    claim against the LLC estate in the amount of 3.75 million

3    dollars.  Important to this settlement is that we are able to

4    submit a stipulation to the Court, hopefully this afternoon, in

5    the LLC case to allow that claim and permit payment of the

6    claim on the effective date of the claim.

7              THE COURT:  I -- so this is different than what's

8    set forth in the black line of the proposed confirmation order?

9              MR. ST. CLAIR:  That's correct, Your Honor.

10             THE COURT:  The confirmation order says that West

11   Loop will be paid solely by the estate of Refco Group Limited

12   3.57 million.

13             MR. ST. CLAIR:  That's correct, Your Honor.

14   It's -- the payment mechanism has changed.

15             THE COURT:  Okay.

16             MR. ST. CLAIR:  It's now going to be in an

17   allowed claim against LLC for 3.57 million.

18             THE COURT:  Okay.  And no other claims against

19   any of the other debtors?

20             MR. ST. CLAIR:  In addition, there will be a

21   claim against RGL in the amount of 20 million dollars, the

22   distribution from which will only be the litigation trust

23   interests would have been allocated to that claim.  There will

24   be no cash payments out of the RGL estate.  The cash will come

25   only from LLC.

12

1          THE COURT:  Okay.

2          MR. ST. CLAIR:  And then those --

3          MR. KIRPALANI:  Your Honor, Susheel Kirpalani of

4    the Official Committee of Unsecured Creditors from Milbank,

5    Tweed, Your Honor.  With respect to the West Loop settlement,

6    actually the machinations for how it is going to be settled are

7    extraordinarily complex for a dollar amount that size, but if

8    you understand the macro issue, it will be pretty easy to

9    follow.

10         Under the plan, no cash can be paid to a general

11   unsecured creditor of Refco Group until the senior subordinated

12   note distribution is made.  That is not intended to be made in

13   full by the effective date, so we have a potential plan

14   violation and plan support agreement violation.

15         In light of that, it'd have to be structured in a

16   different way, and the structure is which is supported by fair

17   consideration and given that the claim was filed against LLC

18   and this is paid by LLC at Mr. Togut's discretion in

19   satisfaction of that claim, but the problem is if, in fact, it

20   were just paid out of LLC with no further mechanics, as money

21   would flow up from LLC to the contributing debtors indirectly

22   the cost of that settlement would be borne half by the RCM's

23   side and half by the contributing debtor's side.  That's

24   unacceptable to RCM constituents, because their view is this is

25   solely an RGL side liability.

13

1          So in order to further effectuate this

2   settlement, which we will work on in the next several hours, we

3   will provide that.  The cash will be paid by LLC.  After --

4   upon the first money flowing up to the contributing debtors

5   from LLC on account of a claim or whatever the distribution is

6   determined to be appropriated by the Court, provided that

7   distribution is available, meaning the senior subordinated note

8   distribution has been paid out, so the first money that could

9   actually go to the contributing debtors general unsecured

10  debtors or RCM, one half of that, RGL's half, will be turned

11  over to the RCM estate to true them up to make sure that they

12  bore no cost of the 3.75 million dollar settlement.

13          In consideration for that mechanic, the

14  litigation trust interest that would issue from RGL to West

15  Loop have been agreed by West Loop to be reassigned to RGL

16  unsecured creditors for sharing litigation trust interests only

17  among the contributing debtors general unsecured creditors, so

18  that would be the mechanics.

19          THE COURT:  Okay.  So net net is really 3.57

20  million going to West Loop?

21          MR. ST. CLAIR:  Net net West Loop is getting that

22  in hand, correct.  In lieu of FXCM interests and litigation

23  trust interests, they won't be keeping any of those.

24          THE COURT:  Okay.  Why don't you let West Loop's

25  counsel confirm that.

14

1          MR. LAZAR:  I would just also add, Your Honor,

2   that part of the consideration for the agreement is that the

3   payment is made on the effective date of the plan, so it's

4   important that that is approved by stipulation today so it can

5   be paid on the effective date.

6          THE COURT:  Okay.

7          MR. LEVINSON:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. LEVINSON:  Sid Levinson for West Loop.  We

10  had -- I mean, the settlement that we had reached had been set

11  forth in the order that -- the proposed order that you

12  submitted and, you know, I found out this morning that they

13  wanted to apply a different structure.

14          Essential to us is because it's settling our plan

15  confirmation objections is that the essential term, i.e., that

16  we're going to get paid 3.75 million dollars on the effective

17  date be approved in advance of the evidentiary hearing, because

18  that would obviously obviate at that point where our plan

19  objections would be, we wouldn't be pursuing those.  And so our

20  understanding is that Your Honor would approve it at this time

21  subj -- and to the extent there's a stipulation submitted and

22  they have certain mechanics, that's obviously between them.

23  That's of no concern of us as long as we get 3.75 million

24  dollars on the effective date.

25          THE COURT:  Okay.  Mr. Lazar, has Mr. Togut

15

1  agreed to this?

2          MR. LAZAR:  Good morning, Your Honor.  Vince

3  Lazar on behalf of Mr. Togut.  Yes, he has, Your Honor.  As

4  you're aware, his office has been prosecuting the objection to

5  the West Loop claim at the LLC level for several months.

6  Mr. Ratner, who's been taking the laboring or is having a baby

7  as we speak, so --

8          THE COURT:  Well, he isn't, but his wife is.

9          MR. LAZAR:  Literally taking the laboring or.

10  [Laughter.]

11          THE COURT:  Okay.

12          MR. LAZAR:  However, irrespective of the plan

13  confirmation, Mr. Togut would have been very comfortable with

14  the settlement.  It's approximately 5 percent of the amount

15  claimed, and the legal expenses and time that was being

16  consumed addressing this claim certainly would justify

17  independent of the plan confirmation issues settlement in this

18  range.

19          The mechanical issue that Mr. Togut needs to deal

20  with is, as you know it's a Chapter 7 estate.  We have a claim

21  objection pending and what we would need to do in order to pay

22  cash to West Loop prior to the effective date is a stipulation

23  or order permitting Mr. Togut both to resolve the claim for

24  3.75 million and to pay it now.

25          THE COURT:  Okay.  All right.  Well, I am quite

1    familiar with the claim issues raised by West Loop both against

2    RGL, as well as the LLC estate.  And separate and apart from

3    West Loop's plan objection, it's clear to me based on my

4    research in preparing for the trial on the claim objection that

5    this is a fair settlement to the [electronic interference

6    through microphone] --

7                    MR. LAZAR:  That one's mine, Judge.

8                    THE COURT:  Okay.  To the estates.  In

9    particular, the claim raised interesting issues about the

10   appropriate cap, but more on a lease termination claim when

11   there was also potentially a separate fraud involved, but more

12   importantly the claim was also asserted against LLC, which was

13   the prime occupant of the space.

14                   MR. LAZAR:  That's correct.

15                   THE COURT:  So I think this is a fair settlement

16   and I would be -- I'm ready to approve it and it, in effect, I

17   think represents a fair settlement of payment in full and that

18   certainly explains why the plan objection would be withdrawn,

19   too.

20                   MR. LAZAR:  Yes.  And, you know, the estate of

21   the case, as Your Honor is aware, we've been -- we have a

22   separately administered estate as the U.S. Trustee and CFDC

23   have insisted.  And while we're not a part of this plan, we

24   certainly are supportive of the global plan process and we're

25   continuing to move forward.  With the resolution of the West

17

1   Loop claim and the class proof of claim recently, we are likely

2   in a position where with the exception of a large inter-company

3   claim, the claims of the other debtors and claims that were

4   assigned under the plan against LLC upon the resolution of

5   those claims we will likely be in a position to send money up

6   and fund the plan.

7            THE COURT:  All right.  Well, my understanding,

8   again based on the record of this case, is that LLC is in all

9   likelihood solvent.  Given that fact and again given my

10  familiarity with the issues raised by the claim and the claim

11  objection, again I find that that settlement is reasonable for

12  the LL estate, as well as the RGL estate obviously and that an

13  intermediate distribution is appropriate given the nature of

14  LLC's resources.

15           MR. LAZAR:  Thank you.  Your Honor, what we'll do

16  is prepare rather than a stipulation, because I don't know who

17  the stipulating parties would be, I think an order simply

18  resolving the claim objection and authorizing payment of that

19  claim of that amount.

20           THE COURT:  All right.  I think that given the

21  structure outlined --

22           MR. LAZAR:  I will, Your Honor --

23           THE COURT:  -- by Mr. Kirpalani, you can -- you

24  know, you may want to do it as part of that document.

25           MR. LAZAR:  I think that is at the Chapter 11

18

1    level as part of the plan.  We just need a simple order --

2                    THE COURT:  Okay.

3                    MR. LAZAR:  -- for the Chapter 7 case.

4                    THE COURT:  All right.  That's fine.  That's

5    fine.

6                    MR. LAZAR:  Thank you.

7                    MR. LEVINSON:  And the one thing we want to make

8    sure it's in the order is the requiring of the payment by the

9    effective date.

10                   THE COURT:  Right.

11                   MR. LEVINSON:  Thank you, Your Honor.

12                   MR. BENDER:  With respect to -- Gerald Bender,

13   Stroock, Stroock & Lavan on behalf of the Ad Hoc Noteholders

14   Committee.  Just one brief comment.  As Mr. Kirpalani

15   explained, there are a lot of machinations that went into

16   making that settlement work, and one of those was to ask the

17   noteholders who's supposed to get the first money out of LLC to

18   defer to this payment, which we were happy to do in the spirit

19   of compromise.

20                   The noteholders have asked, though, and we've

21   been asking this for quite awhile and we've got a little bit of

22   color.  I'd like to get more color from the debtor and from the

23   LLC as to when -- and the rest of the funds or some portion of

24   those funds will be distributed up to the other debtor so that

25   the noteholders can get paid.  The biggest issue, as you can

1    imagine for them, is when they get paid, presumably everything

2    goes well today.  And I'd like to get some indication from the

3    parties who asked to resolve that to find out when that will

4    happen.  Thank you.

5             MR. LAZAR:  Your Honor, if you'd like me to

6    address that, as I was giving you a little bit of background

7    there before, you know, with the resolution of this claim,

8    which is north of 60 million dollars and some of the other

9    large claims, the only material impediment to making a

10   distribution under -- you know, on account of the claims that

11   are being asserted by the other debtors are the claims

12   themselves.  The claims asserted by the other debtors and/or

13   claims that are being assigned to the trust under the plan are

14   several billion dollars in face amount, and we simply need to

15   resolve those claims in order to ensure that the estate has

16   enough money to pay other creditors in full.

17            We are evaluating those claims and we've been

18   working with the financial advisors working and I would hope

19   that within a relatively short window, 30 days or so, we could

20   be back before Your Honor with a resolution of those inter-

21   company claims and a motion to pay creditors in our case.

22            THE COURT:  Okay.  All right.  So I guess

23   conceivably the structure of Mr. Kirpalani outlined could be

24   viewed as amending or modifying the plan, but in light of the

25   amount involved, the ability of the LLC trustee separately to

20

1    settle claims against his estate, I don't view it as a material

2    modification, so there would not in my mind need to be any sort

3    of resolicitation in connection with it.

4                    MR. ST. CLAIR:  All right.  Thank you, Your

5    Honor.  The next objection that was filed was filed by Russia

6    Growth Fund Limited and I believe -- I believe that's been

7    resolved.

8                    THE COURT:  Okay.

9                    MR. CLARK:  Your Honor, Jared Clark, Bingham

10   McCutchen on behalf of the RCM Trustee.  Russia Growth has

11   resolved its plan of protection on the following terms.  Russia

12   Growth will withdraw its plan objection.  It will withdraw with

13   prejudice its administrative expense claim.

14                   And then with respect to Russia Growth's proofs

15   of claim, Claim Number 11440 will be allowed in the amount --

16   will be allowed in the amount of 4.35 million dollars as the

17   securities customer claim as that term is defined under the RCM

18   settlement agreement.  Claim Number 11438 will be classified

19   solely as a related claim as that term is defined in the plan

20   and all other proofs of claim filed by or on behalf of Russia

21   Growth are withdrawn with prejudice.  This is the agreement

22   that we reached with Russia Growth and I have a stipulation

23   that I can hand up.

24                   THE COURT:  As far as the treatment of the first

25   claim is that something that the RCM trustee was prepared to do

21

1    anyway?

2                    MR. CLARK:  Yes, RCM -- and it's reflected in the

3    stipulation that the RCM trustee had considered the factors in

4    the RCM settlement agreement and the Bankruptcy Code and has

5    determined that the treatment of the claim is appropriate as a

6    securities customer.

7                    THE COURT:  As I recall, he was -- he had -- he

8    had made that available anyway beforehand, right?

9                    MR. CLARK:  Correct.

10                    THE COURT:  And similarly with the other claim

11    the debtors were prepared to the related claim?

12                    MR. CLARK:  The related claim is just as against

13    RCM.

14                    THE COURT:  Okay.

15                    MR. CLARK:  The Russia Growth did file --

16                    THE COURT:  So both -- as far as that claim is

17    concerned, RCM was -- the trustee was -- is prepared to endorse

18    that also?

19                    MR. CLARK:  He's prepared to endorse solely the

20    classification as a related and so subordinated claim.

21                    THE COURT:  But not the amount?

22                    MR. CLARK:  Not -- not the amount, correct.

23                    THE COURT:  Okay.  All right.  And you were

24    authorized to say that by Russia Growth?

25                    MR. CLARK:  I was authorized to hand up

22

1   stipulation that reflects this signed by both counsel, by

2   myself and Russia Growth's counsel.

3                    THE COURT:  Okay.

4                    MR. ST. CLAIR:  Your Honor, I need to make one

5   classification with respect to the 3018 motions that I

6   addressed earlier.  I think as this court is aware with respect

7   to PlusFunds, they had filed a 3018 motion but that claim has

8   been settled by an order in this court and, as a matter of

9   fact, Judge Peck has approved that settlement this morning as

10  well.  So the 3018 motion --

11                   THE COURT:  Right, it's moot, then, I guess.

12                   MR. ST. CLAIR:  It's moot.  That's correct.

13                   THE COURT:  Okay.  All right.

14                   MR. ST. CLAIR:  The next objection, Your Honor,

15  is the lead plaintiffs in the securities action.  With respect

16  to that objection, they raise several issues, one of which was

17  the breadth of the releases contained in the plan.

18                   We've added language to the confirmation order in

19  paragraph 38, which clarifies defense -- certain defendants

20  that aren't being released by the class action plaintiffs and

21  that satisfies that issue.

22                   THE COURT:  Okay.  Can I --

23                   MR. ST. CLAIR:  I believe --

24                   THE COURT:  I'm sorry, on that point, that's the

25  language that there was in the black line order that I got?

23

1          MR. ST. CLAIR:  That's correct, Your Honor.

2          THE COURT:  Okay.

3          MR. ST. CLAIR:  And with that, I believe they're

4    willing to withdraw that objection and confirmation, but still

5    have several other live objections that we'll have to address.

6          THE COURT:  Okay.  Why don't we let Mr. Etkin

7    confirm that?

8          MR. ETKIN:  Yes, Your Honor.  Michael Etkin on

9    behalf of the lead plaintiffs.  Mr. St. Clair is correct.  With

10   the last change to the proposed confirmation order, which

11   tweaked the original language a bit, we're comfortable with

12   that.

13          We, for the record, are also withdrawing our

14   objections with respect to the 510(b) noteholder litigation

15   claims.  So the only objection that we're going to be pursuing

16   today, which has not been resolved, is the 1123(a)(4) objection

17   as it relates to the Class A treatment.

18          THE COURT:  Okay.

19          MR. GLYNN:  Good morning, Your Honor.  Joseph

20   Glynn, Weil, Gotshal & Manges on behalf of THLE Equity Advisors

21   5 LLC.  We don't oppose the inclusion in the order of the

22   release of the clarification language of lender lessee.  Our

23   only concern is that the inclusion of that reservation doesn't

24   act to the exclusion of other reservations that were previously

25   included in the --

24

1          THE COURT:  It's just a reservation, so --

2          MR. GLYNN:  -- early [inaudible] -- we just

3    wanted to make that point, Your Honor.

4          THE COURT:  All right.

5          MR. GLYNN:  Thank you.

6          THE COURT:  Fine.

7          MR. ST. CLAIR:  The next objection filed, Your

8    Honor, was with respect to Forex Capital Markets.  We've

9    reached a resolution of that objection this morning early.

10   Part of the objection they raised was that the mergers that

11   were to take effect on the effective date of the plan they

12   argued triggered a right of first refusal with respect to the

13   LLC interests.

14          We've changed the plan and I believe the black

15   line that we sent over last night shows that the Section 5.1,

16   the trustee of the plan administrator, has vested with

17   discretion to take such corporate steps to merge or dissolve

18   company's post-effective date as he deems necessary, but it's

19   not automatic bond effective date.

20          So to the extent the merger occurs post-effective

21   date and they want to raise the -- that creates an issue that

22   triggers the right of first refusal that they still have the

23   ability to do that when it happens.

24          THE COURT:  Okay.

25          MR. ST. CLAIR:  We've also agreed that we will

1  give the 20 days' notice of any merger of proof prior to the

2  merger, so they can address the -- any rights they think they

3  have to a first refusal.

4                    THE COURT:  Any merger or group with --

5                    MR. ST. CLAIR:  Any merger or group with anyone.

6                    THE COURT:  Okay.

7                    MR. ST. CLAIR:  In addition, Your Honor, we've

8  agreed to put on the record that we agree that nothing in the

9  plan, including Section 10.2(b) of the plan, shall impair the

10 right of the FXCM sellers from arguing that they are entitled

11 to an equitable remedy of recession of RGL's purchase of the

12 FXCM equity estate provided, however, any actions seeking such

13 a remedy will be heard by this court unless this court permits

14 them to bring the action in such other form.  And we've agreed

15 to that, Your Honor.

16                    THE COURT:  Okay.  Does that reflect your

17 client's agreement, Mr. Furth?

18                    MR. FURTH:  Yes.  It's an accurate statement and

19 we agree with -- our understanding is that those agreements

20 will be reflected in the confirmation order.

21                    THE COURT:  Okay.

22                    MR. ST. CLAIR:  The next objection, Your Honor,

23 was the objection filed by Joseph Murphy and that objection is

24 being withdrawn with -- we read this language into the record,

25 Your Honor.  "It's confirmed that the single distribution

26

1  language in Section 6.4 of the plan applies to those claims

2  that fall within our definition in the plan of related claims.

3          To the extent a creditor has more than one claim

4  against the debtors or RCM, the creditor may assert each of

5  those claims independently.  If the claims arise under separate

6  legal rights against the debtor and are claims that are

7  independent of each other and do not fall within the definition

8  of related claims."

9          THE COURT:  And where does that language appear?

10          MR. ST. CLAIR:  This --

11          THE COURT:  Or where is it going to appear?

12          MR. ST. CLAIR:  If we were just to put this on

13  the record of the hearing today and --

14          THE COURT:  Okay.

15          MR. ST. CLAIR:  -- affirm that that's our

16  understanding of how the plan works.

17          THE COURT:  All right.  Okay.  Mr. Murphy or his

18  counsel here?

19          MR. ST. CLAIR:  Mr. Jerome is here for

20  Mr. Murphy.

21          MR. JEROME:  Correct, Your Honor.

22          THE COURT:  Does that -- that reflects the

23  agreement?

