EXECUTION COPY

## SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** (this "*Agreement*") is made and entered into as of June 29, 2006, among (i) Refco Capital Markets, Ltd., a Bermuda company ("*RCM*"), acting by and through Marc S. Kirschner (the "*RCM Trustee*") in his capacity as trustee of RCM in its Chapter 11 bankruptcy case referred to below and (ii) those customers and other creditors of RCM named on the signature pages below acting by and through their representatives named on the signature pages.

**WHEREAS**, on October 17, 2005 (the "*Filing Date*"), RCM and Refco, Inc. and, on the Filing Date and on subsequent dates, certain of their affiliates (RCM, Refco, Inc. and such affiliates being herein called, collectively, the "*Debtors*") filed separate petitions under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*");

**WHEREAS**, RCM's Chapter 11 case (the "*RCM Case*") and the other Debtors' Chapter 11 cases (collectively with the RCM Case, the "*Cases*") are being jointly administered as Case No. 05-60006 (RDD);

**WHEREAS**, the Official Committee of Unsecured Creditors (the "*Creditors' Committee*") was appointed in the Cases by the Bankruptcy Court on October 28, 2005, to represent the Debtors' general unsecured creditors in the Cases;

**WHEREAS**, on December 12, 2005, certain creditors of RCM listed on Exhibit A as the MCG Members (the "*MCG Members*") brought a motion (the "*Conversion Motion*") against RCM alleging, among other things, that (a) RCM is a "stockbroker" as defined in § 101(53A) of the Bankruptcy Code, (b) the MCG Members are "customers" of RCM as defined in § 741(2) of the Bankruptcy Code, (c) under § 109(d) of the Bankruptcy Code RCM was not eligible to be a debtor under Chapter 11, (d) under § 1112 of the Bankruptcy Code RCM's case must be converted to Chapter 7 and administered under Subchapter III of Chapter 7, and (e) the MCG Members are entitled under § 752 of the Bankruptcy Code to enforce their claims as customers to "customer property" as defined in § 741(4) of the Bankruptcy Code;

**WHEREAS**, certain other creditors of RCM listed on Exhibit A as the Joinder Parties (the "*Joinder Parties*") subsequently joined with the MCG Members in the Conversion Motion;

**WHEREAS**, the Bankruptcy Court entered certain procedural orders expediting discovery and the trial of the issues raised by the Conversion Motion;

**WHEREAS**, the MCG Members and the Joinder Parties prosecuted the Conversion Motion while the Debtors, the Creditors' Committee and various objecting parties, including

2

foreign exchange and metals transaction customers of RCM, actively opposed the Conversion Motion;

**WHEREAS**, the litigation of the Conversion Motion included expedited discovery (interrogatories, document production and approximately 30 depositions taken), expedited briefing, and a five-day evidentiary trial that began on February 14, 2006, and concluded with final arguments on March 14, 2006;

**WHEREAS**, after final arguments were concluded before the Bankruptcy Court on the Conversion Motion on March 14, 2006, the Bankruptcy Court, over the objections of the objecting parties, issued a preliminary ruling finding that RCM met the Bankruptcy Code's definition of a stockbroker and that at least one of the MCG Members met the requirements of the Bankruptcy Code to be a customer; the Bankruptcy Court required the appointment of a Chapter 11 trustee of RCM but otherwise, at the request of the MCG Parties, the Joinder Parties and certain other parties, agreed to defer acting on the Conversion Motion while various parties in the RCM Case attempted to fashion a settlement of the priority and other issues raised by the Conversion Motion;

**WHEREAS**, on March 22, 2006, the Bankruptcy Court entered an order requiring the appointment of a Chapter 11 trustee for RCM;

**WHEREAS**, due to continuing delays in obtaining the appointment of a Chapter 11 trustee for RCM after the March 14, 2006, preliminary ruling, the MCG Parties and the Joinder Parties prepared and filed an application on April 5, 2006, with the Bankruptcy Court requesting it to establish procedures in order to conduct an immediate creditor election of a Chapter 11 trustee for RCM;

**WHEREAS,** on April 10, 2006, the U.S. Trustee filed a notice with the Bankruptcy Court that the U.S. Trustee had appointed Marc S. Kirschner as the Chapter 11 trustee for RCM, subject to further order of the Bankruptcy Court;

**WHEREAS**, on April 13, 2006, the Bankruptcy Court entered an order authorizing Marc S. Kirschner to act as the Chapter 11 trustee of RCM in the RCM Case;

**WHEREAS**, there are pending before the Bankruptcy Court various adversary proceedings, contested matters and other actions against the RCM estate seeking a determination of whether certain property held by or on behalf of RCM constitutes property of the RCM estate and which actions have been stayed by the Bankruptcy Court's "Order Staying 'Estate Property Issue' Proceedings" dated November 28, 2005 (Docket No. 634), as modified to the date hereof (such actions being referred to in such order, and being hereinafter referred to, as the "*Stayed Proceedings*");

**WHEREAS**, the RCM Trustee and the other parties hereto have reviewed materials prepared by professionals retained by the Debtors and the Creditors' Committee and have negotiated among each other with a view to avoiding protracted litigation and expense relating to the issues raised by the Conversion Motion and the Stayed Proceedings, including whether the

SETTLEMENT AGREEMENT

3

RCM Case must be converted to a Chapter 7 case administered under Subchapter III of Chapter 7, who is a customer of RCM, what constitutes customer property, how to value and administer customer property and other financial assets of the RCM estate, what other assets might or might not constitute property of the RCM estate and how to address certain other claims by, on behalf of or against the RCM estate in the context of administering and liquidating the property of the RCM estate; and

**WHEREAS**, in order to resolve the issues raised by the Conversion Motion and the Stayed Proceedings to the maximum extent possible in the interests of all creditors of the RCM estate and to avoid further protracted litigation and expense, the parties hereto, having reached an agreement in principle embodied in a term sheet read into the record in camera before the Bankruptcy Court on May 16, 2006 (the *"Term Sheet"*), have agreed to enter into this Agreement based upon the Term Sheet and concurrently herewith to seek approval of this Agreement by the Bankruptcy Court pursuant to Rule 9019 of the Bankruptcy Rules and §§ 105(a) and 363 of the Bankruptcy Code to settle, upon the terms, conditions and other provisions and to the extent set forth herein, the issues raised by the Conversion Motion and the Stayed Proceedings;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**§1.    Definitions**. In this Agreement, terms defined and exclusively used in a single Section of this Agreement have the meanings set forth in that Section.  In addition, in this Agreement, the following terms have the following meanings:

*"Advance Amount"* has the meaning set forth in §4 and, in the event of any Advance Increase Amount, the term *"Advance Amounts"* includes the Advance Increase Amount.

*"Advance Increase Amount"* has the meaning set forth in §7(d)(ii).

*"Additional Property"* means all assets and claims of the RCM estate or the RCM Trustee for the benefit of creditors of the RCM estate other than Assets in Place and Specified Customer Preference Claims.  The term includes, without limitation, (a) all loan receivable, intercompany and tax refund claims, (b) all claims on behalf of the RCM estate arising under Chapter 5 of the Bankruptcy Code, and, if the RCM Case is converted to a Chapter 7 case administered under Subchapter III of Chapter 7, all claims for wrongful conversion of customer property and all other claims by or on behalf of the RCM estate arising under Chapter 7, other than Specified Customer Preference Claims, and (c) all claims on behalf of the RCM estate against any other Debtors and their affiliates or against any officers, directors, employees, agents or other representatives, insurers of, lenders to or attorneys, accountants, investment bankers or other professionals or other independent contractors engaged by or having legal obligations to any of the Debtors and their affiliates.

*"Agreement"* has the meaning set forth in the first paragraph.

4

"*April 25 Analysis*" means the schedule of assets of the RCM estate and estimated values dated April 25, 2006, prepared by the Creditors' Committee's financial advisor, Houlihan Lokey Howard & Zukin LLC, and attached hereto as <u>Exhibit B</u>.

"*Assets in Place*" means solely (a) the property set forth on the April 25 Analysis, as supplemented by the property described in the May 12 Memorandum, (b) the proceeds of the SPhinX Settlement (see §7(b)), and (c) any and all proceeds thereof.

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Cases*" has the meaning set forth in the Recitals.

"*Conversion Motion*" has the meaning set forth in the Recitals.

"*Creditor*" includes a person who, if the RCM Case were converted to a Chapter 7 case administered under Subchapter III of Chapter 7, would qualify as a "customer" as defined in § 741(2) of the Bankruptcy Code.

"*Creditors' Committee*" has the meaning set forth in the Recitals.

"*Filing Date*" has the meaning set forth in the Recitals.

"*Final Order*" means a judicial order that is not subject to stay, modification or appeal and for which any period for lodging an appeal or a request for review, rehearing or certiorari has expired. An order shall not fail to be a Final Order merely because there is a possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Bankruptcy Rules may be but has not been filed.

"*FX/Unsecured Claims*" means all prepetition general unsecured claims against the RCM estate. The term includes the Leuthold Remaining Claim. The term does not include (a) administrative or priority claims against the RCM estate, (b) Securities Customer Claims or (c) the Leuthold Metals Claim.

"*Houlihan Claims Schedule*" means the schedule of claims against the RCM estate dated June 8, 2006, prepared by the Creditors' Committee's financial advisor, Houlihan Lokey Howard & Zukin LLC, and delivered to the RCM Trustee, based upon Schedules B-33 and F-1 to RCM's Schedule of Assets and Liabilities filed with the Bankruptcy Court on or about December 30, 2005, in the RCM Case.

"*Implied Deficiency Claims*" has the meaning set forth in §8(b).

"*Initial Effective Date*" has the meaning set forth in §14(b).

"*Interest Accrual*" has the meaning set forth in §14(b)(iv)(A).

BUSDOCS/1558440.20

5

"*Invested Cash Rate*" means, for any period, the average of the annual rates of interest actually earned during such period by the RCM estate on its assets consisting of cash and cash equivalents.

"*Joinder Parties*" has the meaning set forth in the Recitals.

"*Leuthold*" means Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.

"*Leuthold Claimed Metals*" means the 1,074,060 ounces of silver and the 16,493 ounces of palladium that Leuthold alleges are held by RCM in custody for Leuthold.

"*Leuthold Metals Claim*" means Leuthold's claim against the RCM estate for the Leuthold Claimed Metals.

"*Leuthold Remaining Claim*" means all claims of Leuthold against the RCM estate other than the Leuthold Metals Claim.

"*May 12 Memorandum*" means the memorandum dated May 12, 2006, from Stacey Hightower to the RCM Trustee, a copy of which is attached as Exhibit C.

"*Metals Sale*" has the meaning set forth in §7(c).

"*MCG Members*" has the meaning set forth in the Recitals.

"*Plan, Negotiation and Litigation Advisory Committee*" has the meaning set forth in §9(a).

"*Portfolio Management Advisory Committee*" has the meaning set forth in §9(b).

"*Pro Rata*" has the meaning set forth in §8.

"*RCM*" has the meaning set forth in the first paragraph.

"*RCM Case*" has the meaning set forth in the Recitals.

"*RCM Trustee*" has the meaning set forth in the first paragraph. The term includes any successor Chapter 11 trustee for RCM or, if the RCM Case is converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, any trustee appointed in the Chapter 7 case including, if appointed, the RCM Trustee acting in the RCM Case immediately prior to the conversion.

"*Rogers Funds Claims*" means the claims of Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund L.P. asserted against RCM in their complaint dated October 24, 2005 (Adv. Proc. No. 05-03064 (RDD)).

"*Securities Customer Claims*" means claims against the RCM estate to the extent held by entities that, if the RCM Case were converted to a Chapter 7 case to be administered under

6

Subchapter III of Chapter 7, would qualify and be able to assert the claims as "customers" of RCM under § 741(2) of the Bankruptcy Code, as further determined as provided in §3.

"*Specified Customer Preference Claim*" means any claim of the RCM estate or the RCM Trustee to recover money or other property for the benefit of creditors of the RCM estate if (a) the claim is a preference claim, whether arising under § 547 or § 749 of the Bankruptcy Code, seeking avoidance of a transfer of property, including cash or securities, that would, if the RCM Case were converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, be "customer property" as defined in § 741(4) of the Bankruptcy Code, (b) if the RCM Case were converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, the transfer would have been made to a transferee who, but for the transfer, would have held a Securities Customer Claim for such property or its value as "customer property", (c) the transferee was not a Debtor, an "affiliate of RCM (as such term is defined in § 101 of the Bankruptcy Code) or a non-Debtor subsidiary of Refco, Inc. and (d) the transfer was made between the period commencing on October 10, 2005, and ending on and including the Filing Date.

"*SPhinX Settlement*" means the settlement, approved by the Bankruptcy Court on June 8, 2006, of the adversary proceeding (Adv. Proc. No. 05-331(RDD)) brought by the Creditors' Committee on behalf of the RCM estate against SPhinX Managed Futures Fund SPC, et al., as set forth in the Motion dated April 26, 2006, entitled "Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) for Approval of Settlement and Compromise of Avoidance Claims against SPhinx Managed Futures fund SPC, et al."

"*Stayed Proceedings*" has the meaning set forth in the Recitals.

"*Subsequent Effective Date*" has the meaning set forth in §14(c).

