IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

MARC S. KIRSCHNER,                          )
as Trustee of the Refco Litigation Trust,   )
                                            )
    Plaintiff,                             )
                                            )
    -vs-                                   )   Case No. _____ **2007L008818**
                                            )   **CALENDAR/ROOM**
GRANT THORNTON LLP, MAYER,                   )   **TIME 00:00**
BROWN, ROWE & MAW, LLP, ERNST &             )   **Other Com Litigation**
YOUNG U.S. LLP,                              )
PRICEWATERHOUSECOOPERS LLP,                  )
CREDIT SUISSE SECURITIES (USA) LLC           )   Jury Trial Demanded
(f/k/a CREDIT SUISSE FIRST BOSTON            )
LLC), BANC OF AMERICA SECURITIES             )
LLC, DEUTSCHE BANK SECURITIES                )
INC., PHILLIP R. BENNETT, SANTO C.           )
MAGGIO, ROBERT C. TROSTEN, TONE N.           )
GRANT, REFCO GROUP HOLDINGS,                 )
INC., LIBERTY CORNER CAPITAL                  )
STRATEGIES, LLC, WILLIAM T. PIGOTT,          )
EMF FINANCIAL PRODUCTS, LLC, EMF             )
CORE FUND, LTD., DELTA FLYER FUND,           )
LLC, ERIC M. FLANAGAN, INGRAM                )
MICRO, INC., CIM VENTURES, INC.,             )
BECKENHAM TRADING CO. INC.,                  )
ANDREW KRIEGER, COAST ASSET                  )
MANAGEMENT, LLC (f/k/a COAST ASSET           )
MANAGEMENT LP), CS LAND                      )
MANAGEMENT, LLC, and CHRISTOPHER             )
PETITT,                                      )
                                            )
    Defendants.                            )

## COMPLAINT

    This action is brought by Marc S. Kirschner (the "Trustee"), the Court-approved Trustee for

the Refco Litigation Trust (the "Trust"), as the duly authorized representative to commence all

claims and causes of action formerly owned by the bankruptcy estates of Refco Inc. and certain of its

direct and indirect subsidiaries (collectively, "Refco" and, individually or collectively, the

"Company"), including Refco Group Ltd., LLC ("RGL") and Refco Capital Markets, Ltd. ("RCM"),

against defendants Grant Thornton LLP ("GT"), Mayer, Brown, Rowe & Maw LLP ("MB"), Ernst

& Young U.S. LLP ("E&Y"), PricewaterhouseCoopers LLP ("PwC"), Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) ("Credit Suisse"), Banc of America Securities LLC ("BAS"), Deutsche Bank Securities Inc. ("Deutsche"), Phillip R. Bennett ("Bennett"), Santo C. Maggio ("Maggio"), Robert C. Trosten ("Trosten"), Tone N. Grant ("Grant"), Refco Group Holdings, Inc. ("RGHI"), Liberty Corner Capital Strategies, LLC ("Liberty Corner"); William T. Pigott ("Pigott"), EMF Financial Products, LLC ("EMF Financial"), EMF Core Fund, Ltd. ("EMF Core Fund"), Delta Flyer Fund, LLC ("Delta Flyer"), Eric M. Flanagan ("Flanagan"), Ingram Micro, Inc. ("Ingram Micro"), CIM Ventures, Inc. ("CIM Ventures"), Beckenham Trading Co. Inc. ("Beckenham"), Andrew Krieger ("Krieger"), Coast Asset Management, LLC (f/k/a Coast Asset Management LP) ("Coast"), CS Land Management, LLC ("CS Land"), and Christopher Petitt ("Petitt") for their roles in a massive scheme to loot Refco -- a scheme that resulted in one of the swiftest corporate meltdowns in U.S. history and caused Refco over $2 billion in damages.

The Trustee as and for his complaint against the defendants states as follows based on information and belief, such information and belief based on the investigation of the Trustee and his counsel and a review of, among other things:

(a)    the filings of Refco with the U.S. Securities and Exchange Commission ("SEC");

(b)    a review of the filings, documents, and testimony produced pursuant to Refco's reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Proceedings") (assigned to the Honorable Judge Robert Drain and jointly administered under the caption "In re Refco Inc., et al., Case No. 05-60006 (RDD)");

(c)    the Final Report of the Court-appointed Independent Examiner (the "Examiner") in the Bankruptcy Proceedings;

(d)    the Third Superseding Indictment in U.S. v. Phillip R. Bennett, et al., S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007); and

(e)    other relevant public documents:

## Nature of the Case

1.    The defendants include a "who's who" of some of the biggest names in corporate finance, law, and accounting, whose reputations and substantial assistance were required for Bennett, Maggio, Trosten, and Grant (the "Refco Insiders") to strip out billions of dollars in Refco assets. Bennett and other Refco Insiders face criminal charges for their misconduct. The Trustee brings this action to recover from the Refco Insiders and those who knowingly assisted them in stripping out Refco's assets, causing billions of dollars in damage to the Company and its creditors.

2.    The Refco Insiders' looting of Refco was not a simple, straight-forward theft. With the active assistance of the Company's auditors and legal and financial advisors, the Refco Insiders and their cohorts devised an elaborate scheme through which they maintained the illusion that Refco was a highly successful, financially secure broker-dealer. It was this illusion of a thriving company that enabled the Refco Insiders to steal billions of dollars from Refco by positioning Refco for, and ultimately carrying out, what appeared on the surface to be a legitimate "buy-out" of their interests in RGL.

3.    However, as the professionals who advised Refco and facilitated this lucrative cashing-out knew and/or consciously avoided knowing, Refco's financial condition was not sufficient to warrant a lucrative sale, and the buy-out was, in fact, nothing more than an outright looting of Refco's assets. As Refco's auditors and financial, legal, and tax advisors knew and/or consciously avoided knowing, Refco sustained hundreds of millions of dollars in customer and proprietary trading losses in the late 1990s -- trading losses which the Refco Insiders did not disclose because doing so would have shaken customer confidence, negatively impacted Refco's financial condition, and foreclosed any lucrative "cashing-out" of the Refco Insiders' interests.

4.    To maintain the illusion of financial and operational strength and stability long enough for the Refco Insiders to line their pockets with Refco's assets, the Refco Insiders conspired for over seven years to conceal Refco's trading losses, true operating expenses, and marginal performance by fraudulently inflating Refco's revenues and funding virtually every aspect of Refco's operations and expenses with assets belonging to customers of RCM, Refco's unregulated

3

broker-dealer. It was a three-part scheme: create the illusion of solid financial health; maintain that illusion; and orchestrate a lucrative cashing-out of their interests.

5.    Part One -- Cleaning up the Financial Statements.  The Refco Insiders created the illusion that Refco was a financially solid and healthy broker-dealer by concealing Refco's trading losses and operating expenses from its financial statements, recording them as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the leveraged buy-out ("LBO"), by Bennett and Grant, Refco's former CEO), and inflating Refco's revenues by recording hundreds of millions of dollars in accrued interest income on these phantom receivables.

6.    Part Two -- Keep the Illusion Going Long Enough to Cash-Out.  Once these losses and operating expenses were concealed as a receivable *owed to* Refco (along with hundreds of millions of dollars in fictitious accrued interest on that receivable), the Refco Insiders, with the assistance of Refco's lawyers, MB, carefully designed and implemented a series of fraudulent transactions -- the so-called Round Trip Loans ("RTLs") -- whose sole purpose was to prevent these related-party receivables from being disclosed. These RTLs purported to be loans involving third parties, but were, in fact, little more than bogus bookkeeping entries that served to hide the fact that RGHI -- a related-party company owned and controlled by Bennett and Grant, the principal asset of which was stock of Refco -- was being used to hide Refco's trading losses and operating expenses by making them appear to be a debt owed by RGHI to Refco (the "RGHI Receivable").  Each of defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt made this concealment of Refco's true financial condition possible by participating in the RTLs in exchange for a fee.

7.    At the same time that the RGHI Receivable was concealed through fraudulent RTLs, the Refco Insiders funded Refco's operations by routinely swiping RCM's customer assets and using them to finance RGL and other Refco affiliates that had essentially no ability and no intention of repaying the RCM customer funds.

8.    Refco's auditors, legal advisors, and financial advisors actively assisted in manufacturing and maintaining this illusion not only by lending their reputations and an aura of

respectability to Refco's finances and operations but, as detailed below, by actively participating in the fraudulent scheme. Indeed, the fraudulent scheme perpetrated by the Refco Insiders only could have worked with the active assistance of Refco's cadre of outside auditors, professionals, and advisors.

9.     Part Three -- the Cash-Out.  Having successfully maintained the illusion of Refco's financial health, in 2004 the Refco Insiders, with the substantial assistance of the Company's outside accounting and auditing professionals, and legal and financial advisors, caused RGL to borrow $1.4 billion of bank and bond debt to fund a LBO that enriched the Refco Insiders at the expense of Refco and its creditors, including its largest creditor -- RCM.  As a result of the LBO, RGL was stripped of its assets and saddled with $1.4 billion in new debt.  RCM was left with approximately $2 billion in worthless intercompany "IOUs" and was unable to repay the customers from whose accounts assets had been swiped to fund Refco's business as part of the fraud.

