lacked an internal audit function, and was dominated by a limited number of senior executives and managers who had an interest in maximizing Refco's apparent financial condition and operating results.

164.    Nevertheless, GT utterly failed to properly audit Refco's related-party transactions. As a result, even though GT knew and/or consciously avoided knowledge that the RGHI Receivable was used to fraudulently inflate Refco's operating results and learned of the RTLs which served to hide the RGHI Receivable, it continued to issue clean audit opinions for Refco.

165.    For example, in connection with the 2003 audit, on April 28, 2003, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down the receivable due from RGHI. In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of the receivable, then totaling $105 million, by at least $35 million per year, resulting in full payment by February 28, 2006. GT made no effort to determine whether those payments actually were made -- and indeed, they were not. Nor did GT perform any testing to verify the accuracy of the $105 million figure (which was false) or whether RGHI and/or its shareholders had the financial wherewithal to repay the amount. During its 2004 and 2005 audits, GT likewise failed to obtain sufficient evidence to provide any reasonable assurance that related-party transactions were properly reflected in the financial statements.

166.    GT's work papers from the 2003 audit demonstrate that GT contemplated steps to scrutinize related-party transactions, but simply chose not to implement any of them. For example, in conducting its audit of RCC in 2003, GT told Refco that it needed to see certain loan receivables to RCC on the books of the affiliate owing the money. When making this inquiry, GT specifically requested the information about a loan from RCC to RGHI purporting to have a balance of approximately $71 million, including documents to verify the existence and terms of the loan and ensure that RGHI was actually making payments that were received by RCC and reflected in its bank statements. In violation of GT's own practices, as well as Generally Accepted Auditing Standards ("GAAS"), GT never carried out any of these procedures. Had GT done so, GT would have quickly exposed the fraud.

167.    Furthermore, despite the high degree of risk GT knew was connected with related-party transactions at Refco, GT deliberately chose not to take the simple and obvious step of examining the customer statement for the RGHI account at RCC for the months of February and March 2003. Had GT done so, it would have seen the following:

- Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI owed Refco over $600 million.

- On February 21, 2003, RGHI's account at RCC received $308.5 million from a transaction described in the account statement as "TRANSFER FUNDS," reducing the amount that RGHI owed RCC.

- On February 25, 2003, RGHI received two credits for an aggregate of $250 million from a wire transfer from a bank in New York.

- By March 4, 2003 (*i.e.*, just 4 days after Refco's fiscal year-end), the above entries were reversed, and the amount RGHI owed to RCC ballooned from $71.8 million on February 28, 2003, back up to over $600 million.

168.    Moreover, the 2003 disclosed portion of the receivable balance from RGHI's account at RCC of over $70 million represented an approximately $30 million increase over the prior year. Although GT inquired as to the reason for the increase, it took at face value the explanation from Refco that the $30 million represented "additional loans" and never questioned why, during a time when Bennett had promised that RGHI would pay down the RGHI Receivable, Refco was extending further credit to RGHI.

169.    GT's audit plan for 2003 also called for GT to review loan documents concerning the receivable balance in RGHI's account at RCC and to perform an assessment of the interest income represented by Refco to have accrued on this balance. GT failed to perform either procedure. The substantial accrued interest income associated with the RGHI Receivable would have indicated to GT that the receivable had to be massive and far greater than the $105 million falsely disclosed by Bennett.

170.    In fact, after the 2003 audit GT failed to perform any procedures whatsoever to test the RGHI Receivable at RCC. One glaring omission in GT's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates." This document, which GT had obtained and reviewed as part of every Refco audit from 1996 to 2003,

detailed Refco's related-party receivables. GT failed to require Refco to provide it with this critical document for the 2004 and 2005 audits and did nothing to investigate this change in documentation, even though the customer statements for RGHI's account at RCC during the 2004 and 2005 audits made clear that RGHI still had a massive debt balance in favor of RCC. GT intentionally turned a blind eye to this issue.

171.    Similarly, GT failed to properly examine the RGHI balances at RCM. Though Ramler knew that in the past RGHI owed substantial sums of money to Refco through an account at RCM, GT failed to perform even the simplest procedure to ensure that this related-party account was being properly recorded in Refco's books. Had GT looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year-end), GT would have seen the following:

- The debit balance in the account as of February 1, 2003, was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003, of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar manipulations of RGHI's account at RCM.

172.    GT's failure to examine the customer account statements of the related-party RGHI was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it can only be evidence of a willful blindness -- an intentional effort to avoid exposing evidence of the accounting fraud at Refco.

**The RTL Transactions**

173.    During its audits of Refco, GT not only knew of, consciously avoided knowledge of, and failed to properly audit the RGHI Receivable, but it also came face-to-face with the RTLs themselves. Again, GT deliberately ignored numerous red flags indicating that these RTLs were part and parcel of the accounting fraud being perpetrated by the Refco Insiders and those acting in active concert or participation with them.

174.    The RTLs with Refco customers during the periods audited by GT were accomplished by RCM falsely recording a loan as a "reverse repo" or "time deposit" in the RTL

Defendant's customer account. A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and "time deposit" is a loan extended to a customer for purposes of trading. Both "reverse repos" and "time deposits" require the use of collateral, and because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks and warrant heightened scrutiny by auditors. Professional audit standards advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, and not merely their amount.

175.    GT ignored these standards and deliberately failed to inquire into the obviously suspicious circumstances of these transactions and subjected them to little or no scrutiny at all. As noted, the RTLs were not actually "reverse repos" or "time deposits." The RTLs lacked the hallmark of both transactions -- collateral. Nor did the RTL Defendants' total capital provide Refco with adequate security for these substantial advances. Nevertheless, GT accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

176.    For example, during its audit of RCM for 2003, GT noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two of the RTL Defendants (Liberty Corner and Delta Flyer) totaling $650 million. The transactions were timed to span and be unwound at Refco's fiscal year-end. On April 16, 2003, GT sent simple confirmation requests to these two RTL Defendants, which were signed and returned to GT. Although GT performed additional balance sheet testing on other RCM customer accounts for 2003, GT did not conduct additional credit risk testing on these RTL Defendants' accounts and GT did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Defendants' total capital.

177.    In the 2004 audit, GT noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner. As in 2003, GT sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did. This year, however, GT took the additional step of reviewing the potential credit risk from the transaction. GT noted that the entire amount of Liberty

Corner's debit balance -- $720 million -- was at risk, meaning that no collateral secured it. However, GT did not identify the account as a credit risk, and ignored the fact that a real "reverse repo" transaction should be secured by collateral.

178.    As these examples illustrate, in every review and every audit that it conducted of Refco, GT received information that RCM was engaging in large, period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Defendants. In each case, GT understood that the transactions were in fact unsecured loans of hundreds of millions of dollars made to entities without the financial wherewithal to repay the loan, rather than collateralized "reverse repo" transactions. Yet in each case, GT declined to investigate further based on information -- often merely a representation from management -- that the unsecured balance had been repaid. Moreover, despite being engaged for years as Refco's auditors, GT never alerted Refco's directors and officers or anyone else to the pattern and never questioned why Refco entered into these uncollateralized transactions at the end of each and every relevant reporting and audit period. Nor did GT ever question why Refco was characterizing these transactions as "reverse repos" or "time deposits" when they were not collateralized.

179.    Further evidence that GT understood that the RTLs were being used to hide the RGHI Receivable comes from Ramler himself. In Ramler's own handwritten notes, Ramler writes the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL Defendants). Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts." During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts. This is a connection Ramler would not have made unless he, and thus GT, had actual knowledge of the fraud.

180.    Records of internal communications within GT's management show that GT understood that Refco was not an appropriate candidate for an IPO and that GT could be subject to liability for its conduct with respect to Refco. In late December 2004, Ramler had a conversation

with a member of GT's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO. The note states, in part: "Atty called – also this AM – Refco makes Firm uncomfortable . . . issue is sig. def. . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to demonstrate GT's concerns about Refco and the upcoming IPO: "They are moving very fast – too fast for comfort . . . what to do – we would be <u>sued</u>."

181.    Indeed, GT knew and/or consciously avoided knowing that Refco was misappropriating RCM customer assets and using them for other Refco purposes. GT also knew and/or consciously avoided knowledge that Refco was engaging in the RTL scheme in order to hide the fact that Refco was suffering massive losses due to uncollectible receivables, and that RGL was being saddled with guarantees for the RTLs. In sum, GT knew and/or consciously avoided knowledge that Bennett and the other Refco Insiders were fraudulently "dressing up" Refco using these schemes in order to cash-out their own Refco interests. GT was a sophisticated audit and accounting firm that, when faced with knowledge of this fraudulent scheme, chose to look the other way -- apparently to keep a marquee customer happy. GT not only violated the governing standards of GAAS, it substantially assisted and participated in a scheme that ultimately cost RCM and RGL hundreds of millions, if not billions, of dollars in losses. GT is liable for the damages that were incurred as a result of its malfeasance.

182.    In auditing Refco financial statements, GT came to learn of the RGHI Receivable, knew that it was dealing with related companies with which it had to maintain its professional auditing skepticism and saw numerous red flags alerting it to the existence of the RTLs. As the Examiner concluded, GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud," and yet it "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

**Maintaining the Fraudulent Business Model**

183.    Each year, GT issued, among other things, unqualified audit opinions claiming that, after applying GAAS, the financial statements of RCM fairly presented RCM's financial condition in accordance with Generally Accepted Accounting Principles ("GAAP").    In addition, GT consented to the incorporation of its audit opinion in RCM's financial statements. (GT's audit opinions were, as a matter of course, included in RGL's financial statements, which represented the financial statements for the whole of Refco, but excluded RGHI.)

184.    The RCM financial statements for each of years 2003, 2004, and 2005 were false and misleading and failed to state material facts necessary to make the statements contained therein not misleading.  In particular, the RCM financial statements were false because they failed to disclose that the "loans" that RCM had made to other Refco affiliates were uncollectible and  should have been written off -- a fact which would have shown RCM's net income, net assets, and stockholders equity were negative.

