consciously avoided knowing that the LBO and IPO only worked by robbing RCM and leaving its receivables unpaid and unrecoverable.

329.    Indeed, as the Investment Banker Defendants knew and/or consciously avoided knowing, the amounts stolen from RCM substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, RCM's net uncollectible receivables totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. As the Investment Banker Defendants knew, and as their own projections showed, there was no cash to pay down the receivable to RCM and even Refco's projected "goodwill," which was entirely illusory given the Refco Insiders' fraud, was insufficient to meet RGL and its affiliates' obligations to RCM.

**The Investment Banker Defendants' Motivations**

330.    Despite this knowledge, the Investment Banker Defendants, preoccupied with the lucrative fees they expected to make on the LBO and IPO, prepared the offering documents needed to facilitate the LBO and did not focus on the propriety of the LBO for either RCM or RGL. For example, on May 4, 2004 Michael Paasche, a Deutsche banker, pleaded with a senior Deutsche executive to override the CRM's rejection of the Refco LBO transaction as too risky (first emphasis in original):

> Preliminary feedback from credit suggests we will have an important transaction for TH Lee DECLINED by crm middle of this week.  We need your help in preparing to appeal that decision . . . .
>
> * * *
> So in broad summary, we anticipate being one of three banks providing committing to the term loan conditioned upon successfully placing $600 mm of bonds on a best efforts basis. In other words, after successful placement of the bonds, a max underwrite to DB of $250 mm of B loan with a hold target of zero and a take and hold of $25 mm on the revolver. **The ultimate hold of $25 mm compares very favorably with expected fees of about $10 mm.** Furthermore, the bank debt is a very acceptable 35% of total purchase price protected by substantial amounts of equity and sub debt.
>
> Unfortunately, it looks like we will get a DECLINE from credit on the grounds that **levering FIG [financial institutions group] counterparties isn't good due to the potential for "double leverage"** and the difficulty in collecting payments from a regulated entity to pay interest and amortize debt in periods of market declines. . . .

I think the structure is responsive to the concerns of credit but as no one has levered a transaction like this, its not easy for CRM to signoff. Furthermore, *the hold of $25 mm is very attractive for a deal of this size and in light of the $10 mm fee potential.* . . .

331.    Indeed, Mr. Paasche was correct in thinking Deutsche's CRM group would reject the risky Refco deal. On May 11, 2004, Anne Binstock of Deutsche's CRM group stated: "Given the politics and fees, I suppose it is appropriate to provide the business [group] a hearing on this. They do know that I cannot get there on this name/this risk." In response, Lothar Weber of Deutsche noted CRM's decision must stand although it may be overturned for business reasons: "I suggest that this be elevated to Michael Cohrs/ExCo directly for a business decision. Paasche has had intensive discussions with Cohrs and he seems to be supportive on business reason, i.e. *limited risk (hold)/high reward.*" (emphasis added). He further stated, however, that "A point to mention is the Refco (past) reputation and the related reputational risk DB is taking."

332.    On July 22, 2004, Refco Finance Holdings LLC and Refco Finance Inc. issued a Offering Circular regarding the $600 million of senior subordinated notes, with Credit Suisse, BAS, and Deutsche as "joint book-running managers." Thus, the Investment Banker Defendants overcame their credit concerns about Refco motivated by the lucrative fees and opportunity to get close to THL and Refco for future business, including the IPO.

**Investment Bankers' Use of Patently Unreasonable Projections**

333.    The Investment Banker Defendants never trusted the Refco Insiders. Indeed, one BAS employee noted in an email dated April 23, 2004, that he could not "look at the cfo [Trosten] without thinking of [john] lovitz and his pathological liar routine on [Saturday Night Live]." Nevertheless, the Investment Banker Defendants were all too willing to adopt and use patently unreasonable projections prepared by management in arranging and facilitating the LBO and IPO. Vikrant Sawhney of Deutsche advised others internally by email that "[i]n terms of projections, *THL thinks we should take the mgmt projections that were recently distributed at more or less face value.* Though they acknowledge 15% top-line growth long-term is difficult, they believe s/b in the bag (higher) for next 2-3 years, just based on secular trends. Certainly *we should address the challenge of being able to convince the street of our ability to hit these #s, but we don't want to*

*undersell ourselves on valuation etc b/c we have too much knowledge.*" (emphasis added). None of the projections used by the Investment Banker Defendants included any repayment of RCM's pre-existing receivables. The Investment Banker Defendants who had been studying Refco's cash-flows knew and/or consciously avoided knowing that significant cash was historically taken and could still be taken from RCM, and yet never took into account how the $1.4 billion of additional leverage on Refco or the payout of RGL's assets to the Refco Insiders would impact RCM's ability to be repaid. Unlike a properly executed leveraged buy-out, the Investment Banker Defendants knowingly left behind over a billion dollars of unpaid debts owed to RCM.

