1                       UNITED STATES BANKRUPTCY COURT
                         SOUTHERN DISTRICT OF NEW YORK
2

3      ---------------------------------------X
                                             :
4      In Re:                                :   05-60006
                                             :
5              REFCO, INC.,                  :   One Bowling Green
                                             :   New York, New York
6              Debtors.                       :   September 11, 2007
       ---------------------------------------X
7      TONE N. GRANT, et al,                 :   07-2005
                                             :
8                   Plaintiffs,              :
                                             :
9                   v.                       :
                                             :
10     AXIS REINSURANCE COMPANY,             :
                                             :
11                  Defendant.               :
       ---------------------------------------X
12
                            TRANSCRIPT OF HEARING
13              BEFORE THE HONORABLE ROBERT D. DRAIN
                      UNITED STATES BANKRUPTCY JUDGE
14

15     APPEARANCES:

16     For Plaintiffs:          NORMAN L. EISEN, ESQ.
                                Zuckerman, Spaeder, LLP
17                              1800 M Street, N.W.
                                Washington, D.C.  20036
18
       For Messrs Grant:        HELEN B. KIM, ESQ.
19      and Klejna              Baker & Hostetler, LLP
                                333 South Grand Avenue
20                              Los Angeles, California  90071

21     For Mr. Trosten:         BARBARA MOSES, ESQ.
                                Morvillo, Abramowitz, Grand, Jason,
22                               Anello & Bohrer, P.C.
                                565 Fifth Avenue
23                              New York, New York  10017

24     For Axis:                JOAN M. GILBRIDE, ESQ.
                                Kaufman, Borgeest & Ryan, LLP
25                              99 Park Avenue
                                New York, New York  10016

                              (Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

APPEARANCES CONTINUED:


For Mr. Silverman:          RICHARD CASHMAN, ESQ.
                            Heller, Ehrman, LLP
                            Seven Times Square
                            New York, New York  10036

For Messrs. Sexton and:     IVAN O. KLINE, ESQ.
  Shearer                   Friedman, Wittenstein & Hochman
                            600 Lexington Avenue
                            New York, New York  10022

For RJM, LLC:               STEVEN WILOMOWSKY, ESQ.
                            Bingham, McCutchen, LLP
                            399 Park Avenue
                            New York, New York  10022

For Mr. Murphy:             JOHN J. JEROME, ESQ.
                            Saul Ewing, LLP
                            1500 Market Street
                            Philadelphia, Pennsylvania  19102



Court Transcriber:          SHARI RIEMER
                            TypeWrite Word Processing Service
                            356 Eltingville Boulevard
                            Staten Island, New York 10312







Proceedings recorded by electronic sound recording,
transcript produced by transcription service

3

1          THE COURT:   Grant v Axis Reinsurance in the Refco

2     case.

3          MR. EISEN:   Good morning, Your Honor.

4          Norman Eisen representing Mr. Grant and I will be

5     arguing on the motion for advancement on behalf of Mr. Grant,

6     Mr. Trosten and Mr. Bennett, although Mr. Trosten and Mr.

7     Bennett's counsel are here as well and they may wish to join in

8     at certain points.

9          THE COURT:   Okay.

10          MR. EISEN:   On behalf of everyone we want to thank

11     the Court for taking the motion on an expedited basis.   We

12     believe that the fundamental issues that are raised by our

13     advancement motion were raised and decided by the Court on the

14     other insurance motion that we were before the Court on less

15     than two weeks ago.   As the Court knows, the criminal

16     defendants -- we refer to them as the presumed innocent

17     defendants in distinction to Axis' designation -- joined in the

18     motion for advancement we argued, and the Court actually

19     addressed in the course of its holdings -- actually addressed

20     the prejudice to the criminal defendants with respect to the --

21     on the balancing of harms.

22          I will just quickly go through the issues and I

23     think reference to Axis' brief makes clear that fundamentally

24     Axis is rearguing the issues that were before the Court the

25     last time we were here on the question of what the standard is,

4

1    whether this is a prohibitory or mandatory injunction.  The

2    Court has already invoked the reasoning of <u>WorldCom</u> and ruled.

3    The Court has applied the test of a likelihood of success on

4    the merits or a sufficiently serious question and balance of

5    harms.  There is no new issue in the brief about, and we

6    recognize the Court likely went to, the sufficiently serious

7    question and balancing the harms prong of that test.  The Court

8    noted as much when it was ruling previously.  There is no new

9    issue in the papers about the likelihood of success on the

10   merits or the sufficiently serious question going to the

11   merits.  It is a reargument of the clause relating -- the

12   disputed clause and the Court has already ruled on that.

13          On the balance of the harms, we would submit that,

14   again, as noted by the Court the harms are even more severe

15   because the criminal defendants are facing trial; it's not

16   merely a question of a risk of financial loss, it is a liberty

17   interest and the most serious liberty interest, and any

18   disruption in the preparation for trial as the Court noted is a

19   very, very serious harm indeed.

20          One of the only -- I will not rehash absolutely

21   every argument that the Court has heard ad infinitum in the

22   many, many papers that have been filed.  I'll attempt to focus

23   on what's new in Axis' submission and the response.  They do

24   rely on a new case in addressing the balancing of the harms,

25   that is the <u>Gaon v. Twin Cities</u> case.  We obtained from Axis --

5

1          THE COURT:  No one gave me a copy of that case.

2          MR. EISEN:  Your Honor, we had the same problem --

3          THE COURT:  And consequently I'm not going to

4     consider it.

5          MR. EISEN:  Okay.  Then, Your Honor, really the

6     only other significant --

7          THE COURT:  Let me -- it's an unpublished

8     decision.

9          MR. EISEN:  Yes, it is, Your Honor.

10         THE COURT:  You're all familiar with the Second

11    Circuit rule on citing unpublished decisions.  If I were to

12    consider it as persuasive authority, simply like a law review

13    article or the like, I would have expected the parties to have

14    provided it to me since I prepare in advance for these things

15    and this is a preliminary injunction hearing and that's not

16    been done and so I'm not going to consider it.

17         MR. EISEN:  Understood, Your Honor, and we

18    certainly are not relying on it and you won't hear anymore

19    about it from us.

20              The only other issue of significance that is new

21    in the papers is the priority of payments issue and that popped

22    up, really, yesterday with the filing of Axis' opposition and

23    then of the motion to intervene.  With respect to proposed

24    intervenors' issues, we conferred with them before court this

25    morning and we've also informed Axis of this, the movants today

6

1   are satisfied to have the identical form of order that the

2   Court entered last time with the addition of the proposed

3   language that Mr. Klejna's counsel has requested, which is to

4   the effect that nothing in this order shall affect the priority

5   of payments issue.  We really do not view the priority of

6   payments issue as procedurally appropriate for a decision

7   before the Court.  It has not been teed up.  It is not ripe.

8   We don't know if there is a disagreement yet.  We haven't had a

9   chance to evaluate it.  Obviously, there's been no factual

10  development, there's been no briefing.  It really is a last

11  ditch attempt to interpose an obstacle to the payment of the

12  fees that the movants today so desperately need in order to

13  avoid disruption of the criminal case.

14          So, the issues really being the same, we would

15  submit to the Court that it is a straightforward application of

16  the decision that the Court has already rendered and, indeed,

17  was prepared to render but for the Court's request that we file

18  an adversary proceeding of our own and a motion for preliminary

19  injunction which we've done.

20          THE COURT:  What is the -- and there was some

21  confusion about this last time -- billed amount of the defense

22  costs for the three defendants?

23          MR. EISEN:  Your Honor, Axis has provided that

24  information on Page 30 of their opposition and I'll go over

25  that and then I will relate an issue -- conversation that we

7

1   all had amongst ourselves in the hallway just updating that and

2   I know Axis' counsel will correct me if I err.

3              When we were before the Court the last time the

4   total amount was in the neighborhood of $2 million for Axis.

5   As of Friday, the total amount at issue was in excess of $2.9

6   million.  We certainly do not -- I think it's our position and

7   the other insureds' position that none of us begrudge the

8   payment of those sums to the others.  Indeed, for the criminal

9   defendants it is crucial because the pipeline is building up

10  and we have so much work to do and the consequences are so

11  great.  We would ask the Court to order payment of that amount.

12  Approximately $300,000.00 of that $2.9 million has already been

13  paid down or is in the process of being paid down.

14              THE COURT:  Well, let me make sure of that.  The

15  aggregate number you gave me, the $2 million as of last Friday

16  --

17              MR. EISEN:  It's $2.9 million, Your Honor, as of

18  Friday.

19              THE COURT:  I'm sorry.  Then there was $2 million

20  as of the hearing that we had.

21              MR. EISEN:  Yes, Your Honor.

22              THE COURT:  That includes the defense costs of

23  which defendants?

24              MR. EISEN:  I believe that includes the defense

25  costs of all of the parties who were before the Court on the

8

1    previous motions and --

2              THE COURT:  Well, let me make sure.  It does not

3    include Mr. Lee; right?

4              MR. EISEN:  I do not know if it includes or not.

5    I can speak for the five insured individuals represented by

6    Baker, Hostetler and the other firms and I can speak for the

7    three criminal defendants.  I cannot at all speak for Weil,

8    Gotshal's clients, for Mr. Lee.  I'm sure Ms. Gilbride knows

9    the answer to that question.  I do not.

10             THE COURT:  All right.

11             MR. EISEN:  And just to update the Court there

12   have been approximately $1 million in additional invoices that

13   have come in over the weekend and yesterday.

14             MS. GILBRIDE:  I believe that is correct.  I

15   actually anticipated -- to correct you since we're on this

16   topic, I think the $2.9 million as of Friday does include the

17   Thomas H. Lee fees.

18             THE COURT:  It does.  Well, as far as the

19   defendants represented by Ms. Kim and Mr. Goodman, the ones

20   represented by Baker & Hostetler, I gather that that was about

21   $300,000.00/$307,000.00; is that right?

22             MS. GILBRIDE:  That's correct, Your Honor.

23             THE COURT:  And I'm taking that away for the

24   record in the district court?

25                       [Pause in proceedings.]

9

1              MS. GILBRIDE:  Oh, as of the earlier hearing, Your

2    Honor.

3              THE COURT:  Right.

4              MS. GILBRIDE:  Not as of today.

5              THE COURT:  Right.  No, I understand.

6              MS. KIM:  Your Honor, the $307,000.00 was as of

7    August 30th for the five officer defendants that moved as of

8    that day.

9              THE COURT:  All right.  All five of them?

10             MS. KIM:  All five, not just the Baker, Hostetler

11   --

12             THE COURT:  So that's not just Baker & Hostetler

13   but all five.

14             MS. GILBRIDE:  All five of the moving parties;

15   right.

16             THE COURT:  All right.  Do we know how much is for

17   the movants today in the aggregate?  The three?

18             MR. EISEN:  Your Honor, I --

19             THE COURT:  Well, no, no, no, let me hear the

20   answer.

21             MS. GILBRIDE:  Your Honor, my understanding is as

22   of yesterday for just these moving parties it's $2.9 million.

23             THE COURT:  Just them?

24             MS. GILBRIDE:  Just them.

25             THE COURT:  Just these three?

10

1          MS. GILBRIDE:  Yes, Your Honor.

2          MS. MOSES:  Your Honor, Barbara Moses, Your Honor,

3   for Robert Trosten.

4          THE COURT:  Well, let me make sure -- there's some

5   conferring going on over here.

6                    [Pause in proceedings.]

7          THE COURT:  Just these three?

8          MS. GILBRIDE:  Yes, Your Honor.

9          THE COURT:  And how much as of the date that I

10  ordered the -- would you have this number as of the date that I

11  ordered the payment for the five represented --

12         MS. GILBRIDE:  Yes.  Yes, that would be $1.6.

13         THE COURT:  $1.6.

14         MS. MOSES:  These are the three numbers for us.

15         THE COURT:  Okay.  But that would be just for

16  these three --

17         MS. GILBRIDE:  Yes, Your Honor.

18         THE COURT:  -- as of the date of the earlier order

19  that I entered?

