UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: REFCO INC. SECURITIES LITIGATION | MDL-1902 (GEL) |
| MARC S. KIRSCHNER, as Trustee of the Refco Private Actions Trust, <br><br> Plaintiff, <br><br> v. <br><br> PHILLIP R. BENNETT, SANTO C. MAGGIO, ROBERT C. TROSTEN, MAYER, BROWN, ROWE & MAW, LLP, GRANT THORNTON LLP, AND ERNST & YOUNG U.S. LLP, <br><br> Defendants. | Case No. 07 CV 08165 (GEL) <br><br> Judge Gerard E. Lynch <br><br> **ORAL ARGUMENT REQUESTED** |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT ERNST & YOUNG LLP'S MOTION TO DISMISS

Miles N. Ruthberg
Christopher Harris
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York  10022
(212) 906-1200

William P. Hammer, Jr.
Associate General Counsel
Ernst & Young LLP
5 Times Square
New York, NY  10036-6530

*Attorneys for Defendant Ernst & Young LLP*

June 6, 2008

# Table of Contents

**Page**

I.     PRELIMINARY STATEMENT ............................................................................1

II.    BACKGROUND ..............................................................................................5

III.   LEGAL STANDARDS ......................................................................................5

    A.    Applicable Law..................................................................................5

    B.    Standard For Motion To Dismiss..........................................................6

IV.    PLAINTIFF'S AIDING AND ABETTING CLAIMS AGAINST EY ARE
      INSUFFICIENT AS A MATTER OF LAW. ............................................................7

    A.    Plaintiff Fails To Allege Adequately That EY Had Actual Knowledge Of
        Either Scheme. ..................................................................................7

        1.    Plaintiff Must Allege That EY Had Actual Knowledge Of The
            RCM Customer Scheme. ..........................................................8

        2.    Plaintiff Fails To Allege Any Facts That Would Show EY Had
            Actual Knowledge Of The RCM Customer Scheme................................10

        3.    Even If Knowledge Of The Receivable Scheme Were Sufficient,
            Plaintiff Does Not Adequately Allege Such Knowledge...........................13

    B.    Plaintiff Also Fails To Allege Adequately That EY Substantially Assisted
        Either Scheme. ..................................................................................15

        1.    The Only Conduct Alleged To Have Substantially Assisted The
            Injury Was EY's Preparation Of Tax Returns. ...........................................15

            a.    Any Alleged Inactions Are Irrelevant Because EY Did Not
                Have A Duty To The FX Customers. ...........................................16

            b.    The Complaint Alleges No Other Acts By EY That
                 Substantially Assisted The RCM Customer Scheme.....................18

        2.    EY's Preparation Of The Tax Returns Did Not Assist Or Help
            Conceal Either Scheme. ..........................................................18

            a.    Plaintiff Must Allege That EY Furthered The RCM
                Customer Scheme, Not Just The Receivable Scheme. .................18

**b.**  The Preparation Of The Tax Returns Did Not Assist Or Conceal The RCM Customer Scheme. ..........................................19

**c.**  The Preparation Of The Tax Returns Did Not Assist Or Conceal The Receivable Fraud. ...................................................20

**3.**  Plaintiff Fails To Allege Facts Showing That The Preparation Of Refco's Tax Returns Was The Proximate Cause Of The FX Customers' Injuries.................................................................................22

**V.**  CONCLUSION...............................................................................................25

## **Table of Authorities**

## **FEDERAL CASES**

**Page**

*ATSI Communications Inc. v. Shaar Fund Ltd.*, 493 F.3d 87 (2d Cir. 2007) ....................6

*AUSA Life Insurance Co. v. Ernst & Young*, 119 F. Supp. 2d 394 (S.D.N.Y. 2000) ........25

*Aquino v. Trupin*, 833 F. Supp. 336 (S.D.N.Y. 1993) .......................................................19

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .......................................................6

*Billard v. Rockwell International Corp.,* 683 F.2d 51, 57 (2d Cir.1982) .........................25

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985) ......22, 23

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ..........................................20

*Chemtex, LLC v. St. Anthony Enters.*, 490 F. Supp. 2d 536 (S.D.N.Y. 2007) .................16

*Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 02 Civ. 2561, 2006
      WL 335357 (S.D.N.Y. Feb. 5, 2006)..............................................................................7

*Emmanouildes v. Buckthorn, Ltd.*, 642 F. Supp. 964 (S.D.N.Y. 1986) ............................23

*Filler v. Hanvit Bank*, 339 F. Supp. 2d 553 (S.D.N.Y. 2004)..................................9, 12, 15

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d
      349 (S.D.N.Y. 2007 ) .....................................................................................13, 14, 21

*Goldin Associates, L.L.C. v. Donaldson Lufkin & Jenrette Sec. Corp.*, No. 00
      Civ. 8688, 2003 WL 22218643 (S.D.N.Y. Sept. 25, 2003)............................10, 11, 12

*Greenblatt v. Richard Potasky Jewelers*, No. 93 Civ. 3652, 1994 U.S. Dist.
      LEXIS 258 (S.D.N.Y. Jan. 13, 1994) .........................................................................16

*Jungels v. State University College of N.Y.*, 922 F. Supp. 779 (W.D.N.Y. 1996).............23

*Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996) ...................8, 10, 16, 22

*Krause v. Forex Exchange Market, Inc.*, 356 F. Supp. 2d 332 (S.D.N.Y. 2005) ..........6, 13

*Lesavoy v. Lane*, 304 F. Supp. 2d 520 (S.D.N.Y. 2004).....................................................7

*Maxwell v. KPMG*, 520 F.3d 713 (7th Cir. 2008)................................................................4

*Mazzaro de Abreu v. Bank of America Corp.*, 525 F. Supp. 2d 381 (S.D.N.Y. 2007) ................................................................................................................10

*In re Parmalat Securities Litigation*, 501 F. Supp. 2d 560, 579–80 (S.D.N.Y. 2007) ................................................................................................................24

*Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003) ............................22

*Pension Committee of the University of Montreal Pension Plan v. Banc of America Sec., LLC*, No. 05 Civ. 9016, 2007 WL 528703 (S.D.N.Y. Feb. 20, 2007) ................................................................................................15, 22, 24

*In re Refco Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........................20

*In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litigation*, No. 06 Civ. 643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007)................................................1

*Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081 (S.D.N.Y. June 16, 2000)................................................................................................13

*Ryan v. Hunton & Williams*, No. 99-CV-5938, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ................................................................................................ passim

*In re Sharp International Corp. & Sharp Sales Corp.*, 403 F.3d 43 (2d Cir. 2005)......7, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,127 S. Ct. 2499 (2007) ................................14

*VTech Holdings Ltd. v. PricewaterhouseCoopers LLP*, 348 F. Supp. 2d 255 (S.D. N.Y. 2004) ................................................................................................8

