# APPENDIX OF UNPUBLISHED CASES

Westlaw.

Not Reported in F.Supp.2d                                                           Page 1
Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.))**

**H**Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Patricia DANGERFIELD, Plaintiff,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.
No. 02 Civ. 2561(KMW)(GW.

Feb. 15, 2006.

*REPORT AND RECOMMENDATION*

[GORENSTEIN](), Magistrate J.
**\*1** Plaintiff Patricia M. Dangerfield ("Dangerfield"), proceeding *prose,* brought this lawsuit against Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), and her former husband, J William Dangerfield ("Mr.Dangerfield"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), securities fraud, common law fraud, conversion, and aiding and abetting conversion. In September 2003, this Court dismissed all of Dangerfield's claims against Merrill Lynch except the claim of aiding and abetting conversion. In January 2004, Dangerfield stipulated to the dismissal of her claims against Mr. Dangerfield following his death. Merrill Lynch has now moved for summary judgment on the remaining claim against it. For the reasons below, Merrill Lynch's motion should be granted.

I. *BACKGROUND*

A. *Dangerfield's Claim of Aiding and Abetting Conversion*

While the allegations in Dangerfield's Amended Complaint are not admissible in this motion for summary judgment, we briefly summarize the relevant portions to provide some context for her claim.

Dangerfield obtained a final decree of divorce from Mr. Dangerfield in the District Court of Harris County, Texas, on March 11, 1991, under which she was awarded property belonging to Mr. Dangerfield. *See* First Amended Complaint (corrected version), filed Nov. 20, 2002 (Docket # 33) ("Am.Compl."), ¶ 13; Decree of Divorce, dated Mar. 11, 1991 (reproduced as Ex. 2 to Plaintiff's First Amended Complaint (first version), filed Nov. 15, 2002 (Docket # 31)), at 20. Dangerfield attempted to obtain information regarding Mr. Dangerfield's accounts at Merrill Lynch by means of subpoenas issued by the Texas court in 1990, *see* Am. Compl. ¶¶ 10-11, and in 1998, *seeid.* ¶¶ 20-22; Subpoena Duces Tecum, dated Apr. 9, 1998 (reproduced as Exs. 4 and 5 to Docket # 31). She claims that, despite these requests, Merrill Lynch withheld relevant information about Mr. Dangerfield's accounts and that this course of conduct continued through June 2000. *See* Am. Compl. ¶¶ 27-28, 34. Dangerfield alleges that Merrill Lynch knew that its failure to respond to the subpoenas properly would "facilitate the conversion" by Mr. Dangerfield of accounts at Merrill Lynch rightfully belonging to Dangerfield. *Id.* ¶ 58.

B. *Relevant Procedural History*

Dangerfield filed the original complaint in this case on April 3, 2002. *See* Complaint, filed Apr. 3, 2002 (Docket # 1). The Amended Complaint, filed several months later, included claims of RICO violations, securities fraud, common law fraud, conversion, and aiding and abetting conversion. *See* Am. Com pl. ¶¶ 30-49, 50-54, 55-58, 59-61. On April 11, 2003, this Court issued a Report and Recommendation recommending the dismissal of all claims except for the aiding and abetting conversion claim. *See* Report and Recommendation, dated Apr. 11, 2003 (Docket # 50). That Report was adopted by the district judge, who granted Dangerfield leave to move to amend her complaint on certain grounds. *See* Order, dated Sept. 22, 2003 (Docket # 103), at 19-23, 28-29. Dangerfield thereafter filed a "Second Amended Complaint," which the Court construed as a motion to amend her complaint. *See* Report and Recommendation, dated Feb. 2, 2004 (Docket # 76); Order, dated Mar. 17, 2004 (Docket # 80). That motion was denied. *Id.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.))**

Page 2

**\*2** On April 8, 2004, the Court issued an order directing that discovery proceed on the issues of Merrill Lynch's statute of limitations defense and proceedings brought by Dangerfield against Mr. Dangerfield in Norway. *See* Order, dated Apr. 8, 2004 (Docket # 82). This Order was issued in light of the Merrill Lynch's contention that it had a complete defense to Dangerfield's claims based on the applicable statute of limitations and the *res judicata* effect of a judgment unfavorable to Dangerfield in Norway. The original deadline for completion of discovery was June 11, 2004. *Id.*

Following certain discovery disputes, the Court extended the deadline for the completion of discovery to August 6, 2005. *See* Order, dated July 28, 2004 (Docket # 86). Ultimately, the Court granted the parties leave to make cross-motions to compel with respect to their outstanding discovery disputes. *See* Order, dated Oct. 5, 2004 (Docket # 90).

On October 22, 2004, Dangerfield filed a motion to compel. *See* Motion for Order Compelling Production of Documents Requested in Plaintiff's First Discovery Request to Defendants, dated Oct. 21, 2004 (Docket # 93) ("Pl. Motion to Compel"). On the same day, Merrill Lynch filed its own motion to compel. *See* Notice of Motion, dated Oct. 22, 2004 (Docket # 91); Merrill Lynch's Motion to Compel Production of Documents, dated Oct. 22, 2004 (Docket # 92). The gravamen of Dangerfield's motion was similar to the basis for the underlying claim itself: that Merrill Lynch was not fully disclosing information on accounts in the name of Mr. Dangerfield or related accounts. *See* Pl. Motion to Compel at 1-3.

At oral argument on the motions, the Court reversed its April 8, 2004 Order, and directed that discovery should proceed not merely as to the statute of limitations and *res judicata* defenses but as to the entire aiding and abetting conversion claim. *See* Transcript of Conference held on January 20, 2005, filed Feb. 16, 2005 (Docket # 106) ("Tr."), at 6-7, 50-51. This expansion of discovery was also reflected in a written order issued on the same date of the conference. *See* Order, dated Jan. 20, 2005, at 1 (Docket # 104) ("January 20 Order"). The Court ordered Merrill Lynch to respond to the vast majority of plaintiff's discovery requests. *See* Tr. 26-48. The

Court also required Merrill Lynch to provide Dangerfield with any documents it possessed relating to account numbers listed in the motion to compel, or to state that it did not possess such documents. *See* Tr. 20-21; 39:12-13. The Court ordered Merrill Lynch to produce any documents in its possession for a 12-year period: starting from January 1, 1991, until the date of Mr. Dangerfield's death, May 27, 2003. *See* Tr. 37:2-7; January 20 Order ¶ 1. The Court set a deadline of March 21, 2005, for the completion of all discovery. January 20 Order ¶ 2.

In February 2005, Merrill Lynch sought a 30-day extension for the discovery deadlines. This request was granted. *See* Order, dated Feb. 22, 2005 (Docket # 107) ("February 22 Order"). Merrill Lynch sent a letter to the Court describing its responses to Dangerfield's requests, and indicating the efforts it had made to locate the documents requested. *See* Letter from James M. Bergen to Magistrate Judge Gabriel W. Gorenstein, dated Mar. 24, 2005 ("Bergen Letter") (Docket # 130); *see also* Declaration of Daniel R. Spector, dated July 25, 2005 (attached to Notice of Motion for Summary Judgment, dated July 25, 2005 (Docket # 114)) ("Spector Decl."), ¶ 24 (showing list of each account number referenced in the Amended Complaint and how Merrill Lynch responded). In April 2005, Dangerfield sought a 60-day extension of the discovery period. This request was granted, *see* Memorandum Endorsement, dated Apr. 13, 2005 (Docket # 109), making the deadline for all discovery June 21, 2005, and the deadline for summary judgment motions July 25, 2005. *See* January 20 Order; February 22 Order. Dangerfield then sought an order requiring that "an independent forensic computer expert" be given access to Merrill Lynch's electronic records, and that she be provided with Mr. Dangerfield's "portfolio" and "microfiche" copies of documents. *See* Motion for Additional Order to Compel Discovery of Electronic Documents, dated Apr. 18, 2005 (Docket # 111), ¶¶ 1-3. This request was denied because no factual or legal basis was provided for the issuance of such an order. *See* Memorandum Endorsement, dated Apr. 19, 2005 (Docket # 110).[FN1] A few days before discovery was to end, Dangerfield requested yet another 60 days for the completion of discovery. That request was denied because, as described in the Court's Order, Dangerfield had already been allotted ample time to conduct her discovery, and the Court had extended the discovery deadline several times, including the recent 60-day extension at

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.))

Dangerfield's request. *See* Order, dated June 28, 2005 (Docket # 113).

> FN1. Specifically, in contravention of the instructions given to her at the January 20, 2005, conference, *see* Tr. 11-14, Dangerfield provided no evidence to support her assertion that Merrill Lynch had failed to respond to her discovery requests-the factual predicate for the relief sought in her motion. The Court denied the motion also because Dangerfield had once again not complied with the Court's requirement that she confer with her adversary and request a pre-motion conference, *see*Fed.R.Civ.P. 37(a)(2)(B) and Local Civil Rule 37.1, before filing the discovery motion.

C. *The Motions filed by the Parties*

1. *Merrill Lynch's Motion for Summary Judgment*

**\*3** On July 25, 2005, Merrill Lynch moved for summary judgment against Dangerfield. *See* Notice of Motion, filed July 25, 2005 (Docket # 114); Memorandum of Law in Support of Motion for Summary Judgment, dated July 25, 2005 (Docket # 116) ("Sum.Judg.Memo"); Statement of Material Facts Pursuant to Local Rule 56.1, dated July 25, 2005 (Docket # 119) ("56.1 Statement"). Included in its motion was the statement required by Local Civil Rule 56.2 informing Dangerfield of the materials she would have to submit in order to oppose the summary judgment motion. *See* Notice to Pro Se Litigant Opposing Motion for Summary Judgment, dated July 25, 2005 (Docket # 117).

Dangerfield filed a response to this motion. *See* "Notice of Motion," dated Aug. 24, 2005 (Docket # 122) (annexing Plaintiff's Answer to Defendants # 1-52 Statement of Material Facts Pursuant to Local Rules 56.1) ("56.1 Reply"); Amended Memorandum of Law, Response to Summary Judgment by Defendants, dated Aug. 25, 2005 (Docket # 125) ("Sum.Judg.Response"); Declaration of Patricia M. Dangerfield, dated Aug. 24, 2005 (Docket # 123).

Merrill Lynch filed a memorandum of law in reply. *See* Reply Memorandum of Law in Further Support of Motion for Summary Judgment, dated Sept. 12, 2005 (Docket # 126).

2. *Dangerfield's Motion for a "Default Judgment"*

On July 25, 2005, the same date summary judgment motions were due, Dangerfield filed a document she entitled "Motion for Default Judgment Against Merrill, Lynch, Pierce, Fenner & Smith, Inc.," filed July 25, 2005 (Docket # 115). Accompanying these papers was Plaintiff's Memorandum of Law in Support of Motion for Default Judgment, filed July 25, 2005 (Docket # 118) ("Default Judg. Memo").

Counsel for Merrill Lynch wrote to the Court inquiring how it should treat this motion inasmuch as the motion was apparently raising a discovery dispute and discovery had concluded the previous month. On August 10, 2005, the Court issued an order noting the lack of clarity in Dangerfield's papers, specifically, whether Dangerfield was "seeking to have this Court compel the production of additional existing documents or whether plaintiff instead seeks a sanction based on the defendant's failure to retain documents, or both."*See* Order, dated Aug. 10, 2005 (Docket # 120) ("August 10 Order"), at 1. The Court noted that the motion violated the Court's own practices requiring the parties to consult with each other and to write to the Court before filing a discovery motion, and that it violated the requirements of Fed.R.Civ.P. 37(a)(2)(B) and Local Civil Rule 37.1. *Id.* Finally, the Court noted that the motion was untimely under paragraph 7 of the January 20 Order, which had specifically provided that any applications regarding discovery had to be made "promptly after the cause for such a motion arises" and, except in extraordinary circumstances, no later than 30 days prior to the close of discovery, or May 21, 2005. *See* January 20 Order at 2. The January 20 Order had further warned that "untimely applications will be denied." *Id.* Nonetheless, the Court directed Merrill Lynch to respond to the merits of the claims and factual assertions made by Dangerfield in these motion papers. *See* August 10 Order at 1. Before Merrill Lynch could do so, Dangerfield filed what appears to be a supplement to or an amended version of her original motion for a default judgment. These documents consist of an Affidavit, a Notice of Motion, and an "Amended Memorandum of Law for Default Judgment," accompanied by ten numbered exhibits. These three items were filed together on August 24, 2005 as Docket # 124.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*4** In accordance with the Court's direction in the January 20 Order, Merrill Lynch submitted a declaration-filed at the same time it filed its reply brief on the summary judgment motion-that addressed Dangerfield's contentions in her motion for a default judgment. *See* Declaration of James M. Bergen, dated Sept. 12, 2005 (Docket # 127).

In reply, Dangerfield filed a document entitled "Answer to Response to Summary Judgment & Default Judgment Dated 9/21/05," on September 23, 2005 (Docket # 129). Annexed to this document was a one-page Affidavit executed by Dangerfield stating that additional exhibits would be sent "early next week." No additional exhibits were received or filed, however.

## II. *LAW GOVERNING SUMMARY JUDGMENT*

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *seealsoCelotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)* (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus should be left to the finder of fact. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).*

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id. at 255* (citation omitted). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuineissuefortrial,' "*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)* (quoting Fed.R.Civ.P. 56(e)) (alteration in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998)* (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict

in his favor." *Anderson, 477 U.S. at 256*. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir.1999), cert.denied,530 U.S. 1242 (2000).* If the nonmoving party's evidence is "merely colorable" or is not "significantly probative," summary judgment may be granted. *SeeAnderson, 477 U.S. at 249-50* (citing *Dombrowski v. Eastland, 387 U.S. 82, 84 (1967); First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968)); seealsoGottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir.1996)* (plaintiff may not defeat summary judgment "by relying on ... conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.").

**\*5** Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case."*Nebraska v. Wyoming, 507 U.S. 584, 590 (1993)* (quoting *Celotex, 477 U.S. at 322*) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."*Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir.1996)* (citing *Anderson, 477 U.S. at 247-48).*

## III. *DISCUSSION*

Normally, this Court would attempt determine all the undisputed facts for purposes of determining a motion for summary judgment. The problem with taking that route here is that, while Merrill Lynch has provided a Rule 56.1 Statement listing undisputed facts, *see* 56.1 Statement, Dangerfield's responses to this statement, *see* 56.1 Reply, either 1) do not controvert the corresponding paragraph in the 56.1 Statement, 2) are not followed by citations to evidence that would be admissible at trial as required by Local Civil Rule 56.1(d), 3) are conclusory, and/or 4) are incomprehensible.

It is not necessary, however, to parse the nature of each of Dangerfield's responses because Merrill Lynch's motion may be decided on just one of the many grounds it raises: specifically, Dangerfield's

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.))**

failure to offer admissible evidence as to one of the elements of her claim of aiding and abetting conversion. Accordingly, we now address this aspect of Merrill Lynch's argument. Following this discussion, we turn to whether Dangerfield's allegations regarding Merrill Lynch's responses to her discovery requests should affect the disposition of this motion.

A. *Dangerfield's Claim of Aiding and Abetting Conversion*

New York law permits a claim for aiding and abetting conversion where the plaintiff can prove "(1) the existence of a violation committed by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation." *Lesavoy v. Lane,* 304 F.Supp.2d 520, 526 (S.D.N.Y.2004) (citing *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.,* 2002 WL 31426207, at *7 (S.D.N.Y. Oct. 30, 2002), *vacated on other grounds, Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296 (2d Cir.2004), *cert.denied,*125 S.Ct. 1704 (2005)); *accord Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 493 (S.D.N.Y.2003) (citing cases).[FN2] While "wrongful intent is not an essential element of the conversion," *Leve v. C. Itoh & Co. (Am.), Inc.,* 136 A.D.2d 477, 478 (1st Dep't) (citing cases), *appeal denied,*71 N.Y.2d 806 (1988), a plaintiff must show that the defendant "aided and assisted" the converter "with *culpable knowledge* that such funds did not belong to [the converter]." *Weisman, Celler, Spett & Modlin v. Chadbourne & Parke,* 271 A.D.2d 329, 330 (1st Dep't) (emphasis added), *leave to appeal denied,*95 N.Y.2d 760 (2000); *accord Lenczycki v. Shearson Lehman Hutton, Inc.,* 238 A.D.2d 248, 248 (1st Dep't 1997) (aider and abettor must "kn[ow] of [the converter's] intention to convert the funds") (citation omitted). New York " 'has not adopted a constructive knowledge standard for imposing aiding and abetting liability." ' *Lesavoy,* 304 F.Supp.2d at 526 (citing *Kolbeck v. LIT Am., Inc.,* 939 F.Supp. 240, 246 (S.D.N.Y.1996)). Thus, "New York law requires *actual* knowledge of the wrongful conduct." *Diamond State Ins. Co. v. Worldwide Weather Trading LLC,* 2002 WL 31819217, at *6 (S.D.N.Y. Dec. 16, 2002) (emphasis added and citations omitted).

FN2. The parties in their briefs have assumed that New York law applies to Dangerfield's non-federal claims, *see* Sum. Judg. Memo at 12-25; Sum. Judg. Response at 17, 19, thereby signaling their consent to the application of New York law. *See Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (citing *Tehran-Berkeley Civil & Envtl. Eng'rs. v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989)). In addition, Dangerfield was instructed in the Order dated September 22, 2003 (Docket # 103), that the Court would assume that New York law applied to her aiding and abetting conversion claim unless Dangerfield sought reconsideration of the decision on the basis that Texas law applied. *See id.* at 18-19, 29-30.Dangerfield never sought reconsideration on that basis.

*6 As is permitted by the law governing summary judgment, Merrill Lynch asserted in its memorandum of law that there is no admissible evidence supporting Dangerfield's assertion that Merrill Lynch had knowledge of any act of conversion by Mr. Dangerfield. *See* Sum. Judg. Memo at 21-23. Under *Celotex,* where a nonmoving party bears the burden of proof on an issue, it is sufficient for the party moving for summary judgment to "point[ ] out to the district court ... that there is an absence of evidence to support the nonmoving party's case." 477 U.S. at 325. The moving party is permitted to "use a memorandum or brief to point to the absence of evidence and thereby shift to the nonmovant the obligation to come forward with admissible evidence supporting its claim." *Feurtado v. City of New York,* 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) (citing cases) (internal quotation marks omitted). Because Dangerfield bears the burden of proving her claim of aiding and abetting conversion, Merrill Lynch's assertion in its brief that there is no evidence to support the "actual knowledge" element of this claim required Dangerfield to make a showing sufficient to establish this factual predicate. *See Celotex,* 477 U.S. at 322-23; *see also Feurtado,* 337 F.Supp.2d at 599 (defendant's "assertion in its brief that there is no evidence" supporting plaintiff's claim required plaintiff "to furnish admissible evidence in support of his claim") (citations omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.))**

Dangerfield's submission to the Court, however, is devoid of evidence establishing that Merrill Lynch had actual knowledge of any act of conversion by Mr. Dangerfield. Her response to this portion of Merrill Lynch's memorandum of law consists in its entirety of the following:

Merrill Lynch New Brunswick's office of Merrill Lynch handled Mr. Dangerfield's letter in 1991 regarding the dispute over the 568-81W79 account but no correspondence has been presented in discovery either in 1998 or 2005. Mr. Gilmartin together with Mr. Paradis worked up a scheme to send the 317-85378 through the 568-81W79 knowing that it was open and statements were being sent to Mr. Dangerfield in Norway. Both accounts were open way before I got them and yet I was told the second account that it was "new." Statements were not provided before the transfers on July 5, 1989 and June, 1991, respectively.

Sum. Judg. Response at 19.

While it is impossible to discern with certainty the meaning of this paragraph, what is clear is that it does not consist of admissible evidence that would allow a jury to conclude that Merrill Lynch had actual knowledge of any act of conversion by Mr. Dangerfield. The first sentence might be read as asserting that Merrill Lynch has failed to provide a copy of a 1991 letter from Mr. Dangerfield in response to the 1998 subpoena or in response to Dangerfield's demands in this lawsuit. But this is hardly evidence to support a claim that Merrill Lynch had actual knowledge of any conversion by Mr. Dangerfield. The next sentence posits the existence of a scheme involving two Merrill Lynch employees, *see* Default Judg. Memo at 9-10, to do something (the precise nature of which is not readily discernible) with two account numbers "knowing" that one of them was open and that "statements were being sent to Mr. Dangerfield in Norway."But, apart from their lack of clarity, these assertions are not supported by any sworn statement by anyone with personal knowledge. They thus constitute "unsubstantiated speculation," *Scotto,* 143 F.3d at 114, which is insufficient to avoid a grant of summary judgment. The remaining allegations in the paragraph (relating to when accounts were open and when statements were provided), even if admissible, do not constitute evidence of actual knowledge by Merrill Lynch of any act of conversion.

**\*7** As noted, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."*Allen,* 100 F.3d at 258 (citing *Anderson,* 477 U.S. at 247-48). Because Dangerfield has submitted no evidence that would allow a reasonable jury to conclude that Merrill Lynch had actual knowledge of any alleged act of conversion by Mr. Dangerfield, her claim of aiding and abetting conversion must be dismissed. *See,e.g.,Lenczycki,* 238 A.D.2d at 248 (trial court properly dismissed plaintiff husband's claim against his and his ex-wife's money management firm for aiding and abetting his ex-wife's alleged conversion, "in the absence of evidence that they knew of [his ex-wife's] intention to convert the funds.").

Because Dangerfield's claim fails for this reason alone, it is not necessary to reach any of Merrill Lynch's other arguments.

### B. *Dangerfield's Request for Further Discovery*

Rule 56 provides a mechanism whereby a party may avoid summary judgment if the party can make a showing that it is entitled to a continuance to permit further discovery. *See*Fed.R.Civ.P. 56(f). But that rule "applies to summary judgment motions made *before* discovery is concluded."*McAllister v. N.Y.C. Police Dep't,* 49 F.Supp.2d 688, 696 n. 5 (S.D.N.Y.1999) (emphasis added) (citations omitted); *accordChimarev v. TD Waterhouse Investor Servs., Inc.,* 280 F.Supp.2d 208, 229 n. 1 (S.D.N.Y.2003); *McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 588 (W.D.N.Y.1995) ("Applications to extend the discovery deadline must be made prior to expiration of the deadline....Rule 56(f) is not intended to circumvent discovery orders."). Because Dangerfield's "motion for default" comes a month after the discovery period closed-and two months after any such applications were supposed to have been made, *see* January 20 Order ¶ 5, it is untimely and will not suffice as an application under Rule 56(f).[FN3]

> FN3. Moreover, under Fed.R.Civ.P. 56(f), "a party resisting summary judgment on the ground that it needs discovery in order to

Not Reported in F.Supp.2d                                                                                Page 7
Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.))**

defeat the motion must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) (internal quotation marks and citations omitted). Dangerfield's submission, which in large part consists of a stream-of-consciousness regarding her complaints about Merrill Lynch's conduct over the past 15 years, fails in virtually all of these areas.

In any event, even if we were to consider Dangerfield's application as timely, it would have to be denied because Dangerfield had ample opportunity to conduct discovery and to obtain relief with respect to any alleged insufficient responses by Merrill Lynch. Dangerfield denies that she had the opportunity to conduct discovery based on her view that Merrill Lynch has not given complete responses to her requests for documents in this case. *See,e.g.,* Default Judg. Memo at 2-11. Indeed, her dissatisfaction with Merrill Lynch's responses to her document requests here mirrors her dissatisfaction with Merrill Lynch's responses to her 1990 subpoena for information on Mr. Dangerfield's accounts and the 1998 subpoenas seeking the same information. What is at issue for purposes of Rule 56(f), however, is simply whether Dangerfield had an opportunity to pursue discovery in this case-not whether the 1990 and 1998 responses by Merrill Lynch were adequate.

**\*8** Here, Dangerfield had every opportunity to pursue discovery. The Court held a conference on January 20, 2005 (Docket # 106), and issued an order (Docket # 104) directing Merrill Lynch to respond to numerous discovery requests that had been made by Dangerfield and that it do so by February 21, 2005-a date later extended at Merrill Lynch's request. *See* Order, dated Feb. 22, 2005 (Docket # 107). This Order was clarified on terms proposed by Dangerfield herself in a Memorandum Endorsement dated February 3, 2005 (Docket # 105).

At no point since that time has Dangerfield submitted to the Court any intelligible objection to Merrill Lynch's discovery responses. Any objections she has

made seem to rest entirely on her belief that Merrill Lynch is concealing documents and failing to provide truthful information regarding account numbers that she has provided to them. This belief, however, is unsupported by any evidence other than Dangerfield's own conjecture. By contrast, Merrill Lynch has provided an explanation for its responses to Dangerfield's document requests. Specifically, it has stated either that it has provided documents relating to account numbers sought by Dangerfield; that it does not have the particular documents being sought; that the account numbers do not exist; or that the account numbers are unrelated to Dangerfield or Mr. Dangerfield. *See* Spector Decl. ¶ 24; Bergen Letter at 3-17.

While Dangerfield disbelieves these statements by Merrill Lynch, she has never provided this Court with any basis for issuing additional orders to Merrill Lynch regarding their discovery responses. Notably, the Court explained to Dangerfield at the January 20 conference that her mere insistence that Merrill Lynch is withholding documents from her is insufficient to obtain relief from the Court. As the Court stated with respect to Merrill Lynch's responses to Dangerfield's requests prior to the expansion of the scope of discovery:

[Merrill Lynch has] now made an assertion they do not have documents responsive other than the ones that were turned over in the ... eight hundred eighty pages.... I know you disbelieve that, but ... at this point they have responded to that document request. And unless you provide testimony from a Merrill Lynch person or something else showing that, in fact, there are such documents, there's nothing I can do.

(Tr. 10-11). When Dangerfield complained that the Court had barred her from dealing directly with Merrill Lynch employees and had instead required her to go through the attorneys on this case, the Court stated:
[H]ere's what you can do. I don't know if you want to do this. But ... you can take a deposition, if you want to go through that expense, of a document custodian at Merrill Lynch, if you want to verify the answer that there, in fact, are no documents responsive to that. There's nothing stopping you from doing that.

(Tr. 11). When Dangerfield insisted that there had to be documents Merrill Lynch was withholding and

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 335357 (S.D.N.Y.))**

that Merrill Lynch should be sanctioned, the Court
stated:

**\*9** I can't sanction them because I have no basis for
showing that there is existing in their files some
document they've refused to ... give to you.

(Tr. 12).

Dangerfield's failure to make a factual showing that
Merrill Lynch was withholding responsive
documents existed not only on January 20, 2005, but
also when Dangerfield later made complaints about
Merrill Lynch's responses during the course of
discovery. *See* Memorandum Endorsement, dated
Apr. 19, 2005. The same defect exists with respect to
her complaints now. While Dangerfield asserts that
Merrill Lynch has improperly withheld documents
relevant to this case, there is no basis on which the
Court can conclude that Dangerfield has not been
given a full response to her discovery requests.

In sum, Dangerfield's complaints about Merrill
Lynch's discovery responses are not only untimely
but also fail on the merits. Thus, Dangerfield has not
provided any reason for granting a continuance to
allow her to seek additional evidence supporting her
claim of aiding and abetting conversion.

