# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| | § Case No. 05-60006 (RDD) |
| REFCO INC., *et al.*, | § |
| | § Jointly Administered |
| Debtors. | § |
| | § |

## <u>Final Report of Examiner</u>

JOSHUA R. HOCHBERG (JRH 9440)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, DC 20006-1108
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

*Court Appointed Examiner*

CHARLES E. CAMPBELL (CEC 6100)
ROBERT A. BARTLETT (RAB 0550)
MCKENNA LONG & ALDRIDGE LLP
Suite 5300, 303 Peachtree Street, NE
Atlanta, GA 30308
Telephone:  (404) 527-4000
Facsimile:  (404) 527-4198

*Counsel to the Examiner*

had borrowed from Refco, Inc.  Shortly after the losses were sustained, RGHI's wholly-owned

subsidiary, Wells, Ltd., purchased from Refco, Inc. approximately $71 million of the $97 million

debt that Niederhoffer owed Refco, Inc.[555]  Neidhardt said that the remainder of the loss was

recognized at the time.[556]  The remaining $71 million debt from Niederhoffer was "sold" to

RGHI at "face value" — *i.e.*, $71 million — a price that vastly exceeded fair market value.[557]

        According to Neidhardt, the transfer of the N Loss receivable to RGHI had no effect for

tax purposes, although it is not clear what he meant by this statement.  Neidhardt explained that

the loss could be carried forward unless the debt was deemed uncollectible/worthless.  Neidhardt

also explained that until the N Loss was completely worthless, or until part was impaired and a

loss was taken on the books, it could not be deducted.  Neidhardt also stated that if this loss

became worthless at RGHI, the deduction would revert back to a loss on Refco, Inc.'s books.[558]

---

[555] Neidhardt interview.  The only document evidencing this "sale" appears to be an "Assignment Agreement" dated October 28, 1997 purporting to assign and sell Refco, Inc.'s claims against Niederhoffer to Wells, Ltd.  *See* App. D-10.

[556] Neidhardt interview.

[557] Refco and E&Y fully understood that the fair market value of the Niederhoffer receivable that Refco, Inc. sold to RGHI was substantially less than the "face value" of the receivable.  Neidhardt interview.  Some of E&Y's records say that, for tax purposes, E&Y treated the lower fair market value of the Niederhoffer receivable as the value of the asset and the remainder that RGHI "paid" as a capital contribution.  *See* EY-REF 000192 (Dec. 8, 1997 memo to Neidhardt stating that N Loss receivable was treated this way).  *See also* EY-REF-023634 (Mar. 21, 2002 memo to Refco tax files, at footnote 1, stating that all of the bad debts comprising the RGHI Receivable were treated this way).  It is not clear whether these records are accurate, and Neidhardt was not sure whether the sales of receivables were treated in this manner.  Neidhardt interview.

        As Neidhardt explained the tax treatment of the N Loss further during his interview, he cast doubt on whether E&Y treated a portion of the amount "paid" by RGHI as a capital contribution.  Neidhardt said that E&Y treated the amount in excess of fair market value "not as equity" (*i.e.*, not as a capital contribution) so it was permissible for RGL to accrue interest income on the receivable.  Neidhardt also said that even if it was a promised capital contribution, it might be permissible to accrue interest on the obligation.  Neidhardt interview.  Cappel did not know one way or the other whether it would be permissible to accrue interest on a promised capital contribution of this sort.  Cappel interview.

[558] Neidhardt interview.  *See also* REFCO-HC-0299683.  Neidhardt stated that § 267(f) of the tax code provides that when a "legal sale" (an actual sale) occurs between related parties in which a receivable is sold at face value by a sub to the parent, the tax loss must be deferred until the receivable is worthless.  In the case of Refco, when the receivable became worthless at the parent (RGHI), it would be reflected as a loss at Refco, Inc.  Neidhardt further said that if no legal sale occurred, the movement of the receivable from sub to the parent (would be considered a

*(footnote continued on next page)*

According to Neidhardt, Refco told E&Y every year that the debt was not worthless for various reasons, including a pending lawsuit filed by Niederhoffer in which Niederhoffer claimed he might be able to recover some funds and pay back Refco.[559]

