**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

MARC S. KIRSCHNER,               :
As Trustee of the Refco Private Actions Trust  :     ELECTRONICALLY FILED
                                  :

           Plaintiff,   :     07 Civ. 8165 (GEL)
                                  :

        -v-         :     Hon. Gerard E. Lynch
                                  :

PHILLIP R. BENNETT, SANTO C. MAGGIO,  :
ROBERT C. TROSTEN, MAYER, BROWN,  :
ROWE & MAW, LLP, GRANT THORNTON  :
LLP, and ERNST & YOUNG U.S. LLP,   :
                                  :

           Defendants.  :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## GRANT THORNTON LLP'S MOTION TO DISMISS

 

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant*
*Grant Thornton LLP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 6

POINT ONE

    The Trustee lacks standing to assert customer claims because their injuries
    are derivative of RCM's own injury, which the Trustee has asserted on
    RCM's behalf in a separate suit ....................................................................................... 6

POINT TWO

    The aiding and abetting claims must be dismissed because the complaint
    does not allege that Grant Thornton actually knew about or substantially
    assisted the wrongful conduct ......................................................................................... 9

    A.    Grant Thornton did not have actual knowledge of the underlying torts ............... 10

    B.    Grant Thornton did not provide substantial assistance to the Refco insiders ........ 13

POINT THREE

    The aiding and abetting claims against Grant Thornton must be dismissed
    because the Trustee has failed to state a claim for relief under any of the
    underlying causes of action ............................................................................................. 15

    A.    The aiding and abetting fraud claim against Grant Thornton should be
    dismissed for failure to plead fraud or deception with particularity ..................... 15

    B.    The claim for aiding and abetting breach of fiduciary duty should
    be dismissed because RCM and its officers did not owe any duty ....................... 18

    C.    The Trustee has also failed to plead conversion sufficiently and has not
    identified any specific property that was purportedly converted ........................... 22

POINT FOUR

    The claims against Grant Thornton are preempted by SLUSA .......................................... 25

CONCLUSION .................................................................................................................... 25

i

# TABLE OF AUTHORITIES

CASES                                                                                                    PAGE(S)

*9310 Third Ave. Assoc., Inc. v. Schaffer Food Serv. Co.*,
    210 A.D.2d 207, 620 N.Y.S.2d 255 (2d Dep't 1994)............................................................24

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
    No. 97 Civ. 4978, 1999 WL 47223 (S.D.N.Y. Feb. 3, 1999)................................................20

*A.O. Fox Mem'l Hosp. v. Am. Tobacco Co.*,
    302 A.D.2d 413, 754 N.Y.S.2d 368 (2d Dep't 2003)............................................................8

*Bank of Am. Corp. v. Lemgruber*,
    385 F. Supp. 2d 200 (S.D.N.Y. 2005) ..............................................................................8, 20

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
    754 F.2d 57 (2d Cir. 1985) ................................................................................................14

*Calcutti v. SBU, Inc.*,
    273 F. Supp. 2d 488 (S.D.N.Y. 2003) ................................................................................9

*Chill v. General Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) ........................................................................................ 16-17

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) ..............................................................................14

*Daly v. Castro Llanes*,
    30 F. Supp. 2d 407 (S.D.N.Y. 1998) ................................................................................23

*DDCLAB Ltd. v. E.I. Du Pont De Nemours & Co.*,
    No. 03 Civ. 3654, 2005 WL 425495 (S.D.N.Y. Feb. 18, 2005)..........................................18

*Frota v. Prudential-Bache Sec., Inc.*,
    639 F. Supp. 1186 (S.D.N.Y. 1986) ............................................................................21, 23

*Global Mins. & Metals Corp. v. Holme*,
    35 A.D.3d 93, 824 N.Y.S.2d 210 (1st Dep't 2006) ............................................................10

*Goddard v. Citibank, NA*,
    No. 04 Civ. 531, 2006 WL 842925 (E.D.N.Y. Mar. 27, 2006)..........................................23

*Henneberry v. Sumitomo Corp. of Am.*,
    415 F. Supp. 2d 423 (S.D.N.Y. 2006) ..............................................................................18

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992)........................................................................................8-9

*Hughes v. BCI Int'l Holdings, Inc.*,
  452 F. Supp. 2d 290 (S.D.N.Y. 2006) .......................................................20

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................. 16, 18, 23-24

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........................................................12

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ......................................................................16

*In re Van Dresser Corp.*,
  128 F.3d 945 (6th Cir. 1997) ......................................................................8

*Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
  157 F.3d 933 (2d Cir. 1998) .......................................................................19

*Jackson Nat'l Life Ins. Co. v. Ligator*,
  949 F. Supp. 200 (S.D.N.Y. 1996) ...............................................................8

*JP Morgan Chase Bank v. Winnick*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005) .....................................................9, 13

*Kaufman v. Cohen*,
  307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) ................................. 9-11, 13

*Kolbeck v. LIT Am., Inc.*,
  939 F. Supp. 240 (S.D.N.Y. 1996) .............................................................10

*Krause v. Forex Exch. Mkt., Inc.*,
  356 F. Supp. 2d 332 (S.D.N.Y. 2005) .......................................................10

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999) .......................................................................8

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ......................................................................14

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ......................................................................12

*Mfrs. Hanover Trust Co. v. Chemical Bank*,
    160 A.D.2d 113, 559 N.Y.S.2d 704 (1st Dep't 1990) ..........................................24

*Nat'l Westminster Bank USA v. Weksel*,
    124 A.D.2d 144, 511 N.Y.S.2d 626 (1st Dep't 1987) ..........................................12

*Perl v. Smith Barney Inc.*,
    230 A.D.2d 664, 646 N.Y.S.2d 678 (1st Dep't 1996) ..........................................19

*Regions Bank v. Widers & Mastroianni, P.C.*,
    526 F. Supp. 2d 411 (S.D.N.Y. 2007) ...............................................................22

*Republic of Haiti v. Duvalier*,
    211 A.D.2d 379, 626 N.Y.S.2d 472 (1st Dep't 1995) ..........................................24

*Ross v. Bolton*,
    904 F.2d 819 (2d Cir. 2000) ............................................................................18

*Ryan v. Hunton & Williams*,
    No. 99 Civ. 5938(JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ...................12

*Sheehan v. City of N.Y.*,
    40 N.Y.2d 496, 387 N.Y.S.2d 92 (1976) ...........................................................14

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    128 S.Ct. 761 (2008).......................................................................................14

*Suthers v. Amgen Inc.*,
    441 F. Supp. 2d 478 (S.D.N.Y. 2006) ...............................................................19

*Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*,
    158 F. Supp. 2d 335 (S.D.N.Y. 2001) ...............................................................20

