Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))**

▷
A.I.A. Holdings, S.A. v. Lehman Bros., Inc.
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
A.I.A. HOLDINGS, S.A., et al., Plaintiffs,
v.
LEHMAN BROTHERS, INC., and BEAR, STE-
ARNS & CO., INC., Defendants.
LEHMAN BROTHERS, INC. and BEAR, STE-
ARNS & CO., INC. Counterplaintiffs,
v.
A.I.A. HOLDINGS, S.A. et al., Counterdefendants.
LEHMAN BROTHERS, INC. and BEAR, STE-
ARNS & CO., INC. Third-Party Plaintiffs,
v.
SIGMA INTERNATIONAL LTD. SARL, Third-
Party Defendant.
**No. 97 CIV.4978 (LMM).**

Feb. 3, 1999.

MEMORANDUM AND ORDER

MCKENNA, D.J.
*1 Plaintiffs A.I.A. Holdings, S.A., et al.,
("Plaintiffs," "Counterdefendants," or "Investors")
have moved pursuant to Fed.R.Civ.P. 9(b) and
12(b)(6) to dismiss the counterclaims asserted by
Lehman Brothers Inc. ("Lehman") and Bear, Ste-
arns & Co., Inc. ("Bear Stearns")(collectively, the
"Defendants," or "Counterplaintiffs"). For the reas-
ons set forth below, the motion to dismiss is gran-
ted. Leave to replead is granted for the claim of
contribution against Nassereddine.

I. PROCEDURAL HISTORY

The Plaintiffs commenced this underlying action
against Lehman and Bear Stearns in July 1997 al-
leging various claims arising out of a fraud al-
legedly perpetrated against them by a Lebanese
broker and investment advisor, Ahmad Ihsan El-

Daouk ("Daouk"). The complaint alleges that the
Defendants are directly liable to the Plaintiffs for
breach of fiduciary duties (Counts I, III); breach of
contract (Counts XVII, XVIII); negligence (Counts
XIX, XX); negligent supervision of Daouk (Counts
XV, XVI); and aiding and abetting (Counts XXI,
XXII, XXIII, and XXIV). It also alleges that De-
fendants are vicariously liable to Plaintiffs for
Daouk's breach of fiduciary duties (Counts II, IV);
negligence (Counts V, VI); negligent misrepresent-
ation (Counts VII, VIII); fraud (Counts IX, X); con-
structive fraud (Counts XI, XII); and breach of con-
tract (Counts XIII, XIV).

In September 1997, the Defendants moved to dis-
miss the complaint. That motion was granted in part
and denied in part by this Court on March 27, 1998.
*See A.I.A. Holdings, S.A. v. Lehman Bros. and Bear
Stearns & Co.,* 1998 U.S. Dist. LEXIS 4175
(S.D.N.Y. March 27, 1998).

Specifically, the Court dismissed Counts V through
VIII, XIX, and XX, finding these claims which as-
serted negligence and negligent misrepresentation
were duplicative of the contract claims. (*Id.* at 27).
Counts I through IV, IX through XII, and XXI
through XXIV, alleging fraud and breaches of fidu-
ciary duty were also dismissed with leave to re-
plead with particularity. (*Id.* at 27-28).

On May 11, 1998, Lehman and Bear Stearns asser-
ted various counterclaims against the Plaintiffs in-
cluding: unjust enrichment, money had and re-
ceived, contribution against SIGMA International
Ltd. SARL ("SIGMA") and Monhem Nassereddine
("Nassereddine"), and a claim for fraudulent con-
veyance. These counterclaims are the subject of the
Plaintiffs' motion to dismiss.[FN1]

> FN1. Plaintiffs do not challenge the claim
> for contribution against SIGMA in their
> motion to dismiss.

II. BACKGROUND

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))

Page 2

Details of the allegations set forth in the complaint are summarized in this Court's March 27, 1998 opinion. The following summarizes facts alleged in the Defendants' counterclaims that are relevant to the present motion to dismiss. For purposes of deciding the motion, the facts are presumed to be true.

*The Underlying Action*

Plaintiffs are individuals and entities who invested with Daouk, their broker and investment advisor, over the course of seven years. (Ctrclm.¶ 13). The Plaintiffs entered into Trading Agreements with Daouk which gave him discretionary authority to invest and manage the accounts for the Plaintiffs.(*Id.*) Daouk made various misrepresentations to Plaintiffs before opening their accounts upon which Plaintiffs allegedly relied. (*Id.* ¶ 14). Counterplaintiffs allege, upon information and belief, that many of the Counterdefendants had known Daouk personally for many years before retaining him as advisor. (*Id.*) Counterplaintiffs further allege that based on the trust and confidence Counterdefendants reposed in Daouk as a result of these personal relationships, they chose him as their investment advisor. (*Id.*) According to the Counterplaintiffs, that decision was also influenced by Nassereddine's recommendations of Daouk's skills and abilities. (*Id.*)

**\*2** Nassereddine, it is alleged on information and belief, was a fifty percent shareholder, manager, officer and director of SIGMA. (*Id.* ¶ 8). SIGMA was created in 1990 as a vehicle for receiving funds from investors.(*Id.* ¶ 15). The SIGMA fund included the commingled funds of approximately eighteen investors. (*Id.*) Defendants allege upon information and belief that Nassereddine was "responsible for soliciting investors for the SIGMA fund, for communicating with the investors in the fund, and for answering the inquiries of the investors."(*Id.*)

Pursuant to the Trading Agreements, Daouk opened one or more individual trading accounts for each

Plaintiff at Lehman or Bear Stearns, or assigned one or more of the Plaintiffs to a trading account that Daouk created at Lehman or Bear Stearns for the Related Entities.[FN2](*Id.* ¶ 2). Lehman and Bear Stearns acted as clearing brokers for trading done by Daouk on behalf of the Plaintiffs. (*Id.* ¶¶ 17, 18). The Plaintiffs ultimately lost their investments through an elaborate fraud scheme perpetrated against them by Daouk. (*Id.* ¶ 2). Daouk concealed Plaintiffs' losses by forging monthly account statements that reflected fictitious trading activity and net profits, and executing unauthorized inter-account wire transfers to pay the Plaintiffs when they sought to withdraw either the fictitious profits reflected in their monthly statements or their principal investment. (*Id.* ¶¶ 2, 33).

> FN2. The Related Entities consist of three corporations which Daouk created and controlled between 1983 and 1995 in order to handle some of the Plaintiffs' investments: (1) Mideast Trading Limited; (2) International Financial Consulting S.A.R.L.; and (3) SIGMA (collectively the "Related Entities"). (Ctrclm.¶ 1).

*Forged Monthly Statements*

In connection with establishing the individual trading accounts, Daouk provided each Plaintiff with account opening documents from Lehman and Bear Stearns. (*Id.* ¶ 20). The Plaintiffs were required to give an actual residence or business mailing address so that the Defendants could send " 'among other things, trade confirmations, monthly account statements, activity letters, or other related correspondence," ' to the Plaintiffs directly. (*Id.* ¶ 21).

Defendants allege that Daouk substituted, for each of the Plaintiffs' residence or business address, one of his own Beirut post office box addresses. (*Id.* ¶ 22). Unknown to the Defendants, he then intercepted the monthly account statements, trade confirmations and correspondence mailed by the Defendants, and sent out instead forged monthly account statements which he had prepared. (*Id.* ¶ 24). De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))

Page 3

fendants further allege that the forged statements (1) failed to detail specific trades, including instead cash balances and the total amount of U.S. Treasury Bills in the Plaintiffs' accounts for certain time periods; (2) contained misspelled words and mathematical errors; (3) did not include the Plaintiffs' mailing addresses; and (4) showed fictitious activity and net profits of approximately 20% per annum, although the accounts had actually sustained substantial losses. (*Id.* ¶¶ 24-25, 28, 30-31). Additionally, Defendants allege, upon information and belief, that although reference was made to printed information on the reverse of the monthly statements, no such information appeared. (*Id.* ¶ 25).

*3 Moreover, in some cases, statements were received once every three months, instead of monthly, as was required by the account opening documents.(*Id.* ¶ 24). And, in still other cases, Plaintiffs never received any monthly statements. (*Id.* ¶ 29). Rather, these Plaintiffs received correspondence that summarized the balances in their accounts. (*Id.*) Defendants allege that based on the above and the profits that Plaintiffs were receiving on speculative currency and commodity transactions, the Plaintiffs knew or should have known that Daouk's conduct was improper. (*Id.* ¶ 32).

*Transfer of Funds*

Counterplaintiffs allege that Daouk executed unauthorized wire transfers between and among the Counterdefendants' accounts and the proprietary accounts controlled by Daouk. (*Id.* ¶ 33). These inter-account transfers were done to pay the Plaintiffs the fictitious profits shown in their monthly statements or their initial capital investment when they requested withdrawals. (*Id.*) Counterplaintiffs contend that these claims initially alleged by the Counterdefendants in the complaint constitute an admission that some received money that did not belong to them because the funds were transferred from the accounts of other Investors or from Daouk's proprietary accounts. (*Id.*)

III. DISCUSSION

A. Rule 12(b)(6) Standard

Rule 12(b)(6) provides that a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). In the course of resolving a motion to dismiss pursuant to Rule 12(b)(6), the court reads the complaint generously accepting the truth of and drawing all reasonable inferences from the well-pleaded factual allegations.*Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). The court will only dismiss a complaint under Fed.R.Civ.P. 12(b)(6)"if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' ' *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

B. UNJUST ENRICHMENT

Defendants bring this counterclaim against

those Plaintiffs who (i) obtained more funds from Daouk and the Related Entities than they put in; (ii) withdrew funds from Daouk and the Related Entities after their accounts were allegedly "wiped out entirely;" (iii) received, as transfers into their accounts with Daouk and the Related Entities, the funds deposited by other Plaintiffs, which funds the Counterdefendants then used to trade in the speculative currencies and commodities markets; and (iv) received funds from and through Daouk and the Related Entities, which funds were not their own, but rather were funds belonging to other Plaintiffs.

(Ctrclm.¶ 42). Defendants allege that these Plaintiffs were unjustly enriched by the receipt of such transfers. (*Id.* ¶ 45). Defendants claim that the enrichment was at their expense because they are potentially liable to those Plaintiffs whose accounts were debited as part of Daouk's fraudulent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 4
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))**

*Id.*) In Defendants' prayer for relief they request that the funds be returned, "for distribution to those Plaintiffs, if any, to whom Defendants are found liable, together with the costs, disbursements and expenses incurred in bringing [the] action."(*Id.* p. 25 ¶ A).

**\*4** To state a claim for unjust enrichment under New York law the plaintiff must show that the "defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff."*Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983). The Plaintiffs move to dismiss the counterclaim on the following grounds: (1) the transferred funds did not belong to the Defendants; (2) Defendants' potential future liability cannot support this claim; and (3) Defendants do not seek the appropriate relief for a claim of unjust enrichment.

The Court grants the motion to dismiss because Defendants have failed to allege facts showing that Plaintiffs were unjustly enriched at Defendants' expense. The beneficiaries of Daouk's unauthorized wire transfers never obtained money in which the Defendants had a possessory interest-the money belonged to other Investors. Because Defendants lack any possessory interest in the funds, their claim for unjust enrichment fails. *See, e.g., Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 79 (2d Cir.1986); *Mayer v. Josiah Wedgewood & Sons, Ltd.,* 601 F.Supp. 1523, 1536 (S.D.N.Y.1985). If some of the Plaintiffs were unjustly enriched by their receipt of funds belonging to other Plaintiffs, it was not at the Defendants' expense. A claim for unjust enrichment will "lie[ ] only where the defendant possesses money or received a benefit which in equity and good conscience the defendant should not retain because it *belongs to the plaintiff.*" *Martes v. USLIFE Corp.,* 927 F.Supp. 146, 149 (S.D.N.Y.1996)(emphasis added). Counterplaintiffs are unable to make this showing. Accordingly, the counterclaim is dis-

missed. *See, e.g., Reed Int'l Trading Corp. v. Donau Bank AG,* 866 F.Supp. 750, 757 (S.D.N.Y.1994)("Since plaintiffs cannot maintain an unjust enrichment claim for the return of funds in which they had no *possessory interest* their unjust enrichment claims ... must ... be dismissed.") (emphasis added).

### C. MONEY HAD AND RECEIVED

Defendants assert this counterclaim for money had and received against those Plaintiffs previously described in the counterclaim for unjust enrichment. (Ctrclm.¶ 49). Plaintiffs argue that the claim should be dismissed on grounds similar to the ones raised for unjust enrichment. Defendants allege that the funds should be returned to them because the Plaintiffs received the funds by mistake, and that this occurred at Defendants' expense since they may be held liable to Plaintiffs for their losses. (*Id.* ¶ 51).

"The essential elements in a claim for money had and received under New York law are that (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money."*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 125 (2d Cir.1984). Defendants' claim is dismissed for failing to allege facts showing the first element.

**\*5** It is well-settled under New York law that in order for a plaintiff to recover under this cause of action the defendant must have received money or property belonging to the plaintiff. *See Grain Traders, Inc. v. Citibank,* 960 F.Supp. 784, 793 (S.D.N.Y.1997) ("To prevail ...[plaintiff] must prove that ... [it] had a possessory interest in the funds."), *aff'd,*160 F.3d 97 (2d Cir.1998); *Richardson Greenshields Sec. Inc. v. Lau,* 819 F.Supp. 1246, 1268 (S.D.N.Y.1993)("The core elements for a claim of money had and received ... are ... (1) *defendant received money belonging to plaintiff*....")

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))**

(emphasis added); *Amanat v. Bank Leumi Trust Co.*, 662 N.Y.S.2d 501, 502 (App.Div. 1st Dep't.1997)("[A]llegations were correctly held insufficient to state a cause of action for money had and received in that they failed to give notice of why money ... rightfully belongs to plaintiff.").

