**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 Case |
|  | : | No. 05-60006 (RDD) |
| Refco Inc., <u>et</u> <u>al.</u>, | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |
|  | : |  |

------------------------------------------------------------ x

|  |  |  |
|---|---|---|
|  | : |  |
| Marc S. Kirschner, | : |  |
| as Chapter 11 Trustee of | : |  |
| Refco Capital Markets, Ltd. | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : | Adv. Proc. No. 06-01745 (RDD) |
| v. | : |  |
|  | : |  |
| Bencorp Casa de Bolsa, C.A., | : |  |
| Emerging Strategies Fund, L.P., | : |  |
| Debick Partners, LLC, | : |  |
| and Makor Issues & Rights, Ltd., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

------------------------------------------------------------ x

## <u>JUDGMENT</u>

This matter came before the Court for trial on December 11, 2006 (the "<u>Trial</u>").

Prior to the Trial, all claims asserted by or against Defendants had been dismissed, with

the exception of the claim for declaratory relief against Makor Issues & Rights, Ltd.

("<u>Makor</u>").[1]    The Court heard and considered evidence presented at Trial by

plaintiff/counterclaim defendant, Marc S. Kirschner, the chapter 11 trustee (the "<u>RCM</u>

---

[1] Makor's third-party claims against Armin Tobaccowala will be addressed in
further proceedings.

Trustee") of Refco Capital Markets, Ltd. ("RCM"), and defendant/counterclaim plaintiff Makor.

The Court made findings and rulings at the conclusion of the hearing pursuant to Fed.R.Bankr.P. 7052, that, as modified by the Court, are attached hereto as Exhibit A. On the basis of the Court's findings and rulings:

1.     Judgment is entered in favor of the RCM Trustee on Count II of his complaint for declaratory judgment against Makor.[2]  The Court declares that Makor has no property interest in any of the "Assets in Place," as the term is defined in and for purposes of the Settlement Agreement dated as of June 29, 2006, as amended, among certain customers and creditors of RCM and the RCM Trustee, which was approved by order of the Court dated September 15, 2006.

2.     Judgment is entered in favor of the RCM Trustee on Counts I-V of the Counterclaim asserted by Makor against the RCM Trustee.

Dated: New York, New York
        December 29, 2006

                                /s/Robert D. Drain_____
                                ROBERT D. DRAIN
                                UNITED STATES BANKRUPTCY JUDGE

---

[2] On December 5, 2006, the Court granted the RCM Trustee's motion for approval of the settlement between the RCM Trustee and defendant Bencorp Casa de Bolsa, C.A. ("Bencorp").  Further, on December 11, 2006, the RCM Trustee and defendants Emerging Strategies Fund, L.P. ("ESF") and Debick Partners, LLC ("Debick") entered into a Stipulation in which, among other things, ESF and Debick dismissed, with prejudice, the counterclaims asserted against the RCM Trustee.  Thus, Counts I, III and IV of the RCM Trustee's complaint for declaratory judgment and the counterclaims asserted by Bencorp, ESF, and Debick have been resolved.

LITDOCS/664740.1

# Exhibit A

122

1  disparity under the plan between the securities law --

2              MR. GREENWALD:  I understand that.

3              THE COURT:  -- the securities claimants and the

4  unsecured creditors.

5              MR. GREENWALD:  I understand that, Your Honor.

6              THE COURT:  Okay.

7              MR. GREENWALD:  Going to the tracing issue, we

8  acknowledge that we are unable to trace them.  Whether that

9  is -- that is not a requirement under state law, however, it is

10 a requirement under the Bankruptcy Code.  State law is supposed

11 to be applied here, Your Honor.

12             With that being said, Makor asks for judgment in

13 its favor by its counterclaim.

14             THE COURT:  Okay.  All right.  It's 2:00 o'clock

15 and unless -- do you have any further argument?

16             MR. GREENWALD:  No, Your Honor.

17             THE COURT:  Okay.  It's 2:00 o'clock.  I'm going to

18 take a break.  I want to look at the case cited by

19 Mr. Greenwald and I'll be back at 3:00.

20             MR. GREENWALD:  Thank you, Your Honor.

21             (Recess taken.)

