UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MARC S. KIRSCHNER,                                    :
as Trustee of the Refco Private Actions Trust,        :
                                                      :        Case No. 07 Civ. 8165 (GEL)
                        Plaintiff,                    :
                                                      :        ECF Filed
                                                      :
           v.                                         :
                                                      :
PHILLIP R. BENNETT, SANTO C. MAGGIO,                  :
ROBERT C. TROSTEN, MAYER, BROWN,                      :
ROWE & MAW LLP, GRANT THORNTON LLP,                   :
and ERNST & YOUNG US LLP,                             :
                                                      :
                        Defendants.                   :

------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT MAYER BROWN LLP'S MOTION TO DISMISS

June 6, 2008

John K. Villa (admitted *pro hac vice*)
Michael S. Sundermeyer (admitted *pro hac vice*)
Craig D. Singer (admitted *pro hac vice*)
Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Attorneys for Defendant Mayer Brown LLP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

THE ALLEGATIONS IN THE COMPLAINT ................................................. 3

ARGUMENT ................................................................................................... 7

I.   THE FX CUSTOMERS AND THE TRUSTEE AS THEIR ASSIGNEE
     LACK STANDING TO PURSUE THE CLAIMS ALLEGED IN THE
     COMPLAINT. ......................................................................................... 7

     A.   The Refco Bankruptcy Plan Reserves the Pending Claims to the
          Estate, and the Litigation Trust Is Pursuing Them. ................................ 8

     B.   The Trustee's Claims Are Derivative of Losses Suffered by RCM. .......... 9

     C.   Mr. Kirschner Is Pursuing Double-Recovery Through the Litigation
          Trust and Private Actions Trust. ......................................................... 13

II.  THE AIDING AND ABETTING FRAUD CLAIM SHOULD BE
     DISMISSED FOR FAILURE TO ALLEGE RELIANCE UPON ANY
     MATERIAL MISREPRESENTATION OR OMISSION. ........................... 14

     A.   The Complaint Fails To Identify Any Specific Statements Made to and
          Received by the Named FX Customers. ............................................... 15

     B.   Plaintiff Fails To Allege Actual Reliance by Each Named Customer. ........ 17

III. THE COMPLAINT DOES NOT PLEAD ANY BASIS FOR CONCLUDING
     THAT RCM OWED A DUTY TO THE FX CUSTOMERS. ...................... 17

     A.   As a Broker, RCM and Its Management Owed No Fiduciary Duty to
          the FX Customers. ............................................................................ 18

     B.   The Trustee's Allegation that RCM Was Insolvent Does Not Change
          the Analysis. ..................................................................................... 20

IV.  THE AIDING AND ABETTING CONVERSION CLAIMS SHOULD BE
     DISMISSED FOR FAILURE TO PLEAD INTERFERENCE WITH THE FX
     CUSTOMERS' RIGHTS OVER SPECIFIC IDENTIFIABLE PROPERTY. ... 21

V.   THE COMPLAINT DOES NOT ADEQUATELY ALLEGE PROXIMATE
     CAUSE. ................................................................................................ 24

VI.  THE COMPLAINT FAILS TO PLEAD MAYER BROWN'S ACTUAL
     KNOWLEDGE AND INTENT TO ASSIST IN WRONGDOING. ............ 28

     A.   The Complaint Does Not Allege Mayer Brown's Actual Knowledge of
          Any Improper Transfers from RCM to Other Refco Entities. ................... 30

     B.   The Complaint Does Not Allege Mayer Brown's Actual Knowledge of
          Hidden Inter-Company Debt. ............................................................... 32

VII.    SLUSA REQUIRES DISMISSAL OF THIS "COVERED CLASS ACTION." ............. 36

    A.    This Is a "Covered Class Action." ........................................................................ 36

    B.    The Complaint Alleges Fraud "In Connection with the Purchase or
        Sale of a Covered Security." ............................................................................... 37

CONCLUSION ...................................................................................................................... 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abou-Khadra v. Mahshie*, 4 F.3d 1071 (2d Cir. 1993) ..................................................13

*American National Bank of Austin v. MortgageAmerica Corp.*, 714 F.2d 1266
(5th Cir. 1983)..........................................................................................................7

*American Financial International Group-Asia, LLC v. Bennett*, No. 05 Civ. 8988, 2007
WL 1732427 (S.D.N.Y. June 14, 2007) ....................................................... passim

*Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519
(1983).....................................................................................................................13

*AUSA Life Insurance Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000) ...................................25

*Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 850 F.
Supp. 1199 (S.D.N.Y. 1994).................................................................................17

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ............................................................29

*Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237 (S.D.N.Y. 1996)...........................................22

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985)................26, 27

*Bondi v. Grant Thornton International*, 421 F. Supp. 2d 703 (S.D.N.Y. 2006)...........................27

*Brownstone Investment Group, LLC v. Levey*, 468 F. Supp. 2d 654 (S.D.N.Y. 2007) ................15

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164
(1994)....................................................................................................................27

*Citadel Management, Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133 (S.D.N.Y. 2000) .............22

*Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir. 1994)..................................................................13

*Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037 (2d Cir. 1986)............................................7, 11

*Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005) ...........................................24, 25, 27

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)....................25, 26, 27

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349
(S.D.N.Y. 2007)....................................................................................................15

*Frota v. Prudential-Bache Securities, Inc.*, 639 F. Supp. 1186 (S.D.N.Y. 1986) ........................29

*Fundacion Museo de Arte Contemporaneo de Caracas-Sofia Imber v. CBI-TDB Union Bancaire Privee*, 160 F.3d 146 (2d Cir. 1998) .......................................................22

*Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072 (S.D.N.Y. July 26, 2007) ...................................................................................25, 29

*In re Granite Partners*, 194 B.R. 318 (Bankr. S.D.N.Y. 1996)....................................21

*Honigman v. Comerica Bank*, 128 F.3d 945 (6th Cir. 1997).............................7, 10, 13

*In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y. 1993).......................................10

*Jackson National Life Insurance Co. v. Ligator*, 949 F. Supp. 200 (S.D.N.Y. 1996)..............9, 13

*Kirk v. Heppt*, 532 F. Supp. 2d 586 (S.D.N.Y. 2008) ...................................................24

*Kirschner v. Grant Thornton LLP (In re Refco, Inc. Securities Litigation)*, No. 07 Civ. 11604, 2008 WL 1827644 (S.D.N.Y. Apr. 21, 2008)...........................................8, 9

*Kolbeck v. LIT America Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996) ..............................18, 20, 24, 29

*Krause v. Forex Exchange Market, Inc.*, 356 F. Supp. 2d 332 (S.D.N.Y. 2005) .........................28

*LaSala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246, 268-69 (S.D.N.Y. 2007) ...............37

*LaSala v. Bordier et Cie*, 519 F.3d 121 (3d Cir. 2008)...................................................37

*LaSala v. Lloyds TSB Bank, PLC*, 514 F. Supp. 2d 447 (S.D.N.Y. 2007)....................................37

*LaSala v. UBS, AG*, 510 F. Supp. 2d 213 (S.D.N.Y. 2007).....................................................37, 39

*Leider v. Ralfe*, No. 01 Civ. 3137, 2003 WL 22339305 (S.D.N.Y. Oct. 10, 2003).....................13

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...............................................28

*Manson v. Stacescu*, 11 F.3d 1127 (2d Cir. 1993).........................................................10

*Maxwell v. KPMG LLP*, 520 F.3d 713 (7th Cir. 2008).....................................................27

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ....................................25, 27

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) ....................36, 38, 40

*Mitsui & Co. USA v. Hudson Tank Terminals Corp.*, 790 F.2d 226 (2d Cir. 1986).....................13

*National American Insurance Co. v. Ruppert Landscaping Co.*, 187 F.3d 439 (4th Cir. 1999).................................................................................................10, 11

iv

*Nay v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05 Civ. 10264, 2006 WL 2109467 (S.D.N.Y. July 25, 2006) .......................................................22

*Nwachukwu v. Chemical Bank*, No. 96 Civ. 5118, 1997 WL 441941 (S.D.N.Y. Aug. 6, 1997) ....................................................................................................22

*Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.*, No. 00 Civ. 8688, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ...................29

*In re Parmalat Securities Litigation*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007) .........................24, 27

*Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006).....................................24, 28

*Peoples Westchester Savings Bank v. FDIC*, 961 F.2d 327 (2d Cir. 1992)............................22, 24

*Premium Plus Partners, L.P. v. Davis*, No. 04 C 1851, 2005 WL 711591, at *19 (N.D. Ill. Mar. 28, 2005) ......................................................................................38

*In re Refco Capital Markets, Ltd., Brokerage Customer Securities Litigation*, No. 06 Civ. 643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007)....................................... passim

*In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007)............................................................................11

*In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................40

*In re Refco, Inc. Securities Litigation*, No. 05 Civ. 8626, 2007 WL 57872 (S.D.N.Y. Jan. 9, 2007)......................................................................................13

*Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081 (S.D.N.Y. June 16, 2000)..................................................................... 15, 34-35

*Ryan v. Hunton & Williams*, No. 99 Civ. 5938, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000).................................................................................34

*Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63 (2d Cir. 2000)............17

*SEC v. Zandford*, 535 U.S. 813 (2002) ......................................................................................39

*In re Sharp International Corp.*, 403 F.3d 43 (2d Cir. 2005) .......................................................17

*Siepel v. Bank of America, N.A.*, __ F.3d __, 2008 WL 2079028 (8th Cir. 2008).......................38

*Stoneridge Investment Partners LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ..............27

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) .................................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) .........................................29

*Torch Liquidating Trust v. Stockstill*, No. 07-133, 2008 WL 696233
(E.D. La. Mar. 13, 2008)................................................................................21

*Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, No. 06 Civ. 14211, 2007
WL 2219485 (S.D.N.Y. Aug. 2, 2007)........................................................24

*U.S. Mortgage, Inc. v. Saxton*, 494 F.3d 833 (9th Cir. 2007)...........................38, 39, 40

*United States v. O'Hagan*, 521 U.S. 642 (1997) ............................................38

## STATE CASES

*9310 Third Ave. Associates, Inc. v. Schaffer Food*, 620 N.Y.S.2d 255 (App. Div. 1994)............21

*Ascot Fund Ltd. v. UBS PaineWebber, Inc.*, 814 N.Y.S.2d 36 (App. Div. 2006) ........................19

*Independent Discount Corp. v. Bressner*, 365 N.Y.S.2d 44 (App. Div. 1975).............................21

*Laub v. Faessel*, 745 N.Y.S.2d 534 (App. Div. 2002)...................................................25

*North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930
A.2d 92 (Del. 2007) .....................................................................................21

*Town of North Hempstead v. Winston & Strawn LLP*, 814 N.Y.S.2d 237
(App. Div. 2006)........................................................................................25

*Zarcone v. Perry*, 434 N.Y.S.2d 437 (App. Div. 1980)...................................................13

## DOCKETED CASES

*In re Refco Securities Litigation*, No. 05 Civ. 8626 (GEL) (S.D.N.Y.)........................................36

*Kirschner v. Bencorp Casa de Bolsa, C.A. (In re Refco Inc.)*, Adv. Proc. No. 06-07145
(Bankr. S.D.N.Y.) ...................................................................................... passim

*Thomas H. Lee Equity Fund V L.P. v. Mayer, Brown, Rowe & Maw LLP*, No. 07 Civ.
6767 (GEL) (S.D.N.Y.)................................................................................36

