# EXHIBIT 4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| MARC S. KIRSCHNER,<br>as Trustee of the Refco Litigation Trust, | ) ) ) | |
| Plaintiff, | ) ) | |
| -vs- | ) ) | Case No. _____ |
| GRANT THORNTON LLP, MAYER,<br>BROWN, ROWE & MAW, LLP, ERNST &<br>YOUNG U.S. LLP,<br>PRICEWATERHOUSECOOPERS LLP,<br>CREDIT SUISSE SECURITIES (USA) LLC<br>(f/k/a CREDIT SUISSE FIRST BOSTON<br>LLC), BANC OF AMERICA SECURITIES<br>LLC, DEUTSCHE BANK SECURITIES<br>INC., PHILLIP R. BENNETT, SANTO C.<br>MAGGIO, ROBERT C. TROSTEN, TONE N.<br>GRANT, REFCO GROUP HOLDINGS,<br>INC., LIBERTY CORNER CAPITAL<br>STRATEGIES, LLC, WILLIAM T. PIGOTT,<br>EMF FINANCIAL PRODUCTS, LLC, EMF<br>CORE FUND, LTD., DELTA FLYER FUND,<br>LLC, ERIC M. FLANAGAN, INGRAM<br>MICRO, INC., CIM VENTURES, INC.,<br>BECKENHAM TRADING CO. INC.,<br>ANDREW KRIEGER, COAST ASSET<br>MANAGEMENT, LLC (f/k/a COAST ASSET<br>MANAGEMENT LP), CS LAND<br>MANAGEMENT, LLC, and CHRISTOPHER<br>PETITT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Jury Trial Demanded |
| Defendants. | ) ) | |

## **COMPLAINT**

This action is brought by Marc S. Kirschner (the "Trustee"), the Court-approved Trustee for

the Refco Litigation Trust (the "Trust"), as the duly authorized representative to commence all

claims and causes of action formerly owned by the bankruptcy estates of Refco Inc. and certain of its

direct and indirect subsidiaries (collectively, "Refco" and, individually or collectively, the

"Company"), including Refco Group Ltd., LLC ("RGL") and Refco Capital Markets, Ltd. ("RCM"),

against defendants Grant Thornton LLP ("GT"), Mayer, Brown, Rowe & Maw LLP ("MB"), Ernst

& Young U.S. LLP ("E&Y"), PricewaterhouseCoopers LLP ("PwC"), Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) ("Credit Suisse"), Banc of America Securities LLC ("BAS"), Deutsche Bank Securities Inc. ("Deutsche"), Phillip R. Bennett ("Bennett"), Santo C. Maggio ("Maggio"), Robert C. Trosten ("Trosten"), Tone N. Grant ("Grant"), Refco Group Holdings, Inc. ("RGHI"), Liberty Corner Capital Strategies, LLC ("Liberty Corner"); William T. Pigott ("Pigott"), EMF Financial Products, LLC ("EMF Financial"), EMF Core Fund, Ltd. ("EMF Core Fund"), Delta Flyer Fund, LLC ("Delta Flyer"), Eric M. Flanagan ("Flanagan"), Ingram Micro, Inc. ("Ingram Micro"), CIM Ventures, Inc. ("CIM Ventures"), Beckenham Trading Co. Inc. ("Beckenham"), Andrew Krieger ("Krieger"), Coast Asset Management, LLC (f/k/a Coast Asset Management LP) ("Coast"), CS Land Management, LLC ("CS Land"), and Christopher Petitt ("Petitt") for their roles in a massive scheme to loot Refco -- a scheme that resulted in one of the swiftest corporate meltdowns in U.S. history and caused Refco over $2 billion in damages.

The Trustee as and for his complaint against the defendants states as follows based on information and belief, such information and belief based on the investigation of the Trustee and his counsel and a review of, among other things:

(a)     the filings of Refco with the U.S. Securities and Exchange Commission ("SEC");

(b)     a review of the filings, documents, and testimony produced pursuant to Refco's re-organization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Proceedings") (assigned to the Honorable Judge Robert Drain and jointly administered under the caption "*In re Refco Inc., et al.,* Case No. 05-60006 (RDD)");

(c)     the Final Report of the Court-appointed Independent Examiner (the "Examiner") in the Bankruptcy Proceedings;

(d)     the Third Superseding Indictment in *U.S. v. Phillip R. Bennett, et al.*, S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007); and

(e)     other relevant public documents:

**<u>Nature of the Case</u>**

1.      The defendants include a "who's who" of some of the biggest names in corporate finance, law, and accounting, whose reputations and substantial assistance were required for Bennett, Maggio, Trosten, and Grant (the "<u>Refco Insiders</u>") to strip out billions of dollars in Refco assets. Bennett and other Refco Insiders face criminal charges for their misconduct.  The Trustee brings this action to recover from the Refco Insiders and those who knowingly assisted them in stripping out Refco's assets, causing billions of dollars in damage to the Company and its creditors.

2.      The Refco Insiders' looting of Refco was not a simple, straight-forward theft.  With the active assistance of the Company's auditors and legal and financial advisors, the Refco Insiders and their cohorts devised an elaborate scheme through which they maintained the illusion that Refco was a highly successful, financially secure broker-dealer.  It was this illusion of a thriving company that enabled the Refco Insiders to steal billions of dollars from Refco by positioning Refco for, and ultimately carrying out, what appeared on the surface to be a legitimate "buy-out" of their interests in RGL.

3.      However, as the professionals who advised Refco and facilitated this lucrative cashing-out knew and/or consciously avoided knowing, Refco's financial condition was not sufficient  to warrant a lucrative sale, and the buy-out was, in fact, nothing more than an outright looting of Refco's assets.  As Refco's auditors and financial, legal, and tax advisors knew and/or consciously avoided knowing, Refco sustained hundreds of millions of dollars in customer and proprietary trading losses in the late 1990s -- trading losses which the Refco Insiders did not disclose because doing so would have shaken customer confidence, negatively impacted Refco's financial condition, and foreclosed any lucrative "cashing-out" of the Refco Insiders' interests.

4.      To maintain the illusion of financial and operational strength and stability long enough for the Refco Insiders to line their pockets with Refco's assets, the Refco Insiders conspired for over seven years to conceal Refco's trading losses, true operating expenses, and marginal performance by fraudulently inflating Refco's revenues and funding virtually every aspect of Refco's operations and expenses with assets belonging to customers of RCM, Refco's unregulated

broker-dealer. It was a three-part scheme: create the illusion of solid financial health; maintain that illusion; and orchestrate a lucrative cashing-out of their interests.

5.    <u>Part One -- Cleaning up the Financial Statements.</u>  The Refco Insiders created the illusion that Refco was a financially solid and healthy broker-dealer by concealing Refco's trading losses and operating expenses from its financial statements, recording them as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the leveraged buy-out ("<u>LBO</u>"), by Bennett and Grant, Refco's former CEO), and inflating Refco's revenues by recording hundreds of millions of dollars in accrued interest income on these phantom receivables.

6.    <u>Part Two -- Keep the Illusion Going Long Enough to Cash-Out.</u>  Once these losses and operating expenses were concealed as a receivable *owed to* Refco (along with hundreds of millions of dollars in fictitious accrued interest on that receivable), the Refco Insiders, with the assistance of Refco's lawyers, MB, carefully designed and implemented a series of fraudulent transactions -- the so-called Round Trip Loans ("<u>RTLs</u>") -- whose sole purpose was to prevent these related-party receivables from being disclosed.  These RTLs purported to be loans involving third parties, but were, in fact, little more than bogus bookkeeping entries that served to hide the fact that RGHI -- a related-party company owned and controlled by Bennett and Grant, the principal asset of which was stock of Refco -- was being used to hide Refco's trading losses and operating expenses by making them appear to be a debt owed by RGHI to Refco (the "<u>RGHI Receivable</u>").  Each of defendants Liberty Corner, Pigott,  EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt made this concealment of Refco's true financial condition possible by participating in the RTLs in exchange for a fee.

7.    At the same time that the RGHI Receivable was concealed through fraudulent RTLs, the Refco Insiders funded Refco's operations by routinely swiping RCM's customer assets and using them to finance RGL and other Refco affiliates that had essentially no ability and no intention of repaying the RCM customer funds.

8.    Refco's auditors, legal advisors, and financial advisors actively assisted in manufacturing and maintaining this illusion not only by lending their reputations and an aura of

respectability to Refco's finances and operations but, as detailed below, by actively participating in the fraudulent scheme. Indeed, the fraudulent scheme perpetrated by the Refco Insiders only could have worked with the active assistance of Refco's cadre of outside auditors, professionals, and advisors.

9.     <u>Part Three -- the Cash-Out.</u>   Having successfully maintained the illusion of Refco's financial health, in 2004 the Refco Insiders, with the substantial assistance of the Company's outside accounting and auditing professionals, and legal and financial advisors, caused RGL to borrow $1.4 billion of bank and bond debt to fund a LBO that enriched the Refco Insiders at the expense of Refco and its creditors, including its largest creditor -- RCM. As a result of the LBO, RGL was stripped of its assets and saddled with $1.4 billion in new debt. RCM was left with approximately $2 billion in worthless intercompany "IOUs" and was unable to repay the customers from whose accounts assets had been swiped to fund Refco's business as part of the fraud.

10.     A year later, as was always the plan, the LBO was followed up with an initial public offering (the "<u>IPO</u>") that further impaired Refco's assets. The IPO established Refco Inc., a new public company through which the Refco Insiders' fraud was perpetuated. The ill-advised IPO (i) impaired Refco Inc.'s financial condition through the fraudulent sale of more than $583 million of shares of common stock, resulting in damages of as much as a billion dollars from securities fraud claims, (ii) caused Refco Inc. to pay down over $230 million of RGL's LBO debt (despite the fact that RGL was insolvent), approximately $40 million in underwriting fees and expenses, and more than $80 million in the form of a "greenshoe" dividend, for which it received no value, and (iii) thereby allowed the Refco Insiders to strip out all of Refco's remaining assets.

11.     As the Company's auditors, legal advisors, and financial advisors knew and/or consciously avoided knowing, given Refco's true financial state, neither the LBO nor the IPO served any legitimate purpose for Refco. The LBO and IPO were only entered into to allow the Refco Insiders to cash-out their interests in Refco at vastly inflated values that bore no relationship to Refco's true financial condition.

12.     Throughout this scheme, the Refco Insiders acted outside the course and scope of their employment, totally abandoning the Company's interests at every turn in entering into the RTLs, the LBO, and the IPO.  They acted solely to enrich themselves, conferring absolutely no benefit on RCM, RGL, Refco Inc., or the other Refco entities, all of which were left destitute and forced to file for bankruptcy as a result of the fraudulent scheme merely weeks after the IPO, and days after public disclosure of the RGHI Receivable.

13.     The Refco Insiders could not have cashed-out on their fraud if Refco's auditors, GT, had not blessed Refco's fraudulent financial statements despite knowing the nature and massive extent of the fraud being perpetrated by the Refco Insiders.  The illusion of Refco's financial stability and health could not have been maintained without the complicity of MB, Refco's attorneys, who, over the course of more than five years, prepared fraudulent RTLs at the end of each and every relevant reporting and audit period that were solely designed to conceal hundreds of millions of dollars in undisclosed trading losses, misallocated operating expenses, and the fictitious accrued interest on the RGHI Receivable.  Nor could the RTLs have occurred without the complicity of the RTL participants named as defendants in this action.  Similarly, the hoax could not have been maintained if E&Y had not willingly generated false Refco tax returns or if PwC had not validated Refco's deficient internal controls throughout the LBO and IPO process.  Further, Credit Suisse, BAS, and Deutsche structured and facilitated the lucrative cashing-out of the Refco Insiders' interests, all the while recognizing that the LBO would leave RCM's intercompany IOUs unpaid and unrecoverable and cause harm to both RGL and RCM.  And each and every one of these defendants received significant fees and other payments, some amounting to millions of dollars, in return for their support and participation in the Refco Insiders' fraudulent scheme.

## Jurisdiction and Venue

14.     At all relevant times, Refco had substantial operations in Chicago including, among others, its futures business and significant segments of its securities and foreign currency trading businesses as well as back-office administration functions for these and other parts of Refco's businesses and operations.  Refco employed nearly a thousand people in Chicago and maintained

numerous offices in Chicago and the Chicago suburbs. Refco's Chicago headquarters was located at 550 West Jackson Boulevard, Chicago, Illinois.

15.    Defendant GT is a Illinois Limited Liability Partnership with its headquarters at 175 West Jackson Blvd., Chicago, Illinois.

16.    Defendant MB is an Illinois Limited Liability Partnership with its headquarters at 71 South Wacker Drive, Chicago, Illinois.

17.    Defendant E&Y has offices at 233 South Wacker Drive, Chicago, Illinois, and has substantial contacts with Illinois. E&Y does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

18.    Defendant PwC has offices at One North Wacker Drive, Chicago, Illinois, and has substantial contacts with Illinois. PwC does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

19.    Defendant Credit Suisse has offices at Franklin Center, 227 West Monroe Street, Chicago, Illinois, and has substantial contacts with Illinois. Credit Suisse does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

20.    Defendant BAS has offices at 231 South LaSalle Street, Chicago, Illinois, and has substantial contacts with Illinois. BAS does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

21.     Defendant Deutsche has offices at 222 South Riverside Plaza, Chicago, Illinois, and 2333 Waukegan Road, Bannockburn, Illinois, and has substantial contacts with Illinois. Deutsche does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

22.     Defendants Bennett, Maggio, Trosten, and Grant each traveled to Chicago and did business in Chicago in connection with their management of the Refco businesses. Bennett, Maggio, Trosten, and Grant met with MB and GT, among others, in Chicago to perpetrate the fraudulent activities and scheme detailed herein. Defendant Grant is an Illinois resident, residing at 706 Roslyn Terrace, Evanston, Illinois.

23.     Defendant RGHI has an office at 111 West Jackson Boulevard, Chicago, Illinois.

24.     Defendants Liberty Corner and Pigott do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

25.     Defendants EMF Financial, EMF Core Fund, Delta Flyer, and Flanagan do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

26.     Defendants Ingram Micro and CIM Ventures do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois. Defendant Ingram Micro has an office in Illinois.

27.     Defendants Beckenham and Krieger do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

28.     Defendants Coast, CS Land, and Petitt do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

29.     Defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt are collectively referred to as the "RTL Defendants."

30.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, and the Court has personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209.

## Parties

### The Refco Entities

31.    Plaintiff Marc S. Kirschner is the court-approved Trustee of the Refco Litigation Trust, which was established in connection with the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan") confirmed on December 15, 2006, by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the Chapter 11 cases and proceedings of Refco (the "Bankruptcy Proceedings") on December 15, 2006. Upon the substantial consummation and effectiveness of the Plan, on December 26, 2006, the claims and causes of action asserted herein were transferred from the bankruptcy estates of three principal entities and distributed to creditors and equity interest holders of Refco, and such creditors and equity interest holders in turn granted such claims and causes of action to the Refco Litigation Trust in exchange for beneficial interests therein.

32.    The claims and causes of action asserted herein are based on the harm caused to the following three principal entities:

(a)    Refco Group Ltd., LLC - RGL was formed in 1999 and is a Delaware limited liability company. Before the LBO, RGL was the corporate parent of Refco. As set forth herein, RGL was induced to enter into an improvident LBO based on a false and inaccurate understanding of its financial condition, causing RGL to saddle itself with $1.4 billion in debt and to allow its assets to be stripped out and paid to the Refco Insiders while still owing RCM approximately $2 billion in unpaid IOUs. Had the true, precarious, financial condition of RGL not been concealed through the misconduct of the corrupt Refco Insiders and the other defendants, RGL never would have entered into the LBO. RGL filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(b)    Refco Capital Markets, Ltd. - Before the LBO, RCM was an indirect subsidiary of RGL. RCM was organized and existed under the laws of Bermuda. At all relevant times, RCM was an unregulated securities broker and foreign exchange broker, and one of three principal operating subsidiaries of Refco. RCM traded in over-the-counter

9

derivatives and other financial products on behalf of its customers. Although RCM was organized under the laws of Bermuda, RCM had no significant operations in Bermuda and, as a Bermuda exempt company, was statutorily prohibited from operating in Bermuda. RCM closed its Bermuda office in December 2001 and, since that time, its presence in Bermuda has been limited to a mailbox address. As set forth herein, RCM's assets were looted by the Refco Insiders and used to fund and prop up Refco's operations so those insiders could engineer a lucrative cashing-out of their interests in Refco. The Refco entities who used RCM's assets to fund their operations had little to no ability or intention of repaying these loans, and repayment of the RCM IOUs was altogether foreclosed by the LBO and IPO, which stripped out Refco's remaining assets and subordinated RCM's right to repayment to $1.4 billion in new LBO debt. At the time of the LBO, RCM had approximately $2 billion in unpaid IOUs owed to it by RGL and its Refco affiliates; by the time of the IPO, this number had grown to over $2 billion. RCM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(c) Refco Inc. - Refco Inc., a Delaware corporation, was the corporate parent of both RGL and RCM. Before its bankruptcy filing, Refco Inc. was a publicly traded holding company that, through its subsidiaries, provided securities brokerage, execution, and clearing services for exchange-trade derivatives and prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005 IPO, and was the issuer of the stock sold in the August 2005 IPO. As set forth herein, Refco Inc. was induced to enter into an IPO based on a false and inaccurate understanding of its financial condition, which caused Refco Inc. to incur significant liabilities to its shareholders and to unnecessarily retire $231 million in debt owed by RGL, an insolvent subsidiary.

33.     Set out below is an organizational diagram illustrating Refco's basic corporate structure.



34.     As reflected above, the relevant affiliates and subsidiaries of Refco Inc. include:

(a)     Refco Securities, LLC ("RSL") is a non-debtor, indirect Refco Inc. subsidiary.  RSL is a Delaware limited liability company and registered broker-dealer.

(b)     Refco Global Finance Ltd. ("RGF") is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware.  RGF filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(c)     Refco Capital LLC ("RCC") is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware.  As detailed below, Bennett and others used RCC as the "treasury" and "disbursing agent" through which RCM's assets were diverted and

distributed to fund the operations of the other Refco entities.  RCC filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(d)    Refco LLC is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware.  Refco LLC was a registered Futures Commission Merchant and, along with RSL and RCM, was one of three primary Refco operating subsidiaries. Refco LLC filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code on November 25, 2005.

35.    Defendant Refco Group Holdings, Inc. ("RGHI") is a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant.  In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI. From 1999 until the LBO, RGHI had a 90% interest in RGL (the principal Refco holding company before the LBO) and was the controlling shareholder of RGL.  The remaining 10% in RGL was held by a subsidiary of Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG"), a foreign financial institution closely tied to Bennett.

**The Officer Defendants**

36.    Defendant Phillip R. Bennett was the highest ranking corporate officer of various Refco entities until he was forced to resign in October 2005 following the disclosure of the massive fraud he, Maggio, Trosten, and Grant perpetrated on Refco with the assistance of the other defendants.  Among his other positions within Refco, at all relevant times, he served as a director and officer of RGL, RCM, and Refco Inc.  Before serving as President, Chief Executive Officer, and Chairman of RGL from September 1998 on, Bennett had been the Chief Financial Officer of RGL. Bennett has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

37.    Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985, and held executive positions with various Refco entities until he was forced to resign in October 2005 following the disclosure of the massive fraud he, Bennett, Trosten, and Grant perpetrated on

Refco with the active assistance of the other defendants.  Among his other positions within Refco, he served as Executive Vice President of RGL and President and a director of RCM.  At all relevant times Maggio ran the brokerage operations of RSL and RCM and directed, orchestrated, and supervised the diversion of RCM assets alleged herein.  According to press reports, Maggio is cooperating with the United States Justice Department and the SEC in relation, *inter alia*, to his role in various frauds perpetrated during his tenure at Refco.

38.     Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001, and RGL's Chief Financial Officer from 2001 to October 2004.  Trosten was intimately familiar with all details of the fraud he, Bennett, Maggio, and Grant perpetrated on Refco with the active assistance of the other defendants.  Trosten has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

39.     Defendant Tone N. Grant joined RGL in 1981.  Up through 1998, Grant was President and CEO of RGL.  Prior to August 2004, through his ownership interest in RGHI, Grant held a significant ownership stake in Refco.  From 1999 through August 2004, Bennett and Grant each held a 50% interest in RGHI.  In or around August 2004, concurrently with the LBO, Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI.   Grant has been indicted for, among other things, conspiracy to commit securities fraud, bank fraud, and money laundering.

40.     Defendant RGHI was, before the LBO, owned 50% by Bennett and 50% by Grant and was at all relevant times an alter-ego of Bennett and Grant.  RGHI was, before the LBO, the controlling shareholder of Refco.

**The Professional Defendants**

41.     Defendant Mayer, Brown, Rowe & Maw LLP, with more than 1,500 lawyers, is among the largest law practices in the world.  MB is a combination of two limited liability partnerships, each named Mayer, Brown, Rowe & Maw LLP, one established in Illinois, USA, and one organized in England.  MB's global operations are headquartered in Chicago.  MB served as

Refco's principal outside counsel from 1994 until October 2005. As set forth below in more detail, MB was intimately involved in numerous aspects of the Refco Insiders' fraudulent scheme, including preparing the loan documents through which Refco concealed the RGHI Receivable that hid Refco's trading loses and operational expenses, advising the Refco Insiders how to continue diverting RCM's assets to fund Refco's businesses, and playing an active role in the LBO and IPO which it knew was premised on a fictitious picture of Refco's financial condition. Indeed, the Bankruptcy Examiner ("Examiner") in the bankruptcy proceedings in the United States Bankruptcy Court of the Southern District of New York, after exhaustive review of MB's documents and interviews of the responsible MB attorneys, issued a report concluding, among other things, that the evidence establishes that MB understood that the RTLs it structured for Refco were designed to "fraudulently bolster Refco's financial appearance to lenders and investors." MB received at least $23.5 million from Refco for its services.

42.    Defendant Grant Thornton LLP is the Chicago-based United States member firm of Grant Thornton International, one of six global accounting, tax, and business advisory organizations with member firms in 11 countries. GT served as Refco's purportedly independent auditor at all relevant times after 2002, when it replaced Arthur Andersen LLP ("AA") in that role. GT issued clean and unqualified audit opinion letters on Refco's financial statements for fiscal years 2003, 2004, and 2005. GT also served as the purportedly independent auditor for RCM. According to the Examiner, whose investigation was limited by an inability to speak to any GT employees or Refco employees who dealt with the lead GT partner on the engagement (Mark Ramler), GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud" and "circumstantial evidence suggests that [GT] may have had actual knowledge of the fraud." GT received at least $10 million from Refco for its services.

43.    Defendant Ernst & Young U.S. LLP is the United States member firm of Ernst & Young Global Limited. E&Y is a public accounting firm that provides a range of business and professional advisory services to companies worldwide, including assisting firms with complex tax issues. E&Y is a Delaware limited liability partnership with 83 offices and over 26,000 employees

across the United States, including Chicago. E&Y and its affiliates provided Refco with tax advice on numerous issues, served as Refco's independent registered tax accounting firm, prepared tax returns for Refco and RGHI from approximately 1991 through the 2002 tax year, and continued to provide tax advice and assistance to RGL thereafter until 2005 on a worldwide basis. As explained in more detail below, during the course of its engagement with Refco and RGHI, E&Y became aware of the fraud alleged herein and actively aided and abetted it. After the Bankruptcy Court-appointed Examiner catalogued and reviewed the "considerable evidence," he concluded that, like MB and GT, "E&Y knew that . . . Refco's officers were intentionally manipulating Refco's balance sheet for the purpose of bolstering the financial appearance of the company." E&Y received at least $5 million from Refco for its services.

44. Defendant PricewaterhouseCoopers LLP is the United States member of PricewaterhouseCoopers International Limited, a UK membership based public accounting firm that provides a range of business and professional advisory services to companies worldwide, including assisting firms with complex tax issues and management consulting. PwC is a Delaware limited liability partnership with over 25,000 employees in offices throughout the United States, including Chicago. PwC was retained to advise Refco in connection with the LBO and IPO. PwC provided Refco with advice and consulting services in numerous accounting and financial reporting matters, including analyzing the propriety of the LBO and preparing documents to be filed with the SEC in connection with the LBO and IPO. In the period between the LBO and the IPO, in response to concerns over Refco's internal accounting controls, PwC was also engaged to review and strengthen Refco's internal accounting controls, provide tax return services for the tax year beginning January 1, 2004, and serve as Refco's *de facto* Chief Accounting Officer. PwC received approximately $4 million from Refco for its services. While the Examiner included PwC as a part of his initial investigation, a conflict with the Examiner's counsel, and subsequent discussions with the Bankruptcy Court and others, resulted in the Examiner discontinuing its investigation of possible claims against PwC.

45.    Defendant Credit Suisse, a subsidiary of Credit Suisse Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services.  Credit Suisse was a lead financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO, and the lead joint book-running manager and lead underwriter of the August 2005 IPO.  Credit Suisse was also the "exclusive" financial advisor to Bennett and/or RGHI and/or RGL in determining the ways in which the Refco Insiders could facilitate a lucrative cashing-out of their interests in Refco.  Credit Suisse is a Delaware limited liability company.  Credit Suisse collectively received $15.5 million in fees and its share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO, IPO and other services it provided for the Company.

46.    Defendant BAS, a subsidiary of Bank of America Corporation, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services.  BAS was a financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and was a joint book-running manager of the August 2005 IPO.  BAS is a Delaware limited liability company that maintains its headquarters in North Carolina.  BAS received $125,000 in fees and its share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO and IPO.

47.    Defendant Deutsche, a subsidiary of Deutsche Bank, A.G., is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services.  Deutsche was a financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and was a co-manager and underwriter of the August 2005 IPO.  Deutsche is a Delaware corporation.  Deutsche received a share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO and IPO.

48.    Credit Suisse, BAS, and Deutsche are collectively referred to as the "Investment Banker Defendants."  The Court-appointed Examiner did not examine the conduct of the Investment Banker Defendants in connection with the Refco LBO or the IPO.

49.    MB, GT, E&Y, PwC, and the Investment Banker Defendants are collectively referred to as the "Professional Defendants."

**The RTL Defendants**

50.    Defendant Liberty Corner Capital Strategies, LLC was a hedge fund management company located in Summit, New Jersey and organized under the laws of Delaware.  Liberty Corner used Refco as its prime broker up until the time of Refco's bankruptcy.  At all relevant times, Liberty Corner was wholly owned and controlled by defendant William T. Pigott.  As described below, Pigott, through the instrumentality of Liberty Corner, agreed to serve as a conduit for over $5 billion of fictitious loans spread across ten transactions, through which substantial Refco trading losses and operational expenses were concealed.

51.    Defendant EMF Financial Products, LLC is a Delaware corporation founded by and at all relevant times run by, and controlled by, defendant Eric M. Flanagan ("Flanagan").  Flanagan used Refco as EMF Financial's prime broker up to the time of Refco's bankruptcy.  Flanagan directed two entities affiliated with EMF Financial, defendants EMF Core Fund and Delta Flyer, to serve as the conduit in four fictitious loan transactions through which $575 million of the RGHI Receivable was concealed over four successive fiscal year-end reporting periods from February 2000 to February 2003.

52.    Defendant Ingram Micro, Inc., a Delaware corporation, is a technology sales and distribution enterprise based in Santa Ana, California.  Ingram Micro agreed to use its subsidiary, defendant CIM Ventures, Inc, to participate in two RTLs with Refco in 2000 and 2001 through which $400 million of the RGHI Receivable was concealed.

53.    Defendant Beckenham Trading Co. Inc., a New Jersey corporation, is an investment fund wholly owned and operated by defendant Andrew Krieger ("Krieger").  Krieger had a long-standing relationship with Refco, having used Refco as a prime broker for his various entities since

the late 1990s and continuing to use the company until its bankruptcy.  Beckenham engaged in a $125 million RTL with Refco in February 2002 in exchange for a fee.

54.    Defendant Coast Asset Management, L.P., a Delaware corporation, is a hedge fund manager based in Santa Monica, California.  At the time of the RTLs, Christopher Petitt was the CEO of Coast.  Coast had a long-standing relationship with Refco, having done business with the company since 1996 and having used Refco as its prime broker since 1998.  In February 2000, Coast's subsidiary, defendant CS Land Management, LLC, entered into a $110 million RTL with Refco in exchange for a fee.

55.    Although the Court-appointed Examiner was not directed to specifically examine the conduct of the RTL Defendants, the Examiner concluded that the RTLs had no genuine business purpose and were solely designed to improperly conceal hundreds of millions of dollars in unpaid related-party receivables so as to "fraudulently bolster Refco's financial appearance to lenders and investors."  These fraudulent RTL transactions could not have been carried out without the active involvement and participation of the RTL Defendants.

## Factual Background

## Overview of Refco's Business

56.    Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets.  Refco provided financial services by executing trades on behalf of its customers and then recording and "clearing" those trades.  Refco offered these services to a wide variety of customers, including individuals, corporations, hedge funds, financial institutions, retail clients and professional traders, on a broad spectrum of derivative exchanges and over-the-counter, cash and securities markets.

57.    Refco had three major operating subsidiaries through which these services were provided:

(a)    RSL, a registered broker-dealer through which Refco offered prime brokerage services, such as securities financing, securities lending, and trade processing.  RSL was a registered broker-dealer regulated by the SEC and the National Association of Securities

18

Dealers ("NASD"), and was subject to the net capital and other regulatory requirements of those entities.

(b)    Refco LLC, a regulated futures commission merchant through which Refco executed and cleared customers' orders for exchange-traded derivatives. Refco LLC was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to the net capital and other regulatory requirements of those entities.

(c)    RCM, a broker-dealer for securities and foreign currency trades. Because it was incorporated in Bermuda, RCM was purportedly "unregulated." While some of its operations were originally located in Bermuda, most of RCM's operations and business were located and conducted in the United States. In December 2001, Refco shut down RCM's Bermuda operations and "repatriated" all of RCM's operations to the United States with the assistance and guidance of defendant MB.

58.    Refco's legitimate revenues were primarily comprised of (i) transaction fees earned from executing customer orders at its operating subsidiaries, and (ii) interest income earned on cash balances in its customers' trading accounts and from providing financing through repurchase transactions.

**The Refco Insiders' Fraudulent Scheme**

59.    In late 1997, the Refco Insiders decided to engineer a lucrative cashing-out of their interests in Refco for far more than these interests were worth. To this end, the Refco Insiders engaged in a three-part fraudulent scheme through which they concealed Refco's trading losses and operating expenses, inflated Refco's revenues, and hid their manipulation of Refco's financial statements through fraudulent round trip loans, all the while funding Refco's operations with customer assets looted from RCM.

**Part One -- Cleaning Up Refco's Financial Statements**

60.    The Refco Insiders avoided writing off hundreds of millions of dollars in trading losses, misallocated operating expenses and inflated Refco's revenue with phantom interest income,

19

by booking these amounts as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Grant) resulting in a massive related-party receivable owed to various Refco entities. This, in turn, concealed Refco's true financial results, and allowed the Refco Insiders and others (i) to overstate Refco's financial condition and related operating results, and (ii) to fraudulently continue to project to the public an illusion of financial health and strength -- falsely securing customer confidence and ensuring the continued deposits of cash and securities from customers needed to facilitate and fund the Refco Insiders' lucrative cashing-out of their interests.

**Refco's Trading Losses**

61.    As part of its trading business, Refco regularly extended credit to customers who engaged in securities, commodities, and futures trades. As a result, when markets fluctuated drastically, such as they did during the Asian market collapse in 1997, and Refco customers trading on credit could not cover their losses, Refco was forced to assume those losses.

62.    For example, in 1997, Refco was exposed to over $100 million in losses when some of its customers were over-extended in the Asian market collapse. In the same time frame, other over-extended Refco customers trading in other markets incurred additional staggering losses in the $100 million range. Refco was simultaneously suffering substantial losses in its own proprietary trading and lost $50 million in a single transaction in 1998 on an investment in Russian securities and bonds.

63.    Collectively, it is believed that customer and proprietary trading losses assumed and sustained by Refco in 1997-1999 alone amounted to hundreds of millions of dollars. If disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management, and severely damaged Refco's business. The Refco Insiders recognized that customers would not do business with Refco's operating subsidiaries, and Refco's considerable goodwill would be severely eroded, if the public did not believe that Refco had sound internal risk management controls, was appropriately capitalized, and was financially healthy.

(This belief was confirmed in October 2005, when Refco's above-described losses were revealed and Refco's operating subsidiaries experienced a "run" on customer accounts.)

64.    Faced with these debilitating trading losses, the Refco Insiders set out to prop up Refco's reputation -- and its perceived strong financial condition and attractiveness to investors -- through fraud.  Instead of disclosing and writing these losses off as bad debts, the Refco Insiders caused Refco's losses and uncollectible obligations to be secretly transferred to RGHI as a receivable *owed to* Refco by RGHI.

65.    These trading losses were converted to a receivable owed to Refco by RGHI through one of three mechanisms: either (i) the obligation to repay Refco for covering a customer's bad trade on an exchange was transferred by the Refco Insiders from the customer to RGHI; (ii) the obligation to repay money loaned to a Refco customer (where the customers' devalued collateral did not cover its obligation to Refco) was transferred from the customer to RGHI by the Refco Insiders; or (iii) in Refco's own proprietary trading, the Refco Insiders booked losses on trades executed on behalf of Refco at RGHI, creating a receivable owed to Refco by RGHI.  While some of these trading losses were permanently parked at RGHI, others were held at Refco and moved to RGHI just prior to reporting and audit periods.

66.    As a result of this scheme, instead of being written off as bad debt, hundreds of millions of dollars in customer and proprietary trading losses were "converted" from patently worthless receivables into what appeared to be a legitimate and collectible receivable, albeit from RGHI -- a related party whose principal asset was Refco stock.  This had the effect of making Refco's financial position look materially stronger than it actually was.

**Concealing Refco Operating Expenses**

67.    Focused on perpetuating the illusion that Refco was in healthy financial condition and a good prospect for a lucrative buy-out or sale, the Refco Insiders also hid tens of millions of dollars of Refco expenses (and thereby fraudulently increased Refco's apparent profits) by transferring them to RGHI.  Though these expenses were incurred by numerous Refco entities and paid by Refco, they were transferred to RGHI, further increasing the RGHI Receivable.

21

68.    Through this scheme, tens of millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses and millions more in payroll and outside professional expenses, were moved off Refco's books and concealed as a receivable owed to Refco by RGHI. As the Examiner determined, Bennett and those acting in active concert or participation with him ensured that Refco's operating expenses were "transferred to RGHI and added to the [RGHI R]eceivable balance," thereby overstating the earnings capability of RGL.

69.    Other items were also improperly transferred to RGHI and added to the RGHI Receivable. For example, in or around February 2000, a Refco entity paid $6.5 million relating to the settlement of a lawsuit against Refco. The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco. On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

**Inflating RGL's Revenues with Phantom Income**

70.    The Refco Insiders also caused Refco to inflate its income as a result of "transactions" with RGHI. This practice served as a significant source of Refco's income, inflating revenue. On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Refco Insiders of income at Refco. The description of the transaction on the account statement said only "Transfer" for each item.

71.    The Refco Insiders also fraudulently inflated Refco's revenues and financial results by charging RGHI usurious interest of as much as 35% on the RGHI Receivable. This was fictitious income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable. For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal." The $62.75 million of interest had been recorded as income by Refco.

72.    Indeed, between 2001 and 2005 alone, fictitious recorded interest on the RGHI Receivable amounted to at least $250 million. But no interest payments were ever made, and

because the RGHI Receivable was falsely created, held by a related party, and not subject to any form of repayment obligation, the interest income was entirely fictional and should never have been recorded.

73.     As set forth in the chart below, between the trading losses, operating expenses and other transactions that made up the RGHI Receivable, and the accrued interest on the Receivable, just prior to the LBO, the RGHI Receivable ballooned to nearly $1 billion.

**RGHI Receivable Balance**

| Date | RGHI Receivable[*] |
|------|------------------|
| 31-Mar-98 | $ 387,708,449 |
| 31-Mar-99 | 455,135,660 |
| 31-Mar-00 | 596,676,711 |
| 31-Mar-01 | 709,888,962 |
| 31-Mar-02 | 849,144,785 |
| 31-Mar-03 | 943,939,524 |
| 31-Mar-04 | 918,410,130 |

[*] Reflects full amount of RGHI Receivable, including amounts added to RGHI Receivable prior to end of reporting and audit periods.

## Part Two - Keeping the Illusion Going Long Enough to Cash-out

74.     After the Refco Insiders  moved Refco's losses and operating expenses from Refco's books and artificially inflated the company's operating results and apparent value, they had to prevent the fictitious nature of the RGHI Receivable, the trading losses and operating expenses it concealed, and Refco's true financial condition from being disclosed.  The Refco Insiders accomplished this through fraudulent RTLs and by funding Refco's operations with RCM customer assets.  These schemes created the perception that Refco was robust and financially healthy long enough for the Refco Insiders to personally enrich themselves through a lucrative cashing-out.

## The RTL Shell Game

75.     A large receivable owed to Refco by a related-party, owned by its current and former Chief Executive Officer, would have to be disclosed on Refco's financial statements and would have invited scrutiny and skepticism.  To conceal the magnitude and related-party nature of this receivable, with the active assistance of MB, GT, E&Y and the RTL Defendants, the Refco Insiders

devised and implemented a series of sham "loans" -- the RTLs -- timed to straddle Refco's financial reporting and audit periods.

76.    Like a street-corner shell game, this financial sleight-of-hand enabled the Refco Insiders to temporarily transfer massive amounts of uncollectible related-party receivables off of Refco's books by shifting them between wholly-owned Refco subsidiaries, RGHI, and several third-party Refco customers (or their affiliates) who agreed to serve, for a fee, as conduits in the deceptive RTLs.

