# EXHIBIT 32

# DOCUMENT REDACTED – FILED UNDER SEAL PURSUANT TO CONFIDENTIALITY ORDER

# EXHIBIT 33

Received Jan 31 01:51PM (01:12) on RightFax4 Line [0] for 'JOC'    WORKSRV4 printed FAX36B4603D41BB on Jan 31 01:54PM * Pg 1/3
    JAN-31-99  14:58  FROM:REFCO                                  ID:212  390  8708                        PAGE   1/3

# **REFCO**

## PRIVILEGED AND CONFIDENTIAL FACSIMILE

**31 January 1999**

| | |
|---|---|
| **To:** | **Edward Black; Joe Collins – Mayer Brown & Platt** |
| **Cc:** | **David Miller** |
| **From:** | **Martha Blonder, Refco** |
| **Facsimile:** | **212 390-8708** |
| **Telephone:** | **212 693-7276** |
| **Re:** | **Legal Opinion** |

Dear Edward;

Thank you for your opinion with respect to trading foreign exchange with certain European counterparties and customers out of Refco Capital Markets, Ltd ("RCM"). As I discussed briefly with Joe Collins, your opinion seemed to cover transactions contemplated or entered by Refco Overseas Limited (London)("ROL"). In fact, ROL may (or may not) introduce FX transactions to RCM (Bermuda). Could you please expand your opinion to cover the "introduction" of business by ROL to RCM. Also, would you recommend changes to the current operations or language in the confirmations to address the relationship of the two Refco affiliates.

Per David Miller, if ROL introduces transactions to RCM, does that relationship change the anti-money laundering procedures currently being followed for RCM? Please contact me if you require more details.

For your information, I also attach a letter I recently received from another broker. As you can see, FX forwards are absent from the trades they may introduce to their New York affiliate. Other non-bank FX counterparties are following similar guidelines, e.g., "large transaction" restrictions.

Finally, before spending more time on these issues, please check with Joe Collins to ensure they will not become moot by virtue of current projects underway with respect to Refco's FX business.

Otherwise, please sign and return by facsimile, and I will create and forward originals.

Thank you very much for your attention.

Very truly yours.

MB02035944

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT 34

Refco Credit Agreement

# Definitions Related to Financial Covenants

*Rob. As we know, a difficult concept. "Restricted Cash" as "Non-Restricted" would be better.*

## Average Cash on Hand
- Identify "House Cash" and segregate from customer cash and regulated cash
- Is it feasible to have Grant Thorton break out this number in a footnote in future quarterly filings?  *No!! Impossible to break out. Too restrictive practically i.e. funds.*

## Consolidated Funded Indebtedness  *Non Current*
- Need to make sure that we only pick up non-repo and other ordinary course of business indebtedness.) *— Carve out for RCC & Securities (RCM Secured financing*
- How will future financial statements break out debt associated with funding this transaction and any other items that we would consider non-ordinary course long term debt, including current maturities?  *— Confirm this is non-current?*

## Consolidated Interest Charges
- We plan to pick up all interest expense associated with respect to Consolidated Funded Indebtedness.
- If we define Consolidated Funded Indebtedness correctly, is there any reason that this will not work?
- Is it feasible to have Grant Thorton break out this number in a footnote in future quarterly filings?

## Consolidated Net Income
- Is there anything atypical that we need to discuss?  *. Funded /Non Funded.*

## Consolidated EBITDA  *• Excludes repos. – Short Term e.g. RCC etc.*
- The portion of interest that will be added back to Net Consolidated Net Income is the amount of Consolidated Interest Charges, as defined.
- Is there anything else that is atypical that we need to discuss?

## Excess Cash Flow
- What accounts are included in working capital?
- We need to pick up changes in regulatory capital.

## General Financial Covenant Issues
- Capex covenant levels and carryover period (1 year versus 2 years)
- First financial covenant test date – November 2004

MB02011869

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Refco Credit Agreement

## Basket Summary

| Covenant | General Basket |
|---|---|
| Liens | • General Basket - $25,000,000 |
| Investments | • Scheduled investments.<br>• Permitted Acquisitions    _Too Small — Real world possibility_<br>   o $50 million per year with unlimited carryforward.<br>   o Acquired entity to become a wholly owned subsidiary (and therefore a Guarantor).<br>   o Subject to pro forma covenant compliance.<br>• General Basket: _o.k._<br>   o $10 million per fiscal year.<br>   o No limit on investments in existing JVs pursuant to existing arrangements.<br>   o Baskets may be used for Permitted Acquisitions.<br>   o Baskets increased by Permitted Equity Issuances.<br>   o Subject to pro-forma covenant compliance.<br>   o Investments by Loan Parties in non-Loan Parties and Foreign Subsidiaries limited to a TBD amount.<br>• Loans / Officer advances limited to $5 million. |
| Indebtedness | • Permitted Subordinated Indebtedness of Company:<br>   o Up to $15 million permitted without restriction on use of proceeds.<br>   o Amounts greater than $15 million permitted but must be used to pay down term debt.<br>• Regulated Subsidiaries Debt– limited to a TBD amount.<br>• Foreign Subsidiary Debt<br>   o Indebtedness of Foreign and Restricted Subsidiary to Holdings or any Loan Party – a TBD amount.<br>   o Third party indebtedness of Foreign Subsidiaries – a TBD amount.<br>• Permitted secured debt<br>   o Limited to $25 million<br>   o Of which up to $10 million can be purchase money debt.<br>• General Basket for Company and Subs<br>   o $50 million at any time outstanding.<br>• Holdings:<br>   o Permitted Holdco Debt – No cap.<br>   o Subject to 4.50:1 leverage at Holdings and 3.5:1 leverage at Company.<br>   o Pro forma covenant compliance required if amount is greater than $25 million in any fiscal quarter. |
| Asset Sales | • Sale and leaseback - $25 million (proceeds applied to pay down term loan).<br>• General Basket - $50 million (proceeds applied to pay down term loan). |
| Restricted Payments | • Permit restricted payments with proceeds of and to service Permitted Holdco Debt.<br>• Restricted Payments by Company to Holdings permitted in a maximum amount of $10 million, $20 million if Leverage Ratio is less than 4:1 and $30 million if Leverage Ratio is less than 3:1 plus 25% of cumulative free cash flow. |
| Mandatory Prepayments | • Excess cash flow – 50% steps down to 25% when leverage ratio is below 4.0:1 and 0% when leverage ratio is below 3.0:1. Excess cash flow start date – 2/28/05 or 2/28/06?<br>• Asset Sales – 100% for certain permitted sales (subject to certain exceptions, including first $10 million in any fiscal year and any disposition for less than $5 million).<br>• Specifies Equity Issuances – 50% steps down to 25% when leverage ratio is below 4.0:1 and 0% when leverage ratio is below 3.0:1.<br>• Permitted Subordinated Indebtedness, certain Foreign Subsidiary Debt and certain other indebtedness – 100% |

