UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                             :

MARC S. KIRSCHNER, as Trustee of the Refco     :
Private Actions Trust,                        :
                              :

            Plaintiff,           :
                              :           07 Civ. 8165 (GEL)

      -v-                            :
                              :         **OPINION AND ORDER**

PHILLIP R. BENNETT, SANTO C. MAGGIO,     :
ROBERT C. TROSTEN, MAYER, BROWN,      :
ROWE & MAW, LLP, GRANT THORNTON     :
LLP, and ERNST & YOUNG U.S. LLP,      :
                              :

            Defendants.       :
                              :
------------------------------------------------------------x

Richard I. Werder, Jr., Sascha N. Rand, Sanford
I. Weisburst, Rebecca J. Trent, Stephen Broome,
Quinn Emanuel Urquhart Oliver & Hedges LLP,
New York, NY, for plaintiff.

John K. Villa, Michael Sundermeyer, Craig D.
Singer, Thomas G. Ward, Williams & Connolly
LLP, Washington, DC, for defendant Mayer
Brown LLP.

Joel M. Cohen, Anthony M. Candido, Timothy
Casey, Clifford Chance US LLP, New York,
NY, for defendant Mayer Brown Int'l LLP.

David E. Mollón, Bradley E. Lerman, Catherine
W. Joyce, Linda T. Coberly, Winston & Strawn
LLP, New York, NY, and Chicago, IL,
for defendant Grant Thornton LLP.

Christopher R. Harris, Miles N. Ruthberg,
Latham & Watkins LLP, New York, NY, and
William P. Hammer, Jr., Ernst & Young LLP,
New York, NY, for defendant Ernst & Young
LLP.

GERARD E. LYNCH, <u>District Judge</u>:

Plaintiff Marc S. Kirschner, in his capacity as Trustee of the Refco Private Actions Trust

("Trustee" or "Private Actions Trustee"), originally filed this action in New York State Supreme

Court on behalf of Refco's foreign-exchange customers (the "FX customers"), asserting claims

under New York state law against certain Refco insiders, professionals, and advisors for, *inter*

*alia*, breach of fiduciary duty, fraud, and conversion.  (Compl. ¶¶ 210-38.)  Certain defendants

subsequently removed the action to this Court on the ground that the case is "related to" Refco's

Chapter 11 bankruptcy, 28 U.S.C. § 1334(b).  <u>See</u> <u>Kirschner v. Bennett</u>, No. 07 Civ. 8165, 2008

WL 1990669 (S.D.N.Y. May 7, 2008) (denying the Trustee's motion to remand or abstain).  The

Trustee alleges that the FX customers collectively suffered losses totaling more than half a

billion dollars when insiders at Refco diverted assets from their accounts at Refco Capital

Markets ("RCM") in order to bankroll the Refco fraud.  This opinion addresses four motions to

dismiss pursuant to Rules 12(b)(1) and 12(b)(6) filed by Grant Thornton LLP, Ernst & Young

LLP ("EY"), Mayer Brown LLP, and Mayer Brown International LLP (collectively, the

"Professional Defendants").[1]  The motions will be granted.

---

[1] The remaining defendants Phillip R. Bennett ("Bennett") and Santo Maggio ("Maggio") answered the Trustee's Complaint, and by stipulation the Trustee has agreed to stay this action against defendant Robert C. Trosten ("Trosten"), pending Mr. Trosten's sentencing hearing.

# BACKGROUND[2]

## I.    The Refco Fraud

Prior to its collapse in the fall of 2005, Refco[3] presented itself to the public as a leading independent provider of execution and clearing services for exchange-traded derivatives and a major provider of brokerage services in the fixed income and foreign exchange ("FX") markets. (Compl. ¶ 4.[4])  Beginning in the late 1990s, Refco's controlling officer-shareholders – Phillip R. Bennett, Robert C. Trosten, and Santo C. Maggio (collectively, the "insiders")[5] – with the aid of certain professionals and financial advisors, orchestrated a complex fraudulent scheme to

---

[2] The factual allegations concerning the fraud at Refco are substantially similar to those alleged by the Trustee in his alternative capacity as Trustee for the Refco Litigation Trust.  The Court's discussion of these facts is thus substantially similar to that of Kirschner v. Grant Thornton, No. 07 Civ. 11604, 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009), although the instant discussion relies on the complaint filed in this action.

[3] The term "Refco," as used throughout this opinion, refers to both Refco Inc., the publicly traded company formed pursuant to the August 2005 initial public offering ("IPO"), and Refco Group Ltd. ("RGL"), which functioned as Refco's parent company prior to the IPO, as well as to RGL's direct and indirect subsidiaries.

[4] All references to the complaint are to the complaint originally filed in New York State Supreme Court.  (See Juman Decl. Ex. A.)  All factual allegations in the complaint are assumed to be true for purposes of this motion.  See Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001); see also Ashcroft v. Iqbal, 556 U.S. ___, ___, 129 S.Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.")

[5] These "insiders" held the top management positions at RGL, RCM and Refco Inc. (Compl. ¶¶ 10-12.)  Beginning in September 1998, Bennett was President, CEO, and Chairman of RGL and served as a director and officer of RCM.  (Compl. ¶ 10.)  Maggio was the Executive Vice President of RGL, and President and a director of RCM.  (Compl. ¶ 11.)  In that capacity, he "ran the brokerage operations of Refco Securities, LLC ("RSL") and RCM, and directly participated in, and orchestrated and supervised, the theft of [FX customer] assets."  (Id.) Trosten was a member of Refco's corporate finance team from 1997 to 2001 and RGL's chief financial officer from 2001 through October 2004.  (Compl. ¶ 12)  All three men since have been convicted of, or pleaded guilty to, criminal charges involving their conduct at Refco.

artificially enhance Refco's performance and conceal Refco's true financial condition, so that

these insiders, through the company's August 2004 leveraged buy-out ("LBO") and August 2005

initial public offering ("IPO"), could cash out their interests in Refco on lucrative terms.

(Compl. ¶¶ 2-3, 10-12, 26.)  That scheme, which has been thoroughly discussed in this Court's

prior opinions,[6] involved both concealment of Refco's uncollectible debt and the

misappropriation of customer assets.

The concealment of Refco's uncollectible debt involved a two-part process.  First,

hundreds of millions of dollars in uncollectible trading losses and other operating expenses were

converted into apparently legitimate receivables *owed to* Refco by RGHI, a related-party holding

company, or "alter-ego" owned by Bennett and another Refco principal, Tone Grant.  (Compl. ¶¶

40-41, 47-48.)  Although RGHI would never be in a position to repay this debt because RGHI's

primary asset was its ownership of Refco stock – the value of which hinged on the insiders'

ability to conceal the very losses they were shifting off of Refco's books to RGHI – the transfers

had the intended effect of fraudulently increasing Refco's reported profits and concealing

Refco's outstanding debt, the revelation of which would have devastated customer confidence

and severely damaged Refco's business.  (Compl. ¶¶ 45-47.)  This facade was further improved

by various fictitious transfers between Refco and RGHI, including those in which Refco charged

---

[6] See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 618-20 (S.D.N.Y. 2007) (describing the so-called round-trip loans that concealed Refco's massive uncollectible receivables); Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP, 568 F. Supp. 2d 119, 121-23 (S.D.N.Y. 2008) (same), In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig. ("RCM I"), No. 06 Civ. 643, 2007 WL 2694469, at *4 (S.D.N.Y. Sept. 13, 2007) (describing how RCM allegedly diverted customer assets and improperly used the proceeds to fund the business operations of Refco affiliates).

RGHI as much as 35 percent interest on the sham receivables – interest that Refco never, in fact, collected.  (Compl. ¶¶ 57-59.)

