UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARC S. KIRSCHNER,<br>As Trustee of the Refco Private Actions Trust,<br><br>　　　　　Plaintiff,<br><br>　-vs-<br><br>PHILLIP R. BENNETT, SANTO C. MAGGIO,<br>ROBERT C. TROSTEN, MAYER, BROWN LLP,<br>MAYER BROWN INTERNATIONAL LLP,<br>and GRANT THORNTON LLP,<br><br>　　　　　Defendants. | No. 07 Civ. 8165 (JSR)<br><br>MDL-1902 (JSR) |

## FIRST AMENDED COMPLAINT

Plaintiff Marc S. Kirschner (the "Trustee"), as court-approved Trustee for the Refco Private Actions Trust (the "Trust") and assignee of all claims related to Refco Inc. (collectively, with its direct and indirect subsidiaries, "Refco," and with respect to those Refco entities that commenced Chapter 11 bankruptcy cases, the "Debtors") belonging to, among others, the 72 former Refco foreign exchange customers listed on Exhibit A (the "FX Customers") who maintained accounts at, and entrusted funds to, Refco Capital Markets, Ltd. ("RCM"), as and for his Complaint against Phillip R. Bennett ("Bennett"), Santo C. Maggio ("Maggio"), and Robert C. Trosten ("Trosten") (collectively, the "Refco Insiders"); and Mayer Brown LLP, Mayer Brown International LLP (collectively with Mayer Brown LLP, "Mayer Brown"), and Grant Thornton LLP ("Grant Thornton") (with Mayer Brown, the "Professional Defendants"), states as follows:

1

**Nature of the Case**

1.      As has been established by the guilty pleas of each of the Refco Insiders and the convictions of Tone Grant (Refco's prior CEO) and Joseph Collins (the senior Mayer Brown partner who served as Refco's principal outside counsel), the Refco Insiders, with the knowledge and active assistance of its principal outside counsel Mayer Brown and, as alleged herein, its auditor Grant Thornton, engaged in a massive fraud to line their own pockets by cashing-out their interests in Refco for more than those interests were worth.

2.      As set forth herein, this cashing-out depended on the misappropriation, conversion and waste of RCM customer assets, including funds entrusted to RCM by the FX Customers upon whose behalf the Trustee brings this action, to fund Refco's substantial cash needs and thereby conceal Refco's true precarious financial condition.  As the Professional Defendants knew at all relevant times, the Refco Insiders' fraudulent cashing-out scheme rendered unrecoverable the FX Customer assets that had been entrusted to RCM for the specific, limited purpose of engaging in FX trades directed by the FX Customers.

3.      To effect their cashing-out scheme, the Refco Insiders had to falsely present the Refco entities as a financially sound and highly profitable enterprise.  As Mayer Brown and Grant Thornton knew, however, the Refco entities were not sufficiently profitable in their own right to warrant the lucrative cashing-out the Refco Insiders desired and had suffered hundreds of millions of dollars of undisclosed customer trading losses in the late 1990s.  As the Refco Insiders and Professional Defendants knew and feared, disclosure of either fact would substantially diminish the value of the Refco Insiders' interests and foreclose the lucrative cashing-out they desired.

4.      With the knowledge and active participation of Mayer Brown and Grant Thornton, the Refco Insiders therefore engaged in a scheme to conceal the customer trading

losses and artificially boost Refco's perceived financial condition and profitability, including that of RCM.

5.     A critical component of this scheme was the continuous misappropriation, conversion, and waste of assets entrusted to RCM by its customers in violation of RCM's arrangement with its customers and without legal right, so as to maintain the liquidity necessary to fund Refco and the Refco Insiders' cash needs, and thereby conceal Refco's true precarious financial condition.

6.     Far from the solvent, viable broker-dealer that RCM was represented to its customers to be, including the FX Customers, the Refco Insiders operated RCM as a ponzi scheme whose sole true function was funding the Refco Insiders' cashing-out scheme.  As Mayer Brown and Grant Thornton knew, the Refco Insiders made no provision for repayment to RCM or its customers, including the FX Customers, of any of the hundreds of millions of dollars in customer funds that had been misappropriated, converted, and wasted to fund the cashing-out scheme.

7.     To the contrary, as Mayer Brown and Grant Thornton knew, the cashing-out of the Refco Insiders in a leveraged buy-out in 2004 (the "LBO")—in which the Refco Insiders and others acting in active concert and participation with them received over $1 billion dollars for interests in Refco that were worth only a fraction of that amount—altogether foreclosed repayment of RCM's customer assets, include those belonging to the FX Customers.

8.     Following the LBO, Bennett and Maggio, with the knowledge, complicity, and active assistance of the Professional Defendants, continued to hold RCM out as a solvent, viable broker-dealer so as to conceal their fraudulent scheme and complete a further cashing-out in an initial public offering (the "IPO") in August 2005.

9.     Between the LBO and disclosure of the fraud at Refco in October, 2005, approximately $400 million in FX customer funds entrusted to RCM for the limited, specific purpose of FX trading were misappropriated and converted to fund the cashing-out scheme.

10.     These misappropriated and converted funds included those assigned to RCM as part of the acquisition of Cargill, Inc. ("Cargill") in June 2005.  Through this acquisition, in which Mayer Brown played a key and crucial role, hundreds of millions of dollars of additional FX Customer assets were transferred to RCM and subsequently misappropriated and converted with no prospect of repayment.

11.     When the truth concerning Refco's finances and the misconduct of the Refco Insiders emerged in October 2005, the Refco house of cards collapsed, and bankruptcy filings ensued within days.  It was only then discovered that the Refco Insiders had fraudulently induced the FX Customers, along with other RCM customers, into believing that RCM was a viable, solvent broker-dealer when, in fact, at all relevant times, RCM was a ponzi scheme that, after the LBO, had no ability to repay the amounts it owed the FX Customers.

12.     By the time of the bankruptcy, RCM had transferred over $2 billion of customer assets—assets that had been entrusted to RCM for the specific, limited purpose of executing FX and securities trades—including over $800 million in FX customer assets, to other Refco entities that had no prospect or ability to repay them.

13.     As a result of false representations that RCM was a viable, solvent broker-dealer that would be able to return its customers' assets to them on demand, the failure to disclose the true facts regarding RCM's role in the Refco Insiders' fraudulent scheme, and the misappropriation, conversion, and waste of RCM customer assets without legal right, the FX

Customers whose claims have been assigned to the Trust, and whose claims the Trustee asserts in this action, collectively suffered losses totaling over half a billion dollars.

14. By this action, the Trustee seeks to recover those funds from the Refco Insiders and monetary damages from the Professional Defendants that substantially assisted the Refco Insiders in:

a) holding RCM out as a viable, solvent broker-dealer with whom FX Customers could open accounts and place and/or maintain their FX funds so as to engage in FX trading and failing to disclose RCM's role in the Refco Insiders' fraudulent cashing-out scheme;

b) inducing the FX Customers to continue utilizing RCM as their broker-dealer and entrusting and maintaining their assets to RCM for the specific, limited purpose of engaging in FX trading on the basis that RCM was a viable, solvent broker-dealer with whom customers could safely execute FX trades and expect repayment of their balances upon demand; and

c) misappropriating and converting FX Customer assets in violation of the arrangement between RCM and the FX Customers and without legal right, by upstreaming them to other Refco entities to fund the cash needs of the Refco Insiders' cashing-out scheme without any loan documentation, terms, security, or promise or provision of repayment, all the while knowing that RCM was being operated as a ponzi scheme and would be unable to return these funds to its FX Customers upon demand, or otherwise.

**Jurisdiction and Venue**

15.    Pursuant to a decision dated May 6, 2008, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334(b) on the ground that this case is related to the Refco bankruptcy.[1]

16.    This Court has jurisdiction over defendants pursuant to New York's general jurisdiction statute (CPLR § 301) and long-arm statute (CPLR § 302).

17.    Venue is proper under 28 U.S.C. §1407 and §1409(c) because, among other things, the Refco Bankruptcy was pending in the Southern District of New York and this action was coordinated for pre-trial proceedings with the Refco Multidistrict Litigation pending in the Southern District of New York.  Venue is further proper as RCM maintained its principal place of business and conducted its business with the FX Customers from Refco's global headquarters in New York County at all relevant times.

**Parties**

**The Plaintiff**

18.    Plaintiff Marc S. Kirschner is the Court-approved Trustee of the Refco Private Actions Trust, which was established in connection with the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries that was confirmed on December 15, 2006, by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Trustee is the assignee of all Refco-related claims belonging to a number of persons and entities, including the 72 FX Customers of RCM listed on Exhibit A, all of whom maintained accounts at Refco's subsidiary, RCM, principally for the

---

[1]    Plaintiff reserves the right to challenge the Court's prior determination that there is federal subject matter jurisdiction over this action in connection with the appeal of any subsequent dismissal.

purpose of engaging in FX trading and who entrusted funds to RCM for the specific, limited purpose of effectuating FX transactions pursuant to their instructions.

**The Refco Insiders**

19.    Defendant Phillip R. Bennett was the highest-ranking corporate officer and Chairman of various Refco entities until he was forced to resign following the disclosure of the massive fraud that he, Maggio, and Trosten perpetrated at Refco with the assistance of the Professional Defendants.  Among other positions within Refco, Bennett served as a director of RCM at all relevant times and was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties to the FX Customers.

20.    Following the revelation of the fraud at Refco, the United States Attorney's Office for the Southern District of New York indicted Bennett for among other things, conspiracy to commit securities and wire fraud, making false filings with the SEC, and bank fraud, as a result, in part, of acts alleged herein.  *See* Third Superseding Indictment ("Indict.") in *U.S. v. Phillip Bennett, et al*., S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007).

21.    Bennett pleaded guilty to, among other counts, two counts of securities fraud, three counts of making a false filing with the SEC, seven counts of wire fraud and one count of bank fraud.  He was sentenced to three 16-year sentences and a fourth 10-year sentence, all to run concurrently.

22.    Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985 and held executive positions with various Refco entities until he was forced to resign following the disclosure of the massive fraud that he, Bennett, and Trosten perpetrated on Refco with the assistance of the Professional Defendants.  Among other positions within Refco, Maggio served as President and a director of RCM at all relevant times and was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties

to the FX Customers.  Maggio ran the brokerage operations of Refco Securities, LLC ("RSL") and RCM and directly participated in, orchestrated, and supervised the misappropriation and conversion of RCM customer assets alleged herein.

23.     Following Maggio's indictment by the United States Attorney's Office for the Southern District of New York in relation, *inter alia*, to his role in various frauds perpetrated during his tenure at Refco, Maggio pleaded guilty to four counts:  conspiracy, wire fraud and two counts of securities fraud, and is scheduled to be sentenced on February 12, 2010.

24.     Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001 and the Chief Financial Officer of Refco Group Ltd., LLC ("RGL") from 2001 to October 2004.  Trosten was intimately familiar with all details of the cashing-out scheme that he, Bennett, and Maggio perpetrated on Refco with the assistance of the Professional Defendants.

25.     Trosten was indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.  Trosten pleaded guilty to five counts: conspiracy, securities fraud, wire fraud, bank fraud, and money laundering, and is scheduled to be sentenced on January 10, 2010.

**The Professional Defendants**

26.     At all relevant times, Mayer Brown was a partnership that held itself out to the world under the name Mayer, Brown, Rowe & Maw.  This entity continued to act as a single partnership through at least September 2007, when, as heralded by its website, "the firm took the next step in solidifying its brand and reflecting its position in the global legal marketplace by shortening its name to Mayer Brown, a partnership with nearly 600 partners and more than 1,500 lawyers spread across the globe."

27.    On information and belief, starting in January 2002 and continuing through at least 2007, the constituent entities that comprised Mayer Brown Rowe & Maw joined together their money, goods, labor and skill for the purpose of carrying out the business of a law firm for profit, which profits were shared among its unified partnership.

28.    Mayer Brown served as Refco's principal outside counsel from 1994 until October 2005.  As set forth below in more detail, Mayer Brown was intimately involved in every aspect of the Refco Insiders' fraudulent scheme, including preparing the loan documents through which Refco concealed its trading losses and operating expenses, providing the Refco Insiders with improper regulatory advice that allowed them to continue diverting RCM's assets to fund Refco's businesses, and playing an active role in the LBO and IPO, which Mayer Brown knew was premised on a fictitious picture of Refco's financial condition, and would foreclose repayment to RCM's customers of their entrusted funds, including the FX Customers.

29.    Mayer Brown's senior partner responsible for the Refco engagement, Joseph Collins ("Collins"), was indicted and ultimately tried for his role in the Refco fraud.  After thirty-two days of trial, he was convicted on two counts of securities fraud, two counts of wire fraud, and conspiracy related to his role in the Refco Insiders' fraudulent cashing-out scheme.   If sentenced concurrently, Collins faces up to 20 years in prison.  He is scheduled to be sentenced on November 8, 2009.

30.    Foreshadowing Collins's conviction, the Court-appointed Examiner in the Refco Bankruptcy Proceedings, after exhaustive review of Mayer Brown's documents and interviews of the responsible Mayer Brown attorneys, issued a report concluding, among other things, that Mayer Brown understood that fraudulent loans it structured for Refco were designed to assist the fraud:   "there is significant evidence that Mayer Brown . . . assisted Refco by drafting and

negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements" and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

31.     Defendant Grant Thornton LLP is the Chicago-based United States member firm of Grant Thornton International, one of six global accounting, tax, and business advisory organizations with member firms in 11 countries and offices in New York.  Grant Thornton served as Refco's purportedly independent auditor at all relevant times after 2002, when it replaced Arthur Andersen LLP ("AA") in that role.  Grant Thornton issued clean and unqualified audit opinions on Refco's consolidated financial statements for fiscal years 2003, 2004, and 2005.  Grant Thornton also served as the auditor for RCM in connection with its stand alone financial statements and the financial statements of various other Refco entities.

32.     As set forth below, despite knowing of each aspect of the Refco Insiders' cashing-out scheme, including the misappropriation, conversion and waste of the FX Customers' assets, Grant Thornton repeatedly issued unqualified audit opinions on Refco and its affiliates' consolidated and stand alone financial statements that intentionally concealed:  Refco's true precarious financial condition; the extent to which RCM's customer assets, including the FX Customers' assets, had been improperly transferred to other entities to fund the Refco Insiders' cashing-out scheme; that RCM was being operated as a ponzi scheme; and that RCM customers' assets, including those of the FX Customers, had been misappropriated, converted, and wasted and could not be returned by RCM on demand or otherwise.

**Factual Background**

**RCM's Position in Refco's Overall Operations**

33.     Before its collapse in 2005, Refco had three major operating subsidiaries:

a)     RSL, a Delaware limited liability company and registered broker-dealer, which at all relevant times had its principal place of business in New York, New York;

b)     Refco, LLC ("Refco LLC"), a Delaware limited liability company and regulated futures commission merchant which at all relevant times had its principal place of business in New York, New York; and

c)     RCM, a company which at all relevant times had its principal place of business in New York, New York and held itself out to the public and to customers as a securities and foreign exchange broker, and acted as the clearing house for all FX business conducted by Refco.

34.     Refco offered prime brokerage services, such as securities financing, securities lending, and trade processing through RSL, a registered broker-dealer that was regulated by the SEC and the National Association of Securities Dealers ("NASD"), and was subject to the net capital and other regulatory requirements of those entities.   Refco executed and cleared customers' orders for exchange-traded derivatives primarily through Refco LLC, which was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to various net capital and other regulatory requirements of those entities.   Refco engaged in various brokerage activities, including clearing FX trades, through RCM.

35.     In December 2001, in furtherance of the fraudulent scheme alleged herein, Refco shut down RCM's Bermuda operations and "repatriated" RCM to the United States.   This repatriation was conducted with the advice and assistance of Mayer Brown, which as a result of

11

this and other work performed for RCM and Refco was intimately familiar with RCM's business and operations and the activities alleged herein.

36.     In addition to its major operating subsidiaries, Refco also maintained other subsidiaries, including Refco Capital LLC ("RCC"), a Delaware limited liability company which at all relevant times had its principal place of business in New York, New York, and which functioned as the "bank," "treasury," or "disbursing agent" for Refco.

37.     At all relevant times, a substantial portion of the funds disbursed by RCC to or on behalf of various Refco entities in performing this "bank," "treasury," or "disbursing agent" function for Refco were derived from the improper diversion and conversion of entrusted assets from the accounts of RCM customers, including the accounts of the FX Customers.  Without the misappropriation and conversion of the customer property improperly siphoned without legal right from RCM customer accounts, RCC could not have performed its "bank," "treasury," or "disbursing agent" function, and the Refco Insiders would have been unable to effectuate their cashing-out scheme.

**RCM's FX Trading Model**

38.     At all relevant times, RCM held itself out as a viable, solvent broker-dealer with whom customers could execute foreign exchange trading.  It was based on this implicit representation of solvency, viability, and legitimacy—and the nondisclosure of the RCM's role in the Refco Insiders' fraudulent cashing-out scheme—that the FX Customers whose claims the Trustee asserts in this action were induced to place and maintain a substantial amount of property in accounts at RCM for the specific, limited, purpose of engaging in FX transactions at the FX Customers' direction.  If the true facts concerning RCM's role in the Refco Insiders' fraudulent cashing-out scheme had been disclosed to them, whether directly or indirectly, the FX Customers would not have entrusted their funds to RCM.

