UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |
|---|---|
| | :   ELECTRONICALLY FILED |
| MARC S. KIRSCHNER, | : |
| As Trustee of the Refco Private Actions Trust | :   07 MDL 1902 (JSR) |
| | : |
| Plaintiff, | :   07 Civ. 8165 (JSR) |
| | : |
| -v- | :   Hon. Jed S. Rakoff |
| | : |
| PHILLIP R. BENNETT, SANTO C. MAGGIO, | : |
| ROBERT C. TROSTEN, MAYER BROWN, LLP, | : |
| MAYER BROWN INTERNATIONAL LLP, and | : |
| GRANT THORNTON LLP, | : |
| | : |
| Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## GRANT THORNTON LLP, MAYER BROWN LLP AND
## MAYER BROWN INTERNATIONAL LLP'S MOTION TO DISMISS

WINSTON & STRAWN LLP

| | |
|---|---|
| 200 Park Avenue | 35 West Wacker Drive |
| New York, NY 10166 | Chicago, IL 60601 |
| (212) 294-6700 | (312) 558-5600 |

    *Attorneys for Grant Thornton LLP*

WILLIAMS & CONNOLLY
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
*Attorneys for Mayer Brown LLP*

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000
*Attorneys for UK Limited Liability Partnership*
*Mayer Brown International LLP*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ...................................................................................... 1

BACKGROUND ....................................................................................... 6

POINT ONE.............................................................................................. 11

The aiding and abetting claims should be dismissed because the Trustee
has again failed to plead any of the underlying causes of action..................... 11

   A. Like the original complaint, the Amended Complaint fails to plead
      that RCM or its insiders owed the FX Customers any fiduciary duty. ................ 11

      1. The Trustee again fails to plead that RCM had discretionary
         authority. ....................................................................................... 12

      2. The Trustee again fails to plead a fiduciary duty to avoid waste................... 13

   B. Like the original complaint, the Amended Complaint fails to plead fraud
      or deception with particularity. ............................................................ 15

   C. Like the original complaint, the Amended Complaint fails
      to state a claim for conversion of the FX Customers' deposits. .......................... 19

      1. RCM's use of the FX Customers' funds was explicitly
         authorized by the customer agreements. ...................................................... 20

      2. The Trustee's allegation that the FX Customers demanded the return
         of their deposits is not sufficient to support a conversion claim.................... 21

      3. In the alternative, the Amended Complaint does not state a claim for
         conversion because the FX Customers' deposits are not specifically
         identifiable property................................................................................ 23

POINT TWO................................................................................................ 26

The Trustee has again been unable to plead actual knowledge and substantial
assistance—both of which are required to state a claim for aiding and abetting.............. 26

   A. Like the original complaint, the Amended Complaint fails to allege that
      these defendants "substantially assisted" in torts against the FX Customers. ...... 27

   B. Like the original complaint, the Amended Complaint still does not allege
      that these defendants had actual knowledge of any tort against the
      FX Customers. ....................................................................................... 32

i

# <u>TABLE OF CONTENTS (continued)</u>

<u>Page</u>

1. The Trustee has again been unable to allege that Mayer Brown had actual knowledge of any torts against the FX Customers. ............................33

    a.  The Trustee does not allege facts showing that any Mayer Brown lawyer was aware of improper "siphoning" of FX Customer deposits. ..................................................................34

    b.  The Trustee's allegations that Mayer Brown attorneys were aware of any wrongful conduct at RCM are implausible and inconsistent. ..................................................................36

2. The Trustee has again been unable to allege that Grant Thornton had actual knowledge of any torts against the FX Customers. .......................39

POINT THREE ...........................................................................................................43

SLUSA requires dismissal of this "covered class action." ...............................43

   A. This Is a "Covered Class Action." ...........................................................44

   B. The Amended Complaint alleges fraud "in connection with the purchase or sale of a covered security." ...........................................................45

CONCLUSION ..........................................................................................................48

## TABLE OF AUTHORITIES

**CASES**                                                                                         **Page**

*A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*,
    No. 97 Civ. 4978, 1999 WL 47223 (S.D.N.Y. Feb. 3, 1999),
    *reconsideration granted on other grounds,* 2000 WL 302697
    (S.D.N.Y. Mar. 21, 2000) .......................................................................15

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937, 1949 (2009) .......................................................17, 42

        129 S. Ct. at 1949–50 .......................................................32, 40

*Barron Partners, LP v. Lab123, Inc.*,
    593 F. Supp. 2d 667, 670 (S.D.N.Y. 2009)........................................16

*Bauer v. Mellon Mortgage Co.*,
    680 N.Y.S.2d 397, 401 (Sup. Ct. 1998) ............................................14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 570 (2007) ................................................................42

*Bissell v. Merrill Lynch & Co.*,
    937 F. Supp. 237, 246 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) ........................24

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
    754 F.2d 57, 62 (2d Cir. 1985) ........................................................19

        754 F.2d at 62–63 .........................................................28

        754 F.2d at 61–62 .........................................................29

*Bondi v. Grant Thornton International (In re Parmalat Securities Litigation)*,
    421 F. Supp. 2d 703, 722 (S.D.N.Y. 2006) ......................................29

*Calisch Associates, Inc. v. Manufacturers Hanover Trust Co.*,
    542 N.Y.S.2d 644, 646 (App. Div. 1989) ..........................................22

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
    117 F.3d 655, 664 (2d Cir. 1997) ......................................................35

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) .......................................................................27

*Chill v. General Electric Co.*,
    101 F.3d 263, 267 (2d Cir. 1996) .....................................................17

## TABLE OF AUTHORITIES (continued)

**CASES**                                                                **Page**

*Computerized Radiological Services v. Syntex Corp.*,
   786 F.2d 72, 76 (2d Cir. 1986) ...................................................................24

*De Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293, 1306 (2d Cir. 2002) ....................................................22, 23

*Edwards & Hanly v. Wells Fargo Security Clearance Corp.*,
   602 F.2d 478, 484 (2d Cir. 1979) ,
   *superseded on other grounds, Cent. Bank of Denver, N.A. v.
   First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ...................35

*Fesseha v. TD Waterhouse Investor Services*,
   761 N.Y.S.2d 22, 23–24 (N.Y. App. Div. 2003) ...................................20

*Fraternity Fund Ltd., v. Beacon Hill Asset Management, LLC*,
   479 F. Supp. 2d 349, 370–71 ( S.D.N.Y. 2007) ....................................27

*Geler v. National Westminster Bank*,
   770 F. Supp. 210, 215 (S.D.N.Y. 1991) ................................................22

      770 F. Supp. at 215 .........................................................................23

*Global Minerals & Metals Corp. v. Holme*,
   824 N.Y.S.2d 210, 217 (App. Div. 2006) .............................................40

*HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*,
   517 F.3d 454, 457 (7th Cir. 2008) .........................................................35

*High View Fund, LP v. Hall*,
   27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998) .............................................23

*Hollin v. Scholastic Corp. (In re Scholastic Corp. Securities Litigation)*,
   252 F.3d 63, 69–70 (2d Cir. 2001) .......................................................16

*In re Initial Public Offering Sec. Litig.*
   ("*IPO Litigation*"), 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) .........16

      241 F. Supp. 2d at 325 ...................................................................16

*In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation ("RCM I")*,
   No. 06 Civ. 643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) .............1

      2007 WL 2694469, at *9 .................................................................14

      2007 WL 2694469, at *4 .................................................................46

*Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
   157 F.3d 933, 940 (2d Cir. 1998).........................................................14

## TABLE OF AUTHORITIES (continued)

**CASES**                                                                      **Page**

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)....................................................26

        406 F. Supp. 2d at 256 n.6 ........................................................................27

*Keyes v. Paducah & Illinois Railroad*,
    61 F.2d 611, 613 (6th Cir. 1932) ...............................................................25

*Kirschner v. Bennett*,
    No. 07 Civ. 8165, Slip Op. (S.D.N.Y. Aug. 25, 2009) .............................1

*Kolbeck v. LIT America, Inc.*,
    939 F. Supp. 240, 246 (S.D.N.Y. 1996), *aff'd mem.*, 152 F.3d 918
    (2d Cir. 1998) ............................................................................................32

        939 F. Supp. at 246–47 .............................................................................32

*Kottler v. Deutsche Bank AG*,
    607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009)...............................................27

*LaSala v. Bank of Cyprus Public Co.*,
    510 F. Supp. 2d 246, 268–69 (S.D.N.Y. 2007)..........................................44

*LaSala v. Bordier et Cie*,
    519 F.3d 121, 134 (3d Cir. 2008), *cert. dismissed*, 129 S. Ct. 593 (2008) ............................44

        519 F.3d at 132–37 ....................................................................................44

        *Id.* at 137–38 ...............................................................................................45

*LaSala v. Lloyds TSB Bank, PLC*,
    514 F. Supp. 2d 447, 469–70 (S.D.N.Y. 2007), *reconsideration denied*,
    2009 WL 874164 (S.D.N.Y.)....................................................................44

*LaSala v. UBS, AG*,
    510 F. Supp. 2d 213, 235–36 (S.D.N.Y. 2007)..........................................44

*Lehman Brothers Commercial Corp. v. Minmetals International Non-Ferrous Metals Mining
    Trading Co.*,
    179 F. Supp. 2d 159, 163–64 (S.D.N.Y. 2001)..........................................45

*Levitin v. PaineWebber, Inc.*,
    159 F.3d 698, 707 (2d Cir. 1998)...............................................................12

        159 F.3d at 703 ..........................................................................................22

*Linares v. Richards*,
    No. 08-CV-3243, 2009 WL 2386083, at *8 (E.D.N.Y. Aug. 3, 2009)....................................35

## TABLE OF AUTHORITIES (continued)

**CASES**                                                                      **Page**

*Manufacturers Hanover Trust Co. v. Chemical Bank*,
    559 N.Y.S.2d 704, 712 (App. Div. 1990)................................................................25

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71, 86 (2006)................................................................................................43

        547 U.S. at 85................................................................................46, 47, 48

        547 U.S. at 75................................................................................................46

        547 U.S. at 85, 86–87..................................................................................46

        547 U.S. at 89................................................................................................47

*Moses v. Martin*,
    360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)..............................................................19

*Newbro v. Freed*,
    409 F. Supp. 2d 386, 396 (S.D.N.Y. 2006),
    *aff'd* 2007 WL 642941 (2d Cir. Feb. 27, 2007)..............................................20, 24

*OSRecovery, Inc. v. One Groupe International, Inc.*,
    354 F. Supp. 2d 357, 378 (S.D.N.Y. 2005)..............................................................27

*Payne v. White*,
    477 N.Y.S.2d 456, 458 (App. Div. 1984)..................................................................24

*Peoples Westchester Savings Bank v. FDIC*,
    961 F.2d 327, 330 (2d Cir. 1992)..............................................................................25

*Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional de Venezuela*,
    991 F.2d 42, 47 (2d Cir. 1993)..................................................................................18

*Public Employees' Retirement Association v. Deloitte & Touche LLP*,
    551 F.3d 305, 315 (4th Cir. 2009) ............................................................................41

*Republic of Haiti v. Duvalier*,
    626 N.Y.S.2d 472, 475 (App. Div. 1995)..................................................................24

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Securities Litigation)*,
    151 F. Supp. 2d 371, 442–43 (S.D.N.Y. 2001)........................................................45

*Rosner v. Bank of China*,
    528 F. Supp. 2d 419, 426–27 (S.D.N.Y. 2007)........................................................27

## TABLE OF AUTHORITIES (continued)

**CASES**                                                                      **Page**

*Ross v. Bolton,*
    904 F.2d 819, 823 (2d Cir. 1990)...........................................................................16

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946)...........................................................................................45

*SEC v. Zandford,*
    535 U.S. 813, 819 (2002)...................................................................................46

*Segal v. Fifth Third Bank, N.A.,*
    581 F.3d 305, 310 (6th Cir. 2009) .....................................................................45

*Siepel v. Bank of America, N.A.,*
    526 F.3d 1122, 1127 (8th Cir. 2008) .................................................................48

    526 F.3d at 1124, 1127 ......................................................................................48

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
    552 U.S. 148, 161 (2008)...................................................................................31

*Swan Brewery Co. v. U.S. Trust Co.,*
    832 F. Supp. 714, 718 (S.D.N.Y. 1993)...........................................................22

*Swartz v. KPMG LLP,*
    476 F.3d 756, 761 (9th Cir. 2007) .....................................................................47

*Tevdorachvili v. Chase Manhattan Bank,*
    103 F. Supp. 2d 632, 643 (E.D.N.Y. 2000) ......................................................22

*U.S. Mortgage, Inc. v. Saxton,*
    494 F.3d 833, 844 (9th Cir. 2007),
    *abrogated in separate part, Proctor v. Vishay Intertech Inc.,*
    — F.3d —, 2009 WL 3260535 at *6 n.8 (9th Cir. Oct. 9, 2009)............................55

