UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                             :

MARC S. KIRSCHNER, as Trustee of the Refco   :      07 Civ. 8165 (JSR)
Private Actions Trust,                           :      07 MDL No. 1902 (JSR)
                             :
           Plaintiff,               :
                             :      REPORT AND
        -v-                      :      RECOMMENDATION
                             :      OF THE SPECIAL
PHILIP R. BENNETT, SANTO C. MAGGIO,     :      MASTER
ROBERT C. TROSTEN, MAYER BROWN, LLP, :
MAYER BROWN INTERNATIONAL, LLP,      :
and GRANT THORNTON, LLP,           :
                             :
           Defendants            :
                             :
-------------------------------------------------------------x

Daniel J. Capra, Special Master

      This is a report and recommendation to Hon. Jed S. Rakoff concerning motions brought by the defendants Grant Thornton, LLP, Mayer Brown LLP and Mayer Brown International LLP (collectively, the "Professional Defendants") to dismiss the complaint filed against each by Marc S. Kirschner as Trustee of the Refco Private Actions Trust ("Trustee" or "Private Actions Trustee").[1]   The Trustee originally filed this action in New York State Supreme Court on behalf of Refco's foreign-exchange customers (the "FX Customers"), asserting claims under New York law against certain Refco insiders, professionals, and advisors for, *inter alia*, breach of fiduciary duty, fraud, and conversion. *See Kirschner v. Bennett*, 2008 WL 1990669 (S.D.N.Y. May 7, 2008) (denying Trustee's motion to remand or abstain on the ground that the case is "related" to Refco's Chapter 11 bankruptcy). The Trustee alleges that the FX customers collectively suffered losses totaling more than half a billion dollars when insiders at Refco[2] diverted assets from their accounts at Refco Capital Markets ("RCM") in order to bankroll the Refco fraud.  On

---

[1] After Refco applied for bankruptcy, the United States Bankruptcy Court for the Southern District of New York approved a Plan that provided for the establishment of a "Private Actions Trust" ("PAT"),  to prosecute claims owned by Refco creditors or shareholders that were independent of those held by the Refco debtors. Plaintiff Marc Kirschner was appointed as the Private Actions Trustee.

[2] References to "Refco" include Refco Group Ltd. LLC and all of its affiliated entities, including Refco LLC, Refco Capital Markets ("RCM") and Refco Alternative Investments LLC ("RAI").

August 25, 2009, Judge Lynch granted the Professional Defendants' motions to dismiss the original complaint, granting the Trustee leave to replead. *Kirchner v. Bennett*, 648 F. Supp. 2d 525, 528 (S.D.N.Y. 2009) (cited herein as "Op.").[3]   This report and recommendation addresses the motions by the Professional Defendants to dismiss the Amended Complaint.

## I. Introduction

### A. Facts

The original complaint, all claims of which were dismissed by Judge Lynch in his August, 2009 opinion, centers around what has been called "the Refco fraud." *See e.g., Op.* at 529.   The facts surrounding the fall of Refco have been recounted in a number of opinions by Judge Lynch, *see, e.g., id.* at 528-531; *Kirschner v. Grant Thornton*, 2009 WL 996417 (S.D.N.Y.), as well as in Reports and Recommendations of the Special Master in *Krys v. Sugrue*. Familiarity with the basics will be assumed, but a short discussion of the Trustee's allegations most pertinent to the FX Customer claims is appropriate.[4]

Refco's controlling officers (collectively, the "Insiders"), with the assistance of the Professional Defendants, orchestrated "a complex fraudulent scheme to artificially enhance Refco's performance and conceal Refco's true financial condition." Op. at 530. Refco carried a large uncollectible debt from a related company, Refco Group Holdings, Inc. ("RGHI"), and hid this debt through a series of so-called "round trip loans" taking place just before and after reporting periods. *Id.* at 529-30. Judge Lynch refers to the round-trip loans --- as well as other efforts to hide the RGHI debt --- as part of the "receivables scheme." (Op. at 545).

The goal of the receivables scheme was to allow Refco to continue operations until the Insiders could cash out. (Amended Complaint ¶¶ 1-3). By concealing Refco's true financial condition, the Refco insiders were able to effectuate a leveraged buyout ("LBO") in August 2004 and an initial public offering ("IPO") in August 2005. *Id.* (These acts are also part of the receivables scheme according to Judge Lynch.) Together, these events allowed the Refco Insiders to cash out their holdings in Refco at a time when, unbeknownst to the public, Refco affiliates owed RCM approximately two billion dollars. *Id.*   Additionally, the LBO caused Refco to acquire $1.4 billion of bank and bond debt which became senior to the debt that Refco-controlled entities owed to RCM, despite representations in the Offering Circular that it was "effectively junior to all existing and future liabilities." *Id.* The debt acquired in the LBO "altogether foreclosed

---

[3]  The original complaint including aiding and abetting claims against Ernst & Young. Ernst & Young is not included as a defendant in the Amended Complaint.

[4]  Of course the Trustee's assertions are assumed to be true for purposes of the motions to dismiss.

repayment of RCM's customer assets, including those belonging to the FX customers." (Amended Complaint ¶ 7).

The cashing-out depended on maintaining business operations, and that meant obtaining funds to operate Refco and its affiliates. (Amended Complaint ¶2). Refco obtained those funds in large part by misappropriating RCM customer assets, including funds entrusted to RCM by the FX customers. *Id.* All but a de minimis portion of the customer assets were diverted from RCM to Refco Capital LLC ("RCC") under the guise of loans to "customers" that were in fact intercompany, related parties that could not repay what was taken. *Id.* Judge Lynch refers to the siphoning of customer funds as the "customer scheme." (Op. at 545).

### B. The Margin Annex

The Margin Annex is a subsection of the customer agreement that FX Customers entered into with RCM.   It governed RCM's use of and access to customer margin.[5] Specifically, the Margin Annex permitted RCM to "loan, pledge, hypothecate or otherwise use or dispose of such cash, securities, and other property free from any claim or right, until settlement in full of all Transactions entered into pursuant to the [FX] agreement."  Op. at 535 (citing Rand Dec. Ex. 1 at 24).  The Margin Annex further provided that, pursuant to such use, "[RCM]'s sole obligation shall be to return to [FX Customers] such cash, like amounts of similar cash, securities and other property (or the cash value thereof in the event of any liquidation of collateral) to the extent they are not deemed to be collateral to secure Transactions entered into pursuant to this Agreement with any Refco Entities or have not been applied against obligations owing by [FX Customers] to Refco Entities, whether as a result of the liquidation of positions and any Transactions entered into pursuant to this Agreement or otherwise." *Id.*

Of critical importance to the instant motions, Judge Lynch has taken an expansive view of what the Margin Annex permitted RCM to do with its customers' assets. *See* Op. at 538.  As the law of the case, Judge Lynch's construction determines how the Margin Annex must be read in evaluating the motions to dismiss.  *See, e.g., United States v. Vigneau*, 337 F.3d 62, 67 (1st Cir.2003) ("law of the case" doctrine is a "prudential principle that precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided").[6]

---

[5] Margin, as it is discussed in the customer agreement, was money deposited with RCM to act as protection for the broker against swings in the value of the traded currency. Amended Complaint ¶ 42.  When an FX customer was not engaged in trading, the cash that would otherwise have been margin was held in the account for use in future transactions and belonged only to the customer. *Id.* at ¶ 46.

[6] Under the law of the case doctrine, "a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir.1990). Although the doctrine is not ironclad, a prior

Prior to the pleading and dismissal of the original complaint in this case, Judge Lynch analyzed and interpreted the Margin Annex in *In re Refco Capital Markets, Lb. Brokerage Customer Securities Litigation, VR Global Partners, L.P. v. Bennett et al.*, 586 F. Supp. 2d 172 (S.D.N.Y. 2008) (*RCM II*), a case in which customers similarly situated to the FX Customers, and with a virtually identical customer agreement, alleged that RCM engaged in deceptive conduct. Judge Lynch construed the Margin Annex to mean that if an account contained *any amount* of outstanding margin, RCM was permitted to "use or dispose of" any other customer assets in the account in any way it saw fit, whether or not the assets disposed of were actually margin. *RCM II* at 183-94 ("[T]he express terms of the Customer Agreement and Trade Confirmation, . . . taken together, authorized RCM to 'use or dispose of "all" of the customer's property—whether that was collateral against a margin balance, or, "other [non-collateral] property"'—whenever a margin loan was outstanding in the customer's account."). Thus, if RCM used customer monies in excess of the value of a customer's margin balance, that would not be deceptive or fraudulent conduct as it was permitted by the terms of the Margin Annex. *Id.* RCM's use of customer funds was nevertheless contingent upon the existence of at least some margin balance. *Id.* at 184, n.16 (rejecting defendant's contention that Paragraph One of the Trade Confirmation authorized RCM to use Customer securities regardless of the existence of a margin balance).

Judge Lynch also held that when "RCM 'loan[s], pledge[s], hypothecate[s] or otherwise use[s]' a security owned by a customer with an outstanding margin loan, that property has been 'dispose[d] of,' and RCM's 'use' of that security effectively ends after consummation of that transaction." *Id.* at 185. Thus, RCM's failure to reconvey securities to customers at the time of RCM's bankruptcy did not necessarily mean, as the *RCM II* Plaintiffs argued, that RCM was using their securities in contravention of the parties' understanding pursuant to the Customer Agreement. *Id.* In fact, the money may have been "disposed of" at a time when the customer had a margin balance. The effect, then, is that while "[t]he fact that RCM could not reconvey all of plaintiffs' property in October 2005 may be a breach of its contractual obligation to 'return' to plaintiffs all of the property in their accounts" it was not necessarily deceptive or fraudulent. Without an allegation that RCM used their securities at a time when plaintiffs had no outstanding

---

ruling will ordinarily be reconsidered only where: "(1) substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *United States v. Haynes*, 468 F.3d 422, 426 (6th Cir.2006) (quoting *McKenzie v. BellSouth Telecommunications*, Inc., 219 F.3d 508, 513 n. 3 (6th Cir.2000)). The Trustee does not argue that any of these exceptions to the doctrine are applicable in this case.

It makes eminent sense to apply Judge Lynch's construction of the Margin Annex --- as well as other matters --- at this point in the proceedings; as the Trustee recognizes in his Memorandum of Law, any argument that Judge Lynch misconstrued the terms of the Margin Annex can be taken up on appeal.

margin loans, "any disposal of plaintiffs' assets would not have violated the parties' understanding." *Id.* According to *RCM II*, "whatever else RCM may have done, its communications to customers plainly set forth the terms of the margin loans, including RCM's right to use all of the securities [belonging to] its margin customers pending settlement of the margin loans." *Id.* at 195.

In the more recent dismissal of the original complaint in this case, Judge Lynch had further occasion to review and interpret the Margin Annex. He reasoned that the "use or dispose" language in the Margin Annex allowed use for the benefit of RCM and not necessarily the customer, and therefore any such use --- including upstreaming the assets for use by Refco affiliates --- would not constitute a breach of fiduciary duty. Op. at 536.

Judge Lynch also found that the "until settlement in full" language does not, as the Trustee argued under the original complaint, modify or limit the language allowing use free from "any claim of right" and therefore did not convey a false impression that the assets would be returned. Indeed, he found that the Margin Annex language "does not, in any way, restrict RCM's use of the customers' assets" because there is no specific prohibition to which RCM "claimed it would adhere" that would restrict their use. Op. at 538. Further, even if the phrase could be read to limit RCM's use of a customer's money, the Margin Annex explicitly allowed RCM to "loan, pledge, hypothecate or otherwise dispose of [customer] cash . . . free from any claim or right" without limit. *Id.* at 538.

Relying on *RCM II*, Judge Lynch further found that even "putting the case toward self-interested, uncollectible loans for the purpose of the Refco fraud" would not "necessarily be fraudulent" because RCM could still fulfill its obligation by purchasing "like amounts of similar cash [or] securities" from elsewhere and conveying those assets to the customers. Op. at 539 (citing *RCM II* at 185). Thus, whether the use of funds was authorized by the Margin Annex depends upon RCM's "ultimate inability to return the customers' assets on demand, or at the conclusion of any FX transaction" when, according to the Trustee's allegations, the cash that would have otherwise been margin belongs entirely to the customer. *Id.*

### C. Dismissal

Judge Lynch dismissed the Trustee's claims for aiding and abetting fraud, breach of fiduciary duty, and conversion. In so dismissing, he first found that the Trustee had not adequately pled the underlying wrongs. Specifically:

1. Breach of fiduciary duty was not adequately pled because the FX Customer accounts were "non-discretionary" --- RCM's only duty was to execute foreign currency transactions upon receiving explicit customer instructions. And the Trustee did not allege that RCM breached any duty within the scope of that relation. (Op. at 535).