24          MR. JEROME:  That's fine, Your Honor.

25          THE COURT:  Okay.  Thank you.

27

1          MR. ST. CLAIR:  Next, Your Honor, was the

2     objection filed by Revive Limited.  And again, we've resolved

3     that objection and it will be withdrawn if we put the following

4     statement on the record.

5          Revive has authorized Refco FX to advise the

6     Court on its behalf that it has withdrawn its objection to the

7     proposed plan because Revive and Refco FX have reached a

8     settlement in principal subject to approval by this court when

9     documented and presented that will resolve the particular

10    constructive trust and other such claims that Revive has.

11         Revive is and withdrawing its objection further

12    relying on the representations made by Refco FX in its

13    confirmation brief, which Refco FX has undertaken to confirm on

14    the record of this hearing that the plan is not intended to and

15    does not, in fact, prejudice or impair in any way the rights

16    that Revive and other similarly situated customers of Refco FX

17    currently have to pursue claims to funds on deposits in an

18    account in Toyko that have not been determined to be part of

19    the estate of Refco FX and therefore are not currently subject

20    to distribution under the plan.

21         Thus, Revive understands and Refco FX confirms

22    that this is correct that absent consummation of the

23    contemplated settlement, Revive and other similarly situated

24    will be in the same position with respect to their claims

25    against the funds on deposit with the account in Toyko as if

28

1    the plan had not been confirmed.

2            Speaking on behalf of Refco FX, I would like to

3    add the revised engagement with the debtor, the Chapter 11 case

4    and this plan confirmation process has been highly constructive

5    and has led to a contemplated settlement which if consummated

6    will avert further litigation that whatever the outcome would

7    prove costly to the debtors and which if Revive prevailed would

8    have a materially adverse impact on creditor recoveries.

9            And with that statement, Revive has agreed to

10   withdraw its objection to confirmation.

11           THE COURT:  Okay.  Wasn't there some other

12   creditor that wanted to be involved in negotiating the ultimate

13   outcome if there is a negotiated solution of the Japanese

14   account dispute?

15           MR. ST. CLAIR:  There was, Your Honor, and that

16   was the Hillier Capital Management and New York Financial.

17           THE COURT:  Okay.

18           MR. ST. CLAIR:  And we will address that in

19   second.

20           THE COURT:  Okay.  All right.  All right.  Is --

21   does what was just read on the record reflect Revive's

22   agreement if they're here?

23           MR. ST. CLAIR:  I believe Revive's counsel is in

24   Singapore.

25           THE COURT:  All right.  But you were authorized

29

1    to say this?

2                    MR. ST. CLAIR:  I was authorized to read that

3    into the record.

4                    THE COURT:  Okay.

5                    MR. ST. CLAIR:  The next objection, Your Honor,

6    was filed by Interactive Data Corporation.  That objection also

7    is being withdrawn with the statement on the record.  The

8    statement is that --

9                    THE COURT:  I'm sorry.  Whoever is on the phone

10   and it's not on mute, you need to mute it because we're hearing

11   your rustling.

12                   You can go ahead.

13                   MR. ST. CLAIR:  Your Honor, notwithstanding

14   Section 7.1 of the plan reorganization, neither entry of the

15   confirmation order nor the occurrence of the effective date

16   shall cause to be rejected the executory contracts identified

17   in the motion of Interactive Data Corporation to deem certain

18   executory contracts with the Debtor assumed and assigned to

19   Mann Financial.

20                   The status quo will be preserved pending the

21   adjudication of that motion.  In the event the Bankruptcy Court

22   by final nonappealable order denies the relief requested in the

23   motion, the contracts will be deemed to be rejected as of the

24   effective date of the plan.

25                   THE COURT:  Okay.

30

1          MR. BILOWZ:  Your Honor, good morning.  This is

2    Peter Bilowz on behalf of Interactive Data.  That's a correct

3    statement.

4          THE COURT:  All right.  Very well.

5          MR. BILOWZ:  Thank you.

6          THE COURT:  Thank you.

7          MR. ST. CLAIR:  The next objection was filed by

8    American Financial International Group.  That objection is

9    being withdrawn, Your Honor, with our confirmation on the

10   record that only nondebtor parties are receiving releases in

11   connection with these released parties, the only people being

12   released other than released parties contributing nondebtor

13   affiliates and contributing nondebtor affiliate management.

14   These are defined in the plan.

15          Other than that, there are no nondebtor releases.

16          THE COURT:  Okay.

17          MR. ST. CLAIR:  I'm reminded that post-petition

18   management is being released.  Certainly they have the

19   exculpation clause.  I believe they're defined as a release

20   party as well.

21          THE COURT:  All right.  Well, that wasn't

22   there -- the objectant's concern.

23          MR. ST. CLAIR:  That was not their focus, Your

24   Honor.

25          THE COURT:  Okay.

31

1          MR. ST. CLAIR:  The next objections, Your Honor,

2     were filed by Gerald Sherer and Steven Grady.  These are the

3     same objections that were filed by Dennis Pledgna [Ph.] and

4     William Sexton.  We've resolved all those objections by putting

5     language in the confirmation order, which is now in paragraph

6     34, which confirms again our understanding of how 6.4 of the

7     plan works and now they have separate independent claim based

8     on different legal obligations.  6.4 doesn't eliminate those

9     claims.  They're not related claims.

10          We're also confirming that we're not doing

11     anything in the plan and we don't intend to do anything in the

12     plan that expands the right to subordinate claims beyond that

13     which is contained in the Bankruptcy Code in Section 510.  And

14     with those additions to the confirmation order, they're going

15     to withdraw the objection.

16          THE COURT:  And again, these are the additions in

17     the black line that I got, I guess, this morning?

18          MR. ST. CLAIR:  I believe these additions were --

19     were they in this morning's version?

20          MALE SPEAKERS:  Yes.

21          MR. ST. CLAIR:  They were in this morning's

22     version.

23          THE COURT:  Okay.  All right.

24          MR. KOTLER:  Your Honor, I'm sorry to -- Lawrence

25     Kotler of Wayne Morris.  I represent Mr. Grady and Mr. Sherer.

32

1   I have been travelling and I have not had an opportunity to

2   look at the black line order.  Could I just take a quick look

3   to confirm Mr. St. Clair's representations?

4                THE COURT:  Okay.

5                MR. GOLDMAN:  Your Honor, Matthew Goldman, Baker

6   & Hostetler.  I'm counsel for Dennis Klejna.  I did receive the

7   order which came in last night.  Mr. St. Clair neglected one

8   additional provision, which deals with the claim injunction not

9   prohibiting coverage to -- the language which was circulated

10  last night and filed last night is accurate and [inaudible]

11  objection as resolved [inaudible].

12               THE COURT:  Okay.  That's the language dealing

13  with the insurance?

14               MR. KOTLER:  Yes.

15               THE COURT:  Okay.  All right.

16               MR. ST. CLAIR:  Shall we move forward?

17               THE COURT:  Right.  Just if you -- just before

18  counsel's done you can let me know whether that language

19  satisfies it.

20               MR. KOTLER:  Thank you, Your Honor.

21               THE COURT:  Okay.

22               MR. ST. CLAIR:  Your Honor, the next objection

23  was filed by Hillier Capital Management and New York Financial.

24  We resolved this, Your Honor, by agreeing that on the effective

25  date of the plan, the RCM estate will pay to the FX estate two

33

1    million dollars for the benefit of the general unsecured

2    creditors of FXA.

3                In addition, New York Financial whose asserted

4    claims against FXA won't be allowed a general unsecured claim

5    in the amount of 3.5 million dollars.

6                We've also agreed, Your Honor, that we will

7    form --

8                THE COURT:  Against FXA?

9                MR. ST. CLAIR:  Against FXA.

10               THE COURT:  Okay.

11               MR. ST. CLAIR:  An unsecured claim against FXA.

12   We've also agreed that we will form a committee of non-Japanese

13   FXA creditors, which New York Financial will share and Hillier

14   Capital Management will serve on that will oversee the

15   litigation that the FXA estate has brought against the funds in

16   the KKJ Japan account in Toyko.

17               The committee will have rights to approve the

18   terms of any settlement of that litigation and the committee's

19   fees and expenses will be borne by the FXA estate going

20   forward.

21               Finally, Your Honor, we --

22               THE COURT:  I'm sorry, so how does that relate to

23   the agreement with Revive?  Is it something they'll have a

24   chance to analyze?

25               MR. ST. CLAIR:  They will have a chance to

34

1    analyze.  That's correct.  To the extent there's any settlement

2    with the creditors of Revive, the creditors on this committee

3    will be the ones that are negotiating.  In fact, that

4    settlement and will have approval of settlement.

5                    THE COURT:  Okay.  All right.

6                    MR. ST. CLAIR:  We've also agreed, Your Honor, to

7    allow --

8                    THE COURT:  And I'm sorry.  Just to go back a

9    second.  The allowed claim by New York Financial, what relation

10   does that bear to their account balance?

11                   MR. ST. CLAIR:  I believe they had an account

12   balance.  They asserted at one point that their account balance

13   was over 5.5 million dollars because of trading.  We think on

14   the petition date, which is the date I believe we're choosing

15   to settle that the right amount was 3.45 million, but it's

16   right in the middle of the range of the bid and ask on the

17   claims litigation.

18                   THE COURT:  Okay.  All right.  Very well.

19                   MR. ST. CLAIR:  With respect to the employees

20   objection, Mr. Klejna and Sexton, we also want to confirm the

21   last sentence that we added to the confirmation order that says

22   that their rights to set off and recoup much are preserved and

23   aren't impacted in any way by confirmation of the plan.  And

24   with that, I believe they withdraw their objections.

25                   THE COURT:  Okay.

35

1          MR. KOTLER:  Your Honor, it's Lawrence Kotler

2    again on behalf of Mr. Grady and Scharer.  That was actually

3    our request and with that language, we will now withdraw our

4    objection.

5          THE COURT:  All right.

6          MR. KOTLER:  Thank you, Your Honor.

7          MR. ST. CLAIR:  And with respect to New York

8    Financial and Hillier, Your Honor, we've also agreed that those

9    two parties will be entitled to reimbursement on the effective

10   date of the reasonable fees and expenses against the FXA estate

11   in the aggregate of no more than $200,000.00.

12         THE COURT:  In connection with this committee

13   work, right?

14         MR. ST. CLAIR:  No, Your Honor.  This would in

15   connection with representing the creditors to --

16         THE COURT:  Oh, in their --

17         MR. ST. CLAIR:  -- accomplish the two million

18   dollars --

19         THE COURT:  In their objection?

20         MR. ST. CLAIR:  That's correct, Your Honor.

21         THE COURT:  Okay.  All right.

22         MR. ST. CLAIR:  And then finally we have the

23   objection filed by PlusFunds Group, which was resolved and has

24   been withdrawn.

25         THE COURT:  Okay.

36

1        MR. ST. CLAIR:  That, Your Honor, I believe takes

2   care of all the objections that we received and the changes

3   we've made to the plan and disclosure statements to -- in an

4   attempt to incorporate those settlements, Your Honor.  We

5   believe that the modifications that we've made to the plan in

6   order to resolve those settlements are not material

7   modifications such that would require any resolicitation of the

8   plan, and we'd ask also that the Court so find that those are

9   now material and the solicitation is not necessary.

10        THE COURT:  Are you wrapping up this SPhinX one

11   in the PlusFunds?  I thought there was --

12        MR. ST. CLAIR:  Your Honor, the SPhinX Funds

13   objection is still a live objection.

14        THE COURT:  Okay.  All right.  So why don't you

15   list for me the ones that are live at this point?

16        MR. ST. CLAIR:  I believe at this point we have

17   the class action plaintiffs' objection.

18        THE COURT:  To the extent that it's still not

19   resolved, right?

20        MR. ST. CLAIR:  That's correct.  The SPhinX Fund

21   objection and since we've resolved Forex, I believe that's it.

22   I believe that's the only -- oh, that's correct.  Your Honor, I

23   believe last night or maybe as the night before there was an

24   objection filed by -- pro se by a Mr. McNeill [Ph.], which we

25   received by fax.

37

1          THE COURT:  All right.

2          MR. ST. CLAIR:  Who is also, you know, generally

3     urging the plan itself is not fair and he should be entitled to

4     get his account balances back.

5          THE COURT:  Okay.  That list corresponds to my

6     list.

7          Is there anyone else who has an objection to the

8     plan that was filed and I'm not -- it hasn't been listed on

9     those three?  Okay.  Fine.  Thank you.

10          MR. ST. CLAIR:  So with that, Your Honor, with

11     the Court's permission we'd like to move to the evidentiary

12     portion of the confirmation hearing.

13          THE COURT:  Okay.

14          MR. ST. CLAIR:  And for that I will turn it over

15     to my partner, Sally Henry.

16          MS. HENRY:  Good morning, Your Honor.  For the

17     record my name is Sally Henry.  I'm counsel to Refco, Inc., and

18     the other affiliated Chapter 11 debtors with the exception of

19     what has been called RCM.

20          You may recall, Your Honor, that in connection

21     with the pretrial order that was entered by the Court, we had a

22     pretrial hearing earlier in the week at which we went through

23     the exhibits that we would ask to move into evidence and gave

24     everyone an opportunity to attend that pretrial hearing and

25     raise any objections they had with respect to the exhibits.

38

1          A modified list setting forth demonstrative

2     material was filed last night and I'd like to walk through

3     those exhibits which we would like to move into the record.

4          Quite frankly, in light of the resolution of

5     objections --

6          THE COURT:  Do you have -- that list is in the

7     pile here somewhere, but if you have an extra copy, I would

8     appreciate it.

9          MS. HENRY:  Well, that's good, because it's not

10    in my pile.

11         THE COURT:  Oh.

12         MS. HENRY:  It's over there.

13         THE COURT:  All right.

14         MS. HENRY:  They're not material changes.

15         THE COURT:  Do you have another copy?

16         MS. HENRY:  I will bring back to you and I'm sure

17    we'll find another copy here.  If I may approach.

18         THE COURT:  That's fine.  Thanks.

19              [Pause in the proceedings.]

20         MS. HENRY:  You'll see, Your Honor, looking at

21    the exhibit list, which my colleagues are gathering for me

22    right now that, in fact, many of the particular exhibits

23    probably will not be that relevant in light of the fact that we

24    only have a few outstanding objections.  But as my colleagues

25    explained, many of these objections that were resolved were

39

1  only able to be resolved last night or in the early hours of

2  the moment -- morning.  One moment, please.

3            The first exhibit that I would move into

4  evidence, Your Honor, is the disclosure statement with respect

5  to the Chapter 11 plan.  That's been filed with the Court, I

6  think.

7            THE COURT:  Yeah, now that's -- it's part of the

8  record.

9            MS. HENRY:  No issue there.

10            THE COURT:  So that's --

11            MS. HENRY:  Yes.  Similarly with respect to item

12  number two, the disclosure statement, item number there, the

13  disclosure statement that is on Docket 3215, which has certain

14  modifications, the exhibits to the plan, which were filed on

15  Docket Number 3563, the modifications to the plan that were

16  filed in Docket Number 3685 to reflect the resolution of issues

17  for that Ad Hoc Creditors Committee -- I mean, Equity

18  Committee, the modified exhibits that were filed at 3688, the

19  liquidation analysis, which is Exhibit B to the plan, the

20  voting declaration and ballots filed at 3545, the RCM

21  settlement agreement previously filed in this case at 3688, the

22  plan support agreement, the settlement order filed at Docket

23  Number 94, the order clarifying the settlement order filed at

24  Docket Number 94, and in addition we have -- now we're getting

25  into more substantive stuff.

40

1          The expert report of Hoolihan Lokey, which is

2    filed together with all of its exhibits and appendices, that's

3    a report by Brad Gear, who is here in the courtroom, certain

4    inter-company transaction analyses that were performed, those

5    are Numbers 14 through 19, the Refco, Inc. prospectus dated

6    August 10, 2005; Refco, Inc. and affiliates plan class

7    estimates; the resumes of David Pauker, Brad Gear, Todd Brents,

8    and Louis Studny [Ph.].

9          In addition we have demonstrative exhibits which

10   I will be passing out that will summarize the testimony that

11   will be given.  The indenture with respect to Refco Finance

12   Holdings, LLC, the first supplemental indenture, the

13   declaration of Brad Gear of Hoolihan Lokey in support of the

14   modified plan, certain revised exhibits for the modified plan,

15   and plan Schedule 1.56 showing the contributing nondebtor

16   affiliate management.

17          I believe there are no objections to it.  We gave

18   everyone an opportunity under the pretrial order to object, to

19   consult, to meet and confer if there are any questions.

20          THE COURT:  Okay.  Hearing no objections and

21   based on my review of these documents, except for the

22   demonstrative ones, which we'll see in a second, I'll admit all

23   of these exhibits, except the demonstrative ones, which I

24   haven't seen yet.

25       WHEREUPON ALL DOCUMENTS WERE ADMITTED INTO EVIDENCE

David Pauker – Direct/Henry                    41

1          MS. HENRY:  That's --

2          THE COURT:  There was also filed I think recently

3  and not reflected on here a supplemental certification by the

4  balloting agent of Brian Osborne [Ph.].  I don't know if you

5  want that in or not, but it came in.  It was dated

6  December 14th.

7          MS. HENRY:  Yes, Your Honor, we would want that

8  in the record.

9          THE COURT:  Okay.  So that's in, too.

10         MS. HENRY:  Thank you, Your Honor.

11         With that, Your Honor, I would like to call to

12  the stand Mr. David Pauker.

13         THE COURT:  Okay.  It's the one empty seat.

14  [Laughter.]

15         MS. HENRY:  The thing is that when you're a

16  witness you get to have a seat.

17         THE COURT:  Well, it's not the only good thing,

18  but if you would raise your right hand, please.

19                  DAVID PAUKER, SWORN

20         THE COURT:  And could you spell your name for the

21  record?

22         THE WITNESS:  P-a-u-k-e-r.

23         THE COURT:  Okay.

24         MS. HENRY:  Good morning, Mr. Pauker.

25         THE WITNESS:  Good morning.

David Pauker – Direct/Henry                    42

DIRECT EXAMINATION

1    BY MS. HENRY:

2    Q.      Would you -- you've stated your name for the record.

3    Would you explain where you are employed, sir?

4    A.      I'm employed at Golden Associates, LLC.

5    Q.      And what is your position there?

6    A.      I am a managing director and a leader of the firm's

7    national restructuring practice.

8    Q.      For how long have you held that position, sir?

9    A.      I've been at Golden Associates for 17 years.

10   Q.      And in connection with that position have you done work

11   in connection with the estates of Refco, Inc. and certain of

12   its affiliates?

13   A.      Yes.  I have been this past year engaged as executive

14   vice-president and chief restructuring officer of Refco and its

15   affiliates.

16   Q.      And when did your engagement begun, roughly?

17   A.      Golden Associates engagement began in January.  I

18   assumed my responsibilities towards the end of February.

19   Q.      And in general what have your responsibilities

20   encompassed?

21   A.      I've been responsible for the day-to-day affairs of

22   Refco and its various affiliates and subsidiaries excepting

23   those which are currently being administered by bankruptcy

24   trustees under either Chapter 7 or Chapter 11.  With respect to

David Pauker – Direct/Henry                    43

1  the same entities I've been responsible for their restructuring

2  and plan related activities, including overseeing the

3  considerable investigatory activities undertaken by the debtors

4  in furtherance of claim development and plan negotiation.