"*Super Majority*" means those creditors of the RCM estate that are parties to this Agreement holding at least 75% in amount of the Securities Customer Claims held by parties to this Agreement and holding at least 75% in amount of the FX/Unsecured Claims held by parties to this Agreement. Solely for the purpose of determining the Super Majority, (a) the amount of a creditor's Securities Customer Claims or FX/Unsecured Claims shall be the amounts of the claims set forth on the Houlihan Claims Schedule, subject to the amounts of the claims, at the time of determination, having been allowed, modified or disallowed, in whole or in part, under the procedures for resolving claims in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case, (b) a creditor or a group of creditors under common control or management that holds one or more Securities Customer Claims and one or more FX/Unsecured Claims must elect to vote either its Securities Customer Claims or its FX/Unsecured Claims, and the type of claims that such creditor or group of creditors elects *not* to vote shall not be counted in the determination as to whether a Super Majority has been achieved, and (c) unless and until such creditor or group of creditors makes the election, none of the claims of such creditor or group of creditors shall be counted in the determination of whether the Super Majority has been achieved. The election, which shall be irrevocable, shall be made by the creditor or an authorized representative of the group of creditors providing notice of the election to the RCM Trustee and to the Plan, Negotiation and Litigation Advisory Committee.

SETTLEMENT AGREEMENT

7

"*Term Sheet*" has the meaning set forth in the Recitals.

"*True-up Distributions*" means distributions of Additional Property, subsequent to the initial distribution of Additional Property, so that the holders of the allowed Securities Customer Claims and the holders of the allowed FX/Unsecured Claims will have then received total distributions of Additional Property pursuant to this Agreement in their then respective Pro Rata shares.

## §2.    Initial and Ongoing Actions.

(a)    *Bankruptcy Court Approval of this Agreement.*  Concurrently with his execution and delivery of this Agreement, the RCM Trustee will file a motion in the Bankruptcy Court seeking approval of the terms, conditions and other provisions of this Agreement. The motion shall be made with notice, including publication notice, to the other Debtors and all other parties in interest in the Cases.

(b)    *Deferral of Further Action on the Conversion Motion.* The MCG Parties and the Joinder Parties agree, except as otherwise provided in this Agreement, to defer further action on the Conversion Motion and to request, in connection with the motion referred to in §2(a), that the Bankruptcy Court suspend any further action on the Conversion Motion except as otherwise provided in this Agreement.

(c)    *Continuation of Stay of Stayed Proceedings.*  The parties hereto agree to request, in connection with the motion referred to in §2(a), that the Bankruptcy Court continue its stay order with respect to the Stayed Proceedings except as otherwise provided in this Agreement.

(d)    *Rogers Funds Claims.*  Unless otherwise agreed by the RCM Trustee and the Super Majority, if by the end of 14 days from the date of the filing of the motion referred to in §2(a), the holders of the Rogers Funds Claims shall not have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed Securities Customer Claims or, alternatively, as allowed FX/Unsecured Claims, the RCM Trustee shall promptly, and any other party hereto may, request that the Bankruptcy Court finalize and enter the Bankruptcy Court's preliminary ruling on the Conversion Motion as a final ruling, that the RCM Case be converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7 and that the Bankruptcy Court determine that the Rogers Funds Claims are FX/Unsecured Claims. To obtain the determination that the Rogers Funds Claims are FX/Unsecured Claims, the RCM Trustee shall take such action as may be necessary or advisable including obtaining a termination of the stay relating to the adversary proceeding brought by the holders of the Rogers Funds Claims.

(e)    *Other Actions.*  The parties hereto shall, whether in the RCM Case or, if the RCM Case is converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case, (a) execute and deliver such other instruments and documents, provide such additional information and take or cause to be taken all such other actions as may be reasonably necessary or advisable to consummate and carry out the terms and other provisions of this Agreement and (b) consistent with the terms, conditions and

SETTLEMENT AGREEMENT

8

other provisions of this Agreement, use commercially reasonable efforts to cause distributions to creditors of the RCM estate to be made as soon as reasonably practicable.

### §3. Classification of Claims and Net Equity Claims.

(a) *Classification.* In determining whether a claim is a Securities Customer Claim or an FX/Unsecured Claim, the following provisions apply:

(i) Securities Customer Claims shall include, without limitation, all entities' net equity claims based on (A) a securities account opened with RCM as evidenced by a written "CUSTOMER AGREEMENT - Securities Account" contract signed, performed or otherwise accepted by RCM, including without limitation, as evidenced by an RCM generated monthly account statement, and (B) either (1) the actual receipt, acquisition, holding by, or deposit, delivery or other entrustment with or to RCM for the claimant's account of securities for one or more of the purposes set forth in § 741(2)(A)(i) to (vi) of the Bankruptcy Code or (2) a transaction described in § 741(2)(B)(i) or (ii) of the Bankruptcy Code.

(ii) The RCM Trustee confirms, based on his review of the underlying documents and other materials provided to him, and the other parties to this Agreement acknowledge and agree as a condition to and for purposes of this Agreement, that all of the entities listed on the Houlihan Claims Schedule who are included in the MCG Parties or the Joinder Parties are holders of Securities Customer Claims. Upon approval of this Agreement by the Bankruptcy Court, the status of the MCG Parties and the Joinder Parties as holders of Securities Customer Claims will be considered and conclusively determined to be holders of Securities Customer Claims. That determination will be binding on the other parties to this Agreement and on all other parties in interest in the Cases.

(iii) An entity listed on the Houlihan Claims Schedule as a holder of a Securities Customer Claim that is not identified as either an MCG Party or a Joinder Party is anticipated by the creditor parties to this Agreement to become an entity that will be determined to be a holder of a Securities Customer Claim based on information linking such entity to one or more specific customer securities accounts at RCM having a positive balance on the Filing Date (such Securities Customer Claim being herein called an *"Anticipated Securities Customer Claim"*). However, nothing in this Agreement relieves any entity of filing any required proof of claim relating to any Anticipated Securities Customer Claim by any applicable bar date or establishes a presumption or determination that any Anticipated Securities Customer Claim constitutes either an allowed Securities Customer Claim or an allowed FX/Unsecured Claim. Any entity holding an Anticipated Securities Customer Claim for which a proof of claim has been timely filed shall be considered as a holder of a Securities Customer Claim, absent objection to the claim. If an objection is made to the claim, the entity must, in order to hold an allowed claim, prove the nature, extent, amount, priority and validity of its claim in accordance with the Bankruptcy Code, Bankruptcy Rules, and applicable orders entered in connection with the RCM Case and the other Cases.

SETTLEMENT AGREEMENT

9

(iv)     Subject to clause (v) of this subsection, a creditor holding a claim listed on the Houlihan Claims Schedule as an FX/Unsecured Claim may request that the Bankruptcy Court determine that the claim is a Securities Customer Claim instead of an FX/Unsecured Claim, based on such creditor filing a motion (a *"Creditor Motion"*) asserting the claim as a Securities Customer Claim and scheduling a hearing thereon. The claim or any portion thereof may not be determined to be or treated as a Securities Customer Claim unless and until (1) such creditor files the Creditor Motion with the Bankruptcy Court and serves it on all parties hereto and on such other persons as applicable law or rules or the Bankruptcy Court may require, at least ten days' prior to the hearing before the Bankruptcy Court, at which the RCM Trustee or any other creditor of the RCM estate may object to the proposed determination or treatment, and (2) the Bankruptcy Court enters an order approving, in whole or in part, the determination or treatment.   The moving creditor shall have the burdens of production and proof to demonstrate by a preponderance of evidence that the claim, in whole or in part, should be determined to be or treated as a Securities Customer Claim.

(v)     As a condition to and for purposes of this Agreement, each of the parties hereto listed on the Houlihan Claims Schedule exclusively as a holder of FX/Unsecured Claims hereby agrees and acknowledges that it is not a holder of any Securities Customer Claims and relinquishes any right that it may have for any of its claims to be determined to be or treated as Securities Customer Claims.

(vi)     Subject to clause (ii) of this subsection, the RCM Trustee may, in the exercise of his fiduciary duty, propose to treat all or any portion of a claim listed on the Houlihan Claims Schedule as a Securities Customer Claim instead as an FX/Unsecured Claim, based on the RCM Trustee filing a "Notice of Proposed Additional FX/Unsecured Claim" (a *"Trustee Additional FX/Unsecured Claim Notice"*) identifying the claim proposed to be treated as an FX/Unsecured Claim and scheduling a hearing thereon. The claim or any portion thereof may not be determined to be or treated as an FX/Unsecured Claim unless and until (1) the RCM Trustee files the Trustee Additional FX/Unsecured Claim Notice with the Bankruptcy Court and serves it on all parties hereto and on such other persons as applicable law or rules or the Bankruptcy Court may require, at least ten days' prior to the hearing before the Bankruptcy Court, at which any other creditor of the RCM estate may object to the proposed determination or treatment, and (2) the Bankruptcy Court enters an order approving, in whole or in part, the determination or treatment.

(vii)     The claims resolution procedures referred to in §10(b) shall be consistent with the provisions of this subsection in addition to providing for the resolution of other claims not addressed in this subsection.

(b)     *Net Equity Claims.*  For the purpose of determining the amount of a "net equity claim" in accordance with § 741(6) of the Bankruptcy Code, the following valuations of securities shall be prima facie evidence of their value as of the Filing Date:

10

(i)    in the case of fixed income securities commonly traded on an over-the-counter basis (excluding non-defaulted, non-restructured internationally issued US dollar denominated sovereign debt securities, US government securities and European government securities), or equity securities claimed by a customer, or group of customers under common management or control, of RCM for which the total amount of equity shares credited to one or more securities accounts of the customer or group of customers at RCM as of the Filing Date was at least five times the average daily trading volume of such equity shares for the 20 trading days prior to the Filing Date, any valuation of such securities as of the Filing Date provided not later than 30 days after the Filing Date in writing by a broker or dealer active in such securities reflecting market or replacement value of such securities, and

(ii)    in the case of other securities or, in the case of fixed income or equity securities for which the foregoing clause (i) is not applicable for any reason, any valuation of the securities contained in a regularly issued daily or monthly statement from RCM indicating the value of the securities as of a date as close as possible to the Filing Date and in any event as of a date within the period commencing thirty (30) days before and ending thirty (30) days after the Filing Date.

Such prima facie evidence may not be overcome (A) absent an agreement to a different value by the holder of the Securities Customer Claim and the RCM Trustee and approval by the Bankruptcy Court or (B) unless and until there is an objection by the RCM Trustee or the holder of a Securities Customer Claim and, after notice and a hearing, a determination of a different value by Final Order of the Bankruptcy Court.

(c)    *Exceptions.* Any claims asserted by "insiders" or "affiliates" (as those terms are defined in § 101 of the Bankruptcy Code) must be filed and proven in strict accordance with the Bankruptcy Code and Bankruptcy Rules, and the initial prima facie evidence presumptions and shifts in the burdens of production and proof set forth above in this Section 3 in favor of creditors of the RCM estate in certain circumstances shall not apply in favor of any insider or affiliate of RCM to establish the nature, extent, amount, priority or validity of its claim.

**§4.    Advance Amount.** The holders of the allowed FX/Unsecured Claims shall be entitled to an advance from the RCM estate, from amounts otherwise distributable pursuant to this Agreement to holders of the allowed Securities Customer Claims, in an amount equal to $123.6 million less the Interest Accrual (the "*Advance Amount*"). The Advance Amount is incorporated into the distributions set forth in §5(b) and is to be recaptured, with a risk weighted return, for the benefit of the holders of allowed Securities Customer Claims as set forth in §6(c).

**§5.    Distributions of Assets in Place.** Except as expressly provided to the contrary in this Agreement, the Assets in Place or their proceeds shall be distributed as follows:

(a)    *Administrative and Priority Claims.* First, to pay the allowed administrative and priority claims of the RCM estate. The RCM Trustee shall be entitled to reserve the first $60 million of distributions for the payment of such claims, with any unused amounts reserved to be applied towards the allowed Securities Customer Claims. If the allowed administrative and priority claims of the RCM estate exceed the amounts reserved and are not otherwise paid as

11

provided in §6(a) or (e), they shall be paid before there are any further distributions under subsection (d) of this Section.

(b)    *General Unsecured Claims - Initial Distributions (including the Advance Amount).*  Second, the amount of $221 million in cash shall be distributed exclusively to the holders of allowed FX/Unsecured Claims.

(c)    *Distribution of Leuthold Claimed Metals.*  Concurrently with the initial distributions to the holders of allowed FX/Unsecured Claims in §5(b), the Leuthold Claimed Metals, or the proceeds of any Metals Sale as contemplated by §7(c), together with any interest actually earned on the proceeds after the Metals Sale, shall be distributed exclusively to Leuthold as an allowed claim. The distribution to Leuthold shall reduce the Leuthold Remaining Claim as set forth in §7(c).

(d)    *Balance of Distributions.*  The balance to be applied towards payment of the allowed Securities Customer Claims.

**§6.    Distributions of Additional Property and Recoveries on Specified Customer Preference Claims.**  Except as expressly provided to the contrary in this Agreement, any cash or other proceeds of Additional Property, including recoveries on claims against the other Debtors or third parties included in Additional Property, shall be distributed as follows in subsections (a), (b), (c) and (d), and recoveries on Specified Customer Preference Claims shall be distributed as follows in subsection (e):

(a)    *Unpaid Administrative and Priority Claims.*  First, to be applied to the allowed administrative and priority claims of the RCM estate to the extent not covered by the reserves referred to in §5(a) or paid pursuant to §6(e).