10.     A year later, as was always the plan, the LBO was followed up with an initial public offering (the "IPO") that further impaired Refco's assets.  The IPO established Refco Inc., a new public company through which the Refco Insiders' fraud was perpetuated.  The ill-advised IPO (i) impaired Refco Inc.'s financial condition through the fraudulent sale of more than $583 million of shares of common stock, resulting in damages of as much as a billion dollars from securities fraud claims, (ii) caused Refco Inc. to pay down over $230 million of RGL's LBO debt (despite the fact that RGL was insolvent), approximately $40 million in underwriting fees and expenses, and more than $80 million in the form of a "greenshoe" dividend, for which it received no value, and (iii) thereby allowed the Refco Insiders to strip out all of Refco's remaining assets.

11.     As the Company's auditors, legal advisors, and financial advisors knew and/or consciously avoided knowing, given Refco's true financial state, neither the LBO nor the IPO served any legitimate purpose for Refco.  The LBO and IPO were only entered into to allow the Refco Insiders to cash-out their interests in Refco at vastly inflated values that bore no relationship to Refco's true financial condition.

12.    Throughout this scheme, the Refco Insiders acted outside the course and scope of their employment, totally abandoning the Company's interests at every turn in entering into the RTLs, the LBO, and the IPO.  They acted solely to enrich themselves, conferring absolutely no benefit on RCM, RGL, Refco Inc., or the other Refco entities, all of which were left destitute and forced to file for bankruptcy as a result of the fraudulent scheme merely weeks after the IPO, and days after public disclosure of the RGHI Receivable.

13.    The Refco Insiders could not have cashed-out on their fraud if Refco's auditors, GT, had not blessed Refco's fraudulent financial statements despite knowing the nature and massive extent of the fraud being perpetrated by the Refco Insiders.  The illusion of Refco's financial stability and health could not have been maintained without the complicity of MB, Refco's attorneys, who, over the course of more than five years, prepared fraudulent RTLs at the end of each and every relevant reporting and audit period that were solely designed to conceal hundreds of millions of dollars in undisclosed trading losses, misallocated operating expenses, and the fictitious accrued interest on the RGHI Receivable.  Nor could the RTLs have occurred without the complicity of the RTL participants named as defendants in this action.  Similarly, the hoax could not have been maintained if E&Y had not willingly generated false Refco tax returns or if PwC had not validated Refco's deficient internal controls throughout the LBO and IPO process.  Further, Credit Suisse, BAS, and Deutsche structured and facilitated the lucrative cashing-out of the Refco Insiders' interests, all the while recognizing that the LBO would leave RCM's intercompany IOUs unpaid and unrecoverable and cause harm to both RGL and RCM.  And each and every one of these defendants received significant fees and other payments, some amounting to millions of dollars, in return for their support and participation in the Refco Insiders' fraudulent scheme.

**Jurisdiction and Venue**

14.    At all relevant times, Refco had substantial operations in Chicago including, among others, its futures business and significant segments of its securities and foreign currency trading businesses as well as back-office administration functions for these and other parts of Refco's businesses and operations.  Refco employed nearly a thousand people in Chicago and maintained

6

numerous offices in Chicago and the Chicago suburbs. Refco's Chicago headquarters was located at 550 West Jackson Boulevard, Chicago, Illinois.

15.    Defendant GT is a Illinois Limited Liability Partnership with its headquarters at 175 West Jackson Blvd., Chicago, Illinois.

16.    Defendant MB is an Illinois Limited Liability Partnership with its headquarters at 71 South Wacker Drive, Chicago, Illinois.

17.    Defendant E&Y has offices at 233 South Wacker Drive, Chicago, Illinois, and has substantial contacts with Illinois. E&Y does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

18.    Defendant PwC has offices at One North Wacker Drive, Chicago, Illinois, and has substantial contacts with Illinois. PwC does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

19.    Defendant Credit Suisse has offices at Franklin Center, 227 West Monroe Street, Chicago, Illinois, and has substantial contacts with Illinois. Credit Suisse does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

20.    Defendant BAS has offices at 231 South LaSalle Street, Chicago, Illinois, and has substantial contacts with Illinois. BAS does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

21.    Defendant Deutsche has offices at 222 South Riverside Plaza, Chicago, Illinois, and 2333 Waukegan Road, Bannockburn, Illinois, and has substantial contacts with Illinois. Deutsche does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

22.    Defendants Bennett, Maggio, Trosten, and Grant each traveled to Chicago and did business in Chicago in connection with their management of the Refco businesses. Bennett, Maggio, Trosten, and Grant met with MB and GT, among others, in Chicago to perpetrate the fraudulent activities and scheme detailed herein. Defendant Grant is an Illinois resident, residing at 706 Roslyn Terrace, Evanston, Illinois.

23.    Defendant RGHI has an office at 111 West Jackson Boulevard, Chicago, Illinois.

24.    Defendants Liberty Corner and Pigott do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

25.    Defendants EMF Financial, EMF Core Fund, Delta Flyer, and Flanagan do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

26.    Defendants Ingram Micro and CIM Ventures do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois. Defendant Ingram Micro has an office in Illinois.

27.    Defendants Beckenham and Krieger do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

28.    Defendants Coast, CS Land, and Petitt do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

29.    Defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt are collectively referred to as the "RTL Defendants."

30.    Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, and the Court has personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209.

8

## Parties

### The Refco Entities

31.     Plaintiff Marc S. Kirschner is the court-approved Trustee of the Refco Litigation Trust, which was established in connection with the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan") confirmed on December 15, 2006, by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the Chapter 11 cases and proceedings of Refco (the "Bankruptcy Proceedings") on December 15, 2006. Upon the substantial consummation and effectiveness of the Plan, on December 26, 2006, the claims and causes of action asserted herein were transferred from the bankruptcy estates of three principal entities and distributed to creditors and equity interest holders of Refco, and such creditors and equity interest holders in turn granted such claims and causes of action to the Refco Litigation Trust in exchange for beneficial interests therein.

32.     The claims and causes of action asserted herein are based on the harm caused to the following three principal entities:

(a)     Refco Group Ltd., LLC - RGL was formed in 1999 and is a Delaware limited liability company. Before the LBO, RGL was the corporate parent of Refco. As set forth herein, RGL was induced to enter into an improvident LBO based on a false and inaccurate understanding of its financial condition, causing RGL to saddle itself with $1.4 billion in debt and to allow its assets to be stripped out and paid to the Refco Insiders while still owing RCM approximately $2 billion in unpaid IOUs. Had the true, precarious, financial condition of RGL not been concealed through the misconduct of the corrupt Refco Insiders and the other defendants, RGL never would have entered into the LBO. RGL filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(b)     Refco Capital Markets, Ltd. - Before the LBO, RCM was an indirect subsidiary of RGL. RCM was organized and existed under the laws of Bermuda. At all relevant times, RCM was an unregulated securities broker and foreign exchange broker, and one of three principal operating subsidiaries of Refco. RCM traded in over-the-counter

9

derivatives and other financial products on behalf of its customers. Although RCM was organized under the laws of Bermuda, RCM had no significant operations in Bermuda and, as a Bermuda exempt company, was statutorily prohibited from operating in Bermuda. RCM closed its Bermuda office in December 2001 and, since that time, its presence in Bermuda has been limited to a mailbox address. As set forth herein, RCM's assets were looted by the Refco Insiders and used to fund and prop up Refco's operations so those insiders could engineer a lucrative cashing-out of their interests in Refco. The Refco entities who used RCM's assets to fund their operations had little to no ability or intention of repaying these loans, and repayment of the RCM IOUs was altogether foreclosed by the LBO and IPO, which stripped out Refco's remaining assets and subordinated RCM's right to repayment to $1.4 billion in new LBO debt. At the time of the LBO, RCM had approximately $2 billion in unpaid IOUs owed to it by RGL and its Refco affiliates; by the time of the IPO, this number had grown to over $2 billion. RCM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(c)     Refco Inc. - Refco Inc., a Delaware corporation, was the corporate parent of both RGL and RCM. Before its bankruptcy filing, Refco Inc. was a publicly traded holding company that, through its subsidiaries, provided securities brokerage, execution, and clearing services for exchange-trade derivatives and prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005 IPO, and was the issuer of the stock sold in the August 2005 IPO. As set forth herein, Refco Inc. was induced to enter into an IPO based on a false and inaccurate understanding of its financial condition, which caused Refco Inc. to incur significant liabilities to its shareholders and to unnecessarily retire $231 million in debt owed by RGL, an insolvent subsidiary.

33.    Set out below is an organizational diagram illustrating Refco's basic corporate structure.



34.    As reflected above, the relevant affiliates and subsidiaries of Refco Inc. include:

(a)    Refco Securities, LLC ("RSL") is a non-debtor, indirect Refco Inc. subsidiary. RSL is a Delaware limited liability company and registered broker-dealer.

(b)    Refco Global Finance Ltd. ("RGF") is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. RGF filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(c)    Refco Capital LLC ("RCC") is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. As detailed below, Bennett and others used RCC as the "treasury" and "disbursing agent" through which RCM's assets were diverted and

distributed to fund the operations of the other Refco entities. RCC filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(d)    Refco LLC is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. Refco LLC was a registered Futures Commission Merchant and, along with RSL and RCM, was one of three primary Refco operating subsidiaries. Refco LLC filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code on November 25, 2005.