185.    For example, RCM's 2003 financial statements failed to recognize losses with respect to approximately $275 million in uncollectible obligations which the financial statements falsely characterized as "receivable from customers."   In fact, as GT was aware, these were simply RCM customer-entrusted assets, which had been improperly diverted to other uncreditworthy Refco entities, and were not properly characterized as "receivable from customers."  Moreover, had GT properly audited the 2003 financial statements, it would have recognized the need to write off an additional approximately $650 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2003 fiscal reporting period.

186.    The 2004 RCM financial statements similarly failed to recognize losses with  respect to approximately $1 billion in uncollectible related party obligations which the financial statements falsely characterized as "receivable from customers."  Again, as GT was aware, these were simply RCM customer-entrusted assets which had been improperly diverted to other uncreditworthy Refco entities, were not properly characterized as "receivable from customers." Moreover, had GT properly audited the 2004 financial statements, it would have recognized the need to write off an additional

approximately $720 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2004 fiscal reporting period.

187.    The 2005 RCM financial statements failed to recognize losses with respect to approximately $2 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." As GT was aware, these were simply RCM customer-entrusted assets which had been improperly diverted to other uncreditworthy Refco entities, were not properly characterized as "receivable from customers." Moreover, had GT properly audited the 2005 financial statements, it would have recognized the need to write off an additional approximately $345 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2005 fiscal reporting period.

188.    Although in each case, the RCM financial statements stated that a portion of these "receivables from customers" were attributable to "related-party transactions," the financial statements falsely mischaracterized these transactions as having consisted of "securities and other financial instrument transactions" that RCM had transacted with related parties "in the normal course of business." In fact, as GT was aware, a significant portion of these transactions were simply diversions of RCM's customer-entrusted assets, with no collateral, and were certainly not in the normal course of business, as the affiliated companies that received RCM customer assets lacked both the intention and the financial wherewithal to repay the diverted assets.

189.    GT knew and/or consciously avoided knowledge that these assertions in the RCM financial statements were false because it not only had access to, but actually audited and analyzed material information concerning RCM and the intercompany transfers of RCM customer assets. GT knowingly or recklessly failed to take the required audit steps or avoided the resulting audit evidence.    At all relevant times, the affiliated companies lacked the financial intent and/or wherewithal to repay RCM, the loans had no legitimate business purpose for RCM but benefited only the affiliates, the loans were falsely documented as "customer" receivables, RCM's board of directors never approved the transactions, and no collateral or security existed of any value. These

facts constituted huge red flags which were known and/or consciously avoided by GT. Any proper audit examination would have revealed these facts and uncovered the fraud alleged herein.

190.    Further evidence of GT's knowledge of fraud, and GT's active assistance in covering up the fraud, comes from a management deficiency letter (the "Management Letter") prepared by GT following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco. As set forth in this letter, among the accounting irregularities and deficiencies known by GT to have existed well before the LBO were: "Consolidation Process," "Formalized Reporting and Closing Process," "Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," "RCM Custody Reconciliations," "Audit Coordination, " and "IT Environment Deficiencies."

191.    As the Management Letter revealed, GT was fully aware that Refco's internal accounting and auditing functions were in a shambles, that there was no internal audit function, there was insufficient audit coordination, and that there were deficiencies in accounting procedures and functions and in the consolidation processes. Despite these numerous longstanding deficiencies, the correction of which would have made the various accounting improprieties and frauds conducted by the Refco Insiders harder to conceal, GT provided Refco with a clean audit opinion before and in connection with the LBO.

192.    Despite being aware of these deficiencies before the LBO and having "previously discussed" these longstanding deficiencies with Trosten and other Refco Insiders, it was only after the LBO that, to cover its inaction and failure to properly audit Refco, GT "papered" the deficiencies in a letter to Bennett dated October 15, 2004. As GT alludes to in its Deficiency Letter, Refco's "accounting function d[id] not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer." As GT recognized, Refco's deficient accounting practices, and the fraud they helped conceal, could not withstand the increased scrutiny that Refco would be receiving from regulators and investors given the impending IPO. Nonetheless, in its cover letter to Bennett, GT refers to these significant deficiencies as merely "several matters that are opportunities for strengthening internal control and operating efficiency."

193.    Even after belatedly presenting the Management Letter to Bennett in October, 2004, GT failed to follow-up with Bennett or anyone else at the Company regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed. Even then, GT modified its findings at the instructions of Refco management and then affirmatively lied about the letter's existence when GT was asked by THL whether any such management letter existed during the due diligence process.

194.    In late March 2005, long after the conclusion of the LBO, THL learned of the existence of the Management Letter. In an April 1, 2005 internal email, a THL executive expressed his anger that neither Refco nor GT had provided the Management Letter to THL during the due diligence leading up to the LBO. As THL stated internally, "when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both[.]"

195.    The same day, in another internal email, another THL executive explained his discovery that at or about the time that GT provided the Management Letter to the company, Refco management had pressured GT to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by GT:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

196.    A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and GT if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

197.    In sum, GT not only knew of and left unaddressed numerous accounting and controls deficiencies at Refco before, during and after the LBO, GT also eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter. These facts demonstrate both GT's knowledge of and substantial assistance in the Refco Insiders' fraud.

**Failure to Follow Generally Accepted Practices and Standards**

198.    In each of its audits for Refco and affiliated entities, GT failed to satisfy the minimum acceptable standards of professional conduct, including but not limited to GAAS, and failed to ensure that Refco's financials were consistent with GAAP. But for those failures, the Refco Insiders and others acting in concert or participation with them would not have been able to loot and otherwise deprive RCM and RGL of their valuable corporate assets. As set out below, audits performed with the appropriate degree of diligence and professional skepticism would have uncovered the fraudulent scheme alleged herein, and would have prevented the damage inflicted on RCM and RGL by the Refco Insiders and others acting in concert or participation with them (including, but not limited to, the unnecessary bond and bank debt foisted on RGL as a consequence of the LBO).

199.    Auditors are not permitted to accept corporate assurances at face value; if directors and corporate records were to be blindly accepted, there would be little or no point in performing an audit. For that reason, auditors must conduct themselves at all times with a high degree of professional skepticism and with an independence in mental attitude. Ramler, throughout his tenure both at AA and at GT, consistently failed to act with the requisite degree of professional skepticism. Ramler not only took Bennett and other Refco employees at their word -- he personally vouched for their trustworthiness and veracity. Ramler's motivation for doing so was obvious; Refco was an extremely valuable account that he himself managed, and keeping the account through a successful IPO would constitute a coup both for GT and for Ramler. In a conscious attempt to maintain the illusion that Refco was financially solid so as to allow the Refco Insiders to cash-out, GT regularly issued unqualified audit opinions following a procedure that amounted to no audit at all.

200.    GT failed to perform sufficient fieldwork by neglecting to obtain competent evidence to afford a reasonable basis for forming an opinion regarding Refco's financial statements. Essentially all of Refco's records, including RTL documents within the possession of MB and numerous Refco entities and employees, were readily available to GT. Yet GT failed to inspect these documents. Similarly, despite their availability, GT failed to analyze account statements for RCM and RCC accounts held by Refco entities, related parties or by RTL participants. Contrary to GAAS requirements, GT failed to satisfy itself that Refco had implemented adequate safeguards, procedures and controls. GAAS specifically identifies a number of "red flags" for auditors to consider that GT knew and/or consciously avoided knowing were present in this case, including, without limitation: (a) significant related-party transactions totaling hundreds of millions of dollars annually; (b) strong pressures to perpetrate fraud, since the Refco Insiders, and those acting in active concert or participation with them, had confessed a desire to maintain Refco's value for a personally enriching sale of the company in the near future; (c) weaknesses in internal control; (d) numerous undocumented intercompany transfers; and (e) unusual or unexpected analytical relationships evidenced by asymmetrical balance sheets that did not accurately reflect intercompany transactions, including significant funds diverted from RCM without any loan documentation or any record of a receivable at other Refco entities. Yet GT failed to take appropriate precautions, including (as discussed above) failing to obtain and analyze competent supporting materials, verify management representations, and investigate large and complex intercompany and related-party transactions.

201.    GT also failed to scrutinize numerous intercompany and related-party transactions involving Refco, its affiliates, and entities controlled by the Refco Insiders, and those acting in concert or participation with them. This violated numerous applicable professional standards, including those warning that related-party transactions -- which cannot be presumed to be carried out on an arm's length basis -- must be thoroughly examined and substantiated. Moreover, GT failed to follow applicable professional standards that require scrutiny of ostensibly third-party transactions that can be used to obscure or conceal related-party transactions. At a minimum, the frequent large-value round-dollar risk-free loans that Refco repeatedly engaged in at the end of every fiscal year

(and after 2004, every fiscal quarter) were just such transactions, and a competent analysis of these transactions -- including but not limited to an analysis of customer accounts and an examination of loan documents drafted by MB -- would have revealed the fraud.

202.    GT further failed to implement procedures for identifying intercompany transactions and disclosing the details associated with those transactions, including the likelihood that funds upstreamed from RCM would or could be repaid in the future.  Applicable professional standards required GT to test the validity and appropriateness of these transactions and evaluate the probability that these uncollected balances could be realized, particularly given that they were increasing over time.  By knowingly not applying appropriate auditing standards, GT allowed the Refco Insiders to continue looting RCM customer accounts.  Similarly, GT failed to examine the legitimacy of related-party transactions and thinly-concealed related-party transactions (the RTLs), despite professional obligations to ascertain the financial capability of other parties to repay balances owed, to review the agreements and other pertinent documents associated with the transactions, to inspect or confirm and obtain satisfaction concerning collateral for the transactions, and most importantly, to understand the business purpose for the transactions.  None of these steps was taken for the RTLs, despite the fact that they were unusual and large-scale transactions repeatedly timed to coincide with the close of every relevant reporting and audit periods, and despite the fact that they lacked any legitimate business purpose.