**Impact on RCM was Actively Concealed by Investment Banker Defendants**

334.    The April 16, 2004 letter of intent regarding the LBO sent to Refco expressly advised the company that all debt would be paid down in the LBO except "secured" financing used for customer related activity:

> "Our proposal is for a debt-free Company. Accordingly, we would expect that the Sellers would fund from their cash proceeds (or cause the Company to fund at Closing with a concomitant reduction in cash proceeds paid to the Sellers) all of the Company's indebtedness for borrowed money . . . . We understand that the *secured* financing (if any) used principally for customer related activity in the ordinary course of business will not be repaid." (emphasis added)

335.    Similarly, the LBO Offering Circular falsely states that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." This was, simply, not true. As the Investment Banker Defendants knew, the LBO layered on $1.4 billion in debt that would have to be paid off before RCM's intercompany loans could be paid. Nowhere did the Offering Circular explain that the RCM assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and RCC – two of the entities obligated to repay the LBO borrowings; and that the LBO transactions resulted in "priming" these receivables with $1.4 billion of third-party bank and bond debt without regard for the interests of RCM.

336.    Knowing full well the size of RCM's IOUs, the Investment Banker Defendants ensured that repayment of these receivables would be subordinated to the new LBO debt. Despite the statements in the Offering Circular to the effect that RCM would not be harmed by the LBO, Section 7.03 of the Credit Agreement dated as of August 5, 2004, states that if Refco incurs "Indebtedness" that constitutes an "Investment" (which is defined to include an intercompany payable), then "all such Indebtedness" by any Refco entity obligated to repay the bank debt owing to a Refco entity that is not obligated (*i.e.*, RCM) "must be expressly subordinated to the Obligations" to repay the bank debt. In other words, the Investment Banker Defendants knew and/or consciously avoided knowing that the borrower and guarantors on the LBO bank debt were also obligated to pay RCM back for the use of RCM's cash, but *they insisted that RCM's right to be repaid must be subordinated to their right to repayment.*

337.    Similarly, Section 4.04(b)(15) of the bond debt Indenture allowed RGL and the guarantor subsidiaries to repay "intercompany Indebtedness . . . *provided that no Default has occurred and is continuing or would result therefrom.*" (emphasis added.)   Thus, as long as the LBO bond debt was not in default, RGL and RCC could – although they were not required to do so and arguably were precluded from doing so by the bank debt subordination requirements – repay the billions of dollars owed to RCM. But if ever the bond debt were in trouble, RCM's right to be repaid would be trumped by the LBO debt, which is what ultimately happened following Refco's bankruptcy.

338.    Pursuant to a July 22, 2004, purchase agreement, Credit Suisse (as representative of itself, BAS, and Deutsche) agreed that the three Investment Banker Defendants would severally purchase – at 97.5% of the principal amount of the notes – the $600 million of senior subordinated notes. Credit Suisse agreed to purchase $270 million (or 45%) of the notes, and BAS and Deutsche Bank each agreed to purchase $165 million (or 27.5% each) of the notes. As the Notes were issued pursuant to SEC Rule 144A, they did not have to be registered.

339.    Nonetheless, Refco Finance Holdings LLC and Refco Finance Inc. agreed to file a registration statement with the SEC and then to conduct an "Exxon Capital exchange" of registered

notes for the Rule 144A Notes so that the Investment Banker Defendants would be permitted to resell the Refco notes to others, thereby consummating their low-risk-high-reward strategy for the LBO financing by dumping the notes and just holding a small portion of the even more senior bank debt. Credit Suisse took the lead in drafting the risk factors for the SEC filings that facilitated the resale of the LBO notes and the subsequent IPO.