20         MS. GILBRIDE:  Correct.  As of August 31st; right.

21         THE COURT:  Okay.  Go ahead.

22         MS. MOSES:  I apologize, Your Honor.  I was

23  conferring with Mr. Eisen and I missed your last exchange with

24  Ms. Gilbride.  This is Barbara Moses speaking on behalf of

25  Robert Trosten.  But we, the three movants before the Court

11

1    this morning, have added up our numbers among ourselves and

2    they don't add up to $2 million.

3              THE COURT:  Well, okay.  I asked Ms. Gilbride two

4    questions; one was as of the most recent date and that was $2.9

5    and I understood, and then I asked as of August 31st which was

6    the date of my earlier order, and that was $1.6 million.  Have

7    you broken it out that way too?

8              MS. MOSES:  Well, my understanding, Your Honor --

9    and co-counsel for today's moving parties will correct me if I

10   am wrong -- but my understanding is that as of August 30th the

11   three plaintiffs who are before you today had submitted bills

12   totaling -- I'm doing this in my head so bear with me while I

13   round -- approximately $940,000.00 or maybe $950,000.00.

14             THE COURT:  Okay.

15             MS. GILBRIDE:  We received substantial bills just

16   yesterday from --

17             THE COURT:  No, we're just focusing right now --

18             MS. MOSES:  Right.  That was the August 30th

19   figure.

20             MS. GILBRIDE:  Okay.  From Kramer, Levin.

21             THE COURT:  -- as of August 31st.

22             MR. EISEN:  Yes, that was included.

23             MS. GILBRIDE:  Okay.

24                   [Pause in proceedings.]

25             THE COURT:  So you include bills that cover the

12

1  period through August 30th in that $950,000.00 number?

2           MS. MOSES:  Your Honor, I'm going to apologize and

3  correct myself on the record.  Mr. Eisen tells me that my

4  figure was incorrect.

5           THE COURT:  Okay.  So is it as of August 31st it's

6  really $1.6 million?

7           MR. EISEN:  It's $1.6 million to $1.7 million,

8  Your Honor.

9           THE COURT:  Okay.

10           MS. GILBRIDE:  That's the same number we have.

11           THE COURT:  Okay.

12           MR. EISEN:  Then, just so I'm clear if I may ask

13  Axis through the Court it then goes up to $2.6 as of Friday

14  when the papers were filed according to Axis' motion at Page

15  30, Paragraph 65, as of Friday, September 7th, Axis had defense

16  bills with a value of over $2.9, of this amount $307 was

17  subject to the Court's August 31st order so $2.9 minus $300 is

18  $2.6 and then as of the weekend and yesterday it is up to $2.9.

19           THE COURT:  Okay.

20           MS. GILBRIDE:  Yes,

21           THE COURT:  And what is that for?  September?

22           MR. EISEN:  No, Your Honor.

23           THE COURT:  Is that the difference is September?

24           MR. EISEN:  No.  With the Court's leave I will

25  explain the pipeline issue.

13

1          The firms have time going back to June that is in

2     these bills because of the way they're billed at the end of the

3     month.

4          THE COURT:  Okay.

5          MR. EISEN:  So you have June time, you have July

6     time and how you have August time coming in because August has

7     closed and the bills for August issue at the beginning of

8     September.  From the perspective of the criminal defendants --

9     and I don't believe that the other moving insureds who sought

10    advancement and whose motion we previously joined disagree --

11    what we would like to request the Court to do is to enter an

12    order that would be -- really, the words of which would be

13    identical to the order that was entered last time other than

14    the caption and the introductory paragraph, which would provide

15    that the bills should be paid through the date of the order

16    subject to the proviso that nothing in the order affects the

17    priority of payments because, you know, none of us wants -- we

18    recognize as the Court noted previously that it is a narrow

19    ruling confined to the obligation to advance that does not get

20    into other issues.  I would only add that in terms of the

21    equities or the harms to have -- we are already going to be

22    carrying September time while we wait for the issue to be

23    resolved.  We are at the point of having to undertake, as is

24    obvious from the bills, very substantial work to get ready for

25    trial which is in March, and I really think it goes to the

14

1  spirit and the letter of the cases to -- obviously, I'm not

2  asking the Court to issue an injunction that carries forward.

3  I recognize that there's going to be a motion for summary

4  judgment heard in October but in order to avoid disruption it's

5  important to have some lessening of the liabilities hanging

6  over the clients in the pipeline, and the other movants agree

7  with that provided the language is inserted about the priority

8  of payments.

9        THE COURT:  Well, let me make sure I understand

10  that.  I mean I can certainly see them making the argument that

11  they moved first for an injunction and I approved -- ordered

12  the payment of their defense costs through the date of the

13  earlier order so they're in essence now a week or so behind and

14  that may be a meaningful week because of month-end billing, and

15  so you're saying they don't oppose your sort of jumping ahead

16  by that extra billing?

17        MR. EISEN:  Your Honor, I think they would ask

18  that that be reciprocal that it also apply to them so the --

19  and I think that that is --

20        THE COURT:  Well, let me hear from them.  They're

21  standing up behind you so --

22        MR. KLINE:  Your Honor, Ivan Kline from Friedman,

23  Wittenstein for two of the other movants, Mr. Sexton and

24  Mr. Shearer.  I know I'm speaking also for Mr. Silverman.  I

25  believe -- because we joined in the same comment with Baker &

1  Hostetler -- our position is that it should be limited to the

2  same date, August 31st or August 30th, whichever it was --

3          THE COURT:  The date of that order.

4          MR. KLINE:  And they should not be jumping ahead.

5  And let's be realistic, a bill sent for August time on

6  September 8th is really not due now in any event and lawyers

7  all the time carry their bills for thirty days.  We didn't get

8  payment from U.S. Specialty or Lexington in, you know, a week

9  after the bills were submitted and in all fairness,

10 understanding the situation they're in is really -- we could

11 all wait until October 12th for the bills that are being sent

12 out in September.  That is our position and that this order

13 should not go beyond the same August 31st cutoff under any

14 circumstances.

15         THE COURT:  All right.  Ms. Kim, is that the view

16 for your clients as well?

17         MS. KIM:  Yes, Your Honor.  However, if you are

18 inclined to grant that as of this date --

19         THE COURT:  No, I understand.

20         MS. KIM:  Then, of course, we'd want to be brought

21 to the same and not falling behind, Your Honor.  That's all.

22         THE COURT:  Right.  Okay.  All right.

23         MR. EISEN:  Your Honor, our view is -- and I

24 apologize, I had understood from my conversation from Ms. Kim

25 that she was comfortable, in fact I circulated a form of order

16

1    that provided today and I had understood that others were

2    comfortable with that form of order and --

3            THE COURT:  Well, as long as they were going to

4    get pushed up, but I phrased my question with the assumption

5    that they weren't --

6            MR. EISEN:  I apologize if I did not understand

7    the admittedly rushed conversation in the hallway.

8            Your Honor, the criminal defendants, though, would

9    submit to the Court that there are different exigencies that

10   apply to our need and if I may the clients will be facing the

11   prospect of uncertainty as you've heard from Axis very

12   substantial August bills on top of very substantial September

13   bills.  It's not just the question of Axis having agreed to pay

14   and waiting a reasonable amount of time for the invoice to be

15   honored, it is the uncertainty and the precise chilling effect

16   on the ability to defend the case that the WorldCom court was

17   concerned with when it balanced the harms.  I do think in

18   fairness that if the Court were to order this relief that it

19   ought to apply to the intervening parties as well, but the

20   criminal defendants are really in a unique situation because of

21   the pendency of the criminal case and it will have a disruptive

22   effect on the ability to defend that case.  They will be

23   incurring enormous costs, and so I would ask the Court in a

24   balanced way that also recognized the needs of the intervenors

25   and for that matter of Axis with respect to priority of

17

1   payments to enter the order that allows us to limit some of the

2   backlog.  We're not insisting that those bills be paid

3   tomorrow.  Axis can take a reasonable amount of time to

4   evaluate them.  I understand that there were some deductions

5   that they applied to the bills that the others who were before

6   the Court a little less than two weeks ago submitted and we

7   don't have any objection to the normal course.  What is

8   difficult for us is to arrive at mid-October carrying millions

9   of dollars in fees for August and for September not knowing

10  whether our clients are going to be able to defend the criminal

11  case.  We think that the case law provides guidance to the

12  Court that in those circumstances it is appropriate to award

13  those fees and, frankly, the context is not irrelevant.  We

14  believe that Axis -- well, I certainly won't rehash the

15  argument -- we think that Axis should have advanced these fees.

16  The first two layers of insurance did advance the fees, we've

17  been in this position of jeopardy for some time and, you know,

18  Axis could have avoided today by, once the Court made its view

19  of the law and the facts clear, agreeing to advance fees we

20  would not be here.  So to some extent Axis has proceeded at its

21  peril.  We think that that raises issues about the good faith

22  of the insurer but that at any rate it is fair and right and

23  equitable for the criminal defendants to have the pipeline

24  lessened somewhat.

25              THE COURT:  Do you or the other two movants have

18

1    any factual showing that you want to make in respect of the

2    issue of whether, in no particular order, if I ruled -- or

3    whatever court had jurisdiction over this matter ruled --

4    against them ultimately that they could reimburse the money

5    advanced?  That would be one issue.  The other issue is their

6    ability to pay currently, themselves, and, I guess, the third

7    issue is as to the defense counsel's willingness to proceed

8    with this issue hanging over them. Or do you intend to rely on

9    the logic that Judge Cote set forth in WorldCom?

10              MR. EISEN:  Your Honor, I'll take those --

11              THE COURT:  In no particular order.

12              MR. EISEN:  -- in no particular order.  I think

13   there are two guiding precedents; one is the WorldCom case on

14   your first question and the other is this Court's decision two

15   weeks ago and this is the exact argument that the insurers made

16   in WorldCom.  I'll just read from the opinion at 469 to 470,

17   "Continental and Twin City argue that Roberts has failed to

18   show irreparable injury because he has not shown that he is

19   unable to retain counsel from his own funds." And then later on

20   the WorldCom Court also addresses the argument about

21   reimbursement and the Court says, "the issues here surmount

22   whether an individual director has or does not have sufficient

23   funds to pay counsel when confronted with litigation stemming

24   from services of a corporate director.  In some cases it will

25   be minor [here it is massive], in some cases a director will

19

1    have great personal wealth, in other cases she will not.  The

2    issue here is whether every director is protected by a policy

3    to have the ongoing payment of defense costs."  So we think

4    that WorldCom -- that that's the wrong question under WorldCom.

5    This is a -- as the Court noted at 87 to 88 of the transcript,

6    this is a massive litigation.  As demonstrated, the Court has

7    the evidence about the size of the bills, it has the evidence

8    about the pending civil cases that it relied on when we were

9    last before the Court.  It certainly is aware of the pending

10   criminal cases, and, respectfully, Your Honor, we think that

11   the case law does not require that question to be answered and

12   for the same reason that the Court advanced previously it's

13   appropriate to do so as of today or if the Court -- really, as

14   of today as to all the insureds.  We're not asking for special

15   treatment.  It really is as to all the insureds and we wouldn't

16   be here but for Axis' refusal to do that.  Indeed, for their

17   refusal to do something less.

18          THE COURT:  Okay.  What about the other two

19   defendants on that particular question?

20          MS. MOSES:  Thank you, Your Honor.  Barbara Moses

21   for Mr. Trosten.