*In re WorldCom, Inc. Sec. Litigation*, 382 F. Supp. 2d 549 (S.D.N.Y. 2005)....................7

## STATE CASES

*Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) ........................16

*National Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 511 N.Y.S.2d 626
   (1st Dep't 1987) .................................................................................................12

## FEDERAL RULES, REGULATIONS & STATUTES

Fed. R. Civ. P. 9(b) ................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ...................................................................................1

15 U.S.C §77p(b)(1) ........................................................................................1

15 U.S.C §77p(b)(2) ........................................................................................1

15 U.S.C §77p(f)(2)(A)(ii)(I) ..........................................................................1

26 C.F.R. § 301.7216-1 .................................................................................17

26 U.S.C. § 7216(a) ......................................................................................17

## OTHER

Financial Accounting Standards Board, Statement No. 109, Accounting for
   Income Taxes (1992) .................................................................................21

Defendant Ernst & Young LLP ("EY") submits this Memorandum of Law in support of its Motion under Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss against it, for failure to state a claim, the complaint (the "Complaint") by Plaintiff Marc S. Kirschner (the "Trustee" or "Plaintiff") on behalf of 75 foreign exchange customers (the "FX Customers") of Refco Capital Markets, Ltd ("RCM").[1]

## I.    PRELIMINARY STATEMENT

The Complaint asserts only three claims against EY, all of which are for aiding and abetting and all of which fail because they do not sufficiently allege either that EY had actual knowledge of the primary violation or that EY's actions substantially assisted that primary violation. In fact, Plaintiff acknowledges that Refco retained EY for the limited purpose of preparing tax returns and providing tax advice. EY did not provide auditing or accounting services, participate in the company's leveraged buy out ("LBO") or initial public offering ("IPO"), manage customer assets, or prepare financial statements or any other public statements by Refco. Indeed, Plaintiff concedes that EY resigned from the Refco engagement long before the FX customers suffered any harm. In view of these acknowledged facts, it is a mystery how EY could have had "actual knowledge" of and substantially assisted the FX Customers' loss –

---

[1] In addition, EY joins in the arguments raised by other Defendants that (1) Plaintiff's claims are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 77p(b)(1); and (2) Plaintiff, as Trustee for certain Refco customers, lacks standing to bring claims for injuries allegedly suffered by RCM. First, while Plaintiff does not allege that EY was involved in either the LBO or IPO, the Complaint does allege that the 75 FX Customers' injuries stemmed from a scheme designed "to fraudulently bolster Refco's financial appearance to lenders and investors." Compl. ¶ 13. This is sufficient to place the entire action squarely within SLUSA's ambit as a "covered class action," 15 U.S.C. § 77p(f)(2)(A)(ii)(I), that alleges fraud "in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b)(1). Second, Plaintiff, as trustee for certain customers of RCM, lacks standing to pursue claims on behalf of certain customers for injuries alleged to have been suffered by RCM, which therefore affect all RCM creditors equally. Both of these additional flaws are fatal to Plaintiff's Complaint.

especially in light of Plaintiff's admission that the tax returns accurately disclosed the full amount of the receivable. *See*, *e.g.*, Compl. ¶ 205.

The Complaint posits at least two distinct fraudulent schemes.[2] In the first alleged scheme (the "Receivable Scheme"), the Trustee alleges a fraud at Refco Group Holdings, Inc. ("RGHI" or collectively with its subsidiaries, "Refco") in which senior Refco executives (the "Refco Insiders") transferred expenses and losses incurred by certain subsidiaries of Refco Group Ltd., LLC ("RGL") to RGHI as an intercompany receivable and then hid the true size of the receivable through "round-trip-loans."[3] Compl. ¶¶ 40-59. In the second alleged scheme (the "RCM Customer Scheme"), the Trustee alleges a fraud at RCM (one of RGL's subsidiaries) in which Refco transferred the cash contributed by RCM customers, including the FX Customers, to other Refco entities in exchange for IOUs that were not repaid. Compl. ¶¶ 30-35, 60-70. Plaintiff's alleged injury stems from the RCM Customer Scheme – the transfer of FX Customers' funds out of RCM for allegedly worthless IOUs.[4] *See, e.g.*, Compl. ¶ 6 ("The FX Customers . . . suffered losses totaling over half a billion dollars from the fraudulent inducement to entrust their funds to RCM and the improper siphoning of funds that they had entrusted to RCM . . . .").

Although there is a great deal of innuendo about what EY knew, the Complaint's description of EY's alleged knowledge of Refco's schemes focuses almost entirely on the

---

[2] The Court has previously noted these two distinct schemes. *See In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643, 2007 WL 2694469, at *4 (S.D.N.Y. Sept. 13, 2007) ("[n]othing in the complaint suggests that the two frauds were directly connected").

[3] Refco Insiders including CEO Phillip R. Bennett, CFO Robert Trosten, President Tone N. Grant, and RCM President Santo Maggio have pleaded guilty or been convicted of conspiracy to commit securities fraud and other felonies.

[4] The Plaintiff also alleges a third scheme in which the Refco insiders cashed out their equity interests in Refco, first through a LBO in August 2004 and then by an IPO in August 2005. Plaintiff does not allege that EY – which resigned from the Refco engagement in 2003 – was in any way involved in this third scheme.

Receivable Scheme.  Compl. ¶¶ 177–209.  The allegations linking EY to knowledge of the RCM

Customer Scheme are so empty as to be patently insufficient under any pleading standard, much

less the heightened pleading standard for claims sounding in fraud.  Moreover, Plaintiff does not

even adequately allege EY's knowledge of the Receivable Scheme, as the Complaint does not

allege facts indicating that EY knew that Refco's actions were fraudulent.

       In addition, EY's alleged acts cannot have substantially assisted the Receivable

Scheme, much less the RCM Customer Scheme which caused the FX Customers' alleged injury.

To allege substantial assistance, the plaintiff must plead with particularity (1) conduct by the

defendant that affirmatively assisted or helped conceal the primary violation that caused

plaintiff's injury; and (2) that defendant's conduct was the substantial and reasonably

foreseeable, *i.e.* proximate, cause of the injury.  Again, there is an enormous amount of innuendo

regarding what EY did and did not do.  But, once the allegations are parsed, EY's only action

that allegedly substantially assisted the fraud was preparing Refco's tax returns through 2002.

Compl. ¶ 206.  While Plaintiff at times implies that certain alleged inactions by EY were

improper – such as that EY should have disclosed Refco's confidential tax information to third

parties (contrary to its duties of confidentiality as a tax preparer), or resigned earlier – the

Complaint never alleges that EY was required to or even should have taken these actions.

Moreover, the Complaint never alleges that these inactions substantially assisted the schemes.

The Complaint is left only with allegations that EY prepared Refco's tax returns for a time.