*Conclusion*

For the foregoing reasons, Merrill Lynch's motion for
summary judgment (Docket # 114) should be
granted. Dangerfield's motion for a default judgment
(Docket # 115) should be denied.

*PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties have
ten (10) days from service of this Report to file any
objections.  *Seealso*Fed.R.Civ.P. 6(a), (e).  Such
objections (and any responses to objections) shall be
filed with the Clerk of the Court, with copies sent to
the Honorable Kimba M. Wood, 500 Pearl Street,
New York, New York 10007, and to the undersigned
at 40 Centre Street, New York, New York 10007.
Any request for an extension of time to file
objections must be directed to Judge Wood. If a party
fails to file timely objections, that party will not be

permitted to raise any objections to this Report and
Recommendation on appeal. *See Thomas v. Arn,* 474
U.S. 140, 144-45 (1985).

S.D.N.Y.,2006.
Dangerfield v. Merrill Lynch, Pierce, Fenner &
Smith, Inc.
Not Reported in F.Supp.2d, 2006 WL 335357
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

Goldin Associates, L.L.C. v. Donaldson, Lufkin &
Jenrette Securities Corp.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
GOLDIN ASSOCIATES, L.L.C., Liquidating
Trustee of the Worldwide Direct Liquidating Trust,
on behalf of the Smartalk Teleservices, Inc.
bankruptcy estate, Plaintiff,
v.
DONALDSON, LUFKIN & JENRETTE
SECURITIES CORPORATION, Global Retail
Partners, L.P., DLJ Diversified Partners, L.P., DLJ
Diversified Partners-A, L.P., GRP Partners, L.P.,
Global Retail Partners Funding, Inc., DLJ First ESC,
L.P., DLJ ESC-II, L.P., Kenneth A. Viellieu, Linda
Fayne Levinson, Victor Grillo, Jr., Victor Grillo, Sr.,
Lloyd Lapidus, Raymond Wysocki, Defendants.
**No. 00 Civ. 8688(WHP).**

Sept. 25, 2003.

After granting leave to replead some of the claims
previously dismissed in securities fraud action arising
from stock-for-stock merger transaction, several
defendants filed motions to dismiss claims in
plaintiff's second amended complaint. The District
Court, Pauley, J., held that: (1) group pleading
doctrine did not apply to allegedly false data prepared
by acquired company officers and directors that was
contained in an "information book" prepared by
investment banker in connection with company's
acquisition in a stock-for-stock merger transaction;
(2) allegations of fraud based on acquired company's
officers' and directors' false and misleading
representations and omissions concerning company's
cellular technology, and its distribution networks
satisfied the particularity requirements of rule
governing pleading of fraud; (3) complaint failed to
state adequately a claim against defendants for aiding
and abetting a breach of fiduciary duty between
investment banker and acquiring company.

Motions granted in part and denied in part.

West Headnotes

**[1]** Federal Civil Procedure 170A 636

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
170Ak636 Certainty, Definiteness and
Particularity
         170Ak636 k. Fraud, Mistake and
Condition of Mind. Most Cited Cases
Allegations of fraud based on company's officers' and
directors' participation in the preparation of
"information book" prepared by investment banker in
connection with company's acquisition in a stock-for-
stock merger transaction failed to satisfy fraud
pleading requirements; plaintiff failed to allege what
data any of the officers and directors furnished or
when they furnished it, and impermissibly relied on
pleading allegations on information and belief.
Fed.Rules Civ.Proc.Rule 9, 28 U.S.C.A.(b).

**[2]** Federal Civil Procedure 170A 636

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak633 Certainty, Definiteness and
Particularity
         170Ak636 k. Fraud, Mistake and
Condition of Mind. Most Cited Cases
Group pleading doctrine, which permits a securities
fraud plaintiff to allege that misstatements contained
in company documents may be presumed to be the
work of the acquired company's officers and
directors, did not apply to allegedly false data
prepared by company officers and directors that was
contained in an "information book" prepared by
investment banker in connection with company's
acquisition in a stock-for-stock merger transaction.
Fed.Rules Civ.Proc.Rule 9, 28 U.S.C.A.(b).

**[3]** Federal Civil Procedure 170A 636

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak633 Certainty, Definiteness and

Not Reported in F.Supp.2d                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

Particularity
        170Ak636   k. Fraud, Mistake and
Condition of Mind. Most Cited Cases
Allegations of fraud based on acquired company's officers' and directors' false and misleading representations and omissions concerning company's consumer-friendly cellular programming technology, and its distribution networks satisfied the particularity requirements of rule governing pleading of fraud; with respect to statements concerning cellular technology, plaintiff alleged the specific content of the misrepresentation, to whom it was made and when, and why it was false, and thus provided defendants with adequate notice of the claims against them and the grounds on which those claims are based, and with respect to omission of material information concerning distribution networks, complaint provided the person responsible for the omission, the context of the omission, and the manner in which the omission misled acquiring company. Fed.Rules Civ.Proc.Rule 9, 28 U.S.C.A.(b).

**[4] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633   Certainty, Definiteness and
Particularity
                170Ak636   k. Fraud, Mistake and
Condition of Mind. Most Cited Cases
Securities fraud complaint sufficiently alleged circumstances that provided at least a minimal factual basis for its conclusory allegations of scienter; complaint alleged enough facts to allow an inference that officers of acquired company who made misrepresentations acted in a consciously fraudulent or reckless manner, and that officer who omitted material information in discussions with acquiring company had a motive to deceive and access to accurate information. Fed.Rules Civ.Proc.Rule 9, 28 U.S.C.A.(b).

**[5] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633   Certainty, Definiteness and
Particularity

        170Ak636   k. Fraud, Mistake and
Condition of Mind. Most Cited Cases

**Fraud 184 ☞41**

184 Fraud
    184II Actions
        184II(C) Pleading
            184k41 k. Allegations of Fraud in General.
Most Cited Cases
General pleading standards, rather than particularity standards for pleading fraud, applied to claim of aiding and abetting breach of fiduciary duty by investment banker. Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.(a); Fed.Rules Civ.Proc.Rule 9, 28 U.S.C.A.(b).

**[6] Federal Civil Procedure 170A ☞1831**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1831   k. Fact Issues. Most
Cited Cases
Issue of when fiduciary duty between investment banker and merger participant may have been created, if at all, could not be decided on a motion to dismiss.

**[7] Fraud 184 ☞41**

184 Fraud
    184II Actions
        184II(C) Pleading
            184k41 k. Allegations of Fraud in General.
Most Cited Cases
Complaint failed to state adequately a claim against defendants associated with acquired company for aiding and abetting a breach of fiduciary duty between investment banker and acquiring company since complaint did not allege facts that showed that defendants knowingly participated in the furtherance of investment banker's breach of duty; constructive knowledge of the deficiencies of "information book" prepared by investment banker in connection with the acquisition did not suffice to state aiding and abetting claim under New York law. Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[8] Corporations 101 🔑320(7)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k320 Actions Between Shareholders and Officers or Agents
                101k320(7) k. Bill, Petition, or Complaint in General. Most Cited Cases
Complaint failed to state adequately a claim under New York law against officers and directors of acquired company for aiding and abetting a breach of fiduciary duty between investment banker and acquiring company; allegations that certain defendants "persuaded" acquired company's auditors to remove a going concern from drafts of their audit did not establish knowing participation in the alleged breach nor did allegations that defendants provided false data in an "information book" prepared by investment banker in connection the acquisition adequately allege the knowing participation in the breach.

**[9] Federal Civil Procedure 170A 🔑1838**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
        170AXI(B)5 Proceedings
            170Ak1837 Effect
                170Ak1838 k. Pleading Over. Most Cited Cases
Based on the prior proceedings in securities fraud case arising from merger and the related bankruptcy of allegedly defrauded merger participant, and given the fact that plaintiff had already been afforded one opportunity to re-plead, claims which failed to satisfy pleading standards would be dismissed with prejudice and without further leave to re-plead. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.(a).

Hal Neier, Hallie B. Levin, Friedman Kaplan Seiler & Adelman LLP, New York, New York, for Plaintiff.
Diem-Suong T. Nguyen, Davis Polk & Wardell, New York, New York, for Defendants, Donaldson Lufkin & Jenrette Securities Corp. and Kenneth A. Viellieu.
Arthur K. Steinberg, Ronald D. Reynolds, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, New York, for Defendants, Global Retail Partners, L.P., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., GRP Partners, L.P., Global Retail Partners Funding, Inc., DLJ First ESC, L.P., DLJ ESC-II, L.P., and Linda Fayne Levinson.

Arthur H. Aufses III, Kramer Levin Naftalis & Frankel, LLP, New York, New York, for Defendants, Victor Grillo, Jr., Victor Grillo, Sr., Lloyd Lapidus and Raymond Wysocki.

*MEMORANDUM AND ORDER*

PAULEY, J.
**\*1** Last year, this Court granted in part and denied in part several motions to dismiss the First Amended Complaint. See*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenerette Sec. Corp.,* No. 00 Civ. 8688(WHP), 2002 WL 362794 (S.D.N.Y. Mar.6, 2002)(*"DLJ Securities"* ). At that time this Court also granted leave to replead some of the claims it dismissed. Presently before this Court are motions by several defendants to dismiss claims in plaintiff's Second Amended Complaint ("Second Am. Compl."). The background of this action is discussed in detail in *DLJ Securities,* 2002 WL 362794, at \*1-5, and is not repeated here except to the extent necessary to understand the current motions. For the following reasons, the motions to dismiss are granted in part and denied in part.

*Background*

This action arises out of the Chapter 11 bankruptcy proceedings of SMTK Expedite, Inc., formerly known as SmarTalk Teleservices, Inc. ("SmarTalk"), and seeks to recover for alleged derelictions attendant to the company's June 1998 acquisition of Worldwide Direct, Inc. ("WWD") in a stock-for-stock merger transaction. Plaintiff, formerly the Official Committee of Unsecured Creditors appointed by the U.S. Trustee for the District of Delaware, and now Goldin Associates, L.L.C., Liquidating Trustee of the Worlwide Direct Liquidating Trust, acting on behalf of the SmarTalk bankruptcy estate, asserts claims predicated on alleged fraud and breach of fiduciary duty against its financial advisor and investment banker in the merger transaction, Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ Securities Corp."), certain entities and individuals affiliated with DLJ Securities Corp., and four WWD insiders. The defendants fall into three discrete groups: (i) DLJ Securities Corp., and Kenneth A. Viellieu, an

Not Reported in F.Supp.2d                                          Page 4
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

investment banker employed by DLJ Securities Corp. (collectively, the "DLJ Defendants"); (ii) Global Retail Partners, L.P., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., GRP Partners, L.P., Global Retail Partners Funding, Inc., DLJ First ESC, L.P., DLJ ESC-II, L.P. (collectively, the "GRP Entities") and Linda Fayne Levinson, a principal of Global Retail Partners L.P., (together with the GRP Entities, the "GRP Defendants"); and (iii) Victor Grillo, Jr., Victor Grillo, Sr., Lloyd Lapidus, and Raymond Wysocki, who served either as directors, officers or shareholders of WWD (collectively, the "WWD Defendants").

The current spate of motions are addressed exclusively to the repleaded fraud and aiding and abetting breach of fiduciary duty claims against the WWD Defendants and the GRP Defendants. Count III of the Second Amended Complaint alleges a claim of fraud against most, but not all, of the WWD Defendants, namely Grillo, Jr., Lapidus, and Wysocki. Specifically, Count III alleges a claim that Grillo, Jr., Lapidus, and Wysocki defrauded SmarTalk by making material misrepresentations or omissions to it. These misrepresentations or omissions concerned WWD's cellular technology, distribution channels, and financial condition, including, *inter alia,* alleged gross inflations of projected revenues and net income, and WWD's cash situation.

**\*2** Count IV of the Second Amended Complaint alleges a claim of aiding and abetting DLJ Securities Corp.'s breach of its fiduciary duty to SmarTalk against defendant Viellieu, the GRP Defendants, and all of the WWD Defendants. Specifically, Count IV alleges that the GRP Defendants aided and abetted the breach of duty through the acts of defendant Levinson, who participated in (1) the preparation of a false and misleading Information Book provided to SmarTalk; (2) the concealment of serious financial and operational problems at WWD from SmarTalk; and (3) WWD board meetings where WWD's cash crisis was discussed and the merger with SmarTalk agreed on. As for the WWD Defendants, Count IV alleges that they aided and abetted the breach of fiduciary duty by, *inter alia,* providing grossly inflated data concerning WWD's financial condition to DLJ Securities Corp. for inclusion in the Information Book provided to SmarTalk.

The GRP Defendants and the WWD Defendants move to dismiss these claims pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons detailed below, the GRP Defendants' motion to dismiss is granted, and the WWD Defendants' motion to dismiss is granted in part and denied in part.[FN1]

> FN1. None of the DLJ Defendants move to dismiss the remaining claims against them.

### Discussion

On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). Dismissal is proper when the plaintiff fails to plead the basic elements of a cause of action. *See Wright v. Giuliani,* No. 99 Civ. 10091(WHP), 2000 WL 777940, at *4 (S.D.N.Y.), *aff'd,* 230 F.3d 543 (2d Cir.2000); *accord DLJ Securities,* 2002 WL 362794, at *4.

### I. *The Fraud Claims*

The WWD Defendants argue that the fraud claim against them must be dismissed because it does not comport with Rule 9(b)'s requirements for pleading fraud with particularity.

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Rule 9(b) is designed to serve three goals, namely: (i) to provide a defendant with fair notice of the claims against it; (ii) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (iii) to reduce the number of strike suits. *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 293 (S.D.N.Y.2000), *aff'd,* 2 Fed. Appx. 109 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

Cir.2001). Still, Rule 9(b) must be read together with Rule 8(a), which calls for a "short and plain statement" of a claim for relief. *DiVittorio,* 822 F.2d at 1247;*DLJ Securities,* 2002 WL 362794, at *4.

**\*3** To survive scrutiny under Rule 9(b), fraud allegations generally should specify the time, place, speaker and content of an alleged misrepresentation. *DiVittorio,* 822 F.2d at 1247;*O'Brien v. National Prop. Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989). In instances where the alleged fraud is premised on an omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission and the manner in which the omission misled the plaintiff. *Odyssey Re,* 85 F.Supp.2d at 293. Where, as here, there are multiple defendants, the complaint must also disclose the specific nature of each defendant's participation in the alleged fraud. *DiVittorio,* 822 F.2d at 1247;*O'Brien,* 719 F.Supp. at 225-26.

Finally, allegations of fraud ordinarily cannot be based on information and belief. *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972). Still, this pleading restriction may be relaxed where the matter is peculiarly within the knowledge of the defendant. *DiVittorio,* 822 F.2d at 1247;*O'Brien,* 719 F.Supp. at 226. Where pleading on information and belief is appropriate, the allegations must be accompanied by a statement of facts upon which the belief is founded. *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.1988);*Segal,* 467 F.2d at 608.

For most other civil claims, Rule 8(a) requires a plaintiff to provide "fair notice of [the] claim asserted" so as to permit a defendant to answer and prepare for trial, *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988), and does not "permit conclusory statements to substitute for minimally sufficient factual allegations,"*Furlong v. Long Island College Hosp.,* 710 F.2d 922, 927 (2d Cir.1983).

Plaintiff bases its fraud claim against Grillo, Jr., Lapidus, and Wysocki on two principal grounds: (1) WWD gave a false and misleading "Information Book" to SmarTalk; and (2) Grillo, Jr., Lapidus, and Wysocki misrepresented to SmarTalk "the state of WWD's prepaid cellular technology" and WWD's distribution network.

*A. The Information Book*

**[1]** The Second Amended Complaint avers that WWD, as well as DLJ Securities Corp., provided the "Information Book" to SmarTalk, and that it "included data furnished by Grillo, Jr. and other officers and/or directors of WWD, including, upon information and belief, Grillo, Sr., Lapidus, and Wysocki."(Second Am. Compl. ¶ 51.) The WWD Defendants argue that this allegation is inadequate because it lumps all of them together with a generality that WWD provided the Information Book to SmarTalk. They also argue that the allegation that the Information Book included data furnished by Grillo, Jr., and on information and belief, the remaining WWD Defendants, is insufficient under Rule 9(b) because it does not identify what data any WWD Defendant furnished. Finally, they assert that the allegation impermissibly rests on information and belief, and omits any factual undergirding.

**\*4** In *DLJ Securities,* this Court found allegations concerning the WWD Defendants' participation in the preparation of the Information Book to be insufficient in the context of the aiding and abetting claim. *DLJ Securities,* 2002 WL 362794, at *10. Plaintiff attempts to overcome that infirmity with allegations that the Information Book contained data furnished by Grillo, Jr., and on information and belief, Lapidus and Wysocki. (Second Am. Compl. ¶ 51.) However, those allegations cannot surmount the Rule 9(b) hurdle .[FN2]

> **FN2.** Plaintiff does not attempt to replead its fraud claim against Grillo, Sr. in the latest iteration of its complaint.

Like the predecessor complaint, the Second Amended Complaint alleges that the Information Book was provided to SmarTalk by DLJ Securities Corp. and WWD generally. (Second Am. Compl. ¶ 51.) Plaintiff seeks to tie the individual WWD Defendants to the Information Book by alleging that each furnished "data" for inclusion in it. However, that allegation is bereft of any specificity. Plaintiff fails to allege what data any of the WWD Defendants furnished or when they furnished it, and impermissibly relies on pleading allegations on information and belief. *See**DiVittorio,* 822 F.2d at 1247-48;*accord**Landy v. Mitchell Petroleum Tech. Corp.,* 734 F.Supp. 608, 621 (S.D.N.Y.1990) ( "Plaintiffs must clearly identify each defendant's role

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

in the scheme and what their connection was to the alleged misrepresentation."). Even assuming allegations on information and belief were permissible, plaintiff fails to allege any facts on which that belief is founded. *See* *Stern,* 844 F.2d at 1003; *Segal,* 467 F.2d at 608; *DLJ Securities,* 2002 WL 362794, at *6.

[2] Plaintiff argues that the allegation suffices because it is entitled to rely on the "group pleading doctrine" to attribute statements in a group-created document to the officers and directors of the company that created the document, without specifically ascribing each particular statement to a particular defendant. *See* *Elliott Assocs., L.P. v. Hayes,* 141 F.Supp.2d 344, 354 (S.D.N.Y.2000), *aff'd,* 26 Fed. Appx. 83 (2d Cir.2002); *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999).

"The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *Elliott Assocs.,* 141 F.Supp.2d at 354; *accord* *Irvine v. ImClone Sys., Inc.,* Nos. 02 Civ. 109 & 7499 (RO), 2003 WL 21297285, at *2 (S.D.N.Y. June 4, 2003); *In re Emex Corp. Sec. Litig,* No. 01 Civ. 4886(SWK), 2002 WL 31093612, at *7 (S.D.N.Y. Sept.18, 2002); *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999); *The* *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.,* 205 F.Supp.2d 243, 253 (S.D.N.Y.2002). The "doctrine allows ... plaintiffs to 'rely on [a] presumption that statements in 'prospectuses, registration statements, annual reports, press releases, or *other group-published information'* are the collective work of those individuals with direct involvement in the everyday business of the company.' ' *Oxford Health Plans,* 187 F.R.D. at 142 (quoting *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998)) (emphasis added); *accord* *Elliot Assocs.,* 141 F.Supp.2d at 354; *Jordan (Bermuda) Inv.,* 205 F.Supp.2d at 253; *Polar Int'l Brokerage Corp. v. Reeve,* 108 F.Supp.2d 225, 237 (S.D.N.Y.2000).

*5 The doctrine permits a plaintiff to "allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors." *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 219 (S.D.N.Y.1999); *accord* *Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1311

(S.D.N.Y.1996) ("[I]n cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other group published information, it is reasonable to presume that these are the collective actions of the officers.").

"However, the group pleading doctrine is extremely limited in scope. One such limitation is that it applies only to group-published documents, such as SEC filings and press releases." *Elliott Assocs.,* 141 F.Supp.2d at 354 (citations omitted); *accord* *Irvine,* 2003 WL 21297285, at *2; *Jordan (Bermuda) Inv.,* 205 F.Supp.2d at 253; *Oxford Health Plans,* 187 F.R.D. at 142. Further, the doctrine only applies where the officers or directors of the company "participated in the preparation and dissemination" of the group published document. *Degulis,* 928 F.Supp. at 1311-12 ("Consequently, where ... the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a prospectus, plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery."); *accord* *Elliott Assocs., 141 F.Supp.2d at 354.*

Plaintiff's reliance on the group pleading doctrine to repair its fraud allegations is misplaced. The group pleading doctrine is limited to individuals, usually officers or directors, of the company furnishing a group-published document. Even if the Information Book falls within the category of documents to which the group pleading doctrine applies, plaintiff alleges that it was prepared by DLJ Securities Corp, and merely included "data" furnished by the WWD Defendants. (Second Am. Compl. ¶ 51.) If the group pleading doctrine applies to anyone, it is the officers and directors of DLJ Securities Corp., not the WWD Defendants. Plaintiff seeks to extend the group pleading doctrine beyond the pale. While a DLJ Securities Corp. document may be attributable to a DLJ Securities Corp. official, the group pleading doctrine does not draw every outside contributor into its limited orbit. Doing so would defeat the purposes of Rule 9(b). Thus, as plaintiff alleges that the Information Book was prepared by DLJ Securities Corp.,[FN3] there is no connection between the Information Book and the WWD Defendants such that the presumption of the group pleading doctrine should apply.

Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

FN3. In its most specific allegation concerning the Information Book, the Second Amended Complaint avers that it was prepared by DLJ Securities Corp., and merely included data furnished by the WWD Defendants. (Second Am. Compl. ¶ 51.) However, elsewhere in the Second Amended Complaint plaintiff alleges the conclusion that the Information Book was prepared by DLJ Securities Corp. and WWD. (Second Am. Compl. ¶¶ 54-55.) This Court does not credit plaintiff's conclusory allegations that the Information Book was prepared by both WWD and DLJ Securities Corp. since they are belied by more specific allegations earlier in the Second Amended Complaint. *See* *Hirsch v. Arthur Anderson & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995); *In re Am. Express Co. S'holder Litig.,* 39 F.3d 395, 400-01 & n. 3 (2d Cir.1994).

B. *Technology and Distribution Misrepresentations*

[3] Count II also alleges a fraud claim against Grillo, Jr., Lapidus, and Wysocki, based on false and misleading representations those WWD Defendants made to Erich Spangenberg, Chief Executive Officer of SmarTalk, concerning the state of WWD's cellular technology, specifically the integration of certain consumer-friendly programming technology, and WWD's distribution networks. (Second Am. Compl. ¶¶ 67-70.)

1. *Cellular Technology*

**\*6** As to Grillo, Jr. and Lapidus, the Second Amended Complaint alleges that, "[u]pon information and belief, in or about mid-May of 1998, Grillo, Jr. and Lapidus represented to Spagenberg that WWD would posses a new, consumer-friendly programming technology ... by mid-June. Grillo, Jr. and Lapidus assured Spagenberg that representatives of Telemac Corporation ('Telemac'), from which WWD licensed the prepaid cellular software, had promised them that this compressed technology would be integrated into the telephones by that time."(Second Am. Compl. ¶ 68.)

The WWD Defendants contend that these allegations do not satisfy the particularity requirements of Rule 9(b) because the allegation does not identify when, where or how each of the defendants made the supposed representation, and does not properly allege that the defendants' knew the statements were false. This Court disagrees.[FN4] Plaintiff has pleaded facts sufficient to provide Grillo, Jr. and Lapidus with adequate notice of the claims against them under Rule 9(b). Plaintiff alleges the specific content of the misrepresentation, to whom it was made and when, and why it was false, namely that Telemac representatives testified that they never made such a promise. (Second Am. Compl. ¶ 68-69.) "Plaintiff need not plead dates, times and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." ' *Int'l Motor Sports Group,* 1999 WL 619633, at *3; *accord* *Gelles v. TDA Indus., Inc.,* No. 90 Civ. 5133(MBM), 1991 WL 39673, at *6 (S.D.N.Y. Mar.18, 1991) ("[Rule 9(b) ] does not require that a complaint plead fraud with the detail of a desk calendar or a street map."). This Court finds that the allegations contain sufficient specificity to provide Grillo, Jr. and Lapidus with adequate notice of the claims against them and the grounds on which those claims are based, and thus comply with Rule 9(b).

FN4. This Court is not persuaded that an entire allegation must be disregarded simply because one sentence is alleged on information and belief, and without support for that belief. This Court finds that the specific allegations in the Second Amended Complaint provide ample notice of the fraud claims against Grillo, Jr. and Lapidus when the Court balances the requirements of Rule 9(b) and their overall purposes with the requirements of notice pleading under Rule 8(a). *See* *Int'l Motor Sports Group, Inc. v. Gordon,* No. 98 Civ. 5611(MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug.19, 1999) ("Indeed, in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed, R. Civ. P. 8(a), which requires only a 'short and plain statement' of the claims for relief, and Fed.R.Civ.P. 8(f), which provides that 'all pleadings shall be so construed as to do substantial justice." ').

2. *WWD's Distribution Networks*

Not Reported in F.Supp.2d                                                                              Page 8
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

The Second Amended Complaint alleges that Grillo, Jr., Lapidus, and Wysocki provided SmarTalk with "information touting WWD's established distribution channels" and that they "failed to disclose to SmarTalk that the technology problems WWD was experiencing with its prepaid phones posed a significant threat to WWD's relationships with its major distributors."(Second Am. Compl. ¶ 70.) Plaintiff further alleges that Grillo, Jr., Lapidus and Wysocki "emphasized WWD's exclusive distribution network while overlooking the fact that a number of WWD's critical distributor relationships were in jeopardy."(Second Am. Compl. ¶ 70.)

These allegations of omissions fail to satisfy Rule 9(b)'s particularity requirements. Plaintiff's allegations that Grillo, Jr., Lapidus, and Wysocki "provided information to SmarTalk touting WWD's established distribution channels" and that they "emphasized WWD's exclusive distribution network" (Second Am. Compl. ¶ 70), are not specific enough to satisfy Rule 9(b). Plaintiff does not allege what information was provided touting the distribution channels or what was emphasized about the distribution network. Further, plaintiff fails to allege who the information was provided to or when it was provided. Without the specific information as to what the WWD Defendants told or provided SmarTalk, there are no allegations that describe how the WWD Defendants' omission misled SmarTalk. Therefore, these allegations fail to state a fraud by omission. *See Odyssey Re (London), 85 F.Supp.2d at 293.*

**\*7** Nevertheless, plaintiff alleges, with some specificity, that Wysocki "touted the ability of WWD's distribution network to 'sell several million units of a product off the retail shelf' " in a May 6, 1998 memorandum to Spangenberg. (Second Am. Compl. ¶ 67.) This allegation compensates for the earlier deficiencies because it sets forth the specific information that was provided and to whom at SmarTalk, as well as a specific time. However, the WWD Defendants contend that when read in context, Wysocki's statement is one of historical fact that must be alleged to be false to hold Wysocki liable. (WWD Mot. at 12-13.) Plaintiff counters that Wysocki's statement together with the allegation that he "failed to disclose to SmarTalk that the technology problems WWD was experiencing with its prepaid phones posed a significant threat to WWD's relationships

with its major distributors," (Second Am. Compl. ¶ 70), satisfies the requirements of Rule 9(b). This Court agrees with plaintiff. Plaintiff has sufficiently alleged that Wysocki omitted certain material information from his discussions with SmarTalk, specifically that after "touting" the distribution channels and noting that it was "not uncommon for us to sell several million units of a product off the retail shelf," [FN5] Wysocki failed to inform SmarTalk that problems with WWD's product threatened WWD's relationships with its major distributors. (Second Am. Compl. ¶ 70 .) These allegations taken as a whole satisfy Rule 9(b) as to the fraud claim against Wysocki.[FN6] The Second Amended Complaint provides the person responsible for the omission, the context of the omission, and the manner in which the omission misled SmarTalk, namely that after Wysocki's earlier statements his omission of the threats to the relationships with the distributors was misleading to SmarTalk. At the motion to dismiss stage, these allegations are sufficient to state a claim under Rule 9(b).