Neidhardt stated in his interview that he does not know why the N Loss receivable was moved to RGHI. He stated, however, that the movement of the receivable by Refco was not done for purposes of obtaining favorable tax treatment. Documents suggest that at one time, a stated objective was to move the N Loss to RGHI's tax return.[560]

### e. E&Y's Early Understanding of Refco's Objective of Selling the Company as a Whole

E&Y understood since before RGHI's conversion to an S corporation on January 1, 1997 that the goal of Refco's owners was to sell the entire S corporation. Indeed, all of E&Y's tax planning advice was apparently based upon Refco's representation that no sales of separate entities would occur since the goal was to sell the entire S corporation in the future.[561] E&Y understood that the RGHI Receivable would probably get paid upon a sale of the entire company.[562]

---

*(footnote continued from previous page)*

capital contribution by the parent to the sub in the amount of the sale price of the receivable in excess of fair market value. Neidhardt interview.

[559] Neidhardt interview.

[560] EY-REF 000153 (Nov. 6, 1997); EY-REF 002622 (objective in 1997 was to include the N Loss "in the [RGHI tax] return."). E&Y did a significant amount of work with respect to the N Loss. *See, e.g.*, EY-REF 000063; EY-REF 000199; EY-REF 000081; EY-REF-007021 (memoranda and materials dealing with N Loss tax planning).

[561] *See, e.g.*, EY-REF 001199 (May 27, 1999 Neidhardt memo to file, noting that "the goal was to sell the entire S Corp. in the future"); EY-REF 000420 (May 5, 1999 Neidhardt memo, at p.2, stating: "This is why we anticipated selling the entire RGHI entity as opposed to individual pieces or asset sales when we adopted S [corporation] status [on Jan. 1, 1997].").

[562] EY-REF 002123 (handwritten notes on Jan. 4, 1999 Neidhardt e-mail stating, "Will RCM get paid? Yes. probably upon sale of the company or right around then.").

only disagreed with the representations regarding tax liability issues, not representations

regarding financial statement issues.  However, this memo could also be interpreted as reflecting

E&Y's disagreement with the representation that there were no undisclosed liabilities on the

audited RGL financial statements, notwithstanding Neidhardt's statement to the contrary.  The

representation regarding undisclosed liabilities in Section 2.12 of the Purchase Agreement was

arguably false because the financial statements did not disclose the extent of the related-party

receivables.

### g.     Issues in 2000 and 2001 over Allocation of Refco Expenses

E&Y knew that Refco had a practice of allocating vaguely described expenses — often

dealing with computer expenses — to RGHI, but having RGL actually pay the expense and then

adding those expenses to the RGHI Receivable.  Refco justified this practice by pointing to a

RGHI Board of Directors resolution that authorized RGHI to guarantee and be responsible for

certain historical and continuing expenses incurred ostensibly for the benefit of RGHI.[567]  Refco

also justified this practice by claiming that these expenses were "erroneously" paid by RGL, but

were reclassified upon discovery of the error, resulting in these expenses being added to the

RGHI Receivable.[568]  E&Y apparently accepted Refco's explanation.

---

*(footnote continued from previous page)*

should inquire again and that Steve would give him a full description of the issues.") (emphasis added).  *See* EY-REF-005624-25; EY-REF-007743-66.

[567] *See* EY-REF-004463-64 (Oct. 10, 2000 letter from Trosten attaching May 12, 1999 Board Resolution).

[568] *See id.  See also* EY-REF-006430 (Sept. 28, 2000); EY-REF-006428; EY-REF-006429; EY-REF-024088; EY-REF-024472; EY-REF-006416 (computer expense); EY-REF-006414 (explanation of booking accounting of expenses); EY-REF-005202; EY-REF 001748.

h.    **E&Y Learns of an Inter-Company Receivable in an Amount Hundreds of Millions of Dollars in Excess of the Amount Reflected in Refco's Audited Financial Statements**

While working on Refco's tax returns in approximately September 2001, Cappel discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements.  Cappel explained that he learned of this by looking at Schedule L of a 2000 RGL draft tax return (which contains a calendar year-end balance sheet) and comparing it to an audited RGL financial statement dated February 28, 2001.  He noticed that one classification of RGL's assets (receivables owed to RGL) reflected on the Schedule L calendar year-end balance sheet was about $500 million greater than the balance reflected on the audited financial statement.[569]