*Union Bank v. Wolas*,
    502 U.S. 151 (1991)..........................................................................................8

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004) ...............................................................11

*Walden Terrance, Inc. v. Broadwall Mgmt. Corp.*,
    213 A.D.2d 630, 624 N.Y.S.2d 217 (2d Dep't 1995)..........................................24

*WIT Holding Corp. v. Klein*,
    282 A.D.2d 527, 724 N.Y.S.2d 66 (2d Dep't 2001)............................................19

iv

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007) ..................................................................................21

**STATUTES AND RULES**

Fed. R. Civ. P. 9(b) .............................................................................................. 15-16

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 874 (1979)................................................................19

Restatement (Second) of Torts § 876 (1979)................................................................10

## PRELIMINARY STATEMENT

This suit represents another aggressive attempt by a trustee to force third parties to bear responsibility for harm caused by Refco itself.  This time, the suit involves claims by individual customers—transferred to a trust as part of the Refco bankruptcy to be litigated with funding drawn from the Refco estate.  But while the customers here may have had grounds for recovery against Refco, they have no such claim against Grant Thornton LLP ("Grant Thornton").

The customers represented here do not have standing to sue, as their claims are entirely derivative of injury suffered by Refco Capital Markets, Ltd. ("RCM").  These customers were engaged in trading in the foreign exchange ("FX") markets and maintained accounts with RCM, a Refco affiliate and offshore broker.  They claim they were injured when Refco "upstreamed," "downstreamed," and "sidestreamed" customer funds from RCM, ultimately leaving it unable to meet its obligations.  Their injury is thus derivative of losses suffered by RCM itself, which is the only entity with standing to recover them.  Indeed, the same Trustee (and law firm) that brought this suit has also sued Grant Thornton on behalf of the Refco Litigation Trust, seeking damages for RCM and its unsecured creditors for the very same unpaid intercompany loans.  The Trustee cannot have it both ways.  On this basis alone, the complaint here must be dismissed.

"Standing" aside, the Trustee has not stated a claim against Grant Thornton for aiding and abetting anything.  He has not alleged any facts suggesting that Grant Thornton knew about the torts it supposedly aided:  the Refco insiders' alleged fraud against RCM customers, their alleged conversion of the customers' funds, or their alleged breach of fiduciary duty.  Indeed, there are no such facts.  It is now clearer than ever that Refco's financial fraud was designed specifically to prevent Grant Thornton from knowing the truth.  Since the Refco litigation began, four of Refco's top executives have faced criminal charges of lying (or conspiring to lie) to Grant Thornton.  One was recently convicted, and three others have pleaded guilty.  And in respect to

1

the alleged theft of customer funds from RCM—which is the real basis for all the RCM customer lawsuits—any claim of knowledge on Grant Thornton's part is even more far-fetched.  It is difficult even now to see how Grant Thornton could have discovered the torts alleged here.  The Trustee's complaint is infected with the same flaws that prompted this Court to dismiss the complaint by the putative class of RCM securities customers, shortly before this lawsuit was filed:  it fails to explain how any particular intercompany loan was deceptive or improper in respect to the customers and their customer agreements, and it does not allege why the loans were uncollectible, who specifically "lacked the intent" to repay them, or how Grant Thornton could possibly have known about it.  There is no allegation here that Grant Thornton saw any red flags that would have indicated that RCM was mishandling customer accounts or that its affiliates were—at the time of the financial statements—unable or unwilling to repay the loans.

Moreover, Grant Thornton's audits did not proximately cause harm to the customers and thus cannot constitute "substantial assistance."  The Trustee does not allege that any of the FX Customers relied on Grant Thornton's audit opinions when they chose RCM.  But even if they did, the losses they suffered were the result of something else—an outright ***theft*** (according to the Trustee).  Nothing about the audit opinions made that theft necessary or inevitable.

Finally, the Trustee has failed to state a claim for relief on any of the causes of action that underlie the claims of aiding and abetting.  The fraud claim suffers from the same infirmity as the one this Court previously rejected:  despite the complexity of his complaint, the Trustee has not explained how the alleged misconduct at RCM involved ***deception***, and thus he has failed to plead fraud with particularity as required by the federal rules and this Court's decisions.  RCM Brokerage Slip. Op. at 21-23, attached as Exh. A to the Declaration of Ruth A. Braun ("Braun Decl.").  The breach of fiduciary duty claim is defective because neither RCM nor the insiders

2

owed the FX Customers any fiduciary duty.  And the conversion claim is also insufficient, as the Trustee has not identified any separate assets that were converted.  Indeed, the complaint makes clear that the FX Customers' funds were always commingled with those of other customers.

In short, all of the Trustee's claims against Grant Thornton fail as a matter of law.  In light of the clear direction this Court has already given concerning what would be required to state a claim in a customer lawsuit like this one, the Court should dismiss them with prejudice.

## BACKGROUND

RCM was an offshore securities and foreign exchange broker that was part of Refco's business of providing brokerage, execution, and clearing services in the international commodities and derivatives market.  Compl. ¶¶ 4, 16, 17.  Grant Thornton served as outside auditor to RCM and Refco and issued audit opinions on their financial statements for fiscal years 2003, 2004, and 2005.  *Id.* ¶ 14.  Trustee Mark Kirschner is the trustee of the Private Actions Trust, an entity created as part of Refco's plan of reorganization to pursue certain creditors' claims on a consolidated basis, subsidized with funding provided by the estate through the Litigation Trust.  Here, the Trustee is asserting claims on behalf of seventy-five FX Customers who allegedly placed and maintained funds with RCM "for the specific, limited purpose of allowing the customers to engage in specific FX transactions pursuant to the FX Customer's instructions."  *Id.* ¶ 22.

The gravamen of the complaint is that RCM transferred funds deposited by the FX Customers to other Refco affiliates to "dress up" Refco's financial statements and fund the affiliates' operations.  *Id.* ¶¶ 2-4, 19, 30-32.  This scheme was allegedly designed to enable Refco to continue its operations despite substantial customer and proprietary trading losses suffered in the late 1990s.  *Id.* ¶¶ 40-45.  Refco was concealing its true condition by using a series of sham loans with unrelated third parties to systematically remove a large, uncollectible receivable (the

"RGHI Receivable") from its books at the end of each financial reporting period. *Id.* ¶¶ 41, 49-55. This allowed Refco to hide the losses from anyone who might be looking—and from Grant Thornton in particular. According to the Trustee, the Refco insiders funded Refco's operations during this period in part with money they "stole" from RCM customers. *Id.* ¶¶ 60, 67.