Defendants admit that the money transferred does not belong to them. They concede that the funds belong to other Plaintiffs. In fact, Defendants seek the return of the funds solely to re-distribute such funds to those Plaintiffs, if any, to whom they are found liable. Defendants cite no legal authority in support of such relief. Defendants cannot maintain an action for the recovery of funds in which they had no possessory interest. Accordingly, the counterclaim for money had and received is dismissed.

## D. CONTRIBUTION AGAINST MONHEM NAS-SEREDDINE

Defendants allege that Nassereddine

as a 50% shareholder and director of SIGMA, and based upon his relationship with [the Investors] ... owed fiduciary and other duties to the customers of SIGMA to act in good faith, with reasonable care, skill and diligence, in a manner comporting with the customers' financial needs and trading objectives, and to advise his customers of relevant facts and circumstances known to him.

(Ctrclm.¶ 58). Defendants then allege that Nassereddine breached his fiduciary duty by failing to insure that the trading done on the customers' accounts was consistent with their objectives, and that they received accurate trading confirmations and monthly statements. (*Id.* ¶ 59). In the event that some or all of the Plaintiffs obtain a judgment against the Defendants, Defendants seek contribution from Nassereddine in the amount of that judgment.(*Id.* ¶ 62). Plaintiffs argue that this counterclaim should be dismissed because Defendants have failed to allege a fiduciary relationship between Nassereddine and the investors of the SIGMA fund,

and even if such a relationship exists, Defendants have not established a breach of those duties. Plaintiffs also contend that the counterclaim should be dismissed because Defendants did not plead with the requisite specificity required by Rule 9(b).

Under New York law "two or more persons who are subject to liability for damages for the same ... injury to property ... may claim contribution."N.Y. C.P.L.R. § 1401 (McKinney's 1997). A claim for contribution is actionable "whether or not the culpable parties are allegedly liable for the injury under the same or different theories."*Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.*, 528 N.Y.S.2d 516, 518 (1988); *see also Tri-Ex Enters., Inc. v. Morgan Guar. Trust Co.*, 586 F.Supp. 930, 933 (S.D.N.Y.1984) (claim for contribution requires that the parties "share responsibility for an injury in violation of duties they respectively owed to the injured person").

*6 Lehman and Bear Stearns seek contribution for the investment losses Plaintiffs sustained as victims of Daouk's alleged scheme to defraud. They allege that Nassereddine owed fiduciary duties to the SIGMA investors because of his role as a majority shareholder, officer and director of SIGMA, and because he solicited Plaintiffs to invest with Daouk in the SIGMA fund, communicated with them and answered questions about their investments.

Defendants' contribution claim is subject to the particularity requirements of Fed.R.Civ.P. 9(b) ("Rule 9(b)") given that Defendants seek contribution from Nassereddine based on his alleged breach of fiduciary duties in connection with the underlying scheme to defraud Plaintiffs.[FN]*A.I.A. Holdings, S.A.*, 1998 U.S. Dist. Lexis 4175, at *25-26; *American Mobile Communications, Inc. v. Nationwide Cellular Serv., Inc.*, 1992 WL 232058, at *6 (S.D.N.Y. Sept. 3, 1992).Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))

Page 6

FN3. Defendants allege in their opposition papers that Nassereddine was involved on some level in Daouk's scheme to defraud. *See* Counterplainitiffs' Br. p. 17 n. 12 ("Discovery ... further reveals Nassereddine's complicity in Daouk's scheme.").

To successfully plead a claim for breach of fiduciary duty, the plaintiff must show: "the existence of a fiduciary relationship; the nature of the relationship and when and how it arose; [and] the circumstances surrounding the breach of the relationship."*Lunsford v. Farrell Shipping Lines, Inc.,* 1991 WL 150596, at *8 (S.D.N.Y.1991). To prevail the Counterplaintiffs must allege at least some of the factors from which the Court can determine that such a relationship had been established. *Eickhorst v. E.F. Hutton Group, Inc.,* 763 F.Supp. 1196, 1203 (S.D.N.Y.1990). Defendants have failed to do so in compliance with Rule 9(b).

A fiduciary relationship is one that is based on " 'trust or other confidence reposed by one person in the integrity and fidelity of another." ' *Richardson Greenshields S ec., Inc. v . Lau ,* 6 93 F.Supp. 1445, 1456 (S.D.N.Y.1988). Under New York law there is no fiduciary duty owed to the investing public, or to the customers of a corporation by a controlling shareholder, officer, or director of a corporation. *See Klein v. Goetzmann,* 745 F.Supp. 107, 112-13 (N.D.N.Y.1990); *see also O'Connor & Assocs. v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1183-84 (S.D.N.Y.1981)(corporate officers and directors owe fiduciary duties to shareholders of corporation, not to option traders because corporation is not run for his benefit). Thus, Nassereddine's status as a 50% shareholder and officer and director of SIGMA does not create a fiduciary relationship with the investors of the SIGMA fund.

Defendants must then allege other factors demonstrating the existence of a relationship in which trust and confidence has been reposed, such as allegations of past dealings or prior relationships. *See, e.g., Eickhorst,* 763 F.Supp. at 1203;*see also Martin v.. EVP Second Corp.,* 1991 WL 131176, at

*4 (S.D.N.Y July 9, 1991); *Mechigian v. Art Capital Corp.,* 612 F.Supp. 1421, 1431 (S.D.N.Y.1985). Defendants have not done so. Defendants have merely stated in conclusory and general terms that because Nassereddine solicited investors to the SIGMA fund and communicated with them, a fiduciary duty was established. The counterclaim fails to mention which Plaintiffs were solicited, how that was accomplished, what specifically Nassereddine communicated to the Plaintiffs, what questions were answered, or the full extent of his relationship with the SIGMA customers. Given these deficiencies, the Court cannot conclude that Defendants have established the existence of a fiduciary relationship with the requisite specificity required by Rule 9(b). Consequently, the Court does not reach the issue of whether a fiduciary duty was breached. Accordingly, the counterclaim is dismissed, but with permission to replead with particularity within sixty days after discovery has been conducted and Defendants have deposed all Plaintiffs whom they wish to depose.

### E. FRAUDULENT CONVEYANCE

*7 Defendants assert this counterclaim of fraudulent conveyance against certain groups of Plaintiffs to set aside some or all of the funds transferred by Daouk to those Plaintiffs. (Ctrclm.¶¶ 71-80). Defendants presumably rely on Sections 274-276 of New York's Debtor and Creditor Law ("N.Y.D.C.L.") [FN4] to support their claim for fraudulent conveyance. *See* Ctrclm. ¶¶ 79a-c to 80. Plaintiffs move to dismiss the counterclaim alleging that Defendants lack standing because they fail to allege they were injured by the transfers and the transfers did not involve funds of the transferor. Plaintiffs also argue that Defendants do not satisfy the pleading requirements of Rule 9(b).

FN4.

Section 274. Conveyances by persons in business.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 7
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

N.Y. Debtor & Creditor Law § 274 (McKinney 1997).

Section 275. Conveyances by a person about to incur debts

"Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."N.Y. Debtor & Creditor Law § 275 (McKinney 1997).

Section 276. Conveyance made with intent to defraud.

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."N.Y. Debtor & Creditor Law § 276 (McKinney 1997).

The Court finds that the fraudulent conveyance claim fails because Defendants lack standing to assert the claim, and therefore declines to discuss Plaintiffs' other arguments for dismissal. As initially alleged by the Plaintiffs in the complaint, and repeatedly re-alleged by Defendants in the counter-

claims the funds transferred by Daouk did not belong to him, but to the other Investors. (Ctrclm.¶¶ 34-38, 75-76). Defendants seek to set aside these funds as well as the fees and commissions earned by Daouk and the Related Entities from trading done on the Plaintiffs' accounts. (Id. ¶ 72).

The Court is convinced that Defendants may not assert a claim of fraudulent conveyance where the property transferred does not belong to the transferor. See Bell v. Leakas, 1993 WL 77320, at *7 (S.D.N.Y. March 13, 1993); Bryce v. National City Bank, 17 F.Supp. 792, 795 (S.D.N.Y.1937)("In order that a transfer may be actionable as in fraud of creditors, it is necessary that the assets of the transferor be depleted.") (emphasis added), aff'd,93 F.2d 300 (2d Cir.1937); A.J. Armstrong Co. v. Halikman, 45 A.D.2d 995, 996, 358 N.Y.S.2d 86, 87 (App.Div.2d Dep't.1974) (conveyance of husband's interest in property to wife was not fraudulent where wife used her own money for the downpayment, for payment of second mortgage and at the time of conveyance the husband only held his interest in trust for his wife). "[T]he relief to which a defrauded creditor [is] entitled in an action to set aside a fraudulent conveyance [is] limited to that which could have been obtained had there been no conveyance."Marine Midland Bank v. Murkoff, 120 A.D.2d 122, 130, 508 N.Y.S.2d 17, 23 (App.Div.2d Dep't.1986).

In their opposition papers, Defendants argue that their claim should survive because some of the funds transferred were Daouk's fees and commissions and the fees and commissions of the Related Entities earned from investing Plaintiffs' money. (Def. Memo p. 20 ¶ B). They contend that these fees and commissions are assets belonging to Daouk. The Court concludes, however, that the fees and commissions earned by churning the Plaintiffs' investments cannot be considered Daouk's property. Any fees Daouk earned through the alleged fraudulent scheme would be in violation of his fiduciary obligations to the Plaintiffs. The financial profits Daouk earned were the product of illicit activity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.))**

and held in a constructive trust for the benefit of the Plaintiffs. *See United States v. Kearns,* 595 F.2d 729, 733 (D.C.Cir.1978)("Where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary)(citing *Restatement on Restitution* § 197 (1937)); *Sexton v. Sword S.S. Line, Inc.,* 118 F.2d 708, 712 (2d Cir.1941)(L.Hand, J., concurring) ("As soon as the fees were earned the law imposed upon his behalf a constructive trust which compelled him to hold them for the estate's benefit.").

### F. CONCLUSION

**\*8** The counterclaims for unjust enrichment, money had and received and fraudulent conveyance are dismissed. As to the counterclaim for contribution against Nassereddine the motion to dismiss is granted, but Defendants may replead with particularity within sixty days of the conclusion of discovery.

SO ORDERED.

S.D.N.Y.,1999.
A.I.A. Holdings, S.A. v. Lehman Bros., Inc.
Not Reported in F.Supp.2d, 1999 WL 47223 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.))**

**C**
DDCLAB Ltd. v. E.I. DuPont De Nemours and Co.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
DDCLAB LTD., Plaintiff,
v.
E.I. DU PONT DE NEMOURS AND COMPANY,
Defendant.
**No. 03 CV 3654GBD.**

Feb. 18, 2005.

*MEMORANDUM DECISION & ORDER*

DANIELS, J.
**\*1** Plaintiff DDCLAB Ltd. ("DDCLAB") com-
menced this action, *inter alia*, for breach of contract
claiming defendant E.I. Du Pont De Nemours and
Company ("DuPont") failed to provide DDCLAB
with a promised revolving line of credit. DuPont
moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dis-
miss the complaint for failure to state a claim upon
which relief can be granted. The motion is granted
and the complaint is dismissed in its entirety.

The complaint alleges that in October of 2001, the
parties began to negotiate the details of an agree-
ment whereby defendant would invest money in
plaintiff. DDCLAB was "looking for" an invest-
ment of six million dollars to expand its wholesale/re-
tail business without financial restriction. (Compl.¶
5). DDCLAB claims that at a October 16, 2001
meeting, DuPont's representatives indicated that
DuPont would secure a revolving line of credit for
DDCLAB at a low interest rate of 3-4%. (Compl.¶
7). The complaint states that "[t]he revolving line
of credit was to be set up with the banks as part of
DuPont's investment in DDCLAB."(Compl.¶ 7). On
February 25, 2002, DDCLAB was allegedly as-
sured by DuPont "that once the deal was closed,
DuPont would set up the revolving line of credit
with a bank and DuPont would get the best deal for

the borrowing for DDCLAB."(Compl.¶ 8).
DuPont's representative allegedly indicated that the
revolving line of credit would not be included in
the letter of intent between the parties because
DuPont would not be lending the money directly to
DDCLAB. The complaint indicates that on May 31,
2002, it was again represented that the line of credit
would be set up by DuPont with "one of its banks."
(Compl.¶ 9). On June 12, 2002, the parties entered
into a Commercial Agreement and an Investment
Agreement (collectively "the Written Agreements")
whereby DuPont invested one million dollars in
DDCLAB thereby becoming a 19% shareholding in
DDCLAB. The complaint states that "DDCLAB
agreed to a smaller investment than it was origin-
ally seeking by DuPont of only one million dollars
($1,000,000) in consideration for DuPont's assur-
ances that it would set up a revolving line of credit
for DDCLAB once the Written Agreements were
executed."(Compl.¶ 10).

The parties executed a Commercial Agreement and
an Investment Agreement on June 12, 2002. The
Commercial Agreement made no mention of
DuPont's obligation to set up a revolving line of
credit for DDCLAB.