22             THE COURT:  Please be seated.  All right.  We

23 have just concluded the trial in respect of adversary

24 proceeding Number 06-01745 as it pertains to the request for a

123

1 declaratory judgment by Refco Capital Markets' (or "RCM's")

2 Chapter 11 trustee that any property interest claimed by

3 defendant Makor Issues & Rights Limited (or "Makor") in RCM's

4 property is to be disregarded and that Makor should have,

5 instead, only an unsecured claim against RCM.

6       As noted at the beginning of the trial, the

7 cross-claim of Makor against an individual, Armin Tobaccowala,

8 is severed from this trial and will be dealt with separately.

9 Makor also asserted a counterclaim, in its answer, against RCM's

10 Chapter 11 trustee, which essentially is the flip side of the

11 trustee's request for a declaratory judgment.

12       Makor asserts that it has legal and equitable

13 title to cash in RCM's estate equal to the positive credit

14 balance in the account statements received by it from RCM,

15 of $1,068,455.22, and that Makor is entitled to a declaration

16 that such funds are its property, not property of the debtor's

17 bankruptcy estate, and that RCM at best holds bare legal title

18 to such property.

19       Makor couches that claim under various theories,

20 all of an equitable nature, primarily requesting imposition of

21 a constructive trust on such funds, but also asserting a claim

22 based on unjust enrichment generally.  This is because Makor

23 does not have a contractual security interest in such funds and

24 consequently it is relying on equitable doctrines or

124

1   alternatively its interpretation of the agreement between RCM

2   and itself and various emails sent by Mr. Tobaccowala under

3   Refco FXA letterhead in respect of accounts established or to

4   be established by Makor. I will address the constructive trust

5   claim first since that is, I believe, what Makor primarily

6   relies upon.

7            With respect to a constructive trust claim,

8   although the trustee has brought a declaratory judgment action,

9   Makor has the burden of proof.  That is the case under New York

10  law (which I conclude to be applicable here). See generally In

11  re: Stylesite Marketing, Inc., 253 B.R. 503, 508 (S.D.N.Y.

12  2000).  And as I'll note in a moment, that burden of proof is

13  heightened by special considerations that apply to the request

14  for imposition of constructive case in a bankruptcy case

15  against a debtor in bankruptcy.

16           Under New York law, generally speaking the party

17  requesting imposition of a constructive trust must prove four

18  elements:  first, a confidential or fiduciary relationship

19  between it and the other party; second, a promise; three, a

20  transfer in reliance on that promise; and four, unjust

21  enrichment.  Id., see also In Re: First Central Financial

22  Corp., 377 F.3d 209, 212 (2d Cir. 2004).

23           The Second Circuit in First Central Financial was

24  careful to state that in the New York cases not all of these

125

1  elements must necessarily be shown and that first and foremost

2  the movant must establish unjust enrichment, which goes beyond

3  mere enrichment and must rise to a level such that equity and

4  good conscience call for the imposition of a constructive

5  trust.

6          Nevertheless, in the absence of the other factors

7  the presence of unjust enrichment must be even stronger.

8          As I noted, moreover, the Second Circuit has

9  recognized that in bankruptcy cases the party requesting

10 imposition of a constructive trust faces a higher burden --

11 given the nature of bankruptcy cases where many similarly

12 situated creditors are equally harmed because they are not, by

13 the nature of bankruptcy, going to be paid in full,and the

14 related principle of ratable distribution to similarly situated

15 creditors. Consequently, the Second Circuit has reiterated that

16 in bankruptcy cases courts should be cautious before imposing a

17 constructive trust.  In Re: First Central Financial Corp., 377

18 F.3d at 217.  See also In Re: Black and Geddes, Inc., 35 B.R.

19 830, 836, (Bankr. S.D.N.Y. 1984) in which it was stated that

20 imposition of constructive trust must include a consideration

21 of the relative equities between the proposed beneficiary and

22 the other creditors.

23          In considering the facts as laid out in the trial

24 today, including not only in the testimony of the three

126

1 witnesses but also in the exhibits, I conclude that a

2 constructive trust should not be imposed upon the estate of RCM

3 to the extent of the positive credit balance in Makor's account.