## FEDERAL STATUTES AND RULES

11 U.S.C. § 541 ................................................................................................7

11 U.S.C. § 548 ..............................................................................................10

Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p(b), 78bb(f)........... passim

15 U.S.C. § 77r(b)........................................................................................37, 38

15 U.S.C. § 78bb(f)(5)(B)..................................................................................36

15 U.S.C. § 78bb(f)(5)(E) ................................................................................37

Federal Rule of Civil Procedure 8(a) ..............................................................29

Federal Rule of Civil Procedure 9(b) ........................................................ passim

## STATE STATUTES

N.Y. Debtor & Creditor Law § 10-270 ..............................................................10

## MISCELLANEOUS

H.R. Rep. No. 95-595 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963 ...........................................7

SEC Release No. IA-2176 (September 25, 2003) *available at*
    http://www.sec.gov/rules/final/ia-2176.htm#IIB (last visited June 4, 2008) ........................31

Restatement (Second) of Judgments § 53 (1982) ..........................................................13

Restatement (Second) of Torts § 876(b) (1979) ..........................................................28

**INTRODUCTION**

This action is one of more than a dozen springing from the October 2005 bankruptcy of Refco Inc. and its affiliates. Plaintiff Marc S. Kirschner, as Trustee of a novel entity styled the "Private Actions Trust," purports to stand in the shoes of seventy-five former foreign exchange ("FX") customers of Refco Capital Markets ("RCM"), Refco's unregulated, off-shore, currency and securities trading subsidiary. These customers allegedly had more than $500 million in cash and securities on deposit at RCM in October 2005, which they could not withdraw after the Refco bankruptcy because Refco's management (the "Refco Insiders") allegedly had improperly "siphoned" their funds to cover operating costs of other Refco entities. These transfers from RCM allegedly occurred because the Refco Insiders wished to make the overall Refco enterprise appear to be a robust and financially sound company in order to effectuate certain "liquidity transactions," i.e., a leveraged buyout and an IPO. The Complaint alleges that Mayer Brown[1] aided and abetted the Insiders' fraud, breach of fiduciary duty, and conversion.

The Complaint should be dismissed for lack of standing. *See infra* Part I. The Complaint makes clear that the Trustee is not suing for any harm allegedly inflicted on the named FX customers individually. Rather, he seeks damages for harm allegedly suffered by RCM, on the theory that the harm to RCM reduced its available cash and made it unable to pay the FX customers. It is well settled that individual creditors have no standing to bring such a derivative action, which duplicates the separate action Mr. Kirschner has filed in his capacity as Litigation Trustee on behalf of the RCM estate. Any other result would allow the named customers to seek an unwarranted preference and impermissible double recovery.

---

[1] Mayer Brown LLP is an Illinois limited partnership formerly known as Mayer, Brown, Rowe & Maw LLP. Plaintiff describes "Defendant Mayer, Brown, Rowe & Maw LLP" as a "combination" of Mayer Brown LLP and Mayer Brown International LLP, a limited liability partnership formed under U.K. law. Compl. ¶ 13. There is no such single entity. This motion is brought only by Mayer Brown LLP ("Mayer Brown").

Even if the Trustee had standing to pursue these claims, the Complaint is fatally defective for reasons this Court identified in dismissing two prior lawsuits by Refco customers. *See In re Refco Capital Mkts., Ltd., Brokerage Customer Sec. Litig.*, No. 06 Civ. 643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007); *American Financial Int'l Group-Asia, LLC v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007). As in those cases, Plaintiff has failed to plead even minimal facts necessary to state a claim against Mayer Brown for aiding and abetting fraud. *See infra* Part II. The Complaint does not identify any specific statements by the Refco Insiders, nor does it plead actual reliance by any of the named customers on any statement to which Mayer Brown made a knowing contribution.

As in *American Financial*, moreover, the Trustee's claim of aiding and abetting a breach of fiduciary duty fails because brokers like RCM owe no fiduciary duty to their customers. *See* 2007 WL 1732427, at *4-5; *infra* Part III. To show a duty, Plaintiff alleges that RCM was insolvent "at all relevant times." Compl. ¶¶ 27, 28(g). Plaintiff offers no factual basis for believing that RCM was insolvent, however, and even if it was, RCM would not have owed any fiduciary duties to customers that would allow them to bring their own individual claims.

Plaintiff also fails adequately to plead a claim for aiding and abetting conversion against Mayer Brown because (among other things) there was no conversion. *See infra* Part IV. It is black-letter law that, absent a specific contractual provision to the contrary, funds deposited in brokerage accounts are property of the broker, and are not sufficiently unique or identifiable to support a claim for conversion. The Bankruptcy Court dismissed an earlier action by an RCM FX customer in reliance on this presumption.

Other defects in the Complaint pervade all of the claims against Mayer Brown. Fundamentally, the Trustee's allegations fail to connect Mayer Brown's conduct directly to the

alleged damages suffered by the FX customers and thus cannot establish proximate cause.  *See infra* Part V.  The alleged harm is RCM's inability to pay its obligations to the named customers, allegedly because the Insiders transferred funds to other Refco entities.  The Complaint does not specify any knowing or material contribution by Mayer Brown to those transfers.  Rather, the allegations against Mayer Brown focus on legal services provided on "round trip loan transactions," by which Refco allegedly concealed a large receivable that resulted from years of trading and operating losses.  Mayer Brown's alleged acts are far too remote from the alleged injury to show proximate cause.  In addition, the Complaint fails to plead facts sufficient to create the requisite strong inference that Mayer Brown had actual knowledge of the misconduct it supposedly aided and abetted, either with respect to the alleged RCM siphoning or the "round trip loan transactions."  *See infra* Part VI.

Finally, this action should be dismissed under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. §§ 77p(b), 78bb(f).  The "ultimate goal" of the Insiders' efforts was, according to the Complaint, to carry Refco through several "liquidity transactions," including the public sale of Refco debt and stock.  Compl. ¶¶ 2, 26, 36.  The alleged fraud therefore was "in connection with the sale or purchase of a covered security."  *See infra* Part VII.  Because this action is brought under state law on behalf of seventy-five individuals, it should be dismissed under SLUSA.

**THE ALLEGATIONS IN THE COMPLAINT**

RCM was a brokerage company and one of the "operating subsidiaries" of Refco Inc. until its "collapse" in October 2005.  Compl. ¶ 16.[2]  RCM and other Refco entities were, until August 2004, controlled by Refco Insiders Phillip Bennett, Santo Maggio, and Robert Trosten.

---

[2] Refco Inc. was created pursuant to the 2005 Initial Public Offering and took direct or indirect ownership of many pre-existing Refco entities.  The Complaint defines "Refco" as Refco Inc. and its subsidiaries.  Compl. at 1.

*See id.* ¶¶ 10-12.  RCM allegedly was headquartered in New York, *id.* ¶ 16, but had operations in Bermuda until December 2001, when RCM was "repatriated" to the United States, *id.* ¶ 18.  The Complaint alleges that even after the repatriation, Refco "purport[ed] to maintain RCM as an unregulated offshore broker-dealer," thus enabling it to continue attracting customer deposits. *Id.* ¶ 112.

As a result of market fluctuations during the late 1990's, Refco suffered hundreds of millions of dollars of losses.  *Id.* ¶¶ 41-43.  Some were caused by backing customer losses; others by Refco's own proprietary trading.  *Id.* ¶ 42-44.  In addition to these market losses, several Refco entities faced significant operational shortfalls.  *Id.* ¶ 48.  Rather than record these losses on Refco's books, the Complaint alleges that the Insiders transferred the collective debt to Refco's parent, Refco Group Holdings, Inc. ("RGHI").  *Id.* ¶¶ 41, 46, 48.  These transfers left Refco with a receivable from RGHI (the "Receivable").

The Trustee alleges that the Receivable was a "related-party obligation" that had to be disclosed on Refco's financial statements.  Compl. ¶ 49.  He further alleges that such disclosure would have greatly diminished Refco's financial status and so, beginning in 1998, the Insiders concealed the Receivable through a series of short-term loan transactions.  *Id.* ¶¶ 49-56.  These transactions were composed of three legs:  first, a "Refco entity," typically RCM, lent money to a Refco customer; second, that customer lent the same amount to RGHI; and, third, RGHI temporarily paid down its debt to Refco.  *Id.* ¶ 52.  After this paydown, Refco's financial statements reflected a loan to the customer rather than a receivable from RGHI.  *Id.*  The Trustee describes these transactions as "Round Trip Loan Transactions," or "RTLs."  *Id.* ¶ 49.[3]  The

---

[3] Plaintiff presumably uses the term "round trip loan transactions" because he includes the "third leg" of the transaction—the RGHI Receivable paydown—which is the crux of his fraud theory.  Compl. ¶ 49.  While the Complaint alleges that Mayer Brown worked on loan documentation for the first two legs of the transaction, *see id.* ¶¶ 100-05, it does not allege any facts from which one could infer that any Mayer Brown attorney had knowledge of

Insiders allegedly arranged these loans just before the end of Refco's accounting periods so the RGHI Receivable would not appear on Refco's financial statements. *Id.* ¶¶ 49-50. After the end of the reporting period, the loans were "unwound," "restoring the RGHI Receivable." *Id.* ¶ 53.

In addition to using RCM funds to finance some of the back-to-back loans, the Trustee alleges that the Insiders engaged in a separate fraud to "siphon" funds from RCM to cover operating expenses at other Refco entities. *Id.* ¶¶ 30-35, 60-70. These asset transfers allegedly were designed "to keep Refco appearing to be a fast-growing group of companies," "to maintain the illusion that Refco was highly profitable [and] healthy," and to avoid "accessing the capital markets to borrow money." *Id.* ¶ 30. According to the Complaint, these transfers "were used for a wide variety of general and specific funding purposes by various Refco affiliates, all of which were completely unrelated to RCM." *Id.* ¶ 67. By October 2005, Refco owed RCM approximately $2 billion. *Id.* ¶ 61.

According to Plaintiff, the "ultimate goal" of both the back-to-back loans and the RCM asset transfers was to keep Refco in business so the Insiders could "cash out" their interests through a series of "liquidity transactions." Compl. ¶¶ 2, 26, 36. The first such liquidity transaction occurred in August 2004 when T.H. Lee Partners ("THL") purchased a controlling share of Refco in a leveraged buyout (the "LBO"), leading to the public sale of Refco debt instruments. *Id.* ¶¶ 71-80. The second occurred in August 2005 when the Refco Insiders and THL took Refco public, selling Refco stock on the New York Stock Exchange (the "IPO"). *Id.* ¶¶ 82-90. As a consequence of the LBO and the IPO, a considerable portion of the RGHI Receivable was paid down. However, a substantial portion remained and, on October 10, 2005,

---

or involvement in the third leg. To avoid confusion, Mayer Brown uses the term "back-to-back" loans to describe the first two legs of the transactions, for which it provided legal services—the same term used in documents quoted in the Complaint. *Id.* A diagram showing the structure of the loan transactions based on the Trustee's allegations is attached. *See* Ward Decl., Ex. 1.

it was announced that a review of Refco's internal accounting revealed a $430 million receivable owed by RGHI to Refco. *Id.* ¶¶ 5, 88-89. Following the announcement, Refco's market capitalization plummeted and, on October 17, 2005, the Refco entities filed for bankruptcy protection. *Id.* ¶ 90.