77.    The RTLs were implemented at the end of each fiscal year starting in 1998 (and also, starting just before the LBO in 2004, at the end of fiscal quarters) to temporarily "pay-down" the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco. In order to further conceal the size of the RGHI Receivable, a number of RTLs were often employed, temporarily replacing the nearly $1 billion RGHI Receivable with a number of smaller third-party receivables.

78.    Thus, as set forth in the below diagram, at the end of every relevant reporting and audit period, a Refco entity (typically RCM) would extend a "loan" for an amount up to $720 million to a third-party with no apparent relation to Refco, Bennett or RGHI.  That third-party entity would then "loan" the same amount to RGHI (typically via a transfer to one of RGHI's accounts at Refco).  The RTL was completed when RGHI used the "loan" from the third-party to pay down the debt it owed to Refco (typically via a credit to one of RGHI's accounts at Refco).  Thus, on Refco's financial statements, the RGHI Receivable was transformed into a payable on a loan owed to Refco from an unrelated third-party.



79.     Right after the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process.  As set forth in the below diagram, the temporary pay-down of the RGHI Receivable was reversed, RGHI returned the funds it had "borrowed" from the RTL Defendants, and the RTL Defendants in turn paid back the money they had borrowed from Refco (keeping as a fee the spread between the interest charge on the "loan" made to RGHI by the RTL Defendant and the loan made to the RTL Defendant by Refco).  Once the transaction was unwound, the RGHI Receivable was restored to its full value.  This "unwinding" process, like the initial execution of each RTL, often occurred only on paper; with no actual transfer of funds occurring other than the payment of the fees to the RTL Defendants.



80.     For agreeing to participate in the RTLs and conceal the related-party nature of the RGHI Receivable, the RTL Defendants received payment of the "spread" between the interest rates of the two "loans."  The Refco Insiders generally caused RCM to make these payments to the third parties, even though RCM obtained no benefit from the RTLs.  In this manner, for example, Pigott received, either through direct personal payments or through payments to Liberty Corner, at least $1.1 million in interest charges as a reward for his participation in the RTL scheme.  The other RTL Defendants also received fees for their participation in the RTL shell game.

81.     In addition, for many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf, again despite the fact that the RTLs provided no benefit to RGL.  Thus, participants in the RTLs knew and/or consciously avoided knowing that the transactions involved risk-free, paper-only transfers of large round-dollar value amounts only days before the end of Refco's reporting or audit periods, and that these transfers would be unwound days after the start of the new reporting or audit periods.

82.     The Refco Insiders, with the active assistance of MB and the RTL Defendants, engaged in these RTLs at least 18 times from 2000 through 2005, always at the end of a financial reporting or audit period, and never at any other time (with one exception).  In addition, from 2000 through 2005 Refco engaged in approximately 12 additional wire transfer RTLs with, among others, longtime Refco customer -- and 10% RGL equity owner -- BAWAG.  These loans involved transfers of amounts from BAWAG to RGHI in late February, with those transactions being subsequently reversed in early March.

83.     In this manner, at the end of each relevant reporting or audit period, the corrupt Refco Insiders together with MB and the RTL Defendants caused Refco's financial statements to falsely suggest that the RGHI Receivable had been repaid or never existed. This process altogether concealed the magnitude and related-party nature of the RGHI Receivable at the end of each relevant reporting and audit period and thereby concealed Refco's trading losses, its true operating expenses and the fictitious nature of hundreds of millions of dollars in revenue.

84.    The RTLs facilitated by MB and the RTL Defendants included, at the least, the

following:

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/25/2000 | 03/09/2000 | CIM Ventures, Inc. | $150,000,000 |
| 02/25/2000 | 03/03/2000 | EMF Core Fund, Ltd. | $50,000,000 |
| 02/25/2000 | 03/03/2000 | CS Land Management, LLC | $110,000,000 |
| **2000 TOTAL** | | | **$310,000,000** |
| 02/23/2001 | 03/06/2001 | CIM Ventures, Inc. | $250,000,000 |
| 02/26/2001 | 03/02/2001 | Delta Flyer Fund, LLC | $200,000,000 |
| **2001 TOTAL** | | | **$450,000,000** |
| 02/25/2002 | 03/04/2002 | Liberty Corner Capital Strategies, LLC | $325,000,000 |
| 02/25/2002 | 03/04/2002 | Delta Flyer Fund, LLC | $175,000,000 |
| 02/25/2002 | 03/04/2002 | Beckenham Trading Company, Inc. | $125,000,000 |
| **2002 TOTAL** | | | **$625,000,000** |
| 02/21/2003 | 03/04/2003 | Liberty Corner Capital Strategies, LLC | $500,000,000 |
| 02/21/2003 | 03/04/2003 | Delta Flyer Fund, LLC | $150,000,000 |
| **2003 TOTAL** | | | **$650,000,000** |
| 02/20/2004 | 03/04/2004 | Liberty Corner Capital Strategies, LLC | $720,000,000 |
| 05/27/2004 | 06/07/2004 | Liberty Corner Capital Strategies, LLC | $700,000,000 |
| 08/25/2004 | 09/07/2004 | Liberty Corner Capital Strategies, LLC | $485,000,000 |
| 11/26/2004 | 12/03/2004 | Liberty Corner Capital Strategies, LLC | $545,000,000 |
| 12/30/2004 | 01/05/2005 | Liberty Corner Capital Strategies, LLC | $550,000,000 |
| **2004 TOTAL** | | | **$3,000,000,000** |
| 02/23/2005 | 03/08/2005 | Liberty Corner Capital Strategies, LLC | $345,000,000 |
| 05/25/2005 | 06/06/2005 | Liberty Corner Capital Strategies, LLC | $450,000,000 |
| 08/26/2005 | 09/06/2005 | Liberty Corner Capital Strategies, LLC | $420,000,000 |
| **2005 TOTAL** | | | **$1,215,000,000** |

85.    Of all the RTL Defendants, Liberty Corner, which was owned and managed by

Pigott, engaged in the largest number of RTLs.  In February 2002, Pigott arranged for Liberty

Corner's first RTL with Refco for $325 million.  Demonstrating Pigott's awareness that the RTLs

were improper, Pigott rejected using an active fund he managed that was engaged in treasury bill

arbitrage as the RTL conduit, and instead substituted Liberty Corner because Liberty Corner was a

personal management company that could be made to take any and all actions directed by Pigott.

86.    As set forth in the above chart, over the next three years, Pigott and Refco engaged in

nine additional RTLs, concealing hundreds of millions of dollars in related-company receivables

owed to Refco.  Liberty Corner, Pigott's alter ego (and at times Pigott directly, with no corporate

intermediary) received $1.1 million in "fees" for serving as the conduit in these RTLs.  Underscoring

that Pigott understood that the sole purpose of the RTLs was to fraudulently "dress up" Refco's

financial statements, Pigott had RGL guarantee each of the Liberty Corner RTL loans. These guarantees were signed solely by Bennett.

87.    Defendant EMF Financial (managed by Flanagan) was a hedge fund that used Refco as the prime broker for its funds. Like Liberty Corner, EMF Financial repeatedly authorized and arranged for its affiliates, defendant EMF Core Fund and defendant Delta Flyer, to engage in RTL transactions with Refco.

88.    The transactions Flanagan arranged through EMF Financial, and affiliated entities EMF Core Fund and Delta Flyer, concealed $575 million in related-party receivables over the course of Refco's fiscal year-end reporting periods in 2000, 2001, 2002, and 2003. Flanagan, like Pigott, was a sophisticated fund manager. As such, Flanagan (and by extension EMF Financial) would have known and understood that: (i) Refco's year-end reporting period ended February 28; (ii) no cash was moving as a result of these transactions (except for the payment to EMF Financial for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

89.    Indeed, in the wake of the Enron financial scandal, one RTL participant, defendant Ingram Micro, having previously served as a conduit in $400 million of RTLs in 2000 and 2001, opted to cease participating in the RTLs precisely because of concerns about their propriety. On the eve of entering into a February 2002 RTL, Ingram Micro sent an email to Maggio advising him that its participation with the planned third RTL was too risky because "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like [Ingram Micro]."

90.    Similarly, defendants Petitt (using Coast's subsidiary CS Land) and Krieger (who used his Beckenham Trading entity as his RTL conduit) were both sophisticated parties that used Refco as a prime broker. Thus, at the time of their RTL participation, both Petitt and Krieger knew and/or consciously avoided knowing (like Pigott and Flanagan) that: (i) Refco's year-end reporting period ended February 28; (ii) no cash was moving as a result of these transactions (except for the

payments to third parties for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

91.     The RTL Defendants thus directly and knowingly participated in and facilitated the RTLs set up by the Refco Insiders, knowingly helping these corporate insiders manipulate Refco's financial statements in a manner that concealed Refco's losses from innocent members of Refco's management.

92.     The RTL Defendants had existing business with Refco and/or a personal relationship with Bennett and each had an incentive to further their relationship with Bennett and Refco by agreeing to serve as conduits in the RTL transactions.

93.     The RGHI Receivable, RTLs, and other fraudulent actions alleged herein, were at all times unknown to certain Refco directors, officers, and agents, including Refco's inside counsel and others, who would have put a stop to the fraudulent activity had they been aware of it.

**Looting RCM's Assets**

94.     For the Refco Insiders' scheme to succeed, they had to make Refco appear to be fast-growing, highly profitable, and able to satisfy its substantial working capital needs without having to borrow money.  This was a tall order for a company that was, in reality, owed hundreds of millions of dollars from a related party (based upon substantial trading losses and improperly allocated operating expenses).  In order to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available funds," the Refco Insiders needed cash.  As Refco itself stated, "[r]eady access to cash is essential to our business."

95.     Instead of owning up to Refco's true financial condition and borrowing the money they needed as part of an overall restructuring of Refco's operations, the Refco Insiders stole it from RCM and its customers.  The Refco Insiders simply took the money and property entrusted to RCM by its customers and sent the funds to other Refco entities.  None of these entities provided RCM with assurances of their ability, intent, or obligation to repay those assets; none provided RCM with

security or collateral for the diverted assets; and none had the financial wherewithal to repay RCM on demand or otherwise.

96.    On a daily basis, assets in the accounts of RCM customers were transferred out of RCM for use by other Refco entities. The Refco Insiders caused RCM to keep as little cash as possible on hand. In fact, even though RCM purported to hold billions of dollars of customer cash and securities entrusted to it at all relevant times, RCM in fact maintained only about $50 million in cash and those securities it did not need to fund the current operations of RGL and its affiliates.

97.    Without the knowledge, authorization, or consent of RCM's innocent directors and officers or its customers, the money would then generally be transferred by RCM to RCC, in a series of undocumented intercompany "loans." RCC, functioning as a "disbursing" agent, would then distribute the looted property wherever it was needed in the Refco organization.

98.    The diverted RCM assets were used for a wide variety of general and specific funding purposes by various Refco affiliates who would not have been able to sustain their reported financial health and operations without using funds stolen from RCM.

99.    These transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other Refco entities, often occurred without any "loan" documentation between RCM and the Refco entities that received the funds. The purported "loans" of RCM funds to other Refco entities for purposes unrelated to the business of RCM and without benefit to RCM were not arm's length transactions, reflecting blatant and undisclosed conflicts of interest by the Refco Insiders, and were made:

(a)    without compensation, security or collateral;

(b)    without assurances that the funds would or could be repaid on demand or at all by the Refco entities that received them;

(c)    without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

(d)      to other Refco entities that in fact lacked both the intention and the financial wherewithal to repay the diverted RCM assets on demand or at all;

(e)      for the purpose of maintaining the perception of Refco's financial strength and health so that the Refco Insiders could personally benefit from a lucrative cashing out of their interests in Refco.

100.     Because Refco's overall financial health and strength depended on a constant influx of RCM assets, the Refco Insiders kept careful track of the intercompany transactions and of the customer funds that were available for diversion at RCM at any given time.  Those who were directed by the Refco Insiders to divert RCM's assets created daily "cash flow" statements setting forth the amount of customer assets available at RCM for diversion.  The reports were circulated to Bennett, Maggio, and Trosten**.**

101.     The outside Director and outside alternative Director of RCM, Anthony Whaley ("Whaley") and Charles Collis ("Collis") (collectively the "RCM Outside Directors") were, and are, partners in the Bermuda law offices of Conyers Dill & Pearman.  The RCM Outside Directors were at all times unaware of the form, substance, and magnitude of the intercompany transfers from RCM to the other Refco entities.  The RCM Outside Directors were unaware that RCM customer assets were diverted daily without any loan documents or collateral or security to other Refco entities that had little, if any, ability, or intention of repaying the diverted assets.  If either Whaley or Collis had learned of the fraudulent nature of the diversion of RCM's assets in daily undocumented and uncollateralized intercompany transactions to other uncreditworthy Refco entities, they would have taken steps to stop the misappropriation.

102.     At the time of the LBO, RCM was owed approximately $2 billion by Refco affiliates that were never required to post security or collateral for the RCM funds they received and had no intention or ability to repay RCM.  As of October 2005, this number had climbed to over $2 billion.

103.     Without continued, fresh infusions of RCM customer assets, RGL and its affiliates would not have been able to maintain the illusion of financial strength that made them candidates for the LBO and the Refco Insiders would not have been able to cash-out their interests in Refco.

31

104.    The fraudulent scheme perpetrated on the RCM customers was so fundamental to the operation and financing of Refco that it had to have been apparent to each of the Professional Defendants. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible RCM transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

105.    Indeed, when disclosures in October 2005 relating to the fraud prompted RCM customers to lose confidence in Refco and RCM and to begin to withdraw their securities and funds from RCM, the immediate response by Refco was to impose a moratorium on all activities of RCM, including withdrawals from customer accounts. Without the continued availability of RCM customer assets, Refco collapsed, filing for bankruptcy just days later.

### Part Three: The Cash-Out

### The 2004 LBO

106.    The purpose of the entire scheme was to allow the Refco Insiders to sell their interests in Refco at a fraudulently inflated price. Indeed, in the years before the LBO, the Refco Insiders made a number of attempts at partial or complete sale of their interests in Refco with the assistance of various defendants:

- At the end of 1998, with MB's assistance, Bennett, Maggio, and Grant sold a 10% ownership interest in RGL to a subsidiary of longtime Refco customer BAWAG for $95 million and received an additional $85 million for granting BAWAG an option to purchase an additional 10% interest in the company.

- In 2001 and 2002, the Refco Insiders, with E&Y's assistance, explored the possibility of selling substantial portions, and perhaps all, of Refco to BAWAG or to third parties in ways that maximized the tax benefits of any such sale.

- In 2001 and 2002, the Refco Insiders hired Credit Suisse to try to find a major investment bank or commercial bank to purchase Refco outright. Credit Suisse was unable to identify a suitable purchaser.

107.    Through these and other attempted transactions, each of Refco's professional advisers became well aware that the Refco Insiders intended to line their pockets by selling their interests in Refco.

108.    As the Court-appointed Examiner observed, GT "was aware as early as 1998 of Bennett's plan to sell," when Bennett informed GT that he "intended to restructure Refco over the next 3-10 years" and "to increase earnings and maintain RGL's book value," because he and others working with him wanted "to liquidate their positions."

109.    The Examiner concluded that "E&Y understood since before . . . January 1, 1997 that the goal of Refco's owners was to sell the entire [company]."  In mid-2001, Refco Insiders specifically asked E&Y to develop a "tax free" way of selling all or part of Refco.  Although the Refco Insiders seriously considered an outright sale of a portion of Refco to BAWAG in 2001-2002, a satisfactory structure that addressed the various tax considerations raised by E&Y could not be developed and an outright sale to BAWAG was abandoned in 2002.  While no outright sale of a portion of Refco to BAWAG was realized in 2002, BAWAG entered into or contemplated entering into a "proceeds participation" agreement prepared by MB, pursuant to which a BAWAG affiliate ("DFI") made three payments to RGL in exchange for the right to participate in the proceeds of a future sale of RGL.

110.    The Examiner also observed that "no later than February 6, 2002," and possibly long before that, "[MB] knew that the ultimate goal of . . . Bennett and other [Refco employees] . . . was to sell RGL."

111.    Similarly, Credit Suisse knew no later than 2001 that Bennett and the other Refco Insiders wished to cash-out their interests in Refco.  Stymied in his effort to effect a partial sale of Refco, in June 2003, Bennett hired Credit Suisse as Refco's exclusive financial advisor to assist in, among other things, selling Refco.  Bennett asked Credit Suisse to find a major investment or commercial bank to purchase Refco, but Credit Suisse was unable to identify a satisfactory purchaser.  After efforts to sell Refco outright failed, Credit Suisse devised other ways through which the Refco Insiders could sell all or a portion of Refco.

112.    In November 2003, Bennett and others at Refco began negotiations with Thomas H. Lee Partners ("THL"), a private equity firm headquartered in Boston, Massachusetts, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.

113.    The LBO was ultimately carried out on August 5, 2004, and was structured as follows:  THL, through its affiliates, purchased 57% ownership interest in Refco for approximately $507 million; Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.  As a result of the lucrative LBO, Bennett and others acting in active concert or participation with him received $106 million, with at least $25 million going to Bennett personally. In addition, hundreds of millions of dollars were transferred to RGHI in connection with the LBO.

114.    Although THL became aware of certain red flags in its pre-LBO due diligence, any concerns about the financial condition of Refco prior to and in entering into the LBO were allayed by the Refco Insiders.  Leading up to the LBO, the Refco Insiders and the Professional Defendants continued to generate misleading financial statements and to conceal the ballooning RGHI Receivable through the RTL scheme.

115.    In the due diligence process, Bennett and other Refco Insiders made false statements to THL.  By way of example, in connection with the LBO, Bennett executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000, and (b) he had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior 12 months Bennett owned a substantial interest in RGHI, which had engaged in RTLs worth over $1.5 billion and which owed Refco approximately $1 billion as of late February 2004.

116.    Additionally, before the LBO, Bennett falsely represented to THL that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the LBO.  The purported profits Bennett was referring to were, in fact, $110 million of RCM customer funds and the proceeds of a $390 million loan from BAWAG that Bennett  placed into a BAWAG account.  None of these monies were "retained profits" and none were "distributed" as a dividend to shareholders.

117.    Before the LBO was completed, Bennett and other Refco Insiders also sought to conceal the RGHI Receivable and the RTLs from THL.

118.    Had THL learned the substance and scope of (a) the RGHI Receivable, (b) the RTLs, and (c) the resulting house of cards Refco relied upon, THL would not have gone ahead with the LBO, and the failure of the LBO transaction would have prevented RGL and its domestic subsidiaries from assuming $1.4 billion in new debt obligations.

**The LBO Destroyed RGL and RCM's Asset Value**

119.    There was a price to be paid for the Refco Insiders' misconduct leading up to the LBO, and that price, ultimately, was paid by RGL and RCM.  By the time of the LBO, the trading losses and operational expenses that had been pushed onto RGHI's books and hidden through the RTLs had grown to over $700 million and the diversion of RCM property had grown to approximately $2 billion.

120.    Immediately before the LBO, the Refco Insiders were still causing Refco to record hundreds of millions of dollars in trading losses and misallocated expenses as a receivable owed to it by RGHI.  The Refco Insiders were also still boosting Refco's revenues with hundreds of millions of dollars in fictitious interest on the RGHI Receivable and were using billions of dollars in diverted RCM assets to fund Refco's operations, making RCM the biggest creditor of RGL and its affiliates before the LBO.

121.    Even though this was well known to the Refco Insiders and certain of the sophisticated legal and financial advisors and auditors involved in the LBO, RGHI and the Refco Insiders caused RGL (together with all of its domestic subsidiaries, including RCC) to borrow $1.4 billion of bank and bond debt to fund THL's buyout of RGHI's control of Refco.  The LBO proceeds were not used to retire the full amount of the RGHI Receivable, pay the operating expenses that had been concealed on RGHI's books, or repay <u>any</u> of the loans owed to RCM.  Instead, Refco was induced to use the proceeds of its new debt to cash-out the Refco Insiders.

122.    Refco's auditors and legal advisors each played key roles in addressing and allaying THL's concerns in connection with entering into the LBO, and concealing from Refco's innocent directors, officers and agents, including inside counsel and others, and the RCM Outside Directors,

how severely both RGL and RCM would be damaged by the LBO. Nowhere in the Offering Circular was RGL's use of RCM's assets disclosed; nor was the RGHI Receivable.

123.    To divert attention from RCM's role as a primary funder of Refco's operations, RCM was not made a guarantor of the debt issued in connection with the LBO and reference to RCM was glaringly absent in the Offering Circular for the LBO bonds. Nowhere did the Offering Circular explain: (i) that RCM customer assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; (iii) that Refco's business plan did not provide for repayment of these receivables; and (iv) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard for the interests of RCM.

124.    Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." Similarly, the Offering Circular stated elsewhere that "[t]he effect of this subordination is that, in the event of a bankruptcy . . . , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid." These and similar statements describe how the LBO should have been structured -- consistent with the duties the directors of RGL had to RGL, RCM and RCM's customers -- *i.e.*, ensuring that any obligations incurred by any Refco affiliate in connection with the new LBO debt would not be satisfied until after all of RCM's intercompany IOUs were. This is not, however, how the LBO was structured. In fact, as set forth below, the LBO debt was laid in on top of RCM's IOUs, rendering them worthless and, despite the Offering Circular's representations to the contrary, severely damaging RCM.

125.    The Professional Defendants working on the LBO each knew and/or consciously avoided knowing that the magnitude and significance of the Refco entities' obligations to RCM. Each of these defendants would have reviewed, helped prepare, or been aware of the following

information set forth in the "payable to customers" line of the condensed consolidating balance sheet to Note O of the financial statements attached to the LBO Offering Circular, which is labeled Condensed Consolidating Financial Information:

| Condensed consolidating balance sheet | | | | | |
|---|---|---|---|---|---|
| | **February 29, 2004** | | | | |
| | Parent **[RGL]** | Guarantor Subsidiaries **[Includes RCC]** | Non-Guarantor Subsidiaries **[Includes RCM and RGF]** | Consolidation Adjustments | Consolidation Totals |
| Liabilities (in thousands) Payable to customers | $465,681 | $1,556,529 | $6,647,453 | ($3,573,946) | $5,095,717 |

126.    By performing professional services for the Company and/or performing detailed due diligence of the Company in connection with the LBO, each of these Professional Defendants were deeply familiar with Refco's corporate structure and its operations.  While an outsider would have been unable to discern from the condensed consolidating information the full extent to which RCM funds had been siphoned off to RGL and its other affiliates, these Professional Defendants understood, at least, the following:

(a)    that in order to obfuscate Refco's financial statements and conceal their fraudulent scheme, the Refco Insiders misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";

(b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," these Professional Defendants knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a parent holding company with no trading operations and no "customers";

(c)    RCC, the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did

not have any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and

(d)    that only RCM had the volume of unsegregated customer assets necessary to fund billions of dollars in intercompany loans.

127.    Furthermore, as these Professional Defendants knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion through a non-Guarantor Subsidiary, Refco Global Finance, Ltd. ("RGF").  Thus, these Professional Defendants knew and/or consciously avoided knowing that the $3.573 billion in consolidation adjustments were the result of eliminating the approximately $465,681,000 of RGL's intercompany debt owed to RCM, the approximately $1.556 billion of RGF's intercompany debt owed to RCM, and the approximately $1.556 billion of RCC's intercompany debt owed to RGF, and that RCM was thus owed $2 billion ($465 million owed from RGL and $1.556 billion owed from RCC, which when booked in a back-to-back fashion through RGF, added another $1.556 billion to the consolidation adjustment).

128.    Given their due diligence, detailed in-depth understanding of Refco's financial structure and operations, and access to and preparation of the type of condensed consolidating financial information set forth in Note O, each of the Professional Defendants who assisted and advised the Company in connection with the LBO was fully aware of the massive $2 billion payable owed by RGL and its affiliates to RCM.

129.    These Professional Defendants further understood that none of this debt would be repaid as a result of the LBO, which took $1.4 billion in loan proceeds and used them instead to cash-out the Refco Insiders' interests in Refco.

130.    The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, so as to put cash in the Refco Insiders' pockets, leaving RGL and RCM without any assets to satisfy their outstanding obligations to their creditors.

131.    Furthermore, as these Professional Defendants knew and/or consciously avoided knowing, this LBO was atypical because RGL went into the LBO with hundreds of millions of

dollars of concealed trading losses, misallocated operating expenses, phantom revenues, and unpaid billions owing to RCM, whose assets had been used to fund Refco's entire operations.

132.    Given Refco's true financial condition -- and the devastating impact the concealed trading losses and hidden operational expenses would ultimately have on its business if properly recorded and disclosed in its financial statements -- the LBO irreparably undermined Refco's already precarious financial condition.  By saddling RGL with $1.4 billion in secured and senior debt that Refco's operations could not service, and by continuing their plan and siphoning out all of RGL's assets, the Refco Insiders sealed Refco's fate and undermined RCM's ability to collect on its approximately $2 billion of IOUs from its Refco affiliates.

133.    RCM's ability to collect on its IOUs was further undermined when Refco's IPO proceeds were, as in the LBO, principally used to line the pockets of the Refco Insiders and the Investment Banker Defendants, leaving approximately $2 billion in RCM IOUs unpaid.

**The IPO Further Damages Refco**

134.    Less than one year after the LBO, the Refco Insiders and THL led Refco through an initial public offering of its stock.  In the IPO, Bennett sold approximately 7 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $146 million.  THL and its affiliates and co-investors sold approximately 10 million shares of Refco common stock, with a total sale price of approximately $223 million.

135.    A "greenshoe" option was also exercised whereby the Investment Banker Defendants agreed to purchase approximately 4 million shares of Refco common stock for over $80 million. The proceeds from the overallotment sale were used to pay an aggregate dividend to Refco's pre-IPO shareholders.

136.    As evidenced by this dividend, the IPO was structured with the principal goal of allowing the Refco Insiders to cash-out, as opposed to raising funds for Refco to reduce the enormous debt Refco had been saddled with in the LBO.  Furthermore, as RGL was insolvent or operating in the zone of insolvency no later than the LBO, the $231 million in proceeds from the IPO that Refco Inc. used to retire part of RGL's LBO debt was entirely wasted; Refco was induced to

spend over $200 million dollars on RGL -- an insolvent subsidiary that was going to file for bankruptcy merely weeks later.

137.     As a result of the IPO, Refco was saddled with hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus.  Through the IPO, Refco was again saddled with liabilities it could not satisfy -- this time the liability to pay back investors who had purchased Refco stock.

138.     The Professional Defendants who advised the company in connection with the IPO knew and/or consciously avoided knowing that Refco was in no state to undertake an IPO.

139.     Indeed, the most blatant indication that GT, MB, and PwC understood that the Refco Insiders were attempting to hide hundreds of millions of dollars in undisclosed related-party receivables was the conscious editing of SEC disclosure documents to conceal the RGHI Receivable.

140.     Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO.  In early drafts of the S-4 registration statement, which were reviewed and commented on by GT, MB, and PwC and subsequently submitted to the SEC for comment, the S-4 disclosed a $105 million receivable owed from RGHI to Refco, which was characterized as a "customer receivable."  As this was a related-party receivable owed to Refco from RGHI, the SEC questioned characterizing "amounts due from equity members (RGHI) as receivable from customers."  Given the SEC's comment, GT, MB, and PwC were forced to amend subsequent drafts of the S-4 registration statement to reflect that the receivables were due from "equity members."  The final S-4 filed with the SEC on October 12, 2004 reflected that the receivable was owed by "equity members" and not customers.

141.     The Investment Banker Defendants also reviewed and commented on the S-4 registration statement and the SEC's comments on the S-4 registration statement.

142.     The Professional Defendants involved in the LBO thus substantially assisted the Refco Insiders in trying to deceive the SEC and the investing public about the RGHI Receivable. Furthermore, those that were aware of the full massive size of the RGHI Receivable and/or that

RTLs were used to reduce the RGHI Receivable at the end of reporting periods, such as MB, GT, and PwC also knew and/or consciously avoided knowing that the actual amount due from "equity members" was well above $105 million and that the S-4 was therefore still materially false.

143.    Despite being aware of these related-party receivables, none of the Professional Defendants disclosed the RGHI Receivable in the S-1 registration statement that had to be prepared and filed with the SEC in connection with Refco's IPO.

144.    The S-1 was reviewed by and prepared in consultation with GT, MB, PwC, and the Investment Banker Defendants.    While early drafts of the S-1 included the $105 million intercompany receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable despite the fact that none of the Professional Defendants received, or sought, any confirmation that even the limited $105 million portion receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other related-party receivables owed by RGHI to Refco.

145.    The final S-1, reviewed by GT, MB, PwC, and the Investment Banker Defendants, that was signed by Bennett and publicly filed with the SEC on August 8, 2005, thus failed to disclose: (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down RGHI's debt to Refco at year-end and quarter-end financial reporting periods.    Nevertheless, the IPO went forward on August 10, 2005.

146.    In hopes of concealing the fraud and maintaining the illusion of Refco's financial health for as long as possible, in late August 2005, after the IPO was completed, Bennett, with the active participation and assistance of MB, caused Refco to carry out yet another $420 million RTL with Liberty Corner to, once again, cover up the existence of the RGHI Receivable.

147.    Approximately two months after consummation of the IPO, on October 10, 2005, the entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI.    Refco demanded repayment of the debt by Bennett,

who tried unsuccessfully to cover up the fraud by instantly paying down the RGHI Receivable with the proceeds of an emergency loan from BAWAG.

148.    In a press release issued that same day, Refco announced that it had discovered a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction. As a result, Refco announced that "its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

149.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization. Refco's stock was delisted by the New York Stock Exchange, and the Company -- along with its subsidiaries represented in this action -- were forced into bankruptcy.

### The Defendants' Knowledge of and Substantial Assistance in the Fraud

150.    The Refco Insiders could never have carried out their fraudulent scheme without the knowing, active, and willing participation of a host of supporters and professional advisors. Each of the defendants played important roles in the Refco Insiders' fraud.

### GT's Role in the Fraudulent Scheme

151.    GT was aware of the activities alleged herein. By its actions, as alleged herein, GT actively participated and substantially assisted the Refco Insiders and others acting in active concert or participation with them in carrying out the fraud, breach of fiduciary duties, and gross malpractice alleged herein.

152.    After it took over the Refco engagement from AA in 2002, GT provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005. GT served as the purportedly independent auditor of RGL and its affiliates, not just on a consolidated basis, but also audited

subsidiaries, such as RCM, on a stand-alone basis. As GT knew, the financial statements it audited were included in Refco's various registration statements filed in connection with the LBO and IPO.

153.    Refco's financial statements were audited by GT on a consolidated basis under RGL's name. The financial information of RGHI -- RGL's parent company "shell" -- was not consolidated with Refco. As a result, as GT knew, the ballooning RGHI Receivable was hidden from the public in order to preserve Refco's reputation in the marketplace and to conceal the millions of dollars that Refco was owed by a related-party entity owned by Bennett and Grant.

154.    GT's longstanding relationship with Refco through Mark Ramler ("Ramler") (the former AA partner who took Refco's business to GT in the wake of the Enron scandal) gave it a complete picture of the finances, operations, and business of RCM, RGHI, and the rest of Refco. Given GT's exposure to a range of Refco's subsidiary businesses, it had access to all material information. As Refco's auditor, GT also had a complete picture of Refco's third-party transactions, including its related-party transactions with RGHI. Further, GT knew and/or consciously avoided knowing from its review and audit of Refco's financial statements that Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf. GT thus had access to all material information regarding the RTLs and the fraudulent scheme to hide the RGHI Receivable from Refco's books. Given its intimate familiarity with Refco's finances, GT thus knew and/or consciously avoided knowing the details of the fraud described herein and substantially assisted the Refco Insiders in perpetrating the fraud that inflicted billions of dollars in damages on RCM and RGL.

155.    GT substantially assisted the fraud, thereby allowing the fraud to continue and advancing the objectives of the fraud, by, among other things: ignoring red flags that alerted GT to the existence of accounting fraud; knowingly issuing unqualified opinions on Refco's consolidated financial statements for each of fiscal years 2003, 2004, and 2005 that materially misrepresented Refco's financial condition; opining separately on the financial statements of RCM; and continuing to act as Refco's auditor despite its knowledge of a fraud.

156.    GT also substantially assisted the Refco Insiders by issuing an unqualified opinion in connection with its re-audit of Refco's 2002 financial statements in the Fall of 2004 in connection with the LBO. As GT knew, it was a closing condition to the LBO that Refco's financial statements be compliant with SEC Regulation S-X for fiscal years 2002 through 2004. Nonetheless, in re-auditing Refco's 2002 financial statements, which had not been compliant with Regulation S-X, GT again chose to consciously avoid knowledge of the Refco Insiders' fraud.

157.    As GT knew, clean audit opinions were essential to Refco's continued functioning. Had GT ever failed to issue a clean audit opinion for Refco in general or for RCM in particular, the entire fraudulent scheme would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005 notwithstanding GT's efforts to assist the Refco Insiders and others acting in active concert or participation with them to hide the true facts.

158.    This is not a case of an auditor overlooking a few details. GT completely abandoned its obligations of independence, learned first-hand of the fraud, and then aided and abetted that fraud by continuing to provide clean audit opinions in the face of grotesque accounting manipulations. GT was aware of and/or consciously avoided knowledge of all aspects of the Refco Insider's scheme to prop up Refco long enough to cash-out their interests, from the fraudulent RTLs designed to hide Refco's losses to the theft of RCM customer funds.

**Knowledge of Refco's Trading Losses and Balance Sheet Problems**

159.    GT was well aware of the RGHI Receivable.

160.    Before 2002, AA served as Refco's supposedly independent auditor. In fact, the lead partner on the engagement, Ramler, had abandoned any pretense of independence and objectivity. While at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his input. Ramler also bragged that Bennett and other senior Refco management called him on an almost daily basis to discuss transactions and business issues.

161.    After AA collapsed under the weight of the Enron debacle, Ramler moved to GT, taking the Refco engagement with him. Refco was a marquee client for GT, was Ramler's ticket to partnership at GT, and stood to be an even better client for GT if, as GT anticipated, Refco went public. During the course of the Refco engagement, GT earned over $9 million in fees. With Ramler heading the engagement, GT continued AA's practice of turning a blind eye to billions of dollars of questionable accounting transactions in Refco's consolidated financial statements.

162.    Based on his long experience with Refco, when Ramler joined GT, he brought with him knowledge of the following facts:

- As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next 3 to 10 years.

- Refco's internal accounting controls were deficient, and readily capable of being overridden by Refco's management.

- As of February 28, 2002, RGHI was a shell entity with no operations that owed RGL approximately $170 million, and whose financial results were not included in RGL's consolidated financial statements.

- Refco was engaging in substantial and complex related-party transactions with RGHI and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

- Bennett had promised AA that the RGHI Receivable would no longer increase, would be paid down, and that $35 million of the receivable would be paid off in fiscal year 2003.

- In 2001 Bennett improperly recorded a $43 million arbitration award against Refco LLC, over the CFTC's objections, and ultimately transferred the expense to RGHI's books.

163.    GT was thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable, which was not reflected in RGL's consolidated financial statements, was a viable tool for accomplishing such manipulation. GT was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards of the need to apply far more scrutiny to related-party transactions than to ordinary arm's length transactions, when conducting an audit. Accordingly, GT internally categorized Refco as a "high-risk" client in part because it engaged in significant and complex related-party transactions,

45

lacked an internal audit function, and was dominated by a limited number of senior executives and managers who had an interest in maximizing Refco's apparent financial condition and operating results.

164.    Nevertheless, GT utterly failed to properly audit Refco's related-party transactions. As a result, even though GT knew and/or consciously avoided knowledge that the RGHI Receivable was used to fraudulently inflate Refco's operating results and learned of the RTLs which served to hide the RGHI Receivable, it continued to issue clean audit opinions for Refco.

165.    For example, in connection with the 2003 audit, on April 28, 2003, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down the receivable due from RGHI.  In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of the receivable, then totaling $105 million, by at least $35 million per year, resulting in full payment by February 28, 2006.  GT made no effort to determine whether those payments actually were made -- and indeed, they were not.  Nor did GT perform any testing to verify the accuracy of the $105 million figure (which was false) or whether RGHI and/or its shareholders had the financial wherewithal to repay the amount.  During its 2004 and 2005 audits, GT likewise failed to obtain sufficient evidence to provide any reasonable assurance that related-party transactions were properly reflected in the financial statements.

166.    GT's work papers from the 2003 audit demonstrate that GT contemplated steps to scrutinize related-party transactions, but simply chose not to implement any of them.  For example, in conducting its audit of RCC in 2003, GT told Refco that it needed to see certain loan receivables to RCC on the books of the affiliate owing the money.  When making this inquiry, GT specifically requested the information about a loan from RCC to RGHI purporting to have a balance of approximately $71 million, including documents to verify the existence and terms of the loan and ensure that RGHI was actually making payments that were received by RCC and reflected in its bank statements.  In violation of GT's own practices, as well as Generally Accepted Auditing Standards ("GAAS"), GT never carried out any of these procedures.  Had GT done so, GT would have quickly exposed the fraud.

167.    Furthermore, despite the high degree of risk GT knew was connected with related-party transactions at Refco, GT deliberately chose not to take the simple and obvious step of examining the customer statement for the RGHI account at RCC for the months of February and March 2003.  Had GT done so, it would have seen the following:

- Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI owed Refco over $600 million.

- On February 21, 2003, RGHI's account at RCC received $308.5 million from a transaction described in the account statement as "TRANSFER FUNDS," reducing the amount that RGHI owed RCC.

- On February 25, 2003, RGHI received two credits for an aggregate of $250 million from a wire transfer from a bank in New York.

- By March 4, 2003 (*i.e.*, just 4 days after Refco's fiscal year-end), the above entries were reversed, and the amount RGHI owed to RCC ballooned from $71.8 million on February 28, 2003, back up to over $600 million.