MB02011870

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT 35

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 2/17
OCT 19 '99 19:07 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.02/17

**Refco Group Ltd., LLC**

One World Financial Center
200 Liberty Street • Tower A
New York, NY 10281-1094

Telephone
212-693-7000

*[handwritten: Q's]*
*[handwritten: ① if combine loan to Hvldgs +*
*L + d ⇒*
*what % of K, sub*
*debt +*
*to tal debt]*

October 15, 1999

# REFCO

Joseph P. Collins. Esq.
Mayer, Brown & Platt
1675 Broadway – 19 floor
New York, NY 10019

*[handwritten: ② if loan to parent*
*% of parent's*
*K, sub debt,*
*total debt.]*

Dear Joe:

RE: **BAWAG/Refco**

Following our discussions on the structure of the Refco/BAWAG deal I had tried to
analyze the Wells Fargo footnote as a means of responding in a comparable way to
questions concerning the BAWAG loan to Refco Group Holdings. I found this
difficult particularly as the definition of "Borrower" in the footnote is not all together
clear and I was not sure whether the interpretation applied to Wells Fargo's investment
in its subsidiary or the financing activities of that subsidiary with third-party clients. It
may prove, therefore, that the comparison is not entirely valid.

In light of this, I think it may be better to focus on an overall analysis of the financial
resources of Refco Group and repeat, once again, the arms-length nature of the loan
transaction between BAWAG and Refco Group Holdings. Specifically:-

1. Refco Group Holdings is a non-operating holding company. The principal and
   overwhelming asset is its 90% ownership of Refco Group Ltd. and subsidiaries.

2. Refco Group Holdings is closely held and with the exception of the BAWAG loan
   has no third-party lending arrangements or equity investors. This, together with a
   historical policy of strict confidentiality, is the principal reason that the company
   does not (and is not obligated to) produce financial statements. Refco Group Ltd.
   and subsidiaries on the other hand produces regular audited financial statements.

3. Given the fact that it is not an operating company, Refco Group Holdings capital
   (i.e. net worth) is represented by the value of its investment in Refco Group
   Limited. At May 31, 1999, the net worth of Refco Group Ltd. totaled $446
   million. In addition, Refco Group Holdings holds a $16 million subordinated note
   from a subsidiary of Refco Group Ltd., Refco, Inc. The combined value of Refco

   *[handwritten: net eq minus loans to RGH]*

MB02071243

*[handwritten: 2]*

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 3/17
OCT 19 '99 19:07 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.03/17

**Refco Group Ltd., LLC**

October 15, 1999
BAWAG/Refco
Page 2

Group Holdings 90% interest in the equity of Refco Group Ltd. plus the principal
of the subordinated note is, therefore, approximately $418 million.

4.  The loan extended by BAWAG to Refco Group Holdings has a principal value of
    $85 million. This loan, subject to a Separate Loan Agreement, has been negotiated
    at arms length and is not convertible into either equity of Refco Group Holdings or
    equity of Refco Group Ltd. The principal balance of the loan represents
    approximately 20.3% of the value of Refco Group Holding's investment in Refco
    Group Ltd.

5.  In terms of the commercial viability of the loan, interest and principal can readily
    be covered by the remittance of dividend payments or distributions from Refco
    Group Ltd. and its subsidiaries to Refco Group Holdings, its parent entity. There
    would be not additional call upon the assets of Refco Group Ltd. for debt service.

Given the absence of third-party liabilities or investors at the Refco Group Holdings
level and the concentration of Refco Group Holdings assets and net worth in Refco
Group Ltd., an audited entity, we can clearly state that the BAWAG loan to Refco
Group Holdings, quite apart from being arms-length in nature does not represent a
disproportionate share of the capital value of Refco Group Holdings and is in fact less
than 25% of that number. Furthermore, the loan has no direct or indirect rights in
respect of ownership or financial claims against Refco Group Ltd., which should
further support the view that there is no implication of control derived from the
existence of the loan.

A copy of the internal management accounts for May 31, 1999, and the audited
financial statements for February 28, 1999, are enclosed for information in support of
the above financial analysis. Please let me know if you have additional questions.

Yours sincerely,

Phillip Bennett
President and CEO

kf
Enclosure

*[handwritten annotation:]* by 11/30 70MM L-T-Debt to Insure COS

MB02071244

3

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 4/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.04/17