Next, the insiders disappeared the receivables parked at RGHI through a series of so-called round-trip loans.  This additional maneuver was necessary because the disclosure of large "related-party" receivables would have raised red flags among investors and regulators.  (Compl. ¶ 50.)  These "loans," which straddled the end of each fiscal year starting in 1998 and, after the LBO, at the end of several fiscal quarters as well, all worked in essentially the same way.  (Compl. ¶¶ 49-55.)  Several days before Refco closed its books for each financial period, a Refco entity – usually RCM – would lend hundreds of millions of dollars to a third-party customer who then, through the customer's account at Refco, simultaneously lent the same amount to RGHI.  (Compl. ¶ 52.)  The loan agreements between the third party and the "lending" entity – which were done on a book basis (the principal never changed hands) – were meticulously structured so that they were essentially risk-free to the third-party customers: the customers' loans to RGHI were guaranteed by Refco and the customers profited for their participation in the "loans" through interest earned on their loans to RGHI, which by design exceeded the interest they were charged by RCM.[7]  (Compl. ¶ 53.)  RGHI, in turn, used the loans from the customers to pay down the money it owed to Refco for its uncollectible receivables.  (Compl. ¶ 49.)

The net effect of these transactions was that at the close of each reporting period, Refco's books would show apparently legitimate loans to third-party customers, and the RGHI receivables would be gone.  (Id.)  Then, just days after the financial period closed, the

---

[7] Although the third parties purportedly earned interest from RGHI, it was RCM that paid the difference in interest.  (Compl. ¶ 53.)  In effect, RCM paid the interest on a loan extended by a third-party customer to a purportedly separate entity, RGHI.  (Id.)  This payment was the only occasion on which funds actually changed hands in these "round-trip" transactions.  (Id.)

transactions were unwound – the "loans" were repaid, and the uncollectible receivables from RGHI were returned to Refco's books. (Compl. ¶ 53.) Through these transactions, Refco lent money to itself, through third parties, to conceal its trading losses, its true operating expenses, and the fictitious nature of hundreds of millions of dollars in revenue. (Compl. ¶ 55.)

In addition to concealing Refco's debt, the insiders routinely misappropriated customer assets held at RCM in order to prop up other Refco entities with cash infusions. (Compl. ¶¶ 30-35, 61-62.) Some of these assets belonged to the FX customers, who maintained accounts at RCM for the sole purpose of engaging in FX trading pursuant to their instructions.[8] (Compl. ¶¶ 9, 20-25, 28.) The insiders, however, directed that all but a de minimis portion of the assets held in the FX customers' accounts be diverted from RCM to Refco Capital LLC ("RCC"), another Refco subsidiary, under the guise of "loans" to "customers." (Compl. ¶¶ 18, 68.) RCC, in turn, functioned as a disbursing agent and distributed the looted assets wherever they were needed in the Refco organization, without compensation, security, collateral, or appropriate documentation. (Compl. ¶¶ 19, 34, 66, 69-70.) These receiving Refco entities were not, of course, "customers" in any traditional sense – they were intercompany, related parties – nor could they repay these "loans." (Compl. ¶¶ 32, 61, 67-70.) Nevertheless, Refco's overall financial health depended on the steady influx of illicit RCM assets (Compl. ¶¶ 32, 64-65), so the insiders kept careful track of these transactions and distributed among themselves daily "cash flow" statements that calculated the amount of customer assets available for diversion to other

---

[8] In December 2001, Refco shut down RCM's Bermuda operations and "repatriated" RCM to the United States. (Compl. ¶¶ 18, 112-117.) Although this move should have made RCM a regulated broker-dealer, instead RCM became a ghost – it was run entirely by Refco Securities, LLC ("RSL"), another Refco subsidiary, and continued to function as if it were completely unregulated. (Compl. ¶¶ 113, 117.)

Refco entities. (Compl. ¶ 67.) The size of these uncollateralized intercompany transfers – like the size of Refco's concealed debt – was substantial; the transfers involved hundreds of millions of dollars and dwarfed Refco's total capital. (Compl. ¶¶ 62, 64, 137-40.)

At the time of the LBO, Refco affiliates owed RCM approximately two billion dollars. (Compl. ¶ 35, 62.) By falsely presenting RCM to the public as a robust entity, the insiders enabled RCM to attract a substantial volume of business from the FX customers and made the enormous quantities of cash associated with their business available to the Refco organization for improper diversion. (Compl. ¶¶ 32, 38, 64-65.)

II.    The LBO and IPO

The illusion of a thriving company also allowed Refco insiders, with the aid of the Professional Defendants, to position Refco for, and ultimately to carry out, what appeared to be a legitimate "buy-out" of the insiders' interests for far more than those interests were worth. (Compl. ¶ 71.) In 2004, Thomas H. Lee Partners ("THL"), a private equity firm, purchased – by buying out the insider-owned RGHI – a controlling interest in Refco as part of a leveraged buy-out transaction ("LBO"). (Id.) Although the uncollateralized "loans" from RCM totaled almost two billion dollars – a fact that would have been obvious to the Professional Defendants helping the insiders to execute the transaction – Refco acquired an additional $1.4 billion of bank and bond debt through the LBO, which Refco could not possibly repay. (Compl. ¶¶ 71, 73-75.) That additional debt was especially problematic because, contrary to an Offering Circular that represented that the bond debt was "effectively junior to all existing and future liabilities," the debt, in fact, became senior to the debt owed to RCM. (Compl. ¶ 74.) The Offering Circular fiction, however, had the intended result of lulling RCM's customers into believing that RCM's obligations to its customers would be satisfied before its obligations to the LBO creditors. (Id.)

7

Less than a year later, with Refco still concealing its grim financial condition and having filed a fictitious S-4 with the SEC, Refco insiders and THL led Refco through an initial public offering of its stock. (Compl. ¶¶ 83-86.) Some of the IPO proceeds were used to retire part of RGL's LBO debt, but no proceeds were used to repay the amounts owed to RCM. (Compl. ¶ 83.) Weeks after the IPO, the RGHI receivables were revealed and RCM customers, including the FX customers, instructed RCM to return their deposits. (Compl. ¶ 5.) Refco responded by imposing a moratorium on all withdrawals from RCM customer accounts. (Compl. ¶ 65.) Days later, Refco and its subsidiaries and affiliates declared bankruptcy. (Compl. ¶¶ 88-89.)

III.    Refco Private Actions Trust

On December 15, 2006, approximately fourteen months after Refco filed for bankruptcy, the United States Bankruptcy Court for the Southern District of New York confirmed the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan"). (See Kirschner Decl. ¶ 6; id. Ex. A.) The Plan provided for the establishment of a Private Actions Trust ("PAT"), which was formed to prosecute "non-estate" claims – i.e., claims owned by Refco creditors or shareholders that were "independent" of those held by the

Refco Debtors.[9]  (Id. ¶¶ 12, 14.)  On December 26, 2006, the PAT became effective and plaintiff Marc Kirschner was appointed as the Private Actions Trustee.  (Kirschner Decl. ¶¶ 10-11, 14.)

IV.    The Movants

There are four separate motions to dismiss pending.  This section briefly identifies the movant behind each of the motions.

---

[9] Under the Plan, "Non-Estate Refco Claims" are defined as:

> non-estate causes of action arising from any matter involving any Refco Entity including, without limitation, causes of action against: (i) all current and former officers, directors or employees of the Refco Entities; (ii) all persons or entities that conducted transactions with the Refco Entities; and (iii) all persons or entities that provided services to the Refco Entities, including, without limitation, all attorneys, accountants, financial advisors and parties providing services to the Refco Entities in connection with the public issuance of debt or equity.