39.     A central feature of RCM's business model was that it served merely as an intermediary and was not exposed to the currency volatility risk of acting as an unhedged counterparty to its customers' FX trades.  In every foreign exchange trade placed through RCM by its customers, RCM simultaneously entered into an offsetting transaction with a market maker and earned only a transaction fee or profit on the spread between the price it charged to the customer and the price it paid to the market maker.  In the FX industry, this is referred to as running a "flat" book.

40.     That RCM ran a "flat" book—*i.e.*, served only as an intermediary and was not exposed to the currency volatility risk of its customer's trades—was known and material to the FX Customers.

41.     In order to limit the counterparty credit risk posed by its customers, prior to placing a trade, the FX Customers were required to deposit with RCM an amount of money which, in the specific context of FX trading, was referred to as "margin."

42.     In this context, the term "margin" has a different meaning than in the securities context.  Whereas in the securities context, "margin" typically refers to putting up cash and borrowing against securities to increase buying power, in the context of FX trades, the margin ("FX Margin") is a good-faith or "earnest money" deposit.  The FX Margin serves as security for the broker to protect against the credit risk of its customers should there be unexpected swings in the value of traded currencies.

43.     FX Margin was but one component of the balance that FX Customers would have in their RCM FX accounts.  In addition to FX Margin, FX Customers kept additional funds that were not being used as FX Margin in their RCM FX accounts, as well as profits being realized on their trades.

44.     When a trade was placed by an FX Customer, the FX Margin amount would be calculated based on, among other factors, the type of currency being traded and the tenor of the trade being placed by the customer—*i.e.*, a short-term trade of currencies not typically subject to high volatility generally would require less FX Margin than a longer term trade that related to a currency that typically experienced significant volatility.

45.     FX trades are typically settled and liquidated when they are closed, so that the customer will either have his original FX balance (including FX Margin) plus a profit (if the currency appreciated in value during the open trade period), or his original FX balance (including FX Margin) minus a loss (if the currency depreciated in value during the open trade period).

46.     Upon liquidation of a trade, unless and until a new trade is initiated by the FX customer, any funds that served as FX Margin would no longer be FX Margin and would belong entirely to the customer and remain in the customer's account for use in additional FX transactions pursuant to the customer's instructions.

47.     Where an FX Customer had multiple open FX trades at RCM, the FX Margin amount for all trades would be calculated daily.  This FX Margin amount would be adjusted on a daily basis to reflect, among other things, the liquidation and settlement of trades and changes in the volatility of the currencies being traded by the FX customer.

48.     Approximately seventy-five percent of the trades executed by RCM's FX customers were "spot"—*i.e.*, trades involving the purchase of a given amount of a currency at the current "spot price" in the market.  FX spot trades placed with RCM would settle and be liquidated two days after the trade was placed, although certain spot trades would settle and be liquidated one day after the trade was placed.

49.    RCM's FX customers, including the FX Customers, would routinely "roll" spot trades over, repeatedly entering into the same trade at the current spot price every two days. Every time a spot trade was rolled over, the original spot trade would be settled and a new trade would be placed, and a new FX Margin amount calculated.

50.    Given the prevalence of spot FX trading at RCM, and the practice of the "rolling over" of such trades, the FX Customers entered into hundreds, if not thousands, of spot trades.

51.    FX customers also traded forwards and options through RCM.  A forward is an FX trade that has a settlement day more than two days after the trade date.  An option, which gives a purchaser the right to buy or sell a certain amount of currency at a set price at a future date, could be settled on any future date chosen by the parties.

52.    A number of the FX Customers entered into an RCM customer agreement that included a margin annex providing that RCM had "the right to loan, pledge, hypothecate or otherwise use or dispose of [FX Margin] free from any claim or right, until settlement in full of all Transactions entered into [by the FX customer]."  Pursuant to this provision, RCM could make use of Customer Funds that served as FX Margin in an FX Customers' account relating to their open trades, subject to the obligation to return this FX Margin upon settlement of FX Customers' trade(s).

53.    This provision, and the arrangement between the FX Customers and RCM did not, however, permit RCM to use the FX customers' FX Margin (or any other assets entrusted to RCM by the FX Customers) without regard for its return.  Properly construed and considered in light of RCM's duty of good faith and fair dealing, this provision did not authorize RCM to upstream FX Margin (or other entrusted assets) to other Refco entities to fund the operational needs of Refco without any loan documentation, terms, security, or promise or provision of

repayment, all the while knowing that RCM would be unable to return these funds to its FX Customers upon demand, or otherwise.  Return of the FX Margin (and all other balances) in the FX customers' accounts was an express and/or implied condition of the FX Customers' entrustment of their assets to RCM for the specific, limited, purpose of entering into FX trades at their direction.

54.     As explained, this FX Margin amount would be calculated daily to reflect the FX Margin that had to be entrusted to RCM to "cover" the customer's open FX trading positions. Any funds entrusted to RCM by an FX Customer that was not FX Margin on any given day belonged entirely to the FX customer and had to be returned to the FX customer on demand, as did any FX Margin covering a trade upon liquidation of the trade (provided that the FX Margin was not used to fund a loss on the trade).

55.     When, in June 2005, the Refco Insiders decided they needed more FX customer assets to fund Refco's cash needs and conceal their fraud, they purchased a subsidiary of Cargill that acted as a broker dealer, thereby transferring to RCM hundreds of millions of dollars in additional FX funds that were then available for the Refco Insiders' fraudulent cashing-out scheme.

56.     The FX Customers transferred to RCM pursuant to the Cargill transaction did not execute agreements with RCM prior to the disclosure of the fraud at Refco and its bankruptcy, but instead either received a negative consent letter that was silent as to which agreement would govern, or agreed to have their agreements with Cargill assigned to RCM, which assignment was facilitated by Mayer Brown, who knew at all relevant times that RCM was being operated as a ponzi scheme by Bennett and Maggio and that the Cargill customer's FX trading assets would

immediately be misappropriated, converted and dissipated in furtherance of the Refco Insiders' cashing-out scheme.

57.     Upon information and belief, RCM treated the Cargill customer funds transferred to RCM (and the calculation of FX Margin) in the same way that it treated the funds of the FX customers who had executed customer agreements with RCM.

58.     Given that RCM presented itself as a viable, solvent, broker-dealer that ran a flat book, and that RCM's role in the Refco Insiders' fraudulent cashing-out scheme remained undisclosed, the FX Customers were induced to believe, and had a justifiable expectation, that the assets they entrusted to RCM (including amounts being treated as FX Margin) for the sole purpose of engaging in specific FX trading conducted at their direction would be returned to them upon the liquidation and settlement of their trades and that all additional balances maintained in their RCM accounts (i.e. profits and excess funds unrelated to any FX Margin needed to cover open trades) would be available to them on demand.

59.     This was a reasonable expectation given the Refco Insiders' express and implicit representation and inducement that RCM was a viable and solvent broker-dealer at which FX customers could safely execute FX trades and have their FX Margin and other assets returned on demand.

60.     As reflected below, this implicit and express representation of solvency, viability, and ability to return the assets deposited by FX customers with RCM for the limited purpose of engaging in FX trading, which depended on the below-described complicity of the Professional Defendants, caused increasing numbers of FX customers to entrust increasing amounts to RCM to engage in FX trading:

| Date | Approximate FX Customer Balances Deposited with RCM |
|------|------------------------------------------------------|
| January 1, 2003 | $247.1 Million |
| December 31, 2003 | $256.0 Million |
| December 31, 2004 | $402.3 Million |
| September 31, 2005 | $1,292.7 Million |

61.     The Refco Insiders recognized that if customers did not believe that RCM was a viable, solvent, financially healthy, and strong broker-dealer, to which customers were induced to believe they could entrust their cash and securities for specific, limited purposes, FX customers would not have placed and maintained their property in accounts at RCM and would not have used RCM as their broker-dealer—a fact that was indisputably confirmed by the "run" on RCM precipitated by the belated public disclosure of the fraud at Refco in October 2005.

62.     The totality of the facts and circumstances surrounding the creation and maintenance of the relationship between the FX Customers and RCM, and between RCM and its directors and officers, including Bennett and Maggio, were of a fiduciary nature and/or a special relationship of trust and confidence, and not a mere debtor-creditor relationship.  Although FX customers made their own decisions with respect to trading activity, and RCM was not a fiduciary with respect to customers' trading decisions, it assumed a fiduciary role with respect to its use of customer funds and, as a fiduciary, was obligated to ensure that its use of those funds, when rightfully and legally permitted to do so by the relevant customer agreements, was carried out in ways that would ensure that the funds would be available for return to the customers on

demand or otherwise, and that its customers' funds were not dissipated in a fraudulent scheme being effectuated by the Refco Insiders.  These facts and circumstances include the following:

     a)     that the FX Customers entrusted their funds to RCM for the specific, limited purpose of conducting FX transactions pursuant to their instructions and did so with the reasonable expectation that their funds, including amounts utilized as FX Margin for FX trades that subsequently settled, would be returned to the FX Customers on their instruction;

     b)     that RCM held itself out to its customers as a viable, solvent, broker-dealer, when in fact it was being operated as a ponzi scheme in order to effectuate the Refco Insiders' cashing-out scheme and was rendered insolvent by the Refco Insiders' cashing-out in the LBO;

     c)     the custodial and entrustment nature of the relationship between RCM and the FX Customers with respect to the FX Customers' funds;

     d)     that RCM purported to only act as an agent in executing customer instructions, ran a flat book, and did not purport to be subjected to risk beyond that of counterparty credit risk, all of which fostered greater trust and confidence with RCM's customers;

     e)     the lack of any communications from RCM to the FX Customers that would have suggested to the FX Customers that RCM could not be relied upon to return their funds when instructed to do so; and

     f)     RCM's superior knowledge of all of the underlying facts and the fraud alleged herein.

**The Refco Insiders' Cashing-Out Scheme Depended on the Improper Diversion and Conversion of FX Customers' Funds**

63.    As Mayer Brown and Grant Thornton knew, the Refco entities were substantially less profitable than what was reported in their financial statements and needed significant cash to fund day-to-day operations and to fund acquisitions and other aspects of the Refco Insiders' cashing-out scheme.

64.    To effectuate their lucrative cashing-out scheme, the Refco Insiders funded these considerable cash needs by improperly misappropriating and converting without legal right the securities and funds entrusted to RCM by its customers, including the FX Customers, for the specific, limited purpose of engaging in securities and FX trades.

65.    Far from making provision for the return of these customer funds, including those of the FX Customers, the Refco Insiders, with the knowledge and complicity of Mayer Brown and Grant Thornton, caused RCM to distribute the FX Customer funds to other Refco entities— entities that had, in fact, limited ability before, and no ability after, the LBO to return these customer funds.

66.    These transfers from RCM to the other Refco entities were made without any security, collateral, or other assurances that these amounts would be repaid to RCM and were, after the LBO, entirely unrecoverable.

67.    When the FX Customers entrusted their funds to Refco for the purpose of undertaking FX trading, the funds were sent to a specific FX customer account and reference was made to the specific RCM account number of the particular FX customers.

68.    On a daily basis, these FX customer balances, except those minimal amounts needed to conduct RCM's FX trading business that day (without regard as to whether they were FX Margin, other customer funds not being used as FX Margin, or a customer's profits from

settled trades) were transferred to a general account at RCM where they were commingled with assets misappropriated from securities customers and other RCM assets.   The funds in the RCM general account needed to fund the Refco Insiders' cashing-out scheme were then transferred to RCC, which was referred to as the "funding unit" or the "bank."  RCC would, in turn, disperse these funds to whichever Refco entities needed liquidity to fund their ongoing operations, acquisitions and the other cash needs associated with the Refco Insiders' cashing-out scheme. The Refco Insiders would also, on occasion, cause RCM to transfer customer funds directly to Refco entities other than RCC.

69.     Needing as much cash as possible to maintain the illusion that Refco was financially healthy and strong, the Refco Insiders caused RCM to keep just enough cash on hand to prevent routine customer withdrawals from jeopardizing their scheme.  As Vera Kraker, one of the two Refco employees who was responsible for transferring customer funds at the direction of the Refco Insiders from RCM to RCC and other Refco entities testified,  "[o]n a daily basis [she] would be instructed by Maggio 'to fund [RCC] when they needed money.'"  Kraker further recounted that between 2003 and 2005, at any given time RCM had "funded" over a billion dollars to RCC, while keeping only $30-50 million on hand.

70.     As was known to both Grant Thornton and Mayer Brown at all relevant times, the Refco Insiders treated intercompany transfers between RCM and these other Refco entities as transfers among "customers."  As discussed below, by misleadingly treating Refco affiliates as purported "customers" in RCM's financial statements and intentionally providing a misleading description of these intercompany "loans," the Refco Insiders, with Grant Thornton's complicity and assistance, were able to conceal the magnitude of the customer funds being transferred from RCM to RCC and the other Refco entities.

71.     As Grant Thornton discovered in auditing RCM's financial statements, the amount of these cash transfers of customer funds from RCM grew exponentially.   The transactional amounts were at least $280 million as of February 28, 2003; $1.1 billion as of February 29, 2004; and just over $2 billion as of February 28, 2005.  By the time Refco filed for bankruptcy on October 17, 2005, the number was over $2.5 billion.

72.     The net amount of FX customer funds included in these transferred amounts, including those of the FX Customers, grew at a similar rate:

| Date | Approximate Net Amount of FX Customer Balances Transferred By RCM |
|---|---|
| January 1, 2003 | $288.6 M |
| December 31, 2003 | $391.3 M |
| December 31, 2004 | $472.5 M |
| September 31, 2005 | $865.6 M |

73.     Despite the magnitude of these transfers, the FX Customers were never advised that the funds they entrusted to RCM would be distributed to other Refco entities as part of the Refco Insiders' fraudulent scheme.  As Thomas Yorke, another Refco executive who arranged for the transfers (at the direction of Bennett and Maggio), testified under oath in Refco's bankruptcy proceeding, RCM's customers were not told that their entrusted property was swept into a general account at RCM and then distributed to other Refco entities.   Yorke further testified that he would not expect RCM's customers to have known "about the inner workings, relative to what the upstream bank [i.e. RCC] was doing, no."  Nor were they told that the assets were being deployed in a way that they would be dissipated with no prospect of return, as

opposed to maintained in a manner that would provide for their return, as was the FX Customers' reasonable expectation.

74.     The transfers between RCM and RCC and the other Refco entities occurred without any "loan" documentation and were made:

    a)     without compensation, security, or collateral;

    b)     without assurances that the funds would or could be repaid on demand or at all by the Refco entities that received them;

    c)     without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM or RCM's customers of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

    d)     without legal right and in contravention of the duty of good faith and fair dealing and the implied and/or express condition in the customers' relationship with RCM that the FX Margin (and other balances) would be returned on demand;

    e)     to other Refco entities that, after the LBO, altogether lacked the ability to repay the funds;

    f)     for the purpose of perpetuating the Refco Insiders' cashing-out scheme;

    g)     in transactions that provided no benefits to the affected RCM customers and in which the legitimate and reasonable interests and expectations of the RCM customers were entirely ignored; and

    h)     without appropriate disclosure to, or consent by, the affected RCM customers, including the FX Customers.

75.     Rather than making any provision for the return of the RCM customers' assets, with appropriate regard for the legitimate and reasonable interests and expectations of RCM's

customers, the Refco Insiders caused the funds to be upstreamed to entities that, as they and the Professional Defendant knew, would be, and were, entirely foreclosed from returning them after the Refco Insiders' cashing-out in the LBO.

76.     As of October 2005, RCM had more than $2 billion of undisclosed and uncollectible related-party receivables outstanding as a result of these transactions by which entrusted customer funds were, as part of the Refco Insiders' fraudulent scheme, siphoned from customer accounts and distributed to other Refco entities that lacked the financial wherewithal to repay these funds to RCM.

77.     Upon disclosure of the fraud of Refco, the FX Customers instructed RCM to return their property—as RCM was duty-bound to do—but discovered, to their shock and dismay, that enormous amounts of property entrusted to RCM for specific, limited purposes— had been removed from RCM in undocumented, uncollateralized, unsecured transactions to other Refco entities that lacked the ability to repay the wronged RCM customers in order to conceal Refco's true financial condition so as to effectuate the Refco Insiders' cashing-out scheme.  The FX Customers' entrusted property was thus unavailable for return to them pursuant to their instructions.

78.     As a result of this scheme, the FX Customers whose claims the Trustee asserts in this action incurred over half a billion dollars in losses (not including pre-judgment interest).

**The Other Elements of the Refco Insiders' Cashing-Out Scheme**

79.     In order to orchestrate the lucrative payout they desired, the Refco Insiders needed to justify the desired cashing-out of their interests.  In service of this primary objective they needed to induce customers, including FX Customers, to continue to view RCM as a viable, solvent, broker-dealer with which they could safely engage in FX trading (*i.e.*, execute their FX

trades and have their funds returned on demand) so that they could use RCM customer assets to fund their cashing-out scheme.

80.     To achieve this objective, the Refco Insiders, with the knowledge, complicity and assistance of Mayer Brown and Grant Thornton, concealed Refco's true financial condition in the following ways:

      **a.**     **<u>Hiding Undisclosed Losses</u>**

81.     As discussed, in the late 1990s Refco assumed massive undisclosed losses caused by uncollectible customer receivables.  The Refco Insiders hid these losses by transferring them to RGHI, (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Tone Grant ("Grant"), Refco's former CEO), increasing a related-party receivable owed by RGHI to Refco (the "RGHI Receivable"), and then concealing the amount due from RGHI through a series of undisclosed sham "loans" timed to occur at the end of Refco's financial reporting periods.