*United States v. Szur,*
    289 F.3d 200 (2d Cir. 2002)..............................................................................13

    289 F.3d at 211–12 ............................................................................................13

*VR Global Partners, L.P. v. Bennett (In re Refco Capital Markets, Ltd. Brokerage Customer*
    *Securities Litigation)* ("*RCM II*")*,* 586 F. Supp. 2d 172
    (S.D.N.Y. 2008).....................................................................................................1

    586 F. Supp. 2d at 193 ......................................................................................14

    586 F. Supp. 2d at 183 ......................................................................................25

## TABLE OF AUTHORITIES (continued)

**STATUTES**                                                    **Page**

15 U.S.C. § 77p(b) ............................................................................................43

15 U.S.C. § 77r(b) ............................................................................................45

15 U.S.C. § 77r(b)(1) ........................................................................................45

15 U.S.C. § 77r(b)(1)(A) ...................................................................................45

15 U.S.C. § 77r(b)(1)(C) ...................................................................................45

15 U.S.C. § 77r(d)(4) ........................................................................................45

15 U.S.C. § 78bb(f)(1) ......................................................................................43

15 U.S.C. § 78bb(f)(5)(B)............................................................................44, 45

15 U.S.C. §§ 78bb(f)(5)(E) ...............................................................................45

## OTHER AUTHORITIES

Federal Rule of Civil Prodcedure 8 ..................................................................42

Federal Rule of Civil Procedure 9(b) ...................................................4, 16, 19, 35

Defendants Mayer Brown LLP ("Mayer Brown"), Mayer Brown International LLP,[1] and Grant Thornton LLP ("Grant Thornton") move to dismiss the claims against them in the Amended Complaint.  Although Grant Thornton and Mayer Brown provided different kinds of services to Refco and are differently situated in many respects, their arguments in this case overlap significantly.  Accordingly, to avoid repetition, these parties hereby submit this combined brief in support of their motion.  Except where otherwise indicated, all arguments in this brief are made on behalf of Mayer Brown, Mayer Brown International LLP, and Grant Thornton collectively.

## INTRODUCTION

The Amended Complaint is at least the *sixth* attempt by Refco customers to leverage their broker's breach of contract—its failure to refund cash or securities placed with Refco—into claims of fraud and other torts.  None of the prior five has survived a motion to dismiss,[2] and this one should fare no better.  Lawsuits to survive motions to dismiss in this Refco MDL have focused on Refco's fraud against its potential investors, in which it engaged in a series of transactions designed to hide its losses.  Refco's *customers*, however, did not invest in Refco and cannot state a claim based on that fraud.  The customer lawsuits necessarily focus on different

---

[1] The Amended Complaint makes no allegations specific to Mayer Brown International LLP. Accordingly, if the complaint is dismissed as against Mayer Brown for any or all of the reasons discussed herein, it should also be dismissed as against Mayer Brown International LLP.

[2] *See Kirschner v. Bennett*, No. 07 Civ. 8165, Slip Op. (S.D.N.Y. Aug. 25, 2009) (cited herein as "Op.") (attached as Mollón Decl., Ex. 1); *VR Global Partners, L.P. v. Bennett (In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.) ("RCM II")*, 586 F. Supp. 2d 172 (S.D.N.Y. 2008) (dismissing repleaded complaint by RCM customer class, as well as separate complaints in *VR Global Partners, LP v. Bennett*, No. 07 Civ. 8686, and *Capital Management Select Fund Limited, v. Bennett*, No. 07 Civ. 8688); *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig. ("RCM I")*, No. 06 Civ. 643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) (dismissing complaint by putative class of RCM securities customers against Grant Thornton LLP, among others).  In addition, as of the time of this writing, there has not yet been a ruling on the

conduct—namely, Refco's use of customer deposits and its ultimate inability to repay.  But the customers' agreements explicitly *permitted* Refco to use customer deposits for Refco's own purposes.  Am. Compl. ¶ 52.  No customer has been able to plead that Refco's use of its deposits was wrongful at all, much less link any wrongdoing with these defendants.

The plaintiff in this case has had more of a chance than anyone.  He filed his current Amended Complaint (on behalf of seventy-two customers) with the benefit of all these previous complaints and rulings, and after obtaining reams of discovery from the defendants in the MDL.  But his second complaint suffers from the same flaws that doomed his first one.  Ultimately, Refco's inability to repay these customers was (at most) a simple breach of contract—not fraud, not breach of fiduciary duty, not conversion.  And even if these customers *had* been the victims of a tort, the current complaint still does not plead sufficient facts to charge these defendants with aiding and abetting.

*     *     *     *     *

Plaintiff Marc Kirschner is the Trustee of the Private Actions Trust, an entity created as part of Refco's plan of reorganization to pursue the claims of certain Refco creditors on a consolidated basis.  Here, the Trustee asserts claims on behalf of seventy-two customers who used Refco Capital Markets ("RCM") as their broker for trading in the foreign exchange markets ("FX Customers").  According to the Trustee, Refco routinely used RCM customer deposits for its own business, transferring the customers' collateral and other funds to other Refco entities "without regard for the[ir] return."  Am. Compl. ¶¶ 127, 297.  The Trustee claims that this constituted breach of fiduciary duty, fraud, and conversion by RCM and Refco's insiders,

---

defendants' motions to dismiss the complaints in a sixth attempt to state a customer claim:  the SPhinX matters, including *Krys v. Sugrue*, No. 08 Civ. 3086.

allegedly aided and abetted by Refco's independent auditor Grant Thornton and its outside counsel Mayer Brown.

Judge Lynch dismissed the Trustee's first complaint on three grounds, each of which was independently fatal to the claims against these defendants. First, the Trustee's allegations were insufficient to support his claims that RCM and its insiders engaged in breach of fiduciary duty, fraud, or conversion. Second, he did not allege facts showing that Mayer Brown and Grant Thornton had actual knowledge of any of the alleged torts against these customers, as required for his claims of aiding and abetting. Third, and finally, the Trustee did not allege that either of these defendants substantially assisted in any such torts. The Trustee's new Amended Complaint does not cure *any* of these deficiencies, much less all three of them.

As an initial matter, the Trustee has once again failed to allege any tort for these defendants to aid and abet. He has pleaded no basis for finding that the FX Customers were owed any fiduciary duty. RCM had no discretionary authority over the customers' accounts; as the Trustee admits, the customers themselves directed all trading activities. And while RCM's customer agreements gave it the ability to use the customers' cash, that use was for RCM's benefit and created no fiduciary duty, as Judge Lynch recognized. Finally, while the Trustee argues that RCM had a fiduciary duty not to waste or steal their deposits, he cannot identify any basis for finding such a duty or special relationship. Again, to the extent that these customers were injured, their injury was a breach of RCM's obligation to pay them their account balances on demand, not a breach of some extra-contractual duty. The claim for aiding and abetting breach of fiduciary duty therefore should be dismissed.

As for fraud, the Trustee has all but abandoned any claim that the customers were deceived about whether Refco would use funds from their accounts. Now, he claims that the

customers were deceived because "RCM held itself out as a viable, solvent broker-dealer with which customers could safely execute FX trades and which could return their FX Margin and other assets." Am. Compl. ¶ 292; *cf. id.* ¶ 307. But once again, the Trustee makes no effort to identify the supposedly fraudulent statements, nor does he explain who made them, when they were made, and why they were false at the time. The "when" is particularly critical here. According to the Trustee, it was Refco's leveraged buy-out ("LBO") in August 2004 that rendered it unable to return the customers' deposits. But the Trustee does not explain whether the misstatements (whatever they were) occurred before or after the LBO—or, for that matter, before or after these particular customers chose to place their money with RCM in the first place. And for some of these customers, there was no choice at all; they were acquired by RCM in its transaction with Cargill, and it is not clear that they received or relied on *any* representations about RCM. Finally, the connection between any alleged fraud in inducing the customers' deposits with RCM (on the one hand) and RCM's inability to repay them (on the other) is too attenuated to show proximate cause. Thus, the claim for aiding and abetting fraud should be dismissed for failure to plead fraud with particularity as required by Federal Rule 9(b).

The Trustee's attempt to replead conversion is equally deficient. A claim of conversion requires more than the simple assertion that funds owed to customers were not ultimately repaid. As before, these customers have been unable to plead facts showing that RCM exercised "unauthorized dominion" over their funds in any manner not permitted by their customer agreements. RCM had the contractual right to use the customers' deposits, and these customers have failed once again to demonstrate that this "use" was wrongful. The Trustee's vague assertion that Refco ordered the transfer of these deposits "without regard for [their] return" is not supported by any factual allegations, nor is it sufficient in any event. *E.g.*, Am. Compl. ¶ 53.

As Judge Lynch has already held, the customer agreements did not require RCM to return the *same* assets to any particular customer.  Relatedly, the conversion claim should be dismissed for the independent reason that the customers' funds cannot be specifically identified.

Setting aside the problems with the underlying causes of action, the Trustee has also failed to cure either of the two independently fatal flaws in his claims for aiding and abetting.  As Judge Lynch recognized, the Trustee must allege that these defendants had "actual knowledge" of the wrongdoing against the FX Customers, and that they provided "substantial assistance" in furtherance of that wrongdoing.  Op. at 31.  The original complaint did not satisfy either element, nor does the Amended Complaint.  Indeed, rather than linking these defendants to the alleged wrongdoing against Refco's *customers*, the Trustee has attempted to bolster his allegations concerning what these defendants supposedly knew about Refco's fraud against its *investors*.  But as Judge Lynch has already explained, those sorts of allegations relate to a separate set of wrongful acts by Refco; they cannot support the claims asserted here.

Finally, the Trustee's new allegations make it clear that his claims are barred by the Securities Litigation Uniform Standards Act ("SLUSA").  Although Judge Lynch held that the original complaint did not allege any claim that "coincide[d]" with the purchase or sale of a covered security (Op. at 12 n.12), the new complaint now attributes the FX Customers' ultimate losses almost entirely to Refco's 2004 LBO, which indisputably involved the purchase and sale of "covered securities."  These new allegations require dismissal under SLUSA, even if the old allegations did not.

## BACKGROUND

*RCM and the Parties Here.*  RCM was an offshore securities and foreign exchange broker that was part of Refco's business of providing brokerage, execution, and clearing services in the international commodities and derivatives market.  Am. Compl. ¶¶ 33, 34, 38.  Mayer Brown provided legal services to Refco until October 2005.  *Id.* ¶ 28.  Grant Thornton served as the independent outside auditor to RCM and Refco, issuing audit opinions on their financial statements for fiscal years 2003, 2004, and 2005.  *Id.* ¶ 31.

The FX Customers used RCM as their foreign exchange ("FX") broker.  They placed and maintained funds with RCM "for the specific, limited purpose of effectuating FX transactions pursuant to their instructions."  *Id.* ¶ 18.  Whenever the customers held interests in foreign currency, the balances in their accounts provided "margin" for the benefit of RCM—or, in other words, "security for the broker to protect against the credit risk of its customers should there be unexpected swings in the value of traded currencies."  *Id.* ¶ 42.  The FX Customers did not hold segregated accounts, and RCM did not hold their assets in trust.  Indeed, RCM's customer agreements allowed RCM to "'loan, pledge, hypothecate or otherwise use or dispose of [all of a customer's] cash, securities, and other property free from any claim or right, until settlement in full of all [outstanding margin loans].'"  Op. at 15 (quoting customer agreement ("FX Agreement") and its "Margin Annex"); *see also* Am. Compl. ¶ 52.  A deposit, therefore, only gave a customer a contractual right to payment of its account balance in "'cash' or 'like amounts of similar cash, securities and other property.'"  Op. at 21 (quoting FX Agreement).

According to the Trustee, Refco routinely ordered the transfer of RCM customer deposits to meet the funding requirements of other Refco entities.  Am. Compl. ¶¶ 69–70.  At the instruction of RCM President Santo Maggio, RCM employees would transfer assets from

customer accounts into a general account at RCM, where they were "commingled" with other RCM assets and with assets from the accounts of other RCM customers. *Id.* ¶¶ 68–69. The assets were then disbursed to other Refco entities in a series of intercompany loans. The proceeds were used in the affiliates' operations and to fund Refco's continued acquisition campaign. *Id.*

The intercompany loans themselves were no secret; indeed, the Trustee acknowledges that these loans were disclosed in RCM's financial statements. *Id.* ¶ 271. The financial statements included a note explaining that in the normal course of business, RCM executed various securities and other financial instrument transactions with affiliated companies. Although these transactions were recorded in the financial statements in a line item identified as "receivable[s] from customers," the note quantified the portion of that line item that was, in fact, attributable to affiliated-company transactions. *See id.*

During the same period, Refco management was engaged in a massive fraud, concealing its true financial condition by systematically removing massive trading losses from its books at the end of each financial reporting period. *Id.* ¶¶ 82, 89, 94–102. When the truth about these losses emerged in October 2005, RCM experienced a "run" on its customer accounts. *Id.* ¶ 61. The complaint does not specify whether or when any individual FX Customer made a demand to withdraw its deposits. Nevertheless, the Trustee contends that they lost more than $500 million when RCM ultimately filed for bankruptcy. *Id.* ¶¶ 77–78.