2. Fraud was not adequately pled because the upstreaming of the FX Customer Funds was permissible under the Margin Annex and therefore was not fraudulent. (*Id.* at 538).

3. Conversion was not adequately pled because, while the Trustee had raised a question of fact on whether the FX accounts were sufficiently identifiable to be the subject of conversion, he had not made sufficient factual allegations that RCM had exercised "an unauthorized dominion or control" over the accounts --- again, because the Margin Annex permitted RCM to use those accounts. (*Id.* at 540-44). Judge Lynch noted that New York law provides recovery for wrongful *detention* as well as wrongful taking, but also noted that the Trustee made no allegations of wrongful detention. (*Id.* at 544, n. 24).

Judge Lynch further held that, assuming an underlying wrong, the Trustee had failed to state a cause of action against the Professional Defendants for aiding and abetting. Specifically:

1. The Trustee had not sufficiently pled that the Professional Defendants "knowingly aided the insiders in converting the customers' funds, using the customers' funds in a way that breached the insiders' duty of loyalty, or making affirmative misrepresentations that provided the customers with a false understanding of how RCM handled the assets in their accounts." (Op. at 544]. Judge Lynch noted that the bulk of the allegations as to the Professional Defendants' knowledge of wrongdoing was related to the receivables scheme, rather than the customer scheme. He rejected the Trustee's contention that both schemes were component parts of a single, cohesive plan on the part of the Insiders to cash out their interests in Refco. He stated that any "common objective is insufficient to plead claims for aiding and abetting, . . . because the Trustee must offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful conduct *that harmed the FX customers* --- the alleged fraudulent siphoning of their funds --- not actual knowledge of different wrongful conduct that might have harmed others, such as Refco's shareholders." *Id.* at 545 (emphasis in original].

2. For similar reasons, Judge Lynch found that the Trustee had not adequately alleged that the Professional Defendants provided substantial assistance on the underlying wrongs. The allegations tied the defendants' activity to the receivables scheme, but did not allege that the Professional Defendants had substantially assisted the siphoning of the FX accounts at RCM. *Id.*

### D. Repleading

Judge Lynch granted the Trustee leave to amend, noting that it was "far from clear that repleading would be futile here." Op. at 546. He concluded that the Trustee deserved "at least one opportunity" to replead with more specificity. *Id.*

Many of the changes in the Amended Complaint are in the nature of style and reordering of paragraphs, and in deleting the assertions regarding Ernst & Young. Charitably construed, the material differences from the original complaint include the following:

1. The Amended Complaint sharpens, somewhat, the allegations that the FX customers were fraudulently induced to use RCM as a broker, because RCM held itself out as a viable, solvent broker when in fact it was not. *See, e.g.,* Amended Complaint ¶¶14, 38. In the original complaint the First Claim for Relief against the Insiders was for fraud. That has been changed to a claim for fraudulent *inducement.* The claim for fraud has been moved to the Third Claim for Relief and asserts (beyond its duplication of the First Claim) that because of a special relationship, the Insiders had the fiduciary duty to inform the FX customers that RCM was insolvent.

2. The Amended Complaint sharpens, somewhat, the assertion that RCM upstreamed funds with the knowledge that they could not be repaid, i.e., *with no intent to return them.* See, e.g., Amended Complaint ¶ 14.

3. The Amended Complaint alleges that the Margin Annex, construed in light of RCM's duty of good faith and fair dealing, "did not authorize RCM to upstream FX Margin (or other entrusted assets) to other Refco entities to fund the operational needs of Refco . . . all the while knowing that RCM would be unable to return these funds to its FX Customers upon demand, or otherwise." Thus, return of the FX Margin "was an express and/or implied condition of the FX Customers' entrustment of their assets to RCM for the specific, limited, purpose of entering into FX trades at their direction." Amended Complaint ¶ 53. Accordingly, the duty to return the funds was within the scope of the relationship and RCM breached its fiduciary duty by failing to return the funds on demand. *Id.* at ¶62.

4. The Amended Complaint adds allegations about Refco's purchase of a subsidiary of Cargill that acted as a broker-dealer, "thereby transferring to RCM hundreds of millions of dollars in additional FX funds that were then available for the Refco Insiders' fraudulent cashing-out scheme." *Id.* at ¶ 55. The Trustee alleges that Mayer Brown facilitated the assignment of FX funds from Cargill to RCM. *Id.* at ¶¶ 56, 188-94.

5. The allegations against Mayer Brown are put in a mega-context --- that Mayer Brown knew from an early point that the Insiders wanted to cash out, and that they needed customer funds to prop up the company until they could do so. *See, e.g.,* Amended Complaint ¶ 137.

6. The Amended Complaint adds more specific allegations about Mayer Brown's role in advising whether RCM could continue to remain unregulated after it was "repatriated" from Bermuda to the United States. *Id.* at ¶¶ 169-72.

7. The breach of fiduciary claim is amplified to cover a duty to ensure the return of assets that were upstreamed. Amended Complaint ¶ 299.

8. The conversion claim now focuses on wrongful detention as well as wrongful taking. Amended Complaint ¶¶ 317, 321.

---

The question is whether any of these differences can get the Trustee out from under three critical determinations by Judge Lynch.[7] Those three critical rulings are:

1. The terms of the Margin Annex allowed RCM to use the FX monies virtually without restriction, and without regard to the "depravity" of the use. (Op. at 539).

2. Because the FX accounts were non-discretionary, RCM's only fiduciary duty was to effectuate trades as directed by the customers --- a very limited duty, not alleged here to have been violated. (Op. at 535).

3. Allegations of knowledge about, and substantial assistance with, the "receivables scheme" are insufficient to withstand a motion to dismiss --- the Trustee "must show that the defendants knowingly aided the insiders in converting the customers' funds, using the customers' funds in a way that breached the insiders' duty of loyalty, or making affirmative misrepresentations that provided the customers with a false understanding of how RCM handled the assets in their accounts." The fact that the receivables scheme and the customer scheme were part of a common objective to cash out "is insufficient to plead claims for aiding and abetting, however, because the Trustee must offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful conduct *that harmed the FX customers* --- the alleged fraudulent siphoning of their funds --- not actual knowledge of different wrongful conduct that might have harmed others, such as Refco's shareholders." (Op. at 545).

## II. Legal Standard on Motion to Dismiss

The legal standard for evaluating a pleading on a motion to dismiss is as follows:

1. The Plaintiff need not establish that he will ultimately prevail. The question is whether the Plaintiff is entitled to obtain discovery and offer evidence to support his claim. *Triestman v. Fed Bureau of Prisons*, 470 F.3d 471, 476 (2d Cir. 2006)

---

[7] These determinations are law of the case, and the Trustee does not argue that any exceptions to the law of the case doctrine are applicable. See note 5, supra.

2. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If the Plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 547.

3. Claims of fraud must be "stated with particularity." Fed. R. Civ. P. 9(b). "The purpose of Rule 9(b) is to protect the defending party's reputation, discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Shields v. Citytrust Bancorp, Inc.*, 25 F.2d 1124, 1128 (2d Cir. 1994). The Plaintiff must specifically describe the acts alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent. *See generally Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F. 3d 43, 56 (2d Cir. 2005) (finding the details and purposes of an alleged fraudulent transfer to be inadequately pled). This heightened pleading standard requires a complaint to state "the who, what, when, where, and how" of the alleged fraud. *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)). Particularity is necessary to provide the defendant "fair notice of the plaintiff's claim and the factual ground upon which it is based." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990)).

The Second Circuit has found that an inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or, (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Shields v. Citytrust Bancorp, Inc.*, 25 F.2d 1124, 1128 (2d Cir. 1994).

4. Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally." But while the rule allows general averments of intent, knowledge, and other mental conditions, "it nevertheless requires a plaintiff to allege facts that give rise to a 'strong inference' of the defendant's culpable state of mind. This may be done by alleging facts that the defendant had both motive and opportunity to commit or assist fraud, or facts that constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness." *In re Parmalat Securities Litigation*, 501 F.Supp.2d 560, 573 (S.D.N.Y.2007) (quoting *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 479 F.Supp.2d 349, 359-60 (S.D.N.Y.2007).

5. Claims sounding in conversion --- including aiding and abetting --- are evaluated under Rule 8, not Rule 9. (Op. at 524, n.23)

## III. Allegations Concerning Primary Wrongs

The Trustee alleges that the Professional Defendants aided and abetted the Refco insiders in committing three primary wrongs:   fraud (including fraudulent inducement),

breach of fiduciary duty and conversion.  This part of the Report assesses whether the Trustee has adequately pled these primary wrongs.  Of course if the Trustee has failed to plead sufficiently the underlying torts, there can be no aiding and abetting claim against the Professional Defendants.

### A. Fraudulent Inducement (First Claim for Relief), and Fraud (Third Claim for Relief).

Judge Lynch dismissed the fraud claim in the original complaint because the Trustee's allegations did not "suffice to establish any affirmative representation or act that gave plaintiffs a false understanding concerning RCM's use of their assets." Op. at 540.  In response, the Trustee now alleges that RCM fraudulently induced the FX Customers (including the Cargill FX Customers) "to entrust and maintain their assets at RCM based on the false express and/or implied representations that RCM was a viable, solvent broker dealer with which customers could safely execute FX trades and which could return their FX Margin and other assets . . . upon demand or otherwise." Amended Complaint ¶ 292.  According to this argument, RCM's alleged fraud occurred after the point that RCM became insolvent, not before.[8]  Absent this fraudulent inducement, the Trustee argues, the FX Customers would not have entrusted and/or maintained their assets with RCM.[9]

As part of his fraudulent inducement claim, the Trustee alleges that RCM both affirmatively misrepresented and omitted material fact.  New York law establishes the following elements for a fraudulent inducement claim: "'(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury.'" *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (quoting *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d 186 (2d Dept.1980)).

Where the fraud is based on alleged misrepresentations, the complaint must "specify the statements it claims were false or misleading, give particulars as to the

---

[8] Memorandum in Opposition to Motion to Dismiss at 23 ("While the Refco Insiders long knew that their cashing-out scheme would render Refco insolvent, RCM's duty to disclose that it was hopelessly insolvent did not arise until the LBO in August 2004, and RCM did not violate its representation to the FX Customers that it was solvent until that time.") (internal citations omitted).

[9] The Trustee points out that this fraudulent inducement claim is independent of the breach of fiduciary duty claim discussed *infra* because it assumes *arguendo* that the Margin Annex permitted RCM to upstream the FX Customers' funds. The gravamen of the fraudulent inducement claim is that --- regardless of how RCM used the funds --- the FX Customers would never have done business with RCM if they knew it was clearly insolvent. Memorandum in Opposition to Motion to Dismiss at 19.

respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)).

Where the fraud is based on alleged *omission* of material fact --- as is the case here --- the plaintiff must show that the defendant had a duty to disclose. *See United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) ("[W]hen dealing with a claim of fraud based on material omissions, it is well settled that a duty to disclose 'arises [only] when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'") (alteration in original) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)); *Barron Partners, LP v. Lab123, Inc.*, 593 F. Supp. 2d 667, 671 (S.D.N.Y. 2009) ("Nondisclosure only becomes actionable . . . where a defendant has a duty to disclose, which can arise where there is a confidential or fiduciary relationship between the parties.") (internal citations omitted); Op., at 19 (citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 47 (2d Cir. 1993)).

### 1. Fraudulent Inducement --- Omission of Material Fact of Insolvency

The Trustee argues that RCM fraudulently omitted to disclose to the FX Customers that the LBO rendered it hopelessly insolvent and so unable to repay customers who demanded the return of their assets. Concealing this information, the Trustee asserts, induced the FX Customers to entrust to and maintain their assets with RCM, despite the broker's insolvency.