5  Ultimately, all of Refco and its employees and consultants

6  report to me.  I, in turn, report to Harrison Golden, who's the

7  CEO of the company.

8  Q.    Now, sir, you mentioned a few moments ago the

9  investigatory activities that were undertaken in connection

10 with the formulation of the plan of reorganization.  Could you

11 describe for the Court what some of those activities were?

12 A.    Most of our investigatory activities involved extensive

13 reviews of matters relating to the company's inter-company

14 accounts.  The dealings between Refco and Refco Group and RCM

15 and their affiliates, I know that matters respecting these

16 accounts and their bonafides were frequently discussed in this

17 court, that the Court had admonished the debtor to make a lot

18 of progress on this, because it was every -- everyone's

19 understanding that absent some progress on these investigations

20 the parties wouldn't have sufficient information to undertake

21 serious plan and settlement discussions.  We engaged for these

22 purposes a team that included Jay Alex, it included FTI, it

23 included some people from my own firm, Golden Associates, as

24 well as members of Refco's accounting department, all of whom

25 had discrete and separate roles in the investigation.

David Pauker – Direct/Henry                    44

1    Over the course of that time, the so-called 2.1

2    billion dollar RCM treasury balance was extensively analyzed,

3    among other things.  We held a series of six in-depth meetings

4    with groups of creditors, sometimes all creditor

5    constituencies, sometimes separately to give them the

6    opportunity to be updated on our work, on our conclusions as

7    they developed and to direct us into areas that were of concern

8    to them.  We generated information and shared information that

9    we and the creditors believed was both in support of and in

10   contravention of the various arguments that they were all

11   developing.

12   Ultimately, and perhaps most significantly with

13   respect to the larger series of controversies, we arrived at a

14   conclusion shared by -- shared by us and we believe ultimately

15   shared by many of the creditors that the principal inter-

16   company balances in the case as they existed with terminal

17   balances in the various accounts as of the petition date were

18   reasonably stated.  That is to say, they were not the result --

19   they did not appear to be the result of fictitious entries, but

20   to have represented cash movements or underlying transactions,

21   we had looked in particular for transactions that appeared to

22   lack bonafides and for which adjustments might have to be made.

23   And after our review, we ultimately concluded

24   that the inter-company accounts as stated provided a reasonable

25   basis around which the parties could negotiate a bankruptcy

David Pauker - Direct/Henry                    45

1   plan.

2   Q.     Thank you.  You referred earlier to employees of a

3   company known in shorthand as Jay Alex working on the profits

4   under your direction.  Who were those people who worked for

5   Alex and Associates --

6   A.     A managing director of Alex Partners named Louis

7   Studney, a highly-skilled and experienced forensic financial

8   analyst, led much of this effort, including an effort that

9   reviewed billions of dollars of transactions, including the --

10  every transaction over 50 million dollars that have constituted

11  a part of the treasury system balances.  They also reviewed the

12  material trading system balances, which existed as of the

13  petition date.  They did extensive review on other matters,

14  including the company's dealings with RGHI, as did FTI and did

15  work in that area as well.

16          The team was significantly resourced and -- and

17  we obtained direction from all creditors.  Our instruction from

18  Mr. Golden was to solicit input from all interests as to the

19  matters that should be investigated and then to focus first on

20  those matters which were reasonably calculated to elicit

21  information which would inform a plan and negotiation process.

22  Q.     Now, you had also mentioned that there were a number of

23  Golden employees who were working down at Refco after the

24  beginning of the year.  Why was that, sir?

25  A.     Golden Associates was engaged principally to provide

David Pauker – Direct/Henry                    46

1    interim management services in these bankruptcies.  We provided

2    a CEO, a chief restructuring officer, a chief financial

3    officer, numerous additional personnel to assist the company,

4    to manage the company across a variety of functions in

5    treasury, accounting and otherwise.

6    Q.      And why were all those personnel necessary?

7    A.      Prior to our arrival, the company advisors had

8    accomplished the very significant sale of what had been the

9    largest of Refco's businesses, its regulated commodities deal

10   or Refco LLC.  And a large portion of Refco's employees went

11   with that sale.  Because of that, the company did not have

12   executives to fill critical positions and interim management

13   was deemed needed by both the then existing board and the

14   subsequently reconstituted board.

15   Q.      Now, you indicated that at the end of this long --

16   lengthy process of investigation and negotiation a plan of

17   reorganization was proposed, that is, the joint plan that is

18   before the Court today.  Can you briefly overview for the Court

19   and the parties here the nature of that plan?  To assist you, I

20   have a document that I'd like to mark as Exhibit A, if I may.

21   That is A for identification.

22                THE COURT:  Okay.

23      WHEREUPON DEBTOR'S EXHIBIT A WAS MARKED FOR IDENTIFICATION.

24                MS. HENRY:  I have additional copies if anybody

25   need it.

David Pauker – Direct/Henry                    47

 1  BY MS. HENRY:

 2  Q.    I ask you to take a look at this, sir, and ask if you're

 3  generally familiar with this document.

 4  A.    I am generally familiar with the document and with the

 5  terms of the plan.

 6  Q.    And does this generally summarize fairly the terms of

 7  the plan?

 8  A.    It certainly summarizes the terms of the plan with

 9  respect to the distribution of interests contemplated in it.

10          MS. HENRY:  Okay.  Thank you.  Your Honor, I

11  would like to move for admission this demonstrative exhibit,

12  Exhibit A.

13          THE COURT:  All right.  I'll admit it as a

14  demonstrative exhibit.

15    WHEREUPON DEBTOR'S EXHIBIT A WAS ADMITTED INTO EVIDENCE

16  BY MS. HENRY:

17  Q.    Could you -- referring to this summary could you

18  describe for the Court briefly the overall structure of the

19  plan?

20  A.    Certainly.  First of all, the plan incorporates and

21  implements the terms of what we have called the RCM settlement.

22  Pursuant to the RCM settlement, matters among RCM creditors,

23  particularly on the one hand securities customers and on the

24  other hand nonsecurities customers are resolved in terms of

25  determining what property is a fund of customer property in

David Pauker – Direct/Henry                    48

1    effect and what property is not and how that property is to be

2    shared and distributed among RCM creditors.  So with that

3    settlement, which is now implemented and which this court is

4    familiar with, the assets of RCM are distributed accordingly.

5        The plan, however, provides for the assets of the

6    non-RCM Refco entities to be allocated and distributed among

7    the different creditor groups and creditor populations.  Under

8    the plan, some 460 million dollars subject to adjustment is to

9    be distributed over to RCM and to be distributed then by RCM to

10   its creditors according to the terms of the RCM settlement

11   agreement.

12       The contributing debtors -- and we'll come back

13   to that in a minute -- will receive 94 million dollars of

14   assets, again subject to adjustment depending on the assets in

15   the estate.  RCM and the contributing debtors will share the

16   estate's 35 percent interest in a company called FXCM and

17   separately FXA, which is the company's online foreign exchange

18   trading broker, will share in 55 million dollars of cash,

19   basically the cash that they had at the commencement of the

20   case, plus two million dollars, which includes cash which is in

21   Japan and subject to dispute at the -- at the present time.

22   And they will receive distributions largely on account of that

23   cash and certain other assets that they had at that time.

24       To the extent that the creditors of all these

25   entities are not paid in full by distributions of their assets,

David Pauker - Direct/Henry                    49

1   that is to say, of the assets we've described, they will

2   receive litigation -- interest in a litigation trust, which

3   will prosecute claims on behalf of the estates.  All of the

4   various debtors are contributing their affirmative claims with

5   the exception of certain very limited claims retained by RCM.

6   They'll be pursued together by a trust with the proceeds

7   distributed to creditors who had not been paid in full.

8              Now, to the extent that -- that, for example,

9   FA -- FXA creditors receive on account of FXA assets a smaller

10  distribution on a pro rata basis than, say, RCM securities

11  claimants, they would receive per dollar a claim, a larger

12  proportion, again per dollar of claim of trust interests.  So

13  that's how the trust is to be allocated.

14             Creditors have the right to elect to contribute

15  to the -- to a private actions trust claims that they may have

16  of their own that relate to their dealings with Refco.  If they

17  do so, they can participate in recoveries from that trust.

18             The claims of the litigation trust and the

19  private action trust will be pursued jointly and then any

20  recoveries will be allocated among them in their respective

21  interests at a later date.

22             Creditors also as part of the claim receive BAWAG

23  proceeds and may elect not to receive BAWAG proceeds but to

24  retain claims against BAWAG.  In that event, their claims are

25  reduced according to a mechanism which is provided in the plan.

David Pauker – Direct/Henry                    50

1    Q.    Sir, you had been -- you referred to something called

2    RCM as being on of these Refco debtors.  Could you briefly

3    describe your understanding of the business in which RCM

4    engaged prepetition without characterizations?  [Laughter.]

5    A.    RCM was the Debtor's offshore Bermuda affiliate.  It

6    engaged in what I'll call a variety of dealing in FX and over-

7    the-counter transactions.  It may or may not have been a

8    broker, a matter which was the subject of litigation earlier in

9    this case, which is resolved by this plan.

10   Q.    Okay.  Thank you.  Now, you also mentioned that there

11   were a number of issues that had to be resolved in connection

12   with the reorganization plan.  Is that correct?

13   A.    Yes.

14   Q.    I'd like to just mark for identification as Debtor's 2

15   and I'll show this to you, sir.  Mr. Pauker, I've shown you

16   what's been marked as Debtor's Exhibit 2 for identification and

17   ask you --

18           THE COURT:  You know, since you did the last one

19   as A, why don't we make this one B?

20     WHEREUPON DEBTOR'S EXHIBIT A WAS MARKED FOR IDENTIFICATION

21           MS. HENRY:  Oh, hey.

22           THE COURT:  Just so we can --

23           MS. HENRY:  I thought I'd make it interesting.

24           THE COURT:  Okay.

25   BY MS. HENRY:

David Pauker - Direct/Henry                              51

1   Q.      I show you what's been marked as Debtor's Exhibit B for

2   identification and ask you if you're generally familiar with

3   this document.

4   A.      I have seen this document.

5   Q.      And what do you understand it to be, sir?

6   A.      This document is a brief summary of certain of the

7   disputes among creditors and interests that have occupied the

8   parties to this bankruptcy over the past year and which are

9   resolved by way of the plan.

10  Q.      Okay.  And will referring to it help you resolve this

11  various disputes?

12  A.      Certainly.

13          MS. HENRY:  Okay.  Thank you.  I'd like to move

14  this for admission as Debtor's Exhibit B marked, and I have

15  copies if anyone [inaudible].

16    WHEREUPON DEBTOR'S EXHIBIT B WAS MARKED FOR IDENTIFICATION

17          THE COURT:  All right.  Hearing no objection and

18  based on my review, I'll admit this as a demonstrative exhibit.

19    WHEREUPON DEBTOR'S EXHIBIT B WAS ADMITTED INTO EVIDENCE

20  BY MR. HENRY:

21  Q.      Referring to this if you need to -- we'll give everyone

22  a chance to look at it if they want -- I'd like you to address

23  some of the disputes that have to be resolved in part of the

24  plan of reorganization [inaudible].

25  A.    Well, the disclosure statement certainly provides more

David Pauker – Direct/Henry                52

1  detailed information with respect to these and other disputes,

2  but among the disputes that the parties had to investigate,

3  argue over, contend over, and ultimately resolve in the plan

4  were, first of all as we mentioned, questions about the

5  bonafides of the existing inter-company accounts and how they

6  should be treated.

7       For example, RCM raised questions as to whether or

8  not monies that flowed through those accounts could be traced

9  and they might assert actual ownership of assets of the other

10  debtors by way of constructive trust or otherwise.  Non-RCM

11  creditors needed to be satisfied that the money was actually

12  due and owing, but even if it were raised issues and arguments

13  that the amounts due to RCM and others could potentially be

14  subordinated to amounts due to bondholders or other Refco Group

15  subsidiaries.

16       Similarly, there were arguments with respect to the

17  priority and payment of guarantees to bondholders who had --

18  who are -- who had the guarantees of some 24 of the debtors

19  subsidiaries where there was language which appeared to

20  subordinate those -- its claims to the claims of affiliates.

21       There were a variety of arguments, many of them very

22  technical as to whether or not the bondholder claims ultimately

23  would be senior, at least to some of the inter-company debt, or

24  would be junior potentially to all of it.  That issue was

25  resolved.

David Pauker – Direct/Henry                    53

1     I mentioned before the RCM disputes, which were

2  intermural as to customer property and how RCM's assets should

3  be distributed to RCM creditors.  There were issues involving

4  preferences, potential preferences that might have been

5  avoidable.  The bondhold -- the bonds were paid about 230, 231

6  million dollars within the 90 days of the petition date as part

7  of the IPO.  There were defenses raised by the bondholders with

8  respect to potential avoidance actions relating to that

9  payment.  The bondholders argued, among other things, that the

10  money to pay the bond obligations of Refco group had been

11  raised by public shareholders and earmarked for this purpose.

12  That constituted a defense, that it had been paid to financial

13  intermediaries, that it was of the nature of a settlement

14  payment.  So as with all other issues, there were -- there were

15  many different points of views that were argued.

16     There was extensive attention and arguments paid to

17  the nature of the debt that arose in connection with the LBO

18  several years ago and whether any of the debt or the guarantees

19  issued at that time in favor of both the banks and the bonds

20  could be avoided as fraudulent conveyances.  Those issues and

21  whether and when either group or the guarantor subsidiaries may

22  have been insolvent were discussed extensively as were other

23  defenses asserted by both the banks and the bonds.

24     As I said, there were many more of these.  There were

25  disputes that were specific to FXA and how it should be

David Pauker - Direct/Henry                              54

1    treated, disputes that were specific to equity and how it
2    should be treated.  And ultimately, the plan as written today
3    resolves all of those matters.
4    Q.   Yes, thank you.  Sir, you were -- there were discussions
5    about some of these issues among the parties.  Over what period
6    of time were these discussions held?
7    A.   The negotiations among the parties that led to what we
8    call the global settlement, which was ultimately embodied in
9    this plan, began in earnest in August.  The participants
10   included RCM creditors who were securities customers and RCM
11   creditors who were either FX, OTC or other creditors, the RCM
12   trustee bondholders, and the indenture trustee for the
13   bondholders, the senior lenders via their agent, the Debtor.
14   Also represented were more than 51 percent majority of the
15   outstanding claims at Refco Group, which were held by a
16   combination of creditors who by way of guarantee or separate
17   contracts also had claims at RCM, but nonetheless were the
18   principal creditors at group.
19          So these major constituencies were in the room as
20   part of these negotiations which -- they certainly were arms'
21   length.  They certainly involved heated discussions of all the
22   matters which -- which I was discussing before.
23   Q.   Were there numerous meetings with respect to these issues
24   either in person or telephonically or through instant messages?
25   A.   The participants to these -- in these discussions met

David Pauker - Direct/Henry                              55

1    constantly over what I would say is a period of 30 days or

2    more.

3    Q.    And what was the outcome?

4    A.    The outcome was the global settlement, which was

5    ultimately incorporated into the plan support agreement and the

6    plan which is pending here today.

7    Q.    Okay.  Now, you had mentioned that there are -- were a

8    number of issues that were discussed in detail.  Was one of

9    those issues that was discussed the potential substantive

10   consolidation of all or some of these estates?

11   A.    It was a matter which was discussed from time to time over

12   the course of the case and from time to time during these

13   negotiations.

14   Q.    Do you have a general understanding what the terms of the

15   consolidation means, sir?

16   A.    Yes.

17   Q.    And what is that briefly?

18   A.    In the event we had pursued a substantive consolidation

19   plan, not only would be consolidating all the entities

20   together, but the treatment that the creditors would be

21   receiving would be disregarding the original separateness of

22   the entities where they had claims so that they would be

23   participating equally with respect to the assets of all of the

24   entities that were consolidated.  And similarly, creditors that

25   had relied on separateness and that believed they had, for

David Pauker - Direct/Henry                    56

1  example, multiple claims by way of guarantees would lose the

2  benefits of those guarantees.

3  Q.    Were any arguments made in these discussions against the

4  proprietary of consolidation -- substantive consolidation in

5  these cases, sir?

6  A.    I will tell you, although as I said it was discussed from

7  time to time, it was really never discussed seriously.

8  Certainly from the time of the -- that the Court -- to the

9  extent it had ever been discussed seriously from the time the

10 Court shared its decision on the RCM conversion matters,

11 discussion on that really became not central at all to the

12 principal matters that were being discussed among the

13 creditors.

14 Q.    And why was that?

15 A.    Well, the things that would be required typically to

16 obtain subsequent consolidation didn't appear to be here in

17 this case.  You had numerous creditors, both RCM creditors with

18 guarantees and banks and bondholders who had specifically

19 relied upon the separateness of the entities in their dealings

20 with the debtors, you had within the potentially consolidatable

21 group a variety of entities that -- that had segregated --

22 potentially segregated capital or had -- or were regulated.

23 You also had and most significantly from about early March as

24 we began to make for the first time progress on our inter-

25 company review, the idea that consolidation would be --

David Pauker – Direct/Henry                           57

1   substantive consolidation would be appropriate because the

2   finances were so scrambled that we couldn't understand the

3   financial statements and the relative rights of the entities

4   involved, that increasingly appeared to be untrue as we

5   determined that the inter-company accounts were bonafide,

6   although there certainly were -- was some fraud involved in the

7   case, which had led to the company's failure to begin with.

8   This was not a case where you had financials which were so

9   fraudulent or fictitious that you couldn't unscramble the egg.

10  Q.   Now, sir, just to clarify, in this particular case an

11  entity of the claim against Company A based on a contract and

12  an entity as a comp -- claim that's Company B based on another

13  contract or a guarantee of the first contract would there be

14  one or two claims to receive distribution?

15  A.   Under this plan there would be two claims and that would

16  be true whether they contracted on the one hand with -- for

17  example, RCM and on the other with the contributing debtor.  It

18  would -- it would equally be true if they had two separate

19  contracts with one or more of the contributing debtors.

20  Q.   Okay.  Thank you.  Now, what other dispute that you

21  previously mentioned was disputes involving FXA?  And you

22  previously mentioned briefly the nature of that business, but

23  just to put the following discussion in context, which is just

24  to refresh everyone's memory about what the FXA business was

25  and the nature of the key disputes surrounding FXA.

David Pauker - Direct/Henry                          58

1    A.    FXA was the Debtor's online foreign exchange brokerage

2    operation.  It was operated under contract with -- by a company

3    which managed -- built and managed the platform in which Refco

4    had a significant interest itself.  The customers of FXA were

5    generally not U.S. based.  They were customers who did business

6    over the Internet from around the world.  They were generally

7    smaller retail customers, more than 10,000 of them and they

8    engaged in foreign exchange trades.

9    Q.    What assets did FXA have as the negotiations began?

10   A.    I'm sorry, I don't understand the question.

11   Q.    Well, did FXA have any cash?  Was there any cash available

12   to -- for distribution to these creditors?

13   A.    [No verbal response.]

14   Q.    Let me just put it this way.  Was there any cash that was

15   tied up in foreign countries?

16   A.    Before the plan that was negotiated, the availability of

17   assets at FXA that might be available for distribution to

18   benefit creditors were substantially in doubt.  The principal

19   asset of FXA was about 53 million dollars of cash.  Thirty-

20   two -- 32 million dollars of that is in an account at HSB --

21   HSBC in Japan where creditors of Japan have asserted, in

22   effect, customer claims to that cash.  Moreover, that cash is

23   in an account in the name of an entity called RFXJKK, which is

24   not at the present time a direct subsidiary of Refco.  It's a

25   company that was formed by our partner FXCM with, we believe,

David Pauker – Direct/Henry                    59

1   the intention of taking the deposit and then turning the equity

2   over to FXA.  That was never done, so the -- although it is our

3   position that those are our deposits and our accounts,

4   customers in Japan dispute that, and there's litigation over

5   that.