(b)    *Initial Pro Rata Allocation.*  Second, the next $150 million shall be applied as True-up Distributions and thereafter Pro Rata to the holders of allowed Securities Customer Claims on account of their Implied Deficiency Claims and to the holders of allowed FX/Unsecured Claims towards payment of their allowed FX/Unsecured Claims. However, if the amount of the allowed administrative and priority claims of the RCM estate paid pursuant to §5(a) exceeds the sum of $60 million, the amount of the excess shall first be paid to the holders of the allowed Securities Customer Claims from the $150 million otherwise distributable pursuant to the preceding sentence of this subsection, and only the remaining amount of the $150 million shall be distributed as provided in the preceding sentence of this subsection.

(c)    *Repayment of Advance Amounts.*  Third, any and all distributions of Additional Property to be exclusively allocated and made to the holders of the allowed Securities Customer Claims on account of their Implied Deficiency Claims until the Risk Return Amount and the Advance Amounts have been paid. For purposes of this subsection (c):

(i)    the "***Risk Return Amount***" shall be equal to a return of 12% per annum on the Advance Amounts, calculated on the outstanding balance of each distribution included in the Advance Amounts from the date of distribution to the holders of the allowed FX/Unsecured Claims to the date of distribution to the holders of the allowed Securities Customer Claims; and

(ii)    any distribution shall be applied first to the outstanding Risk Return Amount, and thereafter shall be credited against the Advance Amounts in an amount

12

equal to the product of (A) the amount of the balance of the distribution and (B) the then Pro Rata percentage of the holders of the allowed FX/Unsecured Claims.

For the avoidance of doubt, even the distributions not applied to the Risk Return Amount or credited to the Advance Amounts shall be exclusively allocated and paid to the holders of the allowed Securities Customer Claims on account of their Implied Deficiency Claims until the Advance Amounts have been paid as provided in this subsection.

(d)    *Subsequent Pro Rata Allocation.*    Thereafter, to be applied as True-up Distributions and thereafter Pro Rata to the holders of allowed Securities Customer Claims on account of their Implied Deficiency Claims and to the holders of allowed FX/Unsecured Claims on account of their allowed FX/Unsecured Claims.

(e)    *Recoveries on Specified Customer Preference Claims.*    Recoveries on Specified Customer Preference Claims shall first be used to pay the fees and expenses of pursuing such claims and thereafter shall be exclusively distributed to the holders of allowed Securities Customer Claims.    Recoveries on Specified Customer Preference Claims shall be treated as distributions of customer property for purposes of recalculating Implied Deficiency Claims and making further True-up Distributions.

§7.    **Special Treatments and Adjustments.**

(a)    *Rogers Funds Claims.*    Unless otherwise agreed by the RCM Trustee and the Super Majority:

(i)    if the holders of the Rogers Funds Claims have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed FX/Unsecured Claims, or the Bankruptcy Court enters an order determining that the Rogers Funds Claims are allowed FX/Unsecured Claims, then the assets claimed by the holders of the Rogers Funds Claims or their proceeds shall be distributed and applied as True-up Distributions and thereafter Pro Rata between the holders of the allowed Securities Customer Claims (based on their Implied Deficiency Claims determined without Rogers Funds' assets) and the holders of the allowed FX/Unsecured Claims (based on their allowed FX/Unsecured Claims, including the Rogers Funds Claims as allowed FX/Unsecured Claims), and the distribution of such Pro Rata amounts shall be in addition to other initial distributions to the holders of the allowed FX/Unsecured Claims and the holders of the allowed Securities Customer Claims provided in §5; or

(ii)    if the holders of the Rogers Funds Claims have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed Securities Customer Claims, or the Bankruptcy Court enters an order determining that the Rogers Funds Claims are allowed Securities Customer Claims, then the assets claimed by the holders of the Rogers Funds Claims or their proceeds shall be distributed as Assets in Place pursuant to §5.

(b)    *Proceeds of the SPhinX Settlement.*    The proceeds of the SPhinX Settlement shall be distributed as follows:

13

      (i)     The sum of $79.5 million, together with any interest, fees or other charges claimed thereon, shall be reserved for or paid (subject to disgorgement) towards the alleged secured claims of JPMorgan Chase Bank, N.A. against the RCM estate. If the claims of JPMorgan Chase Bank, N.A are determined by Final Order of the Bankruptcy Court not to be secured claims, are determined to be secured claims in a lesser amount or are compromised as secured claims for a lesser amount, the sum or the remaining balance reserved or, as the case may be, the amount disgorged shall be distributed as Additional Property pursuant to §6. If any portion of the $79.5 million sum, together with any interest, fees or other charges thereon, is reserved rather than paid, the amount reserved shall include the interest actually earned on the amount; and

      (ii)    The balance of the proceeds of the SPhinX Settlement shall be distributed as Assets in Place pursuant to §5.

    (c)    *Leuthold Claims.*

      (i)     At any time after the filing of the motion referred to in §2(a), Leuthold shall have the sole right, upon three business days' prior written notice to the RCM Trustee, to direct the RCM Trustee to sell the Leuthold Claimed Metals (the "*Metals Sale*"). Until the Initial Effective Date, the RCM Trustee shall seek any necessary Bankruptcy Court approvals for the Metals Sale on an expedited basis. After the Initial Effective Date, the order of the Bankruptcy Court approving this Agreement shall constitute the Bankruptcy Court's approval for the Metals Sale to be made through any recognized market at which sales of metals of that type are regularly conducted. In the event that the Metals Sale occurs, all proceeds of the Metals Sale shall remain in a separate account at RCM and shall be distributed to Leuthold in lieu of the Leuthold Claimed Metals in accordance with §5(c).

      (ii)    Leuthold's receipt of the Leuthold Claimed Metals or the proceeds of a Metals Sale shall (A) fully satisfy the Leuthold Metals Claim, and (B) reduce the Leuthold Remaining Claim by the difference, if positive, between (1) the value of the Leuthold Claimed Metals on the date of the filing of the motion referred to in §2(a) plus interest from the date of the filing of such motion accruing on such amount calculated at the Invested Cash Rate until the occurrence of any Metals Sale, and at the actual rate of interest earned on the proceeds of any Metals Sale from and after the time of any Metals Sale, and (2) the value of the Leuthold Claimed Metals on the Filing Date. Any increase or decrease in the value of the Leuthold Claimed Metals after the date of the filing of such motion shall be at the sole risk or benefit of Leuthold and shall not have any effect on the amount of the Leuthold Remaining Claim.

    (d)    *Adjustments for Claims under Repurchase Agreements.* Claims against RCM included on the Houlihan Claims Schedule as FX/Unsecured Claims that are determined by a Final Order of the Bankruptcy Court to be allowed Securities Customer Claims are hereinafter referred to as "*Allowed Recharacterized Customer Claims.*" To the extent that any claims against the RCM estate with respect to repurchase agreements included on

SETTLEMENT AGREEMENT

14

Houlihan Claims Schedule as Securities Customer Claims are determined by Final Order of the Bankruptcy Court not to constitute Securities Customer Claims and to constitute instead allowed FX/Unsecured Claims ("*Allowed Repo Unsecured Claims*"), then, if the difference between the aggregate Allowed Repo Unsecured Claims and the aggregate Allowed Recharacterized Customer Claims (the "*Net FX/Unsecured Claim Difference*") is a positive number:

(i)     the total amount referred to in §14(b)(iv)(A) shall be increased by an amount equal to the product of (A) 12.65% and (B) an amount (the "*Repo Claim Adjustment Amount*") equal to the lesser of:

(x)     the Net FX/Unsecured Claim Difference, and

(y)     the total amount of the allowed FX/Unsecured Claims (including the total of the Allowed Repo Unsecured Claims), less $874.1 million; and

(ii)     the Advance Amount(s) shall be increased by an amount (the "*Advance Increase Amount*") equal to the product of (A) 13.84% and (B) the Repo Claim Adjustment Amount.

(e)     *Recoveries Resulting in Section 502(h) Claims*. This subsection applies in all situations where recoveries on preference claims under § 547 or § 749 (to the extent it incorporates § 547) of the Bankruptcy Code ("*Preference Claim Recoveries*") result in an allowed claim under § 502(h) of the Bankruptcy Code ("*Section 502(h) Claim*"). This subsection does not apply to recoveries on Specified Customer Preference Claims.

(i)     A "*Preference True Up Distribution*," when applied pursuant to the remaining clauses of this subsection, means, when a Preference Claim Recovery results in an allowed Section 502(h) Claim, then the property so recovered shall be allocated as follows before it is treated as Additional Property for distribution under §6:

(A)     If the Section 502(h) Claim increases the amount of the allowed Securities Customer Claims, then a percentage of the Preference Claim Recoveries equal to the value of the Assets in Place distributed to the holders of the allowed Securities Customer Claims under §5(d) divided by the total allowed Securities Customer Claims (excluding the Section 502(h) Claim) will be exclusively distributed to the holders of the allowed Securities Customer Claims.

(B)     If the Section 502(h) Claim increases the amount of the allowed FX/Unsecured Claims, then an amount proposed by the Super Majority of the FX/Unsecured Claims (as hereinafter defined) to the other parties to this Agreement will be exclusively distributed to the holders of the allowed FX/Unsecured Claims.

15

After such adjustment(s), any remaining Preference Claim Recoveries will be treated as Additional Property for distribution under §6.

(ii)    If a Preference Claim Recovery results in an allowed Section 502(h) Claim that would constitute an FX/Unsecured Claim, the RCM Trustee shall promptly so advise the other parties to this Agreement in writing and provide to the Plan, Negotiation and Litigation Advisory Committee copies of any documentation that the RCM Trustee possesses showing the source of the preference payments.

(iii)    Within twenty business days after receipt of the notice and documentation provided by the RCM Trustee, a Super Majority of Securities Customer Claims must advise the other parties to this Agreement as to whether they consent to an applicable Preference True Up Distribution. A *"Super Majority of Securities Customer Claims"* means those creditors of the RCM estate that are parties to this Agreement holding at least 75% in amount of the Securities Customer Claims held by parties to this Agreement. Solely for the purpose of determining the Super Majority of Securities Customer Claims, (1) the amounts of a creditor's Securities Customer Claims shall be the amounts of the claims set forth on the Houlihan Claims Schedule, subject to the amounts of the claims, at the time of determination, having been allowed, modified or disallowed, in whole or in part, under the procedures for resolving claims in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case, and (2) a creditor or group of creditors under common control or management that holds both one or more Securities Customer Claims and one or more FX/Unsecured Claims and who has made an election, as contemplated by the definition of the term "Super Majority," to vote only its FX/Unsecured Claims, or who has failed to make the election contemplated by that definition, shall not have its FX/Unsecured Claims counted in determining whether a Super Majority of Securities Customer Claims has been achieved.

(iv)    If (and only if) a Super Majority of Securities Customers Claims declines to permit the Preference True Up Distribution, then a Super Majority of FX/Unsecured Claims has the option of submitting the matter to arbitration within twenty business days. A *"Super Majority of FX/Unsecured Claims"* means those creditors of the RCM estate that are parties to this Agreement holding at least 75% in amount of the FX/Unsecured Claims held by parties to this Agreement. Solely for the purpose of determining the Super Majority of FX/Unsecured Claims, (1) the amounts of a creditor's FX/Unsecured Claims shall be the amounts of the claims set forth on the Houlihan Claims Schedule, subject to the amounts of the claims, at the time of determination, having been allowed, modified or disallowed, in whole or in part, under the procedures for resolving claims in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case and (2) a creditor or group of creditors under common control or management that holds both one or more Securities Customer Claims and one or more FX/Unsecured Claims and who has made an election, as contemplated by the definition of the term "Super Majority," to vote only its Securities Customer Claims, or who has failed to make the election contemplated by

SETTLEMENT AGREEMENT

16

that definition, shall not have its FX/Unsecured Claims counted in determining whether a Super Majority of FX/Unsecured Claims has been achieved. If the matter is submitted to arbitration, there will be only two issues to be decided by an arbitrator, who is to be selected by the Bankruptcy Court in the absence of an agreement by the Super Majority:

(A)    Whether the Preference True Up Distribution should be applied; and

(B)    Whether all or any portion of Preference Claim Recovery should be deemed "customer property." Any recovery of customer property shall reduce Implied Deficiency Claims.

(v)    If a Preference Claim Recovery results in an allowed Section 502(h) Claim that would constitute a Securities Customer Claim, the RCM Trustee shall promptly so advise the other parties to this Agreement in writing and provide to the Plan, Negotiation and Litigation Advisory Committee copies of any documentation that the RCM Trustee possesses showing the source of the preference payments.

(vi)    Within twenty business days after receipt of the notice and documentation provided by the RCM Trustee, a Super Majority of FX/Unsecured Claims must advise the other parties to this Agreement as to whether they consent to an applicable Preference True Up Distribution.

(vii)    If (and only if) a Super Majority of FX/Unsecured Claims declines to permit the Preference True Up Distribution, then a Super Majority of Securities Customer Claims has the option of submitting the matter to arbitration within twenty business days. If the matter is submitted to arbitration, there will be only two issues to be decided by an arbitrator, who is to be selected by the Bankruptcy Court in the absence of an agreement by the Super Majority:

(A)    Whether the Preference True Up Distribution should be applied; and

(B)    Whether all or any portion of Preference Claim Recovery should be deemed "customer property." Any recovery of customer property shall reduce the Implied Deficiency Claims.