35.    Defendant Refco Group Holdings, Inc. ("RGHI") is a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant. In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI. From 1999 until the LBO, RGHI had a 90% interest in RGL (the principal Refco holding company before the LBO) and was the controlling shareholder of RGL. The remaining 10% in RGL was held by a subsidiary of Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG"), a foreign financial institution closely tied to Bennett.

**The Officer Defendants**

36.    Defendant Phillip R. Bennett was the highest ranking corporate officer of various Refco entities until he was forced to resign in October 2005 following the disclosure of the massive fraud he, Maggio, Trosten, and Grant perpetrated on Refco with the assistance of the other defendants. Among his other positions within Refco, at all relevant times, he served as a director and officer of RGL, RCM, and Refco Inc. Before serving as President, Chief Executive Officer, and Chairman of RGL from September 1998 on, Bennett had been the Chief Financial Officer of RGL. Bennett has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

37.    Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985, and held executive positions with various Refco entities until he was forced to resign in October 2005 following the disclosure of the massive fraud he, Bennett, Trosten, and Grant perpetrated on

Refco with the active assistance of the other defendants. Among his other positions within Refco, he served as Executive Vice President of RGL and President and a director of RCM. At all relevant times Maggio ran the brokerage operations of RSL and RCM and directed, orchestrated, and supervised the diversion of RCM assets alleged herein. According to press reports, Maggio is cooperating with the United States Justice Department and the SEC in relation, *inter alia*, to his role in various frauds perpetrated during his tenure at Refco.

38.     Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001, and RGL's Chief Financial Officer from 2001 to October 2004. Trosten was intimately familiar with all details of the fraud he, Bennett, Maggio, and Grant perpetrated on Refco with the active assistance of the other defendants. Trosten has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

39.     Defendant Tone N. Grant joined RGL in 1981. Up through 1998, Grant was President and CEO of RGL. Prior to August 2004, through his ownership interest in RGHI, Grant held a significant ownership stake in Refco. From 1999 through August 2004, Bennett and Grant each held a 50% interest in RGHI. In or around August 2004, concurrently with the LBO, Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI. Grant has been indicted for, among other things, conspiracy to commit securities fraud, bank fraud, and money laundering.

40.     Defendant RGHI was, before the LBO, owned 50% by Bennett and 50% by Grant and was at all relevant times an alter-ego of Bennett and Grant. RGHI was, before the LBO, the controlling shareholder of Refco.

**The Professional Defendants**

41.     Defendant Mayer, Brown, Rowe & Maw LLP, with more than 1,500 lawyers, is among the largest law practices in the world. MB is a combination of two limited liability partnerships, each named Mayer, Brown, Rowe & Maw LLP, one established in Illinois, USA, and one organized in England. MB's global operations are headquartered in Chicago. MB served as

13

Refco's principal outside counsel from 1994 until October 2005. As set forth below in more detail, MB was intimately involved in numerous aspects of the Refco Insiders' fraudulent scheme, including preparing the loan documents through which Refco concealed the RGHI Receivable that hid Refco's trading loses and operational expenses, advising the Refco Insiders how to continue diverting RCM's assets to fund Refco's businesses, and playing an active role in the LBO and IPO which it knew was premised on a fictitious picture of Refco's financial condition. Indeed, the Bankruptcy Examiner ("Examiner") in the bankruptcy proceedings in the United States Bankruptcy Court of the Southern District of New York, after exhaustive review of MB's documents and interviews of the responsible MB attorneys, issued a report concluding, among other things, that the evidence establishes that MB understood that the RTLs it structured for Refco were designed to "fraudulently bolster Refco's financial appearance to lenders and investors." MB received at least $23.5 million from Refco for its services.

42.    Defendant Grant Thornton LLP is the Chicago-based United States member firm of Grant Thornton International, one of six global accounting, tax, and business advisory organizations with member firms in 11 countries. GT served as Refco's purportedly independent auditor at all relevant times after 2002, when it replaced Arthur Andersen LLP ("AA") in that role. GT issued clean and unqualified audit opinion letters on Refco's financial statements for fiscal years 2003, 2004, and 2005. GT also served as the purportedly independent auditor for RCM. According to the Examiner, whose investigation was limited by an inability to speak to any GT employees or Refco employees who dealt with the lead GT partner on the engagement (Mark Ramler), GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud" and "circumstantial evidence suggests that [GT] may have had actual knowledge of the fraud." GT received at least $10 million from Refco for its services.

43.    Defendant Ernst & Young U.S. LLP is the United States member firm of Ernst & Young Global Limited. E&Y is a public accounting firm that provides a range of business and professional advisory services to companies worldwide, including assisting firms with complex tax issues. E&Y is a Delaware limited liability partnership with 83 offices and over 26,000 employees

14

across the United States, including Chicago. E&Y and its affiliates provided Refco with tax advice on numerous issues, served as Refco's independent registered tax accounting firm, prepared tax returns for Refco and RGHI from approximately 1991 through the 2002 tax year, and continued to provide tax advice and assistance to RGL thereafter until 2005 on a worldwide basis. As explained in more detail below, during the course of its engagement with Refco and RGHI, E&Y became aware of the fraud alleged herein and actively aided and abetted it. After the Bankruptcy Court-appointed Examiner catalogued and reviewed the "considerable evidence," he concluded that, like MB and GT, "E&Y knew that . . . Refco's officers were intentionally manipulating Refco's balance sheet for the purpose of bolstering the financial appearance of the company." E&Y received at least $5 million from Refco for its services.

44.    Defendant PricewaterhouseCoopers LLP is the United States member of PricewaterhouseCoopers International Limited, a UK membership based public accounting firm that provides a range of business and professional advisory services to companies worldwide, including assisting firms with complex tax issues and management consulting. PwC is a Delaware limited liability partnership with over 25,000 employees in offices throughout the United States, including Chicago. PwC was retained to advise Refco in connection with the LBO and IPO. PwC provided Refco with advice and consulting services in numerous accounting and financial reporting matters, including analyzing the propriety of the LBO and preparing documents to be filed with the SEC in connection with the LBO and IPO. In the period between the LBO and the IPO, in response to concerns over Refco's internal accounting controls, PwC was also engaged to review and strengthen Refco's internal accounting controls, provide tax return services for the tax year beginning January 1, 2004, and serve as Refco's *de facto* Chief Accounting Officer. PwC received approximately $4 million from Refco for its services. While the Examiner included PwC as a part of his initial investigation, a conflict with the Examiner's counsel, and subsequent discussions with the Bankruptcy Court and others, resulted in the Examiner discontinuing its investigation of possible claims against PwC.

45.     Defendant Credit Suisse, a subsidiary of Credit Suisse Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services. Credit Suisse was a lead financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO, and the lead joint book-running manager and lead underwriter of the August 2005 IPO. Credit Suisse was also the "exclusive" financial advisor to Bennett and/or RGHI and/or RGL in determining the ways in which the Refco Insiders could facilitate a lucrative cashing-out of their interests in Refco. Credit Suisse is a Delaware limited liability company. Credit Suisse collectively received $15.5 million in fees and its share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO, IPO and other services it provided for the Company.

46.     Defendant BAS, a subsidiary of Bank of America Corporation, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services. BAS was a financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and was a joint book-running manager of the August 2005 IPO. BAS is a Delaware limited liability company that maintains its headquarters in North Carolina. BAS received $125,000 in fees and its share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO and IPO.

47.     Defendant Deutsche, a subsidiary of Deutsche Bank, A.G., is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services. Deutsche was a financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and was a co-manager and underwriter of the August 2005 IPO. Deutsche is a Delaware corporation. Deutsche received a share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO and IPO.

48.    Credit Suisse, BAS, and Deutsche are collectively referred to as the "Investment Banker Defendants." The Court-appointed Examiner did not examine the conduct of the Investment Banker Defendants in connection with the Refco LBO or the IPO.

49.    MB, GT, E&Y, PwC, and the Investment Banker Defendants are collectively referred to as the "Professional Defendants."

## The RTL Defendants

50.    Defendant Liberty Corner Capital Strategies, LLC was a hedge fund management company located in Summit, New Jersey and organized under the laws of Delaware. Liberty Corner used Refco as its prime broker up until the time of Refco's bankruptcy. At all relevant times, Liberty Corner was wholly owned and controlled by defendant William T. Pigott. As described below, Pigott, through the instrumentality of Liberty Corner, agreed to serve as a conduit for over $5 billion of fictitious loans spread across ten transactions, through which substantial Refco trading losses and operational expenses were concealed.

51.    Defendant EMF Financial Products, LLC is a Delaware corporation founded by and at all relevant times run by, and controlled by, defendant Eric M. Flanagan ("Flanagan"). Flanagan used Refco as EMF Financial's prime broker up to the time of Refco's bankruptcy. Flanagan directed two entities affiliated with EMF Financial, defendants EMF Core Fund and Delta Flyer, to serve as the conduit in four fictitious loan transactions through which $575 million of the RGHI Receivable was concealed over four successive fiscal year-end reporting periods from February 2000 to February 2003.

52.    Defendant Ingram Micro, Inc., a Delaware corporation, is a technology sales and distribution enterprise based in Santa Ana, California. Ingram Micro agreed to use its subsidiary, defendant CIM Ventures, Inc, to participate in two RTLs with Refco in 2000 and 2001 through which $400 million of the RGHI Receivable was concealed.