203.    An audit properly performed in accordance with GAAS easily would have uncovered the fraud alleged herein.  GT's auditors, including Ramler, would have known that the RTLs and other suspicious transactions were evidence of ongoing and massive financial manipulation.  GT's repeated failure to conduct an appropriate audit and its decision to ignore innumerable red flags requiring a high degree of skepticism and a rigorous examination of Refco's books and records, strongly suggests that GT and Ramler made the conscious decision to conceal the massive ongoing fraud in order to keep Bennett happy and continue collecting professional fees.

204.    At a minimum, GT failed to meet the minimum professional standards of care in discharging its audit duties. Without this professional failure, the fraudulent scheme alleged herein could not have wrought massive damage to the assets of RCM and of RGL.

### MB's Role in the Fraudulent Scheme

205.    MB was aware of the activities alleged herein and was a direct participant in a number of aspects of the Refco Insiders' fraud. By its actions, as alleged herein, MB actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and gross malpractice alleged herein.

206.    MB's relationship with Bennett, Maggio, and Grant dates back to 1994, when MB partner Joseph P. Collins ("Collins") brought the Refco account to MB from his previous law firm. Until October 2005, MB was Refco's primary law firm, and Collins was Refco's primary outside legal counsel. With bills, on average, of approximately $4 million a year, Refco was an extremely lucrative client for MB, and as Collins' largest client, accounted for half of the billings for which he was responsible. Between 1994 and October 2005, MB provided a broad range of legal services to Refco -- representing Refco in SEC investigations, drafting profit sharing plans for key executives, advising Refco on corporate governance issues and United States and foreign regulations regarding its operations and activities, drafting Refco's customer agreements, providing Refco with tax advice, leading financings for senior note and loan agreements, and drafting and negotiating the RTLs. As a result of the varied engagements MB undertook on behalf of Refco, the firm became thoroughly familiar with the inner machinations of the Company. The vast majority of important transactions and deals at Refco, including the LBO and IPO, were cleared through Collins or the attorneys working under his direct supervision, and Collins was aware of the work that everyone was doing on Refco matters by virtue of his review of the bills before they were submitted to Refco.

207.    As the Court-appointed Examiner found, MB was aware of the Refco Insiders' fraud and aided and abetted it. As discussed in more detail below:

- MB was aware of Refco customer losses during the late 1990s through, among other things, its legal work helping the Refco Insiders hide these losses by transferring them to RGHI. MB thus knew and/or consciously avoided knowledge of the

existence of the RGHI Receivable as early as 1999, and by no later than June 2002, MB knew that RGHI owed a related party debt to RGL of at least $350 million.

- MB drafted virtually all of the RTL documents with respect to 18 separate transactions, negotiated the terms of the RTLs with the third-party RTL Defendants, and fully understood the nature of the RTLs.

- MB understood that the RTLs ultimately involved lending hundreds of millions of dollars by Refco, for a period of only a few days, through the RTL Defendants to RGHI, an entity that was controlled by Bennett. MB knew that these massive loans were risk-free to the RTL Defendants and that they served no legitimate business purpose.

- MB knew the implementation of the RTLs were tied to Refco's financial reporting periods. For example, MB knew and/or consciously avoided knowing that prior to the LBO in 2004, Refco was required to submit audited financial statements on a annual basis and, after the LBO, on a quarterly basis. MB knew that the RTLs straddled Refco's financial reporting and audit periods and occurred only at those times (with one exception).

- MB drafted guarantees and indemnities on behalf of RGL in favor of the RTL Defendants to guarantee RGHI's repayment obligation, and MB knew that Bennett signed virtually all of the guarantees and indemnities on behalf of RGL or RCM and the loan documents on behalf of RGHI. MB knew and/or consciously avoided knowing that the guarantees and indemnities Refco was signing in connection with the RTLs violated the terms of other loan agreements that MB had prepared for Refco.

## Awareness of Refco's Trading Losses and Balance Sheet Problems

208.    Starting in 1997, MB provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco. In those cases, the "bad debts" were assigned to RGHI or related entities. For example, in late 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian debt crisis. By the end of 1998, these losses amounted to hundreds of millions dollars. MB attorneys were involved in the resolution of Refco's claims against these customers, which debts later became part of the RGHI Receivable.

209.    In October 1997, a Refco customer named Victor Neiderhoffer and several funds he controlled lost more than $90 million (the "Neiderhoffer Loss"). Instead of disclosing the losses -- losses which Neiderhoffer could not cover -- Refco, with MB's assistance, sold this account receivable to an RGHI subsidiary (Wells Ltd.). These losses were subsequently added to the RGHI

Receivable. Because MB was advising both RGHI and Refco throughout the relevant time, MB was thus aware that Refco could and did use RGHI as a repository for bad debts incurred by Refco itself.

210.    MB continued to be aware of the RGHI Receivable. In a letter dated October 15, 1999, Bennett wrote to Collins to provide arguments to be used to support the apparent net worth of RGHI. Bennett stated that RGHI's value was the value of its investment in RGL. Collins, aware of the RGHI Receivable, jotted in his handwritten notes: "Minus loans to RGH[I]." These handwritten notes show that Collins knew RGHI owed money to RGL.

211.    By June 2002, MB was clearly aware that the RGHI Receivable existed and totaled at least $350 million. On June 11, 2002, in connection with legal work for Refco, MB revised legal documents that included a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of related party debt of [RGHI]."

212.    The RGHI Receivable was not the only method by which MB actively participated in an effort to hide Refco's "bad debts." For example, in late 1999 and early 2000, MB was instrumental in hiding what Maggio perceived to be a $6.3 million "bad debt" (the "Deere Park Debit Balance") owed to Refco by a customer called Deere Park Capital LLC ("Deere Park"). Maggio asked his advisors, MB and E&Y, to develop a transaction -- the Minglewood scheme -- that would conceal the Deere Park Debit Balance. Based on tax advice from E&Y and legal advice from MB, the parties created a joint venture called Minglewood Investments LLC to which Deere Park contributed certain worthless or highly speculative securities and $2 million in cash, while Refco contributed the Deere Park Debit Balance. As Maggio admitted to one of Deere Park's principals, Refco entered into this joint venture to avoid having to write off the Deere Park Debit Balance. Under the terms of the agreement drafted by MB, the $6.3 million debit balance was converted into a note that would only be payable from profits Minglewood Investments LLC earned on its securities, and would convert to a zero balance -- in other words, disappear -- after a set time period. As MB understood, the entire purpose and effect of the Minglewood transaction was to hide the $6.3 million debt from Refco's financial statements. A Deere Park principal has testified under oath to having

61

had conversations with an MB attorney regarding the fact that Refco was entering into the Minglewood transaction so that it would not have to write off a receivable.

**The RTL Transactions**

213.    MB was not only aware of the huge RGHI Receivable, but MB drafted and negotiated the fraudulent RTLs whose sole purpose was to hide its existence. Indeed, over the course of five years, MB drafted virtually all of RTL documents for at least 18 RTL transactions that collectively amounted to billions of dollars in fraudulent loans.

214.    In February 2000, MB drafted RTL documents for a $50 million RTL with defendant EMF Core Fund (a subsidiary of defendant EMF Financial, picked by defendant Flanagan to participate in the scheme).  On February 24, 2000, an MB associate sent Flanagan a packet of materials containing (a) a loan agreement for $50 million from Refco Capital Markets to EMF Core Fund, (b) a loan agreement for $50 million from EMF Core Fund to RGHI, (c) an indemnification agreement by RGHI, and a guarantee by RGL of RGHI's repayment obligation.  The loans were to take place just before the end of Refco's 2000 fiscal year, and were to be unwound just after the beginning of the next fiscal year.

215.    MB employed the same loan structure for each of the RTLs, and drafted (at times even negotiated) RTLs not only with Flanagan's EMF Financial and Delta Flyer entities but with Coast (through its subsidiary CS Land), with Krieger (through his Beckenham Trading entity), and with Ingram Micro (through its subsidiary CIM Ventures).

216.    Although this loan structure -- whereby a loan was made at the close of a financial reporting period only to be unwound shortly after Refco's financial reporting and audit periods -- was suspicious on its face, MB proceeded to draft and transmit the documents necessary to carry out not only the February 2000 RTL with EMF Core Fund, but all of the RTLs discussed herein. Indeed, MB drafted (and at times even negotiated) nearly identical loan documents at least an additional 14 times over the next four years. ·

217.    MB continued to participate actively in the RTL scheme without hesitation, and to draft all documents necessary for the execution of that scheme, even as the amount of the RTLs

increased dramatically. For example, while the February 2000 RTL with EMF Core Fund was for $50 million, MB executed a single RTL for $720 million with RTL Defendant Liberty Corner in February 2004.

218.     Indeed, the $720 million February 2004 RTL was significant not only because of its size; the RTL also occurred at a time when MB was representing Refco in connection with the planned LBO. During that period, MB was well aware that THL would be conducting due diligence seeking to discover Refco's true financial condition, yet MB proceeded to negotiate and draft RTL agreements that transferred huge round-dollar amounts from one Refco entity to RGHI through the RTL Defendants just days before the end of Refco's financial reporting periods.

219.     Moreover, MB knew and/or consciously avoided knowing that the RTLs were designed to hide the RGHI Receivable as Refco went to great lengths to hit specific targets for each RTL. In February 2004, Refco initially planned two RTLs -- a $500 million RTL with Liberty Corner, and a $200 million RTL with RTL Defendant Delta Flyer (an entity affiliated with RTL Defendant EMF Financial). When EMF Financial notified Refco that Delta Flyer could no longer participate, MB revised numerous documents to consolidate the loans, resulting in a single $720 million loan with Liberty Corner. These last-minute changes clearly signaled Refco's need to manipulate its financial records by specific amounts prior to the February close of its 2004 fiscal year.