**The Harm of the IPO to Refco Inc.**

340.    The IPO Registration Statement became effective on August 10th. In connection with the IPO, Refco Inc. issued 26,500,000 shares of common stock to the public at $22/share. The offering consisted of 12,500,000 initial shares by Refco Inc. and 14,000,000 shares of a secondary offering by THL, RGHI, Bennett, and others. An additional 3.975 million shares in overallotment were also issued. The offering generated $258,500,000 in proceeds for Refco Inc., approximately $289,520,000 in proceeds for the selling shareholders and $82.2 million in greenshoe dividend.

341.    As the Investment Banker Defendants always contemplated, and as was set forth in the IPO prospectus, on September 16th, 2005, Refco Inc. used the vast majority of its IPO proceeds to pay $231,262,500 towards the redemption of $210 million of the principal amount of RGL's senior subordinated notes plus $18.9 million in accrued interest and prepayment penalty. As RGL was insolvent at the time, Refco Inc. was induced to make a $231 million contribution to RGL for no consideration.

342.    The Investment Banker Defendants received their share of approximately $45 million in fees in connection with the LBO. The Investment Banker Defendants further received their share of approximately $40 million more in fees in connection with the IPO.

343.    Refco was forced to file for bankruptcy mere weeks after the IPO.

### The RTL Defendants' Role in the Fraudulent Scheme

344.    The RTL Defendants were a crucial participant in the Refco Insiders' fraudulent scheme to hide the RGHI Receivable. From 1999 to 2005, each of the RTLs was designed to, and in fact did, conceal from the innocent RCM and RGL directors, officers and agents, including inside counsel and others, the nature and extent of the RGHI Receivable.

345.   As each of the RTL Defendants knew, the RTL transactions did not serve any legitimate business purpose for RCM, RGL, or for any other Refco affiliate.

346.   By agreeing to act as a conduit for these fraudulent transactions, the RTL Defendants substantially assisted in the execution of the fraudulent scheme. Indeed, without the RTL Defendants' active participation in the scheme alleged herein, it would have been impossible for the Refco Insiders to conceal the nature and extent of the RGHI Receivable, or to facilitate a lucrative cashing-out of their interests in Refco.

347.   Each of the RTL Defendants knew and/or consciously avoided knowing, among other things, the following facts:

(a)   First, that the timing of the RTLs was designed to manipulate Refco's financial condition during its fiscal year-end or quarter-end financial or audit reporting periods. The RTL Defendants did business with Refco and were each aware that Refco's annual reporting year closed at the end of February, and that the RTLs were designed to occur at the end of this fiscal year (and also, starting in 2004, at the end of fiscal quarters) and were unwound shortly after the new reporting period began.

(b)   Second, that the RTLs were not isolated transactions; they were systematic elements in a large-scale fraud, necessitating their use at the end of financial reporting periods. Moreover, at least Liberty Corner (and Pigott) were well aware that the RTLs were occurring with more frequency as Refco's LBO and IPO approached.

(c)   Third, the size of the RTLs alone was suspicious. Each RTL was for a specific and extremely large dollar amount. Moreover, the RTL Defendants who participated in multiple RTLs year after year, such as Liberty Corner (and Pigott), were aware that the annual aggregate amount of the RTLs was increasing.

(d)   Fourth, the RTLs were suspicious and without any legitimate business purpose. The RTLs provided the RTL Defendants with lucrative interest payments (in Pigott's case, more than $1.1 million ) in exchange for their participation in a risk-free transaction. Moreover, the RTL Defendants knew and/or consciously avoided knowing that

they had been selected to provide large-figure loans despite the fact that most or all of the RTL Defendants lacked the financial wherewithal to receive loans of such magnitude on an uncollateralized basis. Similarly, the RTL Defendants whose transactions were guaranteed by RGL knew and/or consciously avoided knowing that the loan transactions were guaranteed by the corporate subsidiary of an insolvent parent, despite that subsidiary's complete lack of interest in or benefit from the transaction.

      (e)    Finally, the RTL loan documents indicated that each RTL Defendant was bound to act as a conduit for transfers from a Refco entity to RGHI just before the end of the relevant period, and that these "loans" were unwound just after the beginning of the new period.

348.    Given the sophistication of the RTL Defendants, each knew and/or consciously avoided knowing that the RTL transactions were designed to conceal a significant related-party receivable at the end of Refco's reporting and audit periods.