22          I concur in Mr. Eisen's remarks.  I would also

23   point out that by asking the question together, by coupling the

24   two questions of ability to pay defense costs currently and

25   ability to repay in the event the case ultimately is determined

20

1    differently, I think Your Honor may have fallen into, perhaps

2    just on a testing the waters basis, what's really a Catch-22

3    that the carrier would like to set up.  On the one hand, they

4    have urged Your Honor -- and Your Honor rejected this on August

5    30th, correctly we believe -- on the one hand they urged Your

6    Honor to require the insureds to prove that they are broke in

7    order to get the advancement to which they are contractually

8    entitled but then in the next breath they have urged Your Honor

9    to rule that if the insureds are broke relief should be denied

10   because they will be at risk of non-repayment should the case

11   turn out adversely later in the day.  It seems to me, Your

12   Honor, that common sense and ordinary principles of equity tell

13   you that they can't have it both ways.  With respect to the

14   ability to repay, let me make the following, I think, also

15   common sense comment which is that the ability of an insured

16   who is facing criminal charges and is subject to a pre-trial

17   asset freeze order to repay at the conclusion of the criminal

18   trial depends in large part on how that trial comes out.  Now,

19   Axis, I think, would like for my client and the other criminal

20   defendants to lose their criminal trial because they will then

21   use that in the coverage dispute, but with respect to the

22   ability to repay I say to you that we need the defense costs

23   now in order to insure that the criminal trial comes out in

24   favor of our clients, which in turn has a bearing on the

25   ability to repay at the end of the day.

21

1          THE COURT:  Okay.

2          MR. GOLENBOCK:  Your Honor, Jeffrey Golenbock for

3    Mr. Bennett.

4          I would like to rely on the arguments that have

5    been made by my colleagues.  I don't think I need to add

6    anything further.  I'll, of course, answer any questions Your

7    Honor may have.

8          THE COURT:  Okay.  Thank you.

9          Ms. Gilbride.

10         MS. GILBRIDE:  Your Honor, the first thing I'd

11   just like to note for the record is that we have gone ahead as

12   suggested by Your Honor during the August 30th hearing and made

13   a motion to withdraw the reference.  I think it is important

14   for the Court to be aware of that.  Perhaps you are already

15   aware of that.

16         THE COURT:  I was.  Yes.

17         MS. GILBRIDE:  Okay.  That motion is before the

18   district court.  We're not quite sure where we are procedurally

19   with that so I can't report back where we are and when there's

20   going to be a hearing.  We have certainly asked that there be a

21   hearing expeditiously.  I believe that there will be, but we

22   face substantial opposition from the insureds with respect to

23   going that route as suggested by Your Honor on August 30th.

24         In any event, I don't believe we're here today in

25   the same posture that we were here on August 30th.  First of

22

1   all, the three moving parties here today initially moved to

2   dismiss Axis' complaint.  They joined in that motion.  That

3   motion was granted by Your Honor.  They have now turned around

4   and instituted an adversary proceeding seeking the same relief

5   sought by other moving parties and, Your Honor, I would suggest

6   that that is just fundamentally unfair and an abuse of the

7   legal system by these moving parties.

8          Additionally, Your Honor, these three defendants

9   are not in the same posture, on any test, particularly, one of

10  the three moving parties, as the moving parties on August 30th

11  who requested the preliminary injunction.  One of these parties

12  is the individual who signed the warranty letter that Axis

13  relied upon.  He's the individual who signed the application,

14  he's the individual whom the company disclosed in an SEC filing

15  three days after -- excuse me, shortly after the company went

16  public that he had hidden $430 million worth of receivables.

17  Well, that was information that Axis relied upon as well.  So,

18  Your Honor, I submit we are not in the same position that we

19  were in on August 30th.

20         With respect to the preliminary injunction, Your

21  Honor, I apologize first of all that we did not attach the Gaon

22  transcript.  It's not a published decision.  It's a transcript.

23  It was before Your Honor on August 30th.  It was submitted by

24  Arch, who sought to intervene on that day.  In any event, we'd

25  be happy to hand up a copy to Your Honor but you've already

23

1   made it clear that you're not going to rule upon it.  This

2   preliminary injunction was brought on very quickly as Your

3   Honor is aware and we apologize, again, for not submitting that

4   but I would strongly urge that the Court consider the

5   propositions that were articulated in that ruling, which

6   essentially our position is that what Judge Wood did was simply

7   apply Second Circuit case law which is clear that if you're

8   going to apply the lower standard for injunctions there has to

9   be a balancing of harms.  There's been no factual record made

10  before this Court; not one affidavit, not one individual has

11  come here to testify before Your Honor with respect to the

12  irreparable harm that they have allegedly suffered.  There is

13  no factual record before Your Honor, and I submit under Second

14  Circuit law that is simply fatal to an application for a

15  preliminary injunction.

16          Going to the balancing of harms, Your Honor, you

17  know, on the one hand you have individuals who have made no

18  factual showing whatsoever but who have come before Your Honor

19  and said that their defense is going to be devastated because

20  their defense counsel is not paid.  Well, I submit that that

21  should have been submitted to Your Honor in factual form.

22  There should have been evidence submitted to your Court of

23  that, not counsels' statements.  But in any event, so there's

24  no factual showing.

25          On the other side of the coin you have an

1    insurance company who has a policy provision that says if we

2    are ultimately successful we are entitled to repayment.  The

3    movants are here on a preliminary injunction.  Rule 65 provides

4    the answer to all of these questions.  If the Court is inclined

5    to grant the preliminary injunction, Your Honor, we would

6    suggest that the Court require the moving parties to post a

7    bond or some form of security so that in the event some court

8    agrees with Axis' position and finds that we have been

9    wrongfully enjoined that there is then some security for Axis

10   with respect to repayment.  Otherwise, Your Honor is advancing

11   something -- advancing relief to these parties on a very

12   preliminary basis without a full-blown hearing, with Axis'

13   complaint having been dismissed.  So with Axis not having the

14   ability to present its arguments in any shape or form and not

15   even requiring a factual showing by the parties and, you know,

16   Your Honor, we would submit under those circumstances at the

17   very least that the Court order these moving parties to post

18   some form of security in the event that Axis is successful.

19            You know, under the circumstances it's clear that

20   Axis has zero prospect of being repaid if at the end of the day

21   Axis is actually successful in whatever form we are able to

22   actually litigate our dispute.

23            With respect -- I don't know if you want to get

24   into the priority of payments issue, Your Honor -- the issue we

25   have there is that separate and apart from defense costs there

25

1  has been an executed MOU submitted to Axis, and as of today if

2  some court ultimately finds that there is actually coverage

3  under the policy and we are required to fund that settlement --

4  if the court says we should have considered that settlement as

5  of the date the settlement was executed, Your Honor will be

6  ordering us to advance defense costs in excess of our policy

7  limits.  Now, we are not at liberty to share that MOU with you

8  but --

9            THE COURT:  But you aren't paying under the MOU;

10  right?  Your clients aren't making a payment.  It's disputing

11  the coverage, I think.

12            MS. GILBRIDE:  Well, we've been asked to fund the

13  settlement.

14            THE COURT:  I know but you're not paying it.

15            MS. GILBRIDE:  I don't know that any determination

16  has been made.  Whether we are going to fund it or not has not

17  come to fruition.

18            THE COURT:  But I thought that Axis disclaimed

19  coverage?

20            MS. GILBRIDE:  Well, we did, Your Honor, but you

21  know, there's a moving target in terms of what the Court is

22  ordering us to do here.

23            THE COURT:  Well, but all I'm saying is the

24  individual -- I'm assuming it's an individual -- who submitted

25  the proposed settlement hasn't sought relief to compel payment;

26

1    right?

2                    MS. GILBRIDE:  Not yet.

3                    THE COURT:  Okay.  So how does requiring payment

4    of the defense costs, to somebody who hasn't sought that relief

5    -- and I'm assuming that anyone whose the beneficiary of the

6    policy knows that if this litigation is going on and would make

7    the same application that if they really wanted to enforce it,

8    but hasn't -- how does my ordering the -- if I were to do it --

9    the advancement of the defense costs put the insurer at a

10   disadvantage?

11                   MS. GILBRIDE:  Your Honor, historically, the

12   defense costs have been reimbursed by the two underlying

13   carriers on a first in/first out basis.  So if one was to

14   consider the settlement as of the date it was executed in that

15   line of payments and we do ultimately -- we are required to

16   fund the settlement -- by advancing these defense costs now, we

17   could theoretically or we would be asked -- we are being put in

18   a position where we potentially are paying fees --

19                   THE COURT:  Well, when was the MOU submitted?

20                   MS. GILBRIDE:  When was it executed?  August 30th.

21                   THE COURT:  Well, what --

22                   MS. GILBRIDE:  Well, it was signed on August 30th.

23                   THE COURT:  But when was it submitted to the

24   insurer?

25                   MS. GILBRIDE:  July 30th.

27

1          MR. EISEN:  No.

2          MS. KIM:  Yes, July 30th.

3          MR. EISEN:  The MOU submitted --

4          THE COURT:  But it was signed after it was

5     submitted?

6          MS. KIM:  Your Honor, may I address that issue?

7          THE COURT:  Okay.

8          MS. KIM:  Helen Kim on behalf of Mr. Klejna, Your

9     Honor.  The MOU which was a settlement demand from the lead

10    plaintiffs in the underlying securities litigation in In Re:

11    Refco securities litigation was submitted to Axis on July 30th

12    on the date it was received by Mr. Klejna.

13          THE COURT:  Okay.

14          MS. KIM:  With a request to Axis to assist in the

15    settlement and to --

16          THE COURT:  To assist, but as far as a settlement

17    itself, when was that submitted as a settlement?

18          MS. KIM:  Well, we requested Axis to join the

19    negotiations because they have an obligation under the policy

20    to consent to settlement.

21          THE COURT:  All right.  But as far as an

22    obligation to pay money in respect of a settlement --

23          MS. KIM:  Well, Your Honor, it is our position

24    that Axis has an obligation, once it's presented with a signed

25    settlement agreement, to either consent or not consent and so

28

1   it has to set aside money for a settlement if it consents.

2              THE COURT:  I'm sorry, it wasn't signed when it

3   was submitted to them in July; right?

4              MS. KIM:  Not on July 30th but after --

5              THE COURT:  It was signed at the end of August;

6   right?

7              MS. KIM:  It was signed on August 30th after Axis

8   gave us -- told us to proceed as a prudent uninsured and to

9   proceed accordingly.

10             THE COURT:  Okay.  So wouldn't that be the

11  relevant date then?

12             MS. KIM:  August 30th; correct, Your Honor.

13             THE COURT:  Okay.

14             MS. KIM:  So what we're saying is -- and this goes

15  to the issue of priority of payments -- as long as any order on

16  the preliminary injunction does not interfere with the priority

17  of payments under the terms of the Axis policy we don't believe

18  that there's a problem.

19             THE COURT:  Okay.  How would it interfere?  Say I

20  were to require payment of these three individuals' defense

21  costs as of the date of my order which, I forget, was that

22  either August 30th or 31st?

23             MS. GILBRIDE:  The 31st.

24             THE COURT:  How would it interfere with this

25  separate potential obligation?

29

```
 1              MS. KIM:  It would not, Your Honor.

 2              THE COURT:  Well, no, I was asking Ms. Gilbride.

 3              MS. KIM:  Oh, I'm sorry.

 4              MS. GILBRIDE:  If you were to order today as of

 5    August 31st?

 6              THE COURT:  Yes.

 7              MS. GILBRIDE:  We're just trying to look at the

 8    numbers and figure this out.  We were anticipating that Your

 9    Honor might be inclined to award advancement of defense costs

10    as of today.

11              THE COURT:  No, well, that wasn't my question.

12              MS. GILBRIDE:  Okay.  I know.  So I don't have the

13    answer readily available.  I apologize.

14              MS. KIM:  If it's $2.1 million as of August 31st

15    which were the numbers that we discussed earlier, there would

16    be nothing, Your Honor.  No interference whatsoever.

17              THE COURT:  All right.

18              MS. GILBRIDE:  Your Honor, I think that if it was

19    as of August 31st I agree that we would still be within the

20    policy limits.

21              THE COURT:  All right.  I'm not saying that that's

22    where I'm going on this.  I'm not saying that's -- no one

23    should read this as a determination of any allocation or

24    priority issues.

25              MS. KIM:  We understand, Your Honor.
```

30

1      THE COURT:  It's just that we're trying to figure

2  out the facts.