       These allegations are insufficient because the Complaint does not, and cannot,

allege that the tax returns caused the FX Customers' loss of assets.  The Complaint does not even

attempt to allege how the preparation of tax returns through 2002 furthered the RCM Customer

Scheme and thus does not allege substantial assistance.  Indeed, the facts alleged in the

Complaint reveal that the tax returns could not have furthered even the Receivable Scheme (furtherance of which would still be insufficient). The gravamen of the alleged Receivable Scheme is that the true size of the receivable was not disclosed on Refco's financial statements; and yet, as Plaintiff admits, the tax returns EY prepared in fact disclosed *the full amount of the receivable. See*, *e.g.*, Compl. ¶ 205. The tax returns thus *disclosed* the supposedly hidden information, rather than aiding the scheme. (Ironically, if EY had disregarded the RGHI receivable as Plaintiff suggests it should have, the effect would have been to *hide* the true size of the receivable on the tax return.) Moreover, the fact of this disclosure disproves any causal link between the returns and any injury. Either (1) no innocent party reviewed the tax returns, and therefore the preparation of the returns cannot have substantially assisted the fraud, or (2) such persons did review the returns and were not concerned about the receivable disclosed there, in which case the returns cannot have assisted the fraud. In short, the Complaint's allegations disprove any causal link between EY's tax return preparation and the Receivable Scheme, much less the RCM Customer Scheme. Furthermore, even if the Complaint had alleged some causal link (which it does not) whereby the tax returns furthered the siphoning of the FX Customers' assets, such siphoning certainly was not a reasonably foreseeable result of preparing the returns.

Indeed, so attenuated is the connection between anything EY did and the harms allegedly suffered by the FX Customers that no one *other than the bankruptcy trustees* has ever sued EY here. As Judge Posner recently noted, bankruptcy trustees have little disincentive to filing frivolous claims, and therefore judges must be "vigilant in policing the litigation judgment exercised by trustees in bankruptcy." *Maxwell v. KPMG*, 520 F.3d 713, 718 (7th Cir. 2008). This is just such a case.

## II.    BACKGROUND

EY prepared tax returns for RGL and its subsidiaries and affiliates from approximately 1991 through the 2002 tax year. *See* Compl. ¶ 15. In addition, EY also provided tax consulting advice to those same entities. *See id.* EY resigned from the Refco engagement in or about November 2003 and stopped preparing tax returns for Refco two years before Refco's bankruptcy and prior to Refco's LBO and IPO. *See* Compl. ¶¶ 3, 202–203.[5]

Although Plaintiff seeks relief against EY based on the RCM Customer Scheme and the FX Customers' losses, Plaintiff never alleges that EY knew of the existence of the FX Customers, much less that EY knew that RCM was siphoning funds away from the FX Customers' accounts. Plaintiff only has alleged that EY should have "understood" these facts, (Compl. ¶ 208) but Plaintiff does not (and cannot) allege actual knowledge of these facts.

Further, EY's only action that is alleged to have substantially assisted any violation is that EY prepared tax returns that were supposedly "inaccurate or false." Compl. ¶ 206. Plaintiff admits, however, that the tax returns EY prepared disclosed the full amount of the receivable. *See*, *e.g.*, Compl. ¶ 205. In addition, while Plaintiff alleges that these returns *could* be reviewed by Refco's innocent directors, officers and agents, and would be presented to lenders, potential investors, underwriters, and other third parties, Plaintiff never alleges that any of those parties in fact reviewed, much less relied on, the returns. *See* Compl. ¶ 206.

## III.    LEGAL STANDARDS

### A.    Applicable Law

New York law applies to this action. RCM's principal place of business "at all relevant times" was in New York. Compl. ¶ 16(c). RCM's officers, defendants Bennett and

---

[5] As noted below, EY's limited post-2003 actions are not alleged to have substantially assisted the primary violation.

Maggio, were located in New York.  RCM "conducted its business with the FX Customers from

Refco's global headquarters in New York County at all relevant times." Compl. ¶ 8.  Finally, EY

and many of the defendants performed their work for RCM in New York and the EY

professionals who worked on the RCM engagement were located in New York.

###    B.      Standard For Motion To Dismiss

"To survive dismissal, the plaintiff must provide the grounds upon which his

claim rests through factual allegations sufficient 'to raise a right to relief above the speculative

level.'"  *ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell*

*Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).  A complaint should be dismissed if it fails

to plead "enough facts to state a claim for relief that is plausible on its face."  *Id.* at 1974.

Moreover, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake.  Malice, intent,

knowledge, and other conditions of a person's mind may be averred generally."  Fed. R. Civ. P.

9(b).  The heightened pleading standards of Rule 9(b) apply not only to claims of fraud, but also

claims based on allegations of fraud, such as aiding and abetting fraud.  *See Krause v. Forex*

*Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005).  Furthermore, because the Trustee's

claims for aiding breaches of fiduciary duty and conversion are based on precisely the same

allegations as the Trustee's claims sounding in fraud, Rule 9(b) also applies to those claims.  *See*

*id.* at 338 n.49 (Rule 9(b) applies to aiding breach of fiduciary duty claim that "incorporate[s] all

of plaintiffs' fraud claims").

IV.     **PLAINTIFF'S AIDING AND ABETTING CLAIMS AGAINST EY ARE INSUFFICIENT AS A MATTER OF LAW.**

Plaintiff's aiding and abetting claims fall far short of the required pleading standards. The elements of aiding and abetting a breach of fiduciary duty,[6] aiding and abetting a fraud,[7] and aiding and abetting a conversion[8] are essentially identical: (1) the existence of a primary violation;[9] (2) actual knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation, also known as proximate causation. With regard to EY, Plaintiff's claims do not come close to satisfying either of these latter two elements.

A.     **Plaintiff Fails To Allege Adequately That EY Had Actual Knowledge Of Either Scheme.**

For any of Plaintiff's aiding and abetting claims to survive, Plaintiff must allege facts demonstrating EY's actual knowledge of the principal's actions that caused the injury (here,

---

[6] The elements of aiding and abetting a breach of fiduciary duty are: (1) "a breach by a fiduciary of obligations to another," of which the aider and abettor "had actual knowledge," (2) "that the defendant knowingly induced or participated in the breach," and (3) "that plaintiff suffered damage as a result of the breach." *In re Sharp Int'l Corp. & Sharp Sales Corp.*, 403 F.3d 43, 49 (2d Cir. 2005) (internal citations omitted).

[7] "Under New York law, a claim of aiding and abetting fraud requires a plaintiff to plead pursuant to Rule 9(b), Fed. R. Civ. P., the existence of a fraud, a defendant's knowledge of the fraud, and a defendant's substantial assistance to advance the commission of the fraud." *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 560 (S.D.N.Y. 2005).

[8] The elements of aiding and abetting a conversion are "(1) the existence of a violation committed by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation." *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 02 Civ. 2561, 2006 WL 335357, at *5 (S.D.N.Y. Feb. 5, 2006) (quoting *Lesavoy v. Lane,* 304 F. Supp. 2d 520, 526 (S.D.N.Y. 2004).