> FN5. The relevant portion of the Wysocki memorandum states, "Clearly, we are excited about the potential of prepaid at retail. It is not uncommon for us to sell several million units of a product off the retail shelf. Unlike historical television product, this is truly brand building and an ever expanding sales potential."(Affidavit of Arthur H. Aufses III dated May 15, 2002, Ex. A.)

> FN6. Although the WWD Defendants may be right that in order for the Wysocki statement to be labeled a misrepresentation, plaintiff must allege that it is false, that does not require dismissal of the claim. The statement in the letter supports a claim of fraud by omission as against Wysocki. Thus, the Court need not determine whether a fraudulent misrepresentation claim against Wysocki has been alleged based on the Wysocki memorandum alone.

[4] Moreover, this Court finds that plaintiff has sufficiently alleged circumstances that provide at least a minimal factual basis for its conclusory allegations of scienter. *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994). This court is satisfied that

Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

the Second Amended Complaint alleges enough facts to allow an inference that Grillo, Jr. and Lapidus acted in a consciously fraudulent or reckless manner,[FN7] and that Wysocki had a motive to deceive and access to accurate information. *See* *Cohen, 25 F.3d at 1173-74;* *In re Solv-Ex Corp. Sec. Litig.,* 210 F.Supp.2d 276, 283-84 (S.D.N.Y.2000).* Accordingly, the WWD Defendants' motion to dismiss Count III of the Second Amended Complaint is denied.

> FN7. The Second Amended Complaint clearly alleges facts that Grillo, Jr. and Lapidus made representations to SmarTalk that they knew or should have known were false. (Second Am. Compl. ¶¶ 68-69.) Thus, plaintiff has alleged a conscious misbehavior or recklessness on the part of those WWD Defendants. *See* *In re Emex Corp. Sec. Litig.,* No. 01 Civ. 4886(SWK), 2002 WL 31093612, at *6-7 (S.D.N.Y. Sept.18, 2002); *In re Solv-Ex Corp. Sec. Litig.,* 210 F.Supp.2d 276, 283-84 (S.D.N.Y.2000).

## II. *Aiding and Abetting Claim*

Count IV of the Second Amended Complaint alleges that "Viellieu, the GRP Entities, Levinson, Grillo, Jr., Grillo, Sr., Lapidus, and Wysocki aided and abetted [DLJ Securities Corp.'s] breaches of fiduciary duty and were active participants in [DLJ Securities Corp.'s] breaches of fiduciary duty to SmarTalk." (Second Am. Compl. ¶ 100.) To plead a claim of aiding and abetting a breach of fiduciary duty under New York law, plaintiff must set forth facts showing (i) a breach by a fiduciary of obligations to another; (ii) that the aider and abettor knowingly induced or participated in the breach; and (iii) that the plaintiff suffered damages as a result of the breach.[FN8] *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847-48 (2d Cir.1987); *Kolbeck v. LIT America, Inc.,* 939 F.Supp. 240, 245 (S.D.N.Y.1996), *aff'd,* 152 F.3d 918 (2d Cir.1998) (table); *accord* *Astor Holdings, Inc. v. Roski,* No. 01 Civ.1905(GEL), 2003 WL 21939710, at *7 (S.D.N.Y. Aug.12, 2003); *Steed Finance LDC v. Laser Advisers, Inc.,* 258 F.Supp.2d 272, 282 (S.D.N.Y.2003); *Kaufman v. Cohen,* 307 A.D.2d 113, 760 N.Y.S.2d 157, 169 (1st Dep't 2003).

> FN8. The parties do not resurrect the choice of law issue from the earlier motion to

dismiss in their latest submissions. However, as the court noted in the previous Memorandum and Order, California law does not differ substantively from New York law with respect to aiding and abetting. Under California law, to be liable under an aiding and abetting theory, the third party must (i) be an active participant in the breach and (ii) participate in the breach for the purpose of advancing his or her interests or financial advantage. *Richardson v. Reliance Nat'l Indem. Co.,* No. C 99-2952(CRB), 2000 WL 284211, at *11 (N.D.Cal. March 9, 2000)* (applying California law); *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 80 Cal.Rptr.2d 329, 342 (Ct.App.1998). Thus, the Court will analyze the current motions under New York law.

**\*8** Actual, as opposed to mere constructive, knowledge is necessary to show that a defendant had the requisite knowledge of the breach of fiduciary duty. *Kolbeck,* 939 F.Supp. at 246-47; *accord* *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.,* No. 99 Civ. 9623(RWS), 2002 WL 31426207, at *8 (S.D.N.Y. Oct.30, 2002); *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.,* No. 97 Civ. 4978(LMM), 2002 WL 88226, at *12 (S.D.N.Y. Jan.23, 2002); *Kaufman,* 760 N.Y.S.2d at 169-70; *see also* *Steed Finance,* 258 F.Supp.2d at 282 (dismissing aiding and abetting fraud claims for failing to adequately allege that defendants had actual knowledge of the fraud). As the court in *Kolbeck* noted:

> To hold all defendants to a standard of constructive knowledge and subject to a duty of inquiry would mean that all defendants, regardless of their independent obligations to the plaintiff, could be liable for inaction. That result is contrary to the law of substantial assistance and confirms that a failure to investigate, *i.e.,* constructive knowledge, is not enough to support a claim for aiding and abetting [breach of] a fiduciary duty absent the existence of a fiduciary duty running from defendant to plaintiff.

939 F.Supp. at 246-47; *accord* *Briarpatch,* 2002 WL 31426207, at *8. Moreover, a plaintiff must allege that the defendant had actual knowledge of the primary violator's status as a fiduciary and actual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

knowledge that the primary violator's conduct contravened a fiduciary duty. *A.I.A. Holdings,* 2002 WL 88226, at *12; *see also* *Kaufman,* 760 N.Y.S.2d at 169-70 ("Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty.").

Further, "[a] defendant may be held liable for 'participating' in another's breach of fiduciary duty only if the defendant provided 'substantial assistance' to the primary violator." *Kolbeck,* 939 F.Supp. at 247 (citing *DePinto v. Ashley Scott, Inc.,* 222 A.D.2d 288, 635 N.Y.S.2d 215, 217 (1st Dep't 1995)); *accord* *Kaufman,* 760 N.Y.S.2d at 170 ("A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator."). Substantial assistance includes one who "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed." *Kolbeck,* 939 F.Supp. at 247 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992)); *accord* *Briarpatch,* 2002 WL 31426207, at *11; *Kaufman,* 760 N.Y.S.2d at 169-70.

[5] The WWD Defendants and the GRP Defendants move to dismiss this claim for failure to plead an adequate claim of aiding and abetting a breach of fiduciary duty. This Court previously found that Rule 9(b)'s particularity standards do not apply to the aiding and abetting breach of fiduciary duty claim asserted here. *DLJ Securities,* 2002 WL 362794, at *8-10. Thus, the general pleading standards of Rule 8(a) apply to this claim. *DLJ Securities,* 2002 WL 362794, at *8-10. Further, though Rule 9(b) does not apply, plaintiff "still must allege some facts, in non-conclusory terms, showing that [the GRP Defendants] and the WWD Defendants knowingly participated in DLJ Securities Corp.'s breach." *DLJ Securities,* 2002 WL 362794, at *10 (citing *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990)); *Furlong v. Long Island College Hosp.,* 710 F.2d 922, 927 (2d Cir.1983)).

A. *The GRP Defendants*

**\*9** The GRP Defendants move to dismiss the aiding and abetting claim as against them arguing mainly that the allegations do not support the plaintiff's conclusions that they knowingly participated in DLJ

Securities Corp.'s breach of its duty. The argument that the GRP Defendants did not knowingly participate in the alleged breach is two-fold: (1) the GRP Defendants contend that DLJ Securities Corp.'s alleged fiduciary duty to SmarTalk could not have existed at the time of their alleged aiding and abetting conduct, thus they could not have known of the duty owed by DLJ Securities Corp. to SmarTalk; and (2) assuming that the GRP Defendants knew of DLJ Securities Corp .'s duty, they did not actually knowingly participate in a breach of duty because none of the alleged acts are wrongful.

[6] Initially, the GRP Defendants argue that the claim against them should be dismissed because the fiduciary duty that was breached, and which they allegedly aided and abetted, did not exist until DLJ Securities Corp. and SmarTalk signed an engagement agreement, or, at the earliest, when the merger negotiations began between WWD and SmarTalk. That argument is unpersuasive. A determination as to when the duty between DLJ Securities Corp. and SmarTalk arose, assuming it ever did, would be inappropriate at the motion to dismiss stage. This Court previously found that plaintiff adequately alleged facts that could support a finding of a fiduciary duty between DLJ Securities Corp. and SmarTalk. *DLJ Securities,* 2002 WL 362794, at *8-9. As the Court noted, the question of whether a duty existed is "often a fact-specific inquiry reserved for a jury." *DLJ Securities,* 2002 WL 362794, at *9. Thus, the issue of when the duty may have been created, if at all, cannot be decided on a motion to dismiss.

[7] Similarly, the GRP Defendants argue that plaintiff alleges that they first became aware of SmarTalk as a potential merger partner for WWD-and therefore DLJ Securities Corp.'s fiduciary relationship with SmarTalk-at the April 27, 1998 WWD board of directors meeting. The GRP Defendants further contend that plaintiff alleges that all of their conduct which allegedly aided and abetted the breach occurred prior to the April 27 board meeting. As such, the GRP Defendants maintain, plaintiff fails to allege that they knew of DLJ Securities Corp.'s fiduciary duty when they committed the acts alleged to have aided and abetted the breach.

This argument is likewise inappropriate at the motion to dismiss stage. The Second Amended Complaint does not affirmatively allege that the April 27, 1998

Not Reported in F.Supp.2d                                                                                     Page 11
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

WWD board meeting was the first time that the GRP Defendants were ever informed of SmarTalk's potential as a merger partner for WWD. (Second Am. Compl. ¶ 50.) Further, drawing all reasonable inferences in favor of the non-moving party as the Court is bound to do on a motion to dismiss, there are sufficient facts alleged in the Second Amended Complaint concerning the GRP Defendants role in locating a suitable merger partner for WWD (Second Am. Compl. ¶¶ 42-43), to infer that the GRP Defendants knew of SmarTalk's existence as a potential merger partner before the April 27 board meeting.[FN9] Thus, at this stage this Court declines to dismiss Count IV on this ground.

> FN9. In fact, the allegation concerning the April 27, 1998 board meeting also states that DLJ Securities Corp. "made a detailed presentation to the board regrading the potential acquisition of WWD by two companies DLJ *had identified,* one of which was SmarTalk." (Second Am. Compl. ¶ 50 (emphasis added).) The use of the phrase "had identified" also supports the inference that the GRP Defendants knew of SmarTalk prior to this meeting.

**\*10** Previously, this Court dismissed the aiding and abetting claim against the GRP Defendants because it failed to allege: (1) the GRP Defendants' role, if any, through Levinson, in the decision by WWD to pursue merger negotiations with SmarTalk; or (2) Levinson's role, if any, in authorizing the disclosure of financial information to SmarTalk. *DLJ Securities,* 2002 WL 362794, at \*11. In the Second Amended Complaint, plaintiff alleges: (1) that the GRP Entities and Levinson decided that they would not allow WWD to incur any additional debt, and thus sought an exit strategy by seeking to locate a suitable merger partner (Second Am. Compl. ¶ 42), (2) that Levinson participated in the discussion, and agreed to the pursuit of merger talks with SmarTalk (Second Am. Compl. ¶ 50), and (3) that Levinson, on behalf of the GRP Entities, authorized the financial information to be provided to SmarTalk (Second Am. Compl. ¶ 52). Like its predecessor, however, the Second Amended Complaint fails to state adequately a claim for aiding and abetting a breach of fiduciary duty against the GRP Defendants.

The Second Amended Complaint does not allege

facts that show the GRP Defendants knowingly participated in the furtherance of a breach of DLJ Securities Corp.'s duty to SmarTalk. Plaintiff alleges that the GRP Defendants aided and abetted the breach of duty through three sets of acts: (1) Levinson's participation in the preparation of the false and misleading Information Book (Second Am. Compl. ¶ 100(c)); (2) Levinson's participation in the elimination of the "going concern" warning (Second Am. Compl. ¶ 100(d)); and (3) Levinson's participation in the decisions to pursue merger discussions and provide the Information Book to SmarTalk (Second Am. Compl. ¶ 100(e)). As these acts are described in the Second Amended Complaint, they are not wrongful and cannot supply the basis for a claim that the GRP Defendants "knowingly participated" in DLJ Securities Corp.'s breach of duty.

First, the allegations in the Second Amended Complaint that the GRP Defendants, through Levinson, participated in convincing WWD's auditors to remove a going concern from drafts of their audit of WWD (Second Am. Compl. ¶ 49), do not establish knowing participation in the alleged breach. Nowhere in the Second Amended Complaint does plaintiff allege that removing the going concern amounted to a fraud, or that it was wrongful under any applicable accounting standards.[FN10] As such, the allegations that Levinson persuaded the auditors to remove the going concern do not support plaintiff's conclusion that Levinson actually knew of DLJ Securities Corp.'s alleged breach and knowingly participated therein. *See Kaufman,* 760 N.Y.S.2d at 169-70.

> FN10. Plaintiff argues in its opposition to the GRP Defendants' motion that removing the going concern was wrongful because the GRP Defendants knew that WWD's cash flow problems jeopardized the company's ability to continue operating (Pl.'s Opp. to GRP at 16), but does not allege in the Second Amended Complaint that the removal of the going concern was wrongful.

Similarly, plaintiff's allegations that Levinson's participation in the decisions to pursue merger discussions with, and provide the Information Book to, SmarTalk (Second Am. Compl. ¶¶ 50, 52), fail to support the aiding and abetting claim. Plaintiff has not pleaded any factual support for its conclusion that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

this conduct by Levinson amounted to a knowing participation in the breach of the duty. There are no factual allegations that Levinson actually knew that there was anything wrong with pursuing merger discussions with, and providing the Information Book to, SmarTalk. Nor are there facts alleged to state that Levinson's role at the meetings or in authorizing the furnishing of the Information Book was wrongful. Thus, plaintiff fails to allege that Levinson knowingly participated in conduct in furtherance of the breach. Plaintiff's conclusory allegations that the GRP Defendants knew that "no one who understood the true extent of WWD's cash problems would be interested in acquiring the company" (Second Am. Compl. ¶ 43), and that WWD was experiencing a cash "crisis" and thus the cash flow data in the Information Book were unrealistic (Second Am. Compl. ¶¶ 60-62), are not supported by adequate facts in the Second Amended Complaint to show that the GRP Defendants actually knew that they were participating in a breach of duty.

**\*11** Finally, plaintiff also fails to allege any facts as to how Levinson's alleged participation in the preparation of the Information Book was a knowing participation in DLJ Securities Corp.'s breach. Plaintiff alleges that the GRP Defendants "played an active role in the preparation of the Information Book, including among other things, reviewing and commenting upon internal drafts."(Second Am. Compl. ¶ 52.) The only fact plaintiff alleges concerning this allegation is that Levinson reviewed at least one draft of the Information Book, prepared on or about April 7, 1998, that contained revenue projections that were substantially lower than the inflated figures set forth in the final Information Book given to SmarTalk. (Second Am. Compl. ¶¶ 52, 54-55.) Plaintiff contends that these allegations sufficiently allege that the discrepancy between the two sets of numbers was a "red flag" that should have caused Levinson to question the accuracy of the data in the Information Book. (Pl.'s Opp. to GRP at 14.) Plaintiff summarizes its argument thusly: "These allegations show at the very least that Levinson and the GRP Entities had access to internal information regarding WWD's financial condition and that the internal information was sharply at odds with what was being reported to SmarTalk."(Pl.'s Opp. to GRP at 13.)

At most, however, plaintiff argues that the GRP

Defendants should be charged with constructive knowledge of the deficiencies of the Information Book and thus DLJ Securities Corp.'s breach. Constructive knowledge, however, does not suffice; plaintiff must allege facts showing that the GRP Defendants had actual knowledge of their participation in a breach of DLJ Securities Corp.'s duty to SmarTalk. *Kolbeck, 939 F.Supp. at 246-47;accord Briarpatch, 2002 WL 31426207, at \*8-10;A.I.A. Holdings, 2002 WL 88226, at \*12;Kaufman, 760 N.Y.S.2d at 169-70.* Plaintiff's lone factual allegation concerning the GRP Defendants participation in the preparation of the Information Book fails to establish that the GRP Defendants had actual knowledge of the wrongful breach or their role in it. Therefore, plaintiff has not alleged an aiding and abetting claim against the GRP Defendants. Accordingly, the GRP Defendants' motion to dismiss the aiding and abetting claim is granted.

B. *The WWD Defendants*

This Court previously dismissed the aiding and abetting claim against the WWD Defendants because the allegations in the First Amended Complaint vaguely suggested collusion between them and DLJ Securities Corp., but did not detail any facts attributing responsibility to any WWD Defendant for any act in furtherance of the breach of duty. *DLJ Securities, 2002 WL 362794, at \*10.* Specifically, although the First Amended Complaint alleged "that 'WWD'-the corporate entity-and DLJ Securities Corp. furnished the Information Book to SmarTalk, which purportedly misstated WWD's financial condition" there were no allegations that "squarely allege[d] that any WWD Defendant prepared, or in any way contributed to, the financial material contained therein."*DLJ Securities, 2002 WL 362794, at \*10.* Thus, the Court rejected the argument that the WWD Defendants were " 'fairly chargeable' with making the purportedly false statements in the Information Book and that it [was] 'reasonable to infer' that they had knowledge of omissions made to SmarTalk and acted to injure SmarTalk by voting for the merger," because the First Amended Complaint was wanting for factual allegations to support the urged inferences. *DLJ Securities, 2002 WL 362794, at \*10.*

**\*12**[8] After claiming to "heed[ ] the guidance

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

offered by the Court in its [prior] Memorandum and Order" (Pl.'s Opp. to WWD at 1), plaintiff contends that it has sufficiently repleaded the aiding and abetting claim against the WWD Defendants. Plaintiff alleges that Grillo, Jr., and on information and belief, Lapidus, Wysocki, and Grillo, Sr., all furnished information to be included in the Information Book provided to SmarTalk. (Second Am. Compl. ¶ 51.) The Information Book, in turn, is alleged to contain misrepresentations and omissions concerning WWD's financial conditions. (Second Am. Compl. ¶¶ 51, 53-61.) However, these allegations still fail to adequately state a claim for aiding and abetting DLJ Securities Corp.'s breach.

Plaintiff alleges that the WWD Defendants aided and abetted the breach by (1) providing false and misleading information for the Information Book; and (2) Grillo, Jr.'s "persuasion" of WWD's auditors to remove a going concern from a WWD audit. First, as noted above with respect to the GRP Defendants, plaintiff's allegations that certain defendants "persuaded" WWD's auditors do not suffice to state a claim for knowing participation in DLJ Securities Corp.'s breach of duty to SmarTalk. No additional factual allegations about the WWD Defendants and the going concern are pleaded that require further analysis on this point. Thus, this allegation is insufficient to state an aiding and abetting against the WWD Defendants.

Plaintiff's other basis for an aiding and abetting claim against the WWD Defendants, namely that they furnished false and misleading "data" for inclusion in the Information Book, is equally unavailing. The Second Amended Complaint alleges that the WWD Defendants provided "data" included in the allegedly false and misleading Information Book prepared by DLJ Securities Corp. (Second Am. Compl. ¶ 51.) However, plaintiff does not allege that the data the WWD Defendants provided was false or misleading in any way. Nor does plaintiff allege that the WWD Defendants actually knew that providing the data was an act in furtherance of DLJ Securities Corp's alleged breach. Therefore, the Second Amended Complaint does not adequately allege the WWD Defendants' knowing participation in the breach. As a result, plaintiff's aiding and abetting claim cannot be sustained against the WWD Defendants.

Accordingly, the allegations in the Second Amended Complaint do not adequately allege an aiding and abetting claim against the WWD Defendants, and thus the WWD Defendants' motion to dismiss that claim is granted.

III. *Punitive Damages*

The WWD and GRP Defendants move again to strike plaintiff's demand for punitive damages, which was reasserted in the Second Amended Complaint. (Second Am. Compl. ¶ 103.) The standard for punitive damages under New York law was set out by this Court in its last Memorandum and Order, and need not be repeated here. *DLJ Securities,* 2002 WL 362794, at *18. Whether the Second Amended Complaint as pleaded supports a prayer for punitive damages as to any claim is open to question. However, this Court, as it did in *DLJ Securities,* declines to dismiss plaintiff's prayer for punitive damages at this stage of the litigation.

IV. *Leave To Amend*

**\*13**[9] If a court grants a motion to dismiss, leave to amend under Rule 15(a) should be "freely given when justice so requires."Fed.R.Civ.P. 15(a). As a general matter, amendments to the pleadings are favored in order to facilitate a resolution on the merits. *See Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 573 (S.D.N.Y.1999). However, the decision to grant leave to amend is committed to the discretion of the trial court, *see Black Radio,* 44 F.Supp.2d at 573 (citing *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)), and may be denied where amendment would be futile. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

Plaintiff's predecessor boasted in the First Amended Complaint that it reviewed thousands of pages of documents produced in the SmarTalk bankruptcy proceedings. (First Amended Complaint ¶ 57.) Plaintiff also concedes that it has participated, to some extent, in the discovery process of other related actions concerning SmarTalk. (Pl.'s Opp. to WWD at 4 n. 2.) Moreover, this Court previously afforded plaintiff an opportunity to re-plead. It is time to move on.

Based on the prior proceedings in this case and the

Not Reported in F.Supp.2d                                                                                    Page 14
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.))**

related bankruptcy, and given the fact that plaintiff has already been afforded one opportunity to re-plead, this Court dismisses the aforementioned claims with prejudice and without further leave to re-plead.

### Conclusion

For the reasons set forth above, defendants' motions to dismiss are granted in part and denied in part. Specifically, the fourth claim for aiding and abetting breach of fiduciary duty against the WWD Defendants and the GRP Defendants is dismissed with prejudice and without leave to re-plead, and the motion to dismiss the third claim for fraud against the WWD Defendants is denied.

S.D.N.Y.,2003.
Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Securities Corp.
Not Reported in F.Supp.2d, 2003 WL 22218643 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1994 U.S. DIST. LEXIS 258



Caution
As of: Jun 06, 2008

**MARTIN GREENBLATT, Plaintiff, v. RICHARD POTASKY JEWELERS, RICHARD POTASKY, MARK SCHER, JEAN WALTHER, and DELOITTE & TOUCHE, Defendants.**

**93 Civ. 3652 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1994 U.S. Dist. LEXIS 258*

**January 13, 1994, Decided
January 13, 1994, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, acting pro se, filed an action with multiple counts, including fraud, conversion, and breach of fiduciary duty, against defendants, a jeweler, the major or sole shareholder of the jeweler and associates, and the jeweler's auditor. The auditor moved to dismiss for failure to state a claim upon which relief could be granted pursuant to *Fed. R. Civ. P. 12(b)(6)* or for judgment on the pleadings pursuant to *Fed. R. Civ. P. 12(c)*.

**OVERVIEW:** Under a consignment agreement plaintiff had with the jeweler, plaintiff supplied diamond jewelry on consignment. When the jeweler sold an item of consigned jewelry to a customer, plaintiff would be asked to provide an invoice for that item, which effectively passed title of the item from plaintiff to the jeweler. When the jeweler filed for bankruptcy protection under Chapter 11, plaintiff brought the action, which sought, inter alia, $ 119,600 in actual damages. Plaintiff claimed that the auditor should have notified him personally of the jeweler's precarious financial condition, while the auditor, in its motion to dismiss, contended that it had no such duty to plaintiff. Treating the auditor's motion as one for summary judgment, the court granted the motion after concluding that because the accountant-client relationship was not fiduciary in nature, the auditor was under no duty to inform plaintiff, a third party, that it had found the jeweler to be in poor financial condition during its most recent audit.

**OUTCOME:** The court granted summary judgment in favor of the auditor and dismissed all claims against the auditor in plaintiff's action to recover based on the auditor's failure to notify plaintiff of the jeweler's precarious financial condition.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Time Limitations > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] Both *Fed. R. Civ. P. 12(b)(6)* and *Fed. R. Civ. P. 12(c)* provide that if matters outside the pleading are presented to and not excluded by the court, the motion

1994 U.S. Dist. LEXIS 258, *

shall be treated as one for summary judgment and disposed of as provided in *Fed. R. Civ. P. 56.*

***Civil Procedure > Summary Judgment > Standards > Genuine Disputes***
***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
***Civil Procedure > Summary Judgment > Standards > Materiality***

[HN2] *Fed. R. Civ. P. 56(c)* provides that summary judgment shall be rendered forthwith if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. While courts have a responsibility to vigilantly weed out those cases that do not merit further judicial attention, they are likewise cautioned that this potent instrument must be used with the precision of a scalpel. The moving party bears the initial responsibility for identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Once the moving party has discharged this duty, the burden shifts to the non-moving party to demonstrate the existence of a genuine issue of material fact. The non-moving party may not, however, simply either rest upon the allegations or denials contained in its pleading, or show that there is some metaphysical doubt as to the material facts. Rather, the non-moving party must present affirmative evidence from which a jury might return a verdict in its favor.

***Civil Procedure > Parties > Self-Representation > General Overview***
***Civil Procedure > Summary Judgment > General Overview***

[HN3] According to the United States Court of Appeals for the Second Circuit, special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment, Moreover, courts in the Southern District of New York have shown a flexibility in construing U.S. Dist. Ct., S.D. N.Y., R. 3(g) when other overriding concerns, such as the existence of a party proceeding pro se, are present.

***Governments > Fiduciary Responsibilities***
***Torts > Malpractice & Professional Liability > Professional Services***

[HN4] Courts do not generally regard the accountant-client relationship as a fiduciary one. Moreover, a purely commercial transaction does not impose fiduciary duties upon the parties to that transaction. It follows, therefore, that when the allegedly aggrieved party is at best a third party to an accountant-client relationship, and no commercial transaction is executed between two parties -- indeed, when no relationship whatsoever exists between two parties -- no fiduciary duties may be imposed on either party.

**JUDGES:** [*1] McKENNA

**OPINION BY:** LAWRENCE M. McKENNA

**OPINION**

***MEMORANDUM AND ORDER***

McKENNA, D.J.