Sometime after noticing the difference between the fiscal year-end asset receivable balance and the calendar year-end asset receivable balance, Cappel believes that he requested monthly tax trial balances to ensure that he had the correct year-end numbers.  He believes E&Y received the monthly tax trial balances, and they correctly tied into the calendar year-end balance.[570]

Neidhardt says that he did not learn about the large receivable in the $700 to $900 million range until Cappel informed him.[571]  Neidhardt was surprised when he learned about the large receivable and until he learned of it, he had thought that the receivable was in the $200 million

---

[569] In his interview, Neidhardt said that he thought Cappel had discovered the large receivable balance when Cappel was examining mid-year trial balances in connection with the proposed BAWAG transaction.  Neidhardt does not know the date of this, but thought it was prior to September 2001.  Neidhardt interview.

[570] Cappel interview.

[571] Neidhardt discussed a $700 million RGHI liability with Trosten on January 3, 2000.  *See* EY-REF-004958 (Jan. 3, 2000 Neidhardt memo documenting discussion with Trosten).  However, when shown the document memorializing this conversation, Neidhardt said it did not reflect his knowledge of a receivable in the amount of $700 million but rather it was just a "hypothetical" that Trosten was throwing around.  Neidhardt said that Trosten

*(footnote continued on next page)*

range based on what the financial statements reported.  Neidhardt said that after learning about the receivable, he spoke to Trosten and conveyed his surprise that the receivable was larger than what the financial statements disclosed.  According to Neidhardt, Trosten said, "You knew about it.  You saw the interest income and expense."[572]

Neidhardt said that E&Y tried to track the source of the large receivable but was unable to do so because Refco never provided E&Y detailed information regarding the receivable buildup.  He also said that there were significant other receivables and interest expenses from Refco's day-to-day activities on Refco's books.  Neidhardt never made detailed inquiry concerning the collectability of the RGHI Receivable.[573]

Although there are indications in the documents that E&Y understood the receivable to be in an amount anywhere from $720 million to over $1 billion,[574] it appears that E&Y ultimately determined that the receivable was $750 million as of spring 2002.[575]

### i.    E&Y's Knowledge that the RGHI Receivable Was a Sham Calculated to Improve the Financial Appearance of RGL

As recounted in their interviews, E&Y personnel had different understandings about the purpose of the RGHI Receivable.  Neidhardt stated that he viewed the assumption of the

---

*(footnote continued from previous page)*

threw around hypotheticals with regularity so he did not think anything of this particular hypothetical.  Neidhardt interview.

[572] Neidhardt interview.

[573] Neidhardt interview.

[574] For example, e-mails in August 2001, EY-REF-004941-44, at App. D-22, speak of a "hypothetical" scenario involving a "$900 receivable" owed by "S Corp" (presumably RGHI) to "LLC" (presumably RGL).  *See also* EY-REF-025950 dated Aug. 8, 2001 ("S Corp owes $900 to LLC");  Nov. 7, 2001 e-mail from Cappel to Stern mentioning that $900 million "utilized to pay down the RGHI payable to RGL." EY-REF-025655; EY-REF-004922 dated 9/13/01 ("Please assume that RGHI has nothing in it but a liability to RGL of $1,072 mm.").  Cappel, however, said that these documents reflected hypotheticals that Trosten posited and did not reflect Cappel's understanding of the precise amount of the RGHI Receivable.  Cappel interview.

[575] A draft memo dated February 28, 2002, EY-REF-023764-70, refers to the RGHI receivable as $750 million.

E&Y delivered a variety of tax services to Refco, including preparation of tax returns and consultation services. The last tax return prepared by E&Y was prepared in 2003 for the 2002 calendar year. E&Y appears to have continued to provide various tax related services through the end of 2004.[671] Many of E&Y's acts and omissions which form the factual bases for the claims discussed above, such as the failure to amend various tax returns known by E&Y to contain false information, appear to have occurred within two years prior to the Petition Date. Accordingly, Refco's estate may argue that the claims discussed above are not barred by the respective statutes of limitation until the later of the running of the applicable limitations period as outlined above, the date of the services complained of or two years from the date the statute of limitations is tolled under Section 108 of the Bankruptcy Code.