The financial fraud at Refco was a crime, specifically designed to conceal the truth from Refco's outside auditors. Former CEO Phillip R. Bennett, former CFO Robert C. Trosten, and former Executive Vice President Santo C. Maggio (who also served as CEO of Refco Securities LLC) have each pleaded guilty to charges that specifically include, among other things, making or conspiring to make material misstatements to auditors. *See* 2/15/08 Plea Colloquy, *United States v. Bennett*, No. 05 Cr 1192, at 7 (pleading guilty to "material misstatements to auditors") (Braun Decl., Exh. B); 2/20/08 Plea Colloquy, *United States v. Trosten*, No. 05 Cr 1192, at 4, 5, 16, 18, 19 (pleading guilty to conspiracy and admitting an agreement to conceal the truth from auditors) (Braun Decl., Exh. C); 12/19/07 Plea Colloquy, *United States v. Maggio*, No. 07 Cr 1196, at 5, 7, 17 (pleading guilty to conspiracy, one object of which was "material misstatements to auditors") (Braun Decl., Exh. D); *see also* Third Superseding Indictment, *United States v. Bennett*, No. 05 Cr 1192 (cited in Compl., at 2), ¶¶ 8, 9, 21, 25, 46, 65 (scheme was designed to hide missing receivable from accountants) (Braun Decl., Exh. E). And recently, on April 17, 2008, a jury found former CEO Tone Grant guilty of conspiracy, one object of which was lying to Refco's auditors. *See* 4/17/08 Trial Transcript, *United States v. Grant*, No. 05 Cr 1192 (Braun Decl., Exh. F); Third Superseding Indictment ¶¶ 6, 7, 25, 69(b) (Braun Decl., Exh. E).

The Trustee alleges that funds deposited by RCM customers, including the FX Customers, were a significant source of capital to facilitate Refco's overall scheme. Compl. ¶¶ 60-61. Refco's senior insiders would inform executives at Refco affiliates of the company's

4

funding needs, and those executives would in turn transfer customer funds to RCM's securities division. *Id.* ¶ 66. RCM then distributed the funds to another Refco affiliate through a series of intercompany loans for disbursement "wherever [they were] needed in the Refco organization." *Id.* These disbursements "were used for a wide variety of general and specific funding purposes by various Refco affiliates." *Id.* ¶ 67. The Trustee alleges that these intercompany loans were always uncollectible "because the Refco affiliates to which the 'loans' were made lacked the intent and/or the financial wherewithal to repay them." *Id.* ¶ 69.

When the hidden RGHI Receivable was disclosed in October 2005, RCM customers, including the FX Customers, instructed RCM to return their deposits. *Id.* ¶ 5. Refco responded by imposing a moratorium on all RCM withdrawals from customer accounts and days later filed for bankruptcy. *Id.* ¶ 65. At the time, RCM had a shortfall of over $2 billion because of the intercompany loans to other Refco affiliates. *Id.* ¶ 35. Thus, according to the Trustee, RCM customers overall lost $2 billion—$500 million of which relates to FX Customers. *Id.*

The Trustee's claims against Grant Thornton center on its issuance of audit opinions on Refco's and RCM's financial statements. Notably, he does not allege that the FX Customers read or relied on the audit opinions. Instead, he alleges generally that if Grant Thornton had not issued clean audit opinions, the scheme would have been revealed earlier. *E.g.*, *id.* ¶ 131. The complaint asserts that the financial statements were "false and misleading" for failing to disclose, among other things, the RGHI Receivable, the improper transfer of the FX Customers' funds, and the fact that the insiders caused RCM to upstream, downstream, and side-stream funds to affiliates that lacked the ability or intention to repay. *Id.* ¶¶ 34, 137. Significantly, the complaint is bereft of any factual allegation that Grant Thornton actually knew that customer deposits were being converted and loaned to affiliates with no intention or ability to repay.

The intercompany loans themselves were no secret; indeed, the Trustee acknowledges that these loans were disclosed in RCM's financial statements. *Id.* ¶¶ 138-41. The financial statements included a footnote explaining that "in the normal course of business," RCM executes various "securities and other financial instrument transactions" "with affiliated companies." *Id.* ¶ 141. Although these transactions were recorded in the financial statements in a line item identified as "receivable[s] from customers," the purpose of this footnote was to explain and quantify the portion of the amount in that line item that was, in fact, attributable to affiliated-company transactions. *See id.* Neither the line item nor the footnote stated whether the affiliated companies were subject to the same credit check or collateral requirements that might apply to an ordinary loan. And, by its nature, the footnote did not report one way or the other on the extent to which these funds were later returned to RCM.

The Trustee filed this suit not long after this Court dismissed analogous claims brought under the securities laws. He asserts claims against Grant Thornton for aiding and abetting the torts of fraud, breach of fiduciary duty, and conversion. *See* Compl., Counts IV-VI.

## ARGUMENT

### POINT ONE

**The Trustee lacks standing to assert customer claims because their injuries are derivative of RCM's own injury, which the Trustee has asserted on RCM's behalf in a separate suit.**

As a threshold matter, the Court should dismiss the Trustee's claims because he and the FX Customers he represents do not have standing to assert them. According to the complaint, the FX Customers were injured when Refco insiders caused RCM customer funds to be "upstreamed," "sidestreamed," and "downstreamed" to other Refco entities in the form of intercompany loans that the affiliates neither intended nor were able to repay. Compl. ¶ 34. If this is true, however, then all losses suffered by FX Customers are entirely derivative of losses

suffered by RCM itself.  Claims for these damages therefore belong to RCM's estate, and only the estate has standing to bring them.  Indeed, as discussed below, the Trustee himself has sued Grant Thornton on RCM's behalf in another suit to recover for exactly the same injury.

The FX Customers were not the only victims of the Refco insiders' alleged fraudulent conversion scheme.  Indeed, the Trustee admits that "[t]he siphoning occurred with respect to **all** of RCM's customers."  *Id*. ¶ 33 (emphasis added); *see also, e.g.*, *id.* ¶ 60 (the Refco insiders "simply stole operating funds from RCM's customers, including the FX Customers"); *id.* ¶ 61 ("[T]he Refco Insiders engaged in a scheme pursuant to which RCM customer assets, including the assets of the FX Customers . . . were secretly siphoned.").  The Trustee has not identified any specific asset that the FX Customers lost.  To the contrary, the complaint makes clear that RCM's customer accounts were always "unsegregated."  *Id*. ¶ 76(d) (noting that RCM "had the volume of unsegregated customer assets necessary to fund billions of dollars in intercompany loans"); *cf. id*. ¶¶ 32, 33, 68.  In short, the Trustee does not and could not contend that the FX Customers had a claim to specific funds or that their funds were required to be segregated from other funds at RCM.