The parties' Investment Agreement is a compre-
hensive forty-nine page contract detailing the par-
ticular rights and obligations of the parties, includ-
ing the expressed representations of both contract-
ing parties. Prior to setting forth the specific terms
of the agreement, the introductory portion of the
contract states:

WHEREAS, DUPONT and DDCLAB are, simul-
taneously with execution of this Investment Agree-
ment, entering into a certain Commercial Agree-
ment (the above agreements are hereafter referred
to as the "Agreements"), which collectively provide
for a constructive and mutually beneficial relation-
ship between DUPONT and DDC LAB;

**\*2** WHEREAS, DDCLAB desires to obtain one

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.))**

Page 2

million dollars ($1,000,000) of additional capital by selling DUPONT 19% of the fully diluted unregistered shares of its common stock and DUPONT desires to acquire the same, all subject to the terms and conditions of this Investment Agreement; and

WHEREAS, DUPONT desires to acquire an option to purchase up to an additional five percent (5%) of the number of issued and outstanding shares of DDCLAB Common Stock, and DDCLAB is willing to grant such an option to DUPONT as an inducement to DUPONT entering the Agreement;

NOW, THEREFORE, in consideration of the respective agreements herein contained and subject to the terms and considerations set forth herein, the parties agree ... (Compl. Ex. B at 1-2).

The Investment Agreement is silent as to any promise by DuPont to establish a revolving line of credit for DDCLAB. The agreement contained an integration provision stating:

This Agreement and the agreements referred to herein contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. (*Id* . at ¶ 9.10).

The agreement further provides that any changes or additions to the agreement require DuPont's consent in writing. (*Id.* at ¶ 9 .1).

The complaint additionally alleges that on July 14, 2004, after the Written Agreements were signed, it was represented that "DuPont would set up a revolving line of credit with banks and other investors" and that "DuPont was working to package DDCLAB to the banks."(Compl.¶ 11). The complaint alleges that on July 17, 2002, DDCLAB advised DuPont "that DuPont's promise to set up the revolving line of credit for DDCLAB was crucial" to DDCLAB's business operations. (Compl.¶ 12). The complaint further states that on August 1, 2002, a DuPont's representative indicated, for the first time, that DuPont did not promise to set up a revolving line of credit for DDCLAB.

Plaintiff claims that it relied on defendant's promises concerning the revolving line of credit by accepting purchase orders for clothing and entering into contractual obligations with manufacturers to produce lines of clothing. DDCLAB contends that it would not have done so without the expectation of an influx of capital from the revolving line of credit. DDCLAB also allegedly hired additional sales personnel in response to DuPont's request that DDCLAB have the necessary personnel to handle the anticipated growth of DDCLAB's business. DDCLAB alleges that without the revolving line of credit, it has been unable to pay manufacturers for purchase orders; has lost profits, clients, and wholesale accounts; suffered damage to its reputation in the industry; and accumulated millions of dollars in debt. The complaint asserts two causes of action for breach of contract, as well as claims for promissory estoppel, fraud, negligent misrepresentation and breach of fiduciary duty.

### *MOTION TO DISMISS STANDARD*

**\*3** In reviewing a complaint for dismissal under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Bolt Elec ., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). The complaint should only be dismissed where it appears beyond doubt that the plaintiff can present no set of facts entitling it to relief. *Conley v. Gibson,* 355 U.S. 41, 46 (1957); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). On a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), the Court is precluded from considering matters outside of the complaint.*Courtenay Communications, Corp. v. Hall,* 334 F.3d 210, 213 (2d Cir.2003). In this regard, a complaint includes any written instrument attached as an exhibit. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel., Co.,* 62

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.))**

Page 3

F.3d 69, 72 (2d Cir.1995)).

### BREACH OF CONTRACT

In the first two causes of action for breach of contract, plaintiff alleges that the continuing promises made on behalf of DuPont gave rise to an enforceable contract between the parties, and that "DuPont has failed and neglected to perform by the terms of its agreement in that it failed to provide a revolving line of credit."[FN1](Compl.¶¶ 21, 28)

> FN1. In the first cause of action, DDCLAB claims that it "entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB."(Compl.¶ 19). In the second cause of action, DDCLAB alleges that it "entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB once *'thedealwasdone.'* ' (Compl.¶ 26) (emphasis added).

DuPont argues that DDCLAB's conclusory assertion that it sold nineteen percent share of its equity to DuPont for one million dollars in consideration of DuPont's oral promises to set up a revolving line of credit fails for the following two reasons: (1) the existence of the comprehensive Written Agreements between the parties; and (2) DDCLAB's unequivocal declaration, through the Investment Agreement's merger clause, that the Written Agreements alone define the rights and obligations of the parties with respect to DuPont's investment in DDCLAB.

Plaintiff argues that its complaint is not based on a claim that, in consideration of defendant's oral promises to set up a revolving line of credit for DDCLAB, DDCLAB sold its equity shares to DuPont for one million dollars. Rather, DDCLAB

contends that the complaint alleges that DDCLAB only entered into the Written Agreements because of DuPont's separate oral and written assurances that it would provide DDCLAB with access to a revolving line of credit. DDCLAB maintains that the revolving line of credit was purposefully separate from the Written Agreements, and that the parties agreed not to memorialized that obligation into the Written Agreements because DuPont was not investing the money directly into DDCLAB.

Where the parties' agreement is clearly set forth in a written document, a determination of the parties' contractual obligations and rights are generally to be determined by examination solely of the written agreement. *W.W.W. Assocs., Inc. v. Giancontieri,* 565 N.Y.S.2d 440, 443 (N.Y.1990). Thus, where the written agreement is "clear and complete on its face" and it "lucidly manifests the parties' intent" that the contract supercedes prior oral promises and constitutes the parties' entire agreement, "the parol evidence rule effectively bars any action to enforce the oral agreement."*Doherty v. New York Tel. Co.,* 609 N.Y.S.2d 306, 307 (N.Y.App.Div.1994) (citation omitted). The purpose of having a merger clause in a contract is so that the parole evidence rule may be applied to preclude the introduction of extrinsic evidence to alter, vary, or contradict the terms of the writing. *Jarecki v. Shung Hoo Louie,* 722 N.Y.S.2d 784, 786 (N.Y.2001) (citation omitted). Such a clause establishes the parties' intent that the written agreement is to be considered a fully integrated writing. *Primex Int'l Corp. v. Wal-Mart Stores, Inc.,* 657 N.Y.S.2d 385, 388 (N.Y.1997).

**\*4** The parole evidence rule is, however, inapplicable with regard to oral agreements that do not vary, modify, or otherwise contradict the parties' written contract. *Gem Corrugated Box Corp. v. Nat'l Kraft Container Corp.,* 427 F.2d 499, 503 (2d Cir.1970). Despite a strong integration clause contained in a written contract, an oral agreement can be treated as a separate and independent contractual obligation. *Lee v. Joseph E. Seagram & Sons, Inc.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 4
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.))**

552 F.2d 447, 451-52 (2d Cir.1977). The primary consideration in determining whether the oral agreement is distinct from the written contract is "whether, in the context of the particular setting, the oral agreement was one which the parties would ordinarily be expected to embody in the writing."*Id.* at 451.

The complaint alleges that "DDCLAB agreed to a smaller investment than it was originally seeking by DuPont of only one million dollars ($1,000,000) in consideration for DuPont's assurances that it would set up a revolving line of credit for DDCLAB once the Written Agreements were executed."(Compl.¶ 10). The complaint further states "that the revolving line of credit was to be set up with the banks as part of DuPont's investment in DCCLAB ."(Compl.¶ 7). The terms of DuPont's investment in DDCLAB is set forth in the Investment Agreement in great detail. However, nowhere in the Investment Agreement, or in the Commercial Agreement, is there any mention of an obligation by DuPont to establish a revolving line of credit as part of its investment in DDCLAB. Moreover, the Investment Agreement specifically outlined the parties' respective consideration forming the basis for this agreement. The enumerated consideration did not include DuPont's future obligation to provide DDCLAB with a line of credit. The agreement indicates that DDCLAB would grant DuPont an option to purchase additional stock as an inducement to DuPont entering into the agreement. Yet, the agreement is silent as to DuPont's alleged obligation to provide a revolving line of credit which DDCLAB claims served as an inducement for DDCLAB to enter into the agreements for far less than the five million dollars it was seeking.

The complaint alleges that the contractual obligation to provide a line of credit was part of the investment deal with DuPont, and was the consideration for DDCLAB to enter into the Written Agreements. Reasonable businesspeople would therefore anticipate such an obligation to be set forth in the written contract.[FN2]Additionally, DuPont's alleged

obligation is so closely connected to the principle transaction, it would clearly be made a part of the written agreement. *See,Mitchill v. Lath,* 160 N.E. 646, 647 (N.Y.1928). Where "the alleged oral agreement is closely related to the subject dealt with in the written agreement, and thus the transactions are necessarily and inextricably bound together," the parole evidence rule will bar the introduction of extrinsic evidence of a claimed oral agreement. *Backer v. Lewit,* 584 N.Y.S.2d 480, 482 & n. 1 (N.Y.App.Div.1992). Since the Investment Agreement contains an integration clause providing that the entire agreement and understanding between the parties are set forth in the agreement, and that the agreement supersedes all prior agreements and understandings, plaintiff is precluded from claiming a separate enforceable contract which induced it to execute the written agreement. Additionally, the Investment Agreement provides that it could not be modified absent written consent by DuPont. Since plaintiff has not alleged that such a written modification occurred, no breach of contract can be premised upon DuPont's alleged oral representations made after the agreement was executed.

> FN2. In fact the complaint alleges that during negotiations, the parties considered whether to include the oral promise in the Written Agreements, and purposely decided to exclude it. Thus, as the parties themselves recognized, given the nature of the promise, it would have been otherwise reasonable to anticipate incorporating it into the Written Agreements. However, the parties opted not to proceed in that manner, and plaintiff chose to execute the contracts with full knowledge that such an oral promise was intentionally omitted and not made a part of the agreements.

*5 Even if providing a revolving line of credit was found to be an independent oral promise of DuPont, separate and apart from the Written Agreements, it would still be unenforceable. In order for a contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to be binding, there must be a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."*Express Indus. and Terminal Corp. v. New York State Dep't of Transp.,* 693 N.Y.S.2d 857, 860 (N.Y.1999) (citation omitted). Even though contractual terms need not be fixed with absolute certainty, *F & K Supply Inc. v. Willowbrook Dev.,* 732 N.Y.S.2d 734, 737 (N.Y.App.Div.2001), the material terms must be reasonably certain for there to be an enforceable contract. *Cobble Hill Nursing Home v. Henry and Warren Corp.,* 548 N.Y.S.2d 920, 923 (N.Y.1989).

No essential material terms were agreed upon by the parties with regard to the alleged oral contract. There is no indication as to the specific sum of financing DuPont purportedly promised to provide to DDCLAB. DDCLAB does, however, note that the parties knew DDCLAB was seeking a six million dollar investment, and settled for a one million dollar cash investment from DuPont. To the extent that such a claim is asserted to suggest that the parties agreed that DuPont would provide an additional five million dollar revolving line of credit, it fails. In the complaint, DDCLAB alleged it was "looking" for a six million dollar investment, not that it was imperative for the continued growth of its business to obtain that amount. The complaint is barren of any factual allegations to reasonably indicate that the parties agreed to a specific amount of financing.

Nor does the complaint reveal that the parties agreed on an interest rate. Although the complaint initially alleges that DuPont indicated that a low interest rate of 3-4% would be obtained, the complaint also alleges that DuPont "would get the best deal" it could for DDCLAB. Additionally, the complaint states that DuPont represented that it would secure the line of credit from its bank, but that DuPont subsequently indicated that it was working with "banks and other investors" and that "DuPont was working to package DDCLAB to the banks."Furthermore, although the complaint states

that the revolving line of credit was to be established after the Written Agreements were signed, the complaint fails to allege any specific date as to when this was to be accomplished. Given the absence of specific material contractual terms, the purported agreement is too vague to be enforceable. *Seeeg.,Arcan Transp. Inc. v. Marine Midland Bank-Western,* 388 N.Y.S.2d 737, 738 (N.Y.App.Div.1976) (finding working capital agreement too inadequate to be enforceable where, *inter alia,* no interest rate was discussed, no repayment schedule was formulated, and no limit was set as to the amount of working capital defendant would be required to advance.).

Additionally, the oral promise is unenforceable as it is not supported by any independent consideration. "[T]wo entirely separate contracts, each based on independent consideration, may be made at the same time and be entirely distinct legally."*Backer,* 584 N.Y.S.2d at 482 n. 1 (citing Willston on Contracts § 637 [3d ed.] ). Although plaintiff contends that the oral contract is distinct from the Written Agreements, plaintiff has not identified any separate consideration supporting the collateral oral agreement. Plaintiff cannot rely on the consideration provided for in the Written Agreements. Plaintiff's assertion that it relied on such a promise in executing the Written Agreements is insufficient to create a separate oral contract.

*\*6* In light of the foregoing, the causes of action for breach of contract are dismissed.

### *PROMISSORY ESTOPPEL*

DDCLAB's third cause of action for promissory estoppel must also be dismissed. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."*Kaye v. Grossman,* 202 F.3d 611, 615 (2d Cir.2000). Promissory estoppel is a legal fiction which is used

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.))**

as consideration for contractual consideration where a party relies, to its detriment, on the promises of another without having entered into an enforceable contract. *See,Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 993 (S.D.N.Y.1989). It is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason. *See,Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp.,* 53 F.Supp.2d 199, 219 (N.D.N.Y.1999). When justice dictates, the doctrine of promissory estoppel may be invoked to avoid plaintiff from suffering an unconscionable injury.*Cyberchron Corp. v. Calldata Sys. Dev., Inc.,* 47 F.3d 39, 44 (2d Cir.1995). Nevertheless, "applying promissory estoppel to create contractual obligations where a comprehensive contract exists would contravene the fundamental rules that extrinsic evidence cannot be used to vary the unambiguous terms of a contract, ... and that obligations inconsistent with the terms of a contract cannot be implied."*See,Hartford,* 723 F.Supp. at 993 (citations omitted).