4  I do so for four separate reasons, each of which, standing

5 alone, would justify my conclusion.

6          The first is that Makor does not meet a

7 requirement sometimes found in the New York cases, but well

8 recognized in bankruptcy cases, which is in addition to the

9 four factors that I have just described.  That requirement,

10 which clearly applies in bankruptcy cases as stated in a number

11 of decisions largely coming out of the Southern District of New

12 York, is that the party requesting imposition of a constructive

13 trust must show the res constituting the trust property, or

14 must be able to trace the res specifically to property in the

15 estate.

16          See, for example, In Re: Schick, 234 B.R. 337,

17 343-44 (Bankr. S.D.N.Y. 1999); In Re: St. Teresa Properties,

18 Inc., 152 B.R. 852, 857 (Bankr. S.D.N.Y. 1993); and In Re:

19 United States Lines, Inc., 79 B.R. 542, 544 (Bankr. S.D.N.Y.

20 1997).  This point was made more recently in In Re: Ames

21 Department Stores, Inc., 274 B.R. 600, 625, Note 16, (Bankr.

22 S.D.N.Y. 2002), aff'd 114 Fed. App. 900 (2d Cir. 2005).  Here

23 the record establishes pursuant to plaintiff's, that is, the

24 RCM trustee's Exhibits 9 through 12, that the funds deposited

127

1 by Makor were commingled with other deposits of customers of

2 RCM, as well as other RCM property in a custodial account at

3 HSBC Bank, which had enormous activity averaging roughly 200

4 million dollars to 300 million dollars of transactions a day.

5 It is shown in the foregoing exhibits that at times the HSBC

6 account had a negative balance at the end of each day,

7 reflecting the fact that RCM moved money out of the account on

8 a regular basis overnight to maximize its return on the funds,

9 since, as was testified to by the trustee's witness, the HSBC

10 account did not bear interest.

11        The trustee asserts, relying primarily upon In

12 Re: Drexel Burnham Lambert Group, Inc., 142 B.R. 633, 638

13 (S.D.N.Y. 1992), that the existence of a negative or zero

14 balance where the claimed res has been commingled with other

15 cash precludes any sort of tracing, which would, given the

16 commingling, only have been achievable, in any event, pursuant

17 to the lowest intermediate balance rule described in that case

18 (as well as in the United States Lines case that I cited

19 earlier). That is probably the end of the matter.

20        However, I do note that on the days where there

21 was a negative balance shown, certain of the transfers from the

22 account were not to third parties, but rather, to other RCM

23 accounts.  So, conceivably, one could follow the money from its

24 initial deposit by Makor in October of 2003 through daily

128

1  transfers to the extent that transfers were made to other RCM

2  accounts over the next two years.

3            However, Mr. Brents testified that the other main

4  RCM account to which transfers were made from the HSBC RCM

5  account was a similar type of account in that it had very

6  active daily transactions occur in it, and it was his testimony

7  that, consequently, tracing through that RCM Chase account the

8  money originally deposited in the HSBC account would be

9  impossible.

10            Makor through its counsel, after having conferred

11 with its accountant, has also acknowledged that it cannot trace

12 the funds, which should conclusively resolve this issue.  Let

13 me say, however, that, again, based on my understanding of the

14 discovery schedule, the prominence of the tracing issue in the

15 case law, and the proper production -- as I believe Makor has

16 acknowledged -- that RCM's trustee made of the monthly bank

17 account statements and Makor's opportunity, starting some time

18 ago -- at least a month and a half ago -- to question the RCM

19 trustee or to seek additional discovery in respect of any

20 transfers out of the HSBC account into other RCM accounts, I do

21 not see a basis for extending any further discovery on behalf

22 of Makor to facilitate any further attempt to try to trace the

23 deposited funds.  It was Makor's choice to try to save money in

24 delaying the retention of an accountant and, secondly, I don't

129

1 believe that this issue necessarily had to wait until an

2 accountant was retained for Makor to at least explore and

3 locate the relevant documents, if indeed any are missing (and

4 the trustee's counsel says that he has produced all such

5 documents under his control).

6          So, on the basis of the failure to trace, I

7 conclude that Makor is not able to establish a constructive

8 trust.