The Trustee purports to sue on behalf of seventy-five former FX customers of RCM who allegedly deposited more than $500 million in cash and securities with RCM. *Id.* ¶¶ 1, 5, 6, 25. According to the Complaint, the named customers were "induced" to make these deposits by the Refco Insiders' conduct, *id.* ¶ 1, which painted an artificially rosy picture of the overall Refco enterprise; those funds subsequently were "siphoned" from RCM to other Refco entities, *id.* ¶ 5; and the FX customers could not withdraw their funds after RCM declared bankruptcy, *id.* ¶¶ 1-6, 20, 26, 30-35. The Trustee alleges that had it not been for the Insiders' efforts to make Refco appear to be financially sound, the named customers would not have deposited funds and securities with RCM and therefore would not have been harmed. *Id.* ¶ 26.

Mayer Brown is alleged to have aided and abetted the Insiders' fraud, breach of fiduciary duty, and conversion by providing legal services on the back-to-back loans, Compl. ¶¶ 99-111, legal advice on regulatory matters, including RCM's "repatriation" to the United States, *id.* ¶¶ 112-18, and certain legal services in connection with the LBO and the IPO, *id.* ¶¶ 119-24. The Trustee asserts that Mayer Brown had "actual knowledge" of the Insiders' misconduct or "[a]lternatively" that it "consciously avoided the truth." *Id.* ¶¶ 231, 234, 237.

As is explained in detail below, all of the claims against Mayer Brown should be dismissed. The Trustee lacks standing to pursue preferential claims on behalf of select RCM creditors based on the harm the Insiders allegedly inflicted on RCM. In addition, the Trustee fails to plead facts necessary to support the requisite elements of any of his claims. Finally,

SLUSA requires dismissal of this state law action, brought on behalf of seventy-five individuals alleging fraud in connection with the purchase or sale of a covered security.

**ARGUMENT**

## I.    THE FX CUSTOMERS AND THE TRUSTEE AS THEIR ASSIGNEE LACK STANDING TO PURSUE THE CLAIMS ALLEGED IN THE COMPLAINT.

The Trustee's claims against Mayer Brown should be dismissed because they are based on damages suffered by RCM, and accordingly only RCM's bankruptcy estate may pursue them. "'[T]he prime bankruptcy polic[y]' that pervades virtually every provision of the Code is that of 'equality of distribution among creditors,' and, conversely, one of the principal bankruptcy *bêtes noires* is the '"race of diligence" of creditors to dismember the debtor' before its assets are exhausted." *Am. Nat'l Bank of Austin v. MortgageAmerica Corp.*, 714 F.2d 1266, 1274 (5th Cir. 1983) (quoting H.R. Rep. No. 95-595, at 178 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138). If a claim is estate property, the estate may pursue it for the benefit of *all* creditors; individual creditors may not gain an unlawful preference by suing on estate claims for their personal benefit. *See Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1042 (2d Cir. 1986) ("[11 U.S.C. § 541] has been construed to prevent individual . . . creditors from suing to enforce a right of the corporation when that corporation is in bankruptcy.").

The Trustee's claims on behalf of the FX customers are entirely derivative of RCM's claims. He alleges that the FX customers were injured not by any conduct directed at individual customers, but rather by the Insiders' "siphoning" of funds from RCM to other Refco entities. Any such injury was suffered by RCM in the first instance, and, accordingly, the claims belong to the RCM estate. *Honigman v. Comerica Bank*, 128 F.3d 945, 947 (6th Cir. 1997) ("Because the tortious conduct [plaintiff] alleges also injured the debtors, only the debtors' estates can

recover"). This lawsuit improperly seeks to prioritize the named customers' claims over those of other unsecured creditors.

### A.    The Refco Bankruptcy Plan Reserves the Pending Claims to the Estate, and the Litigation Trust Is Pursuing Them.

Paragraph 5.10 of the Plan provides that "the Reorganized Debtors and RCM shall retain all Retained Causes of Action . . . to be administered and prosecuted after the Effective Date pursuant to the terms of the Plan." *See* Ward Decl., Ex. 2. "Retained Causes of Action" is defined at Paragraph 1.197 as "all of the Debtors' and RCM's claims, rights, actions, causes of action, liabilities, obligations, suits . . . including, but not limited to, the Litigation Claims." A "non-exclusive" list of these retained claims appears as Exhibit K to the Plan. *See* Ward Decl., Ex. 3. Prominent on this list are actions against "professionals who provided services to the Debtors and/or RCM prior to the Petition Date, as well as professionals who advised other parties (*including, but not limited to, insiders*) in connection with prepetition transactions involving the Debtors and/or RCM" and actions "against any and all former officers or insiders." *Id.* (emphasis added). The list of professionals against whom the estate has reserved standing to bring claims includes Grant Thornton, Ernst & Young, and Mayer Brown. *Id.*

Also pursuant to the Plan, those same causes of action were transferred from the estate to the Litigation Trust.[4] Mr. Kirschner in his capacity as Litigation Trustee is seeking to litigate those claims in a parallel action against the same defendants (and others), which is now pending in this Court. *See* Ward Decl., Ex. 4 (Complaint in Litigation Trust action). In the Litigation Trust case, Mr. Kirschner has sued Mayer Brown as assignee of RCM to recover for the very same misconduct by the Refco Insiders and the same damages he alleges in this case—including

---

[4] *See Kirschner v. Grant Thornton LLP (In re Refco, Inc. Sec. Litig.)*, No. 07 Civ. 11604, 2008 WL 1827644, at *2 (S.D.N.Y. Apr. 21, 2008) ("[T]he transfer of Contributed Claims to the Litigation Trust . . . became effective on December 26, 2006.").

the alleged asset transfers from RCM and the alleged "round trip loan transactions."  *See id.*

¶¶ 205-47, 396-419.  Proceeds from Litigation Trust litigation, if any,[5] will benefit all RCM

creditors according to the schedule of distribution approved by the Bankruptcy Court.  *See* Refco

Litigation Trust Agreement § 2.1 (Ward Decl., Ex. 5); *In re Refco, Inc. Sec. Litig.*, No. 07 Civ.

11604, 2008 WL 1827644, at *2 (S.D.N.Y. April 21, 2008) (general unsecured creditors of

Refco Debtors will receive "Litigation Trust Interests").  In contrast, the PAT purports to stand

in the shoes of only a few select unsecured creditors, the FX customers, for whom the Trustee

seeks an unwarranted preference.

### B.     The Trustee's Claims Are Derivative of Losses Suffered by RCM.

According to the Complaint, the Refco Insiders transferred funds from RCM to other

Refco entities and, as a result of those transfers, RCM was unable to meet its financial

obligations to the named FX customers.  Compl. ¶¶ 5, 33-90.  These allegations show that any

losses suffered by the named customers are entirely derivative of losses suffered by RCM.

Under settled law, these claims are property of the estate, not the individual customers, and only

the estate has standing to bring them.  *See Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp.

200, 203-04 (S.D.N.Y. 1996) (dismissing derivative creditor claims in favor of estate action).

The named customers are only a subset of the RCM creditors allegedly injured by RCM's

inability to fulfill its obligations.  *See* Compl. ¶ 33 ("The siphoning occurred with respect to all

of RCM's customers.").  They cannot allege a "special injury" distinct from the injury to RCM

and its other creditors, including other customers.  *See Jackson*, 949 F. Supp. at 205 (creditors

retain an individual right to sue only "where the plaintiff sustains a direct injury that is separate

and distinct from the injury suffered by the corporation").  The named customers therefore

---

[5] Mayer Brown has moved to dismiss and does not concede the merits of the Litigation Trust's claims.

cannot sue on their own behalf; they are entitled only to an equitable share of assets liquidated by the estate, including the proceeds of lawsuits brought by the Litigation Trust. *See Manson v. Stacescu*, 11 F.3d 1127, 1130-31 (2d Cir. 1993) (Because creditors' injuries were solely a function of losses incurred by the company, "[i]f the Company were to recover its assets, the [plaintiffs'] injuries would be cured."); *Honigman*, 128 F.3d at 948 ("[I]f [plaintiff] had slipped and fallen on a negligently maintained floor at [defendant's] offices, he could recover irrespective of his status as [a creditor]. However, the estates' recovery here against [defendant] makes [plaintiff] whole in terms of the loss caused by [defendant].").

The claims in this case are classic estate claims. "Breach of fiduciary duty by a corporation's officers or directors is usually a claim based on an injury which affects the corporation itself or all shareholders equally[.]" *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 438 (S.D.N.Y. 1993). Therefore, "[a] claim for breach of fiduciary duty based upon acts causing a monetary loss to the corporation cannot, without more, give rise to a claim asserting 'special injury' to [an individual creditor], as distinct from the corporation." *Id.* at 439.

As for the fraud and conversion claims, the Trustee alleges that the individual defendants caused RCM property to be transferred to other Refco entities at a time when RCM was insolvent and without RCM's receiving reasonably equivalent benefit or security. *See* Compl. ¶¶ 27, 60-70. These are the elements of a fraudulent conveyance claim, *see* N.Y. Debt. & Cred. Law § 10-270 ff. (2008); Uniform Fraudulent Transfer Act, § 4. Such claims are reserved to the estate for the benefit of all creditors. *See* 11 U.S.C. § 548; *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999) (though not identical to fraudulent conveyance, claims shared focus on illegal conduct and individual creditors denied standing); *In re Ionosphere*, 156 B.R. at 439-40 ("The creditor of any bankrupt may allege that the prior

10

dealings of other parties with the bankrupt rendered it insolvent; however, such a claim is for fraudulent conveyance properly brought by the Trustee . . . .").  Plaintiff's attempt to restyle these claims as fraud and conversion is inadequate because the Complaint contains no allegations of any specific representations made directly to the named customers.  *See infra* Part II.A.; *Cumberland Oil*, 791 F.2d at 1042-43 (finding argument that creditor fraud claims were merely "artful repleadings of claims that would . . . be property of the bankruptcy estate" unpersuasive only because plaintiff "alleged with particularity [the] misrepresentations of facts").  "To allow selected creditors to artfully plead their way out of bankruptcy court would unravel the bankruptcy process and undermine an ordered distribution of the bankruptcy estate."  *Nat'l Am. Ins. Co.*, 187 F.3d at 442.