168.    Moreover, the 2003 disclosed portion of the receivable balance from RGHI's account at RCC of over $70 million represented an approximately $30 million increase over the prior year. Although GT inquired as to the reason for the increase, it took at face value the explanation from Refco that the $30 million represented "additional loans" and never questioned why, during a time when Bennett had promised that RGHI would pay down the RGHI Receivable, Refco was extending further credit to RGHI.

169.    GT's audit plan for 2003 also called for GT to review loan documents concerning the receivable balance in RGHI's account at RCC and to perform an assessment of the interest income represented by Refco to have accrued on this balance.  GT failed to perform either procedure.  The substantial accrued interest income associated with the RGHI Receivable would have indicated to GT that the receivable had to be massive and far greater than the $105 million falsely disclosed by Bennett.

170.    In fact, after the 2003 audit GT failed to perform any procedures whatsoever to test the RGHI Receivable at RCC.  One glaring omission in GT's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates."  This document, which GT had obtained and reviewed as part of every Refco audit from 1996 to 2003,

47

detailed Refco's related-party receivables. GT failed to require Refco to provide it with this critical document for the 2004 and 2005 audits and did nothing to investigate this change in documentation, even though the customer statements for RGHI's account at RCC during the 2004 and 2005 audits made clear that RGHI still had a massive debt balance in favor of RCC. GT intentionally turned a blind eye to this issue.

171.    Similarly, GT failed to properly examine the RGHI balances at RCM. Though Ramler knew that in the past RGHI owed substantial sums of money to Refco through an account at RCM, GT failed to perform even the simplest procedure to ensure that this related-party account was being properly recorded in Refco's books. Had GT looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year-end), GT would have seen the following:

- The debit balance in the account as of February 1, 2003, was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003, of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar manipulations of RGHI's account at RCM.

172.    GT's failure to examine the customer account statements of the related-party RGHI was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it can only be evidence of a willful blindness -- an intentional effort to avoid exposing evidence of the accounting fraud at Refco.

**The RTL Transactions**

173.    During its audits of Refco, GT not only knew of, consciously avoided knowledge of, and failed to properly audit the RGHI Receivable, but it also came face-to-face with the RTLs themselves. Again, GT deliberately ignored numerous red flags indicating that these RTLs were part and parcel of the accounting fraud being perpetrated by the Refco Insiders and those acting in active concert or participation with them.

174.    The RTLs with Refco customers during the periods audited by GT were accomplished by RCM falsely recording a loan as a "reverse repo" or "time deposit" in the RTL

Defendant's customer account. A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and "time deposit" is a loan extended to a customer for purposes of trading. Both "reverse repos" and "time deposits" require the use of collateral, and because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks and warrant heightened scrutiny by auditors. Professional audit standards advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, and not merely their amount.

175.    GT ignored these standards and deliberately failed to inquire into the obviously suspicious circumstances of these transactions and subjected them to little or no scrutiny at all. As noted, the RTLs were not actually "reverse repos" or "time deposits." The RTLs lacked the hallmark of both transactions -- collateral. Nor did the RTL Defendants' total capital provide Refco with adequate security for these substantial advances. Nevertheless, GT accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

176.    For example, during its audit of RCM for 2003, GT noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two of the RTL Defendants (Liberty Corner and Delta Flyer) totaling $650 million. The transactions were timed to span and be unwound at Refco's fiscal year-end. On April 16, 2003, GT sent simple confirmation requests to these two RTL Defendants, which were signed and returned to GT. Although GT performed additional balance sheet testing on other RCM customer accounts for 2003, GT did not conduct additional credit risk testing on these RTL Defendants' accounts and GT did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Defendants' total capital.

177.    In the 2004 audit, GT noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner. As in 2003, GT sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did. This year, however, GT took the additional step of reviewing the potential credit risk from the transaction. GT noted that the entire amount of Liberty

Corner's debit balance -- $720 million -- was at risk, meaning that no collateral secured it. However, GT did not identify the account as a credit risk, and ignored the fact that a real "reverse repo" transaction should be secured by collateral.

178.    As these examples illustrate, in every review and every audit that it conducted of Refco, GT received information that RCM was engaging in large, period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Defendants.  In each case, GT understood that the transactions were in fact unsecured loans of hundreds of millions of dollars made to entities without the financial wherewithal to repay the loan, rather than collateralized "reverse repo" transactions.  Yet in each case, GT declined to investigate further based on information -- often merely a representation from management -- that the unsecured balance had been repaid.  Moreover, despite being engaged for years as Refco's auditors, GT never alerted Refco's directors and officers or anyone else to the pattern and never questioned why Refco entered into these uncollateralized transactions at the end of each and every relevant reporting and audit period.  Nor did GT ever question why Refco was characterizing these transactions as "reverse repos" or "time deposits" when they were not collateralized.

179.    Further evidence that GT understood that the RTLs were being used to hide the RGHI Receivable comes from Ramler himself.  In Ramler's own handwritten notes, Ramler writes the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL Defendants).  Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts."  During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts.  This is a connection Ramler would not have made unless he, and thus GT, had actual knowledge of the fraud.

180.    Records of internal communications within GT's management show that GT understood that Refco was not an appropriate candidate for an IPO and that GT could be subject to liability for its conduct with respect to Refco.  In late December 2004, Ramler had a conversation

with a member of GT's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO. The note states, in part: "Atty called – also this AM – Refco makes Firm uncomfortable . . . issue is sig. def. . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to demonstrate GT's concerns about Refco and the upcoming IPO: "They are moving very fast – too fast for comfort . . . what to do – we would be sued."

181.    Indeed, GT knew and/or consciously avoided knowing that Refco was misappropriating RCM customer assets and using them for other Refco purposes. GT also knew and/or consciously avoided knowledge that Refco was engaging in the RTL scheme in order to hide the fact that Refco was suffering massive losses due to uncollectible receivables, and that RGL was being saddled with guarantees for the RTLs. In sum, GT knew and/or consciously avoided knowledge that Bennett and the other Refco Insiders were fraudulently "dressing up" Refco using these schemes in order to cash-out their own Refco interests. GT was a sophisticated audit and accounting firm that, when faced with knowledge of this fraudulent scheme, chose to look the other way -- apparently to keep a marquee customer happy. GT not only violated the governing standards of GAAS, it substantially assisted and participated in a scheme that ultimately cost RCM and RGL hundreds of millions, if not billions, of dollars in losses. GT is liable for the damages that were incurred as a result of its malfeasance.

182.    In auditing Refco financial statements, GT came to learn of the RGHI Receivable, knew that it was dealing with related companies with which it had to maintain its professional auditing skepticism and saw numerous red flags alerting it to the existence of the RTLs. As the Examiner concluded, GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud," and yet it "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

**Maintaining the Fraudulent Business Model**

183.    Each year, GT issued, among other things, unqualified audit opinions claiming that, after applying GAAS, the financial statements of RCM fairly presented RCM's financial condition in accordance with Generally Accepted Accounting Principles ("GAAP").  In addition, GT consented to the incorporation of its audit opinion in RCM's financial statements. (GT's audit opinions were, as a matter of course, included in RGL's financial statements, which represented the financial statements for the whole of Refco, but excluded RGHI.)

184.    The RCM financial statements for each of years 2003, 2004, and 2005 were false and misleading and failed to state material facts necessary to make the statements contained therein not misleading.  In particular, the RCM financial statements were false because they failed to disclose that the "loans" that RCM had made to other Refco affiliates were uncollectible and  should have been written off -- a fact which would have shown RCM's net income, net assets, and stockholders equity were negative.

185.    For example, RCM's 2003 financial statements failed to recognize losses with respect to approximately $275 million in uncollectible obligations which the financial statements falsely characterized as "receivable from customers."  In fact, as GT was aware, these were simply RCM customer-entrusted assets, which had been improperly diverted to other uncreditworthy Refco entities, and were not properly characterized as "receivable from customers."  Moreover, had GT properly audited the 2003 financial statements, it would have recognized the need to write off an additional approximately $650 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2003 fiscal reporting period.

186.    The 2004 RCM financial statements similarly failed to recognize losses with respect to approximately $1 billion in uncollectible related party obligations which the financial statements falsely characterized as "receivable from customers."  Again, as GT was aware, these were simply RCM customer-entrusted assets which had been improperly diverted to other uncreditworthy Refco entities, were not properly characterized as "receivable from customers." Moreover, had GT properly audited the 2004 financial statements, it would have recognized the need to write off an additional

approximately $720 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2004 fiscal reporting period.

187.    The 2005 RCM financial statements failed to recognize losses with respect to approximately $2 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers."  As GT was aware, these were simply RCM customer-entrusted assets which had been improperly diverted to other uncreditworthy Refco entities, were not properly characterized as "receivable from customers." Moreover, had GT properly audited the 2005 financial statements, it would have recognized the need to write off an additional approximately $345 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2005 fiscal reporting period.

188.    Although in each case, the RCM financial statements stated that a portion of these "receivables from customers" were attributable to "related-party transactions," the financial statements falsely mischaracterized these transactions as having consisted of "securities and other financial instrument transactions" that RCM had transacted with related parties "in the normal course of business."  In fact, as GT was aware, a significant portion of these transactions were simply diversions of RCM's customer-entrusted assets, with no collateral, and were certainly not in the normal course of business, as the affiliated companies that received RCM customer assets lacked both the intention and the financial wherewithal to repay the diverted assets.

189.    GT knew and/or consciously avoided knowledge that these assertions in the RCM financial statements were false because it not only had access to, but actually audited and analyzed material information concerning RCM and the intercompany transfers of RCM customer assets.  GT knowingly or recklessly failed to take the required audit steps or avoided the resulting audit evidence.  At all relevant times, the affiliated companies lacked the financial intent and/or wherewithal to repay RCM, the loans had no legitimate business purpose for RCM but benefited only the affiliates, the loans were falsely documented as "customer" receivables, RCM's board of directors never approved the transactions, and no collateral or security existed of any value.  These

facts constituted huge red flags which were known and/or consciously avoided by GT. Any proper audit examination would have revealed these facts and uncovered the fraud alleged herein.

190.     Further evidence of GT's knowledge of fraud, and GT's active assistance in covering up the fraud, comes from a management deficiency letter (the "Management Letter") prepared by GT following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco. As set forth in this letter, among the accounting irregularities and deficiencies known by GT to have existed well before the LBO were: "Consolidation Process," "Formalized Reporting and Closing Process," "Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," "RCM Custody Reconciliations," "Audit Coordination, " and "IT Environment Deficiencies."

191.     As the Management Letter revealed, GT was fully aware that Refco's internal accounting and auditing functions were in a shambles, that there was no internal audit function, there was insufficient audit coordination, and that there were deficiencies in accounting procedures and functions and in the consolidation processes. Despite these numerous longstanding deficiencies, the correction of which would have made the various accounting improprieties and frauds conducted by the Refco Insiders harder to conceal, GT provided Refco with a clean audit opinion before and in connection with the LBO.

192.     Despite being aware of these deficiencies before the LBO and having "previously discussed" these longstanding deficiencies with Trosten and other Refco Insiders, it was only after the LBO that, to cover its inaction and failure to properly audit Refco, GT "papered" the deficiencies in a letter to Bennett dated October 15, 2004. As GT alludes to in its Deficiency Letter, Refco's "accounting function d[id] not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer." As GT recognized, Refco's deficient accounting practices, and the fraud they helped conceal, could not withstand the increased scrutiny that Refco would be receiving from regulators and investors given the impending IPO. Nonetheless, in its cover letter to Bennett, GT refers to these significant deficiencies as merely "several matters that are opportunities for strengthening internal control and operating efficiency."

193.     Even after belatedly presenting the Management Letter to Bennett in October, 2004, GT failed to follow-up with Bennett or anyone else at the Company regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed.  Even then, GT modified its findings at the instructions of Refco management and then affirmatively lied about the letter's existence when GT was asked by THL whether any such management letter existed during the due diligence process.

194.     In late March 2005, long after the conclusion of the LBO, THL learned of  the existence of the Management Letter.  In an April 1, 2005 internal email, a THL executive expressed his anger that neither Refco nor GT had provided the Management Letter to THL during the due diligence leading up to the LBO.  As THL stated internally, "when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both[.]"

195.     The same day, in another internal email, another THL executive explained his discovery that at or about the time that GT provided the Management Letter to the company, Refco management had pressured GT to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by GT:

> These are the facts as I've heard them . . . .  A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems.  GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

196.     A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and GT if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

197.    In sum, GT not only knew of and left unaddressed numerous accounting and controls deficiencies at Refco before, during and after the LBO, GT also eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter.  These facts demonstrate both GT's knowledge of and substantial assistance in the Refco Insiders' fraud.

**Failure to Follow Generally Accepted Practices and Standards**

198.    In each of its audits for Refco and affiliated entities, GT failed to satisfy the minimum acceptable standards of professional conduct, including but not limited to GAAS, and failed to ensure that Refco's financials were consistent with GAAP.  But for those failures, the Refco Insiders and others acting in concert or participation with them would not have been able to loot and otherwise deprive RCM and RGL of their valuable corporate assets.  As set out below, audits performed with the appropriate degree of diligence and professional skepticism would have uncovered the fraudulent scheme alleged herein, and would have prevented the damage inflicted on RCM and RGL by the Refco Insiders and others acting in concert or participation with them (including, but not limited to, the unnecessary bond and bank debt foisted on RGL as a consequence of the LBO).

199.    Auditors are not permitted to accept corporate assurances at face value; if directors and corporate records were to be blindly accepted, there would be little or no point in performing an audit.  For that reason, auditors must conduct themselves at all times with a high degree of professional skepticism and with an independence in mental attitude.  Ramler, throughout his tenure both at AA and at GT, consistently failed to act with the requisite degree of professional skepticism.  Ramler not only took Bennett and other Refco employees at their word -- he personally vouched for their trustworthiness and veracity.  Ramler's motivation for doing so was obvious; Refco was an extremely valuable account that he himself managed, and keeping the account through a successful IPO would constitute a coup both for GT and for Ramler.  In a conscious attempt to maintain the illusion that Refco was financially solid so as to allow the Refco  Insiders to cash-out, GT regularly issued unqualified audit opinions following a procedure that amounted to no audit at all.

200.    GT failed to perform sufficient fieldwork by neglecting to obtain competent evidence to afford a reasonable basis for forming an opinion regarding Refco's financial statements. Essentially all of Refco's records, including RTL documents within the possession of MB and numerous Refco entities and employees, were readily available to GT.  Yet GT failed to inspect these documents.  Similarly, despite their availability, GT failed to analyze account statements for RCM and RCC accounts held by Refco entities, related parties or by RTL participants.  Contrary to GAAS requirements, GT failed to satisfy itself that Refco had implemented adequate safeguards, procedures and controls.  GAAS specifically identifies a number of "red flags" for auditors to consider that GT knew and/or consciously avoided knowing were present in this case, including, without limitation: (a) significant related-party transactions totaling hundreds of millions of dollars annually; (b) strong pressures to perpetrate fraud, since the Refco Insiders, and those acting in active concert or participation with them, had confessed a desire to maintain Refco's value for a personally enriching sale of the company in the near future; (c) weaknesses in internal control; (d) numerous undocumented intercompany transfers; and (e) unusual or unexpected analytical relationships evidenced by asymmetrical balance sheets that did not accurately reflect intercompany transactions, including significant funds diverted from RCM without any loan documentation or any record of a receivable at other Refco entities.  Yet GT failed to take appropriate precautions, including (as discussed above) failing to obtain and analyze competent supporting materials, verify management representations, and investigate large and complex intercompany and related-party transactions.

201.    GT also failed to scrutinize numerous intercompany and related-party transactions involving Refco, its affiliates, and entities controlled by the Refco Insiders, and those acting in concert or participation with them.  This violated numerous applicable professional standards, including those warning that related-party transactions -- which cannot be presumed to be carried out on an arm's length basis -- must be thoroughly examined and substantiated.  Moreover, GT failed to follow applicable professional standards that require scrutiny of ostensibly third-party transactions that can be used to obscure or conceal related-party transactions.  At a minimum, the frequent large-value round-dollar risk-free loans that Refco repeatedly engaged in at the end of every fiscal year

(and after 2004, every fiscal quarter) were just such transactions, and a competent analysis of these transactions -- including but not limited to an analysis of customer accounts and an examination of loan documents drafted by MB -- would have revealed the fraud.

202.    GT further failed to implement procedures for identifying intercompany transactions and disclosing the details associated with those transactions, including the likelihood that funds upstreamed from RCM would or could be repaid in the future.  Applicable professional standards required GT to test the validity and appropriateness of these transactions and evaluate the probability that these uncollected balances could be realized, particularly given that they were increasing over time.  By knowingly not applying appropriate auditing standards, GT allowed the Refco Insiders to continue looting RCM customer accounts.  Similarly, GT failed to examine the legitimacy of related-party transactions and thinly-concealed related-party transactions (the RTLs), despite professional obligations to ascertain the financial capability of other parties to repay balances owed, to review the agreements and other pertinent documents associated with the transactions, to inspect or confirm and obtain satisfaction concerning collateral for the transactions, and most importantly, to understand the business purpose for the transactions.  None of these steps was taken for the RTLs, despite the fact that they were unusual and large-scale transactions repeatedly timed to coincide with the close of every relevant reporting and audit periods, and despite the fact that they lacked any legitimate business purpose.

203.    An audit properly performed in accordance with GAAS easily would have uncovered the fraud alleged herein.  GT's auditors, including Ramler, would have known that the RTLs and other suspicious transactions were evidence of ongoing and massive financial manipulation.  GT's repeated failure to conduct an appropriate audit and its decision to ignore innumerable red flags requiring a high degree of skepticism and a rigorous examination of Refco's books and records, strongly suggests that GT and Ramler made the conscious decision to conceal the massive ongoing fraud in order to keep Bennett happy and continue collecting professional fees.

204.    At a minimum, GT failed to meet the minimum professional standards of care in discharging its audit duties.  Without this professional failure, the fraudulent scheme alleged herein could not have wrought massive damage to the assets of RCM and of RGL.

### MB's Role in the Fraudulent Scheme

205.    MB was aware of the activities alleged herein and was a direct participant in a number of aspects of the Refco Insiders' fraud.  By its actions, as alleged herein, MB actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and gross malpractice alleged herein.

206.    MB's relationship with Bennett, Maggio, and Grant dates back to 1994, when MB partner Joseph P. Collins ("Collins") brought the Refco account to MB from his previous law firm.  Until October 2005, MB was Refco's primary law firm, and Collins was Refco's primary outside legal counsel.  With bills, on average, of approximately $4 million a year, Refco was an extremely lucrative client for MB, and as Collins' largest client, accounted for half of the billings for which he was responsible.  Between 1994 and October 2005, MB provided a broad range of legal services to Refco -- representing Refco in SEC investigations, drafting profit sharing plans for key executives, advising Refco on corporate governance issues and United States and foreign regulations regarding its operations and activities, drafting Refco's customer agreements, providing Refco with tax advice, leading financings for senior note and loan agreements, and drafting and negotiating the RTLs.  As a result of the varied engagements MB undertook on behalf of Refco, the firm became thoroughly familiar with the inner machinations of the Company.  The vast majority of important transactions and deals at Refco, including the LBO and IPO, were cleared through Collins or the attorneys working under his direct supervision, and Collins was aware of the work that everyone was doing on Refco matters by virtue of his review of the bills before they were submitted to Refco.

207.    As the Court-appointed Examiner found, MB was aware of the Refco Insiders' fraud and aided and abetted it.  As discussed in more detail below:

- MB was aware of Refco customer losses during the late 1990s through, among other things, its legal work helping the Refco Insiders hide these losses by transferring them to RGHI.  MB thus knew and/or consciously avoided knowledge of the

existence of the RGHI Receivable as early as 1999, and by no later than June 2002, MB knew that RGHI owed a related party debt to RGL of at least $350 million.

- MB drafted virtually all of the RTL documents with respect to 18 separate transactions, negotiated the terms of the RTLs with the third-party RTL Defendants, and fully understood the nature of the RTLs.

- MB understood that the RTLs ultimately involved lending hundreds of millions of dollars by Refco, for a period of only a few days, through the RTL Defendants to RGHI, an entity that was controlled by Bennett. MB knew that these massive loans were risk-free to the RTL Defendants and that they served no legitimate business purpose.

- MB knew the implementation of the RTLs were tied to Refco's financial reporting periods. For example, MB knew and/or consciously avoided knowing that prior to the LBO in 2004, Refco was required to submit audited financial statements on an annual basis and, after the LBO, on a quarterly basis. MB knew that the RTLs straddled Refco's financial reporting and audit periods and occurred only at those times (with one exception).

- MB drafted guarantees and indemnities on behalf of RGL in favor of the RTL Defendants to guarantee RGHI's repayment obligation, and MB knew that Bennett signed virtually all of the guarantees and indemnities on behalf of RGL or RCM and the loan documents on behalf of RGHI. MB knew and/or consciously avoided knowing that the guarantees and indemnities Refco was signing in connection with the RTLs violated the terms of other loan agreements that MB had prepared for Refco.

**Awareness of Refco's Trading Losses and Balance Sheet Problems**

208.     Starting in 1997, MB provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco. In those cases, the "bad debts" were assigned to RGHI or related entities. For example, in late 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian debt crisis. By the end of 1998, these losses amounted to hundreds of millions dollars. MB attorneys were involved in the resolution of Refco's claims against these customers, which debts later became part of the RGHI Receivable.

209.     In October 1997, a Refco customer named Victor Neiderhoffer and several funds he controlled lost more than $90 million (the "Neiderhoffer Loss"). Instead of disclosing the losses -- losses which Neiderhoffer could not cover -- Refco, with MB's assistance, sold this account receivable to an RGHI subsidiary (Wells Ltd.). These losses were subsequently added to the RGHI

Receivable.  Because MB was advising both RGHI and Refco throughout the relevant time, MB was thus aware that Refco could and did use RGHI as a repository for bad debts incurred by Refco itself.

210.     MB continued to be aware of the RGHI Receivable.  In a letter dated October 15, 1999, Bennett wrote to Collins to provide arguments to be used to support the apparent net worth of RGHI.  Bennett stated that RGHI's value was the value of its investment in RGL.  Collins, aware of the RGHI Receivable, jotted in his handwritten notes:  "Minus loans to RGH[I]."  These handwritten notes show that Collins knew RGHI owed money to RGL.

211.     By June 2002, MB was clearly aware that the RGHI Receivable existed and totaled at least $350 million.  On June 11, 2002, in connection with legal work for Refco, MB revised legal documents that included a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of related party debt of [RGHI]."

212.     The RGHI Receivable was not the only method by which MB actively participated in an effort to hide Refco's "bad debts."  For example, in late 1999 and early 2000, MB was instrumental in hiding what Maggio perceived to be a $6.3 million "bad debt" (the "Deere Park Debit Balance") owed to Refco by a customer called Deere Park Capital LLC ("Deere Park").  Maggio asked his advisors, MB and E&Y, to develop a transaction -- the Minglewood scheme -- that would conceal the Deere Park Debit Balance.  Based on tax advice from E&Y and legal advice from MB, the parties created a joint venture called Minglewood Investments LLC to which Deere Park contributed certain worthless or highly speculative securities and $2 million in cash, while Refco contributed the Deere Park Debit Balance.  As Maggio admitted to one of Deere Park's principals, Refco entered into this joint venture to avoid having to write off the Deere Park Debit Balance.  Under the terms of the agreement drafted by MB, the $6.3 million debit balance was converted into a note that would only be payable from profits Minglewood Investments LLC earned on its securities, and would convert to a zero balance -- in other words, disappear -- after a set time period.  As MB understood, the entire purpose and effect of the Minglewood transaction was to hide the $6.3 million debt from Refco's financial statements.  A Deere Park principal has testified under oath to having

61

had conversations with an MB attorney regarding the fact that Refco was entering into the Minglewood transaction so that it would not have to write off a receivable.

**The RTL Transactions**

213.    MB was not only aware of the huge RGHI Receivable, but MB drafted and negotiated the fraudulent RTLs whose sole purpose was to hide its existence. Indeed, over the course of five years, MB drafted virtually all of RTL documents for at least 18 RTL transactions that collectively amounted to billions of dollars in fraudulent loans.

214.    In February 2000, MB drafted RTL documents for a $50 million RTL with defendant EMF Core Fund (a subsidiary of defendant EMF Financial, picked by defendant Flanagan to participate in the scheme).  On February 24, 2000, an MB associate sent Flanagan a packet of materials containing (a) a loan agreement for $50 million from Refco Capital Markets to EMF Core Fund, (b) a loan agreement for $50 million from EMF Core Fund to RGHI, (c) an indemnification agreement by RGHI, and a guarantee by RGL of RGHI's repayment obligation.  The loans were to take place just before the end of Refco's 2000 fiscal year, and were to be unwound just after the beginning of the next fiscal year.

215.    MB employed the same loan structure for each of the RTLs, and drafted (at times even negotiated) RTLs not only with Flanagan's EMF Financial and Delta Flyer entities but with Coast (through its subsidiary CS Land), with Krieger (through his Beckenham Trading entity), and with Ingram Micro (through its subsidiary CIM Ventures).

216.    Although this loan structure -- whereby a loan was made at the close of a financial reporting period only to be unwound shortly after Refco's financial reporting and audit periods -- was suspicious on its face, MB proceeded to draft and transmit the documents necessary to carry out not only the February 2000 RTL with EMF Core Fund, but all of the RTLs discussed herein. Indeed, MB drafted (and at times even negotiated) nearly identical loan documents at least an additional 14 times over the next four years.

217.    MB continued to participate actively in the RTL scheme without hesitation, and to draft all documents necessary for the execution of that scheme, even as the amount of the RTLs

increased dramatically.  For example, while the February 2000 RTL with EMF Core Fund was for $50 million, MB executed a single RTL for $720 million with RTL Defendant Liberty Corner in February 2004.

218.    Indeed, the $720 million February 2004 RTL was significant not only because of its size; the RTL also occurred at a time when MB was representing Refco in connection with the planned LBO.  During that period, MB was well aware that THL would be conducting due diligence seeking to discover Refco's true financial condition, yet MB proceeded to negotiate and draft RTL agreements that transferred huge round-dollar amounts from one Refco entity to RGHI through the RTL Defendants just days before the end of Refco's financial reporting periods.

219.    Moreover, MB knew and/or consciously avoided knowing that the RTLs were designed to hide the RGHI Receivable as Refco went to great lengths to hit specific targets for each RTL.  In February 2004, Refco initially planned two RTLs -- a $500 million RTL with Liberty Corner, and a $200 million RTL with RTL Defendant Delta Flyer (an entity affiliated with RTL Defendant EMF Financial).  When EMF Financial notified Refco that Delta Flyer could no longer participate, MB revised numerous documents to consolidate the loans, resulting in a single $720 million loan with Liberty Corner.  These last-minute changes clearly signaled Refco's need to manipulate its financial records by specific amounts prior to the February close of its 2004 fiscal year.

220.    No later than June 2002, MB knew that RGHI owed a receivable of at least $350 million to RGL.  Yet MB continued to facilitate additional RTLs for the Refco Insiders.

221.    MB not only continued its work on the RTLs, but escalated that work, as RTLs began to occur on a quarterly basis right before the LBO.  Thus, like clock-work, the RTLs always straddled the end of Refco's financial reporting periods and never occurred at any other time (with one exception).  Despite this additional obvious sign that the RTLs were intended solely to manipulate Refco's financial statements, MB continued to participate willingly in the RTL scheme by drafting new documents for the now-quarterly transactions.

222.     As Refco's principal outside counsel from 1994 until October 2005, MB was intimately familiar with Refco's financial reporting and audit periods.  For example, Collins and other MB attorneys received numerous requests to contact Refco's auditors every February in connection with Refco's audits, and received many of these same requests at the end of each quarter following the LBO.  Indeed, Collins advised Bennett and other Refco employees in connection with audit letter responses, and even reviewed footnotes to accompany Refco's financial statements.  Yet MB willingly drafted documents for, negotiated terms of, and otherwise assisted in executing numerous RTLs moving large round-dollar amounts between Refco, RGHI and the RTL Defendants only days before and days after the end of each and every relevant reporting period that Refco faced.

223.     Indeed, MB willingly participated in the RTLs even though MB knew that Refco's bank financings contained covenants specifically prohibiting Refco from incurring additional indebtedness, such as guaranteeing a third party's debts, beyond certain limits.  MB knew these covenants existed because MB had participated in the negotiation and drafting of the LBO financing documents.  Thus, by preparing the RTL documents, MB assisted in transactions that it knew violated loan covenants in financing documents that MB had previously negotiated and drafted.

224.     Additionally, MB knew and/or consciously avoided knowing (through its role as an advisor on finance-related legal matters) that the RTLs had no legitimate business purpose.  These were uncollateralized, short-term loans involving the lending of hundreds of millions of dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL Defendants.  The transactions, which MB knew to be risk-free for the RTL Defendants by virtue of the RGL guarantees, clearly lacked any economic substance and were inherently suspicious.

225.     Moreover, MB's awareness of the impropriety of the RTLs is obvious from the fact that certain RTL Defendants backed out of the deals based on their concerns over the propriety of the transactions in the wake of the Enron scandal.  In February 2000 and again in February 2001, MB drafted the necessary documents for two RTLs ($150 million and $250 million, respectively) with affiliates of Ingram Micro.  Like the RTLs with Pigott's Liberty Corner entity and with Flanagan's

EMF/Delta entities, these loans moved large round-dollar amounts from RCM to RGHI via an Ingram Micro affiliate before the end of the fiscal year, and then back from RGHI to RCM after the new fiscal year began. They also included a guarantee by RGL of RGHI's obligations, as well as an indemnity in favor of the Ingram Micro affiliate -- all signed by Bennett.

226.     In 2002, Ingram Micro was prepared to go forward with yet another RTL, going so far as to send a mark-up of the 2001 loan documents to Collins. However, on January 30, 2002, Ingram Micro had second thoughts about engaging in the RTLs due to recent news about the Enron scandal. Later that same day, Ingram Micro sent Refco an email backing out of the proposed RTL, referencing the Enron debacle and heightened scrutiny from the SEC.

227.     As the Examiner concluded, "there is significant evidence that Mayer Brown . . . assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements," and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

**Maintaining the Fraudulent Business Model**

228.     The Refco Insiders facilitated their fraudulent scheme to attract and siphon RCM assets by purporting to maintain RCM as an unregulated offshore broker-dealer despite the fact that it conducted substantial activity in the United States and did not even maintain any Bermuda operations after 2001. MB advised Refco and RCM on these efforts beginning no later than October 1996 and continuing through October 2005.

229.     In 2001, in furtherance of the fraudulent scheme described herein, the Refco Insiders desired to close down RCM's Bermuda operations and to "repatriate" RCM to the United States. This was actually accomplished in 2002. In so doing, Bennett enlisted the assistance of MB, which advised RCM on the implications of repatriating to the United States. In the course of so doing and as reflected in, among other things, a June 24, 2002 MB memorandum, MB became intimately

familiar with the business and operations of RCM through discussions with Maggio and others. As reflected in an August 3, 1998 MB memorandum, MB was aware when it did this work that RCM was engaging in repurchase agreements, or "repos," and buying and selling customer securities "for its own account." In connection with the repatriation of RCM's Bermuda operations to the United States, MB advised RCM on, among other things, ways to structure its business so as to attempt to avoid being treated as a regulated broker-dealer subject to, *inter alia*, segregation requirements imposed by United States law.

230.    According to a January 31, 1999, memorandum from Refco to MB, MB also was involved in and familiar with various other "projects underway with respect to Refco's FX business," which caused MB -- along with other aspects of MB's engagements for Refco and RCM -- MB to be aware of the diversion of RCM FX customer-entrusted assets to other Refco entities as alleged herein.

231.    In June 2004, in connection with a discussion of financial covenants for a Credit Agreement with Refco Finance Holdings LLC as Borrower, questions were raised by THL's counsel concerning Refco's "average cash on hand." One phrase used in connection with this discussion was "house cash," which MB characterized as "a difficult concept." In response to a question regarding whether it would be feasible to have GT provide a better explanation in future quarterly filings of the composition of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," MB noted emphatically, "No!! Impossible to breakout. Too restrictive operationally i.e. funding." This shows that MB was fully aware of the manner in which the Refco Insiders were siphoning RCM customer-entrusted funds to finance Refco's overall business operations and to fraudulently dress Refco up to facilitate a lucrative cashing-out of the Refco Insiders' interests.

232.    MB's knowledge of and participation in the overall scheme is clearly shown through emails from Refco employee Thomas Yorke to Joseph Collins in January 2005. In those emails, Yorke sought advice from MB on impending regulatory changes that "could mean an extremely large asset transfer away from RCM" and on how to avoid the potential impact of those changes and

how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. As MB was aware, the reason that Yorke wanted to minimize any transfer of cash from RCM customer accounts to customer accounts at other Refco entities was that Refco treated the cash in customer accounts at RCM as available to fund Refco's operations and would not be able to treat cash in customer accounts held at other Refco entities as available for this purpose. MB's proposed solutions included "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

233.     As indicated in a MB memorandum draft dated October 11, 2005, just as the massive fraud at Refco was unraveling, MB was fully aware that as a result of the repatriation from Bermuda to the United States on which it had previously advised RCM:

(a)     RCM's activities were conducted by RSL and not by RCM, and RCM had no personnel available to look out for the legitimate interests of RCM's customers;

(b)     "RCM no longer maintains any personnel or operations in Bermuda, and . . . all of its functions and operations are performed by RSL personnel that are located in the United States";

(c)     While assets in RCM customer accounts were "carried on the books of RCM," those assets were in fact not held by RCM;

(d)     RCM was engaging in "significant" conduct in the United States and, with MB's knowledge and advice, had structured its activities with an intent to "avoid U.S. regulatory requirements" and could not properly claim to be exempt from the regulatory requirements of United States law; and

(e)     RCM was not in fact a "foreign broker-dealer."

234.     The fact that MB was preparing such a memorandum in October 2005, at precisely the same time as the public disclosure of the massive fraud at Refco, is inherently suspicious. By preparing to advise RCM that it should consider changing the way it conducted its business after the fraud had already been disclosed and RCM had been effectively shut down, MB was simply trying to paper the file, cover its tracks, and create the appearance after the fact that it had rendered

appropriate, objective advice to RCM when in fact MB had been intimately involved in advising RCM on RCM's earlier repatriation from Bermuda to the United States at a time when the law was no different than it was in October 2005. Indeed, all of the authorities cited in that draft MB memorandum pre-dated the advice rendered by MB in 2001 and 2002 with respect to RCM's repatriation.

## Conduct in the LBO

235.     Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from MB's conduct in the LBO. MB was closely involved in the LBO process. MB represented Refco and RGHI in connection with the LBO and, according to the Examiner, was "deeply involved" in the LBO process, negotiating the agreement with THL and handling the Refco side of THL's due diligence. Given its knowledge of the misconduct at Refco, MB was hopelessly conflicted in representing both Refco and RGHI. At no time, however, did MB advise RGL's innocent directors, officer or agents of the Refco Insiders fraudulent scheme or that the LBO was a transaction with no business purpose for RGL, and one that would cause RGL to incur substantial additional indebtedness that it was not in a condition to assume. Certain Refco directors, officers, and agents (including THL, inside counsel and others) were unaware of the fraudulent scheme and of the extensive adverse impact that the LBO would have on RGL. As a result of defendants' efforts to conceal the scheme, these directors, officers, and agents (including inside counsel and others) were unaware of Refco's true financial condition (namely, the true nature and extent of the RGHI Receivable), and could not have made themselves aware through reasonable investigatory efforts. Had they learned of the Refco Insiders' fraudulent scheme, they would have taken steps to prevent RGL from becoming saddled with $1.4 billion of bank and bond debt.

236.     The Equity Purchase and Merger Agreement underlying the LBO transaction, a document negotiated and reviewed by MB, represented that there were no undisclosed intercompany loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million. The representation was false and MB knew that the guarantee

requirement would immediately be breached.  There were, in fact, massive related-party loans between Refco and RGHI that had not been disclosed, but rather had been hidden by the RTL scheme that MB had been effectuating.  Moreover, at the very same time MB was reviewing these provisions in the Equity Purchase and Merger Agreement, MB was also preparing documents for a $720 million RTL in which a Refco entity -- RGL -- was guaranteeing the debt.

237.    In addition, the Examiner found that during the LBO diligence process, MB "appears to have failed to disclose key information to THL."  MB met frequently with THL's counsel and reviewed the due diligence and corporate documents provided to them.  When asked by THL's counsel, MB boldly represented, despite having prepared and overseen the execution of dozens of RTLs, that there were no transactions or deals between Refco and RGHI.  In fact, at the same time that MB was making these representations, MB was preparing documents for the $720 million RTL involving Refco, Liberty Corner and RGHI.

238.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from its failure to disclose the existence of the RGHI Receivable despite its review of the LBO prospectus and its issuance of a legal opinion making representations in connection with the LBO.  Furthermore, the Offering Circular:  (a) did not mention the existence of RTLs; (b) stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004; (c) did not disclose the guaranty -- that MB itself had prepared -- to a RTL participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) as discussed above, falsely stated that the LBO bond debt was effectively junior to the payables owed to RCM.

**Conduct Before and After the IPO**

239.    After the LBO closed, Refco began the process of registering the Senior Subordinated Notes so that they could become publicly traded, and also began preparing a prospectus that would lead to an IPO.  MB was involved with both processes.

240.     MB reviewed the initial disclosure document pertaining to the notes registration (the S-4), and received and reviewed the SEC's comments to Refco's S-4 disclosures. Thus, MB was aware that Refco had first listed the RGHI Receivable as being from a customer, but changed the language to reflect that the receivable was due from equity members.

241.     During this time, MB continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, and $550 million in December 2004, $345 million in February 2005, and $450 million in May 2005). In addition, MB continued to receive and respond to periodic requests for audit response letters -- keyed to Refco's relevant reporting periods.