Refco Group Ltd., LLC and Subsidiaries
Consolidated Balance Sheet
May 31, 1999
(USD, in thousands)

|  | May 31, 1999 |
|---|---|
| **ASSETS** | |
| | $    332,822 |
| Cash and short-term investments, at market value | |
| Margin deposits with commodity exchanges, clearing associations and brokers | 778,256 |
| Receivables: | 95,463 |
| Brokers and dealers | 436,723 |
| Loans | 1,582,161 |
| Customers | 151,623 |
| Other | 1,302,007 |
| Financial instruments owned, at market value | 5,996,623 |
| Securities purchased under agreements to resell | 244,551 |
| Other assets | |
| | $ 10,900,229 |
| | |
| **LIABILITIES AND SHARE CAPITAL** | |
| | $      82,275 |
| Payable to brokers, dealers and other financial institutions | 2,409,657 |
| Payable to customers | 330,885 |
| Bank loans | 28,335 |
| Notes payable | 10,627 |
| Loans payable | 442,821 |
| Financial instruments sold not yet purchased, at market value | 6,740,759 |
| Securities sold under agreements to repurchase | 112,007 |
| Accounts payable and other liabilities | |
| | 10,155,346 |
| Long-term debt | 130,000 |
| | 10,285,346 |
| | 16,000 |
| Subordinated debt | |
| | 27,522 |
| Minority interest | |
| | 125,000 |
| Preferred securities issued by a subsidiary | |
| Share capital | |
| Membership shares, $1 par value; 1,000 shares authorized, issued and outstanding | 1 |
| Additional paid-in capital | 223,505 |
| Retained earnings | 228,091 |
| Currency translation adjustment | (5,236) |
| | 446,361 |
| | $ 10,900,229 |

The above financial statement is unaudited and is to be used for internal management purposes only.

MB02071245

4

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 5/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.05/17

Refco Group Ltd., LLC and Subsidiaries
Consolidated Statement of Income and Retained Earnings
For the Three Months Ended May 31, 1999
(USD, in thousands)

|  | May 31, 1999 |
|---|---|
| **REVENUES** | |
| Commissions | $      59,957 |
| Brokerage | 15,473 |
| Interest | 351,026 |
| Principal transactions, net | 13,472 |
| Asset management and advisory fees | 9,461 |
| Other income | 2,088 |
|  | 451,477 |
| **EXPENSES** | |
| Commissions and order execution costs | 46,456 |
| Interest | 332,731 |
| Employee compensation and benefits | 33,034 |
| General, administrative and other | 23,518 |
|  | 435,739 |
| Income before provision for income taxes, minority interest and dividends on preferred securities issued by a subsidiary | 15,738 |
| Provision for income taxes | 1,968 |
| Income before minority interest and dividends on preferred securities issued by a subsidiary | 13,770 |
| Minority interest | 524 |
| Income before dividends on preferred securities issued by a subsidiary | 13,246 |
| Dividends on preferred securities issued by a subsidiary | 2,976 |
| Net income | 10,270 |
| RETAINED EARNINGS AS OF MARCH 1 | 217,821 |
| RETAINED EARNINGS AS OF MAY 31 | $    228,091 |

The above financial statement is unaudited and is to be used for internal management purposes only.

MB02071246

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 6/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540      P.06/17



**Refco Group, Ltd. and Subsidiaries**
Consolidated Financial Statements
February 28, 1999

MB02071247

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 7/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540        P.07/17

# ARTHUR ANDERSEN LLP

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Refco Group, Ltd.:

We have audited the accompanying consolidated balance sheet of Refco Group, Ltd. (a Delaware corporation) and subsidiaries as of February 28, 1999, and the related consolidated statements of income, changes in stockholder's equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Refco Group, Ltd. and subsidiaries as of February 28, 1999, and the results of their operations and their cash flows for the year then ended in conformity with generally accepted accounting principles.

*Arthur Andersen LLP*

New York, New York
May 19, 1999

MB02071248

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEET

### FEBRUARY 28, 1992

(000's omitted)

### ASSETS

| | |
|---|---|
| CASH AND SHORT-TERM INVESTMENTS, at market value | $ 226,910 |
| MARGIN DEPOSITS WITH COMMODITY EXCHANGES, CLEARING ASSOCIATIONS AND BROKERS | 844,949 |
| RECEIVABLES: | |
| Brokers and dealers | 159,769 |
| Loans | 257,477 |
| Customers | 1,317,291 |
| Other | 190,986 |
| FINANCIAL INSTRUMENTS OWNED, at market or fair value | 730,715 |
| SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL | 5,092,298 |
| OTHER ASSETS | 236,791 |
| Total assets | $ 9,069,156 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

| | |
|---|---|
| LIABILITIES: | |
| Payable to brokers, dealers and financial institutions | $ 211,762 |
| Payable to customers | 1,866,920 |
| Bank loans | 244,000 |
| Notes payable | 221,335 |
| Loans payable | 1,351 |
| Financial instruments sold but not yet purchased, at market or fair value | 498,465 |
| Securities sold under agreements to repurchase | 5,196,704 |
| Accounts payable and other liabilities | 171,234 |
| | 8,411,791 |
| LONG-TERM DEBT | 146,000 |
| | 8,557,791 |
| SUBORDINATED DEBT | 16,000 |
| MINORITY INTEREST | 26,998 |
| PREFERRED SECURITIES ISSUED BY SUBSIDIARIES | 125,000 |
| STOCKHOLDERS' EQUITY: | |
| Common stock, $1 par value; 1,000 shares authorized, issued and outstanding | 1 |
| Additional paid-in capital | 120,605 |
| Retained earnings | 217,821 |
| Currency translation adjustment | (5,060) |
| Total stockholder's equity | 333,367 |
| Total liabilities and stockholder's equity | $ 9,069,156 |

The accompanying notes are an integral part of this consolidated balance sheet.

MB02071249

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

## REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF INCOME

## FOR THE YEAR ENDED FEBRUARY 28, 1999

(000's omitted)

| | |
|---|---:|
| REVENUES: | |
| Commissions | $   235,687 |
| Brokerage income | 70,438 |
| Interest | 1,290,553 |
| Principal transactions, net | 90,425 |
| Asset management and advisory fees | 34,768 |
| Other income | 6,660 |
| | 1,728,531 |
| | |
| EXPENSES: | |
| Commissions and order execution costs | 213,510 |
| Interest | 1,222,903 |
| Employee compensation and benefits | 140,845 |
| General, administrative and other | 109,920 |
| | 1,687,178 |
| Income before restructuring charge, provision for income taxes, minority interest, and dividends on preferred securities issued by subsidiaries | 41,353 |
| RESTRUCTURING CHARGE | 5,000 |
| Income before provision for income taxes, minority interest, and dividends on preferred securities issued by subsidiaries | 36,353 |
| PROVISION FOR INCOME TAXES | 4,497 |
| Income before minority interest and dividends on preferred securities issued by subsidiaries | 31,856 |
| MINORITY INTEREST | 877 |
| Income before dividends on preferred securities issued by subsidiaries | 30,979 |
| DIVIDENDS ON PREFERRED SECURITIES ISSUED BY SUBSIDIARIES | 10,859 |
| Net income | $    20,120 |

The accompanying notes are an integral part of this consolidated statement.