(Kirschner Decl. Ex. A ¶ 1.126.)  As this Court explained in In re Refco Inc. Sec. Litig.:

> The Plan [also] provided for the establishment of a Litigation Trust and the appointment of a Litigation Trustee to pursue such "claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any [Refco] Debtor or RCM may hold against any Person."  Pursuant to the Plan, all "Contributed Claims," defined as "any and all Litigation Claims of the Debtors, RCM or their estates," would be irrevocably transferred to the Litigation Trust on the effective date of the Plan. In exchange, "the Litigation Trust Beneficiaries," who are the holders of allowed general unsecured claims against the Refco Debtors, would receive "Litigation Trust Interests," which would be allocated on the basis of the beneficiaries' allowed claims under the confirmed Plan.

___ F. Supp. 2d ___, ___, 2008 WL 1827644, at *2 (citations omitted) (alternation in original). This Court recently dismissed two actions brought by the Litigation Trustee because a bankruptcy trustee does not have standing to sue to recover for a wrong undertaken by the debtor itself.  See Kirschner v. Grant Thornton LLP, No. 07 Civ. 11604, 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009); Kirschner v. KPMG LLP, No. 08 Civ. 8784, 2009 WL 1010060 (S.D.N.Y. Apr. 14, 2009).

A.    <u>Grant Thornton</u>

Grant Thornton LLP served as outside auditor to Refco and issued clean and unqualified audit opinions on the company's financial statements for the fiscal years 2003, 2004, and 2005. (Compl. ¶¶ 14, 136-37.)  Grant Thornton also audited Refco subsidiaries, including RCM, on a "stand-alone" basis (Compl. ¶ 129), and FX customers periodically received Grant Thornton's statements for RCM (Compl. ¶ 14).  Given its multiple roles, Grant Thornton was "on both sides of the fence," giving it a complete picture of how Refco, and the Refco fraud, functioned. (Compl. ¶ 130.)

B.    <u>Mayer Brown LLP and Mayer Brown International LLP</u>

Mayer Brown, which the Trustee claims is a "combination" of two limited liability partnerships – Mayer Brown LLP and Mayer Brown International LLP[10] – served as Refco's principal outside counsel from 1994 until October 2005.  (Compl. ¶¶ 13, 92.)  Mayer Brown provided a broad range of legal services to Refco, including drafting customer agreements, providing Refco with tax and corporate governance advice including advice on the repatriation of RCM, participating in discussions related to the LBO and IPO, and drafting the documents for the so-called "round-trip" loans, which concealed the RGHI receivables.  (Compl. ¶¶ 92, 94, 96,

_____

[10] The Trustee argues that Mayer Brown LLP and Mayer Brown International LLP held themselves out as a single entity that constitutes a "legal partnership" or "combination" under New York law.  (Pl. Opp. at 70.)  Because the Trustee makes no allegations that Mayer Brown International LLP, if found by the Court to be a separate entity, engaged in any wrongdoing, the Court treats Mayer Brown as a single entity for the purposes of this motion.  As to whether there is a sufficient basis to conclude that the two Mayer Brown entities are a de facto partnership, the Trustee has alleged enough to be entitled to conduct focused discovery on this issue. Accordingly, Mayer Brown International LLP's motion to dismiss is denied, without prejudice to a motion for summary judgment after the Trustee conducts discovery on the issue of the precise relationship between Mayer Brown LLP and Mayer Brown International LLP.  In all other respects, Mayer Brown International's motion to dismiss is considered in tandem with that of Mayer Brown LLP.

99.)  Through these and similar activities, Mayer Brown actively participated in carrying out Refco's fraudulent misstatement of its financial position.

C.    Ernst & Young

From 1991 through at least 2005, Ernst & Young ("EY") provided tax-related services to various Refco entities, including RGHI.  (Compl. ¶ 15.)  During that time, EY prepared tax returns and provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and potential third-party investments involving Refco.  (Compl. ¶ 180.)  As a result of this involvement, EY was aware both that the RGHI receivables were not bona fide debts but a sham designed to improve RGL's financials (Compl. ¶¶ 187-93), and that Refco "clean[ed] up" its balance sheets at the end of the fiscal year through the use of round-trip loans (Compl. ¶¶ 194-96).  Despite apprehending the scope of the fraud, EY continued the Refco engagement. (Compl. ¶¶ 197-209.)

**DISCUSSION**

Under New York law, the elements of aiding and abetting a breach of fiduciary duty, aiding and abetting a conversion, and aiding and abetting a fraud are substantially similar.  The claims require the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance.[11]  The Professional Defendants allege that the Trustee's claims for aiding and abetting breach of fiduciary duty, conversion, and fraud all fail

---

[11] See, e.g., Design Strategy, Inc. v. Davis, 469 F.3d 284, 303 (2d Cir. 2006) (aiding and abetting breach of fiduciary duty); Lesavoy v. Lane, 304 F. Supp. 2d 520, 526 (S.D.N.Y. 2004), aff'd in part, vacated on other grounds in part, 170 Fed. Appx. 721 (2d Cir. 2006) (aiding and abetting conversion); JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (aiding and abetting fraud).

both because the Trustee has failed to state a claim for relief under any of the underlying causes

of action, and because the Professional Defendants had no actual knowledge of, nor did they

substantially assist, the underlying violation.  All of the Trustee's claims will be dismissed for

failure to state an underlying violation, and for failure to allege facts sufficient to demonstrate

that the Professional Defendants aided and abetted such violations.[12]

I.    Standard of Review

A defendant must meet a stringent standard in order to obtain dismissal for failure to state

a claim.  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974),

abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982); accord, e.g.,

Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006).

---

[12] The Professional Defendants also argue that plaintiff's claims are preempted by the
Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 77p(b)(1), and
that the Trustee's claims on behalf of the FX customers should be dismissed because the
customers' claims are derivative of those brought by RCM and therefore only RCM's
bankruptcy estate may pursue them.  Although the Court need not reach these arguments because
the Trustee has failed to state a claim on other grounds, neither has merit.  The FX customers are
pursuing state-law claims against third-parties for the injury they suffered when Refco insiders
stole from their FX accounts.  This is a simple claim, for which the FX customers clearly have
standing and which does not plausibly "coincide" with the purchase or sale of a covered security.
See 15 U.S.C. § 77p(b); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 84
(2006); LaSala v. Bank of Cyprus Public Co. Ltd., 510 F. Supp. 2d 246, 273 (S.D.N.Y. 2007)
("Where the alleged conduct giving rise to the claim is too far removed from a securities
transaction, the 'in connection with' requirement is not met.").  In any event, to the extent that
the Professional Defendants object to the customers' standing on the grounds that a "double
recovery" is possible, such concerns have been made moot by this Court's recent decision in
Kirschner v. Grant Thornton LLP, which found that the Trustee, standing in the shoes of the
bankruptcy estate, could not pursue aiders and abettors because a debtor has no standing to sue
to recover for a wrong in which he took part.  See 2009 WL 996417, at *1 (dismissing under the
Wagoner rule the claims brought by the Trustee in his capacity as Trustee of the Refco Litigation
Trust).

Nonetheless, "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). After the Supreme Court's recent decision in Ashcroft v. Iqbal, this "plausibility standard," is guided by "[t]wo working principles." Id.

> First, although "a court must accept as true all of the allegations contained in a complaint," that "tenet" "is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

Harris v. Mills, ___ F.3d ___, ___ No. 07 Civ. 2283, 2009 WL 1956176, at *4 (2d Cir. July 9, 2009) (alterations and omissions in original), quoting Iqbal, 129 S. Ct. at 1949. If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Twombly, 550 U.S. at 547.

Averments of fraud, however, must be "stated with particularity." Fed. R. Civ. P. 9(b). Where the fraud is based on alleged misrepresentations, the complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001), quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).

II.     Breach of Fiduciary Duty

A fiduciary duty arises "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters *within the scope of the relation*." Flickinger v. Harold C.