82.     This scheme was designed to (and did) enable Refco to temporarily transfer massive amounts of uncollectible customer receivables off of its books by shifting these receivables between wholly-owned Refco subsidiaries, related-party companies owned and controlled by the Refco Insiders, and several third-party customers of Refco.  The goal of this scheme was to disguise hundreds of millions of dollars of uncollectible receivables due to Refco so that Refco could fraudulently avoid recording hundreds of millions of dollars in write-offs and continue to project to the public a false impression of financial health and strength and a false sense that RCM was a safe entity to which customers could entrust their customer cash and securities for the specific, limited purpose of engaging in FX trading.

83.     A significant portion of the uncollectible customer receivables originated in trading losses incurred by Refco's customers in the late 1990s.  Refco regularly extended credit to customers who engaged in securities, commodities, and futures trades.  As a result, when markets fluctuated drastically, as they did, for example, during the Asian market collapse in 1997, several Refco customers (other than the FX Customers), having made large speculative trading bets on securities tied to Asian currencies, lost huge sums of money (the "Asian Losses") and were unable to repay over a hundred million dollars worth of loans that Refco had made to them.  Refco was forced to pay these amounts to its counter-parties with RCM customer assets and assume their customers' losses.

84.     Also in 1997, certain Refco customers in the United States to whom Refco had extended credit—entities associated with Victor Niederhoffer—lost more than $90 million in trades (the "Niederhoffer Losses").  When the customer could not meet its margin requirements, the Refco Insiders caused Refco to take out an intra-day loan from a financial institution to meet its margin call and then used funds taken from Refco entities to repay the loan.

85.     Ultimately, the Refco Insiders, with the assistance of Mayer Brown, caused Refco to enter into settlement agreements with the Niederhoffer entities, pursuant to which the Niederhoffer entities agreed to liquidate the positions in their accounts for the benefit of Refco.  Like the Asian Losses, the Niederhoffer Losses were uncollectible—in fact, settlement agreements had released the Niederhoffer entities from liability—and should have been written off in Refco's books as a bad debt expense.

86.     Instead, most or all of these losses were transformed from bad debts to apparent assets by "selling" or transferring them to RGHI so that they could become part of the RGHI Receivable—an asset on the books of RCM.  Despite knowing this, Mayer Brown assisted Refco

with investigations initiated by various commodities regulators by, among other things, revising footnotes for financial statements being provided to the regulators and assisting Refco in responding to inquiries from the Internal Revenue Service.

87.     Refco also suffered substantial losses from its own proprietary trading, *i.e.*, trades carried out on its own behalf, which should have been written off, but instead were "sold" or transferred to RGHI, becoming part of the RGHI Receivable.

88.     Collectively, customer and proprietary trading losses sustained by Refco amounted to hundreds of millions of dollars.  If disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management, undermined RCM's reputation as a broker-dealer in which one could safely execute foreign exchange trades, and foreclosed the lucrative cashing-out the Refco Insiders desired.

89.     Out of concern over the effect disclosure of the losses and uncollectible customer debts would have on Refco and its financial condition (and the value of their interest on any sale of Refco), the Refco Insiders transferred massive amounts of uncollectible customer debt off Refco's books by shifting it into the RGHI Receivable.

90.     RGHI did not, however, have the ability to pay off the RGHI Receivable. RGHI's primary asset was its stock ownership of Refco, the inflated value of which hinged on the Refco Insiders' ability to conceal the very losses they were shifting off of Refco's books and onto RGHI.

### b.    <u>Concealing Refco Operating Expenses</u>

91.     In addition to hiding customer losses, in order to foster the illusion that Refco was in healthy financial condition and a good prospect for a lucrative buy-out or sale, the Refco Insiders also hid over a hundred million dollars of Refco expenses and other transactions by

transferring them to RGHI, thereby fraudulently increasing Refco's apparent profits.  Although the expenses were incurred by numerous Refco entities and paid by Refco, they were transferred to the RGHI Receivable.

92.     Through this scheme, millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses, and millions more in payroll and outside professional expenses, were concealed.

       **c.**      **<u>Hiding the RGHI Receivable</u>**

93.     The multi-hundred million dollar RGHI Receivable was a related-party obligation that was required to be disclosed in Refco's financial statements.  To conceal the magnitude and related-party nature of the RGHI Receivable on these financial statements, the Refco Insiders came up with a remarkably simple scheme that was known to Mayer Brown, who negotiated and prepared the documentation necessary to conceal the transactions, and Grant Thornton, who repeatedly audited these atypical transactions initiated just before, and unwound just after, the close of the financial reporting periods.

94.     The scheme involved implementing a series of Round Trip Loan transactions ("RTLs") at the end of each fiscal year (and also, starting just before the LBO, at the end of fiscal reporting quarters) to temporarily pay down the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco.

95.     Hiding the related-party debt in this manner allowed Refco to avoid disclosing its massive trading losses and/or writing off the hundreds of millions of dollars in losses, thereby concealing Refco's true financial condition.  This, in turn, allowed the Refco Insiders to overstate Refco's financial condition and related operating results, understate its operating expenses, and fraudulently continue to project to the public a false impression of financial health

and strength—falsely securing customer confidence and ensuring continued deposits of cash and securities from RCM customers.

96.     While some of the trading losses were permanently parked at RGHI, others were held at Refco and only moved off Refco's books and transferred into the RGHI Receivable just prior to reporting and auditing periods.  Aside from the irregularity of transferring losses off of Refco's books merely days before a reporting period, large intercompany receivables owed to Refco by a related-party (RGHI) were required to be disclosed on Refco's financial statements and would have invited scrutiny and skepticism.  The Refco Insiders, with the active assistance of the Professional Defendants, devised the RTLs to conceal the massive related-party receivable.

97.     Thus, at the end of every relevant reporting period, a Refco entity would extend a "loan" for an amount up to $720 million to a third party with no apparent relation to Bennett or RGHI and without sufficient collateral to support the loan.  That third-party ("the RTL Participant") would then "loan" the same amount to RGHI.  The RTL was completed when RGHI used the "loan" from the RTL Participant to pay down the debt it owed to Refco.  Thus, on Refco's financial statements, the RGHI Receivable was transformed into a loan owed to Refco from an unrelated third-party.

98.     Right after the start of each new reporting period, the RTL was "unwound" by reversing the entire process.  RGHI would record a new "loan" from Refco, thereby restoring the RGHI Receivable.  Those funds were then transferred to the RTL Participant as repayment for its earlier "loan" to RGHI, and the RTL Participant in turn transferred those funds to Refco in satisfaction of its own "loan" from Refco.

99.     This "unwinding" process, like the initial execution of each RTL, often occurred only on paper; no actual transfers occurred other than the payment of fees to third-party RTL Participants.  For agreeing to participate in the RTLs, the RTL Participants received payment of the "spread" between the interest rates of the two "loans."  The Refco Insiders generally caused RCM to make these payments, even though RCM obtained no benefit from the RTLs.

100.    In addition, from 2000 through 2005, Refco engaged in approximately 12 wire transfer RTLs with, among others, longtime Refco customer Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG").  Like the other RTLs, the wire transfer RTLs involved transfers in late February, with those transactions subsequently reversed in early March.  Altogether, these fraudulent RTLs occurred at least 30 times from 2000 through 2005, at the end of financial reporting periods, and were unwound a few days into the new reporting period.

101.    Through these RTL transactions, the Refco Insiders "made disappear" all but a fraction of the RGHI Receivable in Refco's financial statements up through 2003 and made the RGHI Receivable altogether disappear in the financial statements issued just prior to the LBO and thereafter.

102.    The RGHI Receivable and the RTLs enabled Refco to hide its true financial picture from the public and to continue to present itself as a financially healthy company for which a lucrative cashing-out was appropriate and RCM as a viable, solvent, broker-dealer to which customers could safely entrust their cash and securities for the specific, limited purpose of conducting securities, FX, and other transactions pursuant to their instructions.

103.    Aware that RGHI owed hundreds of millions to Refco that was uncollectable and undisclosed, Collins and Mayer Brown knew that Refco was unfit for the lucrative cashing-out

of the Refco Insiders.  Mayer Brown, nonetheless, concealed the RGHI Receivable and allowed the Refco Insiders to effectuate their cashing-out scheme, despite knowing that it would foreclose repayment of the amounts owed to RCM

### d.      Inflating RGL's Revenues with Phantom Income and Commissions

104.    The Refco Insiders also fraudulently inflated RGL's revenues by recording interest income associated with the fraudulent RGHI Receivable, charging as much as 35% at times.

105.    In addition, the Refco Insiders caused fictitious trades in RGHI's account at RCM for the purpose of creating a phantom "gain" at RGHI and corresponding phantom "income" for RCM.  For example, through 2004 and 2005, RGHI conducted fictitious trades in United States Treasury Bonds, buying bonds and selling them at a gain the same day.  In this manner, the Refco Insiders manufactured millions of dollars of fake "income" for RCM's parent corporation.

106.    The extent of this fictitious interest income was more than simply material—between 1999 and 2005, as set forth below, the fictional interest income on the RGHI Receivable accounted for 50% or more of the consolidated net income Refco reported in its financial statements:

| Year | Net income according to audited financials | Estimated Fictitious income interest associated with RGHI receivable |
|---|---|---|
| 1998 | $28,179,000 | $9,005,428 |
| 1999 | $20,120,000 | $23,703,745 |
| 2000 | $45,321,000 | $46,056,543 |
| 2001 | $74,494,000 | $61,871,190 |
| 2002 | $100,296,000 | $67,366,698 |
| 2003 | $140,119,000 | $83,598,516 |
| 2004 | $187,156,000 | $97,584,970 |
| 2005 | $176,287,000 | $66,963,261 |
| **TOTAL** | **$771,972,000** | **$456,150,351** |

e.    **The Critical Role the FX Customer Funds Played in the Cashing-Out Scheme**

107.    As Refco, in fact, made considerably less net income than it purported to, and had tens of millions in additional expenses that were being booked at RGHI, the Refco Insiders needed a source of liquidity with which to fund Refco's ongoing cash needs so as to conceal Refco's true precarious financial condition and effect the lucrative cashing-out they desired.

108.    Other than RCM, Refco had two operating entities: RSL and Refco LLC.  These two entities could not serve as a source of funds for the Refco Insiders' cashing-out scheme as they were subject to capital adequacy requirements that required them to maintain regulatory capital surplus amounts on hand at all times and regulations that placed very substantial restrictions on the amount of cash they could transfer to affiliates.

109.    As the Refco Insiders could not take funds from RSL or Refco LLC without tipping off regulators and bringing their fraudulent scheme to light, the Refco Insiders were thereby forced to fund Refco's expenses and operations with RCM customer funds, essentially replacing hundreds of millions of dollars of fictitious income with customer funds that had been entrusted to RCM for the specific, limited purpose of engaging in FX and securities trades.  As discussed below, however, the Refco Insiders and Professional Defendants knew that these same restrictions should also have been imposed on RCM following its repatriation in January 2002.

110.    In addition to hundreds of millions of dollars in operating items, the Refco Insiders also used RCM customer assets to fund various acquisitions and other cash needs necessary to effectuate the cashing-out scheme.  These cash outlays, which had nothing whatsoever to do with RCM's business and amounted to a mere dissipation of RCM customer funds, including the FX Customer funds, included, among other things:

- LBO Dividend:  As part of the LBO, Refco claimed it would distribute a $500 million dividend of "excess cash."  In truth, the $500 million of alleged surplus cash on hand was a fiction—$390 million of the $500 "dividend" were the proceeds of an "overdraft" or "loan" from BAWAG to RGHI and the other $110 million were customer assets improperly taken from RCM.

- Repayment of LBO Debt:  In connection with the LBO, Refco entered into senior credit facilities consisting of a $75 million revolving credit facility and an $800 million term loan facility. On January 24, 2005, Refco voluntarily prepaid $150 million of borrowings under the term loan facility, and available borrowings thereunder were reduced to $648 million.  Refco used RCM customer funds to make this $150 million paydown.

- Suffolk Loans:  In March 2005, Refco entered into a loan agreement with the Suffolk Entities (comprised of Suffolk LLC, Suffolk MKK LLC, Suffolk MK LLC and Suffolk SUG LLC) to lend $208 million.  Suffolk used $204 million of this facility to purchase the shares of an entity named PlusFunds Group Inc. ("PlusFunds").  Refco funded this $204 million loan with RCM customer funds. The PlusFunds shares, however, were practically worthless when acquired.

- Cargill:  On June 21, 2005, Refco agreed to purchase certain subsidiaries of Cargill, including the entity that held Cargill's FX customer accounts.  On August 31, 2005, just prior to close, Refco used $200 million in Refco customer funds to pay for this acquisition.

### f.    The Magnitude of These Transfers Was Hidden by Fraud

111.    As discussed, these transfers of customer funds from RCM to RCC and other Refco entities were fraudulently accounted for as "loans" purportedly made by RCM to "customers."   In order to support this fiction, RCM issued fraudulent "customer account statements" to RCC, RSL, and other Refco affiliates to which it transferred RCM customer funds.  The account statements showed the substantial amounts of indebtedness and interest that the entities owed to RCM.  RCM then fraudulently mischaracterized these affiliate "loans" on its books as "customer receivables."

112.    However, as the Professional Defendants knew, these Refco affiliates were not RCM "customers" in any legitimate sense.  None was evaluated for creditworthiness or risk, as was required of RCM customers in the normal course.  Nor did the debts arise from securities or

foreign exchange transactions, which were the ostensible businesses in which RCM was engaged.

113.   The debts in question arose from improper, undisclosed, unsecured, and uncollateralized transfers made by RCM to related parties, at the direction of the Refco Insiders, without consideration, without any analysis of the creditworthiness of the supposed "borrowers" or of the risks of the transactions, without proper documentation or corporate formalities, and without disclosure to RCM's customers, including the FX Customers.  Nor were the recipient Refco affiliates required to post collateral or margin.

114.   The loans were not collateralized with marketable securities, as were the loans that RCM made to customers in the normal course.  Moreover, these purported "loans" were uncollectible because the Refco affiliates to which the "loans" were made lacked the financial wherewithal to repay them as a result of the Refco Insiders' cashing-out scheme.

115.   These transfers served no legitimate business purpose for RCM or the FX Customers.  As noted, RCM received no margin, collateral, or security, and the loans were improperly and fraudulently documented.  RCM did not even receive security interests in any of the assets purchased with the transferred funds.  The monies were simply transferred and dissipated to fund Refco's general operations, acquisitions, and the Refco Insiders' other cash needs in effectuating their cashing-out scheme.

**The Refco Insiders' Cashing-Out Scheme Altogether Foreclosed Repayment of the FX Customer Funds**

116.   As a result of the Refco Insiders' fraud, there was over $450 million in reported net interest income accruing on the RGHI Receivable that RGHI did not (and could not) pay and that was therefore unavailable to repay the amounts owed to RCM.

117.    Had the RGHI Receivable or Refco's true income been disclosed the Refco Insiders would have been unable to pursue their cashing-out scheme, RCM would not have been reduced to a mere ponzi scheme, and RCM's customers, including the FX Customers, would not have had their assets misappropriated, converted, and wasted.

118.    Whatever limited ability Refco had to repay the amounts owed to RCM prior to the LBO, consummation of the Refco Insiders' cashing-out scheme in the LBO entirely foreclosed repayment of the RCM customer funds to RCM's customers, including the FX Customers.

**The LBO's Destruction of RCM's Asset Value**

119.    By the time the Refco Insiders arrived at their big liquidity event—an LBO carried out in conjunction with Thomas H. Lee Partners ("THL")—the unauthorized "loans" by RCM of customer property had grown to over $1 billion and were continuing to increase as more and more customer funds were taken from RCM in exchange for undocumented, uncollateralized IOUs from affiliates.

120.    Meanwhile, the Refco Insiders, with the active assistance of both Mayer Brown and Grant Thornton, caused RGL (together with all of its domestic subsidiaries, including RCC) to borrow $1.4 billion of bank and bond debt, which was used to buy the interests of the Refco Insiders and those acting in active concert with them for approximately four times more than they were actually worth.

121.    Immediately before the LBO, the biggest creditor of RGL and its affiliates was RCM.  Even though this was well known to the Refco Insiders, Grant Thornton, and Mayer Brown, the Refco Insiders caused RGL to distribute the proceeds of the LBO debt to themselves, leaving RGL and its affiliates saddled with over $1 billion of new debt, from which RCM received no benefit.

122.     Not only were the LBO proceeds not used repay the amounts owed to RCM, but three quarters of these proceeds were entirely wasted (by paying Refco Insiders and those acting in concert with them approximately four times more than their interests were worth), but adding insult to injury, the $1.4 billion in debt that Refco assumed to fund this overpayment was senior in priority of repayment to the intercompany amounts owed to RCM and, given Refco's true net earnings, entirely foreclosed repayment of the amounts owed to RCM's customers, including the FX Customers.

123.     Nowhere, not in the Offering Circular for the LBO bonds nor any other disclosure, was it revealed that:  (i) RCM customer assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard to RCM's obligations to its customers; (ii) RCM's most significant assets were over $1 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; and (iii) the LBO transactions resulted in subordinating repayment of RCM to $1.4 billion of new bank and bond debt without regard to the interests of RCM.

124.     The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, so as to put cash in the pockets of the Refco Insiders and others, leaving the Refco entities without any assets to satisfy their obligations to RCM's customers, such as the FX Customers.