**The Trustee's First Complaint.** The original complaint asserted tort claims against former Refco CEO Phil Bennett, former RCM President Santo Maggio, and former Refco CFO Robert Trosten. In addition, the Trustee asserted claims against Grant Thornton and Mayer Brown (referred to in Judge Lynch's opinion as the "Professional Defendants") for aiding and

abetting the insiders' breach of fiduciary duty, fraud, and conversion.  Judge Lynch dismissed these claims on three independent grounds, holding that the Trustee (i) failed to state a claim for breach of fiduciary duty, fraud, or conversion against either RCM or its insiders; (ii) failed to plead that the Professional Defendants had actual knowledge of any such tort, as required for aiding and abetting; and (iii) failed to plead that these defendants had substantially assisted any such tort.

With respect to the claim for aiding and abetting breach of fiduciary duty, the court noted that the FX Customers' accounts were non-discretionary, and the complaint did not allege any other facts indicating that "that [RCM's] actions were designed to instill a special relationship." Op. at 13–15, 18.  Accordingly, the Trustee failed to identify any fiduciary duty owed to these customers.  *Id*. at 13–18.

The complaint also failed to plead fraud because it did not "allege with specificity the material misstatements on which [the FX Customers'] claims are based." *Id.* at 19.  The only misrepresentations hinted at in the complaint—the customers' account statements and customer agreements—simply were not deceptive.  The Trustee had failed to allege any facts concerning the financial status of the entities that received the loans or any other facts showing that the loans were uncollectible as soon as RCM made them, as the Trustee had suggested.  *Id.* at 22–24. Moreover, the court explained that the lack of "absolutely critical" information about how RCM managed the FX Customers' accounts, how the transactions were recorded, and how the account statements conveyed a false impression of how the deposits were handled also necessitated dismissal of the claim.  *Id.* at 23–24.

Finally, the court dismissed the Trustee's conversion claim because it "fail[ed] to make any factual allegations as to how RCM 'exercised . . . dominion over the [FX Customers' funds],

to the alteration or exclusion of plaintiffs' rights.'"  *Id.* at 29 (second alteration in original).

Judge Lynch noted that the complaint failed to allege when or how the funds were stolen from

customer accounts; especially in light of the Margin Annex, which allowed RCM to use or

transfer the customers' funds, there were no allegations suggesting that RCM's use of the

deposits was unauthorized.  *Id.* at 29–30.  "The Trustee must make *some* factual allegations as to

when and how RCM transferred . . . specifically identifiable assets from [FX Customer] accounts

to the Refco affiliates in order for the Court to 'draw the reasonable inference that the defendant

is liable for the misconduct alleged.'"  *Id.* at 30.

While these flaws in pleading the underlying torts would themselves have required

dismissal of the aiding and abetting claims, Judge Lynch also dismissed these claims on two

other independent grounds—failure to plead actual knowledge and failure to plead substantial

assistance, both of which are required elements of an aiding and abetting claim.  The court

rejected the notion that facts suggesting knowledge of *Refco's scheme to defraud investors* were

sufficient to show knowledge of *a scheme to misuse RCM customer deposits*:  "the Trustee must

offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful

conduct *that harmed the FX customers*—the alleged fraudulent siphoning of their funds—not

actual knowledge of *different* wrongful conduct that might have harmed others, such as Refco's

shareholders."  *Id.* at 32.  As Judge Lynch recognized, "the Trustee allege[d] no conduct on the

part of the Professional Defendants that in any way assisted in the alleged unauthorized diversion

of FX Customers' assets that underlies the torts asserted here."  *Id.* at 33.  Although Judge Lynch

found it "puzzling" that the Trustee had elected to stand on a complaint so similar to the one

already found inadequate in the RCM Brokerage Litigation, *see supra* note 1, he granted the

Trustee one opportunity to replead, *id.* at 34.

***The Current Complaint.***   In his Amended Complaint, the Trustee alleges once again that RCM "siphon[ed]" its customers' deposits (Am. Compl. ¶¶ 63, 76), transferring them to other Refco entities for use in their operations, all as part of a plan by Refco's insider/shareholders to boost Refco's performance and cash out their interests for a higher value (*id.* ¶¶ 1–2, 37). Though he now admits that the mere "use" of customer deposits was not wrongful, he complains that RCM and Refco used the customers' funds "without regard for [their] return."  *E.g.*, *id.* ¶¶ 53, 297, 305, 317.  He also attempts to cast his fraud claim in terms of "fraud in the inducement," alleging that Refco insiders represented "that RCM was a viable, solvent broker-dealer with which customers could safely execute FX trades and which could return their FX Margin and other assets."  *Id.* ¶ 292.

The Trustee's Amended Complaint again brings claims against Mayer Brown and Grant Thornton for aiding and abetting three torts by Refco insiders:  breach of fiduciary duty, fraud/fraudulent inducement, and conversion.  Rather than provide facts to link these defendants with the alleged "siphoning" of the FX Customer deposits, however, the Trustee has again focused on allegations about what these defendants supposedly knew *about Refco and RCM generally*.  The Trustee now alleges (in cursory fashion) that these defendants must have known the LBO would render RCM "insolvent" by subordinating all previous debt to the new debt acquired in that transaction.  *E.g.*, *id.* ¶ 7.  He also alleges that they must have known that RCM was transferring large amounts of customer deposits to its affiliates, and that they knew and assisted in the concealment of Refco's true financial condition.  *Id.* ¶¶ 65, 80.  But the Amended Complaint does not address the fundamental issue identified in Judge Lynch's opinion:  whether these defendants knew about and substantially assisted in torts "*that harmed the[se] customers*"—as opposed to wrongdoing that harmed others, "such as Refco's shareholders."  Op.

at 32.  Thus, the Amended Complaint does not remedy *any* of the basic deficiencies identified by Judge Lynch in dismissing the original complaint.

## POINT ONE

### The aiding and abetting claims should be dismissed because the Trustee has again failed to plead any of the underlying causes of action.

First and foremost, the Amended Complaint does not solve the fundamental problems with the three causes of action underlying the claims for aiding and abetting.  As before, the Trustee has not alleged a fiduciary relationship between the FX Customers and either RCM or its insiders, has failed to plead fraud by the Refco insiders with particularity, and has not identified any basis for finding conversion.  Thus even aside from the allegations directed specifically at Mayer Brown and Grant Thornton, the Trustee's aiding and abetting claims should be dismissed.

### A.   Like the original complaint, the Amended Complaint fails to plead that RCM or its insiders owed the FX Customers any fiduciary duty.

"A fiduciary duty arises when one person is under a duty to act for or to give advice for the benefit of another upon matters *within the scope of the relation*."  Op. at 13 (emphasis in original; alteration and internal quotations omitted).  Judge Lynch held that the Trustee's original complaint did not allege facts supporting a fiduciary duty running from RCM to the FX Customers.  Based on the undisputed terms of the FX Agreement, Judge Lynch reasoned that (1) the FX Customers' accounts were non-discretionary and thus did not give rise to a fiduciary duty as a matter of law, and (2) RCM had no separate fiduciary duty not to "waste" or steal the customers' deposits.  *Id.* at 13–18.  Although the Amended Complaint attempts to recast some of the Trustee's allegations of duty, it cannot escape from the undisputed terms of the FX Agreement.  Accordingly the Trustee's claim for aiding and abetting breach of fiduciary duty should be dismissed once again.

- 11 -

### 1.   The Trustee again fails to plead that RCM had discretionary authority.

Although "a broker may owe a fiduciary duty where he has 'discretionary trading authority' over a customer's account," Judge Lynch determined based on the language of the FX Agreement that RCM lacked such discretionary trading authority.  Op. at 14.  He further rejected the Trustee's theory that the FX Agreement's "Margin Annex" vested RCM with relevant discretionary authority.  *See id.* at 15–16.  On the contrary, the Margin Annex entitled RCM to "loan, pledge, hypothecate *or otherwise use or dispose of* [all of a customer's] cash, securities and other property free from any claim or right, until settlement in full of all [outstanding margin loans]."  *Id.* at 15 (emphasis and alterations in original) (quoting the Margin Annex).  This provision exists for RCM's benefit, not the customers'.  No fiduciary duty could arise based on "RCM's use of a customer's margin," therefore, "because the broker's use is not a situation in which the broker 'act[s] for or . . . give[s] advice for the benefit of another within the scope of the relation.'"  *Id.* (alterations and second omission in original) (quoting *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 707 (2d Cir. 1998)).

The Trustee now concedes that RCM lacked discretionary trading authority.  *See* Am. Compl. ¶ 62.  While he makes a cursory attempt to resurrect his theory that a fiduciary duty arose from RCM's authority under the Margin Annex to "use" FX Customer funds (*id.*), the Trustee alleges no facts that could overcome Judge Lynch's holding that a broker's use of customer funds "is not a situation in which the broker acts for or gives advice for the benefit of another within the scope of the relation."[3]  Op. at 15 (alterations, omissions, and internal quotations

---

[3] Although Judge Lynch reached that conclusion by analyzing the FX Agreement's Margin Annex, the Cargill agreements assigned to RCM—which are incorporated in the Amended Complaint (*see* Am. Compl. ¶ 56) and may therefore be cited in support of a motion to dismiss— similarly permitted the broker to hypothecate property in customer accounts "without regard to

- 12 -

omitted). Accordingly, as before, the Trustee fails to plead a fiduciary duty on the theory that RCM had discretionary authority over the FX Customers' accounts.

### 2. The Trustee again fails to plead a fiduciary duty to avoid waste.

In his opinion dismissing the initial complaint, Judge Lynch also rejected the Trustee's alternative theory that RCM owed the FX Customers a fiduciary duty not to waste or steal their deposits.[4] Op. at 16–18. Although the Trustee characterized RCM's use of customer funds as "contrary to what customers reasonably expected," the complaint failed to allege facts sufficient to prove that "the source of that expectation" fell "within the scope" of the affairs entrusted to RCM as broker.[5] *Id.* at 17 (internal quotations omitted). "The complaint simply '[did] not allege facts indicating that [RCM's] actions were designed to instill a special relationship'" beyond an ordinary broker-customer relationship. *Id.* at 18 (second alteration in original) (quoting *Bauer v. Mellon Mort. Co.*, 680 N.Y.S.2d 397, 401 (Sup. Ct. 1998)).

The Amended Complaint is no better. This time around, the Trustee identifies two purported "sources" of the FX Customers' alleged expectation that RCM would avoid waste:

---

whether or not such securities or property remain[ed] in the possession and control of [the broker]." Mollón Decl., Ex. 2 at § 3.

[4] In addition to the "no waste" theory, Judge Lynch briefly considered and rejected several other theories of fiduciary duty not dependent on RCM's discretionary authority. Op. at 16–18. The Amended Complaint cures none of those deficiencies. *See, e.g.*, Am. Compl. ¶ 62 (alleging facts in support of a "totality of the facts and circumstances" theory that are substantially identical to the allegations in paragraphs 28(b), (c), (g), (j), (r), and (q) of the original complaint); *id.* ¶¶ 9, 37, 68–69, 123 (alleging siphoning but failing to specify precisely when siphoning occurred relative to the FX Customers' trading); *id.* ¶¶ 62(b), 298, 309 (asserting without supporting facts or explanation that RCM was insolvent); *see also id.* ¶ 37 (asserting—contrary to the allegation that RCM was insolvent—that at all relevant times RCM was so flush with cash that it funded other Refco entities).

[5] Judge Lynch correctly distinguished *United States v. Szur*, 289 F.3d 200 (2d Cir. 2002), in which "the Second Circuit found that the brokers had a fiduciary duty to disclose their allegedly 'exorbitant commissions' because that 'information [was] relevant to the affairs . . . entrusted to [the broker].'" Op. at 17 (alterations in original) (quoting *Szur*, 289 F.3d at 211–12).

- 13 -

(1) "the broker-dealer relationship between RCM and the FX Customers," and (2) "the entrustment of funds by the FX Customers at RCM for the specific purpose of engagement in FX trading at their direction."  Am. Compl. ¶ 299.  Under New York law, however, "there is no general fiduciary duty inherent in an ordinary broker/customer relationship."  *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998).  That is so notwithstanding that such relationships typically involve the "entrustment" of funds to the broker for customer-directed trading.  *E.g.*, Am. Compl. ¶ 299.  As Judge Lynch has explained on three separate occasions, when a broker lacks discretionary trading authority, the broker's duties "begin and end with each transaction."  Op. at 14 (quoting *De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1306 (2d Cir. 2002)); *see RCM II*, 586 F. Supp. 2d at 193; *RCM I*, 2007 WL 2694469, at *9.