RCM's concealment of its insolvency and inability return assets would be fraudulent only if it had a duty to disclose this type of information to the FX Customers. The Professional Defendants argue that, because RCM did not owe the FX Customers a general fiduciary duty, they similarly did not, as a matter of law, owe the FX Customers a duty to disclose insolvency. *See* Reply Memorandum of Law in Support of Motion to Dismiss, at 8. This argument is overbroad. An absence of a general fiduciary duty does not *eliminate* the possibility of a duty to disclose a fact that is significant to the broker-customer relationship.[10]

The Second Circuit's decision in *United States v. Szur,* 289 F.3d 200 (2d Cir. 2002) is particularly instructive. In *Szur*, securities brokers challenged their conviction for wire fraud for an omission of material fact—they did not tell their customers about a 45% or 50% commission on the customers' sale of stocks. The court noted that even where a general fiduciary duty is lacking, "a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been

---

10   As discussed below in the treatment of the Second Claim for Relief, the Special Master agrees with the Professional Defendants that the Trustee has not adequately pled that RCM owed the FX Customers a general fiduciary duty.

entrusted to the broker." *Szur*, 289 F.3d at 211. This relationship obligates brokers "'to use reasonable efforts to give [the customer] information relevant to the affairs that [have] been entrusted to them.'" *Id.* (alterations in original) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)). The Second Circuit then identified "three basic types of information available to a broker," some of which is relevant to the affairs entrusted to the broker and must be disclosed: "'information border[ing] on insignificant minutia, the omission of which could never be actionable for fraud . . . information [that] is clearly significant and must be disclosed accurately . . . [and] information . . . fall[ing] into a grey area of possible insignificance and possible significance.'" *Id.* at 211-12 (quoting *Press*, 166 F.3d at 536). Using this rubric, the court "easily" concluded that the brokers were under a duty to disclose the steep commissions despite the "absence of any general fiduciary duty resulting from discretionary authority." *Id* at 212.[11]

It should be noted that the Trustee relied on *Szur* in its argument before Judge Lynch, and Judge Lynch held that *Szur*

> is unavailing here because the Trustee's argument is deliberately indifferent as to whether a particular "use" is within the scope of a special relation. Instead, the Trustee contends that *any* use of customer assets by the broker "must be consistent with a fiduciary duty to avoid waste and theft." (Pl. Opp. at 20.) As to this proposition, however, the Trustee cites no relevant precedent, perhaps because, as cases like *Szur* demonstrate, the fiduciary duty is limited by the broker's exercise of discretion on behalf of the customer, not by whether there is a colorable argument that the broker is a crook. The Trustee's focus on "waste" is therefore unpersuasive for the simple reason that a duty must be owed before that duty can be breached.

(Op. at 536-37).

Judge Lynch's discussion of *Szur* is not determinative of the fraudulent inducement claim, however. As the Trustee notes, that claim is not dependent on "waste" or a breach of fiduciary duty. The Trustee is claiming that even if RCM had no general

---

[11] The Professional Defendants argue that *Szur*, and other cases that the Trustee cites for the proposition that RCM had a duty to disclose, "hold only that a fraudulent inducement claim may lie where one party omits material information that is inextricably intertwined with a specific *transaction* entrusted to the other party." Reply Memorandum at 7 (emphasis in original). But in *Szur*, the Second Circuit stated explicitly that its holding was predicated on the importance of the information to the broker-customer relationship. Nowhere in its opinion does the court state that its holding is transaction-specific. The Professional Defendants also cite *Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir.1994), to suggest that a fraudulent inducement claim may lie only where one party omits transaction-specific information. This citation is peculiar, given that *Conway* is one of the few instances in which the Second Circuit found that a broker ordinarily owes a fiduciary duty to the purchaser of securities, *see Press*, 166 F.3d at 536.

fiduciary duty, and even if it could use the FX funds however it wanted, it had the duty to notify customers that it was hopelessly insolvent.

The question then is whether RCM's hopeless financial condition—specifically, its alleged insolvency stemming from the LBO—was the type of information relevant to the affairs entrusted to RCM even in the absence of a fiduciary duty, thereby requiring disclosure. The Trustee answers this question affirmatively, arguing that a broker's insolvency is "highly material to the broker-customer relationship" and should always be disclosed. Memorandum in Opposition to Motion to Dismiss at 20. The Trustee claims to find support for this position in some ancient cases --- *St. Louis & S. F. Ry. Co. v. Johnston*, 133 U.S. 566 (1890), and *Cragie v. Hadley*, 54 Sickels 131 (1885) --- which hold that it is fraudulent for a bank to silently accept a customer's deposit when it is hopelessly insolvent.

Although the focus of the above-cited cases is banks, not brokers, the Trustee's argument becomes more persuasive when one considers Section 339-d of New York's General Business Law, which provides that a broker is guilty of a misdemeanor if the broker, with knowledge that he is insolvent, accepts or receives assets of a customer who remains ignorant of the broker's insolvency. *See* N.Y. Gen. Bus. Law § 339-d (McKinney 2009).[12] The federal securities laws, though not at issue in this case, lend further credibility to the argument. Pursuant to the antifraud provisions of the Securities Exchange Act, see 15 U.S.C. § 78j(b) (2000), a broker violates federal securities laws by accepting deposits from customers without disclosing the broker's insolvency. *See* N.Y. Jur. 2d *Brokers* § 98 (2010). When coupled with the cases that the Trustee cites, these statutes lend at least some support to the notion that insolvency is the type of information relevant to the affairs entrusted to RCM that is sufficiently significant to require disclosure.

The Professional Defendants argue that simple insolvency alone is not enough to trigger a duty to disclose. The Professional Defendants argue that the late nineteenth century cases that the Trustee cites "refer only to a duty to disclose 'irretrievabl[e]' and 'hopeless[]' insolvency—situations in which the individuals or entities entering into the contract *never intended* to make good on their contractual obligations." Reply

---

[12] Section 339-d reads in full:

> Any person, firm, association or corporation engaged in the business of purchasing and selling as broker or dealer, stocks, bonds or other evidences of debt of corporations, companies or associations who, knowing that he or it is insolvent, accepts or receives from a customer ignorant of such broker's or dealer's insolvency, money, stocks, bonds or other evidences of debt belonging to the customer otherwise than in liquidation of, or as security for, an existing indebtedness, is guilty of a misdemeanor. Any person, firm, association or corporation shall be deemed insolvent within the meaning of this section whenever the aggregate of his or its property shall not, at a fair valuation, be sufficient in amount to pay his or its debts.

Memorandum at 8. The Professional Defendants' point is well taken—the law cannot be that at the very point of insolvency, a broker exposes itself to a lawsuit from all its customers. A business operating at the margin might be insolvent on Tuesday, solvent on Wednesday, and insolvent on Thursday. Yet, the Trustee is not alleging insolvency that is doubtful or at the margin. It is this very type of hopeless insolvency that the Trustee alleges RCM fell into by way of the Refco LBO --- and the Trustee sufficiently alleges that Refco was aware of, and indeed engineered, this hopeless insolvency. [13]

Up to this point, the Second Circuit has not articulated whether hopeless insolvency is the type of "information [that] is clearly significant and must be disclosed accurately." *Szur*, 289 F.3d at 211-12 (quoting *Press*, 166 F.3d at 536). But at the very least, it appears to be the type of information "fall[ing] into a grey area of possible insignificance and possible significance." *Id.* Given that ambiguity, it cannot be said as a matter of law that RCM did not have a duty to disclose its financial condition as of the date of the LBO. It is certainly the kind of information on which a reasonable person would rely in deciding whether to place funds with a broker. Therefore, as to FX funds deposited after the date of the LBO, there remains a factual question as to fraudulent inducement that is not appropriately decided in a motion to dismiss.

The analysis is different with respect to FX deposits placed *before* the date of the LBO. The Trustee admits that "before the insolvency there isn't a fraud, after the insolvency there is."[14] The Trustee further admits that the point at which insolvency became clear is at the time of the LBO. [15] Before that, RCM may have been insolvent, but not so clearly so --- and so knowledgeably so --- that it would rise to a duty to disclose under *Szur*.

The Trustee notes that that the Insiders fraudulently induced the customers to "entrust and *maintain* their assets at RCM" based on a false picture of solvency. Memorandum in Opposition to Motion to Dismiss at 2 (emphasis added). Certainly solvency of the broker is as important to customers maintaining their funds with the broker as it is to those deciding to place funds with that broker. But, as will be seen below, questions of *causation* require a different result for deposits made before and after the date of clear insolvency.

### 2. Fraudulent Inducement --- Affirmative Misrepresentation

---

13 Because anything less than irretrievable insolvency cannot be actionable even under the cases cited by the Trustee, it follows that no fraudulent inducement claim can lie for insolvency before the LBO. As stated above and also discussed below, the Trustee's allegations are that it was the LBO that rendered RCM irretrievably insolvent.

14 Transcript of Oral Argument at 101.

15 Transcript of Oral Argument at 99, 104.

14

The Trustee also alleges that RCM made affirmative fraudulent misrepresentations that induced FX customers to do business with RCM. Rather than pointing to any explicit misrepresentations, however, the Trustee relies on the "shingle theory" to posit that RCM impliedly—and falsely—represented to potential customers that it was a solvent broker with the ability to return customer assets upon demand. *See* Memorandum in Opposition to Motion to Dismiss at 21. It was RCM's implied representation of "solvency, viability, and ability to return assets upon demand," the Trustee argues, that induced FX Customers to "entrust[] and maintain[] an increasing amount of assets to RCM to engage in FX trading." *Id.* Although the Trustee points to no authorities stating expressly stating so, the Trustee argues that the so-called "shingle theory" is a sufficient basis for common law fraud liability under New York law.

The Trustee's assertion is without merit. While it is true that courts have adopted the shingle theory to protect the public from brokers' unfair dealings, this extension of the common law doctrine of "holding out"[16] has no application in the instant case. Courts in the Southern District of New York have discussed whether the shingle theory --- a doctrine developed by the SEC to enforce the federal securities laws --- has been adopted as part of New York's common law of fraud. In *Granite Partners L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999), Judge Sweet decidedly answered in the negative, stating that "the shingle theory has not developed as a generic theory of fraud liability . . . but rather a specific theory of recovery under the federal securities laws." *Id.* at 264. Finding no indication that "New York courts have ever embraced the shingle theory as part of New York's common law of fraud," Judge Sweet was loathe to adopt what can be viewed as a more permissive form of fraud liability. *Id.* at 266; *see also Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 167 (S.D.N.Y. 2001) (following *Granite Partners* and refusing to adopt the shingle theory in an action for fraud under New York law). Given the New York state courts' lack of an express statement adopting the shingle theory as part of its common law of fraud --- and the reluctance of courts in this District to so construe New York law --- the Trustee's fraud claim based on an affirmative misrepresentation must fail.[17]

Despite this obstacle the Trustee finds no reason to believe that "New York courts would tolerate a party presenting itself as a viable and solvent entity in order to induce

---

[16]  *See* Thomas Lee Hazen, *The Law of Securities Regulation* § 10.6, at 423 (2d ed. 1994).

[17] The Professional Defendants assert additionally that by hanging out a shingle, a broker at most represents that it is in regulatory compliance, the implication being that the broker makes no representation regarding its solvency. *See* Reply Memorandum at 9. This is an unduly narrow reading of a theory of liability that courts have applied broadly. *See Brennan v. Midwestern United Life Ins. Co.*, 286 F. Supp. 702, 707 (N.D. Ind. 1968) (holding that a broker's failure to disclose its insolvency violated the shingle theory's implied representation of fair dealing).

customers to entrust and to maintain assets with it, knowing that it was in fact insolvent and could not repay those funds." Memorandum in Opposition of Motion to Dismiss at 22 n.7. However, the cases the Trustee cites for this position hardly provide a clear statement indicating that New York courts are prepared to incorporate the shingle theory into the State's common law of fraud. The Trustee claims to find support in *Manela v. Garantia Banking Ltd.*, 5 F. Supp. 2d 165 (S.D.N.Y. 1998), yet Judge Sweet considered this very case and determined that "it can hardly be taken as an indication that the shingle theory has become part of the fabric of New York's common law." *Granite Partners*, 58 F. Supp.2d at 265. Additionally, the Trustee cites *People v. D.H. Blair & Co.*, 2002 WL 766119 (N.Y. Sup. 2002). Although Judge Sweet did not consider this case in *Granite Partners*, it too fails to adopt explicitly the shingle theory, merely saying that the defendants' misrepresentations were "only part of the evidence" that supported their fraudulent scheme. *Id.* at *18. While the defendants' misrepresentations were "relevant to the charges in th[e] indictment," they were not its sole basis. *Id.* In contrast, the Trustee's lengthy complaint fails to set forth *any* affirmative misrepresentation made by Refco or RCM to the FX customers that would supplement its shingle theory.