6           Moreover, because the cash is in an account which is

7   not a title FXA account but is instead an FXJKK to the extent

8   that we prevail and it's determined to be an -- FXJKK is

9   determined to be a unit of FXA, since the cash is cash of a

10  subsidiary, the secured lenders, who have a guarantee of FXA

11  assets can assert a lien on those -- on those assets.

12          Of the assets of the cash remaining in the U.S., all

13  but about seven million dollars of it were in accounts which

14  were subject to the lien of the company's secured lenders.  So

15  absent the settlement, we faced a situation where FXA had as

16  its only asset seven million dollars of cash other than --

17  other than its pledged assets.  It had a receivable from RCM.

18  That also was pledged.

19          Moreover, there were about three million dollars of

20  deposits taken in by FXA inadvertently after the petition date

21  for which there were administrative claims.  And on the order

22  of three to five million dollars of administrative professional

23  fees incurred by the estate, so we were looking at a situation

24  involving FXA where it was potentially administratively

25  insolvent absent some solution that could be negotiated through

David Pauker – Direct/Henry                               60

1   the plan.

2   Q.   Okay.  Now, you testified just now that FXA was

3   potentially administrative insolvent.  How does the plan

4   address that issue?  Because obviously it's important.

5   A.   Under the terms of the plan, first of all, the banks do

6   not take assets directly from FXA on account of their

7   guarantees and as a consequence FXA gets to keep its 53 million

8   dollars in cash, both its domestic cash and the cash that we

9   believe is its cash in Japan, although that matter is subject

10  to some dispute.

11         In addition, pursuant to a settlement negotiated

12  under the -- over the last few days, two million dollars more

13  is added to that 53 million dollar for a total of 55 million

14  dollars.

15         Also under the plan, Refco Group and the contributing

16  debtors on the one hand and RCM on the other hand have agreed

17  to pay the administrative expenses of FXA through the

18  settlement date and thereafter to bear the administrative

19  expenses other than those which are direct expenses of FXA

20  relating to its own claims and its own assets.  And that

21  relieves it of a burden of potentially five million dollars of

22  costs or more.

23         Also under the plan, the creditors of FXA will not be

24  subject to dilution by the very substantial claims of

25  bondholders who have a guarantee from FXA.  They'll also

David Pauker – Direct/Henry                    61

1   receive litigation interests.  They'll also receive some value

2   on account of the sale of their intellectual property, their

3   lists which this court approved last month.

4          The only thing that they give up is their right to

5   distributions on account of an inter-company receivable with

6   RCM.

7   Q.   Now, was that receivable collateral for the bank loan?

8   A.   Right.  It was itself collateral.  And in looking at this

9   settlement that I just described, we did look at the range of

10  potential recoveries for RCM under a variety of scenarios.

11  Q.   And for FXA?

12  A.   I'm sorry.  For FXA under a variety of scenarios that

13  would involve that asset together with other assets being

14  marshaled by the banks.  But then it receiving on account of

15  its claim over, for example, to Refco Group any funds that it

16  might have the right to.  And what we've determined is that the

17  treatment under the plan is anywhere from six to ten times

18  better than -- than a liquidation treatment depending on

19  whether you're looking at a scenario where the Japanese assets

20  are -- are determined to be FXA assets or not.

21         But just as important as far as the most likely

22  litigation scenarios and outcomes which we looked at, the

23  treatment of FXA is in excess of both the mean and median of

24  the various scenarios that we looked at with the assistance of

25  Hoolihan.

David Pauker – Direct/Henry                    62

1   Q.    There seems to be a lot of moving issues there.  When you

2   say you're looking at them with the assistance of Hoolihan

3   could you explain that a little bit more, because it seems to

4   be a critical issue about how much value is going to these

5   people.

6   A.    Well, part of the negotiating process back in August and

7   something that was really necessary to help the parties

8   formulate their positions and make compromises was the

9   preparation of a model which showed the potential distribution

10  to various interests in the case assuming a range of outcomes

11  on the issues which were in dispute.  It didn't seem practical

12  for everyone to be out there building their own model,

13  especially given the Court's instructions that the

14  professionals for the estate and the committee were really to

15  be servicing these kinds of discussions and reviews by all the

16  credit interests.

17         So we worked with Hoolihan.  We provided them on an

18  ongoing basis information about the inter-company balances as

19  we were reviewing them and how they flowed, the information

20  about the third-party liabilities, information about the assets

21  and both current cash and projected realizations.  And they

22  developed a complex model that -- that enabled creditors to

23  look at recoveries assuming a range of different results, what

24  would happen if -- if the inter-companies -- if the bondholders

25  were senior or were subordinated to the various inter-company

David Pauker - Direct/Henry                    63

1   claims against the guarantors.  What would happen if there were

2   preference -- there was a preference recovery against the

3   bonds.

4           There were a large number of these things and all the

5   different creditors were able to -- or creditor groups were

6   able to ask Hoolihan to run scenarios and they were all

7   available to us over the course of these negotiations.

8   Q.   Now, as a consequence of looking at the result of

9   different events transpired were the parties who were

10  negotiating these settlements able to come to a conclusion

11  about whether they were within the range that would occur and

12  you had different results on different litigations?

13  A.   Well, the compromises embodied in the plan really do

14  reflect the agreement among all the parties to accept

15  treatments, which -- which were not either their best or their

16  worst case.  They basically looked at the range of potential

17  outcomes and made their own decisions in these arms-length

18  discussions as to what was an appropriate compromise for them.

19  Q.   And as a representative of the estate did you come to a

20  conclusion about whether these compromises were reasonable?

21  A.   We looked at the compromises that the creditors had

22  arrived at and in discussions in which we had participated and

23  we looked at the Hoolihan model and we considered our own

24  understanding of the issues and what we heard on the issues,

25  and we concluded that the settlements that were reflected in

David Pauker - Direct/Henry                    64

1  the plan were in a range of reasonableness.

2  Q.   Thank you.  Now, there was another settlement that was

3  entered into -- several settlements as we've seen this morning

4  that were entered into after the plan was initially filed.  I'd

5  like to turn your attention to one of them.  As you may recall,

6  early on in this case an ad hoc committee of equity holders was

7  formed.  Do you happen to recall which of the various

8  individual companies that committee's work related to?

9  A.   The Ad Hoc Committee represented shareholders of Refco,

10 Inc., the company's ultimate parent, which was created pursuant

11 to an IBO within the 90 days that proceeded the bankruptcy.

12 Q.   All right.  Could you basically explain -- now that you've

13 explained that it's a parent company, the various debtors, some

14 of the positive actions that the Ad Hoc Equity Committee

15 contended would be available for distribution to creditors and

16 that there were sufficient recovery to equity holders of that

17 company?

18 A.   Well, the argument that was advanced by the equity -- ad

19 hoc equity holders was -- was not that there was a value coming

20 up to Inc. and its equity holder from below where creditors

21 were substantially impaired.  It was that -- that Inc. itself

22 as the ultimate parent had a number of claims that it believed

23 were valuable that it could pursue either on its own or as part

24 of a consolidated effort where it should receive value for the

25 contribution of those claims, and that to the extent that there

David Pauker – Direct/Henry                    65

1   were no claims against creditors at Inc., that the value

2   associated with those claims would ultimately accrue to the

3   benefit of the shareholders of Inc.  So relative to your

4   question, the issue of whether in the extent to which there

5   were claims at Inc. was a significant question for us to try to

6   evaluate.

7   Q.    Now, in looking at the potential for claims of creditors

8   against Inc. were any contentions made or alleged claims

9   brought to your attention with respect to that company

10  particularly rather than against claims against the other

11  companies?

12  A.    Well, there were -- there were arguments, for example,

13  that Inc. had its own -- might have an avoidance claim against

14  third parties with respect to the money that it paid down or

15  that it paid out that was used to pay bondholders what could

16  have been considered an avoidable preference.  However, since

17  that is an action which by their contention was being pursued

18  for the benefit of equity, it was determined in our discussions

19  that that wasn't a valid or viable claim that would benefit

20  them.  In other words, if there were creditors there, creditors

21  would benefit.  If -- if -- to the extent creditors were paid

22  in full, there was no preference, so we had discussions about

23  that.  We didn't see it as a distinct claim.

24          I think the bigger issue was Inc.  The argument was

25  that if the estate had claims against Grant Thornton, Inc. had

David Pauker – Direct/Henry                    66

1   some.  And if the claim -- if the estate had breach of

2   fiduciary duty claims against officers and directors, Inc. had

3   some and so that was an issue that we had to sort of try to

4   figure out and think through.

5   Q.   And, in fact, it's believed that there are potentially a

6   number of litigation claims that may be out there, although no

7   one has put a value on them for purpose of litigation analysis,

8   is that correct?

9   A.   That's correct.  Those are the claims that -- that -- they

10  are included among the claims that are going to the -- being

11  contributed to the litigation trust.

12  Q.   Now, in connection with assessing the certainty, you know,

13  whether it was certain that there would be distribution to

14  equity holders at the Inc. level were there any arguments that

15  were raised that suggested there may not be a huge recovery for

16  Inc. at -- for Inc. to the extent that it would benefit the

17  equity [inaudible]?  Were any arguments made in the meetings

18  you attended?

19  A.   Well, first of all, it was our feeling that to the extent

20  that Inc. did have some portion of the whole pool of claims

21  that they were ultimately very small.  In other words, if we

22  began by thinking about damages or the harm suffered by Inc.,

23  the dam -- the harm it suffered by virtue of what happened at

24  Refco would relate to its loss of the 230 million dollars that

25  it paid down to a subsidiary that -- or for the benefit of a

David Pauker – Direct/Henry                    67

1    subsidiary to have its debt reduced.

2            Putting aside whether that's a fair measure of

3    damages in comparing that to the damages suffered by the other

4    units, you know, that's depending on how you look at it 5 to 10

5    percent of, you know, of the damages.  So if you say it's, you

6    know, 7 or 8 percent, it's somewhere in the middle of the

7    damages.  So if you think about a trust recovering, for

8    example, 500 million dollars and they get 7 or 8 percent of

9    that, they're getting 35, 40 million dollars.  But that assumes

10   that the claims that they're contributing are equally valuable

11   to everybody else.  And we felt very strongly that Inc. was

12   contributing in effect claims -- could only contribute claims

13   that related to its dealings from the IPO onward.  It had 75

14   days of claims as compared to the other debtors, which had

15   claims against third parties that related to the RJHI dealings,

16   which were extensive and developed over a period of time or

17   related to many dealings.  Claims against Grant Thornton

18   would -- relates to what they had seen or not seen, done or not

19   done over an extended period of time.  Same thing with respect

20   to the directors.  So that there's no clear way to evaluate

21   that, but maybe their 35 or 40 million dollars of claims, you

22   know, on account of whether they were contributing were worth,

23   you know, only have -- they're only half as good as the other

24   claims.

25           And then the fact of the matter was that there were

David Pauker - Direct/Henry                    68

1  other estates that were contributing claims.  They would be

2  much cleaner and much neater, such as the claims that RCM is

3  contributing that would relate to the actual liquidation of its

4  portfolio and whether commercially reasonable value was

5  obtained.

6          So it seemed likely that whether it was ten or

7  whether it was 20 million dollars of value ultimately, there

8  was a limit to what Inc. was entitled to by way of an

9  allocation of value.

10         By contrast, there appeared to us to be very

11 significant claims at Inc. well in excess of 10, 20, 30, 40, 50

12 million dollars such would assure that the equity at Inc. would

13 never participate in a distribution on account of those claims.

14 Q.   Do you recall the nature of one of some of those claims

15 asserted against Inc. whether they'd be from customers or

16 people who [inaudible] after --

17 A.   Well --

18 Q.   -- [inaudible] IPO?

19 A.   Well, there were lots of claims asserted against Inc. and

20 for the purposes of this analysis, you know, not all of them

21 were as good.  I mean, there were -- there were -- there are

22 claims by people who had -- there are two billion dollars of

23 claims asserted and they include claims that simply say, well,

24 I lost a lot of money at one entity and you are a related

25 entity or you're the ultimate corporate parent.  And therefore,

David Pauker – Direct/Henry                                69

1   I have a claim against you also.  And there may or may not be

2   something to that, but in the case of Inc., you know, there

3   were quite a few of what I would say were claims that could be

4   separate and particularized.  Whether or not they might be

5   claims under the plan would be called related plans.

6   Q.   Okay.  And at the end of the day was there a resolution of

7   issues with the Ad Hoc Equity Committee?

8   A.   Yes, we -- we ultimately resolved these issues with the

9   equity committee.

10  Q.   And is that incorporated in the planned supplements that

11  were filed with the Court?

12  A.   Yes.

13  Q.   Okay.  And basically it includes a sliding scale of

14  payments depending on recoveries for the litigation charges, is

15  that correct?

16  A.   Under the terms of the settlement with the equity group,

17  they're entitled to participate through Traunch B in 3 percent

18  of the first 500 million dollars of distributions from the

19  trust, 7-1/2 percent of the next 500 million dollars and 15

20  percent of anything over that.

21        However, in order to -- as was described earlier, in

22  order to participate they have to be willing to assign their

23  own related claims to the trust.  In effect, since we concluded

24  that in our view there was no entitlement, one might say that

25  either this is being gifted by the creditors of Inc. to them or

David Pauker – Direct/Henry                    70

1    in the alternative that they are buying in or they're providing

2    some -- something to the trust in exchange, but in either case

3    it's by way of an agreement and settlement and compromise.

4    Q.    Okay.  Thank you.  One moment.

5         THE COURT:  When you said that there were significant

6    claims against Inc. and then you -- I think you went off and

7    said that obviously there were a number that although filed you

8    would not view as allowable, of the claims that you've viewed

9    as allowable against Inc. would those claims in light of all of

10   Inc.'s assets, including its potential litigation claims have

11   nevertheless rendered Inc. insolvent in your view?

12        THE WITNESS:  I haven't done what I would call a

13   technical solvency analysis, but the claims that I'm talking

14   about, and I'm happy to articulate them for you in a little --

15   in -- in a little more detail would clearly appear to be in

16   excess of the value of the affirmative recoveries that we're

17   talking about, so I think the answer is yes.

18        THE COURT:  Was one of the reasons for the settlement

19   that the parties wanted to avoid litigation in which the issue

20   or the value of those litigation claims would be brought out in

21   great detail?

22        THE WITNESS:  Yes.

23        THE COURT:  And why is that?

24        THE WITNESS:  Well, although I just by way of

25   illustration showed that even given a 500 million-dollar

David Pauker - Direct/Henry                    71

1    recovery in our view and assessment there share a small if

2    litigated there could have been much more issues and

3    questioning over -- well, you say 500.  Why not 200, why not a

4    billion.  We weren't anxious to get into justifying particular

5    ranges or issues.  Similarly, besides the preference claim,

6    which I describe, there are other claims that Inc. has which is

7    part of a litigation, which is contributing to the trust, but

8    which as part of the litigation we might have been obliged to

9    make arguments where flawed and had problems and were worth

10   less relative to other claims, so we weren't interested --

11            THE COURT:  So you --

12            THE WITNESS:  -- in doing that.

13            THE COURT:  And that's because you didn't want to

14   give potential defendants a heads up as to potential defenses?

15            THE WITNESS:  Yes, although we recognize that as

16   these claims are investigated and brought, it's to be

17   anticipated that the parties in question will reach their own

18   conclusion by their defenses.  We certainly don't want any

19   statements on the record by parties who are officers,

20   directors, or consultants which call into question the claims

21   or point out weaknesses of claims.

22            THE COURT:  That might affect your ability to settle

23   the claims as well?

24            THE WITNESS:  Might affect our ability to settle

25   or -- or even to recover on them in a litigated outcome.

David Pauker – Direct/Henry                    72

1    THE COURT:  Okay.

2    BY MS. HENRY:

3    Q.   Now, thank you, sir.  Now, in this long detailed factual

4    intensive negotiations that you participated did you ever

5    consider the alternative to a negotiated claim in this case in

6    general?

7    A.   Well, the alternative was going to have us litigating

8    indefinitely on behalf of the non-RCM estates against among

9    others RCM, potentially have us litigating against our

10   bondholders and our banks with respect to avoidance actions and

11   would not have been susceptible to concluding this case in 11

12   months as we've been able to.

13   Q.   Do you have any feeling if you were to have had to

14   litigate all these issues how long it would have taken to

15   resolve it through final determination?

16   A.   I think we made some assumptions in that regard in the

17   liquidation analysis.  I don't recall exactly what we

18   assumed --

19   Q.   Now --

20   A.   -- whether it was 12 to 24 months or 18 months, but we did

21   spend a fair amount of time discussing that among ourselves.

22   And our views collectively with respect to what would happen in

23   a worst-case scenario.  In fact, if the case were converted

24   were shared with the parties.  We ultimately created a set of

25   assumptions and discussed them with Hoolihan and with the

David Pauker – Direct/Henry                    73

1    creditors and they became the basis for Hoolihan's liquidation

2    analysis.

3    Q.   And did you become comfortable that the assumptions in

4    their liquidation analysis were reasonable based on their

5    participation and discussion with the parties and their

6    knowledge of the various facts in the case?

7    A.   Yes.

8    Q.   And did you become comfortable?  I know that you -- let me

9    just say this for the record.  You've reviewed the liquidation

10   analysis when it was finally concluded after the parties had

11   worked and run different scenarios?

12   A.   Yes.

13   Q.   And did you feel that it was the best estimate that you

14   could come up with as to what a likely liquidation scenario

15   would be?

16   A.   Yes, I -- I agreed with the assumptions which I played a

17   material role in formulating and I understood the workings of

18   the Hoolihan model, which generated those results as far as how

19   the inter-company accounts were arrived at, how they're

20   treated, how the assets are marshaled to pay for the bank debt,

21   how the bond debt is allocated, and actually a group of Golden

22   consultants was permitted to come in and vett and review the

23   Hoolihan model, and we were quite comfortable with it.

24   Q.   So at the end of the day how would you compare this plan

25   that is before the court now with the alternative of a

David Pauker – Direct/Henry                               74

1  litigated Chapter 11 where the issues are not resolved due to

2  wrongful compromise?  Is there incorporated in the plan

3  [inaudible]?

4  A.   It's far superior.

5  Q.   And why is that?  I apologize that it's duplicative.

6  A.   I'm sorry.  I --

7  Q.   I said, why is that?  Why did you see it as being far

8  superior, sir?

9  A.   I think as reflected in the Chapter 7 liquidation analysis

10  in the event that we had -- we had a litigation meltdown, it

11  would have been years until most of the parties in this case

12  received the money that they would ultimately be entitled to

13  and the money would be substantially diluted by potentially

14  hundreds of millions of dollars of additional costs, costs that

15  didn't just include our own litigation costs, but we would end

16  up paying again potentially for the bank's costs on the debt

17  which is now settled.  And we would lose the benefit of

18  concessions that had been made and were embodied in the plan.

19  I think that overall given that we have a plan which relative

20  to alternative outcomes as modelled is fair to each of the

21  classes here and is much better than the alternatives, we've

22  done a pretty fair job.

23  Q.   Thank you.  I have no further questions, then.  Is there

24  anything you wanted to add, sir?