(viii)    The reasonable fees and expenses of any arbitrator appointed under this subsection shall be subject to allowance as an administrative expense of the RCM estate to be assessed as determined by the arbitrator.

(f)    *Certain Fees and Expenses of the MCG Members and Joinder Parties.* The reasonable attorneys' fees and expenses of the MCG Members and the Joinder Parties in connection with litigating the Conversion Motion through the filing of the motion to compel an election of a Chapter 11 trustee for RCM, not to exceed the amounts set forth on Exhibit D, shall be allowed administrative expenses, attributable as substantial contributions to the RCM estate and

17

the administration of customer property under §§ 503(b)(3)(D), 507(a)(2) and 752(a) of the Bankruptcy Code, and shall be payable on the Subsequent Effective Date. The reasonable attorneys' fees and expenses shall be entitled to such administrative status and shall be payable on the Subsequent Effective Date pursuant to §5(a) or 6(a), regardless of whether RCM remains in a Chapter 11 case or the RCM Case has been converted to a Chapter 7 case to be administrated under Subchapter III of Chapter 7. The RCM Trustee confirms that his initial review of the details of the attorneys' fees and expenses indicates that the overall fees and expenses are reasonable, but his initial determination of their reasonableness is subject to his final review in the exercise of his fiduciary duties.

### §8.    Determination of "Pro Rata".

(a)    *"Pro Rata" Defined.* The term *"Pro Rata"* means, in relation to a distribution of any money or other property and at the time of determination, the distribution of the money or other property, as between the holders of the allowed Securities Customer Claims and the holders of the allowed FX/Unsecured Claims, in the ratio that each of the aggregate of the allowed Securities Customer Claims constituting Implied Deficiency Claims (as hereinafter defined) and the allowed FX/Unsecured Claims at such time bears to the total of the allowed Securities Customer Claims constituting the Implied Deficiency Claims at such time and the allowed FX/Unsecured Claims at such time.

(b)    *"Implied Deficiency Claims" Defined.* The term *"Implied Deficiency Claims"* means, at the time of determination:

(i)    the total amount of the allowed Securities Customer Claims at such time, plus

(ii)    all allowed administrative and priority claims of the RCM estate at such time (inclusive of reserves) to the extent paid or payable from Assets in Place, net of any amounts paid at such time to the holders of the allowed Securities Customer Claims pursuant to the second sentence of §6(b), less

(iii)    the value of Assets in Place, as determined pursuant to §8(c), that would constitute customer property as determined by the Bankruptcy Court as contemplated by §14(b)(iv), less

(iv)    the proceeds of recoveries on Specified Customer Preference Claims at such time, net of the costs and expenses of recovery, less

(v)    the value of any property determined to be customer property by an arbitrator pursuant to §7(e)(iv)(B) or (vii)(B).

The value of Assets in Place shall not include Assets in Place for which the date for determining the value of those assets has not yet occurred under subsection (c).

18

(c)    *Determination of Value of Customer Property.*  For the purpose of determining Implied Deficiency Claims, the following provisions apply:

(i)    Customer property, other than cash or cash equivalents or securities regularly traded on recognized securities exchanges or markets, shall be valued by the independent valuation expert engaged by the RCM Trustee pursuant to §10 once as of the 15th business day prior to the date of:

(A)    the first distribution under this Agreement if in the RCM estate as of the 30th day prior to the date of first distribution under this Agreement; and

(B)    the next distribution under this Agreement if acquired by the RCM estate during the period commencing 30 days prior to the date of the immediately preceding distribution under this Agreement and ending 30 days prior to the date of the next distribution under this Agreement.

(ii)    The valuation expert's determinations of value as set forth in clause (i) shall be binding and conclusive on all other parties hereto and all other parties in interest unless challenged after notice and a hearing before the Bankruptcy Court by either (A) holders of allowed Securities Customer Claims in the aggregate amount of not less than $685 million or (B) holders of allowed FX/Unsecured Claims in the aggregate amount of not less than $220 million.  For purposes of the preceding sentence, a claim which is disputed in part must be counted to the extent of the part of the claim not disputed.

(iii)    Any customer property consisting of cash or cash equivalents or securities regularly traded on recognized securities exchanges or markets shall be valued by the RCM Trustee once as of the 15th day prior to:

(A)    the first distribution under this Agreement if in the RCM estate as of the 15th day prior to the first distribution under this Agreement; and

(B)    the next distribution under this Agreement if acquired by the RCM estate during the period commencing 15 days prior to the date of the immediately preceding distribution under this Agreement and ending 15 days prior to the date of the next distribution under this Agreement.

(iv)    Clauses (i)(B) and (iii)(B) of this subsection shall not apply to proceeds of customer property previously valued by the independent valuation expert or the RCM Trustee pursuant to this subsection.  Instead, the valuations of the original customer property shall be used.

(d)    *Estimates.*  Attached hereto as <u>Exhibit E</u> is a mathematical presentation of the assumptions used by the parties to negotiate this Agreement based on the April 25 Analysis and the proceeds of the SPhinX Settlement.  As of March 6, 2006, the Pro Rata share of the holders of the Securities Customer Claims was estimated to be approximately 46.8%, and the Pro Rata share of the holders of the FX/Unsecured Claims was estimated to be approximately 53.2%.

SETTLEMENT AGREEMENT

19

§9.    **Establishment of Advisory Committees.**

(a)    *Plan, Negotiation and Litigation Advisory Committee.*  Subject to §9(c), in negotiating a possible plan of reorganization for some or all of the Debtors including RCM or (if the Bankruptcy Court so permits) RCM alone and in considering and pursuing litigation on behalf of the RCM estate, the RCM Trustee shall from time to time consult with a plan, negotiation and litigation advisory committee (the *"Plan, Negotiation and Litigation Advisory Committee"*) consisting of those creditors or their representatives listed on Exhibit F, as amended from time to time.

(b)    *Portfolio Management Advisory Committee.*  Subject to §9(c), the RCM Trustee shall, and shall cause any investment manager, valuation expert or financial advisor appointed pursuant to §10(a) to, consult from time to time with a portfolio management advisory committee (the *"Portfolio Management Advisory Committee"*) consisting of those creditors or their representatives listed on Exhibit G, as amended from time to time, concerning the management of the securities and other financial assets of the RCM estate. If the holders of the FX/Unsecured Claims have designated a representative to act for the holders of the FX/Unsecured Claims, and the representative has so notified the Portfolio Management Advisory Committee, the Portfolio Management Advisory Committee shall provide notice to the representative of all proposed securities transactions.

(c)    *Advisory Committee Procedures.*  Each committee referred to in this Section shall have such consultation rights and shall implement such other procedures, as may be agreed to from time to time with the RCM Trustee.  The procedures shall include mechanisms for providing notices and disseminating information, subject to appropriate confidentiality safeguards, and under what circumstances the RCM Trustee may represent to the Bankruptcy Court what the advisory position of the committee is on any particular issue.

(d)    *Advisory Committee Vacancies.*  In the event that any member of a committee referred to in this Section is no longer qualified, or is unable or otherwise fails to serve as a member of the committee, the RCM Trustee may fill the vacancy by selecting another creditor of the RCM estate acceptable to the majority in number of the remaining members of the committee.  A member of a committee referred to in this Section is no longer qualified to serve if it sells, transfers or assigns more than 15% of the aggregate amount of its claims, measured at the date hereof, against the RCM estate or any option thereon or any right or interest (voting or otherwise) therein and, following such sale or other action, the remaining claims of such member are less than those of any other member of such committee.  The member does not lose its qualification by the mere granting of a security interest without voting authority in favor of a secured party, but does lose its qualification if the security interest is enforced, whether by foreclosure or otherwise.

§10.    **Investment, Liquidation and Distribution of Estate Financial Assets.**

(a)    *Appointment of Investment Management Professionals.*  The RCM Trustee shall engage, with Bankruptcy Court approval, one or more independent persons of recognized

SETTLEMENT AGREEMENT

20

standing to act as a valuation expert to make the determinations of valuing customer property for purposes of §8. The RCM Trustee may engage, with Bankruptcy Court approval, one or more persons of recognized standing to act as an investment manager or financial advisor to advise the RCM Trustee on managing the securities and other financial assets included in the RCM estate, with a view to reducing the financial assets to cash consistent with good market practice and to determining True-up Distributions and Pro Rata shares.

(b)    *Claims Procedures, Reserves, Etc.*  The RCM Trustee will develop usual and customary procedures for resolving claims and, if applicable, for determining the amount of the net equity claim of any holder of a Securities Customer Claim. The RCM Trustee shall be entitled to set aside reasonable reserves, consistent with the terms and other provisions of this Agreement, from amounts otherwise distributable pursuant to this Agreement for such items as (i) actual or anticipated administrative and priority claims and (ii) prepetition claims (whether they be Securities Customer Claims or FX/Unsecured Claims) at the time disputed or still subject to possibly being disputed.  For the avoidance of doubt, the RCM Trustee shall maintain sufficient reserves so that the distributions provided for in this Agreement are based on the amount of the actual final allowed claims. The RCM Trustee shall also be entitled to allocate to separate accounts cash or other property to be distributed to holders of allowed Securities Customer Claims or allowed FX/Unsecured Claims pending distribution.

(c)    *Distributions.*  The RCM Trustee shall as soon as practicable make distributions on or after the Subsequent Effective Date at such times and in such amounts (net of reserves) as are permitted by the Bankruptcy Code (after giving effect to the Bankrutpcy Court's approval of this Agreement) and as he deems appropriate and has otherwise determined to be consistent with his fiduciary duties. However, all distributions following the initial distribution shall include any adjustments, including True-up Distributions, required to correct the amount of prior distributions (including, without limitation, repayment of the Advance Amounts) based on the actual amount of allowed claims. The RCM Trustee shall not make any distributions prior to the Subsequent Effective Date without Bankruptcy Court approval.

(d)    *Distributions in Kind.*  Except as approved by the Bankruptcy Court, the RCM Trustee shall not make distributions of securities in kind.  The RCM Trustee may, subject to Bankruptcy Court approval, implement procedures (i) on a case-by-case basis for a holder of a Securities Customer Claim to receive a distribution of securities in kind, (ii) for distributees to receive a ratable share of certain securities, e.g., by the RCM Trustee contributing the securities to a special purpose entity designed to hold securities transferred to it from the RCM estate and transferring interests ratably in the special purpose entity to the distributees, or (iii) for distributions in kind using other methods that the RCM Trustee determines to be fair and equitable, including options for creditors to receive distributions in kind.

**§11.    Chapter 11 Plan**.  Any Chapter 11 plan of reorganization of some or all of the Debtors including RCM, or (if so permitted by the Bankruptcy Court) of RCM alone, proposed or supported by the RCM Trustee or any of the other parties hereto shall provide for distributions to creditors of the RCM estate, and other terms, consistent with the terms, conditions and other provisions of this Agreement.

SETTLEMENT AGREEMENT

21

### §12.    Chapter 7, Subchapter III Contingency.

(a)    *Conversion to Chapter 7, Subchapter III.*  The RCM Trustee shall promptly, and any other party to the Agreement may, request that the Bankruptcy Court's preliminary ruling on the Conversion Motion become a final ruling, and that the RCM Case be converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, if:

(i)    either:

(A) this Agreement is not approved by the Bankruptcy Court, as contemplated by §14(b)(iv), on or before August 31, 2006, or

(B) the Bankruptcy Court advises the parties hereto that the Bankruptcy Court will not be willing so to approve this Agreement (or will not be willing to do so by August 31, 2006) and within a period of ten days thereafter the parties hereto have not made amendments to this Agreement satisfactory to them and to the Bankruptcy Court for the Bankruptcy Court to approve this Agreement (or to do so by August 31, 2006);

(ii)    a joint Chapter 11 plan of some or all of the Debtors including RCM or (if so permitted by the Bankruptcy Court) of RCM alone and a related disclosure statement, in each case reasonably acceptable to the RCM Trustee and the Super Majority, are not filed with the Bankruptcy Court, by August 31, 2006;

(iii)    the Bankruptcy Court has not approved such disclosure statement by October 15, 2006;

(iv)    the Bankruptcy Court has not confirmed such plan by November 15, 2006; or

(v)    the "Effective Date" under and as defined in such plan has not occurred by December 31, 2006.