53.    Defendant Beckenham Trading Co. Inc., a New Jersey corporation, is an investment fund wholly owned and operated by defendant Andrew Krieger ("Krieger"). Krieger had a long-standing relationship with Refco, having used Refco as a prime broker for his various entities since

17

the late 1990s and continuing to use the company until its bankruptcy. Beckenham engaged in a $125 million RTL with Refco in February 2002 in exchange for a fee.

54.    Defendant Coast Asset Management, L.P., a Delaware corporation, is a hedge fund manager based in Santa Monica, California. At the time of the RTLs, Christopher Petitt was the CEO of Coast. Coast had a long-standing relationship with Refco, having done business with the company since 1996 and having used Refco as its prime broker since 1998. In February 2000, Coast's subsidiary, defendant CS Land Management, LLC, entered into a $110 million RTL with Refco in exchange for a fee.

55.    Although the Court-appointed Examiner was not directed to specifically examine the conduct of the RTL Defendants, the Examiner concluded that the RTLs had no genuine business purpose and were solely designed to improperly conceal hundreds of millions of dollars in unpaid related-party receivables so as to "fraudulently bolster Refco's financial appearance to lenders and investors." These fraudulent RTL transactions could not have been carried out without the active involvement and participation of the RTL Defendants.

**Factual Background**

**Overview of Refco's Business**

56.    Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets. Refco provided financial services by executing trades on behalf of its customers and then recording and "clearing" those trades. Refco offered these services to a wide variety of customers, including individuals, corporations, hedge funds, financial institutions, retail clients and professional traders, on a broad spectrum of derivative exchanges and over-the-counter, cash and securities markets.

57.    Refco had three major operating subsidiaries through which these services were provided:

(a)    RSL, a registered broker-dealer through which Refco offered prime brokerage services, such as securities financing, securities lending, and trade processing. RSL was a registered broker-dealer regulated by the SEC and the National Association of Securities

18

Dealers ("NASD"), and was subject to the net capital and other regulatory requirements of those entities.

      (b)    Refco LLC, a regulated futures commission merchant through which Refco executed and cleared customers' orders for exchange-traded derivatives. Refco LLC was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to the net capital and other regulatory requirements of those entities.

      (c)    RCM, a broker-dealer for securities and foreign currency trades. Because it was incorporated in Bermuda, RCM was purportedly "unregulated." While some of its operations were originally located in Bermuda, most of RCM's operations and business were located and conducted in the United States. In December 2001, Refco shut down RCM's Bermuda operations and "repatriated" all of RCM's operations to the United States with the assistance and guidance of defendant MB.

58.    Refco's legitimate revenues were primarily comprised of (i) transaction fees earned from executing customer orders at its operating subsidiaries, and (ii) interest income earned on cash balances in its customers' trading accounts and from providing financing through repurchase transactions.

**The Refco Insiders' Fraudulent Scheme**

59.    In late 1997, the Refco Insiders decided to engineer a lucrative cashing-out of their interests in Refco for far more than these interests were worth. To this end, the Refco Insiders engaged in a three-part fraudulent scheme through which they concealed Refco's trading losses and operating expenses, inflated Refco's revenues, and hid their manipulation of Refco's financial statements through fraudulent round trip loans, all the while funding Refco's operations with customer assets looted from RCM.

**Part One -- Cleaning Up Refco's Financial Statements**

60.    The Refco Insiders avoided writing off hundreds of millions of dollars in trading losses, misallocated operating expenses and inflated Refco's revenue with phantom interest income,

by booking these amounts as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Grant) resulting in a massive related-party receivable owed to various Refco entities. This, in turn, concealed Refco's true financial results, and allowed the Refco Insiders and others (i) to overstate Refco's financial condition and related operating results, and (ii) to fraudulently continue to project to the public an illusion of financial health and strength -- falsely securing customer confidence and ensuring the continued deposits of cash and securities from customers needed to facilitate and fund the Refco Insiders' lucrative cashing-out of their interests.

**Refco's Trading Losses**

61.     As part of its trading business, Refco regularly extended credit to customers who engaged in securities, commodities, and futures trades. As a result, when markets fluctuated drastically, such as they did during the Asian market collapse in 1997, and Refco customers trading on credit could not cover their losses, Refco was forced to assume those losses.

62.     For example, in 1997, Refco was exposed to over $100 million in losses when some of its customers were over-extended in the Asian market collapse. In the same time frame, other over-extended Refco customers trading in other markets incurred additional staggering losses in the $100 million range. Refco was simultaneously suffering substantial losses in its own proprietary trading and lost $50 million in a single transaction in 1998 on an investment in Russian securities and bonds.

63.     Collectively, it is believed that customer and proprietary trading losses assumed and sustained by Refco in 1997-1999 alone amounted to hundreds of millions of dollars. If disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management, and severely damaged Refco's business. The Refco Insiders recognized that customers would not do business with Refco's operating subsidiaries, and Refco's considerable goodwill would be severely eroded, if the public did not believe that Refco had sound internal risk management controls, was appropriately capitalized, and was financially healthy.

(This belief was confirmed in October 2005, when Refco's above-described losses were revealed and Refco's operating subsidiaries experienced a "run" on customer accounts.)

64.    Faced with these debilitating trading losses, the Refco Insiders set out to prop up Refco's reputation -- and its perceived strong financial condition and attractiveness to investors -- through fraud. Instead of disclosing and writing these losses off as bad debts, the Refco Insiders caused Refco's losses and uncollectible obligations to be secretly transferred to RGHI as a receivable *owed to* Refco by RGHI.

65.    These trading losses were converted to a receivable owed to Refco by RGHI through one of three mechanisms: either (i) the obligation to repay Refco for covering a customer's bad trade on an exchange was transferred by the Refco Insiders from the customer to RGHI; (ii) the obligation to repay money loaned to a Refco customer (where the customers' devalued collateral did not cover its obligation to Refco) was transferred from the customer to RGHI by the Refco Insiders; or (iii) in Refco's own proprietary trading, the Refco Insiders booked losses on trades executed on behalf of Refco at RGHI, creating a receivable owed to Refco by RGHI. While some of these trading losses were permanently parked at RGHI, others were held at Refco and moved to RGHI just prior to reporting and audit periods.

66.    As a result of this scheme, instead of being written off as bad debt, hundreds of millions of dollars in customer and proprietary trading losses were "converted" from patently worthless receivables into what appeared to be a legitimate and collectible receivable, albeit from RGHI -- a related party whose principal asset was Refco stock. This had the effect of making Refco's financial position look materially stronger than it actually was.

**Concealing Refco Operating Expenses**

67.    Focused on perpetuating the illusion that Refco was in healthy financial condition and a good prospect for a lucrative buy-out or sale, the Refco Insiders also hid tens of millions of dollars of Refco expenses (and thereby fraudulently increased Refco's apparent profits) by transferring them to RGHI. Though these expenses were incurred by numerous Refco entities and paid by Refco, they were transferred to RGHI, further increasing the RGHI Receivable.

21

68.    Through this scheme, tens of millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses and millions more in payroll and outside professional expenses, were moved off Refco's books and concealed as a receivable owed to Refco by RGHI. As the Examiner determined, Bennett and those acting in active concert or participation with him ensured that Refco's operating expenses were "transferred to RGHI and added to the [RGHI R]eceivable balance," thereby overstating the earnings capability of RGL.

69.    Other items were also improperly transferred to RGHI and added to the RGHI Receivable. For example, in or around February 2000, a Refco entity paid $6.5 million relating to the settlement of a lawsuit against Refco. The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco. On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

**Inflating RGL's Revenues with Phantom Income**

70.    The Refco Insiders also caused Refco to inflate its income as a result of "transactions" with RGHI. This practice served as a significant source of Refco's income, inflating revenue. On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Refco Insiders of income at Refco. The description of the transaction on the account statement said only "Transfer" for each item.

71.    The Refco Insiders also fraudulently inflated Refco's revenues and financial results by charging RGHI usurious interest of as much as 35% on the RGHI Receivable. This was fictitious income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable. For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal." The $62.75 million of interest had been recorded as income by Refco.

72.    Indeed, between 2001 and 2005 alone, fictitious recorded interest on the RGHI Receivable amounted to at least $250 million. But no interest payments were ever made, and

because the RGHI Receivable was falsely created, held by a related party, and not subject to any form of repayment obligation, the interest income was entirely fictional and should never have been recorded.

73.     As set forth in the chart below, between the trading losses, operating expenses and other transactions that made up the RGHI Receivable, and the accrued interest on the Receivable, just prior to the LBO, the RGHI Receivable ballooned to nearly $1 billion.

**RGHI Receivable Balance**

| Date | RGHI Receivable[*] |
|---|---|
| 31-Mar-98 | $ 387,708,449 |
| 31-Mar-99 | 455,135,660 |
| 31-Mar-00 | 596,676,711 |
| 31-Mar-01 | 709,888,962 |
| 31-Mar-02 | 849,144,785 |
| 31-Mar-03 | 943,939,524 |
| 31-Mar-04 | 918,410,130 |

* Reflects full amount of RGHI Receivable, including amounts added to RGHI Receivable prior to end of reporing and audit periods.