220.     No later than June 2002, MB knew that RGHI owed a receivable of at least $350 million to RGL. Yet MB continued to facilitate additional RTLs for the Refco Insiders.

221.     MB not only continued its work on the RTLs, but escalated that work, as RTLs began to occur on a quarterly basis right before the LBO. Thus, like clock-work, the RTLs always straddled the end of Refco's financial reporting periods and never occurred at any other time (with one exception). Despite this additional obvious sign that the RTLs were intended solely to manipulate Refco's financial statements, MB continued to participate willingly in the RTL scheme by drafting new documents for the now-quarterly transactions.

222.    As Refco's principal outside counsel from 1994 until October 2005, MB was intimately familiar with Refco's financial reporting and audit periods. For example, Collins and other MB attorneys received numerous requests to contact Refco's auditors every February in connection with Refco's audits, and received many of these same requests at the end of each quarter following the LBO. Indeed, Collins advised Bennett and other Refco employees in connection with audit letter responses, and even reviewed footnotes to accompany Refco's financial statements. Yet MB willingly drafted documents for, negotiated terms of, and otherwise assisted in executing numerous RTLs moving large round-dollar amounts between Refco, RGHI and the RTL Defendants only days before and days after the end of each and every relevant reporting period that Refco faced.

223.    Indeed, MB willingly participated in the RTLs even though MB knew that Refco's bank financings contained covenants specifically prohibiting Refco from incurring additional indebtedness, such as guaranteeing a third party's debts, beyond certain limits. MB knew these covenants existed because MB had participated in the negotiation and drafting of the LBO financing documents. Thus, by preparing the RTL documents, MB assisted in transactions that it knew violated loan covenants in financing documents that MB had previously negotiated and drafted.

224.    Additionally, MB knew and/or consciously avoided knowing (through its role as an advisor on finance-related legal matters) that the RTLs had no legitimate business purpose. These were uncollateralized, short-term loans involving the lending of hundreds of millions of dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL Defendants. The transactions, which MB knew to be risk-free for the RTL Defendants by virtue of the RGL guarantees, clearly lacked any economic substance and were inherently suspicious.

225.    Moreover, MB's awareness of the impropriety of the RTLs is obvious from the fact that certain RTL Defendants backed out of the deals based on their concerns over the propriety of the transactions in the wake of the Enron scandal. In February 2000 and again in February 2001, MB drafted the necessary documents for two RTLs ($150 million and $250 million, respectively) with affiliates of Ingram Micro. Like the RTLs with Pigott's Liberty Corner entity and with Flanagan's

EMF/Delta entities, these loans moved large round-dollar amounts from RCM to RGHI via an Ingram Micro affiliate before the end of the fiscal year, and then back from RGHI to RCM after the new fiscal year began. They also included a guarantee by RGL of RGHI's obligations, as well as an indemnity in favor of the Ingram Micro affiliate -- all signed by Bennett.

226.    In 2002, Ingram Micro was prepared to go forward with yet another RTL, going so far as to send a mark-up of the 2001 loan documents to Collins. However, on January 30, 2002, Ingram Micro had second thoughts about engaging in the RTLs due to recent news about the Enron scandal. Later that same day, Ingram Micro sent Refco an email backing out of the proposed RTL, referencing the Enron debacle and heightened scrutiny from the SEC.

227.    As the Examiner concluded, "there is significant evidence that Mayer Brown . . . assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements," and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

### Maintaining the Fraudulent Business Model

228.    The Refco Insiders facilitated their fraudulent scheme to attract and siphon RCM assets by purporting to maintain RCM as an unregulated offshore broker-dealer despite the fact that it conducted substantial activity in the United States and did not even maintain any Bermuda operations after 2001. MB advised Refco and RCM on these efforts beginning no later than October 1996 and continuing through October 2005.

229.    In 2001, in furtherance of the fraudulent scheme described herein, the Refco Insiders desired to close down RCM's Bermuda operations and to "repatriate" RCM to the United States. This was actually accomplished in 2002. In so doing, Bennett enlisted the assistance of MB, which advised RCM on the implications of repatriating to the United States. In the course of so doing and as reflected in, among other things, a June 24, 2002 MB memorandum, MB became intimately

familiar with the business and operations of RCM through discussions with Maggio and others. As reflected in an August 3, 1998 MB memorandum, MB was aware when it did this work that RCM was engaging in repurchase agreements, or "repos," and buying and selling customer securities "for its own account." In connection with the repatriation of RCM's Bermuda operations to the United States, MB advised RCM on, among other things, ways to structure its business so as to attempt to avoid being treated as a regulated broker-dealer subject to, *inter alia*, segregation requirements imposed by United States law.

230.    According to a January 31, 1999, memorandum from Refco to MB, MB also was involved in and familiar with various other "projects underway with respect to Refco's FX business," which caused MB -- along with other aspects of MB's engagements for Refco and RCM -- MB to be aware of the diversion of RCM FX customer-entrusted assets to other Refco entities as alleged herein.

231.    In June 2004, in connection with a discussion of financial covenants for a Credit Agreement with Refco Finance Holdings LLC as Borrower, questions were raised by THL's counsel concerning Refco's "average cash on hand." One phrase used in connection with this discussion was "house cash," which MB characterized as "a difficult concept." In response to a question regarding whether it would be feasible to have GT provide a better explanation in future quarterly filings of the composition of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," MB noted emphatically, "No!! Impossible to breakout. Too restrictive operationally i.e. funding." This shows that MB was fully aware of the manner in which the Refco Insiders were siphoning RCM customer-entrusted funds to finance Refco's overall business operations and to fraudulently dress Refco up to facilitate a lucrative cashing-out of the Refco Insiders' interests.

232.    MB's knowledge of and participation in the overall scheme is clearly shown through emails from Refco employee Thomas Yorke to Joseph Collins in January 2005. In those emails, Yorke sought advice from MB on impending regulatory changes that "could mean an extremely large asset transfer away from RCM" and on how to avoid the potential impact of those changes and

how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. As MB was aware, the reason that Yorke wanted to minimize any transfer of cash from RCM customer accounts to customer accounts at other Refco entities was that Refco treated the cash in customer accounts at RCM as available to fund Refco's operations and would not be able to treat cash in customer accounts held at other Refco entities as available for this purpose. MB's proposed solutions included "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

233.    As indicated in a MB memorandum draft dated October 11, 2005, just as the massive fraud at Refco was unraveling, MB was fully aware that as a result of the repatriation from Bermuda to the United States on which it had previously advised RCM:

(a)    RCM's activities were conducted by RSL and not by RCM, and RCM had no personnel available to look out for the legitimate interests of RCM's customers;

(b)    "RCM no longer maintains any personnel or operations in Bermuda, and . . . all of its functions and operations are performed by RSL personnel that are located in the United States";

(c)    While assets in RCM customer accounts were "carried on the books of RCM," those assets were in fact not held by RCM;

(d)    RCM was engaging in "significant" conduct in the United States and, with MB's knowledge and advice, had structured its activities with an intent to "avoid U.S. regulatory requirements" and could not properly claim to be exempt from the regulatory requirements of United States law; and

(e)    RCM was not in fact a "foreign broker-dealer."

234.    The fact that MB was preparing such a memorandum in October 2005, at precisely the same time as the public disclosure of the massive fraud at Refco, is inherently suspicious. By preparing to advise RCM that it should consider changing the way it conducted its business after the fraud had already been disclosed and RCM had been effectively shut down, MB was simply trying to paper the file, cover its tracks, and create the appearance after the fact that it had rendered

appropriate, objective advice to RCM when in fact MB had been intimately involved in advising RCM on RCM's earlier repatriation from Bermuda to the United States at a time when the law was no different than it was in October 2005. Indeed, all of the authorities cited in that draft MB memorandum pre-dated the advice rendered by MB in 2001 and 2002 with respect to RCM's repatriation.

**Conduct in the LBO**

235.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from MB's conduct in the LBO. MB was closely involved in the LBO process. MB represented Refco and RGHI in connection with the LBO and, according to the Examiner, was "deeply involved" in the LBO process, negotiating the agreement with THL and handling the Refco side of THL's due diligence. Given its knowledge of the misconduct at Refco, MB was hopelessly conflicted in representing both Refco and RGHI. At no time, however, did MB advise RGL's innocent directors, officer or agents of the Refco Insiders fraudulent scheme or that the LBO was a transaction with no business purpose for RGL, and one that would cause RGL to incur substantial additional indebtedness that it was not in a condition to assume. Certain Refco directors, officers, and agents (including THL, inside counsel and others) were unaware of the fraudulent scheme and of the extensive adverse impact that the LBO would have on RGL. As a result of defendants' efforts to conceal the scheme, these directors, officers, and agents (including inside counsel and others) were unaware of Refco's true financial condition (namely, the true nature and extent of the RGHI Receivable), and could not have made themselves aware through reasonable investigatory efforts. Had they learned of the Refco Insiders' fraudulent scheme, they would have taken steps to prevent RGL from becoming saddled with $1.4 billion of bank and bond debt.

236.    The Equity Purchase and Merger Agreement underlying the LBO transaction, a document negotiated and reviewed by MB, represented that there were no undisclosed intercompany loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million. The representation was false and MB knew that the guarantee

68

requirement would immediately be breached. There were, in fact, massive related-party loans between Refco and RGHI that had not been disclosed, but rather had been hidden by the RTL scheme that MB had been effectuating. Moreover, at the very same time MB was reviewing these provisions in the Equity Purchase and Merger Agreement, MB was also preparing documents for a $720 million RTL in which a Refco entity -- RGL -- was guaranteeing the debt.

237.    In addition, the Examiner found that during the LBO diligence process, MB "appears to have failed to disclose key information to THL." MB met frequently with THL's counsel and reviewed the due diligence and corporate documents provided to them. When asked by THL's counsel, MB boldly represented, despite having prepared and overseen the execution of dozens of RTLs, that there were no transactions or deals between Refco and RGHI. In fact, at the same time that MB was making these representations, MB was preparing documents for the $720 million RTL involving Refco, Liberty Corner and RGHI.