## RCM CLAIMS

### FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RCM Against Bennett and Maggio)

349.    Paragraphs 1 to 348 are incorporated as if fully set forth herein.

350.    At all relevant times, RCM was insolvent or operating in the zone of insolvency.

351.    At all relevant times, Bennett and Maggio, as directors of RCM, owed fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM and RCM's customers, who were creditors of RCM.

352.    In furtherance of their scheme to conceal Refco's true financial condition and prop Refco up long enough to facilitate a lucrative cashing-out of their interests in Refco, Bennett and Maggio caused RCM to transfer its valuable assets to RGL and its affiliates. These transfers, which amounted to approximately $2 billion at the time of the LBO, and over $2 billion at the time of the IPO, were unrelated to the business of RCM, did not benefit RCM, were for the sole purpose of

97

maintaining the perception of Refco's financial strength and health so that Bennett, Maggio, and the other Refco Insiders could personally benefit from a lucrative cashing-out of their interests in Refco, and occurred, among other things: (a) without any "loan" documentation between RCM and the Refco entities that received the funds; (b) without providing RCM with any compensation, security, or collateral; (c) without assurances that the "loaned" RCM funds would or could be repaid by the Refco entities that received them; and (d) without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM of the appropriateness or suitability of the "loans" or of the ability of the Refco entities to which the funds were "loaned" to repay the funds.

353.    Bennett and Maggio knew that the Refco affiliates to whom RCM's assets were being transferred would not repay these amounts for various reasons, including, but not limited to, the following: (a) RGL and the other Refco entities to whom RCM's assets were loaned did not have the financial wherewithal or intent to repay RCM; (b) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (c) the negative impact that disclosure of the RGHI Receivable (and the trading losses and operating expenses concealed in the RGHI Receivable) would have on Refco's financial condition, customer confidence and ability to repay RCM; (d) hundreds of millions of dollars in Refco revenue were, in fact, illusory accrued interest on the RGHI Receivable; (e) the negative impact the disclosure that the Refco Insiders had used RTLs to conceal the RGHI Receivable at the end of each relevant reporting and audit period would have on Refco's financial condition, consumer confidence, and ability to repay RCM; and (f) as a result of the foregoing facts that were concealed from RCM, its Outside Directors, and innocent officers and agents, there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

354.    By orchestrating these transfers despite their undisclosed conflict of interest and their knowledge of the foregoing, Bennett and Maggio breached their fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM.

355.    Bennett and Maggio were in a position of unique and superior knowledge regarding, among other things, the true facts concerning the condition of RCM, the diversion of RCM assets to fund Refco's operations, the RGHI Receivable, the RTLs, and the fact that there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates.

356.    In the alternative, Bennett and Maggio are liable for aiding and abetting each other's breaches of fiduciary duties to RCM because, among other things, Bennett and Maggio knew of each other's fiduciary duties to RCM, yet participated in and substantially assisted the other's breaches of those duties, as alleged herein.

357.    As a proximate result of these breaches of fiduciary duty, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Fraud Claim by RCM Against Bennett and Maggio)

358.    Paragraphs 1 to 357 are incorporated as if fully set forth herein.

359.    In order to facilitate a lucrative sale of their interests in Refco, Bennett and Maggio engaged in a fraudulent scheme through which they caused RCM's assets to be transferred to and used by RGL and other Refco affiliates to pay operating expenses, fund acquisitions, and improve Refco's overall perceived financial condition, all the while knowing that these Refco affiliates did not have the financial wherewithal or intent to repay RCM's assets.

360.    In furtherance of this fraudulent scheme, Bennett and Maggio, with the active participation of RCM's professional advisors, concealed from RCM, its Outside Directors, and innocent officers and agents, each of the following components, among others, of their fraudulent

scheme: (a) RCM's assets were transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these purported intercompany RCM loans were not documented or negotiated and were made without any specific terms; (c) no credit analysis was performed in connection with these loans and no security or collateral was given for these loans; (d) with the active assistance of Refco's professional advisors, the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and engineered RTLs to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; and (f) as a result of the foregoing, there was no intention or ability to repay the funds RCM loaned to RGL and other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

361.    In addition, with the active assistance of RCM's professional advisors, Bennett and Maggio fraudulently misrepresented in RCM's financial statements that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," when these receivables were, in fact, undocumented intercompany loans made by RCM to Refco affiliates.