3      MS. KIM:  That's right, Your Honor, and we agree

4  with Your Honor.

5      MR. EISEN:  Your Honor, were the Court to decide

6  to enter the identical order as last time effective as of

7  today, the date of the order, it could also address this issue

8  by simply including the sentence that Ms. Kim requested.  We

9  and Ms. Kim's clients agree on that, that this order does not

10 affect the priority of payments in any way.

11     THE COURT:  Well, I know that an order can say

12 that, but as a practical matter it might wouldn't it?

13     MR. EISEN:  No, Your Honor, we think it would not

14 because the insurer is perfectly capable, as they've

15 demonstrated, of taking positions on the legal issues.  The

16 priority of payment issue is, we think, a make-weight issue.

17 The settlement has not been presented, much less approved.

18 They could certainly pay up to the limits without any risk.

19     THE COURT:  Well, no, let me -- as I understand

20 Axis' point, it's this, that although they have disclaimed

21 coverage, ultimately they might have to pay on the settlement,

22 and since the settlement came in as of a date that preceded

23 some of these bills, you know, the ones in September, they

24 would be paying these bills -- the post-September bills --

25 potentially out of sequence, first come/first serve.  Now,

31

1    maybe that's not right, maybe that priority doesn't depend on

2    first come/first serve necessarily, but that's their point.

3            MR. EISEN:  Your Honor --

4            THE COURT:  And they wouldn't have any ability

5    necessarily to get it back or reallocate it, necessarily.

6            MR. EISEN:  Your Honor, the issue is clouded

7    because the amount of the settlement is unknown.  However, I

8    can represent to the Court based on conversations with various

9    persons attempting to determine, you know, would you pay the

10   bills as of the beginning of September, mid-September, so on

11   and so forth, that the -- we believe it would be possible to,

12   without implicating the priority of payments issue at all, to

13   pay the bills through Friday. But, again, there is a safe

14   harbor for this, which is simply to provide in the order to

15   have us agree that pending the resolution in October the

16   insurer only needs to pay up to the amount of the settlement.

17   If, for example, the settlement is $6.5 million --

18           THE COURT:  No, I understand your point.  All

19   right.  So that would be a cap --

20           MR. EISEN:  That is a way to accommodate the harms

21   that the criminal defendants are facing and at the same time

22   give Axis a safe harbor.

23           THE COURT:  Okay.

24           MS. MOSES:  May I add a word, Your Honor, on the

25   priority of payment issue?  A word which is, I think,

32

1    particularly appropriate given Ms. Gilbride's comments

2    concerning consistency in litigation position.

3              We were required to initiate a new adversary

4    proceeding and to submit a pleading -- an adversary complaint -

5    - demanding payment of our defense costs in an ongoing schedule

6    in order to properly put this issue before Your Honor and be in

7    a position to ask Your Honor for a preliminary injunction for

8    that relief.  The settlement issue has never been teed up in

9    any pleading.  So, clearly, whether the Court has if you will

10   jurisdiction to rule on it at this point --

11             THE COURT:  Well, I don't think they're asking me

12   to rule on it, I think they're saying that as far as the

13   balance of the harms goes, I should take it into account.

14             MS. MOSES:  Well, second, Your Honor, Ms. Gilbride

15   has also asked Your Honor where's the evidence and has in

16   effect asked Your Honor to ask us for evidence of financial

17   condition, but, again, there has been no evidence presented to

18   Your Honor of the settlement or its amount or any of its

19   particulars, and, third, Your Honor, as we all know we have not

20   had an opportunity to brief this point but as we all know from

21   having practiced in federal court and under Rule 23 any

22   settlement in In Re:  Refco would have to be approved both

23   preliminarily and finally after a notice and comment period by

24   Judge Lynch before it would be binding on anyone.

25             THE COURT:  Okay.

33

1          MR. EISEN:  Your Honor, in addition to the very

2  last point that Ms. Gilbride made, I do think that we and

3  Ms. Kim's client and the other insureds agree that that

4  language that she suggested to the order that this does not

5  affect the priority of payments would allow the insurer to pay

6  up to what's available and then provide a safe harbor for the

7  rest.

8          May I very quickly be heard on Ms. Gilbride's

9  other points?

10          THE COURT:  Well, I hadn't finished asking her

11  questions.

12          MR. EISEN:  Okay.  I'll sit down.

13          THE COURT:  You can be, briefly, but after I -- I

14  want to go back over something that we spent a lot of time on

15  the last hearing, the interpretation of the provision of the

16  U.S. Specialty policy that says the insurer will pay covered

17  defense costs on an as incurred basis, and as I understand it

18  Axis' argument is that these defense costs aren't "covered"

19  under the policy?

20          MS. GILBRIDE:  Yes, Your Honor.

21          THE COURT:  But is that based simply on the

22  exclusions?

23          MS. GILBRIDE:  Yes.  It's based upon the warranty

24  and --

25          THE COURT:  Well, the warranty is not part of the

34

1   policy is it?

2           MS. GILBRIDE:  Well, it becomes part of the policy

3   and it provides for its own remedy, Your Honor.  It becomes an

4   exclusion by its own terms.  At the bottom of the warranty it

5   provides that it becomes part of the policy and becomes an

6   exclusion and it does not require any filing or adjudication of

7   facts, it simply requires that Axis in good faith make a

8   determination whether it applies to the facts before it and

9   determine whether or not there's coverage.

10          THE COURT:  Well, now you're moving away from the

11  warranty to the overall argument?

12          MS. GILBRIDE:  No, I was just saying what the

13  remedy is that the warranty provides.

14          THE COURT:  Okay.  All right.

15          Then I guess my other question on this same

16  contract issue is, you point to the following paragraph,

17  Paragraph 3, which is dealing with the allocation of losses

18  "covered" and losses "not covered" and say that that's further

19  indication that the insurance carrier was given the authority

20  under this contract to act unilaterally if it wasn't able to

21  agree; and my question is, I guess, why go through that

22  distinction at all in 3 if "coverage" pertains already?  Why

23  isn't that just a separate provision dealing with allocation?

24  I mean if -- as I take it your first argument is you can act

25  unilaterally as to whether something is "covered" or not.  Why

35

1    would the parties then have a whole separate provision that

2    would say the same thing?

3                MS. GILBRIDE:  Your Honor, we pointed to condition

4    (d)(3) simply as evidence that the entire policy should be

5    construed in context.  So our position is not that you should

6    go to (d)(3) with respect to this dispute, we rely solely with

7    respect to this dispute on (d)(1), but we rely upon (d)(3) as

8    evidence to be in support of our position under (d)(2); (d)(3)

9    is a provision that you actually utilize when there's covered

10   and uncovered claims.  So Your Honor is absolutely right that

11   you would not utilize (d)(3) in this dispute.  We were simply

12   pointing it out to show that it is consistent with Axis'

13   interpretation of (d)(2).  Our position is that (d)(2) says in

14   the first instance if defense costs are not covered, if the

15   policy is not triggered, then Axis, acting in good faith, of

16   course, would not have to advance defense costs.

17                THE COURT:  Okay.  Thanks.

18                MR. EISEN:  Your Honor, I'll take them in order

19   and I will attempt to be brief.

20                Ms. Gilbride's first point was that, after joining

21   in the motion to dismiss, for us now to seek advancement is an

22   abuse.  As the Court well remembers, we did not just join in

23   the motion to dismiss; in the alternative we also joined in the

24   motion to advance, and in response the Court asked us to take

25   procedural steps.  We've done that.  We've been crystal clear

36

1    throughout that we believe there's a legal obligation to

2    advance, so I think there's no inconsistency there.

3            In terms of the factual record issue, I really

4    would point the -- she first makes the point about irreparable

5    harm and then about the balance of the harms.  Our factual

6    showing is exactly the same factual showing that the other

7    moving insureds made.  It's exactly the same factual showing on

8    both of those points as was approved in WorldCom, so I think

9    that this is an argument that was made and that was rejected

10   and that does not --

11           THE COURT:  Well, I guess the only distinction

12   there is -- there seemed to be agreement between the parties

13   last week that the five D's and O's that were covered by the

14   injunction last week were fairly well-healed, and I mean that

15   was a point that Axis made and no one really disputed it -- and

16   that doesn't go to the point of irreparable harm but it does go

17   to their other point about ability to reimburse and I

18   understand your colleague's point about the Catch-22 or a

19   Hobson's Choice, but I think that may be a distinction between

20   last week's record and today's.

21           MR. EISEN:  Your Honor, I do think it is clear in

22   the WorldCom case that given the volume of the defense costs

23   here -- for example, as the Court knows in the KPMG criminal

24   litigation there was recently fact-finding by the district

25   court about what it costs to defend these cases.  Given the

37

1  volume, the precise -- you know, it is a harm on anyone and

2  that that factual showing is not required, we think, under the

3  case law.

4          I would also -- it goes to, I guess,

5  Ms. Gilbride's repeated statements both here today and in the

6  brief that there's zero prospect of repayment.  That really

7  turns the presumption of innocence on its head.  We believe the

8  clients will be acquitted.  We're looking to the Court for the

9  interim time so that we can keep working in September and at

10 the beginning of October towards that goal and to presume that

11 -- and Ms. Gilbride's conclusion really turns the legal

12 presumption on its head -- we think that she's made the wrong

13 analysis and she has not shown that there is zero prospect of

14 repayment, and, of course, I think zero prospect is an

15 overstatement.

16         On the priority of payments issue, we've already

17 made the point that there is a solution, which is to include

18 the language. And then the interpretation issues, we think,

19 have already been decided by the Court and those are queued up

20 for summary judgment, so I won't speak to those now unless the

21 Court wishes me to.

22         THE COURT:  Okay.  Anyone else?

23         MR. CASHMAN:  Your Honor, may I be heard for one

24 moment?

25         THE COURT:  Yes.  Sure.  I'm sorry, which one of

38

1   these movants do you represent?

2          MR. CASHMAN:  I represent defendant Philip

3   Silverman.  He was among those who received the benefit of Your

4   Honor's preliminary injunction last week.

5          THE COURT:  Okay.

6          MR. CASHMAN:  I just wanted to underscore, Your

7   Honor, that I do not believe the issue of priority of payments

8   is appropriately before Your Honor this morning.  I think I

9   would be remiss being here today, having listened to all these

10  arguments, if I did not simply point out to Your Honor that

11  there are various conflicting interests among the insureds that

12  would have to be assessed in connection with any priority of

13  payment argument that were made, and so I think the only issue

14  that ought to be addressed here today is simply whether or not

15  defense costs should continue to be advanced at the request of

16  the moving defendants here and through what date, I think.

17  Those are the only issues that need to be addressed and ought

18  to be addressed, because all the other issues are complicated

19  and raise varying issues that are not before you today and the

20  policy itself does not offer a simple solution to those issues.

21         THE COURT:  Okay.  Well, let me hear somebody who

22  hasn't spoken yet.

23         MR. WILOMOWSKY:  Good morning, Your Honor.  Steven

24  Wilomowsky of Bingham, McCutchen, LLP on behalf of RJM, LLC,

25  the plan administrator.