[9] To the extent the Court holds, based on arguments made by other parties, that Plaintiff has failed to allege properly the underlying torts, EY seeks dismissal on this additional basis as well.

the RCM Customer Scheme).[10]  Plaintiff does not allege that EY knew anything about the RCM

Customer Scheme.  Instead, it only alleges that EY *should have known* of this scheme, which is

patently insufficient.  *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996)

(requirement of actual knowledge is not satisfied by allegations that defendants "should have

known," nor by allegations of "constructive knowledge"); *Ryan v. Hunton & Williams*, No. 99-

CV-5938, 2000 WL 1375265, at *8-9 (E.D.N.Y. Sept. 20, 2000) (allegation that a defendant

knew of "red flags" suggesting fraudulent activities by its client insufficient to satisfy the

requirement of actual knowledge).

Moreover, even with regard to the Receivable Scheme, Plaintiff does not allege

that EY knew that Refco's actions were wrongful.  In fact, Plaintiff acknowledges that Refco's

auditors knew about (and presumably audited) and were comfortable with the RGHI receivable,

the existence of which was disclosed on the audited financial statements.

### 1. Plaintiff Must Allege That EY Had Actual Knowledge Of The RCM Customer Scheme.

Plaintiff must allege that EY had actual knowledge of the primary violator's

fraudulent activities that caused the injury.  *VTech Holdings Ltd. v. PricewaterhouseCoopers

LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004) ("requirement of knowledge of the underlying

fraud refers to actual knowledge of [the primary violator's] alleged fraudulent activities").  Here,

the action that caused the FX Customers' injury was the RCM Customer Scheme.  Knowledge of

---

[10] The essence of Plaintiff's case is that the FX Customers lost their assets because Refco improperly transferred those assets out of RCM in exchange for IOUs that it could never, and never intended to, repay.  *See* Compl. ¶ 5.  Notably, Plaintiff alleges that RGHI, RGL, and RCM were insolvent at all relevant times.  *See* Compl. ¶¶ 27, 83, 193.  The FX Customers' injury was caused not by any deepening of this insolvency, but rather by the fact that their assets were no longer at RCM when the insolvency became apparent.  The Receivable Scheme, even if it contributed to Refco's bankruptcy, thus was not the proximate cause of the FX Customers' loss.

the Receivable Scheme (which as discussed below is not even properly alleged) would not

satisfy the knowledge element because that scheme did not injure the FX Customers.

In *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553, 558 (S.D.N.Y. 2004), for instance,

although the plaintiff had alleged facts indicating that the defendants had knowledge of a

financial statement fraud perpetrated at the Korean branch of a corporation, and knew that the

Korean branch's financial statements were consolidated with those of the branch's Belgian

parent, these facts did not establish defendants' knowledge that the Belgian parent's financial

and other public statements were fraudulent. *Id.* at 557–58. Because the alleged injury was

caused by misleading financial statements issued by the Belgian parent, plaintiff had failed to

allege actual knowledge of the relevant fraud. *Id.* The same logic applies to this case. Even

alleging actual knowledge of the Receivable Scheme would not be enough; Plaintiff must allege

actual knowledge of the RCM Scheme.

Indeed, the link between the two schemes in *Filler* was far closer than between

the Refco schemes. The fraudulent activities at the Korean branch were a subset of the errors in

the Belgian parent's financial and other public statements (unlike the two schemes here). The

*Filler* court noted that the allegations supported that "defendants should have known the impact

of the [Korean] factoring agreements and the false confirmations on Belgium's financial

statements," yet held that these allegations were still insufficient to show actual knowledge of the

fraudulent activity that caused plaintiff's injury. *Id.* at 558. Here, the allegations are even less

connected than the insufficient allegations in *Filler*: There is no relationship between the

Receivable Scheme and the siphoning of the RCM Customers' assets, and knowledge of one

does not imply knowledge of the other as in *Filler*. Plaintiff must thus allege that EY had actual

knowledge of the fraud which caused the alleged injury – the RCM Customer Scheme – not just that EY should have known based on alleged knowledge of the Receivable Scheme.

### 2. Plaintiff Fails To Allege Any Facts That Would Show EY Had Actual Knowledge Of The RCM Customer Scheme.

In sharp contrast to Plaintiff's lengthy (albeit insufficient) efforts to establish EY's knowledge of the Receivable Scheme, Plaintiff *nowhere* alleges that EY knew of the RCM Customer Scheme. This is fatal to Plaintiff's claims.

The closest Plaintiff comes is a vague assertion that EY "understood that Refco was consuming RCM customer funds, including the property belonging to the FX Customers." Compl. ¶ 208. This assertion is patently insufficient. First, it is not an allegation that EY knew of the *RCM Customer Scheme*. The vague reference to "consuming RCM customer funds," whatever that means, says nothing about knowledge that RCM would transfer FX Customers' cash to other Refco entities; that the transfer was in exchange for intercompany IOUs; or that those IOUs could not be repaid. The Complaint does not even allege that EY was aware of the existence of the FX Customers.

Second, even if this allegation described the RCM Customer Scheme, it would at most be an allegation that EY *should* have known of the RCM Customer Scheme, which by definition is insufficient. *See Goldin Assocs., L.L.C. v. Donaldson Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2003 WL 22218643, at *11 (S.D.N.Y. Sept. 25, 2003) ("Constructive knowledge, however, does not suffice; plaintiff must allege facts showing that [defendants] had actual knowledge of their participation in a breach of . . . duty . . . .") (citing *Kolbeck*, 939 F. Supp. at 246–47); *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 387 (S.D.N.Y. 2007) (constructive knowledge insufficient to establish aiding and abetting claim).

Third, even the argument that EY should have known that "Refco was consuming RCM customer funds," whatever that means, is conclusory and logically incoherent.  The Complaint alleges that (1) EY "understood" that Refco needed a "continuous infusion of cash" and (2) that EY "knew and/or consciously avoided knowing" that Refco's three sources of cash were RSL, Refco LLC and RCM, and therefore infers (3) that EY thus "understood" that this meant that Refco was consuming the FX Customers' funds.  Compl. ¶ 208.  On its face, this syllogism is false; the Complaint says there were *three* sources of funds, so there is no reason one would have to assume cash was coming from RCM rather than RSL or Refco LLC.  Moreover, Plaintiff acknowledges that all of these facts that EY supposedly knew were completely public.  *See* Compl. ¶ 30 (alleging that Refco publicly stated that "'[r]eady access to cash is essential to our business'"); ¶16 (alleging that, prior to 2005, RSL, Refco and RCM were three main operating companies of Refco); ¶ 28(d) (alleging that Refco positioned RCM as an "off-shore unregulated entity"); ¶¶ 112, 126 (alleging that Refco purported "to maintain RCM as an unregulated offshore broker-dealer," which had no rules requiring segregation of funds or minimum net capital requirements).  If knowledge of these facts means that one should have known that the RCM Customer assets were being "consumed," then everyone – including the FX Customers – should have known this.