Plaintiff *pro se* Martin Greenblatt filed this action on June 1, 1993, invoking the jurisdiction of this Court pursuant to *28 U.S.C. §§ 1331, 1332,* and *18 U.S.C. § 1965(a).* Plaintiff seeks damages for actions allegedly constituting fraud, intent to defraud, conspiracy, misrepresentation, improper transfer of assets, conversion, embezzlement, and breach of fiduciary duty, as well as for offenses of mail fraud, *18 U.S.C. § 1341,* violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1961 et seq.,* theft and embezzlement relating to pension funds, *18 U.S.C. § 664,* and conspiracy to commit these offenses in violation of *18 U.S.C. § 371.* Defendant Deloitte & Touche ("Deloitte") moves this Court to either dismiss the claims asserted by Plaintiff against Deloitte on the ground that Plaintiff fails to state a claim upon which relief may be granted, pursuant to *Rule* [*2] *12(b)(6) of the Federal Rules of Civil Procedure,* render judgment on the pleadings pursuant to *Rule 12(c),* or, if the Court is inclined to consider papers outside the pleadings, grant summary judgment in Deloitte's favor pursuant to *Rule 56.* For the reasons stated below, Defendants' motion for summary judgment is granted and Plaintiff's action is dismissed with prejudice as against Deloitte.

**I.**

Construing the record in the light most favorable to Plaintiff, the facts are as follows. Plaintiff *pro se* Martin

Greenblatt conducts business from the Diamond Dealers Club in New York. Defendant Richard Potasky Jewelers ("RPJ") had its corporate offices in Ohio and operated a number of jewelry stores in various locations. Defendant Richard Potasky was the major or sole shareholder of RPJ, was active in running its business, and had his offices in Ohio. Defendant Mark Scher was the director of operations of RPJ. Defendant Jean Walther was the executive responsible for reconciling financial records for RPJ. Defendant Deloitte, the auditor for RPJ, maintained offices in Ohio.

At the heart of this action is a consignment agreement to which Plaintiff was a party. Plaintiff entered into [*3] an agreement with Potasky and Scher, on behalf of RPJ, according to which Plaintiff supplied RPJ with diamond jewelry on consignment ("Agreement"). By the terms of the Agreement, before RPJ sold an item of consigned jewelry to a customer, RPJ would request from Plaintiff an invoice for that item; providing RPJ with this invoice effectively passed title of the item from Plaintiff to RPJ. *See* Compl. P 20. After the sale to the customer was completed, RPJ would remit to Plaintiff the amount in the invoice and retain any additional monies as profit. Defendant Deloitte is not alleged to be a party to the Agreement. According to Plaintiff, this Agreement imposed on the Defendants Potasky and Scher a fiduciary duty to Plaintiff to safeguard his merchandise, *see* Compl. P 11, and on all the Defendants generally to alert Plaintiff to circumstances that jeopardized any of the assets of Plaintiff in RPJ's possession. *See id.* P 13.

In late 1992, Plaintiff was reassured by the Defendants that, although RPJ was closing some of its retail stores because they were failing to sustain their overhead, the merchandise belonging to Plaintiff that RPJ was holding was safe. In early 1993, [*4] concerned by a lack of contact with Scher and Potasky, Plaintiff contacted RPJ and was assured by a bookkeeper there that all was well. In January 1993, RPJ requested from Plaintiff an invoice for $ 1,900; in February 1993, RPJ requested from Plaintiff an invoice in the amount of $ 1,600; on April 15, 1993, Defendant Walther, knowing of RPJ's deteriorating financial condition, faxed to Plaintiff a request for invoices for eight items with a total value of $ 23,445. [1] On April 30, 1993, Defendant Walther faxed to Plaintiff a list of all of the items being held by RPJ for Plaintiff; there were 54 items with a total value of $ 85,020. On May 4, 1993, Defendant Scher, knowing of

RPJ's deteriorating financial condition, sent Plaintiff a request for an invoice for $ 1,660. Plaintiff further alleges that RPJ owed Plaintiff $ 7,625 for merchandise invoiced in 1992 and now past due. On May 21, 1993, concerned that RPJ's payment was late, Plaintiff called RPJ headquarters and spoke with Potasky. Potasky informed Plaintiff that, due to RPJ's poor financial condition, RPJ had filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code on May 18, 1993, and that, consequently, Plaintiff's [*5] merchandise that was in RPJ's possession was now considered to be part of RPJ's assets.

> 1    Although it is not entirely clear from the Complaint, it appears that Plaintiff did send invoices for all of these items.

Plaintiff alleges that Defendants knew of the precarious financial condition of RPJ, and knew that this condition placed those assets of Plaintiff held by RPJ in jeopardy, and yet failed to fulfill their duty as fiduciaries to inform Plaintiff of this situation. Plaintiff further alleges that Defendant Deloitte knowingly assisted the fiduciary Defendants in the aforementioned breach by failing to notify Plaintiff of RPJ's poor financial condition. *See* Compl. PP 31a, 35. [2] Deloitte served as an independent auditor for RPJ, and prepared its last audit report -- concerning RPJ's 1991 financial statements -- one-and-a-half years before the transactions at issue in this action took place ("Report"). In the Report, Deloitte opined that RPJ's 1991 financial statements were not presented in accordance with governing [*6] professional standards and that Deloitte had significant doubt about RPJ's ability to continue as a going concern.

> 2    The Complaint contains mistakes in numbering whereby there appear two sets of paragraphs numbered 29, 30, 31, and 35. To the first set of paragraphs so numbered the Court will append "a", and to the latter set, "b".

In light of the foregoing, Plaintiff seeks $ 119,600 in actual damages, [3] treble damages pursuant to the provisions of the RICO statute dealing with damages, and costs.

> 3    The total actual damages that Plaintiff has allegedly incurred should be $ 119,590, not $ 119,600. Plaintiff alleges that he was owed $ 7,625 that was past due from 1992. *See* Compl. PP 30a, 39. The total amount invoiced in 1993

was $ 26,945 ($ 1,900 for January, $ 1,600 for February, and $ 23,445 for April 30), *see* Compl. PP 19, 30a. The total value of the non-invoiced merchandise held by RPJ for Plaintiff was, as of April 30, 1993, $ 85,020. *See* Compl. P 24. (That another invoice was requested on May 4, 1993, for $ 1,660, is irrelevant for purposes of determining actual damages, since it merely moves money from the non-invoiced to the invoiced category within the total.)

[*7] **II.**

Because this Court, in deciding the instant motion, will consider the Independent Auditors' Report, dated August 29, 1991, and appended to Deloitte's Notice of Motion as Exhibit A ("Report"), Deloitte's petition will be treated as a motion for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. [HN1] Both *Rules 12(b)(6)* and *12(c)*, which Deloitte alternatively relies on to ground its motion to dismiss, provide that:

> If . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in *Rule 56* . . . .

*Fed. R. Civ. P. 12(b)(6)* & *12(c)*. This Court has resolved to consider the Report, as well as any other matters outside the pleading submitted by the parties, in reaching a determination on Deloitte's motion. The instant motion, therefore, must be treated as a motion for summary judgment pursuant to *Rule 56*.

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" [*8] *Celotex Corp. v. Catrett, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (citations omitted). Indeed, [HN2] the Federal Rules of Civil Procedure provide that summary judgment *"shall* be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)* (emphasis added). While "courts have a responsibility to vigilantly weed out those cases that do not merit further judicial attention," they are likewise

cautioned that "this potent instrument must be used with the precision of a scalpel." *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 55 (2d Cir. 1987)*. The moving party bears the initial responsibility for "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323* (quoting *Fed. R. Civ. P. 56(c)*). Once the moving party has discharged this duty, the burden shifts to the non-moving party to demonstrate the existence [*9] of a genuine issue of material fact. The non-moving party may not, however, simply either rest upon the allegations or denials contained in its pleading, *see Fed. R. Civ. P. 56(e)*, or "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Rather, the non-moving party must "present affirmative evidence . . . . from which a jury might return a verdict in [its] favor." *Anderson, 477 U.S. at 257*.

Notwithstanding Deloitte's arguments to the contrary, this Court will not grant summary judgment in Deloitte's favor on the ground that Plaintiff has failed to file either a short and concise statement of material facts alleged to be in dispute, as required by Local Civil Rule 3(g) of the United States District Courts for the Southern and Eastern Districts of New York, or an affidavit specifying facts showing that a genuine issue of material fact exists. Plaintiff is proceeding *pro se* in the instant action. [HN3] The Second Circuit has noted [*10] on numerous occasions that "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988)* (citations omitted); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 767 (2d Cir. 1983)*. Moreover, courts in the Southern District have shown a flexibility in construing Local Rule 3(g) when other overriding concerns, such as the existence of a party proceeding *pro se*, are present. *See Rivera v. National R.R. Passenger Corp., 1993 U.S. Dist. LEXIS 18214, 1993 WL 541669* at *4 (S.D.N.Y. Dec. 27, 1993)* (citations omitted). In the instant action, Deloitte appended the Report to its Notice of Motion and Plaintiff acknowledged and relied on the Report in opposing Deloitte's motion. Plaintiff, therefore, is deemed to have had both notice of, and an opportunity

to respond to, the Report. In light of the foregoing, Plaintiff's memorandum opposing Deloitte's motion will be accepted in lieu of both a Local Rule 3(g) statement and an affidavit [*11] in response to Deloitte's motion for summary judgment; the motion will be decided not on procedural grounds, but on the basis of the substantive matters at issue.

### III.

Defendant Deloitte is entitled to summary judgment with regard to all claims asserted by Plaintiff against Deloitte. The gravamen of Plaintiff's Complaint as against Deloitte is that Deloitte knew of RPJ's poor financial condition and yet failed to notify Plaintiff of this fact. *See* Compl. PP 31a, 33, 35b, 36, 48. Despite his attempts to characterize Deloitte as a participant in a scheme to profit at Plaintiff's expense, Plaintiff fails to allege, must less demonstrate the existence of a genuine issue of material fact concerning, any act by Deloitte, other than the alleged failure to inform, tying Deloitte to the alleged harm suffered by Plaintiff. It is, therefore, to this claim, namely that Deloitte's failure to notify Plaintiff personally of RPJ's precarious financial condition is a ground for attaching liability to Deloitte, that this Court now turns.

Deloitte had no duty to inform Plaintiff of RPJ's financial condition. [HN4] "Courts do not generally regard the accountant-client relationship as a fiduciary one." [*12] *Fund of Funds, Ltd. v. Arthur Andersen & Co., 545 F. Supp. 1314, 1356 (S.D.N.Y. 1982)*. Moreover, a purely commercial transaction does not impose fiduciary duties upon the parties to that transaction. *See Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., 33 A.D.2d 766, 306 N.Y.S.2d 599, 600 (App. Div. 1969), aff'd 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972), cert. denied, 409 U.S. 875, 34 L. Ed. 2d 128, 93 S. Ct. 125 (1972)*. It follows, therefore, that when the allegedly aggrieved party is at best a third party to an accountant-client relationship, and no commercial transaction is executed between two parties -- indeed, when no relationship whatsoever exists between two parties -- no fiduciary duties may be imposed on either party. Plaintiff has cited no authority suggesting that an accountant, having concluded on the basis of an audit that an entity is in poor financial condition, has a duty to personally inform all current or future concerns, with which the entity has done or may do business, of its conclusion. Indeed, Deloitte suggests

that such action on its part would have violated its ethical obligation, [*13] under Ohio law, to maintain the confidentiality of client information obtained in the course of an audit. *See, e.g.,* Ohio Admin. Code § 4701-11-02(A) (1993).

### IV.

Given that the allegation that Deloitte had a duty to inform Plaintiff underlies all of Plaintiff's claims against Deloitte, the foregoing discussion effectively disposes of the instant motion. [4] For the reasons set forth above, therefore, Defendants' motion for summary judgment is granted and Plaintiff's action is dismissed with prejudice as against Defendant Deloitte.

> 4   A few other observations are, however, worth making. Plaintiff has alleged neither the existence of a common business transaction between Plaintiff and Deloitte nor intent on the part of Deloitte that any alleged misrepresentation be conveyed to Plaintiff. Plaintiff, therefore, has failed to carry his burden in pleading fraud, intent to defraud, and misrepresentation against Deloitte. *See, e.g., Leasing Service Corp. v. Broetje, 545 F. Supp. 362, 366 (S.D.N.Y. 1982)* (transaction); *Peerless Mills, Inc. v. AT&T, 527 F.2d 445, 449 (2d Cir. 1975)* (intent). Because Plaintiff has not alleged that Deloitte ever came into actual or constructive possession of any property belonging to Plaintiff, the claims alleging improper transfer of assets, conversion, and embezzlement cannot lie. Plaintiff has failed to sufficiently allege either a "pattern" or "enterprise" to satisfy the requirements of a RICO claim. *Cf. Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983), cert. denied sub nom., Moss v. Newman, 465 U.S. 1025, 79 L. Ed. 2d 684, 104 S. Ct. 1280 (1984)*. Courts have consistently held that no private right of action exists pursuant to either *18 U.S.C. § 371* or *18 U.S.C. § 1341. See, e.g., Raffaele v. Designers Break, Inc., 750 F. Supp. 611, 612-13 (S.D.N.Y. 1990)* (mail fraud); *Milburn v. Blackfrica Promotions, Inc., 392 F. Supp. 434, 435 (S.D.N.Y. 1974)* (mail fraud and conspiracy). The actions at issue do not involve a pension fund and thus do not implicate *18 U.S.C. § 664*.

[*14] The remaining parties to this action are directed to complete discovery by June 30, 1994.

1994 U.S. Dist. LEXIS 258, *14

Dated: New York, New York                           LAWRENCE M. McKENNA

January 13, 1994                                     U.S.D.J.

SO ORDERED.

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
(Cite as: 2007 WL 528703 (S.D.N.Y.))

**H**Pension Committee of the University of Montreal
Pension Plan v. Banc of America Securities, LLC
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
THE PENSION COMMITTEE OF THE
UNIVERSITY OF MONTREAL PENSION PLAN,
et al., Plaintiffs,
v.
BANC OF AMERICA SECURITIES, LLC; Citco
Fund Services (Curacao) N.V .; The Citco Group
Limited; International Fund Services (Ireland)
Limited; Pricewaterhousecoopers (Netherland
Antilles); John W. Bendall, Jr.; Richard Geist;
Anthony Stocks; Kieran Conroy; and Declan
Quilligan, Defendants.
**No. 05 Civ. 9016(SAS).**

Feb. 20, 2007.

Scott M. Berman, Anne E. Beaumont, Amy C.
Brown, Jenny F. Cohen, Friedman, Kaplan, Seiler &
Adelman LLP, New York, New York, for Plaintiffs.
Eliot Lauer, Michael Moscato, Milos Naumovic,
Curtis, Mallet-Prevost, Colt & Mosle LLP, New
York, New York, Lewis N. Brown, Dyanne E.
Feinberg, Terence M. Mullen, Gilbride, Heller &
Brown, P.A., Miami, Florida, for Defendants CGL,
ICSL, Citco NV, Kieran Conroy, Declan Quilligan,
and Anthony J. Stocks.
Peter K. Vigeland, Dawn M. Wilson, Li Yu, Paul M.
Winke, Wilmer Cutler Pickering Hale and Dorr LLP,
New York, New York, for Defendant BAS.

*OPINION AND ORDER*

SCHEINDLIN, J.
**\*1** A group of investors brings this action to recover
losses stemming from the liquidation of two British
Virgin Islands ("BVI") based hedge funds in which
they held shares: Lancer Offshore, Inc. and
OmniFund Ltd. ("Funds").[FN1] The Funds were
managed by Michael Lauer ("Lauer") through Lancer
Management Group, LLC ("Lancer
Management").[FN2] Plaintiffs bring claims for
violations of section 10(b) of the Securities Exchange

Act of 1934, and Rule 10b-5 promulgated thereunder,
against one former director of OmniFund, Inter
Caribbean Services, Ltd. ("ICSL") and three former
directors of Lancer Offshore, Anthony J. Stocks,
Kieran Conroy, and Declan Quilligan (collectively,
"Citco Directors"), and a former administrator of the
Funds, Citco Fund Services (Curacao) N.V. ("Citco
NV," and together with the Citco Directors, "Citco
Defendants").[FN3]

> FN1.*See* Second Amended Complaint
> ("SAC") ¶¶ 1, 14.

> FN2.*See id.* ¶ 1.

> FN3.15 U.S.C. § 78j(b); 17 C.F.R. §
> 240.10(b)(5).

Plaintiffs also bring a claim under section 20(a) of the
Securities and Exchange Act against The Citco
Group Limited ("CGL"), based on CGL's alleged
status as a control person of Citco NV.[FN4] Plaintiffs
also bring various common law claims under New
York law against the Citco Defendants and Banc of
America Securities, LLC ("BAS"), the former prime
broker and custodian of the Funds.[FN5]

> FN4.15 U.S.C. § 78t(a). In an Opinion and
> Order dated March 20, 2006, this Court
> denied CGL's motion to dismiss for lack of
> personal jurisdiction, with leave to renew
> after the completion of limited discovery,
> and denied CGL's motion to dismiss for lack
> of standing. *See Pension Comm. of Univ. of
> Montreal Pension Plan v. Banc of Am. Sec.,
> LLC,* No. 05 Civ. 9016, 2006 WL 708470
> (S.D.N.Y. Mar. 20, 2006) ("*Pension Comm.
> II*").

> FN5. The common law claims addressed in
> this Opinion are those against the Citco
> Defendants for fraud, breach of fiduciary
> duty, aiding and abetting fraud and aiding
> and abetting breach of fiduciary duty, and
> those against BAS for aiding and abetting
> fraud and aiding and abetting breach of
> fiduciary duty.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
(Cite as: 2007 WL 528703 (S.D.N.Y.))

In an Opinion and Order dated July 20, 2006, this Court granted in part and denied in part without prejudice, defendants' motion to dismiss plaintiffs' Corrected First Amended Complaint ("CFAC").[FN6] Plaintiffs were also granted leave to replead to cure the deficiencies in the CFAC.[FN7] Plaintiffs filed a Second Amended Complaint ("SAC") on August 25, 2006. The Citco Defendants, CGL, ICSL and BAS now move to dismiss all of the claims against them.

> FN6. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F.Supp.2d 163 (S.D.N.Y.2006)* ("*Pension Comm. III*"). In that ruling, familiarity with which is presumed, this Court: (1) granted the Citco Defendants' (excluding ICSL, which was not named as a defendant in the CFAC) and CGL's motion to dismiss the federal securities law claims for failure to plead scienter, and granted plaintiffs leave to replead those claims; (2) granted the Citco Defendants' and BAS's motion to dismiss the common law fraud and aiding and abetting claims, and granted plaintiffs leave to replead those claims; and (3) denied all other motions. *See id.* at 175.

> FN7. *See id.* at 205.

I. BACKGROUND[FN8]

> FN8. Unless otherwise noted, the following allegations are drawn from the SAC and are presumed to be true for purposes of these motions.

A. The Parties

Plaintiffs are investors from a variety of countries, each of whom invested money in the Funds during the period from 1997 until 2002.[FN9] Virtually all of the money invested in the Funds, upwards of five hundred fifty million dollars, has been lost.[FN10]

> FN9. *See* SAC ¶¶ 1, 14-15.

> FN10. *See id.* ¶¶ 1-2.

Citco NV is allegedly a division and wholly-owned

and controlled subsidiary of CGL.[FN11] Citco NV is a business entity organized under the laws of the Netherlands Antilles, with places of business in Curacao, Netherlands Antilles, and Tortola, British Virgin Islands.[FN12] Citco NV performs fund administration services for hundreds of hedge funds throughout the world, including many in the United States, and receives substantial revenue from sources in the United States, including New York.[FN13] Citco NV acted as administrator of the Funds until September 2002, at which time it was replaced by International Fund Services (Ireland) Limited ("IFSI").[FN14]

> FN11. CGL and its relationship to Citco NV are described more fully in this Court's opinion in *Pension Comm. II. See 2006 WL 708470, at *1-2.*

> FN12. *See* SAC ¶ 34.

> FN13. *See id.* ¶¶ 48-59.

> FN14. *See id.* ¶¶ 87-92, 303. In an Opinion and Order dated March 7, 2006, this Court denied IFSI's motion to dismiss for lack of personal jurisdiction. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* No. 05 Civ. 9016, 2006 WL 559811 (S.D.N.Y. Mar. 7, 2006) ("*Pension Comm. I*").

Citco NV assigned three officers, the Citco Directors, to serve as directors of the Funds in furtherance of their duties on behalf of Citco NV.[FN15] Stocks, who resides in London, England, served as a director of Lancer Offshore from 1995 until July 2001, during which time he was also a director of CGL's International Fund Services division.[FN16] Conroy, who resides in Dublin, Ireland, served as a director of Lancer Offshore from 1998 until early 2002, during which time he was also a managing director of Citco NV.[FN17] Quilligan, who resides in Curacao, Netherlands Antilles, was a director of Lancer Offshore from 2001 until early 2002, during which time he was also a managing director of Citco NV.[FN18] Additionally, ICSL served as director for OmniFund from its inception until early 2002.[FN19] Each of the Citco Directors participated in the fund administration activities engaged in by Citco NV that supported this Court's finding of personal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

jurisdiction over Citco NV.[FN20]

  [FN15].*See* SAC ¶¶ 36, 78.

  [FN16].*See id.* ¶ 36.

  [FN17].*See id.* ¶ 37.

  [FN18].*See id.* ¶ 38.

  [FN19].*See id.* ¶ 215.

  [FN20].*See id.* ¶¶ 36, 78.

**\*2** BAS is a New York limited liability corporation with a principal place of business in New York.[FN21] BAS acted as the prime broker and served as a central custodian for some of the securities held by the Funds.[FN22]

  [FN21].*See id.* ¶¶ 85-86.

  [FN22].*See id.* ¶ 150.

B. The Alleged Scheme

All of the claims asserted by plaintiffs derive from the same set of operative facts related to mismanagement of the Funds by Lauer and Lancer Management. Plaintiffs allege that much of their losses were caused by a fraudulent scheme known as "marking the close." [FN23] To execute this scheme, Lauer and Lancer Management acquired substantial and sometimes controlling stakes in thinly-traded stocks on behalf of the Funds.[FN24] Then, prior to the end of the Funds' reporting periods, Lauer would purchase additional shares of these stocks at significantly higher prices, with the intent of raising the closing market price of the stocks.[FN25] Each Fund would report its net asset value ("NAV") based on the artificially high prices, creating the appearance of a portfolio value vastly higher than its true value, and generating large fees for Lauer and Lancer Management.[FN26]

  [FN23].*Id.* ¶ 124.

  [FN24].*See id.* ¶¶ 120-126.

  [FN25].*See id.*

  [FN26].*See id.*

Plaintiffs contend that this scheme was successful due to misrepresentations in the Funds' private placement memoranda ("PPMs"), monthly newsletters, and other materials.[FN27] These misrepresentations pertained to the types of investments that would be made by the Funds, the processes for determining the values of securities held by the Funds, and the performance of the Funds' portfolios.[FN28] Plaintiffs also allege that from at least March 2000 they received monthly statements of the Funds' NAVs which included fraudulently manipulated month-end closing prices of securities held by the Funds.[FN29] Lancer Offshore's annual reports for 2000, 2002, and 2003 also contained fraudulent NAV figures.[FN30] Plaintiffs allege that defendants, as the Funds' directors and service providers, were pivotal to this fraudulent scheme.[FN31]

  [FN27].*See id.* ¶¶ 117-129.

  [FN28].*See id.*

  [FN29].*See id.* ¶¶ 13, 139-142.

  [FN30].*See id.*

  [FN31].*See id.* ¶¶ 4-13.

1. Citco Defendants

As the Funds' administrator, Citco NV was responsible for providing various services, including maintenance of the Funds' corporate records and books of accounts, preparation and dissemination of the Funds' annual financial statements and quarterly reports, and communication with shareholders and the general public.[FN32] The PPMs represented that the Citco Directors would fairly and reasonably report the values of securities held by the Funds.[FN33] The restated audited financial statements for 2000 and audited financial statements for 2001 state that the Funds' "Board of Directors in conjunction with the investment manager determine at what value the investment securities are reported for the determination of the [NAV] of the Fund."[FN34] Plaintiffs claim that the Citco Defendants

Slip Copy                                                                                                    Page 4
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
**(Cite as: 2007 WL 528703 (S.D.N.Y.))**

breached their obligations by failing to conduct a fair and independent valuation of the Funds and by failing to disclose irregularities in the conduct of the Funds to investors.[FN35]

> FN32.*See id.* ¶¶ 193-195;*see also* 4/1/00 Amended and Restated Administrative Services Agreement between Lancer Offshore and Citco NV ("Administration Agreement") ¶ 1.1, Ex. E to Declaration of Eliot Lauer, Counsel to CGL and the Citco Defendants, in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("Lauer Decl.").

> FN33.*See* SAC ¶ 195; 2/15/02 Placement Memorandum of Lancer Offshore, Inc. ("Lancer Offshore PPM"), Ex. B to Lauer Decl, at 34-35.

> FN34. SAC ¶ 223. *Accord id.* ¶ 224 (alleging that the financial statements also "state that the Board of Directors [of Lancer Offshore] determined the value of 100% of [the fund's] securities").

> FN35.*See, e.g., id.* ¶¶ 234-239, 243-248.

**\*3** Plaintiffs allege that the Citco Defendants are responsible for false statements of the Funds' NAVs. Each month from at least March 2000 through September 2002, defendant Citco NV "distributed to each shareholder of the Funds a statement setting forth the NAVs of the Funds."[FN36]Plaintiffs allege that the Citco Defendants knew or recklessly disregarded the fact that the NAV statements and other materials sent to plaintiffs included fraudulently inflated NAV figures.[FN37]

> FN36.*Id.* ¶ 228.

> FN37.*See id.* ¶¶ 230-232, 243-244, 256-272.

Plaintiffs also allege that the Citco Defendants made false statements about their procedures for ensuring accurate valuations of the Funds. Plaintiffs allege that Citco NV's public representations and marketing materials-prepared by Citco NV and provided to certain investors-stated that Citco followed procedures to ensure accurate valuation of the Funds,

such as reconciling manager's reports with third-party information on pricing.[FN38]Plaintiffs allege that the Citco Directors made similar misstatements in the PPMs and other offering materials.[FN39]Plaintiffs allege that these statements were materially false because Citco NV failed to independently value the portfolios and instead slavishly adhered to the patently "absurd" valuations provided by Lauer.[FN40]

> FN38.*See id.* ¶¶ 196-213.For example, the SAC includes excerpts from a 2001 interview with Quilligan, in which he explains that Citco NV provides shareholders with "independence" and "experience," so that they "don't have to entirely rely on [ ] investment manager[s]."*Id.* ¶ 199.A Citco brochure similarly boasts that it prices portfolios "using independent, recognized pricing sources." *Id.* ¶ 197.

> FN39.*See id.* ¶ 220.

> FN40.*Id.* ¶ 8.*Accord id.* ¶¶ 230-235.