### d.    Fraud, Negligent Misrepresentation, or Breach of Fiduciary Duty

The Examiner concludes that there is insufficient evidence to allow the Refco estate to state a claim upon which relief could be granted for fraud, negligent misrepresentation, or breach of fiduciary duty.

### B.    LEVINE, JACOBS & COMPANY, L.L.C.

### 1.    Introduction and Background

Levine Jacobs is a small accounting firm that prepared the 2003 state and federal tax returns for RGL and RGHI.[672] In 2005, Levine Jacobs prepared the 2004 state and federal tax returns for RGHI, but was not engaged to prepare the 2004 tax returns for RGL.[673] Levine

---

[671] As noted above, E&Y stated that it resigned from its representation of Refco in late 2003; however, it appears that E&Y continued to provide various services through at least December 2004.

[672] *See* LJC 04000.

[673] *See* LJC 03247.

similar audit for the city of Chicago.[679]  Levine Jacobs filed the federal returns in approximately

September 2004.[680]

When Levine Jacobs started its tax preparation work in 2004, E&Y provided Levine

Jacobs with Fast-Tax locator numbers[681] at Refco's request so that Levine Jacobs could review

information related to the Refco returns.[682]  Levine Jacobs could view Refco's prior returns

through 2001 using the Fast-Tax locator numbers.[683]  However, Levine Jacobs could not view

anything else with the Fast-Tax locator numbers, including E&Y's work papers.[684]  Other than

the Fast-Tax locator numbers, E&Y only provided apportionment calculations and net operating

loss calculations to Levine Jacobs.[685]  Levine Jacobs did not have any substantive conversations

with E&Y personnel related to Refco or Refco's tax returns.[686]  In fact, Levine Jacobs' standard

practice when taking over accounting work and obtaining tax related information was to speak

with the client rather than a prior accounting firm.[687]

In 2005, Levine Jacobs' engagement continued.  RGHI retained Levine Jacobs to prepare

2004 federal and state tax returns for RGHI and Refco Securities, LLC.[688]  However, PwC was

retained to prepare RGL's 2004 federal return.[689]  Nonetheless, until the formal engagement

---

[679] *Id.* at 60:3-14.

[680] *Id.* at 61:2-7.

[681] Fast-Tax is a complex web-based program that a number of accounting firms use to assist in the preparation of tax returns.  A locator number allows a tax preparer to access tax return information.  *Id.* at 62:25-63:2.

[682] *See* 2/6/07 Levine Jacobs Interview Transcript at 62:12-63:17.

[683] *Id.* at 63:18-64:4.

[684] *Id.* at 63:18-64:7.

[685] *Id.* at 65:3-66:3.

[686] *Id.* at 66:4-67:1

[687] *Id.* at 66:14-67:1; 69:23-70:2.

[688] *See* LJC 03247; 2/6/07 Levine Jacobs Interview Transcript at 70:18-24; 73:6-15.

[689] *Id.* at 70:25-71:12.

letter with Levine Jacobs was executed in July 2005, Levine Jacobs performed substantial work on the RGL federal return during the first half of 2005 anticipating that it would be engaged to complete the return.[690]  Ultimately, at the request of Refco, Levine Jacobs transferred its work to PwC.[691]  Refco paid Levine Jacobs for the work it performed on the RGL return.[692]  As for the other returns Levine Jacobs was retained to prepare, Levine Jacobs filed the federal returns in approximately September 2005.[693]

Throughout this engagement, Levine Jacobs performed no auditing work, did not prepare or edit any financial statements, and, with the exception of the Illinois and Chicago sales tax audits, simply prepared tax returns and provided limited tax consulting advice regarding transactions.[694]  In addition, during the course of the engagement, Levine Jacobs never spoke with any of the other professionals providing services to Refco, with the exception of very limited communications with E&Y and/or PwC related solely to the transfer of Fast-Tax locator numbers or the transfer of other tax materials.[695]  Levine Jacobs did not have conversations with E&Y or PwC related to anything of substance concerning Refco.[696]  Over the course of Levine

---

[690] Id. at 71:4-72:7.

[691] Id. at 71:4-12; 72:22-73:1.

[692] Id. at 73:2-5.