Nor has the Trustee alleged that the FX Customers' funds remained their own property, held in a constructive trust for their benefit.  Indeed, the bankruptcy court has rejected such a claim.  *Kirschner v. Bencorp Casa de Bolsa, C.A. (In re Refco, Inc.)*, Adv. Proc. No. 06-01745 (RDD) (Bankr. S.D.N.Y. Dec. 29, 2006), Judgment at 129-30 (Braun Decl., Exh. G).  Instead, the Trustee contends that the FX Customers' funds—combined with those of other RCM customers—were "transferred out of RCM, and then converted for use" as "loans" made by RCM to other Refco entities.  Compl. ¶¶ 33-34.  The alleged injury—the lack of repayment— was suffered by RCM and visited equally on all of RCM's customers and creditors.

7

Because the Trustee has not alleged that the FX Customers suffered a special injury distinct from the injury to RCM or any other creditor, he does not have standing to sue. *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 236-39, 241 (2d Cir. 1999) (derivatively injured plaintiffs lack standing to sue for fraud under New York law); *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 220-21 (S.D.N.Y. 2005) (plaintiffs lacked standing because alleged indirect injuries were not "separate and distinct from . . . any fraud committed against the direct addressees") (internal citation omitted); *Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp. 200, 205 (S.D.N.Y. 1996) (creditor retains an individual right to sue only "where the plaintiff sustains a direct injury that is separate and distinct from the injury suffered by the corporation"); *A.O. Fox Mem'l Hosp. v. Am. Tobacco Co.*, 302 A.D.2d 413, 414, 754 N.Y.S.2d 368, 370 (2d Dep't 2003) (dismissing claim for lack of standing where injury was derivative of harm suffered by third parties); *see also In re Van Dresser Corp.*, 128 F.3d 945, 948 (6th Cir. 1997) ("[T]he estates' recovery here against [defendant] makes [plaintiff] whole in terms of the loss caused by [defendant].").  Indeed, to allow the Trustee to proceed under these circumstances would threaten a fundamental purpose of bankruptcy, which is to ensure an equitable distribution of assets among *all* creditors of the debtor.  *See Union Bank v. Wolas*, 502 U.S. 151, 160-61 (1991).

Moreover, allowing the Trustee's claims to proceed would create a significant risk of double recovery, particularly in light of his complaint on behalf of the Litigation Trust and the estate of RCM.  *Jackson*, 949 F. Supp. at 203-07 (citing danger of double recovery in dismissing derivative claim seeking same damages as direct claim); *see also In re Van Dresser Corp.*, 128 F.3d at 949 (where only one recovery can be had, "[t]he estates' recovery takes precedence over [the creditors']").  Because "directly injured victims can generally be counted on to vindicate the

law," the no derivative injury standing rule "obviate[s] the risk for multiple recoveries" against

one defendant for the same misconduct. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 269

(1992). Here, the Trustee has sued many of the same defendants on RCM's behalf, asserting

claims based on the very same injury that the FX Customers seek to recover here. *See* Compl.

¶¶ 210-38, *Kirschner v. Grant Thornton LLP, et al.*, No. 07 Civ. 11604 (GEL) (transferred by the

MDL Panel to this Court from the Northern District of Illinois) (asserting claims for breach of

fiduciary duty, fraud, negligence, malpractice, and aiding and abetting based on the

intercompany loans from RCM to other affiliates, which allegedly "did not have the financial

wherewithal or intent to repay RCM"). The fact that the bankruptcy estate of RCM is already

pursuing claims based on the intercompany loans underscores the urgency of ensuring that no

subset of RCM customers is allowed to seize a preferential or duplicative recovery.

### POINT TWO

**The aiding and abetting claims must be dismissed because the complaint does not allege
that Grant Thornton actually knew about or substantially assisted the wrongful conduct.**

Aiding and abetting liability requires three elements: (1) wrongful conduct by a primary

wrongdoer; (2) knowledge of the wrongful conduct by the alleged aider-abettor; and (3)

substantial assistance by the alleged aider-abettor in achieving the wrongful conduct. *See JP*

*Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (setting forth

elements for aiding and abetting fraud); *Kaufman v. Cohen*, 307 A.D.2d 113, 125-26, 760

N.Y.S.2d 157, 169-70 (1st Dep't 2003) (setting forth elements for aiding and abetting breach of

fiduciary duty); *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003) (setting forth

elements for aiding and abetting conversion). Here, the Trustee's aiding and abetting claims

against Grant Thornton fail because the complaint does not allege that Grant Thornton actually

knew of, or substantially assisted in, any of the alleged underlying torts.

9

A.    **Grant Thornton did not have actual knowledge of the underlying torts.**

A defendant is liable for harm to a third person by the conduct of another only when that defendant "***knows*** that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Restatement (Second) of Torts § 876(b) (1979) (emphasis added).  Accordingly, to state a claim for aiding and abetting, a plaintiff must allege facts sufficient to support an inference that the defendant had "actual knowledge" of the underlying tort.  *Kaufman*, 307 A.D.2d at 125, 760 N.Y.S.2d at 169.  Allegations of constructive knowledge, or that the defendant was on notice as to the misconduct of the wrongdoer, are insufficient to sustain a cause of action.  *Id.*; *see also Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996) ("general suspicion" of tort is "not enough").

Nowhere in the complaint does the Trustee allege any facts suggesting that Grant Thornton had ***actual knowledge*** of any deception or breach of fiduciary duty against the FX Customers or of the alleged conversion of their funds.  The closest the Trustee comes is a series of conclusory allegations that Grant Thornton "was aware" that FX Customer funds "had been improperly directed and converted, removed from RCM and siphoned to other uncreditworthy Refco entities."  Compl. ¶¶ 138-40; *see also id.* ¶ 166 (alleging that Grant Thornton "knew that Refco was misappropriating RCM customer assets").  But the complaint fails to allege any factual basis or explanation in support of these bald assertions—a crucial necessity for pleading aiding and abetting claims.  *See Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 339 (S.D.N.Y. 2005) (complaint must allege "factual basis" for assertions of aider-abettor's knowledge); *Global Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 101-102, 824 N.Y.S.2d 210, 217 (1st Dep't 2006) ("[P]laintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary [misconduct].").  There is simply no allegation that Grant Thornton knew that the loans of cash from RCM to its affiliates

were improper or that the affiliates lacked the intent or ability to repay—much less that the FX

Customers were the victims of fraud, conversion, or breach of fiduciary duty.  Indeed, it is not

clear even now, years later, that the loans were improper or breached any duty held by the

insiders.  *See* Braun Decl., Exh. G at 129-34 (funds held by RCM were not segregated nor

required to be); *see also infra* at 17-18, 24-25.