As previously discussed, no clear and unambiguous promise can be gleaned from a reading of the complaint. The complaint also fails to demonstrate DDCLAB's reasonable reliance on DuPont's alleged promises. "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court is] to consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."*Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003) (citation omitted). Since the parties' Investment Agreement specified their rights and obligations with regard to the investment, it would have been unreasonable for DDCLAB to rely on DuPont's alleged oral promises. Those promises were regarding the same investment, and were deliberately withheld, and yet altered, the terms specified in the written agreement. *See,Four Finger Art Factory, Inc. v. Dinicola,* 2000 WL 145466, *8 (S.D.N.Y. Feb. 9, 2000); *Thayer v. Dial Indus.*

*Sales, Inc.,* 85 F.Supp.2d 263, 272 (S.D.N.Y.2000) (quoting *M.H. Segan L.P. v. Hasbro Inc.,* 924 F.Supp. 512, 527 (S .D.N.Y.1996)).

Given the unambiguous integration clause in the parties' Investment Agreement, there existed no basis for DDCLAB's justifiable reliance on the alleged oral promises made prior to the execution of that agreement. *See,Phoenix Racing,* 53 F.Supp. at 220;*Gebbia v. Toronto-Dominion Bank,* 762 N.Y.S.2d 38, 38-39 (N.Y.App.Div.2003). Nor could DDCLAB justifiably rely on DuPont's alleged oral promises made after the Investment Agreement was executed, given the absence of the requisite written consent by DuPont. The parties are established businesses represented by experienced and sophisticated businesspeople. The parties engaged in nine months of negotiations which ultimately culminated in two comprehensive Written Agreements. Any oral assurances by DuPont's representatives were not incorporated in the Written Agreements, and are not consistent with the terms of those Written Agreements. Any reliance by DDCLAB upon the alleged oral promises is simply unreasonable. Accordingly, the promissory estoppel claim is dismissed.

## *FRAUD*

*7 In the fraud claim, DDCLAB alleges that DuPont knowingly, intentionally and/or recklessly promised a revolving line of credit to DDCLAB with the undisclosed intention not to perform both before and after the Written Agreements were executed.

To assert a claim for fraud under New York law, plaintiff must allege the following four elements: (1) defendant made a material misrepresentation; (2) defendant did so with intent of defrauding plaintiff; (3) plaintiff relied upon the representation; and (4) plaintiff suffered damages as a result of its reliance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995) (citation omitted). If the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.))

fraud claim is premised on the same facts as plaintiff's breach of contract cause of action, with the additional allegation that defendant never intended to perform under the contract, a fraud claim may not be maintained. *See,Astroworks, Inc. v. Astroexhibit,* 257 F.Supp.2d 609, 616 (S.D.N.Y.2003) (quoting, *PI, Inc. v. Quality Prods., Inc.,* 907 F.Supp. 752, 761 (S.D.N.Y.1995)); *Int'l Cabeltel Inc. v. Le Groupe Vedeotron Ltee,* 978 F.Supp. 483, 486 (S.D.N.Y.1997); *New York Univ. v. Cont'l Ins. Co .,* 639 N.Y.S.2d 283, 289 (N.Y.1995) (citations omitted). A fraud claim will nevertheless lie, notwithstanding the parties' contractual relationship, where plaintiff can either "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the representation and unrecoverable as contract damages."*Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996) (citations and internal parenthetical omitted).

DDCLAB does not allege that DuPont owed any legal duty to DDCLAB separate and apart from its alleged contractual duty to provide a revolving line of credit in connection with DuPont's investment. The fraudulent misrepresentation at issue, *i.e.,* DuPont's assurances to set up the line of credit, is not collateral or extraneous to the alleged oral contract, but rather constitutes the heart of the alleged agreement. Moreover, DDCLAB is seeking $11,000,000 in compensatory and reliance damages, which is the exact amount of damages it is seeking in both of its breach of contract causes of action. The complaint fails to indicate that DDCLAB suffered any special damages as a result of alleged fraud in connection with the oral representations. Since the fraud claim is duplicitous of the breach of contract claims, it cannot survive a motion to dismiss.

*NEGLIGENT MISREPRESENTATION AND
BREACH OF FIDUCIARY DUTY CLAIMS*

To state a claim for negligent misrepresentation under New York law, plaintiff must allege the following five elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it: and (5) the plaintiff reasonably relied on it to his or her detriment."*Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir.2000)."A 'special relationship' requires a closer degree of trust than an ordinary business relationship."*Busino v. Meachem,* 704 N.Y.S.2d 690, 693 (N.Y.App.Div.2000); *seealso,United Safety of Am., Inc. v. Consol. Edison Co. of New York, Inc.,* 623 N.Y.S.2d 591, 593 (N.Y.App.Div.1995).

**\*8** To assert a cause of action for breach of fiduciary duty, plaintiff must plead the following three elements: (1) the existence of a fiduciary duty between the parties; (2) the breach of that duty by defendant; and (3) damages suffered by plaintiff as a result of defendant's breach. *See,Kidz Cloz, Inc. v. Officially for Kids, Inc.,* 2002 WL 392291, \*4 (S.D.N.Y. Mar. 13, 2002) (citing *Cramer v. Devon Group, Inc.,* 774 F.Supp. 176, 184 (S.D.N.Y.1991))."Under New York law a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."*Reuben H. Connelly Corp. v. Mark I Mktg. Corp.,* 893 F .Supp. 285, 289 (S.D.N.Y.1995) (citation omitted). A conventional business relationship alone does not give rise to a fiduciary relationship.*Oursler v. Women's Interart Ctr., Inc.,* 566 N.Y.S.2d 295, 297 (N.Y.App.Div.1991); *Feigen v. Advance Capital Mgmt. Corp.,* 541 N.Y.S.2d 797, 799 (N.Y.App.Div.1989). In the context of a commercial contract, a fiduciary duty may nevertheless exists where the parties specifically agree to it or if "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.))

'one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." ' *See,Ross v.. FSG PrivatAir Inc.,* 2004 WL 1837366, *5 (S.D.N.Y. Aug. 17, 2004) (quoting *Calvin Klein Trademark Trust v. Wachner,* 123 F.Supp.2d 731, 734-34 (S.D.N.Y.2000). It is incumbent upon a plaintiff to plead some factors in the complaint from which it can be concluded that the parties had a fiduciary relationship. *Ross,* 2004 WL 1837366, *6 (quoting *Boley v. Pineloch Assocs., Ltd.,* 700 F.Supp. 673, 681 (S.D.N.Y.1988)).

The complaint is bereft of any allegations regarding a prior or existing relationship between the parties which might have given rise to a special relationship of trust and confidence. Rather, the parties' relationship was that of sophisticated businesspeople engaged in an arms-length commercial transaction. Moreover, the complaint fails to reveal that DuPont possessed any special expertise or knowledge, or that DuPont was the only party with access to vital information. The complaint merely indicates that the parties stood on equal footing throughout their negotiations, the execution of the Written Agreements, and their subsequent communications. Notwithstanding DDCLAB's contention to the contrary, a special or fiduciary duty is not imposed upon DuPont as a result of it becoming a minority shareholder in DDCLAB by virtue of the Investment Agreement. *See,Guandong Enter. (N. Am.) Fur Holdings Ltd. v. Hennessy,* 2002 WL 1000953, *21 (S.D.N.Y. May 15, 2002) (finding that no fiduciary relationship exists between two equal shareholders). Since DuPont did not owe any special or fiduciary duty to DDCLAB, outside of its contractual obligations set forth in the Written Agreements, the causes of action for negligent misrepresentation and breach of fiduciary duty must be dismissed.

## CONCLUSION

*9 In light of the foregoing, defendant's motion to dismiss the complaint is granted, and the case is closed.

S.D.N.Y.,2005.
DDCLAB Ltd. v. E.I. DuPont De Nemours and Co.
Not Reported in F.Supp.2d, 2005 WL 425495 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))**

**C**
Goddard v. Citibank, NA
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.NOT FOR PUBLICATION
United States District Court,E.D. New York.
Barbara GODDARD, Plaintiff,
v.
CITIBANK, NA et al., Defendants.
**No. 04CV5317 (NGG)(LB).**

March 27, 2006.

Barbara Goddard, Brooklyn, NY, pro se.
Thomas A. Bizzaro, Certilman Balin Adler & Hyman LLP, East Meadow, NY, Tracy L. Dewitt, Shain, Schaffer and Rafanello, P.C., Bernardsville, NJ, for Defendants.

*MEMORANDUM & ORDER*

GARAUFIS, District Judge.
**\*1** This case involves a state foreclosure proceeding against Plaintiff Barbara Goddard ("Plaintiff" or "Goddard"), a *pro se* litigant who alleges to have been the victim of an illegal foreclosure and imminent eviction stemming from Defendants' erroneous claims that she is in default of her mortgage and that she cancelled a mortgage insurance policy. Plaintiff has brought suit pursuant to 42 U.S.C. § 1983 against Citibank, NA, Citicorp Mortgage Protection Plan, their underwriters and attorneys, and the state court judge who issued the judgment of foreclosure ("Defendants").

At this time, the court considers the Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Defendants' motion is granted in part and denied in part.

I. Factual Background

The facts as alleged in the complaint are deemed to be true for the purposes of this motion. Plaintiff is and has been for all relevant periods a resident of 1025 Hendrix Street, Brooklyn, New York. (Compl., at 1.) On March 5, 1990, Joseph and Barbara Goddard received a $130,500 mortgage from Citibank, NA to purchase the residence. (Mortgage Documents and Credit Report, annexed as Compl., Ex. A, at 6-7.) Pursuant to the mortgage agreement, the Goddards were to pay $1,242.78 per month for thirty years. (*Id.* at 7.) The Goddards also had mortgage insurance through Citicorp Mortgage Protection Plan, underwritten by Family Guardian Life Insurance Company. (Compl., at 2.) Under the terms of the insurance plan, the insurer would cover remaining payments on the mortgage in the event of the death of Mr. Goddard. (*See* Justice Clemente Memorandum and Order, dated July 3, 2001 ("Clemente M & O"), annexed as Compl., Ex. B, at 3.)

Defendants allege that the Goddards were in default of their mortgage payments from June through August, 1996. (Bizzaro Decl. ¶ 6; Clemente M & O, at 1 n. 1, 3.) Defendants further claim that Joseph Goddard called Citibank, NA and the Citicorp Mortgage Protection Plan on February 24, 2002 to cancel the insurance policy, and that the Goddards signed the necessary cancellation documents before Joseph Goddard died on October 4, 1996. (*Id.;* Compl., at 6.) It is uncontested that Plaintiff has not made any mortgage payments since her husband's death.

In 1996, Citibank, NA brought a foreclosure proceeding in Brooklyn state court, in which Plaintiff initially defaulted. Plaintiff moved to vacate the default judgment and filed an answer, and Citibank, NA moved to strike the answer and for summary judgment, which was granted. (Bizzaro Decl. ¶ 7.) Plaintiff then moved to renew and reargue the summary judgment motion, which Justice Nicholas A. Clemente granted on July 3, 2001. (*Id.*) Justice Clemente referred to Justice Maxine Archer the question of "whether defendant defaulted on the mort-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))

gage payments after May 1996 and whether the mortgage insurance was canceled in 1992."(Clemente Order, at 5.) Justice Archer conducted a hearing, after which she found that "no mortgage payments were made by Mrs. Goddard since October 1996 and that Mrs. Goddard is in default under the terms of the mortgage agreement ... [and] that no mortgage insurance was paid by the Goddards to citibank [sic] since 3/10/92 when the policy was cancelled by them."(Order of Justice Maxine Archer, dated January 22, 2002 ("Archer Order"), annexed as Bizzaro Decl., Ex. E, at 5.)

*2 On May 19, 2003, Justice Bert A. Bunyan issued a Judgment of Foreclosure and Sale. (Bunyan Judgment, annexed as Bizzaro Decl., Ex. G, at 6-13.) The property was sold to Citibank, NA on September 18, 2003 for $271,711.82, the proceeds of which paid the mortgage and associated interest and costs, referee fees, and attorney's fees for the foreclosure proceedings. (Referee's Deed, annexed as Bizzaro Decl., Ex. F, at 1.) On May 28, 2004, Justice Bunyan granted Citibank, NA's motion for possession, ordering that the Sheriff of Kings County eject Plaintiff from the premises. (Bunyan Order, annexed as Bizzaro Decl., Ex. H, at 2-13.)

The stress from the foreclosure proceedings in front of Justice Bunyon caused Plaintiff to suffer from a stroke in the courtroom in November 2003, which required the services of an emergency ambulance and 13 days of hospitalization. (Compl., at 2-3, Ex. B, at 7-8.)

In the instant complaint, filed December 7, 2004, Plaintiff claims that she tendered two checks on August 23 and August 25, 1996 to the mortgagor to bring all payments up to date, but defendants erroneously failed to apply the payments to her mortgage, and instead returned them to her. (Compl., at 5.) Plaintiff urges that she was never in default of mortgage payments on her home, as she made all payments up until her husband's death in October 1996. (*Id.*)

Plaintiff also alleges that Citicorp Mortgage Protection Plan erroneously canceled her and her husband's mortgage insurance plan prior to his death.(*Id.* at 6.) Plaintiff contends that she never signed the mortgage insurance cancellation form in 1992, and submits that a handwriting expert has stated that Mr. Goddard forged her signature. (*Id.*) Plaintiff alleges that Justice Archer based her decision on misrepresentations by Citibank, NA, its attorney Certilman Balin Adler & Hyman, LLP, and Citicorp Mortgage Protection Plan. Specifically, she claims that they misrepresented that on February 24, 1992, Joseph Goddard called Citibank, NA and/or Citicorp Mortgage Protection Plan to cancel the mortgage insurance policy, that Plaintiff signed an insurance policy cancellation form, that it informed Plaintiff at the time that the insurance plan was cancelled, and that Plaintiff's monthly payments decreased after 1992 to reflect the cancellation, when in fact the payments increased. (*Id.* at 4, 6.)