9          Secondly, in reviewing the effect of the

10 imposition of a constructive trust upon other similarly

11 situated creditors of RCM I conclude that such a remedy, which

12 effectively would prime those creditors, would be inequitable

13 and, therefore, that it should not be imposed. The creditors

14 that I am referring to are the other general unsecured

15 creditors of RCM, not securities customers or customers who

16 provided identifiable securities or entrusted identifiable

17 securities to RCM, but, rather, general unsecured creditors and

18 also creditors who provided cash to RCM for the purpose of

19 facilitating their trading in foreign exchange.  The testimony

20 in the record today reflects that there were approximately 300

21 to 400 such parties and I believe that singling out and

22 preferring one -- or perhaps two, because there are still

23 pending declaratory judgment actions on somewhat similar facts

24 -- would be to the great detriment of all the other similarly

130

1  situated creditors.

2              I do not believe that the fact that under the

3  current Chapter 11 plan RCM's securities customers are receiving

4  a greater recovery than the general unsecured creditors is

5  relevant here.  Under subpart 3 of Chapter 7 of the Bankruptcy

6  Code, securities customers with  claims to identifiable

7  securities have, as recognized by Congress, explicitly superior

8  rights to general unsecured creditors.  And I do not believe

9  that I am authorized to reduce those rights on equitable

10 grounds, at least based on the facts that are before me today.

11

12             Thirdly, I believe that Makor has not established

13 a basis for a constructive trust, even under New York law --

14 that is, assuming there were no special bankruptcy

15 considerations.  I say that for two reasons.  First, as set

16 forth In Re: First Central Financial Corporation, 377 F.3d at

17 213-14, the existence of a valid and enforceable contract

18 governing a particular subject matter ordinarily precludes

19 recovery for unjust enrichment for events arising out of the

20 same subject matter.  The claim of Makor here is essentially

21 that it entrusted the funds with RCM and that RCM failed to pay

22 them back to Makor when Makor made demand therefor.  The

23 parties set up the relationship between them pursuant to the

24 agreement that was introduced today as Plaintiff's Exhibit

131

1  Number 1, the Foreign Exchange and Options Master Agreement,

2  with the Addendum for Electronic Trading.  And it is

3  essentially a breach of that agreement for failure to return

4  the account balances that Makor complains about.

5                 Under <u>First Central Financial</u> and the cases

6  relied upon by it, that fact precludes the imposition of

7  equitable relief based upon a claim of unjust enrichment

8  including the imposition of a constructive trust.  377 F.3d at

9  213-15.

10                Finally, and fundamentally, I do not believe that

11 the four traditional state law elements of a constructive trust

12 here have been sufficiently established.  First, Makor asserts

13 that it and RCM were in a confidential or fiduciary

14 relationship and that RCM was its fiduciary, but this, I

15 believe, runs counter to applicable law, because RCM as per

16 Mr. Myr's testimony and my own review of the agreements

17 introduced today, was solely a prime broker, and the account

18 established by Makor was a nondiscretionary trading account;

19 that is, Makor made the decisions in connection with the

20 foreign exchange trades, rather than RCM.  Under such

21 circumstances, there's authority under New York law that there

22 is no fiduciary duty owed whatsoever to the customer.  <u>See</u>, for

23 example, <u>Perl v. Smith Barney, Inc.</u>, 230 A.D.2d 664, 646

24 N.Y.S.2d 678, 680 (1st Dept. 1996), as well as <u>Fesseha v. T.D.</u>

132

1  <u>Waterhouse Investor Services, Inc.</u> 305 A.D.2d 268, 761 N.Y.S.2d

2  22 (1st Dept. 2003).  Nevertheless, certain courts in the Second

3  Circuit have recognized a limited fiduciary duty in such

4  situations, which simply requires completing the transaction

5  entrusted to it, within its role as a broker.  <u>See</u> <u>Press v.</u>

6  <u>Chemical Investment Services Corp.</u>, 166 F.3d 529, 536 (2nd Cir.