In an effort to justify the preference he seeks, the Trustee alleges that Refco had an obligation to separate customer deposits and use them only to service customer accounts.  The Complaint offers no factual or legal support for this assertion.  *See infra* Part IV.  On the contrary, Mr. Kirschner himself vigorously disputed this theory of individual standing on numerous occasions in the Bankruptcy Court.  In one such action, Mr. Kirschner, in his capacity as RCM Chapter 11 Trustee, persuaded the Bankruptcy Court that FX customers who sought preferential return of funds deposited at RCM were not entitled to a constructive trust because "such a remedy[,] which effectively would prime those creditors[,] would be inequitable."  *See Kirschner v. Bencorp Casa de Bolsa, C.A. (In re Refco Inc.)*, Adv. Proc. No. 06-01745, J. Tr. at 129 (Bankr. S.D.N.Y. Dec. 29, 2006) (Ward Decl., Ex. 6).[6]  In *Bencorp*, Judge Drain observed that the "Foreign Exchange Master Agreement" that the customer in that action had signed "clearly does not set forth that RCM, for example, is required to return the same property as

---

[6] *See also In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) (fund customers denied individual standing to sue for losses suffered by the fund in the first instance).

provided to it *or to keep such property in a separate account of [the customer's]*." *Id.* at 134

(emphasis added). He further found that periodic customer statements mailed to that FX

customer provided explicit notice that "'Refco does not segregate any collateral or other property

deposited with it.'" *Id.* (quoting customer statement). The customer statements received by the

named FX customers that Mayer Brown has identified contain ███████████[7]

As RCM Chapter 11 Trustee, moreover, Mr. Kirschner brought dozens of adversary

actions seeking to recover funds distributed to RCM's unsecured creditors. At least eleven of

these actions targeted RCM customers who withdrew money from their accounts prior to the

October 2005 crisis. *See* Ward Decl., Exs. 12-29. In each of these cases, Mr. Kirschner claimed

that individual customers had no right to retain that money because it was property of the RCM

estate. *Id.* He alleged that these withdrawals were made for the exclusive benefit of these

customers, and that they received more as a result than they were entitled to under the

Bankruptcy Code. *Id.* Three of these actions, against Tokyo Forex Financial, Inc., Alphix Co.,

Ltd., and Nikko Futures Fund, are particularly noteworthy. All three settled, Ward Decl., Exs.

18-20, 23, 24, and Mr. Kirschner now purports to sue Mayer Brown *on their behalf* to recover

the same deposits he contended they were not entitled to retain. *See* Ex. A to the PAT Compl.

In these circumstances, the named customers simply do not have standing to pursue estate

funds. As Judge Drain found in *Bencorp*: "[T]here were approximately 300 to 400 [general

unsecured creditors of RCM] and I believe that singling out and preferring one . . . would be to

the great detriment of all the other similarly situated creditors." Ward Decl., Ex. 6 at 129.

---

[7] Mayer Brown has located in documents produced from Refco's files certain customer statements for named FX
customers, which are incorporated in the Complaint (*see* ¶¶ 25, 28(m), 33, 226), and which contain ████████
████████████████████. *Compare* Ward Decl., Ex. 6 at 134 (quoting customer statement) to Exs. 7-11.

C.    **Mr. Kirschner Is Pursuing Double-Recovery Through the Litigation Trust and Private Actions Trust.**

As described above, the Trustee in this case is seeking to recover damages for the same injury he is pursuing in the Litigation Trust case on behalf of RCM.  Double recovery for a single injury is prohibited absent specific legislative exception.  *See Abou-Khadra v. Mahshie*, 4 F.3d 1071, 1079 (2d Cir. 1993); *In re Refco, Inc. Sec. Litig.*, No. 05 Civ. 8626, 2007 WL 57872, at *3-6 (S.D.N.Y. Jan. 9, 2007) (refusing to approve settlement language in light of potential double recovery); *Zarcone v. Perry*, 434 N.Y.S.2d 437, 443 (App. Div. 1980) ("[J]udicial policy forestalls a double recovery for an injury.").[8]

The prospect of double recovery in bankruptcy is particularly troubling where creditors bring derivative claims based on losses suffered in the first instance by a bankrupt debtor.  In *Jackson*, for example, Judge Preska found that allowing the creditor of a corporation to sue to recover funds the corporation was pursuing on its own behalf in separate litigation posed a severe danger of "double recovery" and dismissed the creditor suit.  949 F. Supp. at 203-07.  Similarly, the Sixth Circuit in *Honigman* held that where only one recovery could be had, "[t]he estates' recovery [took] precedence over [the creditor's]," 128 F.3d at 949, and on that basis dismissed creditor claims for breach of fiduciary duty and conversion.  The danger of double recovery is just as prominent here as in *Jackson* and *Honigman*.  Because any alleged injury was

---

[8] While the specter of double recovery materializes most frequently when a single plaintiff pursues compensation for the same injury from multiple sources, the prohibition applies with equal force where two or more plaintiffs bring duplicative actions against the same defendant based on a single loss.  *See, e.g., Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 544 (1983) (long-standing prohibition on derivative antitrust claims motivated by risk of duplicate recoveries); *Leider v. Ralfe*, No. 01 Civ. 3137, 2003 WL 22339305, at *3 (S.D.N.Y. Oct. 10, 2003) (same); Restatement (Second) of Judgments § 53 (1982) (where party breaches joint obligation, judgment in action by one obligee precludes subsequent action by second obligee to recover the same loss).  *See also Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994) (in investor suit based on losses from broker's liquidation of investment account, damages awarded on multiple causes of action limited to value of account); *Mitsui & Co. USA  v. Hudson Tank Terminals Corp.*, 790 F.2d 226, 227 (2d Cir. 1986) (where both seller and buyer have right of action against bailee and seller has received compensation for full value of loss, prohibition on double recovery bars duplicative suit by buyer).

suffered by RCM in the first instance, the Trustee's derivative claims on behalf of the FX customers should be dismissed.[9]

*    *    *    *    *

For the reasons discussed above, the Trustee's claims are entirely derivative, seeking damages for conduct that allegedly injured RCM and thus caused the named seventy-five FX customers (and all of RCM's other creditors) to suffer losses as well. Standing therefore is lacking. So too, on the merits, the only way the Trustee could state a claim on behalf of the FX customers would be by showing that they had unique individual claims—that is, that misrepresentations were directed to and relied on by the named customers (in the case of the aiding and abetting fraud claim); that a special fiduciary duty was owed to the named customers, which does not exist in an ordinary broker-customer relationship (in the case of the aiding and abetting breach of fiduciary duty claim); and that there was intentional interference with the customers' distinctly identifiable property (in the case of the conversion claim). As discussed in detail in the following sections, the Complaint fails to allege facts sufficient to establish these and other elements essential to an individual right to recovery.

## II.    THE AIDING AND ABETTING FRAUD CLAIM SHOULD BE DISMISSED FOR FAILURE TO ALLEGE RELIANCE UPON ANY MATERIAL MISREPRESENTATION OR OMISSION.

The Trustee's claim of aiding and abetting fraud requires him to plead, among other elements, that the named customers relied upon material misrepresentations or actionable omissions by the Insiders, which Mayer Brown aided and abetted. *See Am. Fin. Int'l*, 2007 WL 1732427, at *6. Under Federal Rule of Civil Procedure 9(b), the Complaint must allege the

---

[9] The Trustee has argued that his duplicative actions should proceed to judgment, at which point determinations of offset can be made. *See* Plaintiff's Reply Memorandum in Support of Plaintiff's Motion to Remand to New York State Court, filed in this action (Dkt. No. 25), at 11. This position is meritless. Mayer Brown should not be exposed to duplicative actions seeking recovery of the same damages. As in *Jackson* and *Honigman*, this derivative action should be dismissed.

circumstances of the underlying fraud with particularity. *See Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081, at *5 (S.D.N.Y. June 16, 2000).[10]  Plaintiff also must allege Mayer Brown's substantial assistance in the fraudulent statements. *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 370-71 (S.D.N.Y. 2007).

A.     **The Complaint Fails To Identify Any Specific Statements Made to and Received by the Named FX Customers.**

Under these well-established pleading standards the Trustee must, with respect to each of the named customers, identify at least one statement made by one or more of the individual defendants that was reasonably calculated to reach that customer.  The Trustee also must allege how and in what way Mayer Brown made knowing contributions to each of these statements with intent to advance the fraud. *See Brownstone Inv. Group, LLC v. Levey*, 468 F. Supp. 2d 654, 659-60 (S.D.N.Y. 2007) (dismissing fraud claim for failure to specify statements, speaker, and context and to distinguish between multiple defendants).  This Court dismissed fraud claims brought by Refco FX customers in *American Financial*, and by RCM securities customers in *In re Refco Capital Markets* for failure to meet these strict pleading standards.  In *American Financial*, this Court held that plaintiffs' allegations that Refco principals "[a]t all relevant times . . . misrepresented, omitted, and failed to disclose material facts to [foreign exchange customers] . . . including that Refco's financial results were materially misstated and omitted material information" were insufficient because they did "not explain when or where these misrepresentations were made."  2007 WL 1732427, at *7 (quotation marks omitted).

---

[10] It must "(1) specify the statements, oral, or written, that the Plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; (3) state where, when, and to whom the statements were made; and (4) explain why the statements were fraudulent." *Renner*, 2000 WL 781081, at *5.

While the Trustee here spills more ink than his predecessors, he offers no more substance or specificity. The Complaint fails to plead any of the requisite particulars, instead relying on general representations of business worthiness made to the "public" by "Refco" at "all relevant times." *See, e.g.*, Compl. ¶¶ 4, 28(j) & (k), 33. It does not identify any specific statement, when it was published, to whom it can be attributed, which customers received it, when or in what circumstances it was received, much less what actions each customer took in reliance.[11] Having failed to make these necessary allegations, Plaintiff could not, and in fact does not, allege that Mayer Brown made knowing contributions to statements it knew to be false and that it knew would be directed to, received by, and relied upon by RCM customers. *See infra* Part VI.

The Trustee cites obliquely to customer understandings that cash in their RCM accounts was segregated for "specific, limited purposes in connection with FX transactions." *See, e.g.*, Compl. ¶ 20. But the Complaint "fail[s] to explain how defendants created a false impression concerning their handling of [the customers'] assets." *In re Refco Capital Mkts.*, 2007 WL 2694469, at *8.[12] "The simple fact that RCM was eventually left without significant assets to allow its customers to withdraw all funds from their accounts is not necessarily indicative of fraud [where] plaintiffs point to no specific agreement under which they had a right to expect that pooled funds would be invested in any particular way, or guaranteed against loss, or available for immediate withdrawal . . . ." *Id.* at *11.

---

[11] The Trustee alludes to purported misrepresentations in a document relating to the LBO between Refco and THL, Compl. ¶ 119, but does not suggest that those statements were meant for or relied on by the named customers.

[12] As described *supra*, note 7, periodic account statements support the opposite proposition. Such statements ███████████████████████████████ Ward Decl., Exs. 7-11. *See also Kirschner v. Bencorp*, at 134 (Ward Decl., Ex. 6) ("not[ing] that the customer statement[s] sent to [the RCM FX customer at issue in *Bencorp*] consistently stated, starting with what was apparently the first one, dated October 31, 2003, the following; "'Refco does not segregate any collateral or other property deposited with it. Refco's transactions with you are executed in the inter-bank foreign exchange market and these transactions are not subject

## B.    Plaintiff Fails To Allege Actual Reliance by Each Named Customer.

"[A] plaintiff may state a claim for fraudulent misrepresentation made to a third party if he alleges that he relied to his detriment on the defendant's misrepresentation and that the defendant intended the misrepresentation to be conveyed to him." *Am. Fin. Int'l*, 2007 WL 1732427, at *9 (quoting *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 71 (2d Cir. 2000)).  Plaintiffs alleging common law fraud cannot appeal to presumptions, but must allege actual reliance on specified statements.  *See id.* at *10 n.9; *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1221-22 (S.D.N.Y. 1994).  The Trustee eschews these requirements, alleging only general reliance by the "public" on impressions of Refco's "financial health" gained from unspecified sources, Compl. ¶¶ 4, 28(j), 28(k), 125, 216-17, and suggesting that reliance should simply "be presumed," *id.* ¶ 217.  Plaintiff also refers to manipulations of Refco's financial statements, *see, e.g.*, *id.* ¶¶ 49-52, 76, 98, 108, but he has "not alleged that [each of the customers] read any of the financial statements at issue, much less that they actually relied on them."  *Am. Fin. Int'l*, 2007 WL 1732427, at *9.  These general allegations are insufficient as a matter of law.  *Id.*[13]

## III.    THE COMPLAINT DOES NOT PLEAD ANY BASIS FOR CONCLUDING THAT RCM OWED A FIDUCIARY DUTY TO THE FX CUSTOMERS.

To plead aiding and abetting breach of fiduciary duty, a plaintiff must allege (1) a breach of fiduciary obligations to another; (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005).  "To the extent the underlying primary violations are

---

to the U.S. Commodity Exchange Act.  Accordingly, the segregation requirements of the Act are inapplicable even with respect to funds or property transferred from Refco, Inc.'")."