242.     As the disclosure process with the SEC moved forward, MB reviewed Refco's S-1 registration statements, including the final S-1 which failed to disclose (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down its debt to Refco at year-end and quarter-end financial reporting periods.

243.     On August 16, 2005 -- the day the IPO was completed -- MB issued an opinion letter in connection with preparation and filing of the S-1 that made limited representations similar to those it had made in its August 5, 2004 legal opinion included in the LBO Offering Circular. Even though the prospectus was misleading in substantially the same manner as its previous Offering Circular, MB apparently made no efforts to correct or bring those misrepresentations to the attention of Refco's innocent directors, officers and agents, including inside counsel and others.

244.     In late August 2005, after the IPO was completed, MB assisted Refco in engaging in yet another $420 million RTL designed to cover the existence of the RGHI Receivable.

                                    *        *        *

245.     Given MB's awareness (a) of the massive RGHI Receivable; (b) that the RTLs were merely sham transactions designed to allow RGHI to temporarily pay down its obligation to Refco at each financial reporting period; (c) of Bennett's dual roles in the RTLs; (d) that the RTLs violated Refco's financing covenants; and (d) that Refco executives had an incentive to maximize Refco's annual profits and ultimate sale price, MB understood that the purpose of the RTLs was to hide the

RGHI Receivable from Refco's books in order to create a false impression of Refco's financial health and strength.

246.     MB also understood that Refco's continued operation, despite its massive losses, required a continuous infusion of cash.  MB knew that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no segregation or net capital requirements.  MB thus understood that Refco was diverting and consuming RCM customer-entrusted assets.

247.     MB further understood that the goal of both the RTLs and the theft of RCM customer funds was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model.  MB understood that the ultimate purpose of this deception was to allow the Refco Insiders and others to cash-out their interests in Refco.  By its actions, MB not only violated applicable ethical and disciplinary rules, it substantially assisted and participated in a scheme that ultimately cost RCM and RGL billions of dollars in losses.  MB is liable for the damages that were incurred as a result of its malfeasance.

## E&Y's Role in the Fraudulent Scheme

248.     E&Y was aware of the activities alleged herein and/or consciously avoided knowledge of them.  By its actions, E&Y actively participated in and substantially assisted the Refco Insiders and others acting in active concert or participation with them in carrying out the scheme detailed herein.

249.     E&Y began working for Refco around 1991 with the understanding that its client was RGHI and all of the subsidiaries below it, including RGL and Refco, Inc. (which became Refco, LLC).  Initially, E&Y was retained to review tax returns and answer tax questions.  In 1993 or 1994, E&Y began preparing tax returns and later helped with IRS audits as well as state and municipal tax audits.  In 2001-2002, E&Y provided Bennett with tax advice and proposed structures through which a partial sale of Refco could be effectuated with favorable tax treatment.  During this time period, E&Y also prepared tax returns for RGL and its subsidiaries and affiliates, including RGHI, through

the tax year 2002.  E&Y and its affiliates continued to provide advice and services to Refco through as late as 2005, including preparing RGL's New York City tax returns.

250.     E&Y understood that the tax returns it was preparing for Refco were not only submitted to the IRS and state and local authorities, but would also be reviewed by innocent RGL directors, officers, and agents, and would be presented by Refco to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to sell their interests in Refco.

251.     E&Y was not simply a tax preparer for Refco.  E&Y also repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and potential third-party investments involving Refco.  E&Y thus actively assisted and enabled the Refco Insiders to monetize and cash-out their interests in Refco for far more than those interests were worth.  Among the most significant transactions and issues on which E&Y assisted Refco were: (a) RGHI's 1997 conversion to an S corporation and the efforts to avoid "busting" the S election or triggering a "Built-in-Gain" tax; (b) planning which began in 1997 to take advantage of the Neiderhoffer Loss; (c) BAWAG's 1999 acquisition of a 10% interest in RGL; (d) the 2000 Minglewood transaction designed to avoid the need to write off a $6.3 million "bad debt"; (e) the 2001 conversion of RGL subsidiary Refco, Inc. from a C corporation to an LLC (Refco, LLC); (f) structuring and analyzing the tax consequences of plans for profits-only interests in RGL for certain Refco executives; (g) a 2001/2002 proposed acquisition by BAWAG of a controlling interest in RGL while minimizing or avoiding tax consequences to RGHI; and (h) a 2002 proposed BAWAG investment of hundreds of millions of dollars in RGL in three installments in exchange for BAWAG's right to "participate" in the proceeds of a sale of Refco.

252.     E&Y's assistance in facilitating the Refco Insiders' fraudulent scheme was also a two-way street.  In 2000 and 2001, E&Y used Refco as a vehicle for a series of improper and fraudulent tax shelter transactions termed "Contingent Deferred Swaps" ("CDS").  These transactions were designed to create the illusion that the E&Y clients participating in the tax shelter

scheme were losing money in trading activities (*i.e.* suffering business expenses) that could then be charged against these customers' sizable taxable incomes. The success of these tax shelters depended on E&Y fooling the IRS into believing that E&Y's clients were actually engaging in legitimate currency trading. Refco provided E&Y with the vehicle through which it could create that illusion.

253. E&Y placed its clients' funds in Refco trading accounts and engaged in a high volume of short term-trades designed to create the illusion that the money was being traded and was subject to trading risk. In reality, the trades were designed to preserve the clients' capital so it could be returned to the client once the tax benefit -- *i.e.*, the fraudulent write offs -- had been obtained.

254. On May 22, 2007, four E&Y partners were indicted in connection with these CDS tax shelters. As the U.S. Senate's Permanent Subcommittee on Investigations noted in its reports on the Role of Professional Firms in the U.S. Tax Shelter Industry, E&Y enlisted a number of professional firms to help carry out CDS transactions "including investment firms, law firms, and . . . Refco Bank, who participated as the counter-parties for swaps . . . from 2000-2001."

255. As a result of E&Y's tax consulting, advice, and involvement in the Refco Insider's schemes and attempts to sell their interests in Refco, E&Y understood no later than 2001 that the Refco Insiders were seeking to achieve a lucrative cashing-out of their interests in Refco.

256. In mid-2001 through mid-2002, E&Y performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party. During the course of this work, Trosten asked E&Y to assume the existence of a receivable owed by RGHI to RGL in the amount of $720 million to $1 billion. E&Y's advice on this issue ultimately led Bennett to structure Refco's proposed July 2002 transaction with BAWAG as a Proceeds Participation Agreement in which a BAWAG affiliate made payments to Refco in exchange for the right to participate in the proceeds of a future sale of RGL. E&Y understood that certain senior Refco executives stood to profit directly and considerably by a sale of the company and had a corresponding incentive to manipulate Refco's financial statements and related disclosures in addition to its tax returns.

257.     Through rendering advice to Refco, E&Y also learned that the Refco Insiders, aided by GT and MB, were falsifying Refco's financial statements.  In 1999, E&Y provided advice in connection with the structuring of BAWAG's purchase of a 10% interest in RGL.  In connection with this process, E&Y reviewed and commented on the deal documents that MB drafted.  An E&Y internal memorandum shows that E&Y disagreed with representations contained in these draft documents to the effect that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been repaid.  In fact, the RGL financial statements were false because they did not disclose the RGHI Receivable being masked by the RTLs.

258.     Moreover, as a result of its work for Refco, E&Y was aware that the RGHI Receivable was not a bona fide debt, but was a sham, based on, among other things, the following:

- E&Y knew and/or consciously avoided knowing that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value, and that RGHI lacked the ability to pay off the RGHI Receivable;

- E&Y knew and/or consciously avoided knowing that Refco's officers were using the RGHI Receivable to intentionally manipulate Refco's balance sheet and operating results for the purpose of bolstering the financial appearance of the company;

- By as early as September 2001, E&Y understood the RGHI Receivable was approximately $720 million to $900 million and that these receivables were concealed on Refco's audited financial statements, as Refco posted a related-party receivable balance of only $219 million on its February 28, 2001 audited financial statements;

- E&Y knew and/or consciously avoided knowing that by September 2002 the Neiderhoffer Loss, which made up part of the RGHI Receivable, was entirely uncollectible because the debt had been settled and released in 1997;

- As early as February 2002, E&Y knew and/or consciously avoided knowing that the RTLs whereby Refco loaned funds to a third party, who in turn loaned the funds to RGHI to pay down the RGHI Receivable.  E&Y also knew and/or consciously avoided knowing that these transactions occurred in late February and would be reversed in early March, straddling the end of Refco's financial reporting fiscal year;

- E&Y knew and/or consciously avoided knowing that at least one purpose of the RTLs was to improve Refco's balance sheet by concealing the fact that the RGHI Receivable was composed of trading losses and operating expenses that were inappropriately moved to RGHI for the sole purpose of overstating Refco's financial position and operating results; and

- E&Y knew and/or consciously avoided knowing that Refco's income for tax reporting purposes was inaccurate and that correspondingly the income or loss of RGHI for tax reporting purposes was also inaccurate.

259.    Based on E&Y's knowledge of the Refco fraud, the senior E&Y advisor on the Refco engagement decided in late 2003 that E&Y should resign from its engagement with Refco. Nevertheless, E&Y continued to work for Refco through as late as 2005, several months after the LBO, and carried out its withdrawal from Refco assignments in such a way as to allow the fraudulent scheme to continue.

## Knowledge of Refco's Trading Losses and Balance Sheet Problems

260.    As early as 1998, E&Y was aware of a related-party receivable owed by RGHI to Refco that was created when RGHI purchased "bad debt receivables" for full face value from Refco. E&Y was also aware that this receivable had been sitting on RGL's books accruing interest "for years" while a corresponding payable grew on RGHI's books.

261.    In particular, E&Y was aware that one component of the RGHI Receivable was the Neiderhoffer Loss involving a $71 million "bad debt" "purchased" by an RGHI subsidiary, Wells, Ltd., at face value -- a price that vastly exceeded fair market value.  By at least September 2002, and likely much earlier, E&Y knew and/or consciously avoided knowing that the Neiderhoffer Loss was completely uncollectible from Neiderhoffer because there had been a settlement and release in 1997 between Neiderhoffer and Refco, Inc. pertaining to the losses.   In addition, numerous E&Y documents discuss the "Wells losses," which pertain to losses of approximately $50 million on Russian Securities involving the same wholly owned subsidiary of RGHI (Wells, Ltd.) which purchased the Neiderhoffer Loss.  E&Y documents show that E&Y understood these losses also formed part of the RGHI Receivable.

262.    E&Y also knew and/or consciously avoided knowing that Bennett had a practice of allocating vaguely described  expenses -- often listed as IT and computer expenses -- to RGHI, but having RGL actually pay the expense and then book them as part of the RGHI Receivable.

263.    E&Y clearly understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL.  In an email dated August 8, 2001, an E&Y partner observed that a

write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were "protected and buffered" by RGHI.  This email demonstrates that E&Y knew that the RGHI Receivable was being maintained, not because it was legitimate debt, but because elimination of the receivable would destroy RGL's appearance of profitability.

264.    In addition, E&Y was fully aware that the RGHI Receivable was a sham based on the following evidence:

- E&Y never saw a written agreement evidencing the RGHI debt, never knew the terms and conditions of the debt or its repayment schedule, and never knew of any valuable consideration for the debt;

- E&Y never received a requested confirmation directly from Refco's counsel that the debt was valid;

- Other than the sham RTLs, RGHI never made a payment to service or pay down its debt during E&Y's engagement;

- RGHI never made interest payments on its debt and instead simply added accrued interest to the outstanding receivable balance; and

- RGHI never expressed an intention to repay the debt and, never could repay the debt, because, as E&Y knew, RGHI was "basically insolvent."

## The RTL Transactions

265.    In approximately September 2001, E&Y discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements.  While the financial statements reported a related-party receivables of approximately $219 million, the RGHI Receivable was in the range of at least $700 to $900 million.  When E&Y asked a Refco officer about the discrepancy, E&Y was told directly that Refco utilized the RTLs at fiscal year end in order to "clean up" the balance sheet and, for that reason, the related-party receivable balances did not appear on RGL's financial statements.

266.    E&Y has admitted to the Examiner that by no later than February 28, 2002, it knew that at the end of every Refco's fiscal year, RGHI would borrow funds from a third party to pay down the RGHI Receivable and the transaction would be reversed a few days later.

267.    E&Y also knew and/or consciously avoided knowing that the source of the third-party funds in these annual fraudulent transactions was actually RCM.  Several E&Y documents refer to

"circular flows of cash" in the context of discussions of pay down of the RGHI Receivable at fiscal year-end. For example, a November 6, 1997, E&Y handwritten memo regarding the Neiderhoffer Loss (which E&Y knew to be part of the RGHI Receivable) states, in part, "Did RCM advance funds. Circular flow of cash." The handwritten notes of an E&Y partner dated March 4, 2002, contains the phrases "borrowed cash from RGL," "third-party customer," and "Neiderhoffer." In other words, the third-party customer had actually borrowed funds from RGL (via its subsidiary, RCM) to in turn loan to RGHI to hide the RGHI Receivable, which was partly composed of the Neiderhoffer Loss. These notes demonstrate that E&Y understood that a Refco entity was likely the source of the money which RGHI was using to temporarily pay down its receivable.

**Maintaining the Fraudulent Business Model**

268.   E&Y's own documents demonstrate that as early as 1997, E&Y had significant concerns about potential fraud at Refco and E&Y's own potential liability arising out of its involvement with Refco. Yet E&Y did nothing to address these concerns, and instead chose to assist Refco in perpetuating the fraud.

269.   For example, in November 1997, Kurt Neidhardt, the E&Y partner handling the Refco engagement, was concerned about how Refco had treated the Neiderhoffer Loss. Concerned that E&Y could be viewed as "being an accessory to some type of fraud," Neidhardt met with the head of E&Y's Financial Services Department, Jerry Goldman. Incredibly, instead of advising Neidhardt to alert the innocent directors and officers of RGL to this obvious accounting fraud and instead of demanding that E&Y withdraw from representing Refco, Goldman informed Neidhardt that so long as E&Y prepared Refco's tax returns correctly and never gave Refco any accounting advice, E&Y should not be concerned. This cavalier attitude towards Refco's fraud would be shocking enough from one of the world's largest accounting firms. But even more egregious was the fact that E&Y was not preparing Refco's tax returns correctly. As discussed below, the RGL tax returns E&Y prepared were inaccurately reporting interest income that was not being paid and that E&Y knew RGHI did not have the wherewithal to pay, and were shown as erroneous and inflated income on RGL's tax reporting documents.

270.    E&Y continued to have concerns about Refco, specifically about Refco's use of the sham RGHI Receivable to hide losses and other expenses. In the years 2001 through 2003, E&Y sent Refco a letter asking Refco to provide, *inter alia*: (a) a representation from Refco's legal counsel that the related-party receivable payable from RGHI to RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI"; and (c) an analysis of related-party accounts. Despite these requests, E&Y never received a written or verbal representation directly from Refco's legal counsel that the related-party payable was a legally enforceable obligation. Instead, E&Y accepted a representation from a Refco officer to that effect without demanding anything further. In addition, E&Y never received the requested schedule of expenses or analysis of related-party accounts. Despite Refco management having ignored E&Y's request, E&Y took no action and continued to prepare for filing and distribution false and misleading tax returns and supporting tax documents that E&Y knew and/or consciously avoided knowing included a huge uncollectible related-party receivable.

271.    On July 8, 2002, Neidhardt met with the number two partner in E&Y's tax department, Mike Kelley, to discuss E&Y's knowledge that RGHI (which E&Y also prepared the tax returns for and knew was unaudited) owed RGL a payable of $750 million, that RGL's audited financial statements reflected a related-party receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable just before fiscal year-end and reinstate it just afterwards so that only $225 million would be reflected on RGL's audited financial statements. Echoing Goldman's earlier outrageous (and erroneous) reaction, Kelley concluded that this was not a tax return issue, despite the obvious manipulation of the audited financial statements. E&Y did not, however, request further information from Refco or its auditors. E&Y simply continued to prepare false tax returns for Refco based on inflated operating results, and continued to provide the Refco Insiders with tax advice regarding their exit strategies.

272.    On January 16, 2003, Neidhardt met again with Kelley to discuss concerns over Refco. This time, Neidhardt described another RGHI transaction in which a third party would allow RGHI to pay down the RGHI Receivable at fiscal year-end in a manner that would hide the related-

party nature of the receivable and improve the balance sheet without disclosing why the balance sheet improved. Once again, the number two partner in E&Y's tax department chose to ignore this obviously fraudulent manipulation of Refco's audited balance sheet because he believed that as long as E&Y got Refco's tax returns correct (which E&Y didn't), the fraud was not E&Y's concern.

273.    In or about November 2003, E&Y purported to resign from the Refco engagement based in large part on its concerns over potential liability for aiding and abetting the Refco fraud as a result of its knowledge of the massive RGHI Receivable and the fiscal year-end paydown and reinstatement of the RGHI Receivable.

274.    But E&Y did not really resign. Though E&Y did not prepare Refco's federal 2003 tax returns, E&Y continued to perform tax services for Refco through at least 2005, preparing, among other things, misleading and false New York City tax returns for RGL. Moreover, despite its concerns, E&Y did not tell Refco's subsequent tax accountants (or anyone else) the true reasons for its decision to resign or the concerns it had about Refco.

275.    E&Y continued to be nervous about its relationship with Refco even after December 2004. In October 2005, Rory Alex, an E&Y accountant who did not work on the prior Refco engagement, sent Neidhardt an email asking about the possibility of doing work for RGL. The next day, Neidhardt sent an email to another E&Y tax partner who had worked on the Refco account previously, saying "we need to be very careful here. I left [Rory Alex] all my numbers . . . anything [sic] we tell him must be strictly confidential. I may have Nancy Altobello shut him down."

276.    E&Y was clearly aware that the RGHI Receivable was a sham transaction and that it was not a bona fide debt on which interest income could properly accrue for tax purposes. Accordingly, the RGL tax returns reflected interest income associated with the RGHI Receivable that E&Y knew and/or consciously avoided knowing was partially or entirely inaccurate. E&Y also knew and/or consciously avoided knowing that the RGL tax return balance sheets (Schedule L) included as assets the RGHI Receivable. Thus, the Schedules showed an erroneous and inflated income for tax reporting purposes by RGL. These falsehoods substantially assisted the Refco Insiders' efforts to create the illusion that Refco was profitable and financially healthy.

277.    E&Y substantially assisted the Refco Insiders' fraud by preparing and filing tax returns that E&Y knew and/or consciously avoided knowing were inaccurate or false, but that E&Y knew would be reviewed by RGL's innocent directors, officers and agents and presented to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to get financing for Refco and, ultimately, to facilitate a lucrative cashing out of their interests in Refco.

278.    E&Y also actively assisted Refco in hiding its bad debts.  As discussed above, in late 1999 and early 2000, Refco entered into the Minglewood joint venture to avoid having to write off the Deere Park Debit Balance.  E&Y substantially assisted Refco with this goal by devising the structure of the Minglewood transaction, a structure that allowed Refco to keep the Deere Park Debit Balance off its financial statements.

279.    E&Y also understood that Refco's continued operation, despite the massive losses reflected in the RGHI Receivable, required a continuous infusion of cash.  E&Y knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no net capital requirements.  E&Y thus understood that Refco was consuming RCM customer funds.

280.    E&Y further understood that the goal of both the RTLs and the theft of RCM customer funds and the hiding of losses was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model.  E&Y understood that the ultimate purpose of this deception was to allow the Refco Insiders to cash-out their interests in Refco at an inflated value.  By its actions, E&Y substantially assisted and participated in a scheme that ultimately caused RGL and RCM to incur billions of dollars in damages.  E&Y is liable for the damages that were incurred as a result of its malfeasance.

## PwC's Role in the Fraudulent Scheme

281.    PwC was aware of the activities alleged herein and/or consciously avoided knowledge of them. By its actions, PwC actively participated in and substantially assisted the Refco Insiders in carrying out the scheme detailed herein.

282.    PwC was engaged by Refco to provide advisory services in connection with the LBO and IPO.

283.    On May 5, 2004, PwC was engaged by RGL in connection with the LBO bond offering to provide advisory services, including (a) helping Refco to plan and prepare for the LBO, and (b) advising Refco with "accounting and financial reporting matters" relevant to the offering, including the contents of the offering documents.

284.    On June 7, 2004, PwC's engagement was broadened to include analyzing the planned LBO by performing a Transaction Costs Analysis intended to optimize the tax treatment of professional fees (accounting, financial, legal, etc.) associated with the LBO. As part of that analysis, PwC was authorized to conduct "interviews with the outside service providers," as well as "internal personnel involved in the transactions."

285.    After the LBO, to help prepare Refco for the IPO, PwC's engagement was broadened to cover two additional areas. On September 28, 2004, PwC's role was broadened to include "advice and assistance related to the accounting and financial reporting matters for the quarter ended August 31, 2004." On November 10, 2004, PwC's engagement was further extended to helping "improve bottom line performance" by proposing alterations to Refco's "commissions and payouts" in numerous lines of business, including FX and prime brokerage services.

286.    In response to the disclosure that there were accounting control deficiencies at Refco, PwC also became the *de facto* chief accounting officer for Refco and was charged with "assisting in the initial planning and staffing of audits" and implementing improved accounting controls.

287.    Furthermore, on March 8, 2005, PwC was engaged by RGL to provide an assortment of services in connection with Refco's preparation of the Form S-1, including (a) assistance in drafting and reviewing the Form S-1, (b) "consultation on disclosures within the Form S-1 and the

Company's financial statements," (c) providing Refco's "management" with support in preparing any "Underwriters' comfort letter," and (d) assisting Refco with draft responses to SEC comments.

288.    PwC was also engaged by RGL in the summer of 2004 to provide tax consulting services and on April 1, 2005, was engaged to prepare Refco's 2004 state and federal tax returns. Notably, given all the business it was receiving from Refco, PwC offered those services to Refco at "a discount of 30% off of our customary market rates."

289.    As a result of these various auditing, advisory, and tax services and the unfettered access PwC had to Refco personnel and accounting systems, PwC was in a unique position and became aware of the fraudulent scheme of the Refco Insiders, and more specifically, the RGHI Receivable, the RTLs, the use of RCM customer assets to fund Refco, and the inappropriateness of the LBO and IPO in light of Refco's true financial condition.

290.    Through its provision of various auditing, advisory, and tax services, PwC substantially assisted in the fraud alleged herein.  Without these services, Refco's true financial condition would have come to light long before the fraudulent scheme had been completed, and before the Refco Insiders, and others, could have saddled RGL with $1.4 billion in unnecessary LBO debt and allowed the Refco Insiders to strip out RGL's assets.

**Knowledge of the RTLs and Refco's Balance Sheet Problems**

291.    Through the due diligence undertaken as Refco's principal advisor concerning accounting and financial reporting in connection with the LBO and the IPO, and its role as the *de facto* chief accounting officer for Refco, PwC learned of and/or consciously avoided knowledge of the existence of both the RGHI Receivable and the RTLs.

292.    Indeed, an email exchange between PwC and Victor Zarate, Assistant Controller of New Refco Group Ltd., LLC ("New Refco Group") establishes that PwC was fully aware of the wire transfer RTLs in which BAWAG served as the conduit.

293.    On November 22, 2004, Zarate sent Henri Steenkamp, manager of Global Capital Markets at PwC, a schedule of the BAWAG round trip loans, referred to as "BAWAG deposits." The schedule listed the exact sum of money Refco deposited in BAWAG to fund the fraudulent wire

transfer RTLs.  The "deposits" were each made at the end of Refco's fiscal year -- *i.e.*, the last day of February -- for the years 2001, 2002, 2003 and 2004 and also, around the time of the LBO, in July and August of 2004.

294.    Evidencing that PwC understood that these "deposits" related to improper RTLs, PwC responded to the Zarate email listing the BAWAG deposits by asking for "the RGHI loan balances as well for th[ose] periods . . . ."

295.    Given PwC's knowledge and familiarity with Refco's financial reporting periods, PwC accordingly knew and/or consciously avoided knowing that at the end of each annual reporting period, and just before the LBO, Refco was "depositing" money with BAWAG and that, concurrently, the RGHI Receivable was being reduced by a like amount.

296.    As Refco's principal advisor on accounting and financial reporting matters in connection with the LBO and the IPO, PwC knew and/or consciously avoided knowing that there was no legitimate business purpose for these wire transfer RTLs, except to conceal the RGHI Receivable before the end of each relevant reporting or audit period.

297.    As Refco's 2004 tax year preparer, PwC also carefully reviewed Refco's prior tax returns and Refco's financial statement as of each annual, not fiscal, year-end.  As the RTLs were used to conceal the RGHI Receivable in fiscal year reporting and audit periods, PwC discovered and/or consciously avoided knowledge of the full extent of the RGHI Receivable.

298.    Furthermore, because PwC knew the wire transfer RTLs reduced the RGHI Receivable balance, it also knew that the $105 million receivable from RGHI disclosed on Refco's financial statements did not reflect the full amount of the related-party receivable owed by RGHI to Refco.

299.    If PwC had fulfilled its professional obligations, it would have investigated the wire transfer RTLs and the RGHI Receivable, uncovered the full scope and nature of both the RGHI Receivable and the RTLs, and advised Refco's innocent directors, officers, agents, and others of the Refco Insiders' fraudulent scheme.  Instead, PwC chose to substantially assist the Refco Insiders in their fraudulent scheme.

300.     Despite the fact that PwC knew and/or consciously avoided knowing that the Refco Insiders were concealing the full amount of the RGHI Receivable, PwC actively assisted the Refco Insiders in mischaracterizing the $105 million receivable from RGHI that was, in fact, disclosed.

301.     PwC knew and/or consciously avoided knowing that the Refco Insiders routinely referred to intercompany and related-party obligations as receivables and payables owed to and from "customers." As PwC knew, given its understanding of Refco's operations and accounting, the reason the Refco Insiders sought to mischaracterize intercompany and related-party transactions as "customer" activity was to obfuscate and conceal improper intercompany and related-party transactions from Refco's innocent directors, officers, agents and others, and from regulators and the investing public.

302.     Nonetheless, in its role as Refco's principal adviser in connection with accounting and financial reporting matters, PwC prepared and/or reviewed and commented on Refco's initial S-4 registration statement which mischaracterized the $105 million receivable from RGHI as a "customer receivable." It was this misleading language in the S-4 that prompted the SEC to question why related-party transactions with equity members should be booked as receivables from "customers." While the SEC forced the Refco Insiders to change the S-4 registration statement to reflect that the receivables were due from "equity members," the final S-4 did not disclose the wire transfer RTLs, that part of the receivable owed by RGHI was concealed by these RTLs and that the $105 million was only a portion of the overall amount owed by RGHI to Refco.

303.     Furthermore, PwC chose not to disclose any portion of the RGHI Receivable in the S-1 registration statement prepared and filed with the SEC in connection with Refco's IPO. While early drafts of the S-1 included the $105 million related-party receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable despite the fact that PwC, even knowing about the wire transfer RTLs, did not receive, or seek, any confirmation that the $105 million receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other material related-party receivables due from RGHI and others.

304.    Similarly, in connection with commenting on the consolidated financial statements that would be attached to the offering prospectus, it was PwC that edited Note K-Related Party Transactions and characterized the $105 million receivable from RGHI as a receivable "from customers."  PwC, thus, intentionally sought to conceal the related-party nature of even the small amount of the receivable from RGHI that was being disclosed by the Refco Insiders.

**PwC's Awareness of the Looting of RCM Assets**

305.    PwC also knew and/or consciously avoided knowing that Refco was looting RCM's customer assets in order to satisfy Refco's substantial working capital needs and to create the perception that Refco was an appropriate candidate for the LBO and IPO.

306.    Indeed, the fraudulent scheme perpetrated on RCM was so fundamental to the operation and financing of Refco that it had to have been apparent to PwC.  The volume and size of the transfers, involving, on many occasions, hundreds of millions of dollars each, ensured that the amount of RCM funds that were "loaned" to other entities substantially outsized Refco's total capital.  By the time Refco filed for bankruptcy, the net uncollectible transfers totaled $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

307.    Furthermore, PwC was responsible for assisting Refco with the LBO offering materials, the IPO offering materials and the financial reports and registration statements that had to be prepared and filed in connection with both the LBO and the IPO, including the S-1 and the S-4 registration statements.  PwC was thus fully familiar with and helped prepare and/or received and commented on the "payable to customers" condensed consolidated financial information.

308.    Based on PwC's involvement in preparing and/or reviewing and commenting on these condensed consolidated financial statements, PwC knew that the "payable to customer" line item referred to intercompany loans and that there was approximately $2 billion payable owed by RGL and its affiliates to RCM as of the time of the LBO and that these amounts were not repaid in the LBO.

309.    Indeed, one of PwC's comments to Refco's consolidated financial statements was to eliminate from the Summary of Significant Accounting Policies (Note B) -- Receivable From And Payable To Brokers, Dealers and Customers and move to Related Party Transactions (Note K) the following language: "In the normal course of business, a member of the Group engages in customer-related activities which result in receivable from or *payable to customer balances*, which change daily." (Emphasis added). The only reason PwC would have moved this language to the related-party section of the financials is because PwC understood that these "payables to customer balances" referenced RCM customer assets that were being siphoned to fund the operations of other Refco related entities.

310.    As PwC knew and/or consciously avoided knowing, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the incurrence (in order to pay the Refco Insiders) of $1.4 billion of debt by RGL and RCC in the LBO would have a devastating impact on RCM.

311.    Underscoring PwC's willingness to blindly follow the Refco Insiders at the expense of adhering to their professional standards, on October 12, 2005, two days after the RGHI Receivable had been publicly disclosed, PwC agreed to allocate BAWAG's 10% distributive share of RGL's 2004 income to RGHI based on Bennett's oral representation that the BAWAG affiliate that held a 10% interest in RGHI had merged into RGHI.  Even a minimal investigation, however, would have caused PwC to conclude that the merger of this BAWAG affiliate into RGHI occurred on August 5, 2004, eight months into the tax year, making redistribution of BAWAG's 10% share for the entire tax year inappropriate.

312.    By relying on the oral instructions of Bennett, who was on indefinite leave at the time, without undertaking any investigation of its own, PwC failed to live up to its standards of professional conduct.

## The Investment Banker Defendants' Role in the Fraudulent Scheme

313.    Each of the Investment Banker Defendants knew and/or consciously avoided knowing that a broker-dealer such as Refco was an inappropriate candidate for a leveraged buy-out.

Based on their experience and expertise, they knew and/or consciously avoided knowing that leveraged buy-outs required real cash flows to service such a large amount of debt, and that broker-dealers such as Refco typically did not have sufficient unencumbered cash flows of their own to service such debt loads.  However, as they understood that the LBO was to be followed by a near-term IPO and that the LBO was an important first step toward the lucrative cashing-out desired by the Refco Insiders, they ignored their concerns.

314.     Moreover, the Investment Banker Defendants quickly recognized that they could use the RCM funds being siphoned by the Refco Insiders as a proxy for the cash flows Refco lacked that the Investment Banker Defendants would need to successfully pitch the LBO.

315.     Tellingly, none of the Investment Banker Defendants was comfortable putting its own money into the LBO, and at least one of the Investment Banker Defendant's internal credit departments denied approvals to do the same.  It was only after senior executives at the Investment Banker Defendants overrode these denials and concerns based on the fees that could be earned, the opportunity to do a deal with THL and Refco, and the small amount of investment (in exchange for sizeable fees) that would be required by the Investment Banker Defendants themselves, that they agreed to facilitate the deal.

316.     As the Investment Banker Defendants conducted due diligence to justify the LBO, they strived for ways to show that Refco had free cash flow that could be used to service the LBO debt.  Yet they discovered that (i) they could not recreate management's projected free cash flows, (ii) they could not rely on cash distributions from the regulated subsidiaries, and (iii) fortunately for them, Refco had been and would continue to make RCM's customer assets available to RGL and its affiliates.  Although they knew and/or consciously avoided knowing that a credit risk like Refco was not a good target for leverage, they were comfortable proceeding because of the ready availability of RCM's cash.

317.     The Investment Banker Defendants irreparably damaged RCM by arranging $1.4 billion of LBO financing that "primed" RCM's pre-existing receivables due from RGL and the guarantors on the LBO debt.  And despite the fact that they found management, and particularly the

CFO, to not be credible, they blindly accepted management's patently unreasonable projections to service the LBO debt -- projections which never even took into account the $2 billion owed to RCM.

**Knowledge of the Looting of RCM Assets**

318.    In the due diligence undertaken in connection with the LBO, the Investment Banker Defendants learned that Refco was funding its operations with RCM customer assets, that RCM held between $1 and $2 billion in worthless intercompany IOUs, and that the LBO would altogether foreclose the Refco affiliates' ability to pay down their debt to RCM.

319.    Indeed, Deutsche's Credit Risk Management committee (the "CRM") initially rejected Deutsche's participation in the LBO precisely because it recognized that that an entity whose assets Refco was not segregating, such as RCM, might have its assets siphoned out through intercompany loans that the Refco regulated entities would be unable to pay back.  As the CRM observed in a May 12, 2004 memo initially rejecting Deutsche's involvement in the LBO, "there are constant inter-company receivables/payables which can obscure the true capital position of any particular entity.  This type of liquidity deployment is of particular concern when the receivable is from a regulated subsidiary.  Should [Refco] enter into financial difficulty, regulators would not allow payment of these inter-company receivables which would adversely impact debt service anticipated from the unregulated subsidiary."

320.    Regardless of their concerns, as soon as BAS and Deutsche were offered the prospect of earning lucrative fees in the LBO and IPO, their concerns disappeared.  Instead of critical skepticism and full disclosure to Refco's innocent directors, officers and agents of their concerns, the Investment Banker Defendants each jockeyed for a lead position on both the LBO and IPO, substantially assisting the Refco Insiders in stripping out Refco's assets and leaving RCM with over $2 billion in uncollectible IOUs.

321.    The Investment Banker Defendants were always more concerned about upsetting management than they were about the potential harm that might befall pre-existing creditors (like RCM) who would be devastated by layering $1.4 billion of "senior" debt onto Refco.  Each of the Investment Banker Defendants instead remained completely focused on securing a lead role and the

related fees in the transaction and even when they had concerns about Refco's financial condition, as one Investment Banker Defendant internally noted, the strategy always was to "keep the list [of due diligence] very short," as "[w]e didn't want to frighten management with a 4-page list."

322.    As early as May 2004, senior BAS employees were questioning "how Refco use[d] its capital and how the company's net capital change[d] from period to period."  After undertaking a review of RGL's intercompany receivables and obtaining a schedule from Trosten, BAS concluded that it "need[ed] more information to be able to answer what Refco is doing with their capital and why."

323.    Before the LBO closed, employees for the Investment Banker Defendants continued to question how "money flow[ed] into and out of the regulated entities" and the magnitude of "affiliate loans to regulated entities . . . ."  BAS employees, for example, sought an "[e]xplanation of capital flows over . . . eight quarters between regulated and non-regulated entities.  What is the driver of capital movements and where is capital being used (besides what is in the regulated entity) and for what purpose?"  And in connection with determining how Bennett could legitimately request a pre-closing dividend of $500 million from Refco, BAS senior executive William Coupe noted that "[e]xcess capital to pay $500 MM pre-closing dividend also resides outside the regulated entities and consolidates up through Refco Capital Holdings, LLC."  Given BAS's particularized knowledge of Refco's corporate structure, BAS knew and/or consciously avoided knowing that RCM was the purportedly unregulated subsidiary that consolidates up through Refco Capital Holdings, LLC, whose money was constantly being used by the holding company.

324.    Indeed, the Investment Banker Defendants were keenly aware of the difference between how Refco used cash at RCM and its regulated subsidiaries.  They knew that SEC regulations limited the cash that Refco could have moved from its regulated operations and that Refco had to be drawing on customer assets from Refco's other operations -- namely, RCM -- to cover its operational expenses.  Yet they did not consider how and when RCM's IOUs would ever be repaid given that the Investment Banker Defendants were subordinating those IOUs to $1.4 billion in additional LBO debt.  Indeed, none of the projections used by the Investment Banker Defendants

even factored this into the cash needs of Refco's LBO debt parties -- despite the fact that RCM's primary receivables came from RGL and RCC, both of which were guarantors on the LBO debt.

325.     As the Investment Banker Defendants knew, to make the LBO work, the Refco Insiders had to draw on RCM money to fund Refco's operations because the "Customer Segregated Funds" in the regulated entities were off limits and had to be accounted for separately on Refco's balance sheet.  Indeed, in response to inquiries as to why certain customer assets were not being used to "pay down debt," one senior Credit Suisse executive explained that it is "[b]ecause it is restricted customer cash that must be held for regulatory purposes ie it is not the company's cash."   In stark contrast, the Investment Banker Defendants were elated that Refco Insiders did not restrict access to and regularly drew on RCM customer funds that could be used to pay down Refco's LBO debt.  As one BAS employee proclaimed in an email, "FYI . . . looks like Refco Capital Markets isn't regulated . . . that's good for us!"

326.     In reviewing and commenting on the condensed financial information attached to the LBO offering prospectus, the S-4, the S-1, and the IPO prospectus, the Investment Banker Defendants understood that at the time of the LBO there were over a billion dollars in payables owed to RCM by RGL and other guarantors on the LBO debt and that as of the IPO, the siphoned amount had climbed to over $2 billion.

327.     As the Investment Banker Defendants recognized, given their detailed knowledge of the Company, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the assumption (in order to pay the Refco Insiders) of $1.4 billion of new debt by RGL and RCC would have a devastating impact on RCM.  Indeed, the Investment Banker Defendants understood, as referenced in their own documents, that "payables to customers" constituted "obligations of Refco subsidiaries to repay client monies" and that, therefore, the intercompany loans made by RCM to RGL and its affiliates were comprised of RCM customer funds.