-3-

MB02071250

9

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 10/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540     P.10/17

## REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY

## FOR THE YEAR ENDED FEBRUARY 28, 1999

### (000's omitted)

| | Common Stock | Additional Paid-in Capital | Retained Earnings | Currency Translation Adjustment | Total |
|---|---|---|---|---|---|
| BALANCE, February 28, 1998 | $ 1 | $ 35,605 | $ 197,701 | $ (2,283) | $ 231,024 |
| Contributed capital | - | 85,000 | - | - | 85,000 |
| Net income | - | - | 20,120 | - | 20,120 |
| Currency translation adjustment | - | - | - | (2,777) | (2,777) |
| BALANCE, February 28, 1999 | $ 1 | $ 120,605 | $ 217,821 | $ (5,060) | $ 333,367 |

The accompanying notes are an integral part of this consolidated statement.

-4-

MB02071251

10

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 11/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540     P.11/17

## REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CASH FLOWS

## FOR THE YEAR ENDED FEBRUARY 28, 1999

### (000's omitted)

| | |
|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES: | |
| Net income | $    20,120 |
| Noncash items included in net income- | |
| Depreciation and amortization | 13,223 |
| Minority interest in earnings of subsidiaries | 877 |
| (Increase) decrease in operating assets- | |
| Margin deposits with commodity exchanges, clearing associations and brokers | (14,050) |
| Receivable from brokers and dealers | (74,648) |
| Loans receivable | (19,926) |
| Receivable from customers | 248,746 |
| Other receivables | (49,029) |
| Financial instruments owned | 396,352 |
| Securities purchased under agreements to resell | (4,169,786) |
| Other assets | (34,345) |
| | (3,702,586) |
| Increase (decrease) in operating liabilities- | |
| Payable to brokers, dealers and financial institutions | (45,509) |
| Payable to customers | (54,311) |
| Bank loans | 87,251 |
| Notes payable | 71,260 |
| Loans payable | (64,948) |
| Financial instruments sold but not yet purchased | (450,264) |
| Securities sold under agreements to repurchase | 3,922,192 |
| Accounts payable and other liabilities | 19,650 |
| | 3,485,321 |
| Cash used in operating activities | (197,145) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | |
| Repayment of long-term debt | (34,400) |
| Repayment of subordinated debt | (12,295) |
| Issuance of preferred securities by a subsidiary | 50,000 |
| Proceeds from contributed capital | 85,000 |
| Net cash provided by financing activities | 88,305 |
| Net decrease in cash and short-term investments | (108,840) |
| CASH AND SHORT-TERM INVESTMENTS, February 28, 1998 | 337,750 |
| CASH AND SHORT-TERM INVESTMENTS, February 28, 1999 | $    228,910 |

The accompanying notes are an integral part of this consolidated statement.

-5-

MB02071252

11

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 12/17
OCT 19 '99 19:10 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128455540          P.12/17

REFCO GROUP, LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

FEBRUARY 28, 1999

## 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements include the accounts of Refco Group, Ltd. (the "Company") and its subsidiaries (the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Company's worldwide headquarters in Chicago is complemented by a network of United States and international offices.

The consolidated financial statements include the accounts of each of the Company's subsidiaries, all of which are either wholly or majority owned. All material intercompany transactions and balances have been eliminated in consolidation.

The preparation of consolidated financial statements requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements. In the opinion of management, these estimates are not material to the financial position of the Group.

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year-end spot rate. Gains and losses resulting from foreign currency transactions are included in the consolidated statement of income. Gains and losses resulting from translating foreign currency financial statements into U.S. dollars are included in currency translation adjustment, as a separate component of stockholder's equity.

Cash and short-term investments are defined as segregated and nonsegregated cash and short-term, liquid investments with maturities of 90 days or less when acquired.

Financial instruments owned and financial instruments sold but not yet purchased are recorded on a trade date basis and consist primarily of U.S. and foreign equity and fixed income securities as well as derivative financial instruments which are stated at market value or fair value, with unrealized gains and losses included in income.

Loans receivable are stated at principal value, are generally due on demand and bear interest at variable market rates. Loans receivable are renewed at the option of the Group.

MB02071253

12

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Securities purchased under agreements to resell and securities sold under agreements to repurchase are accounted for as collateralized financing transactions and are recorded at the amount at which the securities will be resold or repurchased, including accrued interest. The Group generally controls access to the collateral pledged by the counterparties, which consists largely of securities issued by the U.S. Government and foreign sovereign governments. The value and adequacy of the collateral are continually monitored. Consequently, the risk of credit loss from counterparties' failure to perform in connection with collateralized lending activities is minimal.

The Company continues to report assets as owned when they are pledged as collateral in secured financing arrangements and the secured party cannot sell or repledge the assets or the Company can substitute collateral or otherwise redeem it on short notice. The Company continues not to report securities received as collateral in secured financing arrangements because the debtor typically has the right to substitute or redeem the collateral on short notice.

The Company recognizes commissions earned on customers' open futures positions on a half-turn basis.