13

Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) (citations and internal quotations omitted)

(alteration in original) (emphasis added).  In a broker-customer relationship, the scope of the

"fiduciary obligation . . . is limited to affairs entrusted to the broker."  Bissell v. Merrill Lynch &

Co., 937 F. Supp. 237, 246 (S.D.N.Y. 1996); see also Indep. Order of Foresters v. Donald,

Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998) (applying New York law).  While a

broker may owe a fiduciary duty where he has "discretionary trading authority" over a

customer's account, see id., here, all that the Trustee alleges was "entrusted" to RCM was the

execution of foreign currency transactions upon receiving explicit customer instructions.

(Compl. ¶¶ 9, 22, 28.)  Here, the customer agreement governing the relationship between RCM

and the FX customers (the "FX Agreement") explicitly states that every FX customer entered

into each transaction "independent" of any advice or judgment offered by RCM and that RCM

was not acting "as a fiduciary or an advisor" to the customer.  (Rand Decl. Ex. 1 § 10.)

These are the hallmarks of a non-discretionary account.  See de Kwiatkowski v. Bear,

Stearns & Co., 306 F.3d 1293, 1302 (2d Cir. 2002) (defining a nondiscretionary account as one

in which the "customer by definition keeps control over the account and has full responsibility

for trading decisions").  As the Second Circuit has made clear, under these circumstances a

broker has

> narrowly defined duties that begin and end with each transaction.
> We are aware of no authority for the view that, in the ordinary
> case, a broker may be held to an open-ended duty of reasonable
> care, to a nondiscretionary client, that would encompass anything
> more than limited transaction-by-transaction duties.

14

Id. at 1306; see also In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig. ("RCM II"), 586 F. Supp. 2d 172, 192-94 (S.D.N.Y. 2008) (discussing United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008)).[13]

The fact that RCM, under the so-called "Margin Annex" (Rand Decl. Ex. 1 at 24), could "loan, pledge, hypothecate *or otherwise use or dispose of* [all of a customer's] cash, securities, and other property free from any claim or right, until settlement in full of all [outstanding margin loans]," id. (emphasis added), does not make a customer's account "discretionary" so as to give rise to a fiduciary duty. As the "use or dispose" language suggests, any action RCM took pursuant to assets treated as margin under the agreement was in RCM's own interest, and not undertaken for the benefit of the customer.[14] Accordingly, a fiduciary duty does not arise upon RCM's use of a customer's margin because the broker's use is not a situation in which the broker "act[s] for or . . . give[s] advice for the benefit of another within the scope of the relation." Levitin v. PaineWebber, Inc., 159 F.3d 698, 700 (2d Cir. 1998) (citation and internal quotation marks omitted); Bissell, 937 F. Supp. at 246 (finding that a broker-dealer "has no fiduciary obligations" to its customers in connection with its use of a customer's collateral); see also RCM II, 586 F. Supp. 2d at 193-94 (examining identical language in the RCM customers' agreement and finding, citing Levitin and Bissell, that "to the extent that RCM used plaintiffs'

---

[13] The Trustee argues that Judge Drain in the bankruptcy proceedings found that RCM owed a fiduciary duty to RCM customers in the course of ruling that the customers "entrusted" their assets to RCM. The Court has previously rejected the argument that Judge Drain's discussion found a fiduciary duty. See RCM II, 586 F. Supp. 2d at 193, n.28.

[14] When an FX customer is actively trading, the margin deposited with RCM under the Margin Annex functions as security for the broker against swings in the value of currencies. (Compl. ¶ 23.) When an FX customer is not engaged in trading, the relevant cash belongs entirely to the customer and remains in the customer's account for use in future FX transactions. (Compl. ¶ 24.)

assets when plaintiffs had outstanding margin loans, such conduct created only a creditor-debtor relationship, *not a fiduciary one*.") (emphasis added).[15]

But the Trustee does not allege that the customers' injury emerged either from RCM's execution of any customer-directed transactions or by RCM's use of customer assets outside the Margin Annex umbrella.[16]  Indeed, the Trustee, consistent with the broad allegations of his complaint, specifically asserts that his claims do not "rise or fall" on any such distinctions.  (Pl. Opp. at 20.)  Rather, he contends that RCM owed the FX customers a fiduciary duty, notwithstanding either the terms of the FX Agreement or at precisely what point assets were siphoned from the FX customers' accounts, because *any* use of customer assets by the broker "must be consistent with a fiduciary duty to avoid waste and theft."  (Id.)  This argument, even if

---

[15] The Trustee's argument that these cases are inapposite because "the duty rejected in Bissell and Levitin is a different duty than the one at issue here" (Pl. Opp. at 21-22), is without merit.  If a broker does not owe a fiduciary duty to a customer when he uses a customer's assets, then the broker does not owe a fiduciary duty to the customer whether he uses the assets wisely or uses them poorly.  It is an implausible interpretation of well-settled precedent to argue that only brokers who make *bad* decisions with a customer's assets owe a fiduciary duty.

[16] Nor does he allege that RCM owed the FX customers a duty based on "transformative 'special circumstances,'" such as the "customers' incapacity or simplicity."  de Kwiatkowski, 306 F.3d at 1308-09 (citing cases).  There is no indication in the complaint that the plaintiffs had "impaired faculties[,]" "a closer than arms-length relationship with [RCM,]" or that they are "so lacking in sophistication that de facto control of the [assets were] deemed to rest in [RCM]."  Id. at 1308.  To the extent that the Trustee relies on the "totality of facts and circumstances surrounding the creation and maintenance of the relationship between FX customers and RCM" (Compl. ¶ 28), none support a fiduciary relationship.  Neither the mailing of account statements, nor the presence of a "dedicated salesperson" demonstrate the provision of extraordinary broker-dealer services or distinguish the FX customers' relationship with RCM from a standard broker-customer relationship.  (Id.)  Further, to the extent that RCM represented that it was an unregulated offshore brokerage, that fact "would appear to put customer on notice that the accounts would be managed in unconventional ways" – a heightened risk that, if anything, appears to undermine the presence of, not establish, a fiduciary duty.  RCM I, 2007 WL 2694469, at *9.

it were not in tension with this Court's decision in RCM II,[17] is unpersuasive, because the Trustee's theory of "waste," as pleaded, is overbroad – it contemplates that the broker's use of the customers' assets is contrary to what customers reasonably expected, without pleading *any* facts that identify whether the source of that expectation is "within the scope of the relation." Flickinger, 947 F.2d at 599.

This deficiency distinguishes the circumstances here from those in United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002), where the Second Circuit found that the brokers had a fiduciary duty to disclose their allegedly "exorbitant commissions" because that "information [was] relevant to the affairs . . . entrusted to [the broker]." Id. at 211 (citation and original alterations omitted). Szur is unavailing here because the Trustee's argument is deliberately indifferent as to whether a particular "use" is within the scope of a special relation. Instead, the Trustee contends that *any* use of customer assets by the broker "must be consistent with a fiduciary duty to avoid waste and theft." (Pl. Opp. at 20.) As to this proposition, however, the Trustee cites no relevant precedent, perhaps because, as cases like Szur demonstrate, the fiduciary duty is limited by the broker's exercise of discretion on behalf of the customer, not by whether there is a colorable argument that the broker is a crook. The Trustee's focus on "waste" is therefore unpersuasive for the simple reason that a duty must be owed before that duty can be

---

[17] In that action – brought by similarly-situated RCM customer-plaintiffs with non-discretionary accounts – the Court found RCM owed no fiduciary duty because "the allegations in the complaints [were] insufficient to establish that RCM used plaintiffs' securities when they did not have outstanding margin loans . . . [and] to the extent that RCM used plaintiffs' assets when plaintiffs had outstanding margin loans, such conduct created only a creditor-debtor relationship, *not a fiduciary one*." RCM II, 586 F. Supp. 2d at 193-94 (emphasis added) (finding that a fiduciary relationship does not attach to the use of customer funds that was both authorized and unconditional).

breached.[18]  See In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig. ("RCM I"),

No. 06 Civ. 643, 2007 WL 2694469, at *9 (S.D.N.Y. Sept. 13, 2007) (finding that only "[i]f

RCM had the discretion to trade in customer assets [would] the central issue . . . [be] whether the

loans were bad investments that violated a fiduciary duty").