125.     Furthermore, as the Professional Defendants were aware, unlike the typical LBO participant, RGL went into the LBO with a billion dollars of concealed trading losses, misallocated operating expenses, phantom revenues, fictitious interest income, and another

unpaid billion dollars owing to RCM, consisting of the customer assets which had been misappropriated and converted to fund the Refco's Insiders' cashing-out scheme.

126.    Given Refco's true financial condition—and the devastating impact the concealed trading losses and hidden operational expenses would ultimately have on its business if properly recorded and disclosed in its financial statements—by effectuating their cashing-out scheme in the LBO, the Refco Insiders foreclosed return of RCM customer funds, including those of the FX Customers.

127.    The theft of RCM customer assets, including the FX Customers' assets, nonetheless continued unabated after the LBO, through, among other things, the acquisition of Cargill, and in fact increased during that period until Refco's bankruptcy filing.

**The IPO Further Damages Refco and RCM**

128.    RCM's ability to collect the amounts it had transferred to the other Refco entities was further undermined when, just one year after the LBO, the Refco Insiders, with the active participation and assistance of Grant Thornton and Mayer Brown, led Refco though an initial public offering of its stock.  In the IPO, Bennett sold approximately 7 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $146 million.

129.    The IPO was structured with the goal of allowing the Refco Insiders and others to cash out, as opposed to raising funds for Refco to repay the customer funds owed to RCM. Approximately $231 million in proceeds from the IPO were used to retire part of RGL's LBO debt—debt that had been incurred to overpay the Refco Insiders and those they were complicit with for their interests in Refco, rather than returning RCM customer funds to RCM.

130.    Approximately two months after consummation of the IPO, on October 10, 2005, the entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430

million receivable owed to Refco from RGHI.  Refco demanded repayment of the debt by Bennett, who instantly tried to pay down the RGHI Receivable using an emergency loan from BAWAG.

131.    In a press release issued that same day, Refco announced that it had discovered a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction.  As a result, Refco announced that "its financial statements, as of, for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

132.    Once the fraud was revealed, RCM customers demanded the return of their funds.  As these funds had been transferred to other Refco entities and dissipated in the Refco Insiders' cashing-out scheme, RCM had no means of returning these funds.

**Mayer Brown's Role in the Fraudulent Scheme**

133.    Mayer Brown was aware of (or, in the alternative, consciously avoided) every aspect of the Refco Insiders' cashing-out scheme, including the Refco Insiders' operation of RCM as a ponzi scheme which, by the below-described actions, Mayer Brown actively participated and substantially assisted in.

134.    Mayer Brown's relationship with Refco dates back to 1994, when Mayer Brown partner Joseph P. Collins, who has since been convicted for his role in the Refco Insiders' cashing-out scheme, brought the Refco account to Mayer Brown from his previous law firm.  Until October 2005, Mayer Brown was Refco's primary law firm, and Collins was Refco's primary outside legal counsel.

135.    At all relevant times, Collins and Mayer Brown understood that the Refco Insiders wished to effect a lucrative cashing-out of their interests in Refco.  For instance, as early as 1999, Mayer Brown helped analyze BAWAG's proposed purchase of a 20% voting share of Refco.  This was the first in a series of purchases Mayer Brown assisted in through which BAWAG acquired an increasing interest in Refco.  No later than the fall of 2003, Collins had discussions with CSFB, which Refco had retained as its sell-side advisor, concerning Bennett's desire to cash out his interests in Refco through an IPO.

136.    With bills, on average, of over $4 million a year, Refco was an extremely lucrative client for Mayer Brown, and as Collins's largest client, accounted for half of the billings for which Collins was responsible.  Between 1994 and October 2005, Mayer Brown provided a broad range of legal services to Refco—from representing Refco in SEC investigations, to drafting profit sharing plans for key executives, to advising Refco on corporate governance issues and United States and foreign regulations regarding its operations and activities, including the improper regulatory advise which allowed the Refco Insiders to operate RCM like a ponzi scheme, to drafting customer agreements, to providing Refco with tax advice, to leading financings for senior note and loan agreements, to negotiating the terms of and drafting the documents for the RTLs that concealed the RGHI Receivable, to providing various legal services in connection with the LBO and the IPO.

137.    As a result of the varied engagements Mayer Brown undertook on behalf of Refco, the firm became thoroughly familiar with the inner machinations of the company and the desires of the Refco Insiders to engage in a lucrative cashing-out of their interests in Refco.  The vast majority of important transactions and deals at Refco were cleared through Collins or the attorneys working under his direct supervision, and Collins was aware of the work that everyone

was doing on Refco matters by virtue of his review of the bills before they were submitted to Refco.

138.    As the Refco Examiner found and as confirmed by the trial and conviction of Collins, Mayer Brown was aware of Refco's fraud and aided and abetted it.  As discussed in more detail below:

- Mayer Brown was aware of Refco customer losses during the late 1990s through, among other things, its legal work helping Refco hide these losses by transferring them to RGHI.  Mayer Brown thus knew and/or consciously avoided knowledge of the existence of the RGHI Receivable as early as 1999, and by no later than July 2002, Mayer Brown knew that RGHI owed an intercompany debt to RGL of at least $700 million.

- Mayer Brown drafted virtually all of the RTL documents with respect to 18 separate transactions, negotiated the terms of the RTLs with the third-party RTL participants ("RTL Participants"), and fully understood the fraudulent nature of the RTLs.

- Mayer Brown knew that the Refco Insiders were using RCM customer funds to conceal Refco's true precarious financial condition.

- Mayer Brown knew that after RCM was repatriated to the U.S. in January 2002, RCM should have been treated as a regulated broker dealer, which would have foreclosed the lucrative cashing-out desired by the Refco Insiders.

139.    Mayer Brown's complicity in the Refco Insiders cashing-out scheme is further supported by Collins's conviction on July 11, 2009, after 32 days of trial, on two counts of securities fraud, two counts of wire fraud, and conspiracy for his role in connection with the Refco fraud.

**Mayer Brown Knew About Each Aspect of the Refco Insiders' Cashing-Out Scheme**

**a)     The RGHI Receivable**

140.    Starting in 1997, Mayer Brown provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco customers.  In each transaction, the "bad debts" were assigned to RGHI or related entities.  For example, in 1997, a

group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian currency crisis.  By 1998, these losses amounted to over a hundred million dollars.  Mayer Brown attorneys were involved in the resolution of Refco's claims against these customers, which debts later became part of the RGHI Receivable.

141.    In October 1997, a Refco customer named Victor Niederhoffer and several funds he controlled lost more than $90 million (the "Niederhoffer Loss").  Instead of disclosing the losses—which the Niederhoffer funds could not cover—Refco, with Mayer Brown's assistance, sold these accounts receivable to an RGHI subsidiary (Wells Ltd.).  These losses were subsequently added to the RGHI Receivable.  Because Mayer Brown was advising both Refco and RGHI during the relevant period, Mayer Brown was aware that Refco was using RGHI as a repository for bad debts incurred by Refco related to its customers.

142.    Mayer Brown continued to be aware of the magnitude of the RGHI Receivable. In a letter dated October 15, 1999, Bennett wrote to Collins to provide arguments to be used to support the apparent net worth of RGHI.  Bennett stated that RGHI's value was the value of its investment in RGL.  Collins, aware of the RGHI Receivable, jotted in his handwritten notes: "Minus loans to RGH[I]."  These handwritten notes show that Collins knew RGHI owed substantial amounts of money to RGL.

143.    Further evidence of Mayer Brown's knowledge of this undisclosed and unrecoverable receivable owed by RGHI to Refco can be found in the terms of a Proceeds Participation Agreement ("PPA") signed between Refco and BAWAG.  In 1999, BAWAG acquired a 10% interest in Refco.  Subsequently, BAWAG sought to further expand its stake in Refco, which took the form if the PPA in July 2002, in which a BAWAG subsidiary made payments to RGL in exchange for the right to participate in the proceeds of any sale of RGL.

144.     As a result of the 1999 and 2002 transactions, BAWAG was entitled to over 46% of the proceeds of any sale of RGL.  On June 11, 2002, in the course of preparing the PPA, Mayer Brown revised a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of intercompany debt of [RGHI]."  During this period, as Collins and Mayer Brown knew, Refco's audited financial statements, however, only reflected a receivable balance of $179 million.

145.     Indeed, no later than July 2002, Collins knew that the RGHI Receivable totaled at least $700 million.  In a July 17, 2002 letter to Refco, Refco's Tax adviser, Ernst and Young ("E&Y"), requested a representation from Refco's legal counsel that the intercompany payable between RGHI and RGL was enforceable.  After he received the letter, Trosten called Collins, explained that E&Y was "asking me for some representations regarding the balance between RGHI and RGL, which approximates $700 million or so."  Aware of the receivable, Collins did not question the existence or magnitude of the RGHI Receivable, which he knew to be half a billion dollars greater than publicly disclosed.

146.     By 2004, as a result of negotiations with counsel for Tom Dittmer ("Dittmer"), Refco's former Chairman and CEO, Collins came to learn that the RGHI Receivable had grown to over $1 billion.

147.     While Dittmer sold his interests in Refco in 1999, he was entitled to recover a percentage of the proceeds received for his interests upon the sale of Refco. When Bennett sold a portion of RGHI's interests in Refco in the LBO, Dittmer was entitled to a portion of the proceeds.  Bennett was not, however, prepared to pay Dittmer a share based on the inflated fraudulent valuation used to calculate the payout to the Refco Insiders, as it did not account for the RGHI Receivable.  To convince Dittmer that he was entitled to less, Bennett disclosed the

$1.1 billion magnitude of the RGHI Receivable to Dittmer and his attorney Earl Melamed ("Melamed").

148.     As Bennett was unwilling or unable to provide any verification of the $1.1 billion number, Melamed sought to negotiate a representation or warranty that the RGHI Receivable amounted to $1.1 billion.  In negotiating for this representation with Collins, Melamed and Collins specifically discussed the existence of the RGHI Receivable, that it was around $1.1 billion in size, and that it was "not really verifiable in any concrete way."  These conversations are corroborated by the handwritten notes of Collins, which indicate that in a July 12, 2004 conversation with Melamed, the two discussed a "debt of RGHI, $1 billion."

   b)     **The RTL Transactions**

149.     Not only was Mayer Brown aware of the true undisclosed magnitude of the RGHI Receivable, but it drafted and negotiated the fraudulent RTLs whose sole purpose was to hide its existence.  Indeed, over the course of five years, Mayer Brown drafted all of the documents for RTLs totaling billions of dollars.

150.     The first RTLs that Mayer Brown worked on occurred in February/March 2000. Collins and a colleague negotiated the terms of, and drafted the documents for, three RTLs involving a total of $310 million.  On or about February 1, 2000, Mayer Brown was approached by a Refco employee about the possibility of doing "back-to-back loans"—the first one a loan from RCM to CIM Ventures, a subsidiary of Ingram Micro, Inc., and the second one a loan from CIM Ventures to RGHI.  The loans were to take place just before the end of Refco's 2000 fiscal year, and be unwound just after the beginning of the next fiscal year.

151.     Although this loan structure—a structure whereby a loan was made at the close of a financial reporting period only to be unwound shortly after Refco's financial reporting and audit periods— was obviously illegitimate, Mayer Brown proceeded to prepare, edit, and review

documents for the CIM Ventures transaction, including loan documents, a guarantee by RGL of RGHI's repayment obligation, and an indemnification agreement by RGL in favor of CIM Ventures.  At the end of the process, Mayer Brown was in possession of RCM loan documents, RGHI loan documents, an RGL guarantee of RGHI's obligation, and an indemnity in favor of CIM Ventures—all signed by Bennett.

152.    After the February/March 2000 RTLs matured, Mayer Brown wrote to CIM Ventures, transmitting to them the original promissory note which it had signed in connection with the loans from RCM.  A Mayer Brown associate also played an active role in the transactions when he endorsed the notes as "paid in full" as the authorized agent of RCM.

153.    The following year, CIM Ventures agreed to participate in another RTL with RCM and RGHI (with RGL acting as guarantor), this time for $250 million.  Once again, Mayer Brown prepared all of the necessary deal documents, including loan agreements, guarantees, and indemnifications.  In early 2002, Ingram Micro was prepared to go forward with yet another RTL and sent a mark-up of the 2001 loan documents to Collins.  However, Ingram Micro developed second thoughts about engaging in the RTLs due to recent news about the Enron scandal, and backed out of the transaction.

154.    While fear of the Enron scandal was enough to give Ingram Micro second thoughts about engaging in these kinds of sham transactions, Mayer Brown was undeterred.  Over the next four years, Mayer Brown prepared the documentation for (and in many cases, negotiated) fourteen additional RTLs.  Significantly, the dollar values of the RTLs increased over time, soaring to as much as $720 million for one RTL in February/March 2004.

155.    Even more importantly, the frequency of the RTLs increased over time.  The RTLs took place every February/March through 2004, and then increased to every fiscal quarter-

end beginning in May/June 2004 when Refco began having to report its financial statements on a quarterly basis due to the closing of the 2004 LBO. And as Refco's main counsel, Mayer Brown knew full well that the RTLs were occurring only when Refco had to meet a financial reporting deadline.

156.    On their face, the RTLs had no legitimate business purpose.  They were uncollateralized, short-term, back-to-back loans involving the lending of hundreds of millions of dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL participants.  The transactions clearly lacked any economic substance and were inherently suspicious.

157.    The RTLs were even more suspicious because, as Mayer Brown was aware, Refco's bank financings contained covenants prohibiting Refco from incurring additional indebtedness, such as guaranteeing a third party's debts, beyond certain limits.  Mayer Brown knew these covenants existed because Mayer Brown had participated in the negotiation and drafting of the LBO financing documents.  Thus, by preparing the RTL documents, Mayer Brown assisted in transactions that it knew violated loan covenants in financing documents that Mayer Brown had previously negotiated and drafted.

158.    Mayer Brown was also fully aware that the Refco Insiders had incentives to manipulate Refco's financial statements.  For example, beginning in September 2003, Mayer Brown began to provide legal services to Refco in connection with what would ultimately become the LBO.  Having drafted Refco's executive compensation plan, Mayer Brown was aware that Refco executives stood to profit directly and considerably by the sale of the company, such as through an LBO.  The plan that Mayer Brown drafted (the "Profit Sharing Agreement"

or "PSA") provided certain Refco executives, including the Refco Insiders, with equity-like interests in RGL.

159.    Mayer Brown helped the Refco Insiders hide other debts as well.  For example, in late 1999 and early 2000, Mayer Brown was instrumental in hiding what Maggio perceived to be a $6.3 million "bad debt" (the "Deere Park Debit Balance") owed to Refco by a customer called Deere Park Capital ("Deere Park").  Maggio asked his advisor Mayer Brown to assist with the development of a transaction—the Minglewood scheme—that would conceal the Deere Park Debit Balance.

160.    Based on legal advice from Mayer Brown, the parties created a joint venture called Minglewood Investments LLC to which Deere Park contributed certain worthless or highly speculative securities and $2 million in cash, while Refco contributed the Deere Park Debit Balance.  As Maggio admitted to one of Deere Park's principals, the Refco Insiders had Refco enter into this joint venture to avoid having to write off the Deere Park Debit Balance.

161.    Under the terms of the agreement drafted by Mayer Brown, the $6.3 million debit balance was converted into a note that would only be payable from profits Minglewood Investments LLC earned on its securities, and would convert to a zero balance—in other words, disappear—after a set time period.  As Mayer Brown understood, the entire purpose and effect of the Minglewood transaction was to hide the $6.3 million debt from Refco's financial statements. A Deere Park principal has testified under oath to having had conversations with a Mayer Brown attorney regarding the fact that Refco was entering into the Minglewood transaction so that it would not have to write off a receivable.

c)    **Misappropriation and Conversion of RCM Customer Funds**

162.    Mayer Brown was also aware that Refco was utilizing RCM customer funds in ways not permitted by the relevant customer agreements which, as Refco's longtime outside

counsel on regulatory and other matters, Collins would have drafted or reviewed, and which Mayer Brown therefore knew or should have known did not permit customer funds to be dissipated and converted as alleged herein in support of the Refco Insiders' fraudulent scheme.

163.    Collins became aware of Refco's propensity for improperly siphoning customer assets as early as 1993.  At that time, the CFTC subpoenaed Maggio in connection with an "investment program" between Refco and one of its regulated subsidiaries.  The purpose of this investment program was to siphon money out from customer segregated accounts to fund Refco's operations in violation of CFTC regulations.

164.    In connection with Maggio's deposition, Bennett told Maggio that Collins would represent him, and that Maggio could be completely honest with Collins.  Accordingly, during his deposition preparation, Maggio told Collins in detail exactly how the investment program worked, including that fraudulent bank statements were prepared to hide the fact that the appropriate amount of customer segregated funds were not in Refco's accounts.

165.    Mayer Brown also provided regulatory advice essential to maintaining Refco's access to RCM customer assets. At various times, beginning in October 1996, Refco desired to close down RCM's Bermuda operations and to "repatriate" RCM to the United States.  This was actually accomplished in January 2002.  Federal regulations, however, would have required RCM to segregate customer cash, thereby eliminating the Refco Insiders' access to a large portion of the customer funds they were misappropriating.

166.    To ensure this did not happen, Refco enlisted the assistance of Mayer Brown, which advised RCM on the implications of repatriating to the United States.  In the course of providing this advice and as reflected in, among other things, a June 24, 2002, Mayer Brown memorandum, Mayer Brown became intimately familiar with the business and operations of

RCM through discussions with Maggio and others.  In the course of these discussions, Collins learned from Maggio that Refco needed to book the business offshore "because [Refco] will have capital issues and [Refco] need[s] to have access to the customer funds" despite needing the people to be physically present in the United States.