The Trustee nowhere attempts to plead facts that could create a "special relationship" between the FX Customers and RCM, let alone link such a relationship to the FX Customers' supposed expectation that RCM would avoid waste.  *See* Am. Compl. ¶¶ 2, 5, 6, 13, 32, 117, 312 (asserting only that waste occurred, or occurred "without legal right").  He "does not claim any unauthorized trading, any omission of information material to a particular transaction, any violation of government or industry regulations concerning risk disclosures . . . , or . . . any unsound or reckless advice."  *De Kwiatkowski*, 306 F.3d at 1306; *see also supra* note 4.

Thus, like the original complaint, the Amended Complaint pleads no basis for concluding that RCM owed a fiduciary duty to the FX Customers.  Because the Trustee can therefore prove

no "primary" breach of fiduciary duty,[6] his claim for aiding and abetting breach of fiduciary duty should be dismissed.

### B. Like the original complaint, the Amended Complaint fails to plead fraud or deception with particularity.

In his Amended Complaint, the Trustee tosses aside the theory of fraud set forth in his initial pleading and instead tries on a new one. While he halfheartedly alleges fraud in RCM's alleged practice of using customer deposits "without regard for [their] return" (Am. Compl.¶ 305), this theory runs squarely against Judge Lynch's holding that RCM's use of customer deposits was *permitted* by the customer agreements and involved no deception. The Amended Complaint offers nothing that could change this result. Instead, the Trustee restates his claim as one for "fraud in the inducement," claiming that the FX Customers were induced to use RCM based on alleged misrepresentations about RCM's "viability" as a broker-dealer that they could use "safely" and that would be able to return their deposits. *See, e.g.*, Am. Compl. ¶¶ 8, 11, 13, 14(a)–(b), 38, 59, 79, 82, 88, 102.

Once again, however, the Trustee has failed to plead fraud with particularity. The elements of a fraud-in-the-inducement claim are similar to an ordinary fraud claim:[7] "'At the very threshold,' [plaintiffs] must allege a misrepresentation or material omission on which they relied that induced [plaintiffs] to enter into an agreement." *Barron Partners, LP v. Lab123, Inc.*,

---

[6] The Amended Complaint also alleges that Bennett and Maggio *personally* owed fiduciary duties to the FX Customers. *See* Am. Compl. ¶¶ 298–301. But "[u]nder New York law there is no fiduciary duty owed . . . to the customers of a corporation by a controlling shareholder, officer, or director." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978, 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999), *reconsideration granted on other grounds,* 2000 WL 302697 (S.D.N.Y. Mar. 21, 2000).

[7] Fraudulent inducement requires "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Computerized*

593 F. Supp. 2d 667, 670 (S.D.N.Y. 2009) (Rakoff, J.) (alteration omitted).  As Judge Lynch's opinion explains, Rule 9(b) requires clearly identifying the alleged fraudulent statements, who made them and when, and how those statements were false.  Op. at 13, 19; *see also In re Initial Pub. Offering Sec. Litig.* ("*IPO Litig.*"), 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (explaining that Rule 9(b) requires that the pleadings set forth the alleged fraud with particularity, including "the who, what, when, where, and how" of the fraud (internal quotations omitted)).  "The primary purpose of Rule 9(b) is to afford defendant[s] fair notice of the plaintiff's claim and the factual ground upon which it is based."  *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990).  The allegations in the Trustee's Amended Complaint are far "too amorphous to provide defendants with sufficient notice to permit a response."  *IPO Litig.*, 241 F. Supp. 2d at 325.

The Amended Complaint states repeatedly that the FX Customers were induced to "entrust" their funds to RCM because "RCM presented itself as a viable, solvent broker-dealer with which customers could safely execute FX trades and which could return their FX Margin and other assets."  Am. Compl. ¶ 292; *see also id.* ¶¶ 38, 58, 61, 79, 82, 102.  But the Trustee has not identified any statements misrepresenting RCM's "viability" or safety as a broker dealer, or its ability to return the customers' deposits.  Indeed, the Trustee does not identify *any* alleged misrepresentations, much less specify any particulars about them.  *Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.)*, 252 F.3d 63, 69–70 (2d Cir. 2001) ("The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made."); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) ("[T]he actual fraudulent statements or conduct and the fraud alleged must be stated with particularity.").

---

*Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (internal quotations omitted).

The issue of "when" the relevant misstatements were made is particularly critical here. According to the Trustee, it was not until the LBO in 2004 that RCM's loans to Refco affiliates truly became "uncollectible" and thus RCM became unable to repay its customers. Am Compl. ¶ 62(b). On this theory, a representation made *before* the LBO about RCM's ability to return the customer deposits would not even have been false. *Id.* ¶¶ 62(b), 75, 118. And the Trustee does not identify any misrepresentations that relate to whether customers could use RCM "safely" (*id.* ¶ 292) at *any* point in time. Indeed, RCM held itself out as an offshore broker, which by its nature would not have the safeguards of U.S. regulation. *Id.* ¶ 263. Thus, to claim that these customers chose RCM for its "safety" (*see* Am. Compl. ¶ 14(b)) is simply not plausible, and the Trustee has alleged no facts to make it so, *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The Amended Complaint also does not specify when the relevant misstatements were made relative either to when the FX Customers chose to deposit funds with RCM or to when these defendants allegedly took any action to aid Refco. Grant Thornton, for example, did not issue its first audit opinion for Refco until mid-2003, when Refco issued its financial statements for the fiscal year ending February 28, 2003. The Amended Complaint contains allegations concerning Refco's concealed trading losses and period-end loans dating back to 1999. *See, e.g.*, Am. Compl. ¶¶ 106, 138. To the extent that a particular FX customer was "induced" to choose RCM based on representations *before* Grant Thornton's first audit opinion was issued, Grant Thornton could not possibly have aided and abetted that fraud. The Amended Complaint's failure not only to *identify* the alleged misstatements but also to state *when* they were made (or even when the FX Customers were "fraudulently induced") makes clear that the Trustee has not come close to pleading fraud.

- 17 -

Notably, the Trustee admits that a significant number of the FX Customers never chose RCM at all; they became RCM customers in June 2005—very shortly before Refco's collapse—when their accounts were assigned to RCM as a result of the Cargill acquisition. *Id.* ¶¶ 10, 55–57. The Amended Complaint is utterly silent about what statements were made to those customers, by whom, and how these customers could possibly have been "fraudulently induced." *Id.* To the contrary, the Trustee admits that at least some of the FX Customers whose accounts were transferred from Cargill did *not* execute agreements with RCM, "but instead either received a negative consent letter that was silent as to which agreement would govern, or agreed to have their agreements with Cargill assigned to RCM." *Id.* ¶ 56.

To the extent that the Trustee's fraud claim is based on fraud by omission, that claim also fails. An omission is fraudulent only if there was some duty to disclose, either because disclosure is necessary to render some *other* statement not misleading, or because of a fiduciary duty. *See, e.g.*, Op. at 19 (citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 47 (2d Cir. 1993)). As discussed immediately above, no duty to disclose has been alleged here.

Finally, even were it sufficiently pleaded, the Trustee's new-found fraud-in-the-inducement claim would fail for lack of loss causation. The Trustee alleges that that the FX Customers were "induced" to deposit their money with RCM, Am. Compl. ¶ 292, but they did not actually lose their money until well after that, when (as they now also allege) in October 2005 they asked for and were denied payment of their account balances, *id.* ¶ 132. In the meantime, Refco put the customers' deposits to use—transferring them to other Refco entities through intercompany loans—and, according to the Trustee's allegations, entered into a major corporate transaction (the LBO) that ultimately made it impossible for those loans to be repaid.

- 18 -

Thus, any causal link between the (undefined) misstatements that allegedly induced the deposits and the customers' ultimate losses in 2005 is far too attenuated.  Indeed, according to the Amended Complaint itself, the customers' losses were caused by supervening events *after* the alleged fraudulent inducement—namely, Refco's "siphon[ing]" of the customer deposits and the loans' subordination through the LBO.  *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985).

For all these reasons, the Trustee's allegations of fraud fall far short of the requirements of Rule 9(b).  On this basis alone, the claim for aiding and abetting fraud should be dismissed.

### C.   Like the original complaint, the Amended Complaint fails to state a claim for conversion of the FX Customers' deposits.

Judge Lynch held that the Trustee's original complaint did not state a claim for aiding and abetting conversion because it did not allege facts showing that RCM exercised an "unauthorized dominion" over the FX Customers' deposits.  Op. at 29 (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)).  Because the FX Agreement allowed RCM broad discretion to use the deposits, "no conversion could occur at the time of the 'streaming' unless it took place *outside of* the terms established by the Margin Annex."  *Id.* (emphasis in original).  In repleading, however, the Trustee cannot circumvent the clear terms of the FX Agreement.  Nor can he manufacture a "wrongful detention" merely because the FX Customers may have asked RCM for their money back.  Finally, a conversion claim cannot lie for the independent reason that the FX Customers' deposits are not "specifically identifiable" property.  For all these reasons, the claim for aiding and abetting conversion should be dismissed.

1.      **RCM's use of the FX Customers' funds was explicitly authorized by the customer agreements.**

As Judge Lynch held, to state a claim for conversion, "the Trustee must show that the use of the FX customers' funds was, in fact, unauthorized."  Op. at 30.  The original complaint did not demonstrate an *unauthorized* use, because the FX Agreement permitted RCM to use the deposits as it saw fit:

> Allegations that the funds were "upstreamed, sidestreamed, and downstreamed to other Refco entities[,]" which might be satisfactory to describe a conversion in other circumstances, are decisively underwhelming here because the Margin Annex of the FX Agreement itself specifically authorizes RCM to "loan, pledge, hypothecate or otherwise dispose of such cash, securities and other property *free from any claim or right*, until settlement in full of all Transactions entered into pursuant to the [FX] Agreement."  It readily follows that no conversion could occur at the time of the "streaming" unless it took place *outside of* the terms established by the Margin Annex.

*Id*. at 29 (citations and internal quotations omitted) (all emphasis and second alteration in original); *see also Fesseha v. TD Waterhouse Investor Servs.*, 761 N.Y.S.2d 22, 23–24 (N.Y. App. Div. 2003) (dismissing claims both for breach of contract because "the parties unambiguously agreed to grant defendant TD Waterhouse the right to liquidate securities in plaintiff customer's account, even without notice, when TD Waterhouse deemed such action necessary for its own protection," and for conversion because "[a] cause of action for conversion cannot be predicated on a mere breach of contract"); *Newbro v. Freed*, 409 F. Supp. 2d 386, 396 (S.D.N.Y. 2006) (finding "the rationale underlying courts' reluctance to permit customers to proceed against the depository institution on a conversion theory" to be the institution's "pre-existing contractual relationship with a customer"), *aff'd*, 2007 WL 642941 (2d Cir. Feb. 27, 2007).

That some of the FX Customers are former Cargill customers does not change this result. The Cargill account agreements are, if anything, even *more* explicit in authorizing the broker to

- 20 -

transfer customer deposits.  For instance, the Cargill account agreement for Leuthold Funds, one

of the FX customers represented by the Trustee, provides:

> The Customer agrees that securities, including Collateral securities, and
> other property in the Customer's Account(s) may be pledged, repledged,
> hypothecated or rehypothecated separately or in common with other securities and
> property for the sum due to CISFS thereon or for a greater sum and without
> regard to whether or not such securities or property remain in the possession and
> control of CISFS.

Mollón Decl. Ex. 3 at § 3(a); *accord* Mollón Decl. Ex. 2 at § 3(a).

In sum, although RCM's ultimate failure to pay the FX Customers their account balances

might have been a breach of contract, it cannot be the basis of a claim for conversion absent

some allegation that RCM used the deposits in a manner not authorized by the FX Agreement.

Once again, the Trustee has been unable to make any such allegations.

### 2.  The Trustee's allegation that the FX Customers demanded the return of their deposits is not sufficient to support a conversion claim.

The Amended Complaint emphasizes that after the fraud at Refco was revealed, the FX

Customers requested the return of their funds.  Am. Compl. ¶ 77.[8]  In this fashion, the Trustee

may be attempting to articulate a new theory of "wrongful detention," mentioned in a footnote to

Judge Lynch's opinion.  *See* Op. at 30 n.24.  If so, the attempt fails, for several reasons.