### 3. Fraudulent Inducement --- Causation

The Professional Defendants argue that, alleged misrepresentations and fraudulent omissions aside, the Trustee's fraudulent inducement claim must fail for lack of causation. The Professional Defendants are correct that the Trustee's fraudulent inducement claims fails for lack of causation as to funds deposited with RCM *prior* to the LBO that allegedly rendered the company hopelessly insolvent. It is incorrect as to funds deposited with RCM *subsequent* to the LBO.

RCM's failure to disclose its hopeless insolvency was not the cause of harm to those customers who merely *maintained* their funds with RCM after the company became hopelessly insolvent by way of the LBO. Assuming that, at the time of the LBO, RCM did disclose to its then-customers that it was hopelessly insolvent, there is nothing that those customers could have done at that point to get their money back. The announcement of hopeless insolvency would have triggered a run on RCM, in which all the company's customers would have sought to recover their funds prior to the inevitable bankruptcy filing. Because RCM, by the terms of the Trustee's complaint, had no ability to pay back the money that was upstreamed at the time of the LBO, the FX customers would have been unable to recover their funds.[18] And those who were paid by RCM, if any, would have seen those funds recovered by the bankruptcy trustee as a voidable preference for the benefit of the estate.[19] Consequently, FX customers who were

---

[18] This is not a fanciful scenario. As the Trustee recognizes, it is exactly what happened when Refco's insolvency was eventually made public. See Memorandum of Law in Opposition to the Motion to Dismiss at 23.

[19] Pursuant to 11 U.S.C. § 547, the trustee in bankruptcy may recover, as a voidable preference, a transfer by an insolvent debtor transfer that occurs within 90 days of the

fraudulently induced only to maintain their funds with RCM after the company became hopefully insolvent were not harmed by RCM's failure to disclose its pernicious financial position. Put another way, they were harmed by RCM's insolvency, but not by RCM's cover-up of its insolvency.

**The court, then, should dismiss for lack of causation the claims of those customers who allege that RCM's failure to disclose its hopeless insolvency induced them to *maintain* their funds with the company after the date of the LBO.**

In contrast, FX Customers who claim that RCM's lack of disclosure fraudulently induced them to deposit funds with the company after the LBO should not see those claims dismissed for lack of causation. It is more than plausible to believe that a customer would not deposit money with a hopelessly insolvent broker. Had RCM notified these FX Customers of the company's true financial nature, the customers surely would have refused to deposit their funds with RCM and would have looked for a broker in the position to ensure credibly the return of their investment. The Trustee sufficiently pleads that RCM's lack of disclosure caused these customers financial detriment that they otherwise would have avoided. *See, e.g.,* Amended Complaint ¶ 38. [20]

*Consequently, the Trustee, in his First Claim for Relief for fraudulent inducement, has adequately pled a primary wrong with respect to all deposits made by FX Customers after the date of the LBO. Its claim of a primary wrong as to deposits made by FX Customers before the date of the LBO is, however, insufficient — and therefore its claims against the Professional Defendants for aiding and abetting a fraudulent inducement, with respect to deposits made before the LBO, should be dismissed. That dismissal should be with prejudice because causation cannot be found under the Trustee's own theory.*

### 4. Fraud

---

filing of the bankruptcy petition. The experience regarding the SPhinX funds is indicative of the scenario described in the text. Christopher Sugrue, on behalf of the SPhinX funds, demanded repayment of monies transferred from Refco LLC and upstreamed from RCM. Most of that payment was recovered by the Refco Trustee in a preference action. *See* Report and Recommendation of the Special Master dated February 3, 2010 at 26. And in this very case, the FX Customers were unable to obtain recovery after RCM declared bankruptcy.

[20] The Professional Defendants argue that this is not a "pure fraudulent inducement claim" because it depends on RCM's use of the customers' assets—namely RCM's upstreaming of those assets to other Refco-controlled entities. Reply Memorandum at 11. The Professional Defendants are incorrect. The FX Customers who entrusted their money to RCM subsequent to the LBO were harmed by the insolvent company's inability to return their funds, regardless of how RCM used the funds.

The Trustee's Third Claim for Relief alleges fraud on the part of the Insiders. The allegations are similar to the fraudulent inducement claim for relief, though with at least one exception --- the Trustee alleges that the Insiders had a duty to be forthcoming about RCM's insolvency because they owed a fiduciary duty to the FX customers. It follows that, to the extent the Third Claim for Relief tracks the First Claim for relief, it adds nothing to the claim against the Professional Defendants for aiding and abetting. To the extent the Third Claim for Relief is dependent on a fiduciary duty, its viability is determined by the allegations in the Second Claim for Relief, concerning breach of fiduciary duty. This Report and Recommendation will return to the fraud claim after evaluating the claim for breach of fiduciary duty.

### B. Breach of Fiduciary Duty --- Second Claim for Relief

The Trustee alleges that, in effectuating the cashing-out scheme, RCM and its directors breached a fiduciary duty to the FX Customers. *See* Amended Complaint ¶¶ 295-303. The threshold question therefore is whether RCM and its directors were fiduciaries to the FX Customers.

As discussed in a previous Report and Recommendation, the New York law on breach of fiduciary duty is broad, vague, and not very helpful in determining whether any particular relationship rises to the level of "fiduciary." It is often stated that a fiduciary relationship "may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 724 N.Y.S.2d 66, 68 (2d Dept 2001). "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another." *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-5 (2d Dep't 1976).

New York courts have developed case law specific to the broker-customer relationship that helps to clarify the scope and nature of fiduciary duties in this context. In the broker-customer relationship, the broker's "fiduciary obligation . . . is limited to affairs entrusted to the broker." *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996). As Judge Lynch noted, a broker may owe a fiduciary duty where he has discretionary trading authority over a customer's account. Op. at 534. But where a broker does not have discretionary trading authority over an account, the broker's only duty is the proper execution of transactions upon explicit customer instructions. Op. at 535. *See Jordan v. UBS AG*, 11 A.D.3d 283, 285, 782 N.Y.S.2d 722 (1st Dep't 2004) (no duty of disclosure where customer had the sole authority to make trades: "Absent agreement to the contrary, not present here, a broker does not owe fiduciary duties to a purchaser of securities (see Perl v. Smith Barney, 230 A.D.2d 664, 666, 646 N.Y.S.2d 678 [1996], lv. denied 89 N.Y.2d 803, 653 N.Y.S.2d 281, 675 N.E.2d 1234 [1996] ),

excepting executing trades in accordance with the customer's instructions."). Thus, for non-discretionary accounts, the broker's fiduciary duty is "limited to the narrow task of consummating the transaction requested." 11 N.Y. JUR. 2d Brokers § 81 (2010) (citing *De Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293 (2d. Cir. 2002) (applying New York law)). While the broker in charge of a nondiscretionary account may provide advice and recommendations with respect to a specific transaction, the giving of that advice does not initiate an ongoing duty to do so, nor does it give a "legal claim on the broker's ongoing attention." *De Kwiatkowski*, 306 F.3d at 1302.

In dismissing the Trustee's original complaint, Judge Lynch determined that the Trustee alleged that the FX Customers entrusted to RCM only "the execution of foreign currency transactions upon receiving explicit customer instructions," and found that limited entrustment to be the "hallmark[] of a non-discretionary account." Op. at 535. Judge Lynch also found that RCM's ability to use or dispose of the FX Customer's funds, as contemplated by the Margin Annex, did nothing to make the customers' accounts discretionary. *Id.* To the contrary, RCM's wide latitude to use FX Customers' funds suggested that "any action RCM took pursuant to assets treated as margin under the agreement was in RCM's own interest, [was] not undertaken for the benefit of the customer" and did not give rise to a fiduciary duty because RCM's use was "not a situation in which the broker 'act[s] for or . . . give[s] advice for the benefit of another within the scope of the relation.'" *Id.* (quoting *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir. 1998)). Moreover, Judge Lynch found the Trustee's assertion that RCM had a fiduciary obligation to avoid using the FX customers' funds in a manner that would lead to waste or theft "unpersuasive" and "overbroad." *Id.* at 536. The Trustee predicated his theory of waste on the idea that RCM's use of the FX customers' funds was contrary to what the customers' expected, but, according to Judge Lynch, the Trustee's original complaint failed to identify whether the source of the FX Customers' expectation was within the scope of its relation with RCM.

In response, the Trustee asserts that he has amended his complaint to allege that RCM's use of the FX Customers' funds *did* fall within the scope of the affairs entrusted to RCM. Acknowledging that RCM lacked discretionary trading authority over the FX Customers' accounts, *see* Amended Complaint ¶ 62, the Trustee nonetheless argues that the execution of ordered currency transactions is not the only matter that FX Customers entrusted to RCM. *See* Memorandum of Law in Opposition to the Motion to Dismiss at 15. According to the Trustee, the FX Customers also entrusted to RCM the obligation to return their funds on demand, and entrusted RCM to make reasonable provision for their return. *See* Amended Complaint ¶ 297 (stating that the return of FX Customers' FX Margin and other assets entrusted to RCM "was an express and/or implied condition of the FX Customers' entrustment of their assets to RCM for the specific, limited purpose of entering into FX trades at their direction"). The Trustee maintains that by virtue of this entrustment and RCM's position as the FX Customers' broker, RCM had a fiduciary duty not to waste the FX Customers' assets and "to take reasonable steps to ensure the return

of the FX Customer's FX Margin and other assets upon demand." Amended Complaint ¶ 299.[21]

The Trustee's reformulated fiduciary duty argument rests on the premise that, regardless of whether he is in charge of a discretionary or nondiscretionary account, a broker has a fiduciary duty not to waste a customer's assets and to return a customer's funds upon demand. *See* Amended Complaint ¶ 62 (stating that even though "RCM was not a fiduciary with respect to customers' trading decisions, it assumed a fiduciary role with respect to its use of customer funds and . . . was obligated to ensure that its use of those funds . . . was carried out in ways that would ensure that the funds would be available for return to the customers on demand or otherwise"); Memorandum in Opposition to the Motion to Dismiss at 17 ("Where . . . a customer's . . . funds are unavailable because the broker has wasted them, New York law permits the customer to assert a claim for breach of fiduciary duty despite the fact that the broker had no obligation to provide any advice with respect to those same funds."). The Trustee asserts that by upstreaming the FX Customers' funds to other Refco controlled entities with no intent to repay, RCM breached this duty.

---

[21] The Amended Complaint sets forth several reasons why the FX Customers expected that RCM would avoid wasting their assets:

a) They "entrusted their funds to RCM for the specific, limited purpose of conducting FX transactions pursuant to their instructions" and pursuant to a contract that permitted RCM—if it chose to use the funds—to use the funds in certain circumstances but also required it to do so in ways that would safeguard those funds for return on demand;

b) "the custodial and entrustment nature of the relationship between RCM and the FX Customers with respect to the FX Customers' funds;"

c) "RCM held itself out to its customers as a viable, solvent, broker-dealer;"

d) "RCM purported to only act as an agent in executing customer instructions, ran a flat book, and did not purport to be subjected to risk beyond that of counterparty credit risk, all of which fostered great trust and confidence with RCM's customers;"

e) "the lack of any communications from RCM to the FX Customers that would have suggested to the FX Customers that RCM could not be relied upon to return their funds when instructed to do so;" and

f) "RCM's superior knowledge of all of the underlying facts and the fraud."

Memorandum in Opposition to the Motion to Dismiss at 16-17.

This argument proves too much as it essentially imposes a fiduciary duty on a broker for all non-discretionary accounts that the broker fails to make good on. The Trustee is unable to cite any case law stating expressly that such a broad fiduciary obligation exists for a non-discretionary account. The cases cited are:

1. *In re Nappy*, 269 B.R. 277, 297-98 (Bankr. E.D.N.Y. 1999). But this case does not help the Trustee, because it involves a broker that failed to implement trades properly, and the case stands for the same proposition relied upon by Judge Lynch in dismissing the original claim for breach of fiduciary duty:

> Where the broker does not have discretionary trading authority, the relationship between a broker and the customer, however, is still one of principal and agent. The relationship arises when an order to buy or sell is placed, and terminated when the transaction is completed. The broker's duty is "to 'use reasonable efforts' to give the principal information relevant to the affairs entrusted to it. The affair entrusted to a broker who is to buy or sell through an exchange is to execute the order . . . ."

269 B.R. at 297 (quoting *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 862 (11th Cir.1984).

2. *Gilman v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 93 Misc.2d 941, 944, 404 N.Y.S.2d 258 (Sup.Ct. 1978). But again, this case involves the broker's duty to effectuate trades properly as directed by the customer. The Trustee does not allege any violation of this duty by RCM.