25  A.   We had spoken about some questions regarding releases that

David Pauker – Direct/Henry                                    75

1  you --

2  Q.   Oh, you're right.

3  A.   -- had wanted to cover.   [Laughter.]

4  Q.   Oh, thank you very much.   Ooh, saved by the client.   Okay.

5  Are there releases embodied in the plan?

6  A.   Yes, there are.

7  Q.   And could you briefly describe the nature of those

8  releases?

9  A.   Well, the plan provides for releases by both the debtors

10  and by certain third parties who are benefitting by receiving

11  distributions under the plan.   The releases are to be provided

12  to certain parties who are providing material financial

13  benefits to the plan, also to certain of the nondebtor

14  affiliates of Refco, as well as to post-petition officers and

15  directors.

16  Q.   Now, you had mentioned that lenders are obtaining releases

17  under the plan.   Could you basically explain the rationale for

18  that -- for those releases?

19  A.   This bankruptcy more than -- more than -- for more reason

20  than just its size as a mega case, if you will, is one of those

21  rare bankruptcies where the noise level as far as accusations,

22  investigations, claims by all sorts of parties that they would

23  ultimately assert claims not just against the estate, but

24  against all the other parties that they're negotiating with

25  existed.   It was in that way a little bit like the Drexel case

David Pauker – Direct/Henry                    76

1   many years ago in which there was really unusual as far as the

2   [inaudible] and no way to obtain the value that's to be

3   distributed in the plan without providing the releases.  And a

4   significant amount of the value here is coming from the banks

5   and the bondholders.  And with respect to the banks, they have

6   deferred -- they have agreed to waive in exchange for these

7   releases 15 million dollars of default interests.  And when the

8   releases have -- occur they will also have released such claims

9   and liens as they have to secure their indemnity claims against

10  the estate allowing distributions to flow free and unfettered.

11          As far as the bonds are concerned, they're giving up

12  some 66 million dollars of consideration into the plan as far

13  as recoveries they might otherwise have received.  They're

14  giving up claims that they asserted to post-petition interest

15  which could have been 10 million dollars or more.  They made

16  clear that they weren't about to do this and still be subjects

17  to claims by third parties creditors claiming that they had

18  actions against the bondholders.  The bondholders also made it

19  clear that they weren't going to on any basis settle unless the

20  banks received full, final, and complete releases since they

21  had subordination agreements as between the banks -- between

22  the banks and the bonds.  So there's certainly consideration --

23  there's certainly important, but -- but even more there are a

24  necessary element of the plan so that if we couldn't deliver

25  these releases to the banks and in particular to the

David Pauker – Direct/Henry                    77

1   bondholders, the plan would blow up as it's written right now.

2   And the consequences of that are -- are very significant.

3          Putting aside sort of the global issue of would we go

4   into a litigation meltdown, a number of the more particular

5   consequence of that would be -- it would be very hard to get

6   back to an agreement of the kind of agreement we already had,

7   and that's because as a consequence of having negotiated this

8   global agreement, the RCM settlement agreement is now being

9   implemented and distributions should be made under it.

10         But where we were three to four months ago, the

11  creditors of RCM were very anxious to get that settlement

12  approved.  They believed it was their right to get approved.

13  The bondholders and others including the debtor believed that

14  the RCM settlement made a lot of sense, but only as part of a

15  global solution.  We were also aware that at such time as

16  securities creditors got 70 cents on the dollar on their claims

17  out of RCM it could be much more difficult to negotiate a

18  resolution thereafter.

19         So the global settlement was facilitated in no small

20  part by the RCM creditor's desire to affect the RCM settlement

21  and our willingness to see that done in the context of the

22  global settlement.  If the plan were to blow up now over the

23  issue of releases, it'd be a whole new ball game as far as

24  negotiating.  It would also significantly prejudice the RCM

25  unsecured creditors, because one of the things that we obtained

David Pauker – Direct/Henry                    78

1    through the settlement is the release of claims asserted

2    against RCM by the banks and the bondholders, 1.1 billion

3    dollars of -- of claims which are unsecured claims, but would

4    be highly dilutive of the unsecured distributions at RCM, so

5    effectively the RCM unsecured creditors could be deprived of

6    the benefit of the RCM settlement agreement or at least have it

7    significantly reduced as those claims had to be reserved

8    against.

9            I mentioned earlier that if the -- if the settlement

10   blew up, the consequences to FXA and its creditors could be

11   dire.  It could be administrative insolvent, among other

12   things.  So these lender party releases are absolutely

13   essential as far as I'm concerned and as far as the debtor is

14   concerned, and we wouldn't have a plan without them.

15           THE COURT:  What is the consideration for the

16   nondebtor affiliate releases?  What are they giving to the

17   estate?

18           THE WITNESS:  Well, those releases are designed so

19   that they're only issued if there is consideration, that is to

20   say, they are triggered by the distribution to the debtors of

21   the significant portion of their assets.  So not only is there

22   consideration in terms of that, but the existence of these

23   releases facilitates those distributions in material ways.  One

24   of the things that we were trying to do with those releases is

25   grapple with a concern that some of the overseas officers and

David Pauker – Direct/Henry                    79

1  directors have had and that is they've been working for a year

2  on the claims that they know about.  They're not necessarily in

3  MVLs yet in involuntary liquidations yet.  We've been trying to

4  get money out and distributions out before the MVL process

5  begins as a way of expediting distributions.

6          But there's been some concern, again, given the noise

7  level in the Refco cases as to whether or not, for example,

8  creditors of RCM who were not shy in asserting claims against

9  all the entities or for that matter other Refco creditors might

10 then file claims -- might begin to file claims against all the

11 overseas entities.  And we're looking to avoid that kind of --

12 of double-dipping, it's true, but more to the point we're

13 looking to facilitate the distributions coming back.  Absent

14 these releases, we might end up seeing all these entities in

15 MVL proceedings abroad, which would, in turn, delay these

16 distributions maybe by another six months or more.

17         THE COURT:  Okay.

18 BY MS. HENRY:

19 Q.  And have these managers expressed to you grave concern

20 about these items in litigation consequences making

21 distributions --

22 A.  At --

23 Q.  -- [inaudible] to these estates?

24 A.  At least some have, yes.

25 Q.  Now, there are additional -- a few additional releases to

David Pauker – Direct/Henry                    80

1    the indentured trustee and to post-petition management.  Can

2    you address the rationale for those releases?

3    A.   Well, I think the indenture trustee release is bound up in

4    the logic of the benefit bondholders.  Post-petition management

5    was a matter which was discussed and considered.  It was not

6    considered likely that there would be claims against post-

7    petition management.  After all, we're engaged in business

8    dealings where anything that -- that we do which is out of the

9    ordinary course has to be reviewed by this court and more --

10   and more particularly were subjects to oversight by the

11   Creditors' Committee and the U.S. Trustee, and I think it's

12   safe to say in this particular case a much higher level of

13   scrutiny by a large number of creditors and others who would

14   take it on themselves to provide some additional oversight.

15        To the extent that there might be a claim of fraud

16   based on, you know, a fraud that was hidden, that could never

17   be a released claim.  So what -- what we and the creditors were

18   considering is -- is dealing with the potential of

19   administrative indemnity claims that post-petition management

20   might assert, you know, relative to what the estate -- you

21   know, what's being given up by way of releases.

22        Under the terms of all of our respect engagements and

23   corporate documents, the post-petition or his directors are

24   entitled to administrative indemnities.  And it is seen as not

25   in the estate's interests for a third-party creditor to lobby

David Pauker – Direct/Henry                    81

1   in a claim which then provides the basis for a significant

2   administrative indemnity claim, which then has to be reserved

3   against and potentially eventually paid.  So the releases

4   embodied in the plan prevent that scenario and insure that

5   there will be no dilution by administrative indemnity claims.

6   Q.   As far as the amount of potential litigation here in this

7   case would you say it's a typical Chapter 11 scenario?

8   A.   No, I think earlier I suggested it was a rare care; one of

9   these cases whose unusual circumstances give rise to an

10  enormous amount of litigation or threatened litigation.

11  Certainly, the threats and the noise level in this case

12  exceeded any that I had been in directly with the possible

13  exception of Drexel and Enron.

14          MS. HENRY:  Thank you.

15          Now, I believe I have no further questions.

16          THE COURT:  Okay.

17          Does anyone wish to cross-examine Mr. Pauker?

18                     (No response.)

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MS. HENRY:  Your Honor, the plan proponents have no

22  further witnesses.

23          You do have before you the declarations with respect

24  to the voting, the declaration of Mr. Gere [Ph.] with respect

25  to the liquidation analysis.

82

1          THE COURT:  All right.

2          Does anyone want to cross-examine Mr. Gere on his

3     liquidation analysis?

4                          (No response.)

5          THE COURT:  All right.

6          Does anyone wish to cross-examine the balloting

7     agent?

8                          (No response.)

9          THE COURT:  All right.

10          I'll accept their declarations for purposes of this

11     hearing.

12          MS. HENRY:  Thank you, Your Honor.

13          THE COURT:  Okay.

14          MS. HENRY:  My colleague, Mr. St. Clair, would like

15     to summarize --

16          THE COURT:  Well, let me make -- does any objectant

17     have any evidence that they want to present in respect of their

18     confirmation objection?

19                          (No response.)

20          THE COURT:  Okay.

21          Obviously, you'll have time to provide oral argument

22     if you want but hearing no one I'll close the evidentiary

23     portion of the hearing.

24          MS. HENRY:  Thank you, Your Honor.

25          THE COURT:  Okay.

83

1          MR. ST. CLAIR:  Your Honor, at this point I think

2     there's only two remaining objections to the plan and I would

3     propose that we let them present their objections and we'll

4     address them in turn.

5          THE COURT:  Okay.

6          Well, two, perhaps three.

7          MR. ST. CLAIR:  Perhaps three.

8          THE COURT:  Okay.

9          All right.

10         I don't care who goes first.

11         MR. ST. CLAIR:  Mr. Etkin, maybe, for the lead

12    plaintiff.

13         MR. ETKIN:  Michael Etkin, again, for the lead

14    plaintiffs in the consolidated securities litigation.

15         As I indicated earlier, Your Honor, our objection

16    with the resolution of the other objection and on the releases

17    and the withdrawal of certain objections that we filed boils

18    down to the 1123(a)(4) issue created by the treatment of

19    interest holders under Class 8 based upon the settlement

20    recently reached with the ad hoc committee and I think that

21    settlement even occurred subsequent to the actual objection

22    deadline.

23         The prior plan, Your Honor, interestingly enough,

24    provided Class 8 with a recovery of ten percent of the

25    underwriter claims as they're defined under the prior plan and

84

1    the current plant with no strings attached, no assignment of

2    claims and no assignment of recoveries and, perhaps, I should

3    emphasize that distinction in the first instance, Your Honor,

4    because you've heard a lot of discussion about the settlement

5    agreement that was reached and the focus of that settlement

6    agreement being the assignment of non-Refco claims for the

7    stated purpose -- and it was stated several times this morning

8    -- of not having any competition for the trusts in terms of

9    pursuing their litigation claims eliminating or reducing the

10   amount of competition.

11          Well, that may very well be a valid argument with

12   respect to the assignment of the non-Refco claims as they're

13   defined under the plan and, quite frankly, I don't think our

14   objection really reaches even that.  Our objection focuses on

15   what wasn't discussed in the presentations that were made to

16   you today and that involves the requirement that members of the

17   putative class would be required to essentially sign their

18   recoveries to the trust; write a check if you will to the

19   trust.

20          THE COURT:  Well, there haven't been any recoveries

21   though; right?

22          MR. ETKIN:  Well, there haven't been any approved

23   recoveries yet but there is the $108 million plus BAWAG

24   settlement that's pending before Judge Lynch and that, we

25   anticipate, will be the first of many.  That is certainly out

85

1   there right now.

2           THE COURT:  Okay.

3           Well, leaving BAWAG aside, wouldn't as a practical

4   matter the trust -- if people assigned their claims -- then go

5   with one voice and go negotiate with each target and then there

6   would be a subsequent issue as to what that target would pay

7   but it's all in the trust at that point?

8           MR. ETKIN:  That's now how it works, Your Honor, at

9   least as I understand it because if you look at the definition

10  of non-Refco claims it specifically excludes the class claims

11  so no one would be required to, nor, in our judgment could they

12  but that's not really an issue, but no class member is required

13  to assign their particular class action claim.  What the

14  settlement provides is that whatever recovery that class member

15  obtains through the class action if they want to participate in

16  the Class 8 recoveries under the plan they have to donate,

17  give, buy in, and you just heard testified to -- buy in by not

18  only assigning their non-Refco claims, whatever they may be,

19  but also assigning their recovery in the class action and

20  that's what we have a significant problem with because the

21  pretense of the purpose of the settlement to remove competition

22  is really a non-issue as it relates to the class claims because

23  they're going to be pursued independently and if there are

24  competing claims against common defendants they'll have to be

25  resolved and worked out in the context of whatever litigation

86

1   the trust may bring down the road but those class action claims

2   are going forward under this plan.  The class member is

3   required under the settlement agreement to write a check.  They

4   get money, that money would have to be turned over, not just

5   assign whatever other individual non-Refco claims they have as

6   defined under the plan and that's a problem because you have

7   to, I guess, look at how this settlement was negotiated, who

8   negotiated it and what we believe is the subtext.

9           The settlement was negotiated by the ad hoc

10  committee.  Interestingly enough, the ad hoc committee -- and I

11  think they'll admit but they recently did file a 2019 statement

12  with the Court and I can represent to you that the 2019

13  statement indicates that each member of the ad hoc committee

14  purchased their shares in Refco, Inc. after the petition was

15  filed and, certainly, beyond the class period identified in the

16  consolidated class action complaint.  So they are not class

17  members, they're vulture (sic) purchasers of stock at pennies

18  on the dollars and they got together and formed their ad hoc

19  committee in this case which has been very, very active.  So

20  they have no class claims or potential recovery through the

21  class action to assign.  So they will be buying in, certainly

22  at a much cheaper rate than class members would be compelled to

23  buy in with respect to the treatment afforded to Class 8

24  members under the settlement agreement and that's where you

25  have your 1123(a)(4) problem from our perspective.

1          Your Honor, I'll get to the pleadings that were filed

2   -- the plan proponent's brief and the ad hoc committee filed

3   papers as well -- I'll deal with that a little bit more in

4   detail.  I don't want to take too much time here but,

5   fundamentally, we don't believe whether you characterize this

6   as a gift or a buy in or whatever, we don't believe any of the

7   case law supports the proposition that by virtue of it being a

8   gift that automatically 1123(a)(4) doesn't apply and they can

9   pick and choose and cherry pick within a particular class who

10  is going to get a benefit and who is not and who has to pay how

11  much in order to be provided with that benefit.  We don't

12  believe the case law supports that proposition.  There is case

13  law that the debtor cited to under Dow Corning which is a very

14  different case than this case and obviously had some very

15  different factors given the mass tort nature of that case and

16  the tens of thousands of unliquidated and disputed lawsuits

17  that really were the underpinnings of that bankruptcy case that

18  held under the circumstances of that case that 1123 -- there

19  was no offense to 1123(a)(4) by virtue of some of the

20  physicians, I think, was the fact pattern having to contribute

21  both direct and derivative claims and other physicians only

22  having direct claims.  In fact, if you read through the

23  bankruptcy court's opinion the bankruptcy court, I don't think,

24  even could distinguish between the two claims in any event.

25          THE COURT:  Well, it said that there was no reason to

88

1    because the whole idea of valuing the give up didn't make

2    sense.

3            MR. ETKIN:  It would have been much too unwieldy

4    given the facts and circumstances in that case and what the

5    deal was which is we're releasing our claims against the estate

6    -- all of our claims -- in return for getting a release under

7    the plan.  That's really what the deal was; a very different

8    set of circumstances and Dow Corning did in fact criticize a

9    case which the debtors and the ad hoc committee did not cite,

10   the ALV Industries decision by the Court of Appeals in the D.C.

11   Circuit which in facts stands for the very proposition that

12   we're asserting here today and I can just quote from that case

13   -- a short one -- "It is disparate treatment when members of a

14   common class are required to tender more valuable consideration

15   be it their claim against specific property of the debtor or

16   some other cognizable chosen action in exchange for the same

17   percentage of recovery."

18           THE COURT:  In that case they went on to say that at

19   least as far as the majority was concerned -- and there was a

20   dissent -- that the objecting creditor had a unique claim.

21           MR. ETKIN:  That's correct, Your Honor.

22           THE COURT:  That was liquidated.  They had a guaranty

23   claim, an actual guaranty claim.

24           MR. ETKIN:  That's correct.

25           THE COURT:  I mean the whole thing was kind of a

89

1    farce because you knew at the time that the claim was going to

2    be disallowed but they seemed to ignore that and went ahead and

3    said he has it and there was no evidence to show, really, that

4    anyone else had that type of claim.

5             MR. ETKIN:  Well, that's true, Your Honor, but --

6             THE COURT:  Didn't Dow Corning say, "Look, the claims

7    in our case are unliquidated.  We don't know what they are

8    worth and why should we go through the whole exercise of

9    valuing the consideration?"

10            MR. ETKIN:  Your Honor, it's not that complicated

11   here.  You have a class proof of claim that's been filed,

12   albeit not a certified class yet but that issue is not before

13   the Court today.  It is not that complicated valuing this

14   particular claim.  I don't think there's really much an issue

15   especially after the testimony that you've heard here today as

16   to whether there was some fraud perpetrated or misconduct

17   perpetrated with respect to this IPO.

18            THE COURT:  Well, I'm not talking about the claim

19   against the estate I'm talking about the give up.

20            Your argument is that the debtors are like a theater

21   that says, "You have admission to this distribution if you pay

22   what's in your pocket," and you're saying that what's in your

23   client's pocket is hypothetically $10.00 because that's what

24   the class action litigation is worth and what's in Mr. Lee's

25   pocket is, you know, a nickel and a key and, therefore, his

1    client shouldn't -- that's unfair but (a) why should I get into

2    valuing those two things and (b) what's in the record to show

3    what they're worth?

4            MR. ETKIN:  Well, I don't think valuation is the

5    issue, Your Honor, with respect to this.  I think that it's the

6    function of having to give it up, whatever it is, that's at

7    issue because the class claims are unique to class members and

8    what was negotiated here, what was engineered here through this

9    settlement is a deal that essentially chills class members from

10   being able to participate so as not to dilute the recovery of

11   vulture purchases of stock who pay pennies on the dollar as

12   opposed to our constituency who really are the big losers here.

13           THE COURT:  But how do we know they're going to be

14   chilled from not participating?  I mean, again, if you go back

15   to the ALV case the majority, probably because they were

16   concerned about the dissent, spent a lot of time talking about

17   how the debtor had already settled lawsuits with the only other

18   two known recipients of additional consideration.  So there was

19   proof that -- there was an admission that there was different

20   value here and I don't know where that proof exists

21   particularly if these people have a right to elect.

22           MR. ETKIN:  Well, their right to elect requires them

23   to give up more.  That's really the point.

24           THE COURT:  Well, how do I know that?

25           MR. ETKIN:  Because whatever it is, whatever those

91

1  class claims are worth and, again, those aren't claims that are

2  being given up it's the recovery.  Whatever it's worth, if it's

3  more than zero it's more than anyone who doesn't have a class

4  claim and is not a class member would be compelled to give up

5  in order to participate.