(b)    *Effect of Conversion to Chapter 7, Subchapter III.*  In the event of a conversion of the RCM Case to a Chapter 7 case to be administered under Subchapter III of Chapter 7, whether or not at the request of the RCM Trustee or any other party hereto:

(i)    all of the terms, conditions and other provisions of this Agreement will be binding upon any trustee appointed in the Chapter 7, Subchapter III case, as well as upon the parties to this Agreement and all other parties bound by the Bankruptcy Court's order approving this Agreement, and even though certain terms of this Agreement, on account of the compromises contained in this Agreement, may otherwise vary the requirements of Subchapter III of Chapter 7;

(ii)    each party hereto other than the RCM Trustee agrees to support the election of Marc S. Kirschner as the Chapter 7 trustee if Marc S. Kirschner was

SETTLEMENT AGREEMENT

22

serving as the RCM Trustee immediately prior to the conversion, with this Agreement constituting a pre-conversion ballot in favor of Marc S. Kirschner's election as the Chapter 7 trustee;

(iii)    the RCM Trustee will (A) seek as part of the conversion order to submit his interim or final report to implement the terms of this Agreement, (B) promptly make such interim distributions, as, after reserves, the RCM Trustee believes to be in accord with his fiduciary duties and that the Bankruptcy Court may permit, consistent with the terms of this Agreement, and (C) after consultation with the Plan, Negotiation and Litigation Advisory Committee, pursue recoveries of any remaining Additional Property consisting of claims against the other Debtors and third parties with funding and the services of professionals acceptable to the RCM Trustee and approved by the Bankruptcy Court; and

(iv)    the RCM Trustee will have the option, if necessary or in his judgment advisable, to seek to bind creditors not otherwise bound to the terms, conditions and other provisions of this Agreement by taking such actions as the RCM Trustee may determine to be appropriate in order for those creditors to be bound to the terms, conditions and other provisions of this Agreement. The RCM Trustee may reach agreement with one or more of the other parties hereto to act as a class representative or class representatives for purposes of such action for which the appointment of a class representative or representatives is necessary or desirable. The other parties hereto agree to support or not to object to any such actions reasonably taken by the RCM Trustee to so bind creditors not otherwise bound to the terms, conditions and other provisions this Agreement.

### §13.    Representations and Warranties

(a)    *General.* Each party hereto represents and warrants to the other parties hereto that such party (i) if an organization, validly exists as an organization, and (ii) subject, in each case, to the approval of the Bankruptcy Court (other than for a party's agreements in this Section and in §§2, 7(c)(i), 9, 12(a)(i), 12(a)(ii), 12(b)(ii), 14(d) and 15(b)), such party has the right and power to enter into this Agreement, such party has duly authorized, executed and delivered this Agreement, and such party has obtained all consents of governmental organizations and third parties necessary to enter into this Agreement and to perform such party's obligations hereunder.

(b)    *Ownership of Claims.* Each of the parties hereto other than the RCM Trustee represents and warrants to the other parties hereto that such person owns the claim or claims against the RCM estate purported to be owned by it and has not transferred any such claim to any other person.

(c)    *Security Entitlements.* Each party hereto asserting a Securities Customer Claim to a security or other financial asset from the RCM estate represents and warrants to the other parties hereto that it acquired a security entitlement in the financial asset for value and without notice of an adverse claim to the financial asset. For purposes of this subsection, the terms "security", "financial asset", "security entitlement", "value" and "adverse claim" have the

23

meanings set forth in the Uniform Commercial Code of the State of New York, and the phrase "notice of an adverse claim" has the meaning set forth in § 8-105 of that Uniform Commercial Code.

### §14.  Conditions Precedent.

(a)    *Provisions Effective Upon Execution and Delivery.*  Sections 2, 7(c)(i), 9, 12(a)(i), 12(a)(ii), 12(b)(ii), 13, 14(d) and 15(b) shall become effective upon the execution and delivery of this Agreement by the parties hereto (or their representatives) representing Securities Customer Claims in the amount of at least $1.275 billion, and FX/Unsecured Claims in the amount of at least $300 million, in each case as reflected on the Houlihan Claims Schedule.

(b)    *Conditions for Certain Other Provisions of this Agreement to be Effective.*  The balance of §12 and §§10, 15(a) and 16 through 23 shall become effective on the date (the "***Initial Effective Date***") on which each of the following conditions precedent has been satisfied so long as the conditions are satisfied on or before August 31, 2006:

(i)    this Agreement shall have been duly executed and delivered by each of the RCM Trustee and the creditors (whether directly or through their representatives) named on the signature pages hereto representing the amounts of claims referred to in §14(a).

(ii)    the RCM Trustee shall have completed his investigation of the characterization of the claims set forth on the Houlihan Claims Schedule as being Securities Customer Claims and shall have concluded and advised the other parties hereto that the amount of the Securities Customer Claims whose characterization as Securities Customer Claims the RCM Trustee intends to challenge, exclusive of the Rogers Funds Claims and claims arising under repurchase agreements, do not exceed the sum of $100 million in the aggregate;

(iii)    the RCM Trustee shall have completed his final review of the details of the attorneys' fees and expenses for which payment is sought as substantial contribution claims pursuant to §7(f) and shall have concluded and have advised the other parties hereto that in his opinion the fees and expenses are reasonable and should be approved for payment; and

(iv)    the Bankruptcy Court shall have entered an order or orders in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case (1) approving the terms, conditions and other provisions of this Agreement as a settlement under Bankruptcy Rule 9019 and pursuant to §§ 105(a) and 363 of the Bankruptcy Code consistent with the fiduciary duties of the RCM Trustee, (2) authorizing the distributions contemplated by this Agreement to be made from and after the Subsequent Effective Date, (3) permitting the Metals Sale as provided in § 7(c)(i) and the claims allowances referred to in §§5(c), 7(a), 7(f) and 14(c)(i), (4) confirming the status of the MCG Parties and the Joinder Parties as holders of Securities Customer Claims as provided in §3(a)(ii), (5) deferring further action on the Conversion Motion except as

BUSDOCS/1558440.20

24

provided in this Agreement, (6) continuing the stay of the Stayed Proceedings except as provided in this Agreement and (7) confirming that due and sufficient notice of the hearing on the order or orders had been given, and such order or orders shall be in form and substance reasonably satisfactory to the RCM Trustee and the other parties hereto.

The Bankruptcy Court's order or orders approving this Agreement shall include a determination that the following treatment is a reasonable compromise of the issues raised in the Conversion Motion and the Stayed Proceedings and is fully enforceable against other parties in interest in the Cases as a settlement under Bankruptcy Rule 9019 and pursuant to §§ 105(a) and 363 of the Bankruptcy Code:

> (A)     the sum of (1) $97.4 million of the Assets in Place, plus (2) interest from March 6, 2006, on $97.4 million calculated at the Invested Cash Rate from March 6, 2006 (the "*Interest Accrual*"), plus (3) the Leuthold Claimed Metals (subject to §5(c)) are the exclusive property and assets segregated for and available to the holders of the allowed FX/Unsecured Claims;

> (B)     all other Assets in Place are either "customer property", within the meaning of Section 741(4) of the Bankruptcy Code, of the holders of the allowed Securities Customer Claims, or constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims to general RCM estate property based on the deficiency claims of the holders of the allowed Securities Customer Claims;

> (C)     the Assets in Place referred to in the foregoing clause (B) are collectively the exclusive property and assets segregated for distribution solely to the holders of the allowed Securities Customer Claims, subject to treatment of the Advance Amounts; and

> (D)     the amount of the Assets in Place that constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims based on the deficiency claims of the holders of the allowed Securities Customer Clams (as distinguished from the claims of the holders of the allowed Securities Customer Claims to assets as customer property) is the sum of $99.5 million, plus interest from March 6, 2006, accruing on such amount calculated at the Invested Cash Rate.

(c)     *Conditions for the Remaining Provisions of this Agreement to be Effective.* The remaining provisions of this Agreement shall become effective on the date (the "*Subsequent Effective Date*") on or after the Initial Effective Date on which the following conditions precedent have been satisfied so long as each of the conditions is satisfied on or before the date indicated for that condition:

> (i)     by October 15, 2006, unless the RCM Trustee and the Super Majority have agreed to a different treatment of the Rogers Funds Claims, the holders of the Rogers Funds Claims shall have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed Securities Customer Claims or, alternatively, as allowed FX/Unsecured Claims (even if such agreement were not reached within the 14-day period referred to in §2(d)); or, in the absence of such

25

agreement, the Bankruptcy Court shall have entered an order that the Rogers Funds Claims are allowed Securities Customer Claims or, alternatively, are allowed FX/Unsecured Claims;

    (ii)      by January 15, 2007, either:

        (A)    the provisions of this Agreement shall have been incorporated in all material respects into a joint plan of reorganization of some or all of the Debtors including RCM or (if so permitted by the Bankruptcy Court) of RCM alone, the plan shall have been confirmed by an order entered by the Bankruptcy Court, and the "Effective Date" under and as defined in the plan shall have occurred; or

        (B)    the RCM Case shall have been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7; and

    (iii)     by such date as of which all of the other conditions in this subsection are met, the RCM Trustee shall have determined that there are or will be sufficient funds to pay all of the allowed administrative and priority claims of the RCM estate from the amounts reserved or available pursuant to §§5(a), 6(a) and 6(e).

The provisions of this Agreement shall be considered to have been incorporated into a plan, or to be administered in a Chapter 7, Subchapter III case, even if a creditor that is not party to this Agreement is afforded materially better treatment under the plan or in the Chapter 7, Subchapter III case than a similarly situated creditor party to this Agreement, so long as the creditor's claim is in a convenience class as contemplated by § 1122(b) of the Bankruptcy Code or, in a Chapter 7, Subchapter III case, the Bankruptcy Court finds that the creditor's claim would likely have been in such a class had the RCM Case not been converted and a plan were proposed.

    (d)    *Effect if Conditions Not Met.*  If (1) the conditions set forth in §14(b) to be satisfied on the Initial Effective Date are not satisfied on or before August 31, 2006, (2) the conditions set forth in §14(c) to be satisfied on the Subsequent Effective Date are not satisfied on or before the dates set forth in §14(c), or (3) the Bankruptcy Court advises the parties hereto that the Bankruptcy Court will not be willing to take any action contemplated by §14(b) or (c) (or will not be willing to do so by the date contemplated thereby for that action to be taken) and within a period of ten days thereafter the parties hereto have not made amendments to this Agreement satisfactory to them and to the Bankruptcy Court for the Bankruptcy Court to take such action (or to take such action by the date set forth in §14(b) or (c) for such action to be taken), then:

    (i)      the provisions of this Agreement, other than those in this subsection, shall be void and of no force or effect;

    (ii)     if the RCM Case has not then been converted to a Chapter 7 case, any party hereto may request the Bankruptcy Court to take further action on the Conversion Motion to convert the RCM Case to a Chapter 7 case to be administered under Subchapter III of Chapter 7;

(iii)    any party hereto who has brought a Stayed Proceeding may seek to lift the stay of the Stayed Proceeding; and

(iv)    each of the RCM Trustee and the other parties hereto shall otherwise preserve and reserve all rights and remedies and be subject to all liabilities and obligations as if this Agreement, in so far as it relates to the provisions to become effective on the Initial Effective Date or, as the case may be, the Subsequent Effective Date, shall not have been entered into.  The rights preserved and reserved include, without limitation, the right of any creditor, to the extent that the creditor's claim was not previously resolved apart from this Agreement, to (A) allege that it possesses a claim as a customer under Subchapter III of Chapter 7, (B) litigate any Stayed Proceeding or other claim that assets or property is not property of the RCM estate or (C) file and prosecute an appeal  from any order on the Conversion Motion.

(e)    *Effect of the Occurrence of the Subsequent Effective Date on the Conversion Motion and the Stayed Proceedings.*  If the Subsequent Effective Date shall occur, this Agreement shall constitute a full and final settlement of the Conversion Motion and the Stayed Proceedings and shall in and of itself constitute a stipulation, effective as of the Subsequent Effective Date, of the disposition of the Conversion Motion and Stayed Proceedings without the necessity of filing a separate stipulation of dismissal if otherwise appropriate.  The dispositions shall be final, but preserving and reserving any claims arising out of the failure of any party to this Agreement or other party in interest to comply with the terms and provisions of this Agreement, whether embodied in a Chapter 11 plan or otherwise.

### §15.    <u>Successor and Assigns; Claims Transfer Restrictions</u>.

(a)    *General.*  This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors, administrators, and representatives, including, if the RCM Case is converted to a Chapter 7 to be administered under Subchapter III of Chapter 7, any trustee appointed in the Chapter 7 case.

(b)    *Transfer of Claim.*  No creditor party hereto shall sell, transfer, or assign any of its claims against the RCM estate or any option thereon or any right or interest (voting or otherwise) therein, unless the transferee agrees in writing to be bound by all the terms of this Agreement by executing a counterpart signature page of this Agreement and the transferor provides each of the RCM Trustee, the Creditors' Committee (if then in existence), and the Plan, Negotiation and Litigation Advisory Committee, with a copy thereof.  No creditor party hereto shall grant any proxies, subject any of its claims to a voting trust, enter into a voting agreement or enter into any derivative transaction in respect to any of its claims unless such arrangement provides for the assignee to assume the creditor's obligations under this Agreement and the assignee does so by executing and delivering to the RCM Trustee an instrument of assumption satisfactory to the RCM Trustee.

27

(c)    *Security Interest in Claim.*  Subsection (b) does not apply to the mere granting of a security interest without voting authority in favor of a secured party, but does apply to the enforcement of the security interest, whether by foreclosure or otherwise.

### §16.    Amendments.

(a)    *General.*  No term, condition or other provision of this Agreement may be waived, modified, amended or supplemented except in writing signed by each party hereto affected thereby.  The consent in writing of a representative of a party shall be sufficient to approve any waiver, modification, amendment or supplement to this Agreement on behalf of that party.