## Part Two - Keeping the Illusion Going Long Enough to Cash-out

74.     After the Refco Insiders  moved Refco's losses and operating expenses from Refco's books and artificially inflated the company's operating results and apparent value, they had to prevent the fictitious nature of the RGHI Receivable, the trading losses and operating expenses it concealed, and Refco's true financial condition from being disclosed.   The Refco Insiders accomplished this through fraudulent RTLs and by funding Refco's operations with RCM customer assets.  These schemes created the perception that Refco was robust and financially healthy long enough for the Refco Insiders to personally enrich themselves through a lucrative cashing-out.

## The RTL Shell Game

75.     A large receivable owed to Refco by a related-party, owned by its current and former Chief Executive Officer, would have to be disclosed on Refco's financial statements and would have invited scrutiny and skepticism.   To conceal the magnitude and related-party nature of this receivable, with the active assistance of MB, GT, E&Y and the RTL Defendants, the Refco Insiders

devised and implemented a series of sham "loans" -- the RTLs -- timed to straddle Refco's financial reporting and audit periods.

76.     Like a street-corner shell game, this financial sleight-of-hand enabled the Refco Insiders to temporarily transfer massive amounts of uncollectible related-party receivables off of Refco's books by shifting them between wholly-owned Refco subsidiaries, RGHI, and several third-party Refco customers (or their affiliates) who agreed to serve, for a fee, as conduits in the deceptive RTLs.

77.     The RTLs were implemented at the end of each fiscal year starting in 1998 (and also, starting just before the LBO in 2004, at the end of fiscal quarters) to temporarily "pay-down" the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco. In order to further conceal the size of the RGHI Receivable, a number of RTLs were often employed, temporarily replacing the nearly $1 billion RGHI Receivable with a number of smaller third-party receivables.

78.     Thus, as set forth in the below diagram, at the end of every relevant reporting and audit period, a Refco entity (typically RCM) would extend a "loan" for an amount up to $720 million to a third-party with no apparent relation to Refco, Bennett or RGHI. That third-party entity would then "loan" the same amount to RGHI (typically via a transfer to one of RGHI's accounts at Refco). The RTL was completed when RGHI used the "loan" from the third-party to pay down the debt it owed to Refco (typically via a credit to one of RGHI's accounts at Refco). Thus, on Refco's financial statements, the RGHI Receivable was transformed into a payable on a loan owed to Refco from an unrelated third-party.



79.    Right after the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process. As set forth in the below diagram, the temporary pay-down of the RGHI Receivable was reversed, RGHI returned the funds it had "borrowed" from the RTL Defendants, and the RTL Defendants in turn paid back the money they had borrowed from Refco (keeping as a fee the spread between the interest charge on the "loan" made to RGHI by the RTL Defendant and the loan made to the RTL Defendant by Refco). Once the transaction was unwound, the RGHI Receivable was restored to its full value. This "unwinding" process, like the initial execution of each RTL, often occurred only on paper; with no actual transfer of funds occurring other than the payment of the fees to the RTL Defendants.



80.    For agreeing to participate in the RTLs and conceal the related-party nature of the RGHI Receivable, the RTL Defendants received payment of the "spread" between the interest rates of the two "loans." The Refco Insiders generally caused RCM to make these payments to the third parties, even though RCM obtained no benefit from the RTLs. In this manner, for example, Pigott received, either through direct personal payments or through payments to Liberty Corner, at least $1.1 million in interest charges as a reward for his participation in the RTL scheme. The other RTL Defendants also received fees for their participation in the RTL shell game.

81.    In addition, for many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf, again despite the fact that the RTLs provided no benefit to RGL. Thus, participants in the RTLs knew and/or consciously avoided knowing that the transactions involved risk-free, paper-only transfers of large round-dollar value amounts only days before the end of Refco's reporting or audit periods, and that these transfers would be unwound days after the start of the new reporting or audit periods.

82.    The Refco Insiders, with the active assistance of MB and the RTL Defendants, engaged in these RTLs at least 18 times from 2000 through 2005, always at the end of a financial reporting or audit period, and never at any other time (with one exception). In addition, from 2000 through 2005 Refco engaged in approximately 12 additional wire transfer RTLs with, among others, longtime Refco customer -- and 10% RGL equity owner -- BAWAG. These loans involved transfers of amounts from BAWAG to RGHI in late February, with those transactions being subsequently reversed in early March.

83.    In this manner, at the end of each relevant reporting or audit period, the corrupt Refco Insiders together with MB and the RTL Defendants caused Refco's financial statements to falsely suggest that the RGHI Receivable had been repaid or never existed. This process altogether concealed the magnitude and related-party nature of the RGHI Receivable at the end of each relevant reporting and audit period and thereby concealed Refco's trading losses, its true operating expenses and the fictitious nature of hundreds of millions of dollars in revenue.

84.     The RTLs facilitated by MB and the RTL Defendants included, at the least, the

following:

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/25/2000 | 03/09/2000 | CIM Ventures, Inc. | $150,000,000 |
| 02/25/2000 | 03/03/2000 | EMF Core Fund, Ltd. | $50,000,000 |
| 02/25/2000 | 03/03/2000 | CS Land Management, LLC | $110,000,000 |
| **2000 TOTAL** | | | **$310,000,000** |
| 02/23/2001 | 03/06/2001 | CIM Ventures, Inc. | $250,000,000 |
| 02/26/2001 | 03/02/2001 | Delta Flyer Fund, LLC | $200,000,000 |
| **2001 TOTAL** | | | **$450,000,000** |
| 02/25/2002 | 03/04/2002 | Liberty Corner Capital Strategies, LLC | $325,000,000 |
| 02/25/2002 | 03/04/2002 | Delta Flyer Fund, LLC | $175,000,000 |
| 02/25/2002 | 03/04/2002 | Beckenham Trading Company, Inc. | $125,000,000 |
| **2002 TOTAL** | | | **$625,000,000** |
| 02/21/2003 | 03/04/2003 | Liberty Corner Capital Strategies, LLC | $500,000,000 |
| 02/21/2003 | 03/04/2003 | Delta Flyer Fund, LLC | $150,000,000 |
| **2003 TOTAL** | | | **$650,000,000** |
| 02/20/2004 | 03/04/2004 | Liberty Corner Capital Strategies, LLC | $720,000,000 |
| 05/27/2004 | 06/07/2004 | Liberty Corner Capital Strategies, LLC | $700,000,000 |
| 08/25/2004 | 09/07/2004 | Liberty Corner Capital Strategies, LLC | $485,000,000 |
| 11/26/2004 | 12/03/2004 | Liberty Corner Capital Strategies, LLC | $545,000,000 |
| 12/30/2004 | 01/05/2005 | Liberty Corner Capital Strategies, LLC | $550,000,000 |
| **2004 TOTAL** | | | **$3,000,000,000** |
| 02/23/2005 | 03/08/2005 | Liberty Corner Capital Strategies, LLC | $345,000,000 |
| 05/25/2005 | 06/06/2005 | Liberty Corner Capital Strategies, LLC | $450,000,000 |
| 08/26/2005 | 09/06/2005 | Liberty Corner Capital Strategies, LLC | $420,000,000 |
| **2005 TOTAL** | | | **$1,215,000,000** |

85.     Of all the RTL Defendants, Liberty Corner, which was owned and managed by

Pigott, engaged in the largest number of RTLs.  In February 2002, Pigott arranged for Liberty

Corner's first RTL with Refco for $325 million.  Demonstrating Pigott's awareness that the RTLs

were improper, Pigott rejected using an active fund he managed that was engaged in treasury bill

arbitrage as the RTL conduit, and instead substituted Liberty Corner because Liberty Corner was a

personal management company that could be made to take any and all actions directed by Pigott.

86.     As set forth in the above chart, over the next three years, Pigott and Refco engaged in

nine additional RTLs, concealing hundreds of millions of dollars in related-company receivables

owed to Refco. Liberty Corner, Pigott's alter ego (and at times Pigott directly, with no corporate

intermediary) received $1.1 million in "fees" for serving as the conduit in these RTLs. Underscoring

that Pigott understood that the sole purpose of the RTLs was to fraudulently "dress up" Refco's

27

financial statements, Pigott had RGL guarantee each of the Liberty Corner RTL loans. These guarantees were signed solely by Bennett.

87.     Defendant EMF Financial (managed by Flanagan) was a hedge fund that used Refco as the prime broker for its funds. Like Liberty Corner, EMF Financial repeatedly authorized and arranged for its affiliates, defendant EMF Core Fund and defendant Delta Flyer, to engage in RTL transactions with Refco.

88.     The transactions Flanagan arranged through EMF Financial, and affiliated entities EMF Core Fund and Delta Flyer, concealed $575 million in related-party receivables over the course of Refco's fiscal year-end reporting periods in 2000, 2001, 2002, and 2003. Flanagan, like Pigott, was a sophisticated fund manager. As such, Flanagan (and by extension EMF Financial) would have known and understood that: (i) Refco's year-end reporting period ended February 28; (ii) no cash was moving as a result of these transactions (except for the payment to EMF Financial for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

89.     Indeed, in the wake of the Enron financial scandal, one RTL participant, defendant Ingram Micro, having previously served as a conduit in $400 million of RTLs in 2000 and 2001, opted to cease participating in the RTLs precisely because of concerns about their propriety. On the eve of entering into a February 2002 RTL, Ingram Micro sent an email to Maggio advising him that its participation with the planned third RTL was too risky because "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like [Ingram Micro]."