238.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from its failure to disclose the existence of the RGHI Receivable despite its review of the LBO prospectus and its issuance of a legal opinion making representations in connection with the LBO. Furthermore, the Offering Circular: (a) did not mention the existence of RTLs; (b) stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004; (c) did not disclose the guaranty -- that MB itself had prepared -- to a RTL participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) as discussed above, falsely stated that the LBO bond debt was effectively junior to the payables owed to RCM.

**Conduct Before and After the IPO**

239.    After the LBO closed, Refco began the process of registering the Senior Subordinated Notes so that they could become publicly traded, and also began preparing a prospectus that would lead to an IPO. MB was involved with both processes.

69

240.     MB reviewed the initial disclosure document pertaining to the notes registration (the S-4), and received and reviewed the SEC's comments to Refco's S-4 disclosures. Thus, MB was aware that Refco had first listed the RGHI Receivable as being from a customer, but changed the language to reflect that the receivable was due from equity members.

241.     During this time, MB continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, and $550 million in December 2004, $345 million in February 2005, and $450 million in May 2005). In addition, MB continued to receive and respond to periodic requests for audit response letters -- keyed to Refco's relevant reporting periods.

242.     As the disclosure process with the SEC moved forward, MB reviewed Refco's S-1 registration statements, including the final S-1 which failed to disclose (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down its debt to Refco at year-end and quarter-end financial reporting periods.

243.     On August 16, 2005 -- the day the IPO was completed -- MB issued an opinion letter in connection with preparation and filing of the S-1 that made limited representations similar to those it had made in its August 5, 2004 legal opinion included in the LBO Offering Circular. Even though the prospectus was misleading in substantially the same manner as its previous Offering Circular, MB apparently made no efforts to correct or bring those misrepresentations to the attention of Refco's innocent directors, officers and agents, including inside counsel and others.

244.     In late August 2005, after the IPO was completed, MB assisted Refco in engaging in yet another $420 million RTL designed to cover the existence of the RGHI Receivable.

*          *          *

245.     Given MB's awareness (a) of the massive RGHI Receivable; (b) that the RTLs were merely sham transactions designed to allow RGHI to temporarily pay down its obligation to Refco at each financial reporting period; (c) of Bennett's dual roles in the RTLs; (d) that the RTLs violated Refco's financing covenants; and (d) that Refco executives had an incentive to maximize Refco's annual profits and ultimate sale price, MB understood that the purpose of the RTLs was to hide the

RGHI Receivable from Refco's books in order to create a false impression of Refco's financial health and strength.

246.    MB also understood that Refco's continued operation, despite its massive losses, required a continuous infusion of cash. MB knew that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no segregation or net capital requirements. MB thus understood that Refco was diverting and consuming RCM customer-entrusted assets.

247.    MB further understood that the goal of both the RTLs and the theft of RCM customer funds was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model. MB understood that the ultimate purpose of this deception was to allow the Refco Insiders and others to cash-out their interests in Refco. By its actions, MB not only violated applicable ethical and disciplinary rules, it substantially assisted and participated in a scheme that ultimately cost RCM and RGL billions of dollars in losses. MB is liable for the damages that were incurred as a result of its malfeasance.

### E&Y's Role in the Fraudulent Scheme

248.    E&Y was aware of the activities alleged herein and/or consciously avoided knowledge of them. By its actions, E&Y actively participated in and substantially assisted the Refco Insiders and others acting in active concert or participation with them in carrying out the scheme detailed herein.

249.    E&Y began working for Refco around 1991 with the understanding that its client was RGHI and all of the subsidiaries below it, including RGL and Refco, Inc. (which became Refco, LLC). Initially, E&Y was retained to review tax returns and answer tax questions. In 1993 or 1994, E&Y began preparing tax returns and later helped with IRS audits as well as state and municipal tax audits. In 2001-2002, E&Y provided Bennett with tax advice and proposed structures through which a partial sale of Refco could be effectuated with favorable tax treatment. During this time period, E&Y also prepared tax returns for RGL and its subsidiaries and affiliates, including RGHI, through

71

the tax year 2002. E&Y and its affiliates continued to provide advice and services to Refco through as late as 2005, including preparing RGL's New York City tax returns.

250.     E&Y understood that the tax returns it was preparing for Refco were not only submitted to the IRS and state and local authorities, but would also be reviewed by innocent RGL directors, officers, and agents, and would be presented by Refco to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to sell their interests in Refco.

251.     E&Y was not simply a tax preparer for Refco. E&Y also repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and potential third-party investments involving Refco. E&Y thus actively assisted and enabled the Refco Insiders to monetize and cash-out their interests in Refco for far more than those interests were worth. Among the most significant transactions and issues on which E&Y assisted Refco were: (a) RGHI's 1997 conversion to an S corporation and the efforts to avoid "busting" the S election or triggering a "Built-in-Gain" tax; (b) planning which began in 1997 to take advantage of the Neiderhoffer Loss; (c) BAWAG's 1999 acquisition of a 10% interest in RGL; (d) the 2000 Minglewood transaction designed to avoid the need to write off a $6.3 million "bad debt"; (e) the 2001 conversion of RGL subsidiary Refco, Inc. from a C corporation to an LLC (Refco, LLC); (f) structuring and analyzing the tax consequences of plans for profits-only interests in RGL for certain Refco executives; (g) a 2001/2002 proposed acquisition by BAWAG of a controlling interest in RGL while minimizing or avoiding tax consequences to RGHI; and (h) a 2002 proposed BAWAG investment of hundreds of millions of dollars in RGL in three installments in exchange for BAWAG's right to "participate" in the proceeds of a sale of Refco.

252.     E&Y's assistance in facilitating the Refco Insiders' fraudulent scheme was also a two-way street. In 2000 and 2001, E&Y used Refco as a vehicle for a series of improper and fraudulent tax shelter transactions termed "Contingent Deferred Swaps" ("CDS"). These transactions were designed to create the illusion that the E&Y clients participating in the tax shelter

72

scheme were losing money in trading activities (*i.e.* suffering business expenses) that could then be charged against these customers' sizable taxable incomes. The success of these tax shelters depended on E&Y fooling the IRS into believing that E&Y's clients were actually engaging in legitimate currency trading. Refco provided E&Y with the vehicle through which it could create that illusion.

253. E&Y placed its clients' funds in Refco trading accounts and engaged in a high volume of short term-trades designed to create the illusion that the money was being traded and was subject to trading risk. In reality, the trades were designed to preserve the clients' capital so it could be returned to the client once the tax benefit -- *i.e.*, the fraudulent write offs -- had been obtained.

254. On May 22, 2007, four E&Y partners were indicted in connection with these CDS tax shelters. As the U.S. Senate's Permanent Subcommittee on Investigations noted in its reports on the Role of Professional Firms in the U.S. Tax Shelter Industry, E&Y enlisted a number of professional firms to help carry out CDS transactions "including investment firms, law firms, and . . . Refco Bank, who participated as the counter-parties for swaps . . . from 2000-2001."

255. As a result of E&Y's tax consulting, advice, and involvement in the Refco Insider's schemes and attempts to sell their interests in Refco, E&Y understood no later than 2001 that the Refco Insiders were seeking to achieve a lucrative cashing-out of their interests in Refco.

256. In mid-2001 through mid-2002, E&Y performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party. During the course of this work, Trosten asked E&Y to assume the existence of a receivable owed by RGHI to RGL in the amount of $720 million to $1 billion. E&Y's advice on this issue ultimately led Bennett to structure Refco's proposed July 2002 transaction with BAWAG as a Proceeds Participation Agreement in which a BAWAG affiliate made payments to Refco in exchange for the right to participate in the proceeds of a future sale of RGL. E&Y understood that certain senior Refco executives stood to profit directly and considerably by a sale of the company and had a corresponding incentive to manipulate Refco's financial statements and related disclosures in addition to its tax returns.

73

257.    Through rendering advice to Refco, E&Y also learned that the Refco Insiders, aided by GT and MB, were falsifying Refco's financial statements. In 1999, E&Y provided advice in connection with the structuring of BAWAG's purchase of a 10% interest in RGL. In connection with this process, E&Y reviewed and commented on the deal documents that MB drafted. An E&Y internal memorandum shows that E&Y disagreed with representations contained in these draft documents to the effect that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been repaid. In fact, the RGL financial statements were false because they did not disclose the RGHI Receivable being masked by the RTLs.

258.    Moreover, as a result of its work for Refco, E&Y was aware that the RGHI Receivable was not a bona fide debt, but was a sham, based on, among other things, the following:

- E&Y knew and/or consciously avoided knowing that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value, and that RGHI lacked the ability to pay off the RGHI Receivable;

- E&Y knew and/or consciously avoided knowing that Refco's officers were using the RGHI Receivable to intentionally manipulate Refco's balance sheet and operating results for the purpose of bolstering the financial appearance of the company;

- By as early as September 2001, E&Y understood the RGHI Receivable was approximately $720 million to $900 million and that these receivables were concealed on Refco's audited financial statements, as Refco posted a related-party receivable balance of only $219 million on its February 28, 2001 audited financial statements;

- E&Y knew and/or consciously avoided knowing that by September 2002 the Neiderhoffer Loss, which made up part of the RGHI Receivable, was entirely uncollectible because the debt had been settled and released in 1997;

- As early as February 2002, E&Y knew and/or consciously avoided knowing that the RTLs whereby Refco loaned funds to a third party, who in turn loaned the funds to RGHI to pay down the RGHI Receivable. E&Y also knew and/or consciously avoided knowing that these transactions occurred in late February and would be reversed in early March, straddling the end of Refco's financial reporting fiscal year;

- E&Y knew and/or consciously avoided knowing that at least one purpose of the RTLs was to improve Refco's balance sheet by concealing the fact that the RGHI Receivable was composed of trading losses and operating expenses that were inappropriately moved to RGHI for the sole purpose of overstating Refco's financial position and operating results; and

- E&Y knew and/or consciously avoided knowing that Refco's income for tax reporting purposes was inaccurate and that correspondingly the income or loss of RGHI for tax reporting purposes was also inaccurate.