362.    Bennett and Maggio made the foregoing material omissions and affirmative misrepresentations with the intent to deceive RCM, its Outside Directors, and innocent officers and agents so as to allow Bennett and Maggio to continue to use RCM assets to fund and prop up Refco and its affiliates until the Refco Insiders were able to complete their lucrative cashing-out of their interests in Refco for far more than those interests were worth.

363.    The true facts concerning the foregoing omissions and misrepresentations were material, and RCM, its Outside Directors, and innocent officers and agents would not have permitted RCM's assets to be transferred to uncreditworthy Refco affiliates had they known them.

364.   As directors of RCM, Bennett and Maggio owed fiduciary duties to, and had a special relationship of confidence and trust with, RCM and, given RCM's insolvent condition, its customers, who were creditors of RCM.

365.   Bennett and Maggio were in a position of unique and superior knowledge regarding the true facts concerning the foregoing omissions and material misrepresentations. RCM's Outside Directors and innocent officers and agents did not have access to the books and records maintained by Bennett and Maggio through which these intercompany transfers were made, were limited by Bennett and Maggio to reviewing only certain information concerning RCM and Refco, and had no access to information from which they could have learned of the RGHI Receivable, the fraudulent inflation of Refco's operating results, the RTLs, the subordination of RCM's loans to $1.4 billion in new LBO debt, or any of the other fraudulent actions perpetrated by Bennett, Maggio, and the other Refco Insiders.

366.   RCM's Outside Directors and innocent officers and agents of RCM were justified in relying on Bennett and Maggio, who were RCM directors and officers (with fiduciary duties to RCM) and whose statements regarding Refco's financial health were backed by Trosten, Refco's Chief Financial Officer, and RCM's outside professional advisors, including GT and MB.

367.   In the alternative, Bennett and Maggio are liable for aiding and abetting each other's fraudulent conduct because, among other things, they actively participated in and knowingly and substantially assisted each other's misrepresentations and omissions.

368.   As expected and anticipated by Bennett and Maggio, as a proximate result of their fraudulent omissions and misrepresentations, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

369.   · Had the true facts been fully disclosed, RCM would not have allowed its assets to be diverted and would have sought to stop the LBO or required repayment of the approximately $2 billion it was owed as a condition to Refco's entry into the LBO.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Malpractice Claim by RCM Against GT)

370.    Paragraphs 1 to 369 are incorporated as if fully set forth herein.

371.    At all relevant times, GT was employed by and acted as RCM's auditor.

372.    GT owed a duty of care to RCM on account of its professional relationship with RCM.

373.    GT breached its duty of care to RCM by, among other things, issuing unqualified audit opinions for RCM's financial statements that were false, failing to require disclosure in RCM's financial statements or to advise RCM's Outside Directors and innocent officers and agents that RCM's assets were being routinely transferred to Refco affiliates, and instead allowing these intercompany loans to be characterized as a "receivable from customers" on RCM's audited financial statements. GT also breached its duty of care by failing to require disclosure that the Refco affiliates to whom these loans were made lacked the intention or ability to repay these loans for the reasons set forth above.

374.    Any audit examination conducted with the care and diligence required of professional auditors would have revealed these facts and required their disclosure in RCM's financial statements and/or to RCM's Outside Directors and innocent officers and agents.

375.    As a proximate result of GT's breach of its duty of care, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees,

related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Claim by RCM Against GT)

376.    Paragraphs 1 to 375 are incorporated as if fully set forth herein.

377.    At all relevant times, GT was employed by and acted as RCM's auditor.

378.    As RCM's auditor, GT owed a duty to RCM to verify the accuracy of information concerning the financial condition of RCM, including the actual value of intercompany loans and receivables.

379.    In its annual financial audits of RCM, GT, among other things, allowed the misclassification of intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" and otherwise misrepresented RCM's true financial condition by providing unqualified audit opinions indicating that RCM was in sound financial condition.

380.    GT negligently failed to require disclosure of the intercompany receivables owed by Refco affiliates to RCM and negligently failed to require a write down of these purported "receivables," despite knowing, or negligently disregarding, as the auditor of RGL and the other Refco affiliates, including RCM, that RCM could not collect on these "receivables" because the Refco affiliates to whom RCM had loaned its funds did not have the intention or ability to repay these amounts for the reasons set forth above.