39

1          Your Honor, I just want to make a point on the

2    record with regard to this motion, because the tie-in that

3    brings these parties to this Court is the lift-stay aspect, is

4    obviously the Refco aspect, but it does not follow necessarily

5    that if the Court's analysis that led to the lifting of the

6    automatic stay to the extent applicable for the other

7    defendants necessarily applies to the movants that are here

8    today. And the reason is, Your Honor, the movants today,

9    particularly Mr. Bennett and Mr. Trosten, have not filed proofs

10   of claim against the estates.  Mr. Grant, also, though he did

11   file a proof of claim, his claim has been estimated at zero

12   dollars for all purposes including distribution.

13          To the extent that in considering today's motion

14   Your Honor, taking into account impact on the estate, I think

15   that there is a difference between just, for example,

16   Mr. Klejna, who does have a claim filed against the estate and

17   then, presumably, even though that hasn't been litigated or

18   allowed or disallowed yet, but at least it's a claim that's

19   there that potentially that any recoveries that they are able

20   to get out of Axis or any other insurer is going to serve to

21   reduce the claim against the Debtors' estates, whereas, with

22   respect to the recoveries, for example, that may be achieved by

23   Mr. Bennett, the only thing that's doing is really reducing

24   availability of insurance proceeds for other people who do have

25   claims and whose claims would be reduced if they were able to

40

1   receive insurance proceeds.

2          So we haven't taken a position in this litigation,

3   it's been until now, certainly, it hasn't been -- early on in

4   the cases there had been some involvement, we had been involved

5   with Lexington, and it's been a close call among the plan

6   administrators whether to -- this whole process is an expensive

7   one and it's been a very time-consuming litigation for the

8   parties here and so we've been reluctant to get involved,

9   since, ultimately, there are no dollars -- there are no

10  actually dollars that can come out of this policy that can come

11  back into the estates, but we did want to say that to the

12  extent that Your Honor is reviewing today's motion both in

13  terms of its own jurisdiction and in terms of the lift-stay

14  standards and elements, we would note that the estate is not

15  going to be benefitted to the extent that, for example,

16  Mr. Bennett were to recover from these proceeds.

17         THE COURT:  Whether you take Judge Baer's version

18  of it or Judge Gerber's version of it, doesn't <u>Adelphia</u> control

19  here?  I mean there's been -- at this point they're simply

20  indicted, they're not convicted, and under the <u>Adelphia</u> case

21  law, which I think is the most thorough discussion of this

22  issue, wouldn't they be entitled to the money?  Leaving aside

23  issues of allocation which, again, I don't think I'm going to

24  get into, but assuming that there are no allegation issues,

25  don't they come first?

41

1          MR. WILOMOWSKY:  Well, two responses to that.

2     First, to the extent -- if one supposes that the automatic stay

3     is applicable here and I understand that that could be an open

4     question --

5          THE COURT:  Well, I don't think there's -- people

6     should stop talking about the automatic stay.

7          MR. WILOMOWSKY:  Okay.

8          THE COURT:  It's a plan injunction.

9          MR. WILOMOWSKY:  Okay.

10         THE COURT:  The confirmation order is really clear

11    on this in Paragraph 34.

12         MR. WILOMOWSKY:  Okay.  That's correct, Your

13    Honor.

14         THE COURT:  So when people are saying "automatic

15    stay" I'm translating it in my head --

16         MR. WILOMOWSKY:  They mean --

17         THE COURT:  -- the plan injunction.

18         MR. WILOMOWSKY:  Okay.  You got it, Your Honor.

19         THE COURT:  So that's what we're talking about.

20         MR. WILOMOWSKY:  All right.  In response to your

21    question I think that the differences here is that at least

22    what Adelphia speaks to is the access that the parties can have

23    to the policy notwithstanding the fact that they may be under

24    criminal indictment or whatever their situation might be.  I

25    think it's a separate question as to -- and I may be

42

1    misremembering <u>Adelphia</u> but I don't think that there was a

2    question in terms of the claims or at least the jurisdictional

3    question, I guess, which is if there is no possible benefit to

4    the estate then should this be something -- should this Court

5    be enjoining -- should be requiring this particular result from

6    Axis when either way there isn't going to be any possibility of

7    a benefit to the estate even in the form of a reduced claim.

8    That's the question, I guess.

9              THE COURT:  Well, but it, I guess -- okay.  Now I

10   understand your point now.  It's a jurisdictional point you're

11   raising as opposed to a lifting of an injunction point.

12             MR. WILOMOWSKY:  I think so, Your Honor.

13             THE COURT:  But as far as jurisdiction goes, in

14   addition to the narrow "benefit" issue, isn't there

15   jurisdiction premised on the fact that the policy itself is

16   property of the estate and I'm being asked to interpret it,

17   and, secondly, the fact that it's one in a layering of excess

18   coverage and at some point if the policy is interpreted

19   properly and the facts play out properly in that layering -- in

20   that sequence of layers the estate will benefit because there

21   will be insurance that will pay claims either of D's and O's or

22   of other claimants -- third parties -- who were, under the

23   Plan, made the appropriate election to look to the litigation

24   and, obviously, the insurance that is behind the litigation.

25             MR. WILOMOWSKY:  I think that's right, Your Honor.

43

1    I think though that ironically though the granting of this

2    motion is more likely -- if you assume -- if we don't present -

3    -

4                THE COURT:  No, but you see that goes to the

5    merits as opposed to jurisdiction.  I understand, but sometimes

6    you have --

7                MR. WILOMOWSKY:  I understand, Your Honor.  That

8    was it.  I think I've said enough.

9                THE COURT:  Okay.

10               MR. JEROME:  Your Honor, may I be heard?

11               THE COURT:  Yes.

12               MR. JEROME:  Your Honor, I represent Joseph P.

13   Murphy along with Baker, Hostetler.  Mr. Murphy was an officer

14   of Refco in charge of marketing and ran the regulated company,

15   which as Your Honor may recall was sold in these bankruptcy

16   proceedings.  Now, Mr. Murphy, as an officer of Refco is

17   unfortunately embroiled in the various class actions.  He was

18   also a beneficiary of the various insurance policies which are

19   contested.

20               I think the dark and somewhat unstated fact here

21   is that as the assets -- and I'm not saying that it shouldn't

22   be done and that's not appropriate -- but equitably and fairly,

23   the unhappy fact is that as assets are burned for criminal

24   defense I have no doubt that the consequence of that will be

25   that Mr. Murphy will not in fact have enough funds from

44

1    insurance proceeds to answer to any judgment that might be

2    levied against him, and I also think he probably will not have

3    sufficient funds to defend himself in the class actions given

4    what I know and maybe my knowledge is deficient and Your Honor

5    knows, sometimes that happens with me, but it may be I'm right

6    and I think that I am.

7              So in terms of weighing the harm and the equities

8    here, while I'm not suggesting that the criminal defendants are

9    entitled to the relief that they seek here, I would like to

10   suggest that there is an opportunity that we have, an

11   opportunity of constricted time which we have between now and

12   October 12th when Your Honor will be called upon to make a

13   decision in respect of the permanent injunction.  I would hope

14   that in that constrained time frame we would, perhaps, resort

15   to some form of mediation. And I know, Your Honor, the other

16   insurance companies are not before you and I'm certainly not

17   asking that this Court, although it has the power, to compel

18   mediation.  I'm suggesting that the parties in the interests of

19   trying to iron out these various issues which will continue,

20   Your Honor, to come before this Court, because each and every

21   insurance company is going to deny coverage and is going to be

22   before this Court or some other court arguing this for months

23   on end, I think that if Your Honor would at least on the

24   record, while not compelling arbitration, suggest that it might

25   be a good idea for the parties to engage in between now and

45

1    October 12th and in addition to the parties, those other

2    insurers who are not before Your Honor may at least get a

3    friendly message which would encourage them to sit down and try

4    to at least get the process started.  I think that the result

5    of an appropriately negotiated, successful mediation could

6    result in evening out, I think, some of the tawdry races that

7    we're witnessing in terms of first come/first serve, have you

8    gotten your bills in or haven't you, and in point of fact,

9    Mr. Murphy's $13,000.00 bill for July wasn't filed on time.  We

10   were seven days late.

11          I know we'd like to avoid this and I think

12   mediation, hopefully, if it could resolve these matters could

13   resolve this, I think, unseemly race to the insurance

14   courthouse.  So, Your Honor, I would respectfully request that

15   this Court at least on the record encourage the parties to come

16   to some form of mediation.  I might add that there has been

17   some discussion between the parties on the subject and I think

18   that some of them might be favorably disposed to doing so.  If

19   some of the parties fall out and don't want to do it, that

20   doesn't mean that other parties involved, particularly my

21   client, my shared client, couldn't benefit from the mediation,

22   and in no way, shape or form, Your Honor, am I suggesting that

23   the mediation would prejudice these proceedings or interfere

24   with what's going to happen on October 12th.  I am suggesting

25   that we have a window of time, and I would hope that the Court

46

1  would encourage us and urge us to resort to mediation.

2          With that, Your Honor, I thank you very much for

3  your indulgence.

4          THE COURT:  Okay.

5          MR. EISEN:  Your Honor, I have a couple of very

6  brief points and then Ms. Moses will conclude on behalf of the

7  insureds.

8          With respect to counsel for Mr. Murphy's

9  statement, we wholeheartedly agree.  I don't know that it is

10  necessary or appropriate to be part of an order.  I take it

11  there's no disagreement as with the Debtor's position, they

12  haven't objected to the relief we seek and we think that the

13  idea of all sitting down and talking, bringing the other

14  insurers to the table is a good idea.  So, certainly, the

15  movants today do not need to be ordered to do that.  I do think

16  that the counsel's statement does emphasize the value of

17  issuing an order as of today that will apply to the payments of

18  these fees so that this race is not to the disadvantage of

19  some.  Obviously, we think the disadvantage is greater as to

20  the criminal defendants.

21          On the jurisdictional point that the Debtor

22  raised, the Court responded more eloquently and knowledgeably

23  than I can and I would only echo those points by saying, you

24  know, it really is one dispute that all of the movants are

25  queuing up for the Court.  The Court has already found that it

47

1    has jurisdiction, and as the Debtor noted, Mr. Grant had filed

2    the claims, they were disputed.

3              Then, finally, I looked back at whether it was

4    agreed or not as to the means of the previous movants and in

5    fact it was hotly contested.  Axis made the point very

6    forcefully that the previous insureds had not made a showing

7    either that they can't pay or that they can repay, and the

8    previous insureds replied with equal force that that is not the

9    test and I think the Court will find that the record is

10   completely devoid of that evidence because under WorldCom and

11   under Your Honor's holding that showing is not required in a

12   mega case of this kind and with that I will yield to my

13   colleague.

14             MS. MOSES:  Very briefly, Your Honor, and we do

15   appreciate the time you've devoted to this matter this morning.

16             Mr. Jerome used the term "unseemly" with respect

17   to the various insureds' request for defense payments.  I think

18   the only thing that can be said about that is that my client,

19   Mr. Trosten, and the other indicted plaintiffs, Mr. Bennett and

20   Mr. Grant, did not indict themselves.  They did not choose to

21   be criminal defendants, they are not --

22             THE COURT:  Well, I think he was just talking

23   about a rush to get bills in.  I think that's all he meant by

24   that.

25             MS. MOSES:  Right.

48

1          MR. JEROME:  That's correct, Your Honor.  Thank

2    you.

3          MS. MOSES:  With respect to the mediation point,

4    no lawyer wants to be in the position of resisting a suggestion

5    of mediation and I certainly am not going to put myself in that

6      position but I do think it is fair to point out that while

7    the parties can and I hope they will voluntarily discuss a

8    potential non-litigation solution to this issue between now and

9    October 12th, nothing that we do between now and October 12th

10   can stop the clock with respect to the underlying actions,

11   either civil or criminal, and particularly given Axis' history

12   of resisting to the very last moment and sometimes beyond and

13   its demonstrated reluctance to write a check until and unless

14   it is specifically ordered to do so by this Court, my own view,

15   Your Honor, is that settlement discussions with an eye towards

16   possibly a global settlement involving the higher tier carriers

17   as well will be far more effective and far more likely to

18   succeed after October 12th if, indeed, that is the date for

19   summary judgment.  Thank you.