Fourth, the Complaint's wholly conclusory allegation that EY knew Refco was moving customer funds is insufficient for the further fundamental reason that Plaintiff never alleges EY knew such actions were *wrongful*, *i.e.* that there was a violation.  A plaintiff must allege that defendant knew not just of the principal's actions, but that those actions were wrongful.  *See, e.g., Goldin*, 2003 WL 22218643, at *8 ("[A] plaintiff must allege that the defendant had actual knowledge of the primary violator's status as a fiduciary and actual

11

knowledge that the primary violator's conduct contravened a fiduciary duty.").  In *Goldin*, the plaintiff alleged that the defendants' participation in merger discussions between two companies aided and abetted a fraud on one of the merger participants, but the court held that there were "no factual allegations that [the defendant adviser] actually knew that there was anything wrong with pursuing merger discussions."  2003 WL 22218643, at *11.  The complaint "fail[ed] to establish that the [defendants] had actual knowledge of the *wrongful* breach or their role in it."  *Id.* (emphasis added).  Plaintiff here alleges even less than the plaintiff in *Goldin*, as the Trustee does not even allege that EY knew of Refco's transfer of the FX Customers' assets.  But even if EY was aware of transfers of FX Customer assets (an allegation glaringly missing from the Complaint), this alone would not impart knowledge to EY that such transfers were impermissible.  *Nat'l Westminster Bank USA v. Weksel*, 511 N.Y.S.2d 626, 629 (1st Dep't 1987) (defendant's knowledge of transactions subsequently mischaracterized by the primary violator and relied upon by plaintiff "would not have imparted to [the defendant] any awareness of a scheme to defraud").  Notably (and fatally) Plaintiff never alleges that EY was aware that transfers of FX Customer funds were wrongful.

    In addition, the Complaint does not allege that EY was aware of other critical elements of the fraud that harmed the FX Customers, most notably the LBO and the IPO which supposedly were the essential transactions to consummate the fraud and "cash out" the assets stolen from the FX Customers.  *See* Compl. ¶¶ 2–3, 26.  The Complaint also does not allege that EY was aware of the materials or statements (the Offering Circular and the S-4) that Refco's investors relied on in deciding to invest and thereby allow the liquidity events to occur.  *See* Compl. ¶ 73; *Filler*, 339 F. Supp. 2d at 560 ("Plaintiffs do not allege that defendants were actually aware of the representations made to plaintiffs by L&H Belgium and KPMG.").

    3.    **Even If Knowledge Of The Receivable Scheme Were Sufficient, Plaintiff Does Not Adequately Allege Such Knowledge.**

Plaintiff's alleged injury flows from the RCM Customer Scheme, and therefore even if EY had actual knowledge of the Receivable Scheme (which it did not), such knowledge would be insufficient, as noted above. Nonetheless, Plaintiff fails even to allege adequately that EY knew of any wrongful conduct regarding the receivables.

Plaintiff alleges that EY became aware that the size of the receivable was greater at calendar year end (the date on which the tax returns are based) than at fiscal year end (the date on which the audited financial statements are based). *See* Compl. ¶ 195 (alleging EY admitted to knowing that RGHI borrowed funds at year end to pay down receivable, and that transaction would be reversed a few days later). At most, these alleged facts would indicate that EY had a possible basis to suspect that Refco's actions were wrongful. As a matter of law, however, even actual *suspicion* is insufficient to constitute actual *knowledge* that actions are fraudulent. *See Ryan*, 2000 WL 1375265, at *9 ("Allegations that [defendant] suspected fraudulent activity, however, do not raise an inference of actual knowledge . . . ."); *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081, at *7 (S.D.N.Y. June 16, 2000) (allegation that defendant was "uneasy" about use of plaintiff's funds by alleged primary violator for the benefit of another client merely showed that defendant had suspicions or questions regarding the account, and did not establish actual knowledge).[11]

---

[11] Plaintiff does make numerous conclusory allegations flatly stating that EY knew of the Receivable Scheme. *See, e.g.*, Compl. ¶ 187 (conclusory statements that EY knew RGHI receivable was a sham), ¶191 (conclusory statement that EY knew Refco had policy of allocating sham expenses), ¶ 205 (statement that EY "clearly knew" receivable was a sham). Conclusory allegations of this type, however, are to be disregarded and are insufficient to allege actual knowledge. *See Krause*, 356 F. Supp. 2d at 339; *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2007) (disregarding conclusory allegations of knowledge).

Quite to the contrary, the Complaint and the Examiner's Report on which the Complaint relies make clear that EY did not believe there was anything fraudulent or secretive about the size of the receivable or the paydown.[12]  First, Refco openly discussed the receivable and the paydown with EY; there was no indication that Refco viewed it as secretive.  *See* Exam. Rpt. at pp. 180–82.  Second, Refco's financial statements were audited (*see* Compl. ¶¶ 14, 129, 136, 155), as everyone knew, and included on their face the receivable which was presumably audited as well.  Indeed, *according to Plaintiff*, any GAAS audit would have detected the full size and pay-down of the receivable.[13]  *See* Compl. ¶¶ 132, 156, 157, 159.

Stated another way, knowing that the receivable was paid down before the audited fiscal year end was at most ambiguous – it is consistent with an inference that EY believed that the auditors knew of the pay down and were comfortable with it from a financial statement perspective.  When a fact is consistent both with the fraud and with an innocent explanation, alleged knowledge of that fact does not constitute knowledge of the fraud and the complaint should be dismissed.  *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007) (inference of fraud is not strong in light of "plausible nonculpable explanations for the defendant's conduct"); *Fraternity Fund,* 479 F. Supp. 2d at 369 (S.D.N.Y. 2007) ("The fact that Beacon Hill sent its values to Prudential is ambiguous.  The allegation supports the inference that Prudential knew the values to be false and rubber stamped them because it was colluding with Beacon Hill.  But it is consistent also with the inference that Prudential thought that Beacon Hill was asking in good faith to have its values examined and, if need be, corrected.")  Thus

---

[12] EY is not alleged to have had any role or given any advice on the financial accounting issue of how Refco should account for the receivable and paydown on its financial statements.

[13] EY is not suggesting that Plaintiff is correct, but rather only that Plaintiff is estopped from denying this given his claims against Grant Thornton.

Plaintiff has thus failed to allege EY's knowledge even of the Receivable Scheme, much less of the RCM Customer Scheme.