Plaintiffs allege that Citco NV knew or should have known of the fraud because, among other things, three of its officers were members of the Funds' Board of Directors.[FN41]The Citco Directors "were personally and actively involved in defendant Citco NV's valuation of the Funds' portfolios, and the distribution of false and misleading NAV statements to plaintiffs."[FN42]Citco NV and the Citco Directors had "ample information that contradicted the valuations they were receiving from Lauer, Lancer Management and defendant [BAS]" but "nevertheless disseminated NAV statements that relied on these absurd valuations, in blatant disregard" of the direct harm they would "inevitably cause" to plaintiffs.[FN43]

> FN41.*See id.* ¶ 8.

> FN42.*Id.*

> FN43.*Id.*

**2. BAS**

BAS, as prime broker and custodian to the Funds, allegedly aided and abetted Lauer's fraud and breach

of fiduciary duty by providing Lauer with dial-in access to its computer network and allowing him to generate false position statements ("BAS Position Reports") of the Funds' holdings.[FN44]BAS employees created BAS Position Reports using valuation information sent to them by Lauer, usually by email, without verifying the accuracy of Lauer's information.[FN45]

> FN44.*See id.* ¶¶ 161-164.

> FN45.*See id.*

These false BAS Position Reports contained BAS's name at the top of each page and "when downloaded and printed remotely," they contained "no disclaimer or other marking to suggest they were anything other than official documents prepared by, posted on the BofA Website by, and bearing the imprimatur of, BofA."[FN46]The Position Reports were printed and provided to third parties, including investors and Citco NV, who relied on them to value the Funds.[FN47]Plaintiffs allege that BAS knew or should have known that Lauer would use the position reports for these purposes.[FN48]

> FN46.*Id.* ¶ 154.

> FN47.*See id.* ¶¶ 160-161.

> FN48.*See id.*

C. Defendants' Motions to Dismiss

**\*4** The Citco Defendants now move to dismiss the federal securities claims against them on the grounds that plaintiffs have not cured certain defects in their pleadings identified by this Court in *Pension Comm. III.*Specifically, the Citco Defendants argue that plaintiffs' 10(b) claims against Citco NV and individual Citco Directors should be dismissed for failure to plead scienter, the absence of which is also fatal to plaintiffs' section 20(a) claim against GCL.[FN49] Assuming the federal securities claims will be dismissed, the Citco Defendants urge this Court to decline to exercise subject matter jurisdiction over plaintiffs' common law claims.[FN50]In the alternative, the Citco Defendants argue that plaintiffs have failed to plead their common law claims under New York law.[FN51]BAS also moves to dismiss the common law

claims against it on the grounds that those claims are deficient under New York law.[FN52]

> FN49.*See* Memorandum of Law in Support of Citco Fund Services (Curacao) N.V., the Citco Group Limited, Anthony J. Stocks, Kieran Conroy, Declan Quilligan, and Inter Caribbean Services, Ltd.'s Motion to Dismiss Plaintiffs' Second Amended Complaint ("Citco Mem.") at 2-14.

> FN50.*See id.* at 15.

> FN51.*See id.* at 15-17.

> FN52.*See* Memorandum of Law in Support of Defendant Banc of America Securities LLC's Motion to Dismiss Plaintiffs' Second Amended Complaint ("BAS Mem.") at 3-19.

II. STANDARD OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' [FN53] When deciding a motion to dismiss, courts must "accept all factual allegations as true and draw all reasonable inferences in plaintiff's favor." [FN54]Although "[g]enerally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," [FN55] "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." [FN56]Courts may also take judicial notice of stock prices and press articles, for the fact of their publication.[FN57]

> FN53.*Faulkner v. Beer,* 463 F.3d 130, 133 (2d Cir.2006) (quoting *Twombly v. Bell Atl. Corp.,* 425 F.3d 99, 106 (2d Cir.2005)).*Accord Jones v. Bock,* ( )6D U.S. , 2007 WL 135890, at \*10 (Jan. 22, 2007) ("A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief."). The task of the court in ruling on a Rule 12(b)(6) motion is "merely

to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004) (quotation and citation omitted).

FN54.*Ofori-Tenkorang v. American Int'l Group, Inc.,* 460 F.3d 296, 298 (2d Cir.2006).

FN55.*Faulkner,* 463 F.3d at 134.

FN56.*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).*Accord Faulkner,* 463 F.3d at 134 (holding that it is permissible to consider the "full text of documents partially quoted in complaint" and "documents relied upon by plaintiff in drafting the complaint and integral to the complaint") (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808-09 (2d Cir.1996), and *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991)).

FN57.*See In re AOL Time Warner, Inc. Sec. and ERISA Litig.,* 381 F.Supp.2d 192, 246 n. 61 (S.D.N.Y.2004) (stock prices); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 289 F.Supp.2d 416, 425 (S.D.N.Y.2003) (press articles).

III. DISCUSSION FN58

FN58. In *Pension Comm. III,* this Court set forth the requirements for pleading the federal securities and common law claims that defendants now move to dismiss; those legal standards are hereby incorporated into this Opinion. *See*446 F.Supp.2d at 178-82 (requirements for pleading securities fraud under section 10(b) and Rule 10b-5); *id.* at 190-91 (requirements for pleading control person liability under Section 20(a)); *id.* at 191-96 (requirements for pleading New York common law fraud and aiding and abetting fraud and breach of fiduciary duty).

A. The Scienter Element of the Rule 10b-5 Claims Against the Citco Defendants FN59

FN59. In *Pension Comm. III,* this Court held that plaintiffs had sufficiently alleged causation to sustain primary liability with respect to the Citco Defendants. *See id.* at 182 (sufficiently alleging that Citco NV actually prepared the false statements); *id* . at 183 (sufficiently alleging that misrepresentations were communicated at the Citco Directors' behest); *id.* at 184-86 (sufficiently pleading misstatements with particularity). Because the relevant factual allegations in the SAC are identical to those in the CFAC, I incorporate those rulings into this Opinion.

1. Motive and Opportunity of Citco NV

Defendants argue that plaintiffs still have not sufficiently pled scienter on the part of Citco NV because the SAC alleges that Citco NV was motivated merely by a desire to obtain increased compensation, which defendants maintain is insufficient to prove scienter.FN60While it is well-settled that a "generalized economic interest," is insufficient to show scienter,FN61 this Court previously noted that "[u]nlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees based on inflated NAV figures [is] 'a concrete and personal benefit to the individual defendants resulting from the fraud.' " FN62 Whereas the CFAC failed to allege that defendants received any such benefit, the SAC specifically alleges that Citco NV's fees were tied *directly* to the NAVs: the higher the valuations on the NAVs, the more lucrative Citco NV's fees became.FN63Thus, plaintiffs adequately plead scienter with respect to Citco NV based on motive and opportunity.

FN60.*See* Citco Mem. at 2. Citco NV does not dispute that it had the requisite opportunity to commit fraud.

FN61.*Novak v. Kasaks,* 216 F.3d 300, 307-08 (2d Cir.2000).*Accord San Leandro Emergency Med. Group Profit Sharing Plan,* 75 F.3d at 814 (desire to maintain a high corporate credit rating insufficient to

establish motive); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) (executive compensation dependent on stock value could not, standing alone, suffice to show motive to defraud the public).

FN62.*Pension Comm. III,* 446 F.Supp.2d at 163 (quoting *Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir.2001)).*Accord In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 346 (S.D.N.Y.2004) (plaintiffs pled scienter by alleging that auditor with dual role as consultant had concrete motive to generate fees through sham valuations).

FN63.*See* SAC ¶ 249 ("[A]s Lancer Offshore's NAV soared, Citco NV reaped ever greater fees, which nearly doubled over the life of the Funds.").

2. Conscious Misbehavior and Recklessness of Citco NV, Conroy and Quilligan [FN64]

FN64. In *Pension Comm. III,* this Court held that the scienter of individual Citco NV directors may be imputed to Citco NV to the extent that they were directors of Lancer Offshore during the relevant time period. *See*446 F.Supp.2d at 189. Defendants also correctly note that in the SAC, plaintiffs "lump" the three individual Citco directors and ICSL together as "Citco Directors." Reply Memorandum of Law in Support of Citco Fund Services (Curacao) N.V., The Citco Group Limited, Anthony J. Stocks, Kieran Conroy, Declan Quilligan, and Inter Caribbean Services Ltd.'s Motion to Dismiss Plaintiffs' Second Amended Complaint ("Citco Reply Mem.") at 8. This pleading technique walks the fine line of ascribing to each of them knowledge of information they did not author or receive but comes dangerously close to "blur[ring] important distinctions among defendants and evad[ing] the requirement that fraud be pled with particularity." *Pension Comm. III,* 446 F.Supp.2d at 187 (citing *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)). Plaintiffs are only permitted "to plead scienter of the directors collectively[ ] insofar as those

directors are identically situated."*Id.*

**\*5** In its previous ruling, this Court held that the group pleading doctrine does not permit plaintiffs to automatically impute the scienter of Citco NV to the directors.[FN65] As a result, plaintiffs now separately plead scienter of the Citco Directors, and also of Citco NV, by alleging reckless conduct. The SAC states with particularity facts giving rise to a strong inference that Citco NV and directors Quilligan and Conroy acted recklessly by ignoring red flags of fraud,[FN66] by failing to follow their own stated policies of independently reviewing valuations, and by failing to timely inform investors or authorities that they believed the Fund to be grossly (and illegally) overvalued.[FN67]

FN65.*See id.* at 185;*see also In re Bayer AG Sec. Litig.,* No. 03 Civ. 1546, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004); *In re Citigroup, Inc. Sec. Litig.,* 330 F.Supp.2d 367, 381 (S.D .N.Y.2004) ( "Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made."); *In re Sotheby's Holdings, Inc. Sec. Litig.,* No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.").

FN66. Plaintiffs list six red flags that Stocks, Quilligan, Conroy, ICSL and Citco NV allegedly ignored. *See* SAC ¶¶ 259-258 (ignored discrepancy between growth of NAVs and decline of global equity markets); *id.* ¶¶ 259-261 (ignored Funds' concentration in thinly traded stocks); *id.* ¶¶ 262-263 (ignored drastic increase in values attributed to thinly traded stocks); *id.* ¶¶ 264-266 (ignored dramatic jump in purported value of shares and warrants from their purchase price of either a few cents or nothing at all, to tens of millions dollars in just days or weeks); *id.* ¶¶ 267-269 (ignored numerous

instances in which "Lauer and Lancer Management valued the Funds' holdings of restricted securities using prices from tiny open-market purchases"); *id.* ¶¶ 270-272 (ignored the obvious inference that because the open-market purchases coincided with dates for calculating the Funds' NAVs, they were being done solely to raise corresponding incentive fees paid to Lauer and Lancer Management).

In opposition, the Citco Defendants argue that these so-called red flags fail to show recklessness because they "are all facts consistent with the investment strategy employed by Lauer and fully disclosed in the Funds' Placement Memoranda [ ] provided to each investor."Citco Reply Mem. at 6. This may be true, but on a motion to dismiss the Court must accept all of the factual allegations in the Complaint as true and draw every inference in plaintiffs' favor. The Citco Defendants also note, correctly, that by themselves, dramatic increases in profits-even to record levels-do not provide a basis for claims of reckless disregard in this Circuit. *See id.*(citing *Novak,* 216 F.3d at 309;*Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996)). However, in conjunction with the emails and memoranda quoted in the SAC, defendants' alleged disregard for the red flags-notably, the holdings that miraculously skyrocketed from being worth pennies to tens of millions-support inferences of knowledge and recklessness attributable to Citco NV, Conroy and Quilligan. *See In re Philip Servs. Corp. Sec. Litig.,* 383 F.Supp.2d 463, 475 (S.D.N.Y.2004)* ( "[M]ultiple allegations of 'red flags,' considered in the aggregate, support an inference of fraudulent intent adequate to survive a motion to dismiss.").

FN67.*See* SAC ¶¶ 235, 238, 243-248; *see also* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss of Citco Fund Services (Curacao) N.V., the Citco Group Limited, Anthony J. Stocks, Kieran

Conroy, Declan Quilligan, and Inter Caribbean Services Ltd. ("Pl. Citco Mem.") at 6.

Email traffic chronicled in the SAC indicates that for a significant period of time, Citco NV, Conroy and Quilligan "failed to review or check information that they had a duty to monitor, [and] ignored obvious signs of fraud."[FN68]In one email sent to Conroy in September 2001, Quilligan declares himself convinced that "75% of the [Fund's] portfolio is very illiquid with absurd valuations," that "[w]arrants are grossly overvalued and have been since start [sic] of year," and that since the start of 2001 Lancer had "put absurd valuations on illiquid stocks...."[FN69]

FN68.*Novak,* 216 F.3d at 308. *See, e.g.,* SAC ¶¶ 235, 238, 241, 243-244.

FN69. SAC ¶ 235 (quoting 9/21/01 email from Quilligan to Conroy).

These emails give rise to an inference that because Citco NV, Conroy and Quilligan had actual knowledge that the Funds' positions were fraudulently inflated, their conduct was reckless at the very least.[FN70]That reckless conduct includes their failure to *ever* inform investors or authorities of Lauer and Lancer Management's fraudulent valuations. Regardless of when the Citco Defendants first raised their eyebrows at the numbers, their emails indicate that by early 2002, they knew full well that the numbers were fraudulent. Nevertheless, these defendants carried on as if nothing were out of the ordinary.[FN71]

FN70.*See id.* ¶¶ 236-248.

FN71.*See id.* ¶¶ 247-248.

In mid-August of 2002, when Citco NV ceased managing the Funds, the Funds and Citco NV simply wrote a joint letter to investors informing them of a "mutually agreed upon change of the Fund's Administrator from Citco to International Fund Services (Ireland) Limited effective September 1, 2002."[FN72]Thus, as Citco NV extricated itself from its relationship with Lauer, it made statements to investors conspicuously omitting any mention of the recently uncovered fraud. This silence gives rise to an

Slip Copy                                                                                      Page 9
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
(Cite as: 2007 WL 528703 (S.D.N.Y.))

inference of recklessness because it constituted an implicit endorsement of the Funds' valuations up to that point; it also foreclosed an opportunity for investors or authorities to take steps to mitigate obvious dangers.[FN73]The silence further suggests recklessness because it shows that Citco NV purposefully failed to follow its publicly announced policy of independently pricing and verifying securities portfolios.[FN74]

FN72.*Id.* ¶ 248.

FN73.*See Novak, 216 F.3d at 308* (recklessness is adequately alleged when a plaintiff "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements").

FN74.*See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir.2001)* (defendants knowingly failed to follow own accounting standards); *Rothman v. Gregor, 220 F.3d 81, 91 (2d Cir.2000)* (defendants knowingly failed to follow announced policy of expensing royalty advances); *Novak, 216 F.3d at 311* (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy"). The SAC alleges various instances of "public representations and statements" made by Citco NV and Quilligan announcing that independently valuing securities in funds' portfolios is "one of the primary roles" of a fund administrator. SAC ¶ 196; *see also id.* ¶ 197 (a Citco brochure proclaims it "price[s] the portfolio using independent, recognized pricing sources"); *id.* ¶ 199 (quoting Quilligan from a 2001 article as saying that "[i]ndependence combined with an accurate, timely and professional service is how we can 'add value' to ... our clients ...."); *id.* ¶¶ 195, 211-214.

The Citco Defendants also argue that the SAC is inadequate because it does not allege that Citco NV or the Citco Directors had hard "facts or information contradicting the reported valuations."[FN75]While such data would spotlight conscious misbehavior and bolster the inference of recklessness, their absence is compensated for by circumstantial evidence that Citco NV and directors Quilligan and Conroy failed

to independently value the funds and act as fiduciaries in accordance with their own announced policies. Plaintiffs have now sufficiently pled with the required particularity that these three Citco Defendants ignored red flags and/or possessed knowledge contradicting their public statements.

FN75. Citco Mem. at 5. The Citco Defendants contend that emails and other memoranda discussed in the SAC "absolutely fail, as a matter of law, to show conscious disregard or recklessness" because, when read in context, they merely show Citco NV's burgeoning concern over Lancer-concern that ultimately led Citco NV to commence its own investigation into the Funds' valuation methods. Citco Mem. at 5. This is a reasonable interpretation of the evidence, but it does not, as a matter of law, negate a finding of recklessness. Furthermore, defendants misconstrue Circuit precedent as precluding an inference of recklessness whenever a defendant eventually investigates alleged fraudulent conduct by itself or others. *See id.* (citing *Goldman v. McMahon, Brafman, Morgan & Co., 706 F.Supp. 256, 259 (S.D.N.Y.1989)* (finding that a *refusal* to investigate may give rise to an inference of recklessness)).

3. Scienter of Stocks

**\*6** With respect to Stocks, the only facts alleged in the SAC supporting scienter are that (1) he served as a director of Lancer Offshore between 1998 and 2001; (2) he was employed by Citco NV from 1985 to 2001; and (3) he received a copy of a 1996 memo in which a Citco NV internal auditor opined that the Fund was overvalued.[FN76]These allegations are no more adequate for pleading scienter than those previously rejected by this Court; the claims against Stocks are hereby dismissed.[FN77]

FN76.*See* SAC ¶¶ 36, 232.

FN77.*See Chill, 101 F.3d at 270* ("Fraud cannot be inferred simply because GE might have been more curious or concerned about the activity of Kidder."); *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir.1994)* ("The pleading strongly suggests

Slip Copy                                                                                                          Page 10
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
**(Cite as: 2007 WL 528703 (S.D.N.Y.))**

that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.").

B. Section 20(a) Claim Against CGL

In *Pension Comm. III,* this Court found that plaintiffs "adequately alleged CGL's status as a control person of Citco NV," but dismissed the section 20(a) claim against CGL without prejudice due to plaintiffs' failure to plead a primary violation of the securities laws.[FN78]Because plaintiffs now successfully plead a primary violation by Citco NV as well as CGL's control, CGL's motion to dismiss plaintiffs' section 20(a) claim is denied.

    FN78.446 F.Supp.2d at 191.

C. Common Law Claims [FN79]

    FN79. This Court previously ruled that New York law governs plaintiffs' common law claims against all Citco Defendants. *See id* . at 191-95 (rejecting defendants' contention that BVI law applies).

1. Fraud and Breach of Fiduciary Duty

a. Citco NV, Quilligan and Conroy

The Citco Defendants argue that "for the same reasons that Plaintiffs fail to plead scienter in their section 10(b) claims" their common law fraud-based claims must fail.[FN80]For the reasons stated above with respect to plaintiffs' section 10(b) claims, the fraud-based common law claims against Citco NV, Quilligan and Conroy survive, but the same claims against Stocks are dismissed.[FN81]

    FN80. Citco Mem. at 15.

    FN81.*Pension Comm. III* addressed plaintiffs' breach of fiduciary duty claim against Citco NV at greater length and held that plaintiffs adequately pled Citco NV's "fiduciary duty to investors to ensure the accuracy of reports concerning the valuation of the Funds' assets."*See*446 F.Supp.2d at 196. Plaintiffs also adequately pled a breach

of that duty: "Citco NV held itself out to investors as having policies and procedures to ensure that the Funds' valuations would be accurate and fair, and that [investors] relied on these representations."*Id.* at 196-97.

b. ICSL

Because plaintiffs assert fraud as well as a fraud-based breach of fiduciary duty claim against ICSL,[FN82] the heightened pleadings standards of Rule 9(b) apply to both common law claims.[FN83]With respect to these claims, the Citco Defendants' argument that the SAC "contains no particularized allegations of any conduct on the part of ICSL" is on the mark.[FN84]The SAC makes only sparse, ambiguous references to ICSL's role as the director of OmniFund,[FN85] none of which support an inference that ICSL participated in the misstatements of OmniFund's NAV, or possessed the requisite scienter.[FN86] Plaintiffs' fraud and breach of fiduciary duty claims against ICSL are dismissed.

    FN82.*See* Pl. Citco Mem. at 17.

    FN83.*See Rahl v. Bande,* 328 B.R. 387, 412 (S.D.N.Y.2005) ("It is undisputed that claims based on allegations of fraud trigger the heightened pleading standard of Rule 9(b).").

    FN84. Pl. Citco Mem. at 16.

    FN85.*See* SAC ¶¶ 39, 118-119, 215. In their opposing brief, plaintiffs allege additional facts about ICSL; most importantly, they assert that because Quilligan was a director of ICSL, his knowledge should be imputed to ICSL. *See* Pl. Citco Mem. at 15-16. But as this fact is not found in the SAC, it will not be considered for the purpose of deciding this motion. *See Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006) (district court committed reversible error in considering matters outside the pleadings for the purpose of deciding a 12(b)(6) motion).

    FN86.*Pension Comm. III* held that because

Slip Copy                                                                                                         Page 11
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
(Cite as: 2007 WL 528703 (S.D.N.Y.))

plaintiffs alleged that Conroy and Quilligan were managing directors of Citco NV, and that Stocks was a director of CGL's International Fund Services division, which controlled Citco NV, plaintiffs supplied sufficient "support for the inference that [Conroy, Quilligan, and Stocks] were insiders of Citco NV who participated in its misstatements of Lancer Offshore's NAV." *446 F.Supp.2d at 185*. Plaintiffs now urge this Court to apply the same reasoning against ICSL vis-à-vis Citco NV's misstatements of OmniFund's NAV. *See* Pl. Citco Mem. at 15. However, because the SAC is silent as to any relationship between ICSL and Citco NV, no analogous inference can be made with respect to ICSL's liability for OmniFund's fraudulent NAVs.

2. Aiding and Abetting Fraud and Breach of Fiduciary Duty

In light of new allegations contained in the SAC, some of the requirements for pleading these common law claims have become more or less relevant. This Court is therefore required to discuss a plaintiff's obligation to allege that an aiding and abetting defendant proximately caused the harm on which the primary liability is predicated.[FN87] "But-for" causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct.[FN88] In other words, "[p]roximate cause exists where defendant's actions were 'a substantial factor in the sequence of responsible causation,' and plaintiff's injury was 'reasonably foreseeable or anticipated as a natural consequence.' ' [FN89] At least with respect to an aiding and abetting fraud claim, the "substantial assistance" and "causation" elements are interrelated-"[w]hether the assistance is substantial or not is measured ... by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated." [FN90]

FN87.*See Pension Comm. III, 446 F.Supp.2d at 201* (citing *Diduck,* 974 F.2d at 284);*see also McDaniel v. Bear Stearns & Co., 196 F.Supp.2d 343, 359 (S.D.N.Y.2002)* (with respect to aiding and abetting fraud claim, "[p]roximate cause exists where defendant's actions were a substantial factor in the sequence of

responsible causation, and plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence" (quotation and citation omitted); *Kolbeck v. LIT Am., Inc., 939 F.Supp. 240, 249 (S.D.N.Y.1996)* (in an aiding and abetting breach of fiduciary duty case, "[a]iding and abetting liability arises only when plaintiff['s] injury is a direct or reasonably foreseeable result of the complained-of conduct") (quotation and citation omitted).*Cf. Lattanzio v. Warnaco Group Inc.,-F.3d-, 2007 WL 259877, at *7 (2d Cir. Jan. 31, 2007)* (with respect to a claim of securities fraud, a misstatement "is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations ... alleged by a disappointed investor" (quotations and citation omitted)).

FN88.*See, e.g., Kolbeck, 939 F.Supp. at 249.*

FN89.*McDaniel, 196 F.Supp.2d at 349* (quoting *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir.1994)).*

FN90.*JP Morgan Chase Bank v. Winnick, 406 F.Supp.2d 247, 256 (S.D.N.Y.2005)* (quotation and citation omitted).

a. ICSL [FN91]

FN91. The Citco Defendants point out that the SAC does not specifically identify ICSL as a defendant in plaintiffs' aiding and abetting breach of fiduciary duty claim; only Citco NV, Stocks, Quilligan and Conroy are listed, in a boldfaced heading, as defendants with respect to this particular charge. *See* Citco Mem. at 16; SAC ¶ 360. In response, Plaintiffs contend that their failure to include ICSL in the caption was merely a labeling error, and that throughout the substantive text of the charge, allegations are lodged against all "Citco Directors," a term defined early in the SAC to include ICSL. *See* Pl. Citco Mem. at 16; SAC ¶ 8. There is no prejudice to plaintiffs from this clerical error, and ICSL had an opportunity to

address the claim in its reply brief.

**\*7** As noted above, the SAC is devoid of particularized allegations against ICSL. Plaintiffs merely assert that ICSL is a subsidiary of CGL who "served as sole director" of OmniFund during the relevant period.[FN92]This provides no basis for inferring that ICSL acted with the knowledge required to sustain an aiding and abetting claim under New York law.[FN93]Accordingly, all claims against ICSL are dismissed for failure to plead with the required particularity and without leave to replead.

> FN92. SAC ¶ 39.

> FN93. Although ICSL was not a party when this Court decided *Pension Comm. III,* that Opinion enunciated, in detail, the need for plaintiffs to replead their claims with particularity; it also granted them the opportunity to do so. Moreover, differences between the CFAC and the SAC demonstrate that plaintiffs clearly understood their pleading obligations. In fairness to defendants, as well as to this Court, I decline to grant plaintiffs a proverbial second bite at the apple with respect to ICSL. Lastly, because the breach of fiduciary duty claim against ICSL is dismissed for inadequacy of pleading, I need not reach the issue of whether this claim is time-barred, as defendants contend. *See* Citco Mem. at 17-18.

**b. Citco NV, Quilligan and Conroy**

Defendants contend that plaintiffs have alleged, at most, that Citco NV, Quilligan and Conroy were merely suspicious of, or put on notice of, the underlying fraud. As a result, defendants argue that plaintiffs have failed to meet the stringent standard for pleading an aiding and abetting claim, which requires actual knowledge (as opposed to recklessness).[FN94] However, for the reasons already stated with respect to plaintiffs' section 10(b) claims, plaintiffs have adequately pled that Citco NV, Quilligan and Conroy possessed actual knowledge of Lauer and Lancer Management's fraudulent scheme. Again, the circumstantial evidence giving rise to this inference of knowledge are the series of "red flags" that the Citco Defendants allegedly ignored,[FN95] as

well as the various emails and memoranda quoted in the SAC.[FN96]Plaintiffs have also adequately pled that these defendants failed to act when their fiduciary duty to investors required them to independently verify the Funds' valuations, and also that this inaction enabled the fraud to proceed. Thus, plaintiffs have fulfilled both the "substantial assistance" element of the fraud claim and the "participation" element of the breach of fiduciary duty claim.

> FN94.*See id.* at 16-17 (citing *JP Morgan Chase Bank,* 406 F.Supp.2d at 255;*Design Strategies, Inc. v. Davis,* 384 F.Supp.2d 649, 670 (S.D.N.Y.2005)). The Citco Defendants do not argue that plaintiffs have failed to plead proximate cause with respect to their aiding and abetting claims against Citco NV, Quilligan and Conroy. *See id.*

> FN95.*See* SAC ¶¶ 255-272.

> FN96.*See id.* ¶¶ 235, 238, 241, 243-244, 246.