[693] Id. at 77:10-13.  Levine Jacobs filed the state tax returns shortly after Refco filed for bankruptcy.  Id. at 77:10-17.

[694] Levine Jacobs' engagement letters contained no limitations of liability or indemnification provision.  However, the 2005 engagement letter, signed by Bennett, stated that Refco would provide information relating to the returns and Levine Jacobs would "not verify or audit this information."  See LJC 03247.

[695] See LJC 03247; 2/6/07 Levine Jacobs Interview Transcript at 84:17-85:8; 85:14-88:4.  As to contacts with Refco personnel, during Levine Jacobs' two year engagement, Levine Jacobs' primary contact at Refco was Silverman.  Id. at 49:16-21.  In addition to Silverman, however, Levine Jacobs worked with Trosten and Sean Galvin on certain occasions.  Id. at 49:16-25; 50:13-51:3.  Levine Jacobs also had limited conversations with Bennett, including two meetings and two or three phone conversations.  Id. at 51:4-53:5.

[696] 2/6/07 Levine Jacobs Interview Transcript at 62:12-63:17; 66:4-13; 86:7-89:4.

# EXHIBIT B



Financial Accounting Standards Board

# ORIGINAL PRONOUNCEMENTS

### AS AMENDED

## Statement of Financial Accounting Standards No. 109

Accounting for Income Taxes

Copyright © 2008 by Financial Accounting Standards Board. All rights reserved.
No part of this publication may be reproduced, stored in a retrieval system, or
transmitted. in any form or by any means, electronic, mechanical, photocopying,
recording, or otherwise, without the prior written permission of the Financial
Accounting Standards Board.

**FAS109**                    *FASB Statement of Standards*

b.  A deferred tax liability or asset is recognized for the estimated future tax effects attributable to **temporary differences** and carryforwards.

c.  The measurement of current and deferred tax liabilities and assets is based on provisions of the enacted tax law; the effects of future changes in tax laws or rates are not anticipated.

d.  The measurement of deferred tax assets is reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

9.  The only exceptions in applying those basic principles are that this Statement:

a.  Continues certain exceptions to the requirements for recognition of deferred taxes for the areas addressed by APB Opinion No. 23, *Accounting for Income Taxes—Special Areas,* as amended by this Statement (paragraphs 31–34)

b.  Provides special transitional procedures for temporary differences related to deposits in statutory reserve funds by U.S. steamship enterprises (paragraph 32)

c.  Does not amend accounting for leveraged leases as required by FASB Statement No. 13, *Accounting for Leases,* and FASB Interpretation No. 21, *Accounting for Leases in a Business Combination* (paragraphs 256–258)

d.  Prohibits recognition of a deferred tax liability or asset related to goodwill (or the portion thereof) for which amortization is not deductible for tax purposes (paragraph 30)

e.  Does not amend Accounting Research Bulletin No. 51, *Consolidated Financial Statements,* for income taxes paid on intercompany profits on assets remaining within the group, and prohibits recognition of a deferred tax asset for the difference between the tax basis of the assets in the buyer's tax jurisdiction and their cost as reported in the consolidated financial statements

f.  Prohibits recognition of a deferred tax liability or asset for differences related to assets and liabilities that, under FASB Statement No. 52, *Foreign Currency Translation,* are remeasured from the local currency into the functional currency using historical exchange rates and that result from (1) changes in exchange rates or (2) indexing for tax purposes.

*Temporary Differences*

10.  **Income taxes currently payable**[4] for a particular year usually include the tax consequences of most events that are recognized in the financial statements for that year. However, because tax laws and financial accounting standards differ in their recognition and measurement of assets, liabilities, equity, revenues, expenses, gains, and losses, differences arise between:

a.  The amount of taxable income and pretax financial income for a year

b.  The tax bases of assets or liabilities[4a] and their reported amounts in financial statements.