Rather than pleading actual knowledge, the Trustee essentially claims that Grant

Thornton must have known about the Refco insiders' torts "because it not only had access to, but

actually reviewed material information concerning RCM and the intercompany transfers of RCM

customer assets."  Compl. ¶ 142; *see also id.* ¶ 130 ("Given its multiple roles, GT had access to

all material information concerning the improper transfer of FX Customer assets alleged herein

and the uncollectible debts owed to RCM by other entities." ).  But Grant Thornton's alleged

access to and review of RCM's financial information does not translate into actual knowledge.

At most, the Trustee's allegations amount to constructive knowledge, or a suggestion that Grant

Thornton ***could have discovered*** the theft—allegations that are "legally insufficient to impose

aiding and abetting liability."  *Kaufman*, 307 A.D.2d at 125, 760 N.Y.S.2d at 169; *see also*

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 270 (S.D.N.Y.

2004) (claims that alleged aider-abettor "must have known" are insufficient); *Nat'l Westminster*

*Bank USA v. Weksel*, 124 A.D.2d 144, 147, 511 N.Y.S.2d 626, 629 (1st Dep't 1987) (knowledge

of fraud scheme cannot be "imparted" to a defendant simply by virtue of performing ordinary

services for the primary fraudster).  And these allegations do nothing to show that Grant

Thornton knew the insiders were engaged in fraud, conversion, or breach of fiduciary duty—the

underlying wrongdoing alleged here.

The Trustee's reference to "red flags" does not help his case.  While plaintiffs often point to "red flags" to support an inference of negligence or recklessness, such "red flags" cannot establish the knowledge required for aiding and abetting.  *See*, *e.g.*, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006) (allegations that defendant was aware that primary fraudster had engaged in "improper conduct that would warrant discipline" were not sufficient to support defendant's "actual knowledge of [fraudster's] outright looting of client funds"); *Ryan v. Hunton & Williams*, No. 99 Civ. 5938(JG), 2000 WL 1375265, at **1, 8-9 (E.D.N.Y. Sept. 20, 2000) (allegations that a bank was on notice of "red flags" suggesting that client was using accounts for fraudulent activities were not enough to satisfy the requirement of actual knowledge).  Moreover, some of the "red flags" the Trustee identifies are merely conclusions with no supporting facts. *E.g.*, Compl. ¶ 141 (conclusory assertion that Grant Thornton "was aware" the affiliates "lacked the intent" to repay RCM).

Nor do the Trustee's allegations related to the financial fraud at Refco have any bearing on Grant Thornton's knowledge of the wrongdoing alleged here.  The complaint goes into great detail about Refco's RGHI Receivable and alleges that Grant Thornton was "aware of the RTL scheme that was used to hide the RGHI Receivable."  *See, e.g.*, Compl. ¶ 144; *see also id.* ¶¶ 85-86, 148-49, 158, 161-64.  Whether or not these allegations are sufficient to support an inference that Grant Thornton knew or recklessly disregarded the truth related to the RGHI Receivable,[1]

---

[1]  Although this Court held that the plaintiffs in the Refco securities class action alleged sufficient facts to raise an inference of recklessness on Grant Thornton's part in respect to the RGHI Receivable, it has never held that these allegations support a finding of actual knowledge, nor that such facts would support an inference of scienter relating to the alleged scheme involving RCM.  In addition, one significant basis for this Court's earlier scienter ruling was a factual allegation that has been proven to be false—namely, that Grant Thornton made no effort to confirm any of Refco's loans to unrelated third parties.  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657-58 (S.D.N.Y. 2007). The Trustee does not make such a claim, and indeed admits that Grant Thornton **did** send requests for confirmation to the unrelated third parties who were involved in the sham loans.  *See* Compl. ¶ 161.  As Grant Thornton will argue in motion practice in the securities litigation, the fact that it sent such requests, actually received confirmation,

they certainly do not indicate that Grant Thornton knew that the Refco insiders were engaged in fraud, conversion, or breach of fiduciary duty in respect to RCM customer funds. *Compare* Compl. ¶¶ 30-35 *with id.* ¶¶ 41-56.

In short, a defendant cannot be held liable for aiding and abetting misconduct that it did not know about. And the Trustee's allegations do not support the inference that Grant Thornton was actually aware of the Refco insiders' torts. To the contrary, they rest largely on the assertion that Grant Thornton should have—***but did not***—discover the truth through its audits. Accordingly, the Trustee cannot possibly establish the required element of "actual knowledge," and its aiding and abetting claims against Grant Thornton must be dismissed.

### B.    Grant Thornton did not provide substantial assistance to the Refco insiders.

The Trustee's aiding and abetting clams also fail for another reason: a lack of "substantial assistance." Claims of secondary liability like the ones alleged here require allegations that the alleged aider-abettor provided "substantial assistance" in achieving the wrongful conduct. *Winnick*, 406 F. Supp. 2d at 252. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Kaufman*, 307 A.D.2d at 126, 760 N.Y.S.2d at 170. "Whether the assistance is substantial or not is measured, in turn, by whether the 'action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'" *Winnick*, 406 F. Supp. 2d at 256-57 (citations omitted).

The Trustee has failed to meet this burden. He has not alleged that Grant Thornton proximately caused the FX Customers' injuries. Rather, the Trustee alleges simply that Grant

---

and then observed that the loans had been repaid is compelling proof that it lacked scienter and performed audits that complied with GAAS in all respects.

Thornton provided assistance by serving as Refco's auditor. *E.g.*, Compl. ¶¶ 167-68.[2]  This is not sufficient to allege proximate cause.  The mere fact that Grant Thornton issued audit opinions on Refco's and RCM's financial statements in 2003, 2004, and 2005 does not make Grant Thornton an insurer, responsible for any losses caused by Refco or its affiliates.  This type of "'[b]ut-for' causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct."  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); *cf. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc*., 128 S.Ct. 761, 770 (2008) (ordinary causation analysis requires that the loss be the "necessary or inevitable" result of the defendant's wrongdoing); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (complaint must allege plausible facts demonstrating causal connection between conduct and the harm actually suffered); *Sheehan v. City of N.Y.*, 40 N.Y.2d 496, 503, 387 N.Y.S.2d 92, 96 (1976) (proximate cause not established when conduct "merely furnished the condition or occasion for the occurrence of the event rather than one of its causes").