Plaintiff asks that this court vacate the ejectment order, award compensatory and punitive damages for the loss of her home, and the stroke which caused her extensive hospitalization, and award to her legal fees and costs incurred in the foreclosure proceedings. (*Id.* at 8.)

II. Discussion

A. Standard of Review

In reviewing a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff. See*Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). The complaint may be dismissed only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Hoover v. Ronwin,* 466 U.S. 558,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))

Page 3

587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding such a motion, the "issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."*Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (internal quotations omitted).

**\*3** Because Plaintiff is proceeding *pro se,* her pleadings must be read liberally and interpreted as raising the strongest arguments they suggest.*McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," this court must grant leave to amend the complaint. *SeeCuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000); *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999).

Similar to a motion for failure to state a claim, when a court reviews a motion for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), it accepts as true all material factual allegations in the complaint.*Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.,* 968 F.2d 196, 198 (2d Cir.1992) (internal citations omitted)."Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."*Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000). The plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists, and "a district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it 'lacks the statutory or constitutional power to adjudicate it.' " *Aurecchione v. Schoolman Transp. System, Inc.,* 426 F.3d 635, 638 (2d Cir.2005) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). In contrast to a 12(b)(6) motion for failure to state a claim, when deciding a 12(b)(1) motion for dismissal based on lack of subject matter jurisdiction, the court should not draw "argumentative inferences" in favor of the party as-

serting jurisdiction. *SeeAtlantic Mut.,* 968 F.2d at 198 (internal citations omitted). In a challenge to the court's subject matter jurisdiction over a case, a court "may consider materials extrinsic to the complaint." *Phifer v. City of New York,* 289 F.3d 49, 55 (2d Cir.2002).

Where, as here, a motion to dismiss is made pursuant to both Rules 12(b)(1) and 12(b)(6), the jurisdictional motion must be considered first because if I dismiss the complaint for lack of subject matter jurisdiction, "the accompanying defenses and objections become moot and do not need to be determined."*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148, 1156 (2d Cir.1993) (internal quotation and citation omitted); *seealsoMagee v. Nassau County Med. Ctr.,* 27 F.Supp.2d 154, 158 (E.D.N.Y.1998) ("A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction.").

### B. Lack of Subject Matter Jurisdiction

Defendants urge that this court lacks jurisdiction over this matter pursuant to the *Rooker-Feldman* doctrine, because plaintiff "is attempting to recast her challenge to the outcome of the New York Supreme Court foreclosure proceedings as a § 1983 claim ."(Def.'s Mem. Supp. Mot. Dismiss, at 9.) The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."*Exxon Mobile Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 1521-22, 161 L.Ed.2d 454 (2005). Thus, to properly invoke *Rooker-Feldman,* the defendant must show that the plaintiff: (1) lost in state court; (2) complains of injuries caused by that state court judgment; (3) invites the district court to review and reject the state court judgment; and (4) commenced the federal suit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))

after entry of the state court judgment.*Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.2005).

**\*4** It is uncontested that Plaintiff lost in state court, and that she commenced this federal suit after entry of the state court judgment.[FN1] Next, it is clear that the injuries alleged in the complaint, that Plaintiff has lost possession of her home, and that she suffered a stroke as a result of the stress caused by the foreclosure proceeding, were caused by the state court judgment. Therefore, the only question that gives this court pause is whether Plaintiff's claims invite this court to review and reject the state court judgment.

> FN1. The Supreme Court has held that the *Rooker-Feldman* doctrine is only properly invoked when a final state court decision has been reached.*Exxon Mobil,* 125 S.Ct. at 1527;*see also Dornheim v. Sholes,* 430 F.3d 919, 923 (8th Cir.2005) ("There is no judgment to review if suit is filed in federal district court prior to completion of the state-court action."). Plaintiff has not alleged, and there is nothing in the record to show that Plaintiff appealed the state court judgment, dated May 19, 2003. A judgment becomes final when the state court ruling carries preclusive effect.*Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico,* 410 F.3d 17, 24 & n. 10 (1st Cir.2005). Therefore, the state court proceeding ended for *Rooker-Feldman* purposes when plaintiff allowed the time for appeal to lapse without filing an appeal in state court.

The gravamen of Plaintiff's claim is that Defendants Citibank, NA, Citicorp Protection Mortgage Protection Plan, Family Guardian Life Insurance Company, and Certilman Balin Adler & Hyman LLP misrepresented the facts to the state court in the foreclosure proceeding, and that Justice Bunyon's acceptance of these misrepresentations

constituted negligence, and that these actions caused Plaintiff to suffer a stroke and violated her constitutional rights.[FN2] To the extent that Plaintiff asks that this court find the Judgment of Foreclosure to be invalid because her mortgage payments were up to date and her insurance policy was never cancelled, I find that this claim is barred by the *Rooker-Feldman* doctrine. Such a claim seeks to relitigate the precise issues decided by Justice Archer and to overturn the judgment of foreclosure, which meets the substantive *Rooker-Feldman* requirement that "the federal plaintiff ... seek[s] federal court review and rejection of the state-court judgment."*Hoblock,* 422 F.3d at 85.

> FN2. Plaintiff also complains that Defendants attempted to broker an agreement whereby Plaintiff would surrender possession of the residence in return for monetary compensation. (Compl., at 3.) I note without discussion that an attempt to settle or to mediate the settlement of a civil action without any further allegation does not state a claim.

Having decided that Goddard's claim regarding the invalidity of the judgment of foreclosure is an impermissible attempt to relitigate the state action under the *Rooker-Feldman* doctrine, I must now turn to whether her remaining claims are also foreclosed by *Rooker-Feldman.* The first task for this court is to identify what other cause(s) of action that *pro se* Plaintiff articulates. The complaint accuses Defendants (apart from Judge Bunyon) of misrepresenting material facts to the state court in order to procure a judgment of foreclosure against Plaintiff, which caused her to lose possession of her home and to suffer a stroke.[FN3] For the purposes of this motion, I find that the complaint primarily pleads two causes of action: [FN4] (1) *conversion* in that Plaintiff alleges that Defendants wrongfully invoked the legal process by means of deceit and fraud to obtain a judgment of foreclosure, *see,e.g.,Smith v. Weinberger,* 994 F.Supp. 418, 421 (E.D.N.Y.1998) (citing *Hof v. Mager,* 208 A.D.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))**

Page 5

144, 203 N.Y.S. 161 (1st Dep't 1924)); and (2) *intentional infliction of emotional distress,* in that Plaintiff alleges that Defendants' wrongful actions caused her to suffer severe emotional distress and attendant physical injury. *See,e.g.,Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001); *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (N.Y.1993).

> FN3. I shall address the sufficiency of these allegations in considering Defendants' 12(b)(6) motion to dismiss.

> FN4. Plaintiff may also be able to state a cause of action for fraud upon the court. However, this claim must be made *in the state court* that issued the judgment of foreclosure. "It is settled law that a court has inherent power to vacate *its own* judgment on proof that fraud has been perpetrated on the court."*Levitin v. Homburger,* 932 F.Supp. 508, 518-19 (S.D.N.Y.1996) (emphasis supplied) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991))."This power encompasses a judicial sale conducted under court orders."*Id.*

**\*5** Defendants urge that *Rooker-Feldman* prevents Plaintiff from asserting *any* claim that would imply the invalidity of the Judgment of Foreclosure, because it "either directly or indirectly challenges a state court judgment...." (Def's Mem. Supp. Mot. Dismiss, at 7.) Defendants rely on *Weinberger,* in which a court in this district held that a plaintiff who alleged, *inter alia,* fraud and conversion in obtaining a judgment of foreclosure, was barred by *Rooker-Feldman* from maintaining the action in federal court. *Weinberger,* 994 F.Supp. at 424. In that case, the court held that the plaintiff's conversion claim was precluded by the *Rooker-Feldman* doctrine because the "complaint is, at the very least, an indirect challenge to the default judgment of foreclosure entered in the New York Supreme Court."*Id.* At the time that it ruled, the *Weinberger* court properly relied on the then-leading Second

Circuit opinion on the *Rooker-Feldman* doctrine, *Moccio v. New York State Office of Court Admin.,* 95 F.3d 195, 199-200 (2d Cir.1996). In *Moccio,* the Second Circuit held that federal claims that are "inextricably intertwined" with a state court judgment are barred under *Rooker-Feldman.Id.* at 199-200.Thus, the district court in *Weinberger* found that the *Rooker-Feldman* doctrine barred a subsequent conversion suit because it "indirectly challenges the holding or decision of a State court by raising issues in federal court that are 'inextricably intertwined' with the State court's decision."*Weinberger,* 994 F.Supp. at 243.

However, *Moccio* is no longer good law. The Supreme Court, in *Exxon Mobile,* found that the *Moccio* Court's formulation of *Rooker-Feldman*"extend[s] far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738."*Exxon Mobile,* 125 S.Ct. at 1521 (citing *Moccio,* 95 F.3d at 199-200). The Second Circuit has since found that the "inextricably intertwined" language "has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobile."Hoblock,* 422 F.3d at 87. Thus, to the extent that Defendants, in arguing that this court should adopt the reasoning in *Weinberger,* seek to have this court rule that plaintiff's suit is foreclosed by *Moccio,* this court concludes that *Moccio* has been superseded by *Exxon Mobile.*

The *Exxon Mobile* Court held that under certain circumstances, claims that collaterally attack a state court judgment are not barred under the *Rooker-Feldman* doctrine. "If a federal plaintiff 'presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party ..., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." ' *Exxon Mobil,* 125 S.Ct. at 1527 (quoting *GASH As-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))

socs. v. *Village of Rosemont,* 995 F.2d 726, 728 (7th Cir.1993)). As an exception to the *Rooker-Feldman* doctrine, "[a] federal court 'may entertain a collateral attack on a state court judgment which is alleged to have been procured through fraud, deception, accident, or mistake....' " *In re Sun Valley Foods Co.,* 801 F.2d 186, 189 (6th Cir.1986) (quoting *Resolute Insurance Co. v. State of North Carolina,* 397 F.2d 586, 589 (4th Cir.1968)).

**\*6** I find that Plaintiff's allegations of conversion and intentional infliction of emotional distress are not precluded by the *Rooker-Feldman* doctrine. While the Plaintiff's remaining claims deny a legal conclusion reached by a state court, her claims are of the type held by the Court in *Exxon Mobil* to be independent from the state court judgment, because they allege *fraud in the procurement* of the judgment, independent from the barred claim that the state court issued an incorrect decision regarding the law or the evidence presented to it. Nor do the Plaintiff's claims invite this court to vacate the judgment of foreclosure. The remedies sought in the claims of conversion and intentional infliction of emotional distress, i.e. money damages unavailable in the state court proceeding,[FN5] strongly support the conclusion that these claims are independent from the state court judgment. As a result, I find that Plaintiff's conversion and intentional infliction of emotional distress claims are not precluded by the *Rooker-Feldman* doctrine and this court does have jurisdiction to hear them.

> FN5. A cause of action for conversion pursuant to a wrongfully obtained judgment is generally not to vacate the underlying judgment, but rather seeks to recover "the fair market value of the converted property at the time and place of the conversion, to which interest may be added."*Standard Dyeing & Finishing Co. v. Arma Textile Printers Corp.,* No. 85-Civ. 5399, 1991 U.S. Dist. LEXIS 3614, at \*35 (S.D.N.Y. March 25, 1991).

C. Plaintiff's Section 1983 Claim for Fraud by

Judge Bunyon [FN6]

> FN6. There is no indication that Judge Bunyon was served with a summons and complaint or has otherwise appeared in this action. However, as I now dismiss Plaintiff's claim against Judge Bunyon, the issue of whether this court has personal jurisdiction over him is moot.

Title 42 of the United States Code, Section 1983 allows citizens to sue a state official for the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws [of the United States]."42 U.S.C. § 1983. Section 1983 does not create new rights; it merely provides a mechanism "for redress for the deprivation of rights established elsewhere."*Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citations omitted).

Plaintiff sues Justice Bert Bunyon for "misdeeds and atrocities that [the] Judge ... allowed to foster in the State Supreme Court in Kings County...." (Compl., at 2.) The alleged illegal conduct that Plaintiff complains of is that the judge failed his "judicial responsibility" in allowing Defendants to bring suit against Plaintiff in spite of Judge Celemente's finding that the plaintiff's averments warranted a trial. (Compl., at 3.)

The Supreme Court has "held that state judges are absolutely immune [in § 1983 lawsuits] from liability for their judicial acts...."*Briscoe v. Lahue,* 460 U.S. 325, 334, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (citing *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)). Plaintiff has not stated in her complaint that Judge Bunyon engaged in any conduct that caused her injury apart from his judicial function. *Seeid.* at 336.As a result, Judge Bunyon has absolute immunity, and Plaintiff's claims against Judge Bunyon are dismissed.