7  1999), as well as <u>Bissell v. Merrill Lynch & Company</u>, 937

8  F.Supp. 237, 246-47 (S.D.N.Y. 1996), <u>aff'd</u> 157 F.3d 138 (2d

9  Cir. 1998).  In the <u>Bissell</u> decision, the District Court

10 amplified on its rationale for limiting such a duty and said

11 that the relationship between a broker and its customer with

12 respect to credit and debit balances (and that's what we're

13 talking about here.  This was a million dollars that was simply

14 sitting in an RCM account.  It wasn't tied up in a particular

15 trade, and RCM didn't fail to execute a particular prepetition

16 trade), the relationship between broker and customer with

17 respect to credit and debit balances in such accounts, is that

18 of a debtor and creditor.  <u>Bissell</u> noted as authority for that

19 proposition, in addition to numerous cases, commentary by the

20 SEC, which in adopting Rule 153-2 governing the use of free

21 credit balances and customer accounts explained as follows:

22 "Many customers of broker-dealers are not aware (1) that when

23 they leave free credit balances with a broker-dealer, the funds

24 generally are not segregated and held for the customer, but are

133

1  commingled with other assets of the broker-dealer and used in

2  the operation of the business, and (2) that the relationship

3  between the broker-dealer and the customer as a result thereof

4  is that of creditor-debtor." <u>Bissell, 937 F. Supp. at 246.</u>

5          This comports with the general rule, which I've

6  discussed in other contexts in the Refco LLC and RCM cases,

7  that when funds are deposited with another party, the

8  presumption is that the relationship between the parties is not

9  one of bailor and bailee, but, rather, creditor and debtor.

10  Even if they are deposited for a specific purpose, that is not

11  determinative of the question of whether an account is general

12  or specific.  There needs to be more in the account document or

13  in the relationship between the parties to overcome the general

14  presumption. <u>See</u>, for example, <u>People's Westchester Savings</u>

15  <u>Bank v. FDIC</u>, 961 F.2d 327, 330 (2d Cir. 1992), which dealt

16  with an IOLA account, and <u>In Re: Black and Geddes</u>, 35 B.R. 830,

17  836 (Bankr. S.D.N.Y. 1984).

18          The presumption, therefore, is that in a

19  situation like this, where a party that desires to trade is

20  setting up a trading account that will have account balances in

21  it from time to time, absent clear evidence to the contrary in

22  the parties' agreements or, under proper circumstances, their

23  own dealings with each other, while the broker clearly has an

24  obligation to return a like amount of money, that obligation is

134

1  one of a debtor as opposed to one of a bailee.

2          The agreement introduced as Plaintiff's Exhibit

3  Number 1 does not alter that presumption.  It clearly does not

4  set forth that RCM, for example, is required to return the same

5  property as provided to it or to keep such property in a

6  separate account of Makor's.  This is different, of course,

7  from reporting to Makor in respect of its funds on account with

8  RCM.  Turning to that reporting, I note that the customer

9  statement sent to Makor consistently stated, starting with what

10 was apparently the first one, dated October 31, 2003, the

11 following: "Refco does not segregate any collateral or other

12 property deposited with it.  Refco's transactions with you are

13 executed in the inter-bank foreign exchange market and these

14 transactions are not subject to the U.S. Commodity Exchange

15 Act.  Accordingly, the segregation requirements of that Act are

16 inapplicable even with respect to funds or property transferred

17 from Refco, Inc."

18          The account statement also refers to the

19 maintenance of an account with Refco and the fact that Refco

20 maintains a general lien on, and in, and in all credit balances

21 in, the account.  It may be suggested by Makor that the

22 existence of that grant of a lien -- as evidenced by the

23 account statement, as well as the last page of the account

24 agreement -- is an acknowledgment that the property in the HSBC

135

account "belonged" to Makor.  However, I believe this is a
mistake.  The lien, in terms of the credit balance, is a lien
that RCM has on its own obligation to Makor, which is the
credit balance, and that lien secures any other obligation
running the other way from Makor to RCM.

Given the general presumption, and the absence in
the Foreign Exchange Master Agreement of any agreement altering
the general presumption that the parties have a debtor/creditor
relationship, Makor relies upon a series of emails that it sent
and received when it was setting up the account, the trading
account, with RCM.