[13] Moreover, such reliance would contradict Plaintiff's claim that the named customers believed, no matter how unreasonably, that deposited funds would lie fallow in segregated accounts.  A customer acting under such a belief would have no reason to think that the security of funds deposited at RCM depended on the finances of its parent.

based on fraud, the allegations of aiding and abetting liability must meet the particularity requirements of Fed. R. Civ. P. 9(b)." *Kolbeck v. LIT Am. Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996). Plaintiff also must allege Mayer Brown's *affirmative* participation in the breach: "[I]naction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty *directly to the plaintiff*; that the primary violator owes a fiduciary duty to the plaintiff is not enough." *Id.* at 247 (emphasis added).

The Complaint should be dismissed because it fails to allege any basis for concluding that the Refco Insiders owed a fiduciary duty to the FX customers, let alone that Mayer Brown was aware of such duty and actively aided a breach. As a rule, brokers like RCM owe no fiduciary duties to their customers. The Complaint seeks to overcome this settled law based on "the totality of facts and circumstances surrounding the creation and maintenance of the relationship between FX Customers and RCM," Compl. ¶ 28, but the "facts and circumstances" alleged do not support the hoped-for duty. To the extent the alleged duty arises from RCM's insolvency, the Complaint fails to allege facts supporting the conclusion that RCM was insolvent; that, if RCM was insolvent, Mayer Brown knew it; or that insolvency results in a special duty to the named customers as opposed to RCM creditors at large. These points are elaborated below.

## A.    As a Broker, RCM and Its Management Owed No Fiduciary Duty to the FX Customers.

Citing well-established New York law that "there is no general fiduciary duty inherent in an ordinary broker/customer relationship," this Court dismissed foreign exchange customers' breach of duty claims against Refco Insiders in *American Financial*. 2007 WL 1732427, at *4-5 (quotation marks omitted). The Court observed that a fiduciary duty may be owed by a broker with "discretionary trading authority" over a customer's account, but found no allegations suggesting that such a relationship existed. *Id.* That decision applies equally here. The

18

Complaint baldly alleges that the Refco Insiders owed a duty to the named customers by virtue of "RCM's role as a broker-dealer," Compl. ¶ 28(a), an assertion without legal foundation. *See Am. Fin. Int'l*, 2007 WL 1732427, at *4-5; *Ascot Fund Ltd. v. UBS PaineWebber, Inc.*, 814 N.Y.S.2d 36, 36-37 (App. Div. 2006). Many of the remaining itemized "facts and circumstances" allege nothing more than normal broker-dealer services, including mailing of account statements, assignment of a "dedicated salesperson," etc. Compl. ¶ 28(m), (p). Others are simply mysterious, including Refco's "purporting to be an off-shore unregulated entity" that "lack[ed] deposit or similar insurance." *Id.* ¶ 28(d), (h). Such facts simply do not establish a fiduciary relationship—indeed, they suggest the opposite.

Plaintiff also alleges that "the terms and conditions of the agreements entered into between RCM and its FX Customers" establish a fiduciary relationship. *Id.* ¶ 28(l). But the Complaint utterly fails to specify those terms, and does not attach copies of the alleged agreements. *See In re Refco Capital Mkts.*, 2007 WL 2694469, at *8-9 (dismissing fraud claims based, in part, on plaintiffs' failure to identify source of customer "understanding" allegedly violated by Refco Insiders); *Am. Fin.*, 2007 WL 1732427, at *2, *4-5 (dismissing breach of contract and breach of fiduciary duty claims based, in part, on failure to "explain[] the source or scope of the supposed duty owed by defendants"). That omission is telling. As RCM Trustee, Mr. Kirschner successfully argued to Judge Drain that there was no contractual or factual basis for finding a fiduciary duty between RCM and its customers—the exact opposite of the position he takes here. *See Kirschner v. Bencorp*, at 131 (Ward Decl., Ex. 6).

Finally, even if the Trustee somehow could establish that RCM itself had a fiduciary duty to these customers, the Refco Insiders did not. It is black-letter law that "there is no fiduciary

duty owed to . . . customers of a corporation by a controlling shareholder, officer, or director."
*Am. Fin. Int'l*, 2007 WL 1732427, at *4 (quotation marks omitted).

> **B.    The Trustee's Allegation that RCM Was Insolvent Does Not Change the Analysis.**

The Trustee finally seeks to manufacture a fiduciary duty where none exists by alleging "that RCM was insolvent or in the zone of insolvency at all relevant times."  Compl. ¶¶ 28(g), 220.  This contention is neither supported by the facts alleged in the Complaint, nor would it save the claim from dismissal as a matter of law.

*First*, the facts alleged do not establish RCM's insolvent condition "at all relevant times"—a period covering at least seven years.  *See* Compl. ¶¶ 5, 94.  In fact, the Complaint alleges the opposite:  that at "all relevant times" RCM was so flush with cash it served as a source of operating funds for other Refco entities.  *See, e.g.*, *id.* ¶¶ 30-32, 107, 123-24.  As late as August 2005, RCM made a $420 million loan to RGHI, indicating that it was solvent to the end, even if other Refco entities were not.  *See id.* ¶¶ 87, 124.

*Second*, even assuming that RCM had been insolvent, the Complaint nowhere alleges that Mayer Brown had the requisite actual knowledge of the insolvency and thus of the alleged fiduciary duty.  *See Kolbeck*, 939 F. Supp. at 246 (plaintiff alleging aiding and abetting breach of fiduciary duty must establish defendant's actual knowledge of duty and knowing participation in breach).  To the contrary, RCM's funding of the back-to-back loans would provide Mayer Brown with no reason to suspect RCM's financial fitness.

*Third*, even if the Trustee could establish RCM's insolvency and Mayer Brown's knowledge of it, the legal consequence would not salvage his claim.  The Trustee presumably contends that when a corporation is in "the zone of insolvency," its officers' fiduciary duties shift from the corporation to its creditors.  *See* Compl. ¶¶ 28(g), 220.  But any such shift would not

entitle *individual* creditors like the named customers to bring direct claims on their own behalf.

Rather, claims for breach of fiduciary duty against corporate officers based on conduct while "in

the zone of insolvency" must be brought on behalf of the corporation for the equitable benefit of

*all* creditors. *See supra* Part I.B.; *Torch Liquidating Trust v. Stockstill*, No. 07-133, 2008 WL

696233, at *3-7 (E.D. La. Mar. 13, 2008) (dismissing breach of fiduciary duty claims brought by

litigation trust against officers who inflated financial reports, inducing creditors to do business

with corporation while insolvent, because claims were brought directly on behalf of individual

creditors); *In re Granite Partners*, 194 B.R. 318, 327-28 (Bankr. S.D.N.Y. 1996) (breach of

fiduciary duty claims based on damages suffered by the bankrupt debtor pass to the estate in

bankruptcy, "and the trustee alone can assert them"); *N. Am. Catholic Educ. Programming

Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-03 (Del. 2007) (creditors do not have standing to

bring direct breach of fiduciary duty claims against officers of insolvent corporation).

## IV. THE AIDING AND ABETTING CONVERSION CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD INTERFERENCE WITH THE FX CUSTOMERS' RIGHTS OVER SPECIFIC IDENTIFIABLE PROPERTY.

As a matter of law, the Trustee cannot establish that the FX customers' funds were

specifically identifiable, a necessary prerequisite to any conversion claim. "[T]o establish a

cause of action in conversion, the plaintiff must show legal ownership or an immediate superior

right of possession to a *specific identifiable thing* and must show that the defendant exercised an

unauthorized dominion over the thing . . . to the exclusion of the plaintiff's rights." *Indep.

Discount Corp. v. Bressner*, 365 N.Y.S.2d 44, 46 (App. Div. 1975) (emphasis added). To state

an action for conversion of money, the money must be capable of being "described or identified

in the same manner as a specific chattel." *9310 Third Ave. Assocs., Inc. v. Schaffer Food*, 620

N.Y.S.2d 255, 256 (App. Div. 1994) (quotation marks omitted). "[F]unds deposited in a bank

account are not sufficiently specific and identifiable, in relation to the bank's other funds, to

support a claim for conversion against the bank." *Fundacion Museo de Arte Contemporaneo de Caracas-Sofia Imber v. CBI-TDB Union Bancaire Privee*, 160 F.3d 146, 148 (2d Cir. 1998) (per curiam) (quotation marks omitted). That is because, "[u]nder law, funds deposited in a bank become the property of the bank, and the bank becomes indebted to the depositor for the amount of the funds deposited." *Nwachukwu v. Chem. Bank*, No. 96 Civ. 5118, 1997 WL 441941, at *5 (S.D.N.Y. Aug. 6, 1997).

The same rule applies to ordinary funds in brokerage accounts. *See Nay v. Merrill Lynch*, No. 05 Civ. 10264, 2006 WL 2109467, at *5 (S.D.N.Y. July 25, 2006). When a brokerage customer deposits funds in an investment account, title in those funds passes to the brokerage company, and the funds are available for use in its business. *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 148 n.4 (S.D.N.Y. 2000); *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996). Therefore, a claim for conversion against a financial institution will only lie where plaintiff makes a special deposit that makes the institution a bailee of the depositor. *Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992). However, "a deposit made in the ordinary course of business is presumed to be general, and the burden of proof is on the depositor to overcome such presumption." *Id.*; *see also Bencorp*, at 132-33 (Ward Decl., Ex. 6) ("[T]he general rule, which I've discussed in other contexts in the Refco LLC and RCM cases, [is] that when funds are deposited with another party, the presumption is that the relationship between the parties is not one of bailor and bailee, but, rather, creditor and debtor.").