328.     The fraudulent scheme perpetrated on RCM was fundamental to the operation and financing of Refco and each of the Investment Banker Defendants was fully aware and/or

consciously avoided knowing that the LBO and IPO only worked by robbing RCM and leaving its receivables unpaid and unrecoverable.

329.    Indeed, as the Investment Banker Defendants knew and/or consciously avoided knowing, the amounts stolen from RCM substantially outsized Refco's total capital.  By the time Refco filed for bankruptcy, RCM's net uncollectible receivables totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. As the Investment Banker Defendants knew, and as their own projections showed, there was no cash to pay down the receivable to RCM and even Refco's projected "goodwill," which was entirely illusory given the Refco Insiders' fraud, was insufficient to meet RGL and its affiliates' obligations to RCM.

## The Investment Banker Defendants' Motivations

330.    Despite this knowledge, the Investment Banker Defendants, preoccupied with the lucrative fees they expected to make on the LBO and IPO, prepared the offering documents needed to facilitate the LBO and did not focus on the propriety of the LBO for either RCM or RGL.  For example, on May 4, 2004 Michael Paasche, a Deutsche banker, pleaded with a senior Deutsche executive to override the CRM's rejection of the Refco LBO transaction as too risky (first emphasis in original):

> Preliminary feedback from credit suggests we will have an important transaction for TH Lee DECLINED by crm middle of this week.  We need your help in preparing to appeal that decision . . . .
>
> * * *
>
> So in broad summary, we anticipate being one of three banks providing committing to the term loan conditioned upon successfully placing $600 mm of bonds on a best efforts basis. In other words, after successful placement of the bonds, a max underwrite to DB of $250 mm of B loan with a hold target of zero and a take and hold of $25 mm on the revolver. *The ultimate hold of $25 mm compares very favorably with expected fees of about $10 mm.* Furthermore, the bank debt is a very acceptable 35% of total purchase price protected by substantial amounts of equity and sub debt.
>
> Unfortunately, it looks like we will get a DECLINE from credit on the grounds that *levering FIG* [*financial institutions group*] *counterparties isn't good due to the potential for "double leverage"* and the difficulty in collecting payments from a regulated entity to pay interest and amortize debt in periods of market declines. . . .

I think the structure is responsive to the concerns of credit but as no one has levered a transaction like this, its not easy for CRM to signoff.  Furthermore, *the hold of $25 mm is very attractive for a deal of this size and in light of the $10 mm fee potential*. . . .

331.    Indeed, Mr. Paasche was correct in thinking Deutsche's CRM group would reject the risky Refco deal.  On May 11, 2004, Anne Binstock of Deutsche's CRM group stated:  "Given the politics and fees, I suppose it is appropriate to provide the business [group] a hearing on this.  They do know that I cannot get there on this name/this risk."  In response, Lothar Weber of Deutsche noted CRM's decision must stand although it may be overturned for business reasons:  "I suggest that this be elevated to Michael Cohrs/ExCo directly for a business decision.  Paasche has had intensive discussions with Cohrs and he seems to be supportive on business reason, i.e. *limited risk (hold)/high reward*."  (emphasis added).  He further stated, however, that "A point to mention is the Refco (past) reputation and the related reputational risk DB is taking."

332.    On July 22, 2004, Refco Finance Holdings LLC and Refco Finance Inc. issued a Offering Circular regarding the $600 million of senior subordinated notes, with Credit Suisse, BAS, and Deutsche as "joint book-running managers."  Thus, the Investment Banker Defendants overcame their credit concerns about Refco motivated by the lucrative fees and opportunity to get close to THL and Refco for future business, including the IPO.

**Investment Bankers' Use of Patently Unreasonable Projections**

333.    The Investment Banker Defendants never trusted the Refco Insiders.  Indeed, one BAS employee noted in an email dated April 23, 2004, that he could not "look at the cfo [Trosten] without thinking of [john] lovitz and his pathological liar routine on [Saturday Night Live]."  Nevertheless, the Investment Banker Defendants were all too willing to adopt and use patently unreasonable projections prepared by management in arranging and facilitating the LBO and IPO.  Vikrant Sawhney of Deutsche advised others internally by email that "[i]n terms of projections, *THL thinks we should take the mgmt projections that were recently distributed at more or less face value*.  Though they acknowledge 15% top-line growth long-term is difficult, they believe s/b in the bag (higher) for next 2-3 years, just based on secular trends.  Certainly *we should address the challenge of being able to convince the street of our ability to hit these #s, but we don't want to*

*undersell ourselves on valuation etc b/c we have too much knowledge*." (emphasis added). None of the projections used by the Investment Banker Defendants included any repayment of RCM's pre-existing receivables. The Investment Banker Defendants who had been studying Refco's cash-flows knew and/or consciously avoided knowing that significant cash was historically taken and could still be taken from RCM, and yet never took into account how the $1.4 billion of additional leverage on Refco or the payout of RGL's assets to the Refco Insiders would impact RCM's ability to be repaid. Unlike a properly executed leveraged buy-out, the Investment Banker Defendants knowingly left behind over a billion dollars of unpaid debts owed to RCM.

**Impact on RCM was Actively Concealed by Investment Banker Defendants**

334.    The April 16, 2004 letter of intent regarding the LBO sent to Refco expressly advised the company that all debt would be paid down in the LBO except "secured" financing used for customer related activity:

> "Our proposal is for a debt-free Company. Accordingly, we would expect that the Sellers would fund from their cash proceeds (or cause the Company to fund at Closing with a concomitant reduction in cash proceeds paid to the Sellers) all of the Company's indebtedness for borrowed money . . . . We understand that the *secured* financing (if any) used principally for customer related activity in the ordinary course of business will not be repaid." (emphasis added)

335.    Similarly, the LBO Offering Circular falsely states that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." This was, simply, not true. As the Investment Banker Defendants knew, the LBO layered on $1.4 billion in debt that would have to be paid off before RCM's intercompany loans could be paid. Nowhere did the Offering Circular explain that the RCM assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and RCC – two of the entities obligated to repay the LBO borrowings; and that the LBO transactions resulted in "priming" these receivables with $1.4 billion of third-party bank and bond debt without regard for the interests of RCM.

336.     Knowing full well the size of RCM's IOUs, the Investment Banker Defendants ensured that repayment of these receivables would be subordinated to the new LBO debt.  Despite the statements in the Offering Circular to the effect that RCM would not be harmed by the LBO, Section 7.03 of the Credit Agreement dated as of August 5, 2004, states that if Refco incurs "Indebtedness" that constitutes an "Investment" (which is defined to include an intercompany payable), then "all such Indebtedness" by any Refco entity obligated to repay the bank debt owing to a Refco entity that is not obligated (*i.e.*, RCM) "must be expressly subordinated to the Obligations" to repay the bank debt.  In other words, the Investment Banker Defendants knew and/or consciously avoided knowing that the borrower and guarantors on the LBO bank debt were also obligated to pay RCM back for the use of RCM's cash, but ***they insisted that RCM's right to be repaid must be subordinated to their right to repayment.***

337.     Similarly, Section 4.04(b)(15) of the bond debt Indenture allowed RGL and the guarantor subsidiaries to repay "intercompany Indebtedness . . . ***provided that no Default has occurred and is continuing or would result therefrom***." (emphasis added.)   Thus, as long as the LBO bond debt was not in default, RGL and RCC could – although they were not required to do so and arguably were precluded from doing so by the bank debt subordination requirements – repay the billions of dollars owed to RCM.  But if ever the bond debt were in trouble, RCM's right to be repaid would be trumped by the LBO debt, which is what ultimately happened following Refco's bankruptcy.

338.     Pursuant to a July 22, 2004, purchase agreement, Credit Suisse (as representative of itself, BAS, and Deutsche) agreed that the three Investment Banker Defendants would severally purchase – at 97.5% of the principal amount of the notes – the $600 million of senior subordinated notes.  Credit Suisse agreed to purchase $270 million (or 45%) of the notes, and BAS and Deutsche Bank each agreed to purchase $165 million (or 27.5% each) of the notes.  As the Notes were issued pursuant to SEC Rule 144A, they did not have to be registered.

339.     Nonetheless, Refco Finance Holdings LLC and Refco Finance Inc. agreed to file a registration statement with the SEC and then to conduct an "Exxon Capital exchange" of registered

notes for the Rule 144A Notes so that the Investment Banker Defendants would be permitted to resell the Refco notes to others, thereby consummating their low-risk-high-reward strategy for the LBO financing by dumping the notes and just holding a small portion of the even more senior bank debt. Credit Suisse took the lead in drafting the risk factors for the SEC filings that facilitated the resale of the LBO notes and the subsequent IPO.

**The Harm of the IPO to Refco Inc.**

340.     The IPO Registration Statement became effective on August 10th. In connection with the IPO, Refco Inc. issued 26,500,000 shares of common stock to the public at $22/share. The offering consisted of 12,500,000 initial shares by Refco Inc. and 14,000,000 shares of a secondary offering by THL, RGHI, Bennett, and others. An additional 3.975 million shares in overallotment were also issued. The offering generated $258,500,000 in proceeds for Refco Inc., approximately $289,520,000 in proceeds for the selling shareholders and $82.2 million in greenshoe dividend.

341.     As the Investment Banker Defendants always contemplated, and as was set forth in the IPO prospectus, on September 16th, 2005, Refco Inc. used the vast majority of its IPO proceeds to pay $231,262,500 towards the redemption of $210 million of the principal amount of RGL's senior subordinated notes plus $18.9 million in accrued interest and prepayment penalty. As RGL was insolvent at the time, Refco Inc. was induced to make a $231 million contribution to RGL for no consideration.

342.     The Investment Banker Defendants received their share of approximately $45 million in fees in connection with the LBO. The Investment Banker Defendants further received their share of approximately $40 million more in fees in connection with the IPO.

343.     Refco was forced to file for bankruptcy mere weeks after the IPO.

**The RTL Defendants' Role in the Fraudulent Scheme**

344.     The RTL Defendants were a crucial participant in the Refco Insiders' fraudulent scheme to hide the RGHI Receivable. From 1999 to 2005, each of the RTLs was designed to, and in fact did, conceal from the innocent RCM and RGL directors, officers and agents, including inside counsel and others, the nature and extent of the RGHI Receivable.

345.    As each of the RTL Defendants knew, the RTL transactions did not serve any legitimate business purpose for RCM, RGL, or for any other Refco affiliate.

346.    By agreeing to act as a conduit for these fraudulent transactions, the RTL Defendants substantially assisted in the execution of the fraudulent scheme.    Indeed, without the RTL Defendants' active participation in the scheme alleged herein, it would have been impossible for the Refco Insiders to conceal the nature and extent of the RGHI Receivable, or to facilitate a lucrative cashing-out of their interests in Refco.

347.    Each of the RTL Defendants knew and/or consciously avoided knowing, among other things, the following facts:

(a)    First, that the timing of the RTLs was designed to manipulate Refco's financial condition during its fiscal year-end or quarter-end financial or audit reporting periods.    The RTL Defendants did business with Refco and were each aware that Refco's annual reporting year closed at the end of February, and that the RTLs were designed to occur at the end of this fiscal year (and also, starting in 2004, at the end of fiscal quarters) and were unwound shortly after the new reporting period began.

(b)    Second, that the RTLs were not isolated transactions; they were systematic elements in a large-scale fraud, necessitating their use at the end of  financial reporting periods.    Moreover, at least Liberty Corner (and Pigott) were well aware that the RTLs were occurring with more frequency as Refco's LBO and IPO approached.

(c)    Third, the size of the RTLs alone was suspicious.    Each RTL was for a specific and extremely large dollar amount.    Moreover, the RTL Defendants who participated in multiple RTLs year after year, such as Liberty Corner (and Pigott), were aware that the annual aggregate amount of the RTLs was increasing.

(d)    Fourth, the RTLs were suspicious and without any legitimate business purpose.    The RTLs provided the RTL Defendants with lucrative interest payments (in Pigott's case, more than $1.1 million ) in exchange for their participation in a risk-free transaction.    Moreover, the RTL Defendants knew and/or consciously avoided knowing that

they had been selected to provide large-figure loans despite the fact that most or all of the RTL Defendants lacked the financial wherewithal to receive loans of such magnitude on an uncollateralized basis. Similarly, the RTL Defendants whose transactions were guaranteed by RGL knew and/or consciously avoided knowing that the loan transactions were guaranteed by the corporate subsidiary of an insolvent parent, despite that subsidiary's complete lack of interest in or benefit from the transaction.

(e)    Finally, the RTL loan documents indicated that each RTL Defendant was bound to act as a conduit for transfers from a Refco entity to RGHI just before the end of the relevant period, and that these "loans" were unwound just after the beginning of the new period.

348.    Given the sophistication of the RTL Defendants, each knew and/or consciously avoided knowing that the RTL transactions were designed to conceal a significant related-party receivable at the end of Refco's reporting and audit periods.


# RCM CLAIMS


## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RCM Against Bennett and Maggio)

349.    Paragraphs 1 to 348 are incorporated as if fully set forth herein.

350.    At all relevant times, RCM was insolvent or operating in the zone of insolvency.

351.    At all relevant times, Bennett and Maggio, as directors of RCM, owed fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM and RCM's customers, who were creditors of RCM.

352.    In furtherance of their scheme to conceal Refco's true financial condition and prop Refco up long enough to facilitate a lucrative cashing-out of their interests in Refco, Bennett and Maggio caused RCM to transfer its valuable assets to RGL and its affiliates. These transfers, which amounted to approximately $2 billion at the time of the LBO, and over $2 billion at the time of the IPO, were unrelated to the business of RCM, did not benefit RCM, were for the sole purpose of

maintaining the perception of Refco's financial strength and health so that Bennett, Maggio, and the other Refco Insiders could personally benefit from a lucrative cashing-out of their interests in Refco, and occurred, among other things: (a) without any "loan" documentation between RCM and the Refco entities that received the funds; (b) without providing RCM with any compensation, security, or collateral; (c) without assurances that the "loaned" RCM funds would or could be repaid by the Refco entities that received them; and (d) without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM of the appropriateness or suitability of the "loans" or of the ability of the Refco entities to which the funds were "loaned" to repay the funds.

353.    Bennett and Maggio knew that the Refco affiliates to whom RCM's assets were being transferred would not repay these amounts for various reasons, including, but not limited to, the following: (a) RGL and the other Refco entities to whom RCM's assets were loaned did not have the financial wherewithal or intent to repay RCM; (b) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (c) the negative impact that disclosure of the RGHI Receivable (and the trading losses and operating expenses concealed in the RGHI Receivable) would have on Refco's financial condition, customer confidence and ability to repay RCM; (d) hundreds of millions of dollars in Refco revenue were, in fact, illusory accrued interest on the RGHI Receivable; (e) the negative impact the disclosure that the Refco Insiders had used RTLs to conceal the RGHI Receivable at the end of each relevant reporting and audit period would have on Refco's financial condition, consumer confidence, and ability to repay RCM; and (f) as a result of the foregoing facts that were concealed from RCM, its Outside Directors, and innocent officers and agents, there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

354.    By orchestrating these transfers despite their undisclosed conflict of interest and their knowledge of the foregoing, Bennett and Maggio breached their fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM.

355.     Bennett and Maggio were in a position of unique and superior knowledge regarding, among other things, the true facts concerning the condition of RCM, the diversion of RCM assets to fund Refco's operations, the RGHI Receivable, the RTLs, and the fact that there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates.

356.     In the alternative, Bennett and Maggio are liable for aiding and abetting each other's breaches of fiduciary duties to RCM because, among other things, Bennett and Maggio knew of each other's fiduciary duties to RCM, yet participated in and substantially assisted the other's breaches of those duties, as alleged herein.

357.     As a proximate result of these breaches of fiduciary duty, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Fraud Claim by RCM Against Bennett and Maggio)

358.     Paragraphs 1 to 357 are incorporated as if fully set forth herein.

359.     In order to facilitate a lucrative sale of their interests in Refco, Bennett and Maggio engaged in a fraudulent scheme through which they caused RCM's assets to be transferred to and used by RGL and other Refco affiliates to pay operating expenses, fund acquisitions, and improve Refco's overall perceived financial condition, all the while knowing that these Refco affiliates did not have the financial wherewithal or intent to repay RCM's assets.

360.     In furtherance of this fraudulent scheme, Bennett and Maggio, with the active participation of RCM's professional advisors, concealed from RCM, its Outside Directors, and innocent officers and agents, each of the following components, among others, of their fraudulent

scheme: (a) RCM's assets were transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these purported intercompany RCM loans were not documented or negotiated and were made without any specific terms; (c) no credit analysis was performed in connection with these loans and no security or collateral was given for these loans; (d) with the active assistance of Refco's professional advisors, the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and engineered RTLs to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; and (f) as a result of the foregoing, there was no intention or ability to repay the funds RCM loaned to RGL and other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

361.    In addition, with the active assistance of RCM's professional advisors, Bennett and Maggio fraudulently misrepresented in RCM's financial statements that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," when these receivables were, in fact, undocumented intercompany loans made by RCM to Refco affiliates.

362.    Bennett and Maggio made the foregoing material omissions and affirmative misrepresentations with the intent to deceive RCM, its Outside Directors, and innocent officers and agents so as to allow Bennett and Maggio to continue to use RCM assets to fund and prop up Refco and its affiliates until the Refco Insiders were able to complete their lucrative cashing-out of their interests in Refco for far more than those interests were worth.

363.    The true facts concerning the foregoing omissions and misrepresentations were material, and RCM, its Outside Directors, and innocent officers and agents would not have permitted RCM's assets to be transferred to uncreditworthy Refco affiliates had they known them.

364.    As directors of RCM, Bennett and Maggio owed fiduciary duties to, and had a special relationship of confidence and trust with, RCM and, given RCM's insolvent condition, its customers, who were creditors of RCM.

365.    Bennett and Maggio were in a position of unique and superior knowledge regarding the true facts concerning the foregoing omissions and material misrepresentations.  RCM's Outside Directors and innocent officers and agents did not have access to the books and records maintained by Bennett and Maggio through which these intercompany transfers were made, were limited by Bennett and Maggio to reviewing only certain information concerning RCM and Refco, and had no access to information from which they could have learned of the RGHI Receivable, the fraudulent inflation of Refco's operating results, the RTLs, the subordination of RCM's loans to $1.4 billion in new LBO debt, or any of the other fraudulent actions perpetrated by Bennett, Maggio, and the other Refco Insiders.

366.    RCM's  Outside Directors and innocent officers and agents of RCM were justified in relying on Bennett and Maggio, who were RCM directors and officers (with fiduciary duties to RCM) and whose statements regarding Refco's financial health were backed by Trosten, Refco's Chief Financial Officer, and RCM's outside professional advisors, including GT and MB.

367.    In the alternative, Bennett and Maggio are liable for aiding and abetting each other's fraudulent conduct because, among other things, they actively participated in and knowingly and substantially assisted each other's misrepresentations and omissions.

368.    As expected and anticipated by Bennett and Maggio, as a proximate result of their fraudulent omissions and misrepresentations, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

369.    Had the true facts been fully disclosed, RCM would not have allowed its assets to be diverted and would have sought to stop the LBO or required repayment of the approximately $2 billion it was owed as a condition to Refco's entry into the LBO.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Malpractice Claim by RCM Against GT)

370.    Paragraphs 1 to 369 are incorporated as if fully set forth herein.

371.    At all relevant times, GT was employed by and acted as RCM's auditor.

372.    GT owed a duty of care to RCM on account of its professional relationship with RCM.

373.    GT breached its duty of care to RCM by, among other things, issuing unqualified audit opinions for RCM's financial statements that were false, failing to require disclosure in RCM's financial statements or to advise RCM's Outside Directors and innocent officers and agents that RCM's assets were being routinely transferred to Refco affiliates, and instead allowing these intercompany loans to be characterized as a "receivable from customers" on RCM's audited financial statements. GT also breached its duty of care by failing to require disclosure that the Refco affiliates to whom these loans were made lacked the intention or ability to repay these loans for the reasons set forth above.

374.    Any audit examination conducted with the care and diligence required of professional auditors would have revealed these facts and required their disclosure in RCM's financial statements and/or to RCM's Outside Directors and innocent officers and agents.

375.    As a proximate result of GT's breach of its duty of care, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees,

related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Claim by RCM Against GT)

376.    Paragraphs 1 to 375 are incorporated as if fully set forth herein.

377.    At all relevant times, GT was employed by and acted as RCM's auditor.

378.    As RCM's auditor, GT owed a duty to RCM to verify the accuracy of information concerning the financial condition of RCM, including the actual value of intercompany loans and receivables.

379.    In its annual financial audits of RCM, GT, among other things, allowed the misclassification of intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" and otherwise misrepresented RCM's true financial condition by providing unqualified audit opinions indicating that RCM was in sound financial condition.

380.    GT negligently failed to require disclosure of the intercompany receivables owed by Refco affiliates to RCM and negligently failed to require a write down of these purported "receivables," despite knowing, or negligently disregarding, as the auditor of RGL and the other Refco affiliates, including RCM, that RCM could not collect on these "receivables" because the Refco affiliates to whom RCM had loaned its funds did not have the intention or ability to repay these amounts for the reasons set forth above.

381.    As RCM's auditors, GT knew and intended that RCM's Outside Directors and innocent officers and agents would and did reasonably rely on the unqualified audit opinions that GT issued.

382.    The GT audit opinions were false and misleading and contained materially false statements of fact, including false statements regarding the absence of material intercompany transfers of RCM's assets to Refco affiliates and the unimpaired value of these receivables.

383.    RCM's reliance on GT's false statements was reasonable and justified under the circumstances.

384.     As a proximate result of GT's material misrepresentations, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
### Against GT)

385.     Paragraphs 1 to 384 are incorporated as if fully set forth herein.

386.     By virtue of its role as the auditor for RCM and RGL and its affiliates, GT knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (d) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (f) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (g) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

387.    GT was aware of its own role in Bennett and Maggio's overall scheme.

388.    Notwithstanding this knowledge, GT knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) allowing the misclassification of the uncollectible intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" in RCM's financial statements; (b) failing to require a write down of RCM's intercompany receivables, despite its knowledge of the true financial condition of RGL and its affiliates; and (c) providing unqualified audit opinions that indicated that RCM was in sound financial condition when, in fact, as GT knew and/or consciously avoided knowing, RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency.

389.    As a proximate result of GT's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against GT)

390.    Paragraphs 1 to 389 are incorporated as if fully set forth herein.

391.    GT had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and

IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (e) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

392.    GT also knew that Bennett and Maggio affirmatively misrepresented to RCM's Outside Directors and innocent officers and agents that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," rather than uncollectible intercompany loans.

393.    GT was aware of its own role in Bennett and Maggio's overall scheme.

394.    Notwithstanding this knowledge, GT knowingly and substantially assisted in the fraud by, among other things: (a) allowing the misclassification of the intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" in RCM's audited financial statements; (b) failing to require a write down of RCM's intercompany receivables, despite its knowledge of the foregoing components of Bennett and Maggio's fraudulent scheme; and (c) providing unqualified audit opinions that indicated that RCM was in sound financial condition when, in fact, as GT knew and/or consciously avoided knowing, RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency.

395.    As a proximate result of GT's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts,

did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Malpractice Claim by RCM Against MB)

396.    Paragraphs 1 to 395 are incorporated as if fully set forth herein.

397.    At all relevant times, MB was employed by and acted as Refco's outside counsel.

398.    MB provided legal advice to RCM regarding, among other things: (a) the customer agreements utilized by RCM; (b) the applicability and impact of United States and foreign regulations and law to and on RCM's activities, operations, and use of customer funds; and (c) the repatriation of RCM to the United States.

399.    MB owed a duty of care to RCM on account of its professional relationship with RCM.

400.    MB breached its duty of care to RCM by, among other things, not properly advising RCM concerning its obligations to safeguard customer funds; improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; representing both Refco and RGHI in the LBO and the RTLs, despite being conflicted due to its knowledge and/or conscious avoidance of the misconduct at Refco; and failing to advise RCM, its Outside Directors, and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay these amounts for the reasons set forth above.

401.    Given MB's knowledge of the RGHI Receivable, MB's preparation of the documents for each RTL transaction, and MB's role as legal advisor to Refco (including RCM) in all matters, including corporate governance, United States and foreign regulations and law governing Refco's

(and RCM's) operations, activities, and use and treatment of client funds, securities, and other property, and preparation and review of Refco's customer agreements, among other things, MB knew that it was improper for RCM to transfer its funds to Refco affiliates that lacked the financial wherewithal or intent to repay RCM.

402.    Any law firm acting properly under the ethical standards of the profession would have revealed these facts to RCM and required their disclosure in RCM's financial statements and/or to RCM's Outside Directors and innocent officers and agents.

403.    As a proximate result of MB's breach of its duty of care, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RCM Against MB)

404.    Paragraphs 1 to 403 are incorporated as if fully set forth herein.

405.    At all relevant times, MB served as RCM's outside counsel and provided legal advice to RCM regarding, among other things: (a) the customer agreements utilized by RCM; (b) the applicability and impact of United States and foreign regulations and law to and on RCM's activities, operations, and use of customer funds; and (c) the repatriation of RCM to the United States.

406.    As RCM's legal outside counsel, MB owed fiduciary duties to RCM. At all relevant times, MB also served as outside counsel and provided legal advice to RGHI and RGL.

407.    MB had an undisclosed conflict of interest and breached its fiduciary duty to RCM by, among other things, not properly advising RCM concerning its obligations to safeguard customer

funds and not disclosing that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay these amounts for the reasons set forth above.

408.    As a proximate result of MB's breaches of fiduciary duty, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM Against MB)

409.    Paragraphs 1 to 408 are incorporated as if fully set forth herein.

410.    By virtue of its role as outside counsel for RCM and RGL and its affiliates, MB knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (d) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to

repayment to $1.4 billion in new LBO debt; (f) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (g) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

411.    MB was aware of its own role in Bennett and Maggio's overall scheme.

412.    Notwithstanding this knowledge, MB knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) not properly advising RCM concerning its obligations to safeguard customer funds; (b) improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; (c) failing to advise RCM's Outside Directors and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay them; (d) preparing the documentation for each of the RTLs used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (e) advising Refco in connection with the LBO, through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt.

413.    As a proximate result of MB's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.


### TENTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against MB)

414.    Paragraphs 1 to 413 are incorporated as if fully set forth herein.

415.    MB had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the

following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (e) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

416.    MB also knew that Bennett and Maggio affirmatively misrepresented to RCM's Outside Directors and innocent officers and agents that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," rather than uncollectible intercompany loans.

417.    MB was aware of its own role in Bennett and Maggio's overall scheme.

418.    Notwithstanding this knowledge, MB knowingly and substantially assisted in the fraud by, among other things: (a) not properly advising RCM concerning its obligations to safeguard customer funds; (b) improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; (c) failing to advise RCM's Outside Directors and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay them; (d) preparing the documentation for each of the RTLs used to conceal the

existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (e) advising Refco in connection with the LBO, through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt.

419.    As a proximate result of MB's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM Against E&Y)

420.    Paragraphs 1 to 419 are incorporated as if fully set forth herein.

421.    By virtue of its substantial work for Refco, E&Y knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests for more than these interests were worth; (b) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (c) RGL and its affiliates were unable to repay RCM; (d) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (e) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

422.    E&Y was aware of its own role in Bennett and Maggio's overall scheme.

423.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI, RGL, and Refco affiliates that concealed the existence of the RGHI Receivable (and, along with it, the Refco entities' trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns of behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) as a result of the foregoing, creating the illusion that RGL and its other affiliates were financially healthy and creditworthy when in fact they lacked the financial wherewithal to repay RCM.

424.    As a proximate result of E&Y's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against E&Y)

425.    Paragraphs 1 to 424 are incorporated as if fully set forth herein.

426.    E&Y had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests for more than these interests were worth; (b) the Refco Insiders concealed substantial Refco trading losses and operating

expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; and (c) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

427.    E&Y was aware of its own role in Bennett and Maggio's overall scheme.

428.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in the fraud by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI, RGL, and Refco affiliates that concealed the existence of the RGHI Receivable (and, along with it, the Refco entities' trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns of behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) as a result of the foregoing, creating the illusion that RGL and its affiliates were financially healthy and creditworthy when in fact they lacked the financial wherewithal to repay RCM.

429.    As a proximate result of E&Y's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF
## (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
## Against PwC)

430.    Paragraphs 1 to 429 are incorporated as if fully set forth herein.

431.    By virtue of its role as a financial and tax advisor and *de facto* Chief Accounting Officer for Refco, PwC knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (e) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (f) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

432.    PwC was aware of its own role in Bennett and Maggio's overall scheme.

433.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) advising and guiding Refco through the LBO in which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt; and (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, which failed to disclose the RGHI Receivable and the RTLs.

434.    As a proximate result of PwC's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

115

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FOURTEENTH CLAIM FOR RELIEF
#### (Aiding and Abetting Fraud Claim by RCM Against PwC)

435.    Paragraphs 1 to 434 are incorporated as if fully set forth herein.

436.    PwC had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were being transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (c) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (d) there was no intention or ability to satisfy the funds RCM had loaned to the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

437.    PwC was aware of its own role in Bennett and Maggio's overall scheme.

438.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in the fraud by, among other things: (a) advising and guiding Refco through the LBO through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt; and (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, which failed to disclose the RGHI Receivable and the RTLs.

439.    As a proximate result of PwC's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FIFTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
### Against Credit Suisse, BAS, and Deutsche )

440.    Paragraphs 1 to 439 are incorporated as if fully set forth herein.

441.    By virtue of their role as financial advisors to Refco in connection with the LBO and the IPO, Credit Suisse, BAS, and Deutsche knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition  so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (c) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (d) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (e) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

442.    Credit Suisse, BAS, and Deutsche were aware of their own roles in Bennett and Maggio's overall scheme.

443.    Notwithstanding this knowledge, Credit Suisse, BAS, and Deutsche knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things, devising and facilitating an LBO through which the RCM receivables were

117

subordinated to $1.4 billion in new LBO debt, leaving Refco with no meaningful capital with which to repay RCM.

444.     As a proximate result of Credit Suisse, BAS, and Deutsche's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse, BAS, and Deutsche for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

# RGL CLAIMS

## SIXTEENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RGL Against Bennett, Maggio, and Trosten)

445.     Paragraphs 1 to 444 are incorporated as if fully set forth herein.

446.     At all relevant times, RCM was the principal creditor of RGL.

447.     As officers of RGL, Bennett, Maggio, and Trosten owed fiduciary duties of loyalty, care, honesty, and good faith to RGL, and, at all times RGL was insolvent or operating in the zone of insolvency, to RGL's creditors, including RCM.

448.     Bennett, Maggio, and Trosten breached these fiduciary duties by causing RGL and its affiliates to enter into an LBO through which Bennett, Maggio, and Trosten would receive a lucrative cashing-out of their interests in Refco for more than those interests were worth, while knowingly failing to advise the innocent RGL directors, officers and agents, including inside counsel and others, of the following facts, among others, each of which constituted a separate and distinct breach of the fiduciary duties Bennett, Maggio, and Trosten owed to RGL and RGL's principal creditor, RCM: (a) there were material related-party transactions between Refco and RGHI through

118

which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing breaches of fiduciary duty, RGL was insolvent or operating in the zone of insolvency.

449.     Bennett, Maggio, and Trosten knew that their representations to the innocent RGL directors, officers and agents, including inside counsel and others, regarding the financial health of RGL and its affiliates were false because, among other things, they were intimately involved in and directed the RGHI Receivable scheme, the RTLs, the diversion of RCM assets to RGL and its affiliates, and the other fraudulent conduct alleged herein.

450.     Bennett, Maggio, and Trosten were in a position of unique and superior knowledge regarding, among other things, the true facts concerning the condition of RGL, the true substance and scope of the RGHI Receivable, the RTLs, the diversion of RCM assets to fund Refco's operations, and the fact that the appearance of RGL's financial health and strength was fabricated.

451.     In the alternative, Bennett, Maggio, and Trosten are liable for aiding and abetting each other's breaches of fiduciary duties to RGL because, among other things, Bennett, Maggio, and Trosten knew of each other's fiduciary duties as directors and officers of RGL, yet actively participated in and knowingly and substantially assisted the other's breaches of those duties, as alleged herein.

452.     As a proximate result of these breaches of fiduciary duty, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett, Maggio, and Trosten for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### SEVENTEENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RGL Against RGHI, Bennett, and Grant)

453.    Paragraphs 1 to 452 are incorporated as if fully set forth herein.

454.    Prior to the LBO, RGHI held a 90% interest in RGL and was the controlling shareholder of RGL.  RGHI owed fiduciary duties of loyalty, care, honesty, and good faith to RGL as its controlling shareholder.

455.    Prior to the LBO, Bennett and Grant each held 50% interests in RGHI and, therefore, as the sole owners of RGL's controlling shareholder, owed fiduciary duties of loyalty, care, honesty, and good faith to RGL.

456.    RGHI, Bennett, and Grant breached their duties to RGL by, among other things, causing RGL and its affiliates to enter into an LBO through which the Refco Insiders would receive a lucrative cashing-out of their interests in Refco for more than those interests were worth, while knowingly failing to advise the innocent RGL directors, officers and agents, including inside counsel and others, of the following facts, among others, each of which constituted a separate and distinct breach of the fiduciary duties RGHI, Bennett, and Grant owed to RGL: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany

loans; and (f) as a result of the foregoing breaches of fiduciary duty, RGL was insolvent or operating in the zone of insolvency.

457.    RGHI, Bennett, and Grant knew that their representations to the innocent RGL directors, officers and agents, including inside counsel and others, regarding the financial health of RGL and its affiliates were false because they were intimately involved in and directed the RGHI Receivable scheme, the RTLs, the diversion of RCM assets to RGL and its affiliates, and the other fraudulent conduct alleged herein.

458.    RGHI, Bennett, and Grant were in a position of unique and superior knowledge regarding the true facts concerning the condition of RGL, the true substance and scope of the RGHI Receivable, the RTLs, the diversion of RCM assets to fund Refco's operations, and the fact that the appearance of RGL's financial health and strength was fabricated.

459.    In the alternative, Bennett and Grant are liable for aiding and abetting each other's and/or RGHI's breach of its fiduciary duties to RGL because, among other things, they were aware of the existence of those duties, yet actively participated in and knowingly and substantially assisted the breach of those duties, as alleged herein.

460.    As a proximate result of these breaches of fiduciary duty, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against RGHI, Bennett, and Grant for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## EIGHTEENTH CLAIM FOR RELIEF
### (Fraud Claim by RGL Against Bennett, Maggio, and Trosten)

461.    Paragraphs 1 to 460 are incorporated as if fully set forth herein.

462.    Bennett, Maggio, and Trosten were the masterminds behind the fraudulent scheme alleged herein, controlling and directing every aspect of the fraud.

463.    In order to facilitate a lucrative sale of their interests in Refco, Bennett, Maggio, and Trosten engaged in a fraudulent scheme through which they propped up the perceived financial condition of RGL and its affiliates and caused RGL to enter into an imprudent LBO whereby RGL was saddled with $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, and was left unable to satisfy it obligations, including its obligation to repay the RCM intercompany loans.

464.    In furtherance of this scheme, Bennett, Maggio, and Trosten affirmatively misrepresented Refco's financial condition to the innocent RGL directors, officers and agents, including inside counsel and others, and falsely represented that RGL did not engage in any material related-party transactions.

465.    Bennett, Maggio and Trosten knew the falsity of the foregoing material misrepresentations and concealed, among other things, the following fraudulent components of their overall scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates used RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and its suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

466.    Bennett, Maggio, and Trosten knew that their representations regarding the financial health of RGL and its affiliates were false because they were intimately involved in and directed the RGHI Receivable scheme, the RTLs, the diversion of RCM assets to RGL and its affiliates, and the other fraudulent conduct alleged herein.

467.    Bennett, Maggio, and Trosten made the foregoing material omissions and affirmative misrepresentations with the intent to deceive RGL, the innocent RGL directors, officers and agents, including inside counsel and others, so as to induce RGL to enter into an imprudent LBO which would solely benefit the Refco Insiders at RGL's expense.

468.    As officers of RGL, Bennett, Maggio, and Trosten had fiduciary duties to, and a special relationship of confidence and trust with, RGL and, given RGL's insolvent condition, its creditors, including RCM.

469.    The innocent RGL directors, officers and agents, including inside counsel and others, were justified in relying on Bennett, Maggio, and Trosten, who were Refco senior officers (with fiduciary duties to Refco) and whose statements regarding Refco's financial health were backed by outside professional advisors, including MB, GT, E&Y, PwC, and the Investment Banker Defendants.

470.    Bennett, Maggio, and Trosten were in a position of unique and superior knowledge regarding the true facts concerning the condition of RGL, the true substance and scope of the RGHI Receivable, the RTLs, the diversion of RCM assets to fund Refco's operations, and the fact that the appearance of RGL's financial health and strength was fabricated.

471.    As expected and anticipated by Bennett, Maggio, and Trosten, and those acting in active concert or participation with them, RGL entered into the LBO in ignorance of its true precarious financial condition.  Had the true facts been fully disclosed, RGL would not have entered into the LBO.

472.    In entering into the LBO, RGL relied to its detriment on the appearance of financial health and strength fraudulently created by Bennett, Maggio, and Trosten with the active

participation and assistance of the Professional Defendants, and on its ignorance of the true facts with respect to RGL's true precarious financial condition.

473.    The true facts concerning the foregoing omissions and misrepresentations were material, and the innocent RGL directors, officers and agents, including inside counsel and others, would not have permitted the LBO to go forward had they known them.

474.    The innocent RGL directors, officers and agents, including inside counsel and others, were justified in relying on Bennett, Maggio, and Trosten who were RGL's directors and officers (with fiduciary duties to RGL) and whose statements regarding Refco's financial health were backed by RGL's outside professional advisors, including GT, MB, E&Y, PwC, and the Investment Banker Defendants.