## 2. RECEIVABLES FROM AND PAYABLE TO BROKERS AND DEALERS, FINANCIAL INSTITUTIONS AND CUSTOMERS

These balances primarily pertain to margin and open contractual commitments related to futures, foreign currencies and securities transactions. These receivables are generally secured or collateralized. For certain receivables that are not fully secured and where the Company deems appropriate, the Company pursues collection of these receivables through various means, including legal action, and provides reserves when, in the opinion of management, such reserves are appropriate. The Group nets receivables and payables related to its foreign currency and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

## 3. BANK LOANS, NOTES PAYABLE, SUBORDINATED DEBT, AND LONG-TERM DEBT

The Company maintains a committed unsecured revolving credit facility of $135 million under an agreement with a syndicate of banks. The agreement contains covenants which require, among other things, that the Company maintain specified levels of liquidity and tangible net worth, as defined in the agreement. Borrowings under this line at February 28, 1999 totaled $85 million and are included under bank loans in the accompanying financial statements.

Remaining Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers. At February 28, 1999, the Group had approximately $128 million of secured bank loans for which the Group had collateral pledged of approximately $223 million.

Notes payable include amounts due to former shareholders of acquired companies, a term loan from a financial institution, and obligations issued by a subsidiary. These notes bear interest at negotiated rates and have maturity dates through December 31, 2000.

MB02071254                    13

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 14/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR H9 312 782 2770 TO 12128495540    P.14/17

Subordinated debt due to the stockholder bears interest at the prime rate and is subordinated to the claims of present and future general creditors. During 1999, the weighted average interest rate on subordinated debt was 8.23%. The maturity date is May 31, 2000.

Subordinated debt can be repaid only if after giving effect to such repayment, certain regulated subsidiaries meet the capital requirements governing repayment of subordinated debt.

Long-term debt of $146 million represents unsecured senior notes with maturities ranging from May 16, 1999 to December 18, 2006. These loans bear interest at rates ranging from 7.18% to 8.21%, which are fixed rates based upon market rates at their respective dates of issuance.

## 4. REGULATORY CAPITAL REQUIREMENTS

The Company operates globally through a network of subsidiaries, with several being subject to regulatory requirements in the United States. Certain subsidiaries of the Company are subject to either minimum financial requirements as set forth by the Commodities Futures Trading Commission or the net capital requirement of the Securities Exchange Commission (the "SEC"). In accordance with these regulations, at February 28, 1999, these subsidiaries are required to maintain minimum net capital, as defined, of approximately $55.3 million and have excess net capital of approximately $94.7 million.

## 5. CONTINGENCIES

Two subsidiaries of the Company, together with several other financial institutions, including primary government securities dealers, have been named as defendants in civil actions. Another subsidiary of the Group has been named as a defendant in several lawsuits and arbitrations which involve claims that aggregate to substantial amounts.

With regard to these civil actions and arbitrations, the Company, its subsidiaries and legal counsel believe that the resolution for these matters will not have a material adverse effect on the financial condition and results of operations of the Company.

## 6. INCOME TAXES

Effective January 1, 1997, the Group's parent filed an election with the United States Internal Revenue Service to be treated as an S corporation for U.S. federal income tax purposes, as defined in the regulations. Under these regulations, the stockholder of the Group is responsible for the federal income tax liability related to the Group's operating results, except for Refco, Inc., a subsidiary, which files its own federal corporate tax return. Accordingly, the Group did not record any U.S. federal income tax liability related to its operating results. This election does not affect foreign, state or city taxes. A provision for foreign, state and city taxes is included in the consolidated financial statements.

Income taxes are allocated to members of the consolidated group by computing such taxes as if the member were a separate taxpayer. Income taxes are payable to its parent.

-8-

MB02071255

14

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP -

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 15/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR H9 312 782 2770 TO 12128495540    P.15/17

## 7. RELATED PARTY TRANSACTIONS

During the year ended February 28, 1999, the Group loaned money to and borrowed money from its stockholder, affiliated companies and other related parties. At year-end, these balances included net loans receivable of approximately $252 million due from these related parties. Those transactions occurred in the normal course of the Group's business. Interest was generally charged at prevailing market rates.

## 8. OFF-BALANCE SHEET AND CONCENTRATION OF CREDIT RISK

In the normal course of its customer-driven operations, the Group enters into various contractual commitments involving forward settlement. These include exchange-traded futures, fixed income swaps, equity swaps, foreign currency forwards and options contracts. Most contracts entered into are fully hedged with offsetting contracts or the underlying cash instrument.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off-balance sheet.

Derivatives are generally based on notional values. Notional values are not recorded on the consolidated balance sheet, but rather are utilized solely as a basis for determining future cash flows to be exchanged. Although notional or contractual amounts may be indicative of the level of transactions, they do not measure the Group's exposure to market or credit risk. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits. Management believes the Group's exposure to market risk, however, is expected to be immaterial relative to the underlying notional amounts.

A summary of the approximate notional amounts of derivative financial instruments at February 28, 1999 appears below (in millions):

| | |
|---|---:|
| Forward currency contracts: | |
| Commitments to sell | $ 8,007 |
| Commitments to purchase | 7,787 |
| Forward financing transactions: | |
| Commitments to purchase securities under agreements to resell | 382 |
| Commitments to sell securities under agreements to repurchase | 2,185 |
| Swap contracts: | |
| Commitments to sell | 11 |
| Commitments to purchase | 16 |
| Option contracts sold or written | 10,959 |
| Option contracts purchased | 10,965 |

MB02071256        15

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 16/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.16/17

A summary of the market or fair value of derivative financial instruments at February 28, 1999 appears below (in millions); averages are based on quarter-end balances.

| | Assets | | Liabilities | |
|---|---|---|---|---|
| | February 28, 1999 | Average | February 28, 1999 | Average |
| Forward currency contracts | $ 29 | $ 144 | $ 41 | $ 142 |
| Option contracts | 180 | 569 | 189 | 571 |
| Swap contracts | 1 | 12 | 3 | 12 |

The Group regularly transacts business with corporations and other financial institutions and owns securities issued by a broad range of governments and U.S. and foreign corporations. The Group also enters into collateralized financing agreements in which it extends short-term credit to financial institutions and customers. The Group generally controls access to the collateral pledged by the counterparties, which consists largely of securities issued by the U.S. Government and foreign sovereign governments. The value and adequacy of the collateral are continually monitored. Consequently, the risk of credit loss from counterparties' failure to perform in connection with collateralized lending activities is minimal.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouses its customers' performance under these contracts. To reduce its risk, the Group requires its customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer which reduces the risk to the Group of failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements. Management believes that the margin deposits held at February 28, 1999 were adequate to minimize the risk of material loss which could be created by the positions held at that time.