 In sum, the "no-waste" obligations the Trustee seeks to impose on RCM do not arise

from affairs entrusted to the broker as a fiduciary.  The complaint simply "does not allege facts

indicating that [RCM's] actions were designed to instill a special relationship."  See Bauer v.

Mellon Mortgage Co., 680 N.Y.S.2d 397, 400-01 (N.Y. Sup. Ct. 1998) (granting a motion to

dismiss); see also Tevdorachvili v. Chase Manhattan Bank, 103 F. Supp. 2d 632, 640 (E.D.N.Y.

2000) (dismissing plaintiff's claim for breach of fiduciary duty because "he has failed to allege

any factual circumstance about his relationship with [the broker] that might support such a

claim").[19]  Accordingly, because there is no underlying fiduciary duty, the Professional

Defendants could not have aided and abetted the breach of such a relationship.  The Trustee's

fifth claim against the Professional Defendants is therefore dismissed.

## III. Fraud

 "Under New York law, '[t]o state a cause of action for fraud, a plaintiff must allege a

representation of material fact, the falsity of the representation, knowledge by the party making

---

[18] Accordingly, even if there were merit to the Trustee's argument that a "when using, don't waste" duty turns on the "intensely factual question" of whether the use was wasteful, this argument does not prevent the Court from determining the preliminary question of whether a fiduciary duty exists.

[19] The Trustee alleges that RCM "was insolvent or in the zone of insolvency at all relevant times" (Compl. ¶ 28(g)), but presents no argument that this insolvency establishes a fiduciary relationship.  In any event, as the Professional Defendants point out, the complaint fails to allege facts in support of the allegation and thus such an approach would not survive a motion to dismiss.

the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury.'" Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291 (2d Cir. 2006), quoting Kaufman v. Cohen, 307 A.D.2d 113, 119 (1st Dep't 2003). Where, as here, RCM did not owe the FX customers a fiduciary duty, the Trustee must allege that RCM made affirmative misrepresentations which provided the customers with a false understanding of how RCM handled the assets in their accounts. See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuala, 991 F.2d 42, 47 (2d Cir. 1993) (explaining that proof of fraud requires either an affirmative misrepresentation of a material fact, or an omission of a material fact coupled with a duty of disclosure). Although the Trustee concedes that the "thrust" of his allegations of fraud involve material omissions (Pl. Opp. at 26), the Trustee also makes two allegations of affirmative misrepresentation. He argues that the FX Agreement affirmatively misrepresented how the FX customers' relationship with RCM would be governed, and that the account statements provided to FX customers misrepresented the positive equity held in each customer's account. (Pl. Opp. at 28-29; Compl. ¶ 28.) The Professional Defendants argue that the Trustee's fraud claims must be dismissed for failure to allege with specificity the material misstatements on which his claims are based. They are correct.

The Court has already rejected, in a discussion of some length and on substantially similar allegations, the arguments put forward by the Trustee. In In re Capital Markets, the securities customers of RCM relied on nearly identical customer agreements and account statements in support of their claim that RCM engaged in deceptive conduct under federal securities laws. The Court, after allowing the customers to replead, found that the customers had "fail[ed] to establish that RCM actually used [their] securities in a manner that violated the parties' understanding under the [agreement]," RCM II, 586 F. Supp. 2d at 186, and that "the

19

account statements correctly listed plaintiffs' non-collateral securities as credits that RCM had to repay upon demand, even if RCM had, in fact, already physically dispose[d] of the particular securities that had been deposited with it," id. at 188 (citation and internal quotation marks omitted) (alteration in original).

The Trustee's argument, which is based on a complaint that pre-dates both RCM I and RCM II, renews the basic contours of this now-rejected approach.[20]  The crux of the Trustee's claim with respect to the FX Agreement is that the Margin Annex limited what RCM could do with the collateral customers had posted.  The provision with which the Trustee takes issue provides that RCM only had "the right to loan, pledge, hypothecate or otherwise dispose of such cash, securities and other property free from any claim or right, until settlement in full of all Transactions entered into pursuant to the [FX] Agreement."  (Rand Decl. Ex. 1 at 24.)[21]  The Trustee looks to this language, however, not to allege that RCM, in fact, hypothecated customers' assets at times other than those permitted by the Agreement – indeed the Trustee appears to concede that some use by RCM under the circumstances was perfectly acceptable, see RCM II, 586 F. Supp. 2d at 185 – but rather to contend that the phrase "until settlement in full" conveyed the false impression that the customers' assets would be returned, when, in fact, given

_____

[20]  Unlike the securities customers in In re Capital Markets, see RCM II, 586 F. Supp. 2d 172, 181 n.12, who abandoned the argument that "uncollectibility is . . . [an] element of the pleaded fraud" upon repleading, the Trustee argues that the purported loans that RCM made to its affiliates with the proceeds of the misappropriated securities were uncollectible, or "in great danger" of being uncollectible.  (Pl. Opp. at 48; Compl. ¶ 70.)

[21]  There are other allegations in the Complaint, including that the Offering Circular that was distributed as part of the 2004 LBO represented, falsely, that the LBO debt would be junior to other subsidiary liabilities (Compl. ¶¶ 73-74), but the complaint does not allege who created and disseminated the document, or any facts that would connect the document to the FX customers.

Refco's decision to divert the assets into shady affiliate-to-affiliate loans, the likelihood of such an event was exceptionally remote. (Pl. Opp. at 28.)

This "uncollectibility" argument is unavailing for at least two reasons. First, the provision quoted by the Trustee does not, in any way, restrict RCM's use of the customers' assets. At the least, as in In re Capital Markets, there is no "requirement to which RCM claimed it would adhere that [would] prohibit[] brokerages from using customer assets for loans to affiliated companies." RCM I, 2007 WL 2694469, at *9. Rather, like the provisions the Court examined in that case, the relevant provision of the FX Agreement provides that RCM may "loan, pledge, hypothecate or otherwise dispose of [customer] cash . . . free from any claim or right." (Rand Decl. Ex. 1 at 24.)

Second, even if the Trustee's suggestion that the "until settlement in full" language should modify, or impose a limit on, the phrase, "*an*y claim or right," that would not explain the provision that explicitly allows RCM to "hypothecate or otherwise *dispose of*" a customer's assets. As this Court explained in RCM II, 586 F. Supp. 2d at 185, quoting from language found verbatim in the FX Agreement, RCM's sole "obligation" under the agreement was to "return" to the customer "cash" or "like amounts of similar cash, securities and other property." (Rand Decl. Ex. 1 at 24.) Thus, even if RCM had physically disposed of the assets deposited with it by FX customers – say by putting the cash toward self-interested, uncollectible loans for the purposes of concealing the Refco fraud – nothing about that action would necessarily be *fraudulent* because RCM could fulfill its contractual obligations by purchasing "like amounts of similar cash [or] securities" on the open market and conveying those assets to customers. See RCM II, 586 F. Supp. 2d at 185. The issue, therefore, is not – as the Trustee would have it – the depravity of the purported loans that RCM made to its affiliates, but rather RCM's ultimate

inability to return the customers' assets on demand, or at the conclusion of any FX transaction, consistent with the Trustee's allegation that when an FX customer is not engaged in trading, the relevant margin cash property belongs entirely to the customer (Compl. ¶ 24). But lacking specific allegations, as this Court has already explained, "[t]he fact that RCM could not reconvey all of [the FX customers'] property in October 2005 may be a breach of its contractual obligation to 'return'. . . all of the property in their accounts, but it does not ipso facto make RCM's 'use or dispos[al]' . . . deceptive." RCM II, 585 F. Supp. 2d at 185.