167.    In connection with the repatriation of RCM's Bermuda operations to the United States, Mayer Brown advised RCM on, among other things, ways to structure its business so as to attempt to avoid being treated as a regulated broker-dealer subject to, *inter alia*, segregation requirements imposed by United States law.  As Collins knew, if RCM had been registered with the SEC and become subject to numerous SEC regulations and additional accounting requirements, the Refco Insiders' cashing-out scheme would have ceased and their fraud would have come to light as RCM, like RSL and Refco LLC, would have become subject to capital adequacy and segregation requirements and would have been prevented from hypothecating its customers securities or upstreaming those funds.

168.    Though permitting RCM to remain unregulated, Mayer Brown was fully aware that RCM should have been treated as a registered broker-dealer with the SEC at all times after January 2002, when, as Mayer Brown knew, all of RCM's operations were repatriated to the United States.

169.    That Collins and Mayer Brown knew this to be the case is evident from a June 24, 2002 memo Collins wrote to "file" in which he recognized that "it is a closer question whether the Emerging Market Debt Trading [i.e. RCM's role as a broker-dealer in emerging market securities] would be subject to SEC jurisdiction."  Collins goes on to conclude that the "SEC might assert jurisdiction over these RCM activities *if they are principally conducted from a U.S. location* . . . [and that] [i]t may be prudent, therefore, for RCM to cease its Emerging Market

Debt Trading and transfer existing options, equity and convertible trading clients to Refco's registered securities broker and dealer, RSL."

170.    Aware that the Refco Insiders needed to continue to use RCM's customer securities, as well as the funds of its FX customers, Collins, however, did nothing to stop RCM from falsely acting as an unregistered broker-dealer despite knowing that RCM's operations were being conducted exclusively in the United States after January 2002.

171.    For instance, Mayer Brown was again confronted with Refco's upstreaming of RCM's customer assets in early 2003 in connection with an SEC investigation concerning unlawful short sales.  In the course of this investigation, Refco's General Counsel, Dennis Klejna ("Klejna"), expressed concern to Maggio that the RCM business was being physically conducted in the United States, but being booked overseas.  Maggio, worried that if Klejna knew the truth he would force the entries to be properly booked and eliminate Refco's access to these RCM Customer funds, went to Bennett.  Bennett again reassured Maggio that they could trust Collins with the truth, so Maggio again reached out to Collins.

172.    Maggio told Collins that Klejna "doesn't understand the reason why we have to conduct [RCM] business offshore," and that Refco could not post capital without access to these customer funds.  After Maggio explained the upstreaming of the cash and its purpose, Collins created a set of purported guidelines that would allow Refco to continue to operate RCM as an unregulated ponzi scheme, booking the business offshore, so that Refco would have access to the customer accounts, free from the scrutiny of any regulator.

173.    Collins knew that even putting aside the fraudulent purpose for which the upstreaming of RCM customer assets was being effected, these guidelines were questionable at

best and would be unlikely to pass regulatory scrutiny, but he believed that they would be sufficient to pacify Klejna.

174.    In connection with providing RCM with regulatory advice and working on various aspects of the LBO and IPO, upon information and belief, Collins and Mayer Brown came to learn of the magnitude of RCM customer assets that had been improperly transferred to RCC and other Refco entities.

175.    In June 2004, in connection with a discussion of financial covenants for a Credit Agreement with Refco Finance Holdings LLC as Borrower, questions were raised concerning Refco's "average cash on hand."  One phrase used in connection with this discussion was "house cash," which Mayer Brown characterized as "a difficult concept."  In response to a question regarding whether it would be feasible to have Grant Thornton provide a better explanation in future quarterly filings of the composition of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," Mayer Brown, fully aware that Refco was using RCM customer cash as its own, stated emphatically, "No!!  Impossible to breakout."

176.    Mayer Brown's knowledge of and participation in the upstreaming of RCM customer assets is also demonstrated by an email from Thomas Yorke to Joseph Collins in January 2005.   In those emails, Yorke sought advice from Mayer Brown on impending regulatory changes that "could mean an extremely large asset transfer away from RCM" and on how to avoid the potential impact of those changes and how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities.

177.    As Mayer Brown was aware, the reason that Yorke wanted to minimize any transfer of cash from RCM customer accounts to customer accounts at other Refco entities was

that Refco treated the cash in customer accounts at RCM as available to fund Refco's operations and would not be able to treat cash in customer accounts held at other Refco entities as available for this purpose.  Mayer Brown's proposed solutions included to "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

178.    That Collins and Mayer Brown always knew that RCM should have acted as a registered broker-dealer upon its repatriation to the United States in January 2002 is evident from a Mayer Brown memo dated October 11, 2005 (just as the massive fraud at Refco was unraveling).  In this memo, Mayer Brown notes and advises Refco that:

a)      RCM's activities were conducted by RSL and not by RCM, and RCM had no personnel available to look out for the legitimate interests of RCM's customers;

b)      "RCM no longer maintains any personnel or operations in Bermuda and . . . all of its functions and operations are performed by RSL personnel that are located in the United States;"

c)      while assets in RCM customer accounts were "carried on the books of RCM," those assets were in fact not held by RCM;

d)      RCM was engaging in "significant" conduct in the United States and, with Mayer Brown's knowledge and advice, had structured its activities with an intent to "avoid U.S. regulatory requirements" and could not properly claim to be exempt from the regulatory requirements of United States law; and

e)      RCM was not in fact a "foreign broker-dealer;" and

f) "certain aspects of RCM's operations likely **_do_** fall within the reach of the federal securities laws. . . . [and that] RCM [should] consider terminating its securities related activities and transfer its securities trading operations and customers to RSL."

179. The fact that Mayer Brown was preparing such a memorandum in October 2005, at precisely the same time as the public disclosure of the massive fraud at Refco, is inherently suspicious. By preparing to advise RCM that it should consider a fundamental change in the way it conducted its business after the fraud had already been disclosed and RCM had been effectively shut down, Mayer Brown was simply trying to paper the file, cover its tracks, and create the appearance after the fact that it had rendered appropriate, objective advice to RCM when in fact Mayer Brown had been intimately involved in advising RCM on RCM's earlier repatriation from Bermuda to the United States at a time when the law was no different than it was in October 2005. Indeed, all of the authorities cited in that draft Mayer Brown memorandum pre-dated the advice rendered by Mayer Brown in 2001 and 2002 with respect to RCM's repatriation.

**Mayer Brown's Involvement in the LBO**

180. Mayer Brown also played an integral role in the LBO process. It reviewed due diligence and corporate documents that were to be provided to THL and its counsel, Weil Gotshal. Mayer Brown also drafted and negotiated the Equity Purchase and Merger Agreement ("Merger Agreement"), the LBO's operative document. In particular, the Merger Agreement represented that there were no undisclosed related-party loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million.

181. This representation was false, and Mayer Brown knew that the guarantee requirement would immediately be breached. There were, in fact, massive related-party loans

between Refco and RGHI that had not been disclosed, but rather had been temporarily hidden by the RTL scheme that Mayer Brown had been effectuating.  Moreover, at the very same time Mayer Brown was reviewing these provisions in the Merger Agreement, Mayer Brown was also preparing documents for a $720 million RTL in which a Refco entity, RGL, was guaranteeing the debt.

182.    In fact, Collins repeatedly met with THL's attorneys and made representations that there were no undisclosed transactions between Refco and RGHI; while at the same time other Mayer Brown attorneys were preparing a $700 million RTL between Refco, RGHI and a third-party.  Indeed, Mayer Brown caused four sets of RTLs to occur during the time period THL was performing due diligence on Refco.  Collins himself admitted at his criminal trial that "the [RTLs] should have been disclosed under the related party transactions provision of the equity purchase and merger agreement."

183.    Moreover, despite knowing the terms of the Merger Agreement required disclosure of BAWAG's 46% interest in the company acquired via the PPA, Mayer Brown actively hid its existence.  From discussions with John Sullivan, an attorney for BAWAG, Mayer Brown knew that disclosure of the PPA would drive down the sale price and reveal that the RGHI Receivable was far in excess of the amount disclosed on Refco's audited financial statements, effectively scuttling the LBO.

184.    Accordingly, when Collins had conversations in March 2004 with Jay Tabor, an attorney at Weil Gotshal, in which Tabor specifically asked if there were additional agreements between Refco and BAWAG, Collins remained silent.  Mayer Brown then actively assisted Bennett and Maggio in deceiving THL and others by preparing a fraudulent version of the 4th

Amended LLC Agreement of RGL, which eliminated any reference to the interests BAWAG acquired via the PPA.

185.    Nor did Mayer Brown disclose the existence of the RGHI Receivable during its review of the LBO Offering Circular and its issuance of a legal opinion making representations in connection with the LBO.  As Mayer Brown knew, the Offering Circular: (a) did not mention the existence of RTLs; (b) falsely stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004, purportedly retiring the full receivable owed by RGHI to Refco; (c) did not disclose the guaranty—that Mayer Brown itself had prepared—to a RTL participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) did not disclose that the LBO would render the customer assets transferred by RCM to RCC and other Refco entities unrecoverable.

186.    Mayer Brown was thus intimately involved in every aspect of the LBO; from the earliest stages of diligence, to preparing the core deal documents, to effectuating the RTLs that made Refco appear to be an attractive acquisition, to not disclosing the existence of the RTLs or PPA when prompted, to counterfeiting corporate documents to eliminate evidence of the PPA. Its assistance was more than substantial—it was invaluable to the Refco Insiders' cashing-out scheme.

**Mayer Brown's Conduct Leading up to the IPO**

187.    After the LBO, Mayer Brown continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, $550 million in December 2004, $345 million in February 2005, and $450 million in May 2005).  In addition, Mayer Brown continued to receive and respond to periodic requests for audit response letters—keyed to Refco's fiscal quarters that ended in the same months as the RTLs.

188.   At the same time, despite knowing that the Refco Insiders were causing RCM to misappropriate, convert, and transfer its customers' assets to other Refco entities that were using them with no prospect for their repayment, Mayer Brown substantially assisted Refco in acquiring certain subsidiaries of Cargill in September 2005, so as to allow hundreds of millions of dollars in customer deposits to flow to RCM, which Refco then upstreamed and utilized in the Refco Insiders' fraudulent scheme.   Ironically, having no other source of funds for the acquisition, Bennett used $200 million in RCM customer funds to pay for the Cargill acquisition.

189.   In April 2005, Collins drafted a memorandum to Bennett describing the structure of the transaction, including the acquisition of Cargill's FX operations.   Yet Cargill soon determined that Mayer Brown, Refco's longtime outside counsel, had also provided legal advice and representation to Cargill.   Therefore, Mayer Brown had a conflict representing Refco in the transaction and sought and successfully obtained a waiver from Refco and Cargill whereby Mayer Brown was to represent only Refco in the Cargill transaction.

190.   Although a conflicts screening memo was distributed within Mayer Brown to create an ethical wall to separate the team working for Refco from the team that represented Cargill in other matters, Collins and other Mayer Brown attorneys that represented Cargill collaborated on the transaction and failed to honor the ethical wall required by the waiver.

191.   Mayer Brown proceeded to continue to effectively work for both Cargill and Refco and arranged for the transfer of hundreds of millions of dollars of FX Customer funds to RCM that Collins knew Bennett and Maggio would immediately misappropriate and convert as part of their cashing-out scheme.

192.   Mayer Brown was the primary negotiator and drafter for the Cargill acquisition. Mayer Brown prepared and reviewed each of the deal documents, ensuring the acquisition would

take place and that the FX customer funds at Cargill would be transferred and made available to the Refco Insiders to perpetuate their cashing-out scheme.

193.     Mayer Brown's assistance in effectuating the Cargill transaction also extended to helping Cargill obtain consents on behalf of certain of its customers to assign their FX customer agreements with Cargill to RCM.  Such consents were not obtained directly from the customer, but instead from a subsidiary of Cargill that purported to represent the customers' interests. Mayer Brown, outwardly representing Refco, while all along using its special relationship with Cargill to the disadvantage of Cargill's FX customers, facilitated the transfer of FX customer funds to RCM.

194.     Mayer Brown thereby ensured that the Refco Insiders would have access to the Cargill FX customer funds.  For instance, on or about August 4, 2005, Mayer Brown instructed Cargill to execute a consent letter on behalf of JWH Global Trust.  Likewise, on or about August 11, 2005, Mayer Brown sent similar letters to Cargill to execute on behalf of the IDS Managed Funds.  As Mayer Brown did not disclose that RCM was being operated as a ponzi scheme, Cargill provided the requested consents, and the Refco Insiders were able to take possession of these customer funds and use them to perpetuate in the fraudulent scheme.

195.     Following the LBO, Mayer Brown was involved in both Refco's registration of the Senior Subordinated Notes (utilizing  United States Securities and Exchange Commission ("SEC") Form S-4, ("S-4")) so that they could become publicly traded, and in preparing Refco's IPO prospectus (utilizing SEC Form S-1 ("S-1") (the S-4 and S-1 collectively ("SEC Filings").  The process by which Refco submitted its SEC Filings required a constant dialogue with the SEC and numerous amendments to each form.  Mayer Brown actively participated in this

process, reviewing the SEC Filings and the SEC's comments thereto.  Indeed, Mayer Brown is listed as counsel to Refco in Refco's S-1.

196.    During the time frame between Refco's LBO and IPO, Collins regularly spoke with Bennett regarding due diligence meetings and concerns, and attended meetings regarding the Senior Subordinated Notes.  At the same time, other Mayer Brown attorneys were continuing to effectuate the RTLs, performing the transactions in August 2004, November 2004, December 2004, February 2005, and May 2005, keeping Collins abreast of their work.

197.    In August 2005, Collins and a Mayer Brown associate worked on and circulated the auditor update for Refco's S-1.  Despite the fact that the S-1 contained the same false and misleading statements as the Offering Circular to the LBO, at no time did Mayer Brown seek to correct those representations or inform anyone else of them.

198.    In late August 2005, after the IPO was completed, Mayer Brown assisted Refco in engaging in yet another $420 million RTL designed to cover the existence of the RGHI Receivable.

*     *     *     *     *

199.    Given its intimate knowledge of the RGHI Receivable and Refco's regulatory requirements, Collins and Mayer Brown understood that the Refco Insiders' cashing-out scheme required a continuous infusion of cash that could only be provided by RCM, which Mayer Brown was enabling the Refco Insiders to operate as a purportedly unregulated broker-dealer, despite the fact that all of RCM's operations were conducted in the United States.  Despite knowing that the Refco Insiders were concealing the RGHI Receivable and Refco's true financial condition, and that the Refco Insiders' cashing-out scheme would render the RCM

customer funds unrecoverable, Mayer Brown facilitated the cashing-out scheme, including the misappropriation and conversion of the FX Customer funds, to continue unabated.

### Grant Thornton's Role in the Fraudulent Scheme

200.    This was not a case of an auditor overlooking a few details.  Grant Thornton was fully aware of and complicit in every step of the Refco Insiders' fraudulent cashing-out scheme: the RGHI Receivable, the RTLs used to hide it, the Refco Insiders' misappropriation and conversion of FX Customer assets and the complete inability, after the LBO, of the other Refco entities to return to RCM the billions in customer funds that had been transferred from it.

201.    After Grant Thornton took over the Refco engagement from Arthur Anderson in 2002, it provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005 and re-audited Refco's 2002 financial statements.

202.    At all relevant times, Grant Thornton served as the purportedly independent auditor of RGL and its affiliates, not just on a consolidated basis, but also for Refco subsidiaries, including RCM, on a stand-alone basis.  Grant Thornton did not audit RGL's parent entity, RGHI, which was not part of the consolidated group.

203.    Based on Grant Thornton's audits, it had a complete picture of the finances, operations and business of both RCM and the other Refco entities and had access to all material information concerning the transfers of FX Customer assets and the hundreds of millions of dollars in uncollectible debt that RCC and other Refco entities owed to RCM, which amounts Grant Thornton knew belonged to RCM's customers.

204.    As Refco's auditor, Grant Thornton had the responsibility to obtain sufficient, competent evidence regarding Refco's intercompany transactions, including those concerning related-party transactions with RGHI.  Pursuant to auditing guidelines (such as AU Section 334,

*Related Parties*), Grant Thornton was required to undertake audit procedures necessary "to obtain satisfaction concerning the purpose, nature, and extent of [related party] transactions and their effect on the financial statements."  Despite having access to all relevant information, Grant Thornton failed to perform <u>any</u> substantive audit procedures in regard to the RGHI Receivable and instead looked the other way so as to allow the Refco Insiders to effect their cashing-out scheme.

205.    Grant Thornton knew clean audit opinions were essential to Refco's continued functioning.  Had Grant Thornton ever truly scrutinized the RGHI Receivable, the RTLs or RCM's transfers of billions of dollars in customer funds to other Refco entities with no promise or prospect or repayment and insisted on accurate consolidated and RCM financial statements or qualified their audit opinions, the entire fraudulent cashing-out scheme (including the Refco Insiders' operation of RCM as a ponzi scheme) would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005.

206.    In each of its audits for Refco and its affiliated entities, Grant Thornton violated and ignored minimum acceptable standards of professional conduct, including but not limited to Generally Accepted Auditing Standards ("GAAS"), and failed to ensure that Refco's financials were consistent with Generally Accepted Accounting Principles ("GAAP").