First, RCM's alleged failure to repay money owed to the FX Customers on demand does

not suffice to state a claim for conversion.  If it did, then *any* breach of a loan contract by the

borrower would be a tort; the borrower would "convert" the lender's money any time he did not

repay the lender in full.  Every bankruptcy of a bank or brokerage house would spawn countless

---

[8] The Trustee's original complaint said largely the same thing—that the Refco entities receiving
the FX funds "provided no assurances of their ability, intent, or obligation to repay those assets
*on demand or otherwise*."  Compl. ¶ 31 (emphasis added); *see also id.* ¶ 34(b)–(c).  Still, Judge
Lynch dismissed the conversion claim.

conversion lawsuits and needlessly complicate bankruptcy proceedings.  Such an enormous

expansion of tort law conflicts with the many authorities holding that a conversion claim requires

*more* than a breach of a contractual obligation.[9]  After all, funds deposited in a financial

institution are not always available to be repaid on demand; they are typically lent out or

otherwise invested.  *See Levitin v. Painewebber, Inc.*, 159 F.3d 698, 703 (2d Cir. 1998).

Second, if the Trustee's new conversion theory turns on RCM's failure to pay the

customers their account balances on demand in or after October 2005, the Trustee has not begun

to allege the defendants' knowledge or substantial participation in that conduct, as required for

an aiding and abetting claim.  *See infra* Point Two.  There is no allegation that Mayer Brown or

Grant Thornton knew that the FX Customers had demanded their money back or that they did

anything to help RCM withhold or "detain" the money.  Rather, the Trustee's allegations focus

on what RCM did with the money *before* any such demand—upstreaming, downstreaming,

sidestreaming, and so on—and, as discussed above, there was nothing "wrongful" about any of

that.

Third, the allegation that RCM did not pay the customers' account balances on demand

does not state a claim for *wrongful* detention in any event.  The FX Agreement does not require

---

[9] *See, e.g. Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 643 (E.D.N.Y. 2000)
("[T]he relationship between a bank and a depositor is the strictly contractual one of debtor and
creditor. . . . The bank at the same time becomes contractually indebted to the depositor in the
amount of the funds deposited."); *Swan Brewery Co. v. U.S. Trust Co.*, 832 F. Supp. 714, 718
(S.D.N.Y. 1993) ("A depository institution may apply the funds in a general account to set off
debts owed to it by a depositor."); *Geler v. Nat'l Westminster Bank*, 770 F. Supp. 210, 215
(S.D.N.Y. 1991) ("[A] bank receiving a general deposit is not a bailee of the deposited funds, but
merely owes an ordinary debt to the depositor." (citation omitted)); *Calisch Assocs., Inc. v. Mfrs.
Hanover Trust Co.*, 542 N.Y.S.2d 644, 646 (App. Div. 1989) ("[A] customer's bank account is
merely a debt owed to it by the bank, and there is no identifiable property which could have been
taken by defendant . . . .").

the defaulting party to repay deposits upon a mere demand.  The Trustee tacitly admits this, alleging that such a right to repayment is "express and/or implied."  *See, e.g.*, Am. Compl. ¶ 53. Rather, the Agreement makes RCM's insolvency an "event of default," Mollón Decl., Ex. 4 at § 1, and provides that although the "close-out shall be effective upon receipt by the Defaulting Party of notice that the Non-Defaulting Party is terminating such Currency Obligations and Options," the right to liquidate is subject to other provisions in the Agreement, which the Trustee does not allege were satisfied.  Mollón Decl., Ex. 4 at § 8.1(a).

> **3.  In the alternative, the Amended Complaint does not state a claim for conversion because the FX Customers' deposits are not specifically identifiable property.**

Even if the Trustee somehow could show an unauthorized use of the FX Customers' deposits, a conversion claim still cannot lie because the deposits were not "specifically identifiable"—a required element of the claim.  *See, e.g.*, *High View Fund, LP v. Hall*, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998) (internal quotations omitted).   Although Judge Lynch found this question to be too fact-specific to resolve on a motion to dismiss based on the allegations in the original complaint, the Amended Complaint now adds allegations that the FX Customers' deposits were in specific accounts with specific account numbers.  Am. Compl. ¶ 67.  But the new allegations are still insufficient to distinguish the FX Customers' accounts from ordinary bank or brokerage accounts.

When a bank breaches its obligation to honor a customer's withdrawals, the mere fact that the customer had a specific account and account number does not transform that breach into conversion.  *See Geler Nat'l Westminster Bank USA v. Gluckman*, 770 F. Supp. 210, 215

(S.D.N.Y. 1991).  For these purposes, it makes no difference that RCM was a brokerage house and not a bank.  *See Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998).

As Judge Lynch observed, some cases find that deposited funds may sometimes be the subject of conversion claims, but these authorities arise only in the *absence* of a contractual relationship between the parties.  In *Newbro*, for example, the court allowed the conversion action to proceed where

> plaintiff is not asserting claims against [the clearing house or broker].  Instead, plaintiff is suing another client of an admittedly crooked broker, the transferee of separate and identifiable funds.  Defendants are not in the position of a bank or other financial institution that had a pre-existing contractual relationship with a customer.  Thus, the rationale underlying courts' reluctance to permit customers to proceed against the depository institution on a conversion theory does not apply here.

409 F. Supp. 2d at 396.  Similarly, *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475 (App. Div. 1995), which both *Newbro* and Judge Lynch cited, addressed a claim not against a bank but against a person who deposited traceable, ill-gotten funds into the account.  And *Payne v. White*, 477 N.Y.S.2d 456, 458 (App. Div. 1984), involved a claim by one joint account owner against another joint account owner who improperly removed more than his share of the account.  These cases do not support a conversion claim against a broker, like RCM, which had an explicit contract with its customers.

The Second Circuit has affirmed the rule that funds deposited with a financial institution are presumed to be general deposits, and the depositor maintains the burden of overcoming that presumption:

> Whether a deposit in a bank is general or special depends upon the mutual understanding and intention of the parties at the time such deposit is made, and a deposit made in the ordinary course of business is presumed to be general, and the burden of proof is on the depositor to overcome such presumption *by proving that*

- 24 -

> *the deposit was made upon such terms and conditions as constituted a special deposit, or a deposit for a specific purpose, as distinguished from a general deposit.*

*Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992) (emphasis added) (quoting *Keyes v. Paducah & Ill. R.R.*, 61 F.2d 611, 613 (6th Cir. 1932)).  The allegations of the Amended Complaint, however, do not come close to satisfying that burden.  The FX Customers regularly received statements that advised:  "Refco does not segregate any collateral or other property deposited with it."  Mollón Decl., Ex. 5 at 15.  Additionally, the bankruptcy court found that "the funds deposited by [an RCM customer] were commingled with other deposits of customers of RCM, as well as other RCM property in a custodial account at HSBC Bank, which had enormous activity averaging roughly 200 million dollars to 300 million dollars of transactions a day."  *Id.* at 7–8.  Irrespective of whether they had individual account numbers, the FX Customers admit that the deposited funds were commingled (*see, e.g.*, Am. Compl. ¶ 68), and they have not alleged facts sufficient to indicate that the deposits were—or were required to be—treated in any special manner.  An action will lie for the conversion of money only "where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question."  *Mfrs. Hanover Trust Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 712 (App. Div. 1990).  The Trustee has articulated no obligation to return specific funds to the FX Customers, and the agreements the customers signed "explicitly allowed RCM to satisfy its contractual obligations by purchasing 'like amounts of similar cash [or] securities' on the open market and conveying those assets to customers."  Op. at 30 (quoting *RCM II*, 586 F. Supp. 2d at 183).  For this independent reason as well, the claim for aiding and abetting conversion should be dismissed.

**POINT TWO**

**The Trustee has again been unable to plead actual knowledge
and substantial assistance—both of which are required to state
a claim for aiding and abetting.**

Even if the Trustee had been able to show that the FX Customers were the victims of a tort by RCM, he still has not been able to plead that these defendants aided and abetted it.  To state a claim for aiding and abetting, a plaintiff must allege *both* that the defendant had actual knowledge of the underlying wrongdoing *and* that it provided substantial assistance.  *See* Op. at 31; *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005).  The Trustee's original complaint failed to allege either of these elements, and his amended filing does nothing to change that.

For these purposes, "the only allegations that matter are those that support the contention that [these defendants] had actual knowledge of, as well as substantially assisted in, the siphoning of the FX customers' assets"—that is, that they "knowingly aided the insiders in converting the customer's funds, using the customers' funds in a way that breached the insiders' duty of loyalty, or making affirmative misrepresentations that provided the customers with a false understanding of how RCM handled assets in their accounts."  Op. at 31, 33.  As Judge Lynch recognized, the Trustee seeks damages based on "the so-called RCM 'customer scheme' that siphoned the FX customers' assets"—not the "'receivables scheme'" in which the Refco insiders used end-of-period third-party loans to hide its losses.  *Id*. at 32.  As a result, allegations about what these defendants supposedly knew or did in respect to the "receivables scheme" cannot support the Trustee's claims.

In this respect, the Amended Complaint suffers from the same problem as the original one.  Unable to make allegations linking these defendants with the torts alleged in this case, the Trustee has chosen to amplify his allegations about the "receivables scheme," ignoring Judge

Lynch's conclusion that such allegations are distinct from the alleged torts against these customers.  He still has not provided allegations to support either the "substantial assistance" or "actual knowledge" elements of his claims.

> **A.    Like the original complaint, the Amended Complaint fails to allege that these defendants "substantially assisted" in torts against the FX Customers.**

As Judge Lynch recognized, a complaint for aiding and abetting "must . . . show that the defendants rendered 'substantial assistance' such that they 'affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] the [underlying harm] to proceed.'"  Op. at 31 (alterations in original) (quoting *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 378 (S.D.N.Y. 2005)).  "The actions of the abettor must also proximately cause the harm to satisfy the 'substantial assistance' prong."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009).[10]  Judge Lynch correctly determined that the Trustee had not alleged any "conduct on the part of the Professional Defendants that *in any way* assisted the alleged unauthorized diversion of FX Customers' assets that underlies the tort claims asserted here."  Op. at 33 (emphasis added).  This conclusion, he decided, was unaffected by the Trustee's allegations about the supposed contributions by these defendants to the

---

[10] Although Judge Lynch's opinion expressed some doubt as to whether "substantial assistance" can be equated to proximate cause (Op. at 31 n.25), the Second Circuit has specifically used the "proximate cause" standard in the context of aiding and abetting, *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.,* 602 F.2d 478, 484 (2d Cir. 1979), *superseded on other grounds*, *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), and district courts within this Circuit have consistently applied this same standard.  *See e.g.*, *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 426–27 (S.D.N.Y. 2007); *Fraternity Fund Ltd.*, *v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 370–71 (S.D.N.Y. 2007) (citing *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 n.6 (S.D.N.Y. 2005) (recognizing that the Second Circuit has used the proximate cause standard in this context).  But even if a lesser "meaningful contribution" standard were applied here (*see* Op. at 31 n.25), the Trustee's claims would nevertheless fail because he has put forth no allegations that Grant Thornton or Mayer Brown had any involvement whatsoever, let alone contributed in a meaningful way, with respect to any tort committed against these FX Customers.

"receivables scheme":  "such aid is not tantamount to the defendants[] . . . doing anything to facilitate[] the looting of customer accounts."  *Id.*

In the Amended Complaint, nothing has changed.  As before, the Trustee centers his allegations about these defendants on their supposed connection with the "receivables scheme"—that is, Refco's fraud on its auditors and potential investors.  For Mayer Brown, for example, the Trustee continues to focus on its alleged role in connection with the documentation for Refco's end-of-period loans to third parties (*compare* Compl. ¶¶ 94–111, *with* Am. Compl. ¶¶ 140–61) and on its work as counsel to Refco in the LBO and IPO (*compare* Compl. ¶¶ 119–24, *with* Am. Compl. ¶¶ 180–98).  The Trustee still cannot make a single allegation that Mayer Brown participated in any transferring of RCM customer deposits to other Refco entities—let alone that it participated in any improper "siphoning" beyond the terms of the FX Agreement.[11] As before, the Trustee cannot shoehorn Mayer Brown's work as counsel to Refco on certain loan agreements and the LBO and IPO into substantial assistance for the specific torts alleged here. *See* Op. at 33; Opp. to Mot. to Dismiss at 63–65.  *See generally Bloor*, 754 F.2d at 62–63 (law firm did not provide substantial assistance to insiders' wrongdoing despite allegations it prepared public documents misrepresenting client's financial condition that attracted plaintiffs' investments to the company, thus allowing insiders to loot the proceeds).