3. *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1292, 1305 (2d Cir. 2002). But this case states that there is "no authority for the view that," absent special circumstances, "a broker may be held to an open-ended duty of reasonable care[] to a nondiscretionary client." *Id.* at 1306. Notably, Judge Lynch, specifically considering the applicability of *de Kwiatkoski*, found that the Trustee had not alleged any of the special circumstances listed in that case as possibly creating a fiduciary duty over the management of a non-discretionary account.[22] Nor does the Trustee try, in the Amended Complaint, to plead any of those special circumstances.

---

[22] See Op. at 536, n. 16:
> Nor does [the Trustee] allege that RCM owed the FX customers a duty based on "transformative 'special circumstances,' " such as the "customers' incapacity or simplicity." *de Kwiatkowski*, 306 F.3d at 1308-09 (citing cases). There is no indication in the complaint that the plaintiffs had "impaired faculties[,]" "a closer than arms-length relationship with [RCM,]" or that they are "so lacking in sophistication that de facto control of the [assets were] deemed to rest in [RCM]." *Id.* at 1308. To the extent that the Trustee relies on the "totality of facts and circumstances surrounding the creation and maintenance of the relationship between FX customers and RCM" (Compl. ¶ 28), none support a

The Trustee argues that he has adequately responded to Judge Lynch's dismissal because he has now pleaded that the FX Customers had "a clear expectation --- well within the scope of their customer relationship with RCM --- that any margin being used in connection with a potential trade . . . would not be wasted and would be available to be returned to them on demand." Plaintiff's Memorandum of Law at 15-16. But pleading an expectation does not make it so given Judge Lynch's grounds for dismissing the original complaint. Judge Lynch's point was not that the Trustee simply had to amend the complaint to allege a "no-waste" fiduciary duty, but rather that the Trustee would have to show how the FX Customers could have reasonably expected that RCM would not waste the assets, given 1) that the account was non-discretionary and 2) that the terms of the Margin Annex --- as he interpreted them --- allowed RCM to dispose of the FX Customer funds in any way it saw fit.

The case on fiduciary duty is ultimately closed by the Margin Annex as construed by Judge Lynch.[23] Any finding of a fiduciary duty regarding the misuse and non-return of funds must fall short if the Margin Annex says that RCM could use the funds for any purpose. The Trustee, in a number of places in his Amended Complaint, essentially seeks to reinterpret the Margin Annex. For example, in Paragraph 1, the Trustee states: "Properly understood, this Margin Annex permitted RCM to use funds designated as FX Margin for the limited period in which trades were open, and it did not authorize waste of the funds, i.e., a use that RCM knew was likely or inevitably to be a losing transaction." (citation omitted). That may well be a reasonable reading of the Margin Annex; it may be a ground for appeal. But it was not the reading given to it by Judge Lynch. Therefore, the Trustee's attempt to get out from under the Margin Annex and plead a breach of fiduciary duty must fail.

***Accordingly, the Trustee has failed to plead the primary wrong of breach of fiduciary duty --- and any claim against the Professional Defendants for aiding and abetting a breach of fiduciary duty should be dismissed. This dismissal should be with prejudice because the Trustee has already been given an opportunity to plead around Judge Lynch's interpretation of the Margin Annex and has failed to do so.***

---

fiduciary relationship. Neither the mailing of account statements, nor the presence of a "dedicated salesperson" demonstrate the provision of extraordinary broker-dealer services or distinguish the FX customers' relationship with RCM from a standard broker-customer relationship. (Id.) Further, to the extent that RCM represented that it was an unregulated offshore brokerage, that fact "would appear to put customer on notice that the accounts would be managed in unconventional ways"-a heightened risk that, if anything, appears to undermine the presence of, not establish, a fiduciary duty. *RCM I*, 2007 WL 2694469, at *9.

[23] Judge Lynch's expansive analysis of the rights given to RCM under the Margin Annex is discussed in Part One of this Report and Recommendation.

### C. Fraud (Redux) --- Third Claim for Relief

The Amended Complaint separates out a claim for fraudulent inducement (Claim One) and a claim for fraud (Claim Three). As discussed above, much of Claim Three tracks Claim One --- specifically the claim that RCM projected itself out as a viable broker-dealer, and if it had disclosed its true financial condition the FX Customers would never have placed their funds with RCM. Amended Complaint ¶¶ 307-308.

One difference in the Third Claim for Relief is the assertion that the Insiders had a duty to disclose RCM's insolvency because they had "a special relationship of trust and confidence with the FX customers and owed them a duty of candor that their cashing-out scheme either had, or would, render RCM a non-viable, insolvent broker-dealer." Amended Complaint ¶ 310. This allegation is a reference to a fiduciary duty that would require disclosure --- but the viability of this allegation is controlled by the previous section, finding that the Trustee has not stated a breach of fiduciary duty.

Ultimately it is not necessary to parse out Claim Three, because the Professional Defendants are not named under that Claim and so there is no motion to dismiss it before the court. It is enough to say that Claim Three adds nothing to the viability of the allegations of primary wrongs. As stated above, the Trustee has adequately pled fraudulent inducement with respect to FX funds placed with RCM after the date of the LBO. But he has not adequately pled any kind of fraud with respect to FX funds placed with RCM before that date.

### D. Conversion --- Fourth Claim for Relief

Judge Rakoff has set forth the requirements for a cause of action for conversion under New York law: "the legal interests that a party bringing a conversion claim must show are either 'legal ownership or an immediate superior right of possession to a specific identifiable thing and ... that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights.'" *Starr Intern. Co., Inc. v. American Intern. Group, Inc.,* 2009 WL 614752, at *2 (S.D.N.Y. 2009) (quoting *Fiorenti v. Central Emergency Physicians, PLLC,* 305 A.D.2d 453, 454-55, 762 N.Y.S.2d 402 (2d Dep't 2003)).

*See also* Op. at 540:

To withstand a motion to dismiss in a conversion claim, a plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Moses v.*

*Martin,* 360 F.Supp.2d 533, 541 (S.D.N.Y.2004) (citation and internal quotation marks omitted).

A claim for conversion will not lie "where damages are merely sought for breach of contract." *Citadel Mgmt., Inc. v. Telesis Trust, Inc.,* 123 F. Supp. 2d 133, 148 (S.D.N.Y. 2000) (citations omitted).   Where a conversion claim is grounded in a contractual dispute, the plaintiff "must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights." *Moses,* 360 F. Supp. 2d, at 441 (citing *Calcutti v. SBU, Inc.,* 223 F.Supp.2d 517, 523 (S.D.N.Y.2002)).

Additionally, New York makes a distinction between the wrongful *taking* of another's property and the wrongful *detention* of that property. *See Newbro v. Freed,* 409 F. Supp. 2d 386, 394 (S.D.N.Y. 2006) (citing *MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co.,* 193 N.Y. 92, 101, 85 N.E. 801 (1908)).   In a wrongful detention case, the original possession of another's property may well be lawful, but the conversion occurs when "the owner makes a demand for the return of the property and the person in possession of the property refuses to return it." *In re King,* 305 A.D.2d 683, 683, 759 N.Y.S.2d 895 (2d Dep't 2003).

### 1. Specifically Identifiable

In their motions to dismiss the original complaint, the Professional Defendants argued that the funds in the FX Customer accounts were not specifically identifiable, and so could not be the subject of a conversion claim. But Judge Lynch found that the identifiability of the accounts raised a question of fact. He noted that funds "may be 'specifically identifiable' despite the fact that they are not alleged to be held in a segregated account." Op. at 541-42. There is nothing in the Amended Complaint that would change Judge Lynch's assessment and therefore his ruling on the subject of identifiability is the law of the case.

### 2. Unauthorized Taking

As discussed above, Judge Lynch dismissed the conversion claim because the Margin Annex allowed RCM to use the FX Customer funds as it wanted, and therefore the Trustee could not allege that the taking was unauthorized. In response to Judge Lynch's declaration that the Trustee's original complaint failed to allege that RCM's siphoning of FX Customers' funds "took place *outside of* the terms established by the Margin Annex," Op. at 543, the Trustee attempts to reformulate his wrongful taking claim by advancing two separate arguments to support his conclusion that RCM's use of the FX Customers' FX Margin was unauthorized.

First, the Trustee contends that RCM's use of the FX Customers' funds constituted a conversion because it was "contrary to RCM's duties as a bailee of the FX

Customers' funds." Memorandum in Opposition to the Motion to Dismiss at 24. The bailor-bailee relationship, the Trustee alleges, can impose a "'legal duty independent of contractual obligations . . . as an incident to the parties' relationship'" that can "'subject [a bailee] to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.'" *Id.* at 25 (quoting *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540 551-52 (1992)). Following this line of reasoning, the Trustee contends that RCM's transfer of FX Margin to other Refco-controlled entities without regard for the funds' return constituted a breach of RCM's legal duty as a bailee sufficient to state a claim for version.

The Trustee's claim, however, mischaracterizes the relationship between the FX Customers and RCM. New York law provides that when a customer of a bank deposits funds into a bank account, title passes from the depositor to the bank, and the bank may use those funds in conducting its business. *See Citadel Mgmt., Inc.*, 123 F. Supp. 2d at 148 n.4. The deposit establishes a debtor-creditor relationship between the bank and the depositor in which the former becomes indebted to the latter for the amount of the deposit. *Feinberg v. Katz*, 2002 WL 1751135, at *17 (S.D.N.Y. July 26, 2002).[24] New York law presumes that when a person deposits funds in a bank, the relationship between those parties is that of debtor and creditor. *Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992) ("a deposit made in the ordinary course of business is presumed to be general, and the burden of proof is on the depositor to overcome such presumption by proving that the deposit was made upon such terms and conditions as constituted a special deposit, or a deposit for a specific purpose"). In the event, then, that the bank uses the funds, the depositor is precluded from bringing a conversion claim—a claim predicated on the unlawful use of funds belonging to another—because, at that point in time, the funds do in fact belong to the bank. *See Citadel Mgmt., Inc.*, 123 F. Supp. 2d at 148; *Newbro v. Freed*, 409 F.Supp. 2d 386, 396 (S.D.N.Y. 2006) (noting that courts are reluctant to permit "customers to proceed against . . . depository institution[s] on a conversion theory").[25]

---

[24] *See also Nwachukwu v. Chemical Bank*, 1997 WL 441941, at * 5-6 (S.D.N.Y. ):

> Under law, funds deposited in a bank become the property of the bank, and the bank becomes indebted to the depositor for the amount of the funds deposited. Therefore, a conversion claim, predicated on the unlawful use of funds belonging to another, is not sustainable between a bank and a depositor with a standard debtor-creditor relationship.

(citation omitted).

[25] **Error! Main Document Only.**The rule is different, however, if funds are held in a *segregated* account— i.e., the funds are held independently of the bank's other funds. *See People's Westchester Savings Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992); *Citadel Mgmt.*, 123 F.Supp.2d at 147 ("While New York recognizes that money is the sort of property that may be the subject of a conversion action, the money must be held in a specific, identifiable fund and [subject to] an obligation to return or otherwise treat in a particular manner the specific fund in question.") (quotation omitted). By contractually

The same rule applies to funds invested with brokerages. *Citadel Mgmt., Inc.*, 123 F. Supp. 2d at 148 n.4 (the rule as it relates to banks "also applies to funds invested with brokerages, unless the funds are held in a distinct separate account"). If the funds with a broker are unsegregated, a customer merely will be a creditor of the brokerage and therefore precluded from bringing a conversion claim. *See Newbro*, 409 F. Supp. 2d at 396 (concluding that "a claim against a broker for converting funds in a free credit balance fails for the same reason as a customer's claim against a bank—the funds at issue arise from a debtor-creditor relationship and are not segregated vis-à-vis other accounts at the brokerage firm").; *Feinberg*, 2002 WL 1751135 at *17 (finding it inconsequential to plaintiff's conversion claim that his funds were not maintained in a segregated account because the case "does not involve bank or investment accounts and therefore the special need for a segregated account does not arise"). Although "'many customers of broker-dealers are not aware,'" the Securities and Exchange Commission has confirmed the less-than-intuitive rule, "'(1) that when they leave free credit balances with a broker-dealer, the funds generally are not segregated and held for the customer, but are commingled with other assets of the broker-dealer and used in the operation of the business, and (2) that the relationship between the broker-dealer and the customer as a result thereof is that of creditor-debtor.'" *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996) (quoting Adoption of Rule 15c3-2 under the Securities Exchange Act of 1934, Exchange Act Release No. 34-7325, 1964 SEC LEXIS 131, *2-3 (1964)).