6         THE COURT:  Well, I'll talk to the debtors about this

7  or the plan proponents but it seemed to me -- and leave aside

8  BAWAG for the moment -- that if you were a class representative

9  you could potentially see a way here to augment those claims by

10  teaming up with the estate which has its own claims and, I

11  guess, Mr. Lee's brief says his clients -- Mr. Lee is very good

12  at coming up with claims -- have claims, too, separate and

13  apart from wearing their estate hat, you go to whichever target

14  there is, the accountants, the lawyers, whoever they are and

15  say, "You can settle today everything but you're going to have

16  to pay a lot for it."  At the end of the day isn't that what's

17  going to happen anyway?  They're going to want to have absolute

18  peace?

19         MR. ETKIN:  Well, one can hope and in cases like this

20  -- and I've been involved in a few -- it's always best if the

21  meter isn't ticking on defense costs and people sit down and

22  attempt to work out a global resolution.  Whether that happens

23  or not, I don't know, but that's really not impacted by what's

24  going on here and what's going on --

25         THE COURT:  I guess that's what I don't understand.

1    Why isn't it?  Doesn't this really -- I mean if one were to

2    recognize the class claim in this bankruptcy given where we are

3    in the case it's probably because the existence of a class adds

4    something to just there being claims generally asserted and it

5    would seem that the only thing that it adds is an additional

6    argument to make to any target that they can get absolute peace

7    in one negotiation and it seems to me that this is what this

8    deal facilitates.  They don't have to talk to Mr. Lee

9    separately and he doesn't have to drive them crazy and they

10   don't have to talk to Mr. Kirschner and he doesn't have to

11   drive them crazy, they can talk to all three of you at once.

12         MR. ETKIN:  Well, they could but they may have to

13   talk to people separately because again, Your Honor, the class

14   claims are not being assigned to the trust, just the recovery.

15   So let's take a for instance, if a particular class member

16   decides to buy in they would be assigning whatever non-Refco

17   claims they have.

18         THE COURT:  Well, isn't that simply because the class

19   hasn't been certified yet and the class representatives haven't

20   been able to do that?  This is a way to give them that option.

21   I mean that's what we talked about at the disclosure statement

22   hearing is that you didn't want to have an assignment because

23   you hadn't gotten to that stage in the process yet and this

24   preserved that option for people including the class

25   representatives.

1          MR. ETKIN:  Well, that wasn't an issue for our class

2     at the time and --

3          THE COURT:  Well, but I mean it makes sense.

4          MR. ETKIN:  It may very well, Your Honor, but the

5     point being that it's simply the recovery that a particular

6     class member is being compelled to put on the table in order to

7     buy in.

8          If Mr. Lee's clients buy in as I'm sure they will,

9     they're going to be giving up their non-Refco claims and the

10    trustee will have whoever else buys in, whether it's a class

11    member or not, would have to clearly contribute their non-Refco

12    claims and for purposes of our position today we're not

13    disputing that, whether Mr. Lee's clients have claims or don't

14    have non-Refco claims, we don't need to get into that.

15         We don't view this as a means to facilitate a global

16    resolution with respect to the claims that are going to be

17    pursued by the trustee by the class.  That, perhaps, should

18    and, hopefully, will happen on its own.  What this does in our

19    view and what it's intended to do in our view is to make it

20    extremely difficult for a class member to buy in, they have to

21    pay more for it, they're not going to do it, they're going to

22    forego the distribution that would otherwise be offered to them

23    under Class 8 and Mr. Lee's clients will be much less diluted

24    in terms of their ultimate recovery.

25         THE COURT:  How do I know they won't do it?

94

1          MR. ETKIN:  Well, Your Honor, what we have to do

2    essentially is certify the class for purposes of allowing every

3    class member to make that choice one way or the other.

4          THE COURT:  And they face a real risk that if that

5    doesn't happen unless they've filed a proof of interest or a

6    510(b) claim in the case their case will be disallowed.  It's

7    just another incentive to let it happen.

8          MR. ETKIN:  Not necessarily, Your Honor, because I

9    think it boils down to the motivation to work together to

10   globally resolve the class action and the claims that are going

11   to be pursued by the trustee.

12         THE COURT:  Well, no, but the cases -- the better

13   reasoned cases on class claims in bankruptcy like Woodward and

14   Lawthrup [Ph.] -- Judge Bernstein -- say that even if a class

15   is certifiable that the bankruptcy court has discretion not to

16   recognize the class claim and one of the factors to consider --

17   a major factor is what benefit to the case generally is there

18   in having a class given that it's a collective proceeding

19   anyway and does that override the detriment of allowing a lot

20   of people to participate who miss the bar date and I can see

21   those who are putting up this contingent fund as saying, "Well,

22   we'll do that but we want something in return."  It really

23   dovetails with the whole rationale for permitting the claim

24   anyway in the case which is, "Fine, we'll join forces."

25         MR. ETKIN:  Well that, Your Honor, at least to me is

95

1  really an argument for another day.  For example, if the

2  requirements --

3         THE COURT:  But all I'm saying is how do I -- this is

4  all in response to your statement that I should assume that

5  these people won't exercise this option to opt in.

6         MR. ETKIN:  I wouldn't be that presumptuous to ask

7  you to assume that, Your Honor, I'm suggesting that by virtue

8  of the fact that they're having to give up something that

9  others are not being required to give up and they're in fact

10  essentially having to do the equivalent of paying money that

11  that will be a disincentive.

12         THE COURT:  But maybe and their class representatives

13  will realize that although they're putting something in they

14  also are getting something back, at least those who didn't file

15  proofs of claim or interest and, of course, those who filed

16  proofs of interest if they are current holders still -- if they

17  didn't sell to Mr. Lee's clients but they're still holders --

18  they get the benefit of this.

19         MR. ETKIN:  They certainly do.  Those who are holders

20  who also happen to be class members will get the benefit of it

21  but, again, because they happen to be class members they've got

22  to give up something more and that's what the problem is here,

23  they've got to give up something more and --

24         THE COURT:  Mr. Lee's clients are giving up

25  something, too, though.

96

```
 1          MR. ETKIN:  Well, yes, they are giving up something
 2  too and, again, for purposes of our argument I'm not disputing
 3  that the requirement to give up non-Refco claims is
 4  problematic.  That at least to us is much more sustainable but
 5  the requirement goes beyond that.  That's where the problem
 6  lies.
 7          THE COURT:  Okay.
 8          MR. ETKIN:  And that's where we have a problem and
 9  that's where we think the settlement runs afoul of 1123(a)(4).
10          THE COURT:  Okay.
11          As far as the form of the election itself, as I read
12  -- I'm assuming the order hasn't changed on this -- the
13  proposed order has the election going out to among others the
14  class representatives.  I'm assuming that means they'll be able
15  through some mechanism in the District Court to make the
16  election.
17          MR. ETKIN:  Well, frankly, we just saw that, Your
18  Honor, and we have not fully thought that through as to what
19  would have to be done in order to even make the election viable
20  to begin with from the district standpoint.
21          THE COURT:  All right.
22          But it seemed to me that that fact or that proposal
23  obviated your concerns about notice because it would
24  potentially -- if the class representatives wanted to get
25  involved and I'm assuming they would -- it would leave the door
```

1  open to making an appropriate motion in the District Court to

2  take the action to accept or reject or at least to have proper

3  consideration of that.  In that sense this election wouldn't

4  run afoul of what's -- to the extent a class action proceeding

5  has been set up in the District Court and it's in a kind of a

6  limbo right now but to the extent it has been it wouldn't run

7  afoul of that.

8         MR. ETKIN:  Potentially, Your Honor, it would

9  certainly conceivably shift the cost of all of that to those

10 who could less afford it in our view but, again, we haven't

11 thought that entirely through since we just saw the notice that

12 was filed, I think, maybe yesterday.

13        THE COURT:  Okay.

14        MR. ETKIN:  Again, Your Honor, you know, all of that

15 could be obviated, frankly, by just eliminating the requirement

16 to contribute cash in order to participate and although there

17 may have been just one unique creditor in ALV, here, I would

18 suggest that we're dealing with many unique creditors when you

19 look across the spectrum of what the body of claims look like

20 that constitute Class 8 under the claim.  The fact that there

21 are more than one does not make it any less discriminatory in

22 our view.

23        THE COURT:  Okay.

24        MR. KIRPALANI:  Good afternoon, Your Honor.

25        Susheel Kirpalani of Milbank, Tweed on behalf of the

98

1   creditors committee.

2        Your Honor, there are at least three levels of

3   reasons or arguments why Mr. Etkin's objection to confirmation

4   should be overruled and, very briefly, they are the gift

5   theory, a standing problem that Mr. Etkin has that he tried to

6   gloss over and an evidentiary problem that Mr. Etkin has that

7   he also tried to gloss over.

8        With respect to the gift I know that Your Honor

9   already understands this issue.  Our position is that for

10  1123(a)(4) purposes, treatment means distribution, treatment

11  means recovery from the debtor's estates.  The record is closed

12  with respect to there being any assets at Refco, Inc. that

13  would be distributable in a best interests analysis to the

14  members of Mr. Etkin's putative class.  So I don't think that

15  there is any basis for the 1123(a)(4) argument.

16       To the extent there is, Your Honor, the issue about

17  standing goes back to the questions that Your Honor raised

18  about whether it's appropriate to certify a class in a

19  bankruptcy case and the case law that Your Honor referenced

20  does, indeed -- the Woodward and Lawthrop Holdings case, 105 BR

21  365 -- make very clear -- Chief Judge Bernstein stated that

22  it's not automatic and that Your Honor in this contested matter

23  under 9014 has broad discretion to determine whether or not to

24  recognize the class for purposes of a contested matter.

25  Mr. Etkin argued that that issue is not before the Court today.

1    We believe that's an incorrect statement of the law.

2           With respect to there needing to be an objection

3    filed to the class proof of claim prior to that issue becoming

4    ripe, the case In Re:  Ephedra products liability litigation,

5    329 BR 1, S.D.N.Y. 2005, stated just the opposite, "This is

6    part of the class claimant's burden as a proof of claimant to

7    come forward and identify their interests."  If we look only at

8    the proof of claim that Mr. Etkin signed on behalf of the

9    putative class, the claim itself, in order to comply with Rule

10   3001 needed to state who the creditor was or that the lawyer

11   signing it was an authorized agent.  The proof of claim in

12   Paragraph 1 only identifies two entities; R.H. Capital and

13   Pacific Investment Management and identifies those people as

14   having authorized as an agent the Lowenstein, Sandler firm and

15   then it goes on to say, "They also submit this claim on behalf

16   of all members of the yet uncertified class but they're not

17   authorized agents under the proof of claim or under any

18   document submitted with the Court.

19          If we look then to the Rule 2019 statement filed by

20   Lowenstein, Sandler it's again clear that there are only two

21   parties identified as being clients of Mr. Etkin.  There is

22   also reference to the uncertified class but I think that brings

23   us all right back to where we started which is whether this

24   court will certify a class for purposes of this contested

25   matter.

1          A lot of my presentation actually had to do with the

2     feasibility issue of providing notice, Your Honor, and we

3     believe that what Your Honor stated is exactly right; the

4     notion that the putative class makes that you can't approve

5     this settlement because it's so unwieldy to require notice and

6     there's no procedures in place to insure that there is fair

7     notice because the debtors in the estate have not even

8     undertaken to identify all the members of the class puts this

9     completely backwards.  It is pursuant to Rule 2019, pursuant to

10    Rule 3001 and pursuant to the requirements of the Bankruptcy

11    Code that the creditor is identified by itself or by

12    themselves.  It's not the estate's burden nor this Court's

13    burden to identify creditors and trying to figure out what

14    their addresses are and how they should be served and we think

15    that that's exactly the purpose of the Rule.

16          In terms of the evidentiary record, the value

17    paradigm that Your Honor talked about with respect to Mr. Lee

18    having small change and Mr. Etkin having dollars bills, I think

19    that actually is exactly the argument that was adopted by the

20    Court in the Dow Corning case.  On Page 669 and 670, just to

21    quote from the opinion, "The Morrison claimants' argument that

22    multiple rupture breast implant claimants who opt for

23    settlement are required to provide greater consideration is

24    also unpersuasive; first, it was not clear that counsel for the

25    Morrison claimants had standing to make this argument for he

101

1    did not identify a single client that had had multiple

2    ruptures" -- I think that's analogous, Your Honor -- "and,

3    second, even if one of his clients had experienced multiple

4    ruptures, counsel failure to present any evidence indicating

5    that this would materially increase the value of such claim

6    meaning the value of what the give up was.  I think the same is

7    true here from an evidentiary point of view other than asking

8    Your Honor to speculate on the very issues that the Court in

9    <u>Dow Corning</u> found to be untenable and for those reasons

10   disagreed with the reasoning of <u>ALV Industries</u>.  We think the

11   same reasoning applies here per force (sic).

12           Again, Your Honor, we think that the proposed notice

13   procedures that the debtors have come up with makes sense.  We

14   don't believe that there is a benefit to recognizing the class

15   in this bankruptcy case in this contested matter at this time

16   and, therefore, Your Honor, we request that the confirmation

17   order be entered and that the settlement with the ad hoc equity

18   committee be approved and that this objection be overruled.

19           THE COURT:  Well, let me go back to something

20   Mr. Etkin raised about giving up recoveries.

21           He says that this is basically a way to have the

22   other -- I guess is what he's saying is that this is a

23   mechanism either to freeze out the class action claimants or in

24   essence to have them do all the work and then turn the money

25   over by winning their various claims and then this is just a

1   turnover mechanism so that they share those recoveries with the

2   trust.

3          MR. KIRPALANI:   That's not the intention of the

4   settlement, Your Honor.   There is a broad side response to that

5   and then there is the more direct response.   Let me do the

6   direct one first.   The intent of the settlement was in fact to

7   coordinate all Refco related litigation into the vehicles

8   created by the plan.   Your Honor may know that there were

9   issues relating to this very matter in the BAWAG settlement.

10  That in fact was the reason for the creation of the private

11  actions trust to avoid those problems in the future and to the

12  extent it is consistent with law to have the class actions

13  themselves transferred to the trust, the plan proponents would

14  have no problem with that.   If Your Honor recalls from the

15  disclosure statement hearing, as you mentioned, there was

16  reference from Josh Angel and his clients that that cannot

17  happen as a matter of non-bankruptcy law and so, therefore, it

18  would be advisable to narrow it down and provide that the

19  proceeds be delivered over because the intent was the same.

20  The intent, for example, with Mr. Angel is that there will be

21  massive coordination between the private actions trust, the

22  litigation trust and the class action, not only to minimize

23  professional fees from trying to pursue the same targets but,

24  also, to insure that there's a coordinated effort and not

25  competing interests.   So in connection with those assignments

103

 1    there's a lot more that is sought to be done than just taking

 2    the recoveries out of the class action.  We're trying to do

 3    what's consistent with law but --

 4           THE COURT:  I guess I was looking at the -- the

 5    definition of non-estate Refco claims which is what the

 6    electing Class 8 members have to give over is actually defined

 7    as non-estate causes of action.  It's not defined as proceeds.

 8           MR. KIRPALANI:  It's designed as non-estate causes of

 9    action and then, again, because of the issues raised at a

10    disclosure statement hearing there was a carve out for class

11    actions and then the corollary but, of course, the proceeds

12    should still come in to the trust; the idea being, Your Honor,

13    that the economic stakeholders will drive the litigation.  The

14    economic stakeholders should be unified and whether we say that

15    the actual actions are transferred or the economic incentives

16    behind the actions, *i.e.*, the right to receive the proceeds are

17    transferred we should achieve the same result.

18           THE COURT:  Okay.

19           Now, let me turn to the BAWAG situation where there

20    appears to be an actual result.  How does this apply to their

21    BAWAG settlement which, I gather, has been agreed to but not

22    yet approved.  Is that right, Mr. Etkin?

23           MR. ETKIN:  That's correct, Your Honor.

24           THE COURT:  I mean I'm assuming they opted out of the

25    BAWAG deal.

104

1          MR. KIRPALANI:  Well, Your Honor, very few people

2     opted out of the BAWAG deal at least on the contributing

3     debtors' side.  I'm not sure how many people filed proofs of

4     claims that are in their putative class.

5          THE COURT:  There is a case where obviously they're

6     not working together.  If they don't collect on the BAWAG side

7     is it really fair to have them give up the $105 million that

8     they've agreed to with BAWAG?  I'm not sure whether that's

9     covered in any event since it's very shortly not going to be a

10    cause of action, it's going to be a settlement.  I don't know.

11    I didn't know whether that was -- I was a little surprised when

12    Mr. Etkin said it would be covered.

13         MR. KIRPALANI:  To be perfectly honest, I'm not sure

14    it was contemplated, the details of that particular cause of

15    action, Your Honor, but just in terms of an alternative

16    response to your question, we disagree with Mr. Etkin's

17    position that we couldn't have just provided this gift.  The

18    general unsecured creditors for whom I'm speaking couldn't have

19    just provided this distribution to holders of current equity

20    interest holders.  We decided to make it available to others in

21    exchange for the benefits that would be associated with

22    coordinating litigation.  If it's preferable to limit the

23    beneficiaries, I'm sure I could talk to the plan proponents

24    about that.

25         THE COURT:  Well, apparently there are current

105

1    holders of equity who are in the class.

2              Is that right, Mr. Etkin?

3              MR. ETKIN:  I couldn't state that as a fact, Your

4    Honor --

5              THE COURT:  You don't know?

6              MR. ETKIN:  -- but I would presume then, Your Honor,

7    given the short period of time that this stock was on the

8    market, I heard some people didn't have time to sell (sic).

9              THE COURT:  Well, I don't know if you want to talk

10   with people about the BAWAG issue or not?

11             MR. KIRPALANI:  I think I'd like a few minutes to do

12   that.

13             THE COURT:  Okay.

14             It's actually almost 1:00.  Maybe it would make sense

15   to have a lunch break now and come back at 2:00.

16             Does that make sense?

17             MR. KIRPALANI:  Sure.

18             THE COURT:  All right.

19             For those on the phone if you call into the number a

20   little before 2:00 then we'll reconnect you if there is anyone

21   still on the phone.

22             Okay.

23                           (Recess.)

24             THE COURT:  Please be seated.

25             Okay.

106

1          We're back on the record in <u>Refco, Inc.</u>

2          MR. KIRPALANI:  Thank you, Your Honor.

3          Susheel Kirpalani of Milbank, Tweed on behalf of the

4    creditors committee.

5          Your Honor had a pending question to us and the plan

6    proponents whether we would agree to clarify the section

7    dealing with the settlement for Class 8 old equity interests

8    that it would not be required in order to participate in the

9    distribution -- that holders of Class 8 old equity interests

10   that were the securities class action claimants would not have

11   to contribute the proceeds of the pending BAWAG settlement, the

12   details of which we can document afterwards.

13         We have spoken with the debtors and with Mr. Lee, who

14   is the principal negotiating counterparty for the settlement,

15   and it is acceptable to us and I believe it's acceptable to

16   Mr. Lee -- I know he wants to have a few remarks with the Court

17   and he will address that.

18         THE COURT:  Okay.  All right.

19         MR. LEE:  Thank you, Your Honor.

20         John Lee for the ad hoc equity committee.

21         That's accurate.  It was not our contemplation in

22   negotiating this treatment that that in-hand settlement would

23   be swept up or surrendered under that election.