(b)    *Super Majority Vote.*  Notwithstanding §16(a), any term, condition or other provision of this Agreement may be waived, modified, amended or supplemented in a writing signed by the RCM Trustee and the Super Majority, so long as (i) each of the parties hereto that holds Customer Securities Claims, FX/Unsecured Claims or (if applicable) the Leuthold Metals Claim is treated by the waiver, modification, amendment or supplement in the same manner as each other party holding such claims unless such party consents to any different treatment contemplated thereby or (ii) if the waiver, modification, amendment or supplement is timely objected to by another party, the forum chosen pursuant to §17 does not find that the objecting party is materially prejudiced thereby.  For purposes of this subsection, an objection by a party is timely if lodged with the RCM Trustee within 15 calendar days following its receipt of notice of the intended waiver, modification, amendment or supplement.

(c)    *Exceptions.*  Section 16(b) shall not apply to a waiver, modification, amendment or supplement to (i) this Section, to the definition of "Super Majority," or to §3(a)(ii), 4, 5, 6, 7(d) or 8 unless, where §16(b) otherwise requires the signature in writing of the Super Majority, the waiver, modification, amendment or supplement is signed by the Super Majority with the percentage of 75% referred to in the definition of the term "Super Majority" being instead 95%, or (ii) §5(c) or 7(c) without the written consent of Leuthold.

### §17.    Governing Law; Chosen Forum.

(a)    *Governing Law.*  Except to the extent governed by the provisions of the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts made and to be performed entirely within the State of New York, without regard to any choice of law provision which would require the application of the law of any other jurisdiction.

(b)    *Bankruptcy Court Forum.*  Each of the parties hereto hereby irrevocably and unconditionally agrees that any legal action, suit, or proceeding by or against the party with respect to any matter under or arising out of or in connection with this Agreement shall be brought in the Bankruptcy Court, and irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding, but only, in each case, to the extent that, at the time, the Bankruptcy Court has

28

jurisdiction thereof. In addition, each of the parties hereto irrevocably consents to the reopening of any of the Cases for the purpose of interpreting or enforcing any provision of this Agreement.

(c)    *Other Chosen Forum if Applicable.* In the event that the Bankruptcy Court does not at the time have jurisdiction over the legal action, suit or proceeding, each of the parties hereto hereby irrevocably and unconditionally agrees that the legal action, suit, or proceeding shall be brought in a federal or New York State court located in New York City and irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding.

### §18.    Reservations.

(a)    *Allowance of Claims.*    Nothing contained in this Agreement constitutes an allowance of any particular claim, or restricts, impairs or otherwise affects the RCM Trustee's right to seek disallowance or the equitable subordination of any claim on any basis, except:

(i)    as provided in §5(c) for the Leuthold Metals Claim or 7(f) for certain substantial contribution claims, or

(ii)    for the allowance of the Rogers Funds Claims to the extent provided in §7(a) or 14(c)(i).

(b)    *RCM Trustee's Actions.* Nothing contained in this Agreement shall prohibit the RCM Trustee at any time from selling or otherwise disposing of assets of the RCM estate subject to Bankruptcy Court approval or from requesting the Bankruptcy Court to convert the RCM Case to a Chapter 7 case to be administered under Subchapter III of Chapter 7. Nothing contained in §2(e) or 3 shall require the RCM Trustee to act or to omit from acting in any manner which in the sole judgment of the RCM Trustee would be inconsistent with his or her fiduciary duties.

(c)    *Plan Voting.* Nothing contained in this Agreement requires any party hereto to vote in favor of any Chapter 11 plan.

(d)    *Appeals from the Conversion Motion Ruling.*    Nothing contained in this Agreement prevents any party who objected to the Conversion Motion, or who has a right to appeal under applicable law, from prior to the Subsequent Effective Date filing and pursuing a protective appeal of any order converting the RCM Case to a Chapter 7 case. The parties hereto agree to cooperate with each other and to take such other action as may be appropriate to seek from the U.S. District Court a stay of any such appeal pending the occurrence of the Subsequent Effective Date or the application of §14(d).

§19.    **Specific Performance**. It is understood and agreed by each of the parties hereto that money damages would not be a sufficient remedy for any breach of this Agreement by any party and that each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

SETTLEMENT AGREEMENT

29

**§20.**   **Interpretation.**  In the event that a provision of this Agreement conflicts with a provision of the Term Sheet, the provision of this Agreement controls.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

**§21.**   **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which, taken together, shall constitute one and the same agreement.  An executed counterpart transmitted to the RCM Trustee by facsimile shall be sufficient as an original executed counterpart.

**§22.**   **Joinders by Additional Creditors**.   After the execution and delivery of this Agreement by the original parties hereto, any other creditor of the RCM estate may become a party to this Agreement by (a) executing and delivering to the RCM Trustee a counterpart of this Agreement and (b) the RCM Trustee accepting the counterpart.  The RCM Trustee will notify the other parties hereto of the creditor joining as a party to this Agreement and will file a notice of the joinder with the Bankruptcy Court.  This Section does not apply to a person who becomes a party to this Agreement pursuant to §15(b).

**§23.**   **Notices.**  All notices or other communications under this Agreement to any party hereto shall be delivered or sent to such party at its address, or at the address of its counsel, indicated on the signature page for such party below or at such other address as such party or its counsel may communicate to the other parties hereto.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

THE RCM TRUSTEE


By _____
Name: Marc S. Kirschner
Title: Chapter 11 Trustee of Refco Capital Markets, Ltd.

Marc S. Kirschner (MSK3631)
1120 Park Avenue, 18A
New York, NY 10128
Telephone: (212) 860-7577

SETTLEMENT AGREEMENT

BUSDOCS/15584440

31

CLEARY GOTTLIEB STEEN
& HAMILTON LLP

By: _____
Thomas J. Moloney (TM-9775)
Neil P. Forrest (NF-8162)
Jason P. Gottlieb (JG-8398)
One Liberty Plaza
New York, New York 10006-1470
(212) 225-2000

*Attorneys for Inter Financial Services, Ltd.*

06/28/2006 18:34 FAX 7083432083          OfficeMax                              ☑002

32

CAPITAL MANAGEMENT SELECT FUND
LTD.

By:    Vytėnis Rasutis
Title:  Director

*Address for notices:*

DICKSTEIN SHAPIRO MORIN
 & OSHINSKY LLP (*up to and through July 9,
2006*)

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

DICKSTEIN SHAPIRO LLP (*as of and after July
10, 2006*)

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
1825 Eye Street, N.W.
Washington, DC 20006-5403
Tel: (202) 420-3144
Fax: (202)-420-2201

*Attorneys for Capital Management Select Fund Ltd.*

SETTLEMENT AGREEMENT

BUSDOCS/1558440

33

COLE, SCHOTZ, MEISEL,
  FORMAN & LEONARD, P.A.
  A Professional Corporation

By: _____
Joshua Angel (JA-8288)
Laurence May, Esq. (LM-9714)
Seth F. Kornbluth, Esq. (SK-4911)
460 Park Avenue
New York, NY 10022-1906
(212) 752-8000

*Attorneys for Global Management Worldwide
Limited; Arbat Equity Arbitrage Fund Limited;
Russian Investors Securities Limited; and Garden
Ring Fund Limited*

SETTLEMENT AGREEMENT

34

PILLSBURY WINTHROP SHAW
  PITTMAN LLP

By:

Rick B. Antonoff (RA-4158)
C. Nicole Gladden (CG-3707)
1540 Broadway
New York, New York 10036
(212) 858-1000

*Attorneys for RB Securities Limited*

SETTLEMENT AGREEMENT

BUSDOCS/1558440

35

SHUTTS & BOWEN LLP *(By Larry Glick w/permission)*

By: *Robert Fracasso*
Robert Fracasso (RF-2538)
Peter E. Shapiro (PES-4795)
201 South Biscayne Boulevard
1500 Miami Center
(305) 379-9102

LARRY I. GLICK, P.C.
Larry I. Glick (LG-8665)
1305 Franklin Avenue, Suite 180
Garden City, New York 11530
(516) 739-1111

*As attorneys for IDC Financial S.A.;*
*Investment & Development Finance Corp.;*
*Oslo International S.A.; Alfredo Skinner–Klee*
*and Alexandra Sol de Skinner-Klee; Ernesto*
*Ruiz Sinibaldi; Christian Klose Pieters and*
*Aida Margarita Rosales de Klose; Ballery*
*Holdings; and Bilston International Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: *Larry J. Glick*
*LARRY I. GLICK (LG-8665)*

*As attorneys for Banco Reformador S.A. and*
*Transcom Bank (Barbados) Ltd.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Banco Uno S.A.- Panama;*
*Banco Uno S.A.- El Salvador; and Banco*
*Uno S.A.- Guatemala*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: *Larry J. Glick*
*LARRY I. GLICK (LG-8665)*

*As attorneys for GTC Bank Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: *Larry J. Glick*
*LARRY I. GLICK (LG-8665)*

*As attorneys for INS-Bancredito Valores*
*Puesto de Bolsa, S.A. and Servicios*
*Generales Bursatiles, S.A. de C.V.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Miguel Sauma*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Victor Hoyos and Altima*
*Capital Management, Inc.*

SETTLEMENT AGREEMENT

HOLLAND & KNIGHT LLP

By: _Sandra E. May_

Sandra E. Mayerson (SM-8119)
Arthur E. Rosenberg (AR-0513)
Peter A. Zisser (PZ-9634)
195 Broadway
New York, NY 10007
(212) 513-3200

*Attorneys for Turisol Casa de Cambio C.A.;*
*Heptagon Financial Services, Inc., f/k/a*
*Interfin Capital Inc.; Sud America de Seguros C.A.;*
*Sul America Compania de Seguros del*
*Ecuador C.A.; Latina Seguros y Redseguros S.A., f/k/a*
*Generali Peru Compania de Seguros y*
*Reseguros; Heptagon Financial Planners,*
*Ltd.; and Brooke Financial Services Ltd.*

P.02/02

37

AKIN GUMP STRAUSS HAUER
& FELD LLP

By: _____
Fred S. Hodara (FH-7497)
Andrew J. Rossman (AR-0596)
590 Madison Avenue
New York, NY 10022
(212) 872-1000

*Attorneys for VR Global Partners, L.P.; Paton
Holdings Ltd.; VR Capital Group Ltd.; and VR
Argentina Recovery Fund, Ltd.*

SETTLEMENT AGREEMENT

BUSDOCS/1558440

38

HOGAN & HARTSON L.L.P.

By: _____

Ira S. Greene (IG-2315)
Scott A. Golden (SG-6663)
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Attorneys for Premier Bank International N.V. and
Banco de Hipotecario de Inversion Turistica de
Venezuela as trustee of Fideicomiso Federal Forex
Investment*

SETTLEMENT AGREEMENT

BUSDOCS/1558440

39

CHADBOURNE & PARKE LLP

By: _____
Joseph H. Smolinsky (JS-8408)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Markwood Investments Ltd.*

SETTLEMENT AGREEMENT

40

FOLEY & LARDNER LLP

By: _Salvatore A. Barbatano_

Robert A. Scher (RS 2910)
Dorit S. Heimer (DH 7511)
Emily R. Sausen (ES 9097)
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329

FOLEY & LARDNER LLP
Scott E. Early (pro hac vice)
Salvatore A. Barbatano (pro hac vice)
Geoffrey S. Goodman (pro hac vice)
321 North Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Leuthold Funds, Inc. and Leuthold
Industrial Metals Fund, L.P.*

BUSDOCS/1558440

41

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Andrew Dash (AD 7913 )
Seven Times Square
New York, New York 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

BROWN RUDNICK BERLACK ISRAELS LLP
William R. Baldiga
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Attorneys for Hain Capital Group, LLC; Wayzata
Investment Partners; and Contrarian Capital
Management*

42

KATTEN MUCHIN ROSENMAN LLP

By: _____
Jeff J. Friedman (JF-7661)
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for Lyxor/Estlander & Ronnlund
Fund Ltd.; Lyxor/Beach Discretionary Fund
Ltd.; and Société Générale S.A.*

43

[page reserved]

SETTLEMENT AGREEMENT

BUSDOCS/15584440

44

[page reserved]

SETTLEMENT AGREEMENT

BUSDOCS/1558440

CHADBOURNE & PARKE LLP

By: *Christy Rivera*
Howard Seife (HS 7995)
Christy L. Rivera (CR 8895)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Carlos Sevilleja, Cosmorex, Ltd.,
and Creative Finance Limited*

46

FAEGRE & BENSON LLP

By

Michael B. Fisco (#175341)
Stephen M. Mertz (#212131)
Abby E. Wilkinson (#0313981)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Cargill Financial Services
Corporation; Cargill Global Funding PLC;
Cargill, Incorporated; and Cargill Meat Solutions
Corporation (formerly Excel Corporation)*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC  20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for RR Investment Company Limited*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC  20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for Rovida Holdings Limited*

SETTLEMENT AGREEMENT

BUSDOCS/15584440

48

AKIN GUMP STRAUSS HAUER & FELD LLP

By:

Robert A. Johnson (RJ 6353)
590 Madison Avenue
New York, NY 10022-2524
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Attorneys for Reserve Invest (Cyprus) Ltd.*

SETTLEMENT AGREEMENT

BLANK ROME LLP

By: _____

Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Grand Trading Limited*

BLANK ROME LLP

By: _____

Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Armajaro Commodities, Ltd.*

SETTLEMENT AGREEMENT

BUSDOCS/15584440

EVEREST ASSET MANAGEMENT INC.