90.     Similarly, defendants Petitt (using Coast's subsidiary CS Land) and Krieger (who used his Beckenham Trading entity as his RTL conduit) were both sophisticated parties that used Refco as a prime broker. Thus, at the time of their RTL participation, both Petitt and Krieger knew and/or consciously avoided knowing (like Pigott and Flanagan) that: (i) Refco's year-end reporting period ended February 28; (ii) no cash was moving as a result of these transactions (except for the

payments to third parties for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

91.    The RTL Defendants thus directly and knowingly participated in and facilitated the RTLs set up by the Refco Insiders, knowingly helping these corporate insiders manipulate Refco's financial statements in a manner that concealed Refco's losses from innocent members of Refco's management.

92.    The RTL Defendants had existing business with Refco and/or a personal relationship with Bennett and each had an incentive to further their relationship with Bennett and Refco by agreeing to serve as conduits in the RTL transactions.

93.    The RGHI Receivable, RTLs, and other fraudulent actions alleged herein, were at all times unknown to certain Refco directors, officers, and agents, including Refco's inside counsel and others, who would have put a stop to the fraudulent activity had they been aware of it.

**Looting RCM's Assets**

94.    For the Refco Insiders' scheme to succeed, they had to make Refco appear to be fast-growing, highly profitable, and able to satisfy its substantial working capital needs without having to borrow money. This was a tall order for a company that was, in reality, owed hundreds of millions of dollars from a related party (based upon substantial trading losses and improperly allocated operating expenses). In order to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available funds," the Refco Insiders needed cash. As Refco itself stated, "[r]eady access to cash is essential to our business."

95.    Instead of owning up to Refco's true financial condition and borrowing the money they needed as part of an overall restructuring of Refco's operations, the Refco Insiders stole it from RCM and its customers. The Refco Insiders simply took the money and property entrusted to RCM by its customers and sent the funds to other Refco entities. None of these entities provided RCM with assurances of their ability, intent, or obligation to repay those assets; none provided RCM with

security or collateral for the diverted assets; and none had the financial wherewithal to repay RCM on demand or otherwise.

96.     On a daily basis, assets in the accounts of RCM customers were transferred out of RCM for use by other Refco entities. The Refco Insiders caused RCM to keep as little cash as possible on hand. In fact, even though RCM purported to hold billions of dollars of customer cash and securities entrusted to it at all relevant times, RCM in fact maintained only about $50 million in cash and those securities it did not need to fund the current operations of RGL and its affiliates.

97.     Without the knowledge, authorization, or consent of RCM's innocent directors and officers or its customers, the money would then generally be transferred by RCM to RCC, in a series of undocumented intercompany "loans." RCC, functioning as a "disbursing" agent, would then distribute the looted property wherever it was needed in the Refco organization.

98.     The diverted RCM assets were used for a wide variety of general and specific funding purposes by various Refco affiliates who would not have been able to sustain their reported financial health and operations without using funds stolen from RCM.

99.     These transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other Refco entities, often occurred without any "loan" documentation between RCM and the Refco entities that received the funds. The purported "loans" of RCM funds to other Refco entities for purposes unrelated to the business of RCM and without benefit to RCM were not arm's length transactions, reflecting blatant and undisclosed conflicts of interest by the Refco Insiders, and were made:

(a)     without compensation, security or collateral;

(b)     without assurances that the funds would or could be repaid on demand or at all by the Refco entities that received them;

(c)     without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

(d)     to other Refco entities that in fact lacked both the intention and the financial wherewithal to repay the diverted RCM assets on demand or at all;

(e)     for the purpose of maintaining the perception of Refco's financial strength and health so that the Refco Insiders could personally benefit from a lucrative cashing out of their interests in Refco.

100.     Because Refco's overall financial health and strength depended on a constant influx of RCM assets, the Refco Insiders kept careful track of the intercompany transactions and of the customer funds that were available for diversion at RCM at any given time. Those who were directed by the Refco Insiders to divert RCM's assets created daily "cash flow" statements setting forth the amount of customer assets available at RCM for diversion. The reports were circulated to Bennett, Maggio, and Trosten.

101.     The outside Director and outside alternative Director of RCM, Anthony Whaley ("Whaley") and Charles Collis ("Collis") (collectively the "RCM Outside Directors") were, and are, partners in the Bermuda law offices of Conyers Dill & Pearman. The RCM Outside Directors were at all times unaware of the form, substance, and magnitude of the intercompany transfers from RCM to the other Refco entities. The RCM Outside Directors were unaware that RCM customer assets were diverted daily without any loan documents or collateral or security to other Refco entities that had little, if any, ability, or intention of repaying the diverted assets. If either Whaley or Collis had learned of the fraudulent nature of the diversion of RCM's assets in daily undocumented and uncollateralized intercompany transactions to other uncreditworthy Refco entities, they would have taken steps to stop the misappropriation.

102.     At the time of the LBO, RCM was owed approximately $2 billion by Refco affiliates that were never required to post security or collateral for the RCM funds they received and had no intention or ability to repay RCM. As of October 2005, this number had climbed to over $2 billion.

103.     Without continued, fresh infusions of RCM customer assets, RGL and its affiliates would not have been able to maintain the illusion of financial strength that made them candidates for the LBO and the Refco Insiders would not have been able to cash-out their interests in Refco.

104.    The fraudulent scheme perpetrated on the RCM customers was so fundamental to the operation and financing of Refco that it had to have been apparent to each of the Professional Defendants. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible RCM transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

105.    Indeed, when disclosures in October 2005 relating to the fraud prompted RCM customers to lose confidence in Refco and RCM and to begin to withdraw their securities and funds from RCM, the immediate response by Refco was to impose a moratorium on all activities of RCM, including withdrawals from customer accounts. Without the continued availability of RCM customer assets, Refco collapsed, filing for bankruptcy just days later.

### **Part Three: The Cash-Out**

#### **The 2004 LBO**

106.    The purpose of the entire scheme was to allow the Refco Insiders to sell their interests in Refco at a fraudulently inflated price. Indeed, in the years before the LBO, the Refco Insiders made a number of attempts at partial or complete sale of their interests in Refco with the assistance of various defendants:

- At the end of 1998, with MB's assistance, Bennett, Maggio, and Grant sold a 10% ownership interest in RGL to a subsidiary of longtime Refco customer BAWAG for $95 million and received an additional $85 million for granting BAWAG an option to purchase an additional 10% interest in the company.

- In 2001 and 2002, the Refco Insiders, with E&Y's assistance, explored the possibility of selling substantial portions, and perhaps all, of Refco to BAWAG or to third parties in ways that maximized the tax benefits of any such sale.

- In 2001 and 2002, the Refco Insiders hired Credit Suisse to try to find a major investment bank or commercial bank to purchase Refco outright. Credit Suisse was unable to identify a suitable purchaser.

107.    Through these and other attempted transactions, each of Refco's professional advisers became well aware that the Refco Insiders intended to line their pockets by selling their interests in Refco.

108.    As the Court-appointed Examiner observed, GT "was aware as early as 1998 of Bennett's plan to sell," when Bennett informed GT that he "intended to restructure Refco over the next 3-10 years" and "to increase earnings and maintain RGL's book value," because he and others working with him wanted "to liquidate their positions."

109.    The Examiner concluded that "E&Y understood since before . . . January 1, 1997 that the goal of Refco's owners was to sell the entire [company]." In mid-2001, Refco Insiders specifically asked E&Y to develop a "tax free" way of selling all or part of Refco. Although the Refco Insiders seriously considered an outright sale of a portion of Refco to BAWAG in 2001-2002, a satisfactory structure that addressed the various tax considerations raised by E&Y could not be developed and an outright sale to BAWAG was abandoned in 2002. While no outright sale of a portion of Refco to BAWAG was realized in 2002, BAWAG entered into or contemplated entering into a "proceeds participation" agreement prepared by MB, pursuant to which a BAWAG affiliate ("DFI") made three payments to RGL in exchange for the right to participate in the proceeds of a future sale of RGL.

110.    The Examiner also observed that "no later than February 6, 2002," and possibly long before that, "[MB] knew that the ultimate goal of . . . Bennett and other [Refco employees] . . . was to sell RGL."

111.    Similarly, Credit Suisse knew no later than 2001 that Bennett and the other Refco Insiders wished to cash-out their interests in Refco. Stymied in his effort to effect a partial sale of Refco, in June 2003, Bennett hired Credit Suisse as Refco's exclusive financial advisor to assist in, among other things, selling Refco. Bennett asked Credit Suisse to find a major investment or commercial bank to purchase Refco, but Credit Suisse was unable to identify a satisfactory purchaser. After efforts to sell Refco outright failed, Credit Suisse devised other ways through which the Refco Insiders could sell all or a portion of Refco.

112.    In November 2003, Bennett and others at Refco began negotiations with Thomas H. Lee Partners ("THL"), a private equity firm headquartered in Boston, Massachusetts, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.

113.    The LBO was ultimately carried out on August 5, 2004, and was structured as follows: THL, through its affiliates, purchased 57% ownership interest in Refco for approximately $507 million; Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks. As a result of the lucrative LBO, Bennett and others acting in active concert or participation with him received $106 million, with at least $25 million going to Bennett personally. In addition, hundreds of millions of dollars were transferred to RGHI in connection with the LBO.