259.   Based on E&Y's knowledge of the Refco fraud, the senior E&Y advisor on the Refco engagement decided in late 2003 that E&Y should resign from its engagement with Refco. Nevertheless, E&Y continued to work for Refco through as late as 2005, several months after the LBO, and carried out its withdrawal from Refco assignments in such a way as to allow the fraudulent scheme to continue.

**Knowledge of Refco's Trading Losses and Balance Sheet Problems**

260.   As early as 1998, E&Y was aware of a related-party receivable owed by RGHI to Refco that was created when RGHI purchased "bad debt receivables" for full face value from Refco. E&Y was also aware that this receivable had been sitting on RGL's books accruing interest "for years" while a corresponding payable grew on RGHI's books.

261.   In particular, E&Y was aware that one component of the RGHI Receivable was the Neiderhoffer Loss involving a $71 million "bad debt" "purchased" by an RGHI subsidiary, Wells, Ltd., at face value -- a price that vastly exceeded fair market value. By at least September 2002, and likely much earlier, E&Y knew and/or consciously avoided knowing that the Neiderhoffer Loss was completely uncollectible from Neiderhoffer because there had been a settlement and release in 1997 between Neiderhoffer and Refco, Inc. pertaining to the losses.  In addition, numerous E&Y documents discuss the "Wells losses," which pertain to losses of approximately $50 million on Russian Securities involving the same wholly owned subsidiary of RGHI (Wells, Ltd.) which purchased the Neiderhoffer Loss.  E&Y documents show that E&Y understood these losses also formed part of the RGHI Receivable.

262.   E&Y also knew and/or consciously avoided knowing that Bennett had a practice of allocating vaguely described expenses -- often listed as IT and computer expenses -- to RGHI, but having RGL actually pay the expense and then book them as part of the RGHI Receivable.

263.   E&Y clearly understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL.  In an email dated August 8, 2001, an E&Y partner observed that a

write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were "protected and buffered" by RGHI. This email demonstrates that E&Y knew that the RGHI Receivable was being maintained, not because it was legitimate debt, but because elimination of the receivable would destroy RGL's appearance of profitability.

264.    In addition, E&Y was fully aware that the RGHI Receivable was a sham based on the following evidence:

- E&Y never saw a written agreement evidencing the RGHI debt, never knew the terms and conditions of the debt or its repayment schedule, and never knew of any valuable consideration for the debt;

- E&Y never received a requested confirmation directly from Refco's counsel that the debt was valid;

- Other than the sham RTLs, RGHI never made a payment to service or pay down its debt during E&Y's engagement;

- RGHI never made interest payments on its debt and instead simply added accrued interest to the outstanding receivable balance; and

- RGHI never expressed an intention to repay the debt and, never could repay the debt, because, as E&Y knew, RGHI was "basically insolvent."

**The RTL Transactions**

265.    In approximately September 2001, E&Y discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements. While the financial statements reported a related-party receivables of approximately $219 million, the RGHI Receivable was in the range of at least $700 to $900 million. When E&Y asked a Refco officer about the discrepancy, E&Y was told directly that Refco utilized the RTLs at fiscal year end in order to "clean up" the balance sheet and, for that reason, the related-party receivable balances did not appear on RGL's financial statements.

266.    E&Y has admitted to the Examiner that by no later than February 28, 2002, it knew that at the end of every Refco's fiscal year, RGHI would borrow funds from a third party to pay down the RGHI Receivable and the transaction would be reversed a few days later.

267.    E&Y also knew and/or consciously avoided knowing that the source of the third-party funds in these annual fraudulent transactions was actually RCM. Several E&Y documents refer to

"circular flows of cash" in the context of discussions of pay down of the RGHI Receivable at fiscal year-end. For example, a November 6, 1997, E&Y handwritten memo regarding the Neiderhoffer Loss (which E&Y knew to be part of the RGHI Receivable) states, in part, "Did RCM advance funds. Circular flow of cash." The handwritten notes of an E&Y partner dated March 4, 2002, contains the phrases "borrowed cash from RGL," "third-party customer," and "Neiderhoffer." In other words, the third-party customer had actually borrowed funds from RGL (via its subsidiary, RCM) to in turn loan to RGHI to hide the RGHI Receivable, which was partly composed of the Neiderhoffer Loss. These notes demonstrate that E&Y understood that a Refco entity was likely the source of the money which RGHI was using to temporarily pay down its receivable.

### Maintaining the Fraudulent Business Model

268.    E&Y's own documents demonstrate that as early as 1997, E&Y had significant concerns about potential fraud at Refco and E&Y's own potential liability arising out of its involvement with Refco. Yet E&Y did nothing to address these concerns, and instead chose to assist Refco in perpetuating the fraud.

269.    For example, in November 1997, Kurt Neidhardt, the E&Y partner handling the Refco engagement, was concerned about how Refco had treated the Neiderhoffer Loss. Concerned that E&Y could be viewed as "being an accessory to some type of fraud," Neidhardt met with the head of E&Y's Financial Services Department, Jerry Goldman. Incredibly, instead of advising Neidhardt to alert the innocent directors and officers of RGL to this obvious accounting fraud and instead of demanding that E&Y withdraw from representing Refco, Goldman informed Neidhardt that so long as E&Y prepared Refco's tax returns correctly and never gave Refco any accounting advice, E&Y should not be concerned. This cavalier attitude towards Refco's fraud would be shocking enough from one of the world's largest accounting firms. But even more egregious was the fact that E&Y was not preparing Refco's tax returns correctly. As discussed below, the RGL tax returns E&Y prepared were inaccurately reporting interest income that was not being paid and that E&Y knew RGHI did not have the wherewithal to pay, and were shown as erroneous and inflated income on RGL's tax reporting documents.

270.    E&Y continued to have concerns about Refco, specifically about Refco's use of the sham RGHI Receivable to hide losses and other expenses. In the years 2001 through 2003, E&Y sent Refco a letter asking Refco to provide, *inter alia*: (a) a representation from Refco's legal counsel that the related-party receivable payable from RGHI to RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI"; and (c) an analysis of related-party accounts. Despite these requests, E&Y never received a written or verbal representation directly from Refco's legal counsel that the related-party payable was a legally enforceable obligation. Instead, E&Y accepted a representation from a Refco officer to that effect without demanding anything further. In addition, E&Y never received the requested schedule of expenses or analysis of related-party accounts. Despite Refco management having ignored E&Y's request, E&Y took no action and continued to prepare for filing and distribution false and misleading tax returns and supporting tax documents that E&Y knew and/or consciously avoided knowing included a huge uncollectible related-party receivable.

271.    On July 8, 2002, Neidhardt met with the number two partner in E&Y's tax department, Mike Kelley, to discuss E&Y's knowledge that RGHI (which E&Y also prepared the tax returns for and knew was unaudited) owed RGL a payable of $750 million, that RGL's audited financial statements reflected a related-party receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable just before fiscal year-end and reinstate it just afterwards so that only $225 million would be reflected on RGL's audited financial statements. Echoing Goldman's earlier outrageous (and erroneous) reaction, Kelley concluded that this was not a tax return issue, despite the obvious manipulation of the audited financial statements. E&Y did not, however, request further information from Refco or its auditors. E&Y simply continued to prepare false tax returns for Refco based on inflated operating results, and continued to provide the Refco Insiders with tax advice regarding their exit strategies.

272.    On January 16, 2003, Neidhardt met again with Kelley to discuss concerns over Refco. This time, Neidhardt described another RGHI transaction in which a third party would allow RGHI to pay down the RGHI Receivable at fiscal year-end in a manner that would hide the related-

party nature of the receivable and improve the balance sheet without disclosing why the balance sheet improved. Once again, the number two partner in E&Y's tax department chose to ignore this obviously fraudulent manipulation of Refco's audited balance sheet because he believed that as long as E&Y got Refco's tax returns correct (which E&Y didn't), the fraud was not E&Y's concern.

273.    In or about November 2003, E&Y purported to resign from the Refco engagement based in large part on its concerns over potential liability for aiding and abetting the Refco fraud as a result of its knowledge of the massive RGHI Receivable and the fiscal year-end paydown and reinstatement of the RGHI Receivable.

274.    But E&Y did not really resign. Though E&Y did not prepare Refco's federal 2003 tax returns, E&Y continued to perform tax services for Refco through at least 2005, preparing, among other things, misleading and false New York City tax returns for RGL. Moreover, despite its concerns, E&Y did not tell Refco's subsequent tax accountants (or anyone else) the true reasons for its decision to resign or the concerns it had about Refco.

275.    E&Y continued to be nervous about its relationship with Refco even after December 2004. In October 2005, Rory Alex, an E&Y accountant who did not work on the prior Refco engagement, sent Neidhardt an email asking about the possibility of doing work for RGL. The next day, Neidhardt sent an email to another E&Y tax partner who had worked on the Refco account previously, saying "we need to be very careful here. I left [Rory Alex] all my numbers . . . anything [sic] we tell him must be strictly confidential. I may have Nancy Altobello shut him down."

276.    E&Y was clearly aware that the RGHI Receivable was a sham transaction and that it was not a bona fide debt on which interest income could properly accrue for tax purposes. Accordingly, the RGL tax returns reflected interest income associated with the RGHI Receivable that E&Y knew and/or consciously avoided knowing was partially or entirely inaccurate. E&Y also knew and/or consciously avoided knowing that the RGL tax return balance sheets (Schedule L) included as assets the RGHI Receivable. Thus, the Schedules showed an erroneous and inflated income for tax reporting purposes by RGL. These falsehoods substantially assisted the Refco Insiders' efforts to create the illusion that Refco was profitable and financially healthy.