381.    As RCM's auditors, GT knew and intended that RCM's Outside Directors and innocent officers and agents would and did reasonably rely on the unqualified audit opinions that GT issued.

382.    The GT audit opinions were false and misleading and contained materially false statements of fact, including false statements regarding the absence of material intercompany transfers of RCM's assets to Refco affiliates and the unimpaired value of these receivables.

383.    RCM's reliance on GT's false statements was reasonable and justified under the circumstances.

384.    As a proximate result of GT's material misrepresentations, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM Against GT)

385.    Paragraphs 1 to 384 are incorporated as if fully set forth herein.

386.    By virtue of its role as the auditor for RCM and RGL and its affiliates, GT knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (d) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (f) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (g) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

387.    GT was aware of its own role in Bennett and Maggio's overall scheme.

388.    Notwithstanding this knowledge, GT knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) allowing the misclassification of the uncollectible intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" in RCM's financial statements; (b) failing to require a write down of RCM's intercompany receivables, despite its knowledge of the true financial condition of RGL and its affiliates; and (c) providing unqualified audit opinions that indicated that RCM was in sound financial condition when, in fact, as GT knew and/or consciously avoided knowing, RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency.

389.    As a proximate result of GT's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against GT)

390.    Paragraphs 1 to 389 are incorporated as if fully set forth herein.

391.    GT had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and

105

IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (e) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

392.    GT also knew that Bennett and Maggio affirmatively misrepresented to RCM's Outside Directors and innocent officers and agents that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," rather than uncollectible intercompany loans.

393.    GT was aware of its own role in Bennett and Maggio's overall scheme.

394.    Notwithstanding this knowledge, GT knowingly and substantially assisted in the fraud by, among other things: (a) allowing the misclassification of the intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" in RCM's audited financial statements; (b) failing to require a write down of RCM's intercompany receivables, despite its knowledge of the foregoing components of Bennett and Maggio's fraudulent scheme; and (c) providing unqualified audit opinions that indicated that RCM was in sound financial condition when, in fact, as GT knew and/or consciously avoided knowing, RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency.

395.    As a proximate result of GT's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts,

did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Malpractice Claim by RCM Against MB)

396.    Paragraphs 1 to 395 are incorporated as if fully set forth herein.

397.    At all relevant times, MB was employed by and acted as Refco's outside counsel.

398.    MB provided legal advice to RCM regarding, among other things: (a) the customer agreements utilized by RCM; (b) the applicability and impact of United States and foreign regulations and law to and on RCM's activities, operations, and use of customer funds; and (c) the repatriation of RCM to the United States.

399.    MB owed a duty of care to RCM on account of its professional relationship with RCM.

400.    MB breached its duty of care to RCM by, among other things, not properly advising RCM concerning its obligations to safeguard customer funds; improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; representing both Refco and RGHI in the LBO and the RTLs, despite being conflicted due to its knowledge and/or conscious avoidance of the misconduct at Refco; and failing to advise RCM, its Outside Directors, and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay these amounts for the reasons set forth above.

401.    Given MB's knowledge of the RGHI Receivable, MB's preparation of the documents for each RTL transaction, and MB's role as legal advisor to Refco (including RCM) in all matters, including corporate governance, United States and foreign regulations and law governing Refco's

(and RCM's) operations, activities, and use and treatment of client funds, securities, and other property, and preparation and review of Refco's customer agreements, among other things, MB knew that it was improper for RCM to transfer its funds to Refco affiliates that lacked the financial wherewithal or intent to repay RCM.

402.    Any law firm acting properly under the ethical standards of the profession would have revealed these facts to RCM and required their disclosure in RCM's financial statements and/or to RCM's Outside Directors and innocent officers and agents.

403.    As a proximate result of MB's breach of its duty of care, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RCM Against MB)

404.    Paragraphs 1 to 403 are incorporated as if fully set forth herein.

405.    At all relevant times, MB served as RCM's outside counsel and provided legal advice to RCM regarding, among other things: (a) the customer agreements utilized by RCM; (b) the applicability and impact of United States and foreign regulations and law to and on RCM's activities, operations, and use of customer funds; and (c) the repatriation of RCM to the United States.