20         THE COURT:  Okay.  Do you have anything to say,

21   Ms. Gilbride?

22         MS. GILBRIDE:  Yes, just very, very briefly, Your

23   Honor.

24         With respect to the arguments advanced by both

25   counsel that the WorldCom decision controls somehow, whether or

49

1    not Your Honor has to consider balancing of harms, I would just

2    simply submit that the WorldCom court did not consider

3    balancing of harms in any way, shape or form.  It didn't say

4    that you don't consider it, it simply wasn't considered.  There

5    is Second Circuit authority precisely on point which says that

6    the balancing of harms must be considered when the Court orders

7    a preliminary injunction.

8            With respect to the Catch-22 that counsel and Your

9    Honor are concerned about, respectfully, there is a provision

10   in the Federal Rules that deal with that precise issue, it's

11   Rule 65(c), which states that when ordering a preliminary

12   injunction a court can and should but has discretion, of

13   course, order that the party who is being awarded the

14   preliminary injunction either post a bond or securitize the

15   amounts being awarded, and, respectfully, I think that that

16   deals with the Catch-22 situation that counsel is referring to

17   and, perhaps, was meant for just that situation.

18           With respect to the priority of payments issue,

19   Your Honor, I haven't had a chance to confer with Baker &

20   Hostetler but if Your Honor so desires a copy of the MOU in

21   camera with consent of counsel, we'd be happy to submit that to

22   you if you so desire.

23           I have nothing further.  Thank you.

24           THE COURT:  Okay.

25           MR. EISEN:  Your Honor, could I just respond to

50

1    the WorldCom point, because it is in the case.

2                    THE COURT:  No, I read -- I know.

3                    I'm going to take a look at Judge Woods' decision,

4    so you can hand that up to me and I'm going to take a break,

5    but before I do that I'm going to deal with the two pre-trials

6    that I put at the end of the calendar and then I'll come back

7    to you all probably by -- hopefully, by 12:00 or 12:15, so you

8    can check your Blackberrys and make some phone calls and I'll

9    be back around 12:15 or so, is my guess, with a ruling.

10                   ALL ATTORNEYS:  Thank you, Your Honor.

11                   THE COURT:  So if you could hand that up and then

12    I'll take the American Express v. Rodriquez or Gloria Ramirez.

13                        [Off the record.]

14                   THE CLERK:  Please be seated.

15                   THE COURT: Before the Court is a motion for a

16    preliminary injunction brought by Messrs. Grant, Trosten and

17    Bennett in this adversary proceeding in which they are

18    ultimately seeking a declaratory judgment and permanent

19    injunction against Axis Reinsurance Company, an excess insurer

20    that is currently in line in the tiers of insurance coverage

21    obtained by the debtor, Refco, Inc., for its officers and

22    directors and itself.

23                   Procedurally, I should go through the history of

24    this matter briefly.  The first step in respect of this

25    insurance company or insurance coverage dispute was taken by

51

1   Axis in initiating an adversary proceeding against not only

2   Grant, Trosten and Bennett but the other officers and directors

3   of Refco, Inc. who have made claims in respect of the policy,

4   as well as Refco, for a declaratory judgment that Axis was not

5   obligated to pay under the policy.

6        That was followed by different responses by

7   various groups of defendants.  First, one group of defendants

8   represented by Weil, Gotshal moved to dismiss Axis' adversary

9   complaint. Second, another group of officers and directors made

10  a counterclaim for the advancement of defense costs, and third,

11  the present group, Grant, Trosten and Bennett, joined in or

12  purported to join in both of those requests for relief.  I

13  granted the motion to dismiss Axis' request for a declaratory

14  judgment as to its obligations generally under the policy to

15  provide coverage on the basis of the so-called "substantial

16  overlap" doctrine as set forth in numerous cases, including by

17  Judge Cote in In re: WorldCom, Inc. Securities Litigation, 2002

18  W.L. 31729501 (S.D.N.Y., December 5, 2002), as well as in

19  Adelphia and Enron.

20        The basis set forth in my bench ruling was that

21  ultimately the facts that Axis would need to establish to

22  prevail on its claim and, to the contrary, the facts that the

23  defendants would need to refute to defeat Axis' claim

24  substantially overlap with facts that would also in all

25  likelihood arise in the pending securities litigation before

52

1    District Judge Lynch, as well as, potentially, in the District

2    Court criminal litigation against Grant, Trosten and Bennett.

3              Turning then to the counterclaim and related

4    request  for a preliminary injunction, I determined that there

5    was a likelihood of success on the merits and irreparable harm

6    and, absent such, sufficient questions going to the merits and

7    the balance of harms in favor of the counter-claimants to

8    support an injunction requiring the advancement of their

9    defense costs billed through the date of my order.

10             However, I also concluded that procedurally the

11   request for the same relief by Messrs. Grant, Trosten and

12   Bennett was not properly before me, as they themselves had not

13   made a counterclaim and there was no adversary proceeding

14   asserting their claims against Axis and, consequently, no basis

15   for granting them a preliminary injunction.  They subsequently

16   remedied that procedural defect by commencing an adversary

17   proceeding and seeking and obtaining an expedited hearing on

18   their motion for a preliminary injunction for the advancement

19   of defense costs.

20             I should note as an aside that the parties should,

21   unless I'm missing something, promptly consolidate this

22   adversary proceeding with the counterclaim, which is now its

23   own adversary proceeding brought by the defendants represented

24   in part by Baker & Hostetler.

25             I won't go over at length the findings that I made

1    and the rulings that I made at the prior hearing.  They're set

2    forth in the transcript -- which I've reviewed as far as typos

3    and misheard words are concerned and corrected, and I hope

4    that's what the parties have.  I think it is.

5            I'll note that there was a procedural matter that

6    -- consistent with some of my remarks on the record, Axis has

7    subsequently moved in the District Court for withdrawal of the

8    reference of the adversary proceeding, and that well may be

9    heard before the hearing that I've scheduled for mid-October on

10   the ultimate relief requested by the counterclaim plaintiffs

11   and by Grant, Trosten and Bennett against Axis.

12           However, pending a determination of that motion

13   for withdrawal of the reference, I continue to have

14   jurisdiction and, as noted at the prior hearing and I think as

15   reiterated today in the colloquy with counsel for the Refco

16   plan administrators, I believe I have jurisdiction over this

17   matter and this adversary proceeding because it is one in which

18   I am asked to interpret the provisions of the Axis policy,

19   which is property of the debtor's estate, and, secondly,

20   because the payments under the policy affect distributions to

21   creditors of this estate, either creditors with indemnification

22   claims such as the directors and officers or, perhaps,

23   ultimately, securities law creditors and others who have made

24   claims not only against Refco but also against officers and

25   directors and under the plan agreed to a mechanism for pursuing

54

1    those claims jointly with the Refco estate.

2         This motion before me also seeks relief from --

3    what it says is the automatic stay -- to permit payment of the

4    insurance proceeds in respect of the advancement of defense

5    costs, which is also a "core" matter.  However, as I noted at

6    the last hearing, Paragraph 34 of the confirmation order

7    provides that the automatic stay itself is no longer in place.

8    However, it also notes that it does not otherwise amend the

9    Plan and the other provisions of the confirmation order, which

10   does contain its own plan injunction which may be implicated by

11   the payment of the defense costs.

12        In any event, because of that request, which I am

13   taking as a request for relief from the Plan injunction as

14   opposed to from the automatic stay, I also, as a third basis,

15   have jurisdiction here because ultimately I'm being asked to

16   interpret the Plan and enforce the Plan by considering relief

17   from the injunction in the Plan.

18        In short, the basis for the request for a

19   preliminary injunction is the movants' contention that under

20   the applicable insurance policies, which include the primary

21   policies as incorporated in the Axis policy, Axis is obligated

22   to advance, that is pay, defense costs, subject to

23   reimbursement if it's ultimately concluded that such defense

24   costs were not covered under the policy.

25        The movants contend that that contractual language

55

1    when coupled with the various presumptions regarding

2    interpretation of insurance policies under New York law

3    particularly provisions of insurance policies dealing with

4    exclusions and dealing with defense costs -- is clear and that

5    there's a substantial likelihood that they would prevail on the

6    merits.

7            They also contend that given the amount of defense

8    costs that have been incurred to date and the fact that they

9    are criminal defendants subject to freeze orders, the failure

10   to advance the defense costs irreparably harms them in that it

11   impairs their ability to mount an effective defense, in this

12   case of a criminal indictment.

13           They also contend that even if they were not a

14   substantial likelihood of success the balance of harms tips in

15   their favor given the foregoing contentions and the opposite

16   consideration that Axis is a very substantial corporation and

17   that it agreed to make these payments and take the risk of non-

18   payment in the policy.

19           Finally, they state, as a matter of public policy,

20   they should not be saddled with the payment of the defense

21   costs since that would vitiate the purpose of a D&O policy and

22   ultimately discourage parties from serving as officers and

23   directors of a corporation.

24           They have not presented any other evidence than

25   the amount of the defense costs and the fact that they are

1    facing a criminal trial in March of 2008 and the request for me

2    to take judicial notice of freeze orders.  That is, they've not

3    offered evidence as to their financial condition or their law

4    firms' willingness to work with the overhanging uncertainty as

5    to whether they would ultimately be paid for conducting the

6    movants' defense.

7              Axis has responded by, first, disputing that there

8    is a substantial likelihood that the movants would ultimately

9    prevail on the merits.  It is also contended that as a factual

10   matter irreparable harm has not been shown and that neither has

11   a balance of the equities tipping in favor of or a  balance of

12   the harms tipping in favor of the movants.  They also contend

13   that the public policy cited by some of the courts that have

14   previously considered this issue is less significant where an

15   officer and director is the subject of a criminal indictment

16   and is being defended in a criminal proceeding.  It has sought

17   a bond under Rule 65(c), as well.

18             Finally, it has contended that the relief that is

19   sought here is fundamentally inequitable because the movants

20   had previously joined in the motion, which was successful, to

21   dismiss Axis' declaratory judgment complaint.

22             As far as the amount of the defense costs is

23   concerned, I believe the record is now clear that through the

24   date of my prior injunction order, August 31st, the cost billed

25   was approximately $1.6 million for these three movants and that

57

1    it is approximately $2.9 million as of today.  The policy

2    itself has a $10 million limit.

3            Clearly, as far as these defendants are concerned,

4    they have been in serious litigation mode with very large

5    defense costs being incurred since July of this year, and it is

6    likely that that will continue over the next several months as

7    they prepare for trial in what appears to be a complex, at

8    least as a factual matter, case.  And I'll note in that regard

9    that I take judicial notice of the cost incurred by the Refco

10   estate of examining the facts and circumstances surrounding the

11   claims that at least overlap with the claims against

12   Mr. Bennett and the other two criminal defendants, costs which

13   I had to approve before they were paid.

14           Let me turn to the last point raised by Axis

15   first.  I concluded last week that it is not inequitable to

16   proceed with this type of claim and to grant preliminary

17   injunctive relief notwithstanding the movants' prior request to

18   dismiss Axis' complaint, although they along with Weil, Gotshal

19   were successful in that request or the Weil, Gotshal defendants

20   were successful in that request.  I do not believe there is a

21   basis for judicial estoppel here because I believe that the

22   issues pertaining to the motion to dismiss are fundamentally

23   different than the issues presented by the claim asserted in

24   the present adversary proceeding as well as the counterclaim

25   asserted by the other defendants.