> **B.      Plaintiff Also Fails To Allege Adequately That EY Substantially Assisted Either Scheme.**

Plaintiff fails to allege that EY substantially assisted the Refco Insiders' misconduct.  To satisfy the substantial assistance prong, Plaintiff must allege (1) conduct by the defendant that affirmatively assists or helps conceal the primary violation, and (2) that defendant's conduct was a proximate cause of the injury to Plaintiff.  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2007 WL 528703, at *6 (S.D.N.Y. Feb. 20, 2007); *Filler*, 339 F. Supp. 2d at 557.  "Proximate cause" in turn requires proof that defendant's conduct was a substantial and reasonably foreseeable link in the sequence of events leading to Plaintiff's injury, here the diversion of the FX Customers' funds. *Univ. of Montreal*, 2007 WL 528703, at *6 ("'But-for' causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct.").

Here, the only allegedly relevant conduct – EY's preparation of tax returns – did not affirmatively assist or help conceal the RCM Customer Scheme (or even the Receivable Scheme).  And preparing the tax returns certainly was not a reasonably foreseeable cause of the FX Customers' cash being diverted to other Refco entities and not returned.

> **1.      The Only Conduct Alleged To Have Substantially Assisted The Injury Was EY's Preparation Of Tax Returns.**

The Complaint contains an enormous amount of innuendo about what EY allegedly did and did not do.[14]  Although the Complaint implies that EY should have taken certain actions, or that other actions EY took were improper, in fact it actually alleges that very

---

[14] For example, Plaintiff devotes two paragraphs to discussing tax shelter issues that have literally nothing to do with Plaintiff's claims.  *See* Compl. ¶¶ 183-84.

15

little of what EY did was wrongful.  And focusing on what Plaintiff alleges as substantial

assistance narrows things even further to a single item – EY's preparation of Refco's returns

through 2002 – which is insufficient as a matter of law under the circumstances here.

> ### a.    Any Alleged Inactions Are Irrelevant Because EY Did Not Have A Duty To The FX Customers.

First, any implication that EY substantially assisted the fraud by *failing* to act in a

certain way is irrelevant.  Inaction cannot constitute substantial assistance because EY owed no

duty to the FX Customers.  *See Chemtex, LLC v. St. Anthony Enters.*, 490 F. Supp. 2d 536, 547

(S.D.N.Y. 2007) ("Mere inaction is insufficient . . . unless the defendant has an independent duty

to the plaintiff."); *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (1st Dep't 2003) (defendants owed

no duty to plaintiffs and therefore had no duty to report another party's role in alleged fraud);

*Ryan,* 2000 WL 1375265, at *10 (in aiding and abetting claim, defendant bank did not

substantially assist an alleged fraud where it did not disclose information to a plaintiff to whom it

owed no fiduciary duty).  Plaintiff does not allege that EY owed any duty to the FX Customers.[15]

Moreover, although Plaintiff at times implies that EY should have taken certain

actions, it does not in fact allege that EY was required to do so, much less allege that such

inactions constitute substantial assistance.  For example, Plaintiff *implies* that EY should have

gone to a third party (such as the auditors) and discussed the size of the receivable, but Plaintiff

*never actually alleges* that EY should have done so, or that this inaction substantially assisted the

---

[15] Plaintiff would have to allege that EY had a specific, independent duty to the FX Customers, not just a duty to Refco.  *Kaufman*, 760 N.Y.S.2d at 170 (defendant must owe a duty "directly to the plaintiff").  The fact that the alleged primary violator (Refco) owed a duty to the plaintiff is not enough.  *Kolbeck*, 939 F. Supp. at 247 (standard does not hold all defendants "regardless of their independent obligations to plaintiff . . . liable for inaction").  Plaintiff does not allege EY had any duty, much less a specific one to the FX Customers.  *See Greenblatt v. Richard Potasky Jewelers*, No. 93 Civ. 3652, 1994 U.S. Dist. LEXIS 258, at *12 (S.D.N.Y. Jan. 13, 1994) ("[W]hen the allegedly aggrieved party is at best a third party to an accountant-client relationship . . . no fiduciary duties may be imposed on either party.").

RCM Customer Scheme.  *See* Compl. ¶ 198.   And that is because Plaintiff *cannot* so allege; EY was required by federal criminal law, in addition to professional standards, not to reveal client tax information to a third party.  *See* 26 U.S.C. § 7216(a); 26 C.F.R. § 301.7216-1.

Likewise, the Complaint *implies* that EY should have withdrawn sooner, but does not in fact allege that EY was required to do so, or that this failure to withdraw sooner substantially assisted the fraud.  *See* Compl. ¶ 188.  Moreover, any such allegations would be false.  First, the Complaint itself acknowledges that EY ceased preparing tax returns for Refco after the 2002 returns, and did not assist in the preparation of Refco returns for 2003 or 2004.  Compl. ¶¶ 202–03.  Nevertheless, the Complaint then describes how the Refco Insiders continued to siphon the FX Customers' accounts after EY's withdrawal.  *See*, *e.g.*, *id.* ¶ 81 ("The theft of RCM customer assets continued unabated after the LBO [in 2004], and in fact increased until Refco's bankruptcy filing.").  Plaintiff does not, and cannot, explain how an earlier withdrawal by EY would have halted the siphoning, given that such siphoning purportedly continued "unabated" in the years after EY's actual withdrawal.  Second, Refco hired two other tax preparers/consultants after EY resigned, and their retention did not stop the Receivable or RCM Customer Schemes.  Exam. Rpt. at pp. 217, 220-221.  Third, EY was not allowed to disclose Refco's tax information, as noted above.  Any withdrawal would thus need to be "quiet," as EY's withdrawal was.  As EY could not publicly reveal any information regardless of when it withdrew, withdrawing earlier would not have affected the fraud in any way.

The Complaint's indignant assertions that EY did not reveal Refco's information to third parties, that it did not approach the auditors, and that it did not resign earlier, are ultimately irrelevant – apparently thrown in merely to try to make EY look bad.

17

**b.    The Complaint Alleges No Other Acts By EY That Substantially Assisted The RCM Customer Scheme.**

In addition to the irrelevant inactions alleged in the Complaint, Plaintiff mentions various actions by EY that Plaintiff ultimately does not allege constitute substantial assistance. For example, the Complaint alleges that EY provided tax consulting advice before EY's resignation in 2003 (*see* Compl. ¶ 180), provided limited clean-up services after 2003 (*see id.* ¶ 203), and was involved in contingent deferred swaps (*id.* ¶¶181–84). Plaintiff, however, does not allege that any of these actions were wrongful, much less that any of these actions substantially assisted the fraud.[16]

Instead, the only substantial assistance alleged is EY's preparation of allegedly false tax returns through 2002. Compl. ¶ 206. At the end of the day, those tax returns are the sole basis for EY's alleged liability. To establish substantial assistance, Plaintiff must allege with the particularity required by Rule 9(b), that preparing those returns furthered the siphoning of the FX Customers' assets, and that it was reasonably foreseeable that preparing those returns would result in such siphoning. But none of this is, or can be, alleged.