**c. BAS**

BAS moves to dismiss plaintiffs' aiding and abetting claims on the ground that the SAC alleges no new material facts with respect to BAS and therefore suffers the same fatal flaws as the CFAC.[FN97]BAS asserts that the modified pleadings remain "devoid of allegations raising the inference that BAS or its employees were actually aware of Lauer's fraudulent scheme," and that there remains "no basis for inferring that BAS owed [plaintiffs] any duty to monitor, verify, or investigate the veracity of the information disseminated by Lauer."[FN98]Additionally, BAS argues for dismissal based on plaintiffs' failure to allege facts establishing that BAS proximately caused their injuries.[FN99]

> FN97.*See* BAS Mem. at 1, 3. In sum, the SAC alleges that Lauer and Lancer Management supplied BAS with fraudulently inflated stock and warrant prices, which BAS then put into the Position Reports even though BAS knew at the time that these prices were fraudulent. *See* SAC ¶¶ 143-191.

Slip Copy                                                                                           Page 13
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
**(Cite as: 2007 WL 528703 (S.D.N.Y.))**

FN98.*Pension Comm. III,* 446 F.Supp.2d at 202.

FN99.*See* BAS Mem. at 19-20.

Because BAS is correct in observing that plaintiffs still fail to satisfy their burden of pleading proximate causation, I need not determine whether the SAC alleges sufficient facts to support an inference of BAS's knowledge.[FN100] While it may have been reasonably foreseeable to BAS that fictional reports of multimillion dollar gains would cause plaintiffs' injuries,[FN101] none of BAS's alleged actions were a " 'substantial factor in the sequence of responsible causation." '[FN102] With respect to proximate cause, the SAC contains only conclusory assertions. It alleges that BAS's role in Lauer's scheme was "vital" because BAS knew the Position Reports would be relied upon by auditors and administrators who were responsible for calculating and verifying the Funds' NAVs.[FN103]The SAC also baldly claims that BAS

FN100.*See* Reply Memorandum of Law in Further Support of Defendant Banc of America Securities LLC's Motion to Dismiss Plaintiffs' Second Amended Complaint at 9-10. An allegation of actual knowledge is required because plaintiffs expressly disavow alleging in the SAC that BAS owed them a duty to verify or otherwise monitor the truthfulness of information supplied by Lauer and Lancer Management. *See* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss of Banc of America Securities, LLC ("Pl. BAS Mem.") at 16. Where there is no fiduciary duty, "the scienter requirement scales upward." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983).

FN101.*See* Pl. BAS Mem. at 21-23 (arguing that BAS ought to have reasonably foreseen plaintiffs' injuries because the BAS employees involved were (1) "licensed securities representatives" knowledgeable about the types of trades at issue; (2) aware that the BAS Position Reports "painted the only complete picture of the Funds' portfolio" and that the reports were circulated to the Funds' "service providers;" and (3) aware that they alone had the

authority to enter valuation information into the Position Reports posted on BAS's website).

FN102.*McDaniel,* 196 F.Supp.2d at 349 (quoting *First Nationwide Bank,* 27 F.3d at 769).*Accord Armstrong,* 699 F.2d at 91 (where these is no fiduciary duty, "the assistance rendered must be knowing and substantial").

FN103. SAC ¶ 436.

**\*8** proximately caused plaintiffs' damages because, absent BAS's knowing and active participation, Lauer could not have perpetrated his fraudulent scheme. Only BAS had the authority to enter and modify trades and prices on the BAS computer system for eventual inclusion in the fraudulent Position Reports that Lauer and Lancer Management disseminated to PWC NA, Citco NV and IFS which, in turn, used the fraudulent Position Reports to create fraudulent NAV statements and audit reports.[FN104]

FN104.*Id.* ¶ 439.

Perhaps Lauer's fraudulent scheme "may only have been possible because of [BAS's] actions, or inaction," but that does not make BAS's conduct a proximate cause of the scheme.[FN105]

FN105.*Crommer Finance Ltd.,* 137 F.Supp.2d at 472 (holding that plaintiffs could not satisfy their obligation to plead substantial assistance by merely "emphasizing that the alleged fraud included a Ponzi scheme that could not have functioned but for [defendant's] extension of credit and margin violations").*Cf. Lattanzio,* 2007 WL 259877, at *9 (plaintiffs failed to plead loss causation because they had not alleged facts showing that an outside accountant's misstatements, which were "among others (made by [another defendant] ) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss;" nor had plaintiffs alleged "facts that would allow a factfinder to ascribe some rough proportion of the whole loss" to the outside accountant's misstatements).

Slip Copy                                                                                          Page 14
Slip Copy, 2007 WL 528703 (S.D.N.Y.)
**(Cite as: 2007 WL 528703 (S.D.N.Y.))**

The SAC places the responsibility for preparing and verifying the Funds' NAVs on Lauer, the Citco Directors, and the Funds' external auditor.[FN106]As BAS points out, the preparation of the NAVs was supposed to be preceded by (i) the director defendants' evaluation of the appropriateness of Lauer's valuations; (ii) Citco NV's validation of the valuations using independent pricing sources; and (iii) Citco NV's own computation of the NAVs.[FN107]Lastly, the Funds' external auditor, PriceWaterhouseCoopers (Netherlands Antilles), was responsible for independently validating the accuracy of the Funds' financial statements.[FN108]Conspicuously absent from the SAC is any assertion that the Position Reports were supposed to play a role-let alone a significant role-in the independent evaluation and certification process. Because plaintiffs have not adequately pled that BAS proximately caused their alleged injuries, the claims against BAS are dismissed without leave to replead.

>        FN106._See_ SAC ¶¶ 193-194, 218-220, 251-253, 273-302.

>        FN107._See_ BAS Mem. at 20 (citing SAC ¶¶ 218-220, 193-194).

>        FN108._See_ SAC ¶¶ 274-278.

IV. CONCLUSION

For the foregoing reasons, the Citco Defendants' motion to dismiss is granted with respect to the claims against ICSL and Stocks and denied in all other respects. BAS's motion to dismiss is granted. A conference is scheduled for March 2, 2007, at 4:30 p.m. The Clerk of the Court is directed to close these motions [Docket Nos. 87, 94].

SO ORDERED:

S.D.N.Y.,2007.
Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC
Slip Copy, 2007 WL 528703 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



C In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re REFCO CAPITAL MARKETS, LTD. BROKERAGE CUSTOMER SECURITIES LITIGATION.
**No. 06 Civ. 643(GEL).**

Sept. 13, 2007.

Richard L. Stone and Mark A. Strauss, Kirby McInerney & Squire, LLP, New York, New York, for lead plaintiffs Global Management Worldwide Limited, Arbat Equity Arbitrage Fund Limited, and Russian Investors Securities Limited.

Jeffrey T. Golenbock and Adam C. Silverstein, Golenbock Eiseman Assor Bell & Peskoe LLP, New York, New York, for defendant Phillip R. Bennett.

Michael T. Hannafan and Blake Tyler Hannafan, Hannafan & Hannafan, Ltd., Chicago, Illinois; and Norman L. Eisen and Laura E. Neish, Zuckerman Spaeder LLP, New York, New York, for defendant Tone N. Grant.

David E. Mollón, Winston & Strawn LLP, New York, New York; Bruce Braun, Bradley Lerman, and Linda T. Coberly, Winston & Strawn LLP, Chicago, Illinois; and Margaret Maxwell Zagel and Tracy W. Berry, Grant Thornton LLP, Chicago, Illinois, for defendant Grant Thornton LLP.

Matthew J. Sava and Yoram Jacob Miller, Shapiro Forman Allen Sava & McPherson LLP, New York, New York, for defendants Joseph J. Murphy and Gerald M. Sherer.

Stuart I. Friedman and Ivan Kline, Friedman & Wittenstein, New York, New York, for defendant William M. Sexton.

Holly Kay Kulka, Heller Ehrman LLP, New York, New York, for defendant Philip Silverman.

Barbara Moses and Rachel Marissa Korenblat, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, New York, for defendant Robert C. Trosten.

Greg A. Danilow and Paul Dutka, Weil, Gotshal & Manges LLP, New York, New York, for the THL Defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

**\*1** In this securities class action, plaintiff customers of Refco Capital Markets, Ltd. ("RCM"), a securities brokerage, allege that corporate officers improperly lent assets from customers' trading accounts to affiliated Refco companies. This opinion addresses motions to dismiss by various corporate officers, Refco's auditor Grant Thornton LLP, and a group of defendants affiliated with Thomas H. Lee Partners, L.P. (the "THL Defendants" [FN1]) who collectively owned a majority interest in Refco at the time of the alleged scheme. Because plaintiffs have failed to allege that defendants engaged in deceptive conduct, the motions to dismiss will be granted; however, plaintiffs will be given leave to replead.

> FN1. The "THL Defendants" are Thomas H. Lee Partners, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., THL Equity Advisors V, LLC, Thomas H. Lee Investors Limited Partnership, The 1997 Thomas H. Lee Nominee Trust, THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Refco Acquisition Partners III, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

**BACKGROUND**

This is one of a number of cases arising from the fiery implosion of the brokerage and trading company Refco and its several affiliates. *See Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett,* No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007); *In re Refco, Inc. Secs. Litig.,* No. 05 Civ. 8626, 2007 WL 1280649 (S.D.N.Y. Apr. 30, 2007) ("*Refco I*"); *Thomas H. Lee Equity Fund V, L.P. v. Bennett,* No. 05 Civ. 9608, 2007 WL 950133 (S.D.N.Y. Mar. 28, 2007); *In re Refco, Inc.,* No. 06 Civ. 1888, 2006 WL 1379616 (S.D.N.Y. May 16, 2006); *Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX, Ltd.),* Nos. 06-11760, 06 Civ. 13215, 371

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 2694469 (S.D.N.Y.)
**(Cite as: 2007 WL 2694469 (S.D.N.Y.))**

B.R. 10, 2007 WL 1965597 (Bankr.S.D.N.Y. Jul. 05, 2007). The alleged scheme at issue, however, is distinct from the schemes alleged in those cases.

### I. *The Alleged Scheme*

Plaintiffs essentially allege that Refco improperly lent itself money from accounts belonging to a subsidiary's customers. The scheme involved a Refco subsidiary known as Refco Capital Management Ltd. ("RCM"), a corporation organized under the laws of Bermuda with its principal place of business in New York City. (Compl.¶ 17.[FN2]) RCM "purported to be an offshore securities broker and foreign exchange broker," and was one of Refco's three principal operating subsidiaries. (*Id.*)

> FN2. All references or citations to the complaint in this opinion are to the Consolidated Amended Class Action Complaint dated September 5, 2006, and filed on September 9, 2006.

RCM advertised itself as an offshore brokerage, not subject to U.S. brokerage regulation. (*Id.* ¶¶ 47, 72.)According to the complaint, RCM specifically considered itself exempt from the requirements of 17 C.F.R. § 240.15c3-1, which sets forth requirements involving the maintenance of a certain quantity of net capital, and 17 C.F.R. § 240.15c3-3, which requires, inter alia, that broker-dealers segregate certain customers' funds and securities. (Compl.¶¶ 45, 68.) According to plaintiffs, RCM was a "sham entity" with no offices or employees of its own and "no independent existence." (*Id.* ¶ 73.)All transactions on behalf of RCM were handled by employees of Refco Securities, LLC ("RSL"), another Refco affiliate. (*Id.* ¶ 74.)Plaintiffs claim that RCM existed only on the books of other Refco entities, functioning entirely as a device for the avoidance of U.S. securities laws (*id.* ¶ 73), and that because RCM had no employees of its own, RSL employees in New York performed all essential tasks for RCM. (*Id.* ¶ 56.)

**\*2** Plaintiffs bring this action on behalf of a putative class of "all securities brokerage customers" of RCM. (*Id.* ¶ 39.)The complaint does not explain exactly what services RCM promised to perform for its "securities brokerage customers." Nor does the complaint give any details as to the procedures and agreements under which RCM normally handled customers' assets or how, exactly, the alleged fraudulent mishandling of assets was accomplished.

The complaint alleges that "securities held by RCM on behalf of its customers were secretly sold," and the "proceeds diverted" to other Refco entities.(*Id.* ¶ 46). The complaint never explains how customers' assets were managed in the normal course of business, which makes it difficult to understand what the word "diverted" means. For example, the complaint never explains whether the brokerage held securities on behalf of individual customers or pooled customer assets to purchase securities.[FN3]Similarly, the allegation that the securities were sold "secretly" suggests that RCM was under some obligation to seek prior authorization for or at least provide notice of the sale of the securities in question, but the complaint never explains the source of this obligation. Without knowing anything about the terms of the agreements pursuant to which RCM held securities "on behalf of" its customers, it is difficult to know what uses of those securities would constitute an improper diversion of funds.

> FN3. Some aspects of the complaint suggest that RCM's customers assets were pooled to purchase securities, as opposed to securities being held in the name of any particular customer. RCM operated as an offshore brokerage purportedly not required to keep customers' assets separate from the assets of other customers, or to maintain a minimum proportion of customer assets in liquid accounts. The complaint never expressly explains whether RCM did pool customer assets, although certain allegations suggest it did. When plaintiffs allege that RCM lent "customer assets" (*see, e.g.,* Compl. ¶ 58) to related Refco entities, they carefully avoid alleging that the assets in question belonged to any particular RCM customer. This suggests that customer assets were not segregated. Defendants, at least, appear to believe that assets were not segregated. (Officer Reply 13 n. 10.) The complaint also alleges that "[h]ad RSL properly maintained RCM customer accounts in accordance with U.S. regulatory requirements, including the segregation rules, the fraudulent scheme alleged herein would not have been possible."(Compl.¶ 78.) If customer assets

Slip Copy                                                                                           Page 3
Slip Copy, 2007 WL 2694469 (S.D.N.Y.)
**(Cite as: 2007 WL 2694469 (S.D.N.Y.))**

were pooled, then the loan from RCM to the Refco affiliates would have been a loan from the pool, rather than from the accounts of any particular customers. The complaint never alleges that customers were deceived or misled about whether assets would be pooled or maintained in segregated accounts.

It appears that two sets of transactions are at issue in this case, although plaintiffs never make clear exactly which of the transactions constituted the alleged fraud. The transactions were: (1) sales of securities held by RCM on customers' behalf, and (2) loans of the proceeds of those sales to affiliated Refco entities. (*Id.* ¶¶ 49-51.) Again, however, the complaint fails to explain what agreements, if any, governed RCM's ability to make such loans. It is clear from the complaint that RCM was, in some circumstances, in the business of making loans; plaintiffs elsewhere complain that the loans to Refco affiliates failed to conform to RCM's standard loan procedures. (*Id.* ¶ 55-58.) The complaint does not explain, however, whether RCM was permitted to make loans using the assets of "securities brokerage customers." Nor does it set forth the terms of the allegedly fraudulent loans themselves. It does not explain, for example, to whom the Refco affiliates owed their debt.

The complaint alleges that the loans in question were made for the benefit of Refco officials, rather than for legitimate business purposes. The transactions were allegedly initiated by "Refco senior management, including defendants Maggio and Bennett and other persons acting on behalf of [Refco affiliates] Refco Global Finance, [Refco Capital LLC ("RCC") ] and Refco Group." These officers and others would communicate with RSL executives, who would in turn sell the RCM securities and transfer the proceeds to Refco Global Finance and then to RCC. (Compl.¶¶ 49-50.) RCC would then disperse the funds wherever they were needed within the Refco organization, often to Refco Group, for various uses, including payroll payments and daily operations. (*Id.* ¶ 50-51.) The funds were also used to extend credit to customers of Refco affiliates (*id.* ¶ 51), to pay down Refco's debts, and to fund acquisitions (*id.* ¶¶ 52-53). The complaint also alleges that the Refco affiliates that received the loans never intended to repay them, and lacked the financial ability to repay them in any event. (*Id.* ¶ 57.) Plaintiffs say that the proceeds from

the sales of RCM customer assets were essential to Refco's continued functioning; Refco's financial state was weak, and without the RCM customers' money, it would have collapsed "long before it did." (*Id.* ¶ 48.)

**\*3** Plaintiffs also make a number of allegations pertaining to the process by which the loans at issue were approved. Plaintiffs allege that the RSL executives responsible for the transfers received substantial bonus payments for implementing these transactions; the bonus structure was specifically designed to maximize the amount of RCM customer assets "monetized" and "pushed upstream." (*Id.* ¶ 58.) They allege that no independent officer at RCM considered or approved the loans; Maggio, a senior Refco Group officer, was the senior risk officer at RCM, and RCM's board of directors, which was dominated by Bennett and Maggio, never considered the loans. (*Id.* ¶ 55.) Because the complaint does not provide any information about the agreements governing RCM's brokerage services, however, it is difficult to know what procedures plaintiffs believe should have been applied.

The complaint alleges that the defendants "fraudulently mischaracterized" the transactions at issue as "loans" to RCM "customers" (*id.* ¶ 46) and that some of the transactions were "undocumented." (*Id.* ¶ 50.) It does not, however, explain what it means by the term "undocumented." Elsewhere, the complaint alleges that "Refco management ... kept track of the intercompany transactions and of the RCM customer funds that were available at any given time." (*Id.* ¶ 161.) It is not clear how management "kept track" of loans that were "undocumented." Nor, again, does the complaint explain the procedures that plaintiffs believe should have been applied in documenting the loans to Refco affiliates.

Reading the complaint in context, it appears that when plaintiffs allege that the loans were "undocumented" or "fraudulently mischaracterized" as loans, they mean that the true nature of the transactions was not fairly reflected in Refco's books. The complaint does not allege, for example, that Refco's books were altered to show fake counterparties for these transactions, or that the loans were made without any documentary record. Instead, it alleges that the Refco affiliates who received the loans were inaccurately identified as "customers" of

Slip Copy                                                                                      Page 4
Slip Copy, 2007 WL 2694469 (S.D.N.Y.)
**(Cite as: 2007 WL 2694469 (S.D.N.Y.))**

RCM. (*Id.* ¶ 54.)The complaint assets that Refco Global Finance, RCC, Refco Group, and the other Refco affiliates who received the proceeds of the sales could not fairly be considered RCM customers (*id.* ¶ 55), because the loans differed from loans to other customers in a variety of ways: the Refco affiliates were not evaluated for risk or creditworthiness; the transactions were made "without fair or any consideration" (by which plaintiffs may mean simply that the affiliates' promises to repay were not sincere; the complaint does not deny that promises to repay were made for each loan or claim that the loans were interest-free); the transactions were made without proper documentation or observation of corporate formalities (*id.* ¶ 55); and the recipient affiliates were not required to post collateral, as would be the case with loans made in normal course. *Id.* The complaint also makes clear, however, that the transactions were identified as related-party transactions in Grant Thornton's audit report. (Compl.¶ 85b.)

**\*4** According to the complaint, approximately $2.6 billion in RCM customer assets was missing when Refco filed for bankruptcy on October 17, 2005. (*Id.* ¶ 46.)As noted above, however, plaintiffs do not say from where the assets were missing, that is, whether the missing money should have been available as cash, as debt, as securities held by RCM for individual customers, as securities held on behalf of a pool of customers, or in some other form.

The alleged scheme at issue in this case took place against a background familiar from other Refco cases, in which another fraud, the revelation of which eventually caused Refco's collapse, was ongoing. The complaint mentions, but does not discuss in depth, the allegation (central to other Refco actions) that Refco's management devised a scheme to hide the fact that several of Refco's significant assets had been rendered worthless by the Asian financial crisis of the late 1990s. (Compl,¶ 4.) The details of this alleged scheme have been discussed in other cases. *See Refco I, 2007 WL 1280649, at \*1-\*2.* Essentially, to hide their worthless assets, Refco's management allegedly devised a "round-robin" scheme in which the uncollectible receivables were transferred onto the books of Refco Group Holdings, Inc. ("RGHI"), a non-party Refco affiliate. Then, another Refco subsidiary would lend money to a third party, which would in turn lend it to RGHI to pay down the

uncollectible receivables, effectively erasing them from Refco's books. These transactions would happen shortly before the end of each relevant financial period, and be "unwound" shortly after the reporting period was over. *See id.*Nothing in the complaint suggests that the two frauds were directly connected; there is no allegation, for example, that proceeds from the sale of RCM customer assets were used in the circular transactions at issue in the round-robin fraud.[FN4] The only apparent connection is that both schemes were designed to hide financial problems at Refco and its affiliates from the public and from investors.

> FN4. Allegations by the plaintiffs in *Refco I* suggest that the money used in the round-robin fraud originated at RCM. According to the plaintiffs in that case, funds in the round-robin fraud were allegedly paid by "Refco Capital" to a third party, which would then loan them to RGHI so that RGHI could temporarily pay down the uncollectible receivables.*Refco I, 2007 WL 1280649, at \*1-\*2.* The entity referred to by the *Refco I* plaintiffs as "Refco Capital" is apparently RCM. *See Refco I* Compl. ¶ 25; *but see Refco I, 2007 WL 1280649, at \*31 n. 31* (noting that at least one defendant raises an issue as to the identity of "Refco Capital").

## II. *Refco's Collapse*

Refco Inc. went public in an initial public offering ("IPO") on August 11, 2005. Nine weeks later, on October 10, 2005, Refco issued a press release announcing that it had discovered an "undisclosed affiliate transaction" involving a hidden receivable in the amount of $430 million owed to Refco by RGHI. The release explained that RGHI had assumed obligations owed by third parties to Refco, "which may have been uncollectible." Refco disavowed its financial statements for fiscal years 2002, 2003, and 2004. (Compl.¶ 60.) The circular transactions had been publicly revealed, but the alleged fraud involving the RCM customer accounts had not.

After the public disclosure of the circular fraud, RCM customers began attempting to withdraw assets from their accounts. On October 13, 2005, citing liquidity concerns, Refco announced that it was imposing a 15-day moratorium on trading activity at RCM,

including withdrawals. (Compl.¶ 62.) On October 17, 2005, Refco and some of its subsidiaries filed for bankruptcy. (*Id.* ¶ 63.)*See In re Refco Inc., et al.,* No. 05-60006(RDD) (S.D.N.Y.Bankr.). In bankruptcy proceedings, Refco acknowledged that RCM owes its customers approximately \$4.16 billion, but has only \$1.905 billion in assets. (Compl.¶¶ 65, 67.) A substantial part of this debt is intercompany debt owed to RCM by other Refco affiliates, including Refco Global Finance and Refco Group. (*Id.* ¶ 66.)

### III. *Defendants*

**\*5** Because it is unnecessary to reach the various questions unique to individual defendants at this time, the roles played by the various defendants in Refco and RCM can be summarized briefly. Defendants Tone N. Grant, Joseph J. Murphy, William M. Sexton, Gerald M. Sherer, Philip Silverman, Robert C. Trosten, and Phillip R. Bennett were corporate officers of Refco and/or RCM. (Compl.¶¶ 22-30.) Defendant Grant Thornton was RCM's auditor. (Compl. ¶ 38 .) It provided auditing services in connection with RCM's financial statements for the fiscal years ending in February 2003, 2004 and 2005. Each year, Grant Thornton issued unqualified audit opinion letters attesting that those financial statements fairly presented RCM's financial condition in accordance with Generally Accepted Accounting Principles ("GAAP") and that its audits had been conducted in accordance with Generally Accepted Auditing Standards ("GAAS"). (Compl.¶ 79.)

The THL Defendants were, at the relevant times, majority owners of Refco. In June 2004, one year prior to the IPO, the THL Defendants purchased a 57% equity stake in Refco for approximately \$507 million. (*Id.* ¶ 133.)Plaintiffs allege that defendant Thomas H. Lee Partners was at all times authorized to act for and on behalf of all of the other THL Defendants. (*Id.* ¶ 134.)After the IPO, the THL Defendants continued to hold a dominant 44% interest. (*Id.* ¶ 143.)

### DISCUSSION

The complaint must be dismissed because it fails sufficiently to allege deceptive conduct. Defendants raise a number of other issues in their motions to dismiss, including whether plaintiffs have adequately

alleged loss causation (Joint Mem. of Defs. Grant, Murphy, Sexton, Sherer, Silverman, and Trosten ("Officer Mem.") 16), whether any deceptive scheme was properly alleged "in connection with" the sale of securities (Bennett Mem. 9), whether plaintiffs allege acts by Grant Thornton in furtherance of the scheme, whether plaintiffs have adequately alleged scienter, whether plaintiffs have stated a claim for control person liability against the THL Defendants and defendants Bennett, Grant, Trosten, and Maggio, and whether the class allegations should be stricken for various reasons. Since the complaint must be dismissed for failure to allege deceptive conduct, it is not necessary to reach these arguments at this time. Accordingly, the complaint will be dismissed with leave to replead, and defendants' other arguments will be addressed if and when plaintiffs file an amended complaint that satisfactorily alleges deceptive conduct.

### I. *Standards for Motions to Dismiss*

Under the notice pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). The Supreme Court recently reconsidered the standard for motions to dismiss in *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007), in the wake of which courts are to apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."*Iqbal v. Hasty,* 490 F.3d 143, 158 (2d Cir.2007). Under this standard, a complaint may be dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its face."*Twombly,* 127 S.Ct. at 1974."[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do."*Id.* at 1965 (internal quotation marks omitted). In order to state a claim, the factual allegations "must be enough to raise a right to relief above the speculative level."*Id.* Where a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed."*Id.* at 1974.

**\*6** It remains true, however, that "[s]pecific facts are

not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests."*Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) (internal alteration, citations and quotation marks omitted). As always, the court must "accept[ ] all factual allegations in the complaint and draw [ ] all reasonable inferences in the plaintiff's favor."*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

As a threshold matter, it should be noted that three motions to dismiss in this case-by defendants Silverman, Sexton, and Murphy and Sherer-are not opposed by plaintiffs. Although these motions were properly served on plaintiffs, plaintiffs' opposition papers do not address or mention these defendants' motions at all. Accordingly, plaintiffs have abandoned their claims against those defendants, whose motions to dismiss will be granted on that basis. *See George v. Ford Motor Co.,* No. 03 Civ. 7643, 2007 WL 2398806, at *7 (S.D.N.Y. Aug. 17, 2007) ("Defendant does not even attempt to rebut these objections, and thus appears to abandon its request."); *Shady Records, Inc. v. Source Enter.,* 371 F.Supp.2d 394 (S.D.N.Y.2005) ("whether [plaintiff's] claims had merit is now moot in light of [its] willingness to abandon those claims.") As plaintiffs have entirely failed to defend their complaint, or to suggest that they could amend the complaint to cure the defects asserted by these defendants, leave to replead as against these defendants will not be granted.

## II. *Deceptive Conduct*

### A. Deceptive Conduct Must Be Alleged

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.,* provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors.

15 U.S.C. § 78j.

The U.S. Securities and Exchange Commission (the "SEC") adopted a number of rules pursuant to Section 10(b), most notably Rule 10b-5, 17 C.F.R. § 240.10b-5, which provides that it is unlawful

(a) [t]o employ any device, scheme or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

***7***Id.*"[C]ourts long have held that a private right of action was indeed created" by Section 10(b) and Rule 10b-5. *Ontario,* 369 F.3d at 31.

Subsections (a) and (c) of Rule 10b-5 prohibit the use of "any device, scheme, or artifice to defraud" or participation "in any act, practice, or course of business" that would perpetrate fraud on investors. The elements of a claim under Rule 10b-5(a) and (c) have been stated in different ways by courts in this district.[FN5]No matter how the test is stated, however, one element is that plaintiffs must allege conduct that is "manipulative or deceptive." *In re Parmalat Secs. Litig.,* 383 F.Supp.2d 616, 622 (S.D.N.Y.2005); *see In re Global Crossing, Ltd. Secs. Litig.,* 322 F.Supp.2d 319, 336 (S.D.N.Y.2004). Indeed, the most basic element of all fraud claims is that the victim must be deceived by the perpetrator's words or actions. *See id. at 335* ("a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.").