11.  An assumption inherent in an enterprise's statement of financial position prepared in accordance with generally accepted accounting principles is that the reported amounts of assets and liabilities will be recovered and settled, respectively. Based on that assumption, a difference between the tax basis of an asset or a liability and its reported amount in the statement of financial position will result in taxable or deductible amounts in some future year(s) when the reported amounts of assets are recovered and the reported amounts of liabilities are settled. Examples follow:

a.  *Revenues or gains that are taxable after they are recognized in financial income.* An asset (for example, a receivable from an installment sale) may be recognized for revenues or gains that will result in future taxable amounts when the asset is recovered.

b.  *Expenses or losses that are deductible after they are recognized in financial income.* A liability (for example, a product warranty liability) may be recognized for expenses or losses that will result in future tax deductible amounts when the liability is settled.

c.  *Revenues or gains that are taxable before they are recognized in financial income.* A liability (for example, subscriptions received in advance) may be recognized for an advance payment for goods or services to be provided in future years. For tax purposes, the advance payment is included in taxable income upon the receipt of cash. Future sacrifices to provide goods or services (or future refunds to those who cancel their

---

[4]References in this Statement to income taxes currently payable and (total) **income tax expense** are intended to include also **income taxes currently refundable** and (total) **income tax benefit,** respectively.

[4a]Interpretation 48 provides guidance for computing the tax bases of assets and liabilities for financial reporting purposes.

FAS109–8

*Accounting for Income Taxes*          **FAS109**

orders) will result in future tax deductible amounts when the liability is settled.

d. *Expenses or losses that are deductible before they are recognized in financial income.* The cost of an asset (for example, depreciable personal property) may have been deducted for tax purposes faster than it was depreciated for financial reporting. Amounts received upon future recovery of the amount of the asset for financial reporting will exceed the remaining tax basis of the asset, and the excess will be taxable when the asset is recovered.

e. *A reduction in the tax basis of depreciable assets because of tax credits.*[5] Amounts received upon future recovery of the amount of the asset for financial reporting will exceed the remaining tax basis of the asset, and the excess will be taxable when the asset is recovered.

f. *ITC accounted for by the deferral method.* Under Opinion 2, ITC is viewed and accounted for as a reduction of the cost of the related asset (even though, for financial statement presentation, deferred ITC may be reported as deferred income). Amounts received upon future recovery of the reduced cost of the asset for financial reporting will be less than the tax basis of the asset, and the difference will be tax deductible when the asset is recovered.

g. *An increase in the tax basis of assets because of indexing whenever the local currency is the functional currency.* The tax law for a particular tax jurisdiction might require adjustment of the tax basis of a depreciable (or other) asset for the effects of inflation. The inflation-adjusted tax basis of the asset would be used to compute future tax deductions for depreciation or to compute gain or loss on sale of the asset. Amounts received upon future recovery of the local currency historical cost of the asset will be less than the remaining tax basis of the asset, and the difference will be tax deductible when the asset is recovered.

h. *Business combinations.* There may be differences between the assigned values and the tax bases of the assets and liabilities recognized in a business combination. Those differences will result in taxable or deductible amounts when the reported amounts of the assets and liabilities are recovered and settled, respectively.

12. Examples (a)–(d) in paragraph 11 illustrate revenues, expenses, gains, or losses that are included in taxable income of an earlier or later year than the year in which they are recognized in pretax financial income. Those differences between taxable income and pretax financial income also create differences (sometimes accumulating over more than one year) between the tax basis of an asset or liability and its reported amount in the financial statements. Examples (e)–(h) in paragraph 11 illustrate other events that create differences between the tax basis of an asset or liability and its reported amount in the financial statements. For all eight examples, the differences result in taxable or deductible amounts when the reported amount of an asset or liability in the financial statements is recovered or settled, respectively.

13. This Statement refers collectively to the types of differences illustrated by those eight examples and to the ones described in paragraph 15 as *temporary differences.* Temporary differences that will result in taxable amounts in future years when the related asset or liability is recovered or settled are often referred to in this Statement as **taxable temporary differences** (examples (a), (d), and (e) in paragraph 11 are taxable temporary differences). Likewise, temporary differences that will result in deductible amounts in future years are often referred to as **deductible temporary differences** (examples (b), (c), (f), and (g) in paragraph 11 are deductible temporary differences). Business combinations (example (h)) may give rise to both taxable and deductible temporary differences.

14. Certain basis differences may not result in taxable or deductible amounts in future years when the related asset or liability for financial reporting is recovered or settled and, therefore, may not be temporary differences for which a deferred tax liability or asset is recognized. One example under current U.S. tax law is the excess of cash surrender value of life insurance over premiums paid. That excess is a temporary difference if the cash surrender value is expected to be recovered by surrendering the policy, but is not a temporary difference if the asset is expected to be recovered without tax consequence upon the death of the insured (there will be no taxable amount if the insurance policy is held until the death of the insured).