Indeed, the complaint establishes as matter of law that the losses suffered by the FX Customers were ***not*** proximately caused by any conduct by Grant Thornton.  The Trustee's principal claim is that the FX Customers suffered losses because the Refco insiders ***stole their money***—upstreaming it to affiliates who lacked the intention or ability to repay.  The Refco insiders' alleged ***theft*** was the cause of the FX Customers' injury, not any statement or action by Grant Thornton.  Courts have long recognized that loss causation does not exist where the losses were caused by a supervening event, such as the fraudulent conduct of management.  *See, e.g.*, *Bloor v. Carro*, *Spanbock*, *Londin*, *Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985).  Indeed, the

---

[2]  The Trustee also alleges that Grant Thornton substantially assisted Refco insiders through the preparation of a Management Letter in 2004, which cited various internal control and accounting deficiencies at the company. Compl. ¶ 168.  But as with the allegations pertaining to Grant Thornton's audit opinions, the Trustee does not—and cannot—allege that the preparation of this letter caused the alleged theft of RCM customer funds.

14

Trustee here does not even allege transaction causation—that is, that the FX Customers relied on Grant Thornton's audit opinions in choosing RCM as their broker.

Here, the complaint affirmatively demonstrates that any harm suffered by the FX Customers was caused by the theft—and the misuse of intercompany loans. *E.g.*, Compl. ¶ 33 ("assets in the accounts of FX Customers were improperly siphoned from those accounts. . . ."); ¶ 34 ("the Refco Insiders . . . caused the funds to be 'upstreamed,' 'side-streamed,' and 'down-streamed' to other Refco entities."); ¶ 61 ("the Refco Insiders engaged in a scheme pursuant to which RCM customer assets . . . were secretly siphoned from their accounts at RCM."); ¶ 66 (FX Customer assets were "transferred by RCM to RCC, in a series of undocumented intercompany 'loans'"). Grant Thornton did not direct the conversion of FX Customer funds or take part in the Refco insiders' supposed breach of duty. The only conduct that Grant Thornton *is* accused of— issuing audit opinions—is far too remote from the injury to constitute substantial assistance. For this reason too, the Trustee's claims should be dismissed.

## POINT THREE

**The aiding and abetting claims against Grant Thornton must be dismissed because the Trustee has failed to state a claim for relief under any of the underlying causes of action.**

The Trustee's aiding and abetting claims must also be dismissed because each of the underlying causes of action on which they are premised is insufficient and fails to state a claim for relief. As discussed below, the Trustee failed to plead a fraud by the Refco insiders with the requisite particularity, cannot allege a fiduciary relationship between the FX Customers and RCM or the insiders, and has not identified any specific property that was purportedly converted.

### A.    The aiding and abetting fraud claim against Grant Thornton should be dismissed for failure to plead fraud or deception with particularity.

The complaint in this case suffers from the same infirmities as the complaint in the RCM Brokerage Securities Litigation that this Court dismissed last September. Rule 9(b) requires that

"[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  To satisfy this heightened pleading requirement, the Trustee must identify each misleading statement and explain why it is misleading.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996).  Generalized allegations of fraud do not suffice; the Trustee must instead set forth specific facts.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (Rule 9(b) requires that the pleadings set forth the alleged fraud with particularity, including "the who, what, when, where, and how" of the fraud).  Thus "[t]he complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).

In alleging the fraud that Grant Thornton supposedly aided, the complaint here fails to meet any of these requirements.  Instead, it points generally to various statements without explaining who made them, to whom, and the context in which they were made.  For example, the Trustee complains of apparently fraudulent "account statements sent to the FX Customers" (Compl. ¶ 33), but he provides no details as to when these account statements were sent, who sent them, or (most significantly) what they contained.  Likewise, with regard to an "LBO Offering Circular,"[3] the Trustee fails to explain who issued the document, when it was distributed, and who received it.  *Id.* ¶¶ 73-74.  The complaint's references to other statements are plagued by a similar lack of particularity.  *See, e.g., id.* ¶¶ 28(i)-(q), 137.

---

[3]  The Trustee alleges that an Offering Circular was distributed as part of the 2004 leveraged buyout of Refco by TH Lee.  Compl. ¶ 73.  According to the complaint, this Offering Circular failed to discuss RCM's role in Refco and provided assurances that the LBO debt would be junior to other subsidiary liabilities.  *Id.* ¶¶ 73-74.  But the complaint is devoid of any details regarding who created and disseminated the circular or who received it—nor does the Trustee connect it with the FX Customers in particular.

Even if the complaint supplied these details, the Trustee's allegations still fail because they do not explain *why* any statements to the FX Customers were misleading or provide particularized detail regarding the allegedly fraudulent conduct. *See Chill*, 101 F.3d at 267 ("[T]he actual fraudulent statements or conduct and the fraud alleged must be stated with particularity."). The complaint alleges that RCM made intercompany loans and booked "worthless" receivables in return (Compl. ¶¶ 34, 60), when in fact these loans "were uncollectible because the Refco affiliates to which the 'loans' were made lacked the intent and/or the financial wherewithal to repay them" (*id.* ¶ 69). These allegations simply parrot the bald assertion previously rejected by this Court—namely, that Refco's affiliates "lacked the intent . . . to repay" the loans. Compl. ¶ 69; *see also, e.g.*, *id.* ¶¶ 5, 6, 31, 34(d), 35. As this Court explained, this vague allegation "could mean any number of things." For example:

> [I]t might mean that Refco officers devised a scheme pursuant to which the RCM customer assets would be "borrowed" from a pool of RCM customer assets, used for Refco affiliates' own business purposes, and never replaced. . . . On the other hand, the complaint might be read to mean that Refco officers allowed the loans to take place knowing that Refco was in such financial trouble that any debt it incurred might become uncollectible. This would be quite a different matter from taking out a loan with the specific intent never to repay it.

Braun Aff., Exh. A at 21-22. Despite this Court's clear admonishment, the Trustee has not fleshed out this theory or filled in these holes. He still does not identify any specific officer or affiliate who lacked the intent to repay.

Similarly, this Court also took issue with an allegation that affiliates "lacked the financial wherewithal to repay" because it was not sufficiently specific to demonstrate plausibility:

> The complaint never allege[d] that all Refco affiliates were rendered insolvent by the round-robin fraud; nor does it allege any basis for the broad, unqualified contention that the Refco affiliates were unable to pay the RCM loans. If plaintiffs really mean that all of the RCM loans were uncollectible, they have failed to support their claim with sufficient supporting allegations; if, on the other hand, they mean that some of the loans at issue were uncollectible, their failure to

17

specify which loans makes it impossible for defendants or the Court to tell which transactions are alleged to be fraudulent.

*Id.* Here, the Trustee's allegations suffer the same affliction, failing to allege which affiliates were insolvent and which could not repay for other reasons. *See, e.g.*, Compl. ¶¶ 5, 6(c), 31, 34(d), 35, 69. And simply pointing to the hidden RGHI Receivable is not enough. *See id.* ¶¶ 41-56. As a matter of logic, the RGHI Receivable itself cannot have rendered the loans uncollectible when they were made: when a particular affiliate received the proceeds of a loan, it did—by definition—have the ability to repay, simply by giving back what it had just received. To the extent that the affiliate later lost the ability to repay, it must have been through imprudent use of the loaned funds—a fact that the complaint also fails to address in its allegations.