D. Plaintiff's State Claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff's remaining claims allege that Defendants Citibank, NA, Citicorp Mortgage Protection Plan, Family Guardian Life Insurance Company, and Certilman Balin Adler & Hyman LLP fraudulently procured a judgment of foreclosure from Plaintiff in state court, causing her to lose her home and suffer a stroke. I note from the outset that these allegations do not constitute a § 1983 action, because there is no reasonable inference that would allow this court to conclude that these defendants in their alleged activities acted under color of law. *See,e.g.,Spear v. West Hartford,* 954 F.2d 63, 68 (2d Cir.1992) ("A private defendant may be held liable only as 'a willful participant in joint activity with the State or its agents.' " (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970))). I shall therefore consider whether Plaintiff alleges a state claim for conversion or intentional infliction of emotional distress that may be entertained by this court.[FN7]

> FN7. I note for the record that there remains the question of whether this court should exercise supplemental jurisdiction over Plaintiff's remaining state law claims. A district court "may decline to exercise supplemental jurisdiction over a [state law] claim if ... the district court has dismissed all claims over which it has original jurisdiction."28 U.S.C. § 1367(c)(3); *seealsoUnited Mine Workers of America v. Gibbs,* 338 U.S. 715, 726 (1966).Section 1367 directs that this court has the discretion to decide whether or not to exercise supplemental jurisdiction over Plaintiff's state law claims. As defendants have not raised this issue, and plaintiff is *pro se* and may be barred by the statute of limitations were this court to dismiss this action, I decline at this point to dismiss the claims. As this M & O grants Plaintiff leave to amend her complaint, if Defendants feel that this court should decline supplemental jurisdiction over her state law claims, they are free to argue this issue in the event that

Plaintiff files an amended complaint.

*7 I must first proceed to determine whether these claims are barred under principles of res judicata (claim preclusion), or collateral estoppel (issue preclusion). Under New York law, issue preclusion applies if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding."*Phifer,* 289 F.3d at 56. "The burden rests upon the proponent of collateral estoppel to demonstrate that the issues in question were actually and necessarily decided."*Richards v. City of New York,* No. 97-Civ-7990, 2003 U.S. Dist. LEXIS 8037, at *26-*27 (S.D.N.Y. May 7, 2003) Defendants do not argue, and there is nothing in the record to support the inference, that Plaintiff has had a full and fair opportunity to litigate these issues prior to the instant complaint. The Defendants having failed to meet their burden, I hold that Plaintiff's state claims are not subject to issue preclusion. See *id.* at *37-*41 (finding that plaintiff did not have a full and fair opportunity to litigate issue despite fact that issue was necessarily decided upon in previous litigation)

Claim preclusion applies under New York law if a plaintiff seeks "to litigate those matters for which a valid final judgment ha[s] already been entered in a prior action when the claims interposed could have and should have been litigated in that former action."*Weinberger,* 994 F.Supp. at 421 (quoting *Romano v. Astoria Federal Sav. & Loan Ass'n,* 111 A.D.2d 751, 752, 490 N.Y.S.2d 244, 245 (2d Dep't 1988))."However, New York law also provides that a plaintiff may attempt a collateral attack on a judgment based either on a lack of jurisdiction, or a demonstration that the prior judgment was procured by fraud."*Id.* (quoting *Bell v. Town of Pawling,* 146 A.D.2d 729, 730, 537 N.Y.S.2d 214, 215 (2d Dep't 1989)). As stated *supra,* Defendants do not argue that Plaintiff's conversion and intentional infliction of emotional distress claims have been alleged prior to this action. Granting Plaintiff a judgment of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))**

money damages would not require this court to invalidate the judgment of foreclosure. Moreover, these causes of action accrued after the foreclosure proceedings. The Judgment of Foreclosure was issued in May 2003. Plaintiff's cause of action for conversion accrued in September 2003, when the property was sold. Plaintiff's cause of action for intentional infliction of emotional distress accrued when she suffered from a stroke in November 2003. As a result, Plaintiff is clearly not barred by res judicata from maintaining this action.

Having decided that Plaintiff's claims for conversion and intentional infliction of emotional distress are not foreclosed under preclusion principles, I shall proceed to examine the sufficiency of Plaintiff's allegations under 12(b)(6) standards.

*1. Conversion*

In assessing Plaintiff's conversion claim, her allegation that Defendants employed fraud in the procurement of the judgment of foreclosure triggers heightened pleading standards pursuant to Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."*Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Thus, in examining this claim, I shall consider whether Plaintiff is in compliance with the heightened pleading standards for fraud as stated in Fed.R.Civ.P. 9(b).

**\*8** "Under New York law, conversion is any unauthorized exercise of control by one who is not the owner which interferes with a superior possessory right of another in property."*Tese-Milner v. TPAC, LLC (In re Ticketplanet.com),* 313 B.R. 46, 69 (Br.S.D.N.Y.2004). A conversion claim must allege that the contested acts "are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights."*Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984). Where a judgment of foreclosure underlies the conversion claim, plaintiff must allege "that the foreclosure was wrongfully obtained."*Weinberger,* 994 F.Supp. at 421 (citing *Hof v. Mager,* 208 A.D. 144, 203 N.Y.S. 161 (1st Dep't 1924), *Korman v. R.H. Macy & Co.,* 142 N.Y.S.2d 455 (Sup.Ct. Queens Cty.1955), 23 N.Y. Jur.2d Conversion § 28).

Plaintiff alleges that she is the actual owner of 1025 Hendrix Street, that she paid all monthly mortgage payments for that property, and that she never cancelled the mortgage insurance policy, which provided for full payment of the mortgage balance when her spouse died. She further alleges that Defendants made a number of knowingly false representations in the foreclosure proceeding, including that she in fact did cancel the insurance policy, that Defendants informed her prior to her spouse's death that she canceled her mortgage insurance policy, and that she defaulted on her mortgage payments prior to her husband's death. However, she does not specify who made these statements, the circumstances in which these statements were made (e.g. if they were made as a part of or outside of the foreclosure proceeding, in front of which judge they were made, or if the statements were credited by the judge), and if the statements were material to the judge's decision. As a result, I find that Plaintiff has failed to meet the Rule 9(b) standards of pleading a fraud-based claim.

*2. Intentional Infliction of Emotional Distress*

"Under New York law, a claim of intentional infliction of emotional distress requires: '(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.))**

severe emotional distress; (3) a causal connection between the conduct and the [in]jury; and (4) severe emotional distress." ' *Conboy,* 241 F.3d at 258 (quoting *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999)). The complained of conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (quoting *Stuto,* 264 F.3d at 827).

Plaintiff in her complaint has failed to allege the first three elements of this claim. Regarding the first prong, extreme and outrageous conduct, Plaintiff has not described any conduct that rises to the requisite level of outrageousness. For examples, she has made no allegations of physical threats, verbal abuse, or public humiliation. *Stuto,* 164 F.3d at 828. Plaintiff must allege that Defendants knew or should have known that their conduct would have caused her severe emotional distress, and must also link the abusive conduct in question to the stress that led her to suffer a stroke.

*9 For these reasons, I find that Plaintiff's complaint does not state a claim for intentional infliction of emotional distress. Furthermore, I have doubts based on the allegations in her complaint that Plaintiff will be able to state a claim in an amended complaint. However, as Plaintiff is *pro se,* this court must grant Plaintiff an opportunity to amend her complaint "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."*Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999). Therefore, I decline to dismiss plaintiff's conversion and intentional infliction of emotional distress claims at this moment. Instead, I shall grant Plaintiff sixty (60) days to amend her complaint to plead her claims with particularity. To avoid dismissal of her conversion claim, Plaintiff in her amended complaint must specify the statements made by Defendants that she believes are fraudulent, the speakers who made them, the date and place in which the statements were

made, and why they are fraudulent. To state a claim for intentional infliction of emotional distress, plaintiff must allege the specific conduct that rose to the requisite level of outrageousness, that the speaker should have known that the conduct would cause severe emotional distress, and that the conduct caused her emotional distress.

### III. Conclusion

For the aforementioned reasons, the Defendants' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, is hereby GRANTED in part and DENIED in part.

All of Plaintiff's claims except her state law claims for conversion and intentional infliction of emotional distress against Citibank, NA, Citicorp Mortgage Protection Plan, Family Guardian Life Insurance Copy, and Certilman Balin Adler & Hyman LLP are hereby dismissed. With respect to these remaining claims, Defendants' motion to dismiss is denied at this time. The Plaintiff is granted sixty (60) days from the date of the issuance of this Order to submit to the court an amended complaint that pleads with particularity her conversion and intentional infliction of emotional distress claims. The Defendants will have thirty (30) days from the date of the Plaintiff's submission, if any is made, to respond. Upon submissions by all parties, the court will reevaluate this claim. If the Plaintiff fails to submit an amended complaint in compliance with this order, her remaining claims will be dismissed.

SO ORDERED.

E.D.N.Y.,2006.
Goddard v. Citibank, NA
Not Reported in F.Supp.2d, 2006 WL 842925 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

▷
Ryan v. Hunton & Williams
E.D.N.Y.,2000.
Only the Westlaw citation is currently available.
    United States District Court, E.D. New York.
    Peter F. RYAN, PRD Corp., Dale W. Ryan, PDR
    Holdings, Inc., PDR Corp. Defined Benefit Plan &
    Trust, Ryan Realty Trust, Loperena Trust, Jaquith
    Holdings, Inc., Peter F. Ryan Irrevocable Trust, Re-
    search & Finance Corp., Glen Guillet, DOIT Corp.,
    Zayin Investments, Ltd., Beny Primm, RPE Man-
    agement, Inc., Daniel Langer, Jay Sicklen, Myker-
    inus Holdings, Inc., and Charles Schmidt, Plaintiffs,
                            v.
    HUNTON & WILLIAMS, Scott J. McKay Wolas,
    Franklin H. Stone, Christopher M. Mason, Kathy
    McClesky Robb, Jerry E. Whitson, Tardino &
    Tardino, Victor J. Tardino, Jr., Victor J. Tardino,
    Sr., Crystal Waters, N.V., Crystal Distributors,
    L.P., Crystal Distributors, L.P. II, Chase Manhattan
    Bank f/k/a Chemical Bank, Fleet Bank f/k/a Nation-
    al Westminster Bank, and Gregory Wolas, Defend-
                           ants.
                    No. 99-CV-5938 (JG).

                    Sept. 20, 2000.

Sigmund S. Wissner-Gross, Esq., Heller, Horowitz
& Feit, P.C., New York, for Plaintiffs.
Andrew R. Kosloff, Esq., The Chase Manhattan
Bank Legal Department, New York, for Defendant
Chase Manhattan Bank.

                MEMORANDUM AND ORDER

GLEESON, District J.
**\*1** The plaintiffs initiated this action to recover for
injuries they sustained as a result of their invest-
ment in a "Ponzi" scheme operated by Scott J. Mc-
Cay Wolas ("Wolas"), a partner at the New York
office of Hunton & Williams ("H & W"). Defend-
ant Chase Manhattan Bank ("Chase") has moved to
dismiss the claims against it for failure to state a

claim upon which relief can be granted and for fail-
ure to plead fraud with particularity pursuant to
Rules 12(b)(6) and Rule 9(b) of the Federal Rules
of Civil Procedure. For the following reasons, the
motion is granted.

                        BACKGROUND

The following factual background is based on the
allegations contained in the plaintiffs' complaint,
which are assumed to be true for the purposes of
this motion.

From 1989 to 1995, Wolas ran a "Ponzi" scheme.
He induced the plaintiffs and others to invest with
him by misrepresenting that their investments
would be used to purchase large shipments of
Scotch whiskey in Scotland for resale in the Orient.
In fact, there were no such purchases; instead,
Wolas used the funds to pay prior "investors" and
for other unknown purposes. In 1995, Wolas ab-
sconded, and his whereabouts are still unknown.
(See Compl. ¶ 1.)

In 1994 Chemical Bank [FN1] ("Chemical") was on
notice of various of "red flags" that indicated fraud-
ulent conduct by Wolas and/or those with whom he
was associated. For example, in May 1994, John
Dolan, a cohort of Wolas, tried to open an account
at Chemical in the name of SEV Enterprises, Inc.
("SEV"). Chemical, however, declined to open the
account because Patrick J. Connor, of Chemical's
in-house fraud investigative unit, suspected that
SEV was probably running an "advance fee scam."
(Id. ¶¶ 1 11-12.)Then, on June 29, 1994, a lawyer
representing a former associate at H & W contacted
Mark E. Segal, Assistant General Counsel of
Chemical, and informed him that Wolas fraudu-
lently overbilled Manufacturers Hanover Trust,
Chemical's predecessor, for work done on a litiga-
tion matter. Later that year, Chemical shut down
accounts maintained by Wolas and Albert H.
Wolas, Inc., a family business owned by Wolas's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 2
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

father and brother, after a $950,000 check to Wolas, drawn on one of the business accounts, bounced. (*See id.* ¶¶ 113-14.)

> FN1. Chemical Bank has since merged with Defendant Chase Manhattan Bank.

On March 16, 1995, just three months before the "Ponzi" scheme collapsed, Dolan opened a primary account in the name of SEV and Wolas opened a sub-account (to the SEV account) at a Chemical branch on Third Avenue in Manhattan. Although the sub-account was an attorney escrow account, Wolas authorized Dolan, a non-lawyer, to have signing authority over the sub-account. Wolas and/ or Dolan further informed Chemical in-house counsel Manuel Gottlieb that the sub-account was an attorney escrow account and that all of the money passing through the sub-account was escrow money. (*See id.* ¶¶ 110, 115-16.)

From the accounts' inception, branch officer Kevin O'Dea suspected that they were a vehicle for fraudulent activity and immediately referred them to Chemical's in-house fraud investigative unit. On May 2, 1995, an employee of the fraud unit notified O'Dea and Gottlieb of the unit's concerns one year earlier when Dolan tried to open an account in the name of SEV, and urged that Chemical immediately shut down the primary and subaccounts. Then, on May 5, 1995, O'Dea notified Dolan and SEV that the accounts had to be closed by June 5, 1995, one month later.[FN2](*See id.* ¶¶ 115, 117-18.)

> FN2. On May 30, 1995, a grand jury in the Southern District of Texas issued a subpoena, in part, to one of the two SEV sub-accounts. This subpoena was faxed to in-house counsel Gottlieb on June 1, 1995. (*See* Compl. ¶ 124.)