I should note first when referring to these
emails, however, that I do not believe they alter the agreement
between the parties, because the parties agreed in the Foreign
Exchange Master Agreement that they could alter that agreement
only in a writing executed by each of the parties.  The emails
in my view did not rise to that level. But, equally
importantly, I do not believe that the emails, without more,
could alter the general presumption pertaining to the nature of
the debtor-creditor relationship between the parties. The
first, and most important, email in the chain is Defendant's
Exhibit Number 2, dated September 2, 2003, from Makor to Armin
Tobaccowala, apparently an employee of Refco FX.  In that
email, Makor through Mr. Myr asks in Paragraph 3, "Will our

136

1   account have full FDIC account protection?"  The response to
2   that question is found in an email from Mr. Tobaccowala back to
3   Mr. Myr in which he says in Paragraph 6, "Refco is not a bank"
4   or indicates that Refco is not a bank.  In Paragraph 3 he notes
5   that "Your funds are held at HSBC in New York, an FDIC-insured
6   bank."  I believe that it is reasonable to assume that Makor
7   would understand that response to indicate that the money in
8   HSBC, an FDIC-insured bank is protected under the FDIC rules,
9   but that such account is not Makor's account -- as is confirmed
10  by the account statement sent by RCM to Makor -- but that
11  Makor's account relationship is, instead, with RCM, as opposed
12  to HSBC.
13          Paragraph 3 of Mr. Tobaccowala's email then goes
14  on to say, "And it is held in a customer segregated account by
15  Refco."  Again, while I understand that there may be some
16  ambiguity or confusion in that clause, which goes beyond
17  answering the question that was posed by Mr. Myr in his
18  September 2 email to Mr. Tobaccowala, one can read that
19  statement very consistently as saying that Refco is the account
20  party with HSBC, which was in fact the case, not that Makor had
21  a separate account with HSBC.
22          Paragraph 3 of Mr. Tobaccowala's answer then
23  states, "Refco, according to CFTC and NFA regulation needs to
24  keep in excess capital the exact amount of customer segregated

137

funds." Again, given the reference to "customer segregated

funds," I could see some ambiguity in that answer. However, I

believe that a reasonable person reading that sentence would

understand that Tobaccowala was saying that Refco -- that is,

the regulated entity -- is required to keep excess capital as a

credit and regulatory matter to support its obligations to

those of its customers with positive credit balances, again

evidencing a debtor-creditor relationship.

I further note that Mr. Tobaccowala's email

responds to another question raised by Mr. Myr in his September

2 email by telling Mr. Myr that Makor will receive "the prime

U.S. interest rate. Right now, it is 1 percent." That also is

indicative of a debtor-creditor relationship, as opposed to a

custodial relationship, particularly where it is clear (and I

believe it's clear from the customer statements, but also from

the account agreement) that the obligation to pay interest is

Refco's, since that is where the account is, as opposed to

HSBC's.

In addition to those two emails, Makor relies on

two other emails that Mr. Myr sent to Mr. Tobaccowala. The

first was sent on September 7, 2003, in which Mr. Myr said at

paragraph 3, "We need that our money will be separate from

other Refco accounts. Please confirm that we will wire the

money to Makor Issues & Rights Ltd. account in the bank." Mr.

138

1  Myr then testified that he never received any confirmation

2  about Makor's money being separate from all other Refco

3  accounts. Then, shortly before he received the foreign exchange

4  agreement, which is dated September 9th, 2003, Mr. Myr sent a

5  third e-mail to Mr. Tobaccowala which also was not responded to

6  in any way, which asked in paragraph 2, "Please clarify account

7  protection matter.  We understand that if our money will be in

8  Refco account in HSBC, then the money will be fully protected.

9   Please confirm."

10          Again, there was no response, no confirmation in

11  response to that question.  I note further that the question

12  acknowledged that the account at HSBC was a Refco account, as

13  opposed to a Makor account.  And one could read the question,

14  particularly in light of the initial question from the

15  September 2 email as to whether the the account was FDIC-

16  protected and Mr. Tobaccowala's response to that question that

17  the account is in an FDIC-insured bank, that Tobaccowala's

18  prior response was sufficient.