This Court in *In re Refco Capital Markets* dismissed securities claims alleging "misappropriation" of assets held by customers in their RCM accounts, finding that plaintiffs failed "sufficiently to allege deceptive conduct." 2007 WL 2694469, at *5. In particular, the

customers failed to allege how their assets were to be held and the source of that understanding. 2007 WL 2694469, at *8. They further failed to show a contractual or legal duty not to lend assets in RCM customer accounts to other Refco entities. *Id.* at *9. Reflecting on those omissions, this Court expressed skepticism that these necessary allegations could be made because "Refco publicly described RCM as not subject to requirements that brokerages segregate customer funds and maintain sufficient capital to operate safely." *Id.*

The Trustee's allegations in this case fare no better. The Complaint alleges generally that the named customers deposited funds in their accounts "for specific, limited purposes." Compl. ¶¶ 5, 9, 20, 22, 28, 38, 40, 55, 56, 73, 227. By this repeated allegation, the Trustee implies that RCM was obliged to segregate and not lend funds in customer accounts to other Refco entities and that doing so constituted conversion. *See id.* ¶¶ 226-29. As in *In re Refco Capital Markets*, however, he "never explains the source of this obligation." 2007 WL 2694469, at *2. In fact, as is clear from the Complaint, "RCM was, in some circumstances, in the business of making loans," *id.*; *see also* Compl. ¶ 42 ("Refco regularly extended credit to its customers . . ."). RCM customers received regular notice on account statements that "Refco does not segregate any collateral or other property deposited with it," *Kirschner v. Bencorp*, at 134 (Ward Decl., Ex. 6); *see supra*, note 7; and, in fact, customer deposits were "commingled" with "other RCM property," *Bencorp* at 127-28 (Ward Decl., Ex. 6). Judge Drain in *Bencorp* applied the presumption that RCM was merely a creditor of its customers, not a bailor of unique, identifiable, or segregated funds, *id.* at 134, and the Trustee offers no reason why that presumption should not apply here. Finally, the Complaint contains no factual (as opposed to conclusory) allegations to support the claim that RCM was prohibited from funding loans to other Refco entities with customer money. To the contrary, RCM customers apparently received

23

interest on balances in their accounts.  *See, e.g.*, *id.* at 137 (noting that RCM FX customer's understanding that it would receive interest on free balances was "indicative of a debtor-creditor relationship").  "[A]s a matter of simple business or economic sense, a bank would not pay interest on funds which it could not use."  *Peoples Westchester*, 961 F.2d at 331 (alteration in original) (internal quotation marks omitted).

The Trustee's failure to state a primary claim for conversion defeats his aiding and abetting claim, but the allegations that Mayer Brown aided and abetted a conversion are equally deficient.  The Complaint alleges no facts from which it may be inferred that Mayer Brown knew that these FX customers had any special rights beyond the status of ordinary depositors, knew that the Insiders were unlawfully interfering with such rights, or made knowing contributions with the intention of assisting an unlawful conversion.  *See infra* Part VI.  Indeed, it even fails to connect Mayer Brown's alleged conduct to RCM's losses, as discussed in the next section.

## V.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE PROXIMATE CAUSE.

The Complaint does not adequately plead that Mayer Brown's conduct proximately caused harm to each of the named customers.  That failure is fatal to all of the Trustee's claims and is properly addressed in a motion to dismiss.  *Kirk v. Heppt*, 532 F. Supp. 2d 586, 591-92 (S.D.N.Y. 2008) (dismissing, in part, breach of fiduciary duty claim); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, No. 06 Civ. 14211, 2007 WL 2219485, at *4 (S.D.N.Y. Aug. 2, 2007) (same); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201-02 (S.D.N.Y. 2006) (dismissing claims for aiding and abetting fraud and breach of fiduciary duty).  Because the Trustee's claims sound in fraud, his allegations must meet the requirements of Rule 9(b).  *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 581 (S.D.N.Y. 2007); *Kolbeck*, 939 F. Supp. at 245.

Proximate cause requires a direct relationship between the plaintiff's injury and the defendant's injurious conduct. *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 343-46 (2005) (requiring direct causal connection between defendant's conduct and plaintiff's economic loss); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 226 (2d Cir. 2008) (central question in proximate cause inquiry is whether alleged violation led *directly* to plaintiff's injuries); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769–72 (2d Cir. 1994);[14] *Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072, at *16 (S.D.N.Y. July 26, 2007) (proximate cause inquiry requires consideration of foreseeability, intervention of other independent causes, and directness); *Town of N. Hempstead v. Winston & Strawn LLP*, 814 N.Y.S.2d 237, 239-40 (App. Div. 2006) (plaintiff must show that "attorney's conduct was the proximate cause of the loss sustained" and that he "sustained damages as a direct result of the attorney's actions"). No such direct relationship is alleged here.

The Complaint alleges that the named FX customers were damaged by the shortfall at RCM that left it unable to meet the customers' October 2005 requests for return of deposited funds. Compl. ¶ 5. The shortfall allegedly was caused, in turn, by the Refco Insiders' transfers of funds from RCM to other Refco entities. *Id.* ¶¶ 1, 5, 35, 60-70. Yet, Plaintiff fails to allege specific facts demonstrating Mayer Brown's knowledge of, much less its knowing contribution to, the siphoning scheme. *See infra* Part VI; Compl. ¶¶ 26, 37, 62 (alleging that customer money was transferred by Refco Insiders).

The Trustee's allegations against Mayer Brown focus on the back-to-back loans. However, as he admits, the back-to-back loans themselves did not cause a cash shortfall at RCM.

---

[14] Although these cases involved federal claims and invoke the concept of "loss causation," they recognize that this is equivalent to common law proximate cause. *See, e.g., Dura*, 544 U.S. at 344; *see also AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000); *Laub v. Faessel*, 745 N.Y.S.2d 534, 536-37 (App. Div. 2002).

The loans were extremely short in term—usually spanning two weeks—and were "unwound" each time, making them net-neutral to RCM.  Compl. ¶¶ 52, 53.  In some cases, Plaintiff even alleges that "no actual transfers occurred."  *Id.* ¶ 53.  The Complaint does not allege that the named customers were impeded in their ability to withdraw funds, take positions in the currency markets, or otherwise were denied possessory rights in their accounts due to the back-to-back loans.  Indeed, the last back-to-back loan occurred in August 2005, *id.* ¶¶ 123-24, and none was outstanding in October 2005 when the customers allegedly asked to withdraw their funds, *id.* ¶ 5.

The Trustee's apparent theory of causation relies on a far more indirect and attenuated chain of events:  Mayer Brown's work on the back-to-back loans allegedly provided temporary liquidity to RGHI, which, in turn, the Insiders used to hide the RGHI receivable, which, in turn, allowed the Insiders to make false statements regarding Refco's financial status, which statements, in turn, caused customers to deposit funds at RCM, which, in turn, the Insiders caused to be transferred to other Refco entities (together, presumably, with RCM's other assets), which, in turn, left RCM unable to meet its contractual duties to the named FX customers.  This theory does not support proximate cause, both because it is much too remote and because it involves numerous independent intervening causes.  *See Gelt*, 27 F.3d at 769 ("[W]hen factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.").

Courts in this Circuit repeatedly have rejected similarly attenuated allegations of proximate causation.  For example, in *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985), a bankruptcy trustee sued a law firm that allegedly prepared SEC filings and other documents misrepresenting its client's financial condition, enabling the client to raise large amounts of capital that was then looted by corporate officers.  The Second Circuit held that

26

these "claims allege[d] only 'but for' causation" and "fail[ed] to show that [the company's] subsequent losses were caused by [the law firm's] actions." *Id.* at 62. "[T]he theft of corporate funds by officers was hardly a reasonably foreseeable result, let alone the direct result, of any of [the law firm's] alleged actions." *Id.*; *see also In re Parmalat*, 501 F. Supp. 2d at 579-80 (S.D.N.Y. 2007) (following *Bloor*, dismissing similar claim against auditors); *Bondi v. Grant Thornton Int'l*, 421 F. Supp. 2d 703, 722 (S.D.N.Y. 2006) ("Conduct that merely creates a condition that made the resulting injury possible is too remote to constitute legal cause.").

Here too, the Refco Insiders' alleged misuse of the FX customers' deposits was not proximately caused by anything Mayer Brown is alleged to have done. Certainly Mayer Brown's work on the back-to-back loans did not result in a transfer of assets out of RCM—all transactions resulted in RCM receiving the principal of the loan with interest. That RCM sought to and did attract customer funds—a normal and necessary business function—did not make it foreseeable that the Insiders would decide to misuse those funds. *See Bloor*, 754 F.2d at 61-62; *see also Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 770 (2008) (defendants' actions did not "ma[ke the fraud] necessary or inevitable"). In addition, to impose liability on attorneys in such circumstances would likely increase the cost, and reduce the availability, of professional services. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994); *Maxwell v. KPMG LLP*, 520 F.3d 713, 717 (7th Cir. 2008) ("To hold the defendant liable [in the absence of loss causation] would . . . mak[e] him an insurer against conditions outside [of] his control." (quotation marks omitted)).

Given the remoteness of Mayer Brown's conduct to the alleged harms, and the multiplicity of independent intervening causes, it is sheer speculation to argue that Mayer Brown caused the alleged damages to the named FX customers. The Trustee's claims therefore should

be dismissed. *See Dura*, 544 U.S. at 343-46 (forbidding speculative inferences of causation); *McLaughlin*, 522 F.3d at 226-27 (same); *Gelt*, 27 F.3d at 769-72 (same).

## VI.    THE COMPLAINT FAILS TO PLEAD MAYER BROWN'S ACTUAL KNOWLEDGE AND INTENT TO ASSIST IN WRONGDOING.

All of the Trustee's claims against Mayer Brown are for aiding and abetting, and thus he is required to plead and prove that Mayer Brown actually knew about, and intended to assist in, the Refco Insiders' tortious conduct. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006)*; see also* Restatement (Second) of Torts § 876(b) (1979) (defendant liable for aiding and abetting when he "*knows* that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself" (emphasis added)).  Allegations that the firm suspected fraud or knew of improper conduct will not withstand a motion to dismiss. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006); *Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 339 (S.D.N.Y. 2005) (plaintiff must allege factual basis for aider-abettor's knowledge).  The actual knowledge requirement also forecloses claims based on recklessness or willful blindness. *See Pension Comm.*, 446 F. Supp. 2d at 201 n.279 (collecting cases).  The Complaint, however, fails to allege any facts that plausibly support the conclusion that Mayer Brown actually knew that the Refco Insiders were engaged in conduct amounting to fraud, breach of fiduciary duty, or conversion.

The facts supporting actual knowledge must be alleged with specificity.  Applying this principle, in *Lerner*, the Second Circuit dismissed the plaintiffs' claim for aiding and abetting fraud against certain defendants because the "plaintiffs conclusorily allege[d] that the [defendants] had actual knowledge," and did not "allege[] facts . . . giv[ing] rise to the 'strong inference,' required by Federal Rule of Civil Procedure 9(b), of actual knowledge of [the

fraudulent conduct]." 459 F.3d at 292-93. As the Supreme Court recently explained in the context of a federal securities claim, allegations in a complaint give rise to a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 n.5 (2007) (quotation marks omitted). A court applying Rule 9(b) to an aiding and abetting claim requiring actual knowledge should employ the same standard. *See Glidepath*, 2007 WL 2176072, at *10 n.5 (Supreme Court's interpretation of the "strong inference" of scienter requirement in *Tellabs* also guides district courts charged with evaluating claims for common law fraud under Rule 9(b)).

These standards should apply equally to all of Plaintiff's claims. Though styled as aiding and abetting breach of fiduciary duty and aiding and abetting conversion, all of his claims depend on the same allegations of fraud and therefore must meet the same heightened pleading standard. *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996); *Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) (dismissing common law breach of fiduciary duty claims for failure to meet 9(b) where those claims "merely incorporate[d] the allegations of [prior] securities fraud and RICO counts").

Even if Rule 8(a)'s general pleading standard applied to some or all of the Plaintiff's claims, they should be dismissed. Under that rule, a complaint must plead facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007); *see also Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *8-10 (S.D.N.Y. Mar. 6, 2002) (plaintiff must "allege some facts, in non-conclusory terms, showing that [alleged aiders and abettors] knowingly participated in [the primary actors'] breach"). Plaintiff's claims against Mayer

Brown should be dismissed under either standard, because the Complaint fails to allege facts giving rise to a strong inference, or even a plausible inference, that any Mayer Brown attorney had actual knowledge of the Refco Insiders' misconduct.