475.    In the alternative, Bennett, Maggio, and Trosten are liable for aiding and abetting each other's fraudulent conduct because, among other things, they actively participated in and knowingly and substantially assisted each other's misrepresentations and omissions.

476.    As expected and anticipated by Bennett, Maggio, and Trosten, as a proximate result of their fraudulent omissions and misrepresentations, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett, Maggio, and Trosten for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## NINETEENTH CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against MB)

477.    Paragraphs 1 to 476 are incorporated as if fully set forth herein.

478.    At all relevant times, MB was employed by and acted as the outside counsel to RGL and its affiliates.

479.     MB provided legal advice to RGL and its affiliates regarding, among other things: (a) the customer agreements utilized by RGL and its affiliates; (b) the applicability and impact of United States and foreign regulations and law on RGL's activities and operations; (c) corporate governance of Refco; (d) loan and financing transactions entered into by RGL and its affiliates; and (e) the disclosures filed with regulators and the public in connection with the LBO.

480.     MB owed a duty of care to RGL on account of its professional relationship with RGL.

481.     MB breached its duty of care to RGL by preparing, negotiating, and facilitating the RTLs and failing to advise the innocent RGL directors, officers and agents, including inside counsel and others that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs MB prepared were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

482.     Given MB's knowledge of the RGHI Receivable, MB's preparation of the documents for the RTL transactions and MB's role as legal advisor to RGL, MB knew that RGL was not in a suitable condition to undergo the LBO.

483.     Any law firm acting properly under the ethical standards of the profession would have revealed these facts and required their disclosure in RGL's financial statements and/or to the innocent RGL directors, officers and agents, including inside counsel and others.

484.     As a proximate result of MB's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and

other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

**TWENTIETH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty Claim by RGL Against MB)**

485.    Paragraphs 1 to 484 are incorporated as if fully set forth herein.

486.    At all relevant times, MB served as RGL's outside counsel and provided legal services to RGL.

487.    At the same time, MB served as RGHI's counsel and provided legal services to RGHI.

488.    As RGL's outside counsel, MB had a fiduciary duty to protect RGL's interests.

489.    MB had an undisclosed conflict of interest and breached its fiduciary duties to RGL by facilitating an LBO that benefited RGHI at RGL's expense.

490.    As a proximate result of MB's breach of its fiduciary duties, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-FIRST CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RGL Against MB)

491.     Paragraphs 1 to 490 are incorporated as if fully set forth herein.

492.     By virtue of its role as outside counsel for RGL and its affiliates, MB knew and/or consciously avoided knowing that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs MB prepared were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; (f) as a result of the foregoing, RGL and its affiliate were insolvent or were operating in the zone of insolvency; and (g) Bennett, Maggio, Trosten, Grant and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

493.     MB was aware of its own role in the Refco Insiders and RGHI's overall scheme.

494.     Notwithstanding this knowledge, MB knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of their fiduciary duties to RGL by, among other things: (a) preparing the documentation for each of the RTLs, which were used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; (b) advising Refco in connection with an LBO that would leave RGL unable to satisfy its obligations, including repayment of the funds diverted from RCM; (c) improperly advising RCM that it could transfer its customer funds to RGL and its affiliates despite knowing that these entities did not have the financial wherewithal to satisfy these additional obligations; and (d) failing to disclose its knowledge of the RGHI Receivable and the RTLs to the innocent RGL directors, officers and agents, including inside counsel and others.

495.    As a proximate result of MB's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### TWENTY-SECOND CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against MB)

496.    Paragraphs 1 to 495 are incorporated as if fully set forth herein.

497.    MB had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue;  (c) the RTLs MB prepared were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

498.    MB was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

499.    Notwithstanding this knowledge, MB knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things: (a) preparing the documentation for

each of the RTLs which were used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; (b) advising Refco in connection with an LBO that would leave RGL unable to satisfy its obligations, including repayment of the funds diverted from RCM; (c) improperly advising RCM that it could transfer its customer funds to RGL and its affiliates despite knowing that these entities did not have the financial wherewithal to satisfy these additional obligations; and (d) failing to disclose its knowledge of the RGHI Receivable and the RTLs to the innocent RGL directors, officers and agents, including inside counsel and others.

500.     As a proximate result of MB's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-THIRD CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against GT)

501.     Paragraphs 1 to 500 are incorporated as if fully set forth herein.

502.     At all relevant times, GT was employed by and acted as RGL's auditor.

503.     GT owed a duty of care to RGL on account of its professional relationship with RGL.

504.     GT breached its duty of care to RGL by, among other things, issuing unqualified audit opinions that were false and failing to require disclosure in RGL's financial statements or to advise the innocent RGL directors, officers and agents, including inside counsel and others that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the

129

RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

505.    Any audit examination conducted with the care and diligence required of professional auditors would have revealed these facts and required their disclosure in RGL's financials and/or to the innocent RGL directors, officers and agents, including inside counsel and others.

506.    As a proximate result of GT's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Claim by RGL Against GT)

507.    Paragraphs 1 to 506 are incorporated as if fully set forth herein.

508.    At all relevant times, GT was employed by and acted as RGL's auditor.

509.    As RGL's auditor, GT had a duty to RGL to verify the accuracy of the information concerning RGL's financial condition.

510.    In its annual financial audits of RGL, GT negligently misrepresented RGL's financial condition and negligently issued unqualified audit opinions that were false despite knowing, or negligently disregarding, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating

expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

511.    As RGL's auditors, GT knew and intended that the innocent RGL directors, officers and agents, including inside counsel and others, regulators, investors, and future purchasers of Refco would and did reasonably rely on the unqualified audit opinions that GT issued.

512.    RGL's reliance on GT's false statements was reasonable and justified under the circumstances.

513.    As a proximate result of GT's material misrepresentations and omissions about RGL's financial condition, which gave the appearance of financial health and strength, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty Claims by RGL**
**Against GT)**

514.    Paragraphs 1 to 513 are incorporated as if fully set forth herein.

515.    By virtue of its role as RGL's auditor, GT knew and/or consciously avoided knowing that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency; and (g) Bennett, Maggio, Trosten, Grant, and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

516.    GT was aware of its own role in the Refco Insiders and RGHI's overall scheme.

517.    Notwithstanding this knowledge, GT knowingly and substantially assisted in Maggio, Bennett, Trosten, Grant, and RGHI's breaches of their fiduciary duty to RGL by, among other things, issuing unqualified audit opinions that were false, and failing to require disclosure in RGL's audited financial statements or to advise the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue;  (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo

the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

518.    As a proximate result of GT's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### TWENTY-SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against GT)

519.    Paragraphs 1 to 518 are incorporated as if fully set forth herein.

520.    GT had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

521.    GT also knew that Bennett, Maggio, and Trosten affirmatively misrepresented to the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things, there were no material related-party transactions.

522.    GT was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

523.    Notwithstanding this knowledge, GT knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things, issuing unqualified audit opinions that were false and failing to require disclosure in RGL's financial statements or to advise the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

524.    As a proximate result of GT's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

134

## TWENTY-SEVENTH CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against E&Y)

525.    Paragraphs 1 to 524 are incorporated as if fully set forth herein.

526.    E&Y prepared federal, state, and municipal tax returns for Refco, assisted Refco in audits, and repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, potential third-party investments involving Refco, and the actual sale of a 10% interest in RGL to BAWAG.

527.    E&Y owed a duty of care to RGL on account of its professional relationship with RGL.

528.    E&Y breached its duty of care to RGL by, among other things, preparing false tax returns for RGL without disclosing in RGL's tax documents or advising the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; and (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period.

529.    Any tax return prepared with the care and diligence required of a professional tax preparer would have revealed these facts, and such a professional tax preparer would have required their disclosure in RGL's tax documents.

530.    As a proximate result of E&Y's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys'

fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-EIGHTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Claim by RGL Against E&Y)

531.    Paragraphs 1 to 530 are incorporated as if fully set forth herein.

532.    E&Y prepared federal, state, and municipal tax returns for Refco, assisted Refco in audits, and repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, potential third-party investments involving Refco, and the actual sale of a 10% interest in RGL to BAWAG.

533.    As RGL's tax advisor and preparer, at all relevant times, E&Y owed duties to provide RGL with accurate information concerning the tax obligations of RGL.

534.    In preparing RGL's tax returns, E&Y negligently misrepresented RGL's financial condition by preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGL that failed to disclose that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; and (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue.

535.    E&Y should have known, but instead negligently disregarded, the falsity of the RGL tax returns that it prepared.

536.    As RGL's tax preparer and advisor, E&Y knew and intended that the innocent RGL directors, officers and agents, including inside counsel and others, regulators, investors, and future purchasers of Refco would and did reasonably rely on the tax returns E&Y prepared.

537.    RGL's reliance on E&Y's false statements was reasonable and justified under the circumstances.

136

538.    As a proximate result of E&Y's material misrepresentations and omissions about RGL's financial condition, which gave the appearance of financial health and strength, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### TWENTY-NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RGL Against E&Y)

539.    Paragraphs 1 to 538 are incorporated as if fully set forth herein.

540.    By virtue of its role as RGL's tax advisor and preparer, E&Y knew and/or consciously avoided knowing that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition to facilitate a lucrative sale of the Refco Insiders' interests for more than these interests were worth; and (e) Bennett, Maggio, Trosten, Grant, and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

541.    E&Y was aware of its own role in the Refco Insiders and RGHI's overall scheme.

542.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of their fiduciary duties to RGL by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of

RGHI and Refco that concealed the existence of the RGHI Receivable (and, along with it, RGL's trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns on behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) advising the Refco Insiders in connection with the concealment of trading losses through the Minglewood transaction.

543.    As a proximate result of E&Y's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRTIETH CLAIM FOR RELIEF
#### (Aiding and Abetting Fraud Claim by RGL Against E&Y)

544.    Paragraphs 1 to 543 are incorporated as if fully set forth herein.

545.    E&Y had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; and (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition to facilitate a lucrative sale of the Refco Insiders' interests for more than these interests were worth.

546.    E&Y was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

547.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI and Refco that concealed the existence of the RGHI Receivable (and, along with it, RGL's trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns on behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) advising the Refco Insiders in connection with the concealment of trading losses through the Minglewood transaction.

548.    As a proximate result of E&Y's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-FIRST CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against PwC)

549.    Paragraphs 1 to 548 are incorporated as if fully set forth herein.

550.    PwC provided consulting services to RGL in numerous accounting and financial relevant reporting matters, including analyzing the propriety of the LBO and preparing registration statements and other documents to be filed with the SEC in connection with the LBO and IPO, reviewing and strengthening Refco's internal accounting controls, and serving as Refco's *de facto* Chief Accounting Officer. In addition, PwC served as RGL's tax preparer and tax consultant for the tax year beginning January 1, 2004.

551.    PwC owed a duty of care to RGL on account of its professional relationship with RGL.

139

552.    PwC breached its duty of care to RGL by, among other things, advising and guiding Refco through the LBO and IPO, preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, and preparing false tax returns for RGL without disclosing in these disclosures and tax returns or advising the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

553.    Given PwC's role as RGL's *de facto* Chief Accounting Officer and its role as a financial and accounting consultant for RGL in connection with RGL's LBO and its preparation for the IPO, PwC knew that RGL was not in a position to undergo the LBO.

554.    As a proximate result of PwC's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-SECOND CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RGL Against PwC)

555.    Paragraphs 1 to 554 are incorporated as if fully set forth herein.

556.    By virtue of its role as a financial and tax advisor and *de facto* Chief Accounting Officer for Refco, PwC knew and/or consciously avoided knowing that, among other things: (a) there were undisclosed material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including RCM's intercompany loans; (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency; and (g) Bennett, Maggio, Trosten, Grant, and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

557.    PwC was aware of its own role in the Refco Insiders and RGHI's overall scheme.

558.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of fiduciary duties to RGL by, among other things: (a) advising and guiding Refco through the LBO; (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO, which failed to disclose the RGHI Receivable, the RTLs, the RCM intercompany receivables, or Refco's inability to repay these loans to RCM; and (c) preparing false tax returns for RGL which failed to disclose or account for the RGHI Receivable and the RTLs.

559.    As a proximate result of PwC's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco

Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-THIRD CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against PwC)

560.    Paragraphs 1 to 559 are incorporated as if fully set forth herein.

561.    PwC had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

562.    PwC was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

563.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things: (a) advising and guiding RGL through the LBO; (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO which failed to disclose the RGHI Receivable, the RTLs, the RCM

intercompany receivables, or Refco's inability to repay these loans to RCM; and (c) preparing false tax returns for RGL which failed to disclose or account for the RGHI Receivable and the RTLs.

564.    As a proximate result of PwC's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRTY-FOURTH CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against Credit Suisse)

565.    Paragraphs 1 to 564 are incorporated as if fully set forth herein.

566.    At all relevant times, Credit Suisse was employed by and acted as RGL's "exclusive financial advisor" in connection with marketing and selling RGL.

567.    Among other responsibilities, Credit Suisse was charged with "evaluating the business, operations and financial position of [RGL]" and assisting RGL with evaluating proposals from potential purchasers and with structuring and negotiating the sale of the company.

568.    Credit Suisse owed a duty of care to RGL on account of its professional relationship with RGL.

569.    Credit Suisse was grossly negligent in breaching its duty of care to RGL by, among other things, developing an LBO in which RGL would be left with unreasonably small capital to pay its debts, including its obligation to repay the RCM intercompany loans.

570.    As a proximate result of Credit Suisse's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Claim by RGL Against Credit Suisse)

571.    Paragraphs 1 to 570 are incorporated as if fully set forth herein.

572.    At all relevant times, Credit Suisse was employed by and acted as RGL's "exclusive financial advisor."

573.    Among other responsibilities, Credit Suisse was charged with "evaluating the business, operations and financial position of [RGL]" and assisting RGL with evaluating proposals from potential purchasers and with structuring and negotiating the sale of the company.

574.    As RGL's exclusive financial advisor, Credit Suisse owed duties to provide RGL with accurate information concerning the financial condition of RGL, including its ability to satisfy its obligations after the LBO.

575.    In the projections it prepared in connection with the LBO, Credit Suisse negligently misrepresented that, among other things, RGL would be able to satisfy its obligations after the LBO, despite knowing, or negligently disregarding, that the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repayment of RCM's intercompany loans, and render RGL insolvent or operating in the zone of insolvency.

576.    Credit Suisse should have known, and negligently disregarded, the falsity of the foregoing material misrepresentations and omissions.

577.    As RGL's exclusive financial advisor, Credit Suisse knew and intended that the innocent RGL directors, officers and agents, including inside counsel and others, regulators, investors, and future purchasers of Refco would and did reasonably rely on the projections that Credit Suisse prepared in connection with their evaluation of the LBO.

578.    RGL's reliance on Credit Suisse's false projections was reasonable and justified under the circumstances.

579.    As a proximate result of Credit Suisse's material misrepresentations and omissions about RGL's financial condition, which gave the appearance of financial health and strength, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claim by RGL Against Credit Suisse, BAS, and Deutsche)

580.    Paragraphs 1 to 579 are incorporated as if fully set forth herein.

581.    By virtue of their roles as financial advisors to Refco in connection with the LBO and the IPO, Credit Suisse, BAS, and Deutsche knew and/or consciously avoided knowing that, among other things: (a) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (b) the LBO which would line the Refco Insiders' pockets would cause RGL to incur $1.4 billion in new LBO debt and leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; (c) the LBO would render RGL insolvent or in the zone of insolvency; and (d) by having RGL enter into the LBO, Bennett, Maggio, Trosten, Grant, and RGHI were thereby breaching their fiduciary duties to RGL.

582.    Credit Suisse, BAS, and Deutsche were aware of their own roles in the Refco Insiders and RGHI's overall scheme.

145

583. Notwithstanding this knowledge, Credit Suisse, BAS, and Deutsche knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of their fiduciary duties to RGL by, among other things, purposefully advising and facilitating an LBO through which RGL's assets were distributed to Refco Insiders and other RGL equity holders and RCM's right to repayment was subordinated to $1.4 billion in new LBO debt, thereby leaving RGL unable to satisfy its obligations, including repaying the RCM intercompany loans, and insolvent or operating in the zone of insolvency.

584. As a proximate result of Credit Suisse, BAS, and Deutsche's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse, BAS, and Deutsche for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL
### Against the RTL Defendants)

585. Paragraphs 1 to 584 are incorporated as if fully set forth herein.

586. Each of the RTL Defendants knew and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things, the RTLs were concealing a related-party receivable at the end of each relevant reporting and audit period.

587. The RTL Defendants were aware of their own roles in Bennett, Maggio, and Trosten's scheme to conceal the RGHI Receivable.

588. Notwithstanding this knowledge, the RTL Defendants knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things, knowingly entering into

and facilitating the fraudulent RTL transactions, without which Bennett, Maggio, and Trosten could not have fraudulently concealed Refco's true financial condition.

589.     As a proximate result of the RTL Defendants' knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against the RTL Defendants for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## REFCO INC. CLAIMS

### THIRTY-EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by Refco Inc. Against Bennett and Maggio)

590.     Paragraphs 1 to 589 are incorporated as if fully set forth herein.

591.     At all relevant times, Bennett and Maggio owed fiduciary duties of loyalty, care, honesty, and good faith to Refco Inc. (hereinafter defined to include Refco's corporate parents -- RGL and New Refco Group -- prior to the IPO).

592.     Bennett and Maggio breached these fiduciary duties by, among other things: (a) engaging in an IPO transaction based on inaccurate financial information that saddled Refco Inc. with liabilities to the purchasers of its stock; (b) causing Refco Inc. to pay down, as part of the IPO structure, $231 million in debt obligations owed by RGL, which was insolvent; and (c) distributing Refco Inc.'s assets to the Refco Insiders and other New Refco Group equity holders without paying down the significant amounts RGL owed to RCM.

593.     As a proximate result of Bennett and Maggio's breaches of their fiduciary duties, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

## THIRTY-NINTH CLAIM FOR RELIEF
### (Malpractice Claim by Refco Inc. Against MB)

594.    Paragraphs 1 to 593 are incorporated as if fully set forth herein.

595.    At all relevant times, MB was employed by and acted as Refco's outside counsel.

596.    MB provided legal advice to RGL and its affiliates regarding, among other things: (a) the customer agreements utilized by RGL and its affiliates; (b) the applicability and impact of United States and foreign regulations and law on RGL's activities and operations; (c) corporate governance of Refco; (d) loan and financing transactions entered into by RGL and its affiliates; (e) the disclosures filed with regulators and the public in connection with the IPO; and (f) its legal opinion based on its review of the IPO prospectus.

597.    MB owed a duty of care to Refco Inc. on account of its professional relationship with Refco Inc.

598.    MB breached its duty of care to Refco Inc. by, among other things, reviewing and commenting on the documents necessary to facilitate the IPO and the disclosures submitted in connection with the IPO, and providing a legal opinion in connection with the IPO without advising Refco Inc.'s innocent directors, officers and agents, including inside counsel and others, that, among other things: (a) substantial Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs MB prepared, negotiated, and facilitated; (d) RCM funds were being used to pay the operating expenses of RGL and its affiliates so as to make Refco's overall perceived financial condition suitable for the IPO; (e) Refco's financial statements were inaccurate and that, as a result of the IPO, Refco Inc. would be saddled

with liabilities to the purchasers of its stock; and (f) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to the Refco Insiders, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations, including the amounts owed to RCM.

599.    Given MB's knowledge of the RGHI Receivable, MB's preparation of the documents for the RTL transactions, MB's role as legal advisor to Refco in all matters, including corporate governance and United States and foreign regulations and law governing Refco's operations, activities, and use and treatment of client funds, securities, and other property, and preparation and review of Refco's customer agreements, MB knew that Refco Inc. was not in a suitable financial condition to undergo the IPO.

600.    Any law firm acting properly under the ethical standards of the profession would have revealed these facts and required their disclosure in Refco Inc.'s financial statements and/or to Refco Inc.'s innocent directors, officers and agents, including inside counsel and others.

601.    As a proximate result of MB's breach of its duty of care, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

## FORTIETH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claim by Refco Inc. Against MB

602.    Paragraphs 1 to 601 are incorporated as if fully set forth herein.

603.    By virtue of its role as outside counsel for Refco Inc. and its affiliates, MB knew and/or consciously avoided knowing that, among other things: (a) substantial Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of

dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs MB prepared, negotiated, and facilitated; (d) RCM funds were being used to pay the operating expenses of RGL and its affiliates so as to make Refco's overall perceived financial condition suitable for the IPO; (e) as a result of the IPO, Refco Inc. would be saddled with liabilities to the purchasers of its stock; and (f) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to the Refco Insiders, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations, including the amounts owed to RCM; and (g) Bennett and Maggio were thereby breaching their fiduciary duties to Refco Inc.

604.    MB was aware of its own role in Bennett and Maggio's overall scheme.

605.    Notwithstanding this knowledge, MB substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to Refco Inc. by, among other things: (a) preparing the documentation for each of the RTLs which were used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (b) advising on and facilitating the IPO by reviewing IPO documents and disclosures and preparing a legal opinion in connection with the IPO without disclosing to Refco's innocent directors, officers and agents, including inside counsel and others, the foregoing facts of Bennett and Maggio's breaches of their fiduciary duties.

606.    As a proximate result of MB's knowing and substantial assistance, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

## FORTY-FIRST CLAIM FOR RELIEF
### (Malpractice Claim by Refco Inc. Against GT)

607.    Paragraphs 1 to 606 are incorporated as if fully set forth herein.

608.    At all relevant times, GT was employed by and acted as Refco Inc.'s auditor.

609.    GT owed a duty of care to Refco Inc. on account of its professional relationship with Refco Inc.

610.    GT breached its duty of care to Refco Inc. by, among other things, issuing unqualified audit opinions that were false and failing to require disclosure in the financial statements which accompanied the IPO prospectus or to advise Refco Inc.'s innocent directors, officers and agents, including inside counsel and others, that, among other things: (a) substantial Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs; (d) Refco's financial statements were inaccurate and that, as a result of the IPO, Refco Inc. would be saddled with liabilities to the purchasers of its stock; and (e) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary.

611.    Any audit examination conducted with the care and diligence required of professional auditors would have revealed these facts and required their disclosure in the audited financial statements attached to the IPO prospectus.

612.    As a proximate result of GT's breach of its duty of care, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses and, pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

**FORTY-SECOND CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty Claim by Refco Inc.**
**Against GT**

613.    Paragraphs 1 to 612 are incorporated as if fully set forth herein.

614.    By virtue of its role as Refco Inc.'s auditor, GT knew and/or consciously avoided knowing that, among other things: (a) substantial undisclosed Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs; (d) RCM funds were being used to pay the operating expenses of RGL and its affiliates so as to make Refco's overall perceived financial condition suitable for the IPO; (e) as a result of the IPO, Refco Inc. would be saddled with liabilities to the purchasers of its stock; and (f) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to Bennett, Maggio, and Trosten, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations, including the amounts owed to RCM; and (g) Bennett and Maggio were thereby breaching their fiduciary duties to Refco Inc.

615.    GT was aware of its own role in Bennett and Maggio's overall scheme.

616.    Notwithstanding this knowledge, GT substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to Refco Inc. by, among other things, issuing unqualified audit opinions that were false, failing to disclose Refco's true financial position in the audited financial statements attached to the IPO prospectus, and failing to advise Refco's innocent directors, officers and agents, including inside counsel and others, of these facts.

617.    As a proximate result of GT's knowing and substantial assistance, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

### FORTY-THIRD CLAIM FOR RELIEF
### (Malpractice Claim by Refco Inc. Against Credit Suisse)

618.    Paragraphs 1 to 617 are incorporated as if fully set forth herein.

619.    At all relevant times, Credit Suisse was employed by and acted as Refco Inc.'s "exclusive financial advisor" in connection with the LBO and IPO.

620.    Among other responsibilities, Credit Suisse was charged with "evaluating the business, operations and financial position of [RGL]" and assisting Refco Inc. with evaluating proposals from potential purchasers and with structuring and negotiating the sale of the company.

621.    Credit Suisse owed a duty of care to Refco Inc. on account of its professional relationship with Refco Inc.

622.    Credit Suisse was grossly negligent in breaching its duty of care to Refco Inc. by, among other things, failing to advise Refco Inc.'s innocent directors, officers and agents, including inside counsel and others, that, among other things: (a) the IPO would leave Refco Inc. with insufficient capital to pay its obligations including over $2 billion it owed to RCM; and (b) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary.

623.    As a proximate result of Credit Suisse's breach of its duty of care, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion million and are to be determined at trial.

**FORTY-FOURTH CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty Claim by Refco Inc.**
**Against Credit Suisse, BAS, and Deutsche)**

624.    Paragraphs 1 to 623 are incorporated as if fully set forth herein.

625.    By virtue of their roles as financial advisors to Refco in connection with the LBO and the IPO, Credit Suisse, BAS, and Deutsche knew and/or consciously avoided knowing that, among other things: (a) RGL and its affiliates had borrowed upwards of $2 billion in RCM funds to finance their operations, fund acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through the IPO; (b) the IPO would leave Refco Inc. with insufficient capital to pay its obligations, including over $2 billion it owed to RCM; (c) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to the Refco Insiders, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations; and (d) Bennett and Maggio were thereby breaching their fiduciary duties to Refco Inc.

626.    By virtue of the foregoing knowledge, Credit Suisse, BAS, and Deutsche were aware of their roles in Bennett and Maggio's overall scheme.

627.    Notwithstanding this knowledge, Credit Suisse, BAS, and Deutsche substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to Refco Inc. by, among other things, purposefully facilitating the IPO and providing inaccurate financial projections that failed to take into account repayment of RCM's intercompany loans.

628.    As a proximate result of Credit Suisse, BAS, and Deutsche's knowing and substantial assistance, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse, BAS and Deutsche for the amount of damages

sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

WHEREFORE, as to all the foregoing claims, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT, MB, E&Y, PwC, the Investment Banker Defendants, Bennett, Maggio, Trosten, Grant, RGHI, and the RTL Defendants for the amount of damages sustained, including attorneys' fees, related expenses and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial and demands trial by jury for all matters asserted by law.

Dated:  August 21, 2007

Respectfully submitted,

MARC S. KIRSCHNER, as Trustee of the
Refco Litigation Trust

By: _____
One of His Attorneys

Of Counsel
Richard I. Werder, Jr.
Michael B. Carlinsky
Susheel Kirpalani
Sascha N. Rand
Robert C. Juman
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: (212) 849-7000
Facsimile: (212) 849-7100

John R. McCambridge
Todd C. Jacobs
Gary M. Miller
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Facsimile: (312) 558-1195
Firm No. 17044

131028

# GLOSSARY

**AA** - Arthur Andersen

**BAS** - Banc of America Securities LLC (Professional Defendant)

**BAWAG** - Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft

**Beckenham** - Beckenham Trading Co. Inc. (RTL Defendant)

**Bennett** - Phillip R. Bennett (Refco Insider)

**CFTC** - Commodity Futures Trading Commission

**CIM Ventures** - CIM Ventures, Inc. (RTL Defendant)

**Coast** - Coast Asset Management, LLC (f/k/a Coast Asset Management LP) (RTL Defendant)

**Collins** - Joseph P. Collins, MB partner

**Collis** - Charles Collis, RCM Outside Director

**The Company** - Refco Inc. and its direct and indirect subsidiaries

**Credit Suisse** - Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) (Professional Defendant)

**CRM** - Deutsche's Credit Risk Management committee

**CS Land** - CS Land Management, LLC (RTL Defendant)

**Deere Park** - Deere Park Capital LLC

**Delta Flyer** - Delta Flyer Fund, LLC (RTL Defendant)

**Deutsche** - Deutsche Bank Securities Inc. (Professional Defendant)

**E&Y** - Ernst & Young U.S. LLP (Professional Defendant)

**Eastern** - Eastern Trading Company

**EMF Core Fund** - EMF Core Fund, Ltd. (RTL Defendant)

**EMF Financial** - EMF Financial Products, LLC (RTL Defendant)

**The Examiner** - Bankruptcy Court-appointed Examiner

**Flanagan** - Eric M. Flanagan (RTL Defendant)

**Grant** - Tone N. Grant (Refco Insider)

**GT** - Grant Thornton LLP (Professional Defendant)

**Ingram Micro** - Ingram Micro, Inc. (RTL Defendant)

**Investment Banker Defendants** - Credit Suisse, BAS and Deutsche

**IPO** - 2005 Refco initial public offering

**Krieger** - Andrew Krieger (RTL Defendant)

**LBO** - 2004 Refco leveraged buy-out

**Liberty Corner** - Liberty Corner Capital Strategies, LLC (RTL Defendant)

**Maggio** - Santo C. Maggio (Refco Insider)

**Management Letter** - GT management deficiency letter

**MB** - Mayer, Brown, Rowe & Maw LLP (Professional Defendant)

**Minglewood** - Minglewood Investments, LLC

**NASD** - National Association of Securities Dealers

**New Refco Group** - New Refco Group Ltd., LLC

**NFA** - National Futures Association

**Petitt** - Christopher Petitt (RTL Defendant)

**Pigott** - William T. Pigott (RTL Defendant)

**The Plan** - Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries

**PwC** - PricewaterhouseCoopers LLP (Professional Defendant)

**RCC** - Refco Capital LLC

**RCM** - Refco Capital Markets, Ltd.

**RCM Outside Directors** - Anthony Whaley and Charles Collis

**Refco** - Refco Inc. and certain of its direct and indirect subsidiaries

**The Refco Insiders** - Bennett, Maggio, Trosten and Grant

**RGHI** - Refco Group Holdings, Inc. (Defendant)

**RGF** - Refco Global Finance Ltd.

**RGL** - Refco Group Ltd., LLC

**RSL** - Refco Securities, LLC

**RTL** - Round trip loan transaction

**RTL Defendants** - Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt

**THL** - Thomas H. Lee Partners

**Trosten** - Robert C. Trosten (Refco Insider)

**The Trust** - Refco Litigation Trust

**Wells Ltd.** - RGHI subsidiary

**Whaley** - Anthony Whaley, RCM Outside Director

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

MARC S. KIRSCHNER,                      )
as Trustee of the Refco Litigation Trust, )
                                        )    No. _____
                   Plaintiff,           )
                                        )
v.                                      )
                                        )
GRANT THORNTON LLP, et al.,             )
                                        )
                   Defendant.           )

### SUPREME COURT RULE 222 AFFIDAVIT

We, Grippo & Elden LLC, on behalf of Marc S. Kirschner, as Trustee of the

Refco Litigation Trust, do state that the damages sought in this cause of action exceed Fifty

Thousand Dollars ($50,000.00), plus costs.

By: 

John R. McCambridge

SUBSCRIBED and SWORN to
before me this 21st day of August 2007

_____
Notary Public

"OFFICIAL SEAL"
CONSTANCE L ROBERTS
COMMISSION EXPIRES 11/07/08

Of Counsel

Richard I. Werder, Jr.
Michael B. Carlinsky
Susheel Kirpalani
Sascha N. Rand
Robert Juman
QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: (212) 849-7000
Facsimile: (212) 849-7100

John R. McCambridge
Todd C. Jacobs
Gary M. Miller
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Facsimile: (312) 558-1195
Firm No. 17044

# EXHIBIT 5

PLAN EXHIBIT F
LITIGATION TRUST AGREEMENT

**This Exhibit is subject to all of the provisions of the Plan, including, without limitation section 12.5, under which the Plan Proponents have reserved the right to alter, amend, or modify the Plan, including any Exhibits thereto, under section 1127(a) of the Bankruptcy Code at any time prior to the Effective Date.**

REFCO LITIGATION TRUST AGREEMENT

TABLE OF CONTENTS

ARTICLE 1 ESTABLISHMENT OF THE LITIGATION TRUST .................................. 2
1.1    Establishment of Litigation Trust and Appointment of Original Trustee.......... 2
1.2    Transfer of Assets and Rights to the Litigation Trustee. ................................... 3
1.3    Title to Contributed Claims. .............................................................................. 4
1.4    Nature and Purpose of the Litigation Trust. ..................................................... 4
1.5    Incorporation of Plan. ........................................................................................ 5
1.6    Funding of the Litigation Trust. ......................................................................... 5
1.7    Appointment as Representative. ......................................................................... 6
ARTICLE 2 LITIGATION TRUST INTERESTS ........................................................ 6
2.1    Allocation of Litigation Trust Interests. ............................................................ 6
2.2    Interests Beneficial Only. ................................................................................... 6
2.3    Evidence of Beneficial Interests. ....................................................................... 7
2.4    Securities Law Registration. .............................................................................. 7
2.5    Transfer and Exchange. ...................................................................................... 7
2.6    Access to the Trust Register by the Litigation Trust Beneficiaries. .................. 8
2.7    Absolute Owners. ............................................................................................... 8
2.8    Issuance of Certificates Upon Transfer. ............................................................ 8
2.9    Mutilated, Defaced, Lost, Stolen or Destroyed Certificates. ............................ 9
2.10   Cash-Out Option. ............................................................................................... 9
ARTICLE 3 THE LITIGATION TRUSTEE ............................................................... 10
3.1    Litigation Trust Proceeds. ................................................................................ 10
3.2    Collection of Income. ....................................................................................... 10
3.3    Payment of Litigation Trust Expenses. ............................................................ 10
3.4    Distributions. .................................................................................................... 11
3.5    Tenure, Removal, and Replacement of the Litigation Trustee. ........................ 11
3.6    Acceptance of Appointment by Successor Litigation Trustee. ........................ 12
3.7    Regular Meetings of the Litigation Trustee and the Litigation Trust Committee.
       ........................................................................................................................... 12
3.8    Special Meetings of the Litigation Trustee and the Litigation Trust Committee.
       ........................................................................................................................... 12
3.9    Notice of, and Waiver of Notice for, Litigation Trustee and Litigation Trust
       Committee Meetings. ........................................................................................ 12
3.10   Manner of Acting. ............................................................................................. 13
3.11   Role of the Litigation Trustee. ......................................................................... 13
3.12   Authority of Litigation Trustee. ....................................................................... 14
3.13   Limitation of Litigation Trustee's Authority. .................................................. 16
3.14   Books and Records. .......................................................................................... 17
3.15   Inquiries into Trustee's Authority. ................................................................... 17
3.16   Compliance with Laws. .................................................................................... 17
3.17   Compensation of the Litigation Trustee. ......................................................... 18
3.18   Reliance by Litigation Trustee. ........................................................................ 19
3.19   Investment and Safekeeping of Litigation Trust Assets. ................................. 19
3.20   Standard of Care; Exculpation. ........................................................................ 19

ARTICLE 4 LITIGATION TRUST COMMITTEE ..................................................... 20
4.1     Litigation Trust Committee. .......................................................... 20
4.2     Authority of the Litigation Trust Committee. ................................ 20
4.3     Regular Meetings of the Litigation Trust Committee. .................... 21
4.4     Special Meetings of the Litigation Trust Committee. .................... 21
4.5     Manner of Acting. ......................................................................... 21
4.6     Litigation Trust Committee's Action Without a Meeting. .............. 22
4.7     Tenure, Removal, and Replacement of the Members of the Litigation Trust
        Committee. .................................................................................... 22
4.8     Compensation of the Litigation Trust Committee. ......................... 23
4.9     Standard of Care; Exculpation. ..................................................... 23
ARTICLE 5 TAX MATTERS .................................................................................. 24
5.1     Federal Income Tax Reporting. ..................................................... 24
5.2     Allocations of Litigation Trust Taxable Income. .......................... 25
ARTICLE 6 DISTRIBUTIONS .............................................................................. 26
6.1     Annual Distribution; Withholding. ................................................ 26
6.2     Manner of Payment or Distribution. .............................................. 26
6.3     Delivery of Litigation Trust Distributions. .................................... 28
6.4     Cash Distributions. ....................................................................... 28
ARTICLE 7 INDEMNIFICATION .......................................................................... 28
7.1     Indemnification of Litigation Trustee and the Litigation Trust Committee. .... 28
ARTICLE 8 NET LITIGATION TRUST RECOVERY ............................................ 29
8.1     No Effect on Mutuality. ................................................................ 29
8.2     Section 502(h). ............................................................................. 29
ARTICLE 9 REPORTS TO LITIGATION TRUST BENEFICIARIES ...................... 29
9.1     Reports. ........................................................................................ 29
ARTICLE 10 TERM; TERMINATION OF THE LITIGATION TRUST ................... 30
10.1    Term; Termination of the Litigation Trust. .................................... 30
10.2    Continuance of Trust for Winding Up. .......................................... 31
ARTICLE 11 AMENDMENT AND WAIVER .......................................................... 31
11.1    Amendment and Waiver. ............................................................... 31
ARTICLE 12 MISCELLANEOUS PROVISIONS .................................................... 32
12.1    Intention of Parties to Establish the Litigation Trust. .................... 32
12.2    Reimbursement of Trust Litigation Costs. ..................................... 32
12.3    Laws as to Construction. ............................................................... 32
12.4    Jurisdiction. .................................................................................. 32
12.5    Dispute Resolution. ...................................................................... 33
12.6    Severability. .................................................................................. 33
12.7    Notices. ......................................................................................... 33
12.8    Fiscal Year. ................................................................................... 35
12.9    Headings. ...................................................................................... 35
12.10   Counterparts. ................................................................................ 35
12.11   Confidentiality. ............................................................................. 35
12.12   Entire Agreement. ......................................................................... 36

This Litigation Trust Agreement (the "Litigation Trust Agreement"), dated as of December 26, 2006, by and among RCM, the Debtors, and Marc S. Kirschner, as the trustee (the "Original Trustee"), is executed in order to establish a liquidating trust (the "Liquidating Trust") in connection with the Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries, including, without limitation, any supplement to such Plan and the exhibits and schedules thereto (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the "Plan"). Capitalized terms used in this Litigation Trust Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## W I T N E S S E T H

WHEREAS, RCM and certain of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code, on October 17, 2005, with the Bankruptcy Court, and certain other Debtors filed petitions with the Bankruptcy Court thereafter;

WHEREAS, the Creditors' Committee was appointed by the United States Trustee in the Chapter 11 Cases of the Debtors on October 28, 2005, and was reconstituted on March 29 and July 21, 2006;

WHEREAS, pursuant to the Bankruptcy Court's March 22, 2006, Order Authorizing Appointment of Chapter 11 Trustee for Estate of Refco Capital Markets, Ltd., Case No. 05-60018, the U.S. Trustee on April 10, 2006, filed a Notice appointing Marc S. Kirschner as the Chapter 11 trustee for RCM (the "RCM Trustee"), which Notice and appointment was approved by Bankruptcy Court Order dated April 13, 2006, as amended by Orders entered on April 19, 2006, and April 24, 2006;

WHEREAS, on August 3, 2006, the U.S. Trustee filed Notices of Bifurcation of Official Committee of Unsecured Creditors by Further Reconstitution And Amended Appointment, further reconstituting the Creditors' Committee and establishing the Additional Committee;

WHEREAS, on October 6, 2006, RCM and the Debtors filed the initial Plan and related Disclosure Statement, and on October 25, 2006, RCM and the Debtors filed a revised Plan and the related Disclosure Statement;

WHEREAS, on October 20, 2006, the Bankruptcy Court entered an order approving the revised Disclosure Statement;

WHEREAS, on December 4, 2006, RCM and the Debtors filed the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries;

WHEREAS, on December 15, 2006, the Bankruptcy Court entered the Confirmation Order approving the Plan;

WHEREAS, the Litigation Trust is created pursuant to, and to effectuate certain provisions of, the Plan and pursuant to which the Litigation Trustee will hold the Contributed Claims (which Contributed Claims, prior to the transfer to the Litigation Trust, are held by the RCM Trustee and the Debtors, as debtors in possession, on behalf of the Litigation Trust Beneficiaries pursuant to the terms of the Plan) and is contemplated by the Confirmation Order;

WHEREAS, the Litigation Trustee was duly appointed as a representative of each of the Estates pursuant to section 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code;

WHEREAS, the Litigation Trust is organized for the primary purpose of liquidating and distributing assets transferred to the Litigation Trustee with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust;

WHEREAS, the Litigation Trust is established for the benefit of the Litigation Trust Beneficiaries;

WHEREAS, the Litigation Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d); and

WHEREAS, the Litigation Trust is established for the pursuit of all Contributed Claims, which excludes any claims, rights of action, suits, or proceedings held by the RCM Estate pursuant to sections 547 and 749, and to the extent a recovery is predicated upon such sections, section 550, of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan, the RCM Trustee, the Debtors, the Committees, and the Litigation Trustee agree as follows:

ARTICLE 1

ESTABLISHMENT OF THE LITIGATION TRUST

1.1    <u>Establishment of Litigation Trust and Appointment of Original Trustee</u>.