The Group engages in various trading activities which include the use of derivative instruments described in the aforementioned table. The net principal transactions revenues related to the trading of foreign exchange, fixed income and equity derivatives comprise principal transactions, net on the accompanying consolidated statement of income.

## 9. PREFERRED SECURITIES ISSUED BY SUBSIDIARIES

During calendar year 1998, Refco Preferred Capital Trust I and II, consolidated subsidiaries of the Company, issued $125 million of Trust Originated Preferred Securities ("TOPRs") to third parties with a weighted average interest rate of 9.52%. The Company has guaranteed payment of all distributions on the TOPRs, with the guarantees being subordinated to all senior indebtedness. Distributions are payable semiannually if funds are legally available. These securities have maturities extending through 2008. The TOPRs are recorded as Preferred Securities Issued by Subsidiaries on the accompanying consolidated balance sheet.

-10-

MB02071257

16

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 17/17
OCT 19 '99 19:12 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540         P.17/17

## 10. RESTRUCTURING

The Company recorded a $5 million restructuring charge related to certain actions taken to improve ongoing profitability. These actions are a result of specific business reviews and the reorganization of certain corporate functions. These reviews resulted in reductions of both business unit and corporate personnel. The charge primarily consists of severance payments made to terminated employees.

## 11. SUBSEQUENT EVENTS (UNAUDITED)

In May 1999, the Company reorganized into a Delaware limited liability company, Refco Group, Ltd. LLC, and sold 10% of LLC interests to a subsidiary of Bank fur Arbeit und Wirtschaft (BAWAG) for $95 million. The amounts sold represent 4.9% voting LLC interests and 5.1% non-voting LLC interests.

-11-

MB02071258

17

** TOTAL PAGE.17 **

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT 36

June ___, 2002

**[Newco, Inc.
INSERT ADDRESS]**

Re: Letter Agreement

Ladies and Gentlemen:

Reference is made to: (1) the Proceeds Participation Agreement dated as of June ___, 2002 (the "Agreement") between Refco Group Ltd., LLC, a Delaware limited liability company (the "Company"), and Newco, Inc, a Delaware corporation, ("Newco"); and (2) the Second Amended and Restated Limited Liability Company Agreement of the Company (the "LLC Agreement"). This letter agreement, dated June ___, 2002 (the "Letter Agreement"), sets forth the further agreements of the parties to the Agreement and the Voting Members of the LLC Agreement. All capitalized terms used and not otherwise defined herein have the meanings assigned thereto in the Agreement or the LLC Agreement.

In consideration of the mutual representations, covenants and agreements made between the parties hereto in connection with the Agreement and the LLC Agreement, and intending to be legally bound hereby, the parties hereto have agreed as follows:

1.      The objective target and intention of all parties to this Letter Agreement is to effect a "Sale of the Company". The phrase "Sale of the Company" means the sale of the Membership Shares of the Company or the assets of the Company including without limitation by means of any of the following actions:  (i) sale of the Membership Shares of the Company to the public pursuant to a registration statement under the Securities Act of 1933, as amended (the "Securities Act") or to a third party in a transaction exempt from the registration requirements of the Securities Act; (ii) the merger or consolidation of the Company; or (iii) the sale of all or substantially all of the assets of the Company or its Membership Shares. The parties to this Letter Agreement, in particular the management of the Company as so directed by the Company, will use their reasonable best efforts to consummate such a transaction prior to February 28. 2005.

2.      The Company shall keep all parties to this Letter Agreement fully informed as to any developments, progress, and circumstances on the project outlined in Section 1 above immediately after it having occurred or being achieved, including providing relevant information on any offer received by the Company and any related negotiations.

3.      The minimum target price for a Sale of the Company (including a sale of all its outstanding Membership Shares) shall be its fair market value.

4.      A Sale of the Company (including a sale of all its outstanding Membership Shares) shall be structured in a manner so as to be most tax-efficient and provide the most attractive financial opportunities to all the parties.

4960202.1 061102 1706C 98511025

MB02068524

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

[Newco, Inc.]
Page 2
June ___, 2002

5.    (a)    A Sale of the Company (including a sale of all its outstanding Membership Shares) shall be undertaken only with the consent of all the parties to this Letter Agreement; such consent shall not be unreasonably withheld by any party.

(b)    Newco, and after the February 28, 2005 Refco Group Holdings, Inc., is entitled to withhold its consent, regardless of other reasons, if the purchase price for the Sale of the Company (including a sale of all its outstanding Membership Shares) is less than $1,650,000,000; such amount shall be adjusted ratably upward or downward (as the case may be) in accordance with the method of determination of the Purchase Price (and accordingly the minimum sale price) described in Section 1.01(c) of the Agreement to the extent that the net income of the Company for the fiscal year ending February 28, 2003 is less than or greater than $132,000,000.

6.    In the event that a Sale of the Company (including a sale of all its Membership Shares) has not been effected prior to February 28, 2006 and Newco (after having exercised its right to receive Membership Shares pursuant to Section 1.01(b) of the Agreement) decides after February 28, 2006 to effect a Sale of the Company or a sale of all its Membership Shares to a Third Party Buyer (other than the Company, any other Member, or any affiliate of Newco) at a price and on sales terms according to Sections 3, 4, and 5(b) above, Newco shall have the right to require the other Members to sell to the Third Party Buyer, together with Newco and the Company, all their Membership Shares or for the same price (pro rata) and upon the same terms and conditions as are applicable to Newco. The right to require the other Members to participate in any proposed Sale of the Company or the Membership Shares held by Newco in accordance with the immediately preceding sentence shall be exercised by Newco by delivery of a written notice to the other Members (the "Drag Along Notice") on or prior to the date which is at least thirty (30) days prior to the date that the proposed transaction is scheduled to close. The Drag Along Notice shall set forth (i) the time and place of the closing of the proposed transaction and (ii) the expected consideration to be paid at such closing. The other Members are obliged to consent to the Sale of the Company or the Membership Shares of Newco and the other Members to the Third Party Buyer and to sell all their Membership Shares on the conditions set forth in this Section to the Third Party Buyer.