In any event, the Trustee's allegations that the loans that RCM made to its affiliates with the proceeds of the misappropriated customer assets were "uncollectible" are woefully underpleaded. The reason for this underwhelming showing is not readily discernible. Allegations that the receiving entities "lacked the intent and/or financial wherewithal to repay . . . on demand or otherwise" (Compl. ¶ 32), or that RCM was "insolvent or in the zone of insolvency at all relevant times" (Compl. ¶ 28(g)), are plainly inadequate because they lack any corroborating detail concerning the receiving entities' financial status and/or alleged inability to pay. Such allegations, if they are not critical to "nudg[ing] [the customers'] claims across the line from conceivable to plausible," Twombly, 550 U.S. at 547, are certainly required to meet the heightened pleading standard of Rule 9(b).[22]

---

[22] Nearly the entirety of the Court's discussion in RCM I is relevant here. See 2007 WL 2694469 at *10. As the Court has explained,

> The complaint uses strong, unqualified language ("the Refco affiliates . . . lacked the financial ability and intention to repay") that seems to suggest that no Refco affiliate intended to repay any of the RCM loans. . . . The complaint never alleges that all Refco affiliates were rendered insolvent by the round-robin fraud; nor does it allege any basis for the broad, unqualified contention that the Refco affiliates were unable to pay the RCM loans. If plaintiffs

22

As to the account statements provided to the FX customers, the Trustee alleges that the statements contained material misrepresentations because they showed "customer orders being fulfilled and . . . being fulfilled in a way that reflected customer ownership."  (Compl. ¶ 28(m).) But the Trustee provides no explanation of what he means by "ownership," nor details how RCM recorded the debits and credits in the account statements at issue, or why the account statements might fairly be characterized as deceptive or misleading.  Such supporting allegations, however, are crucial because, as explained above, the Margin Annex, like the customer agreement at issue in In re Capital Markets, allowed RCM to satisfy its contractual obligations to the FX Customers merely by purchasing "like amounts of similar cash [or] securities" on the open market and conveying *those* assets to customers, presumably after the customer's assets had been "disposed of."  See also RCM II, 586 F. Supp. 2d at 185.  It is therefore absolutely critical for the Trustee to plead with specificity how RCM managed the FX customers' accounts, how the transactions were recorded, and how the account statements conveyed a false impression of how RCM was handling the FX customers' assets.  This the Trustee has not done.

Although it is clear that wrongdoing occurred at RCM, as this Court has recently explained, "[t]heft not accomplished by deception . . . is not fraud absent a fiduciary duty."  RCM I, 2007 WL 2694469, at *8, citing United States v. Finnerty, 474 F. Supp. 2d 530, 543

---

> really mean that all of the RCM loans were uncollectible, they have failed to support their claim with sufficient supporting allegations; if, on the other hand, they mean that some of the loans at issue were uncollectible, their failure to specify which loans makes it impossible for defendants or the Court to tell which transactions are alleged to be fraudulent.

Id.

(S.D.N.Y. 2007).  None of the grounds advanced by the Trustee, either individually or taken together, suffice to establish any affirmative misrepresentation or act that gave plaintiffs a false understanding concerning RCM's use of their assets consistent with the heightened pleading standard of Rule 9(b), Fed R. Civ. P.  Accordingly, the Trustee's fourth claim against the Professional Defendants is dismissed.

## IV.    Conversion

According to New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."  Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006), quoting Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 44 (1995).  To withstand a motion to dismiss in a conversion claim, a plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."  Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (citation and internal quotation marks omitted).

Although an action of conversion does not lie to enforce a mere obligation to pay money, see Ehrlich v. Howe, 848 F. Supp. 482, 492 (S.D.N.Y. 1994) (collecting cases), "it is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question," Mfrs. Hanover Trust Co. v. Chem. Bank, 559 N.Y.S.2d 704, 712 (1st Dep't 1990); accord In re Musicland Holdings, Inc., 386 B.R. 428, 440 (S.D.N.Y. 2008) (finding a valid conversion claim where "the money converted was in specific tangible funds of which claimant was the owner and

24

entitled to immediate possession"). If the allegedly converted money is "incapable of being described or identified in the same manner as a specific chattel," such as when a customer of a bank deposits funds into an account at the bank, it is "not the proper subject of a conversion action." High View Fund, L.P. v. Hall, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998). "This is so because a depositor loses (and the bank gains) title to money deposited in a general account at the moment those funds are deposited." Citadel Mgmt., Inc. v. Telesis Trust, Inc., 123 F. Supp. 2d 133, 148 (S.D.N.Y. 2000); see also Feinberg v. Katz, No. 99 Civ. 45, 2002 WL 1751135, at *16-17 (S.D.N.Y. July 26, 2002) ("Funds deposited with a bank become an asset of the bank").

As a threshold matter, the Professional Defendants argue that the FX customers' funds cannot be the subject of a conversion claim either because the funds are not "specifically identifiable," or for the same reasons that no conversion claim could lie against a bank. See, e.g., Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union Bancaire Privée, 160 F.3d 146, 148 (2d Cir. 1998) (finding funds deposited in a general bank account insufficiently identifiable in relation to a bank's other funds to support a claim for conversion), quoting Chem. Bank v. Ettinger, 196 A.D.2d 711 (1st Dep't 1993). Although the Trustee's claims are insufficiently pleaded for other reasons, this line of argument raises issues of fact that may not be resolved on a motion to dismiss.

On the face of the pleadings, the Trustee alleges that each FX customer deposited funds into his account "for [the] specific, limited purposes" of conducting securities, FX, and other transactions pursuant to his instructions (Compl. ¶¶ 5, 9, 20, 22, 28, 38, 40, 55-56, 73, 226-27), but that insiders instead "improperly siphoned [assets] from [their] accounts . . . and then converted [the assets] for use by other Refco entities" (Compl. ¶ 33) without repayment (Compl.

25

¶ 65).  These allegations appear to state that the property subject to conversion is a specific

identifiable thing:  FX customers transferred

> a specific sum . . .  to be credited to a specific account and, by
> doing so, created an obligation on [RCM's] part either to treat the
> transfer in the specified manner or return the funds. [RCM] did
> neither.  Instead, it ["lent"] the transfer [for a purpose] for which it
> was never intended, ultimately using the transferred funds to
> [perpetuate Refco's fraudulent scheme].

Mfrs. Hanover Trust Co., 559 N.Y.S.2d at 712 (finding a claim for conversion); see also Banco

Central de Paraguay v. Paraguay Humanitarian Found., Inc., 2005 WL 1561504, at *1 (S.D.N.Y.

June 30, 2005) (finding that a conversion takes place if the funds, after being placed in an

account, are subsequently withdrawn or transferred elsewhere).