207.    As is underscored by the fraud being uncovered by a new RCM Controller who had been on the job for less than two months, audits performed with even a negligible degree of diligence and professional skepticism would have uncovered the fraudulent scheme alleged herein.

208.     It is a bedrock tenet of auditing standards that an auditor is not permitted to accept unsubstantiated corporate assurances at face value and must approach an audit with professional skepticism and with an independence in mental attitude.   As set forth in controlling GAAS guidance (AU Section 230, *Due Professional Care in the Performance of Work*) in exercising professional skepticism, the auditor cannot rely on "less than persuasive evidence because of a belief that management is honest."   Without such skepticism, an auditor is transformed from a critical and necessary independent evaluator of a company's financial condition to a rubber stamp and a mere agent of corrupt members of a company's management, as happened here.

209.     The lead partner on the engagement at both Arthur Anderson ("AA") (Refco's auditor until that entity collapsed due to its involvement in the Enron scandal) and Grant Thornton was Mark Ramler ("Ramler").   Throughout his tenure both at AA and at Grant Thornton, Ramler acted merely as the Refco Insiders' agent, consistently failing to act with the requisite degree of professional skepticism.   Ramler not only took Bennett and other Refco employees at their word—he personally vouched for their trustworthiness and veracity.

210.     Ramler's motivation for doing so was obvious: Refco was an extremely valuable account, and keeping the account through a successful IPO would constitute a coup both for Grant Thornton and for Ramler.   As a result, despite its first-hand knowledge of the fraud and Bennett's fraudulent motives, Grant Thornton completely abandoned its obligations of independence and deliberately refrained from performing even the simplest audit procedures on any aspect of the Refco Insiders' cashing-out scheme.

211.     In a conscious attempt to maintain the illusion that Refco was financially sound so as to allow the Refco Insiders to effectuate their lucrative cashing-out including the misappropriation and conversion of FX customer funds, Grant Thornton repeatedly issued

unqualified audit opinions despite failing to conduct any meaningful examination of one of the most basic audit areas—the existence, business purpose, magnitude, terms and collectability of intercompany and related-party transactions as required by AU Section 334 and other controlling GAAS guidance.

**Grant Thornton's Knowledge of the Refco Insiders' Desire to Cash Out**

212.    AA performed annual audits of Refco from the late 1980s through the 2002 fiscal year, and, from the mid-1990s onward, Ramler was the lead auditor and had become, like Collins, one of the Refco Insiders' trusted advisors.

213.    Indeed, while at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without getting his advice. Ramler also bragged that Bennett and other senior Refco management called him on an almost daily basis to discuss transactions and business issues.

214.    Long before he left AA, Ramler knew that Bennett wanted to bolster the market's perception of Refco's financial condition so that he and the other Refco Insiders could cash out their interests.  At a May 12, 1998 status meeting, for example, Bennett informed Ramler that he "intended to restructure Refco over the next 3-10 years as the shareholders would eventually want to liquidate their positions."

215.    Ramler knew at all relevant times that Bennett's stated intentions posed serious audit risks.  For instance, in a 1998 "Fraud Risk Assessment" worksheet, AA noted that as a result of Bennett's plans "there is a risk that profits could be inflated to attract a higher selling price."  Despite AA's acknowledgement that the Refco Insiders' planned exit strategy posed real audit risks, Ramler made no modifications to AA's audit plan.

216.    Not only did Ramler know that Bennett and the other Refco Insiders had a motive to commit fraud, he understood that there was a serious risk of such fraud.  In its audit planning documents, AA consistently noted that there were "significant" risks of misstatement due to the "[d]omination of management by a single person or small group"—the Refco Insiders.  Ramler knew that, because Refco lacked an internal audit function, Refco's domination by a "single person or small group" allowed for management override of the accounting controls and posed the risk that income could (and would) be overstated.

217.    After AA collapsed, Ramler moved to Grant Thornton, taking the Refco engagement with him.  In terms of revenue generation, Refco was the largest client that Ramler took from AA.  Refco was thus a marquee customer for Grant Thornton and Ramler's ticket to joining Grant Thornton.  Moreover, Refco stood to be an even better client for Grant Thornton if, as Grant Thornton anticipated, Refco went public.  During the course of the Refco engagement, Grant Thornton earned close to $10 million in fees.

218.    Grant Thornton internally categorized Refco as a "high risk" client because it engaged in significant and complex related-party transactions, lacked an internal audit function and, prior to the LBO, was dominated by a limited number of senior executives and managers who had an interest in maximizing the apparent financial condition and operating results of the company in order to cash out their stake in the company.  Indeed, like AA, Grant Thornton's "Inherent Risk Assessments" recognized that Refco posed a "high" risk of misstatement because "[o]perating and financial decisions [were] dominated by a limited number of individuals."

219.    In addition, in an April 11, 2005 memorandum, Ramler recognized that "the risk of fraud has to be seriously considered with the LBO and the potential IPO.  The IPO price will

be based on a multiple of proforma earnings so there is a considerable gain to shareholders in overstating earnings in presenting the most favorable financial picture."

220.    As set forth below, despite knowing that the Refco Insiders had a propensity to move receivables to RGHI and that billions of customer funds were being transferred from RCM to other Refco entities with no provision or likelihood of repayment, Grant Thornton's work papers are devoid of any meaningful investigation of the Refco Insiders' obvious mechanism for fraud—Refco's related-party and inter-company transactions.

### a)    Grant Thornton's Knowledge of the RGHI Receivable

221.    As a result of his time at AA, Ramler had years-long experience with the RGHI Receivable.  From the outset of Grant Thornton's involvement with Refco, Ramler thus knew about the existence and true magnitude of the RGHI Receivable.

222.    As part of Grant Thornton's new client evaluation process, Ramler indicated not only that RGHI was a related party, but that, as of February 28, 2002, RGHI owed RGL a "reported," unsecured amount of approximately $170 million.  Ramler, however, knew that the true amount of the RGHI Receivable was far greater.  He also knew that even the disclosed amount of the RGHI Receivable, if not paid off—or implicitly if it were any larger—threatened to subsume RGL's equity.

223.    As reflected in Grant Thornton's audit work papers, Grant Thornton knew that RGHI was a related party that Grant Thornton did not audit.  Audit guidance requires auditors to be particularly skeptical of transactions with related parties that that are not audited or are audited by another firm precisely because of the risk of potential fraud posed in such circumstances.  Grant Thornton's audit manual—which sets forth the audit requirements that Grant Thornton's auditors must follow—is to the same effect and required Grant Thornton's

auditors to perform additional procedures to gain independent verification of the nature of such transactions.

224.    Grant Thornton's own audit manual provides that once Grant Thornton has identified related-party transactions, it is required to perform verification procedures "to obtain sufficient evidence to support [Grant Thornton's] understanding of their *substance and business purpose and to support the presentation and disclosure assertions*."  Moreover, it instructs that "management representations *do not constitute sufficient audit evidence*" and "[c]ollectibility of related party receivables should be evaluated with care."

225.    Despite Grant Thornton's own audit manual and the relevant binding GAAS guidance to the same effect, Grant Thornton never obtained, nor sought out, any evidence regarding the substance or business purpose of the RGHI Receivable or material support for the disclosures relating to it.

226.    In fact, Ramler and Grant Thornton knew that, in the late 1990s, disruptions in the market shook Refco leaving it with substantial unsecured receivables from its customers and that if these receivables were ever uncovered the Refco Insiders' scheme to cash out would be thwarted.  In March 2003, Grant Thornton held a planning meeting for the Refco audit in which one of the "Audit Issues" discussed was the existence of significant unsecured debits stemming from "1998-Russian market crash [five years earlier]…underlying value of customer accts. went down & blew out."  As Ramler knew, RGHI, a related party controlled by certain of the Refco Insiders that Grant Thornton did not audit, was the obvious place for the Insiders to hide such losses.

227.    During Grant Thornton's new client acceptance process, Ramler indicated, however, that he "viewed" this unsecured receivable as a loan to RGL's shareholders, including

Bennett and Grant and falsely advised (when he knew otherwise) that that he "believed" that the receivable was not the "result of losses which should have been recognized by the Group."   At the same time, he noted that RGHI was "a shell entity with no operations other than its ownership of [RGL]."   Yet, Grant Thornton never questioned why a "shell" entity with no operations required hundreds of millions of dollars on an unsecured basis.   Nor did Grant Thornton *ever*, at any point in any of its audits request the purported loan documentation for any part of the RGHI Receivable.

228.    Similarly, Grant Thornton did not perform a single, substantive audit procedure to determine the collectability of the RGHI Receivable despite the massive credit risk it posed as an unsecured obligation.   Grant Thornton's work papers for the Refco audits—the primary historical record of audit steps that Grant Thornton performed—fail to contain a shred of material audit evidence concerning RGHI's ability to repay its unsecured obligations.   Ramler has, indeed, admitted as much, testifying under oath that Grant Thornton's entire inquiry into this area was to obtain a verbal representation that Bennett and others were "good for it."

229.    As Ramler knew, however, the Refco Insiders were not "good for it."   Ramler and Grant Thornton never performed proper audit procedures on the RGHI Receivable because they knew what they would find and knew disclosure of the RGHI Receivable would prevent the Refco Insiders from cashing-out.

230.    While at AA, Ramler, as part of the audits of RCM's financial statements, had the audit team request and review audit confirmations sent to RGHI, attaching fiscal year-end customer statements of RGHI's account at RCM.   From these, AA and Ramler learned that, in February 1999, for example, RGHI owed RCM over $82 million but that, shortly before year-

end, RGHI's account received a cash infusion turning its unsecured debt to RCM into a $25 million credit balance.

231.    The confirmation for the 2000 audit showed that RGHI repaid $350 million to RCM mere days before the end of the reporting period.  Indeed, Ramler has testified that he would have been "very surprised" if RGHI had an actual source for those funds.  The following audit year, however, on Ramler's instructions, AA stopped requesting that RCM send audit confirmations to RGHI as part of its audit.  Despite the heightened motivation for fraud given the Refco Insiders' cashing-out in the LBO and IPO, for all four fiscal years Grant Thornton audited, Grant Thornton did not once request that RCM or RCC send an audit confirmation to RGHI.

232.    Ramler's own hand written notes establish that he knew that a half billion dollar RGHI Receivable remained even just prior to the IPO.  In connection with discussing the May 31, 2005 RTL with Liberty Corner, presumably with Bennett, Ramler's handwritten notes state "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL participants).  Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts."  During the quarter ended May 31, 2005, there was in fact a $450 million RTL "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" the RGHI Receivable.  This is a connection Ramler would not have been able to make unless he knew of the true size of the RGHI Receivable and the manner in which the RTLs were used to conceal it before each reporting period.

233.    Ramler and Grant Thornton were thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable was a viable tool for

accomplishing such manipulation.  Grant Thornton was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards to apply far more scrutiny to related-party transactions than to ordinary arm's length transactions when conducting an audit.  As set forth in auditing guidance (AU Section 334, *Related Parties*), an auditor should "test material transactions with parties he knows are related to the reporting entity."  Nevertheless, Grant Thornton utterly failed to perform any meaningful audit procedures with respect to the RGHI Receivable (or any other step in the Refco Insiders' cash-out scheme).

234.    For example, in connection with the 2003 audit, on April 28, 2003, to avoid having to scrutinize the full magnitude of the RGHI Receivable, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down RGL's related-party receivables from RGHI and receivables owed by other Bennett-controlled related parties.  In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of these receivables, then purportedly totaling $105 million, by at least $35 million per year, resulting in full payment by February 28, 2006.

235.    Grant Thornton made no effort to determine whether those payments actually were made—and indeed, they were not.  Nor did Grant Thornton make any attempt to verify the $105 million figure, which Ramler knew to be false, or seek any assurance that RGHI and/or its shareholders had the financial wherewithal to repay the amount.  Grant Thornton relied simply on Bennett's representations regarding the RGHI Receivable, which was a violation of both GAAS and Grant Thornton's own internal GAAS guidelines.

236.    Grant Thornton's work papers from the 2003 audit also show that Grant Thornton contemplated steps to scrutinize Refco's related-party transactions, but, realizing what that

would reveal, simply chose not to implement any of them.  For example, in conducting its audit of RCC in 2003, Grant Thornton told Refco that it needed to see certain loan receivables owed to RCC on the books of the affiliate owing the money.  When making this inquiry, Grant Thornton specifically requested the information about a loan from RCC to RGHI purporting to have a balance of approximately $71 million, including documents to verify the existence and terms of the loan and ensure that RGHI was actually making payments that were received by RCC and reflected on its bank statements.   Yet, Grant Thornton never carried out any of these procedures—in violation of Grant Thornton's own practices, as well as GAAS.

237.   Furthermore, despite the high degree of risk Grant Thornton knew was connected with related-party transactions at Refco, Grant Thornton deliberately refrained from examining the RGHI Receivable's intra-year activity (as opposed to merely its static year-ending balance) and thus never reviewed, much less requested, the customer statements for RGHI's accounts at RCC or RCM at year-end or any time during the year.  To illustrate, in RGHI's customer statement at RCC for the months of February and March 2003, Grant Thornton would have seen the following:

- Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI owed Refco over $600 million.

- On February 21, 2003, RGHI's account at RCC received "transfer funds" for $308.5 million, reducing the amount that RGHI owed RCC.

- On February 25, 2003, RGHI received two credits for an aggregate of $250 million from a wire transfer from a bank in New York.

- By March 4, 2003, (*i.e.*, just 4 days after Refco's fiscal year-end), the above entries were reversed, and the amount RGHI owed to RCC ballooned from $71.8 million on February 28, 2003 back up to over $600 million.

238.   Moreover, the "disclosed" portion of the February 28, 2003 receivable balance from RGHI's account at RCC of over $70 million represented an approximately $30 million

increase over the prior year.  Although Grant Thornton inquired as to the reason for the increase, it took at face value the explanation from a Refco insider that the $30 million represented "additional loans" and never questioned why, during a time when Bennett had promised that RGHI would pay down the RGHI Receivable, RCC was extending RGHI additional credit.

239.    Grant Thornton's audit plan for 2003 also called for Grant Thornton to review loan documents concerning the RGHI Receivable at RCC and to perform an assessment of the interest income represented by Refco to have accrued on the RGHI Receivable.  Grant Thornton failed to perform either procedure.

240.    Similarly, Grant Thornton intentionally did not examine the RGHI balances at RCM because it knew what it would uncover.  Though Ramler knew that, in the past, RGHI owed substantial sums of money to Refco through an account at RCM, Grant Thornton intentionally ignored even the simplest procedures to ensure that this related-party account was being properly recorded in Refco's books.  Had Grant Thornton looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year end), Grant Thornton would have seen the following:

- The debit balance in the account as of February 1, 2003 was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003 of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have revealed similar manipulations of RGHI's account at RCM.

241.    Ramler knew that performing these simple procedures would expose the full amount of the RGHI receivable.  So he didn't do them.

242.    After the 2003 audit, despite the upcoming LBO, Grant Thornton again failed to perform any procedures—other than obtain representations from the Refco Insiders—to monitor or test the RGHI Receivable.  Indeed, they did not request any objective support whatsoever to verify the Refco Insiders' representations.

243.    Another unconscionable omission in Grant Thornton's audit workpapers after its audit for fiscal year 2003 (i.e. February, 2003) was the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates."   This document, which Refco's auditors had obtained and reviewed as part of every Refco audit from 1996 to 2003, detailed Refco's related-party receivables.  Refco failed to provide this document to Grant Thornton for the 2004 and 2005 audits; precisely the audits when Grant Thornton should have been employing a heightened scrutiny given the LBO and IPO.  Grant Thornton did not insist on this critical audit material or otherwise investigate this change in documentation, even though the statement for RGHI's account at RCC made clear that RGHI still had a massive debit balance in favor of RCC. By the 2005 audit, the Grant Thornton audit team did not even know what RGHI was or the risks that it posed.

244.    For instance, Michael Patanella, the manager (or second-in-charge on the audit) on the 2005 audit of RGL's consolidated financial statement stated under oath that, apart from thinking that RGHI was a Refco customer, ***he had no recollection of RGHI or of having ever been told by Ramler to look out for receivables owed by RGHI to Refco as RGHI was a related party that had historically owed Refco significant receivables***.

245.    Although it conducted multi-million dollar audits of Refco in 2003, 2004 and 2005 and a re-audit of Refco's financial statements for 2002, Ramler and Grant Thornton never once requested or obtained a single piece of documentary evidence to substantiate the Refco

Insiders' representations concerning the size, nature and collectability of the RGHI Receivable. Given the historical existence of such a receivable, its critical importance to the audit, and the heightened scrutiny with which Refco had to be approached given its internal risk rating and LBO and IPO, there is only one plausible explanation. Ramler and Grant Thornton looked the other way so as to allow the Refco Insiders to effect their cashing-out scheme.

           **b)**      **<u>Grant Thornton's Knowledge of the RTL Transactions</u>**

246.    Not only did Grant Thornton have, (or, alternatively, consciously avoid) knowledge that RGHI owed a massive unsecured debt to RGL, Grant Thornton also knew (or, alternatively, consciously avoided) the Refco Insiders' scheme to hide the RGHI Receivable through the use of the RTLs.

247.    The RTLs during the periods audited by Grant Thornton were accomplished by falsely recording RCM's loan as a "reverse repo" or "time deposit" in the RTL Participant's customer account. A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and a "time deposit" is a loan extended to a customer for purposes of trading. Both "reverse repos" and "time deposits" require the use of collateral, and because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks and warrant heightened scrutiny by auditors.