The only allegation that speaks to RCM specifically is that Mayer Brown attorneys offered Refco regulatory advice and "did nothing to stop RCM from falsely acting as an unregistered broker-dealer."  Am. Compl. ¶ 170; *see also id.* ¶¶ 165–78 (describing regulatory

---

[11] In fact, while the Trustee relies on deposition testimony by Vera Kraker, "one of the two Refco employees who was responsible for transferring customer funds," the Trustee neglects to mention Kraker's testimony that she never spoke to Mayer Brown attorneys about transferring customer funds from RCM to RCC or other entities.  Am. Compl. ¶ 69; *see* Mollón Decl., Ex. 6 at 205:11–208:5.

advice).  By no stretch of the imagination did this alleged conduct proximately cause the Refco insiders to siphon the FX Customers' money.  Indeed, if RCM had conducted its operations offshore, as the Trustee contends it should have to qualify for unregistered status, it still could (and presumably would) have transferred the funds to other Refco entities.  Conversely, even if RCM was onshore and unregistered, the Trustee does not allege that the FX Customers' foreign-exchange trading would have had to be done through a registered broker-dealer.[12]  Whether RCM had been on- or offshore, therefore, no failure of registration could have affected its ability to take on the FX Customers' deposits, let alone "siphon" them to other Refco entities.

The Trustee's added allegations regarding Mayer Brown's services to Refco in its acquisition of Cargill also do not change the analysis.  *See* Am. Compl. ¶¶ 189–94.  Providing legal services in an acquisition that results in additional FX customers with accounts at RCM does not substantially assist the Refco insiders in transferring those deposits *out of RCM* at some point thereafter.  At most, the Trustee has alleged "[c]onduct that merely creates a condition that made the resulting injury possible," *Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 421 F. Supp. 2d 703, 722 (S.D.N.Y. 2006) (internal quotations omitted), which "is too remote to constitute legal cause," *id.*  That RCM sought to and did attract customer funds—a normal and necessary business function—did not preordain that the insiders would decide to misuse those funds.  *See Bloor*, 754 F.2d at 61–62.

---

[12] The Trustee refers to two memoranda by Mayer Brown that both advise RCM that domestic foreign-exchange trading was not subject to regulation, *see* Am. Compl. ¶¶ 166–69, 178–79; Mollón Decl., Exs. 7 & 8 (June 2002 memorandum and October 2005 memorandum), and does not allege that this advice was incorrect.

The additional allegations against Grant Thornton are also markedly deficient.  Rather than linking Grant Thornton with any transfers of RCM customer deposits, the Trustee has merely added allegations about Grant Thornton's audits of Refco and RCM and its alleged role in failing to detect and stop the "receivables scheme" that concealed Refco's losses.  *E.g.*, Am. Compl. ¶¶ 201–11, 278.  For all the reasons stated by Judge Lynch, that is simply irrelevant in this context.  The Trustee has not alleged—nor can he—that Grant Thornton played any role in connection with RCM's customer agreements, account statements, account management, or margin practices.  Ultimately, the Trustee's claims all stem from RCM's and its insiders' use of customer deposits allegedly "without regard for [their] return."  *E.g.*, *id*. ¶ 305.  But the Trustee does not provide a single factual allegation about how Grant Thornton assisted in those acts.

Although the Trustee notes that Grant Thornton provided unqualified audit opinions for RCM, he does not explain how those audit opinions were false or how the audits of RCM were deficient—much less what role those audit opinions played in the alleged torts against the FX Customers.  Judge Lynch has held repeatedly that a claim against Grant Thornton would require more than bare allegations that the intercompany loans disclosed in RCM's financial statements actually had "no promise or prospect [of] repayment."  Am. Compl. ¶ 205.  Indeed, in dismissing the Trustee's original complaint, he held that the Trustee's allegations on this point were "woefully underpleaded."  Op. at 22 & n.22.  But the Trustee still has not provided "any corroborating detail" concerning the Refco entities that received the loans or their "financial status and/or alleged inability to pay"—as Judge Lynch said would be required.  *Id*.

The only new allegation on this point is the Trustee's suggestion that the 2004 LBO had the effect of subordinating RCM's intercompany loans, and thus the loans became uncollectible at that point in time.  *E.g.*, Am. Compl. ¶¶ 65, 74 (after the LBO, affiliates "altogether lacked the

ability to repay").  *But see id.* ¶ 272 (suggesting that the Refco affiliates that received the loans

from RCM *never* had "the intent and/or the financial wherewithal to repay").  Even that

allegation, however, is hopelessly conclusory.  Which Refco entities held RCM debt at that time?

When did they receive the loans from RCM?  What were their prospects for taking the loan

proceeds and earning a healthy return for Refco?  And what part of this was concealed from the

public?  The Trustee has never suggested that Refco failed to disclose the fact that its LBO led to

a subordination of other debt.  Thus even after the LBO, the only alleged misstatements about the

financial condition of the Refco enterprise were still related to its efforts to hide massive losses

through the "receivables scheme."  Accordingly, there is simply no plausible basis for suggesting

that the torts against these customers were the "necessary or inevitable" consequence of any act

by Grant Thornton.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148,

161 (2008) (to show causation, plaintiff must allege facts demonstrating that its loss was the

"necessary or inevitable" result of the defendant's wrongdoing).

Further, as noted above, it is unclear *when* any of these FX Customers actually chose

RCM as its broker—and whether that choice was made at a time when Grant Thornton was

actually engaged by Refco.  Grant Thornton did not issue *any* audit opinions for Refco or RCM

until mid-2003.  *See* Am. Compl. ¶ 31.  Thus if any of the customers here were "fraudulently

induced" to choose RCM or suffered conversion or a breach of fiduciary duty before that time,

Grant Thornton could not even arguably have provided substantial assistance to that tort.

Finally, the Trustee's suggestion that Grant Thornton refrained from performing "even

the simplest audit procedures on any aspect of the Refco Insiders' cashing-out scheme" is both

conclusory and outrageously misleading.  *See* Am. Compl. ¶ 210.  As the Trustee is well aware,

Grant Thornton employed a large number of auditors on each Refco engagement and performed

a wide range of audit procedures, including audit planning, sampling, risk assessments, confirmation of account balances, evaluations of internal controls, and analytics.  Indeed, as the Trustee admits, Grant Thornton actually requested—and received—confirmation of the legitimacy of the end-of-period transactions with Liberty Corner that Refco used to keep Grant Thornton in the dark about its true condition.  *Id.* ¶ 253 (acknowledging that Liberty Corner, a third party with no apparent connection to Refco, confirmed the legitimacy of the account balance it held as part of an end-of-period transaction).  But once again, even this grossly misleading assertion is unrelated to the torts against the FX Customers on which the Trustee's claims depend.

### B. Like the original complaint, the Amended Complaint still does not allege that these defendants had actual knowledge of any tort against the FX Customers.

To satisfy the knowledge requirement of an aiding and abetting claim, a plaintiff must allege that the defendant had "actual knowledge" of the underlying tort.  Op. at 31; *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996), *aff'd mem.*, 152 F.3d 918 (2d Cir. 1998).  Anything less—including allegations of constructive knowledge, or that the defendant was merely on notice as to the misconduct of the wrongdoer—is insufficient to sustain a cause of action.  *See id.* at 246–47 ("general suspicion" of tort is "not enough" (internal quotations omitted)).  Further, in order to support his claim, a plaintiff must do more than merely state that the defendant had knowledge, he must plead facts sufficient to make that conclusion more plausible than other inferences.  *See Iqbal*, 129 S. Ct. at 1949.

Here, then, the Trustee was required to "offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful conduct *that harmed the FX customers*—the alleged fraudulent siphoning of their funds—not actual knowledge of different wrongful conduct that might have harmed others, such as Refco's shareholders."  Op. at 32 (emphasis in original).

Allegations about a defendant's knowledge of Refco's alleged "receivables scheme" or whether Refco "lacked the financial health it presented to the outside world" (*id.* (quoting Pl.'s Opp. to Mot. to Dismiss at 50)) will not suffice to support the claims the Trustee seeks to bring "against *these* defendants in *this* action," *id.* (emphasis in original).

The Trustee's first complaint fell far short of meeting that burden, and the Amended Complaint comes no closer.  In repleading, the Trustee added *no* allegations even arguably suggesting that these defendants had actual knowledge that the insiders (i) converted the FX Customers' funds; (ii) used the FX Customers' funds in a way that breached the insiders' duty of loyalty; and (iii) misled the FX Customers about RCM's safety as a brokerage and about its intentions in using its customers' deposits.  Instead, he has focused on bolstering his irrelevant allegations about the "receivables scheme" and other aspects of Refco's wrongdoing.  But those allegations are no more relevant now than they were at the time of Judge Lynch's first decision.

To the extent that he has added new allegations about the services each of these defendants provided for RCM itself, those allegations remain insufficient to show actual knowledge of any wrongdoing against these customers.  Mayer Brown and Grant Thornton address the allegations specific to each of them in the sections below.

> **1.      The Trustee has again been unable to allege that Mayer Brown had actual knowledge of any torts against the FX Customers.**

The Amended Complaint alleges no facts that could establish a strong inference that Mayer Brown knew Refco insiders were wrongly siphoning money from FX customers.  Certainly the Trustee's allegations regarding Mayer Brown's regulatory advice are not sufficient—Judge Lynch already considered most of these allegations and held that they did not raise an inference of knowledge of wrongful siphoning. *See* Op. at 32–34.  And the Trustee's

attempts to show that Mayer Brown lawyers were aware of any wrongful activity at RCM are
implausible and rest on inconsistencies.

> ### a.   The Trustee does not allege facts showing that any Mayer Brown lawyer was aware of improper "siphoning" of FX Customer deposits.

The Trustee contends that Mayer Brown attorneys became aware that Refco insiders were
"utilizing RCM customer funds in ways not permitted by the relevant customer agreements."
Am. Compl. ¶ 162.  As discussed above, however, and as Judge Lynch specifically recognized in
analyzing the Trustee's original allegations of knowledge, "some use of the FX customers'
margin collateral by RCM is specifically contemplated by the FX Agreement."  Op. at 34.  Thus
whether the Trustee can plead knowledge on the part of Mayer Brown depends on whether or not
he has raised a strong inference that Mayer Brown knew of "*unauthorized* diversions of funds
from FX customers' accounts."  *Id.* (emphasis added).

The Trustee cannot raise any such inference, as demonstrated by his first substantive
allegation regarding the regulatory advice provided to RCM.  If the Trustee is right that Mayer
Brown partner Joe Collins and others within the firm "would have drafted or reviewed" RCM's
customer agreements and studied their contents (Am. Compl. ¶ 162), then they would have
learned that RCM could use customer deposits pursuant to the Margin Annex.  *See* Op. at 21
(discussing terms of FX Agreement).  Thus, even if one could credit the Trustee's bare allegation
that Mayer Brown lawyers learned that "Refco needs to have access to the customer funds" (*see*
Am. Compl. ¶ 166 (alternations omitted)), that alleged knowledge does not raise a strong
inference that Mayer Brown knew that the Refco insiders' use of the deposits was unauthorized.

The same deficiency plagues the Trustee's new allegations about Refco's acquisition of
Cargill's FX operations.  *See* Am. Compl. ¶¶ 189–94.  The most that can be gleaned from these
allegations is that Mayer Brown lawyers understood that Refco wanted Cargill's FX customer

base.  But that is not indicative of any fraud or wrongful siphoning.  It is simply an acquisition by one company of the complementary business of another.

Nor does the Trustee's allegation—based only on "information and belief"—that "Collins and Mayer Brown came to learn of the magnitude of RCM customer assets that had been improperly transferred to RCC and other Refco entities" in the course of the LBO and IPO raise a strong inference that Mayer Brown was aware of improper siphoning.  *Id.* ¶ 174.  For the fraud-based claims that must be pleaded under Rule 9(b), this allegation is obviously deficient because the Trustee has failed to "provide a statement of facts upon which the belief is founded." *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997); *see Linares v. Richards*, No. 08-CV-3243, 2009 WL 2386083, at *8 (E.D.N.Y. Aug. 3, 2009).  In any event, under any standard the statement is a pure conclusion and does not allege any *facts* that could support an inference that "Collins and Mayer Brown" came to possess such knowledge.

Even if this conclusory allegation were considered, however, it would not establish a strong inference that Mayer Brown was aware of wrongful siphoning.  The Trustee nowhere alleges that Mayer Brown reviewed the details of Refco's intra-corporate financial transactions, and outside counsel would not ordinarily do so.[13]  *See HA2003 Liquidating Trust v. Credit Suisse Sec. (USA) LLC*, 517 F.3d 454, 457 (7th Cir. 2008) (noting that a "division of labor" between professional advisors is the "norm" and "benefits [the] economy").  It is therefore implausible that Mayer Brown attorneys ever learned the magnitude of Refco's siphoning.  And, in any event, knowledge of the magnitude of RCM transfers standing alone would not establish

---

[13] In fact, the Amended Complaint rightly abandons an implausible allegation made in the Trustee's first pleading that line items in a note within Refco's financial statements should have alerted Mayer Brown to siphoning at RCM.  *See* Compl. ¶¶ 75–76; Opp. at 52–53; *see also supra* p. 7.

knowledge of wrongful siphoning of RCM customer funds, given that RCM had the right under the Margin Annex to use and transfer FX customer deposits as it saw fit.