Under New York law, then, the FX Customers were not in a bailor-bailee relationship with RCM; they were merely creditors of RCM. That conclusion is supported by the terms of the Margin Annex, as construed by Judge Lynch. RCM's right to dispose of the funds for any purpose provides a strong indication that the FX Customers' funds were not segregated and that RCM was not acting as a bailee.

Under New York law title remains with a broker's customers only where the funds are *both* specifically identifiable and segregated.[26] For purposes of this motion,

---

obligating a bank to hold a depositor's funds in a segregated account, the depositor retains title to its deposited funds, thereby creating a bailor-bailee relationship between the depositor and bank. This is why a conversion claim was viable in *Krys v. Sugrue*. See Report and Recommendation of the Special Master on Primary Wrongs in *Krys v. Sugrue* dated March 1, 2010. The funds at issue in *Krys v. Sugrue* were placed in a segregated account, and the Trustee alleged that those funds were wrongfully diverted to unsegregated accounts and lost when RCM declared bankruptcy.

[26] The Trustee cites some New York cases which appear to hold that conversion will lie as to specifically identified bank accounts, without the special requirement of segregation. But these cases stand only for the proposition that conversion will lie as against third parties --- not the bank. *See, e.g., Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 626 N.Y.S.2d 472, 475 (1st Dept. 1995) (allowing a conversion claim not against a bank but against a person who deposited traceable, ill-gotten funds into an account); *Payne v. White,* 101 A.D.2d 975, 477 N.Y.S.2d 456, 458 (3d Dept. 1984) (involving a

only one prong of this conjunctive test is satisfied.  While Judge Lynch stated that a factual question remains as to whether the FX Customers' funds were specifically identifiable, *see supra*, nowhere in the Amended Complaint does the Trustee allege that the customer agreement between RCM and the Customers required maintenance of customers' funds in segregated accounts.[27]  Absent a sufficient allegation that the FX Customers' funds were kept in segregated accounts, it must be assumed that the FX Customers relinquished title to the assets when they deposited them with RCM.  RCM's use of the FX Margin therefore did not violate any duty as a bailee of the funds, and there is no primary wrong of conversion based on unauthorized use.[28]

As an alternative argument, the Trustee alleges that the Refco insiders' knowing waste of RCM customer assets was unauthorized because it violated RCM's contractual duty of good faith and fair dealing --- which precludes a contracting party from doing anything to destroy or injure the right of the other party from receiving the fruits of the contract. *See* Memorandum in Opposition to Motion to Dismiss at 26.  The Trustee contends that RCM and Refco Insiders "destroyed the purpose of its agreements with the FX Customers by upstreaming the FX Margin (and other customer assets) without regard for their return." *Id.* at 26-27.  It would appear that Judge Lynch's interpretation of the Margin Annex nullifies this argument --- because upstreaming was permitted by the contract between the parties.  Not so, according to the Trustee, who seeks to revisit the meaning of the Margin Annex and declares that under no plausible reading did it sanction

---

claim by one joint account owner against another who improperly removed more than his share of the account). These results are justified by the fact that there was no contractual relationship between the parties involved --- unlike the contractual relationship that exists between a bank (or broker) and a depositor.

[27] The Trustee alleges in ¶ 67 of the Amended Complaint that FX Customers' funds "were sent to a specific FX customer account and reference was made to the specific RCM account number of the particular FX customers." The Trustee does not allege, however, that the FX Customers had a right to have the funds segregated in special accounts. Compare the allegations in *Krys v. Sugrue,* as described in the March 1, 2010 Report and Recommendation at 5 ("**Error! Main Document Only.**The SPhinX Funds were a platform of funds organized as Cayman Islands Exempted Segregated Portfolio Companies ("SPCs") and designed to track the performance of the Standard & Poor's Hedge Fund Index. (SAC ¶2). Retaining customer-segregated assets in SPCs was essential to the structure of the SPhinX funds. (SAC ¶3)"). As noted in the Reports and Recommendations in *Krys v. Sugrue,* the accounts at Refco LLC were segregated whereas the funds at RCM, an unregulated entity, were commingled.

[28] Indeed, Judge Lynch held similarly in *RCM II,* a case involving a "nearly identical" customer agreement that did not purport to require RCM to segregate customers' funds. *See  RCM II* at 194-95 (finding that RCM's use of its customers' assets when they had outstanding margin loans "created only a creditor-debtor relationship"). Although Judge Lynch's holding is not binding in this case, it strongly supports the conclusion that the FX Customers were not in a bailor-bailee relationship with RCM.

the knowing waste of FX Margin. *Id.* at 27. This argument hinges on interpreting the phrase "free from any claim or right" in the Margin Annex, which the Trustee understands to mean merely that RCM need not account to FX Customers for profits earned on its use of margin. According to the Trustee, this phrase, taken together with the words "otherwise use," indicates that the Margin Annex cannot be read to allow waste or theft, or the use of customer assets in the absence of adequate provision for their return. *Id.* Such uses, the Trustee posits, constitute the exercise of unauthorized dominion of the FX Customers' funds.

The good faith and fair dealing argument is of course highly dependent on the terms of the contract. *See, e.g., 511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496, 500–01 (2002) ("duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship"). And unfortunately for the Trustee, his allegation of a contractual obligation is in direct conflict with Judge Lynch's broad interpretation of what constitutes permissible use of customer funds under the Margin Annex. In dismissing the Trustee's prior complaint, Judge Lynch declared unequivocally that because RCM could transfer FX Margin to other Refco entities free from any claim or right, "it readily follows that no conversion could occur at the time of the 'streaming' unless it took place *outside of* the terms established by the Margin Annex." Op. at 29 (emphasis in original). Judge Lynch emphasized that, under his interpretation, it would be difficult to even conceptualize a use outside the Margin Annex. For example, when confronted with a nearly identical customer agreement provision in *RCM II*, Judge Lynch held that RCM's failure to reconvey its customers' property upon Refco's fraud becoming public in October 2005 could not be considered use outside of the Margin Annex. *RCM II* at 185. So too, Judge Lynch has held that the "until settlement in full" language does not, as the Trustee argued under the first complaint, modify or limit the language allowing use free from "any claim of right" and therefore did not convey a false impression that the assets would be returned. On the contrary, he found the language "does not, in any way, restrict RCM's use of the customers' assets" because there is no specific prohibition to which RCM "claimed it would adhere" that would restrict their use. Op. at 538.

An unauthorized taking claim is dependent on whether the defendant exercised unauthorized dominion over plaintiff's property. Judge Lynch has found that the Margin Annex permitted the uses alleged by the Trustee. This interpretation of the Margin Annex is controlling in the instant case. RCM's use of those funds, then, cannot be said to have been unauthorized and therefore the Trustee has failed to state an actionable conversion claim for unauthorized use of the FX Customer funds.

### 3. *Wrongful Detention*

The Trustee alleges that RCM wrongfully *detained* the FX Customers' funds after they demanded their return. *See* Amended Complaint ¶¶ 77, 132, 321. The Trustee roots this argument in his assertion that the FX Customers entered into a bailor-bailee

relationship with RCM upon depositing their funds with the broker, and that the customers were therefore entitled to the return of their funds upon demand because they never conveyed title to RCM. *See* Memorandum in Opposition to the Motion to Dismiss at 28. Under this theory, even if RCM's initial use of the property was permitted, the conversion occurred when RCM failed to return it because it was the FX Customer's property all along.

For the reasons discussed above, the Trustee mischaracterizes the nature of the relationship between RCM and the FX Customers. At all times the relationship between the two parties was that of creditor-debtor, not bailor-bailee. Title to the FX Customers' assets transferred to RCM at the time that RCM took custodial possession of the funds, and therefore it cannot be said that RCM's retention of the funds interfered with the FX Customers' legal title or superior right of possession. In the end, the Trustee's conversion claim rests on an alleged breach of contract for failure to pay a debt --- and as stated previously, New York law does not permit a plaintiff to raise a breach of contract into a conversion claim. *Citadel Mgmt. Inc.,* 123 F.Supp.2d at 148 ("an action for conversion cannot lie where damages are merely sought for breach of contract.") For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some "wrong" that is separately actionable. *Id.* None is found here. *See also In re Chateaugay Corp.,* 10 F.3d 944, 958 (2d Cir.1993) (holding that a tort claim will not arise where plaintiff is essentially seeking enforcement of the bargain).[29] Accordingly, the Trustee has not stated a primary wrong of wrongful detention.

*In sum, the Trustee has failed to plead the primary wrong of conversion --- and any claim against the Professional Defendants for aiding and abetting a conversion should be dismissed. This dismissal should be with prejudice because the Trustee*

---

[29]   The Professional Defendants also argue that the Trustee fails to provide support for his claim that RCM's failure to return the FX Customers' funds on demand violated its contractual duty. *See* Reply Memorandum at 13, n.6.   The Trustee left this out intentionally, the Professional Defendants assert, because RCM's financial situation had triggered an event of default, as defined by the FX Agreement, and the amended complaint fails to allege that the FX Customers followed the agreement's requisite process for cashing out their interests where an event of default has occurred. *See id.* The Professional Defendants argue that, as a result, "RCM's detention of the deposits after demand for return was not necessarily wrongful." *Id.*

The Professional Defendants acknowledge, however, that whether RCM's financial condition did in fact constitute an event of default remains unclear. *See id.* (stating that some of the definitions of "events of default" in the FX Agreement could "plausibly apply to the facts alleged in this case"). Thus the question whether an event of default was triggered by the broker's precarious financial condition is one of fact that is not properly resolved in a motion to dismiss. The Professional Defendants' argument that RCM's failure to pay was "not necessarily wrongful" under the contract does not provide valid grounds on which to dismiss the Trustee's wrongful detention claim.

*cannot allege that the FX Customer accounts were segregated, and therefore cannot, as a matter of law, allege the bailor-bailee relationship that is necessary for a wrongful use or wrongful detention claim.*

## IV. Aiding and Abetting

Assuming the court finds that the Trustee has adequately alleged a primary wrong, the Trustee must also sufficiently plead that the Professional Defendants aided and abetted that wrong. To establish an aiding and abetting claim, a plaintiff must adequately plead "(1) the existence of a violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted the primary wrongdoer." *Chemtex, LLC v. St. Anthony Enterprises, Inc.* 490 F.Supp.2d 536, 546 (S.D.N.Y.,2007).

Judge Lynch dismissed the aiding and abetting claim in the original complaint, finding that the Trustee failed to plead sufficiently either prong of the cause of action. He noted that the allegations against the Professional Defendants related to their part in the receivables scheme --- round-trip loans, LBO, IPO, etc. Judge Lynch rejected the Trustee's attempt to equate the Professional Defendants' "knowledge of or participation in the so-called 'receivables scheme' that involved the round-trip loans, with [the Professional Defendants'] knowledge of or participation in the so-called 'customer scheme' that siphoned the FX customers' assets." Op. at 545. Judge Lynch disagreed with the Trustee's contention that the receivables scheme and the customer scheme were two parts of an integrated whole. Any "common objective is insufficient to plead claims for aiding and abetting, however, because the Trustee must offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful conduct *that harmed the FX customers* --- the alleged fraudulent siphoning of their funds --- not actual knowledge of different wrongful conduct that might have harmed others, such as Refco's shareholders." *Id.* (emphasis in the original).

Therefore, to successfully state a claim for aiding and abetting, the Trustee must have amended the complaint to allege facts demonstrating that the Professional Defendants had actual knowledge of and substantially assisted in the Refco Insiders' siphoning of FX Customers' funds, i.e., the customer scheme.

Yet the vast majority of the Trustee's aiding and abetting allegations in the Amended Complaint continue to relate to the receivables scheme. *See, e.g.,* ¶¶133-161 (detailing Mayer Brown's knowledge of and assistance of round trip loans and hiding the RGHI receivable); ¶¶ 180-187, 195-198 (Mayer Brown's knowledge of and assistance with the LBO and IPO); ¶¶ 201-211 (Grant Thornton's role in the Insiders' scheme to cash out); ¶¶ 221-261 (Grant Thornton's knowledge of the RGHI receivable and the round-trip loans).

The claims of aiding and abetting in the Amended Complaint that are specifically directed to the customer scheme are the following:

1. Both of the Professional Defendants knew about the customer scheme because they knew that Refco needed to use the funds at RCM to prop itself up, they knew that RCM was unregulated, and they knew that after the LBO it would be impossible for RCM to pay back the money it had upstreamed.