24         THE COURT:  Right.

25         I mean it's not part of the litigation assets either

107

1    -- the litigation --

2         MR. LEE:  It's there.  It's been paid essentially,

3    Your Honor.

4         THE COURT:  Right.

5         Now, touching on this issue I'd like to respond --

6    I'm not going to respond to the vulture allegation other than

7    to say this is the first time I've heard something like that

8    from securities class action counsel, the prototypical

9    vultures, and just elaborating on the distinction, the proceeds

10   of the securities claims being assigned in is that that

11   structure is designed to address the issue of the question of

12   the question of whether you can actually assign a class action

13   securities claim.  In substance it would be the same if

14   Mr. Etkin's entire class were to make that election and

15   essentially the estate and the class interests become aligned

16   as we're trying to achieve under the trust and so,

17   substantively, that would take place.

18         A lot of these issues have been covered by

19   Mr. Kirpalani.  They're covered in the briefs and I'm not going

20   to belabor some of these points.  Obviously, you've been

21   through them.  I will say I do believe there's a serious

22   standing issue here for Mr. Etkin speaking on behalf of his

23   putative class.  There are no class claims that have been

24   allowed or certified.  They did not appear and litigate or

25   negotiate on any of this process we've been through.  They tend

108

1    to use the class allegation to further their personal interests

2    and at the same time hurt the estate but we don't see them

3    coming forward as a class trying to negotiate a plan and help

4    the estate get through this process.

5        You've hit on the Dow Corning decision which I've

6    read again over the break and I think it's right on point on

7    this issue here.

8        The plan, itself, that you're being asked to confirm

9    gives equal treatment to all persons treated under Class 8.

10   The plan terms itself as equal.  The fact that you have equal

11   treatment given to all these people does not mean equal

12   economic effect on each holder.  The Third Circuit couldn't

13   have said that any clearer than it did.  That's on Page 668 and

14   669.  Bankruptcy cases would be impossible to administer if you

15   had to calculate the economic effect of treatment on every

16   holder within a class and the treatment under this plan, you

17   remember, is the plan says you get no distribution if you're in

18   Class 8 but if you make an election -- a voluntary choice to

19   agree otherwise -- then you get this treatment and if that

20   treatment is disparate or has a different economic effect it is

21   because the member of that class has elected that and so,

22   hence, they have agreed to the different treatment which is

23   this last clause at 1123(a)(4) and Dow Corning says that's how

24   the statute works.

25       There's no evidence of this difference in value --

1  the $10.00 theater ticket versus the $5.00 -- on this record.

2  What we have here is, arguably -- we haven't made this claim

3  but some current shareholders might argue that since the stock

4  price has gone down during the bankruptcy maybe they have some

5  individual claim also.  But like the physicians in <u>Dow Corning</u>,

6  the current shareholders have derivative claims that they could

7  seek.  That's what we've been after the whole time we've been

8  appearing in this courtroom arguing the parent level estate has

9  causes of action and that we'd like to see a Chapter 7 or 11

10  Trustee in there prosecuting just for the benefit of the

11  parent.  That's a basket of claims and rights and how much

12  those claims end up being and what the dividend would be net of

13  the allowable amount of the creditor claims was a disputed

14  litigation issue that just was embroiling the entire process

15  until we settled.  So there's some value to what the current

16  shareholders have.

17          Now, what are the claims worth that would be given up

18  and assigned in by the class people?  Who knows.  They have

19  very strict pleading requirements under the PSLRA.  There's

20  been no class certified, there's motions to dismiss filed by

21  numerous, very talented law firms that have some meat in them.

22  They'll be subject to multiple satisfactions.  We have a

23  hundred whatever million that's come in on BAWAG so their claim

24  will keep working down.  You don't know how much it's going to

25  be at the end of the day but a key thing here is that everyone

110

1    who is being given the right to opt into this class and elect

2    into Class 8 now likely or may not even have a claim against

3    the estate.  They may be given something that they don't have

4    right now because there have been no class claims certified and

5    so far as I know I don't know how many if any people have filed

6    their own direct individual 510(b) claim.  So here's something

7    else they get under this election.  It's not just a one way

8    give up.

9            To value these claims on this record, you know, it's

10   absolutely impossible to say who is worth more, who has given

11   up more to take this treatment and, again, if the treatment is

12   done it's elected and it's a voluntary decision.  There's also

13   a rational basis to put these claims together.  I mean 510(b)

14   says they're the same priority.  The context in which you

15   usually see this sort of classification argument is where

16   people are gerrymandering classes, as you know, to try to get a

17   vote.  Well, here, that didn't happen because we've got a

18   presumed rejection by each class so you know that's not going

19   on here.  But the rational basis of putting this altogether is

20   you combine in these trusts that we're going to set up, you

21   avoid the argument of whether it's an estate claim or an

22   individual claim, you avoid the arguments over which estate

23   owns the claims or has the better claim.  You put them all in,

24   they can all be coordinated together.  It saves costs, time and

25   coordinates actions.

1          I'd add this.  We could have done this settlement --

2     we could have structured this differently and had a Class 8(a)

3     and 8(b); one for the current shareholders, one for 510(b)

4     claimants.  We put them together to keep the existing structure

5     as a matter of convenience.  Just because two claims have the

6     same priority doesn't mean they have to be treated in the same

7     class.  The gift, like in <u>Dow Corning</u>, could have been made and

8     we could have different treatment between the classes

9     especially when we're meeting the 1129(a)(7) standard that

10    you're getting what you would get on the liquidation because

11    that's what the record shows, that there would be nothing

12    obtained on the litigation without this election into this

13    treatment.  So we could have set this up separately with two

14    different classes because there's a rational basis for that

15    even if they're equal priority and the seniors could have

16    chosen to make their gift to those who were left in just the

17    current shareholder class and not the other class.  If

18    Mr. Etkin's group is not happy with its treatment and it

19    doesn't want to make the election we could have achieved this

20    result that way anyway.  By the same reasoning, the senior

21    class could have conditioned its gift or made its gift in the

22    plan just to the current equity holders and not the 510(b)

23    creditors.

24          So in summary, I believe the Class 8 equity treatment

25    is appropriate and it should be approved.

112

1          THE COURT:  Okay.

2          MR. ETKIN:  Your Honor, just a few points in

3     response.

4          First, in terms of some of the points Mr. Lee made.

5     He talked about our having derivative claims.  Well, that's

6     exactly what we don't have.  We have direct claims under the

7     securities laws and they're not derivative claims.  The

8     derivative claims -- I think the case law is pretty clear --

9     are property of the estate and I assume those are the claims

10    that the estate will be prosecuting.

11         In terms of the motions to dismiss, yes, some

12    defendants have filed motions to dismiss.  The underwriters in

13    fact have answered and have not filed motions to dismiss and in

14    terms of 510(b) claimants having the same priorities as

15    shareholders, yes, as it relates to their claims against the

16    estate, not as it relates to independent claims that they have

17    against third parties.

18         Your Honor, there was some mention of standing

19    issues.  This is the first I've heard of it.  Actually, it

20    wasn't mentioned in any of the papers.  I don't think there's

21    much to that at all and in any event our objection was filed

22    not only behalf of the putative class but on behalf of the lead

23    plaintiffs who filed their own independent proofs of claim in

24    the bankruptcy proceeding and our representative role is set

25    forth in the 2019 statement but I'm not going to get bogged

113

1   down with that.

2            You've heard much about, also, the desire to

3   coordinate.  That was an issue that Your Honor brought up

4   earlier today before the lunch break.  The fact is that we

5   could have been brought to the table and we weren't.  We have

6   not been as active, perhaps, as the ad hoc committee in the

7   case but we haven't been strangers in this case either.  So

8   that obviously works both ways.

9            The problem here, Your Honor, again, is not -- we

10  don't see it as one evaluation.  We're talking about unique

11  claims that belong to class members being asserted on their

12  behalf, the proceeds of which they're being asked to contribute

13  and, again, just by doing the math -- and I understand the

14  Court's point about evidence on the record but let's assume

15  that the trust recovers net $1 billion.  That's $50 million

16  under the formula to Class 8 to be distributed among class

17  members who elect and current equity holders.  Obviously, the

18  BAWAG settlement alone dwarfs that number where obviously the

19  underwriters have answered there are potential recoveries that

20  dwarf that number.  So even if the class recovered another $100

21  million over and above that $108 million in the BAWAG

22  settlement which I think is now $140 million or thereabouts by

23  virtue of the sale of the bank, even assuming for the sake of

24  argument it was only another $100 million to be split among the

25  class members, it dwarfs the potential recovery here.  So I

114

1    think that just feeds into the point that this is really a

2    choice without a choice, Your Honor, and that's why we maintain

3    that it is discriminatory, that it requires class members to

4    give up something that other members of Class 8 are not

5    required to give up for the price of admission, whatever the

6    value is, whether it be a penny or more, and as a result we

7    think that the election and the settlement are discriminatory

8    as it relates to that aspect of the deal.

9              THE COURT:  Okay.

10             All right.

11             I'm going to rule on these objections as they're

12   heard so let me rule now on the objection filed by the lead

13   plaintiffs in the uncertified class pending in the Refco

14   securities litigation.

15             The lead plaintiffs contend that the treatment of

16   Class 8, old common equity holders under the plan, is in

17   violation of Section 1123(a)(4) of the Bankruptcy Code which

18   provides that "a plan shall provide the same treatment for each

19   claim or interest of a particular class unless the holder of a

20   particular claim or an interest agrees to a less favorable

21   treatment of such particular claim or interests."  The lead

22   plaintiffs represent, purportedly, in the record -- it doesn't

23   establish anything to the contrary -- both former and current

24   holders of shares of the parent debtor Refco, Inc., in respect

25   of claims that would be covered under Section 510(b) of the

115

1    Bankruptcy Code and, consequently, that would be properly

2    classified as they are with the other current shareholders of

3    Refco, Inc. common stock because under 510(b) any such claims

4    would be subordinated to the level of such common stock.

5          The plan on its face provides the same treatment for

6    each interest in Class 8 in that all interest holders and

7    holders of 510(b) claims based on such interests have the

8    opportunity to obtain a sliding scale share of an interest in

9    litigation Trust B (sic) interests provided that they elect

10   affirmatively to donate their non-debtor litigation claims or

11   in the case of class action claimants, their recoveries

12   thereon, to the related private actions trust.

13         The testimony today established that the debtor

14   Refco, Inc. is insolvent today when factoring in a reasonable

15   estimate of allowable claims against it and its assets

16   including potential litigation claims.  Consequently, the plan

17   proponents have argued that the distribution under the plan to

18   Class 8 is not a distribution of assets or property of Refco,

19   Inc.'s estate but rather a gift or a settlement by those

20   creditors of Refco, Inc. and the members of Class 8 who would

21   otherwise not be entitled to any distribution.  That theory may

22   or may not be accurate but as Class 8 is currently constituted

23   it alone does not carry the day because under the objection it

24   is alleged that current holders of Refco common stock are also

25   being discriminated against in that some current holders hold

116

1  and are being asked to give up more valuable private actions as

2  a condition to participating in the distribution than other

3  current holders, namely in the latter instance those holders

4  who are not members of the putative class in the securities

5  litigation.

6          So I've not focused on the line of cases and the

7  distinctions among those cases as summed up in the

8  SPM/Worldcom/Genesis line of cases versus the Third Circuit's

9  fairly recent Armstrong decision.  Instead, I've focused on

10  whether even assuming for purposes of this objection that the

11  treatment of Class 8 is not a gift that the members of more

12  senior classes are free to allocate as they please, the

13  treatment provided for Class 8 does run afoul of Section

14  1123(a)(4).  I'll note at the outset that on the face of the

15  statute it does not run afoul of that section because as I

16  noted earlier it does provide the same treatment for each

17  interest in Class 8, that is each interest holder and/or the

18  subordinated creditors who are subordinated to the level of

19  such interest holders get the same treatment and have to make

20  the same election to get that treatment and under the plain

21  meaning rule I could stop there.  It appears that's where the

22  bankruptcy court in In Re:  Dow Corning Corporation stopped.

23  The case appears at 244 BR 634, Bankruptcy E.D. Michigan,

24  ultimately affirmed at 280 F.3d, 648, 6th Cir. 2002.  That case

25  involved a very similar plan provision that provided for a

117

1    specific treatment conditioned upon a release of claims of

2    rights by a class where certain class members asserted they

3    were giving up more rights or claims than other class members

4    and, therefore, were discriminated against and that 1123(a)(4)

5    was violated.  The bankruptcy court in a well-reasoned analysis

6    concluded to the contrary on alternative grounds; the first

7    being simply a matter of statutory construction that the plan

8    provision applied on its face equally to all the claimants.  It

9    didn't stop there, however, and I don't think I should either

10   particularly in light of the only other case that apparently

11   deals with this type of issue which is In Re:  ALV Industries,

12   Inc. at 792 F.2d 1140, D.C. Circuit 1986.  The Dow Corning

13   court analyzed the ALV case and found it not persuasive.  That

14   case involved a similar plan provision where in return for

15   receiving a settlement fund from third party creditors had to

16   give up certain rights against that party and a dissenting

17   creditor alleged that it was being unfairly discriminated

18   against because it had greater rights than the others.

19        The ALV decision had a strong dissent and in essence

20   the Dow Corning court found the rationale of that dissent to be

21   the right one which is that given the face of the statute and

22   the face of the plan provision the bankruptcy court should not

23   have to engage in a process whereby it valued the various

24   rights of the claimants to determine whether -- although they

25   received the same treatment -- such treatment was less valuable

118

1   for some and more valuable for others.

2           In addition, the _Dow Corning_ case makes the point --

3   and it's clear when one reads the _ALV_ case -- that the facts in

4   _ALV_ even if one accepted the logic set forth by the majority in

5   the opinion are distinguishable not only from the _Dow Corning_

6   situation but from the present situation.  In _ALV_, the Court

7   went to great lengths to show that in fact on the record the

8   objecting creditor very clearly had superior rights given its

9   written guaranty claim which as the Court noted several times,

10  the debtor had previously in the disclosure statement

11  recognized as having additional value as the Court said at Page

12  1153, "What is decisive, however, is the acknowledgment in the

13  disclosure statement that quite apart from the plan the

14  funders, that is the people putting up the money, settled

15  direct claims, that is like the claims of the objecting

16  creditor, for additional consideration."  Given that fact and

17  the fact that the recipients of the direct claims were "easily

18  segregable" the Court felt that it should go through this

19  analysis.  Here, as in _Dow Corning_ to the contrary and in

20  particular now that the record has made it clear that the

21  agreed upon BAWAG settlement reached between the class

22  claimants and BAWAG Bank would not be part of the election to

23  give up non-estate claims, all of the other claims of the

24  putative class as well as the other members of Class 8 that are

25  third party claims are unliquidated and there's really nothing

1  in the record for me to value them.  The holders of those

2  claims have the ability as well as I can and, certainly,

3  putative class representatives do, to make such a determination

4  and to decide whether to elect in or not which was the third

5  point in favor of not finding such provision in violation of

6  1123(a)(4) that the <u>Dow Corning</u> Court made which is that each

7  member would have the right to elect in or not.

8            I should note further there is a clear logic behind

9  this provision.  It does appear to me to be designed simply to

10 isolate and prefer the holders of Class 8 interests that are

11 not members of the class of securities law litigants.  The

12 benefit to all of the class members in having a common strategy

13 against potential litigation targets of both estate claims and

14 non-estate claims should be evident.  No litigant is

15 particularly eager to settle related claims and here all the

16 claims hinge on fraud allegations and breach of fiduciary duty

17 allegations and professional misconduct allegations without

18 getting complete peace, hence, it makes sense that they would,

19 if given the opportunity, want to negotiate with all parties

20 under the same tent and might well pay more for doing so.

21 Moreover, in sharing economic interests in such a resolution

22 the members of Class 8 as well as the other beneficiaries of

23 the two litigation trusts would be able, also, to share in the

24 resources of counsel and the estates' having funded the

25 analysis of the examiner which in other circumstances might not

120

1    be available to parties such as the class action litigants.

2            In addition, as I noted at oral argument, the use of

3    the class action device in a bankruptcy case is problematic

4    where there are no additional benefits from such a device in

5    what is already a collective proceeding and there is a

6    detriment in that adopting the class device gives those who did

7    not file their own proof of claim or proof of interest a free

8    ride in that they would not be subject to the constraint of the

9    bar date.  This mechanism offers such parties an opportunity if

10   appropriate to argue to the Court that there is a rationale for

11   having the class claim recognized in that there will be

12   potentially a significant election into the treatment afforded

13   by Class 8.

14           All of that is a fairly long-winded way of saying

15   that even if I did not follow the plain language of Section

16   1123(a)(4) and determined that I would have to look behind that

17   language to decide that I should also examine whether there is

18   discrimination in placing a condition upon the receipt of the

19   Class 8 distribution that is unfair it seems to me that I

20   cannot make such a finding on this record that some members of

21   Class 8, for example, would be as a matter of course likely to

22   opt out and are in effect being forced to opt out for the

23   benefit of those represented by the ad hoc equity committee.  I

24   don't see that because I believe there are (a) real benefits

25   potentially offered to all Class 8 parties and, also, on this

121

1    record no invidious distinction between the private action

2    claims that would be given up by the ad hoc committee's

3    constituents and anyone else.

4          So for those reasons, although I do find that the

5    lead plaintiffs have standing to make their objection, I find

6    that the objection should be denied.

7          I also note that I have reviewed the provision of the

8    order approving the notice of the right to elect or opt in.

9    The notice would be provided not only to those who have timely

10   filed a proof of claim or interest but also to the purported

11   class representatives.  That would give them the opportunity

12   either in this Court or in the District Court if they chose to

13   make such an election on behalf of the class generally to

14   devise or to work out with the debtor a special procedure to do

15   so.

16         So it seems to me that given the fact that I have not

17   yet recognized the class in this case the provision of the

18   notice to those who have clearly filed timely claims under

19   510(b) is appropriate and that other than giving notice in

20   addition to those parties, to the lead plaintiffs, no further

21   notice need be given since only those parties have complied

22   with the bar date and as far as the lead plaintiffs are

23   concerned, while they complied with the bar date their class

24   claim has not yet been recognized in this Court or in fact in

25   the District Court.

122

1          MR. ST. CLAIR:  Thank you, Your Honor.

2          The next objection was from the joint official

3     liquidators of the Sphinx Funds.

4          MR. MORRIS:  Good afternoon, Your Honor.

5          Matthew Morris from Lovells for the Sphinx

6     liquidators.

7          Your Honor, we only have one standing objection at

8     this point.  Two of our objections we have effectively

9     withdrawn based on the debtor's response in our ballot election

10    last Friday.  The objection that we do want to continue to

11    press, however, is the release of RAI, Refco Alternative

12    Investments, as a contributing non-debtor.

13         As you know, Your Honor -- and I know I'm beginning

14    to sound like a broken record on this point -- the Sphinx

15    liquidators are conducting a factual and legal investigation

16    and conducting discovery and at the conclusion of that may

17    determine that they have claims against RAI, some of which may

18    be quite substantial, and as I understand it from

19    communications with debtor's counsel last night, RAI's

20    contribution to the reorganization is approximately $1.3

21    million which will not, certainly at a de minimis, given the

22    scope of potential claims that the Sphinx liquidators may have,

23    I think, is disproportionate.

24         THE COURT:  Let me ask you -- because it wasn't clear

25    to me whether the claims that the Sphinx liquidators may have

123

1    against RAI were covered by this release and injunction.

2              Have you discussed that with the debtors or the plan

3    proponents?