By:    Peter Lamoureux
Title:    President

*Address for notices:*

HENDERSON & LYMAN

Douglas E. Arend
175 West Jackson Boulevard
Suite 240
Chicago, IL 60604
Tel: (312) 986-6960
Fax: (312) 986-6960

*Attorneys for Everest Asset Management Inc.*

SETTLEMENT AGREEMENT

BUSDOCS/15584440

# EXHIBIT A

## MCG MEMBERS AND JOINDER PARTIES

### MCG Members

Inter Financial Services, Ltd.

Capital Management Select Fund Ltd.

Global Management Worldwide Limited
Arbat Equity Arbitrage Fund Limited
Russian Investors Securities Limited
Garden Ring Fund Limited

RB Securities Limited

GTC Bank Inc.
IDC Financial S.A.
Investment & Development Finance Corp.
Oslo International S.A.
Alfredo Skinner–Klee
    and Alexandra Sol de Skinner-Klee
Ernesto Ruiz Sinibaldi
Christian Klose Pieters
Aida Margarita Rosales de Klose
Ballery Holdings
Bilston International Inc.
Banco Reformador S.A.
Transcom Bank (Barbados) Ltd.

### Joinder Parties

Banco Uno S.A.- Panama
Banco Uno S.A.- El Salvador
Banco Uno S.A.- Guatemala
INS-Bancredito Valores Puesto de Bolsa, S.A.*
Servicios Generales Bursatiles, S.A. de C.V.*
Altima Capital Management, Inc.*

Turisol Casa de Cambio C.A.
Heptagon Financial Services, Inc.,
    f/k/a Interfin Capital Inc.
Sud America de Seguros C.A.
Sul America Compania de Segurose del Ecuador C.A.
Latina de Seguros, f/k/a Generali Peru Compania de
    Seguros y Reseguros
Heptagon Financial Planners, Ltd.
Brook Financial Services Ltd.

VR Global Partners, L.P.
Paton Holdings Ltd.
VR Capital Group Ltd.
VR Argentina Recovery Fund, Ltd.

Premier Bank International N.V.
Banco de Hipotecario de Inversion Turistica de
    Venezuela as trustee of Fideicomiso Federal Forex
    Investment*

Markwood Investments Ltd.

* Treated as a Joinder Party for purposes of Sections 3(a)(ii) and 14(b)(iv)(4) of the Agreement.

**EXHIBIT B**

**APRIL 25 ANALYSIS**

*DRAFT - PRIVILEGED AND CONFIDENTIAL*                                                      *SUBJECT TO MATERIAL CHANGE*

**RCM ASSETS - DRAFT ALLOCATION OF ASSETS TO FX AND CUSTOMER GROUP**
**AMOUNTS IN $US, BASED ON VALUATION AS OF MARCH 8, 2005**

| NOTE | LINK | COUNTER-PARTY | ACCOUNT REF | 3/4/04 BALANCE | 15/18/05 BALANCE | INCREASE/ (DECREASE) | PRELIMINARY ALLOCATION | NOT IDENTIFIABLE | FX & OTC PORTION | CUSTOMER PORTION |
|---|---|---|---|---|---|---|---|---|---|---|
| CASH ACCOUNTS | | | | | | | | | | |
| 1 | | Bank of NT Butterfield & Sons | xxx100 | $ 12,628 | $ - | $ 12,628 | N | $ 12,628 | | |
| 2 | | Bank of NT Butterfield & Sons | xxx206 | - | 3,804 | (3,804) | | | | |
| 3 | | Bank of NT Butterfield & Sons | xxx627 | - | 8,760 | (8,760) | | | | |
| 4 | | CIBC-Mellon Global Securities Services Company | xxx022 | 461,060 | - | 461,060 | C | | | $ 461,060 |
| 5 | A | Euroclear | xxx982 | 17,762,652 | 4,744,508 | 13,018,144 | C | | | 17,762,852 |
| 6 | C | Euroclear | xxx917 | 2,896,429 | 1,069,322 | 1,842,107 | C | | | 2,896,429 |
| 7 | D | Harris Trust & Savings | xxx715 | 170,124,391 | 97,962,026 | 72,162,365 | N | 46,852,080 | $ (3,508,075) | 127,843,665 |
| 8 | | HSBC | xxx967 | 105,969,322 | 103,269,040 | 5,699,552 | SPLIT | | 95,915,530 | 13,054,292 |
| 9 | | HSBC | xxx274 | 8,039,337 | - | 8,039,337 | FX | | 8,039,337 | |
| 10 | | HSBC | xxx281 | 3,314,258 | - | 3,314,258 | FX | | 3,314,258 | |
| 11 | | HSBC | xxx201 | 2,336 | - | 2,336 | FX | | 2,336 | |
| 12 | E | JP Morgan Chase - London | xxx701 | (22,047,280) | - | (22,047,280) | N | $ (22,047,280) | | |
| 13 | F | JP Morgan Chase - DTC | xxx570 | 560,581 | 36,614,646 | (36,054,065) | C | | | 560,581 |
| 14 | G | JP Morgan Chase - Fed | xxx590 | 11,262 | 19,908,950 | (19,897,688) | C | | | 11,262 |
| 15 | F&G | JP Morgan Chase | | 383,916,868 | - | 383,916,868 | SPLIT | | 12,000,000 | 371,916,868 |
| 16 | | JP Morgan Chase | xxx534 | 117,941,393 | - | 117,941,393 | C | | | 117,941,393 |
| 17 | H | Merrill Lynch | | 13,393,297 | 8,196,883 | 5,196,314 | O | | | 13,393,297 |
| 18 | | Standard Charter Bank | xxx310 | - | 1,689,707 | (1,689,707) | N/A | | | |
| 19 | I | Wachovia Bank, NA | xxx853 | 36,363,791 | - | 36,863,791 | FX | | 36,863,791 | |
| **SUBTOTAL: CASH ACCOUNTS** | | | | **$ 840,029,741** | **$ 276,639,404** | **$ 563,390,337** | | **$ 24,827,408** | **$ 150,631,477** | **$ 665,883,636** |
| CASH DUE FROM BROKERS | | | | | | | | | | |
| 20 | I | Counterparty terminations - FX | | $ 6,453,523 | $ 42,879,395 | $ (36,524,872) | FX | | $ 6,453,523 | |
| 21 | D | Counterparty terminations - Sec | | 16,270,663 | 140,851,266 | (124,380,403) | C | | | $ 16,270,663 |
| 22 | | Refco Securities LTD | | - | 14,840,078 | (14,940,078) | N/A | | | |
| 23 | | Refco, LLC (Man Financial) | | 43,351,834 | 40,964,347 | 2,387,487 | N | 43,351,834 | | |
| **SUBTOTAL: CASH DUE FROM BROKERS** | | | | **$ 66,076,220** | **$ 239,534,086** | **$ (173,457,866)** | | **$ 43,351,834** | **$ 6,453,523** | **$ 16,270,663** |
| CUSTODY ACCOUNTS | | | | | | | | | | |
| 24 | A | CIBC | | $ 8,316,788 | $ 6,878,567 | $ 2,443,231 | C | | | $ 8,316,788 |
| 25 | | Clearstream | | 26,908,251 | 41,376,814 | (14,567,563) | C | | | 26,906,251 |
| 26 | | Dresdner - To OTC | | - | 43,634,161 | (43,634,161) | | | | |
| 27 | | Dresdner - To Euroclear | | - | 19,002,368 | (19,002,368) | | | | |
| 28 | | Euroclear - Refco Sec Inc. 21939 | | - | 63,828,728 | (63,828,728) | | | | |
| 29 | C | Euroclear - Refco Secs LLC NY 92917 | | 92,511,976 | 5,895,419 | 66,616,567 | C | | | 92,511,976 |
| 30 | | Euroclear-RCM LDN 21936 | | 6,271 | 6,693 | 678 | C | | | 6,271 |
| 31 | B | Euroclear-RCM NY 11982 | | 407,620,419 | 410,533,021 | (2,912,602) | O | | | 407,620,419 |
| 32 | | HSBC - London (Precious Metals) | | 19,804,305 | 11,982,813 | 3,721,492 | FX | | $ 15,604,305 | |
| 33 | F | JP Morgan Chase - DTC | | 426,577,743 | 339,041,822 | 87,535,921 | C | | | 426,577,743 |
| 34 | G | JP Morgan Chase - Fed | | 91,505,480 | 399,664,706 | (298,179,220) | C | | | 91,505,480 |
| 35 | E | JP Morgan Chase - London | | 7,304,737 | 42,071 | 7,262,666 | C | | | 7,304,737 |
| 36 | H | Merrill Lynch | | 67,522,967 | 56,664,318 | 10,938,659 | C | | | 87,522,967 |
| 37 | | Refco Singapore | | 1,954,899 | 1,901,851 | 52,948 | C | | | 1,954,899 |
| **SUBTOTAL: CUSTODY ACCOUNTS** | | | | **$ 1,149,745,836** | **$ 1,399,308,538** | **$ (243,562,652)** | | **$ -** | **$ 15,604,305** | **$ 1,130,141,551** |
| **GRAND TOTALS** | | | | **$ 3,691,591,917** | **$ 1,908,482,028** | **$ 146,369,769** | | **$ 67,979,238** | **$ 172,689,306** | **$ 1,812,096,063** |

*Note: Allocations do not reflect any compromises that may have been reached in settlement discussions.*

DRAFT - PRIVILEGED AND CONFIDENTIAL                                                    SUBJECT TO MATERIAL CHANGE

**RCM ASSETS - DRAFT ALLOCATION OF ASSETS TO FX AND CUSTOMER GROUP**
**AMOUNTS IN $US, BASED ON VALUATION AS OF MARCH 6, 200**

**NOTES**

| | |
|---|---|
| 1 | Petty cash for expenses incurred in Bermuda |
| 2 | Transferred to revised Butterfield account. |
| 3 | Transferred to revised Butterfield account. |
| 4 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts. |
| 5 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) |
| 6 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) |
| 7 | Unidentifiable amounts represent treasuries reverse repoed over time from RSL for unidentifiable cash and deposited as collateral at Lehman to for emerging market options transactions. The balance relates to the collection of cash proceeds from securities counter-party terminations. |
| 8 | Increase related to collection of FX counter-party terminations prior to opening of Wachovia account. |
| 9 | Account identified subsequent to 11/18 as FX related activity for Hong Kong customers. |
| 10 | FX related activity for Hong Kong customers. |
| 11 | Account identified subsequent to 11/18 as FX related activity for Hong Kong customers. |
| 12 | Upon further review, it has become clear that the debit balances arose over time based on hundreds/thousands of transactions in multiple currencies and tracing the origin of the debits is not realistically feasible. |
| 13 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts. Decrease due to cash sweep to interest bearing JP Morgan Chase account. |
| 14 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts. Decrease due to cash sweep to interest bearing JP Morgan Chase account. |
| 15 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts; includes proceeds from matured Rogers securities, which are assumed to be "customer" property. Increase due to cash sweep from JP Morgan Chase accounts. Corresponds to decreased balance in JP Morgan Chase securities accounts. Per V. Kraker, FX amount relates to maturities of treasuries held for RIG customers in OTC account. As of 3/6/06, $604M of Rogers securities remained in a JPMC account and have been allocated as customer assets. |
| 16 | Balance as of 2/28/06. Money Market account for RSL/RCM disputed cash proceeds connected with securities movement from Eurocler accounts. |
| 17 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) |
| 18 | This cash may be an RSL asset and is included in the RSL liquidation analysis. Further, note that 11/18 amount was erroneously stated in Yen. $US balance is approx. $13k. |
| 19 | Account set-up 2/14/06. Balance relates to collection of FX counter-party terminations. Deposits to account monitored by David Fox. |
| 20 | Outstanding balance for counter-party terminations related to FX transactions. Decrease due to collections in HSBC and Wachovia accounts |
| 21 | Outstanding balance for securities counter-party terminations. Decrease due to collections in Harris and JP Morgan Chase accounts. 11/18 contained receivable from UBS paid to HSBC account. |
| 22 | RCM securities customer accounts at RSL included in intercompany balances. As of 3/6, balance is $15,008,222. |
| 23 | Includes $24.9MM related to OTC/Derivative trades and $18.4MM related to FX trades the origin of which is unidentifiable. Amounts collected subsequent to 3/6/06 |
| 24 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) and current market valuation. |
| 25 | Decrease relates primarily to bond maturity for $0 value. Confirmation of this maturity and current status of proceeds under review by RCM personnel. |
| 26 | Repo collateral returned to DTC custody account. |
| 27 | Repo collateral returned to Euroclear custody account. |
| 28 | Securities consolidated to Euroclear account 92917. |
| 29 | Increase relates to return of Dresdner collateral, consolidation of account with 21919, and current market valuation. |
| 30 | Increase related to current market valuation. |
| 31 | Decrease related to maturities and current market valuation. |
| 32 | Increase related to current market valuation. |
| 33 | Increase relates to return of Dresdner collateral and current market valuation. |
| 34 | Decrease relates to treasury maturities offset by increase in market valuation for remaining securities. |
| 35 | Increase relates to additional securities associated with account subsequent to 11/18/05. Per V. Kraker, $6.3MM of the current value reported by JPM relates to 2 securities positions that RCM personnel view as illiquid and potentially valueless. RCM continues to investigate this issue. |
| 36 | Increase related to current market valuation. |
| 37 | Increase related to current market valuation. |

**EXHIBIT C**

## Memo

**Refco**

**To:** Marc Kirshner

**CC:** Eric Simonsen, David Pauker

**From:** Stacey Hightower

**Date:** 5/12/2006

**Re:** RCM Assets and Investments Update

Dear Marc,

There are several RCM book-owned assets that are in various stages of due diligence to verify RCM ownership, assess value, and identify a strategy to monetize that value for the Estate. This memo addresses these assets and their current status in the due diligence/recovery pipeline. Most of them will need advisement and support from you in order to advance their position. I have placed these assets into the following three categories.