114.    Although THL became aware of certain red flags in its pre-LBO due diligence, any concerns about the financial condition of Refco prior to and in entering into the LBO were allayed by the Refco Insiders. Leading up to the LBO, the Refco Insiders and the Professional Defendants continued to generate misleading financial statements and to conceal the ballooning RGHI Receivable through the RTL scheme.

115.    In the due diligence process, Bennett and other Refco Insiders made false statements to THL. By way of example, in connection with the LBO, Bennett executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000, and (b) he had not, in the prior fiscal year, been indebted to Refco or its affiliates. In fact, during the prior 12 months Bennett owned a substantial interest in RGHI, which had engaged in RTLs worth over $1.5 billion and which owed Refco approximately $1 billion as of late February 2004.

116.    Additionally, before the LBO, Bennett falsely represented to THL that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the LBO. The purported profits Bennett was referring to were, in fact, $110 million of RCM customer funds and the proceeds of a $390 million loan from BAWAG that Bennett placed into a BAWAG account. None of these monies were "retained profits" and none were "distributed" as a dividend to shareholders.

117.    Before the LBO was completed, Bennett and other Refco Insiders also sought to conceal the RGHI Receivable and the RTLs from THL.

34

118.    Had THL learned the substance and scope of (a) the RGHI Receivable, (b) the RTLs, and (c) the resulting house of cards Refco relied upon, THL would not have gone ahead with the LBO, and the failure of the LBO transaction would have prevented RGL and its domestic subsidiaries from assuming $1.4 billion in new debt obligations.

**The LBO Destroyed RGL and RCM's Asset Value**

119.    There was a price to be paid for the Refco Insiders' misconduct leading up to the LBO, and that price, ultimately, was paid by RGL and RCM. By the time of the LBO, the trading losses and operational expenses that had been pushed onto RGHI's books and hidden through the RTLs had grown to over $700 million and the diversion of RCM property had grown to approximately $2 billion.

120.    Immediately before the LBO, the Refco Insiders were still causing Refco to record hundreds of millions of dollars in trading losses and misallocated expenses as a receivable owed to it by RGHI. The Refco Insiders were also still boosting Refco's revenues with hundreds of millions of dollars in fictitious interest on the RGHI Receivable and were using billions of dollars in diverted RCM assets to fund Refco's operations, making RCM the biggest creditor of RGL and its affiliates before the LBO.

121.    Even though this was well known to the Refco Insiders and certain of the sophisticated legal and financial advisors and auditors involved in the LBO, RGHI and the Refco Insiders caused RGL (together with all of its domestic subsidiaries, including RCC) to borrow $1.4 billion of bank and bond debt to fund THL's buyout of RGHI's control of Refco. The LBO proceeds were not used to retire the full amount of the RGHI Receivable, pay the operating expenses that had been concealed on RGHI's books, or repay any of the loans owed to RCM. Instead, Refco was induced to use the proceeds of its new debt to cash-out the Refco Insiders.

122.    Refco's auditors and legal advisors each played key roles in addressing and allaying THL's concerns in connection with entering into the LBO, and concealing from Refco's innocent directors, officers and agents, including inside counsel and others, and the RCM Outside Directors,

how severely both RGL and RCM would be damaged by the LBO. Nowhere in the Offering Circular was RGL's use of RCM's assets disclosed; nor was the RGHI Receivable.

123.    To divert attention from RCM's role as a primary funder of Refco's operations, RCM was not made a guarantor of the debt issued in connection with the LBO and reference to RCM was glaringly absent in the Offering Circular for the LBO bonds. Nowhere did the Offering Circular explain: (i) that RCM customer assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; (iii) that Refco's business plan did not provide for repayment of these receivables; and (iv) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard for the interests of RCM.

124.    Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." Similarly, the Offering Circular stated elsewhere that "[t]he effect of this subordination is that, in the event of a bankruptcy . . . , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid." These and similar statements describe how the LBO should have been structured -- consistent with the duties the directors of RGL had to RGL, RCM and RCM's customers -- i.e., ensuring that any obligations incurred by any Refco affiliate in connection with the new LBO debt would not be satisfied until after all of RCM's intercompany IOUs were. This is not, however, how the LBO was structured. In fact, as set forth below, the LBO debt was laid in on top of RCM's IOUs, rendering them worthless and, despite the Offering Circular's representations to the contrary, severely damaging RCM.

125.    The Professional Defendants working on the LBO each knew and/or consciously avoided knowing that the magnitude and significance of the Refco entities' obligations to RCM. Each of these defendants would have reviewed, helped prepare, or been aware of the following

information set forth in the "payable to customers" line of the condensed consolidating balance sheet to Note O of the financial statements attached to the LBO Offering Circular, which is labeled Condensed Consolidating Financial Information:

| Condensed consolidating balance sheet | | | | | |
|---|---|---|---|---|---|
| | **February 29, 2004** | | | | |
| | Parent [RGL] | Guarantor Subsidiaries [Includes RCC] | Non-Guarantor Subsidiaries [Includes RCM and RGF] | Consolidation Adjustments | Consolidation Totals |
| Liabilities (in thousands) Payable to customers | $465,681 | $1,556,529 | $6,647,453 | ($3,573,946) | $5,095,717 |

126.    By performing professional services for the Company and/or performing detailed due diligence of the Company in connection with the LBO, each of these Professional Defendants were deeply familiar with Refco's corporate structure and its operations. While an outsider would have been unable to discern from the condensed consolidating information the full extent to which RCM funds had been siphoned off to RGL and its other affiliates, these Professional Defendants understood, at least, the following:

(a)    that in order to obfuscate Refco's financial statements and conceal their fraudulent scheme, the Refco Insiders misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";

(b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," these Professional Defendants knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a parent holding company with no trading operations and no "customers";

(c)    RCC, the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did

not have any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and

(d)    that only RCM had the volume of unsegregated customer assets necessary to fund billions of dollars in intercompany loans.

127.    Furthermore, as these Professional Defendants knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion through a non-Guarantor Subsidiary, Refco Global Finance, Ltd. ("RGF"). Thus, these Professional Defendants knew and/or consciously avoided knowing that the $3.573 billion in consolidation adjustments were the result of eliminating the approximately $465,681,000 of RGL's intercompany debt owed to RCM, the approximately $1.556 billion of RGF's intercompany debt owed to RCM, and the approximately $1.556 billion of RCC's intercompany debt owed to RGF, and that RCM was thus owed $2 billion ($465 million owed from RGL and $1.556 billion owed from RCC, which when booked in a back-to-back fashion through RGF, added another $1.556 billion to the consolidation adjustment).

128.    Given their due diligence, detailed in-depth understanding of Refco's financial structure and operations, and access to and preparation of the type of condensed consolidating financial information set forth in Note O, each of the Professional Defendants who assisted and advised the Company in connection with the LBO was fully aware of the massive $2 billion payable owed by RGL and its affiliates to RCM.

129.    These Professional Defendants further understood that none of this debt would be repaid as a result of the LBO, which took $1.4 billion in loan proceeds and used them instead to cash-out the Refco Insiders' interests in Refco.

130.    The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, so as to put cash in the Refco Insiders' pockets, leaving RGL and RCM without any assets to satisfy their outstanding obligations to their creditors.

131.    Furthermore, as these Professional Defendants knew and/or consciously avoided knowing, this LBO was atypical because RGL went into the LBO with hundreds of millions of

38

dollars of concealed trading losses, misallocated operating expenses, phantom revenues, and unpaid billions owing to RCM, whose assets had been used to fund Refco's entire operations.

132.    Given Refco's true financial condition -- and the devastating impact the concealed trading losses and hidden operational expenses would ultimately have on its business if properly recorded and disclosed in its financial statements -- the LBO irreparably undermined Refco's already precarious financial condition.  By saddling RGL with $1.4 billion in secured and senior debt that Refco's operations could not service, and by continuing their plan and siphoning out all of RGL's assets, the Refco Insiders sealed Refco's fate and undermined RCM's ability to collect on its approximately $2 billion of IOUs from its Refco affiliates.

133.    RCM's ability to collect on its IOUs was further undermined when Refco's IPO proceeds were, as in the LBO, principally used to line the pockets of the Refco Insiders and the Investment Banker Defendants, leaving approximately $2 billion in RCM IOUs unpaid.

**The IPO Further Damages Refco**

134.    Less than one year after the LBO, the Refco Insiders and THL led Refco through an initial public offering of its stock.  In the IPO, Bennett sold approximately 7 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $146 million.  THL and its affiliates and co-investors sold approximately 10 million shares of Refco common stock, with a total sale price of approximately $223 million.

135.    A "greenshoe" option was also exercised whereby the Investment Banker Defendants agreed to purchase approximately 4 million shares of Refco common stock for over $80 million.  The proceeds from the overallotment sale were used to pay an aggregate dividend to Refco's pre-IPO shareholders.

136.    As evidenced by this dividend, the IPO was structured with the principal goal of allowing the Refco Insiders to cash-out, as opposed to raising funds for Refco to reduce the enormous debt Refco had been saddled with in the LBO.  Furthermore, as RGL was insolvent or operating in the zone of insolvency no later than the LBO, the $231 million in proceeds from the IPO that Refco Inc. used to retire part of RGL's LBO debt was entirely wasted; Refco was induced to

spend over $200 million dollars on RGL -- an insolvent subsidiary that was going to file for bankruptcy merely weeks later.