277.    E&Y substantially assisted the Refco Insiders' fraud by preparing and filing tax returns that E&Y knew and/or consciously avoided knowing were inaccurate or false, but that E&Y knew would be reviewed by RGL's innocent directors, officers and agents and presented to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to get financing for Refco and, ultimately, to facilitate a lucrative cashing out of their interests in Refco.

278.    E&Y also actively assisted Refco in hiding its bad debts.  As discussed above, in late 1999 and early 2000, Refco entered into the Minglewood joint venture to avoid having to write off the Deere Park Debit Balance.  E&Y substantially assisted Refco with this goal by devising the structure of the Minglewood transaction, a structure that allowed Refco to keep the Deere Park Debit Balance off its financial statements.

279.    E&Y also understood that Refco's continued operation, despite the massive losses reflected in the RGHI Receivable, required a continuous infusion of cash.  E&Y knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no net capital requirements.  E&Y thus understood that Refco was consuming RCM customer funds.

280.    E&Y further understood that the goal of both the RTLs and the theft of RCM customer funds and the hiding of losses was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model.  E&Y understood that the ultimate purpose of this deception was to allow the Refco Insiders to cash-out their interests in Refco at an inflated value.  By its actions, E&Y substantially assisted and participated in a scheme that ultimately caused RGL and RCM to incur billions of dollars in damages.  E&Y is liable for the damages that were incurred as a result of its malfeasance.

## PwC's Role in the Fraudulent Scheme

281.    PwC was aware of the activities alleged herein and/or consciously avoided knowledge of them. By its actions, PwC actively participated in and substantially assisted the Refco Insiders in carrying out the scheme detailed herein.

282.    PwC was engaged by Refco to provide advisory services in connection with the LBO and IPO.

283.    On May 5, 2004, PwC was engaged by RGL in connection with the LBO bond offering to provide advisory services, including (a) helping Refco to plan and prepare for the LBO, and (b) advising Refco with "accounting and financial reporting matters" relevant to the offering, including the contents of the offering documents.

284.    On June 7, 2004, PwC's engagement was broadened to include analyzing the planned LBO by performing a Transaction Costs Analysis intended to optimize the tax treatment of professional fees (accounting, financial, legal, etc.) associated with the LBO. As part of that analysis, PwC was authorized to conduct "interviews with the outside service providers," as well as "internal personnel involved in the transactions."

285.    After the LBO, to help prepare Refco for the IPO, PwC's engagement was broadened to cover two additional areas. On September 28, 2004, PwC's role was broadened to include "advice and assistance related to the accounting and financial reporting matters for the quarter ended August 31, 2004." On November 10, 2004, PwC's engagement was further extended to helping "improve bottom line performance" by proposing alterations to Refco's "commissions and payouts" in numerous lines of business, including FX and prime brokerage services.

286.    In response to the disclosure that there were accounting control deficiencies at Refco, PwC also became the *de facto* chief accounting officer for Refco and was charged with "assisting in the initial planning and staffing of audits" and implementing improved accounting controls.

287.    Furthermore, on March 8, 2005, PwC was engaged by RGL to provide an assortment of services in connection with Refco's preparation of the Form S-1, including (a) assistance in drafting and reviewing the Form S-1, (b) "consultation on disclosures within the Form S-1 and the

Company's financial statements," (c) providing Refco's "management" with support in preparing any "Underwriters' comfort letter," and (d) assisting Refco with draft responses to SEC comments.

288.    PwC was also engaged by RGL in the summer of 2004 to provide tax consulting services and on April 1, 2005, was engaged to prepare Refco's 2004 state and federal tax returns. Notably, given all the business it was receiving from Refco, PwC offered those services to Refco at "a discount of 30% off of our customary market rates."

289.    As a result of these various auditing, advisory, and tax services and the unfettered access PwC had to Refco personnel and accounting systems, PwC was in a unique position and became aware of the fraudulent scheme of the Refco Insiders, and more specifically, the RGHI Receivable, the RTLs, the use of RCM customer assets to fund Refco, and the inappropriateness of the LBO and IPO in light of Refco's true financial condition.

290.    Through its provision of various auditing, advisory, and tax services, PwC substantially assisted in the fraud alleged herein. Without these services, Refco's true financial condition would have come to light long before the fraudulent scheme had been completed, and before the Refco Insiders, and others, could have saddled RGL with $1.4 billion in unnecessary LBO debt and allowed the Refco Insiders to strip out RGL's assets.

**Knowledge of the RTLs and Refco's Balance Sheet Problems**

291.    Through the due diligence undertaken as Refco's principal advisor concerning accounting and financial reporting in connection with the LBO and the IPO, and its role as the *de facto* chief accounting officer for Refco, PwC learned of and/or consciously avoided knowledge of the existence of both the RGHI Receivable and the RTLs.

292.    Indeed, an email exchange between PwC and Victor Zarate, Assistant Controller of New Refco Group Ltd., LLC ("New Refco Group") establishes that PwC was fully aware of the wire transfer RTLs in which BAWAG served as the conduit.

293.    On November 22, 2004, Zarate sent Henri Steenkamp, manager of Global Capital Markets at PwC, a schedule of the BAWAG round trip loans, referred to as "BAWAG deposits." The schedule listed the exact sum of money Refco deposited in BAWAG to fund the fraudulent wire

transfer RTLs. The "deposits" were each made at the end of Refco's fiscal year -- *i.e.*, the last day of February -- for the years 2001, 2002, 2003 and 2004 and also, around the time of the LBO, in July and August of 2004.

294.    Evidencing that PwC understood that these "deposits" related to improper RTLs, PwC responded to the Zarate email listing the BAWAG deposits by asking for "the RGHI loan balances as well for th[ose] periods . . . ."

295.    Given PwC's knowledge and familiarity with Refco's financial reporting periods, PwC accordingly knew and/or consciously avoided knowing that at the end of each annual reporting period, and just before the LBO, Refco was "depositing" money with BAWAG and that, concurrently, the RGHI Receivable was being reduced by a like amount.

296.    As Refco's principal advisor on accounting and financial reporting matters in connection with the LBO and the IPO, PwC knew and/or consciously avoided knowing that there was no legitimate business purpose for these wire transfer RTLs, except to conceal the RGHI Receivable before the end of each relevant reporting or audit period.

297.    As Refco's 2004 tax year preparer, PwC also carefully reviewed Refco's prior tax returns and Refco's financial statement as of each annual, not fiscal, year-end. As the RTLs were used to conceal the RGHI Receivable in fiscal year reporting and audit periods, PwC discovered and/or consciously avoided knowledge of the full extent of the RGHI Receivable.

298.    Furthermore, because PwC knew the wire transfer RTLs reduced the RGHI Receivable balance, it also knew that the $105 million receivable from RGHI disclosed on Refco's financial statements did not reflect the full amount of the related-party receivable owed by RGHI to Refco.

299.    If PwC had fulfilled its professional obligations, it would have investigated the wire transfer RTLs and the RGHI Receivable, uncovered the full scope and nature of both the RGHI Receivable and the RTLs, and advised Refco's innocent directors, officers, agents, and others of the Refco Insiders' fraudulent scheme. Instead, PwC chose to substantially assist the Refco Insiders in their fraudulent scheme.

300.    Despite the fact that PwC knew and/or consciously avoided knowing that the Refco Insiders were concealing the full amount of the RGHI Receivable, PwC actively assisted the Refco Insiders in mischaracterizing the $105 million receivable from RGHI that was, in fact, disclosed.

301.    PwC knew and/or consciously avoided knowing that the Refco Insiders routinely referred to intercompany and related-party obligations as receivables and payables owed to and from "customers." As PwC knew, given its understanding of Refco's operations and accounting, the reason the Refco Insiders sought to mischaracterize intercompany and related-party transactions as "customer" activity was to obfuscate and conceal improper intercompany and related-party transactions from Refco's innocent directors, officers, agents and others, and from regulators and the investing public.

302.    Nonetheless, in its role as Refco's principal adviser in connection with accounting and financial reporting matters, PwC prepared and/or reviewed and commented on Refco's initial S-4 registration statement which mischaracterized the $105 million receivable from RGHI as a "customer receivable." It was this misleading language in the S-4 that prompted the SEC to question why related-party transactions with equity members should be booked as receivables from "customers." While the SEC forced the Refco Insiders to change the S-4 registration statement to reflect that the receivables were due from "equity members," the final S-4 did not disclose the wire transfer RTLs, that part of the receivable owed by RGHI was concealed by these RTLs and that the $105 million was only a portion of the overall amount owed by RGHI to Refco.

303.    Furthermore, PwC chose not to disclose any portion of the RGHI Receivable in the S-1 registration statement prepared and filed with the SEC in connection with Refco's IPO. While early drafts of the S-1 included the $105 million related-party receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable despite the fact that PwC, even knowing about the wire transfer RTLs, did not receive, or seek, any confirmation that the $105 million receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other material related-party receivables due from RGHI and others.

84

304.    Similarly, in connection with commenting on the consolidated financial statements that would be attached to the offering prospectus, it was PwC that edited Note K-Related Party Transactions and characterized the $105 million receivable from RGHI as a receivable "from customers." PwC, thus, intentionally sought to conceal the related-party nature of even the small amount of the receivable from RGHI that was being disclosed by the Refco Insiders.

**PwC's Awareness of the Looting of RCM Assets**

305.    PwC also knew and/or consciously avoided knowing that Refco was looting RCM's customer assets in order to satisfy Refco's substantial working capital needs and to create the perception that Refco was an appropriate candidate for the LBO and IPO.

306.    Indeed, the fraudulent scheme perpetrated on RCM was so fundamental to the operation and financing of Refco that it had to have been apparent to PwC. The volume and size of the transfers, involving, on many occasions, hundreds of millions of dollars each, ensured that the amount of RCM funds that were "loaned" to other entities substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible transfers totaled $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

307.    Furthermore, PwC was responsible for assisting Refco with the LBO offering materials, the IPO offering materials and the financial reports and registration statements that had to be prepared and filed in connection with both the LBO and the IPO, including the S-1 and the S-4 registration statements. PwC was thus fully familiar with and helped prepare and/or received and commented on the "payable to customers" condensed consolidated financial information.