406.    As RCM's legal outside counsel, MB owed fiduciary duties to RCM. At all relevant times, MB also served as outside counsel and provided legal advice to RGHI and RGL.

407.    MB had an undisclosed conflict of interest and breached its fiduciary duty to RCM by, among other things, not properly advising RCM concerning its obligations to safeguard customer

108

funds and not disclosing that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay these amounts for the reasons set forth above.

408.    As a proximate result of MB's breaches of fiduciary duty, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM Against MB)

409.    Paragraphs 1 to 408 are incorporated as if fully set forth herein.

410.    By virtue of its role as outside counsel for RCM and RGL and its affiliates, MB knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (d) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to

repayment to $1.4 billion in new LBO debt; (f) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (g) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

411.    MB was aware of its own role in Bennett and Maggio's overall scheme.

412.    Notwithstanding this knowledge, MB knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) not properly advising RCM concerning its obligations to safeguard customer funds; (b) improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; (c) failing to advise RCM's Outside Directors and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay them; (d) preparing the documentation for each of the RTLs used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (e) advising Refco in connection with the LBO, through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt.

413.    As a proximate result of MB's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### TENTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against MB)

414.    Paragraphs 1 to 413 are incorporated as if fully set forth herein.

415.    MB had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the

following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (e) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

416.    MB also knew that Bennett and Maggio affirmatively misrepresented to RCM's Outside Directors and innocent officers and agents that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," rather than uncollectible intercompany loans.

417.    MB was aware of its own role in Bennett and Maggio's overall scheme.

418.    Notwithstanding this knowledge, MB knowingly and substantially assisted in the fraud by, among other things: (a) not properly advising RCM concerning its obligations to safeguard customer funds; (b) improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; (c) failing to advise RCM's Outside Directors and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay them; (d) preparing the documentation for each of the RTLs used to conceal the

111

existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (e) advising Refco in connection with the LBO, through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt.

419.     As a proximate result of MB's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
### Against E&Y)

420.     Paragraphs 1 to 419 are incorporated as if fully set forth herein.

421.     By virtue of its substantial work for Refco, E&Y knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests for more than these interests were worth; (b) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (c) RGL and its affiliates were unable to repay RCM; (d) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (e) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

422.     E&Y was aware of its own role in Bennett and Maggio's overall scheme.

112

423.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI, RGL, and Refco affiliates that concealed the existence of the RGHI Receivable (and, along with it, the Refco entities' trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns of behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) as a result of the foregoing, creating the illusion that RGL and its other affiliates were financially healthy and creditworthy when in fact they lacked the financial wherewithal to repay RCM.

424.    As a proximate result of E&Y's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against E&Y)

425.    Paragraphs 1 to 424 are incorporated as if fully set forth herein.

426.    E&Y had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests for more than these interests were worth; (b) the Refco Insiders concealed substantial Refco trading losses and operating

expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; and (c) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

427.    E&Y was aware of its own role in Bennett and Maggio's overall scheme.

428.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in the fraud by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI, RGL, and Refco affiliates that concealed the existence of the RGHI Receivable (and, along with it, the Refco entities' trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns of behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) as a result of the foregoing, creating the illusion that RGL and its affiliates were financially healthy and creditworthy when in fact they lacked the financial wherewithal to repay RCM.

429.    As a proximate result of E&Y's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
### Against PwC)

430.    Paragraphs 1 to 429 are incorporated as if fully set forth herein.

431.    By virtue of its role as a financial and tax advisor and *de facto* Chief Accounting Officer for Refco, PwC knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (e) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (f) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

432.    PwC was aware of its own role in Bennett and Maggio's overall scheme.

433.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) advising and guiding Refco through the LBO in which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt; and (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, which failed to disclose the RGHI Receivable and the RTLs.

434.    As a proximate result of PwC's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against PwC)

435.    Paragraphs 1 to 434 are incorporated as if fully set forth herein.

436.    PwC had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were being transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (c) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (d) there was no intention or ability to satisfy the funds RCM had loaned to the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

437.    PwC was aware of its own role in Bennett and Maggio's overall scheme.

438.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in the fraud by, among other things: (a) advising and guiding Refco through the LBO through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt; and (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, which failed to disclose the RGHI Receivable and the RTLs.