1          As I noted previously, the basis for this request

2     is one in which I need not consider the factual issues that

3     overlap with the District Court securities litigation and the

4     criminal litigation but rather need only consider the language

5     of the contract, that is the insurance policies and the related

6     warranty, and applicable case law.  If, in fact, I were to

7     conclude ultimately that Axis was not obligated to advance

8     defense costs but could withhold those costs pending a

9     determination as to whether they were -- whether Axis would be

10    successful in concluding that this denial of coverage was

11    appropriate and correct, then there would be an overlap and at

12    that point this adversary proceeding and the adversary

13    proceeding brought by the counterclaim parties would be either

14    stayed or dismissed without prejudice pending the development

15    of those facts in the multi-district securities litigation

16    and/or the criminal case.  But I believe I can -- and unless

17    the reference is withdrawn, I must -- consider whether as a

18    matter of reading the insurance policies and the case law and

19    the related warranty whether there is a separate obligation to

20    advance defense costs prior to determination of the underlying

21    coverage dispute based on whether there was a misrepresent -- a

22    breach of the representation -- a breach of the so-called

23    warranty and/or the exclusions in the policy relied upon by

24    Axis for disclaimer of coverage apply.

25          Turning then to the other defenses raised by Axis,

59

1    let me address first the appropriate standard by which I should

2    consider the motion here for a preliminary injunction.  Axis

3    contends that because the relief sought here is one in which

4    Axis would be compelled to advance defense costs, this is a

5    request for mandatory injunctive relief rather than for a

6    prohibitory injunction.  Consequently, Axis argues, I need to

7    consider the request pursuant to a heightened standard that

8    applies to mandatory injunctions -- where I would have to find

9    on the merits a substantial likelihood that the plaintiffs

10   would ultimately prevail.  See, for example, Tom Doherty

11   Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 35

12   (2d Cir. 1995).  In that case, the Second Circuit noted that

13   the distinction between a mandatory and a prohibitory

14   injunction has been the subject of criticism and particularly

15   noted the criticism of that standard in respect of breach of

16   contract cases where one party's assertion that the status quo

17   is merely being maintained is another party's assertion that

18   that party is actually breaching the status quo by breaching

19   the underlying agreement.

20          This very issue was addressed by what I believe to

21   be the leading case, or the most relevant case to the issues

22   before me, that is Judge Cote's opinion in In re: WorldCom,

23   Inc. Securities Litigation, 354 F. Supp. 2d. 455 (S.D.N.Y.

24   2005) in which she concluded ultimately that the heightened

25   standard for a preliminary mandatory injunction does not apply

60

1    to a motion for a preliminary injunction for the advancement of

2    defense costs, for the reason that -- for the reasons that she

3    lays out at Page 463 of that opinion.  She notes first that in

4    that matter, as well as here, given that the amount at issue is

5    well under the policy limit that a preliminary injunction would

6    not make it difficult or impossible to render a meaningful

7    remedy to a defendant who prevails on the merits at trial, and

8    that only part of the benefits to which the directors, in this

9    case the directors and officers, are seeking ultimately would

10   be covered here in the injunction.  And, secondly, that the

11   policy itself contemplated reimbursement.

12          That view was also recently followed in Great

13   American Insurance Company v. Gross, 2005 U.S. District Lexis

14   8003 (E.D. Va., May 3, 2005), which was vacated on other

15   grounds, 468 F. 3d 199 (4th Cir. 2006).

16          So I don't believe that I must follow the

17   heightened standard requiring the finding of clear likelihood

18   or a substantial likelihood of success on the merits.

19   Nevertheless, I have considered obviously whether there would

20   be a likelihood of success on the merits, as did Judge Cote in

21   the WorldCom case, but did not limit my inquiry to that

22   analysis but considered also the regular standard.

23          I conclude that, as did Judge Cote, in her words,

24   nevertheless even if the heightened standard applies I believe

25   that the movants here have established a clear likelihood of

61

1    success on the merits.

2              Let me turn to the merits now.  As Judge Cote

3    recognized, under New York law (and as an aside I previously

4    concluded that New York law should apply to disputes in respect

5    of this insurance coverage for the reasons set forth in my

6    earlier bench ruling), while the plain language of an insurance

7    agreement, as with any contract covered by New York law, is the

8    best evidence, and, if unambiguous, the only evidence, of the

9    parties' intentions, as a matter of law for the Court to

10   decide, in respect of insurance contracts, to the extent an

11   ambiguity exists and is unresolved by extrinsic evidence, such

12   ambiguity is read against the insurer.  The rule that insurance

13   policies are to be construed in favor of the insured is most

14   rigorously applied in construing the meaning of exclusions

15   incorporated into a policy of insurance or provisions seeking

16   to narrow the insurer's liability. And, finally, that where a

17   contract of insurance includes the duty to defend or to pay for

18   the defense of its insured that duty is a "heavy" one.

19             As set forth by Judge Cote, in addition under New

20   York law, including as interpreted by the Appellate Division in

21   the Kozlowski/Tyco case, as well as by numerous Southern

22   District courts, the duty of an insurer to pay an insured's

23   defense costs is distinct from and broader than its duty

24   ultimately to indemnify. Even where the policy does not provide

25   specifically for when defense costs are to be advanced, it has

62

1    been held that they need to be advanced as incurred under a

2    liability policy as set forth in Judge Baer's <u>Nu-Way</u> decision.

3           Moreover, it appears clear to me under New York

4    law that the duty to pay defense costs exists whenever a

5    complaint against the insured alleges claims that <u>may</u> be

6    covered under the insurer's policy.  That is, if it appears

7    from the face of the underlying complaint against the insured

8    that there is an issue as to whether that complaint sets forth

9    a claim that <u>may</u> be covered the costs would need to be

10   advanced.  See, for example, the <u>Kozlowski/Tyco</u> case as well as

11   the <u>Nu-Way</u> decision, which appears at 1997 U.S. District Lexis

12   11884 (S.D.N.Y. August 12, 1997).

13          The opposition to the motion by Axis attempts to

14   make a distinction between situations where the courts have

15   considered a refusal to pay defense costs because the insurer

16   has sought or has taken the position that the policy was

17   rescinded.  It has also taken the position that there should be

18   a distinction between the present matter and decisions which

19   have dealt with the duty to defend as opposed to a duty to

20   advance defense costs.  But I conclude based on my review of

21   the case law that where an insurer takes the position that a

22   claim is not covered and therefore it is not obligated to

23   advance defense costs those distinctions are not meaningful, in

24   that they apply in cases of rescission, cases where there's an

25   alleged obligation to advance and cases where there's an

63

1    alleged obligation to defend.

2           For example, in the Tyco/Kozlowski matter the

3    insurer alleged that the underlying claims were not covered and

4    therefore the defense costs would not be covered either.  The

5    Court held, however, that unless the insurer has no duty as a

6    matter of law it would have an obligation to advance the

7    defense costs, stating that the duty to defend or pay defense

8    costs is construed liberally and any doubts about coverage are

9    resolved in the insured's favor.  Furthermore, an insurer can

10   only invoke a policy exclusion to avoid coverage if it can show

11   that the allegations in the complaint casts that pleading

12   solely and entirely within the policy exclusions.  The duty to

13   defend arises when the action is brought and is unaffected by

14   the outcome of the action.  See, also, Pepsico, Inc. v.

15   Continental Casualty Company (S.D.N.Y. 1986), McGinnis v.

16   Employer's Reinsurance Corporation, 648 F. Supp. 1263 (S.D.N.Y.

17   1986); The Great American Insurance Company v. Gross case that

18   I referred to earlier and G1 Holdings, Inc. v. Heyman -- I'm

19   sorry, G1 Holdings, Inc. v. Reliance Insurance Company, 2006

20   U.S. District Lexis 17597 (D. New Jersey, March 22, 2006).

21          Axis' response, in addition to saying that it need

22   not advance the costs pending resolution of the dispute, is

23   that it is clear from the language of the insurance policy

24   itself that there is no way that it would be obligated to

25   provide coverage here.

1          As I noted in my prior ruling on the earlier

2    request for an injunction, this is ultimately premised upon

3    Axis' reading of Paragraph D2 of the underlying policy which

4    states that "the insurer will pay covered defense costs on an

5    as incurred basis.  If it is finally determined that any

6    defense costs paid by the insurer are not covered under this

7    policy the insured's agree to repay such non covered defense

8    costs to the insurer."  Axis contends that because of the word

9    "covered" in the first sentence, it need not pay costs that are

10   not covered under the policy.

11          I conclude that it is likely that that

12   interpretation will not prevail, given the foregoing case law

13   as well as the provision when read as a whole, which, first,

14   requires the insurer to pay covered defense costs "on an as

15   incurred basis," i.e. not waiting until an ultimate

16   determination, but as incurred with out of pocket payment, and,

17   secondly, the second sentence, which provides for reimbursement

18   if it is finally determined that any defense costs paid by the

19   insurer were not covered.

20       Axis contends that the word covered in the first sentence

21   has to mean "covered" by the policy but I have two responses to

22   that. The first is that I see little difference between that

23   argument and an argument that says that, as in the cases that I

24   previously cited, a defense cost falls into an exclusion

25   because it's not for costs determined to have arisen from

65

1    defense of a claim covered by a policy -- i.e. the policy, it

2    was argued in those other cases, doesn't cover certain types of

3    claims and, therefore, the defense costs also would not fall

4    into the coverage of the policy.  Notwithstanding those

5    arguments, courts like the Kozlowski court determined that the

6    costs should be advanced pending ultimate determination of that

7    issue.

8            Secondly, "covered" -- when one looks at the

9    definition of defense costs and loss in the first sentence --

10   "covered," as used in the first sentence after looking at those

11   definitions, could mean whether it pertained to "insured

12   persons," or not, or whether those persons had become "legally

13   obligated," or not, to make the payments of their defense

14   costs.

15           So, in any event, I believe that ultimately it is

16   likely that the movants here would prevail on the merits. I

17   conclude that the following paragraph of the policy, which

18   deals with the allocation of losses covered and losses not

19   covered by the policy, does little to advance Axis'

20   interpretation and may slightly advance the movants' in that it

21   would seem to be superfluous if Axis' interpretation were the

22   correct one.  That is, you would not need to provide for a

23   distinction between losses covered and losses not covered if

24   the insurer could withhold under Paragraph D2, defense costs

25   that it believed were not covered.

1          I do not believe the language, which, again,

2     requires payment on an "as incurred," basis is materially

3     different from the language quoted by Judge Cote in the

4     WorldCom case and would need to be far clearer to create an

5     exclusion here.

6          Turning to the issue of irreparable harm, Judge

7     Cote found in WorldCom that wherever individual officers and

8     directors were faced with substantial defense costs that were

9     not being paid, they would -- they were subject to irreparable

10    harm.  As she says, "it is impossible to quantify the impact on

11    a litigant of a failure to have adequate representation at this

12    critical stage of litigation.  The ability to mount a

13    successful defense requires competent and diligent

14    representation.  The impact of an adverse judgment will have

15    ramifications beyond the money that will necessarily be

16    involved."  That's especially true, as noted by Judge Gerber in

17    the Adelphia/Regis case where the insured or the beneficiary of

18    the policy is the subject of a criminal proceeding.

19          Judge Cote is not alone in finding irreparable

20    harm in these circumstances.  It was also found in the G1 and

21    Gross cases that I cited earlier, as well as in McPeek v.

22    Travelers Casualty & Surety Company of America, 2006 U.S.

23    District

24    Lexis -- I'm sorry, excuse me.  Let me back up.

25          It was recognized in the Bondex International,

67

1   <u>Inc. v. Hartford Accident & Indemnity Company</u> case, 2006 U.S.