**2.    EY's Preparation Of The Tax Returns Did Not Assist Or Help Conceal Either Scheme.**

**a.    Plaintiff Must Allege That EY Furthered The RCM Customer Scheme, Not Just The Receivable Scheme.**

Plaintiff must allege that EY furthered the RCM Customer Scheme, not just the Receivable Scheme. EY's action must have damaged the FX Customers; if it did not, there can

---

[16] Plaintiff asserts in a single paragraph that EY assisted in creating a structure for the "Minglewood transaction." Compl. ¶ 207. However, the Complaint offers no explanation of how this transaction has any relevance to either the Receivable Scheme or the RCM Customer Scheme. Indeed, the Complaint itself alleges this transaction involved an unrelated customer debt. Compl. ¶ 98. Moreover, Plaintiff does not allege that EY had any knowledge that the transaction was fraudulent or otherwise wrongful, and so this transaction cannot be the basis for aiding and abetting liability. This lone paragraph is patently insufficient under Rule 9(b).

be no liability.  Substantial assistance of just the Receivable Scheme is clearly not enough to

satisfy the substantial assistance element because that scheme did not damage the FX Customers.

*See*, *e.g.*, *In re Sharp*, 403 F.3d at 50 (where primary actor engaged in "numerous breaches of

fiduciary duty," defendants' conduct must have aided the breach of fiduciary duty that injured

plaintiffs).  Instead, EY must have substantially assisted "the breach . . . that resulted in

damages," *i.e.* the RCM Customer Scheme.  *Id.*

> **b.  The Preparation Of The Tax Returns Did Not Assist Or Conceal The RCM Customer Scheme.**

Plaintiff utterly fails to plead how preparation of the tax returns enabled the RCM

Customer Scheme.  The Complaint contains only one, boilerplate allegation even mentioning any

alleged nexus between EY and the FX Customers' injury: "By its actions, E&Y substantially

assisted and participated in a scheme that ultimately cost the FX Customers hundreds of millions

of dollars in losses."  Compl. ¶ 209.  This allegation is completely empty; it does not allege any

casual chain, much less with the specificity required by Rule 9(b).

Notably, Plaintiff does not attempt to explain a causal connection between the

preparation of the tax returns and the loss of the FX Customers' assets.  The plaintiff must at

least state what the alleged causal linkage is, such as: the tax returns said A; the returns were

reviewed and relied upon by third party B; as a result the third party took action C that injured

the FX Customers, etc.  Here, dismissal is required because Plaintiff has failed even to lay out

this chain, much less explain how the connections (whatever they may be) are plausible.  *See*

*Aquino v. Trupin*, 833 F. Supp. 336, 342–44 (S.D.N.Y. 1993) (dismissing aiding and abetting

claims against accounting firm where plaintiffs failed to explain how accountants' tax

projections caused losses).

This lack of specificity blatantly violates Rule 9(b) which requires that Plaintiff allege in detail how the tax returns enabled the diversion of RCM Customer funds. The Complaint fails to include any explanation, much less one in detail sufficient for Rule 9(b).

### c.    The Preparation Of The Tax Returns Did Not Assist Or Conceal The Receivable Fraud.

Moreover, EY's preparation of the tax returns did not even affirmatively assist or help conceal the Receivable Scheme (much less the RCM Customer Scheme as noted above). *See* Compl. ¶¶ 177–209 (allegations against EY). First, the returns *revealed* rather than hid the true size of the receivable. Plaintiff alleges that the true amount of the receivable was greater than that disclosed in Refco's financial statements, but the returns EY prepared *disclosed the true amount of the receivable* in Schedule L. *See* Compl. ¶ 205. In fact, even the Examiner – on whose report the Plaintiff relies – acknowledged this fundamental point. Exam. Rpt. at p. 181.[17] Thus, if EY's returns had any effect on the fraud it would be to undermine it. Indeed, Plaintiff repeatedly alleges that disclosure – exactly what EY's returns did – would have prevented the fraud. *See* Compl. ¶¶ 45, 55, 60, 88. One irony of Plaintiff's position is that had the returns been prepared the way Plaintiff asserts they should have been – ignoring the receivable as fictitious – the result would have been to *hide* rather than disclose the receivable.

Second, Plaintiff does not allege that anyone – much less the FX Customers – actually reviewed the tax returns EY prepared, and therefore cannot explain how the preparation of those returns assisted the fraud in any way. The Complaint merely alleges that third parties

---

[17] The Examiner's Report is explicitly referenced in the Complaint (*see, e.g.*, Compl. at unnumbered first paragraph, subsection (c)) and therefore, for the purposes of this Motion to Dismiss, should be considered incorporated into the pleading by reference. *In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 623 (S.D.N.Y. 2007) ("In deciding motions to dismiss, the Court may consider documents that are referenced in the Complaint . . . ." (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002))).

*would* look at the returns (Compl. ¶ 206), but notably does not allege that anyone actually received, much less reviewed, the returns.  For the tax returns to have assisted the fraud, the Plaintiff must allege that someone actually looked at them and relied on them.  *See Fraternity Fund,* 479 F. Supp. 2d at 371 ("[I]n order to plead causation and therefore substantial assistance, plaintiffs must allege that they received and relied upon the [document allegedly containing the misrepresentations].")  The causal connection cannot be that Refco relied on the supposedly inaccurate returns, since Refco itself knew of the truth.  Plaintiff does not allege that the Thomas H. Lee entities; their advisers; the underwriters; their advisers; the audit committee; or the FX Customers reviewed the tax returns in making their decisions to do business with Refco.  And in fact, as noted above, had anyone reviewed the tax returns *they would have seen the full extent of the receivable* and, according to Plaintiff, the fraud would have ended.  Since no one is alleged to have reviewed the returns (other than the Refco insiders), it is inconceivable that the returns affected anyone's actions or enabled the fraud.  Plaintiff does not even attempt to explain how this could be so.

Third, Plaintiff ignores the fact that, under the tax and accounting rules, tax income often differs from financial statement income.  *See*, *e.g.*, Financial Accounting Standards Board, Statement No. 109, Accounting for Income Taxes ¶¶ 10–15 (1992).  For example, while Plaintiff asserts that the receivable allowed Refco to hide RGL's losses and expenses in its financial statements, the Examiner acknowledged that those losses and expenses were in fact *booked on the tax returns* of RGL or its subsidiaries that EY prepared.  *See* Exam. Rpt. at p. 177 and n.558.[18]

---

[18] For this reason, parties do not review tax returns to determine a company's financial position, explaining why Plaintiff does not allege anyone did here. To the extent that third parties review tax returns (though no one allegedly did here), it is to determine whether there are tax liabilities.

Fourth, the Complaint itself acknowledges that, although EY ceased preparing tax returns for Refco after the 2002 returns and did not assist in the preparation of Refco's returns for 2003 or 2004, the fraud nonetheless continued.  *See* Compl. ¶¶ 88–90, 202–03.  Critically, all EY could do is prepare returns, or not; it could not force Refco to file a return it did not want to (nor does Plaintiff so allege).  So when EY took the only alternative available to it, to stop preparing returns, that still did not stop the alleged fraud.  Thus, on the most basic level, EY's preparation of the returns had no effect whatsoever on the Receivable Scheme, which continued even after EY resigned.