> FN5. Compare *In re Parmalat Secs. Litig.,* 383 F.Supp.2d 616, 622 (S.D.N.Y.2005) (stating that plaintiff must allege that defendant "(1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants'

Slip Copy                                                                                    Page 7
Slip Copy, 2007 WL 2694469 (S.D.N.Y.)
**(Cite as: 2007 WL 2694469 (S.D.N.Y.))**

actions caused the plaintiffs' injuries.") with *In re Global Crossing, Ltd. Secs. Litig.,* 322 F.Supp.2d 319, 336 (S.D.N.Y.2004) ("All that is required in order to state a claim for a primary violation under Rule 10b-5(a) or (c) is an allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance.").

Claims under Rule 10b-5(a) and (c) "sound in fraud and therefore come within Rule 9(b). The plaintiffs therefore must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Parmalat,* 383 F.Supp.2d at 622.

In securities cases, there are several kinds of cognizable deception. The most obvious is misleading statements or material omissions, which are proscribed by Rule 10b-5(b). Another is market manipulation, which is proscribed by Rule 10b-5(a) and (c). The gravamen of a market manipulation claim is that defendants' actions convey to investors, via the market (which, absent manipulation, would produce a price that fairly reflects the value of securities), a false sense of a security's value. *ATSI Commc'ns,* 493 F.3d at 101. In other words, instead of deceiving investors by making false statements, fraudsters in market-manipulation cases deceive investors by causing the market to make their false statements for them.

Another kind of securities fraud claim is based on conduct that is deceptive because it is inconsistent with a fiduciary duty. In claims of this kind, the fiduciary duty serves as a sort of standing false representation by the fraudster, who deceives the victim by violating the commitment associated with her fiduciary duty. Acceptance of a fiduciary duty creates an understanding that the fiduciary will behave in certain ways; if the fiduciary allows this understanding to continue while acting inconsistently with her obligations, she has deceived the victim. *See SEC v. Zandford,* 535 U.S. 813, 821 (2002). A fiduciary duty is not a required element of a deceptive conduct claim in cases where there is some conduct or representation that gives the victim the relevant false impression. Thus, in a market manipulation case, there is no need to show a fiduciary relationship, *ATSI Commc'ns,* 493 F.3d at 101, because the false impression is the misleading share price created through manipulative market activity. The point is that there must be some conduct or representation by the fraudster that deceives the victim-that is, the defendant's conduct must create in the victim a sense that things are otherwise than they are.

**B. Plaintiffs Have Not Alleged Deceptive Conduct**

**\*8** Plaintiffs make various allegations of wrongdoing or mishandling of assets, but they fail to explain how defendants created a false impression concerning their handling of plaintiffs' assets. The apparent basis of plaintiffs' claim is deceptive conduct, rather than market manipulation.[FN6] But it is not clear how plaintiffs believe they were deceived.

> FN6. Plaintiffs do not contend that the complaint alleges a market manipulation claim, as it clearly does not. Market manipulation is a "term of art" that "refers to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Kemp v. Universal Am. Fin. Corp.,* No. 05 Civ. 9883, 2007 WL 86942, at \*16 (S.D.N.Y. Jan. 10, 2007) (internal citations and quotation marks omitted). The defendants' alleged use of customers' assets was designed to help finance Refco's coverup of its financial problems, and thereby keep the stock price artificially high. It did not do so, however, by affecting the market in which Refco securities were traded. On the contrary, all of the alleged activity was meant to be kept secret.

In general, it is difficult to understand the complaint's allegations regarding use of customer assets, because the complaint never explains how those assets were held. For example, the complaint alleges that RCM would sell customer' securities in whatever amount was needed to raise the cash Refco needed (Compl.¶ 49), and refers to "[s]ecurities held by RCM on behalf of its customers"(*id.* ¶ 46), but it never explains whether those securities were held in RCM's name or the customers' name. Nor does it ever describe the understanding pursuant to which RCM held customer assets. The complaint alleges that the

sales of RCM customer assets "occurred without the knowledge, authorization or consent of plaintiffs and the class."(Compl.¶ 49.) Authorization, of course, is not required for all brokerages making trades on behalf of a client; some brokerages hold assets on a discretionary basis, meaning that they are permitted to make trades without the client's specific authorization. The complaint does not explain whether the accounts were discretionary. Nor does it describe any other aspect of the agreements between RCM and its customers.

In order to coherently allege deceptive conduct, plaintiffs must identify (1) the source of the understanding falsely created by defendants (that is, a fiduciary duty, prior representation, or some other reason why they believed defendants would act otherwise than they did), and (2) conduct that violated that understanding. The complaint does neither.

Plaintiffs allege that defendants schemed to "steal" their money when they lent customer funds to other Refco entities. (Pl.Mem.8.) This is a legal conclusion, not a factual allegation, and plaintiffs do little to explain what about the use of RCM customers' assets constituted theft, much less what would have made any such theft deceptive. Use of assets could not constitute theft if it was authorized, and since plaintiffs never set forth the terms of the agreements pursuant to which those assets were held, or even allege that any agreement was violated by RCM's use of the assets, it is impossible to accept the conclusory contention that RCM stole customers' assets.

More importantly, it is necessary to identify the sense in which the conduct was deceptive, as opposed to merely untoward. Not all thefts constitute fraud; only if the theft breaches some representation, explicit or implicit, can it be said to be deceptive. Theft not accomplished by deception (e.g., physically taking and carrying away another's property) is not fraud absent a fiduciary duty. *See United States v. Finnerty, 474 F.Supp.2d 530, 543 (S.D.N.Y.2007).* Stealing a stranger's car, for example, does not deceive the victim; it merely deprives him of his car. Even if plaintiffs had adequately alleged that customers' assets were stolen, nothing in the complaint explains what about the theft was deceptive.

***9** Plaintiffs rely primarily on *Zandford,* in which the

Supreme Court held that a broker who sold a client's shares for his own profit had engaged in actionable deceptive conduct. In that case, however, there was a fiduciary duty between the clients and the broker; thus, each sale "was deceptive because it was neither authorized by, nor disclosed to, the [clients]."535 U.S. at 821. "[E]ach time respondent 'exercised his power of disposition for his own benefit,' that conduct, 'without more,' was a fraud."*Id .,* quoting *United States v. Dunn,* 268 U.S. 121, 131 (1925). The conduct was deceptive because the victims "were duped into believing respondent would 'conservatively invest' their assets in the stock market and that any transactions made on their behalf would be for their benefit for the 'safety of principal and income.' " 535 U.S. at 821. That is, the victims believed, on the basis of the perpetrator's specific representations and the fiduciary duty he owed them, that their money would be handled in a certain way.

*Zandford* does not help plaintiffs' case because plaintiffs do not say whether they believe that defendants owed them any fiduciary duty or how defendants' conduct was inconsistent with representations made to plaintiffs. *See generally Stewart v. J.P. Morgan Chase & Co.,* No. 02 Civ.1936, 2004 WL 1823902, at *12 (S.D .N.Y.2004) ("The courts have consistently held that where a brokerage client has a self-directed account, the broker ordinarily has no legal responsibilities beyond the prompt and accurate carrying out of any transaction directed by the client."); *De Kwiatkowski v. Bear, Stearns & Co., Inc.,* 306 F.3d 1293, 1305-06 (2d Cir.2002) (discussing special circumstances in which brokers may have more extensive duties). If RCM had the discretion to trade in customer assets, then the central issue in this case is whether the loans were bad investments that violated a fiduciary duty. If RCM had no such discretion, then the central question is whether RCM deceptively made unauthorized trades. Thus, plaintiffs' failure to make clear whether a fiduciary duty existed is significant, because the case will present different questions depending on the answer to that question.

Nor did RCM ever suggest, like the fraudsters in *Zandford,* that it would "conservatively invest" plaintiffs' money. On the contrary, the only representation mentioned in the complaint is RCM's representation that it was an offshore brokerage not subject to U.S. regulations. Far from suggesting

Slip Copy                                                                                                Page 9
Slip Copy, 2007 WL 2694469 (S.D.N.Y.)
(Cite as: 2007 WL 2694469 (S.D.N.Y.))

deception, that representation would appear to put customer on notice that the accounts would be managed in unconventional ways. The terms of the complaint make clear that plaintiffs were aware when they invested with RCM that RCM intended to engage in conduct that would ordinarily be unlawful under U.S. regulations if RCM were a U.S. broker. Refco publicly described RCM as not subject to requirements that brokerages segregate customer funds and maintain sufficient capital to operate safely. (Compl.¶¶ 68, 72.) Whether RCM was actually permitted by U.S. regulations to engage in that conduct is beside the point; what matters is that plaintiffs were well aware it intended to do so.[FN7] Plaintiffs never identify any requirement to which RCM claimed it would adhere that prohibited brokerages from using customer assets for loans to affiliated companies. The complaint therefore provides no reason why plaintiffs could reasonably have expected RCM not to use their assets in the manner it did. Even if the loans to Refco affiliates constituted extremely bad or even self-interested management, nothing in the complaint explains how they were deceptive. Unlike *Zandford*, in short, there is no apparent sense in which the conduct alleged contravened some prior understanding or broker's duty.

> FN7. Plaintiffs contend that RCM was, contrary to its representations, subject to U.S. brokerage regulation. (Pl. Mem. 13-14; Compl. ¶ 77.) This matters not at all, because whether RCM was actually allowed by law to engage in the activities in question has nothing to do with whether those activities were deceptive. Authorized bad conduct is not fraud. If RCM had advertised with a sign saying "Invest With Us, and We'll Flush Your Money Down The Toilet," plaintiffs could not claim fraud when the company then did exactly what it had promised, even if the flushing was illegal.

**\*10** Aside from the failure to identify the source of the prior understanding that was violated, the complaint also fails to explain what aspect of the transactions-or, indeed, which transactions-violated their understanding as to how their assets would be treated. In other words, the complaint does not explain what aspect of any specific action was deceptive. Was it the unauthorized sale of plaintiffs'

assets that was fraudulent, or the decision to use the resulting funds for self-interested and unprofitable ends? Either of these theories, or some other, might suffice to allege deceptive conduct.[FN8] But it is impossible to analyze other issues, such as scienter, without knowing what deceptive act plaintiffs see as the heart of the fraud and whether that deception was premised on a fiduciary duty or a prior representation. Defendants are entitled to know "what deceptive or manipulative acts were performed" and in what sense they were deceptive. *Parmalat,* 383 F.Supp.2d 622.

> FN8. It is difficult to imagine that self-dealing loans to insolvent affiliates could be consistent with any fiduciary duty; nor does it seem likely that RCM made any disclosure that would have rendered permissible the making of self-interested loans to entities known to be insolvent, because no investor would give money to a company that announced its plan to use some of the pool of customer assets for self-dealing loans to insolvent affiliate companies.

Plaintiffs allege that "the purported 'loans' made by RCM were uncollectible because the Refco affiliates to which the loans were made lacked the financial ability and intention to repay them."(Compl.¶ 57.) This allegation, which is unsupported by any other details, lacks the supporting allegations that would "nudge [plaintiffs'] claims across the line from conceivable to plausible." *Twombly,* 127 S.Ct. at 1974.

The complaint uses strong, unqualified language ("the Refco affiliates ... lacked the financial ability and intention to repay") that seems to suggest that *no* Refco affiliate intended to repay *any* of the RCM loans. With respect to ability to repay, the complaint does not clearly allege that every Refco entity that borrowed from RCM was insolvent. It could perhaps be inferred that the reason for the inability to repay was the round-robin fraud, and therefore that the Refco officers involved in the round-robin fraud knew that the affiliates could not repay RCM or its customers. That would be quite a leap to make, however, from the terms of the complaint's allegations, which simply state in blanket terms that "the Refco affiliates" lacked the ability to repay. The

complaint never alleges that all Refco affiliates were rendered insolvent by the round-robin fraud; nor does it allege any basis for the broad, unqualified contention that the Refco affiliates were unable to pay the RCM loans. If plaintiffs really mean that all of the RCM loans were uncollectible, they have failed to support their claim with sufficient supporting allegations; if, on the other hand, they mean that some of the loans at issue were uncollectible, their failure to specify which loans makes it impossible for defendants or the Court to tell which transactions are alleged to be fraudulent.

With respect to intent to repay, it is difficult to determine the basis for plaintiffs' allegation that the affiliates lacked the intent to repay, which could mean any number of things. For example, it might mean that Refco officers devised a scheme pursuant to which the RCM customer assets would be "borrowed" from a pool of RCM customer assets, used for Refco affiliates' own business purposes, and never replaced. This would presumably be deceptive whether plaintiffs alleged a fiduciary duty or a violation of the terms of their brokerage agreements. On the other hand, the complaint might be read to mean that Refco officers allowed the loans to take place knowing that Refco was in such financial trouble that any debt it incurred might become uncollectible. This would be quite a different matter from taking out a loan with the specific intent never to repay it.

**\*11** Importantly, the complaint also fails to explain which of the defendants in this case, if any, knew that the affiliates were insolvent or lacked the intent to repay. Nor does it identify the specific officers at the borrower affiliates who lacked the intent to repay. Thus, plaintiffs have identified neither the party who deceived them nor the act by which they were deceived nor the circumstances that made it deceptive.

The complaint also does not explain to whom the loans *should* have been repaid. It is impossible to understand what conduct plaintiffs claim was deceptive without understanding which entities were parties to the allegedly fraudulent loan agreements and whose money was loaned to the Refco affiliates. If customer assets were pooled, the alleged fraud might be significantly different than a fraud in which a broker sells a client's assets for his own benefit.

RCM operated as an offshore brokerage, purportedly permitted to maintain net asset levels without regard to the minimum levels established in U.S. brokerage regulation. If customer assets were pooled to purchase securities, therefore, the complaint suggests that customers were warned that not all customer funds would be committed to the securities RCM held on customers' behalf. The simple fact that RCM was eventually left without significant assets to allow its customers to withdraw all funds from their accounts is not necessarily indicative of fraud-plaintiffs point to no specific agreement under which they had a right to expect that pooled funds would be invested in any particular way, or guaranteed against loss, or available for immediate withdrawal by customers. Nor do plaintiffs point to any agreement of which they were aware under which defendants were obliged to return funds to the RCM pooled account at any particular time. Using pooled funds for self-interested purposes with no possibility of profit for plaintiffs would likely be a violation of a fiduciary duty, if one existed. But that would be a very different kind of fraud than a fraud involving the making of unauthorized trades from specific nondiscretionary accounts. Defendants are entitled to know which kind of fraud they are alleged to have committed.

Other aspects of the allegedly fraudulent transactions are described in the complaint, but in each case plaintiffs fail to explain what understanding was violated by those transactions or what false impression was created by them. The complaint alleges, for example, that the intercompany transfers in question were "not recorded on Refco's general ledger as they should have been."(Compl. ¶ 54.) The phrase "should have been" here has no referent. Plaintiffs allege that the loans were mischaracterized as loans to customers, but they support this argument only by arguing that Refco affiliates were treated differently than other recipients of loans from RCM; nothing in the complaint explains why plaintiffs expected Refco affiliates would not receive loans in this fashion. If plaintiffs had been induced by defendants to believe that transactions would be recorded in a certain way, then an allegation of deceptive conduct might be stated, but in the absence of any allegations regarding the understanding pursuant to which plaintiffs' assets were held, this is insufficient.[FN9]

FN9. Moreover, the complaint acknowledges that loan statements were issued, showing "the indebtedness and interest that the entities owed to RCM" (Compl.¶ 54), and says that Refco management "kept careful track of the intercompany transactions."(*Id.* ¶ 59.)It is not clear how this fits with plaintiffs' contention that the loans were not properly documented.

**\*12** In short, the complaint fails to make sufficient allegations as to deception, the most basic element of fraud. Accordingly, there is no need to reach the defendants' other arguments pertaining to other elements of fraud, or the arguments relating to control liability, because no primary violation of the securities laws has been alleged. *See Refco I,* 2007 WL 1280649, at *18 (noting that control liability claims must allege a primary violation).FN10

FN10. Similarly, the parties' arguments concerning standing are difficult to resolve given the vagueness of the current complaint. Defendants rely on the line of cases holding that to have standing, plaintiffs must have purchased securities in a company that made qualifying misstatements. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 754-55 (1975) (holding that individuals who *failed* to purchase a stock due to a company's misrepresentation of its value did not have standing to sue, because they were not purchasers or sellers of the security); *Ontario Pub. Svc. Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F .3d 27, 33 (2d Cir.2004) (holding that plaintiffs who purchased the securities of a company that did not make the misstatements at issue did not have standing to sue, even if they purchased securities in a company that had a close business relationship with that company). Defendants contend that "[a] deposit of securities with a brokerage firm is a bailment, not a sale, and cannot support a Rule 10b-5 claim even if induced by fraud."(Officer Mem. 8.) In response, plaintiffs contend that they were "unwitting sellers of securities" (Pl.Mem.16). The complaint is so vague

with regard to the arrangements by which RCM held plaintiffs' securities that it is difficult to determine whether this argument has merit. Defendants also argue that plaintiffs have no standing because they have failed to identify any specific securities owned by plaintiffs that were sold by defendants. (Officer Mem. 10 n. 5.) If customer accounts were pooled, as discussed below, it would be impossible to identify specific customers' assets sold by RCM.

### IV. *Leave to Replead*

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to replead should be "freely given when justice so requires."Fed.R.Civ.P. 15(a). Leave to replead may be denied if repleading would be futile, *Acito v. IMCERA Group, Inc.,* 47 F .3d 47, 55 (2d Cir.1995), but it is far from clear that repleading would be futile here. As noted above, several different potential fraudulent schemes could be hypothesized within the vague contours of plaintiffs' allegations. Given the opportunity to explain what conduct by defendants was deceptive, plaintiffs may be able to point to some specific duty or action on defendants' part that created the requisite false impression. Plaintiffs have not previously sought to amend (their first amendment was as of right), and granting leave to amend would not prejudice defendants, since the case is still at an early stage.

Moreover, developments in related cases may allow all parties to benefit from repleading. After the instant motions were fully submitted, plaintiffs forwarded to the Court copies of complaints in two related cases filed by Marc S. Kirschner, the trustee appointed to bring certain claims associated with the Refco bankruptcy by the U.S. Bankruptcy Court for the Southern District of New York. *See Kirschner v. Grant Thornton LLP, et al.,* No.2007L008818 (Cir. Ct. Cook County, Aug. 21, 2007), and *Kirschner v. Bennett et al.,* No. 07602896 (N.Y.Sup.Ct.N.Y.County, Aug. 27, 2007). Plaintiffs request that "the Court take judicial notice of the judicial admissions" contained in these complaints. (*See* Letter from Mark A. Strauss, Esq., to the Court, dated Sept. 7, 2007; Letter from Mark A. Strauss, Esq., to the Court, dated Aug. 28, 2007.) Under the doctrine of judicial admissions, factual assertions made in a pleading bind the party filing the pleading

Slip Copy                                                                                                      Page 12
Slip Copy, 2007 WL 2694469 (S.D.N.Y.)
**(Cite as: 2007 WL 2694469 (S.D.N.Y.))**

to those assertions, *see Gibbs v. CIGNA Corp.,* 440 F.3d 571, 578 (2d Cir.2006), but plaintiffs do not explain how it could be relevant to preclude Kirschner, who is not a party to this litigation, from contradicting any particular claim in this case. Plaintiffs do not indicate any desire to incorporate factual allegations made in Kirschner's complaints into their own allegations. Repleading will allow the plaintiffs to examine these new filings to determine whether they wish to incorporate Kirschner's allegations into their own complaint.

Along with these new complaints, two recent opinions by this Court in Refco-related cases were issued after the filing of the instant motions. In *Refco I,* 2007 WL 1280649, and *Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett,* 2007 WL 1732427, this Court addressed a number of the same issues and facts raised in this complaint and the resulting motions. For example, many of the same allegations in support of scienter used in *Refco I* are also used in this case with respect to the same defendants. (Compare *Refco I,* 2007 WL 1280649, at *25-*33, with Compl. ¶¶ 160-188.) It may be helpful to all parties for plaintiffs to replead their claims with the benefit of the standards and analysis set forth in those opinions, because each side will be better able to frame its arguments if it does so with an awareness of the standards the Court will apply.

**\*13** Accordingly, leave to replead will be granted as to the defendants other than those as to whom plaintiffs' claims have been abandoned.

## CONCLUSION

For the foregoing reasons, the joint motion to dismiss by defendants Tone N. Grant, Joseph J. Murphy, William M. Sexton, Gerald M. Sherer, Philip Silverman, and Robert C. Trosten (Doc. # 46), and the motions to dismiss by defendants William M. Sexton (Doc. # 49), Joseph J. Murphy and Gerald M. Sherer (Doc. # 54), Grant Thornton, L.L.P. (Doc. # 57), Phillip R. Bennett (Doc. # 59), the THL Defendants (Doc. # 62), and Phillip Silverman (Doc. # 68) are granted.

Leave to replead is granted as to all defendants except defendants Silverman, Sexton, Murphy and Sherer. Accordingly, the Clerk of the Court is respectfully directed to mark the case closed as to

those defendants.

Plaintiffs are directed to advise the Court by October 8, 2007, as to whether they intend to file an amended complaint. If so, the parties (with the exception of those defendants finally dismissed from the case) are directed to meet and confer regarding a schedule for the filing of an amended complaint and subsequent motions to dismiss, and submit a stipulated schedule, or competing proposed schedules, to the Court by October 22, 2007.

SO ORDERED.

S.D.N.Y.,2007.
In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation
Slip Copy, 2007 WL 2694469 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

Ryan v. Hunton & Williams
E.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.
Peter F. RYAN, PRD Corp., Dale W. Ryan, PDR
Holdings, Inc., PDR Corp. Defined Benefit Plan &
Trust, Ryan Realty Trust, Loperena Trust, Jaquith
Holdings, Inc., Peter F. Ryan Irrevocable Trust,
Research & Finance Corp., Glen Guillet, DOIT
Corp., Zayin Investments, Ltd., Beny Primm, RPE
Management, Inc., Daniel Langer, Jay Sicklen,
Mykerinus Holdings, Inc., and Charles Schmidt,
Plaintiffs,
v.
HUNTON & WILLIAMS, Scott J. McKay Wolas,
Franklin H. Stone, Christopher M. Mason, Kathy
McClesky Robb, Jerry E. Whitson, Tardino &
Tardino, Victor J. Tardino, Jr., Victor J. Tardino, Sr.,
Crystal Waters, N.V., Crystal Distributors, L.P.,
Crystal Distributors, L.P. II, Chase Manhattan Bank
f/k/a Chemical Bank, Fleet Bank f/k/a National
Westminster Bank, and Gregory Wolas, Defendants.
**No. 99-CV-5938 (JG).**

Sept. 20, 2000.

Sigmund S. Wissner-Gross, Esq., Heller, Horowitz &
Feit, P.C., New York, for Plaintiffs.
Andrew R. Kosloff, Esq., The Chase Manhattan Bank
Legal Department, New York, for Defendant Chase
Manhattan Bank.

MEMORANDUM AND ORDER

GLEESON, District J.
**\*1** The plaintiffs initiated this action to recover for
injuries they sustained as a result of their investment
in a "Ponzi" scheme operated by Scott J. McCay
Wolas ("Wolas"), a partner at the New York office of
Hunton & Williams ("H & W"). Defendant Chase
Manhattan Bank ("Chase") has moved to dismiss the
claims against it for failure to state a claim upon
which relief can be granted and for failure to plead
fraud with particularity pursuant to Rules 12(b)(6)
and Rule 9(b) of the Federal Rules of Civil
Procedure. For the following reasons, the motion is
granted.

BACKGROUND

The following factual background is based on the
allegations contained in the plaintiffs' complaint,
which are assumed to be true for the purposes of this
motion.

From 1989 to 1995, Wolas ran a "Ponzi" scheme. He
induced the plaintiffs and others to invest with him
by misrepresenting that their investments would be
used to purchase large shipments of Scotch whiskey
in Scotland for resale in the Orient. In fact, there
were no such purchases; instead, Wolas used the
funds to pay prior "investors" and for other unknown
purposes. In 1995, Wolas absconded, and his
whereabouts are still unknown. (*See* Compl. ¶ 1.)

In 1994 Chemical Bank [FN1] ("Chemical") was on
notice of various of "red flags" that indicated
fraudulent conduct by Wolas and/or those with whom
he was associated. For example, in May 1994, John
Dolan, a cohort of Wolas, tried to open an account at
Chemical in the name of SEV Enterprises, Inc.
("SEV"). Chemical, however, declined to open the
account because Patrick J. Connor, of Chemical's in-
house fraud investigative unit, suspected that SEV
was probably running an "advance fee scam." (*Id.* ¶¶
111-12.)Then, on June 29, 1994, a lawyer
representing a former associate at H & W contacted
Mark E. Segal, Assistant General Counsel of
Chemical, and informed him that Wolas fraudulently
overbilled Manufacturers Hanover Trust, Chemical's
predecessor, for work done on a litigation matter.
Later that year, Chemical shut down accounts
maintained by Wolas and Albert H. Wolas, Inc., a
family business owned by Wolas's father and brother,
after a $950,000 check to Wolas, drawn on one of the
business accounts, bounced. (*See id.* ¶¶ 113-14.)

> FN1. Chemical Bank has since merged with
> Defendant Chase Manhattan Bank.

On March 16, 1995, just three months before the
"Ponzi" scheme collapsed, Dolan opened a primary
account in the name of SEV and Wolas opened a sub-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

account (to the SEV account) at a Chemical branch on Third Avenue in Manhattan. Although the sub-account was an attorney escrow account, Wolas authorized Dolan, a non-lawyer, to have signing authority over the sub-account. Wolas and/or Dolan further informed Chemical in-house counsel Manuel Gottlieb that the sub-account was an attorney escrow account and that all of the money passing through the sub-account was escrow money. (*See id.* ¶¶ 110, 115-16.)

From the accounts' inception, branch officer Kevin O'Dea suspected that they were a vehicle for fraudulent activity and immediately referred them to Chemical's in-house fraud investigative unit. On May 2, 1995, an employee of the fraud unit notified O'Dea and Gottlieb of the unit's concerns one year earlier when Dolan tried to open an account in the name of SEV, and urged that Chemical immediately shut down the primary and subaccounts. Then, on May 5, 1995, O'Dea notified Dolan and SEV that the accounts had to be closed by June 5, 1995, one month later.[FN2] (*See id.* ¶¶ 115, 117-18.)

> **FN2.** On May 30, 1995, a grand jury in the Southern District of Texas issued a subpoena, in part, to one of the two SEV sub-accounts. This subpoena was faxed to in-house counsel Gottlieb on June 1, 1995. (*See* Compl. ¶ 124.)

A. *The Account Activity*

**\*2** In April and May of 1995, O'Dea and his assistant signed or approved bank checks and transfers out of Wolas's sub-account and into the SEV primary account. Specifically, O'Dea effected the following transactions:

(i) Beginning on April 27, 1995, O'Dea personally signed bank checks drawn on the Wolas sub-account;

(ii) On April 25, 1995, O'Dea personally approved the internal transfer of $1 million of investor funds from the sub-account to the SEV primary account, and such transfer occurred on April 27, 1995; and

(iii) On May 2, 1995, O'Dea's assistant approved the transfer of $1.6 million from the sub-account to the SEV primary account.