---

[5]The Tax Equity and Fiscal Responsibility Act of 1982 provided taxpayers with the choice of either (a) taking the full amount of Accelerated Cost Recovery System (ACRS) deductions and a reduced tax credit (that is, investment tax credit and certain other tax credits) or (b) taking the full tax credit and a reduced amount of ACRS deductions.

**FAS109**          *FASB Statement of Standards*

15. Some temporary differences are deferred taxable income or tax deductions and have balances only on the income tax balance sheet and therefore cannot be identified with a particular asset or liability for financial reporting. That occurs, for example, when a long-term contract is accounted for by the percentage-of-completion method for financial reporting and by the completed-contract method for tax purposes. The temporary difference (income on the contract) is deferred income for tax purposes that becomes taxable when the contract is completed. Another example is organizational costs that are recognized as expenses when incurred for financial reporting and are deferred and deducted in a later year for tax purposes. In both instances, there is no related, identifiable asset or liability for financial reporting, but there is a temporary difference that results from an event that has been recognized in the financial statements and, based on provisions in the tax law, the temporary difference will result in taxable or deductible amounts in future years.

**Recognition and Measurement**

16. An enterprise shall recognize a deferred tax liability or asset for all temporary differences[6] and operating loss and tax credit carryforwards in accordance with the provisions of paragraph 17. **Deferred tax expense or benefit** is the change during the year in an enterprise's deferred tax liabilities and assets.[7] For deferred tax liabilities and assets acquired in a purchase business combination during the year, it is the change since the combination date. Total income tax expense or benefit for the year is the sum of deferred tax expense or benefit and income taxes currently payable or refundable.

*Annual Computation of Deferred Tax Liabilities and Assets*

17. Deferred taxes shall be determined separately for each tax-paying component (an individual entity or group of entities that is consolidated for tax purposes) in each tax jurisdiction. That determination includes the following procedures:

a. Identify (1) the types and amounts of existing temporary differences and (2) the nature and amount of each type of operating loss and tax credit carryforward and the remaining length of the carryforward period
b. Measure the total deferred tax liability for taxable temporary differences using the applicable tax rate (paragraph 18)
c. Measure the total deferred tax asset for deductible temporary differences and operating loss carryforwards using the applicable tax rate
d. Measure deferred tax assets for each type of tax credit carryforward
e. Reduce deferred tax assets by a **valuation allowance** if, based on the weight of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The valuation allowance should be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized.

18. The objective is to measure a deferred tax liability or asset using the enacted tax rate(s) expected to apply to taxable income in the periods in which the deferred tax liability or asset is expected to be settled or realized. Under current U.S. federal tax law, if taxable income exceeds a specified amount, all taxable income is taxed, in substance, at a single flat tax rate. That tax rate shall be used for measurement of a deferred tax liability or asset by enterprises for which graduated tax rates are not a significant factor. Enterprises for which graduated tax rates are a significant factor shall measure a deferred tax liability or asset using the average graduated tax rate applicable to the amount of estimated annual taxable income in the periods in which the deferred tax liability or asset is estimated to be settled or realized (paragraph 236). Other provisions of enacted tax laws should be considered when determining the tax rate to apply to certain types of temporary differences and carryforwards (for example, the tax law may provide for different tax rates on ordinary income and capital gains). If there is a phased-in change in tax rates, determination of the applicable tax rate requires knowledge about when deferred tax liabilities and assets will be settled and realized.

19. In the U.S. federal tax jurisdiction, the applicable tax rate is the regular tax rate, and a deferred tax asset is recognized for alternative minimum tax credit carryforwards in accordance with the provisions of

---

[6]Refer to paragraph 9. A deferred tax liability shall be recognized for the temporary differences addressed by Opinion 23 in accordance with the requirements of this Statement (paragraphs 31–34) and that Opinion, as amended.
[7]Paragraph 230 addresses the manner of reporting the transaction gain or loss that is included in the net change in a deferred foreign tax liability or asset when the reporting currency is the functional currency.