"The primary purpose of Rule 9(b) is to afford defendants fair notice of the plaintiff's claim and the factual ground upon which it is based." *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 2000). Here, as in the RCM securities complaint dismissed last September, the Trustee's fraud allegations are "too amorphous to provide defendants with sufficient notice to permit a response." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 325. Thus the claim against Grant Thornton for aiding and abetting the insiders' fraud must be dismissed.

### B. The claim for aiding and abetting breach of fiduciary duty should be dismissed because RCM and its officers did not owe any duty.

The Trustee's claim for aiding and abetting breach of fiduciary duty fails because he has not alleged—and cannot allege—that RCM or its officers owed a duty to the FX Customers. A claim for breach of fiduciary duty requires the existence of a fiduciary relationship and a breach of that relationship. *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 459 (S.D.N.Y. 2006); *see also DDCLAB Ltd. v. E.I. Du Pont De Nemours & Co.*, No. 03 Civ. 3654, 2005 WL 425495, at *8 (S.D.N.Y. Feb. 18, 2005) ("It is incumbent upon a plaintiff to plead some factors in the complaint from which it can be concluded that the parties had a fiduciary relationship.").

18

A fiduciary relationship exists only where one party "is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts: Violation of Fiduciary Duty § 874 (1979); *see also WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 529, 724 N.Y.S.2d 66, 68 (2d Dep't 2001) ("A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge.").

Here, the Trustee's claim for aiding and abetting breach of fiduciary duty rests on an alleged breach by RCM, Bennett, and Maggio. Compl. ¶¶ 219-22. The alleged fiduciary duties are based on a number of supposed "facts and circumstances" surrounding the relationship between the FX Customers and RCM. Compl. ¶ 28. While the Trustee purports to set out a laundry list of factors, this list can be distilled into two relevant categories: (1) that RCM and the FX Customers were in a broker-dealer relationship; and (2) that RCM was insolvent or in a "zone of insolvency" at all relevant times. *Id.* But both are inadequate to demonstrate a breach of fiduciary duty on these facts.

First, under New York law, even RCM itself did not owe a fiduciary duty to the FX Customers. New York law is clear that "[a] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities." *Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 666, 646 N.Y.S.2d 678, 680 (1st Dep't 1996) (citation omitted). "Fiduciary duties do not arise solely because one party has expertise that is superior to another." *Suthers v. Amgen Inc.*, 441 F. Supp. 2d 478, 487 (S.D.N.Y. 2006). Rather, in the broker-customer context, a fiduciary duty arises only in special circumstances, such as "where the customer has delegated discretionary trading authority to the broker." *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998). The mere acceptance of deposits and the accompanying

19

ordinary duties of care does not establish a fiduciary relationship. *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 344 (S.D.N.Y. 2001). Here, the Trustee alleges only that the FX Customers were trading customers of RCM. Compl. ¶¶ 9, 22, 28(c). The FX Customers deposited funds with RCM, and RCM executed trades on their explicit instructions. *Id*. ¶ 22 ("The FX Customers entrusted these funds to RCM for the specific, limited purpose of allowing customers to engage in specific FX transactions pursuant to the FX Customers' instructions. . . ."). The complaint is devoid of any allegations that RCM exercised any discretionary authority on behalf of the FX Customers. Indeed, Judge Drain specifically held that the fact that RCM did not have any discretionary authority would preclude any general fiduciary relationship between RCM and FX customers. Braun Decl., Exh. G at 129-133.

Moreover, as to Bennett and Maggio, the fiduciary relationship allegations are even more strained. "Under New York law there is no fiduciary duty owed . . . to the customers of a corporation by a controlling shareholder, officer, or director of a corporation." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978, 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999); *see generally Lemgruber*, 385 F. Supp. 2d at 224 ("A corporate officer or director generally owes a fiduciary duty only to the corporation over which he exercises management authority. . . ."). While the Refco insiders may have owed fiduciary duties to various Refco entities, their duties did not extend to the customers of those entities.

As for the second factor, while it is true that directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors, *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006), the Trustee's bald and unsupported assertions that RCM was insolvent at the relevant time are insufficient as a matter of law. Under New York law, where an alleged breach of fiduciary duty is, in substance, a claim of

20

fraud, the heightened requirements of Rule 9(b) are triggered.  *See World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007) ("In order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship.") (citation omitted); *Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake whatever may be the theory of legal duty-statutory, common law, tort, contractual, or fiduciary.").  It is indisputable that all of the Trustee's claims—including breach of fiduciary duty—sound in fraud as perpetrated by the Refco insiders.

Under this heightened pleading standard, the Trustee's allegations are insufficient.  The complaint states in conclusory fashion that RCM was insolvent or in a zone of insolvency at all relevant times.  *See* Compl. ¶¶ 27, 28(g), 220.  But the only allegations that could serve as a potential basis for RCM's insolvency—the allegations about its intercompany loans—are woefully vague and insufficient.  As explained above, the Trustee contends that RCM made intercompany loans and booked "worthless" receivables in return (*id.* ¶¶ 34, 60), when in fact the loans "were uncollectible because the Refco affiliates to which the 'loans' were made lacked the intent and/or the financial wherewithal to repay them" (*id.* ¶ 69).  *See also, e.g., id.* ¶¶ 5, 6(c), 31, 34(d), 35.  But as noted above (at 17-18), the complaint fails to supply any details to support or explain the assertion that Refco affiliates lacked the "intent to repay," nor does it identify any specific officer or affiliate who lacked the intent to repay.  It is also unclear what is meant by the allegation that the affiliates lacked the "financial wherewithal to repay" the loans.  No allegations explain which affiliates, if any, were insolvent and which could not repay the loans for other reasons.  And as discussed previously, the RGHI Receivable could not have rendered the loans

uncollectible when they were made; the Refco affiliate that received the proceeds of a loan always had the ability to repay by returning the funds it had just received.

If anything, the complaint demonstrates that RCM was *solvent* during the relevant period. As the complaint sets forth, Refco disclosed information related to the sham third-party loans and the RGHI Receivable in October 2005.  Compl. ¶ 56.  These disclosures "prompted RCM customers to lose confidence in Refco and RCM" (*id.* ¶ 65), caused Refco's stock to plummet, "leading to well over $1 billion in lost market capitalization" (*id.* ¶ 90), and forced Refco into bankruptcy (*id.*).  By the Trustee's own account, then, it was these events in 2005 that caused Refco and its affiliates to eventually become insolvent and seek bankruptcy protection.