A. *The Account Activity*

**\*2** In April and May of 1995, O'Dea and his assistant signed or approved bank checks and transfers out of Wolas's sub-account and into the SEV primary account. Specifically, O'Dea effected the following transactions:

(i) Beginning on April 27, 1995, O'Dea personally signed bank checks drawn on the Wolas sub-account;

(ii) On April 25, 1995, O'Dea personally approved the internal transfer of $1 million of investor funds from the sub-account to the SEV primary account, and such transfer occurred on April 27, 1995; and

(iii) On May 2, 1995, O'Dea's assistant approved the transfer of $1.6 million from the sub-account to the SEV primary account.

(*See* Compl. ¶ 119.)

Then, on April 27, 1995, O'Dea personally approved the issuance of two Chemical checks drawn on the SEV primary account, each in the amount of $100,000, and certified another SEV primary account check, in the amount of $28,459. Several days later, O'Dea approved a May 2, 1995, certified check for $200,000 drawn on the SEV primary account. This check was immediately altered to indicate that it was drawn on the sub-account. By no later than May 10, 1995, O'Dea knew that this certified check had been altered, and relied on this information in insisting that the accounts be closed. (*See id.* ¶ 120.)

By May 2, 1995, O'Dea was also aware that $10 million was to be wired into another SEV sub-account at Chemical. (*See id.* ¶ 121 .)O'Dea (and/or another Chemical employee or officer) specifically approved multiple wire transfers that resulted in the theft of investor funds. For example, O'Dea approved the following transactions:

(i) the May 2, 1995, wire transfer of $50,000 from the SEV primary account to Kehle & Co., Inc. in Florida;

(ii) the May 4, 1995, wire transfer of $40,000 to a "Keeco" entity in Washington;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

(iii) the May 4, 1995, wire transfer of $50,000 for credit to Warley, Inc.;

(iv) the May 4, 1995, wire transfer of $7,500 to Jim Roma in Washington, with "special instructions" from "F. Kelly," which O'Dea knew was false and fraudulent since the funds did not come from F. Kelly;

(v) the May 12, 1995, wire transfer of $10,000 to "David J. Friednbach" in Oregon; and

(vi) the May 12, 1995, wire transfer of $500,000 to "Jack Vita, Esq. Client Trust Account," with "special instructions" from "Warley, Inc.," which O'Dea knew was false and fraudulent since the funds did not come from Warley, Inc.

(*See id.* ¶ 122.)

B. *The Relevant Plaintiffs*

1. *DOIT Corp.*

O'Dea was aware that several million dollars had been wired from the Florida Cordova Law Center ("Cordova"), in April and May 1995, to the Wolas sub-account at Chemical. However, neither O'Dea nor anyone else at Chemical contacted Cordova regarding the purpose of those transfers or alerted it of Chemical's concerns. On May 16, 1995, Plaintiff DOIT Corp. ("DOIT") deposited $500,000 in escrow with the Cordova, with the expectation that the funds would then be transferred to the Wolas sub-account at Chemical. DOIT was never advised that Chemical had already taken steps to shut down the sub-account. (*See id.* ¶ 125.)

2. *Research & Finance Corp.*

*3 In late May 1995, the Chairman of the Research & Finance Corp. ("RFIN"), who maintained personal accounts at Chemical, contacted Chemical's Private Banking Group to confirm the status of what he believed was an H & W Client Funds account before he transferred $500,000 out of his personal account on behalf of RFIN to that account. The Chairman was advised that the H & W Client Funds account was in good standing, but was not told, among other things, (i) that the escrow account was a sub-account of SEV; (ii) that the sub-account was Wolas's and that H & W did not maintain the firm's principal attorney escrow account at Chemical; (iii) that Chemical had notified Wolas and SEV in early May 1995 to close the primary and subaccounts; and (iv) that Chemical believed that primary and subaccounts were being used for fraudulent purposes. (*See id.* ¶ 126.)

On June 29, 1995, pursuant to H & W's instructions, RFIN's accountant attempted to transfer $500,000 on RFIN's behalf to the Wolas sub-account at Chemical, believing it to be an escrow account maintained by H & W. As the SEV account and Wolas sub-account had already been closed at that point, the transfer did not go through. Chemical did not disclose to RFIN, however, why the Wolas sub-account had been closed. Believing it to be an administrative matter and that H & W had moved its escrow account to another bank, RFIN transferred the funds on July 13, 1995, to an account at National Westminster Bank ("Nat West"), now known as Fleet Bank, maintained by Wolas. (*See id.* ¶ 127.)

C. *This Action*

On September 24, 1999, various investors in Wolas's "Ponzi" scheme commenced this action for damages against H & W, Wolas, and other defendants for violations of the Securities Exchange Act of 1934, the Racketeering Influenced and Corrupt Organization Act, and New York common law. Relevant to the motion before me now are the claims by DOIT and RFIC against Chase (formerly Chemical) for fraud, aiding and abetting fraud, and commercial bad faith.[FN3] Chase has moved to dismiss these claims for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity, pursuant to Rules 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Proced-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

Page 4

ure.

> FN3. Although Plaintiff Glen Guillet originally asserted these claims against Chase as well, I was informed at oral argument on May 26, 2000, that Guillet's claims had been settled.

## DISCUSSION

### A. *The Rule 12(b)(6) Standard*

In a 12(b)(6) motion, a federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The inquiry focuses not on whether a plaintiff might ultimately prevail on her claim, but on whether she is entitled to offer evidence in support of the allegations in the complaint. *See id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* Rule 12(b)(6) warrants a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59 (2d Cir.1997). In considering a defendant's motion, the Court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton,* 128 F.3d at 59 (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740 (1976)).

### B. *Common Law Fraud*

*4 Chase contends that RFIN's fraud or fraudulent concealment claims must be dismissed because it has failed to allege the elements of the claims and sufficient facts to give rise to a strong inference of fraudulent intent under Rule 9(b).[FN4]

> FN4. DOIT has abandoned its fraud claim against Chase. (*See* Pls.' Mem. of Law in

Opp'n at 3 n. 2.)

To state a claim of common law fraud under New York law, plaintiff must establish, by clear and convincing evidence, that (i) the defendant made a material misrepresentation; (ii) with knowledge of its falsity; (iii) with the intent to defraud the plaintiff; (iv) on which the plaintiff reasonably relied; and (v) that caused damage to the plaintiff as a result. *See Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997); *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995).

### 1. *Proximate Cause*

RFIN alleges that Chemical made a material false misrepresentation when it represented to RFIN's Chairman that the Wolas sub-account was in good standing. It further alleges that it reasonably relied on this representation and suffered at least $500,000 in damages when its investment was later misappropriated by Wolas from his account at NatWest. In response, Chase contends that RFIN has failed to establish that Chemical's statement was the proximate cause of RFIN's injury. I agree.

"The absence of adequate causation is ... fatal to a common law fraud claim under New York law." *Bennett v. United States Trust Co.,* 770 F.2d 308, 316 (2d Cir.1985). A plaintiff may establish proximate cause if an injury "is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'" *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1496 (2d Cir.1992) (quoting *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.1986)). "The requisite causation is established only where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes." *Revak v. SEC Realty Corp.,* 18 F.3d 81, 89-90 (2d Cir.1994) (citing *Bennett,* 770 F.2d at 316).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In *Bennett,* the plaintiffs used the proceeds of a series of loans from the defendant bank to purchase public utility stock and then deposited the stock with the bank as collateral for the loans. *See*770 F.2d at 310. In negotiating the loans, the bank misrepresented to the plaintiffs that the Federal Reserve's margin rules do not apply when public utility stock is deposited as collateral. The stock subsequently generated insufficient dividends to cover the interest, and its market value decreased. Thus, in addition to the plaintiffs' loss of the equity itself, they owed the bank the outstanding interest and principal in excess of the stock's depreciated value. *See id.*The district court dismissed the plaintiffs' common law fraud claim for lack of causation and the Second Circuit affirmed, concluding that the plaintiffs had only alleged "but for" causation, *i.e.,* that they would not have purchased the stock if the bank had denied the loans. *See id.* at 314-16.Noting that the plaintiffs' common law fraud and securities fraud claims were equally flawed, the court stated that there was "simply no direct or proximate relationship between the loss and the misrepresentation."*Id.* at 314, 316.The court emphasized that the plaintiffs approached the bank for a loan with the plan to purchase the public utility stock; the bank recommended neither public utility stock in general, that stock in particular, nor the investment value of any such stock. *See id.* at 313-14.Accordingly, the court concluded that the "loss at issue was caused by the [plaintiffs'] own unwise investment decisions, not by [the bank's] misrepresentation." *Id.* at 314.

**\*5** RFIN's fraud claim fails for precisely the same reasons. RFIN approached Chemical with the intention of investing in Wolas's whiskey scheme. Indeed, RFIN's Chairman contacted Chemical's Private Banking Group only to confirm the status of Wolas's account at Chemical prior to directing the transfer of $500,000 into the account. (*See* Compl. ¶ 126.) At that time, the Chairman was told that Wolas's account was in good standing. (*See id.*)Although RFIN insists that it would not have invested with Wolas (by depositing $500,000 in his

account at Nat West after learning that the Chemical account was closed) if the Chemical officer had not made that representation or had told RFIN's Chairman of Chemical's concerns about the Wolas sub-account, these allegations at most establish "but for" causation. Simply put, the direct and proximate cause of RFIN's loss was Wolas's fraud, not Chemical's representation about the status of the Wolas sub-account.

### 2. *Duty to Disclose*

In addition, RFIN asserts that it has a claim of fraudulent concealment based on Chemical's failure to disclose to RFIN's Chairman that (i) Chemical had notified Wolas and SEV that it would close the accounts as of June 5, 1995; (ii) Chemical suspected fraudulent activity in the accounts; (iii) H & W did not maintain an escrow account at Chemical; and (iv) Wolas's escrow account was a sub-account of the SEV account.

To establish a claim of fraudulent concealment under New York law, the plaintiff must prove the aforementioned elements of common law fraud *and* that "the defendant had a duty to disclose the material information."*Banque Arabe,* 57 F.3d at 153. A duty to disclose may arise in two circumstances: (i) "where the parties enjoy a fiduciary relationship" and (ii) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984).

RFIN claims that Chemical's duty to disclose arose from its superior information about the status of the Wolas sub-account. It argues that such information was not readily available to RFIN, and that Chemical knew that RFIN was acting, or attempting to act, on the basis of mistaken knowledge when RFIN attempted to transfer $500,000 to the account after it was closed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

Page 6

As an initial matter, I question whether RFIN may bring a fraudulent concealment claim against Chase since such a claim "ordinarily arises only in the context of business negotiations where parties are entering a contract."*Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,* No. 89 Civ. 2809(BSJ), 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996); *see also Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 2000 WL 781081, at *9 n. 5 (S.D.N.Y. June 14, 2000) (questioning in *dicta* whether defendant bank had duty to disclose where plaintiff neither conducted business nor negotiated contracts with bank or bank employee); *Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), 1998 WL 397887, at *8 (S.D .N.Y. July 15, 1998) (questioning in *dicta* whether insurance company receiver had standing to bring fraudulent concealment claim where defendant bank and insurance company "never stood on opposite sides of the same transaction").

*6 However, even if RFIN can state a fraudulent concealment claim in these circumstances, it has not done so. Chase cannot properly be held accountable for failing to disclose information about the Wolas's sub-account to RFIN. "[A] bank should keep its own customers' affairs confidential."*Aaron Ferer,* 731 F.2d at 123 (citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,*411 N.Y.S.2d 756 (4th Dep't 1978)); *see also Graney,* 400 N.Y.S.2d at 719 ("It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account.") (internal quotation marks and citations omitted); *Renner,* 2000 WL 781081, at *9 (citing *Aaron Ferer* and *Graney* and noting that bank officer had no duty to respond to plaintiff's letters inquiring about bank customers); *cf. Young v. United States Dep 't o f J ustice,* 8 82 F.2d 633, 640-43 (2d Cir.1989) (encouraging New York courts to recognize duty of confidentiality between bank and customer). Thus, Chemical had no duty to volunteer to RFIN additional information about the alleged suspicious activity in the Wolas sub-account.

Finally, even if Chemical was obligated to disclose this additional information, there is no indication that Chemical knew that RFIN was acting on the basis of mistaken knowledge concerning the financial transaction between Wolas and RFIN. According to the plaintiff's allegations, Chemical knew only that RFIN inquired about the sub-account and attempted to transfer funds to the account after it had been closed. This attempted transfer does not support an inference that RFIN was acting on its mistaken information that Wolas was not engaging in fraud. For all Chemical knew, assuming Chemical knew of the scheme at all, RFIN was a cohort of Wolas, not a potential defrauded investor. Accordingly, RFIN has not stated claim for fraudulent concealment.[FN5]

> FN5. RFIN's fraudulent concealment claim also fails due to the absence of proximate cause. *See supra.*

### 3. *Intent to Defraud Under Rule 9(b)*

Lastly, RFIN's fraud claim must also be dismissed for the failure to plead Chemical's intent to defraud with the requisite particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rule9(b) provides, in pertinent part, that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). The rule is designed to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."*Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)) (internal quotation marks omitted). Allegations of fraud, therefore, must be specific enough to provide a defendant with "a reasonable opportunity to answer the complaint and ... adequate information to frame a response."*Ross v. A.H. Robins Co.,* 607 F.2d 545, 557-58 (2d Cir.1979).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 7
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

**\*7** Four essential requirements comprise Rule 9(b). A plaintiff must (i) " 'specify the statements that the plaintiff contends were fraudulent' "; (ii) " 'identify the speaker' "; (iii) " 'state where and when the statements were made' "; and (iv) " 'explain why the statements were fraudulent." ' *Acito,* 47 F.3d at 51 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Although a plaintiff need not plead detailed evidentiary matters, *see Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981), it must plead "facts that give rise to a strong inference of fraudulent intent," *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). This inference may be established either (i) "by alleging facts to show that defendants had both motive and opportunity to commit fraud," or (ii) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

RFIN concedes that it does not rely on evidence of motive and opportunity to commit fraud to satisfy its burden under Rule 9(b). Accordingly, I will restrict my analysis to whether RFIN's allegations establish circumstantial evidence of recklessness to give rise to the requisite inference of fraudulent intent.