19          It is contended that Mr. Tobaccowala's, and, I

20  guess implicitly, Refco's, silence in response to those last

21  two

22  emails constitutes an admission.  However, the law on this

23  point, even as set forth in the case cited by Makor at oral

24  argument, is not so clear.  As stated in Southern Stone

139

1  <u>Company, Inc. v. Singer</u>, 665 F.2d 698 (5th Cir. 1982), at page

2  703, "the mere failure to respond to a letter does not indicate

3  an adoption unless it was reasonable under the circumstances

4  for the sender to expect the recipient to respond and to

5  correct erroneous assertions."  See also <u>4 Weinstein's Evidence</u>

6  Paragraph 801(d)(2)(B)(01) at 801-146, which states that

7  whether silence constitutes an admission depends upon whether a

8  denial would be normal under the circumstances.

9              Given the ambiguities in the earlier emails –and,

10 further, the general nature of the relationship between a

11 customer and a broker, and, further, the absence of any

12 variation of that relationship as set forth in the Foreign

13 Exchange Master Agreement that was sent to Makor essentially in

14 response to those emails -- I conclude that the absence of a

15 response to Mr. Myr's September 7th and 9th requests for

16 confirmation was not so misleading as to require the imposition

17 of a constructive trust.

18              Arguably, the relationship between Mr.

19 Tobaccowala and Makor at that point was one that went beyond a

20 mere arm's length relationship, since Mr. Tobaccowala was

21 facilitating setting up the accounts: the transaction entrusted

22 to him.  However, the law in this area is clear, the document

23 that Mr. Tobaccowala returned for purposes of setting up the

24 account speaks for itself, and the absence of any variation of

140

1  that law in the document I believe also speaks volumes. And

2  finally, the customer statement itself and its clear

3  recitations with regard to non-segregation should have made it

4  clear to Makor as early as the end of October 2003, if not

5  before, when Makor received the Master Agreement, that it had

6  not received assurance that Refco was holding its funds as a

7  custodian or as a bailee as opposed to a debtor.

8          Consequently, while I believe that there is a

9  breach of the obligation to return the amount of money that is

10 shown as a positive account balance, RCM only has an obligation

11 to do that.  That is, Makor only has a claim against RCM for

12 its failure to return the amount that RCM owes, as opposed to

13 an interest in specific funds.

14         Essentially for the same reasons as set forth in

15 Black & Geddes, Westchester Savings Bank and numerous other

16 authorities, including Wisetex Trading Limited v. Gindy, 2001

17 U.S.Dist. LEXIS (S.D.N.Y. January 3, 2001), Weststeyn Dairy 2

18 v. Eades Commodities Company, 280 F.Supp.2d 1044, 1080 (E.D.

19 Ca. 2003), and Swan Brewery Company Limited v. U.S. Trust

20 Company of New York, 832 F. Supp. 714, 719-720 (S.D.N.Y. 1993),

21 I also conclude that separate and apart from there being no

22 basis for a constructive trust, there's no basis to hold that

23 Makor owns any property of RCM.  Makor is, instead, limited to

24 a claim.

141

1           So, counsel for the trustee should submit an

2   order to that effect.  As is generally my practice with long

3   bench rulings, I'll go over it, check the cites and make sure I

4   didn't leave anything out or say anything grossly

5   ungrammatical, and, if I correct it, that will be my final

6   ruling on the matter, but the gist of the holding won't change.

7

8           MR. WILLETT:  Thank you, Your Honor.  We'll

9   submit a form of judgment and Your Honor's -- I guess that will

10  be the findings and rulings what you --

11          THE COURT:  Yes.

12          MR. WILLETT:  -- recited.

13          THE COURT:  Correct.

14          MR. WILLETT:  Thank you very much, Your Honor.

15          THE COURT:  Okay.

16          MR. WILLETT:  Wanted to also let you know that we

17  are quite close to an arrangement with PlusFunds that would

18  resolve the matters on for tomorrow.  It's --

19          THE COURT:  Okay.

20          MR. WILLETT:  -- not quite done, but I am very

21  hopeful that it will be.

22          THE COURT:  And I -- we gave them --

23          MR. WILLETT:  You've been giving us --

24          THE COURT:  -- an extension on their -- your time