> ### A.    The Complaint Does Not Allege Mayer Brown's Actual Knowledge of Any Improper Transfers from RCM to Other Refco Entities.

The Complaint alleges virtually nothing to support Plaintiff's conclusion that Mayer Brown knew that the Insiders improperly transferred RCM funds to other Refco entities "to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its . . . needs." Compl. ¶ 30. The Trustee contends that Mayer Brown gave legal advice to RCM on certain regulatory matters, but fails to offer any explanation tying that advice to the allegedly improper transfers. Indeed, *none* of the documents cited in the Complaint bears the slightest relationship to the allegedly illegal transfers.

Plaintiff certainly cannot hope to draw inferences of scienter from Mayer Brown's knowledge that RCM did not segregate customer funds. On the contrary, that was the nature of RCM's business as an unregulated entity, and is not itself indicative of fraud. Indeed, Mayer Brown would have had every reason to believe that RCM's customers and the public at large generally understood that RCM need not and did not segregate. *See In re Refco Capital Mkts.*, 2007 WL 2694469, at *9 ("Refco publicly described RCM as not subject to requirements that brokerages segregate customer funds and maintain sufficient capital to operate safely.").

The Trustee alleges that Mayer Brown's knowledge of the RCM transfers is "clearly shown through e-mails between Refco employee Thomas Yorke and [Mayer Brown attorney] Joseph Collins in January 2005." Compl. ¶ 116. But these e-mails (attached as Ward Decl., Ex. 30), say nothing about any alleged transfers by Refco Insiders and are, in fact, completely inconsistent with fraudulent intent. They show that Yorke sought advice about the impact of a

new SEC regulation requiring certain investment advisors, who had previously been exempt

from registration, to register with the SEC.  *See id.*; *see also* SEC Release No. IA-2333 (Dec. 7,

2004) *available at* http://www.sec.gov/rules/final/ia-2333.htm (last visited June 4, 2008).

Because registered investment advisors were required to keep their funds with a "qualified

custodian," and RCM was not a "qualified custodian" because it had no duty to segregate

customer funds, the new regulation could have resulted in those affected investment advisors'

withdrawing the funds they managed from their accounts at RCM.  *See* Ward Decl., Ex. 30;  *see*

*also* SEC Release No. IA-2176 (September 25, 2003) *available at*

http://www.sec.gov/rules/final/ia-2176.htm#IIB (last visited June 4, 2008).

     The e-mails show that Collins understood that Yorke was concerned about the loss of

those customers, which "could mean an extremely large asset transfer away from RCM."  Ward

Decl., Ex. 30.  Collins proposed a number of options that would allow compliance with the

regulation while addressing Yorke's concern.  *Id.*  He proposed, among other things,[15] that RCM

could "segregate the funds and make the necessary disclosures" or "keep the funds at RSL or

Refco LLC," which were both regulated entities with a duty to segregate.  *Id.*  Far from

demonstrating guilty knowledge, Collins's advice shows that he was not complicit in the alleged

scheme to use RCM funds to prop up other Refco entities.  If he had been, he would have known

that segregating customer funds at RCM or moving funds from RCM to a regulated entity with a

segregation requirement were not options because the alleged scheme relied upon the Refco

Insiders having unfettered access to non-segregated and unregulated funds.

     Plaintiff also asserts that the timing of Mayer Brown's October 11, 2005, memorandum,

attached as Ward Decl., Ex. 31, is "inherently suspicious" because it post-dates disclosure of the

---

[15] Collins also suggested that RCM could "stall on the [] registration," reflecting that the pertinent requirement did not take effect for a full year after the date of his e-mail.  Ward Decl., Ex. 30 at 2.

fraud. Compl. ¶¶ 117-18. In that memorandum, Mayer Brown attorneys analyzed whether the

SEC's broker-dealer registration requirement would apply to RCM, concluding that registration

would not be required for RCM's foreign exchange and derivative trading, but may be required

for certain securities-related activities. Ward Decl., Ex. 31. The Trustee claims this

memorandum shows that Mayer Brown was attempting to "paper the file" or "cover its tracks"

by only offering "appropriate, objective advice" after the Refco fraud had already been

disclosed. Compl. ¶ 118. In fact, the "appropriate, objective advice" in the October 11, 2005,

memorandum is no different than advice Mayer Brown provided to Refco *over three years*

*earlier* in a similar memorandum. *Id.* ¶ 113 (incorporating this document, attached as Ward

Decl., Ex. 32).[16]

In sum, despite the Trustee's access to over 40 million pages of Refco's documents, he

alleges absolutely no basis for his conclusion that Mayer Brown attorneys actually knew of—let

alone assisted in—a scheme to transfer RCM's assets to other Refco entities.

> **B.    The Complaint Does Not Allege Mayer Brown's Actual Knowledge of Hidden Inter-Company Debt.**

Although the Trustee repeats at length his allegations about the claimed "round trip loan"

scheme, they have no apparent relevance to the claims in this lawsuit. The Trustee's

manufactured theory of causation fails as a matter of law for the reasons outlined above. But it

also fails because Plaintiff has not pleaded sufficient facts to give rise to a strong inference that

---

[16] Plaintiff also points to a January 31, 1999, memo from Refco to Mayer Brown attorneys and a June 2004 document setting forth questions about definitions in a Refco Credit Agreement. *See* Compl. ¶¶ 114-15; Ward Decl., Exs. 33, 34. Nothing in either document indicates that Mayer Brown knew that the Refco Insiders were transferring customer funds away from RCM. The handwritten notations (whose author is unidentified) simply reflect that RCM, an unregulated entity, did not segregate customer funds, and therefore, it would be difficult to distinguish "house cash" from "customer cash" or "regulated cash." Judge Drain reached a similar conclusion in denying the claims of another RCM customer. *See Kirschner v. Bencorp*, at 127-28 (Ward Decl., Ex. 6) ("[F]unds deposited by [RCM customers] were commingled with other deposits of customers of RCM, as well as other RCM property.").

Mayer Brown had actual knowledge of Refco's substantial *hidden* inter-company debt, which Mayer Brown attorneys allegedly helped conceal through their work on the back-to-back loans.

According to the Complaint, the true amount of the RGHI Receivable reached at least $900 million. *See* Compl. ¶ 194. Yet the Complaint does not allege that Mayer Brown attorneys ever knew about hidden inter-company debt of that magnitude. In fact, the sporadic encounters Mayer Brown attorneys are alleged to have had with a far more limited and public amount of inter-company debt at Refco dispel any inference that they were, or should have been, aware of a larger, hidden RGHI Receivable. There is no better evidence of this than the handwritten notations to the October 15, 1999, draft letter that the Complaint claims support the allegation that "[Mayer Brown attorneys] knew that RGHI owed money to RGL." Compl. ¶ 96.[17] The letter itself attaches Refco's audited financial results for fiscal year 1998, which openly disclose under an entry for "Related Party Transactions" that Refco was owed "net loans" amounting to $252 million from, among other entities, its "stockholder"—RGHI. Ward Decl., Ex. 35. The handwritten note referencing "loans to RGH[I]" confirms only that, on one occasion, a Mayer Brown lawyer was exposed to the fact that Refco had reported inter-company debt on its audited financial statements. It does not suggest any knowledge at all about *hidden* inter-company debt.

The same is true of the Complaint's allegations regarding $350 million in inter-company debt disclosed in a June 2002 "Letter Agreement" between Refco and a third party. Compl. ¶ 97; *see* Ward Decl., Ex. 36. The Complaint does not allege any facts to suggest that the Mayer Brown attorneys who worked on the transaction thought this $350 million inter-company receivable was in any way secret, much less that Refco had a secret receivable of $900 million. As the Complaint alleges, the $350 million debt was disclosed openly as part of an agreement

---

[17] The Complaint attributes these notations to Joseph Collins without providing any explanation or support. In fact these notations were not made by Collins.

providing that it was to be paid off using part of the transaction proceeds. *Id.* Thus, any Mayer Brown attorney reading the transaction documents would have believed not only that Refco disclosed its inter-company debt, but that the debt was scheduled to be paid off.

Similarly, there is no factual basis in the Complaint to support the notion that any Mayer Brown attorney connected—or even should have connected—the back-to-back loans with the inter-company debt. As an initial matter, the Complaint does not and cannot allege that Mayer Brown attorneys were aware of the fraudulent third leg of the so-called "round trip loan transactions," in which RGHI allegedly used loan proceeds to pay down the RGHI Receivable. Although Mayer Brown lawyers worked on the back-to-back loans (the first two legs of the transactions), the Complaint does not and cannot allege that they worked on or had any knowledge of the third leg of the transactions, which was how Refco effectuated the fraud. Compl. ¶ 102. Moreover, the amounts of inter-company debt to which any single Mayer Brown lawyer was fleetingly exposed bore no relation to the dollar amounts of the back-to-back loans. The highest level of inter-company debt any Mayer Brown lawyer allegedly was aware of was $350 million in 2002. The back-to-back loans peaked at $720 million in 2004. *See id.* ¶ 107.

The Complaint's remaining allegations regarding the impropriety of the "round trip loan transactions" also fail to show actual knowledge. For example, Plaintiff asks the Court to infer that Mayer Brown "knew and/or consciously avoided knowledge" that the RTLs were designed to hide the RGHI Receivable from the fact that "the RTLs straddled Refco's financial reporting periods and audit periods and occurred only at those times (with one exception)." *Id.* ¶ 93. Plaintiff cannot bootstrap actual knowledge from these alleged "red flags." *See Ryan v. Hunton & Williams*, No. 99 Civ. 5938, 2000 WL 1375265, at *8-10 (E.D.N.Y. Sept. 20, 2000) (allegation that defendant knew of "red flags" suggesting its client was using accounts for

fraudulent activities insufficient to establish actual knowledge); *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081, at *7-8 (S.D.N.Y. June 16, 2000) (defendant's knowledge that bank rejected "questionable transactions" and his "uneas[iness]" about the proposed transactions did not establish that defendant actually knew that they were fraudulent).

In any event, there is no support for a conclusion even that Mayer Brown should have known of the Insiders' fraud from the structure of the back-to-back loans.  Back-to-back loans are commonly used in financing transactions.[18]  The purpose of these transactions, as is clear from the face of the loan documents, was to provide RGHI with short-term liquidity, which is unremarkable for financial institutions and brokerage houses.  It is not unusual for privately-held parent companies to obtain liquidity for themselves or their shareholders by borrowing money from their subsidiaries rather than taking dividends.  Similarly, it is of no moment that the loans usually occurred at regular intervals.  *See* Compl. ¶ 49.  RGHI could have wanted the money for a cyclical investment or trading opportunity.  Such opportunities abound in the sophisticated commodities futures and foreign exchange markets in which Refco operated.[19]  Nor would it have been of concern that RGHI sought liquidity close to the end of Refco's financial reporting periods.  Companies frequently engage in legitimate year- and quarter-end transactions. Attorneys need not assume that such conduct is evidence of fraud.