(a)    Pursuant to the Plan, the RCM Trustee, the Debtors and the Original Trustee hereby establish a trust which shall be known as the "Refco Litigation Trust" on behalf of the Litigation Trust Beneficiaries.

(b)    The Original Trustee is hereby appointed as trustee of the Litigation Trust effective as of the Effective Date of the Plan (the "<u>Effective Date</u>") and agrees to accept and hold the assets of the Litigation Trust in trust for the Litigation Trust Beneficiaries subject to the terms of the Plan and this Litigation Trust Agreement.  The Original Trustee and each successor trustee serving from time to time hereunder (the "<u>Litigation Trustee</u>") shall have all the rights, powers and duties set forth herein.

2

1.2     Transfer of Assets and Rights to the Litigation Trustee.

(a)     As of the Effective Date, (i) the RCM Trustee, on behalf of RCM's Estate, and each of the Debtors, in its respective capacity as a debtor in possession on behalf of its Estate, hereby transfer, assign, and deliver to the Litigation Trustee, without recourse, all of their respective rights, title, and interests in and to the Contributed Claims free and clear of any and all Liens, Claims (other than Claims in the nature of setoff or recoupment), encumbrances or interests of any kind in such property of any other Person or entity (including all Liens, Claims, encumbrances or interests of RCM creditors that were subordinated for purposes of Distributions under the Plan) and (ii) the RCM Trustee, the Debtors and the Committees hereby transfer, assign, and deliver to the Litigation Trustee and the Litigation Trust Committee, without waiver, all of their respective rights, title and interests in and to any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Contributed Claims (collectively, "Privileges"), which shall vest in the Litigation Trustee and the Litigation Trust Committee, in trust, and, consistent with section 1123(b)(3)(B), for the benefit of the Litigation Trust Beneficiaries.  None of the foregoing transfers to the Litigation Trustee and the Litigation Trust Committee shall constitute a merger or consolidation of any of the Estates or any of their Contributed Claims, each of which shall retain its separateness following the transfer for all purposes relevant to the prosecution thereof.

(b)     On or as promptly as practicable after the Effective Date, the RCM Trustee, the Debtors, and, as applicable, the Committees shall (i) deliver or cause to be delivered to the Litigation Trustee any and all documents in connection with the Contributed Claims (including those maintained in electronic format and original documents) whether held by the RCM Trustee, the Debtors, the Committees, their respective employees, agents, advisors, attorneys, accountants, or any other professionals and (ii) provide access to such employees of RCM or the Debtors, or their agents, advisors, attorneys, accountants or any other professionals hired by RCM, the Debtors or the Committees with knowledge of matters relevant to the Contributed Claims.  Upon the reasonable request of the Litigation Trustee, to the extent permitted by law, the RCM Trustee, the Debtors and the Committees shall provide the Litigation Trustee with a list of all documents in connection with the Contributed Claims known to it but not held by it or any of its employees, agents, advisors, attorneys, accountants or any other professionals.  Such list shall contain a description of each document, to the extent feasible and permitted by law, as well as the name of the entity or Person holding such document.

(c)     At any time and from time to time on and after the Effective Date, the RCM Trustee, the Reorganized Debtors and the Committees to the extent in existence, agree (i) at the reasonable request of the Litigation Trustee to execute and/or deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), (ii) to take, or cause to be taken, all such further actions as the Litigation Trustee may reasonably request in order to evidence or effectuate the transfer of the Contributed Claims and the Privileges to the Litigation Trustee (and, in the case of the Privileges, the Litigation Trust Committee) and

the consummation of the transactions contemplated hereby and by the Plan and to otherwise carry out the intent of the parties hereunder and under the Plan and (iii) to cooperate with the Litigation Trustee in the prosecution of the Contributed Claims.

       (d)     The Examiner shall transmit to the Litigation Trustee a copy of the report of his investigation and all attachments thereto promptly after filing that report and attachments with the Bankruptcy Court unless there is pending before the Bankruptcy Court a motion asking that dissemination of the report and attachments be restricted or unless the Court has ordered otherwise.  The Litigation Trustee may seek documents from the Examiner before or after the filing of such report, even if beyond the scope of the foregoing.  If the Examiner and the Litigation Trustee are unable to reach an agreement on what if any other or additional documents should be provided to the Litigation Trustee, either the Examiner or the Litigation Trustee may by motion seek an order from the Bankruptcy Court resolving the issue.  A copy of any such motion shall be served upon the United States Trustee.

      1.3     Title to Contributed Claims.

       The transfer of the Contributed Claims to the Litigation Trustee shall be made for the ratable benefit of the Litigation Trust Beneficiaries to the extent such Litigation Trust Beneficiaries are entitled to Litigation Trust Interests under the Plan.  In this regard, the Contributed Claims will be treated for tax purposes as being (i) a deemed transfer to the Litigation Trust Beneficiaries in partial satisfaction of Allowed Claims, to be held by RCM and the Debtors on their behalf, and (ii) immediately thereafter, a deemed transfer to the Litigation Trustee in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust Beneficiaries, in accordance with the Plan.  Upon the transfer of the Contributed Claims, the Litigation Trustee shall succeed to all of the RCM Trustee's and each of the Debtors' right, title and interest in and to the Contributed Claims and RCM and the Debtors will have no further interest in or with respect to the Contributed Claims or the Litigation Trust.

      1.4     Nature and Purpose of the Litigation Trust.

       (a)     Purpose.  The Litigation Trust is organized and established as a trust pursuant to which the Litigation Trustee, subject to the terms and conditions contained herein and in the Plan, is to (i) hold the assets of the Litigation Trust and dispose of the same in accordance with this Litigation Trust Agreement and the Plan in accordance with Treasury Regulation Section 301.7701-4(d) and (ii) oversee and direct the expeditious but orderly liquidation of the assets of the Litigation Trust.  Accordingly, the primary purpose of the Litigation Trust is to liquidate the assets transferred to the Litigation Trustee with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve or enhance the liquidation value of the assets of the Litigation Trust, and consistent with, the liquidating purpose of the Litigation Trust.

       (b)     Actions of the Litigation Trustee.  The Litigation Trustee, upon direction of the Litigation Trust Committee, and the exercise of their collective

reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Litigation Trust, make timely distributions and not unduly prolong the duration of the Litigation Trust.  The liquidation of the Contributed Claims may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise.  The Litigation Trustee, subject to the approval of the Litigation Trust Committee, except as set forth in Section 3.12 herein, shall have the absolute right to pursue, settle and compromise or not pursue any and all Contributed Claims as it determines is in the best interests of the Litigation Trust Beneficiaries, and consistent with the purposes of the Litigation Trust, and the Litigation Trustee shall have no liability for the outcome of any such decision except for any damages caused by recklessness, gross negligence, willful misconduct, or knowing violation of law.

(c)    Relationship.  This Litigation Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Litigation Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Trustee, the Litigation Trust Committee (or any of its members or ex officio members), or the Litigation Trust Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Litigation Trust Beneficiaries to the Litigation Trustee and the Litigation Trust Committee shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Litigation Trust Agreement.

1.5    Incorporation of Plan.

The Plan and the Confirmation Order are each hereby incorporated into this Litigation Trust Agreement and made a part hereof by this reference; provided, however, to the extent that there is conflict between the provisions of this Litigation Trust Agreement, the provisions of the Plan, and/or the Confirmation Order, each such document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Litigation Trust Agreement.

1.6    Funding of the Litigation Trust.

On or after the Effective Date, upon the determination of the Litigation Trustee, subject to the approval of the Litigation Trust Committee, the Litigation Trust shall be funded (i) from a loan that is non-recourse to RCM, the Debtors or the Estates, secured only by the proceeds of the Contributed Claims from one or more lenders who agree to make such loan on terms acceptable to the Litigation Trustee and the Litigation Trust Committee, (ii) from reserves maintained from the proceeds of Contributed Claims in accordance with Section 6.1, and (iii) with up to $25 million drawn from the Contributing Debtors Distributive Assets, deducted on a pro rata basis from the Distributions that otherwise would be made to (x) Holders of Contributing Debtors General Unsecured Claims in accordance with the calculation of the Contributing

5

Debtors General Unsecured Distribution and (y) to the RCM Estate in accordance with the calculation of the RCM Intercompany Claims Distribution in Section 3.1 of the Plan. Any failure or inability of the Litigation Trust to obtain funding will not affect the enforceability of the Litigation Trust.

        1.7      <u>Appointment as Representative</u>.

Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Plan appointed the Litigation Trustee as the duly appointed representative of each of the Estates, and, as such, the Litigation Trustee succeeds to all of the rights and powers of a trustee in bankruptcy with respect to prosecution of the Contributed Claims for the ratable benefit of the Litigation Trust Beneficiaries. To the extent that any Contributed Claims cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Contributed Claims shall be deemed to have been retained by the applicable Reorganized Debtor or RCM, as appropriate, and the Litigation Trustee shall be deemed to have been designated as a representative of the applicable Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Contributed Claims on behalf of such Estate. Notwithstanding the foregoing, all net proceeds of the Contributed Claims shall be transferred to the Effective Beneficiaries consistent with the provisions of the Plan and this Litigation Trust Agreement.

ARTICLE 2

LITIGATION TRUST INTERESTS

        2.1      <u>Allocation of Litigation Trust Interests</u>.

The allocation and Distribution of the Litigation Trust Interests shall be accomplished as set forth in the Plan, including, without limitation, Article III, Section 5.7(c), and Article VI of the Plan. Any Litigation Trust Interests to be distributed to the RCM Trustee under the Plan shall be deemed distributed to the applicable Effective Beneficiaries having Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims against RCM, and the RCM Trustee shall be deemed to hold such interests in trust for such Effective Beneficiaries. Alternatively, any Litigation Trust Interests to be distributed to the RCM Trustee under the Plan may be directly distributed to the applicable Effective Beneficiaries in such amounts and proportions as may be approved by the RCM Trustee consistent with the terms of the RCM Settlement. The aggregate number and face value of Litigation Trust Interests to be distributed pursuant to the Plan shall be determined by the Litigation Trustee, subject to approval of the Litigation Trust Committee, consistent with the intent and purposes of the Plan.

        2.2      <u>Interests Beneficial Only</u>.

The ownership of a Litigation Trust Interest shall not entitle any Litigation Trust Beneficiary to any title in or to the assets of the Litigation Trust as such (which title

6

shall be vested in the Litigation Trustee) or to any right to call for a partition or division of the assets of the Litigation Trust or to require an accounting.

2.3     Evidence of Beneficial Interests.

The Litigation Trust Interests may be represented either by book entries on the books and records of the Litigation Trust or by certificates, in either definitive or global form, as shall be determined by the Litigation Trustee upon consultation with and subject to approval of the Litigation Trust Committee.  In the event certificates are created, the Litigation Trustee shall cause to be placed on such certificate such legends as it deems are required or appropriate under tax laws or regulations in connection with tax withholding pursuant to Section 6.1, under securities laws or regulations in connection with registration or reporting requirements, if any, or otherwise.  Any Person to whom a certificate is issued or transferred, by virtue of the acceptance thereof, shall assent to and be bound by the terms and conditions of this Litigation Trust Agreement and the Plan.  In the event certificates are issued, the form of such certificates shall be determined by the Litigation Trustee subject to approval of the Litigation Trust Committee.

2.4     Securities Law Registration.

To the extent the Litigation Trust Interests are deemed to be "securities," the issuance of Litigation Trust Interests to Holders of Allowed Claims or the Disputed Claims Reserve (or any redistribution of such interests or related interests by the RCM Trustee to the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims) under the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended and any applicable state and local laws requiring registration of securities.  If the Litigation Trustee determines, with the advice of counsel, that the Litigation Trust is required to comply with registration and reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or the Investment Company Act of 1940, as amended (the "Investment Company Act"), then the Litigation Trustee shall, after consultation with the Litigation Trust Committee, take any and all actions to comply with such registration and reporting requirements, if any, and file periodic reports with the Securities and Exchange Commission (the "SEC").  Notwithstanding the foregoing procedure, nothing herein shall be deemed to preclude the Litigation Trust Committee and the Litigation Trustee from amending this Litigation Trust Agreement to make such changes as are deemed necessary or appropriate by the Litigation Trustee, with the advice of counsel, to ensure that the Litigation Trust is not subject to registration or reporting requirements of the Exchange Act, or the Investment Company Act.

2.5     Transfer and Exchange.

(a)     No transfer, assignment, pledge, hypothecation or other disposition of a Litigation Trust Interest may be effected until either (i) the Litigation Trustee and the Litigation Trust Committee have received such legal advice or other information that they, in their sole discretion, deem necessary or appropriate to assure that any such disposition shall not require the Litigation Trust to comply with the registration and

reporting requirements of the Exchange Act or the Investment Company Act or (ii) the Litigation Trustee and the Litigation Trust Committee have determined to register and/or make periodic reports in order to enable such disposition to be made.  In the event that any such disposition is allowed, the Litigation Trust Committee and the Litigation Trustee may add such restrictions upon transfer and other terms to this Litigation Trust Agreement as are deemed necessary or appropriate by the Litigation Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

(b)    The Litigation Trustee shall appoint a registrar, which may be the Litigation Trustee (the "Registrar") for the purpose of recording ownership of the Litigation Trust Interests as herein provided.  The Registrar, if other than the Litigation Trustee, may be such other institution acceptable to the Litigation Trust Committee.  For its services hereunder, the Registrar, unless it is the Litigation Trustee, shall be entitled to receive reasonable compensation from the Litigation Trust as a cost of administering the Litigation Trust.

(c)    The Litigation Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by them from time to time, a registry of the Litigation Trust Beneficiaries of the Litigation Trust (the "Trust Register") which shall be maintained pursuant to such reasonable regulations as the Litigation Trustee and the Registrar may prescribe.

2.6    Access to the Trust Register by the Litigation Trust Beneficiaries.

Litigation Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Registrar and the Litigation Trustee, and in accordance with the reasonable regulations prescribed by the Registrar and the Litigation Trustee, to inspect and, at the sole expense of the Litigation Trust Beneficiary seeking the same, make copies of the Trust Register, in each case for a purpose reasonably related to such Litigation Trust Beneficiary's interest in the Litigation Trust.

2.7    Absolute Owners.

The Litigation Trustee may deem and treat the Litigation Trust Beneficiary of record in the Trust Register as the absolute owner of such Litigation Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever and the Litigation Trustee shall not be charged with having received notice of any claim or demand to such Litigation Trust Interests or the interest therein of any other Person.

2.8    Issuance of Certificates Upon Transfer.

In the event certificates representing Litigation Trust Interests are created, subject to the conditions of Section 2.5(a), whenever any certificate shall be presented for transfer or exchange, the Litigation Trustee shall cause the Registrar to issue, authenticate

and deliver in exchange therefor, the certificate for the Litigation Trust Interest(s) that the person presenting such certificates shall be entitled to receive.

    2.9    Mutilated, Defaced, Lost, Stolen or Destroyed Certificates.

    In the event certificates representing Litigation Trust Interests are created, if a Beneficiary claims that his/her certificate (the "Original Certificate") has been mutilated, defaced, lost, stolen or destroyed, the Litigation Trustee shall issue, and the Registrar shall authenticate, a replacement certificate if such Beneficiary submits a notarized affidavit certifying that (i) he/she is the true, lawful, present and sole owner of the Original Certificate, (ii) he/she has diligently searched all of his/her financial and other records and the Original Certificate is nowhere to be found, (iii) the Original Certificate and any rights or interests therein were not endorsed, and have not been pledged, sold, delivered, transferred or assigned under any agreement, hypothecated or pledged for any loan, or disposed of in any manner by the Beneficiary or on his/her behalf, (iv) no other Person or other entity has any right, title, claim, equity or interest in, to, or respecting the Original Certificate and (v) in the event of the recovery of the Original Certificate at any time after the issuance of a new certificate in exchange thereof, the Beneficiary will cause the recovered Original Certificate to be returned to the Litigation Trustee, or his or her successor, for cancellation.  In addition, such Beneficiary will indemnify, and if required by the Litigation Trustee or the Registrar, provide a bond or other security sufficient in the reasonable judgment of the Litigation Trustee, the Registrar or any authenticating agent, from any loss which any of them may suffer if the Original Certificate is replaced, including a loss resulting from the assertion by any entity or Person of the right to payment under the Original Certificate.  Such Beneficiary shall pay reasonable charges established by the Litigation Trustee and the Registrar for the purpose of reimbursing the Litigation Trust and the Registrar for the expenses incident thereto, including any tax or other governmental charges.  The Litigation Trustee shall incur no liability to anyone by reason of anything done or omitted to be done by it in good faith under the provisions of this Section 2.9.  All Litigation Trust Interests shall be held and owned upon the express condition that the provisions of this Section 2.9 are exclusive in respect of the replacement or payment of mutilated, defaced, lost, stolen or destroyed certificates and shall, to the extent permitted by law, preclude any and all other rights or remedies respecting such replacement or the payment in respect thereto.  Any duplicate certificate issued pursuant to this Section 2.9 shall constitute original interests in the Litigation Trust and shall be entitled in the manner provided herein to equal and proportionate benefits with all other Litigation Trust Interests issued hereunder in any monies or property at the time held by the Litigation Trustee for the benefit of the Litigation Trust Beneficiaries.  The Litigation Trustee and the Registrar shall not treat the Original Certificate as outstanding.

    2.10    Cash-Out Option.

    The Litigation Trustee, subject to the approval of the Litigation Trust Committee, may negotiate with one or more third parties one or more offers to purchase Litigation Trust Interests from the Litigation Trust Beneficiaries, at the option of each Litigation Trust Beneficiary.

ARTICLE 3

THE LITIGATION TRUSTEE

3.1     Litigation Trust Proceeds.

        All Contributed Claims Recoveries shall be added to the assets of the
Litigation Trust (the "Litigation Trust Proceeds") and held as a part thereof (and which
title shall be vested in the Litigation Trustee).

3.2     Collection of Income.

        The Litigation Trustee shall collect all income earned with respect to the
assets of the Litigation Trust, which shall thereupon be added to the assets of the
Litigation Trust and held as a part thereof  (and which title shall be vested in the
Litigation Trustee).

3.3     Payment of Litigation Trust Expenses.

        (a)     The Litigation Trustee shall maintain a litigation expense fund (the
"Litigation Expense Fund") and expend the assets of the Litigation Expense Fund (i) as
are reasonably necessary to meet contingent liabilities and to maintain the value of the
assets of the Litigation Trust during liquidation, (ii) to pay reasonable administrative
costs (including but not limited to, the costs and expenses of the Litigation Trustee
(including reasonable fees, costs, and expenses of professionals) and the members of the
Litigation Trust Committee (but excluding the fees of professionals retained by such
members), any taxes imposed on the Litigation Trust or fees and expenses in connection
with, arising out of or related to the Contributed Claims, and (iii) to satisfy other
liabilities incurred or assumed by the Litigation Trust (or to which the assets are
otherwise subject) in accordance with the Plan or this Litigation Trust Agreement.

        (b)     The Litigation Trustee may retain from the Litigation Trust
Proceeds and add to the Litigation Expense Fund, at any time and from time to time, such
amounts as the Litigation Trustee deems reasonable and appropriate to ensure that the
Litigation Expense Fund will be adequate to meet the expenses and liabilities described
in subsection (a) of this Section.

        (c)     Notwithstanding any other provision of this Litigation Trust
Agreement to the contrary, the Litigation Trustee shall not be required to take any action
or enter into or maintain any claim, demand, action or proceeding relating to the
Litigation Trust unless it shall have sufficient funds in the Litigation Expense Fund for
that purpose.

3.4    <u>Distributions</u>.

    The Litigation Trustee shall distribute the net distributable assets of the Litigation Trust to the Litigation Trust Beneficiaries in accordance with the provisions of <u>Article 6</u>.

3.5    <u>Tenure, Removal, and Replacement of the Litigation Trustee</u>.

    (a)    Each Litigation Trustee will serve until resignation and the appointment of a successor pursuant to subsection (b) below, removal pursuant to subsection (c) below, Disability (as defined in <u>Section 3.17(c)(ii)</u>), or death (if applicable).

    (b)    The Litigation Trustee may resign by giving not less than ninety (90) days' prior written notice to the Litigation Trust Committee.  Such resignation will become effective on the later to occur of:  (i) the day specified in such notice and (ii) the appointment of a successor trustee as provided herein and the acceptance by such successor trustee of such appointment.  If a successor trustee is not appointed or does not accept his or her appointment within ninety (90) days following delivery of notice of resignation, the Litigation Trustee may file a motion with the Bankruptcy Court, upon notice and hearing, for the appointment of a successor trustee;

    (c)    Subject to <u>Section 3.17(b)</u>, the Litigation Trustee may be removed for any reason by vote of the majority of the members of the Litigation Trust Committee;

    (d)    In the event of a vacancy in the position of the Litigation Trustee (whether by removal, resignation, Disability, or death, if applicable), the vacancy will be filled by the appointment of a successor trustee by (i) majority vote and resolution of the Litigation Trust Committee, and by the acceptance of the Litigation Trust by the successor trustee in accordance with <u>Section 3.6</u> or (ii) an order of the Bankruptcy Court after an opportunity for a hearing (<u>provided</u>, <u>however</u>, that only the Litigation Trust Committee shall have standing to seek such an order, except as provided <u>Section 3.5(b)</u>). If a successor trustee is appointed by resolution, as provided in clause (i) of the preceding sentence, and such appointment is accepted by the successor trustee, the Litigation Trust Committee shall file notice of such appointment and acceptance with the Bankruptcy Court, which notice will include the name, address, and telephone number of the successor trustee; provided that the filing of such notice shall not be a condition precedent to the vesting in the successor Litigation Trustee of all the estates, properties, rights, powers, trusts, and duties of his or her predecessor;

    (e)    Immediately upon the appointment of any successor trustee, all rights, powers, duties, authority, and privileges of the predecessor Litigation Trustee hereunder will be vested in and undertaken by the successor trustee without any further act; and the successor trustee will not be liable personally for any act or omission of the predecessor Litigation Trustee;

    (f)    Upon the appointment of a successor trustee, the predecessor Litigation Trustee (or the duly appointed legal representative of a deceased Litigation

Trustee) shall, if applicable, when requested in writing by the successor trustee, execute and deliver an instrument or instruments conveying and transferring to such successor trustee upon the trust herein expressed, without recourse to the predecessor Litigation Trustee, all the estates, properties, rights, powers and trusts of such predecessor Litigation Trustee, and shall duly assign, transfer, and deliver to such successor trustee all property and money held hereunder, and all other assets and documents relating to the Litigation Trust, the Contributed Claims, or the Litigation Trust Interests then in his or her possession and held hereunder; and

(g)     During any period in which there is a vacancy in the position of Litigation Trustee, the Litigation Trust Committee shall appoint one of its members to serve as interim Litigation Trustee, (the "Interim Trustee").  The Interim Trustee shall be subject to all the terms and conditions applicable to a Litigation Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a member of the Litigation Trust Committee merely by his or her appointment as Interim Trustee.

3.6     Acceptance of Appointment by Successor Litigation Trustee.

Any successor trustee appointed hereunder shall execute an instrument accepting such appointment and assuming all of the obligations of the predecessor Litigation Trustee hereunder and thereupon the successor trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of his or her predecessor in the Litigation Trust hereunder with like effect as if originally named herein.

3.7     Regular Meetings of the Litigation Trustee and the Litigation Trust Committee.

Meetings of the Litigation Trustee and the Litigation Trust Committee are to be held with such frequency and at such place as the Litigation Trust Committee may determine in its sole discretion (but, as to place, in consultation with the Litigation Trustee), but in no event shall such meetings be held less frequently than quarterly.

3.8     Special Meetings of the Litigation Trustee and the Litigation Trust Committee.

Special meetings of the Litigation Trustee and the Litigation Trust Committee may be held whenever and wherever called for either by the Litigation Trustee or at least two members of the Litigation Trust Committee.

3.9     Notice of, and Waiver of Notice for, Litigation Trustee and Litigation Trust Committee Meetings.

Notice of the time and place (but not necessarily the purpose or all of the purposes) of any regular or special meeting will be given to the Litigation Trustee and the members of the Litigation Trust Committee in person or by telephone, or via mail, electronic mail, or facsimile transmission.  Notice to the Litigation Trustee and the

members of the Litigation Trust Committee of any such special meeting will be deemed given sufficiently in advance when (i) if given by mail, the same is deposited in the United States mail at least ten (10) calendar days before the meeting date, with postage thereon prepaid, (ii) if given by electronic mail or facsimile transmission, the same is transmitted at least one business day prior to the convening of the meeting, or (iii) if personally delivered (including by overnight courier) or given by telephone, the same is handed, or the substance thereof is communicated over the telephone to the Litigation Trustee and the members of the Litigation Trust Committee or to an adult member of his/her office staff or household, at least one business day prior to the convening of the meeting. The Litigation Trustee and any member of the Litigation Trust Committee may waive notice of any meeting and any adjournment thereof at any time before, during, or after it is held, as provided by law. Except as provided in the next sentence below, the waiver must be in writing, signed by the Litigation Trustee or the applicable member or members of the Litigation Trust Committee entitled to the notice, and filed with the minutes or records of the Litigation Trust. The attendance of the Litigation Trustee or a member of the Litigation Trust Committee at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

     3.10    <u>Manner of Acting</u>.

     The Litigation Trustee or any member of the Litigation Trust Committee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. The Litigation Trustee or any member of the Litigation Trust Committee participating in a meeting by this means is deemed to be present in person at the meeting.

     3.11    <u>Role of the Litigation Trustee</u>.

     In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee, subject to the terms and conditions contained herein and in the Plan, shall have the power to (i) prosecute, compromise and settle, abandon or dismiss for the benefit of the Litigation Trust Beneficiaries all claims, rights and causes of action transferred to the Litigation Trustee (whether such suits are brought in the name of the Litigation Trustee or otherwise), and (ii) to otherwise perform the functions and take the actions provided or permitted in the Plan or in this Litigation Trust Agreement. In all circumstances, the Litigation Trustee shall act in the best interests of all the Litigation Trust Beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.

3.12    Authority of Litigation Trustee.

Subject to any limitations contained herein (including, without limitation, Article 4 hereof) or in the Plan, the Litigation Trustee shall have the following powers and authorities.

(a)    hold legal title to any and all rights of the holders of the Litigation Trust Interests in or arising from the Contributed Claims, including, without limitation, collecting, receiving any and all money and other property belonging to the Litigation Trust and, subject to the approval of the Litigation Trust Committee, the right to vote any claim or interest relating to a Contributed Claim in a case under the Bankruptcy Code and receive any distribution therein;

(b)    in consultation with and subject to the approval of the Litigation Trust Committee, perform the duties, exercise the powers, and assert the rights of a trustee under sections 704 and 1106 of the Bankruptcy Code, including, without limitation, commencing, prosecuting or settling causes of action, enforcing contracts or asserting claims, defenses, offsets and privileges; provided, however, that the Litigation Trustee shall not be required to consult with or obtain approval of the Litigation Trust Committee, to the extent such matters are limited to a claim or cause of action against a person or entity where the amount demanded from such person or entity, in the aggregate, is less than or equal to $100,000 or such other amount as may be approved by a majority of the members of the Litigation Trust Committee (a "De Minimis Claim or Cause of Action");

(c)    in consultation with and subject to the approval of the Litigation Trust Committee, protect and enforce the rights to the Contributed Claims by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(d)    in consultation with and subject to the approval of the Litigation Trust Committee, obtain reasonable insurance coverage with respect to the liabilities and obligations of the Litigation Trustee and the Litigation Trust Committee under this Litigation Trust Agreement (in the form of an errors and omissions policy or otherwise);

(e)    in consultation with and subject to the approval of the Litigation Trust Committee, obtain insurance coverage with respect to real and personal property that may become assets of the Litigation Trust, if any;

(f)    in consultation with and subject to the approval of the Litigation Trust Committee, retain and approve compensation arrangements of such counsel and other professionals, including, without limitation, any professionals previously retained by the Committees, RCM, the RCM Trustee or the Debtors, as the Litigation Trustee shall select to assist the Litigation Trustee in his or her duties, on such terms as the Litigation Trustee and the Litigation Trust Committee deem reasonable and appropriate, without Bankruptcy Court approval; subject to the foregoing, the Litigation Trustee may

14

commit the Litigation Trust to and shall pay such counsel and other professionals reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred;

(g)     in consultation with and subject to the approval of the Litigation Trust Committee, retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Litigation Trust as may be required by the SEC and applicable securities laws and as may be reasonable and appropriate in the Litigation Trustee's discretion and to prepare and file any tax returns, informational returns, or periodic or current reports as required by applicable securities laws, for the Litigation Trust as may be required; subject to the foregoing, the Litigation Trustee may commit the Litigation Trust to and shall pay such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred;

(h)     in consultation with and subject to the approval of the Litigation Trust Committee, retain and approve compensation arrangements of such third parties to assist the Litigation Trustee in carrying out his or her powers and duties under this Litigation Trust Agreement;  subject to the foregoing, the Litigation Trustee may commit the Litigation Trust to and shall pay all such persons or entities reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, as well as commit the Litigation Trust to indemnify any such parties in connection with the performance of services (provided that such indemnity shall not cover any losses, costs, damages, expenses or liabilities that result from the recklessness, gross negligence, willful misconduct, or knowing violation of law by such party);

(i)     in consultation with and subject to the approval of the Litigation Trust Committee, waive any privilege (including the Privileges) or any defense on behalf of the Litigation Trust or, with respect to the Contributed Claims, RCM or the Debtors, as applicable; provided, however, that the Litigation Trustee shall not be required to consult with or obtain approval of the Litigation Trust Committee, to the extent such matters are limited to a De Minimis Claim or Cause of Action, and such waiver shall be effectively limited to such matters;

(j)     in consultation with and subject to the approval of the Litigation Trust Committee, compromise, adjust, arbitrate, sue on or defend, pursue, prosecute abandon, exercise rights, powers, and privileges with respect to, or otherwise deal with and settle, in accordance with the terms set forth herein, all causes of action in favor of or against the Litigation Trust; provided, however, that the Litigation Trustee shall not be required to consult with or obtain approval of the Litigation Trust Committee, to the extent such matters are limited to a De Minimis Claim or Cause of Action;

(k)     in consultation with and subject to the approval of the Litigation Trust Committee, avoid and recover transfers of RCM's or the Debtor's property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law;

(l)     in consultation with and subject to the approval of the Litigation Trust Committee, coordinate with the Plan Administrator, the RCM Trustee, or the Reorganized Debtors, as applicable, to execute offsets, assert counterclaims against Holders of Claims, establish reserves for Disputed Claims, and make determinations as to Pro Rata calculations, as provided for in the Plan; provided, however, that the Litigation Trustee shall defer to the RCM Trustee, the Plan Administrator, or the Reorganized Debtors, as applicable, to reconcile customer accounts, loan balances, and ordinary business transactions that may be required to do any of the foregoing, including any litigation relating thereto;

(m)     invest any moneys held as part of the Litigation Trust in accordance with the terms of Section 3.19 hereof, limited, however, to such investments that are consistent with the Litigation Trust's status as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and in accordance with Rev. Proc 94-45, 1994-2 C.B. 684;

(n)     in consultation with and subject to the approval of the Litigation Trust Committee, request any appropriate tax determination with respect to the Litigation Trust, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(o)     subject to applicable securities laws, if any, establish and maintain a website for the purpose of providing notice of Litigation Trust activities in lieu of sending written notice to holders of Litigation Trust Interests, subject to providing notice of such website to such holders;

(p)     in consultation with the Litigation Trust Committee, seek the examination of any entity, subject to the provisions of Bankruptcy Rule 2004 or any other applicable law or rule;

(q)     subject to the approval of the Litigation Trust Committee, make one or more loans to the Private Actions Trust to provide funding to such trust secured by liens upon the assets therein; and

(r)     take or refrain from taking any and all other actions that the Litigation Trustee, upon consultation with and subject to the approval of the Litigation Trust Committee, reasonably deems necessary or convenient for the continuation, protection and maximization of the Contributed Claims or to carry out the purposes hereof; provided, however, that the Litigation Trustee shall not be required to (i) consult with or obtain approval of the Litigation Trust Committee, to the extent such actions are limited to a De Minimis Claim or Cause of Action or (ii) consult with or obtain approval of the Litigation Trust Committee, to the extent such actions are purely ministerial in nature.

3.13     Limitation of Litigation Trustee's Authority.

(a)     Notwithstanding anything herein to the contrary, the Litigation Trustee shall not (i) be authorized to engage in any trade or business, (ii) take such

actions inconsistent with the orderly liquidation of the assets of the Litigation Trust as are required or contemplated by applicable law, the Plan and this Litigation Trust Agreement, or (iii) be authorized to engage in any investments or activities inconsistent with the treatment of the Litigation Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684.

(b)    The Litigation Trust shall not hold 50% or more of the stock (in either vote or value) of any entity that is treated as a corporation for federal income tax purposes, nor be the sole member of a limited liability company, nor have any interest in an entity that is treated as a partnership for federal income tax purposes, unless such stock, membership interest, or partnership interest was obtained involuntarily or as a matter of practical economic necessity in order to preserve the value of the assets of the Litigation Trust.

3.14    Books and Records.

(a)    The Litigation Trustee shall maintain books and records relating to the assets of the Litigation Trust and income of the Litigation Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Litigation Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting and securities law requirements of the Litigation Trust. Nothing in this Litigation Trust Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust, or as a condition for managing any payment or distribution out of the assets of the Litigation Trust.

(b)    The Litigation Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Litigation Trustee, to inspect and, at the sole expense of such Litigation Trust Beneficiary seeking the same, make copies of the books and records relating to the Litigation Trust on any business day and as often as may be reasonably be desired, in each case for a purpose reasonably related to such Litigation Trust Beneficiary's interest in the Litigation Trust.

3.15    Inquiries into Trustee's Authority.

Except as otherwise set forth in the Litigation Trust or in the Plan, no Person dealing with the Litigation Trust shall be obligated to inquire into the authority of the Litigation Trustee in connection with the protection, conservation or disposition of the Contributed Claims.

3.16    Compliance with Laws.

Any and all distributions of assets of the Litigation Trust and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, without limitation, applicable federal and state securities laws.

3.17    Compensation of the Litigation Trustee.

(a)    The Original Trustee shall be compensated for his services, and reimbursed for his expenses, in accordance with Schedule A attached hereto, as a cost of administering the Litigation Trust.  In the event a successor trustee is appointed, such successor shall be compensated for his or her services, and reimbursed for his or her expenses, as cost of administering the Litigation Trust, in accordance with and pursuant to the terms of, a separate agreement to be negotiated and executed by the Litigation Trust Committee, which agreement shall not be subject to any third-party notice or approval.

(b)    In the event that the Litigation Trustee's appointment terminates by reason of (i) the death of the Litigation Trustee, (ii) the removal of the Litigation Trustee by the Litigation Trust Committee pursuant to Section 3.5(c) by reason of the Litigation Trustee's Disability or (iii) the removal of the Litigation Trustee pursuant to Section 3.5(c) by the Litigation Trust Committee without Cause, the Litigation Trustee, or his or her estate, as applicable, shall be entitled to payment of any earned but unpaid portion of compensation, any earned but unpaid bonus, and any un-reimbursed business expenses incurred prior to such death, Disability, or effective date of removal.