7.    The phrase "further working capital adjustment" in Section 2.02(c) of the Agreement shall mean $180,000,000.

8.    In the event that a Member transfers any of its Membership Shares in accordance with Section 18(b) of the Amended and Restated Limited Liability Company Agreement of the Company to an affiliate or a Family Member of such Member, the assignee must execute and agree to be bound by the provisions of this Letter Agreement.

9.    The Members which are parties hereto agree to vote any Membership Shares held by it so as to effectuate Section 2.04 of the Agreement. In the event Mr. Phillip R. Bennett

4960202.1 061102 1706C 98511025

**MB02068525**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

[Newco, Inc.]
Page 3
June ___, 2002

cannot serve as CEO of the Company at any time, Holdings and BAWAG shall designate a successor, and Holdings agrees to vote for such designee as Mr. Bennett's successor. If Holdings and BAWAG cannot agree on a designated successor within 30 days, Holdings has the right to designate such successor at all times prior to the Third Payment Date and BAWAG has the right to designate such successor at all times on and after the Third Payment Date. The designation of a successor in each instance shall be subject to the consent of the other party, such consent not to be unreasonably withheld.

     10.    The Company agrees that $350 million of the Purchase Price for the Participation Right shall be used or caused to be used for the retirement of inter-company debt of Refco Group Holdings, Inc.

                     Sincerely,

                     REFCO GROUP LTD., LLC

                     By:_____
                     Name:_____
                     Title:_____

                     REFCO GROUP HOLDINGS LLC

                     By:_____
                     Name:_____
                     Title:_____

                     REFCO GROUP HOLDINGS, INC.

                     By:_____
                     Name:_____
                     Title:_____

4960202.1 061102 1706C 98511025

MB02068526

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

[Newco, Inc.]
Page 4
June ___, 2002


Agreed:

**[NEWCO, INC.]**


By:_____
Name:_____
Title:_____


BAWAG OVERSEAS, INC.


By:_____
Name:_____
Title:_____

4960202.1 061102 1706C 98511025

**MB02068527**

**CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP**

# EXHIBIT 37



 Security Gets Smarter
Soros on Philanthropy
Oil: No Relief In Sight



Search

Forbes.com    Quotes    Video    Web    Blogs    Advanced

Site Search

U.S.    EUROPE    ASIA    HOME PAGE FOR THE WORLD'S BUSINESS LEADERS    Free Trial Issue

INSIDE F
▪ Most Pop
▪ Top 10 Di
▪ Top 5 Co

HOME    BUSINESS    TECH    MARKETS    ENTREPRENEURS    LEADERSHIP    PERSONAL FINANCE    FORBESLIFE

Video    Blogs    E-mail Newsletters    Org Chart Wiki    People Tracker    Portfolio Tracker    Special Reports    Widgets    CEC

E-Mail    E-Mail Newsletters    RSS

ADVERTISEMENT

advertisement

Do You Think the I
is Headed For a F

If you have a $500,000 portfolio
should download the latest repo
*Forbes* columnist Ken Fisher. In
you where he thinks the stock m
headed, and why. This must-rea
includes his latest stock market
plus proprietary research, and a
won't find anyplace else. Don't m

Click Here to Download Y

Fis

AFX News Limited

# UPDATE: JPMorgan shares down after financing Bear Stearns; analysts back ratings

03.14.08, 4:11 PM ET

## Popular Videos

3G iPhone Countdown

America's Super Subprime Problem

Art Market Correction May Loom

Gossip Girl's Struggle

Gurus Get Wired With Tech

## Most Popular Stories

Young Billionaires

Easily Overlooked Tax Deductions

The No-Tech Hacker

Job Hunting In A Downturn

How To Tap Lenders When Credit Is Tight

Updates with Bear Stearns comments from conference call

NEW YORK (Thomson Financial) - Shares of JPMorgan Chase & Co. fell as much as 5% Friday after the investment bank provided secured funding to struggling competitor Bear Stearns Cos.

'One of the reasons we went to JPMorgan is because they are our clearing agent for our collateral; therefore, it was easy for them to see the kind and quality of the collateral that we had available and therefore could move very, very quickly,' Bear Stearns CEO Alan Schwartz said during a conference call Friday.

The investment bank said a liquidity crisis emerged at Bear Stearns over a 24-hour period, leading it to secure temporary emergency financing from the New York Federal Reserve Bank and JPMorgan Chase.

Make Forbes.com My Home Page

News by E-mail Get stories by E-Mail on t

**Companies**

☐ JPM                    ☐ TGT

**Topics**

☐ retailing              ☐ financin
                           investm

☐ United States

Become a member FREE

Already a M
Log In

Enter Username          Enter E-Mail

Select Your Title        Receive Sp
                          Offers? ☑

Bear Stearns needs to receive financing through JPMorgan because it is not a depository institution, so it doesn't have access to the Term-Auction Facility.

Analysts backed ratings on JPMorgan after the announcement, saying

JPMorgan isn't taking any risk by lending to Bear Stearns.

'We spoke with [investor relations] at J.P. Morgan,' Morgan Stanley analyst Betsy Graseck wrote to clients Friday. 'J.P. Morgan has a special arrangement and believe that they will NOT have any risk from any change in collateral values used in this secured financing facility.'

The analyst reiterated an overweight rating on the stock, citing its strong capital levels and 'strong risk management as evidenced by its lower exposure to the riskiest assets than peers (lower CDO and subprime exposure).'