The Professional Defendants nevertheless attempt to refute that a claim for conversion

lies, contending that the funds deposited by the FX customers were not sufficiently identifiable

because the Trustee's complaint refers to "unsegregated customer assets" at RCM (Compl. ¶

76(d)).  This argument and isolated allegation, without more, does not summarily defeat the

Trustee's claim at the pleading stage.[23]  Funds may be "specifically identifiable" despite the fact

---

[23] Contrary to the Professional Defendants' argument, the Trustee's claim for conversion
is not subject to the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P., because the
Trustee's claim for conversion does not "rest[] on an allegation of fraudulent taking."  Daly v.
Castro Llanes, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998).  To the contrary, the gravamen of the
Trustee's conversion claim is that the FX customers placed assets in their accounts and those
assets were taken by RCM for its own benefit and not returned.  A showing of pretense or fraud
adds nothing to the claim because the defendant need only "inten[d] to exercise dominion or
control over property in a manner inconsistent with the rights of another" for a conversion to
take place.  LoPresti v. Terwilliger, 126 F.3d 34, 42 (2d Cir. 1997); Aeroglide Corp. v. Zeh, 301
F.2d 420, 422 (2d Cir. 1962) (finding that the "tort of conversion requires no intent or fault").
Nor does it matter that the customers' funds, once converted, allegedly contributed to the
insiders' scheme to cash out their interest for far more than those interests were worth.  The
insiders' purpose does not produce a conversion by fraudulent means, but rather a conversion in
order to carry out a fraud.  Accordingly, because the Trustee is alleging a straightforward
conversion of the FX customers' assets, heightened pleading as to this claim is not required.

that they are not alleged to be held in a segregated account.  See LoPresti v. Terwilliger, 126

F.3d 34, 42 (2d Cir. 1997) (finding that the fact that employees' union dues were not segregated,

but instead placed in the company's general account, "does not mean that those monies are not a

'specific identifiable thing' for purposes of imposing liability for conversion."); Vanderbilt Univ.

v. Dipsters Corp., No. 84 Civ. 7215, 1986 WL 10471, at *2 (S.D.N.Y. Sept. 17, 1986) (same);

Feinberg, 2002 WL 1751135, at *16-17 (citing cases).  Accordingly, whether the funds in the FX

customers' accounts were sufficiently identifiable raises fact questions involving how, precisely,

those accounts were maintained.

     This conclusion endures even if the Court were to find probative the Professional

Defendants' argument that the funds at issue here are analogous to funds held in a bank's general

accounts.  First, there is only "some authority" for the idea that deposits made with banks are

analogous to those made with brokerages – not settled precedent.  Newbro v. Freed, 409 F. Supp.

2d 386, 396 (S.D.N.Y. 2006).  Second, even if this argument were on firmer ground, the

Professional Defendants' reliance on this theory would still be inconclusive because in some

contexts, courts have still found that "'funds of a specific, named bank account are sufficiently

identifiable' to support a conversion claim," Id. at 395, quoting Republic of Haiti v. Duvalier,

626 N.Y.S.2d 472, 475 (1st Dep't 1995); see also Payne v. White, 477 N.Y.S.2d 456, 456 (3d

Dep't 1984) (lower court erred in dismissing conversion claim based on unidentifiability of the

funds in question where "the funds at issue . . . were clearly identifiable as the balance of a

specific bank account").  Next, a cautious approach is particularly warranted where, as here,

RCM was not a mere "passive repository" of customer assets, but rather held customer funds for

the "specific purpose" of FX trading pursuant to customer instructions, a service for which it was

separately compensated (Compl. ¶ 21).  See Peoples Westchester Sav. Bank v. F.D.I.C., 961

F.2d 327, 331 (2d Cir. 1992) (noting that "'[s]pecific purpose' connotes that, in holding the

funds, the bank itself acts as an agent directly on behalf of [the customer]").  Although the fact

that funds are deposited for a specific purpose is not conclusive as to whether the funds were

sufficiently specific and identifiable to support a claim for conversion, see Swan Brewery Co.

Ltd. v. U.S. Trust Co. of N.Y., 832 F. Supp. 714, 719 (S.D.N.Y. 1993), it casts doubt on whether

FX customers' accounts for the purpose of purchasing and selling foreign currencies are

genuinely akin to deposits "peculiar to the banking business, in which the depositor, for his own

convenience, parts with the title to his money, and loans it to the banker." Peoples Westchester

Sav. Bank, 961 F.2d at 331, citing Marine Bank v. Fulton Bank, 69 U.S. (2 Wall.) 252, 256

(1864).

        Finally, it should be noted that many of the cases in which courts have found that funds

deposited in general bank accounts are insufficiently identifiable to support a claim for

conversion involve claims for conversion where a breach of contract claim would have been

more appropriate.  Newbro, 409 F. Supp. 2d at 395-96 (citing cases and explaining that the

"rationale for this rule is that funds deposited with a bank become an asset of the bank, and the

bank, in turn, becomes indebted to the depositor" and therefore the appropriate remedy is

contract rather than tort).  But here, as in Newbro, there is no remedy in contract.  See id.

(explaining that the defendants had no "pre-existing contractual relationship" with the customer).

This action is brought by a bankruptcy trustee against aiders-and-abettors.  Accordingly, the only

remedy the FX customers have is in tort and "the rationale underlying courts' reluctance to

permit customers to proceed against the depository institution on a conversion theory does not

apply." Id.; see also Eastman Kodak Co. v. Camarata, No. 05 Civ. 6384, 2006 WL 3538944, at

*14 (W.D.N.Y. Dec. 6, 2006) (reaching the same conclusion).  Accordingly, because the cases

cited by the Professional Defendants are not controlling, and even if they were persuasive, their application requires resolution of issues of fact, the Trustee has adequately pleaded that the funds were sufficiently identifiable and that the FX customers "had ownership, possession or control over the property before its conversion" such that the funds are not analogous to funds held in a bank's general accounts for the reasons discussed above.  See Moses, 360 F. Supp. 2d at 541.

The Trustee's allegations are, nevertheless insufficient because they fail to make any factual allegations as to how RCM "exercised an unauthorized dominion over the [FX Customers' funds], to the alteration of its condition or to the exclusion of the plaintiff's rights." Id. (internal quotation marks omitted).  Allegations that the funds were "upstreamed, sidestreamed, and downstreamed to other Refco entities" (Compl. ¶ 34), which might be satisfactory to describe a conversion in other circumstances, are decisively underwhelming here because the Margin Annex of the FX Agreement itself specifically authorizes RCM to "loan, pledge, hypothecate or otherwise dispose of such cash, securities and other property *free from any claim or right*, until settlement in full of all Transactions entered into pursuant to the [FX] Agreement."  (Rand Decl. Ex. 1 at 24.)  It readily follows that no conversion could occur at the time of the "streaming" unless it took place *outside of* the terms established by the Margin Annex.  But the Trustee has not made a single factual allegation as to when or even how the funds were "siphoned" from the customer accounts, instead resting on the assertion that the funds were, at unspecified times and in unspecified amounts, "removed [and transferred] in undocumented, uncollateralized, unsecured, transactions to other Refco entities that lacked the intent and/or the financial wherewithal to repay."  (Compl. ¶ 5.)  The issue is not, however, the depravity of the use, but whether the use "exercised unauthorized dominion" over the FX customers' funds.  As the Court has already noted in discussing the Trustee's other claims,

because the FX Agreement explicitly allowed RCM to satisfy its contractual obligations by purchasing "like amounts of similar cash [or] securities" on the open market and conveying those assets to customers, see RCM II, 586 F. Supp. 2d at 185, perhaps after the customer's assets had been "disposed" in ill-advised intercompany "loans," the Trustee must show that the use of the FX customers' funds was, in fact, unauthorized. That is, the Trustee must make *some* factual allegations as to when and how RCM transferred their specifically identifiable assets from their accounts to the Refco affiliates in order for the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 129 S. Ct. at 1950.[24] Accordingly, the Trustee's sixth claim against the Professional Defendants is dismissed.

V.     Aiding and Abetting

Even if the Court were to find that the Trustee's pleading as to the underlying claims were sufficient, however, the Trustee's claims for aiding and abetting would nevertheless be dismissed because he has not sufficiently pleaded either that the defendants had actual knowledge of, or that they substantially assisted in, the conduct giving rise to the underlying claims.