248.    Professional audit standards (such as AU Section 330, *The Confirmation* Process) require that when confirming high-risk transactions such as these, the auditor should verify the terms of the transactions, and not merely their amount. Grant Thornton's audit manual required no less and instructed that high-risk transactions, such as the RTLs, are those that are large, unusual or complex and usually occur at year-end or at reporting periods. Professional audit

standards and Grant Thornton's internal procedure required that Grant Thornton treat these transactions with absolute skepticism.

249.   Grant Thornton ignored these standards, deliberately failed to inquire into the obviously suspicious circumstances of these transactions, and subjected them to little or no scrutiny at all.  This was so because Grant Thornton knew and/or consciously avoided knowing that the RTLs were not actually "reverse repos" or "time deposits."   The RTLs lacked the hallmark of both transactions—collateral.  Nor did Grant Thornton otherwise determine that the RTL Participants' total capital provide Refco with adequate security for these substantial advances or ascertain the business purpose of these high risk atypical transactions.

250.   During its audits and quarterly reviews, Grant Thornton consistently reviewed Refco's "Funding Product Accrued Interest Report."  For every transaction listed on this report, including the RTLs, the report would identify the trade, the amount of the trade and the trade's maturity date.  These reports showed that at year- or quarter-end, an RTL Participant would borrow hundreds of millions of dollars from RCM with the expectation that the trade would "mature" (i.e. unwind) two to four days after the reporting period.  Always involving hundreds of millions of dollars and straddling the end of Refco's reporting periods, the RTLs were highly suspicious on their face.

251.   Nevertheless, Grant Thornton accepted at face value the Refco Insiders' characterization of these transactions despite clear evidence that they were not what they purported to be.  The work papers reveal that Grant Thornton's entire audit procedure was generally to send the RTL Participants confirmations for their accounts at RCM and then confirm verbally with a Refco Insider that the RTL Participants had repaid the amounts they owed RCM merely days after the reporting period.  As Ramler confirmed under oath, Grant Thornton never

requested to see any of the loan documentation supporting these transactions, nor did it ever even question the RTL Participant's financial wherewithal to repay these amounts.

252.    For example, during its audit of RCM for 2003, Grant Thornton noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two of the RTL Participants totaling $650 million.  The transactions were timed precisely to span Refco's fiscal year-end.  On April 16, 2003, Grant Thornton sent simple confirmation requests to these RTL Participants, which were signed and returned to Grant Thornton.  Grant Thornton, however, did not conduct additional testing on these RTL Participant accounts, and Grant Thornton did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Participants' total capital.

253.    In the 2004 audit, Grant Thornton noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner.  As in 2003, Grant Thornton sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did.  This year, however, Grant Thornton took the additional step of reviewing the potential credit risk from the transaction.  Grant Thornton noted that the entire amount of Liberty Corner's debit balance— $720 million—was at risk, meaning that no collateral secured it.  Yet, Grant Thornton did not identify the account as a credit risk and ignored the fact that a real "reverse repo" transaction should be secured by collateral.

254.    Even more amazing was Grant Thornton's complete disregard of a $545 million transaction with RGHI in November 2004.  As with prior fiscal year ends and quarterly reporting dates, Grant Thornton received information about repos and reverse repos pending as of the date of the financial statements being reviewed.  Once again, Grant Thornton saw evidence of a large,

period-end, round-dollar transaction purporting to be a reverse repo or time deposit with Liberty Corner in the amount of $545 million.

255.    This time, however, Grant Thornton also saw a purported reverse repo transaction or time deposit with RCM for exactly the same amount and covering exactly the same dates as the Liberty Corner transaction, yet this one was with RGHI.  Grant Thornton was even sent a copy of Refco's "Accrued Interest Report" that displayed these two transactions on two consecutive lines, the only difference being that Liberty Corner was being charged a 2.00% interest rate while RGHI's was 2.75%.

256.    Despite Ramler's long history with the RGHI Receivable, Grant Thornton never questioned why Refco appeared to be extending an additional $545 million unsecured loan to RGHI in November 2004 that was purportedly repaid shortly after the end of the reporting period or why this was done on the same day and in the same amount as the purported reverse repo with Liberty Corner.

257.    As these examples illustrate, in every audit and review that it conducted of Refco, Grant Thornton received information that RCM was engaging in large period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Participants.  In each case, Grant Thornton understood that the transactions were in fact unsecured loans of hundreds of millions of dollars made to entities without the intent and/or financial wherewithal to repay the loans rather than collateralized "reverse repo" transactions.

258.    In each case, Grant Thornton declined to investigate further based on information—often merely a representation from management—that the unsecured balance had been repaid.  Moreover, despite being engaged for years as Refco's auditor, Grant Thornton never alerted anyone to the pattern and never questioned why Refco entered into these

uncollateralized transactions at the end of each and every relevant financial and audit reporting period.  Nor did Grant Thornton ever question why Refco was characterizing these transactions as "reverse repos" or "time deposits" when they were not collateralized.

259.   Further evidence that Grant Thornton understood that the RTLs were being used to hide the RGHI Receivable comes from Ramler's own handwritten notes.  In these notes, Ramler wrote the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL participants).  Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts."  During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts.  Ramler could not have made this connection unless he knew both the true magnitude of the RGHI Receivable and how the RTLs "cleaned up" this related party "interco account."

260.   As Ramler and Grant Thornton knew, if the full magnitude of the RGHI Receivable were disclosed, the Refco Insiders' cashing-out scheme (including the misappropriation and conversion of RCM customer funds) would cease.

261.   As Refco prepared for its IPO, Ramler began to become concerned that Grant Thornton's complicity in the Refco Insiders' cashing-out scheme might be uncovered.  Records of internal communications within Grant Thornton's management show that Grant Thornton understood it was subject to liability for its conduct with respect to Refco.  In late December 2004, Ramler had a conversation with a member of Grant Thornton's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO.  The note states, in part:  "Atty called—also this AM—Refco makes Firm uncomfortable . . . issue is sig.

def. . . .  Issue is no CFO.  Probably had weak one before.  We might not want to participate in IPO once this S-4 is done."  The note goes on to demonstrate Grant Thornton's concerns about Refco and the upcoming IPO:  "They are moving very fast—too fast for comfort . . . what to do—we would be <u>sued.</u>" (emphasis in original).

> **c)**  **Grant Thornton's Knowledge of the Use of FX Customer Funds to Effectuate the Cashing-Out Scheme**

262.    At all relevant times Grant Thornton also knew that the Refco Insiders were causing RCM to upstream hundreds of millions of dollars in customer assets without making any provision for their return.

263.    Grant Thornton knew that Refco set up RCM as an unregulated, offshore entity so that RCM could provide "enhanced leverage"—the ability to loan and transfer funds without the limitations imposed by the United States securities laws' margin rules and segregation requirements.  Like Collins and Mayer Brown, Ramler and Grant Thornton knew that RCM should never have been an unregulated entity.

264.    As he testified under oath, Ramler knew that the bulk of RCM's back-office operations were moved to New Jersey and that Grant Thornton never sent auditors to view RCM's purported operations in Bermuda and never received any information from Bermuda regarding RCM.  Despite this knowledge, however, Grant Thornton never once evaluated or sought a representation as to whether RCM's financial statements had to comply, and be audited subject to, the numerous additional requirements imposed on regulated broker-dealers.

265.    At the same time Grant Thornton knew that RCM made substantial intercompany loans to the other Refco entities using the cash and securities of RCM's customers, including those on whose behalf the Trustee brings this action.  Ramler was well aware that Refco treated RCC as the bank for the consolidated group and that RCC, as Ramler put it, "paid the bills."

266.    As demonstrated by its work papers, Grant Thornton knew that Refco had transferred enormous amounts in cash "loans" from RCM to RGF.  For example, during its audit of Refco's 2004 and 2005 consolidated financial statements, Grant Thornton prepared work sheets showing RCM's "Due to/From" balances with other Refco affiliates.  These documents show that, by the end of the 2004 and 2005 fiscal years, RCM had made transfers of at least $975 million and $1.5 billion, respectively, to RGF alone, putting aside any transfers that had been made to other Refco entities.  As Grant Thornton knew, RGF had no operations, no bank accounts and was simply a conduit for moving funds to RCC, which "paid the bills" for Refco.  Yet Grant Thornton never requested any loan agreements in connection with these transfers nor did it make any effort to obtain sufficient audit evidence verifying their collectability.

267.    Ramler and Grant Thornton knew that these cash transfers could only consist of RCM customer assets, including FX Customer funds.

268.    Not accounting for the impact of the fictitious interest associated with the RGHI Receivable booked at RCM, in fiscal year 2004, RCM had revenues of $325 million and net income of $90 million.  In fiscal year 2005, RCM had revenues of $424 million and net income of $135 million.  As Ramler and Grant Thornton knew, the intercompany cash transfer to RGF alone in these years dwarfed RCM's limited earnings and net income and had to be customer funds, and no one from Grant Thornton has been able to contest under oath that a substantial portion of the cash that RCC held came from RCM and that the source of these funds were the assets customers entrusted to RCM, for the specific, limited purpose of engaging in securities and FX trading.

269.    In a situation where a purportedly unregulated broker-dealer makes cash loans of customer funds in the billion dollar range to its affiliates, the above-referenced GAAS guidance

requires an auditor to understand the nature of the loan, the terms upon which it will be repaid, the interest to be charged and to assess its collectability.  If Grant Thornton had performed such procedures, it would have determined that the other Refco entities had a limited ability to repay these amounts before the LBO, and no ability to repay RCM after Refco assumed an additional $1.4 billion in debt after the LBO.

270.    Instead of performing an appropriate audit of these intercompany transactions so as to understand the nature and terms of these transfers, Grant Thornton instead actively concealed the existence of these loans on RCM's financial statements.

271.    Though RCM's financial statements included these intercompany loans in a note titled "related party transactions," these intercompany transfers of RCM's customer funds were included in the note as part of "receivable from customers" and falsely mischaracterized as transactions consisting of "securities and other financial instrument transactions" that RCM had transacted with related parties "in the normal course of business."

272.    In fact, as Grant Thornton was aware, these transactions were uncollateralized cash loans and were certainly not in the normal course of business, as the affiliated companies that received RCM customer assets lacked the intent and/or the financial wherewithal to repay these misappropriated assets.

273.    Neither Ramler, a concurring partner, nor a manager for GT's audits of Refco were able, under oath, to justify how RCM's intercompany loans to Refco affiliates could fairly be described as "Receivables from Customers" or "securities and other financial instrument transactions."  If Grant Thornton had not concealed that hundreds of millions in RCM customer funds were being upstreamed and misappropriated to other Refco entities with no prospect of return as part of the Refco Insiders' cashing-out scheme, that scheme would not have been

effectuated and the misappropriation and conversion of the RCM customer funds, including the FX customer funds, would have ceased.

274.     Grant Thornton thus not only failed to perform any substantive audit procedures on these intercompany transfers, they actively conspired to conceal them on RCM's financial statements.

**d)     Grant Thornton Knew that the LBO Would Prevent Repayment to the FX Customers**

275.     Grant Thornton knew that it was RCM's Customers, including the FX Customers, who would bear the brunt of the Refco Insiders' cashing-out scheme.

276.     Shortly after completing its audit of Refco's February 28, 2004 financial statements, Grant Thornton conducted a re-audit of Refco's February 28, 2002 financial statements in preparation for the LBO.  Grant Thornton also assisted Refco in the preparation of the LBO's offering documents.  By the time of the LBO in August 2004, Refco Insiders had misappropriated and converted billions of dollars of RCM customer assets, including FX Customer funds, from RCM to other Refco entities in order to create the appearance of a financially robust company.

277.     Given his knowledge of Refco's overall financial condition, acquired as a result of his service as lead auditor, Ramler knew that Refco had a limited ability to repay these amounts; an ability that Ramler knew was entirely foreclosed by the assumption of a billion dollars of more senior debt in the LBO.

278.     Despite its knowledge that the Refco Insiders were engaged in a fraudulent scheme to cash out their interests, Grant Thornton nonetheless substantially assisted the Refco Insiders by, among other things, knowingly issuing unqualified opinions on Refco's consolidated

financial statements and RCM's stand-alone financial statements for each of fiscal years 2003, 2004, and 2005 that materially misrepresented Refco's and RCM's financial condition.

279.   Further evidence of Grant Thornton's knowledge of fraud, and Grant Thornton's active assistance in covering up the fraud, comes from Management Letter Comments ("Management Letter") prepared by Grant Thornton following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco.  As set forth in this letter, among the accounting irregularities and deficiencies known by Grant Thornton to have existed well before the LBO were: "Consolidation Process," "Formalized Reporting and Closing Process," "Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," RCM "Custody Reconciliations," "Audit Coordination, "and "IT Environment Deficiencies."

280.   As the Management Letter revealed, Grant Thornton was fully aware that Refco's internal accounting and auditing functions were in a shambles, that there was no internal audit function, there was insufficient audit coordination and that there were deficiencies in accounting procedures and functions and in the consolidation processes.  Despite these numerous longstanding deficiencies, the correction of which would have made the various accounting improprieties and frauds conducted by the Refco Insiders harder to conceal, Grant Thornton provided Refco with an unqualified audit opinion prior to and in connection with the LBO.

281.   Despite being aware of these deficiencies prior to the LBO and having "previously discussed" these longstanding deficiencies with Trosten and other Refco Insiders, it was only after the LBO that, to cover its inaction and failure to properly audit Refco, Grant Thornton "papered" the deficiencies in a letter to Bennett dated October 15, 2004.

282.    As Grant Thornton alludes to in its Management Letter, Refco's "accounting function d[id] not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer."   As Grant Thornton recognized, Refco's deficient accounting practices, and the fraud they helped conceal, could not withstand the increased scrutiny that Refco would be receiving from regulators and investors given the impending IPO.

283.    Nonetheless, in its cover letter to Bennett, Grant Thornton minimizes the significance of these deficiencies by referring to them as merely "matters that are opportunities for strengthening internal control and operating efficiency."   As set forth below, however, as Grant Thornton admitted a few months later (after the February 28, 2005 audit and just before the IPO), Refco had "significant" accounting and control deficiencies.

284.    Even after belatedly presenting the Management Letter to Bennett in October 2004, Grant Thornton failed to follow-up with Bennett or anyone else at Refco regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed.   Even then, Grant Thornton modified its findings at the instructions of Refco management and then affirmatively lied about the letter's existence during the LBO due diligence process.

285.    In late March 2005, long after the conclusion of the LBO, THL learned of the existence of the Management Letter.   In an April 1, 2005, internal email, a THL executive expressed his anger that neither Refco nor Grant Thornton had provided the Management Letter to THL during the due diligence leading up to the LBO.   As THL stated internally, "when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. if this letter

was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both[.]"

286.   The same day, in another internal email, another THL executive explained his discovery that at or about the time that Grant Thornton provided the Management Letter to the company, Refco management had pressured Grant Thornton to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by Grant Thornton:

> These are the facts as I've heard them . . . .  A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore Grant Thornton a new one" for using the words "significant deficiency" with regard to the systems.   Grant Thornton printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

287.   A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and Grant Thornton if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the Grant Thornton management letter. As we discussed on Monday neither the company nor Grant Thornton shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and Grant Thornton if there were management letters and was told no.

288.   In sum, Grant Thornton not only knew and/or consciously avoided knowledge of numerous accounting and controls deficiencies at Refco before, during and after the LBO, but Grant Thornton also eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter.  These facts demonstrate both Grant Thornton's knowledge of and substantial assistance in the Refco Insiders' fraud.

\*   \*   \*   \*   \*

289.   Despite being aware of each aspect of the Refco Insiders' cashing-out scheme, Grant Thornton provided unqualified audit opinions in connection with each of RCM's stand-alone statements and Refco's consolidated financial statements, knowing that by doing so it was allowing the Refco Insiders to conceal Refco's true precarious financial condition and effectuate their fraudulent cashing-out scheme, thereby foreclosing repayment of the RCM customer funds, including those of the FX Customers.

### FIRST CLAIM FOR RELIEF
### (Fraudulent Inducement Against Bennett, Trosten and Maggio)

290.   Paragraphs 1 to 289 are incorporated as if fully set forth herein.

291.   Bennett, Maggio, and Trosten knew that, as a result of their cashing-out scheme, RCM would no longer be a viable, solvent broker-dealer.  Regardless, the Refco Insiders failed to divulge this material fact to the FX Customers at any time.

292.   Bennett, Maggio, and Trosten nonetheless knowingly induced FX Customers to enter into and maintain a broker-dealer arrangement with RCM and induced the FX Customers, including the Cargill FX Customers, to entrust and maintain their assets at RCM based on the false express and/or implied representations that RCM was a viable, solvent broker-dealer with which customers could safely execute FX trades and which could return their FX Margin and other assets, entrusted for the specific, limited purpose of engaging in FX trades, at their instruction, upon demand or otherwise.

293.   The FX Customers reasonably relied on the Refco Insiders' fraudulent misrepresentations and were induced, having no knowledge of:  the Refco Insiders' cashing-out scheme; the RGHI Receivable; the RTLs; Refco's true precarious financial condition; and that

the funds they deposited at RCM were being misappropriated, converted, and used by other Refco entities that, as a result of the Refco Insiders' cashing-out scheme, were unable to return the funds to RCM on demand or otherwise.