> **b.** **The Trustee's allegations that Mayer Brown attorneys were aware of any wrongful conduct at RCM are implausible and inconsistent.**

Unable to show that Mayer Brown attorneys were aware of improper siphoning of RCM assets, the Trustee resorts to allegations suggesting Mayer Brown lawyers were aware of some form of general wrongdoing at Refco. These allegations are irrelevant, as they do not begin to show knowledge of the alleged wrongdoing that supposedly harmed the FX Customers. But even if knowledge of general wrongdoing were relevant, the Trustee's allegations here cannot pass even the most basic scrutiny.

For example, the Trustee makes several allegations about the regulatory advice Mayer Brown provided to RCM. In particular, he emphasizes a June 2002 memorandum advising Refco that "[c]ertain aspects of RCM's operations likely do fall within the reach of the federal securities laws," and that RCM should cease certain securities activities or transfer those activities to Refco's registered securities broker/dealer, Refco Securities, LLC. *See* Am Compl. ¶ 169 (quoting the memorandum as stating "[i]t may be prudent, therefore, for RCM to cease" certain operations and to "transfer existing options, equity and convertible trading clients to Refco's registered securities broker and dealer"); *see also* Mollón Decl., Ex. 7. Thus, the Trustee's premise in this and other allegations—that Collins was providing advice on how to keep RCM unregulated so that it could keep using customer funds—is implausible given that the advice he gave (for RCM to stop conducting securities business) would have *deprived* RCM of the ability to use those funds.

The 2002 memorandum also reveals inconsistencies in many of the Trustee's other allegations. The Trustee's insinuation that Collins wrote the memorandum to the "file" to keep it

secret is disproven from the face of the document.  The memorandum in question, which Mayer

Brown attached to its first Motion to Dismiss, *see* Mollón Decl., Ex. 7, was not sent "to the file."

It was sent to Refco's General Counsel, Dennis Klejna, to another Refco executive besides

Maggio, and to other partners at Mayer Brown.  *See id.*  The Trustee cites Maggio's testimony at

Collins's trial that Maggio supposedly bypassed Klejna in 2003 to speak directly with Collins

about Refco's need to conduct RCM business offshore so that Refco could access customer

funds.  *See* Am. Compl. ¶¶ 171–73.[14]  This allegation is implausible given that Mayer Brown and

Collins had already advised Refco, in a memorandum received by Klejna and Maggio, that parts

of RCM's operations "likely do fall within the reach of the federal securities laws" and were at

least in part conducted in the United States.  Mollón Decl., Ex. 7.  Moreover, the 2002

memorandum was based on a meeting Collins had with Klejna and Maggio, demonstrating that

Klejna was not being kept out of discussions.  *See id.*

    The 2002 memorandum also shows the implausibility of the Trustee's assertion that the

timing of a subsequent October 11, 2005, memorandum, attached as Mollón Decl., Ex. 8, is

"inherently suspicious" because it post-dates disclosure of the fraud.  Am. Compl. ¶¶ 178–79.

In that memorandum, Mayer Brown attorneys analyzed whether the SEC's broker-dealer

registration requirement would apply to RCM, concluding that registration would not be required

---

[14] The Amended Complaint also cites Maggio's testimony at the Collins trial as the basis for the
Trustee's allegation that Collins learned of Refco's "propensity" for siphoning customer assets in
1993.  *See* Am. Compl. ¶¶ 163–64.  The transfers about which Maggio testified are disconnected
both by time and substance to the siphoning scheme the Trustee alleges.  Maggio gave testimony
about conduct he undertook in 1991 that did not involve RCM or any unregulated entity.  *See*
Mollón, Decl Ex. 9 at 2145:6–2150:9 and 2158:13–16 .  He skimmed a discrete amount of
money ($25 million) from an account by manipulating account statements, and he admitted that
he did not tell Collins how much he had taken.  *See id.*

for RCM's foreign exchange and derivative trading, but might be required for certain securities-related activities.  Mollón Decl, Ex. 8.  The Trustee claims this memorandum shows that Mayer Brown was attempting to "paper the file" or "cover its tracks" by only offering "appropriate, objective advice" after the Refco fraud had already been disclosed.  Am. Compl. ¶ 179.  In fact, the "appropriate, objective advice" in the October 11, 2005, memorandum is no different than advice Mayer Brown provided to Refco over three years earlier in the 2002 memorandum.  *Compare* Mollón Decl., Ex. 8, *with id.*, Ex. 7.

The Trustee further suggests that a January 2005 e-mail exchange between Collins and RCM executive Thomas Yorke suggests knowledge of impropriety.  Am. Compl. ¶¶ 176–77.  But in fact the e-mails with Yorke (attached as Mollón Decl., Ex. 10) are completely inconsistent with fraudulent intent.  They show that Yorke sought advice about the impact of a new SEC regulation requiring certain investment advisors, who had previously been exempt from registration, to register with the SEC.  *See id.*; *see also* Registration under the Advisers Act of Certain Hedge Fund Advisers, SEC Release No. IA-2333, *available at* http://www.sec.gov/rules/final/ia-2333.htm (last visited Nov. 11, 2009).  Because registered investment advisors were required to keep their funds with a "qualified custodian," and RCM was not a "qualified custodian" because it had no duty to segregate customer funds, the new regulation could have resulted in those affected investment advisors' withdrawing the funds they managed from their accounts at RCM.  *See* Mollón Decl., Ex. 10; *see also* Custody of Funds or Securities of Clients by Investment Advisers, SEC Release No. IA-2176, *available at* http://www.sec.gov/rules/final/ia-2176.htm#IIB (last visited Nov. 11, 2009).

Despite the Trustee's cherry-picking certain advice from this e-mail (*see* Am. Compl. ¶ 177), Collins's response demonstrates that Collins did not understand RCM to need access to

customer cash and that he certainly was not aware of any wrongful siphoning.  In the e-mail, Collins proposed a number of options that would allow compliance with the regulation while addressing Yorke's concern.[15]  *Id.*  He proposed, among other things, that RCM could "segregate the funds and make the necessary disclosures" or "keep the funds at RSL or Refco LLC," which were both regulated entities with a duty to segregate.  Mollón Decl., Ex. 10.  If Collins had known about a scheme that relied upon the Refco insiders' having unfettered access to non-segregated and unregulated funds, there is no way he would have advised Refco to segregate customer funds at RCM or move funds from RCM to a regulated entity that segregated funds. The only plausible inference is that Collins did not know of any improper siphoning.

In sum, the Trustee's second attempt at pleading actual knowledge of unauthorized looting fares no better than his first.  He has utterly failed to raise a strong inference that Mayer Brown lawyers were aware of improper siphoning.

2.      **The Trustee has again been unable to allege that Grant Thornton had actual knowledge of any torts against the FX Customers**.

As for Grant Thornton, the Trustee makes no effort at all to allege that the audit firm played any role in or knew about RCM's alleged wrongdoing with respect to the FX Customers. As noted above, Grant Thornton's role was only to audit RCM's and Refco's financial statements; it was never engaged to provide any advice or services at all in connection with RCM's customer agreements, margin practices, or regulatory status.

At most, the Trustee asserts that Grant Thornton knew that Refco entities were using RCM customer deposits.  Of course, that allegation is an inference based on an inference; the

---

[15] Even the isolated language quoted in paragraph 177 of the Amended Complaint does not suggest wrongful intent.  Collins's suggestion that RCM could "stall on the . . . registration" simply reflects that the pertinent requirement did not take effect for a full year after the date of his e-mail.  Mollón Decl., Ex. 10.

only *fact* he points to is that Grant Thornton knew RCM routinely made cash transfers in amounts larger than its own profits.  Am. Compl. ¶¶ 266, 267.  Indeed, those transfers were listed on the financial statements as "related party transactions."  *See supra* p. 7.  But this is nowhere near enough to sustain his claim.  Under the pleading standard set forth in *Iqbal*, a plaintiff cannot simply assert that the defendant "knew" something; the plaintiff must plead facts sufficient to make that conclusion more than "consistent" with the possibility of liability, but "plausible" on its face.  *See* 129 S. Ct. at 1949–50.  The Trustee once again has failed to do so.

Setting aside that particular deficiency, the Trustee still fails to allege that Grant Thornton knew that any particular use of customer deposits was *deceptive or wrongful*.   The suggestion that Refco's use of these deposits was "without regard [to the funds'] return" is entirely conclusory.  Am. Compl. ¶¶ 53, 297, 305.  The Trustee does not even hint at who lacked concern for the funds' return, when they lacked that concern, or how Grant Thornton knew about that lack of concern.  *See Global Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 217 (App. Div. 2006) ("[P]laintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary [misconduct].").  Moreover, as discussed above, the Trustee admits that the FX Agreement explicitly *allowed* RCM to use customer deposits (Am. Compl. ¶ 52), and it did not require RCM to return the specific assets that the customers had deposited (*see supra* pp. 2, 6).  The Trustee has not pleaded facts showing that the deposits of any particular FX customer were used at a time and in a way that violated the terms of the margin provision, and he certainly has not pleaded facts sufficient to show that Grant Thornton knew about any such violation.

Even the allegations of actual knowledge of the "receivables scheme" are insufficient. The Trustee himself notes that the guilty pleas of the insiders "establish[]" that Refco and its

insiders engaged in a massive fraud.  Am. Compl. ¶ 1.  But the very same guilty pleas also "establish" that the insiders engaged in a conspiracy predicated on keeping the truth from Grant Thornton.  Defendants Phil Bennett, Robert Trosten, and Santo Maggio have each pleaded guilty to charges that specifically include, among other things, making or conspiring to make material misstatements to auditors.  And, on April 17, 2008, a jury found former Refco CEO Tone Grant guilty of conspiracy, one object of which was lying to Refco's auditors.  *See* 4/17/08 Trial Tr., *United States v. Grant*, No. 05 Cr. 1192 (Mollón Decl., Ex. 11); Third Superseding Indictment ¶¶ 6, 7, 25, 69(b) (Mollón Decl., Ex. 12).[16]

Thus it is now beyond doubt that the Refco insiders conspired to keep Grant Thornton in the dark—and, indeed, that this was a critical component of their overall scheme.  Given all this, the Trustee does not explain—nor can he—how his conclusory allegations can possibly support the inference that Grant Thornton had "actual knowledge" of the fraud the insiders worked so hard to hide.  *See Pub. Employees' Ret. Ass'n v. Deloitte & Touche LLP*, 551 F.3d 305, 315 (4th Cir. 2009) (even in considering scienter—as opposed to actual knowledge—the insiders' admissions that they had lied to the auditor-defendant, coupled with the fact that the auditor actually requested and received confirmations from third parties, were inconsistent with the inference that the auditor knew about or was reckless in not knowing about the insiders' fraud).

---

[16] *See* 2/15/08 Plea Colloquy, *United States v. Bennett*, No. 05 Cr 1192, at 7 (pleading guilty to "material misstatements to auditors") (Mollón Decl., Ex. 13); 2/20/08 Plea Colloquy, *United States v. Trosten*, No. 05 Cr 1192, at 4, 5, 16, 18, 19 (pleading guilty to conspiracy and admitting an agreement to conceal the truth from auditors) (Mollón Decl., Ex. 14); 12/19/07 Plea Colloquy, *United States v. Maggio*, No. 07 Cr 1196, at 5, 7, 17 (pleading guilty to conspiracy, one object of which was "material misstatements to auditors") (Mollón Decl., Ex. 15)]; *see also* Third Superseding Indictment, *United States v. Bennett*, No. 05 Cr 1192, ¶¶ 8, 9, 21, 25, 46, 65 (scheme was designed to hide missing receivable from accountants) (Mollón Decl., Ex. 12).

Indeed, the Amended Complaint's allegation that Grant Thornton was "fully aware of and complicit in every step of the Refco insiders' fraudulent cashing out scheme" (Am. Compl. ¶ 200), is utterly devoid of any facts to make it plausible, as required even for claims pleaded under Rule 8. *See Iqbal*, 129 S. Ct. at 1949; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Despite having had the benefit of nearly 100 depositions and tens of millions of pages of document production, the Trustee cannot point to any evidentiary basis for the assertion that Grant Thornton knew about the insiders' fraud, and even the facts he does cite do not support that inference.