2. Mayer Brown provided substantial assistance to the customer scheme by a) acting as the primary negotiator and drafter for the Cargill acquisition, thus allowing RCM to upstream the Cargill-related FX funds; and b) advising Refco on how to keep RCM unregulated after its operations were relocated to the United States.

3. Grant Thornton issued unqualified audit opinions in connection with RCM's stand-alone statements, and improperly reported the RCM upstreaming as loans to customers.

4. Most importantly, the Trustee propounds a theory that by assisting Refco Insiders in the receivables scheme, the Professional Defendants knew about and substantially assisted the customer scheme --- because the receivables scheme was dependent on the infusion of cash derived from the customer scheme.

### A. Actual Knowledge

### 1. Legal Standard

An aiding and abetting claim requires that the defendant had knowledge of the underlying wrongful conduct --- a standard that is not satisfied by a mere allegation of constructive knowledge. *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law . . . has not adopted a constructive knowledge standard for imposing aiding and abetting liability"). Rather, New York law requires that a plaintiff must alleged facts that give rise to a "'strong inference'" of knowledge. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006)).

There is dispute in the case law on whether "conscious avoidance" is sufficient for an aiding and abetting claim. In *Fraternity Fund, supra*, Judge Kaplan opted for a standard of conscious avoidance for aiding and abetting claims, and distinguished that standard from constructive knowledge:

> Constructive knowledge is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." Conscious avoidance, on the other hand, occurs when "it can almost be said that the defendant actually knew" because he or she suspected a fact

and realized its probability, but refrained from confirming it in order later to be able to deny knowledge. Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence. Reflecting this analysis, the Second Circuit has held in the criminal context that conscious avoidance may satisfy the knowledge prong of an aiding and abetting charge. Accordingly, the Court sees no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers.

*Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368 (citations omitted).

Other courts in the Southern District have held that even conscious avoidance is not enough --- the plaintiff must allege that the alleged aider and abettor actually knew about the primary wrong. *See, e.g., Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC,* 446 F.Supp.2d 163, 202, n. 273 (S.D.N.Y. 2006) (noting that the weight of authority under New York law requires actual knowledge, as distinct from "willful blindness"). The difference, however, between actual knowledge and "it can almost be said that the defendant actually knew" based on underlying knowledge of facts and circumstances is, to say the least, a narrow one. To the extent there is a difference, Judge Kaplan's view is persuasive. If conscious avoidance is enough to satisfy a *criminal* charge of aiding and abetting, it should certainly suffice for a civil claim.

### 2. *Application of Knowledge Standard to Mayer Brown*

Under either test of knowledge, the Trustee has sufficiently pleaded that Mayer Brown knew about the customer scheme. For example paragraphs 162-179 of the Amended Complaint provide substantial detail about Mayer Brown's work concerning RCM's "repatriation." Mayer Brown is also, and with particularity, alleged to have overseen virtually all aspects of Refco's business plan, thus becoming aware of the intent of the Insiders to cash out, and of the fact that money to fund Refco was being funneled through RCM. The Trustee also alleges (¶¶ 163-64) that Mayer Brown through its representation became aware of RCM's propensity to siphon assets to fund Refco's operations --- an allegation that is certainly relevant to actual knowledge. Given Mayer Brown's extensive involvement with all things Refco, and its specific work on the unregulated status of RCM, it is more than plausible to conclude that, Mayer Brown knew that RCM was upstreaming customer funds and that at least after the LBO those funds could not be repaid. The Amended Complaint also, as discussed above, contains particularized allegations about Mayer Brown's role in the acquisition of Cargill --- which, given Mayer Brown's knowledge of the rest of the Insiders' business plan and the need to get money from customers, provides further evidence of knowledge of a customer scheme.

Moreover, "[a]ctual knowledge may also be implied from a strong inference of fraudulent intent." *Rosner v. Bank of China*, 528 F.Supp.2d 419, 426 (S.D.N.Y.,2007), and a motive can provide part of that inference. As to Mayer Brown, the Trustee has sufficiently alleged a motive --- the millions of dollars of fees that Mayer Brown received in representing Refco, and the consequent interest in seeing Refco stay afloat. And as to Mayer Brown, there is fraudulent intent aplenty, as shown by Joseph Collins's conviction.

In sum, the Amended Complaint adequately pleads knowledge --- at the very least conscious avoidance, and actual knowledge if that is required --- on Mayer Brown's part.

### 3. *Application of Knowledge Standard to Grant Thornton*

The Amended Complaint adequately alleges Grant Thornton's knowledge of the customer scheme. The Trustee alleges that Grant Thornton audited RCM on a stand-alone basis for the years 2003-2005. ¶278. And Grant Thornton audited Refco's financial statements on a consolidated basis. Thus, Grant Thornton "had a complete picture of the finances, operations and business of both RCM and the other Refco entities and had access to all material information concerning the transfers of FX Customer assets." ¶ 203. The Amended Complaint alleges that Grant Thornton knew that RCM was an unregulated entity --- an allegation that is more than plausible given Grant Thornton's role. ¶¶ 263-64. And Grant Thornton's own reports indicate that it knew that RCM was making substantial transfers to affiliates, which were fart greater than RCM's profits. ¶¶265-68.

Grant Thornton argues that the Refco Insiders' guilty pleas are evidence of a lack of knowledge on Grant Thornton's part --- because the Insiders admitted to lying to Grant Thornton. But at best this is evidence that a jury could consider on the question of knowledge. It does not render the Trustee's specific averments as to knowledge implausible --- especially considering the inference of motive that can be derived from Grant Thornton's motivation to generate fees.

In sum, the Amended Complaint adequately pleads knowledge --- at the very least conscious avoidance, and actual knowledge if that is required --- on Grant Thornton's part.

### B. *Substantial Assistance*

### 1. *Legal Standard*

Judge Kaplan, in Fraternity *Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F.Supp.2d 349, 370-71 (S.D.N.Y. 2007), provides this description of the substantial assistance requirement --- and the related requirement of probable cause --- for an aiding and abetting claim:

Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [primary wrong] to occur. In addition, substantial assistance is intimately related to the concept of proximate cause. Whether the assistance is substantial or not is measured by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated.

In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated. Plaintiffs must allege more than but-for causation. They must allege also that their injury was a direct or reasonably foreseeable result of the conduct.

There is some debate about whether proximate cause and substantial assistance ought to be equated in the aiding and abetting context. *See Winnick*, 406 F.Supp.2d at 256 n. 6 (S.D.N.Y.2005) ("This Court has some doubt about whether 'substantial assistance' can be equated with proximate cause. A person can make a meaningful contribution to a fraudulent scheme without being understood to have legally 'caused' the scheme or its results."); *see also In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 34 (E.D.N.Y.2006) ("[S]ome question has been expressed whether the 'proximate cause' standard or a lesser standard should be utilized in the context of aiding and abetting liability."). Nevertheless, as the *Winnick* court recognized, "the Second Circuit has utilized the 'proximate cause' standard in the context of aiding and abetting securities fraud." *Winnick*, 406 F.Supp.2d at 256 n. 6 (citing *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979), *superseded on other grounds, Cent. Bank*, 511 U.S. 164, 114 S.Ct. 1439).

(Some citations and internal quotations omitted)

Judge Lynch was the author of *Winnick*, cited by Judge Kaplan as a case questioning the equation of substantial assistance and probable cause. See Op. at 544, n. 5 ("Although the Trustee does not dispute this point, this Court has, in the past, expressed some doubt as to whether 'substantial assistance' can be equated with proximate cause on the ground that a person can 'make a meaningful contribution to a fraudulent scheme without being understood to have legally 'caused' the scheme or its results.'"). Judge Lynch found it unnecessary to decide the question in this case, "because the Trustee has not adequately alleged facts giving rise to a strong inference of defendants' actual knowledge of the alleged conversion, breach of fiduciary duty, or fraud." Because, as Judge Kaplan notes, there is Second Circuit authority requiring proximate cause in a related context, it makes sense to require a showing of probable cause in this case. *See also Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F.Supp.2d 163, 201 (S.D.N.Y. 2006) ("the plaintiff must allege that the aiding and abetting defendant proximately caused the harm on which the primary liability is predicated").

### 2. *Application of Substantial Assistance/Probable Cause Standard to Mayer Brown.*

The Trustee's substantial assistance argument is mostly --- but not completely --- an attempt to ask for reconsideration of Judge Lynch's ruling that efforts to further the receivables scheme are irrelevant to furtherance of the customer scheme. The Trustee, in his Memorandum of Law at 43, avers that the Amended Complaint "clarifies that it was not only the initial siphoning, but also the LBO's subordination of the intercompany debt that made return of the funds impossible." But those same allegations were made in the original complaint that Judge Lynch dismissed.

Of equal importance, the Trustee's purported linkage is faulty because he makes no argument that an act to effectuate the LBO (or indeed any act involved in hiding the RGHI receivable) *assisted* the siphoning. If anything, it would be the other way around -- - an act to effectuate the siphoning might be thought to assist the cashing-out scheme because it served to prop up Refco until that cashing-out could occur. But the reverse is not the case --- Refco did not do an LBO in order to be able to siphon cash from RCM.

Because the Trustee's attempt to link the receivables scheme and the customer scheme is precluded by Judge Lynch's ruling and in any event lacks plausibility, none of Mayer Brown's acts pertaining to the receivables scheme can be considered to substantially assist or proximately cause the primary wrongs in this case.

With respect to Mayer Brown, the Trustee does allege some involvement with the customer scheme. Specifically, Mayer Brown offered regulatory advice on RCM's repatriation and "did nothing to stop RCM from falsely acting as an unregistered broker-dealer." Amended Complaint ¶ 170. But this allegation does not come close to establishing substantial assistance, much less proximate cause (assuming the standards are different), of the customer scheme. First, Mayer Brown's advice, if followed, could well have led to Refco going back to operating RCM as an offshore operation --- a result much more likely than adopting a plan of regulation that would stop the upstreaming of funds. Second and more important, the Trustee does not refute Mayer Brown's contention that FX trading was not subject to regulation in any event. Memorandum of Law in Support of the Motion to Dismiss at 29, n.12. Therefore, even registering RCM as a domestic entity would not have stopped the upstreaming of FX Customer funds.

The second allegation against Mayer Brown related to the customer fraud concerns the services it rendered in acquiring Cargill, and the FX accounts held by Cargill. Amended Complaint ¶¶ 189-94. There is no allegation that the acquisition was itself illegal or improper. The only allegation is that Mayer Brown, by its legal work, provided Refco the opportunity some time thereafter to upstream the FX accounts derived from Cargill. But as Judge Kaplan has held, "conduct that merely creates a condition that made the resulting injury possible" is "too remote to constitute legal cause." *Bondi v.*

*Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 421 F.Supp.2d 703, 722 (S.D.N.Y. 2006).

> *In sum, the Trustee has failed to adequately plead that Mayer Brown substantially assisted or proximately caused the customer scheme. Therefore, the claims against Mayer Brown for aiding and abetting should be dismissed. And that dismissal should be with prejudice, as there is no indication that the Trustee will be able to plead anything further that will implicate Mayer Brown in the customer scheme.* [30]

### 3. Application of Substantial Assistance/Probable Cause Standard to Grant Thornton.

As discussed above, any acts of Grant Thornton directed toward the receivables scheme cannot be considered as substantially assisting or proximately causing the harm alleged from the customer scheme.

With respect to the customer scheme, the Trustee's allegations center on Grant Thornton's unqualified audit opinions of RCM from 2003-5. The original complaint referred to the unqualified audit opinions, and it would seem that under Judge Lynch's analysis, that allegation should have warranted consideration on the question of aiding and abetting --- Judge Lynch's reasoning on aiding and abetting was that the Professional Defendants must have done something to further the customer fraud, and an unqualified audit opinion of RCM itself ostensibly could have done so.