4              MR. MORRIS:  I had a brief conversation last night

5    with Mr. Dickerson and our reading of it, Your Honor, was that

6    they were.  I mean it was a relatively broad release.  I don't

7    have the language immediately in front of me.

8              THE COURT:  Well, let me read it.  This is 10(c),

9    it's the release and subordination by holders of claims and

10   interests in the debtors.  Now, Sphinx has an independent claim

11   against the debtors?  Is there a claim that Sphinx has against

12   the debtors?

13             MR. MORRIS:  We have several pending claims.

14             THE COURT:  Okay.

15             Separate and apart from any claim growing out of the

16   litigation?  You have separate claims?

17             MR. MORRIS:  Yes.

18             THE COURT:  All right.

19             So 10(c) says that Sphinx is a holder of the claim in

20   any one of the debtors, gives the following release or

21   subordination against contributing non-debtor affiliates and

22   their management and the release says that you either

23   subordinate or release "all claims of the type described in

24   Section 10.2(b) against such parties" and then 10.2(b) says

25   that those such claims are -- you know, "all claims, demands,

124

1    debts, rights, causes of action or liabilities whether

2    liquidated or unliquidated, fixed or contingent, matured or

3    unmatured, known or unknown, seen or unforseen then existing

4    or, thereafter, arising in law or equity or otherwise that are

5    based in whole or in part on any act or omission, transaction,

6    event or other occurrence taking place on or prior to the

7    effective date in any way relating to the debtors, RCM, the

8    Chapter 11 cases, the plan or the disclosure statement."  So

9    these aren't claims that relate to the Chapter 11 cases, the

10   plan or the disclosure statements.  So your concern is that

11   these in some way relate to the debtors or RCM?

12              MR. MORRIS:  Yes.

13              Again, Your Honor --

14              THE COURT:  Let me just follow up.

15              Obviously "relating to" is a fairly broad term but my

16   understanding of this provision is that -- and this came out of

17   Mr. Pauker's testimony also -- the provision is designed to

18   prevent claims that are really claims that would be made

19   against these debtors spilling over -- someone saying, "Well,

20   Refco is a great, big fraud.  I'm going to sue everybody."  My

21   impression is the claims that you're concerned about are much

22   more targeted to RAI.  For example, you describe a particular

23   sum of money that was distributed to RAI or received by RAI.

24              MR. MORRIS:  That's correct, Your Honor.

25              THE COURT:  Other than the fact that RAI is an

125

1   affiliate, it seems to me that it's hard to imagine that a

2   separate payment to RAI from Sphinx would be viewed as covered

3   by this.  I mean I understand the logic of saying, "Well, you

4   can't sue RAI just because you don't like the name, Refco," you

5   know, because you have claims against Refco and you don't like

6   the fact that there was a settlement in the Refco bankruptcy

7   case and so "we're just going to make trouble for RAI," but to

8   the extent there's an actual independent claim against RAI it

9   seems to me under the logic of Mr. Pauker's testimony this

10  wouldn't apply.

11          MR. MORRIS:  If that's the case, Your Honor, that's

12  fine with us.  As we expressed in our objection it was somewhat

13  unclear and we made the objection for that purpose.

14          THE COURT:  Right.

15          I understand that.

16          Do the debtors have any -- I don't know, I mean maybe

17  I'm going beyond what you had in mind but that seems to me to

18  be something you can deal with.

19          MR. ST. CLAIR:  No, Your Honor, we agree completely

20  to the extent it's a claim not against the estates but a claim

21  independently against a non-debtor.

22          THE COURT:  It's not a derivative claim or something

23  like that.

24          MR. ST. CLAIR:  Correct.  Correct.

25          THE COURT:  Right.  Derivative of claims against the

126

1    estate.

2            MR. ST. CLAIR:  It's not intended to pick that up in

3    the release.

4            THE COURT:  All right.

5            Well, it seems to me that you should be able to

6    clarify that with the JOLs in a way that they could keep so

7    that it's not just on the record but they have some form of

8    agreement that they can show to RAI when they sue them.

9            MR. ST. CLAIR:  I'm sure we can reach some agreement

10   with joint liquidators on that specific claim.

11           THE COURT:  Okay.

12           MR. MORRIS:  Thank you, Your Honor.

13           THE COURT:  All right.

14           Okay.

15           MR. ST. CLAIR:  Your Honor, I believe the only

16   remaining objection is that by pro se plaintiff McNeil [Ph.].

17           THE COURT:  Right.

18           Mr. McNeil, are you on the phone?

19                        (No response.)

20           THE COURT:  He had called in and we gave him the

21   number yesterday but I guess he's not on the phone.

22           PHONE OPERATOR:  Your Honor, this is your call

23   operator and I do have Michael McNeil.  He is live in the

24   courtroom (sic).

25           THE COURT:  Okay.

127

1          Mr. McNeil?

2                    (No response.)

3          THE COURT:  Well, I read the letter and it's more

4     than a rant, it's a real letter.  I mean he raises important

5     issues.  So the main thing I'd like you to address is not the

6     issue about constructive trust and the like because as

7     recognized in the responsive brief and has been set forth on

8     the record, the plan itself does not do anything with regard to

9     constructive trust claims.  Those are still assertable and they

10    can be dealt with in a separate litigation.

11         MR. ST. CLAIR:  That's correct.

12         THE COURT:  The one point Mr. McNeil makes that I'd

13    like to hear a response on is that FCA should really be in a

14    commodities broker liquidation and I don't know whether that

15    falls under (a)(7) or (a)(1) but I've looked at it

16    independently and have some thoughts on it but I imagine that

17    someone on the debtor's side has looked at this before.

18         MR. ST. CLAIR:  Absolutely.

19         THE COURT:  Given all the eminent counsel who have

20    represented foreign exchange claimants in the cases, I would

21    have thought it might have come up before.

22         MR. ST. CLAIR:  Let me caucus for a minute.

23         THE COURT:  Okay.

24                    (Pause in proceedings.)

25         MR. ST. CLAIR:  Your Honor, we'll check the Code to

128

1    confirm this but it's our understanding that a commodities

2    broker is not a registered broker so it wouldn't fall within

3    Section 7 on Chapter 7 like a registered stockbroker would.

4              THE COURT:  You mean FXA is not registered?

5              MR. ST. CLAIR:  Correct.

6              A commodities broker is not registered as a

7    stockbroker.

8              THE COURT:  All right.

9              Okay.

10             Does anyone else have anything to say on this?

11             MR. KIRPALANI:  Your Honor, it's Susheel Kirpalani.

12             May I just -- I was just caucusing with Mr. Hodare

13   [Ph.] and he was reminding me that Your Honor during the RCM

14   conversion trial ruling had found based on Mr. Golden's

15   testimony there, which we believe would be equally applicable

16   here to the extent there is any kind of determination,

17   preliminary or otherwise by the Court, that FXA does qualify

18   for a different chapter in Chapter 11, that the same provision

19   in 1112 would apply with equal force and I think Mr. Pauker's

20   testimony today, particularly in respect of the best interests

21   test, would go a long way towards a record to support that.

22             THE COURT:  Okay.

23             All right.

24             I agree with that.  I actually spent a fair amount of

25   time looking at his along with my poor clerks and I see

129

1    everyone flipping through Subchapter 4 and it's not easy

2    reading.

3            I think the short answer is that the question of

4    whether FXA is subject to and required to be liquidated under

5    Subchapter 4 of Chapter 7 is one that is not easily answered

6    for a number of reasons; the first is the one that has been

7    articulated just now which is that it was not a registered

8    broker.  Mr. McNeil properly cites the Busirus [Ph.] case that

9    appears at 127 BR 45, District Court of Kansas, 1988, in which

10   the Court said that notwithstanding that fact it would treat

11   the debtor as subject to Subchapter 4.  However, Collier at 6

12   Collier on Bankruptcy, Paragraph 761.10(1) quite severely

13   criticizes Busirus and with some real logic behind it.  It

14   says, "To achieve the purpose of the CEA the `ordinate course

15   of business' requirement should be interpreted in a restrictive

16   and exclusionary manner in analyzing the purchase and sale of

17   commodity futures for others by an entity not registered as an

18   FCM or futures commission merchant and not generally known to

19   be in such a business but in a liberal expansive manner when

20   reviewing commodity transactions for others by a registered

21   FCM."  The reason for that statement is the unfairness to the

22   other general creditors of the alleged broker and those

23   creditors here are quite significant; you have the banks with

24   their lien and you have the bond holders with their guaranty.

25   I take judicial notice of the facts and it's quite clear given

130

1   that I've had three trials in the last several days on this

2   point, the customer statements received by all the FXA

3   customers make it clear that FXA is not holding funds in

4   segregation and that it's not registered and I think that at a

5   minimum there's a very substantial dispute about whether the

6   logic of the Busirus case could be applied to this case.

7          Moreover, the product that was brokered by FXA is

8   foreign exchange primarily -- foreign currency transactions --

9   and until recently, until 2000, there was no question, I

10  believe, that such a product was not a commodity under the

11  definitions set forth in 7 U.S.C. Section 1(a)(4) and in

12  particular in light of the so-called Treasury Amendment which

13  excluded foreign exchange -- foreign currency -- from the

14  definition of commodity.  That was somewhat amended in 2000 to

15  permit the area to be regulated but it's not clear whether it,

16  nevertheless, fits within the definition of commodity and in

17  fact Collier says at Paragraph 760.021(b), "The CEA does not

18  apply and the commission does not have jurisdiction over

19  transactions in foreign currency unless such transactions

20  involve the sale thereof for future delivery conducted on a

21  board of trade" and that's been in this context defined

22  narrowly because of the Treasury Amendment.  Then Colliers goes

23  on to say, "Such transactions would not be considered commodity

24  contracts and engaging solely in such transactions would

25  accordingly not render an entity a commodity broker for

131

1  purposes of the commodity broker liquidation subchapter."  It

2  goes on to say it was modified in certain respects in 2000,

3  Collier says this, but doesn't really say what the consequences

4  of that modification are and as best as I can make out the

5  modification in the Commodity Future Modernization Act permits

6  regulation of certain FX transactions in certain contexts and

7  based on today's record it's not clear to me that FXA's

8  customers or the majority of them would fall into that context.

9      So, again, at a minimum it seems to me that the issue

10  of conversion of this case -- and there's no pending motion to

11  convert -- is problematic and as Mr. Kirpalani said, for the

12  same reasons that I did not order immediate conversion of RCM,

13  although I ultimately concluded it was a stockbroker and the

14  basis for that was, I think, a lot clearer than the basis here

15  for concluding -- if I were to conclude that FXA was a

16  commodity broker subject to Subchapter 4.

17      I take the view that the settlements provided for in

18  the plan including the plan's treatment of the bank's claims

19  against FXA mean that there are -- even if I were to ultimately

20  conclude that FXA was subject to Subchapter 4 of Chapter 7,

21  there are unusual circumstances that would under this plan

22  preclude such conversion and that the secured debt's treatment

23  under the plan as against FXA and the other benefits of the

24  plan eluded to or testified to by Mr. Pauker are a proper

25  settlement of what would be a problematic determination.

132

1      So for that reason I'll overrule Mr. McNeil's

2  objection.

3      MR. ST. CLAIR:  Thank you, Your Honor.

4      I believe that disposes all of the confirmation

5  objections and unless Your Honor has any questions or issues

6  the Court would like to address I think we're comfortable

7  standing on the undisputed record of the testimony provided by

8  Mr. Pauker in front of the Court and asking the Court to

9  confirm the plan.

10      THE COURT:  All right.

11      I will confirm the plan based not only upon

12  Mr. Pauker's testimony but also the liquidation analysis and

13  the expert report submitted by Houlihan.  I conclude that I can

14  make the findings with respect to the plan as set forth in the

15  proposed confirmation order and that in particular the

16  settlements embodied in the plan are in the best interests of

17  various debtors in entering into those settlements and are also

18  fair and equitable.  The settlements were embodied in the plan

19  which gave all the parties-in-interest additional protection in

20  terms of rights to object and rights to vote and although the

21  unsecured creditor class of FXA was the only voting class not

22  to accept the plan, I conclude that the proponents have

23  satisfied 1129(b) with respect to that class, particularly in

24  light of not only the fact that there's no distribution to a

25  junior of FXA but, also, the benefits of the settlement which

133

1    in fact enhance the recovery of that class.

2            I had one question about the order which is a

3    provision near the end.  I think it's the next to last

4    provision of it which is kind of like a 364(m) provision.  I've

5    never understood the authority for that type of provision in a

6    confirmation order.

7            Maybe someone can explain it?

8            It basically says, "pending an appeal if any action

9    is taken" -- it basically prejudges mootness it seems.

10           Anyway, but my inclination is to delete it unless

11   there's some rationale for it that someone wants to articulate.

12           MS. HENRY:  No, Your Honor.

13           MR. ST. CLAIR:  You're not addressing the

14   inconsistencies --

15           THE COURT:  No, it's right before that.

16           MR. ST. CLAIR:  Oh, okay.

17                   (Pause in proceedings.)

18           MS. HENRY:  Your Honor, which paragraph?

19           THE COURT:  Well, I lost my copy of the order.

20           MS. HENRY:  Okay.

21           We'll find it.  Thanks.

22                   (Pause in proceedings.)

23           THE COURT:  44.  Reversal.  Always a favorite term

24   for bankruptcy judges.

25           It says, "If any or all of the provisions of this

134

1  confirmation order are hereafter reversed, modified or vacated,

2  actions taken in good faith in the meantime are --

3          MR. ST. CLAIR:  363.  Yes.

4          THE COURT:  Yes.

5          I think I should delete that.

6          MR. ST. CLAIR:  We'd be okay with deleting that.

7          Yes.

8          THE COURT:  Okay.

9          MR. ST. CLAIR:  Your Honor, on behalf of the plan

10 proponents, too, I would like to express our deep gratification

11 to the Court and the staff throughout these eight months.  It's

12 been a very difficult case and this Court has given us time

13 when we needed it and ruled promptly and we very much

14 appreciate all that it's done.

15         THE COURT:  Okay.

16         Well, I wasn't working around the clock like you guys

17 were.

18         There's that one remaining motion, I think, which is

19 the motion by Mr. Kirschner to convert the case?

20         MS. BROZMAN:  Yes.

21         Your Honor, I wonder whether you would be kind enough

22 to indulge the plan proponents, the U.S. Trustee, the other

23 debtors in a chambers conference?

24         THE COURT:  Okay.

25         Is it likely we'll go back on the record after that?

135

1          MS. BROZMAN:  Possibly for just a minute and a half.

2          THE COURT:  All right.

3          So we'll keep the line open and people are free to

4     stay if they want to.

5          Before we break though in case people decide to

6     leave, you're going to submit to me then a revised confirmation

7     order?

8          MR. ST. CLAIR:  We will, Your Honor, and we'll try

9     and get you one this afternoon.

10          THE COURT:  Okay.

11          I'll also look for the stipulation on West Loop and I

12     guess a couple of other stipulations that have been eluded to.

13          MR. ST. CLAIR:  Your Honor, I also want to mention on

14     the record that we've agreed with respect to ballots that were

15     submitted where the vote wasn't counted for some reason or the

16     other, we will still recognize the elections that were made in

17     those ballots.

18          THE COURT:  Okay.

19                         (Off the record.)

20          THE COURT:  Please be seated.

21          So we're back on the record in Refco.

22          As I said, the last matter on the calendar is the

23     Chapter 11 Trustee's motion to convert and, Ms. Brozman, you

24     had something to say on that?

25          MS. BROZMAN:  I did, Your Honor.

136

1          As you know, the RCM settlement agreement can be

2     culminated in one of two ways; one is the confirmation of the

3     Chapter 11 plan, the other is through conversion of the case.

4          Your Honor, I assume, based on the record that we

5     heard earlier in the day, is going to enter an order of

6     confirmation very soon but I'm going to ask Your Honor in an

7     abundance of caution if you would be so kind as to adjourn the

8     conversion motion until the next date that we're in court which

9     is the 21st of December.

10          THE COURT:  That's fine.

11          I have no problem in adjourning that motion.

12          As I said, I did review the draft confirmation order

13     that was submitted and with the one change that I set on the

14     record I'm comfortable with that order and prepared to make

15     those findings so that will be entered, assuming the changes

16     made today, and in light of that I continue to see unusual

17     circumstances that would not require conversion of the case.

18     In fact, in some respects it may be moot because of the fact

19     that the plan is confirmed and implements the settlement

20     agreement but the Trustee certainly can have an adjournment to

21     think about it some more.

22          MS. BROZMAN:  Thank you so much, Your Honor.

23          THE COURT:  Okay.

24          MR. KIRPALANI:  Your Honor, there's just one more --

25     not a housekeeping matter, but one more matter that the

137

1    examiner and the U.S. Trustee's Office had raised relating to

2    the plan specifically to the litigation trust agreement.  It's

3    not a major matter but we've reached an agreement and it was

4    requested that I put it on the record.

5            THE COURT:  Okay.

6            MR. KIRPALANI:  The litigation trust agreement that

7    was filed on December 4th and subsequently modified and

8    circulated among the parties will be finalized prior to the

9    effective date pursuant the plan, provides for the examiner --

10   given that the creditors committee and the debtors shall no

11   longer exist for the same types of purposes, the litigation

12   trustee will wind up becoming the lead investigator and

13   prosecutor of causes of action so we needed a mechanism to

14   insure that the cooperation that had been experienced to date

15   would continue.

16           The language in the litigation trust agreement states

17   that "The examiner shall deliver the report to the litigation

18   trustee and its appendices when it's completed."  The committee

19   had put in additional language stating that we would have the

20   right to seek additional or different information before or

21   after the report.  The report might not come out for four

22   months and they had some concern that we would interfere with

23   their investigation.  We suggested we could always come back to

24   court and the idea was not change what is the status quo but

25   rather to continue it and I think with that understanding

138

1    Mr. Valez-Rivera was okay with the language.

2            THE COURT:  Is that all right?

3            The burden is on the committee to do something in

4    other words?

5            MR. KIRPALANI:  Yes, it is.

6            MR. CAMPBELL:  Your Honor, if I could, Charles

7    Campbell with McKenna, Long & Aldridge representing the

8    examiner, Joshua Hogberg [Ph.]

9            Just to be sure the record is clear about what our

10   understanding of what the examiner is to do going forward, we

11   are going to cooperate with the litigation trustee and his

12   counsel just as we have with the committee which means

13   coordinating interviews and depositions.  There are some

14   documents that the examiner has that he's under restriction as

15   a result of protocols with government agencies not to share.

16   So those kind of documents we will not be able to share but

17   nothing is changing from what has happened in terms of the

18   cooperation that has taken place thus far.  That's up until the

19   date the examiner files this report.

20           THE COURT:  Right.

21           MR. CAMPBELL:  Once he files his report if the

22   litigation trustee feels that he needs anything other than the

23   report and the appendices or exhibits, then we will meet with

24   the litigation trustee and try to reach an accord and if we

25   cannot we'll come to the Court to get that resolved.

139

1          THE COURT:  Okay.

2          That sounds reasonable.

3          MR. CAMPBELL:  Thank you.

4          THE COURT:  Again, that was another reason I thought

5   that Class 8 arrangements had some value to all the people.

6          Okay.  Very well.  Thank you.

7                          *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

140

1                              * * * * *

2        I certify that the foregoing is a court transcript from an

3   electronic sound recording of the proceedings in the above-

4   entitled matter.

5

6                           _____

7                                    Ruth Ann Hager

8   Dated: 12/16/06

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25