– Category 1: RCM Investments; these are assets owned by RCM that have been researched fully, but await a decision from you to either liquefy or hold the assets for now.

– Category 2: RCM Dealer Liquidations; these are RCM positions that have been liquidated as of the bankruptcy filing, and the funds need to be returned to RCM. The counterparties have been either delinquent in providing information to reconcile amounts, or will not respond to our inquiries.

– Category 3: B-33 Schedule; these are RCM book assets that are mostly in the early stage of due diligence to verify RCM ownership and determine value.

## Category 1: RCM Investments

– <u>Lonestar International Fund</u>: Lonestar International Fund is comprised of three separate funds a) Sigma Fund International, b) North Star International, and c) Northbridge Partners International.

# REDACTED

o Sigma Fund International- RCM is the sole investor, with an approximate value of $2.3MM as of 11/05.

o North Star International- RCM is the sole investor, with an approximate value of $2.3MM (11/05). Of the total investment, $1.03MM is held in an RCM account #4488 in the name of Northstar Fund.

o Northbridge Partners International- RCM is one of two investors in this vehicle. RCM's investment is approximately $2.8MM (11/05) of the total $4MM.

o Beckenham Trading Co. (BTC) has filed a claim for $250,000 held in three accounts: 4127 & 4217A01 in the name of Beckenham Trading Company, and 4138 in the name of Beckenham FX Clear. BTC is a NCM related entity.

REDACTED

1

**REDACTED**

*Next Steps:*

REDACTED

- **Dendreon:** 152,778 shares of Dendreon, a public company, are held in an account in the name of Refco Group that is held at RCM. These shares will await the final global RCM decision. The share price has moved adversely since end of Jan from $5.06 to $3.93 at 5/10/06 ($773,000 vs. $600,000).

## Category 2: RCM Dealer Liquidations

- **Barclays Bank PLC:** Barclays is willing to pay $1.5MM for the liquidation of RCM foreign currency trades. Our RCM foreign currency dept believes Barclays owes $1.79MM. We have asked for the specific prices that Barclays' trades were liquidated to reconcile the amount owed.

    o *Next Steps:*

    REDACTED

- **Dresner Bank AG:** Dresner has paid us liquidations related to the RCM securities, but we have a discrepancy regarding the liquidation of RCM foreign currency trades. Our RCM foreign currency dept believes Dresner owes $1.63MM. We've asked for the specific prices at which their trades were liquidated to reconcile the amount owed.

    *Next Steps:*

    REDACTED

- **Bear Stearns Forex:** The RCM foreign currency department estimates that Bear Stearns owes RCM approximately $347,000 for liquidated trades. The RCM securities department needs Bear Stearns to provide them with a liquidation price on a bond in their possession.

    o *Next Steps:*

    REDACTED

- **FIMAT SA:** FIMAT agrees that there is $1.8MM in liquidations to be paid. They have received a counter claim by RJ Trading claiming RJ Trading is the rightful owner of the $1.8MM.  FIMAT is holding onto the funds until clearly directed which party rightfully owns the funds. Upon clarification, FIMAT is willing to make the disbursement.

o   RJ Trading was the Advisor/agent for RCM on all the PIMAT trades. RJT claims that the liquidation was RJT's client positions (ABBA, Living Water, and Jenkins). They also claim that RCM is attempting to seize the property of said RJT clients.

o   *Next Steps:*

**REDACTED**

### Category 3: B-33 Schedule:

These book assets are in the early stages of due diligence to verify RCM ownership and value. We have prioritized due diligence based on highest to lowest book value. The due diligence process involves internal searches to locate any records or documents related to the asset, initial acquisition or verification of ownership. Externally, we contact the Counterparty to verify ownership through documentation. Where we can't locate an external Counterparty, we conduct internet and Bloomberg searches to locate the entity. Below is a synopsis of the assets currently in the due diligence process.

−   **PFG Relative Value Opportunity Overseas Fund:** The fund is comprised of U.S. debt, exchanged traded and OTC interest rate futures and options and, to a lesser extent, currency equity, commodity, liquid foreign sovereign debt and U.S. and foreign fixed income securities. PFG Advisors LLC is the Fund's investment manager.

   o   RCM's investment value: RCM owns 5,000 shares valued at $5.26MM as of 4/30/2006

   o   Redemption can be executed with a letter notice to PFG and Citco (Fund administrator) 65 days prior to the end of the quarter. Funds will then arrive 10-15 days after the end of the quarter.

   o   *Next Steps:*      

−   **Acies Assets Management SA:** This is a Geneva-based asset management company. In August, 2005 RCM and Acies Assets Management (AAM) entered into a stock purchase and business relationship agreement. RCM received 20% (30,000 shares) of AAM's equity for SF$300,000 and monthly charges of SF$200,000/month for 3 years (SF$7,200,000). RCM agreed to provide dealer and brokerage service for AAM clients. The current book value listed is $6,900,000 and 45,000 shares.

**REDACTED**

   o   *Next Steps:*      

– **Additional B-33 items in initial due diligence phase**

| Asset Name | Quantity | Book Value in USD | Comments |
|---|---|---|---|
| ACTIVCARD | 300 | 26,389 | TBD |
| BANK OF AYUNDHYA PUB CO-FORGN | 60,000 | 590 | TBD |
| BK OF AYUDHYA | 550,000 | 6,539 | TBD |
| C A LA ELECTRICIDAD DE CARACAS | 1 | 10 | TBD |
| CLICKMARKS.COM | 516,129 | 800,000 | Called company waiting on information |
| IRIDIUM WORLD COMMUNICATIONS | 1,000 | 12 | TBD |
| MINFIN OF RUSSIA 3 05/14/08 | 200,000 | 189,630 | TBD |
| ROCKCREEK PARTNER | 780,000 | 402,000 | Called company; awaiting response |
| RUSSIA-IAN (VNESHECONOMBANK) | 804,164 | 276,577 | TBD |
| SN BANK | 403,100 | 1,000,000 | We have documents Searching for pricing information and need Korean interpreter |
| SN BANK CO LTD, CONVERTIBLE | 600,000,000 | 619,642 | We have documents Searching for pricing information and need Korean interpreter |



**EXHIBIT D**

**ATTORNEYS' FEES / SUBSTANTIAL CONTRIBUTION**

1. Akin Gump Strauss Hauer & Feld LLP ............................................. $927,794.00

2. Chadbourne & Parke LLP ................................................................. $10,000.00

3. Cleary Gottlieb Steen & Hamilton LLP ............................................. $1,450,492.27

4. Cole, Schotz, Meisel, Forman & Leonard, P.A. ................................... $167,748.42

5. Dickstein Shapiro Morin & Oshinsky LLP ......................................... $707,777.30

6. Hogan & Hartson L.L.P. .................................................................. $140,716.25

7. Holland & Knight LLP ..................................................................... $477,109.74

8. Larry I. Glick, P.C. .......................................................................... $62,631.37

9. Pillsbury Winthrop Shaw Pittman LLP .............................................. $255,241.54

10. Shutts & Bowen LLP ...................................................................... $163,519.71

Exhibit E to Settlement Agreement





IV. Reallocation (reapportion)ment:
Increase general pool upfront recovery:
Upfront recovery after reallocation compromise:

V. Contingent recoveries from Additional Property:
Sharing percentage on contingent recoveries:
Contingent recoveries required for catch-up:
Contingent recoveries before activation of catch-up:
Accrual rate on catch-up (% p.a.):
Attribution of phase 1 contingent recoveries:
Recoveries after phase 1 contingent recoveries:
% recoveries after phase 1 contingent recoveries:
Phase 2 contingent recovery catch-up:
Phase 2 contingent recovery (interest) (S):
Recoveries after phase 2 contingent recoveries:
% recoveries after phase 2 contingent recoveries:

| | Customer Pool | General Pool | Total | |
|---|---|---|---|---|
| | (123.6) | 123.6 | | This is the Agreed Advance Amount, which will be repaid dollar-for-dollar by interest accrued on $57-Area from March 6, 2006. |
| | 1,932.6 | 236.6 | 2,176.2 | |
| | | | | This amount was a fixed $222area plus the face value of the Late/Gr3 Assets. |
| | 49.82% | 53.17% | 100.0% | Percentage here are for illustrative purpose only. Actual percentages to be calculated based on actual allowed Implied Deficiency Claims and actual allowed FX/Unsecured Claims. |
| 222.5 | | | | |
| 12% | | | | |
| | 70.3 | 79.7 | 150.0 | This figure is illustrative. Actual amount will be calculated at (1)/13.6area the interest accrued on $57-area from March 6, 2006 divided by a fraction of the total allowed FX/Unsecured Claims (i.e., the numerator) and the total of the total allowed FX/Unsecured Claims and the Implied Deficiency Claims of the holders of ?% that allowed Sum-area Customer Claims (i.e., the denominator), subject to any adjustments provided for in the Agreement. |
| | 2,005.9 | 318.3 | 2,324.2 | |
| | 123.1% | 35.4% | | |
| | 222.5 | | | |
| | 8.3 | | | |
| | 2,261.9 | 318.0 | 2,568.0 | |
| | 81.9% | 35.4% | | |

VI. Estimated Recovery chart:
Assets in phase plus Advance Amount:
Contingent recoveries from Additional Property:

| | Customer Pool | General Pool | Total | |
|---|---|---|---|---|
| 50.0 | 1,838.6 | 238.6 | 2,176.2 | |
| 100.0 | 1,883.6 | 283.6 | 2,226.2 | |
| 150.0 | 1,866.4 | 298.6 | 2,276.2 | |
| 200.0 | 2,008.9 | 318.3 | 2,326.2 | |
| 250.0 | 2,058.9 | 318.3 | 2,376.2 | |
| 300.0 | 2,108.9 | 318.3 | 2,426.2 | |
| 350.0 | 2,158.9 | 318.3 | 2,476.2 | |
| 400.0 | 2,208.9 | 318.3 | 2,526.2 | |
| 450.0 | 2,258.9 | 318.3 | 2,576.2 | |
| 500.0 | 2,208.8 | 356.4 | 2,620.3 | |
| 550.0 | 2,307.2 | 360.0 | 2,670.2 | |
| 600.0 | 2,346.9 | 385.6 | 2,726.2 | |
| 650.0 | 2,354.1 | 422.1 | 2,776.2 | |
| 700.0 | 2,377.6 | 445.7 | 2,820.3 | |
| 750.0 | 2,420.0 | 470.3 | 2,870.3 | |
| 800.0 | 2,424.3 | 501.9 | 2,920.3 | |
| 850.0 | 2,442.7 | 526.6 | 2,970.2 | |
| 900.0 | 2,476.2 | 556.0 | 3,020.2 | |
| 950.0 | 2,494.6 | 581.6 | 3,076.2 | |
| 1,000.0 | 2,516.0 | 609.2 | 3,126.2 | |
| | 2,541.4 | 634.4 | 3,176.2 | This annual rate will apply to all Advance Amounts. |

Assets in phase plus Advance Amount:
Contingent recoveries from Additional Property:

| | Customer Pool | General Pool |
|---|---|---|
| 50.0 | 76.5% | 25.5% |
| 100.0 | 71.4% | 32.6% |
| 150.0 | 73.2% | 32.4% |
| 200.0 | 73.1% | 35.4% |
| 250.0 | 74.4% | 35.4% |
| 300.0 | 76.2% | 35.4% |
| 350.0 | 78.3% | 35.4% |
| 400.0 | 80.3% | 35.4% |
| 450.0 | 82.3% | 35.4% |
| 500.0 | 82.4% | 36.3% |
| 550.0 | 83.6% | 38.3% |
| 600.0 | 83.5% | 41.3% |
| 650.0 | 84.3% | 44.2% |
| 700.0 | 85.4% | 47.2% |
| 750.0 | 86.4% | 50.2% |
| 800.0 | 87.5% | 53.2% |
| 850.0 | 88.1% | 56.2% |
| 900.0 | 88.8% | 59.3% |
| 950.0 | 89.8% | 62.3% |
| 1,000.0 | 90.7% | 65.3% |
| | 90.4% | 71.1% |

Notes to analysis:
(4) Premium for risk and delay. Assumes six-month delay.

**EXHIBIT F**

**PLAN, NEGOTIATION AND LITIGATION
ADVISORY COMMITTEE**

The Plan, Negotiation and Litigation Advisory Committee shall be composed of all MCG Members and Joinder Parties as well as all holders of FX/Unsecured Claims who are party to the Agreement and who have signed the Agreement (either individually or through counsel) on or before July 12, 2006. However, the Plan, Negotiation and Litigation Advisory Committee shall not include any party that elects not to serve as a member or any party that the RCM Trustee determines to be unsuitable to serve as a member as a result of wrongful conduct or for other good cause.

**EXHIBIT G**

**PORTFOLIO MANAGEMENT ADVISORY COMMITTEE**

Fintech Advisory Inc.
IDC Financial S.A.
RB Securities Limited
VR Advisory Services, Ltd.