137.    As a result of the IPO, Refco was saddled with hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus.  Through the IPO, Refco was again saddled with liabilities it could not satisfy -- this time the liability to pay back investors who had purchased Refco stock.

138.    The Professional Defendants who advised the company in connection with the IPO knew and/or consciously avoided knowing that Refco was in no state to undertake an IPO.

139.    Indeed, the most blatant indication that GT, MB, and PwC understood that the Refco Insiders were attempting to hide hundreds of millions of dollars in undisclosed related-party receivables was the conscious editing of SEC disclosure documents to conceal the RGHI Receivable.

140.    Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO.  In early drafts of the S-4 registration statement, which were reviewed and commented on by GT, MB, and PwC and subsequently submitted to the SEC for comment, the S-4 disclosed a $105 million receivable owed from RGHI to Refco, which was characterized as a "customer receivable."  As this was a related-party receivable owed to Refco from RGHI, the SEC questioned characterizing "amounts due from equity members (RGHI) as receivable from customers."  Given the SEC's comment, GT, MB, and PwC were forced to amend subsequent drafts of the S-4 registration statement to reflect that the receivables were due from "equity members."  The final S-4 filed with the SEC on October 12, 2004 reflected that the receivable was owed by "equity members" and not customers.

141.    The Investment Banker Defendants also reviewed and commented on the S-4 registration statement and the SEC's comments on the S-4 registration statement.

142.    The Professional Defendants involved in the LBO thus substantially assisted the Refco Insiders in trying to deceive the SEC and the investing public about the RGHI Receivable.  Furthermore, those that were aware of the full massive size of the RGHI Receivable and/or that

RTLs were used to reduce the RGHI Receivable at the end of reporting periods, such as MB, GT, and PwC also knew and/or consciously avoided knowing that the actual amount due from "equity members" was well above $105 million and that the S-4 was therefore still materially false.

143.    Despite being aware of these related-party receivables, none of the Professional Defendants disclosed the RGHI Receivable in the S-1 registration statement that had to be prepared and filed with the SEC in connection with Refco's IPO.

144.    The S-1 was reviewed by and prepared in consultation with GT, MB, PwC, and the Investment Banker Defendants.   While early drafts of the S-1 included the $105 million intercompany receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable despite the fact that none of the Professional Defendants received, or sought, any confirmation that even the limited $105 million portion receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other related-party receivables owed by RGHI to Refco.

145.    The final S-1, reviewed by GT, MB, PwC, and the Investment Banker Defendants, that was signed by Bennett and publicly filed with the SEC on August 8, 2005, thus failed to disclose: (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down RGHI's debt to Refco at year-end and quarter-end financial reporting periods. Nevertheless, the IPO went forward on August 10, 2005.

146.    In hopes of concealing the fraud and maintaining the illusion of Refco's financial health for as long as possible, in late August 2005, after the IPO was completed, Bennett, with the active participation and assistance of MB, caused Refco to carry out yet another $420 million RTL with Liberty Corner to, once again, cover up the existence of the RGHI Receivable.

147.    Approximately two months after consummation of the IPO, on October 10, 2005, the entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI. Refco demanded repayment of the debt by Bennett,

who tried unsuccessfully to cover up the fraud by instantly paying down the RGHI Receivable with the proceeds of an emergency loan from BAWAG.

148.    In a press release issued that same day, Refco announced that it had discovered a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction. As a result, Refco announced that "its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

149.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization. Refco's stock was delisted by the New York Stock Exchange, and the Company -- along with its subsidiaries represented in this action -- were forced into bankruptcy.

### The Defendants' Knowledge of and Substantial Assistance in the Fraud

150.    The Refco Insiders could never have carried out their fraudulent scheme without the knowing, active, and willing participation of a host of supporters and professional advisors. Each of the defendants played important roles in the Refco Insiders' fraud.

### GT's Role in the Fraudulent Scheme

151.    GT was aware of the activities alleged herein. By its actions, as alleged herein, GT actively participated and substantially assisted the Refco Insiders and others acting in active concert or participation with them in carrying out the fraud, breach of fiduciary duties, and gross malpractice alleged herein.

152.    After it took over the Refco engagement from AA in 2002, GT provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005.  GT served as the purportedly independent auditor of RGL and its affiliates, not just on a consolidated basis, but also audited

subsidiaries, such as RCM, on a stand-alone basis. As GT knew, the financial statements it audited were included in Refco's various registration statements filed in connection with the LBO and IPO.

153.    Refco's financial statements were audited by GT on a consolidated basis under RGL's name. The financial information of RGHI -- RGL's parent company "shell" -- was not consolidated with Refco. As a result, as GT knew, the ballooning RGHI Receivable was hidden from the public in order to preserve Refco's reputation in the marketplace and to conceal the millions of dollars that Refco was owed by a related-party entity owned by Bennett and Grant.

154.    GT's longstanding relationship with Refco through Mark Ramler ("Ramler") (the former AA partner who took Refco's business to GT in the wake of the Enron scandal) gave it a complete picture of the finances, operations, and business of RCM, RGHI, and the rest of Refco. Given GT's exposure to a range of Refco's subsidiary businesses, it had access to all material information. As Refco's auditor, GT also had a complete picture of Refco's third-party transactions, including its related-party transactions with RGHI. Further, GT knew and/or consciously avoided knowing from its review and audit of Refco's financial statements that Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf. GT thus had access to all material information regarding the RTLs and the fraudulent scheme to hide the RGHI Receivable from Refco's books. Given its intimate familiarity with Refco's finances, GT thus knew and/or consciously avoided knowing the details of the fraud described herein and substantially assisted the Refco Insiders in perpetrating the fraud that inflicted billions of dollars in damages on RCM and RGL.

155.    GT substantially assisted the fraud, thereby allowing the fraud to continue and advancing the objectives of the fraud, by, among other things: ignoring red flags that alerted GT to the existence of accounting fraud; knowingly issuing unqualified opinions on Refco's consolidated financial statements for each of fiscal years 2003, 2004, and 2005 that materially misrepresented Refco's financial condition; opining separately on the financial statements of RCM; and continuing to act as Refco's auditor despite its knowledge of a fraud.

43

156.    GT also substantially assisted the Refco Insiders by issuing an unqualified opinion in connection with its re-audit of Refco's 2002 financial statements in the Fall of 2004 in connection with the LBO. As GT knew, it was a closing condition to the LBO that Refco's financial statements be compliant with SEC Regulation S-X for fiscal years 2002 through 2004. Nonetheless, in re-auditing Refco's 2002 financial statements, which had not been compliant with Regulation S-X, GT again chose to consciously avoid knowledge of the Refco Insiders' fraud.

157.    As GT knew, clean audit opinions were essential to Refco's continued functioning. Had GT ever failed to issue a clean audit opinion for Refco in general or for RCM in particular, the entire fraudulent scheme would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005 notwithstanding GT's efforts to assist the Refco Insiders and others acting in active concert or participation with them to hide the true facts.

158.    This is not a case of an auditor overlooking a few details. GT completely abandoned its obligations of independence, learned first-hand of the fraud, and then aided and abetted that fraud by continuing to provide clean audit opinions in the face of grotesque accounting manipulations. GT was aware of and/or consciously avoided knowledge of all aspects of the Refco Insider's scheme to prop up Refco long enough to cash-out their interests, from the fraudulent RTLs designed to hide Refco's losses to the theft of RCM customer funds.

**Knowledge of Refco's Trading Losses and Balance Sheet Problems**

159.    GT was well aware of the RGHI Receivable.

160.    Before 2002, AA served as Refco's supposedly independent auditor. In fact, the lead partner on the engagement, Ramler, had abandoned any pretense of independence and objectivity. While at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his input. Ramler also bragged that Bennett and other senior Refco management called him on an almost daily basis to discuss transactions and business issues.

161.    After AA collapsed under the weight of the Enron debacle, Ramler moved to GT, taking the Refco engagement with him. Refco was a marquee client for GT, was Ramler's ticket to partnership at GT, and stood to be an even better client for GT if, as GT anticipated, Refco went public. During the course of the Refco engagement, GT earned over $9 million in fees. With Ramler heading the engagement, GT continued AA's practice of turning a blind eye to billions of dollars of questionable accounting transactions in Refco's consolidated financial statements.

162.    Based on his long experience with Refco, when Ramler joined GT, he brought with him knowledge of the following facts:

- As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next 3 to 10 years.

- Refco's internal accounting controls were deficient, and readily capable of being overridden by Refco's management.

- As of February 28, 2002, RGHI was a shell entity with no operations that owed RGL approximately $170 million, and whose financial results were not included in RGL's consolidated financial statements.

- Refco was engaging in substantial and complex related-party transactions with RGHI and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

- Bennett had promised AA that the RGHI Receivable would no longer increase, would be paid down, and that $35 million of the receivable would be paid off in fiscal year 2003.

- In 2001 Bennett improperly recorded a $43 million arbitration award against Refco LLC, over the CFTC's objections, and ultimately transferred the expense to RGHI's books.

163.    GT was thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable, which was not reflected in RGL's consolidated financial statements, was a viable tool for accomplishing such manipulation. GT was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards of the need to apply far more scrutiny to related-party transactions than to ordinary arm's length transactions, when conducting an audit. Accordingly, GT internally categorized Refco as a "high-risk" client in part because it engaged in significant and complex related-party transactions,