308.    Based on PwC's involvement in preparing and/or reviewing and commenting on these condensed consolidated financial statements, PwC knew that the "payable to customer" line item referred to intercompany loans and that there was approximately $2 billion payable owed by RGL and its affiliates to RCM as of the time of the LBO and that these amounts were not repaid in the LBO.

309.    Indeed, one of PwC's comments to Refco's consolidated financial statements was to eliminate from the Summary of Significant Accounting Policies (Note B) -- Receivable From And Payable To Brokers, Dealers and Customers and move to Related Party Transactions (Note K) the following language: "In the normal course of business, a member of the Group engages in customer-related activities which result in receivable from or *payable to customer balances*, which change daily." (Emphasis added).  The only reason PwC would have moved this language to the related-party section of the financials is because PwC understood that these "payables to customer balances" referenced RCM customer assets that were being siphoned to fund the operations of other Refco related entities.

310.    As PwC knew and/or consciously avoided knowing, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the incurrence (in order to pay the Refco Insiders) of $1.4 billion of debt by RGL and RCC in the LBO would have a devastating impact on RCM.

311.    Underscoring PwC's willingness to blindly follow the Refco Insiders at the expense of adhering to their professional standards, on October 12, 2005, two days after the RGHI Receivable had been publicly disclosed, PwC agreed to allocate BAWAG's 10% distributive share of RGL's 2004 income to RGHI based on Bennett's oral representation that the BAWAG affiliate that held a 10% interest in RGHI had merged into RGHI.  Even a minimal investigation, however, would have caused PwC to conclude that the merger of this BAWAG affiliate into RGHI occurred on August 5, 2004, eight months into the tax year, making redistribution of BAWAG's 10% share for the entire tax year inappropriate.

312.    By relying on the oral instructions of Bennett, who was on indefinite leave at the time, without undertaking any investigation of its own, PwC failed to live up to its standards of professional conduct.

### The Investment Banker Defendants' Role in the Fraudulent Scheme

313.    Each of the Investment Banker Defendants knew and/or consciously avoided knowing that a broker-dealer such as Refco was an inappropriate candidate for a leveraged buy-out.

86

Based on their experience and expertise, they knew and/or consciously avoided knowing that leveraged buy-outs required real cash flows to service such a large amount of debt, and that broker-dealers such as Refco typically did not have sufficient unencumbered cash flows of their own to service such debt loads. However, as they understood that the LBO was to be followed by a near-term IPO and that the LBO was an important first step toward the lucrative cashing-out desired by the Refco Insiders, they ignored their concerns.

314.  Moreover, the Investment Banker Defendants quickly recognized that they could use the RCM funds being siphoned by the Refco Insiders as a proxy for the cash flows Refco lacked that the Investment Banker Defendants would need to successfully pitch the LBO.

315.  Tellingly, none of the Investment Banker Defendants was comfortable putting its own money into the LBO, and at least one of the Investment Banker Defendant's internal credit departments denied approvals to do the same. It was only after senior executives at the Investment Banker Defendants overrode these denials and concerns based on the fees that could be earned, the opportunity to do a deal with THL and Refco, and the small amount of investment (in exchange for sizeable fees) that would be required by the Investment Banker Defendants themselves, that they agreed to facilitate the deal.

316.  As the Investment Banker Defendants conducted due diligence to justify the LBO, they strived for ways to show that Refco had free cash flow that could be used to service the LBO debt. Yet they discovered that (i) they could not recreate management's projected free cash flows, (ii) they could not rely on cash distributions from the regulated subsidiaries, and (iii) fortunately for them, Refco had been and would continue to make RCM's customer assets available to RGL and its affiliates. Although they knew and/or consciously avoided knowing that a credit risk like Refco was not a good target for leverage, they were comfortable proceeding because of the ready availability of RCM's cash.

317.  The Investment Banker Defendants irreparably damaged RCM by arranging $1.4 billion of LBO financing that "primed" RCM's pre-existing receivables due from RGL and the guarantors on the LBO debt. And despite the fact that they found management, and particularly the

CFO, to not be credible, they blindly accepted management's patently unreasonable projections to service the LBO debt -- projections which never even took into account the $2 billion owed to RCM.

**Knowledge of the Looting of RCM Assets**

318.    In the due diligence undertaken in connection with the LBO, the Investment Banker Defendants learned that Refco was funding its operations with RCM customer assets, that RCM held between $1 and $2 billion in worthless intercompany IOUs, and that the LBO would altogether foreclose the Refco affiliates' ability to pay down their debt to RCM.

319.    Indeed, Deutsche's Credit Risk Management committee (the "CRM") initially rejected Deutsche's participation in the LBO precisely because it recognized that that an entity whose assets Refco was not segregating, such as RCM, might have its assets siphoned out through intercompany loans that the Refco regulated entities would be unable to pay back. As the CRM observed in a May 12, 2004 memo initially rejecting Deutsche's involvement in the LBO, "there are constant inter-company receivables/payables which can obscure the true capital position of any particular entity. This type of liquidity deployment is of particular concern when the receivable is from a regulated subsidiary. Should [Refco] enter into financial difficulty, regulators would not allow payment of these inter-company receivables which would adversely impact debt service anticipated from the unregulated subsidiary."

320.    Regardless of their concerns, as soon as BAS and Deutsche were offered the prospect of earning lucrative fees in the LBO and IPO, their concerns disappeared. Instead of critical skepticism and full disclosure to Refco's innocent directors, officers and agents of their concerns, the Investment Banker Defendants each jockeyed for a lead position on both the LBO and IPO, substantially assisting the Refco Insiders in stripping out Refco's assets and leaving RCM with over $2 billion in uncollectible IOUs.

321.    The Investment Banker Defendants were always more concerned about upsetting management than they were about the potential harm that might befall pre-existing creditors (like RCM) who would be devastated by layering $1.4 billion of "senior" debt onto Refco. Each of the Investment Banker Defendants instead remained completely focused on securing a lead role and the

related fees in the transaction and even when they had concerns about Refco's financial condition, as one Investment Banker Defendant internally noted, the strategy always was to "keep the list [of due diligence] very short," as "[w]e didn't want to frighten management with a 4-page list."

322.    As early as May 2004, senior BAS employees were questioning "how Refco use[d] its capital and how the company's net capital change[d] from period to period." After undertaking a review of RGL's intercompany receivables and obtaining a schedule from Trosten, BAS concluded that it "need[ed] more information to be able to answer what Refco is doing with their capital and why."

323.    Before the LBO closed, employees for the Investment Banker Defendants continued to question how "money flow[ed] into and out of the regulated entities" and the magnitude of "affiliate loans to regulated entities . . . ." BAS employees, for example, sought an "[e]xplanation of capital flows over . . . eight quarters between regulated and non-regulated entities. What is the driver of capital movements and where is capital being used (besides what is in the regulated entity) and for what purpose?" And in connection with determining how Bennett could legitimately request a pre-closing dividend of $500 million from Refco, BAS senior executive William Coupe noted that "[e]xcess capital to pay $500 MM pre-closing dividend also resides outside the regulated entities and consolidates up through Refco Capital Holdings, LLC." Given BAS's particularized knowledge of Refco's corporate structure, BAS knew and/or consciously avoided knowing that RCM was the purportedly unregulated subsidiary that consolidates up through Refco Capital Holdings, LLC, whose money was constantly being used by the holding company.

324.    Indeed, the Investment Banker Defendants were keenly aware of the difference between how Refco used cash at RCM and its regulated subsidiaries. They knew that SEC regulations limited the cash that Refco could have moved from its regulated operations and that Refco had to be drawing on customer assets from Refco's other operations -- namely, RCM -- to cover its operational expenses. Yet they did not consider how and when RCM's IOUs would ever be repaid given that the Investment Banker Defendants were subordinating those IOUs to $1.4 billion in additional LBO debt. Indeed, none of the projections used by the Investment Banker Defendants

even factored this into the cash needs of Refco's LBO debt parties -- despite the fact that RCM's primary receivables came from RGL and RCC, both of which were guarantors on the LBO debt.

325.    As the Investment Banker Defendants knew, to make the LBO work, the Refco Insiders had to draw on RCM money to fund Refco's operations because the "Customer Segregated Funds" in the regulated entities were off limits and had to be accounted for separately on Refco's balance sheet. Indeed, in response to inquiries as to why certain customer assets were not being used to "pay down debt," one senior Credit Suisse executive explained that it is "[b]ecause it is restricted customer cash that must be held for regulatory purposes ie it is not the company's cash." In stark contrast, the Investment Banker Defendants were elated that Refco Insiders did not restrict access to and regularly drew on RCM customer funds that could be used to pay down Refco's LBO debt. As one BAS employee proclaimed in an email, "FYI . . . looks like Refco Capital Markets isn't regulated . . . that's good for us!"

326.    In reviewing and commenting on the condensed financial information attached to the LBO offering prospectus, the S-4, the S-1, and the IPO prospectus, the Investment Banker Defendants understood that at the time of the LBO there were over a billion dollars in payables owed to RCM by RGL and other guarantors on the LBO debt and that as of the IPO, the siphoned amount had climbed to over $2 billion.

327.    As the Investment Banker Defendants recognized, given their detailed knowledge of the Company, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the assumption (in order to pay the Refco Insiders) of $1.4 billion of new debt by RGL and RCC would have a devastating impact on RCM. Indeed, the Investment Banker Defendants understood, as referenced in their own documents, that "payables to customers" constituted "obligations of Refco subsidiaries to repay client monies" and that, therefore, the intercompany loans made by RCM to RGL and its affiliates were comprised of RCM customer funds.

328.    The fraudulent scheme perpetrated on RCM was fundamental to the operation and financing of Refco and each of the Investment Banker Defendants was fully aware and/or