116

439.    As a proximate result of PwC's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FIFTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
### Against Credit Suisse, BAS, and Deutsche )

440.    Paragraphs 1 to 439 are incorporated as if fully set forth herein.

441.    By virtue of their role as financial advisors to Refco in connection with the LBO and the IPO, Credit Suisse, BAS, and Deutsche knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (c) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (d) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (e) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

442.    Credit Suisse, BAS, and Deutsche were aware of their own roles in Bennett and Maggio's overall scheme.

443.    Notwithstanding this knowledge, Credit Suisse, BAS, and Deutsche knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things, devising and facilitating an LBO through which the RCM receivables were

117

subordinated to $1.4 billion in new LBO debt, leaving Refco with no meaningful capital with which to repay RCM.

444.    As a proximate result of Credit Suisse, BAS, and Deutsche's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse, BAS, and Deutsche for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## RGL CLAIMS

### SIXTEENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RGL Against
### Bennett, Maggio, and Trosten)

445.    Paragraphs 1 to 444 are incorporated as if fully set forth herein.

446.    At all relevant times, RCM was the principal creditor of RGL.

447.    As officers of RGL, Bennett, Maggio, and Trosten owed fiduciary duties of loyalty, care, honesty, and good faith to RGL, and, at all times RGL was insolvent or operating in the zone of insolvency, to RGL's creditors, including RCM.

448.    Bennett, Maggio, and Trosten breached these fiduciary duties by causing RGL and its affiliates to enter into an LBO through which Bennett, Maggio, and Trosten would receive a lucrative cashing-out of their interests in Refco for more than those interests were worth, while knowingly failing to advise the innocent RGL directors, officers and agents, including inside counsel and others, of the following facts, among others, each of which constituted a separate and distinct breach of the fiduciary duties Bennett, Maggio, and Trosten owed to RGL and RGL's principal creditor, RCM: (a) there were material related-party transactions between Refco and RGHI through

118

which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing breaches of fiduciary duty, RGL was insolvent or operating in the zone of insolvency.

449.    Bennett, Maggio, and Trosten knew that their representations to the innocent RGL directors, officers and agents, including inside counsel and others, regarding the financial health of RGL and its affiliates were false because, among other things, they were intimately involved in and directed the RGHI Receivable scheme, the RTLs, the diversion of RCM assets to RGL and its affiliates, and the other fraudulent conduct alleged herein.

450.    Bennett, Maggio, and Trosten were in a position of unique and superior knowledge regarding, among other things, the true facts concerning the condition of RGL, the true substance and scope of the RGHI Receivable, the RTLs, the diversion of RCM assets to fund Refco's operations, and the fact that the appearance of RGL's financial health and strength was fabricated.

451.    In the alternative, Bennett, Maggio, and Trosten are liable for aiding and abetting each other's breaches of fiduciary duties to RGL because, among other things, Bennett, Maggio, and Trosten knew of each other's fiduciary duties as directors and officers of RGL, yet actively participated in and knowingly and substantially assisted the other's breaches of those duties, as alleged herein.

452.    As a proximate result of these breaches of fiduciary duty, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

119

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett, Maggio, and Trosten for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### SEVENTEENTH CLAIM FOR RELIEF
**(Breach of Fiduciary Duty Claim by RGL Against RGHI, Bennett, and Grant)**

453.    Paragraphs 1 to 452 are incorporated as if fully set forth herein.

454.    Prior to the LBO, RGHI held a 90% interest in RGL and was the controlling shareholder of RGL. RGHI owed fiduciary duties of loyalty, care, honesty, and good faith to RGL as its controlling shareholder.

455.    Prior to the LBO, Bennett and Grant each held 50% interests in RGHI and, therefore, as the sole owners of RGL's controlling shareholder, owed fiduciary duties of loyalty, care, honesty, and good faith to RGL.

456.    RGHI, Bennett, and Grant breached their duties to RGL by, among other things, causing RGL and its affiliates to enter into an LBO through which the Refco Insiders would receive a lucrative cashing-out of their interests in Refco for more than those interests were worth, while knowingly failing to advise the innocent RGL directors, officers and agents, including inside counsel and others, of the following facts, among others, each of which constituted a separate and distinct breach of the fiduciary duties RGHI, Bennett, and Grant owed to RGL: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany

120