2   District Lexus 50083 (N.D. Ohio, July 21, 2006), to apply in a

3   case of an individual beneficiary or insured under a director's

4   and officer's policy but would not apply to a corporation, at

5   least absent evidence of insolvency, which again I believe

6   heightens or puts a fine point upon the burden faced by an

7   individual here.

8           There is one case that takes a contrary view, and

9   that is the <u>McPeek</u> case that I started to cite earlier.  <u>McPeek</u>

10  <u>v. Travelers Casualty & Surety Company of America</u>, 2006 U.S.

11  District Lexis 28619 (W.D. Penn., May 10, 2006), in which the

12  court found there was not irreparable harm because there had

13  not been a showing, a factual showing, that the beneficiaries

14  there would be unable to mount a defense.

15          There may conceivably be circumstances where an

16  additional factual showing would need to be made to establish

17  irreparable harm in this context, but I believe that there's a

18  sufficient record before me to show irreparable harm given the

19  substantial amount of the defense costs, the freezing of the

20  defendants' assets and the fact that they're subject to

21  criminal exposure.  So to the extent that I find <u>McPeek</u> at all

22  persuasive, I believe it's distinguished under the present

23  circumstances.

24          As did Judge Cote, therefore, I've concluded, although I

25  do not believe the heightened standard needs to apply, that the

1  movants meet it here.

2         Turning, however, to the ordinary standard for a

3  preliminary injunction, I've already discussed the merits, and

4  even if one were not to take the view that there was a clear or

5  substantial likelihood of success, for the reasons I've stated

6  I believe there is definitely sufficient a issue going to the

7  merits that I would turn then to the balance of harms, as the

8  merits are fair ground for litigation.

9         I conclude that the balance of harms tips

10 decidedly in favor of the movants here.  I believe that

11 although she did not have a heading in her opinion in which she

12 balanced the harms, Judge Cote did consider the harm not only

13 to the movant in not granting injunctive relief but also the

14 potential harm to the insurer were she to grant the relief, and

15 concluded, as I conclude here, that the balance of harms tips

16 decidedly in favor of the movant and that, as she discussed,

17 the fact that the -- in her belief there was no undue hardship

18 on the insurer as its liability is ultimately capped and,

19 secondly, that the policy set out a mechanism that the insurer

20 bargained for for reimbursement ultimately and that

21 particularly in light of the potential harm to the movant and

22 the public interest in favor of advancing the defense costs,

23 the insurer should not be entitled to more.

24         In a more explicit analysis both the McPeek and

25 Great American v. Gross cases similarly found a balance of

69

1    harms tipping in favor of the movant as well as the public

2    interest being in favor of the movant.

3                As noted at oral argument, Axis had cited to me an

4    unpublished -- including not appearing on either Lexis or

5    Westlaw -- ruling by Judge Wood in a civil matter, Gaon v. Twin

6    City Fire Insurance Company.  I've reviewed that,

7    notwithstanding the Second Circuit's rule on citation to

8    unpublished opinions and the fact that a copy of the ruling was

9    not obtainable by the Court or provided to the Court prior to

10   oral argument, and I conclude, first, that the decision by

11   Judge Wood is distinguishable in that she had, to my mind, a

12   far different view of the underlying merits of the case, which

13   was a very different case than the case before me. I note

14   further that while she mused that cases such as WorldCom may

15   not have considered sufficiently the balance of harms or the

16   balance of the equities, I do not view her as ultimately ruling

17   on that basis.

18                In any event, again, as I distinguished the McPeek

19   case, I believe that the amount at issue here and the fact that

20   this is a criminal matter distinguish the present matter from

21   Gaon.

22                As far as Axis' request that the movants post a

23   bond under Rule 65(c) incorporated by Rule 7065, I again follow

24   the logic set forth by Judge Cote in WorldCom, which was also

25   adopted by the Great American v. Gross and G1 cases that I

70

1  cited earlier: effectively, to require a bond here in my view

2  would vitiate the entire ruling, particularly since these are

3  individual defendants.  In essence, it would under the guise of

4  obtaining a bond require the movants to pay for insurance all

5  over again, notwithstanding the language of the policy.

6          So I exercise my discretion not to require a bond

7  in these circumstances. I do so also mindful that the amount

8  that I'm going to require to be advanced is well within the

9  capped amount of the policy and that, as I noted earlier, the

10 ultimate issues here are teed up for a final determination in

11 31 days, and that leads into the last part of my ruling.

12         It was requested by Axis that I rule as to the

13 proper allocation or priority of payment of funds directed to

14 be paid, if any, by me. I do not believe that request is

15 appropriately before me, given the seriousness of it, the

16 parties who would be affected by it, and the limited amount of

17 notice.  As importantly, I don't believe it's a ripe question,

18 because I don't believe any other priority or any priority

19 issues are necessarily determined by my ruling today, and,

20 further, although this is not critical to my ruling, I don't

21 believe that my ruling today would put Axis in a position of

22 acting at its peril and paying out one way or another under the

23 policy, which it has generally disclaimed and refused to pay

24 out under, absent a judicial ruling requiring it to do so.

25         It appears to me that, therefore, an order

1   requiring payment with a full reservation of rights as to the

2   allocation, or priority, of payment generally under the policy

3   is appropriate.  I've determined, given the record as to the

4   billing of costs and the incurrence of costs, that it would be

5   appropriate to require Axis to advance the defense costs to

6   these three movants billed through the date of my prior order

7   so that there's no, if you will, acceleration of billing, and

8   that in my view the costs through the date of the prior order

9   were in large measure billed in the ordinary course and I think

10  appropriately paid.

11          I also believe that requiring the payment through

12  that date puts these three movants on an even footing with the

13  other movants who previously obtained the preliminary

14  injunction.  Given that I will be ruling, unless the reference

15  is withdrawn, at or around October 12th, I believe that my

16  present ruling would provide sufficient comfort to the law

17  firms defending these three individuals that they will continue

18  to provide the same level of service going forward without the

19  necessity of paying them the additional amounts that have been

20  billed starting in September and through today and that such

21  payments would not be necessary to avoid irreparable harm in

22  light of this ruling.

23          So it has been represented by counsel for the

24  movants that they would propose an order that's substantially

25  similar if not precisely similar to the prior injunction that I

72

1    had entered. I believe it would contain the language about,

2    though, the reservation and preservation of all issues as to

3    priority of payment.  Have you -- do you have such an order?

4                    MR. EISEN: Your Honor, I have the following order.

5    I also have a disk.  This order is identical other than

6    changing the identities of the parties.  I provided a copy to

7    Ms. Gilbride and I provided a copy to Ms. Kim before the

8    hearing today.  If the Court likes as last time I can hand this

9    draft up and the Court can --

10                   THE COURT: Does it have the language about the

11   reservation of rights as to priority?

12                   MR. EISEN: It does not have the language about

13   reservations of rights.

14                   THE COURT: All right.  Well, you should consider

15   the injunction effective as of today but I think you should

16   circulate that language because I think it's meaningful to the

17   parties and you can submit an order tomorrow.  It's 1:20 now.

18   You may get it in today, but submit it with that language.  You

19   don't have to settle it on the parties but they'll have some

20   time.  You should email it to them at the same time you submit

21   it to Chambers.  They can tell me if it doesn't agree with my

22   ruling.

23                   MR. EISEN: I will, Your Honor.

24                   MS. GILBRIDE: Your Honor, given the amount of

25   money involved and the fact that we've only recently received

73

1   most of these bills, Axis would respectfully request a

2   reasonable amount of time to review the bills and --

3              THE COURT: It's the same as the last ruling.  I

4   think it's -- it doesn't change anything as far as the policy,

5   as far as your other rights under the policy including

6   reviewing the bills, et cetera.

7              MS. GILBRIDE: It's just the turnaround time.

8   Since we've just gotten the bills it does take a little bit of

9   time to review the bills.

10             THE COURT: Again, this doesn't change that.  I'm

11  not saying you pay them tomorrow.

12             MS. GILBRIDE: I think the order says that we pay

13  them within ten days of the order.

14             MR. EISEN: Your Honor, if I understand the Court

15  correctly, it's only the bills that were presented to Axis as

16  of the Court's previous --

17             THE COURT: The date was August 31st.

18             MR. EISEN: August 31st.

19             MS. GILBRIDE: Presented to us or through that day?

20             THE COURT: Yes, billed.  Billed.

21             MR. EISEN: It's that the -- what I understood the

22  Court to be saying was the insurers had -- if the insurer had

23  the bills in hand as of August 31.

24             THE COURT: Okay.

25             MS. GILBRIDE: Thank you.

74

1          THE COURT: Now, as far as -- I know we're having -

2     - I had previously scheduled a telephonic conference on the

3     14th.  I saw the result in front of Judge Koetl. I don't know

4     whether there will be a motion for a stay or not.  I don't know

5     where you're going with withdrawal of the reference but I would

6     like to keep this on track for the 12th.  So --

7          MS. KIM:  Yes, Your Honor, that is our intention

8     to keep the motion for summary --

9          THE COURT: So I think we should still have that

10    conference on the 14th.

11         MS. KIM: That's fine, Your Honor. With respect to

12    Judge Koeltl, Judge -- we had an oral argument last Wednesday.

13         THE COURT: I read the -- someone attached the

14    transcript and the ruling.  So I'm up to date on that I think

15    unless there -- I read what was attached to the exhibit as an

16    exhibit.

17         MS. KIM: Well, actually that transcript, Axis

18    submitted a letter --

19         THE COURT: I saw that.  I saw that.  Very well.

20    Mr. Jerome raised the issue of mediation.  This is perhaps an

21    appropriate thing for the parties to do it.  I did not hear

22    Axis say whether it would be amenable to mediation or not. I

23    think it would need to include the other insurers.  It seems to

24    me that the parties should consider mediation, but I don't

25    believe that these issues should be put on hold unless there is

1    substantial progress in such a mediation.  It seems to me that,

2    as I noted at the last hearing --

3              MS. GILBRIDE: Just so Your Honor is clear, it was

4    actually Axis' suggestion initially.

5              THE COURT: That's fine.  I'm happy if Axis wants

6    to mediate, but I think there are other insurers involved and

7    that would be fine to have happen but there's a -- I believe

8    there's a legal regime that governs in this area where insurers

9    refuse to pay under policies and the parties are free to

10   mediate but that legal regime governs and I think it needs to

11   be followed because there are consequences beyond just a ruling

12   by the Court as to whether the insured failed to pay or not.

13   So I'm not going to hold off in the litigation unless there's

14   substantial progress on a mediation, and I encourage the

15   parties to try to make substantial progress on it.  But I'm

16   afraid "the parties" means not just Axis but other parties.

17   This is not a litigation matter.  This is a mediation matter

18   and I think, as a practical matter, to mediate it you're going

19   to need other parties, the other insurers.

20             Ms. Kim.

21             MS. KIM: Your Honor, just one last housekeeping

22   matter.  Our intervention motion, I don't think anyone -- no

23   one opposed it.  So if you could just --

24             THE COURT: That's fine.  I obviously heard you

25   all. Again, the two proceedings should be consolidated, I

76

1   believe.  They raise the same issues in terms of interpreting

2   the contract at least.

3                MR. EISEN: Your Honor, we would move for

4   consolidation.  If the Court wants to order that now then we'll

5   take the appropriate steps with the clerk.

6                THE COURT: Do you want to think about that?

7                MS. GILBRIDE: Your Honor, we would appreciate an

8   opportunity to consider that.

9                THE COURT: That's fine.  That's fine.  It seems to

10  me it's sort of --

11               MR. EISEN: Thank you, Your Honor.

12                         *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

77

1      I certify that the foregoing is a court transcript from

2     an electronic sound recording of the proceedings in the above-

3     entitled matter, except where, as indicated, the Court has

4     modified the transcript.

5

6                             _____

7                                     Shari Riemer

8    Dated:  September 12, 2007

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25