### 3. Plaintiff Fails To Allege Facts Showing That The Preparation Of Refco's Tax Returns Was The Proximate Cause Of The FX Customers' Injuries.

Moreover, even if preparing the tax returns did somehow assist or help conceal either scheme (which it did not), Plaintiff still must allege that EY's actions were the proximate – meaning a substantial and reasonably foreseeable – cause of Plaintiff's injuries.[19]  *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985) ("complaint must allege that the acts of the aider and abettor proximately caused the harm . . . on which the primary liability is predicated"); *Kolbeck*, 939 F. Supp. at 249 ("Aiding and abetting liability arises only when plaintiffs' injury was 'a direct or reasonably foreseeable result' of the complained-of conduct."); *Univ. of Montreal Pension Plan*, 2007 WL 528703, at *6 (plaintiff must allege "defendant's actions were 'a substantial factor in the sequence of responsible causation,' and plaintiff's injury was a 'reasonably foreseeable or anticipated as a natural consequence.").  Furthermore, these allegations must be sufficiently detailed to satisfy Rule 9(b) by "describ[ing] with . . . specificity in what way the plaintiff has suffered pecuniary loss as a

---

[19] Where as here the facts as pled fail to show a causal connection between EY's actions and the injuries suffered by Plaintiff, the court may decide proximate causation as a matter of law.  *See Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 538 (S.D.N.Y. 2003).

direct, immediate, and proximate result of whatever the false representations may have been made." *Jungels v. State Univ. Coll. of N.Y.*, 922 F. Supp. 779, 788–89 (W.D.N.Y. 1996); *see also Emmanouildes v. Buckthorn, Ltd.*, 642 F. Supp. 964, 966 (S.D.N.Y. 1986) (plaintiff's bald allegations of indefinite damages failed to adequately plead causation under Rule 9(b)).

Plaintiff thus must allege *with particularity* facts that, if true, establish that it was reasonably foreseeable to EY that by preparing Refco's tax returns through 2002 the FX Customers would lose their assets. Even to state the issue reveals how absurd this is. As noted above, Plaintiff does not even allege that anyone ever looked at Refco's tax returns, let alone explain how EY's actions assisted or concealed either scheme in any way, much less any substantial and reasonably foreseeable connection to the FX Customers losing their assets. Indeed, any hypothetical chain of causation that Plaintiff may attempt to conjure in these circumstances would be, as the Second Circuit held in the Bloor case, "too tenuous to support liability for aiding and abetting." *Bloor*, 754 F.2d at 63.

As the Plaintiff admits: (1) the tax returns EY prepared disclosed the full size of the receivable (Compl. ¶ 205); (2) EY expected that third parties would review those tax returns, meaning they would know the full size of the receivable (*id.* ¶ 179); and (3) had people known the full size of the receivable, they would have stopped doing business with Refco which would have stopped the fraud (*see id.* ¶¶ 45, 55, 60, 88). In other words, according to the facts Plaintiff alleges, the most foreseeable result of EY's returns was to undermine, not cause, the fraud.

Even if it were somehow reasonably foreseeable that EY's tax returns would cause a third party to have a falsely inflated view of Refco's financial situation, as a matter of law it would still not be reasonably foreseeable that Refco would loot the FX Customers' funds. Inflating financial statements is not the same thing as insider looting. *See Ryan*, 2000 WL

1375265, at *5 (holding that the direct and proximate cause of plaintiff's loss was the defendant's fraud, not the bank's representation about the status of the defendant's bank account). Cases have repeatedly held that even if it is reasonably foreseeable that a company's financial performance would be overstated, that does not mean that it is reasonably foreseeable that insiders will loot assets. *See e.g., Univ. of Montreal Pension Plan*, 2007 WL 528703, *7–8 (although defendants' creation of position papers facilitating fraudulent NAV statements and audit reports may have been but-for cause of fraud, plaintiff failed to allege that defendants' conduct was proximate cause of scheme). Indeed, Plaintiff does not allege that EY was even aware of the existence of the FX Customers, much less that RCM was diverting their assets. It is hard to conceive how EY *could* have – much less reasonably *should* have – foreseen that preparing Refco's tax returns would cause those unknown customers to have their cash transferred to other Refco entities.

Moreover, there are a huge number of intervening events that, as a matter of law, would foreclose any proximate causation between EY's actions and the FX Customers' injury. EY prepared Refco's tax returns through tax year 2002. The FX Customers suffered their injury in October 2005. In the intervening period, a huge number of actions occurred, which Plaintiff claims were essential to the fraudulent scheme, and which Plaintiff never alleges EY had knowledge of or involvement in, including the LBO and IPO. Furthermore, Refco replaced its tax preparers *twice* before its bankruptcy and the FX Customers' loss. Exam. Rpt. at pp. 217, 220-21. As a matter of law these intervening events, far more closely tied both substantively and temporally to the injury, prevent EY from having caused this injury in law. *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 579–80 (S.D.N.Y. 2007) (proximate causation not found where looting accomplished through intervening transactions that were not foreseeable result of

defendants' conduct); *see also AUSA Life Ins. Co. v. Ernst & Young*, 119 F. Supp. 2d 394, 407

(S.D.N.Y. 2000) ("Without allowing hindsight to dominate our determination of predictability,

we are compelled to find that plaintiffs' loss on their investments in JWP's notes was not a

foreseeable result of E&Y's complicity in JWP's misrepresentations but of post-audit

developments that could not have been anticipated.").

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's claims should be dismissed with prejudice.[20]


Dated:  June 6, 2008

                      Respectfully submitted,

                      LATHAM & WATKINS LLP

                    By:  /s/ Christopher R. Harris
                        Miles N. Ruthberg
                        Christopher R. Harris
                        LATHAM & WATKINS LLP
                        885 Third Avenue
                        New York, New York 10022
                        (212) 906-1200

                        William P. Hammer, Jr.
                        Associate General Counsel
                        Ernst & Young LLP
                        5 Times Square
                        New York, NY  10036-6530

                        *Attorneys for Ernst & Young LLP*

---

[20] "A district court may deny leave to amend a complaint if the amendment would be futile." *Ryan*, 2000 WL 1375265, *11.  Dismissal with prejudice is especially appropriate where plaintiff has had "access to full discovery," but yet was unable to state a claim. *Id.* (citing *Billard v. Rockwell Int'l Corp.*, 683 F.2d 51, 57 (2d Cir.1982)).  Indeed, Plaintiff here had access to 40 million pages of Refco documents, 37,000 pages of EY documents, and untold millions of documents from other parties, but yet failed to allege adequately a claim against EY.