(*See* Compl. ¶ 119.)

Then, on April 27, 1995, O'Dea personally approved the issuance of two Chemical checks drawn on the SEV primary account, each in the amount of $100,000, and certified another SEV primary account check, in the amount of $28,459. Several days later, O'Dea approved a May 2, 1995, certified check for $200,000 drawn on the SEV primary account. This check was immediately altered to indicate that it was drawn on the sub-account. By no later than May 10, 1995, O'Dea knew that this certified check had been altered, and relied on this information in insisting that the accounts be closed. (*See id.* ¶ 120.)

By May 2, 1995, O'Dea was also aware that $10 million was to be wired into another SEV sub-account at Chemical. (*See id.* ¶ 121 .)O'Dea (and/or another Chemical employee or officer) specifically approved multiple wire transfers that resulted in the theft of investor funds. For example, O'Dea approved the following transactions:

(i) the May 2, 1995, wire transfer of $50,000 from the SEV primary account to Kehle & Co., Inc. in Florida;

(ii) the May 4, 1995, wire transfer of $40,000 to a "Keeco" entity in Washington;

(iii) the May 4, 1995, wire transfer of $50,000 for credit to Warley, Inc.;

(iv) the May 4, 1995, wire transfer of $7,500 to Jim Roma in Washington, with "special instructions" from "F. Kelly," which O'Dea knew was false and fraudulent since the funds did not come from F. Kelly;

(v) the May 12, 1995, wire transfer of $10,000 to "David J. Friednbach" in Oregon; and

(vi) the May 12, 1995, wire transfer of $500,000 to "Jack Vita, Esq. Client Trust Account," with "special instructions" from "Warley, Inc.," which O'Dea knew was false and fraudulent since the funds did not come from Warley, Inc.

(*See id.* ¶ 122.)

Not Reported in F.Supp.2d                                                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

## B. *The Relevant Plaintiffs*

### 1. *DOIT Corp.*

O'Dea was aware that several million dollars had been wired from the Florida Cordova Law Center ("Cordova"), in April and May 1995, to the Wolas sub-account at Chemical. However, neither O'Dea nor anyone else at Chemical contacted Cordova regarding the purpose of those transfers or alerted it of Chemical's concerns. On May 16, 1995, Plaintiff DOIT Corp. ("DOIT") deposited $500,000 in escrow with the Cordova, with the expectation that the funds would then be transferred to the Wolas sub-account at Chemical. DOIT was never advised that Chemical had already taken steps to shut down the sub-account. (*See id.* ¶ 125.)

### 2. *Research & Finance Corp.*

**\*3** In late May 1995, the Chairman of the Research & Finance Corp. ("RFIN"), who maintained personal accounts at Chemical, contacted Chemical's Private Banking Group to confirm the status of what he believed was an H & W Client Funds account before he transferred $500,000 out of his personal account on behalf of RFIN to that account. The Chairman was advised that the H & W Client Funds account was in good standing, but was not told, among other things, (i) that the escrow account was a sub-account of SEV; (ii) that the sub-account was Wolas's and that H & W did not maintain the firm's principal attorney escrow account at Chemical; (iii) that Chemical had notified Wolas and SEV in early May 1995 to close the primary and subaccounts; and (iv) that Chemical believed that primary and subaccounts were being used for fraudulent purposes. (*See id.* ¶ 126.)

On June 29, 1995, pursuant to H & W's instructions, RFIN's accountant attempted to transfer $500,000 on RFIN's behalf to the Wolas sub-account at Chemical, believing it to be an escrow account maintained by H & W. As the SEV account and Wolas sub-account had already been closed at that point, the transfer did not go through. Chemical did not disclose to RFIN, however, why the Wolas sub-account had been closed. Believing it to be an administrative matter and that H & W had moved its escrow account to another bank, RFIN transferred the funds on July 13, 1995, to an account at National Westminster Bank ("Nat West"), now known as Fleet Bank, maintained by Wolas. (*See id.* ¶ 127.)

## C. *This Action*

On September 24, 1999, various investors in Wolas's "Ponzi" scheme commenced this action for damages against H & W, Wolas, and other defendants for violations of the Securities Exchange Act of 1934, the Racketeering Influenced and Corrupt Organization Act, and New York common law. Relevant to the motion before me now are the claims by DOIT and RFIC (formerly Chemical) for fraud, aiding and abetting fraud, and commercial bad faith.[FN3] Chase has moved to dismiss these claims for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity, pursuant to Rules 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.

> FN3. Although Plaintiff Glen Guillet originally asserted these claims against Chase as well, I was informed at oral argument on May 26, 2000, that Guillet's claims had been settled.

## DISCUSSION

### A. *The* Rule 12(b)(6) *Standard*

In a 12(b)(6) motion, a federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The inquiry focuses not on whether a plaintiff might ultimately prevail on her claim, but on whether she is entitled to offer evidence in support of the allegations in the complaint. *See id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* Rule 12(b)(6) warrants a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59 (2d Cir.1997). In considering a defendant's motion, the Court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton,* 128 F.3d at 59 (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740 (1976)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

B. *Common Law Fraud*

**\*4** Chase contends that RFIN's fraud or fraudulent concealment claims must be dismissed because it has failed to allege the elements of the claims and sufficient facts to give rise to a strong inference of fraudulent intent under Rule 9(b).[FN4]

> FN4. DOIT has abandoned its fraud claim against Chase. (*See* Pls.' Mem. of Law in Opp'n at 3 n. 2.)

To state a claim of common law fraud under New York law, plaintiff must establish, by clear and convincing evidence, that (i) the defendant made a material misrepresentation; (ii) with knowledge of its falsity; (iii) with the intent to defraud the plaintiff; (iv) on which the plaintiff reasonably relied; and (v) that caused damage to the plaintiff as a result. *See Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997); *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995).

1. *Proximate Cause*

RFIN alleges that Chemical made a material false misrepresentation when it represented to RFIN's Chairman that the Wolas sub-account was in good standing. It further alleges that it reasonably relied on this representation and suffered at least $500,000 in damages when its investment was later misappropriated by Wolas from his account at NatWest. In response, Chase contends that RFIN has failed to establish that Chemical's statement was the proximate cause of RFIN's injury. I agree.

"The absence of adequate causation is ... fatal to a common law fraud claim under New York law."*Bennett v. United States Trust Co.,* 770 F.2d 308, 316 (2d Cir.1985). A plaintiff may establish proximate cause if an injury "is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud."' *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1496 (2d Cir.1992) (quoting *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.1986))."The requisite causation is

established only where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes."*Revak v. SEC Realty Corp.,* 18 F.3d 81, 89-90 (2d Cir.1994) (citing *Bennett,* 770 F.2d at 316).

In *Bennett,* the plaintiffs used the proceeds of a series of loans from the defendant bank to purchase public utility stock and then deposited the stock with the bank as collateral for the loans. *See* 770 F.2d at 310. In negotiating the loans, the bank misrepresented to the plaintiffs that the Federal Reserve's margin rules do not apply when public utility stock is deposited as collateral. The stock subsequently generated insufficient dividends to cover the interest, and its market value decreased. Thus, in addition to the plaintiffs' loss of the equity itself, they owed the bank the outstanding interest and principal in excess of the stock's depreciated value. *See id.*The district court dismissed the plaintiffs' common law fraud claim for lack of causation and the Second Circuit affirmed, concluding that the plaintiffs had only alleged "but for" causation, *i.e.,* that they would not have purchased the stock if the bank had denied the loans. *See id.* at 314-16.Noting that the plaintiffs' common law fraud and securities fraud claims were equally flawed, the court stated that there was "simply no direct or proximate relationship between the loss and the misrepresentation."*Id.* at 314, 316.The court emphasized that the plaintiffs approached the bank for a loan with the plan to purchase the public utility stock; the bank recommended neither public utility stock in general, that stock in particular, nor the investment value of any such stock. *See id.* at 313-14.Accordingly, the court concluded that the "loss at issue was caused by the [plaintiffs'] own unwise investment decisions, not by [the bank's] misrepresentation." *Id.* at 314.

**\*5** RFIN's fraud claim fails for precisely the same reasons. RFIN approached Chemical with the intention of investing in Wolas's whiskey scheme. Indeed, RFIN's Chairman contacted Chemical's Private Banking Group only to confirm the status of Wolas's account at Chemical prior to directing the transfer of $500,000 into the account. (*See* Compl. ¶ 126.) At that time, the Chairman was told that Wolas's account was in good standing. (*See id.*)Although RFIN insists that it would not have invested with Wolas (by depositing $500,000 in his account at Nat West after learning that the Chemical

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 5
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

account was closed) if the Chemical officer had not made that representation or had told RFIN's Chairman of Chemical's concerns about the Wolas sub-account, these allegations at most establish "but for" causation. Simply put, the direct and proximate cause of RFIN's loss was Wolas's fraud, not Chemical's representation about the status of the Wolas sub-account.

### 2. *Duty to Disclose*

In addition, RFIN asserts that it has a claim of fraudulent concealment based on Chemical's failure to disclose to RFIN's Chairman that (i) Chemical had notified Wolas and SEV that it would close the accounts as of June 5, 1995; (ii) Chemical suspected fraudulent activity in the accounts; (iii) H & W did not maintain an escrow account at Chemical; and (iv) Wolas's escrow account was a sub-account of the SEV account.

To establish a claim of fraudulent concealment under New York law, the plaintiff must prove the aforementioned elements of common law fraud *and* that "the defendant had a duty to disclose the material information."*Banque Arabe,* 57 F.3d at 153. A duty to disclose may arise in two circumstances: (i) "where the parties enjoy a fiduciary relationship" and (ii) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984).

RFIN claims that Chemical's duty to disclose arose from its superior information about the status of the Wolas sub-account. It argues that such information was not readily available to RFIN, and that Chemical knew that RFIN was acting, or attempting to act, on the basis of mistaken knowledge when RFIN attempted to transfer $500,000 to the account after it was closed.

As an initial matter, I question whether RFIN may bring a fraudulent concealment claim against Chase since such a claim "ordinarily arises only in the context of business negotiations where parties are entering a contract."*Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,* No. 89 Civ. 2809(BSJ), 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996); *see also Renner v.*

*Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 2000 WL 781081, at *9 n. 5 (S.D.N.Y. June 14, 2000) (questioning in *dicta* whether defendant bank had duty to disclose where plaintiff neither conducted business nor negotiated contracts with bank or bank employee); *Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), 1998 WL 397887, at *8 (S.D .N.Y. July 15, 1998) (questioning in *dicta* whether insurance company receiver had standing to bring fraudulent concealment claim where defendant bank and insurance company "never stood on opposite sides of the same transaction").

**\*6** However, even if RFIN can state a fraudulent concealment claim in these circumstances, it has not done so. Chase cannot properly be held accountable for failing to disclose information about the Wolas's sub-account to RFIN. "[A] bank should keep its own customers' affairs confidential."*Aaron Ferer,* 731 F.2d at 123 (citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,*411 N.Y.S.2d 756 (4th Dep't 1978)); *see also Graney,* 400 N.Y.S.2d at 719 ("It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account.") (internal quotation marks and citations omitted); *Renner,* 2000 WL 781081, at *9 (citing *Aaron Ferer* and *Graney* and noting that bank officer had no duty to respond to plaintiff's letters inquiring about bank customers); *cf. Young v. United States Dep't of Justice,* 882 F.2d 633, 640-43 (2d Cir.1989) (encouraging New York courts to recognize duty of confidentiality between bank and customer). Thus, Chemical had no duty to volunteer to RFIN additional information about the alleged suspicious activity in the Wolas sub-account.

Finally, even if Chemical was obligated to disclose this additional information, there is no indication that Chemical knew that RFIN was acting on the basis of mistaken knowledge concerning the financial transaction between Wolas and RFIN. According to the plaintiff's allegations, Chemical knew only that RFIN inquired about the sub-account and attempted to transfer funds to the account after it had been closed. This attempted transfer does not support an inference that RFIN was acting on its mistaken information that Wolas was not engaging in fraud. For all Chemical knew, assuming Chemical knew of the scheme at all, RFIN was a cohort of Wolas, not a potential defrauded investor. Accordingly, RFIN has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

not stated claim for fraudulent concealment.[FN5]

> [FN5.] RFIN's fraudulent concealment claim also fails due to the absence of proximate cause. *See supra.*

### 3. Intent to Defraud Under *Rule 9(b)*

Lastly, RFIN's fraud claim must also be dismissed for the failure to plead Chemical's intent to defraud with the requisite particularity to satisfy *Rule 9(b) of the Federal Rules of Civil Procedure. Rule9(b)* provides, in pertinent part, that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."*Fed.R.Civ.P. 9(b).* The rule is designed to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."*Acito v. Imcera Group, Inc., 47 F.3d 47, 52 (2d Cir.1995)* (quoting *O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991))* (internal quotation marks omitted). Allegations of fraud, therefore, must be specific enough to provide a defendant with "a reasonable opportunity to answer the complaint and ... adequate information to frame a response."*Ross v. A.H. Robins Co., 607 F.2d 545, 557-58 (2d Cir.1979).*

**\*7** Four essential requirements comprise *Rule 9(b).* A plaintiff must (i) " 'specify the statements that the plaintiff contends were fraudulent' "; (ii) " 'identify the speaker' "; (iii) " 'state where and when the statements were made' "; and (iv) " 'explain why the statements were fraudulent." ' *Acito, 47 F.3d at 51* (quoting *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)).* Although a plaintiff need not plead detailed evidentiary matters, *see Credit & Fin. Corp. v. Warner & Swasey Co., 638 F.2d 563, 566 (2d Cir.1981)*, it must plead "facts that give rise to a strong inference of fraudulent intent," *see Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994).* This inference may be established either (i) "by alleging facts to show that defendants had both motive and opportunity to commit fraud," or (ii) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

RFIN concedes that it does not rely on evidence of motive and opportunity to commit fraud to satisfy its burden under *Rule 9(b).* Accordingly, I will restrict my analysis to whether RFIN's allegations establish circumstantial evidence of recklessness to give rise to the requisite inference of fraudulent intent.

Recklessness is established by conduct which is " 'highly unreasonable and which represents an extreme departure from the standard of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ' *Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir.1996)* (quoting *Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir.1978))* (alteration in *Rolf* ). In some instances, an inference of recklessness may be raised by " '[a]n egregious refusal to see the obvious, or to investigate the doubtful." ' *Id.* (quoting *Goldman v. McMahan, Brafman, Morgan & Co., 706 F.Supp. 256, 259 (S.D.N.Y.1989)).* Nonetheless, the plaintiff bears a "significant burden ... in stating a fraud claim based on recklessness." *Id. at 270.*

Here, RFIN has failed to allege facts that constitute strong circumstantial evidence of recklessness. First, in March 1995, when the accounts were opened, Chemical had no actual knowledge that Dolan and Wolas had previously engaged in fraudulent activity. Rather, Chemical's officer, Bruce Whitcomb, had been "suspicious" of fraud in 1994, and had referred the matter to the fraud unit, which had concluded that it was "probably an advance fee scam." (Compl.¶ 112.) Likewise, neither the anonymous report to Chemical's Assistant General Counsel, Mark Segall, that Wolas had fraudulently overbilled Chemical's predecessor on a litigation matter nor the allegation that Chemical closed down a Wolas family business account due to a bounced check (both of which occurred in 1994) establishes that Chemical knew Wolas was engaged in fraud in 1995. (*See* Com pl. ¶¶ 113-14.) Thus, these allegations do not give rise to any inference of Chemical's fraudulent intent.

**\*8** Second, the allegations that Chemical's branch officer, Kevin O'Dea, approved various internal transfers between the SEV account and the sub-account, (*see* Compl. ¶¶ 119-20), similarly do not satisfy *Rule 9(b)*'s requirement. *See Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), *1997 WL 289865, at *3 (S.D.N.Y. May 30, 1997)* (mere

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

transfer of funds between accounts was insufficient to raise inference of knowledge of check-kiting scheme to satisfy Rule 9(b) or Rule 12(b)(6) for claim of fraudulent concealment).

Third, as soon as Chemical's fraud investigative unit alerted O'Dea of the prior suspected advance fee scam and urged that Chemical shut down the accounts, O'Dea notified Dolan that the SEV account and the Wolas sub-account would be closed in one month. (*See* Compl. ¶¶ 117-18.) Although Chemical may have shown greater vigilance by closing the accounts immediately, rather than continuing to approve transfers and bank checks until the accounts were closed one month later, this failing does not establish recklessness sufficient to raise a strong inference of Chemical's intent to defraud RFIN. *See Chill*, 101 F.3d at 269;*see also Renner, 2000 WL 781081, at *14* (bank's failure to detect fraud sooner insufficient to satisfy Rule 9(b) burden of pleading fraudulent intent for aiding and abetting fraud claim); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960(MBM), 1999 WL 558141,* at *7-*8 (S.D.N.Y. July 30, 1999) (bank's negligent failure to investigate several red flags and to prevent additional wire transfers after second fraudulent transfer uncovered by transferring bank did not give rise to strong inference of fraudulent intent to satisfy Rule 9(b) for claims of commercial bad faith and aiding and abetting fraud).

Finally, in light of the aforementioned case law concerning the confidential nature of bank customer information, Chemical's failure to provide information to RFIN about Wolas's sub-account beyond the representation that it was in good standing cannot give rise to an inference of an intent to defraud.

In sum, RFIN has failed its significant pleading burden. Its allegations do not raise any inference, let alone a strong inference, of an intent to defraud. Accordingly, RFIN's fraud and fraudulent concealment claims must be dismissed.

## C. *Aiding and Abetting Fraud*

To establish a claim of aiding and abetting fraud under New York law, a plaintiff must establish (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong. *See Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir.1983).* Chase contends, and I agree, that RFIN and DOIT have failed to allege either Chemical's knowledge of Wolas's fraud or that Chemical substantially assisted in the commission of the fraud.

### 1. *Actual Knowledge*

New York law requires a plaintiff to establish that the alleged aider and abettor had " 'actual knowledge' " of the primary wrong. *Renner, 2000 WL 781081, at *6* (quoting *Kolbeck v. LIT Am., Inc ., 939 F.Supp. 240, 246 (S.D.N.Y.1996)); see also Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir.2000)* (stating that "knowledge of the underlying wrong" is "required element" under New York law).

**\*9** Here, the plaintiffs have failed to allege that Chemical had actual knowledge of Wolas's fraud. As explained *supra*, the allegations that Chemical suspected that Dolan and SEV were running an advance fee scam in 1994, (*see* Compl. ¶ 112), that Wolas allegedly overbilled Chemical's predecessor in connection with litigation, (*see id.* ¶ 113), and that Chemical shut down a Wolas family account in 1994 due to a bounced check, (*see id.* ¶ 114), do not establish that Chemical had actual knowledge of Wolas's fraudulent scheme in 1995.

Turning to the allegations in 1995, O'Dea requested Chemical's fraud investigation unit to review the SEV account and the Wolas sub-account based on suspicions-not actual knowledge-of fraudulent activity. (*See id.* ¶ 115, 117.)Subsequently, upon receiving the recommendation of the fraud unit that the accounts be closed, O'Dea informed Dolan that Chemical would close the accounts in one month. (*See id.* ¶ 117-18.)Allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud.[FN6]

> FN6. This case is closely analogous to Judge Haight's opinion in *Renner, 2000 WL 781081.* In that case, the plaintiff alleged that Chase aided and abetted a prime bank guarantee scam. The allegation of actual knowledge on the part of Chase was based on, *inter alia,* its officials' rejection of a letter of credit proposal based on their

Not Reported in F.Supp.2d                                                                                     Page 8
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

suspicion that the letters were potential vehicles for fraud. *See id.* at *12. The court rejected this argument, however, and concluded that there was "no factual basis for the assertion that Chase officials actually knew the fraud [they suspected] was, in fact, occurring."*Id.*

Finally, O'Dea's authorization of transfers between the SEV account and the sub-account, (*see id.* ¶ 119), and his approval of multiple wire transfers, (*see id.* ¶ 122), do not create an inference of knowledge of the scheme. In *Williams,* 1997 WL 289865, a statutory receiver for an insurance company brought an action for, *inter alia,* aiding and abetting fraud, and alleged that the defendant bank had actual knowledge of a check-kiting scheme where the bank had approved various bank transfers. *See id.* at *4. The court rejected this argument, concluding that the account transfers and other allegations established only constructive knowledge on the part of the bank, which is insufficient to state a claim for aiding and abetting fraud. *See id.*Similarly, in this case, the plaintiffs have failed to establish that Chemical had any actual knowledge of Wolas's fraud, and thus, their aiding and abetting fraud claim must be dismissed.[FN7]

> FN7. The plaintiffs' remaining allegations, that Chemical improperly permitted Dolan, a non-lawyer, to be a signatory on the Wolas's attorney escrow account, (*see* Compl. ¶ 116), that Chemical knew that a check drawn on the SEV account had been altered to reflect that it was issued from the Wolas sub-account, (*see id.* ¶ 120), and that Chemical knew that H & W did not maintain a firm escrow account at Chemical, (*see id.* ¶ 123), do not establish that Chemical knew of Wolas's fraud. These allegations only support a finding that Chemical had constructive notice of the fraud.

### 2. *Substantial Assistance*

The second element of an aiding and abetting fraud claim is substantial assistance. "A defendant provides substantial assistance only if it 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed.' ' *Nigerian Nat'l,* 1999 WL 558141, at *8 (quoting

*Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992)) (alteration in *Nigerian Nat'l* ).

Again, the plaintiffs have failed to allege that Chemical substantially assisted Wolas's fraud. The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance. In *Williams,* the court considered whether the use of bank accounts by the participants in the fraudulent scheme constituted substantial assistance by the bank in the participants' fraud. *See*1997 WL 289865, at *4. Rejecting the claim, the court held that "the mere fact that all the participants in the alleged scheme used accounts at [the bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability."*Id.; see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's execution of repeated wire transfers for millions of dollars did not constitute substantial assistance for an aiding and abetting fraud claim); *Renner,* 2000 WL 781081, at *12 (Chase did not give substantial assistance to participants of prime bank guarantee scam simply because participants used accounts at Chase).

**\*10** Turning to the plaintiffs' allegations of Chemical's inaction, *e.g.,* failing to shut down the accounts sooner or to inform the plaintiffs about the suspected fraud, these omissions likewise do not rise to the level of substantial assistance. As previously stated, a defendant may provide substantial assistance by failing to act only when it was required to act. *See Nigerian Nat'l,* 1999 WL 558141, at *8. Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability. *See King v. George Schonberg & Co.,* 650 N .Y.S.2d 107, 108 (1st Dep't 1996); *see also Renner,* 2000 WL 781081, at *12 ("[A]bsent a fiduciary duty, inaction does not constitute substantial assistance."). Here, the plaintiffs and Chemical do not have a fiduciary relationship. The relationship between a bank and its depositor is not a fiduciary one, but only that of a debtor and creditor. *See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984). Thus, RFIN or RFIN's Chairman, who had an account at Chemical's Private Banking Group, did

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

not have a fiduciary relationship with Chemical. DOIT is not even a client of Chemical. Moreover, even assuming that RFIN had a confidential relationship with Chemical by virtue of its status as a customer, *see id.* at 123 ("[A] bank should keep its own customers' affairs confidential."(citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,* 411 N.Y.S.2d 756 (4th Dep't 1978))), Chemical was under no obligation to disclose confidential information about Wolas, another customer. The plaintiffs, therefore, have failed to establish that Chemical substantially assisted in Wolas's fraud. Accordingly, their aiding and abetting fraud claim must be dismissed.

D. *Commercial Bad Faith*

A claim for commercial bad faith against a depository bank will lie if the "bank acts dishonestly-where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme." *Prudential-Bache Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 275 (1989). Thus, "knowledge of the underlying wrong" is a "required element" of commercial bad faith under New York law. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000).

As I have already concluded that the complaint fails adequately to allege that Chemical had actual knowledge of Wolas's fraud, the plaintiffs' claim for commercial bad faith must also be dismissed. At most, the plaintiffs have alleged that Chemical negligently failed to monitor the accounts adequately and close them promptly. However, pleading " 'merely a lapse of wary vigilance or even suspicious circumstances which might well have induced a prudent banker to investigate" ' is insufficient to state a claim of commercial bad faith. *Renner,* 2000 WL 781081, at *17 (quoting *Prudential-Bache,* 73 N.Y.2d at 275);*see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's alleged failure to investigate "red flags" and negligent approval of additional wire transfers, even after bank was alerted to fraudulent transfer, insufficient to state commercial bad faith claim).

**\*11** The plaintiffs' reliance on *Prudential-Bache,* 73 N.Y. 263, and *Peck v. Chase Manhattan Bank, N.A.,* 593 N.Y.S. 509 (1st Dep't 1993), to support their contention that Chemical had actual knowledge of Wolas's fraud is unpersuasive. Indeed, these cases support Chase's position. In *Prudential-Bache,* two bank officers were convicted of accepting bribes in connection with participation in a fraudulent scheme. The bank officers set up accounts without proper opening records and corporate resolutions, and with fictitious corporate officers, and also agreed not to prepare certain records required to be filed with the Internal Revenue Service. *See* 73 N.Y.2d at 267. To implement the embezzlement scheme, one of the co-conspirators cashed several checks on a single day and often left the branch with large quantities of cash or cashiers' checks. Furthermore, other bank employees, including managers, were also allegedly aware of the fraud due to a co-conspirator's frequent visits to the bank, his repeated large cash withdrawals at teller windows, and his conversations with other bank employees. *See id.* at 268.Although the bank argued that the conduct of its agents, the convicted officers, could not be imputed to it under the adverse agent doctrine, the New York Court of Appeals declined to decide that issue and held that the plaintiff had stated a commercial bad faith claim against the bank. *See id.* at 276-77.In *Peck,* the plaintiff alleged that an internal bank memorandum reflected that bank employees actually knew that checks payable to third parties were being deposited into the thief's account, but no action was taken. 593 N.Y.S.2d at 511. The trial court granted the bank's motion to dismiss, but the Appellate Division reversed, holding that the allegations of actual knowledge adequately stated a claim for commercial bad faith. *See id.*

Here, the plaintiffs' allegations fall short of these cases, which involved either active participation in the fraud by bank officials or actual knowledge on their part of the ongoing fraud, as they have failed to allege either on the part of Chemical. Accordingly, their commercial bad faith claim must be dismissed.

E. *Leave to Amend*

The plaintiffs argue, in the alternative, that if I grant Chase's motion I should give them leave to replead. I decline to do so.

A district court may deny leave to amend a complaint if the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962). As the plaintiffs drafted their complaint well after discovery had been

Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

taken in a related case, *see Accousti v. Wolas,* 95-CV-5267 (JG) (E.D.N.Y. filed Dec. 20, 1995), an opportunity to amend would be futile. *See Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (denial of leave to amend not abuse of discretion where plaintiff had "access to full discovery" in a related case).

### CONCLUSION

For the aforementioned reasons, Chase's motion to dismiss is granted.

**\*12** So Ordered.

E.D.N.Y.,2000.
Ryan v. Hunton & Williams
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.