In sum, the Trustee's underlying claim for breach of fiduciary duty is fatally flawed, as it fails to allege a fiduciary relationship between RCM or its officers and the FX Customers.  On that basis as well, the claims for aiding and abetting the breach must be dismissed.

    **C.**    **The Trustee has also failed to plead conversion sufficiently and has not identified any specific property that was purportedly converted.**

Finally, the Trustee's claim for aiding and abetting conversion also fails because of flaws in the underlying cause of action.  Under New York law, "[t]o maintain a claim for conversion, a plaintiff must show legal ownership of a *specific identifiable piece of property* and the defendant's exercise of dominion over or interference with the property in defiance of plaintiffs' rights."  *Regions Bank v. Widers & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 413 (S.D.N.Y. 2007) (internal quotations omitted) (emphasis added).  Here, the conversion claims must be dismissed because the Trustee does not plead conversion with the requisite particularity and because the complaint does not allege that any specific, identifiable property was converted by the Refco insiders.

The allegations in the complaint render it impossible to discern the substance of the claimed conversion. The Trustee alleges only that the FX Customers placed funds with RCM for the purpose of executing FX transactions (*see, e.g.*, Compl. ¶¶ 20-22), and that at the time of Refco's bankruptcy, RCM was unable to pay back the funds deposited with RCM (*id.* ¶ 65). But what happened to these funds in the meantime is a complete mystery. While the Trustee does allege that the Refco insiders "caused the funds to be 'upstreamed,' 'side-streamed,' and 'down-streamed' to other Refco entities" (*id.* ¶ 34), the complaint is devoid of critical details. The Trustee provides absolutely no information as to what the agreement between the FX Customers and RCM provided for, where the FX Customers' funds were placed initially, how the funds were maintained upon placement with RCM, which funds were transferred to which Refco entities, or what happened to these funds after being loaned to other entities.

In a case like this one, such cursory allegations are not sufficient. Again, while claims for conversion are usually subject to general pleading requirements, "Rule 9(b) extends to all averments of fraud or mistake whatever may be the theory of legal duty-statutory, common law, tort, contractual, or fiduciary." *Frota*, 639 F. Supp. at 1193. Accordingly, where a "[p]laintiff's claim of conversion . . . rests on an allegation of fraudulent taking," it is "subject to the pleading requirements of Rule 9(b)." *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998); *Goddard v. Citibank, NA*, No. 04 Civ. 531, 2006 WL 842925, at *7 (E.D.N.Y. Mar. 27, 2006) (allegations that fraud was employed in the claimed conversion "trigger[] heightened pleading standards pursuant to Federal Rule of Civil Procedure 9(b)"). Here, the purported conversion is based on and results from an alleged fraud perpetrated by the Refco insiders. Without some detail as to "the who, what, when, where, and how" of the alleged fraudulent conversion (*In re*

23

*Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 327), the Trustee's allegations about conversion at RCM are all but impossible for Grant Thornton to defend.

Moreover, even if these allegations were sufficient to plead conversion sounding in fraud, the conversion claim still fails because the Trustee has not identified the specific property that was purportedly converted. Plaintiffs must allege the "specific and identifiable property converted by the defendants." *Walden Terrance, Inc. v. Broadwall Mgmt. Corp.*, 213 A.D.2d 630, 631, 624 N.Y.S.2d 217, 218 (2d Dep't 1995). This requirement is particularly important where, as is here, the property allegedly converted is ***money***. Courts have found that money placed with other entities is not the proper subject of a conversion action unless it is specifically identifiable or segregated from other funds. *See Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dep't 1995) ("Where the property is money, it must be specifically identifiable. . . ."); *9310 Third Ave. Assoc., Inc. v. Schaffer Food Serv. Co.*, 210 A.D.2d 207, 208, 620 N.Y.S.2d 255, 256 (2d Dep't 1994) ("[S]ince the allegedly converted money is incapable of being 'described or identified in the same manner as a specific chattel,' it is not the proper subject of a conversion action.") (internal citation omitted); *Mfrs. Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 124, 559 N.Y.S.2d 704, 712 (1st Dep't 1990) (allegedly converted money must be "specifically identifiable and segregated").

Here, the Trustee does not identify the FX Customer funds as a specific chattel and fails to allege that the funds in the FX Customer accounts were maintained separately or segregated from one another. Indeed, there is no reason to believe that these funds were segregated at all—a fact recognized by Judge Drain in the bankruptcy proceedings. Braun Decl., Exh. G at 129-34. The complaint does not explain which funds were transferred to which Refco entities or what happened to these funds. Instead, the allegations in the complaint indicate that all the FX

24

customer funds were held collectively. *See, e.g.*, Compl. ¶ 33 ("RCM purported to hold hundreds of millions of dollars of FX Customer cash at all relevant times."); *id.* ¶ 76(d) (noting that RCM "had the volume of unsegregated customer assets necessary to fund billions of dollars in intercompany loans"). Because the Trustee has failed to allege the specific and identifiable property purportedly converted, the claim of aiding and abetting conversion must be dismissed.

## POINT FOUR

### The claims against Grant Thornton are preempted by SLUSA.

The claims in this case must also be dismissed as preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), which preempts state law claims brought on behalf of more than 50 individuals based on wrongdoing in connection with the purchase or sale of securities. Here, as in the Litigation Trust action, the Trustee contends that the conversion of RCM customer funds was part of an overall scheme that culminated in the issuance of common stock through an initial public offering. Compl. ¶¶ 3, 4. As pleaded, this case therefore falls within SLUSA's preemption provisions. On this point, Grant Thornton joins and adopts the SLUSA argument advanced by defendant Mayer Brown LLP in its memorandum, also filed today.

## <u>CONCLUSION</u>

For the reasons discussed above, the Trustee's claims should be dismissed with prejudice.

Dated:  June 6, 2008
      New York, New York

Respectfully submitted,

WINSTON & STRAWN LLP

_____/s/_____
By:  David E. Mollón

*Of Counsel:*

Margaret Maxwell Zagel
Tracy W. Berry
Kenneth Cunningham
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
Ph: 312-856-0001
Fax: 312-565-3473

David E. Mollón (dmollon@winston.com)
WINSTON & STRAWN LLP
200 Park Avenue
Ph: 212-294-6700
Fax: 212-294-4700

Bradley E. Lerman (blerman@winston.com)
Catherine W. Joyce (cjoyce@winston.com)
Linda T. Coberly (lcoberly@winston.com)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Ph: 312-558-5600
Fax: 312-558-5700

*Attorneys for Grant Thornton LLP*

26