Recklessness is established by conduct which is " 'highly unreasonable and which represents an extreme departure from the standard of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ' *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)) (alteration in *Rolf* ). In some instances, an inference of recklessness may be raised by " '[a]n egregious refusal to see the obvious, or to investigate the doubtful." ' *Id.* (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989)). Nonetheless, the plaintiff bears a "significant burden ... in stating a fraud claim based on recklessness." *Id.* at 270.

Here, RFIN has failed to allege facts that constitute

strong circumstantial evidence of recklessness. First, in March 1995, when the accounts were opened, Chemical had no actual knowledge that Dolan and Wolas had previously engaged in fraudulent activity. Rather, Chemical's officer, Bruce Whitcomb, had been "suspicious" of fraud in 1994, and had referred the matter to the fraud unit, which had concluded that it was "probably an advance fee scam." (Compl.¶ 112.) Likewise, neither the anonymous report to Chemical's Assistant General Counsel, Mark Segall, that Wolas had fraudulently overbilled Chemical's predecessor on a litigation matter nor the allegation that Chemical closed down a Wolas family business account due to a bounced check (both of which occurred in 1994) establishes that Chemical knew Wolas was engaged in fraud in 1995. (*See* Com pl. ¶¶ 113-14.) Thus, these allegations do not give rise to any inference of Chemical's fraudulent intent.

**\*8** Second, the allegations that Chemical's branch officer, Kevin O'Dea, approved various internal transfers between the SEV account and the sub-account, (*see* Compl. ¶¶ 1 19-20), similarly do not satisfy Rule 9(b)'s requirement. *See Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), 1997 WL 289865, at \*3 (S.D.N.Y. May 30, 1997) (mere transfer of funds between accounts was insufficient to raise inference of knowledge of check-kiting scheme to satisfy Rule 9(b) or Rule 12(b)(6) for claim of fraudulent concealment).

Third, as soon as Chemical's fraud investigative unit alerted O'Dea of the prior suspected advance fee scam and urged that Chemical shut down the accounts, O'Dea notified Dolan that the SEV account and the Wolas sub-account would be closed in one month. (*See* Compl. ¶¶ 117-18.) Although Chemical may have shown greater vigilance by closing the accounts immediately, rather than continuing to approve transfers and bank checks until the accounts were closed one month later, this failing does not establish recklessness sufficient to raise a strong inference of Chemical's intent to defraud RFIN. *See Chill,* 101 F.3d at 269;*see also*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

Page 8

*Renner,* 2000 WL 781081, at *14 (bank's failure to detect fraud sooner insufficient to satisfy Rule 9(b) burden of pleading fraudulent intent for aiding and abetting fraud claim); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,* No. 98 Civ. 4960(MBM), 1999 WL 558141, at *7-*8 (S.D.N.Y. July 30, 1999) (bank's negligent failure to investigate several red flags and to prevent additional wire transfers after second fraudulent transfer uncovered by transferring bank did not give rise to strong inference of fraudulent intent to satisfy Rule 9(b) for claims of commercial bad faith and aiding and abetting fraud).

Finally, in light of the aforementioned case law concerning the confidential nature of bank customer information, Chemical's failure to provide information to RFIN about Wolas's sub-account beyond the representation that it was in good standing cannot give rise to an inference of an intent to defraud.

In sum, RFIN has failed its significant pleading burden. Its allegations do not raise any inference, let alone a strong inference, of an intent to defraud. Accordingly, RFIN's fraud and fraudulent concealment claims must be dismissed.

### C. *Aiding and Abetting Fraud*

To establish a claim of aiding and abetting fraud under New York law, a plaintiff must establish (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong. *See Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983). Chase contends, and I agree, that RFIN and DOIT have failed to allege either Chemical's knowledge of Wolas's fraud or that Chemical substantially assisted in the commission of the fraud.

### 1. *Actual Knowledge*

New York law requires a plaintiff to establish that the alleged aider and abettor had " 'actual knowledge' " of the primary wrong. *Renner,* 2000 WL 781081, at *6 (quoting *Kolbeck v. LIT Am., Inc .,* 939 F.Supp. 240, 246 (S.D.N.Y.1996)); *see also Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000) (stating that "knowledge of the underlying wrong" is "required element" under New York law).

*9 Here, the plaintiffs have failed to allege that Chemical had actual knowledge of Wolas's fraud. As explained *supra,* the allegations that Chemical suspected that Dolan and SEV were running an advance fee scam in 1994, (*see* Compl. ¶ 112), that Wolas allegedly overbilled Chemical's predecessor in connection with litigation, (*see id.* ¶ 113), and that Chemical shut down a Wolas family account in 1994 due to a bounced check, (*see id.* ¶ 114), do not establish that Chemical had actual knowledge of Wolas's fraudulent scheme in 1995.

Turning to the allegations in 1995, O'Dea requested Chemical's fraud investigation unit to review the SEV account and the Wolas sub-account based on suspicions-not actual knowledge-of fraudulent activity. (*See id.* ¶ 115, 117.)Subsequently, upon receiving the recommendation of the fraud unit that the accounts be closed, O'Dea informed Dolan that Chemical would close the accounts in one month. (*See id.* ¶ 117-18.)Allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud.FN6

> FN6. This case is closely analogous to Judge Haight's opinion in *Renner,* 2000 WL 781081. In that case, the plaintiff alleged that Chase aided and abetted a prime bank guarantee scam. The allegation of actual knowledge on the part of Chase was based on, *inter alia,* its officials' rejection of a letter of credit proposal based on their suspicion that the letters were potential vehicles for fraud. *See id.* at *12. The court rejected this argument, however, and concluded that there was "no factual basis for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

Page 9

the assertion that Chase officials actually knew the fraud [they suspected] was, in fact, occurring."*Id.*

Finally, O'Dea's authorization of transfers between the SEV account and the sub-account, (*see id.* ¶ 119), and his approval of multiple wire transfers, (*see id.* ¶ 122), do not create an inference of knowledge of the scheme. In *Williams,* 1997 WL 289865, a statutory receiver for an insurance company brought an action for, *inter a lia,* aiding and abetting fraud, and alleged that the defendant bank had actual knowledge of a check-kiting scheme where the bank had approved various bank transfers. *See id.* at *4. The court rejected this argument, concluding that the account transfers and other allegations established only constructive knowledge on the part of the bank, which is insufficient to state a claim for aiding and abetting fraud. *See id.* Similarly, in this case, the plaintiffs have failed to establish that Chemical had any actual knowledge of Wolas's fraud, and thus, their aiding and abetting fraud claim must be dismissed.[FN7]

> FN7. The plaintiffs' remaining allegations, that Chemical improperly permitted Dolan, a non-lawyer, to be a signatory on the Wolas's attorney escrow account, (*see* Compl. ¶ 116), that Chemical knew that a check drawn on the SEV account had been altered to reflect that it was issued from the Wolas sub-account, (*see id.* ¶ 120), and that Chemical knew that H & W did not maintain a firm escrow account at Chemical, (*see id.* ¶ 123), do not establish that Chemical knew of Wolas's fraud. These allegations only support a finding that Chemical had constructive notice of the fraud.

*2. Substantial Assistance*

The second element of an aiding and abetting fraud claim is substantial assistance. "A defendant provides substantial assistance only if it 'affirmatively assists, helps conceal, or by virtue of

failing to act when required to do so enables [the fraud] to proceed.' " *Nigerian Nat'l,* 1999 WL 558141, at *8 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992)) (alteration in *Nigerian Nat'l* ).

Again, the plaintiffs have failed to allege that Chemical substantially assisted Wolas's fraud. The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance. In *Williams,* the court considered whether the use of bank accounts by the participants in the fraudulent scheme constituted substantial assistance by the bank in the participants' fraud. *See*1997 WL 289865, at *4. Rejecting the claim, the court held that "the mere fact that all the participants in the alleged scheme used accounts at [the bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability."*Id.; see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's execution of repeated wire transfers for millions of dollars did not constitute substantial assistance for an aiding and abetting fraud claim); *Renner,* 2000 WL 781081, at *12 (Chase did not give substantial assistance to participants of prime bank guarantee scam simply because participants used accounts at Chase).

*10 Turning to the plaintiffs' allegations of Chemical's inaction, *e.g.,* failing to shut down the accounts sooner or to inform the plaintiffs about the suspected fraud, these omissions likewise do not rise to the level of substantial assistance. As previously stated, a defendant may provide substantial assistance by failing to act only when it was required to act. *See Nigerian Nat'l,* 1999 WL 558141, at *8. Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability. *See King v. George Schonberg & Co.,* 650 N .Y.S.2d 107, 108 (1st Dep't 1996); *see also Renner,* 2000 WL 781081, at *12 ("[A]bsent a fiduciary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duty, inaction does not constitute substantial assistance."). Here, the plaintiffs and Chemical do not have a fiduciary relationship. The relationship between a bank and its depositor is not a fiduciary one, but only that of a debtor and creditor. *See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984). Thus, RFIN or RFIN's Chairman, who had an account at Chemical's Private Banking Group, did not have a fiduciary relationship with Chemical. DOIT is not even a client of Chemical. Moreover, even assuming that RFIN had a confidential relationship with Chemical by virtue of its status as a customer, *see id.* at 123 ("[A] bank should keep its own customers' affairs confidential."(citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,*411 N.Y.S.2d 756 (4th Dep't 1978))), Chemical was under no obligation to disclose confidential information about Wolas, another customer. The plaintiffs, therefore, have failed to establish that Chemical substantially assisted in Wolas's fraud. Accordingly, their aiding and abetting fraud claim must be dismissed.

### D. *Commercial Bad Faith*

A claim for commercial bad faith against a depository bank will lie if the "bank acts dishonestlywhere it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme."*Prudential-Bache Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 275 (1989). Thus, "knowledge of the underlying wrong" is a "required element" of commercial bad faith under New York law. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000).

As I have already concluded that the complaint fails adequately to allege that Chemical had actual knowledge of Wolas's fraud, the plaintiffs' claim for commercial bad faith must also be dismissed. At most, the plaintiffs have alleged that Chemical negligently failed to monitor the accounts adequately and close them promptly. However, pleading " 'merely a lapse of wary vigilance or even suspicious circumstances which might well have induced a prudent banker to investigate" ' is insufficient to state a claim of commercial bad faith.*Renner,* 2000 WL 781081, at *17 (quoting *Prudential-Bache,* 73 N.Y.2d at 275);*see also Nigerian Nat'l,* 1 999 WL 558141, at *8 (bank's alleged failure to investigate "red flags" and negligent approval of additional wire transfers, even after bank was alerted to fraudulent transfer, insufficient to state commercial bad faith claim).

**\*11** The plaintiffs' reliance on *Prudential-Bache,* 73 N.Y. 263, and *Peck v. Chase Manhattan Bank, N.A.,* 593 N.Y.S. 509 (1st Dep't 1993), to support their contention that Chemical had actual knowledge of Wolas's fraud is unpersuasive. Indeed, these cases support Chase's position. In *Prudential-Bache,* two bank officers were convicted of accepting bribes in connection with participation in a fraudulent scheme. The bank officers set up accounts without proper opening records and corporate resolutions, and with fictitious corporate officers, and also agreed not to prepare certain records required to be filed with the Internal Revenue Service. *See*73 N.Y.2d at 267. To implement the embezzlement scheme, one of the co-conspirators cashed several checks on a single day and often left the branch with large quantities of cash or cashiers' checks. Furthermore, other bank employees, including managers, were also allegedly aware of the fraud due to a co-conspirator's frequent visits to the bank, his repeated large cash withdrawals at teller windows, and his conversations with other bank employees. *See id.* at 268.Although the bank argued that the conduct of its agents, the convicted officers, could not be imputed to it under the adverse agent doctrine, the New York Court of Appeals declined to decide that issue and held that the plaintiff had stated a commercial bad faith claim against the bank. *See id.* at 276-77.In *Peck,* the plaintiff alleged that an internal bank memorandum reflected that bank employees actually knew that checks payable to third parties were being deposited into the thief's account, but no action was taken. 593 N.Y.S.2d at 511. The trial court granted the bank's motion to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))**

dismiss, but the Appellate Division reversed, holding that the allegations of actual knowledge adequately stated a claim for commercial bad faith. *See id.*

Here, the plaintiffs' allegations fall short of these cases, which involved either active participation in the fraud by bank officials or actual knowledge on their part of the ongoing fraud, as they have failed to allege either on the part of Chemical. Accordingly, their commercial bad faith claim must be dismissed.

E. *Leave to Amend*

The plaintiffs argue, in the alternative, that if I grant Chase's motion I should give them leave to replead. I decline to do so.

A district court may deny leave to amend a complaint if the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962). As the plaintiffs drafted their complaint well after discovery had been taken in a related case, *see Accousti v. Wolas,* 95-CV-5267 (JG) (E.D.N.Y. filed Dec. 20, 1995), an opportunity to amend would be futile. *See Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (denial of leave to amend not abuse of discretion where plaintiff had "access to full discovery" in a related case).

CONCLUSION

For the aforementioned reasons, Chase's motion to dismiss is granted.

**\*12** So Ordered.

E.D.N.Y.,2000.
Ryan v. Hunton & Williams
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.