---

[18] Back-to-back loans are used legitimately in numerous contexts, including for tax purposes, regulatory purposes, foreign exchange transactions, whole business securitization, municipal financing, and sovereign debt restructuring, not to mention for investment purposes.  *See, e.g.*, *JP Morgan Shares Down After Financing Bear Stearns; Analysts Back Ratings*, available at http://money.cnn.com/news/newsfeeds/articles/newstex/AFX-0013-23783077.htm (last viewed Apr. 30, 2008), (Ward Decl., Ex. 37) (discussing Federal Reserve's financing of Bear Stearns with "back-to-back financing" through JP Morgan).

[19]  The fluctuations in the loan amounts also are more consistent with legitimate use than fraud.  Plaintiff alleges that the amount of the receivable was ever-increasing, demanding larger and larger loans to cover it.  However, according to the Complaint, the amount of the back-to-back loans fluctuated, ranging from $550 million in December 2004 to $345 million in February 2005 and back up to $450 million in May 2005.  Compl. ¶ 123.  Such variation in the loan amounts is more consistent with efforts to take advantage of investment opportunities than it is with covering a steadily growing deficit.

The Complaint's allegations of actual knowledge and intent to advance the alleged wrongdoing are entirely insufficient,[20] and the Trustee's claims against Mayer Brown should be dismissed.

## VII.    SLUSA REQUIRES DISMISSAL OF THIS "COVERED CLASS ACTION."

The Securities Litigation Uniform Standards Act ("SLUSA") requires dismissal of all "covered class action[s]" alleging state law claims for "untrue statement or omission of a material fact" or use of any "manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b); *see id.* § 78bb(f). The statute, a supplement to the Private Securities Litigation Reform Act, reflects Congress's effort to curb the "targeting of deep-pocket defendants" and "nuisance filings" designed to achieve "extortionate settlements." *Merrill Lynch v. Dabit*, 547 U.S. 71, 81-82 (2006). SLUSA requires dismissal here, because this action (A) is a "covered class action" as defined in the statute, and (B) alleges fraud "in connection with the purchase or sale of a covered security."

### A.    This Is a "Covered Class Action."

A "covered class action" under SLUSA is a lawsuit in which "damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate." 15 U.S.C. § 78bb(f)(5)(B). This action meets both the numerosity and predominance thresholds.

*Numerosity.* Plaintiff seeks damages as assignee of seventy-five former customers of RCM, Compl. ¶ 1, and the PAT has more than fifty beneficiaries. Thus, whether the proper

---

[20] The Complaint asserts other baseless and unsupported allegations regarding the knowledge of Mayer Brown attorneys. While it is not feasible to address here each and every one of these, Mayer Brown respectfully refers the Court to its briefing in *Thomas H. Lee Equity Fund V, L.P. v. Mayer, Brown, Rowe & Maw LLP*, No. 07 Civ. 6767 (GEL) (S.D.N.Y.) and *In re Refco Securities Litigation*, 05 Civ. 8626 (GEL) (S.D.N.Y.) where it addressed similar allegations. *See, e.g.*, Mem. in Supp. of Mot. to Dismiss of Mayer Brown LLP (Dkt. No. 56) at 36–44 in *Lee*.

measure is the number of assignors, *see LaSala v. Bordier et Cie*, 519 F.3d 121, 134 (3d Cir. 2008),[21] or the number of trust beneficiaries,[22] *see LaSala v. Lloyds TSB Bank, PLC*, 514 F. Supp. 2d 447, 469-70 (S.D.N.Y. 2007); *LaSala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246, 268-69 (S.D.N.Y. 2007); *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 235-36 (S.D.N.Y. 2007), the numerosity component is satisfied in this case.

*Predominance.*  Setting aside issues of individual reliance, as SLUSA commands, the central remaining issues, including the nature of the alleged fraud and the roles and culpability of Mayer Brown and other defendants, are pleaded in common on behalf of all named customers. Plaintiff certainly makes no effort to assert individual allegations on behalf of each named customer.  Accordingly, this case satisfies both criteria of a "covered class action."

### B.    The Complaint Alleges Fraud "In Connection with the Purchase or Sale of a Covered Security."

SLUSA defines a "covered security" as a security listed on a national exchange or issued by a registered investment company.  *See* 15 U.S.C. §§ 78bb(f)(5)(E), 77r(b).  The Trustee attempts to insulate his Complaint from SLUSA by alleging that "FX trades do not constitute 'trades of securities' as that term is defined by U.S. federal securities laws."  Compl. ¶ 21.  Even assuming that allegation is correct, however, there are a host of covered securities transactions implicated by the alleged fraud.  Principal among these are purchases and sales of publicly traded Refco debt, sold by a coalition of registered investment banks, listed with the Securities Exchange Commission, and traded on national markets; and Refco stock, listed on the New York

---

[21] In *Bordier*, the Third Circuit held that estate claims, assigned to a litigation trust, were brought on behalf of only one "person":  the estate.  519 F.3d at 131-37.  When considering thousands of individual creditor claims assigned to the same trust, however, the court opined that "these counts likely are brought to recover damages 'on behalf of more than 50 persons' . . . so they would seem to take the form of a covered class action."  *Id.* at 137.  This latter circumstance is presented here.

[22] While the Complaint does not disclose exactly how many beneficiaries the PAT has, the total is at least seventy-five—the named customers listed in Exhibit A to the Complaint.

Stock Exchange.  *See* Compl. ¶¶ 82-90, 122; *see also* 15 U.S.C. § 77r(b) (defining "covered

securities"); *Premium Plus Partners, L.P. v. Davis*, No. 04 C 1851, 2005 WL 711591, at *19

(N.D. Ill. Mar. 28, 2005) (Treasury Bonds are "covered securit[ies]" for SLUSA purposes).

It is no answer that the FX customers themselves did not purchase or sell the "covered

securities," because the "in connection with" element encompasses a far broader array of claims.

"In [*Dabit*], the Supreme Court dramatically simplified the analysis of whether a particular

complaint alleges fraud in connection with the purchase or sale of a covered security within the

meaning of SLUSA."  *U.S. Mortgage, Inc. v. Saxton*, 494 F.3d 833, 844 (9th Cir. 2007).  "A

unanimous Supreme Court flatly rejected a strict 'purchaser/seller' requirement and endorsed an

expansive view of SLUSA's preemptive scope."  *Id.*  In doing so, it held that, for SLUSA

purposes, "the identity of the plaintiffs does not determine whether the complaint alleges fraud

'in connection with the purchase or sale of securities.'"  *Dabit*, 547 U.S. at 89.  It is not

necessary that a purchaser or seller be a party to the action; it is not even necessary to specify a

purchaser or seller.  *See id.* at 85.  "[I]t is enough that the fraud alleged 'coincide' with a

securities transaction—whether by the plaintiff or by someone else."  *Id.*;[23] *see Siepel v. Bank of

Am., N.A.*, __ F.3d __, 2008 WL 2079028, at *4 (8th Cir. 2008);[24] *see also United States v.

O'Hagan*, 521 U.S. 642, 657, 660 (1997) (fraud was "in connection with" the purchase of a

security even though victim not a party to purchase transaction).

---

[23] The plaintiff in *Dabit* alleged that he and other Merrill Lynch brokers were provided inaccurate information about Merrill's investment banking clients, leading them to hold stock in companies they otherwise would have sold.  547 U.S. at 75.  The Court held that the misstatements were "in connection with" the purchase or sale of covered securities because even if plaintiff did not buy or sell stocks, others did.  *Id.* at 85, 86-87.

[24] In *Siepel*, the Eighth Circuit held that beneficiaries of a trust, misled by statements of the trustee, alleged fraud in connection with the purchase or sale of a covered security, despite the fact that none of the plaintiff-beneficiaries bought or sold securities, because the trustee purchased covered securities.  __ F.3d __, 2008 WL 2079028, at *1, *4.

In *U.S. Mortgage*, for example, holders of notes issued on development projects alleged that the developer, assisted by outside professionals, falsely inflated its financial statements to prop up its stock. 494 F.3d at 836-39. When the truth was revealed, the stock plummeted and the developer defaulted on the loans. *Id.* The plaintiffs had neither bought nor sold the developer's stock, but the Ninth Circuit held that it was enough that others did, and accordingly dismissed the complaint under SLUSA. *Id.* at 844-45.

Under this standard, the fraud alleged here certainly was "in connection with" the purchase or sale of publicly traded Refco debt and stock. The Complaint makes clear that "[t]he securities sales and [the Insiders' alleged] fraudulent practices were not independent events." *SEC v. Zandford*, 535 U.S. 813, 820 (2002). To the contrary, Plaintiff repeatedly alleges that the "ultimate goal" of the alleged fraud was to take Refco through several "liquidity transactions" designed to sell Refco debt and stock to the public. Compl. ¶¶ 2, 26, 36, 60, 71-90. *See also UBS*, 510 F. Supp. 2d at 239 (SLUSA applies where fraud is an integral part of the alleged conduct and claims "sound" in fraud). The "round trip loan transactions" and the purported siphoning allegedly were designed to "dress up" the company so investors would buy Refco debt and stock, Compl. ¶¶ 2, 5, 19, 26, 32, 38, 65, and this same "dressing up" allegedly "induced" the named FX customers to deposit funds with RCM, *id.* ¶ 1. According to these allegations, the Insiders' efforts to attract and then convert RCM customer deposits to fund these activities did not merely "coincide" with the securities fraud, they were the linchpin of the scheme. *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007) (per curiam). As a result of the Insiders' efforts, Refco sold hundreds of millions of dollars of securities on national markets. Compl. ¶¶ 3, 71-90.

While Mayer Brown does not concede that the back-to-back loans were a proximate cause of losses suffered by RCM or the named customers, the Complaint repeatedly alleges that

the "round trip loan transactions" were conducted "in order to fraudulently bolster Refco's financial appearance to lenders and investors." Compl. ¶ 13. Under the Trustee's theory, therefore, the fraud alleged here was "in connection with" the purchase of a covered security. *See Dabit*, 547 U.S. at 89 ("fraudulent manipulation of stock prices . . . unquestionably qualifies as fraud 'in connection with the purchase or sale' of securities"); *U.S. Mortgage*, 494 U.S. at 844-45 (alleged scheme to "fraudulently hide [company's] financial condition—having the necessary effect of artificially inflating the price of [company's] publicly traded shares—through material misrepresentations in [company's] public filings and other public statements" connected claims to purchase or sale of covered security where plaintiffs, purchasers of notes, relied on the same statements, regardless of whether the notes were covered securities). While Plaintiff does not allege that the named customers were duped into buying Refco securities, many others allegedly were. *See, e.g.*, *In re Refco Inc., Sec. Litig.*, 503 F. Supp. 2d 611, 620 (S.D.N.Y. 2007) (discussing Refco's IPO). In fact, all the individual defendants, and several other Refco employees, have been convicted of federal securities violations "in connection with" those purchases.

Because this is a "covered class action" alleging fraud "in connection with" "covered securities," the Complaint should be dismissed in its entirety under SLUSA.

## CONCLUSION

For the foregoing reasons, Mayer Brown respectfully requests that the Complaint against it be dismissed.

Dated: Washington, D.C.
June 6, 2008

Respectfully submitted,

John K. Villa (admitted *pro hac vice*)
Michael S. Sundermeyer (admitted *pro hac vice*)
Craig D. Singer (admitted *pro hac vice*)
Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (fax)

*Attorneys for Defendant Mayer Brown LLP*