(c)    For purposes of Section 3.17(b), the following terms shall have the following meanings:

(i)    "Cause" shall mean (a) commission of any act of fraud or dishonesty in connection with his or her appointment by the Litigation Trust Committee; (b) commission of misconduct that adversely affects, as determined in good faith by the Litigation Trust Committee, the assets held by the Litigation Trustee for the benefit of the Litigation Trust Beneficiaries; (c) engaging in conduct constituting a misdemeanor involving moral turpitude or a felony or the indictment of the Litigation Trustee for a felony; or (d) continued failure to perform his or her substantial job functions, after written notice has been delivered by the Litigation Trust Committee to the Litigation Trustee if such failure is not cured within 10 days of such notice; provided, however, that the Litigation Trust Committee may not deliver any such notice in respect of any failure to perform that is the result of absence from duties or incapacity due to a Disability.

(ii)    "Disability" of the Litigation Trustee shall have occurred if, as a result of the Litigation Trustee's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Trustee, and reasonably acceptable to the Litigation Trust Committee, the Litigation Trustee shall have been substantially unable to perform his or her duties hereunder for three consecutive months, or for an aggregate of 180 days during any period of twelve consecutive months.

3.18    <u>Reliance by Litigation Trustee</u>.

Except as otherwise provided herein:

(a)    the Litigation Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Litigation Trustee to be genuine and to have been signed or presented by the proper party or parties; and

(b)    Persons dealing with the Litigation Trustee shall look only to the assets of the Litigation Trust to satisfy any liability incurred by the Litigation Trustee to such Person in carrying out the terms of this Litigation Trust Agreement, and neither the Litigation Trustee nor any member of the Litigation Trust Committee shall have any personal obligation to satisfy any such liability.

3.19    <u>Investment and Safekeeping of Litigation Trust Assets</u>.

The Litigation Trustee shall invest all assets transferred to the Litigation Trustee (other than Contributed Claims), all Litigation Trust Proceeds, the Litigation Expense Fund and all income earned by the Litigation Trust (pending periodic distributions in accordance with the provisions of the Plan) only in cash, cash equivalents, U.S. Treasury securities, money market investments, and similar investments; <u>provided</u>, <u>however</u>, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the guidelines of the United States Internal Revenue Service (the "<u>IRS</u>") , whether set forth in IRS rulings, other IRS pronouncements or otherwise, (b) the Litigation Trustee may retain any Litigation Trust Proceeds received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets in Cash; and (c) under no circumstances, shall the Litigation Trustee segregate the assets of the Litigation Trust on the basis of classification of the holders of Litigation Trust Interests, other than with respect to Distributions to be made on account of Disputed Claims in accordance with the provisions of the Plan.

3.20    <u>Standard of Care; Exculpation</u>.

Neither the Litigation Trustee nor any of his or her duly designated agents or representatives or professionals shall be liable for any act or omission taken or omitted to be taken by the Litigation Trustee in good faith, other than acts or omissions resulting from the Litigation Trustee's own gross negligence, recklessness, willful misconduct, or knowing violation of law.  The Litigation Trustee may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with his or her attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.  Notwithstanding such authority, the Litigation Trustee shall be under no obligation to consult with his or her attorneys,

19

accountants, financial advisors or agents, and his or her good faith determination not to do so shall not result in the imposition of liability on the Litigation Trustee, unless such determination is based on gross negligence, recklessness, willful misconduct, or knowing violation of law.

## ARTICLE 4

## LITIGATION TRUST COMMITTEE

4.1    Litigation Trust Committee.

A litigation trust committee (the "Litigation Trust Committee") shall be established and initially consist of, as set forth on Schedule B attached hereto, five (5) Persons including a representative from VR and four representatives of Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings.  Other than the VR representative, the remaining four members of the Litigation Trust Committee shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee).  Such Litigation Trust Committee members shall have the right to direct and remove the Litigation Trustee, and shall have such other rights to operate and manage the Litigation Trust as are not inconsistent with the terms hereof.  No Holder of Tranche A Litigation Trust Interests (except to the extent such Holder is a member of the Litigation Trust Committee) and no Holder of Tranche B Litigation Trust Interests shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust.

4.2    Authority of the Litigation Trust Committee.

The Litigation Trust Committee shall have the authority and responsibility to oversee, review, and guide the activities and performance of the Litigation Trustee and shall have the authority to remove the Litigation Trustee in accordance with Section 3.5(c) herein.  The Litigation Trustee shall consult with and provide information to the Litigation Trust Committee in accordance with and pursuant to the terms of this Litigation Trust Agreement and the Plan.  The Litigation Trust Committee shall have the authority to select and engage such Persons, and select and engage such professional advisors, including, without limitation, any professional previously retained by the Committees, RCM or the Debtors in accordance with the terms of the Plan and this Litigation Trust Agreement, as the Litigation Trust Committee deems necessary and desirable to assist the Litigation Trust Committee in fulfilling its obligations under this Litigation Trust Agreement and the Plan, and the Litigation Trustee shall pay the reasonable fees of such Persons (including on an hourly, contingency, or modified contingency basis) and reimburse such Persons for their reasonable and documented out-of-pocket costs and expenses consistent with the terms of this Litigation Trust Agreement.

4.3     Regular Meetings of the Litigation Trust Committee.

Meetings of the  Litigation Trust Committee are to be held with such frequency and at such place as the Litigation Trustee and the members of the Litigation Trust Committee may determine in their reasonable discretion, but in no event shall such meetings be held less frequently than quarterly.

4.4     Special Meetings of the Litigation Trust Committee.

Special meetings of the Litigation Trust Committee may be held whenever and wherever called for by the Litigation Trustee or any two members of the Litigation Trust Committee.

4.5     Manner of Acting.

(a)     A majority of the total number of members of the Litigation Trust Committee then in office shall constitute a quorum for the transaction of business at any meeting of the Litigation Trust Committee.  The affirmative vote of a majority of the members of the Litigation Trust Committee present and entitled to vote at a meeting at which a quorum is present shall be the act of the Litigation Trust Committee except as otherwise required by law or as provided in this Litigation Trust Agreement.  Any or all of the members of the Litigation Trust Committee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  Any member of the Litigation Trust Committee participating in a meeting by this means is deemed to be present in person at the meeting.  Voting may, if approved by the majority of the members at a meeting, be conducted by electronic mail or individual communications by the Litigation Trustee and each member of the Litigation Trust Committee.

(b)     Any member of the Litigation Trust Committee who is present and entitled to vote at a meeting of the Litigation Trust Committee when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Litigation Trust Committee, unless: (i) such member of the Litigation Trust Committee objects at the beginning of the meeting (or promptly upon his/her arrival) to holding it or transacting business at the meeting; or (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Litigation Trust Committee before its adjournment.  The right of dissent or abstention is not available to any member of the Litigation Trust Committee who votes in favor of the action taken.

(c)     Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each member of the Litigation Trust Committee shall report to the Litigation Trust Committee any conflict of interest such

21

member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such member might have with respect to or in connection with such matter or issue, other than solely as a Litigation Trust Beneficiary).  A member who has or who may have a conflict of interest shall be deemed to be a "conflicted member" who shall not be entitled to vote or take part in any action with respect to such matter or issue (however such member shall be counted for purposes of determining the existence of a quorum);  the vote or action with respect to such matter or issue shall be undertaken only by members of the Litigation Trust Committee who are not "conflicted members."

       4.6      <u>Litigation Trust Committee's Action Without a Meeting</u>.

       Any action required or permitted to be taken by the Litigation Trust Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Litigation Trust Committee as evidenced by one or more written consents describing the action taken, signed by all members of the Litigation Trust Committee and recorded in the minutes or other transcript of proceedings of the Litigation Trust Committee.

       4.7      <u>Tenure, Removal, and Replacement of the Members of the Litigation Trust Committee</u>.

       The authority of the members of the Litigation Trust Committee will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation Trust is terminated in accordance with Section 11.1 hereof.  The service of the members of the Litigation Trust Committee will be subject to the following:

       (a)      The members of the Litigation Trust Committee will serve until death or resignation pursuant to subsection (b) below, or removal pursuant to subsection (c) below.

       (b)      A member of the Litigation Trust Committee may resign at any time by providing a written notice of resignation to the remaining members of the Litigation Trust Committee.  Such resignation will be effective upon the date received by the Litigation Trust Committee or such later date specified in the written notice.

       (c)      A member of the Litigation Trust Committee may be removed by the majority vote of the other members of the Litigation Trust Committee, written resolution of which shall be delivered to the removed Litigation Trust Committee member; <u>provided</u>, <u>however</u>, that such removal may only be made for Cause.  For purposes of this <u>Section 4.7(c)</u>, "Cause" shall be defined as:  (a) commission of any act of fraud or dishonesty in connection with his or her appointment to serve on the Litigation Trust Committee; (b) commission of misconduct that adversely affects, as determined in good faith by a majority of the remaining members of the Litigation Trust Committee, the assets held by the Litigation Trustee for the benefit of the Litigation Trust Beneficiaries;

(c) engaging in conduct constituting a misdemeanor involving moral turpitude or a felony or the indictment of such member for a felony; or (d) continued failure to perform his or her substantial job functions, after written notice has been delivered by the Litigation Trust Committee to such member if such failure is not cured within 10 days of such notice.

(d)    In the event of a vacancy on the Litigation Trust Committee (whether by removal, death, or resignation), a new member may be appointed to fill such position by a majority of the remaining members of the Litigation Trust Committee. Any such appointment of a new member cannot alter the structure or power of the Litigation Trust Committee as set forth in Section 4.1. In the event that there are no remaining members of the Litigation Trust Committee, appointments to fill such vacancies that would have been made by a majority of the remaining members of the Litigation Trust Committee shall be made upon an order entered after an opportunity for a hearing by the Bankruptcy Court, upon motion of the Litigation Trustee. The appointment of a successor member of the Litigation Trust Committee will be evidenced by the Litigation Trustee's filing with the Bankruptcy Court of a notice of appointment, which notice will include the name, address, and telephone number of the successor member of the Litigation Trust Committee.

(e)    Immediately upon the appointment of any successor member of the Litigation Trust Committee, all rights, powers, duties, authority, and privileges of the predecessor member of the Litigation Trust Committee hereunder will be vested in and undertaken by the successor member of the Litigation Trust Committee without any further act; and the successor member of the Litigation Trust Committee will not be liable personally for any act or omission of the predecessor member of the Litigation Trust Committee.

4.8    Compensation of the Litigation Trust Committee.

Each member of the Litigation Trust Committee shall be paid, by the Litigation Trust or the Reorganized Debtors, as allocable, the amount of $20,000 annually (in addition to reasonable out-of-pocket expenses reimbursable hereunder) as compensation for its services hereunder, including, without limitation, any services rendered with respect to the Disputed Claims Reserve (all such duties or services are referred to herein as the "Duties"). Additionally, except as set forth herein, all reasonable and documented out-of-pocket fees and expenses incurred by members of the Litigation Trust Committee in connection with the performance of the Duties shall be reimbursed, without duplication, by the Litigation Trust upon demand for payment thereof.

4.9    Standard of Care; Exculpation.

None of the Litigation Trust Committee, its members, designees or professionals, nor any of their duly designated agents or representatives, shall be liable for the act or omission of any other member, agent or representative of the Litigation Trust Committee, nor shall the Litigation Trust Committee or any of its members be

liable for any act or omission taken or omitted to be taken by the Litigation Trust Committee in good faith, other than acts or omissions resulting from the Litigation Trust Committee's own gross negligence, recklessness, willful misconduct, or knowing violation of law.  The Litigation Trust Committee and each of its members may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith in accordance with advice or opinions rendered by such Persons.  Notwithstanding such authority, neither the Litigation Trust Committee nor any of its members shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and its good faith determination not to do so shall not result in the imposition of liability on the Litigation Trust Committee or, as applicable, its members or designees, unless such determination is based on gross negligence, recklessness, willful misconduct, or knowing violation of law.

ARTICLE 5

TAX MATTERS

5.1     Federal Income Tax Reporting.

(a)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Article 5.  The Litigation Trustee shall also annually send to each Litigation Trust Beneficiary a separate statement setting forth such Litigation Trust Beneficiary's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns.

(b)     As soon as practicable after the Effective Date, but in no event later than sixty (60) days thereafter, (i) the Litigation Trustee, in consultation with the Litigation Trust Committee, the Debtors, and the RCM Trustee will determine the fair market value as of the Effective Date of all assets transferred to the Litigation Trustee, and such determined fair market value shall be used by the Reorganized Debtors, the RCM Trustee, the Litigation Trust, the Litigation Trustee, the Litigation Trust Committee, and the Effective Beneficiaries for all federal income tax purposes, and (ii) the Litigation Trustee shall apprise the Litigation Trust Beneficiaries, in writing of such valuation.  The Litigation Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit and pay taxes, if any, properly payable by the Litigation Trust.

(c)     The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust under section 505(b) of the Bankruptcy Code for all returns

filed for, or on behalf of, the Litigation Trust for all taxable periods through the effective date of the dissolution of the Litigation Trust.

(d)     For federal income tax purposes, the Reorganized Debtors, the RCM Trustee, the Litigation Trustee, and the Effective Beneficiaries will treat the transfer of assets to the Litigation Trustee and issuance of Litigation Trust Interests as a deemed transfer by the Debtors and the RCM Trustee of the assets to the Effective Beneficiaries, followed by a deemed transfer of such assets by the Effective Beneficiaries to the Litigation Trustee in exchange for direct or indirect beneficial interests in the Litigation Trust.

(e)     For federal income tax purposes, the Effective Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Litigation Trust.

5.2     Allocations of Litigation Trust Taxable Income.

(a)     Allocations of Litigation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Litigation Trust Beneficiaries, taking into account all prior and concurrent distributions from the Litigation Trust (including all distributions held in escrow pending the resolution of Disputed Claims).  Similarly, taxable loss of the Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Contributed Claims.  The tax book value of the Contributed Claims for this purposes shall equal their fair market value on the Effective Date, adjusted in either case in accordance with tax accounting principles prescribed by the United States Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

(b)     To the extent of any transfers of Litigation Trust Interests in accordance with Section 2.5(a) herein, the Litigation Trustee shall promptly establish a standard convention for allocating and apportioning taxable income and loss between a transferor and its transferee and shall not be required to so allocate and apportion based on the actual Litigation Trust activities prior and subsequent to the date of any transfer. The Litigation Trustee shall notify the Litigation Trust Beneficiaries of the convention adopted promptly after such adoption.  The Litigation Trustee shall use his or her discretion to establish a fair and equitable convention to apply and may, but is not required to, adopt a monthly, quarterly or similar record date convention.

ARTICLE 6

DISTRIBUTIONS

6.1     <u>Annual Distribution; Withholding</u>.

The Litigation Trustee shall distribute at least annually to the Litigation Trust Beneficiaries all net cash income plus all net cash proceeds from the liquidation of assets; <u>provided</u>, <u>however</u>, that the Litigation Trust may retain such amounts (i) as are reasonably necessary to maintain reserves for distributions to holders of Disputed Claims that may be entitled to Litigation Trust Interests upon allowance of such claims, (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Litigation Trust during liquidation, (iii) to pay or reserve for reasonable administrative expenses (including the costs and expenses of the Litigation Trust, the Litigation Trustee, and the Litigation Trust Committee and the fees, costs and expenses of all professionals retained by the Litigation Trustee, and any taxes imposed on the Litigation Trust or in respect of the assets of the Litigation Trust), and (iv) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Litigation Trust Agreement.  All such distributions shall be pro rata based on the number of Litigation Trust Interests held by a Litigation Trust Beneficiary compared with the aggregate number of Litigation Trust Interests outstanding, subject to the terms of the Plan and this Litigation Trust Agreement.  The Litigation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

6.2     <u>Manner of Payment or Distribution</u>.

(a)     All distributions made by the Litigation Trustee to holders of Litigation Trust Interests shall be payable to the holders of Litigation Trust Interests of record as of the 20th day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such day shall be the following Business Day.  If the distribution shall be in Cash, the Litigation Trustee shall distribute such Cash by wire, check, or such other method as the Litigation Trustee deems appropriate under the circumstances.  Notwithstanding anything to the contrary herein, or in the Plan, any distributions to be made to the RCM Trustee for distribution to holders of Allowed RCM Securities Customer Claims or Allowed FX/Unsecured Claims shall be made and deemed made for all purposes directly to such holders as the Effective Beneficiaries.

(b)     Any Contributed Claims Recoveries shall first be used to repay the funding (including any fees, costs, or interest incurred in connection therewith) described in Section 5.7(e) of the Plan and then such proceeds shall be transferred to the Disbursing Agent or the RCM Trustee or to the Effective Beneficiaries directed by the RCM Trustee, as applicable, for distribution to the Litigation Trust Beneficiaries as provided for herein.  To the extent that the Reorganized Debtors or Post-Confirmation RCM become liable for the payment of any Claims arising under section 502(h) of the Bankruptcy Code on

account of Contributed Claims Recoveries, the Litigation Trustee will be responsible for making Distributions on account of such Claims pursuant to Section 8.2.

        (c)    All distributions shall be apportioned by the Litigation Trustee as distributable either to Tranche A Litigation Trust Interests or Tranche B Litigation Trust Interests.

        (d)    All Contributed Claims Recoveries, whether distributable to Tranche A Litigation Trust Interests or Tranche B Litigation Trust Interests shall be distributed Pro Rata to Holders of the beneficial interests in such Tranche.

        (e)    Effective Beneficiaries of Tranche A Litigation Trust Interests shall consist of Holders of RCM Securities Customer Claims, Holders of RCM FX/Unsecured Claims, Holders of Contributing Debtors General Unsecured Claims (excluding the Secured Lender Claims or Senior Subordinated Note Claims), and Holders of FXA General Unsecured Claims (excluding FXA Convenience Class Claims) and such Litigation Trust Beneficiaries shall share the Tranche A Litigation Trust Interests Pro Rata based on (x) in the case of Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims, the aggregate amount of Allowed RCM Implied Deficiency Claims and the Allowed RCM FX/Unsecured Claims, subject to the distribution scheme set forth in the RCM Settlement Agreement and (y) in the case of Holders of Contributing Debtors General Unsecured Claims and the Holders of FXA General Unsecured Claims, the amount of each such Holder's Allowed Claim.

        (f)    Beneficiaries of Tranche B Litigation Trust Interests shall consist of those Holders of Old Equity Interests that have elected to contribute their Non-Estate Refco Claims and their rights to proceeds of Class Actions Claims to the Private Actions Trust ("Participating Old Equity Interest Holders") in exchange for a portion of the Litigation Trust and Private Actions Trust, and such Litigation Trust Beneficiaries shall share the Tranche B Litigation Trust Interests Pro Rata based on (x) in the case of Holders of common stock of Refco Inc., the aggregate amount of common stock of Refco Inc. held by Participating Old Equity Interest Holders and (y) in the case of Holders of Claims arising from rescission of a purchase or sale of common stock of Refco Inc. or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of common stock of Refco Inc. or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such Claims, the aggregate amount of common stock of Refco Inc. held or previously held by such Holders.  Notwithstanding the contribution of Non-Estate Refco Claims and the rights to proceeds of Class Action Claims, the right of any Participating Old Equity Interest Holder to seek equitable subordination or disallowance of the Old Equity Interests of any other Participating Old Equity Interest Holder pursuant to section 510(c) of the Bankruptcy Code shall be preserved and retained to assert at any time, at its own expense, prior to the final distribution of the Litigation Trust.

6.3     Delivery of Litigation Trust Distributions.

All distributions under this Litigation Trust Agreement to any holder of Litigation Trust Interests shall be made at the address of such holder as set forth in the Trust Register or at such other address or in such other manner as such holder of Litigation Trust Interests shall have specified for payment purposes in a written notice to the Litigation Trustee and the Registrar at least 20 days prior to such distribution date.  In the event that any distribution to any holder is returned as undeliverable, the Litigation Trustee shall be entitled to rely on the most current information available from the Plan Administrator or the RCM Trustee, as applicable, to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Litigation Trustee has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such undeliverable or unclaimed distributions shall be deemed unclaimed property at the expiration of one year from the date of distribution.  The Litigation Trustee shall reallocate the undeliverable and unclaimed distributions for the benefit of all other Litigation Trust Beneficiaries in the same tranche.

6.4     Cash Distributions.

No Cash distributions shall be required to be made to any Litigation Trust Beneficiary in an amount less than $100.00.  Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions.  Notwithstanding the foregoing, all cash shall be distributed in the final distribution of the Litigation Trust.

ARTICLE 7

INDEMNIFICATION

7.1     Indemnification of Litigation Trustee and the Litigation Trust Committee.

(a)     To the fullest extent permitted by law, the Litigation Trust, to the extent of its assets legally available for that purpose, shall indemnify and hold harmless the Litigation Trustee and each of the members of the Litigation Trust Committee and each of their respective directors, members, shareholders, partners, officers, agents, employees, attorneys and other professionals (collectively, the "Indemnified Persons") from and against any and all losses, costs, damages, reasonable and documented out-of-pocket expenses (including, without limitation, fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does, or refrains from doing for the business or affairs of the Litigation Trust, except to the extent that the loss, cost, damage, expense or liability resulted primarily from the Indemnified Person's recklessness, gross negligence, willful misconduct, or knowing violation of law.  To the extent reasonable, the Litigation Trust shall pay in advance or reimburse reasonable and documented out-of-pocket expenses (including advancing reasonable costs of defense) incurred by the Indemnified

28

Person who is or is threatened to be named or made a defendant or a respondent in a proceeding concerning the business and affairs of the Litigation Trust.

(b)    Any Indemnified Person may waive the benefits of indemnification under this Section 7.1, but only by an instrument in writing executed by such Indemnified Person.

(c)    The rights to indemnification under this Section 7.1 are not exclusive of other rights which any Indemnified Person may otherwise have at law or in equity, including without limitation common law rights to indemnification or contribution.  Nothing in this Section 7.1 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under this Litigation Trust Agreement, or any other agreement or instrument to which that Person is a party.

ARTICLE 8

NET LITIGATION TRUST RECOVERY

8.1    No Effect on Mutuality.

Notwithstanding anything contained in this Litigation Trust Agreement to the contrary, nothing herein shall affect the mutuality of obligations, if any, of any Holder of any Claim under section 553 of the Bankruptcy Code.

8.2    Section 502(h).

Notwithstanding anything contained in the Plan or this Litigation Trust Agreement to the contrary, in the event that a compromise and settlement of a Contributed Claim or a Final Order with respect to a Contributed Claim provides for the allowance of a Claim pursuant to section 502(h) of the Bankruptcy Code against one or more of RCM or the Debtors, the Distributions to be made on account of such Claim pursuant to the Plan shall be funded by the Litigation Trust, in the amount(s), from time to time, that all similarly situated Holders of Claims are entitled to receive under the Plan.

ARTICLE 9

REPORTS TO LITIGATION TRUST BENEFICIARIES

9.1    Reports.

(a)    The Litigation Trustee shall cause to be prepared, as applicable, either at such times as may be required by the Exchange Act, if applicable, or, not less than annually, financial statements of the Litigation Trust, to be delivered to the Effective Beneficiaries together with annual income tax reporting of the Litigation Trust.  To the extent required by law, the financial statements prepared as of the end of the fiscal year shall be audited by nationally recognized independent accountants in accordance with

U.S. generally accepted accounting principles.  The materiality and scope of audit determinations shall be established between the Litigation Trustee (in consultation with the Litigation Trust Committee) and the appointed auditors with a view toward safeguarding the value of the assets of the Litigation Trustee, but nothing relating to the mutually agreed scope of work shall result in any limitation of audit scope that would cause the auditors to qualify their opinion as to scope of work with respect to such financial statements.

(b)     Within ten (10) Business Days after the end of the relevant report preparation period the Litigation Trustee shall cause any information reported pursuant to Section 9.1(a) to be mailed to such Litigation Trust Beneficiaries and to be filed with the Bankruptcy Court.

(c)     Any report required to be distributed by the Litigation Trustee under Section 9.1(a) hereof shall also be distributed to the Persons listed in Section 12.6 hereof within ten Business Days of his or her distribution to the Litigation Trust Beneficiaries under Section 9.1(a) hereof.  The Litigation Trustee may post any report required to be provided under this Section 9.1 on a web site maintained by the Litigation Trustee in lieu of actual notice to the Litigation Trust Beneficiaries (unless otherwise required by law) subject to providing notice to the Persons listed in Section 12.6 herein.

ARTICLE 10

TERM; TERMINATION OF THE LITIGATION TRUST

10.1    Term; Termination of the Litigation Trust.

(a)     The Litigation Trust shall have an initial term of five (5) years, provided that if reasonably necessary to realize maximum value with respect to the assets in the Litigation Trust and following Bankruptcy Court approval, the term of the Litigation Trust may be extended for one or more one (1) year terms.

(b)     The Litigation Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing all of or the last of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and the RCM Case to the extent the RCM Case was converted to chapter 7; and (ii) the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust.

(c)     Notwithstanding the foregoing, the Bankruptcy Court upon motion by the Litigation Trustee or the Litigation Trust Committee, on notice with an opportunity for a hearing, at least three (3) months before the expiration of the original term or any extended term, may extend, for a fixed period, the term of the Litigation Trust if it is necessary to facilitate or complete the liquidation of the assets of the Litigation Trust.  The Bankruptcy Court may approve multiple extensions of the term of the Litigation Trust.

10.2     Continuance of Trust for Winding Up.

After the termination of the Litigation Trust and for the purpose of liquidating and winding up the affairs of the Litigation Trust, the Litigation Trustee shall continue to act as such until his or her duties have been fully performed.  Prior to the final distribution of all of the remaining assets of the Litigation Trust and upon approval of the Litigation Trust Committee, the Litigation Trustee shall be entitled to reserve from such assets any and all amounts required to provide for his or her own costs and expenses, in accordance with Section 3.17 herein, until such time as the winding up of the Litigation Trust is completed.  Upon termination of the Litigation Trust, the Litigation Trustee shall retain for a period of two years, as a cost of administering the Litigation Trust, the books, records, Litigation Trust Beneficiary lists, the Trust Register, and certificates and other documents and files that have been delivered to or created by the Litigation Trustee.  At the Litigation Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two years from the completion and winding up of the affairs of the Litigation Trust.  Except as otherwise specifically provided herein, upon the termination of the Litigation Trust, the Litigation Trustee shall have no further duties or obligations hereunder.

ARTICLE 11

AMENDMENT AND WAIVER

11.1     Amendment and Waiver.

(a)     The Litigation Trustee, with the prior approval of the majority of the members of the Litigation Trust Committee, may amend, supplement or waive any provision of, this Litigation Trust Agreement, without notice to or the consent of any Litigation Trust Beneficiary or the approval of the Bankruptcy Court:  (i) to cure any ambiguity, omission, defect or inconsistency in this Litigation Trust Agreement provided that such amendments, supplements or waivers shall not adversely affect the distributions to be made under this Litigation Trust Agreement to any of the Litigation Trust Beneficiaries, or adversely affect the U.S. federal income tax status of the Litigation Trust as a "liquidating trust"; (ii) to comply with any requirements in connection with the U.S. Federal income tax status of the Litigation Trust as a "liquidating trust"; (iii) to comply with any requirements in connection with maintaining that the Litigation Trust is not subject to registration or reporting requirements of the Exchange Act, or the Investment Company Act; (iv) to make the Litigation Trust a reporting entity and, in such event, to comply with or seek relief from any requirements in connection with satisfying the registration or reporting requirements of the Exchange Act or the Investment Company Act; and (v) to evidence and provide for the acceptance of appointment hereunder by a successor trustee in accordance with the terms of this Litigation Trust Agreement and the Plan.

(b)     Any substantive provision of this Litigation Trust Agreement may be amended or waived by the Litigation Trustee, subject to the prior approval of two-thirds vote of the members of the Litigation Trust Committee, with the approval of the

Bankruptcy Court upon notice and an opportunity for a hearing; provided, however, that no change may be made to this Litigation Trust Agreement that would adversely affect the distributions to be made under this Litigation Trust Agreement to any of the Litigation Trust Beneficiaries, or adversely affect the U.S. Federal income tax status of the Litigation Trust as a "liquidating trust." Notwithstanding this Section 11.1, any amendments to this Litigation Trust Agreement shall not be inconsistent with the purpose and intention of the Litigation Trust to liquidate in an expeditious but orderly manner the Contributed Claims in accordance with Treasury Regulation Section 301.7701-4(d).

ARTICLE 12

MISCELLANEOUS PROVISIONS

12.1    Intention of Parties to Establish the Litigation Trust.

This Litigation Trust Agreement is intended to create a liquidating trust for federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Litigation Trust Agreement may be amended in accordance with Section 11.1 to comply with such federal income tax laws, which amendments may apply retroactively.

12.2    Reimbursement of Trust Litigation Costs.

If the Litigation Trustee, the Litigation Trust Committee, or the Litigation Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Litigation Trust Agreement or the enforcement thereof, the Litigation Trustee, the Litigation Trust Committee or the Litigation Trust, as the case may be, shall be entitled to collect any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action. To the extent that the Litigation Trust has advanced such amounts, the Litigation Trust may recover such amounts from the non-prevailing party.

12.3    Laws as to Construction.

THIS LITIGATION TRUST AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO WHETHER ANY CONFLICTS OF LAW WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.

12.4    Jurisdiction.

Without limiting any Person or entity's right to appeal any order of the Bankruptcy Court or to seek withdrawal of the reference with regard to any matter, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Litigation Trust Agreement and to decide any claims or disputes which may arise or result from, or

be connected with, this Litigation Trust Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties, including the Litigation Trust Beneficiaries, and Holders of Claims and Equity Interests, hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.

      12.5    <u>Dispute Resolution</u>.

      In the event of any unresolved dispute between the Litigation Trustee and the Litigation Trust Committee, such dispute shall be resolved by the Bankruptcy Court upon motion by the Litigation Trustee or the Litigation Trust Committee, which motion shall be filed under seal, to the extent permitted by the Bankruptcy Court, unless otherwise agreed by the Litigation Trustee and a majority of the members of the Litigation Trust Committee.

      12.6    <u>Severability</u>.

      If any provision of this Litigation Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Litigation Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Litigation Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

      12.7    <u>Notices</u>.

      All notices, requests or other communications to the parties hereto shall be in writing and shall be sufficiently given only if (i) delivered in person; (ii) sent by electronic mail or facsimile communication (as evidenced by a confirmed fax transmission report); (iii) sent by registered or certified mail, return receipt requested; or (iv) sent by commercial delivery service or courier.  Until a change of address is communicated, as provided below, all notices, requests and other communications shall be sent to the parties at the following addresses or facsimile numbers:

      If to the Litigation Trustee, to:

      Marc S. Kirschner
      1120 Park Ave
      Suite 18 A
      New York, New York 10128
      Facsimile:  (212) 996-4849
      E-mail:  msk18a@yahoo.com

      With a copy to:

      Susheel Kirpalani

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Facsimile:  (212) 530-5219
E-mail:  skirpalani@milbank.com


If to the Litigation Trust Committee, to:

Refco Litigation Trust Committee
c/o Ira S. Greene, Esq.
Hogan & Hartson LLP
875 Third Avenue
New York, New York 10022
Facsimile:  (212) 918-3100
E-mail:  isgreene@hhlaw.com


If to the Reorganized Debtors, to:

Refco Plan Administrator

RJM, LLC
8 Hunting Court
New Vernon, New Jersey 07976
Facsimile:  (973) 425-8999
E-mail:  rmanzo@capstoneag.com


With a copy to:

Edwin E. Smith, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Facsimile:  (212) 752-5378
E-mail:  edwin.smith@bingham.com


If to the RCM Trustee, to:

Marc S. Kirschner
1120 Park Ave
Suite 18 A
New York, New York 10128
Facsimile:  212 996 4849

E-mail: msk18a@yahoo.com

With a copy to:

Tina L. Brozman, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Facsimile:  (212) 752-5378
E-mail:  tina.brozman@bingham.com

All notices shall be effective and shall be deemed delivered (i) if by personal delivery, delivery service or courier, on the date of delivery; (ii) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (iii) if by mail, on the date of receipt.  Any party from time to time may change its address, facsimile number, or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

     12.8   <u>Fiscal Year</u>.

       The fiscal year of the Litigation Trust will begin on the first day of January and end on the last day of December of each year.

     12.9   <u>Headings</u>.

       The section headings contained in this Litigation Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Litigation Trust Agreement or of any term or provision hereof.

     12.10   <u>Counterparts</u>.

       This Litigation Trust Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

     12.11   <u>Confidentiality</u>.

       The Litigation Trustee and each successor trustee and each member of the Litigation Trust Committee and each successor member of the Litigation Trust Committee (each a "<u>Covered Person</u>") shall, during the period that they serve in such capacity under this Litigation Trust Agreement and following either the termination of this Litigation Trust Agreement or such individual's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the assets of the Litigation Trust relates or of which it has become aware in its capacity (the "<u>Information</u>"), except to the extent disclosure is required by applicable law, order,

regulation or legal process.  In the event that any Covered Person is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation, demand or similar legal process) to disclose any Information, such Covered Person shall notify the Litigation Trust Committee reasonably promptly (unless prohibited by law) so that the Litigation Trust Committee may seek an appropriate protective order or other appropriate remedy or, in its discretion, waive compliance with the terms of this Section (and if the Litigation Trust Committee seeks such an order, the relevant Covered Person will provide cooperation as the Litigation Trust Committee shall reasonably request).  In the event that no such protective order or other remedy is obtained, or that the Litigation Trust Committee waives compliance with the terms of this Section and that any Covered Person is nonetheless legally compelled to disclose the Information, the Covered Person will furnish only that portion of the Information, which the Covered Person, advised by counsel, is legally required and will give the Litigation Trust Committee written notice (unless prohibited by law) of the Information to be disclosed as far in advance as practicable and exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

      12.12  <u>Entire Agreement</u>.

      This Litigation Trust Agreement (including the Recitals), the Plan, and the Confirmation Order constitute the entire agreement by and among the parties hereto and there are no representations, warranties, covenants or obligations except as set forth herein or therein.  This Litigation Trust Agreement, the Plan and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  Except as otherwise specifically provided herein, in the Plan or in the Confirmation Order, nothing in this Litigation Trust Agreement is intended or shall be construed to confer upon or to give any person other than the parties thereto and their respective heirs, administrators, executors, successors, or assigns any right to remedies under or by reason of this Litigation Trust Agreement.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

       IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Litigation Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

**REORGANIZED DEBTORS**

_____

By:
Title:

**RCM TRUSTEE**

_____

By:
Title:

**LITIGATION TRUSTEE**:

_____

By:
Title:

## SCHEDULE A

## COMPENSATION TERMS OF ORIGINAL TRUSTEE
### (INCLUSIVE OF COMPENSATION FOR SERVING AS PRIVATE ACTIONS TRUSTEE)

The Original Trustee shall receive reasonable compensation for serving as Litigation Trustee and Private Actions Trustee, and reimbursement of reasonable out-of-pocket costs, in accordance with the following contingency-based schedule:

- The following percentage of aggregate net recoveries of the Litigation Trust and Private Actions Trust, which, for the avoidance of doubt, shall be calculated after all costs of litigation and collection, including attorneys' fees, experts, and consultants --

    o 0.5% of the first $100,000,000 of net recoveries

    o 1.0% of net recoveries in excess of $100,000,000 but less than or equal to $250,000,000

    o 2.0% of net recoveries in excess of $250,000,000 but less than or equal to $400,000,000

    o 2.5% of net recoveries in excess of $400,000,000

- Reimbursement of reasonable out-of-pocket expenses (excluding overhead for office space and secretarial assistance) on a monthly basis. Significant costs may be advanced from the assets of the Litigation Trust with the approval of the Litigation Trust Committee.

- Any and all net recoveries actually received by the Litigation Trust, whether by judgment or settlement, during the tenure of the Original Trustee or the Applicable Period (as defined below) following the Original Trustee's termination in accordance with Section 3.17(b) of the Litigation Trust Agreement (a "Qualifying Termination") shall be deemed earned and unpaid compensation or bonus for purposes of such section. Any such actual recoveries shall also include any deferred payment recovery from defendant(s) or putative defendant(s) that is agreed to in writing within the Applicable Period by such defendant(s) or putative defendant(s), even if not paid or payable until after the Applicable Period, provided that such deferred payment recovery is in fact realized by the Litigation Trust (collectively, "Qualifying Recoveries"); provided, however, that the Original Trustee will only receive his or her percentage of Qualifying Recoveries as, if, and when such deferred payment is actually received by the Litigation Trust.

    o "Applicable Period" shall mean a minimum period of six (6) months after a Qualifying Termination, and if the Litigation Trustee has worked for more than six (6) months in that position, such period shall increase by one day for each day the Litigation Trustee works as Litigation

A

Trustee after the initial six (6) months up to a maximum period of twenty-four (24) months; <u>provided</u>, <u>however</u>, that any fees payable to the Original Trustee on account of Qualifying Recoveries occurring after twelve (12) months following a Qualifying Termination shall be reduced by fifty percent (50%) of the calculation set forth above.

- The compensation of the Original Trustee shall be payable in connection with each distribution made to the Litigation Trust Beneficiaries  and the Private Action Litigation Trust Beneficiaries and shall be allocated in the same proportion to the Litigation Trust and the Private Actions Trust as the proceeds are allocated to such trusts.

B

**SCHEDULE B**

**LIST OF INITIAL MEMBERS OF THE LITIGATION TRUST COMMITTEE**

- VR Global Partners, L.P.

- Premier Bank International, N.V.

- Lyxor/Beach Discretionary Fund Ltd.

- Capital Management Select Fund, Ltd.

- Abadi & Co.