Standard & Poor's reiterated its rating on JPMorgan's stock, pointing to the bank's strong capital position. 'We believe JPMorgan will seek similar transactions to take advantage of market turmoil,' credit rating agency said, pointing to reports that JPMorgan is also in discussions with Target Corp. to take half-interest in the retailer's credit card operations.

Blaming recent insolvency rumors, Bear Stearns said a liquidity crisis emerged over the past 24 hours that led it to secure temporary emergency financing from the New York Federal Reserve Bank and JPMorgan Chase.

The banks are offering Bear Stearns financing for 28 days. J.P. Morgan said the Fed will provide 'non-recourse, back-to-back financing' for the deal so it doesn't believe the transaction represents any material risk for its shareholders.

In addition, JPMorgan said it's 'working closely' with Bear Stearns on securing 'permanent financing or other alternatives' for the company.

Earlier this week, Citigroup reiterated a hold rating while it lowered its earnings estimates for JPMorgan, saying the bank's long-term outlook is good amid signs of internal growth and opportunities.

'JPMorgan faces several large headwinds in next couple years due mainly to higher home equity losses, tougher capital markets and higher losses in credit card, which should lead to a period of below-trend earnings,' the shop said. Citi cut its 2008 earnings estimate by 75 cents to $3.15 a share, below Wall Street's $3.61 a share view, and lowered its 2009 estimate to $3.70, versus the $4.41 mean estimate. The firm reduced its target price to $41 from $44.

JPMorgan shares recently fell 2.1 to $37.30 on volume of almost 40 million.

Bear Stearns shares have fallen in recent sessions on fears that the bank could become insolvent, rumors which Bear Stearns repeatedly denied. The company's CEO Alan Schwartz, in a news release, blamed market chatter for a significant deterioration in the company's liquidity position over a period of 24 hours.

The stock plunged to a low of $26.85 in intraday trading, the lowest price seen since October 1998, before paring losses to trade down 47% at $30.17 just ahead of the close.

Sign Me Up!

FAQ | Terms, Conditions and Notices |

**Also available:** E-Mail Newsletters

ADVERTISEMENTS

**Countrywide® Home Loans**
No Closing Cost Refi. No Points. No Credit
Processing Fees.
www.Countrywide.com

**Lean Six Sigma Online**
Lean Six Sigma Online Certification Program
Now.
www.VillanovaU.com

**Tulane University**
Lead Like An MBA. Business Certificates On
www.TulaneU.com

**Why Sink With The Dollar?**
Profit From 4 Powerful Investments That Ris
Falls!
MoneyAndMarkets.com

**Free Forex Guide**
Free Forex Starter Kit from GFT. Includes a
Account.
www.GFTforex.com

ADVERTISEMENT

**Related Business Topics**

Starting A Small Business        Small

ForbesAutos.com

Michelle Rama

mr/jw/mr/tk1

COPYRIGHT

Copyright Thomson Financial News Limited 2007. All rights reserved.

The copying, republication or redistribution of Thomson Financial News Content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Financial News.

*Neither the Subscriber nor AFX News warrants the completeness or accuracy of the Service or the suitability of the Service as a trading aid and neither accepts any liability for losses howsoever incurred. The content on this site, including news, quotes, data and other information, is provided by AFX News and its third party content providers for your personal information only, and neither AFX News nor its third party content providers shall be liable for any errors, inaccuracies or delays in content, or for any actions taken in reliance thereon.*





| **Your Rating** ☆☆☆☆☆ | **Overall Rating** ☆☆☆☆☆ |
|---|---|

**Reader Comments**

💬 Post A Comment

**More On This Topic**

**Companies:** JPM | TGT
**E-Mail Newsletters:** Sign Up Now To Stay Informed On A Range Of Topics
**Attaché:** Customize Forbes.com Now To Track This Author And Industry

**Article Controls**

E-Mail   |   E-Mail Newsletters

🔖 del.icio.us   |   💾 Digg It!   |   🅨 My Yahoo!   |   Share   |   📶 RSS

**Related Sections**
Home > News & Analysis

**Today On Forbes.com**

**Perfect Storm**
Steve Schaefer
Soaring oil, bad jobs report, and little confidence from investors prompts U.S. stocks to nosedive.

- Morgan Stanley's Oil Influence
- Dollar Loses It
- **Complete Coverage:** Markets



**CEO Book Club**

BOOK EXCERPTS
**John A. Quelch and Katherine E. Joc**



BOOK REVIEW
**Pot Stickler**
David K. Randall
Jennifer 8. Lee delves into t intricacies and quality of Ch outside of China.








Lipstick On A Pig


Icahn Puts A Price On Yahoo!


The iPhone Stakeout: Part II


Wal-Mart To The Rescue

News Headlines | More From Forbes.com | Special Reports

**Subscriptions >**

**Subscribe To Newsletters     Subscriber Customer Service**

More From **Forbes**.com

➥ Century 21 CEO On Fannie Mae

➥ Buffett Buys

➥ Nissan CEO Carlos Ghosn

➥ Mitel Chairman Terry Matthews

➥ DuPont's Chief Charles Holliday

**SITEMAP   HELP   CONTACT US   INVESTMENT NEWSLETTERS   FORBES CONFERENCES   FORBES MAGAZINES   FO**

Ad Information   Forbes.com Mobile   RSS    Reprints/Permissions   Subscriber Services
Privacy Statement   Terms, Conditions and Notices   About Our Ads
© 2008 Forbes.com LLC™   All Rights Reserved

Tested By        Market Data By   Market Data By   Market Data By    Investopedia      Polska        Luxury Cars    Lux

SPIRENT   HEMSCOTT   THOMSON   quotemedia   INVESTOPEDIA         Fort TR

Stock quotes are delayed at least 15 minutes for Nasdaq, at least 20 minutes for NYSE/AMEX.U.S. indexes are
delayed at least 15 minutes with the exception of Nasdaq, Dow Jones Industrial Average and S&P 500 which are
2 minutes delayed.

Powered By          Oracle DBA by

at&t                THE PYTHIAN GROUP
Intelligent Content     REMOTE DBA
Distribution System    Oracle·SQL·MySQL