---

[24] New York law distinguishes claims that the defendant wrongfully detained – in contrast to having wrongfully taken – the property in question. For claims of wrongful detention, "a conversion does not occur until the owner makes a demand for the return of the [lawfully obtained] property and the person in possession of the property refuses to return it." In re King, 759 N.Y.S.2d 895, 896 (2d Dep't 2003); see also D'Amico v. First Union Nat'l. Bank, 728 N.Y.S.2d 146, 151 (1st Dep't 2001). Although the Trustee makes allegations that at the time of Refco's bankruptcy, RCM was unable to return funds deposited with RCM (Compl. ¶ 65), the Trustee's theory of the conversion is not that the FX customers' funds were wrongfully detained. Rather, consistent with the allegations of his complaint, he relies solely on the argument that the funds were wrongfully taken "[w]hen those specifically identifiable assets were transferred by RCM to Refco entities [via intercompany 'loans']." (Pl. Opp. at 34.)

The knowledge requirement of an aiding and abetting claim is satisfied by alleging actual knowledge of the underlying harm.  See Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996) (noting that New York "has not adopted a constructive knowledge standard for imposing aiding and abetting liability").  To survive a motion to dismiss, therefore, the Trustee must allege facts giving rise to a "strong inference" of defendant's actual knowledge of the underlying harm, or the conscious avoidance of the same such that "it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367-68 (S.D.N.Y. 2007).  The Trustee must also show that the defendants rendered "substantial assistance" such that they "affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] the [underlying harm] to proceed." OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F. Supp. 2d 357, 378 (S.D.N.Y. 2005) (citation omitted).[25]  Here, that means that the Trustee must show that the defendants knowingly aided the insiders in converting the customers' funds, using the customers' funds in a way that breached the insiders' duty of loyalty, or making affirmative misrepresentations that provided the customers with a false understanding of how RCM handled the assets in their accounts.

---

[25] Although the Trustee does not dispute this point, this Court has, in the past, expressed some doubt as to whether "substantial assistance" can be equated with proximate cause on the ground that a person can "make a meaningful contribution to a fraudulent scheme without being understood to have legally 'caused' the scheme or its results." See Winnick, 406 F. Supp. 2d at 256, n.6; see also Fraternity Fund, 479 F. Supp. 2d at 371, n.113.  The Court need not address this question here, however, because the Trustee has not adequately alleged facts giving rise to a strong inference of defendants' actual knowledge of the alleged conversion, breach of fiduciary duty, or fraud.

The bulk of the Trustee's allegations, however, are nowhere near sufficient to meet this standard.[26]  Consistent with the Trustee's position that there was one "cohesive scheme by the [i]nsiders to maximize the appearance of financial stability at Refco so that they could sell the company and cash out" (Pl. Opp. at 56), the bulk of the Trustee's allegations equate a defendant's knowledge of or participation in the so-called "receivables scheme" that involved the round-trip loans, with a defendant's knowledge of or participation in the so-called RCM "customer scheme" that siphoned the FX customers' assets.  But the one cannot be equivalent to the other where, as in In re Capital Markets, the "only apparent connection" between the schemes is that both "were designed to hide financial problems at Refco and its affiliates from the public and from investors," RCM I, 2007 WL 2694469, at *4.  This common objective is insufficient to plead claims for aiding and abetting, however, because the Trustee must offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful conduct *that harmed the FX customers* – the alleged fraudulent siphoning of their funds – not actual knowledge of different wrongful conduct that might have harmed others, such as Refco's shareholders.  Accordingly, arguments by the Trustee that the complaint "raises a strong inference that [the defendants were] aware of the magnitude of the RGHI [r]eceivable[s]" or that "Refco lacked the financial health it presented to the outside world" (Pl. Opp. at 50), are insufficient to support the Trustee's aiding and abetting claims against *these* defendants in *this* action.

Similarly, while the complaint alleges that the Professional Defendants provided services that rendered concrete assistance to the Refco insiders in making and concealing the round-trip

---

[26] The Trustee's claims of aiding and abetting fraud are also subject to Fed. R. Civ. P. 9(b).  See Wight, 219 F.3d at 91.

loans, and obscuring the company's true financial condition (Compl. ¶¶ 93-111, 119-127, 136-

164, 167-176, 180-202), the Trustee alleges no conduct on the part of the Professional

Defendants that in any way assisted in the alleged unauthorized diversion of FX Customers'

assets that underlies the tort claims asserted here.  Even if, as the Trustee alleges, the

Professional Defendants helped effectuate the round-trip loans that transformed Refco's

uncollectible losses into receivables owed to Refco by third-parties – a claim vigorously disputed

by all of the defendants – such aid is not tantamount to the defendants' knowing about, or doing

anything to facilitate, the looting of customer accounts.

The Trustee's attempt to patch over this deficiency by arguing that, given the defendants'

knowledge of the receivables scheme and, in particular, the knowledge that the receivables

parked at RGHI were uncollectible, the defendants must also have known that the Refco entities

to which RCM lent the funds lacked the wherewithal to repay, is unpersuasive.  Like the other

arguments made by the Trustee and now thrice rejected, allegations regarding the impropriety or

uncollectibility of the intercompany "loans," let alone allegations concerning the defendants'

knowledge of the uncollectibility of other receivables parked at RGHI, are no substitute for

factual allegations sufficient to demonstrate that the defendants had actual knowledge that the

insiders breached a fiduciary duty to the FX customers, or that RCM made affirmative

misrepresentations to the FX customers, or otherwise "exercised an unauthorized dominion

over"  the FX Customers' funds, Moses, 360 F. Supp. 2d at 54.  Whatever the quality of the

Trustee's allegations regarding the Professional Defendants' conduct in assisting Refco insiders

to cook Refco's books or conceal Refco's uncollectible debt, the only allegations that matter are

those that support the contention that the Professional Defendants had actual knowledge of, as

well as substantially assisted in, the siphoning of the FX customers' assets.  Such allegations

become all the more crucial where, as the Trustee has acknowledged, some use of the FX customers' margin collateral by RCM is specifically contemplated by the FX Agreement. Yet the current complaint fails to adequately allege that the Professional Defendants had any idea that unauthorized diversions of funds from FX customers' accounts were occurring, or that they played any role in assisting such alleged misconduct.

Accordingly, assuming arguendo that diverting funds from FX customers' accounts involved fraud, breach of fiduciary duty, or conversion, the Trustee must make allegations that these defendants had actual knowledge of and substantially assisted in *this* putative scheme.

VI.    Leave to Replead

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to replead should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). Leave to replead may be denied if repleading would be futile, Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995), but it is far from clear that repleading would be futile here. The complaint in this action was filed in state court in August 2007 – prior to this Court's decisions in RCM I and RCM II, and prior to a number of other developments in related cases that may allow all parties to benefit from repleading.[27] While the Trustee has enjoyed access to a substantial trove of Refco's internal documents, and while the Trustee's decision to stand on a complaint substantially similar to the one the Court found wholly inadequate in RCM I is puzzling, the Trustee deserves "at least one opportunity to plead fraud with greater specificity." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007). One such opportunity will be afforded.

---

[27] That leave to replead is granted does not indicate that repleading is encouraged, or suggest that an amended complaint is likely to state a cause of action. It merely reflects that the Court, necessarily ignorant of the facts that plaintiff might be able to allege, cannot conclude that repleading is necessarily futile.

## CONCLUSION

For the foregoing reasons, the Professional Defendants' motions to dismiss the Trustee's complaint as to them is granted. The Trustee is granted leave to replead and is directed to advise the Court by September 25, 2009, as to whether he intends to file an amended complaint. If so, the parties are directed to meet and confer regarding a schedule for the filing of an amended complaint and subsequent motions to dismiss, and submit a stipulated schedule, or competing proposed schedules, to the Court by October 9, 2009. If the Trustee intends to replead, the Trustee and Mayer Brown International LLP are also directed to meet and confer regarding a schedule for discovery and motion practice related to whether Mayer Brown is a single entity that constitutes a "legal partnership" or "combination" under New York law. Such a schedule should be submitted to the Court no later than October 9, 2009.

SO ORDERED.

Dated: New York, New York
       August 25, 2009

                                        GERARD E. LYNCH
                                        United States District Judge

35