294.    As a result of the fraud alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over half a billion dollars.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Bennett and Maggio)

295.    Paragraphs 1 to 294 are incorporated as if fully set forth herein.

296.    Bennett and Maggio were directors of RCM.

297.    Neither the overall broker-dealer relationship between the FX Customers and RCM nor the customer agreements executed as part of that relationship permitted RCM to use the FX Customers' FX Margin or any other assets entrusted to RCM by the FX Customers without regard for the return of such assets to the FX Customers, and such return was an express and/or implied condition of the FX Customers' entrustment of their assets to RCM for the specific, limited purpose of entering into FX trades at their direction.

298.    At all relevant times, RCM was insolvent or operating in the zone of insolvency causing RCM, and Bennett and Maggio as directors of RCM, to owe fiduciary duties of care, honesty, good faith, and trust to the FX Customers, who were creditors and customers of RCM.

299.    At all relevant times, by virtue of the broker-dealer relationship between RCM and the FX Customers and the entrustment of funds by the FX Customers at RCM for the specific purpose of engagement in FX trading at their direction, RCM owed fiduciary duties to its FX Customers not to waste their assets, including their FX Margin, and to take reasonable steps to ensure the return of the FX Customer's FX Margin and other assets upon demand.

300.    The discharge of these fiduciary duties was under the direction and control of Bennett, Maggio, and persons or entities acting in active concert or participation with them.

301.    In effectuating their cashing-out scheme, RCM, Bennett, and Maggio breached these fiduciary duties.

302.    In the alternative, Bennett and Maggio are liable for aiding and abetting RCM's breach of its fiduciary duties to the FX Customers because, among other things, they were aware of the existence of those duties and actively participated in and substantially assisted the breach of those duties, as alleged herein.

303.    As a result of the breach of the fiduciary duties alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over half a billion dollars.

**THIRD CLAIM FOR RELIEF**
**(Fraud against Bennett, Trosten and Maggio)**

304.    Paragraphs 1 to 303 are incorporated as if fully set forth herein.

305.    Neither the overall broker-dealer relationship between the FX Customers and RCM nor the customer agreements executed as part of that relationship permitted RCM to use the FX Customers' FX Margin or any other assets entrusted to RCM by the FX Customers without regard for the return of such assets to the FX Customers, and such return was an express and/or implied condition of the FX Customers' entrustment of their assets to RCM for the specific, limited purpose of entering into FX trades at their direction.

306.    Bennett, Maggio, and Trosten were the masterminds behind the fraudulent cashing-out scheme alleged herein, controlling and directing every aspect of the fraud; and persons or entities acting in active concert or participation with them made, directed, or are otherwise responsible for, all of the fraudulent statements and omissions of Refco and RCM alleged herein.

307.    RCM held itself out as a viable, solvent broker-dealer with which the FX Customers could entrust their assets for the specific, limited purpose of engaging in FX trades at their instruction and with the reasonable expectation that their assets would be returned to them on demand.

308.    Absent this representation, RCM would not have been able to attract, receive, and retain cash and other assets from its customers, and the FX Customers would not have placed and held their property in accounts at RCM, where it was available to be transferred by RCM to Refco entities that were foreclosed by the Refco Insiders' cashing-out scheme from returning these assets.

309.    Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, were in a position of unique and superior knowledge regarding the true facts concerning RCM's insolvent financial condition and the fact that the appearance of Refco's financial health and strength was fraudulently manufactured.

310.    Bennett, Maggio, and Trosten had a special relationship of trust and confidence with the FX customers and owed them a duty of candor that their cashing-out scheme either had, or would, render RCM a nonviable, insolvent broker-dealer.

311.    As expected and anticipated by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, RCM customers, including the FX Customers, placed and maintained cash and securities into accounts at RCM without knowledge that Bennett, Trosten and Maggio's cashing-out scheme would render RCM nonviable and insolvent because the Refco Insiders never informed the FX Customers as such.

312.    This nondisclosure was material:  had the true facts been fully disclosed, RCM's customers, including the FX Customers, would not have done business with RCM, and their cash

and securities would not have been misappropriated and wasted in order to effectuate the cashing-out scheme of Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, as alleged herein.

313.   In placing and maintaining funds in accounts at RCM, the FX Customers relied to their detriment on the misrepresentation that RCM was and would remain a viable, solvent broker-dealer, and the FX Customers were ignorant of the true facts with respect to the misappropriation and diversion of their assets, including the FX Margin, from RCM, and the inability for these funds to be returned to them on demand.

314.   Under the facts and circumstances alleged herein, reliance on the fraud by the FX Customers may be presumed.

315.   As a result of the fraud alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

### FOURTH CLAIM FOR RELIEF
### (Conversion Against Bennett, Trosten and Maggio)

316.   Paragraphs 1 to 315 are incorporated as if fully set forth herein.

317.   Neither the overall broker-dealer relationship between the FX Customers and RCM nor the customer agreements executed as part of that relationship permitted RCM to use the FX Customers' FX Margin or any other assets entrusted to RCM by the FX Customers without regard for the return of such assets to the FX Customers, and such return was an express and/or implied condition of the FX Customers' entrustment of their assets to RCM for the specific, limited purpose of entering into FX trades at their direction.

318.   Properly construed and considered in light of RCM's duty of good faith and fair dealing, the customer agreements between RCM and the FX Customers did not authorize RCM to upstream FX Margin (or other entrusted assets) to other Refco entities to fund the operational

needs of Refco without any loan documentation, terms, security, or promise or provision of repayment, all the while knowing that RCM would be unable to return these funds to its FX Customers upon demand, or otherwise.

319. The assets entrusted to RCM by each FX Customer were reflected on periodic account statements that the FX Customers received from RCM.

320. By the actions alleged herein, Bennett, Trosten, and Maggio, and persons or entities acting in active concert or participation with them, wrongfully converted the assets that had been entrusted to RCM by the FX Customers at the time that the FX Customers' assets, including FX Margin, were transferred out of RCM with no ability to recover them, and dissipated in order to effectuate the Refco Insiders' cashing-out scheme.

321. To the extent that RCM had a limited right to make use of the FX Customers' FX Margin, conversion occurred when, upon disclosure of the fraud at Refco, the RCM Customers demanded return of their account balances and RCM refused to return their property.

322. By the actions alleged herein, the Refco Insiders, and persons or entities acting in active concert or participation with them, wrongfully converted the FX Customers' assets.

323. In the alternative, the Refco Insiders are liable for aiding and abetting RCM's and/or Refco's conversion of assets that had been entrusted to RCM for specific, limited purposes by the FX Customers because, among other things, they were aware of the conversion and actively participated in and substantially assisted the conversion.

324. As a result of the conversion alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

**FIFTH CLAIM FOR RELIEF**
**(Aiding and Abetting Fraudulent Inducement and Fraud Against the Professional Defendants)**

325. Paragraphs 1 to 324 are incorporated as if fully set forth herein.

326.     Mayer Brown and Grant Thornton had actual knowledge of the fraudulent inducement and fraud alleged herein.   Alternatively, Mayer Brown and Grant Thornton consciously avoided the truth.

327.     Notwithstanding this knowledge, Mayer Brown and Grant Thornton substantially assisted in the fraud.

328.     As a result of the Professional Defendants' conduct alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Against the Professional Defendants)

329.     Paragraphs 1 to 328 are incorporated as if fully set forth herein.

330.     Mayer Brown and Grant Thornton had actual knowledge of the breaches of fiduciary duties alleged herein.   Alternatively, Mayer Brown and Grant Thornton consciously avoided the truth.

331.     Notwithstanding this knowledge, Mayer Brown and Grant Thornton substantially assisted in the breaches of fiduciary duty.

332.     As a result of the Professional Defendants' conduct alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Conversion Against the Professional Defendants)

333.     Paragraphs 1 to 332 are incorporated as if fully set forth herein.

334.     Mayer Brown and Grant Thornton had actual knowledge of the conversion alleged herein.  Alternatively, Mayer Brown and Grant Thornton consciously avoided the truth.

335.    Notwithstanding this knowledge, Mayer Brown and Grant Thornton substantially assisted in the conversion.

336.    As a result of the Professional Defendants' conduct alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.


## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment and grant the following relief:

(a)    An award of an amount to be proven at trial in compensatory damages for the losses that the FX Customers have incurred as a result of the acts and omissions of the defendants set forth in this Complaint;

(b)    An award of punitive damages;

(c)    An award of all costs incurred in connection with the prosecution of this action;

(d)    An award of attorneys' fees incurred in the prosecution of this action; and

(e)    Prejudgment and post-judgment interest as allowed by law.


## JURY DEMAND

Plaintiff demands a jury trial on all matters so triable.

DATED:  New York, New York
        October 15, 2009

                                  QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP


                                  By: _____
                                     Richard I. Werder, Jr.
                                     Michael B. Carlinsky
                                     Sascha N. Rand

                                  51 Madison Avenue, 22nd Floor
                                  New York, New York  10010-1601
                                  (212) 849-7000

                                  *Attorneys for Plaintiff*
                                  *Marc S. Kirschner, as Trustee for the*
                                  *Refco Private Actions Trust*

# Exhibit A

| FX Customer | Allowed Claim |
|---|---|
| Abu Dhabi Investment Authority | $29,918,680.50 |
| Advance Currency Markets SA | $495,750.01 |
| Alaron Trading Corporation | $378,282.41 |
| Aldarra Fund SPC Class A Euro | $399,713.47 |
| Alpen Agency Limited | $1,280,832.51 |
| Alpen Fund Limited | $5,026,911.19 |
| AQR Absolute Return Master Account | $19,383,500.00 |
| AQR Global Asset Allocation Master Account | $8,828,886.64 |
| American Pegasus Perpetual Income NTD Plus | $148,677.52 |
| Anselan S. A. | $172,920.00 |
| Cargill Financial Services Corp | $23,358,164.23 |
| Cargill Global Funding PLC | $5,825,291.75 |
| Cargill Incorporated | $21,377,793.66 |
| Cosmorex, Ltd. | $105,850,964.00 |
| Creative Finance Ltd. (Carlos Sevilleja) | $21,735,972.00 |
| Creative Finance Ltd. | $65,445,343.00 |
| De Shaw Laminar Portfolios LLC | $3,949,848.10 |
| Denali Asset Management LLP | $7,968,275.23 |
| Denizbank A.S. | $332,743.00 |
| DFD Diversified Trust | $1,040,818.55 |
| DK Acquisition Partners LP | $1,374,811.78 |
| Dominique Mottas | $296,772.55 |
| Eduard Sarkisyan | $205,445.74 |
| Espirito Santo Fundos De Pensoes, S.A. | $1,447,915.76 |
| European Sicav Alliance Odin | $33,677.21 |
| European Sicav Alliance Insulate | $12,996,905.79 |
| Felbury Finance Ltd. | $262,233.00 |
| Finnaval Maritime Ltd. | $4,224,254.14 |
| Gary Steckel | $17,331.46 |
| Grand Trading Ltd. | $3,543,331.87 |
| Guido Raso | $329,640.57 |
| Hain Capital/MBT Technologies | $358,701.00 |
| IDS Managed Fund LLC | $3,267,928.79 |
| IDS Managed Futures LLP | $8,326,047.12 |
| IDS Managed Futures II LLP | $1,550,582.38 |
| JWH Global Trust | $56,544,205.40 |
| KPC Corporation | $7,842,900.65 |

| FX Customer | Allowed Claim |
|---|---|
| Le Rose Incorporated | $80,190.83 |
| Leuthold Funds Incorporated | $67,855,495.84 |
| Lyxor Estlander & Ronnlund Ltd. | $5,029,268.72 |
| Lyxor/Beach Discretionary Fund Ltd. | $7,696,965.14 |
| Multi Manager Futures Ltd. | $1,082,602.10 |
| Myrtle Asset Ltd. | $199,474.65 |
| Namos Capital International Ltd. | $1,126,578.00 |
| Nikko Futures Fund | $1,355,107.69 |
| Oleg Ilchenko | $13,229.15 |
| Refco Advantage Multi-Manager Fund | $41,678,077.43 |
| Refco Diversified Futures | $27,222,787.85 |
| Sage Fund LP | $1,184,068.04 |
| Sapphire Special Opportunities Fund | $1,718,014.68 |
| Stilton International Holdings Ltd. | $66,900,000.00 |
| Stratford Trading LLC | $1,158,727.80 |
| Tagol, SA | $476,198.04 |
| Tau 28 Fund Ltd. | $4,238,735.00 |
| Te Grinham Portfolio Ltd. (aka GS Grinham) | $24,584,718.28 |
| Te Jenkins Portfolio Ltd. | $124,052.52 |
| The Everest Fund | $5,546,244.71 |
| The Everest Fund | $1,936,086.95 |
| Tokyo Forex Financial Co. Ltd. | $11,514,726.54 |
| Union Holding Company Inc. | $251,592.96 |
| Wayland Distressed Opportunities Fund I-B LLC | $129,682.56 |
| Wayland Distressed Opportunities Fund I-C LLC | $191,208.10 |
| Wayland Distressed Opportunities I-A LLC | $134,113.89 |
| Wayland Investment Fund | $4,568,101.19 |
| Wayland Investment Fund | $1,600,034.91 |
| Wayland Investment Fund LLC | $234,151.00 |
| Wayland Investment Fund LLC | $858,553.00 |
| Wayland Investment Fund LLC | $1,209,780.00 |
| Wayzata Recovery Fund LLC | $652,990.76 |
| Wayzata Recovery Fund LLC | $335,861.10 |
| Winterbotham Trust Co. Ltd. | $550,735.00 |
| Yamazen Shoji Co. Ltd. | $788,987.14 |
| **TOTAL** | $709,769,194.55 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: REFCO INC. SECURITIES LITIGATION | MDL-1902 |

---

MARC S. KIRSCHNER,                                      )
as Trustee of the Refco Private Actions Trust,   )
                                                                          )
                    Plaintiff,                                      )
                                                                          )          Case No. 07 CV 8165 (JSR)
          -vs-                                                        )
                                                                          )
PHILLIP R. BENNETT, SANTO C.                   )
MAGGIO, ROBERT C. TROSTEN, MAYER,  )
BROWN, ROWE & MAW, LLP, GRANT         )
THORNTON LLP, and ERNST & YOUNG      )
U.S. LLP,                                                             )
                                                                          )
                    Defendants.                                  )
                                                                          )

---

## CERTIFICATE OF SERVICE

I hereby certify that, on October 15, 2009, I caused to be served Plaintiff's First Amended

Complaint on all parties registered to receive service in the above captioned matter, docket

number 07-CV-8165 (JSR). Copies of this document were served by first class mail to counsel

as listed in the attached Service List below.

Dated:  December 8, 2009
              New York, New York

By:  _____
        Nicholas J. Calamari
        Quinn Emanuel Urquhart Oliver &
        Hedges LLP
        51 Madison Avenue, 22nd Floor
        New York, NY  10010
        Tel:  (212) 849-7000
        Email:
        *nicholascalamari@quinnemanuel.com*

**Service List**

| | |
|---|---|
| Ruth Anne Braun<br>David Emilio Mollon<br>Winston & Strawn LLP (NY)<br>200 Park Avenue<br>New York, NY 10166<br>(212)-294-2640<br>(212)-294-4700 (fax)<br>rbraun@winston.com | James Spiegel Darrow<br>Barbara Moses<br>Morvillo, Abramowitz, Grand, Iason, Anello &<br>Bohrer, P.C<br>565 Fifth Avenue<br>New York, NY 10017<br>(212) 880-9540<br>(212) 856-9494 (fax)<br>bmoses@maglaw.com |
| Linda T. Coberly<br>Catherine W. Joyce<br>Bradley E. Lerman<br>Winston & Strawn LLP (IL)<br>35 West Wacker Drive<br>Chicago, IL 60601<br>(312)-558-8768<br>(312)-558-5700 (fax)<br>lcoberly@winston.com | Jeffrey T. Golenbock<br>Golenbock Eiseman Assor Bell & Peskoe LLP<br>437 Madison Avenue<br>New York, NY 10022<br>212-907-7373<br>212-754-0777 (fax)<br>jgolenbock@golenbock.com |
| Richa Shyam Dasgupta<br>Daniel P. Shanahan<br>Craig D. Singer<br>Michael S. Sundermeyer<br>John K. Villa<br>Thomas George Ward<br>John S. Williams<br>Williams & Connolly LLP<br>725 Twelfth Street, North West<br>Washington, DC 20005<br>(202) 434-5000<br>(202) 434-5029 (fax) | Anthony Mathias Candido<br>Clifford Chance US, LLP (NYC)<br>31 West 52nd Street<br>New York , NY 10019<br>(212)-878-3140<br>(212)-878-8375 (fax) |
| Christopher R. Harris<br>Miles Norman Ruthberg<br>Latham & Watkins, LLP<br>885 Third Avenue, Suite 1000<br>New York, NY 10022<br>212-906-1880<br>212-751-4864 (fax)<br>christopher.harris@lw.com | Scott Edward Hershman<br>White & Case LLP (NY)<br>1155 Avenue of the Americas<br>New York, NY 10036<br>(212) 819-8200<br>(212) 354-8113 (fax)<br>Scott.Hershman@whitecase.com |

| | |
|---|---|
| Elizabeth Heering Hickey<br>Latham & Watkins, L.L.P.<br>One Newark Center<br>Newark, NJ 07101<br>(213) 485-1234<br>elizabeth.hickey@lw.com | Rachel Marissa Korenblat<br>Morvillo, Abramowitz, Grand, Iason, Anello &<br>Bohrer, P.C<br>565 Fifth Avenue<br>New York, NY 10017<br>(212)-880-9525<br>(212)-856-9494 (fax)<br>rkorenblat@maglaw.com |