For example, the Amended Complaint baldly asserts that Grant Thornton audit partner Mark Ramler "knew that the true amount of the [Refco Group Holdings, Inc.] Receivable was far greater [than reported on Refco's financial statements]." Am. Compl. ¶ 222. But the paragraphs following this assertion simply confirm that the Refco insiders hid this fact from Grant Thornton. In fact, the only factual basis proffered to support an inference of Grant Thornton's knowledge is a single page of Mark Ramler's handwritten notes that reflects a laundry list of issues related to Refco. Although the Trustee cites deposition testimony throughout the Amended Complaint, he studiously avoids mentioning any testimony regarding these notes. That is because the uncontroverted testimony regarding these notes reveals that they were prepared in September 2005, during the events leading up to the disclosure of Refco's fraud. Mollón Decl., Ex. 16 at 551:25–562:5 and 667:2–671:18. Moreover, the documentary record clearly shows that Grant Thornton raised each of the items referenced on this list in September 2005, not May 2005 as Plaintiff suggests. Mollón Decl., Exs. 17, 18 & 19. When Grant Thornton raised these issues, it was advised by Refco management that the Audit Committee had commissioned an internal investigation—the same investigation that led to the disclosure of the insiders' fraud.

In short, Plaintiff's allegations of Grant Thornton's knowledge are, if anything, considerably weaker now than before, given the guilty pleas and the development in the factual record in the last two years.  The record now shows unequivocally that Grant Thornton was affirmatively deceived by Refco management and by third parties like Liberty.  Particularly after all the discovery that has taken place—including discovery that is explicitly but selectively cited in the Amended Complaint—Plaintiff cannot state a claim based merely on conclusory assertions of knowledge.

## POINT THREE

### SLUSA requires dismissal of this "covered class action."

The Securities Litigation Uniform Standards Act ("SLUSA") requires dismissal of all "covered class action[s]" alleging state law claims for "untrue statement or omission of a material fact" or use of any "manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."  15 U.S.C. § 77p(b); *see id.* § 78bb(f)(1).  The statute was intended to supplement the Private Securities Litigation Reform Act and, given Congress's concerns in passing both statutes, the Supreme Court has admonished courts not to give SLUSA "[a] narrow reading."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006).  Based on the allegations in the original complaint, Judge Lynch concluded that SLUSA did not apply to bar the Trustee's claims.  Op. at 12 n.12.  But in view of the allegations in the Amended Complaint—which now suggests that it was the LBO that ultimately made it impossible for these customers to recover their funds—the relevance of SLUSA is now far more clear than before.  The Amended Complaint is barred by SLUSA because this action (i) is a "covered class action" as defined in the statute, and (ii) alleges fraud "in connection with the purchase or sale of a covered security."

### A.        This Is a "Covered Class Action."

A "covered class action" under SLUSA is a lawsuit in which "damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate."  15 U.S.C. § 78bb(f)(5)(B).  The Trustee has not denied that his complaint meets this requirement.  Opp. to Mot. to Dismiss at 66–69 (contesting SLUSA preclusion only on other grounds).

As for the "numerosity" element, the Trustee seeks damages as assignee of seventy-two former customers of RCM (Am. Compl. ¶ 18) and the PAT has more than fifty beneficiaries. Thus, whether the proper measure is the number of assignors, *see LaSala v. Bordier et Cie*, 519 F.3d 121, 134 (3d Cir. 2008), *cert. dismissed*, 129 S. Ct. 593 (2008),[17] or the number of trust beneficiaries,[18] *see LaSala v. Lloyds TSB Bank, PLC*, 514 F. Supp. 2d 447, 469–70 (S.D.N.Y. 2007), *reconsideration denied*, 2009 WL 874164 (S.D.N.Y. Mar. 31, 2009); *LaSala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246, 268–69 (S.D.N.Y. 2007); *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 235–36 (S.D.N.Y. 2007), the numerosity component is satisfied in this case.

As for predominance, and setting aside issues of individual reliance (as SLUSA commands), the central remaining issues—including the nature of the alleged fraud and the roles and culpability of the defendants—are pleaded in common on behalf of all named customers.

---

[17] In *Bordier*, the Third Circuit held that estate claims, assigned to a litigation trust, were brought on behalf of only one "person":  the estate.  519 F.3d at 132–37.  When considering thousands of individual creditor claims assigned to the same trust, however, the court opined that "these counts likely are brought to recover damages 'on behalf of more than 50 persons' . . . so they would seem to take the form of a covered class action."  *Id.* at 137–38 (citation omitted).  This latter circumstance is presented here.

[18] While the Amended Complaint does not disclose exactly how many beneficiaries the PAT has, the total is at least seventy-two—the named customers listed in Exhibit A and referred to in paragraph 18 of the Amended Complaint.

The Trustee certainly makes no effort to assert individual allegations on behalf of each named customer.  Accordingly, this case satisfies both criteria of a "covered class action."

**B.      The Amended Complaint alleges fraud "in connection with the purchase or sale of a covered security."**

The preclusive scope of SLUSA extends to all state law claims in connection with a covered security.  15 U.S.C. § 78bb(f)(1).  SLUSA defines a "covered security" as a security listed on a national exchange or issued by a registered investment company.  *See* 15 U.S.C. §§ 78bb(f)(5)(E), 77r(b).  Even if the FX Customers' foreign-exchange contracts were not themselves securities, *see Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Mining Trading Co.*, 179 F. Supp. 2d 159, 163–64 (S.D.N.Y. 2001) (concluding foreign-exchange trading fails general test for investment contracts in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)), the alleged fraud implicated at least two sets of covered securities.  The stock issued in the IPO was a covered security because it was "listed . . . on the New York Stock Exchange" under 15 U.S.C. § 77r(b)(1)(A).  And, the bonds registered in the wake of the LBO (*see* Am. Compl. ¶ 195) were "senior securit[ies]" to the stock offered in the IPO, which makes the bonds themselves "covered securit[ies]" under 15 U.S.C. § 77r(b)(1)(C).[19]  *See Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 442–43 (S.D.N.Y. 2001) (notes registered through *Exxon Capital* exchange are covered securities as "the debt of a company with securities listed on the . . . NASDAQ").

As for the "in connection with" requirement, courts have construed the "clause 'flexibly,' not 'technically and restrictively.'"  *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir.

---

[19] Subparagraph (C) of § 77r(b)(1) provides that "a security of the same issuer that is equal in seniority or that is a *senior security* to a security described in subparagraph (A)" is a covered security.  (Emphasis added).  In turn, § 77r(d)(4) defines "senior security" to mean "any bond, debenture, note, or similar obligation or instrument constituting a security and evidencing indebtedness."

2009) (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).  "[I]t is enough that the fraud

alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else."

*Dabit*, 547 U.S. at 85.[20]  The Amended Complaint now more explicitly alleges fraudulent

activity "in connection with" the offering of these covered securities, in two related ways.

First, Plaintiff alleges that the Refco Insiders engaged in two efforts to "cash out" of

Refco—the LBO and IPO (*e.g.*, Am. Compl. ¶¶ 7–8)—and that "this cashing-out depended on

the misappropriation, conversion and waste of RCM customer assets" (*id.* ¶ 2).  Indeed, the

Trustee goes so far as to claim that the Refco Insiders "needed" to perpetrate a fraud on the FX

customers to achieve "this primary objective" of cashing out of Refco (*id.* ¶ 79), and devotes an

entire section of his amended pleading to explaining the allegedly "critical role" the supposed

fraud on the FX customers played in the eyes of the Refco insiders (*id.* at 32 (heading); *id.*

¶¶ 107–10; *see also id.* at 20 ("The Refco Insiders' Cashing-Out Scheme *Depended* on the

Improper Diversion and Conversion of FX Customers' Funds") (emphasis added)).  Thus, even

though Judge Lynch correctly decided that the Trustee could not rely on allegations regarding the

*defendants'* supposed knowledge and assistance in different wrongful conduct (Op. at 32), he

acknowledged that both that scheme and the Refco insiders' scheme concerning RCM customer

assets shared a "common objective" in that "both 'schemes were designed to hide financial

problems at Refco and its affiliates from the public and from investors'" (*id.* (quoting *RCM I*,

2007 WL 2694469, at *4)).  That is to say, although the Trustee still has not pleaded that these

defendants knew about or substantially assisted in any wrongful conduct aimed at the FX

---

[20] The plaintiff in *Dabit* alleged that he and other Merrill Lynch brokers were provided
inaccurate information about Merrill's investment banking clients, leading them to hold stock in
companies they otherwise would have sold.  547 U.S. at 75.  The Court held that the
misstatements were "in connection with" the purchase or sale of covered securities because even
if plaintiff did not buy or sell stocks, others did.  *Id.* at 85, 86–87.

Customers, the Refco insiders' "entire *purpose*" of upstreaming FX customer deposits was the offering of covered securities, thus bringing the claim within SLUSA.  *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007) (per curiam) (emphasis added).

Second, the securities offerings and the siphoning scheme also "coincide" because the Amended Complaint alleges that the siphoning occurred both before and after the offerings of securities and that the LBO and IPO themselves worsened the siphoning.  *Dabit*, 547 U.S. at 85. The Trustee alleges that the funds initially deposited by FX Customers were transferred throughout the time period of the LBO and IPO, continuing up to Refco's bankruptcy.  Am. Compl. ¶¶ 71–72.  He also alleges that the LBO and IPO saddled Refco with large debt loads it could never repay, subordinated its prior debt, thus diminishing RCM's ability to collect on its intercompany loans and, in turn, preventing repayment of the FX Customers's funds.  *See* Am. Compl. ¶¶ 119–27 (alleging that LBO "entirely foreclosed return of RCM customer funds, including those of the FX customers"); *id.* ¶¶ 128–30 (describing how IPO "further undermined" RCM's ability to repay customers).

It is no answer that the FX Customers themselves did not purchase or sell the "covered securities," because the "in connection with" element encompasses a far broader array of claims. In *Dabit*, "[a] unanimous Supreme Court flatly rejected a strict 'purchaser/seller' requirement and endorsed an expansive view of SLUSA's preemptive scope."  *U.S. Mortgage, Inc. v. Saxton*, 494 F.3d 833, 844 (9th Cir. 2007)*, abrogated in separate part, Proctor v. Vishay Intertech Inc.,* — F.3d —, 2009 WL 3260535, at *6 n.8 (9th Cir. Oct. 9, 2009).  In doing so, it held that, for SLUSA purposes, "the identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale' of securities."  *Dabit*, 547 U.S. at 89.  It is not necessary that a purchaser or seller be a party to the action; it is not even necessary to specify a

purchaser or seller.  *See id.* at 85; *Siepel v. Bank of Am., N.A.*, 526 F.3d 1122, 1127 (8th Cir.

2008).[21]  In sum, because this is a "covered class action" alleging fraud "in connection with"

"covered securities," the Amended Complaint should be dismissed in its entirety under SLUSA.

## CONCLUSION

For all these reasons, the Amended Complaint's claims against Grant Thornton and

Mayer Brown should be dismissed once again.  The Trustee does not seek another opportunity to

replead, nor is there any basis for granting him such an opportunity.  Accordingly, the dismissal

should be with prejudice.

Dated:  November 12, 2009          Respectfully submitted,
     New York, New York

                    WINSTON & STRAWN LLP

                    _____

*Of Counsel:*                   /s/

                    By:  David E. Mollón

Margaret Maxwell Zagel       David E. Mollón (dmollon@winston.com)
Tracy W. Berry             WINSTON & STRAWN LLP
Kenneth Cunningham        200 Park Avenue
GRANT THORNTON LLP      New York, NY 10166
175 West Jackson, 20th Floor    Ph: 212-294-6700
Chicago, Illinois 60604      Fax: 212-294-4700
Ph: 312-856-0001
Fax: 312-565-3473         Bruce R. Braun (bbraun@winston.com)
                    Catherine W. Joyce (cjoyce@winston.com)
                    Linda T. Coberly (lcoberly@winston.com)
                    WINSTON & STRAWN LLP
                    35 W. Wacker Drive
                    Chicago, Illinois 60601
                    Ph: 312-558-5600
                    Fax: 312-558-5700

                    *Attorneys for Grant Thornton LLP*

---

[21] In *Siepel*, the Eighth Circuit held that beneficiaries of a trust, misled by statements of the trustee, alleged fraud in connection with the purchase or sale of a covered security, even though none of the plaintiff-beneficiaries bought or sold securities, because the trustee purchased covered securities.  526 F.3d at 1124, 1127.

WILLIAMS & CONNOLLY LLP

_Thomas J. Ward /cкк_

By: Thomas G. Ward

John K. Villa (jvilla@wc.com)
    (admitted *pro hac vice*)
Michael S. Sundermeyer (msundermeyer@wc.com)
    (admitted *pro hac vice*)
Craig D. Singer (csinger@wc.com)
    (admitted *pro hac vice*)
Thomas G. Ward (tward@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., NW
Washington, DC 20005
Ph: 202-434-5000
Fax: 202-434-5029

*Attorneys for Mayer Brown LLP*

CLIFFORD CHANCE US LLP

By: Anthony M. Candido

Anthony M. Candido (Anthony.Candido@cliffordchance.com)
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
Ph: 212-878-8000
Fax: 212-878-8375

*Attorneys for UK Limited Liability Partnership
Mayer Brown International LLP*