Apparently, Judge Lynch dismissed any consideration of the audits on the aiding and abetting question because the Trustee's assertions as to the internal finances of Refco and RCM were not sufficiently particularized. See Op. at 539:

> In any event, the Trustee's allegations that the loans that RCM made to its affiliates with the proceeds of the misappropriated customer assets were "uncollectible" are woefully underpleaded. The reason for this underwhelming showing is not readily discernible. Allegations that the receiving entities "lacked the intent and/or financial wherewithal to repay ... on demand or otherwise" (Compl. ¶ 32), or that RCM was "insolvent or in the zone of insolvency at all relevant times" (Compl. ¶ 28(g)), are plainly inadequate because they lack any corroborating detail concerning the receiving entities' financial status and/or

---

[30] As the Professional Defendants note, the Trustee has already obtained substantial discovery from the defendants in the MDL. Memorandum in Support of Motion to Dismiss at 2. And as Judge Lynch noted, **Error! Main Document Only.**the Trustee has enjoyed access to a substantial trove of Refco's internal documents." Op. at 546. Finally, in granting leave to replead, Judge Lynch stated that "[o]ne such opportunity will be afforded." *Id.* Under all these circumstances, leave to amend again is not justified.

alleged inability to pay. Such allegations, if they are not critical to "nudg[ing] [the customers'] claims across the line from conceivable to plausible," *Twombly,* 550 U.S. at 547, 127 S.Ct. 1955, are certainly required to meet the heightened pleading standard of Rule 9(b).

In response, the Trustee has beefed up his assertions about Grant Thornton's conduct in auditing RCM; on the financial relationship between RCM and other Refco affiliates; and on the effect of the LBO in rendering RCM clearly insolvent (as distinct from "in the zone of insolvency at all relevant times"). For example, Amended Complaint ¶266, et seq. provides background and explanation of the relevant facts:

> As demonstrated by its work papers, Grant Thornton knew that Refco had transferred enormous amounts in cash "loans" from RCM to RGF. For example, during its audit of Refco's 2004 and 2005 consolidated financial statements, Grant Thornton prepared work sheets showing RCM's "Due to/From" balances with other Refco affiliates. These documents show that, by the end of the 2004 and 2005 fiscal years, RCM had made transfers of at least $975 million and $1.5 billion, respectively, to RGF alone, putting aside any transfers that had been made to other Refco entities. As Grant Thornton knew, RGF had no operations, no bank accounts and was simply a conduit for moving funds to RCC, which "paid the bills" for Refco. Yet Grant Thornton never requested any loan agreements in connection with these transfers nor did it make any effort to obtain sufficient audit evidence verifying their collectability.

Paragraph 268 provides factual allegations on the finances of RCM and Grant Thornton's knowledge of the upstreaming:

> Not accounting for the impact of the fictitious interest associated with the RGHI Receivable booked at RCM, in fiscal year 2004, RCM had revenues of $325 million and net income of $90 million. In fiscal year 2005, RCM had revenues of $424 million and net income of $135 million. As Ramler and Grant Thornton knew, the intercompany cash transfer to RGF alone in these years dwarfed RCM's limited earnings and net income and had to be customer funds, and no one from Grant Thornton has been able to contest under oath that a substantial portion of the cash that RCC held came from RCM and that the source of these funds were the assets customers entrusted to RCM, for the specific, limited purpose of engaging in securities and FX trading.[31]

Paragraphs 271-273 provide allegations concerning the misstatement of intercompany transfers as loans to customers:

---

[31] Paragraph 71 specifically states that Grant Thornton would have learned the extent of these intercompany transfers through its audit of RCM. And Paragraph 72 provides a specific breakdown of the transfers.

Though RCM's financial statements included these intercompany loans in a note titled "related party transactions," these intercompany transfers of RCM's customer funds were included in the note as part of "receivable from customers" and falsely mischaracterized as transactions consisting of "securities and other financial instrument transactions" that RCM had transacted with related parties "in the normal course of business."

In fact, as Grant Thornton was aware, these transactions were uncollateralized cash loans and were certainly not in the normal course of business, as the affiliated companies that received RCM customer assets lacked the intent and/or the financial wherewithal to repay these misappropriated assets.

Neither Ramler, a concurring partner, nor a manager for GT's audits of Refco were able, under oath, to justify how RCM's intercompany loans to Refco affiliates could fairly be described as "Receivables from Customers" or "securities and other financial instrument transactions." If Grant Thornton had not concealed that hundreds of millions in RCM customer funds were being upstreamed and misappropriated to other Refco entities with no prospect of return as part of the Refco Insiders' cashing-out scheme, that scheme would not have been effectuated and the misappropriation and conversion of the RCM customer funds, including the FX customer funds, would have ceased.

These allegations are substantially more particularized than those regarding the RCM audits, and RCM's upstream transfers, in the original complaint.[32] The question is whether they pass the threshold of Rule 9(b) (with respect to the claims for aiding and abetting fraud and breach of fiduciary duty) and Rule 8 (with respect to aiding and abetting conversion).[33]

The question of sufficient particularity is, within certain perameters, a judge-specific judgment call. ***The Special Master concludes that the allegations in the Amended Complaint concerning the audits of RCM --- and their relevance to the***

---

[32] Grant Thornton argues that the Trustee's allegations about the LBO are essentially the same as in the previous complaint. This is largely true, but Judge Lynch did not specifically state that the allegations regarding the LBO were insufficiently particularized. And the fact is that paragraphs 119-127 of the Amended Complaint, when read together with the paragraphs discussed in the text, describe with sufficiently particularity how the LBO rendered RCM hopelessly insolvent.

[33] As discussed previously, Judge Lynch held that Rule 8 and not Rule 9(b) governs the conversion claim – and the derivative claims for aiding and abetting are evaluated under the same respective rules.

*financial status of RCM and its relationship with other Refco affiliates, are sufficiently*
*particular to withstand a motion to dismiss.*

The question then is whether Grant Thornton's unqualified audit opinion substantially assisted/proximately caused any of the alleged primary wrongs. Certainly it is a question of fact whether an FX Customer, if properly informed through public dissemination of information about an audit that RCM was upstreaming its assets to related entities and given its financial condition, would have seen the red flag and refrained from depositing its funds.

Questions of proximate cause can certainly be decided as a matter of law, but are generally left to the jury. *See, e.g., In re Sept. 11 Prop. Damage & Bus. Loss Litig.* 468 F.Supp.2d. 508, 531 (S.D.N.Y. 2006 ) ("the issue of proximate cause is fact-laden and inappropriate for a motion to dismiss"); *Am. Tissue v. Donaldson, Lufkin & Genrette Secs. Corp.* 351 F.Supp.2d 79, 91 (S.D.N.Y. 2004) ("proximate causation generally remains an issue of fact for the jury"). The scenario posed by the Trustee --- that an FX customer would be made aware of the customer scheme through a proper audit --- is sufficiently plausible (assuming the allegations about the audit itself are true) to raise a jury question as to whether Grant Thornton's audit opinions substantially assisted/proximately caused a primary wrong by the Refco Insiders.

One complication remains, however: the aiding and abetting must be tied to the primary wrong. As discussed above, the Special Master recommends that only one of the alleged primary wrongs be found adequately pled --- and that is the fraudulent inducement claim for all FX Customer deposits made after the LBO. If the court accepts this recommendation as to the primary wrong, it will obviously affect the aiding and abetting claim. Specifically, with respect to FX deposits made *before* the LBO, Grant Thornton cannot be responsible, because aiding and abetting is derivative liability, and with respect to those deposits, the fraud by the Refco Insiders in concealing the insolvency did not cause their damages.

*In sum, the Trustee has adequately alleged that Grant Thornton, by issuing*
*unqualified audit opinions of RCM, substantially assisted a primary wrong. But the*
*claim should be limited to recovery for deposits made at RCM after the date of the*
*LBO.*

## IV. SLUSA

The Professional Defendants argue that the Trustee's claims are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 77p(b). Judge Lynch rejected this argument when lodged against the original complaint. See Op. at 533, n.5. He stated that:

The FX customers are pursuing state-law claims against third-parties for the injury they suffered when Refco insiders stole from their FX accounts. This is a simple claim, . . . which does not plausibly "coincide" with the purchase or sale of a covered security. See 15 U.S.C. § 77p(b); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 84, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006); *LaSala v. Bank of Cyprus Public Co. Ltd.*, 510 F.Supp.2d 246, 273 (S.D.N.Y.2007) ("Where the alleged conduct giving rise to the claim is too far removed from a securities transaction, the 'in connection with' requirement is not met."). . . .

The Professional Defendants argue that the SLUSA question must be revisited because the Amended Complaint "now suggests that it was the LBO that ultimately made it impossible for these customers to recover their funds." Memorandum in Support of Motion to Dismiss at 43.

It is true that the Trustee's attempt to cast allegations about the receivables scheme generally and the LBO and IPO specifically raises SLUSA concerns. But those same concerns were raised in the original complaint As Judge Lynch noted, the original complaint contained extensive allegations that the receivables scheme and the customer scheme had a "common objective" (Op. at 545) of propping up Refco in order to allow the Insiders to cash out. But because Judge Lynch categorically rejected the Trustee's broad conception of "two frauds make one" he found that the only relevant allegations were those that pertained to the customer scheme. It therefore followed that he would reject the Professional Defendants' SLUSA argument --- those defendants do not argue that SLUSA preempts claims that are limited to the customer scheme.

The same reasoning applies to the Amended Complaint. The Special Master recommends, in accordance with Judge Lynch's opinion, that the Trustee's attempt to plead the receivables fraud as part of a single scheme (or as a hook for aiding and abetting) be rejected. If that recommendation is adopted, then, as before, the SLUSA defense drops out of the case.

It is true that the primary wrong recognized as adequately pled by the Special Master is in some sense related to the LBO. But the claim for fraudulent inducement does not require any showing of a purchase or sale of a security. Rather, the LBO is simply a fact --- by the Trustee's allegation, the LBO rendered RCM clearly insolvent. For the fraudulent inducement claim, it does not matter *how* RCM became insolvent, only *that* it was.

The Professional Defendants argue that the Amended Complaint alleges fraud "in connection with" the purchase or sale of a covered security under SLUSA. But their arguments in that regard relate to the Trustee's attempt to tie the receivables scheme into the customer scheme --- that the LBO and IPO were used to cash-out the Insiders, and that the siphoning was part of the grand scheme.  See Memorandum in Support of Motion to Dismiss at 46-47. These broader allegations by the Trustee would trigger SLUSA preemption, because they allege damages "in connection with" the purchase or

sale of a "covered security."[34] The term "in connection with" is construed broadly. *See generally Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) (rejecting a seller/purchaser requirement and endorsing a broad view of SLUSA's preemptive scope). Certainly, allegations that an LBO and an IPO were central parts of a fraud that injured plaintiffs would suffice.[35] But it cannot be construed so broadly as to preempt an action alleging only that a transaction caused a fact that is relevant to a separate wrong.

   *To the extent the Trustee's claims are limited to wrongs tied only to the customer scheme --- as Judge Lynch required and as this Report recommends --- those claims are not preempted by SLUSA.*

### Recommendations

   1. The Trustee has adequately pled a claim for fraudulent inducement as to those FX Customer deposits with RCM made *after* the 2004 LBO.

   2. The Trustee has not adequately pled a claim for fraudulent inducement as to those FX Customer deposits made *before* the 2004 LBO.

   3. The Trustee has not adequately pled a claim for breach of fiduciary duty.

   4. The Trustee has not adequately pled a claim for conversion.

   5. The Motion to Dismiss the Fifth, Sixth and Seventh Claims for Relief against Mayer Brown should be *granted*. Those dismissals should be *with prejudice* because the Trustee cannot allege facts that would create a plausible claim that Mayer Brown substantially assisted the customer scheme.

   6. The Motion to Dismiss the Fifth Claim for Relief against Grant Thornton should be *denied* with respect to those FX Customer deposits with RCM made after the 2004 LBO.

---

34  At least this is so with respect to the claims sounding in fraud in connection with the purchase or sale of a covered security. The claims regarding conversion are not preempted by SLUSA in any event. *Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208, 1226-28 (9th Cir. 2009) (citing cases). The Professional Defendants do not appear to argue otherwise.

35  The SLUSA numerosity requirement --- more than 50 --- is clearly met. 15 U.S.C. ¶ 78bb(f)(5)(B). And, again assuming the "one scheme" assertions of the Trustee were to be accepted, that broad claim would implicate a "covered security" within the meaning of SLUSA, given the stock issued in the IPO and the bonds registered after the LBO. See 15 U.S.C. ¶¶ 78bb(f)(5)(E), 77r(b).

7. The Motion to Dismiss the Fifth Claim for Relief against Grant Thornton should be *granted* with respect to those FX Customer deposits with RCM made before the 2004 LBO. The dismissal should be *with prejudice* because the Trustee cannot show that the primary wrong caused any injury.

8. The Motions to dismiss the Sixth and Seventh Claims for Relief against Grant Thornton should be *granted*. The dismissals should be *with prejudice* because the Trustee cannot allege facts that would create a plausible claim of a primary wrong.

Daniel J. Capra
Special Master

Dated:  June 3, 2010
New York, New York